## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW HAMPSHIRE

| | | |
|---|---|---|
| ANDRES MEJIA, | ) | |
| | ) | |
| CHRISTINA KIM PHILIBOTTE, and | ) | |
| | ) | |
| NATIONAL EDUCATION | ) | |
| ASSOCIATION-NEW HAMPSHIRE, | ) | |
| | ) | Civil No. _____ |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| FRANK EDELBLUT, in his official | ) | |
| capacity only as the Commissioner of the | ) | |
| New Hampshire Department of Education, | ) | |
| | ) | |
| JOHN M. FORMELLA, in his official | ) | |
| capacity only as the Attorney General of the | ) | |
| State of New Hampshire, | ) | |
| | ) | |
| AHNI MALACHI, in her official capacity | ) | |
| only as the Executive Director of the New | ) | |
| Hampshire Commission for Human Rights, | ) | |
| | ) | |
| CHRISTIAN KIM, in his official capacity | ) | |
| only as the Chairperson of the New | ) | |
| Hampshire Commission for Human Rights, | ) | |
| | ) | |
| KEN MERRIFIELD, in his official capacity | ) | |
| only as the Commissioner of the New | ) | |
| Hampshire Department of Labor, | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT FOR INJUNCTIVE RELIEF

# **TABLE OF CONTENTS**

Introduction ……………………………………………………………………………1

Parties …………………………………………………………………………………..8

   I.     Plaintiff Andres Mejia…………………………………………………………8
   II.    Plaintiff Christina Kim Philibotte………………………………………………10
   III.   Plaintiff National Education Association-New Hampshire…………………………12
   IV.   Defendants………………………………………………………………...15

Jurisdiction and Venue………………………………………………………………...19

Facts…………………………………………………………………………………...19

   I.     The 2020 Racial Justice Protests in New Hampshire, and the Recognition of the Importance of DEI Instruction Throughout the Granite State………………………...19
   II.    The Growing Need and Demand for DEI Instruction in Education—Including in New Hampshire—Following the 2020 Racial Justice Protests……………………………23
   III.   The National Backlash, and President Trump's September 22, 2020 Executive Order………………………………………………………………………27
   IV.   The New Hampshire Backlash and the Enactment of the Banned Concepts Act ……...29
        A.  The Banned Concepts Act in the New Hampshire House of Representatives…….29
        B.  The Banned Concepts Act in the New Hampshire Senate.....................................31
   V.    The Banned Concepts Act's Provisions Are Vague…………………………………33
        A.  The Act's Four Banned Concepts………………………………………………33
              (1) Banned Concept #1………………………………………………34
              (2) Banned Concept #2………………………………………………35
              (3) Banned Concept #3………………………………………………37
              (4) Banned Concept #4………………………………………………38
        B.  The Act's Penalties and Reporting Requirement………..……………………41
   VI.   The Defendants' Failure to Answer Specific Questions Concerning the Banned Concepts Act………………………………………………………………43
   VII.  Even Education Lawyers Do Not Know What the Banned Concepts Act Actually Bans…………………………………………………………………………51
   VIII. Defendant Commissioner Edelblut's Website and the Moms for Liberty Bounty……53
   IX.   The Chill of the Banned Concepts Act………………………………………………55
   X.    The Harm of Chilling DEI Instruction………………………………………………57

Cause of Action………………………………………………………………………..60

## INTRODUCTION

1.      Martin Luther King Jr. wrote in 1967 that "Whites, it must frankly be said, are not putting in a … mass effort to reeducate themselves out of their racial ignorance."  Martin Luther King Jr., *Where Do We Go From Here: Chaos or Community?* 24 (1967; 2010 ed.).  He added: "It is an aspect of their sense of superiority that the white people of America believe they have so little to learn."  *Id.*  Similarly, he said in an interview that "[t]he concept of supremacy is so imbedded in the white society that it will take many years for color to cease to be a judgmental factor."  Martin Luther King Jr., *A Testament of Hope: The Essential Writings of Martin Luther King Jr.* 375 (1986).  The teachings of Martin Luther King Jr. have been commonly taught in New Hampshire public schools for more than 50 years since his assassination.  However, under a recently enacted law at N.H. Rev. Stat. Ann. ("RSA") 354-A:29-34 and RSA 193:40 (hereinafter, the "Banned Concepts Act" or the "Act"), these words could only be taught in New Hampshire public schools and in trainings of public employees as an outdated historical relic with no application to either present-day society or participants' personal experiences.  And any educator or other public employee with the temerity to suggest otherwise risks investigation, public condemnation, and professional ruin.

2.      Plaintiffs—New Hampshire educators and two diversity, equity, and inclusion school administrators—seek a declaration that the Due Process Clause of the Fourteenth Amendment forbids enforcement of this Banned Concepts Act.  The vague provisions of the Act, which became effective June 25, 2021, leave New Hampshire educators and school administrators with an impossible and unconstitutional choice: either avoid important topics in classroom discussion and instruction related to race, gender, gender identity, sexual orientation, and disability—including topics like systemic racism and implicit bias—or risk losing their licenses

and livelihoods for violating the Act.  The full text of the Banned Concepts Act is attached as *Exhibit 1*.

3.      The Banned Concepts Act's vagueness creates a chill that effectively prevents teachers from doing what society needs them to do: teach.  While RSA 193:40, II ostensibly permits discussion of "the historical existence of ideas and subjects identified [in the Banned Concepts Act]," the Act may even forbid teachers from guiding students to apply the lessons of the past to the world of the present, their hopes for the future, and their own personal experiences. Where instruction crosses the line between permissible instruction about the past existence of discrimination and present reality is impossible to discern.  Yet educators must bet their jobs every day on how that line might be drawn by every single person in New Hampshire—all of whom are empowered to file a lawsuit for any perceived transgression of the Act's illusory and opaque provisions.

4.      The very purpose of public education is to teach students the relevance of history and ideas to their lives and push students to use what they learn to form their own opinions and forge their own path.  This task of preparing students to thrive as citizens is so essential that it is recognized as one of the most fundamental duties of the state of New Hampshire by both the New Hampshire Constitution and the decisions of the New Hampshire Supreme Court.  As the New Hampshire Supreme Court has recognized, public education is the "cornerstone of our democratic system." *Claremont v. Governor*, 635 A.2d 1375, 1381 (N.H. 1993).  It serves to prepare students to thrive as "citizens who are able to participate intelligently in the political, economic and social functions" of our society.  *Id.*

5.      Yet in New Hampshire today, because of the Act's vagueness, educators across the state are pulling books from the curriculum and avoiding discussing and instructing on concepts

that are necessary for students preparing to take their place as full participants in our increasingly complex and diverse society. For example, the Banned Concepts Act has already led New Hampshire educators to temporarily postpone from either staff or classroom instruction books like *Stamped (For Kids): Racism, Antiracism, and You* (which was adapted by Sonja Cherry-Paul from the work of Dr. Ibram X. Kendi) and *This Book is Anti-Racist* by Tiffany Jewell—a book designed to empower 11-15-year-olds, including those of color—based on reasonable fears that such instruction may cross the murky line drawn by the Act and place educators' licenses and livelihood at risk. The reasonableness of these fears is underscored by Defendant Commissioner of Education Frank Edelblut's own suggestion in a June 13, 2021 op-ed that Dr. Ibram X. Kendi's book *How to be an Anti-Racist* would be banned under the Act, and his subsequent suggestion at a July 8, 2021 State Board of Education meeting that Tiffany Jewell's *This Book is Anti-Racist* would also be banned. Are any of these books banned under the Act's terms? No one knows, the Defendants have not provided straight answers, and the Act's incomprehensible terms provide educators with no clarity in resolving these questions. Simply put, thanks to the Act's vague commands and Commissioner Edelblut's public remarks, it appears that book banning is happening in New Hampshire.

6.    By its terms, the Act broadly prohibits public employees and government contractors from "teach[ing]," "train[ing]," "instruct[ing]" on a series of concepts, including:

- that "one's age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion or national origin is inherently superior to people of another age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin";

- that "an individual, by virtue of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin, is inherently racist, sexist, or oppressive, whether consciously or unconsciously";

- that "an individual should be discriminated against or receive adverse treatment solely or partly because of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin"; or

- that "people of one age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin cannot and should not attempt to treat others equally and/or without regard to age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin."

While one may teach the "historical existence of" these concepts—albeit only "as part of a larger course of academic instruction," whatever that may mean, *see* RSA 193:40, II—the ability to teach the continuing relevance of this history, and make it personally relevant, to students is unclear. Can one discuss the reasons why in our country's entire history only a single African American has ever been elected the President of the United States and no woman ever has?  Can one teach about the proven fact that racial and other unconscious biases shut the doors of opportunity for so many?  Can one teach Martin Luther King Jr.'s "I Have a Dream" speech and discuss whether that dream has been realized?

7.     When educators guess at the answers to these and other questions, they do so subject to severe penalties if they guess wrong.  Any person may file suit in court or a complaint with the New Hampshire Commission for Human Rights for violations of the Banned Concepts Act.  Significantly, "[a]ny person" claiming to be aggrieved by a violation of the Banned Concepts Act "may pursue all of the remedies available under" any applicable laws, *see* RSA 354-A:34, as well as file a complaint against a school or school district.  RSA 193:40, III.  And violations of the Banned Concepts Act "shall be considered a violation of the educator code of conduct that justifies disciplinary action by the state board of education."  RSA 193:40, IV.  Disciplinary action for violations of the code of conduct can lead to suspension and revocation of an educator's teaching

license, meaning not only the loss of their job, but also the loss of their ability to obtain another teaching job in the future.  *See* N.H. Admin. Code R. Ed 511.02.  Moreover, because a licensed educator's failure to report a suspected violation of the code of conduct is itself a violation of the same code, the Act presses educators into service as mandatory informants on their colleagues to enforce the Act's vague restrictions.  *See id.* 510.05.

8.      Further, even if an educator is ultimately found not to have violated the Banned Concepts Act, they nevertheless suffer harm because the educator is forced to expend time and resources defending themselves and is exposed to public scrutiny about their actions.  Educators now find their teaching being critiqued and their personal character being attacked on social media, in the news, and at school board meetings.

9.      In an unprecedented move, the Department of Education has published a complaint form on its website for anyone to make complaints about supposed violations of the Banned Concepts Act and send them to the New Hampshire Commission for Human Rights.  No such specific Department of Education complaint website exists for violations of other provisions of the Law Against Discrimination or RSA 193:38-39 that were added in 2019 to apply to public schools.

10.     The Department of Education's public complaint form was immediately seized on by the group "Moms for Liberty NH" by way of this November 12, 2021 tweet offering $500 for any person "catch[ing]" a teacher violating the Act:



11.     The impact of the vague and unclear provisions of the Banned Concepts Act—compounded by the sweeping enforcement dragnet that the Act and the Department of Education have set up—have had broad effects on the instruction that students are being provided.  Through the Act's chill, students are (and have been) robbed of the information, ideas, and instructional approaches that would prepare them to engage in the robust dialogue and analytical thinking necessary to effectively function as citizens in America's democratic system.  Our schools are "nurseries of democracy."  *See Mahanoy Area Sch. Dist. v. B. L. ex rel. Levy*, 141 S. Ct. 2038, 2046 (2021).  As the United States Supreme Court has explained:

> The classroom is peculiarly the "marketplace of ideas."  The Nation's future depends upon leaders trained through wide exposure to that robust exchange of ideas which discovers truth "out of a multitude of tongues, (rather) than through any kind of authoritative selection."

*Tinker v. Des Moines Indep. Cmty. Sch. Dist*., 393 U.S. 503, 512 (1969) (quoting *Keyishian v. Board of Regents*, 385 U.S. 589, 603 (1967) (alteration in original)).  By chilling instruction involving race, racism, and gender—as well as silencing discussion of and instruction on the perspectives of Black, Hispanic, Native American, and other communities—the Act prevents

students from being exposed to perspectives that are critical to enable them to be active participants in democracy.

12.     The chill and self-censorship of teaching practices created by the Banned Concepts Act also frustrate the competency-based approach to classroom instruction that is widely accepted by New Hampshire educators and promoted by the New Hampshire Department of Education.[1] Competency-based learning is designed to ensure that students have meaningful opportunities to achieve critical knowledge and skills, and then apply the same skill and knowledge as citizens. Students are robbed of such opportunities when their teachers are afraid to engage with them on topics which, while developing critical thinking and citizenship skills, may be perceived to touch on banned concepts under the Act.

13.     The Defendants are aware of the widespread chill that the Banned Concepts Act has had on educators.  However, despite repeated requests by Plaintiff NEA-New Hampshire, they have refused to clarify key points of the Act that would provide educators with certainty as to how to comply with it.  Accordingly, the NEA-NH, along with Andres Mejia and Christina Kim Philibotte—the only two full-time diversity, equity, and inclusion administrators employed by school districts in New Hampshire (collectively, "Plaintiffs")—come to this Court for relief from the unconstitutionally vague provisions of the Banned Concepts Act.  They bring a claim for declaratory and injunctive relief against officials of the State of New Hampshire who are charged with enforcing the Act.  Plaintiffs seek a ruling (i) declaring that the Banned Concepts Act violates the Due Process Clause of the Fourteenth Amendment both facially and as applied because it is unconstitutionally vague, and (ii) permanently enjoining these state officials from enforcing the

---

[1]    N.H. Dep't of Education, "Performance Assessment of Competency Education," https://www.education.nh.gov/who-we-are/division-of-learner-support/bureau-of-instructional-support/performance-assessment-for-competency-education.

Act.

In support of their claim, Plaintiffs further allege as follows:

## PARTIES

### I.     Plaintiff Andres Mejia

14.     Plaintiff Andres Mejia lives in Strafford County, New Hampshire.  Mr. Mejia is the Director of Diversity, Equity, Inclusion, and Justice for the Exeter Region Cooperative School District.  Mr. Mejia is the first person to hold this position, and he started on August 2, 2021.  The Exeter Region Cooperative School District—along with the Manchester School District—are the first school districts in New Hampshire to have full-time DEI ("diversity, equity, and inclusion") administrators.  Mr. Mejia brings this claim in his individual capacity, and not on behalf of the District.

15.     In his role, Mr. Mejia works closely with various stakeholders and is responsible for prioritizing and operationalizing DEI initiatives, especially those dealing with curriculum, cultural competency, faculty and staff recruitment and retention, and professional learning.[2]  Mr. Mejia has dedicated his entire professional life to DEI work because he believes that it is critical to create an education community where every student—including students who are less privileged and who may be from historically marginalized communities—feels like they belong.

16.     Prior to accepting this position with the Exeter Region Cooperative School District and after graduating from the University of New Hampshire, Mr. Mejia worked for four years as a program manager with New Hampshire Listens—a civic engagement initiative of the Carsey School of Public Policy at the University of New Hampshire.  New Hampshire Listens has a

---

[2] *See* "'Deep Understanding': Exeter Schools Hire New Director to Focus on Diversity and Equity," *Portsmouth Herald* (Aug. 2, 2021), https://www.seacoastonline.com/story/news/2021/08/02/exeter-nh-schools-hire-new-director-focus-diversity-and-equity/5455939001/.

mission to "build, strengthen, and sustain civic infrastructure to support a sustainable democracy" by helping "communities talk, listen and act together so communities can work for everyone."

17.    In his role as Director of Diversity, Equity, Inclusion, and Justice, Mr. Mejia is directly impacted and harmed by the Banned Concepts Act.  As part of his duties, he conducts staff trainings within the District on concepts like implicit bias, institutional bias, race, racism, belonging, and inclusiveness.  Because of the Act's ambiguity, if he teaches these topics, he may be violating the Act, and potentially will subject himself to a complaint or lawsuit—even if such trainings are voluntary.  Accordingly, there is a substantial risk that Mr. Mejia will be prosecuted under the Act.  This risk is all the more credible where Defendant Commissioner Edelblut has set up a website to field complaints for prosecution under the Act.

18.    Mr. Mejia also routinely fields inquiries from teachers in Exeter as to whether certain books, video content, curriculum, materials, and information—as well as what a teacher would say—would be banned under the Banned Concepts Act.  Yet, given the Act's vagueness, he cannot answer basic questions as to what is covered under the Act.  As a result of this uncertainty, instructional choices have been chilled in order to avoid enforcement consequences. For example, professional development around implicit bias, race, and racism has been put on hold.  Especially given Defendant Commissioner Edelblut's June 13, 2021 statements condemning Dr. Ibram X. Kendi's book *How to Be an Antiracist*, and his July 8, 2021 critique of Tiffany Jewell's book *This Book is Anti-Racist*[3]—Mr. Mejia is struggling to evaluate whether the concepts "anti-bias" and "anti-racism" can be used.  Perhaps even worse, the Act chills and causes teachers to second guess how to respond to incidents of racism and bullying against Black and LGBTQ+

---

[3] *See* N.H. State Board of Education Meeting (July 8, 2021),
https://us02web.zoom.us/rec/play/9LhY5d2K7pIYMFI_k_Y03oe4-
IAF2kBzSxqGiFW_AYoJCAwC_4FGOgkvueh7OsagTe0sVbKwPttCNONe.pDFAngwZ6nvzBFP1 (starting at 3:22:19).

children for fear that, if they take appropriate action, they will be accused of violating the Act and lose their licenses.

19.     Finally, as an agent of a "public employer" under RSA 354-A:30, III, as a conductor of government training programs, and as someone who advises teachers on how to comply with the Act, Mr. Mejia is also subjected to the restrictions imposed under the Banned Concepts Act at RSA 354-A:31-32 and RSA 193:40, including any applicable penalties.

## II.    Plaintiff Christina Kim Philibotte

20.     Plaintiff Christina Kim Philibotte lives in Merrimack County, New Hampshire. She grew up in Manchester and graduated from West High School.[4]  She is the Chief Equity Officer for the Manchester School District, which is the largest and most diverse school district in New Hampshire with over 40% of its students being of color.[5]  Ms. Philibotte is the first person to hold this position, and she started in July of 2021.  Ms. Philibotte brings this claim in her individual capacity, and not on behalf of the District.

21.     In her role, Ms. Philibotte is devoted to nurturing an equitable and inclusive school environment where all students feel seen, heard, and valued.  She brings to this role over 15 years of experience in public education advocating and applying anti-racist/anti-bias and culturally responsive teaching practices as a DEI educational consultant, English teacher, and Dance/Performing Arts Teacher/Director.  Through her work, she has led and designed (and

---

[4] *See* Sarah Gibson, "In an Effort to Improve Equity, Manchester School District Turns to a West High Alum," *NHPR* (Sept. 21, 2021), https://www.nhpr.org/nh-news/2021-09-21/in-effort-to-improve-equity-manchester-school-district-turns-to-a-west-high-school-alum; *see also* Manchester Proud, "Champion Spotlight: Tina Philibotte, MSD Chief Equity Officer," https://www.manchesterproud.org/champion-spotlight-tina-philibotte/.
[5] *See* Michael Cousineau, "Manchester Schools' Diversity Efforts Will Take Years," *Union Leader* (Dec. 19, 2021), https://www.unionleader.com/news/business/whats_working/manchester-schools-diversity-efforts-will-take-years/article_e92b6c28-4b28-5df0-b407-7d5bc2031009.html ("The school district's population of 12,400 students is split almost equally between Whites and minorities.").

continues to lead and design) conversations about race and equity through teacher/leader workshops, presentations, and trainings.

22.     Ms. Philibotte previously was an English teacher and Director of the Dance Program at Goffstown High School for nearly 13 years.  In this role, she was a finalist for New Hampshire Teacher of the Year, as well as the recipient of the School Administrative Unit ("SAU") 19 Dreamkeeper award.

23.     Ms. Philibotte is a fellow with New Hampshire Listens.  She is also a two-time fellow of the National Writing Project—a network of teachers, university faculty, researchers, writers, and community educators working to advance writing and the teaching of writing.  She is in the current 2022 class of Leadership New Hampshire—a statewide program whose mission is to "build[] a community of informed and engaged leaders."  She is also an Advisory Group member of the Endowment for Health's Race & Equity Series—a series that holds important convenings of diverse stakeholders, as well as ongoing working groups, tackling racial justice and equity challenges in New Hampshire, including in civic engagement, economic development, education, government, health, and law enforcement/criminal justice.

24.     Ms. Philibotte is directly impacted by the Banned Concepts Act.  She conducts staff trainings within the District focusing on culturally responsive education—a student-centered practice of mindfully and intentionally incorporating the experiences, culture, and identity of students (including those from historically marginalized groups) to help expand their educational opportunities.  This includes developing strategies for how to relate and empathize with students, as well as developing curriculum consistent with these goals, so that each student is seen, heard, and valued.  Previously, in conducting DEI trainings before the Act, she would specifically use terms and concepts like "anti-racism" and "anti-bias."  Due to the chill from the Act, she has

11

stopped using these terms and concepts focusing on "anti-racism"—and advised others to avoid them as well—out of fear of the Act's penalties.  Due to her work, there is a substantial risk that Ms. Philibotte will be prosecuted under the Act if she discusses these concepts.  This risk is all the more credible where Defendant Commissioner Edelblut has set up a website to field complaints for prosecution under the Act.

25.     As one of only two full-time DEI school administrators in New Hampshire, Ms. Philibotte also routinely fields inquiries from teachers throughout New Hampshire as to whether certain books and information would be banned under the Banned Concepts Act.  Yet, given the Act's vagueness, she cannot answer basic questions as to what is covered under the Act.  As a result of this uncertainty, instructional choices have been chilled in order to avoid enforcement consequences.

26.     Finally, as an agent of a "public employer" under RSA 354-A:30, III, as a conductor of government training programs, and as someone who advises teachers on how to comply with the Act, Ms. Philibotte is also subjected to the restrictions imposed under the Banned Concepts Act at RSA 354-A:31-32 and RSA 193:40, including any applicable penalties.  Further, she is certified by the State Board of Education and, thus, is subject to the Educator Code of Conduct that is now embedded within the Banned Concepts Act's provisions in RSA 193:40.  *See* RSA 193:40, V (defining "[a]dministrators" as an "educator").

### III.     Plaintiff National Education Association-New Hampshire

27.     Plaintiff National Education Association-New Hampshire ("NEA-NH") is located in Concord, New Hampshire and was founded in 1854—then as the New Hampshire State Teachers Association.  It is suing on its behalf and on behalf of its members.

28.     The NEA-NH became one of the "founding ten" state education associations that formed the National Education Association ("NEA") in 1857.

29.     The NEA-NH is comprised of more than 17,000 member educators in New Hampshire representing the majority of all public-school employees in the state.  The NEA-NH's mission is to strengthen and support public education and serve their members' professional, political, economic, and advocacy needs.  The NEA-NH's members are public school educators in all stages of their careers, including classroom teachers and other certified professionals, education support personnel, instructors and staff at public higher education institutions, students preparing for a teaching career, and those retired from the profession.

30.     The NEA-NH has standing to pursue this action both in its own right and on behalf of its members.  The Banned Concepts Act has forced the NEA-NH to divert its organizational resources to identify and counteract the Act's impermissibly vague restrictions, and it has frustrated the NEA-NH's mission of advocating for public school employees and for the kind of robust public education that will prepare the children of New Hampshire as citizens and members of society.  *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378–79 (1982) (describing the requirements for direct organizational standing).  Moreover, NEA-NH members adversely affected by the Banned Concepts Act would have standing to sue, the interests at stake in this suit are germane to the NEA-NH's purpose, and neither the claims asserted nor the relief sought requires participation of the NEA-NH's individual members to adjudicate the claims.  *See Hunt v. Wash. State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977) (describing the requirements for representational standing).

31.     The NEA-NH also provides a service to its members by assisting with collective bargaining of contracts with local school districts.  Job security, termination of employment,

discipline, evaluation, and academic freedom are all topics which can be bargained for. The NEA-NH cannot properly advise its membership as to how to adjust their collective bargaining agreements to account for the Act's edicts due to its vague nature.

32.     Members of the NEA-NH also receive the benefit of extensive professional development programming by the organization. The Banned Concepts Act's vague nature has made it impossible for the NEA-NH to provide meaningful professional development about the Act to its members despite the demand from its membership to do so.

33.     The NEA-NH also represents members in matters before the State Board of Education—both in licensure actions contesting alleged violations of the Educator Code of Conduct and in actions representing educators appealing the non-renewal of their teaching contracts.

34.     Members of the NEA-NH are directly subjected to the restrictions in the Banned Concepts Act (*see* RSA 354-A:31-32) not only as agents of "public employers" under RSA 354-A:30, III, and as the conductors of government programs, but also as certified educators who are subject to the Educator Code of Conduct, which now includes the restrictions in RSA 193:40. *See* RSA 193:40, IV. These members have been directly chilled under the Act. For example:

- The book *Stamped (For Kids): Racism, Antiracism, and You* was planned for use in an interdisciplinary unit of study in a Cheshire County middle school, but the use of the book was placed on indefinite hold after the Act was passed.

- A complaint was made to the Department of Education regarding *Stamped (For Kids)* being taught by middle school social studies teachers in Hillsborough County. When made aware of the complaint, the teachers and building administrators could not determine if the book was prohibited by the Act due to its vague provisions. They did not receive any guidance from the Department of Education or any of the other Defendants after the complaint was made.

- A high school AP English teacher in Hillsborough County has changed their approach to teaching *Beloved*, the Pulitzer Prize winning book by Toni Morrison. While the teacher determined to teach the book despite uncertainty about whether it violates the

Act, they will no longer tie the book's theme of the traumatic, enduring legacy of slavery to current events or students' own experiences because they fear running afoul of the Act.

- A high school social studies teacher in Hillsborough County has disallowed students to pick their own topics for research papers for fear that topics chosen by students may lead to discussions in class that may violate the Act.

- A social studies teacher in Cheshire County had been undertaking a review of their curriculum to ensure that more experiences of Black, Indigenous, and other people of color were represented in their American history units and related materials. However, these plans were curtailed because of passage of the Act.

- A widely understood best practice in teaching is applying the material to students' own experiences and interests. A high school social studies teacher in Hillsborough County has all but ceased that practice in their world history class. Rather, this teacher feels that they must teach the material in a vacuum to limit the analogies students may draw to current events that could implicate one or more of the Act's banned concepts.

- A Cheshire County social studies teacher is spending countless hours finding factual citations for commonly understood historical facts in order to be prepared to field parent complaints that the teacher might be violating the Act simply by presenting accurate historical information on the founding of our country.

## IV.    Defendants

35.    Defendant Frank Edelblut is the Commissioner of the New Hampshire Department of Education. He is named in his official capacity. His office is located at 101 Pleasant Street, Concord, NH 03301. Commissioner Edelblut has enforcement authority over the Banned Concepts Act's provisions located at RSA 193:40, I, which state that violations of the Act "shall be considered a violation of the educator code of conduct that justifies disciplinary sanction by the state board of education." *See* RSA 193:40, IV; *see also* *Exhibit 2* (New Hampshire Code of Conduct for Educational Professionals, codified at N.H. Code Admin. R. Ed 510.01 et seq.). As the Department of Education's administrative rules make clear, the Commissioner and his Department have the authority to field complaints and conduct investigations—as well as impose sanctions—under the Educator Code of Conduct. *See* *Exhibit 2* (N.H. Code Admin. R. Ed 511.01

entitled "Complaints, Cases and Investigations"; *id.* 511.02 entitled "Reprimand, Suspension, or Revocation"; *id.* 511.03 entitled "Disciplinary Hearings").

36.     Defendant John M. Formella is the Attorney General of the State of New Hampshire.  He is named in his official capacity.  His office is located at 33 Capitol Street, Concord, NH 03301.  The Attorney General is the chief legal officer and chief law enforcement officer of the State.  He "shall act as attorney for the state in all criminal and civil cases in the supreme court in which the state is interested …."  *See* RSA 7:6.  Independent of the Attorney General's supervisory authority over the enforcement of all laws in New Hampshire, the Attorney General also has specific enforcement authority over the Banned Concepts Act because portions of the Act were placed in the Law Against Discrimination at RSA ch. 354-A.  *See* RSA 354-A:29-33; *see also* RSA 354-A:34 (Banned Concepts Act further stating that "[a]ny person aggrieved by an act made unlawful under [RSA 354-A:29-33] may pursue all of the remedies available under RSA 354-A").  The Law Against Discrimination specifically gives the Attorney General the authority to "make, sign, and file [a] complaint" under the Law, which would include a complaint for an alleged violation of the Banned Concepts Act.  *See* RSA 354-A:21, I(a).  In connection with the filing of a complaint under the Law Against Discrimination, the Attorney General also is "authorized to take proof, issue subpoenas and administer oaths in the manner provided in the civil practice law and rules."  *See* RSA 354-A:21, I(b).  The Banned Concepts Act's provisions at RSA 193:40, III also state that the Attorney General "may initiate a civil action against a school or school district in superior court for legal or equitable relief" for a violation of RSA 193:40, I.  *See* RSA 193:40, III.  Finally, the Attorney General "shall have and exercise general supervision of the criminal cases pending before the supreme and superior courts of the state."   *See* RSA 7:6.  The Attorney General's authority over criminal cases is material because a "willful" violation of

any order issued by the New Hampshire Commission for Human Rights under the Law Against Discrimination—including an order addressing the provisions of the Banned Concepts Act located at RSA 354-A:29-34—shall be a "misdemeanor if a natural person, or … a felony if any other person." *See* RSA 354-A:24.

37.     Ahni Malachi is the Executive Director of the New Hampshire Commission for Human Rights.  Christian Kim is the Chairperson of the New Hampshire Commission for Human Rights.  They are named in their official capacities.  The Commission for Human Rights is located at 2 Industrial Park Drive, Building One, Concord, NH 03301.  The Commission for Human Rights is the state agency established to enforce the Law Against Discrimination located at RSA ch. 354-A.  *See* RSA 354-A:5.  Director Malachi and Chairperson Kim, as the heads of the Commission for Human Rights, have enforcement authority over the Banned Concepts Act because portions of the Act were placed in the Law Against Discrimination at RSA ch. 354-A.  *See* RSA 354-A:29-33; *see also* RSA 354-A:34 (Banned Concepts Act further stating that "[a]ny person aggrieved by an act made unlawful under [RSA 354-A:29-33] may pursue all of the remedies available under RSA 354-A").  The Banned Concepts Act's provisions located at RSA 193:40, III also state that "[a]ny person claiming to be aggrieved by a violation of [RSA 193:40, I] … may initiate a civil action against a school or school district … with the New Hampshire commission for human rights as provided in RSA 354-A:34."  *See* RSA 193:40, III.  Accordingly, Director Malachi and Chairperson Kim have the power to receive, investigate, and make findings on complaints under the Banned Concepts Act, as well as to hold public hearings on alleged violations of the Act.  *See* RSA 354-A:5, VI (stating that the Commission has the power "[t]o receive, investigate and pass upon complaints alleging violations of this chapter"); RSA 354-A:5, VII (stating that the Commission has the power "[t]o hold hearings, subpoena witnesses, compel their attendance,

administer oaths, take the testimony of persons under oath, and, in connection therewith, require the production for examination of any books or papers relating to any matter under investigation or in question before the commission"). Director Malachi, Chairperson Kim, and their Commission also have the authority to engage in outreach, training, research, and education with respect to the Banned Concepts Act. *See* RSA 354-A:5, VIII (stating that the Commission has the power "[t]o create such advisory agencies and conciliation councils, local, regional or statewide, as in its judgment will aid in effectuating the purpose of this chapter, and the commission may empower them to … make recommendations to the commission for the development of … programs of formal and informal education which the commission may recommend to the appropriate state agency").

38. Ken Merrifield is the Commissioner for the New Hampshire Department of Labor. He is named in his official capacity. His office is located at 95 Pleasant Street, Concord, NH 03301. The Department of Labor helps employers and insurance carriers operate successfully within New Hampshire's labor laws. Commissioner Merrifield has enforcement authority over the Banned Concepts Act. This is because the Banned Concepts Act specifically states that "[a]ny person aggrieved by an act made unlawful under [RSA 354-A:29-33] may pursue all of the remedies available under … RSA 275-E," which is New Hampshire Whistleblowers' Protection Act. Accordingly, an individual who alleges that a public employee has violated the Banned Concepts Act may file a complaint to the Department of Labor as a purported "whistleblower." The Department of Labor has the authority to investigate and hold hearings on complaints under RSA ch. 275-E. *See* RSA 275-E:4; RSA 275-E:8.

## JURISDICTION AND VENUE

39.     This action arises under the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.  This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343.

40.     Declaratory relief is authorized by 28 U.S.C. § 2201 and 28 U.S.C. § 2202.

41.     Defendants are public officials of the State of New Hampshire.  Defendants reside within this District and/or perform official duties within the State of New Hampshire.  This Court, accordingly, has personal jurisdiction over the Defendants.

42.     Venue in the District of New Hampshire is based on 28 U.S.C. § 1391(b).

## FACTS

I.     **The 2020 Racial Justice Protests in New Hampshire, and the Recognition of the Importance of DEI Instruction Throughout the Granite State.**

43.     On May 25, 2020, White Minneapolis police officer Derek Chauvin knelt on the neck and back of George Floyd—a Black man—for 9 minutes and 29 seconds while Mr. Floyd was handcuffed face down in the street.  Mr. Floyd died.[6]  Mr. Chauvin was later convicted of second-degree murder and sentenced to over 22 years in prison.[7]  On December 15, 2021, Mr. Chauvin pleaded guilty to a federal charge of violating Mr. Floyd's constitutional rights.[8]

44.     The killings of George Floyd, Breonna Taylor, Ahmaud Arbery, and numerous other Black people in 2020 reinvigorated the decades long struggle against racism in America and elsewhere.  International protests erupted against systemic racism and police brutality.  These

---

[6] "George Floyd: What Happened in the Final Moments of his Life," *BBC* (July 16, 2020), https://www.bbc.com/news/world-us-canada-52861726.
[7] "George Floyd Murder: Derek Chauvin Sentenced to Over 22 Years," *BBC* (June 25, 2020), https://www.bbc.com/news/world-us-canada-57618356.
[8] Amy Forliti, "Chauvin Pleads Guilty to Federal Charge in Floyd's Death," *Associated Press* (Dec. 15, 2021), https://apnews.com/article/death-of-george-floyd-george-floyd-minneapolis-race-and-ethnicity-st-paul-a8b12b1e3e0fedc1270c659e3428134e.

protests, led by communities of color, are among the most significant mass movements in the country's history.

45.     These protests also erupted in New Hampshire, often spearheaded by young public school students of color and newly-formed local Black Lives Matter chapters.[9]  Protesters flooded cities like Manchester, Nashua, Concord, Dover, and Portsmouth as part of this civil rights movement.[10]

46.     These calls for racial justice reflected a larger shift across the country.  According to a 2020 study conducted by Monmouth University, a newfound majority of Americans agreed that "racism and discrimination is a 'big problem,'" and that "there's a lot of discrimination against black Americans in society."[11]

47.     The 2020 movement for racial justice was intersectional, reflecting an increasing understanding that other identities combined with race—including ethnicity, religion, sex, gender identity, and sexual orientation—are implicated in the disproportionate violence faced by people of color.  Other movements—including the "Me Too" and "Times Up" campaigns—shed light on the rampant discrimination and violence faced by women of color and LGBTQ+ people of color.

---

[9] Indeed, New Hampshire is not immune from such racial justice concerns.  For example, the most recent available data from 2019 compiled by The Sentencing Project shows that, in New Hampshire, the rate of Black people incarcerated is 742 per 100,000 Black people.  *See* The Sentencing Project, New Hampshire Profile, https://www.sentencingproject.org/the-facts/#map. This compares to only 269 out of 100,000 White people.  *Id.*  Thus, New Hampshire has a Black/White imprisonment disparity ratio of 2.8 to 1.  *See id.*  A 2016 New Hampshire Public Radio study further exposed racial disparities in arrests and jailing.  *See* Emily Corwin, "Data Shows Racial Disparities Increase at Each Step of N.H.'s Criminal Justice System," *NHPR* (Aug. 10, 2016) https://www.nhpr.org/nh-news/2016-08-10/data-shows-racial-disparities-increase-at-each-step-of-n-h-s-criminal-justice-system.   Data from this study showed that Black people have a 5 times greater chance of being jailed compared to White people—a statistic that is well above the United States average where Black people are 3.5 times more likely to be in jail than White people.  *Id.*  Equally disturbing is that Black people in New Hampshire have a 2.8 times greater chance of being arrested compared to White people.  And in Hillsborough County—the most populous and diverse county in New Hampshire—African Americans are nearly 6 times more likely to be in jail than White people.  *Id.*
[10]       Wikipedia,       "George       Floyd       Protests       in       New       Hampshire," https://en.wikipedia.org/wiki/George_Floyd_protests_in_New_Hampshire.
[11] Nate Cohn & Kevin Quealy, "How Public Opinion Has Moved on Black Lives Matter," *N.Y. Times* (June 10, 2020), https://www.nytimes.com/interactive/2020/06/10/upshot/black-lives-matterattitudes.html.

The battle for LGBTQ+ civil rights crested in June of 2020 when the United States Supreme Court issued its momentous decision in *Bostock v. Clayton County*, holding that federal laws prohibiting sex discrimination apply equally to discrimination based on sexual orientation and transgender status. 140 S. Ct. 1731 (2020).[12]

48.    These social and legal shifts popularized discussions about how to dismantle racism and sexism and how to increase inclusivity, surfacing concepts such as "structural," "systemic," or "institutional" racism, and "racial privilege" or "white privilege."  Students in New Hampshire witnessed these events and participated in these conversations.  The largest of the protests in New Hampshire was a march of approximately 2,000 persons in Concord on June 6, 2020, and it was organized, in part, by students of color from Concord High School.[13]

49.    In response to these protests, New Hampshire Governor Chris Sununu signed an Executive Order on June 16, 2020 establishing the formation of a Commission on Law Enforcement Accountability, Community, and Transparency (hereinafter, "LEACT Commission") to, in part, "develop recommendations for reforms … necessary to enhance transparency, accountability, and community relations in law enforcement," including diversity training.  *See Exhibit 3* (June 16, 2020 Executive Order in LEACT Materials).

50.    After over 25 meetings, the LEACT Commission published its recommendations on August 31, 2020.  Many of the recommendations concerned implicit and racial bias training, including the following: (i) mandating that the New Hampshire Police Standards and Training Council ("PSTC")—the body that oversees the certification of police officers—conduct annual in-

---

[12] At the same time, at least 44 transgender and gender nonconforming people were murdered in the United States in 2020, marking the deadliest year on record.  *See* Human Rights Campaign, "Fatal Violence Against the Transgender and Gender Non-Conforming Community in 2020," https://www.hrc.org/resources/violence-against-the-trans-and-gender-non-conforming-community-in-2020.

[13] *See* Tony Schinella, "Nearly 2,000 March Against Racism in Concord: Watch," *Patch.com* (June 7, 2020), https://patch.com/new-hampshire/concord-nh/nearly-2-000-march-against-racism-concord-watch (noting that protest was organized by Concord High School students).

service training for at least two hours on implicit bias and cultural responsiveness; (ii) encouraging, beginning on January 1, 2021, that all law enforcement agencies require that their officers participate and receive at least two hours of training on implicit bias and cultural responsiveness; (iii) recommending that the PSTC add implicit bias to the police academy and in-service training curriculum; (iv) strongly encouraging implicit bias and racial profiling training for all prosecutors, including all police prosecutors, all criminal defense attorneys, and all judges; (v) recommending that the Attorney General establish a system whereby all new prosecutor hires receive implicit bias and racial profiling training within 30 days of their start date; and (vi) recommending that the New Hampshire Supreme Court require one hour of yearly continuing legal education credit to be dedicated to implicit bias and racial profiling training.  *See id.* (Aug. 31, 2020 LEACT Recommendations in LEACT Materials).

51.     On September 17, 2020, Governor Sununu endorsed all the LEACT Commission recommendations, including those addressing implicit bias training for law enforcement.  *See id.* (Sept. 17, 2020 Press Release in LEACT Materials).  Consistent with this support, Governor Sununu signed an Executive Order on October 7, 2020 that implemented many of these recommendations, including the requirement of implicit bias training for law enforcement.  *See id.* (Oct. 7, 2020 Executive Order).  Following this Executive Order, the requirement for implicit bias training has largely been implemented.  *See id.* (LEACT implementation records); *see also Exhibit 4* (Implicit Bias Training Hosted by the New Hampshire Attorney General's Office on Nov. 20, 2020; addressing concepts like "structural/systemic discrimination" and "white privilege" in slides 11-12, 33 of James McKim's presentation "Are You Your Implicit Bias?"); *Exhibit 5* (May 3, 2021 and May 4, 2021 Presentations to N.H. Court System; addressing concepts like "structural/systemic discrimination" and "white privilege" in slides 12-13 of James McKim's May

3, 2021 presentation "Introduction to Diversity, Equity, and Inclusion," and slides 18 and 26 of

James McKim's May 4, 2021 presentation "Race in NH").[14]

## II.     The Growing Need and Demand for DEI Instruction in Education—Including in New Hampshire—Following the 2020 Racial Justice Protests.

52.     Following George Floyd's murder, many schools increased efforts to expose

students to perspectives and experiences—both past and present—of Black, Hispanic, Native

American, and other students of color.  These efforts were part of a growing and widespread

consensus among educators that inclusive education practices that give voice and attention to the

experiences of all students provide students with the robust education necessary to prepare them

to function effectively as participants in our increasingly diverse and multi-racial democracy.  Such

efforts help all students and harm none.  By presenting a more informed and realistic portrayal of

topics such as slavery, Jim Crow, segregation, and racial discrimination[15]—and discussing with

students the legacy of these actions, racial stereotypes, prejudice, explicit and implicit bias or

"unconscious bias"[16]—educational opportunities for all students are expanded.  This expansion of

educational opportunity takes many forms but it is unified by the aim of ensuring equal access to

educational content for students of all backgrounds, and exposure to various perspectives that

reflect the diversity of New Hampshire and America.

---

[14] Of course, if such trainings to prosecutors and judges on implicit bias, white privilege, and structural/systemic discrimination reflected in *Exhibits 4 and 5* are permissible under the Banned Concepts Act, then this instruction also would be permissible to students in schools under the Act.  But, as explained below, Defendants have been mum on many of these important questions.

[15] Antonia L. Hill, Culturally Responsive Teaching: An Investigation of Effective Practices for African American Learners     23–24     (Dec.     2012)     (Ph.D.     dissertation,     Loyola     University     Chicago), https://ecommons.luc.edu/cgi/viewcontent.cgi?article=1352&context=luc_diss; Dr. Chastity McFarlan, "Supporting Marginalized     Students     Through     Culturally     Relevant     Pedagogy,"     *Renaissance*     (Sept.     10,     2021), https://www.renaissance.com/2021/09/10/blogsupporting-marginalized-students-through-culturally-relevant-pedagogy/.

[16] NEA  Ctr.  for  Soc.  Just.,  *Implicit  Bias,  Microaggressions,  and  Stereotypes  Resources*  (Jan.  2021), https://www.nea.org/resource-library/implicit-bias-microaggressions-andstereotypes-resources.

53.     New Hampshire educators embraced this call and engaged in professional development opportunities to enhance their skills to teach both (i) to Black, Indigenous, Hispanic, Asian, and other students from historically marginalized groups, and (ii) about the experiences and perspectives of those groups.

54.     For example, in 2020, Misty Crompton, a member of the Plaintiff NEA-NH and an educator who teaches in Derry, was awarded the prestigious Christa McAuliffe Sabbatical from the New Hampshire Charitable Foundation for her project called "Promoting Just Schools."[17]  The sabbatical, created in 1986 in honor of the Concord High School teacher and astronaut, gives one exemplary New Hampshire teacher a year off with pay and a materials budget to bring a great educational idea to fruition. Ms. Crompton's project focused on educational equity—namely, levelling the playing field for students by recognizing how identity, race, and culture of students and teachers play out in the classroom.

55.     The importance of elevating the perspectives and histories of individuals of color was confirmed by the 2020 census, which indicated that New Hampshire is rapidly growing more racially diverse.  These results indicated that—while New Hampshire's population grew by a modest 4.6% during the past decade—the number of residents who are people of color increased by 74.4% to 176,900 in 2020.  Black, Hispanic, and other people of color now represent 12.8% (176,900) of the state's population compared to 7.5% (101,400) in 2010.[18]  This diversity is particularly prevalent in the southern part of New Hampshire.  For example, the population of Manchester and Nashua was 98% White in 1980.[19]  Manchester now is 84.8% White, 10.4%

---

[17]     N.H.   Charitable   Foundation,   "Misty   Crompton   Awarded   Christa   McAuliffe   Sabbatical," https://www.nhcf.org/what-were-up-to/misty-crompton-awarded-christa-mcauliffe-sabbatical/.
[18] Kenneth Johnson, "Modest Population Gains, but Growing Diversity in New Hampshire with Children in the Vanguard," *Carsey School of Public Policy* (Aug. 30, 2021), https://carsey.unh.edu/publication/modest-population-gains-but-growing-diversity-in-new-hampshire-with-children-in-vanguard.
[19]     *See* Census Data for 1980, *available at* https://www.census.gov/content/dam/Census/library/working-papers/2005/demo/POP-twps0076.pdf (page 76).

Hispanic (approximate population 11,717), and 6.1% Black (approximate population 6,873).[20]

Nashua now is 82.6% White, 12.7% Hispanic (approximate population 11,348), and 4.1% Black

(approximate population 3,663).[21]

56.     As the Carsey School of Public Policy at the University of New Hampshire

explained, "children are at the leading edge of the state's growing diversity."[22]  The *Union Leader*

also recently reported that "more than 2 of every 5 children in Manchester and Nashua hail from

families of color," and that, "[i]n 30 years, Manchester's youngest generation has shifted from

94% White in 1990 to 57% last year."[23]  Students of color in Manchester are also more likely to

live in poorer areas of the city.[24]

57.     Consistent with these demographic trends, the Manchester School District—the

largest and most diverse school district in New Hampshire—hired a Chief Equity Officer, Plaintiff

Christina Kim Philibotte, in July 2021.  As she told *NHPR*, her role was created by the District to

help ensure that—especially given that dropout, detention, and suspension rates are high for

students of color—these students are supported and recognized for the institutional disadvantages

that they frequently experience.[25]  The goal of this work also is to train staff to understand the

needs of communities of color—an effort that, in concert with creating a better sense of belonging

---

[20] 2019 Census Data for Manchester,
https://www.census.gov/quickfacts/fact/table/manchestercitynewhampshire/PST045219.
[21] 2019 Census Data for Nashua,  https://www.census.gov/quickfacts/fact/table/nashuacitynewhampshire/PST045219.
[22] Kenneth Johnson, "Modest Population Gains, but Growing Diversity in New Hampshire with Children in the
Vanguard," *Carsey School of Public Policy* (Aug. 30, 2021), https://carsey.unh.edu/publication/modest-population-
gains-but-growing-diversity-in-new-hampshire-with-children-in-vanguard.
[23] *See* Michael Cousineau, "NH Grows More Diverse, Faces Call For Change," *Union Leader* (Dec. 19, 2021),
https://www.unionleader.com/news/business/whats_working/nh-grows-more-diverse-faces-call-for-
change/article_8c1cfc2d-73c1-51f3-9a5d-939525c3c21e.html.
[24] *See* Michael Cousineau, "Manchester Schools' Diversity Efforts Will Take Years," *Union Leader* (Dec. 19, 2021),
https://www.unionleader.com/news/business/whats_working/manchester-schools-diversity-efforts-will-take-
years/article_e92b6c28-4b28-5df0-b407-7d5bc2031009.html.
[25] *See* Sarah Gibson, "In an Effort to Improve Equity, Manchester School District Turns to a West High Alum," *NHPR*
(Sept. 21, 2021), https://www.nhpr.org/nh-news/2021-09-21/in-effort-to-improve-equity-manchester-school-district-
turns-to-a-west-high-school-alum.

for these students, is aimed to address some of the systemic inequities that often exist in education. For example, a report from the Juvenile Reform Project—a coalition of New Hampshire advocacy organizations—demonstrates that school discipline in New Hampshire is disproportionately harsh on students of color.  During the 2014-2015 academic year, "[w]hile students of color made up 13.9 percent of the student population, they comprised approximately 22.7 percent of students receiving out-of-school suspensions."[26]  In hiring Ms. Philibotte, the Manchester School District is taking proactive steps to tackle these important equity issues, including racial disparities in discipline and test scores.

58.    The Exeter Region Cooperative School District made a similar decision, hiring Plaintiff Andres Mejia on August 2, 2021 as the District's first Director of Diversity, Equity, Inclusion, and Justice.  As the District's superintendent, Dr. David Ryan, stated in announcing the position: "The work around diversity, equity, inclusion and justice is critically important and is helping us create an educational community where every student, educator, parent, guardian and community member feels like they belong."[27]  This work is also vital in Exeter, which has well over 800 residents of color—including over 350 Asian Americans and over 350 Hispanic Americans.[28]  This work not only helps White students in Exeter learn about the growing diversity

---

[26] *Keeping Kids in School: The Urgent Need for Reform of School Discipline in NH* (January 2019), *available at* https://www.nhla.org/assets/customContent/FINAL_Keeping_Kids_in_School_-_The_Urgent_Need_to_Reform_School_Discipline_in_NH.pdf.  Concord High School also experienced similar racial disparities.  *See* Eileen O'Grady, "Suspensions, Expulsions are Used Disproportionately to Discipline N.H. Students of Color," *Concord Monitor* (July 4, 2020), https://www.concordmonitor.com/Race-and-discipline-in-NH-schools-34921292 ("That data showed that in the 2015-16 school year at Concord High School, Black students made up 8% of the student body, but made up 22% of out-of-school suspensions.").  The Concord School District is taking important steps in this area, including through its Racial Equity Advisory Committee.

[27] *See* "'Deep Understanding': Exeter Schools Hire New Director to Focus on Diversity and Equity," *Portsmouth Herald* (Aug. 2, 2021), https://www.seacoastonline.com/story/news/2021/08/02/exeter-nh-schools-hire-new-director-focus-diversity-and-equity/5455939001/.

[28] 2019 Census Data for Exeter, https://www.census.gov/quickfacts/fact/table/exetertownrockinghamcountynewhampshire/HSG650219.

of their community, but also helps students of color in Exeter know that they are not alone and that they are welcome.

59.    The work of the Manchester School District, the Exeter Region Cooperative School District, and other New Hampshire school districts in creating a comprehensive inclusive curriculum is central to the promise in *Brown v. Bd. of Educ.*, 347 U.S. 483 (1954), of true integration in education.  *Brown* explained that schools are "a principal instrument in awakening the child to cultural values, in preparing [the child] for later professional training, and in helping [the child] to adjust normally to his environment."  *Id.* at 493.  Moreover, the ability of students to access education equally impacts their "ability to study, to engage in discussions" and to "exchange views with other students."  *Id.* (quoting *McLaurin v. Oklahoma State Regents*, 339 U.S. 637, 641 (1950)).

### III.    The National Backlash, and President Trump's September 22, 2020 Executive Order.

60.    As these reforms took hold, so did the backlash.

61.    On September 22, 2020, President Trump signed an Executive Order entitled "Combatting Race and Sex Stereotyping," which targeted diversity, equity, and inclusion trainings in federal government agencies, as well as in businesses contracting with the federal government. *See Exhibit 6* (Sept. 22, 2020 Trump Executive Order).

62.    The Executive Order sought to censor certain viewpoints and chill speech.  The Executive Order, in part, banned federal contractors and federal grant recipients from engaging in workplace training that purportedly "inculcates" employees on the following "divisive" concepts:

**(1) one race or sex is inherently superior to another race or sex;**

(2) the United States is fundamentally racist or sexist;

**(3) an individual, by virtue of his or her race or sex, is inherently racist, sexist, or oppressive, whether consciously or unconsciously;**

**(4) an individual should be discriminated against or receive adverse treatment solely or partly because of his or her race or sex;**

**(5) members of one race or sex cannot and should not attempt to treat others without respect to race or sex;**

(6) an individual's moral character is necessarily determined by his or her race or sex;

(7) an individual, by virtue of his or her race or sex, bears responsibility for actions committed in the past by other members of the same race or sex;

(8) any individual should feel discomfort, guilt, anguish, or any other form of psychological distress on account of his or her race or sex; or

(9) meritocracy or traits such as a hard work ethic are racist or sexist, or were created by a particular race to oppress another race.

[(10)] The term ''divisive concepts'' also includes any other form of race or sex stereotyping or any other form of race or sex scapegoating.

*See id.* (Sept. 22, 2020 Trump Executive Order, with the bolded text reflecting those concepts that are substantially similar to the prohibited concepts in the Banned Concepts Act).

63.    The Executive Office of the President's September 28, 2020 memorandum implementing this Order specifically referenced the third banned concept—namely, that "an individual, by virtue of his or her race or sex, is inherently racist, sexist, or oppressive, whether consciously or unconsciously"—and made clear that it was targeting trainings that, for example, used the phrases "white privilege," "intersectionality," "systemic racism," "racial humility," and "unconscious bias." *See Exhibit 7* (Sept. 28, 2020 Executive Office of the President's Memorandum indicating that such phrases "may help to identify the type of training prohibited by the" Executive Order).

64.    On December 22, 2020, a federal court partially enjoined the Executive Order, in part, on the ground that the plaintiffs were likely to succeed on their vagueness challenge. *See*

*Santa Cruz Lesbian & Gay Cmty. Ctr. v. Trump*, 508 F. Supp. 3d 521, 543 (N.D. Cal. 2020).  The district court found that the Executive Order's banned concepts are "so vague that it is impossible for Plaintiffs to determine what conduct is prohibited." *Id.*[29]

## IV.   The New Hampshire Backlash and the Enactment of the Banned Concepts Act.

65.    Despite the Court's decision in *Santa Cruz Lesbian & Gay Cmty. Ctr.*, bills copying President Trump's Executive Order began spreading in state houses throughout the United States in an attempt to ban educators from teaching about gender and race discrimination, as well as concepts relating to racial equity and other forms of instruction aimed at acknowledging and addressing the past and present inequities facing historically marginalized communities.

### A.  The Banned Concepts Act in the New Hampshire House of Representatives.

66.    This included New Hampshire House Bill 544's "Propagation of Divisive Concepts Prohibited Act," which copied all ten banned concepts in President Trump's September 22, 2020 Executive Order and applied them not only to all government agencies and employees, but also to (i) private companies that contract with the state, and (ii) course instruction at New Hampshire public colleges and universities.  *See Exhibit 8* (HB544 Docket and Language).

67.    The chief sponsor of HB544 argued that this legislation was necessary to address "critical race theory" and, more specifically, to ban certain "diversity training or inclusion

---

[29] A separate lawsuit was filed by the NAACP Legal Defense Fund in October 2020 (amended complaint filed in January 2021), challenging the Executive Order on behalf of the National Urban League, the National Fair Housing Alliance, and the American Association for Access, Equity and Diversity.  *See National Urban League v. Trump*, 1:20-cv-03121-APM (D.D.C. Jan. 11, 2021), *available at* https://www.naacpldf.org/wp-content/uploads/Amended-Complaint-EO-AAAED.pdf.  The lawsuit raised three constitutional claims: vagueness, viewpoint discrimination, and equal protection. The Court did not issue any substantive orders in the case.  The plaintiffs filed a notice of dismissal with prejudice on June 15, 2021.

training[s]," which he described as "snake oil" that "propos[es] to cure a disease but in actuality it's even making it worse."[30]

68.     Other proponents of HB544 argued that the bill was necessary to eliminate discussion of and instruction on concepts like "implicit bias," "systemic racism," "white privilege," and "anti-racism" in schools and in government trainings, with many specifically calling such topics "Marxist" or "advancing Socialism," and identifying certain books as problematic.  *See Exhibit 9* (Select Written Testimony From Public Supporting HB544 to House Executive Departments and Administration Committee, With Highlights Added).

69.     On April 7, 2021, as part of a legislative strategy to ensure the passage of HB544's language in the face of a threatened veto, the House of Representatives amended the budget trailer bill, HB2, to insert the operative provisions of HB544.  HB2 passed the House that same day.  *See Exhibit 10* (HB2/Budget Trailer Materials, Docket Entry Approving Amendment 2021-1059h). The next day, having accomplished its mission in passing this legislation, the House of Representatives tabled the original version of HB544.  *See Exhibit 8* (HB544 Docket and Language).

70.     After this language was inserted in HB2, one legislator supporting HB544 explained that the legislation was needed to address, for example, a staff training in a school district that referenced "white privilege," as well as programs at one New Hampshire university where employers and managers discuss "unconscious bias."  *See Exhibit 11* (Rep. Daniel Itse, "Taxpayers Money is Being Used to Promote Systemic Racism in NH," *Union Leader* (Apr. 28, 2021)).

---

[30]  *See* Executive Departments and Administration Hearing on HB 544 (Feb. 11, 2021), https://www.youtube.com/watch?v=ycrODcuaLDc (Rep. Keith Ammon's remarks starting at 1:31:50, with quotation at 1:37:20).

71.     In response to these claims, several school districts made clear that HB544's language, if enacted in HB2, would potentially deprive students of vital information.  For example, the Oyster River Cooperative School District and the Concord School District, along with other organizations, called the law "ambiguous" and "antithetical" to the principles of diversity and inclusion.  *See Exhibit 12* (Open Letter from Business Community).  The school district covering Hanover, Dresden, and Norwich, as well as the Hopkinton School District, also formally opposed the legislation.  *See Exhibit 13* (SAU70 Resolution Opposing HB544); *Exhibit 14* (Hopkinton School District May 6, 2021 Opposition to Divisive Concepts Language in HB2).  The Manchester School District similarly declared its opposition, announcing that "[w]e are opposed to any bill which will limit any school's ability to talk about race or gender, or to educate our students and staff about the historical discrimination against communities of color, women, and other marginalized groups, and the impacts this long standing racism and sexism has had on the American people."  *See Exhibit 15* (Manchester School Board Committee Meeting Agendas, Materials, and Minutes Concerning Opposition to HB544).

**B.  The Banned Concepts Act in the New Hampshire Senate.**

72.     When HB2 moved to the Senate, the Senate Finance Committee, on or about May 28, 2021, proposed an amendment to HB2's "divisive concepts" provisions.  *See Exhibit 10* (HB2/Budget Trailer Materials, Senate Finance May 28, 2021 2021-1799s amendments).  This amendment deleted six of the ten "divisive concepts" and made some cosmetic changes to the language.  In an effort to politically rebrand the restrictions as an "anti-discrimination law," the amendment also inserted its banned concepts in the Law Against Discrimination at RSA ch. 354-A and expanded the focus of the restrictions from "race or sex" to "age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion,

or national origin." Lastly, the amendment changed the restrictions to no longer apply to (i) private companies contracting with the State of New Hampshire, or (ii) course instruction at state colleges and universities *by faculty*. *See* RSA 354-A:29, III.

73.    The Senate's effort to reframe the law also went even further than the original language in HB544 insofar as it now included the draconian penalty provisions specifically targeting certified educators by making violations of the law punishable under the Educator Code of Conduct. *See* RSA 193:40, IV.

74.    On June 3, 2021, the Senate passed HB2, including the provisions constituting the Banned Concepts Act, by a vote of 14 to 9. *See Exhibit 10* (HB2/Budget Trailer Materials).

75.    The House did not concur with the Senate's version of HB2. As a result, a committee of conference was appointed.

76.    As this committee of conference process was getting underway, Defendant Commissioner Edelblut published an op-ed in which he claimed that the Banned Concepts Act was necessary to prevent concepts like those in Dr. Ibram X. Kendi's book *How to Be an Antiracist* from being taught in schools. *See Exhibit 16* (Frank Edelblut, "Teach Children About Racism, Not to Be Racists," Union Leader (June 13, 2021)).

77.    In the meantime, the committee of conference ultimately agreed on a report recommending the language to be included in HB2, and it included the Senate's version of the Banned Concepts Act. This report was filed on June 24, 2021, and it was approved in both chambers.

78.    The governor signed the Banned Concepts Act, along with all of HB2, into law on June 25, 2021. The Banned Concepts Act immediately became effective.

79.     Following the Governor's signing of the Act into law, 10 of the 17 members of his Advisory Council on Diversity and Inclusion resigned in protest.  *See Exhibit 17* (Governor's Advisory Council on Diversity and Inclusion Correspondence Regarding Banned Concepts Act, June 29, 2021 Letter).

80.     Educators immediately began requesting assistance in understanding the Act. Plaintiff NEA-NH heard from members all over the state about their outrage and disappointment with the Act, their confusion about its meaning, and their fear about the consequences of violating it.[31]

## V.     The Banned Concepts Act's Provisions Are Vague.

### A.  The Act's Four Banned Concepts.

81.     The text of the Banned Concepts Act is ambiguous and confusing, leaving educators, DEI trainers, school districts, and government employees to guess what it means, chilling instruction and important trainings, and encouraging arbitrary and discriminatory enforcement.

82.     For example, the Act bans public employers—"either directly or through the use of an outside contractor"—and government programs from "teach[ing]," "train[ing]," or

---

[31] Consistent with this backlash against the 2020 racial justice protests and following up on the passage of the Banned Concepts Act, several New Hampshire legislators—including two of the sponsors of HB544—recently proposed HB1255, which states the following: "No teacher shall advocate any doctrine or theory promoting a negative account or representation of the founding and history of the United States of America in New Hampshire public schools which does not include the worldwide context of now outdated and discouraged practices.  Such prohibition includes but is not limited to teaching that the United States was founded on racism."  *See* Eileen O'Grady, "N.H. 'Teacher Loyalty' Bill Would Restrict How U.S. History, Especially Racism, Can Be Discussed in School," *NHPR* (Dec. 3, 2021), https://www.nhpr.org/nh-news/2021-12-03/teacher-loyalty-bill-would-restrict-how-u-s-history-especially-racism-can-be-discussed-in-school.  In response to a question from *WMUR* about how this bill would impact classroom discussion of the Three-Fifths Compromise which dehumanized Black Americans, sponsor Representative Erica Layon explained: "The three-fifth compromise actually made it so that the slaveholding south didn't have more of a voice in Congress.  They actually were worried that … [if] they counted each slave as a whole vote and a whole voter, that then there would be more slavery throughout the country, and that it would be unequal because a viewpoint that was on its way out would be overrepresented."  *See* https://twitter.com/AdamSextonWMUR/status/1466584833312710657.

"instruct[ing]" on any of four banned concepts.  RSA 354-A:31, RSA 354-A:32.  The Act also states that "[n]o pupil in any public school … shall be taught [or] instructed" on any of the four banned concepts.  *See* RSA 193:40.  Moreover, given the passive voice usage of the phrase "shall be taught," this language, though unclear, may even include discussion without an educator's input where students engage each other on these concepts.

83.     The four banned concepts themselves are vague and aimed at chilling classroom discussions, instruction, and course materials.  These four banned concepts are substantially similar to four of the ten banned concepts from former President Trump's September 22, 2020 Executive Order.  Although a federal court barred portions of the Executive Order from going into effect, in part, on vagueness grounds on December 22, 2020, *see Santa Cruz Lesbian & Gay Cmty. Ctr. v. Trump*, 508 F. Supp. 3d 521, 543 (N.D. Cal. 2020), the New Hampshire legislature enacted the Banned Concepts Act without curing the vague terminology.

**(1) Banned Concept #1.**

84.     Under the Act's first banned concept, "[n]o pupil in any public school in this state shall be taught"—and "[n]o public employer … shall … train"—"[t]hat people of one age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin *are inherently superior or inferior* to people of another age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin."  *See* RSA 193:40, I(a); RSA 354-A:31, I; RSA 543-A:32, I; RSA 354-A:33, I (emphasis added).

85.     The Act does state that "[n]othing in this section shall be construed to prohibit discussing, as part of a larger course of academic instruction, the historical existence of ideas and subjects identified in this section."  RSA 193:40, II.  But the limitation that only the "historical

existence" of an idea may be discussed leaves impermissibly vague at what point the discussion of that history's relevance to students' lives crosses the line and is now prohibited.

86.     One of Plaintiff NEA-NH's members has given the example of being free to teach that the Declaration of Sentiments was written at the Seneca Falls women's rights convention of 1848, but wondering if students would misunderstand the lesson as the teacher critiquing White men.

### (2) Banned Concept #2.

87.     Under the Act's second banned concept, "[n]o pupil in any public school in this state shall be taught"—and "[n]o public employer … shall … train"—"[t]hat an individual, _by virtue of his or her_ age, sex, gender identity, sexual orientation, race, creed, marital status, familial status, mental or physical disability, religion or national origin _is inherently racist, sexist, or oppressive, whether consciously or unconsciously_."   *See* RSA 193:40, I(b); RSA 354-A:31, II; RSA 543-A:32, II; RSA 354-A:33, II (emphasis added).

88.     This broad and vaguely worded second banned concept arguably deprives students, teachers, and other public employees of information about (among other things) "implicit bias" or "unconscious bias," which is a concept relevant to many academic fields and is a key portion of the instruction provided by professionals who specialize in diversity, equity, and inclusion.  While most commonly associated with race, these concepts are also integral to educating people about how to relate to individuals with disabilities and individuals who differ in some way from themselves.[32]

89.     The Court in *Santa Cruz Lesbian & Gay Cmty. Ctr.* specifically concluded that the analogous provision in President Trump's Executive Order was vague in the face of the plaintiffs'

---

[32] *See* Michigan State University, "The Unpopular Truth About Biases Toward People with Disabilities," *ScienceDaily* (July 18, 2019), www.sciencedaily.com/releases/2019/07/190718112453.htm.

allegations that "training on unconscious bias is critical" to their work, and plaintiffs "do not know whether they can continue with this critical training" under this language. *Santa Cruz Lesbian & Gay Cmty. Ctr.*, 508 F. Supp. 3d at 543-44. As in *Santa Cruz Lesbian & Gay Cmty. Ctr.*, Plaintiffs Andres Mejia and Christina Kim Philibotte—and educators throughout New Hampshire—have no idea whether this specific prohibition in the Act's text includes concepts like "unconscious" or "implicit bias" that have (i) become important components to trainings and education addressing diversity, equity, and inclusion, and (ii) been targeted by proponents of the law.

90.    For example, it is unclear based on the Act's terms whether it goes so far as to potentially bar voluntary staff trainings addressing "implicit bias," "unconscious bias," "white privilege," "anti-racism," and "systemic racism," as well as instruction where all the students and their families are willing and eager to engage with this information. New Hampshire law already creates a process for students' families who object to certain course material to opt out of that instruction. *See* RSA 186:11, IX-c (stating that school districts shall implement a policy including "a provision requiring the parent or legal guardian to notify the school principal or designee in writing of the specific material to which they object and a provision requiring an alternative agreed upon by the school district and the parent, at the parent's expense, sufficient to enable the child to meet state requirements for education in the particular subject area"). But the Act goes even further and bans any covered instruction even where there is no objection from a student or their family. The reasonableness of the fears that such instruction is barred is underscored by the fact that the Trump Administration construed its own Executive Order using nearly identical terms as rendering suspect the topics of "white privilege," "systemic racism" and "unconscious bias." *See Exhibit 7* (Sept. 28, 2020 Executive Office of the President's Memorandum).

91.     The ban on this concept has chilled educators in their pursuit of professional development that would aid them in identifying their own biases which can impact their students. For example, an educator in Hillsborough County was brutally criticized by parents on social media and at a local school board meeting for attending a training that addressed bias and anti-racism instruction.  Colleagues who witnessed the backlash are unlikely to risk the same fate.

92.     The Act does add that it does not "prohibit racial, sexual, religious, or other workplace sensitivity training on the inherent humanity and equality of all persons and the ideal that all persons are entitled to be treated with equality, dignity, and respect."  *See* RSA 354-A:29, II.  But this proviso only adds to the Act's ambiguity, given that it provides no definition of "sensitivity training" that would allow educators or trainers to understand when concepts like implicit bias and systemic racism may be discussed.

### (3) Banned Concept #3.

93.     Under the Act's third banned concept, "[n]o pupil in any public school in this state shall be taught"—and "[n]o public employer … shall … train"—"[t]hat an individual *should be discriminated against or receive adverse treatment solely or partly* because of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin."  *See* RSA 193:40, I(c); RSA 354-A:31, III; RSA 543-A:32, III; RSA 354-A:33, III (emphasis added).

94.     This sweeping prohibition chills classroom discussion on and instruction of important contemporary topics, as educators fear the significant repercussions of making an erroneous guess as to what discussions are permissible and what discussions are forbidden. Further, this concept may demand race neutrality or color blindness, and thus potentially even implicates instruction on topics like affirmative action and other race-conscious remedies.

95.     This banned concept's ambiguity chills discussions with students about whether or how to rectify wrongs of the past—discussions that are essential because students will shape this country's future.  For example, because of this prohibition, educators may not know whether they can introduce materials where the authors debate or critique the concept of reparations for the descendants of enslaved people or affirmative action for Black Americans and other historically marginalized groups.  Although both are topics currently debated by policy makers and in the news, educators may fear that they cannot bring that type of discussion into their classroom because of the potential negative repercussions that could result for them professionally and personally.

### (4) Banned Concept #4.

96.     Under the Act's fourth banned concept, "[n]o pupil in any public school in this state shall be taught"—and "[n]o public employer … shall … train"—"[t]hat people of one age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin *cannot and should not attempt to treat others equally and/or without regard to* age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin."  *See* RSA 193:40, I(d); RSA 354-A:31, IV; RSA 543-A:32, IV; RSA 354-A:33, IV (emphasis added).

97.     The Act's contorted prohibition of the concept that people "cannot and should not attempt to treat others equally and/or without regard to" categories like age, race, sex, or disability is undecipherable.  It is unclear what it would mean to treat a person "without respect to" age, race, sex, or disability, and it is further unclear what it would mean to teach that a person "cannot and should not attempt" to do so.  Combining these phrases in one prohibition creates a confusing double negative.  Both state and federal laws and regulations addressing discrimination are well

established, but the New Hampshire legislature did not reference existing law to clarify its meaning or explain the intended operation of this concept in relation to these laws. While the New Hampshire legislature intended this banned concept to have some force and effect, it is not clear what it prohibits. As such, educators are left to guess at its meaning, violating their due process rights.

98.     Like the third banned concept, this fourth banned concept also may demand race neutrality or color blindness, and thus potentially implicates instruction on topics like affirmative action, reparations for descendants of enslaved African Americans, and other race-conscious remedies because of generations of discrimination—policies in which people are subjected to certain treatment "with regard to" race.

99.     Similarly, this banned concept may impact discussions and considerations required by state and federal law that entitle persons with disabilities to receive reasonable accommodations or modifications to ensure that they are treated equitably in society.   In other words, these laws require specific treatment "with regard to" disability. *See* RSA 354-A:7(VII)(a), 10, 12(III)(B), 17 (in employment, housing, and public accommodations, highlighting obligations to provide access and make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person with a disability an equal opportunity to such services); 42 U.S.C. §§ 12112(b), 12132, 12182(a) (federal Americans with Disabilities Act ("ADA") provisions proscribing discrimination on the basis of disability, and entitling persons with disabilities to reasonable accommodations or modifications to ensure that they are not denied employment, "the benefits of services, programs, or activities of a public entity," or "full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation").

100.    Indeed, discussing the importance of equity for individuals with disabilities—including through the provision of reasonable accommodations "with regard to" disability that would not necessarily be provided to others—is critical to allowing students and other individuals with disabilities to exercise their civil rights and participate in their communities in ways that those without disabilities are able to do with no need to talk about accommodations.  *See also* <u>*Exhibit 5*</u> (Disability Rights Center Presentation to N.H. Court System, The Disability Community and Access to Justice (May 3, 2021) (noting the need to "[i]dentify auxiliary aids/accommodations")).

101.    A report from the Juvenile Reform Project—a coalition of New Hampshire advocacy organizations which includes the Disability Rights Center-New Hampshire—demonstrates that school discipline in New Hampshire is disproportionately harsh on students with disabilities.  During the 2014-2015 academic year, "while students with disabilities made up 20.3 percent of the student population, they comprised approximately 38 percent of students receiving out-of-school suspensions."[33]    Clear and honest discussions about disabilities, including discussions about accommodations and modifications, are essential to eliminate the isolation of persons with disabilities, as Congress intended to do when it enacted the ADA.  *See* 42 U.S.C. § 12101(a).

102.    This banned concept also seems to ignore the fact that the law specifically provides anti-discrimination protections "with regard to" age.  For example, the federal Age Discrimination in Employment Act of 1967 ("ADEA") protects certain applicants and employees 40 years of age and older from discrimination on the basis of age in hiring, promotion, discharge, compensation, or terms, conditions or privileges of employment.  Those under 40 years of age cannot avail

---

[33] *Keeping Kids in School: The Urgent Need for Reform of School Discipline in NH* (January 2019), *available at* https://www.nhla.org/assets/customContent/FINAL_Keeping_Kids_in_School_-_The_Urgent_Need_to_Reform_School_Discipline_in_NH.pdf.

themselves of this law.  *See* 29 U.S.C. §§ 621-634.  Under this concept, can a teacher facilitate a discussion that the line drawn by this federal statute is appropriate?  This is unclear.

### B. The Act's Penalties and Reporting Requirement.

103.     The Banned Concepts Act couples these ambiguities with strict penalties for violations, particularly for educators.

104.     One remedy for a perceived violation is a civil action in Superior Court against a government entity (including a school district)—and potentially even the employee—for damages and equitable relief, including an injunction to stop the instruction of or training on the banned concept.  *See* RSA 354-A:34 ("*Any person aggrieved* by an act made unlawful under this subdivision may pursue all remedies available under RSA 354-A, RSA 491 ….") (emphasis added); RSA 193:40 III ("Any person claiming to be aggrieved by a violation of this section [government teaching banned concepts in schools], including the attorney general, may initiate a civil action against a school or school district in superior court for legal or equitable relief ….").  The private right of action afforded to "[a]ny person aggrieved by an act made unlawful" under the Banned Concepts Act will serve to compound the chilling effect of the law.  *See* RSA 354-A:34.  For example, under RSA 193:40 III, any parent, co-worker, or even neighbor that sees a teacher's lesson plan with the name of a book perceived as being prohibited by the Banned Concepts Act could file a Superior Court lawsuit against the teacher's school, school district, and potentially the teacher.

105.     Another remedy is a complaint against the government entity or its employee to the New Hampshire Commission on Human Rights, which has the power to receive, investigate, and pass upon complaints of illegal discrimination by teaching prohibited concepts.  RSA 193:40 III.

There does not appear to be any "qualified immunity" for a public employee who has violated the Act but done so reasonably or unintentionally.

106.    The Act also contemplates especially harsh and punitive sanctions for educators. In particular, the Act states that "[v]iolation of this section by an educator _shall_ be considered a violation of the educator code of conduct that justifies disciplinary sanction by the state board of education."  RSA 193:40, III (emphasis added); _see also_ RSA 193:40, V (establishing that this section extends to "[a]dministrators, specialists, and teachers").  Violations of the Educator Code of Conduct can lead to the occupational and professional "death penalty" of revoking an educator's license to work in the state.  _See Exhibit 2_ (N.H. Code Admin. R. Ed 511.02 addressing sanctions). A teacher's entire professional life depends on interpreting a statute which is indecipherable.

107.    The Act also leverages the threat of professional sanctions to press educators into service as informants of their fellow colleagues and enforcers of the Act's vague restrictions.  That is because a licensed educator's failure to report a suspected violation of the Code of Conduct is itself punishable as a violation of the Code.  _See id_. 510.05(a) (stating that "[a]ny credential holder shall report any suspected violation of the code of conduct following the school, school district, or SAU reporting procedures"); _id._ 510.05(f) (stating that, "[i]f the department has reason to suspect that any violation of the code of conduct enumerated in Ed 510.01 through Ed 510.04 was known by a credential holder and not reported, the department shall undertake an investigation, as enumerated in Ed 511.01, against that credential holder as required by Ed 510.05(a), (b), or (c)").  As a result, educators must risk their livelihood on their best guess of the Act's inscrutable restrictions—not only when it comes to their own teaching, but also in deciding whether to report and jeopardize the career of a fellow teacher.  Further, the prospect of an educator needing to file

a report will be constant considering that educators cannot parse the Act with enough specificity to be sure that they have no *suspicion* of any conduct which violates the Act.

108.    All of these remedies are costly and time consuming for educators to defend. Reputational harm and unwanted personal scrutiny will result even from complaints which are ultimately unfounded.  Even if a complaint in any of these venues is ultimately dismissed, the educator will still be subjected to the process of defending themselves.  The threat of lengthy legal proceedings and public scrutiny influences educator choices and causes them to shy away from any topic or material which could be misinterpreted.

**VI.    The Defendants' Failure to Answer Specific Questions Concerning the Banned Concepts Act.**

109.    Immediately after passage of the Banned Concepts Act, Plaintiff NEA-NH began to hear from members that they were confused about what they could and could not teach under the Act, as well as scared of the repercussions for guessing wrong.

110.    On July 12, 2021, NEA-NH President Megan Tuttle, on behalf of more than 17,000 educator members, wrote to Defendant Attorney General Formella requesting clarification of the ambiguity of the Act.  *See Exhibit 18* (July 12, 2021 NEA-NH Letter).  The letter asked 12 specific questions which reflected the sentiments that the NEA-NH had been hearing from its members who are the vast majority of the state's educators impacted by the Act.

111.    Defendant Attorney General Formella did not respond to that letter even to acknowledge receipt.

112.    On July 21, 2021, Defendants Commissioner Edelblut, Attorney General Formella, and Director Malachi issued so-called "guidance" on the Banned Concepts Act.  *See Exhibit 19* (July 21, 2021 Guidance).

113.    As a threshold matter, New Hampshire state courts have independent enforcement authority over the Banned Concepts Act apart from any interpretation that the Attorney General may give to the Act's terms.  The Act provides for a private right of action for any individuals allegedly "aggrieved" by the Act.  *See* RSA 193:40, III (allowing "aggrieved" persons to "initiate a civil action against a school or school district in superior court for legal or equitable relief").  As a result, any interpretation from the Attorney General is not binding, as enforcement power under the Act is also delegated to a state judicial branch that is outside the Attorney General's control.

114.    In any event, this July 21, 2021 "guidance" barely scratches the surface of the Act's provisions.  The "guidance" fails to provide any extensive and concrete examples.  It does not explain what specific types of diversity, equity, and inclusion training are or are not covered under the Act.  The "guidance" also fails to directly answer all the questions posed by Plaintiff NEA-NH on behalf of its members.

115.    For example, the July 21, 2021 "guidance" for K-12 educational programs says, generically and without elaboration, that the Act does not "prohibit *discussions* related to current events including … efforts to promote equality and inclusion, or other contemporary events that impact certain identified groups."  *See Exhibit 19* (July 21, 2021 Guidance) (emphasis added).  But it did so while explicitly omitting whether such efforts—including those that capture concepts like "implicit bias" or "white privilege"—can be "taught," "advocated for," "trained on" "advanced," or "instructed" in schools despite the Act's terms.  *See* RSA 354-A:31 (no public employer "either directly or through the use of an outside contractor, shall teach, advocate, instruct, or train" on the banned concepts); RSA 354-A:32 ("[n]o government program shall teach, advocate, or advance" on the banned concepts); RSA 193:40, I (no pupil "shall be taught, instructed or compelled to express belief in" a banned concept).

116.    The line between discussing (perhaps allowed under the "guidance") and teaching/advocating for/training on/advancing/instructing (perhaps prohibited) is so murky that enforcement of the Act poses a danger of arbitrary and discriminatory application.  *See Santa Cruz Lesbian & Gay Cmty. Ctr.*, 508 F. Supp. 3d at 544 ("The line between teaching or implying (prohibited) and informing (not prohibited) is so murky, enforcement of the ordinance poses a danger of arbitrary and discriminatory application.") (internal citations omitted).

117.    The July 21, 2021 "guidance" for K-12 educational programs also does not address fundamental questions like whether the Act specifically prohibits or allows classroom instruction to students on topics like "systemic racism," "implicit" or "unconscious bias," and "white privilege."  This "guidance" for educational programs fails to address these questions despite the fact that the Trump Administration construed its own Executive Order using nearly identical terms as rendering suspect the topics of "white privilege," "systemic racism," and "unconscious bias." *See Exhibit 7* (Sept. 28, 2020 Executive Office of the President's Memorandum).

118.    For educators, rather than clarifying the Act, the July 21, 2021 "guidance" only further confuses matters when read in conjunction with the Act's text and with the knowledge of what the legislature sought to do.  For example, the guidance says that the Act does not prohibit "discussions related to current events including but not limited to: the Black Lives Matter movement."  *See Exhibit 19* (July 21, 2021 Guidance).   However, the Black Lives Matter movement's mission is, among other things, to "eradicate white supremacy and build local power to intervene in violence inflicted on Black communities by the state and vigilantes," and to work for a world "where Black lives are no longer systematically targeted for demise."[34]   A teacher cannot, on one hand, have a "permissible" discussion about the Black Lives Matter movement in

---

[34] *See* Black Lives Matter, About, https://blacklivesmatter.com/about/.

the news and yet, on the other hand, completely ignore discussing white privilege, systemic racism, and unconscious bias—concepts that are foundational to understanding this movement.

119.    The July 21, 2021 "guidance" for public employers and government programs similarly is problematic.  While it is nominally more instructive in saying that the Act does not "prohibit implicit bias training" and allows public employers to have "trainings" and "programs" "to examine issues related to equity, diversity, inclusion, and equality," the guidance does not include or reference classroom instruction to students, nor does the "guidance" reference specific concepts like "systemic racism" and "anti-racism" that have become staples in DEI instruction, would benefit students in creating a more inclusive educational environment, and were specifically targeted by proponents of the Act.

120.    Given the deficiencies in the July 21, 2021 "guidance," Plaintiff NEA-NH wrote Defendants Attorney General Formella and Commissioner Edelblut on August 5, 2021 presenting a reasoned and plausible interpretation of the Banned Concepts Act and asking for confirmation that their interpretation of the guidance was correct before disseminating such advice to their concerned members prior to the 2021-2022 school year.  For example, the NEA-NH sought confirmation, among other things, that the following was appropriate:

> (i) "[i]ntroducing students to the concept of implicit bias, discussing the topic, and discussing student experiences with bias is permitted, so long as students are not taught that bias is inherent in students due to their status as members of a specific group";
>
> (ii) discussion of "Structural Racism (a.k.a Societal Racism, Systemic Racism) [which] describes the ways in which institutional, historical, cultural, and interpersonal practices that are learned or imposed create racism within structures of society, the economy and the government";
>
> (iii) "[a]ssigning students the writings of certain authors that express the author's particular view or theory about discrimination, racism or other prejudices is permitted provided the educator conveys to students that the book represents the author's opinion or theory and the educator does not require the student to adopt the theory or opinion"; and

(iv) discussion of "the subject of 'white privilege,' a set of social and economic advantages that are a product of systems, structures, and learned biases, so long as the privilege is not discussed in such a way as to indicate that the racial favoritism at the core of white privilege is 'inherent' or cannot be overcome."

*See* *Exhibit 18* (NEA-NH Aug. 5, 2021 Letter).

121.    The NEA-NH also sought confirmation that "[s]pecific books or works of certain authors are not 'banned' under the law." *Id.*  This question was particularly important given that Defendant Commissioner Edelblut, in a June 13, 2021 op-ed in the *Union Leader*, left the distinct impression that Dr. Ibram X. Kendi's book *How to be an Anti-Racist* may not be read under the Act.  *See* *Exhibit 16* (Frank Edelblut, "Teach Children About Racism, Not to Be Racists," *Union Leader* (June 13, 2021)).  The NEA-NH added that, "if there are certain texts which your offices' believe are per se prohibited under this law, please provide a list so educators know that prior to making 2021-2022 lesson plans." *See* *Exhibit 18* (NEA-NH Aug. 5, 2021 Letter).  The NEA-NH's concern was further realized when Commissioner Edelblut later raised a complaint about Tiffany Jewell's book for 11-15-year-olds entitled *This Book is Anti-Racist* at the July 8, 2021 State Board of Education meeting.  At this meeting, the Commissioner read portions of Chapter 10 from this text, and strongly suggested that he believed that this book was banned under the Act.[35]

122.    Neither Attorney General Formella nor Commissioner Edelblut directly responded to these reasonable questions in Plaintiff NEA-NH's August 5, 2021 letter.  *See* RSA 21-N:1, II(a) (noting that "[t]he department [of education] shall have the dual role of providing regulatory direction and instructional assistance to public elementary and secondary schools").

---

[35]    *See*    N.H.    State    Board    of    Education    Meeting    (July    8,    2021), https://us02web.zoom.us/rec/play/9LhY5d2K7pIYMFI_k_Y03oe4-IAF2kBzSxqGiFW_AYoJCAwC_4FGOgkvueh7OsagTe0sVbKwPttCNONe.pDFAngwZ6nvzBFP1    (starting    at 3:22:19).

123.     Rather than respond to the NEA-NH—the chosen representative of the vast majority of educators in New Hampshire—Defendant Commissioner Edelblut blithely suggested during an interview on *WMUR* in late August 2021 that, "if there are educators who are concerned about a particular curricular material or something like that, they can reach out to the Department [of Education] and we can take a look at that for them and provide feedback for them on that."[36]

124.     Further, in response to a specific question from *WMUR* as to whether under the Act "a teacher should lose their license if they teach that systemic racism exists in the United States," Commissioner Edelblut did not directly answer and, instead, said that the circumstance would have to be looked at individually.  He agreed that there is "not a bright line," but that the "bright line … that we all share is that we are not discriminating against one another, whether that is in the classroom or outside the classroom."[37]  Defendant Commissioner Edelblut also noted in a separate *NHPR* interview in late August 2021 that, "if educators believe that somehow this is providing a chilling effect—the conversations that they're having—they should consider what it is that they're talking about."[38]

125.     On September 7, 2021, Defendant Attorney General Formella issued "Attorney General Opinion No. 2021-01" entitled "Request for Attorney General's Opinion Regarding New Anti-Discrimination Protections."  *See Exhibit 20* (Sept. 7, 2021 Attorney General Opinion).  This opinion letter has no binding effect.  *See Hess v. Turner*, 529 A.2d 386, 387 (N.H. 1987) ("the way the attorney general chooses, in his discretion, to implement [the statute] does not determine for

---

[36] Adam Sexton, "CloseUp: Commissioner Expects to Fund 1000-1500 Education Freedom Accounts This Year," *WMUR* (Aug. 29, 2021), https://www.wmur.com/article/closeup-commissioner-expects-to-fund-1000-1500-education-freedom-accounts-this-year/37424825 (starting at 9:58).
[37] *Id.*
[38] "N.H. Education Commissioner: 'Divisive Concepts' Restrictions Won't Hinder Classroom Conversations," *NHPR* (Aug. 24, 2021), https://www.nhpr.org/nh-news/2021-08-24/nh-education-divisive-concepts-restrictions-wont-hinder-classroom-conversations.

us what the statute compels the State to do").  And, far from resolving or narrowing the ambiguity and confusion over effect of the Banned Concepts Act, it only serves to add more.

126.   The opinion apparently was in response to a request from the New Hampshire Commission on Human Rights for an official opinion "concerning the scope and application of the" Banned Concepts Act.  *See Exhibit 20* (Sept. 7, 2021 Attorney General Opinion).  In responding to the Commission, the Attorney General's nine-page opinion effectively memorialized the July 21, 2021 "guidance," while acknowledging that "[s]ome have voiced concerns that these new statutes are confusing and that public employers and schools will struggle to understand the scope of the new prohibitions."  However, like the July 21, 2021 "guidance," this opinion fails to provide any extensive and concrete examples of what specific texts and types of diversity, equity, and inclusion trainings are (or are not) covered under the Act.

127.   Much of the confusion sewn by this non-binding September 7, 2021 opinion comes from Defendant Formella's argument that the Act's overall purpose is to prohibit teaching that racism and other biases are "natural, biological, or innate, as opposed to being apparent, accidental, or a characteristic created by external action or external factors, such as current or historical discrimination, stereotyping, environment, or cultural messaging."  To begin with, virtually no one believes that racism is "natural, biological, or innate" in the kind of genetically-preordained sense suggested by Defendant Formella's opinion, thereby raising the question of why such time and effort would be devoted to restricting the teaching of concepts that are all but non-existent.  Likewise, no one would understand what is meant by the claim that teaching about racism and other bias is permissible so long as they are presented as being "accidental" or "apparent"—the idea is simply non-sensical.

128.    The confusion only grows when Defendant Formella attempts to provide further detail.  For example, Defendant Formella asserts that the Act's use of the term "inherently" in the prohibition on teaching that certain groups are "inherently racist, sexist, or oppressive, whether consciously or unconsciously" must be read to include "belonging by … settled habit."  Yet, at the same time, Defendant Formella's opinion states that the Act does not prohibit teaching that certain groups are biased or racist "because of external action or external factors, such as current or historical discrimination, stereotyping, environment, or cultural messaging."  Educators unwilling to risk their livelihood have no way of reliably distinguishing between lessons that discuss racist beliefs acquired though "settled habit" (perhaps prohibited) and those that discuss racist beliefs due to "external action or external factors" (perhaps not prohibited).  (The opinion creates the same confusion and ambiguity for trainers of implicit bias: it declares that trainings cannot teach that certain groups are "racist, sexist, or oppressive, whether consciously or unconsciously" out of "settled habit," while at the same time claiming that the Act does not prohibit training that "recognizes that biases develop over time through such means as personal experiences, messaging people may receive from media, and other sources.").

129.    Finally, Defendant Formella's opinion exacerbates the vagueness and chilling effect of the Act by declaring that a violation may occur not just because of the content of a lesson or instructional material, but also because of implications and inferences that a student or trainee may subjectively draw from the material.  For example, the opinion explains that, while it may be permissible to provide "Anti-Racist Resources," those resources may not be offered in a way that "may imply that white people … are in need of anti-racist resources."

130.    In sum, Defendants have allowed the chill of the Act to persist.  The Defendants' refusal to answer specific questions as to what texts are covered under the Act is not only unhelpful

and indifferent, but also affirms the broadest and most variable interpretation of the Act and invites arbitrary and discriminatory enforcement.

131.    Moreover, the Human Rights Commission's need to ask for a formal opinion on the Act's scope and the Attorney General's need to issue two (albeit not specific and lacking in specificity themselves) "guidance" documents only highlight the Act's vagueness and lack of clarity.  And if Defendants cannot (or are unwilling to) answer basic questions as to what texts are specifically banned under the Act's text, educators cannot possibly be expected to decipher these vague prohibitions for themselves and comply.  Instead, educators have been left to "dangle in the wind" as they attempt to interpret how to comply with the Act's provisions in the face of dire penalties.

132.    As a result, the NEA-NH has not been able to confidently provide guidance to its members as to how they could comply with the vague prohibitions in the Act.  Educators still do not know what topics can be taught or trained.  If the Defendants know specific books, lessons, or materials which are prohibited, then they should just say so explicitly.

## VII.    Even Education Lawyers Do Not Know What the Banned Concepts Act Actually Bans.

133.    Prominent education lawyers who give advice to educational institutions have highlighted the Act's ambiguity, and how this ambiguity creates a chilling effect given the Act's penalties—even in the face of Defendants' July 21, 2021 "guidance."

134.    For example, the Banned Concepts Act uses the passive voice, stating in part that "[n]o pupil in any public school in this state shall be taught, instructed, [or] inculcated" on any of the banned concepts.  RSA 193:40, I.  Thus, as Attorney David Wolowitz from McLane Middleton explained in a piece published in July/August 2021, this Act may even capture classroom discussion on banned topics where students are teaching one another:

> As drafted, the construction of sentence prohibits teaching or instruction of the prohibited concepts, regardless of whether the teaching or instruction inculcates or compels the students to believe in or support the concepts … Classroom discussions present a particular risk because a teacher cannot predict what students might say and because the definition of 'taught' is so broad …. [I]f a student were to assert that the prohibitions and penalties in the new law are motivated by racism or sexism, which some critics have argued, permitting such discussion to continue could be construed as a violation of the statute.

See *Exhibit 21* (David Wolowitz, "A Proposal to Mitigate the Risk to Public School Teachers' Careers From New Hampshire's Right to Freedom from Discrimination in Public Workplaces and Education Act," (July 6, 2021/Aug. 2, 2021)).

135.    Accordingly, even in the face of Defendants' July 21, 2021 "guidance," Attorney Wolowitz advised educators to exercise extreme caution, explaining that, "to protect themselves against potential professional conduct complaints, teachers should be prepared to immediately stop any classroom discussions on any and all topics potentially relating to the prohibited concepts." *Id.* He added—confirming the potential chill of the law—that, "[g]iven the extraordinarily high risk of teaching related to any of these topics, I recommend that teachers exercise caution even when they are confident their teaching does not violate the statutory prohibitions." *Id.*

136.    Similarly, attorneys Meghan S. Glynn, James A. O'Shaugnessy, and Milliana R. Zonarich of the law firm Drummond Woodsum—who represent school districts throughout New Hampshire—have conducted trainings of educators on behalf of their education institution clients. The attorneys' materials explained the Act's ambiguity.  For example, these lawyers highlighted as a "gray area" the following: (i) "[p]rograms that involve discussion of power structures or power imbalances in society"; and (ii) "programs that involve advocating for … [a]ffirmative action to promote equity, [r]eparations for past wrongs, [and] [w]hite privilege."  *See Exhibit 22* (Drummond Woodsum August 5, 2021 Presentation).  These lawyers also added that a "gray area" includes "[d]iscussions regarding power structures in present-day society," and "[d]iscussions of

cultural sensitivity." *Id.*  These lawyers further explained that: (i) "The state guidance [issued on July 21, 2021], while helpful, does not fully resolve many of the concerns caused by the use of imprecise or vague language in the new law;" (ii) "The law is difficult to understand, often relying on double-negative sentence construction and undefined terms, which will have a chilling effect on otherwise lawful academic discussions"; and (iii) "One of the biggest compliance issues is how to appropriately monitor and control classroom discussions while lawfully regulating student speech." *Id.*  Drummond Woodsum's trainings with this information are ongoing.

137.    In short, even lawyers who regularly advise school districts do not know what the Act means and cannot answer many fundamental questions as to what is covered under the Act— an uncertainty that only has scared and chilled educators further.  If lawyers do not know where to draw the lines, then how can teachers?  The (understandable) inability of experienced education lawyers to understand the Act means that school districts and those authorized to enforce the Act are likely to apply the Act in ways that are arbitrary and discriminatory.

138.    Moreover, some of Plaintiff NEA-NH's members report either no training on the Act at all by their school district or training which left them confused about what was permissible. These educators are being left to fend for themselves because of the vagueness of the Act and the Defendant's refusal to provide concrete, unambiguous guidance to them.  Members have conveyed that they feel like the lack of clarity on the Act amounts to a trap being set, and educators fear that they are walking into it unwittingly and unavoidably.

### VIII.   Defendant Commissioner Edelblut's Website and the Moms for Liberty Bounty.

139.    If the inherent chill of the Act was not enough, it was compounded when Defendant Commissioner Edelblut and the Department of Education, on or about November 10, 2021, published a website to invite members of the public to file complaints against teachers under the

Act.  *See Exhibit 23* (DOE Website as of Dec. 19, 2021).  The website contains a complaint form that can be sent directly to the Commission for Human Rights.

140.    The Department of Education's website (at least initially before it was later deleted) also included an email address of a Department of Education employee who could field complaints directly.  The Department of Education initially included a Department employee as a person to field complaints despite the fact that the Defendants' July 21, 2021 "guidance" said that complaints should be sent to the New Hampshire Commission for Human Rights or the New Hampshire Office of the Attorney General.  *See Exhibit 19* (July 21, 2021 Guidance).

141.    The Department of Education established and advertised this complaint website even though, to the best of Plaintiffs' knowledge, the Department of Education has not established a similar, specific website for violations of other provisions of the Law Against Discrimination or RSA 193:38-39 that were added in 2019 to apply to public schools.[39]

142.    In other words, the Department of Education set up this website to target teachers directly under the Banned Concepts Act.

143.    As of December 19, 2021, the Department of Education's complaint website, *see Exhibit 23*, also fails to mention or make reference to the Attorney General's September 7, 2021 opinion purporting to interpret the Act's provisions.

144.    Adding to this chill—and the underlying intent of the Act to cause teachers to self-censor with respect to important conversations on race and gender—the group "Moms for Liberty

---

[39]    *See* Department of Education, Complaints and Concerns, https://www.education.nh.gov/who-we-are/commissioner/complaints-and-concerns; *see also* RSA 354-A:27-28 (added in 2019, and stating, in part, that "[n]o person shall be excluded from participation in, denied the benefits of, or be subjected to discrimination in public schools because of their age, sex, gender identity, sexual orientation, race, color, marital status, familial status, disability, religion or national origin, all as defined in this chapter"); RSA 193:38-39 (added in 2019, and stating, in part, that "[n]o person shall be excluded from participation in, denied the benefits of, or be subjected to discrimination in public schools because of their age, sex, gender identity, sexual orientation, race, color, marital status, familial status, disability, religion, or national origin, all as defined in RSA 354-A").

NH" published a tweet on November 12, 2021 in response to the Department of Education's complaint website.  The tweet stated the following:



*See* <u>Exhibit 24</u> (Bounty Tweet).[40]

### IX.    The Chill of the Banned Concepts Act.

145.    Through usage of vague terms with a harsh enforcement mechanism and draconian

---

[40] A similar "Moms for Liberty" group in Tennessee has alleged that the books being assigned to Second Graders in one county entitled *Martin Luther King Jr. and the March on Washington* by Frances E. Ruffin and *The Story of Ruby Bridges* by Robert Coles—which is about the Black 6-year-old who integrated a Louisiana public school in 1960—violate Tennessee's similar "divisive concepts" law.  *See* Gabriella Borter, "'Critical Race Theory' Roils a Tennessee School District," *Reuters* (Sept. 21, 2021), https://www.reuters.com/world/us/critical-race-theory-roils-tennessee-school-district-2021-09-21/; *see also* Moms for Liberty Letter (June 30, 2021), https://drive.google.com/file/d/16W9grkwSFsIPRQOSpQfnAHNJzvDH5Bkk/view.

penalties, the Act chills permissible instruction by teachers who are uncertain whether their instruction could lead students to inquire about a prohibited concept as described throughout this Complaint.  As a result, teachers across New Hampshire have begun self-censoring certain texts and discussions on race and gender.  This should hardly be surprising.  The Act's ambiguities and penalties—coupled with the Department of Education's cultivation of a climate of fear—create strong incentives for school districts (even those who want to actively promote DEI work) to, upon fielding a parental complaint, immediately shelve books slated for classroom instruction to avoid liability.

146.    Similarly, educators fear that students, as well as parents, will respond to this Moms for Liberty "bounty" given its monetary reward.  Teachers are already subject to students creating social media pages targeting them or clandestinely videoing their lessons and classroom interactions.  Educators feel like they cannot freely engage with their students and, instead, have retreated to guarded lessons that do not serve these students as well as an honest education does.

147.    In addition to the examples in Paragraph 34, examples of this chill include the following:

- A group of teachers focused on diversity at a Rockingham County middle school received a grant to purchase Lisa Moore Ramée's book *A Good Kind of Trouble*—and a collection of other titles, including *So You Want to Talk About Race* by Ijeoma Oluo, *The New Jim Crow* by Michelle Alexander, *The Black Friend: On Being a Better White Person* by Frederick Joseph, *Ghost Boys* by Jewell Parker Rhodes, *Raising White Kids: Bringing Up Children in a Racially Unjust America* by Jennifer Harvey, *Me and White Supremacy* by Layla Saad, and *The Hate U Give* by Angie Thomas—as part of efforts to focus more on equity in schools.  The group wanted to have these books used as resources and included in their classroom libraries, but those plans have been put on hold.

  In particular, *A Good Kind of Trouble* is for students ages 8-12 and tells the story of a 12-year-old Young African American girl who, after experiencing a powerful racial justice protest, starts getting more active in the Black Lives Matter movement.  With respect to this book, a parent sent an email to Defendant Commissioner Edelblut in October 2021 demanding that the "so-called professionals that are allowing this in

school need to be disciplined!"  The parent also complained that the "book has an underlying tone that white people and police officers are against black people all the way down to how white people look at a black person."  Further, she objected to certain so-called "gender books" being read.  The parent concluded by asking Commissioner Edelblut, in part, "[w]hat disciplinary action will result?," and "[h]ow do we proceed? Do I need to get a lawyer?"

- Similarly, a Rockingham County middle school has temporarily set aside Tiffany Jewell's book entitled *This Book is Anti-Racist*, which was used by a teacher group for professional development.

### X.     The Harm of Chilling DEI Instruction.

148.    The Act's chill of education focusing on race, gender, and DEI concepts harms all Granite Staters because the inclusion of such concepts in classrooms provides a multitude of benefits for students and society at large.  Student body diversity—and the resultant diversity in views and perspectives that flows from such diverse students' participation—improves critical thinking and problem solving, increases cross-racial understanding, reduces stereotypes and prejudices, and develops leadership skills and many other skills necessary to thrive in an increasingly diverse society.[41]  Research also shows that a culturally inclusive education can increase graduation rates, school attendance, and standardized test scores.[42]  These benefits manifest for all students.

149.    While all Granite Staters are harmed by the Act, the Act's chill of instruction on race and gender inflicts disproportionate injury on students of color, with compounded harms for LGBTQ+, women, and girls of color.  Instruction on race and gender, including DEI concepts, serves to close existing opportunity gaps and inequalities faced by students of color and other historically marginalized groups.  Research demonstrates that increasing cultural proficiency

---

[41] *See, e.g.,* Roslyn Arlin Mickelson, *Research Brief: School Integration and K-12 Outcomes: An Updated Quick Synthesis of the Social Science Evidence* 5, Nat'l Coal. On Sch. Diversity (Oct. 2016), https://files.eric.ed.gov/fulltext/ED571629.pdf.

[42]  *See, e.g.*, Thomas Dee & Emily Penner, The Causal Effects of Cultural Relevance: Evidence from an Ethnic Studies Curriculum, 54 Am. Educ. Res. J. 127, 217 (2017), https://files.eric.ed.gov/fulltext/EJ1132535.pdf.

among teachers and introducing culturally responsive teaching practices and pedagogy can provide effective support for students of color.[43]  Studies in brain science and education find that drawing on learners' background knowledge shapes comprehension.[44]  Research also illustrates that instructional materials, assignments, and texts that reflect students' backgrounds and experiences are critical to engagement and deep, meaningful learning.[45]  Additional research shows that enrollment in an ethnic studies course results in positive academic outcomes across a variety of indicators, including a 21% increase in ninth-grade attendance rates and average GPA increase of 1.4 grade points.[46]

150.    In addition, this type of instruction serves to break down stereotypes and prejudices that disproportionately inflict harm on students of color, both within the educational system and broader society across healthcare, the penal system, and workplaces.  For example, trainings on implicit bias help to counteract existing prejudice which research suggests results in educators disciplining Black students more harshly than their White peers for similar offenses.[47]

151.    Such barriers are compounded for students of color who have other marginalized identities, including LGBTQ+ students of color.  LGBTQ+ students are subject to bullying and harassment at much higher rates.  One 2019 state survey assessing school climate for LGBTQ+ youth in New Hampshire's secondary schools found that up to 63% of respondents reported verbal harassment based on sexual orientation, and up to 22% reported physical harassment based on

---

[43] *Id.* at 127–66.
[44] *See Understanding Culturally Responsive Teaching,* New Am., https://www.newamerica.org/education-policy/reports/culturally-responsiveteaching/understanding-culturally-responsive-teaching/ (discussing and citing studies).
[45] Alfred Tatum, *Black Males and Critical Literacy* 66, The Reading Teacher, 661–69. (2013).
[46] Dee & Penner, *supra* note 42, at 129.
[47] *See, e.g., "*Educator Bias is Associated with Racial Disparities in Student Achievement and Discipline," *Brookings* (July 20, 2020), https://www.brookings.edu/blog/browncenter-chalkboard/2020/07/20/educator-bias-is-associated-with-racial-disparities-instudent-achievement-and-discipline/.

sexual orientation, with 8% of those cases resulting in physical assaults.[48]  LGBTQ+ students of color face additional barriers, as surveys indicate that LGBTQ+ youth of color report a higher likelihood of dropping out of school due to hostile school climates as compared to their White LGBTQ+ peers.[49]  While instruction on sexual orientation, gender identity, and DEI serves to address these barriers, the Act's chill further deprives LGBTQ+ youth of color of anti-discrimination measures, educational supports, and engaging curricula.  Evidence shows that education policies that are inclusive of LGBTQ+ students aid student well-being and success by reinforcing a positive school climate.[50]  Likewise, LGBTQ+-inclusive curricula contribute to school safety for all students.[51]

152.    Women and girls of color also face a range of compounded barriers in the education context due to the intersections between their racial and gender identity.  For example, girls of color disproportionately face punitive disciplinary measures in school and sexual harassment.  DEI work in schools can serve to effectively address these intersectional barriers.

153.    Plaintiffs Andres Mejia and Christina Kim Philibotte have dedicated their professional lives to training on diversity, equity, and inclusion.  Their experiences confirm the findings that such instruction is vital for the provision of a quality education and thriving democracy for all Granite Staters, and particularly Granite Staters of color.  This instruction has increased the engagement, participation, and sense of belonging for students of color in their districts.  And students of color have expressed to Mr. Mejia and Ms. Philibotte their desire to gain greater exposure to the perspectives of communities of color and theories related to race and gender

---

[48]    "School Climate for LGBTQ Students in New Hampshire," *GLSEN* (2019), https://www.glsen.org/sites/default/files/2021-01/New-Hampshire-Snapshot-2019.pdf.

[49] "Educational Exclusion: Drop Out, Push Out, and the School-to-Prison Pipeline Among LGBTQ Youth," *GLSEN* (2013), https://www.glsen.org/sites/default/files/2019-11/Educational_Exclusion_2013.pdf.

[50] The National Academies of Science, Engineering, and Medicine, Understanding the Well-Being of LGBTQI+ Populations, at 9-5 (2020).

[51] *Id.* at 9-8.

because such conversations make them feel more connected to the curricula and prepared to tackle the issues facing their communities.  White students also have asked them to learn more about DEI, gender, LGBTQ+ race, racism, and other perspectives about marginalized identities.  These courageous conversations are essential for all students—especially those of color—as they build community where people feel seen and validated in a secure space, and thus more comfortable speaking and sharing their experiences on complex topics which, in turn, teaches other students.

## CAUSE OF ACTION

## COUNT ONE – FOURTEENTH AMENDMENT -- VAGUENESS

154.    The foregoing allegations in the preceding paragraphs are re-alleged and incorporated herein by reference.

155.    A law is "void for vagueness if its prohibitions are not clearly defined."  *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).  This principle applies to administrative, civil, and criminal prohibitions.  *See, e.g., FCC v. Fox Television Stations, Inc*., 567 U.S. 239, 253–54 (2012) (civil fines); *Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1048–51 (1991) (state bar rule).  A law is impermissibly vague if it either "fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits" or "authorizes or even encourages arbitrary and discriminatory enforcement." *Hill v. Colorado*, 530 U.S. 703, 732 (2000).

156.    The Banned Concepts Act located at RSA 354-A:29-34 and RSA 193:40 is unconstitutionally vague on its face and as applied to Plaintiffs because it fails to provide fair notice of what educators can and cannot include in their courses, and because it invites arbitrary and discriminatory enforcement—up to and including the loss of teaching licenses.

157.    Educators and administrators, including Plaintiffs, at every level are confused about what they can legally teach and train, and they risk the loss of employment, licenses, and certifications if they unwittingly violate the Banned Concepts Act.

158.    The Banned Concepts Act is vague and violates the Fourteenth Amendment rights of Plaintiffs facially and as applied by Defendants Commissioner Frank Edelblut, Attorney General John Formella, Director Ahni Malachi, Chairperson Christian Kim, and Commissioner Ken Merrifield—all of whom have enforcement authority under the Banned Concepts Act.

159.    Because of the Banned Concepts Act's vagueness, Plaintiffs have suffered and will continue to suffer irreparable harm, including violations of their Fourteenth Amendment right to due process.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests relief as follows:

A.    Issue preliminary and permanent injunctive relief restraining Defendants, their employees, agents, and successors in office from enforcing the Banned Concepts Act located at RSA 354-A:29-34 and RSA 193:40;

B.    Declare that the Banned Concepts Act located at RSA 354-A:29-34 and RSA 193:40 is unconstitutional facially and as applied under the Fourteenth Amendment's Due Process provisions to the United States Constitution;

C.    Award Plaintiffs' costs of suit and reasonable attorneys' fees and other expenses under 42 U.S.C. § 1988; and

D.    Award such other relief as the Court deems just and equitable.

ANDRES MEJIA AND CHRISTINA KIM PHILIBOTTE,

By and through their attorneys,

/s/ Gilles R. Bissonnette
Gilles R. Bissonnette (N.H. Bar. No. 265393)
Henry R. Klementowicz (N.H. Bar No.
  21177)
SangYeob Kim (N.H. Bar No. 266657)
AMERICAN CIVIL LIBERTIES UNION OF NEW
  HAMPSHIRE
18 Low Avenue, Concord, NH 03301
Tel.: 603.225.3080
gilles@aclu-nh.org
henry@aclu-nh.org
sangyeob@aclu-nh.org

Chris Erchull (N.H. Bar No. 266733)
GLBTQ LEGAL ADVOCATES & DEFENDERS
18 Tremont, Suite 950
Boston, MA 02108
Tel.: 617.426.1350
cerchull@glad.org

Sarah J. Jancarik (N.H. Bar No. 272310)
DISABILITY RIGHTS CENTER-NEW HAMPSHIRE
64 N Main St, Ste 2
Concord, NH 03301-4913
Tel.: 603.228.0432
Sarahj@drcnh.org

William E. Christie (N.H. Bar No. 11255)
S. Amy Spencer (N.H. Bar No. 266617)
SHAHEEN & GORDON, P.A.
107 Storrs Street
P.O. Box 2703
Concord, NH 03302
Tel.: 603.225.7262
wchristie@shaheengordon.com
saspencer@shaheengordon.com

/s/ David A. Vicinanzo
David A. Vicinanzo (N.H. Bar No. 9403)
NIXON PEABODY LLP
900 Elm Street, 14th Floor
Manchester, NH 03101
Tel.: 603.628.4000
dvicinanzo@nixonpeabody.com

Travis Hill*
NIXON PEABODY LLP
55 West 46th Street
New York, NY 10036-4120
Tel.: 212.940.3131
thill@nixonpeabody.com

Morgan C. Nighan (N.H. Bar No. 21196)
NIXON PEABODY LLP
Exchange Place
53 State Street
Boston, MA 02109-2835
Tel.: 617.345.1031
mnighan@nixonpeabody.com

Emerson Sykes*
Speech, Privacy, and Technology Project
Leah Watson*
Sarah Hinger*
Racial Justice Program
AMERICAN CIVIL LIBERTIES UNION
  FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
Tel.: 212.549.2500
esykes@aclu.org
lwatson@aclu.org
shinger@aclu.org

NATIONAL EDUCATION ASSOCIATION-
NEW HAMPSHIRE,

By and through its attorneys,

*/s/ Esther K. Dickinson*
Esther K. Dickinson (N.H. Bar No. 20764)
Lauren Snow Chadwick (N.H. Bar No. 20288)
Staff Attorneys
NATIONAL EDUCATION ASSOCIATION-
    NEW HAMPSHIRE
9 South Spring Street
Concord, NH 03301-2425
Tel.: 603.224.7751
edickinson@nhnea.org
lchadwick@nhnea.org

Nathan R. Fennessy (N.H. Bar No. 264672)
Rue K. Toland (N.H. Bar No. 269021)
PRETI FLAHERTY BELIVEAU & PACHIOS LLP
57 North Main Street
Concord, NH 03301
Tel.: 603.410.1500
nfennessy@preti.com
rtoland@preti.com

Alice O'Brien*
Jason Walta*
NATIONAL EDUCATION ASSOCIATION
1201 Sixteenth St. NW
Washington, DC 20036
Tel: 202.822.7035
aobrien@nea.org
jwalta@nea.org

*Certifications for admission *pro hac vice* to follow.

December 20, 2021