**EXHIBIT 8**

HB544 Docket and Language

# HB544

| Body | Description |
| --- | --- |
| H | Introduced (in recess of) 01/06/2021 and referred to Executive Departments and Administration **HJ 2** P. 53 |
| H | ==RECESSED== Public Hearing: 02/11/2021 11:30 am Members of the public may attend using the following link: To join the webinar: https://zoom.us/j/91078617911 / Executive session on pending legislation may be held throughout the day (time permitting) from the time the committee is initially convened. |
| H | ==CONTINUED== Public Hearing: 02/18/2021 01:30 pm Members of the public may attend using the following link: To join the webinar: https://zoom.us/j/97238685330 / Executive session on pending legislation may be held throughout the day (time permitting) from the time the committee is initially convened. |
| H | Majority Committee Report: Ought to Pass with Amendment # 2021-0611h (Vote 10-9; RC) **HC 18** P. 45 |
| H | Minority Committee Report: Inexpedient to Legislate |
| H | Lay on Table (Rep. Osborne): MA DV 347-18 04/08/2021 **HJ 6** P. 72 |

**HB 544 - AS INTRODUCED**

2021 SESSION

21-0732
05/04

| | |
|---|---|
| HOUSE BILL | *544* |
| AN ACT | relative to the propagation of divisive concepts. |
| SPONSORS: | Rep. Ammon, Hills. 40; Rep. Cordelli, Carr. 4; Rep. J. Osborne, Rock. 4 |
| COMMITTEE: | Executive Departments and Administration |

---

ANALYSIS

This bill defines and prohibits the dissemination of certain divisive concepts related to sex and race in state contracts, grants, and training programs.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Explanation: Matter added to current law appears in **bold italics.**
Matter removed from current law appears [in brackets and struckthrough.]
Matter which is either (a) all new or (b) repealed and reenacted appears in regular type.

**HB 544 - AS INTRODUCED**

21-0732
05/04

STATE OF NEW HAMPSHIRE

*In the Year of Our Lord Two Thousand Twenty One*

AN ACT       relative to the propagation of divisive concepts.

*Be it Enacted by the Senate and House of Representatives in General Court convened:*

1  1 New Chapter; Propagation of Divisive Concepts Prohibited.  Amend RSA by inserting after chapter 10-B the following new chapter:

CHAPTER 10-C

PROPAGATION OF DIVISIVE CONCEPTS PROHIBITED

10-C:1  Definitions.  In this chapter:

I. "Contractor" means any and all persons, individuals, corporations, or businesses of any kind that in any manner have entered into a contract, or perform a subcontract pursuant to a contract, with the state of New Hampshire.

II. "Divisive concept" means the concept that:

(a)  One race or sex is inherently superior to another race or sex;

(b)  The state of New Hampshire or the United States is fundamentally racist or sexist;

(c)  An individual, by virtue of his or her race or sex, is inherently racist, sexist, or oppressive, whether consciously or unconsciously;

(d)  An individual should be discriminated against or receive adverse treatment solely or partly because of his or her race or sex;

(e)  Members of one race or sex cannot and should not attempt to treat others without respect to race or sex;

(f)  An individual's moral character is necessarily determined by his or her race or sex;

(g)  An individual, by virtue of his or her race or sex, bears responsibility for actions committed in the past by other members of the same race or sex;

(h)  Any individual should feel discomfort, guilt, anguish, or any other form of psychological distress on account of his or her race or sex; or

(i)  Meritocracy or traits such as a hard work ethic are racist or sexist, or were created by a particular race to oppress another race.

(j)  The term "divisive concepts" includes any other form of race or sex stereotyping or any other form of race or sex scapegoating.

III. "Race or sex stereotyping" means ascribing character traits, values, moral and ethical codes, privileges, status, or beliefs to a race or sex, or to an individual because of his or her race or sex.

IV. "Race or sex scapegoating" means assigning fault, blame, or bias to a race or sex, or to members of a race or sex because of their race or sex.  It similarly encompasses any claim that,

1 consciously or unconsciously, and by virtue of his or her race or sex, members of any race are
2 inherently racist or are inherently inclined to oppress others, or that members of a sex are
3 inherently sexist or inclined to oppress others.

4 V. "The state of New Hampshire" means all agencies and political subdivisions of the state
5 of New Hampshire, including counties, cities, towns, school districts, and the state university
6 system.

7 VI. "Student" means any and all students of any school district, school, college, or university
8 which receives grants, funds, or assets from the state of New Hampshire.

9 10-C:2 Unlawful Propagation of Divisive Concepts.

10 I. Requirements for the state of New Hampshire:

11 (a) The state of New Hampshire shall not teach, instruct, or train any employee,
12 contractor, staff member, student, or any other individual or group, to adopt or believe any of the
13 divisive concepts defined in RSA 10-C:1, II.

14 (b) No employee, contractor, staff member, or student of the state of New Hampshire
15 shall face any penalty or discrimination on account of his or her refusal to support, believe, endorse,
16 embrace, confess, act upon, or otherwise assent to the divisive concepts defined in RSA 10-C:1, II.

17 II. Requirements for government contractors:

18 (a) All state contracts entered into on or after the effective date of this chapter shall
19 include the following provision:

20 "During the performance of this contract, the contractor agrees as follows:
21 The contractor shall not use any workplace training that inculcates in its employees any form of race
22 or sex stereotyping or any form of race or sex scapegoating, including the concepts that: (a) one race
23 or sex is inherently superior to another race or sex; (b) an individual, by virtue of his or her race or
24 sex, is inherently racist, sexist, or oppressive, whether consciously or unconsciously; (c) an individual
25 should be discriminated against or receive adverse treatment solely or partly because of his or her
26 race or sex; (d) members of one race or sex cannot and should not attempt to treat others without
27 respect to race or sex; (e) an individual's moral character is necessarily determined by his or her race
28 or sex; (f) an individual, by virtue of his or her race or sex, bears responsibility for actions committed
29 in the past by other members of the same race or sex; (g) any individual should feel discomfort, guilt,
30 anguish, or any other form of psychological distress on account of his or her race or sex; or (h)
31 meritocracy or traits such as a hard work ethic are racist or sexist, or were created by a particular
32 race to oppress another race. The term "race or sex stereotyping" means ascribing character traits,
33 values, moral and ethical codes, privileges, status, or beliefs to a race or sex, or to an individual
34 because of his or her race or sex, and the term "race or sex scapegoating" means assigning fault,
35 blame, or bias to a race or sex, or to members of a race or sex because of their race or sex."

36 (b) The contractor shall send to each labor union or representative of workers with
37 which the contractor has a collective bargaining agreement or other contract or understanding, a

notice, to be provided by the agency contracting officer, advising the labor union or workers' representative of the contractor's commitments under this section, and shall post copies of the notice in conspicuous places available to employees and applicants for employment.

(c)  In the event of the contractor's noncompliance with the requirements of this section, or with any rules, regulations, or policies that may be promulgated in accordance with this section, the contract may be canceled, terminated, or suspended in whole or in part and the contractor may be declared ineligible for further government contracts.

(d)  The contractor shall include the provisions of this section in every subcontract or purchase order unless exempted by rules, regulations, or policies of the department of administrative services, so that such provisions shall be binding upon each subcontractor or vendor.  The contractor shall take such action with respect to any subcontract or purchase order as may be directed by the department of administrative services as a means of enforcing such provisions including sanctions for noncompliance.

III.  The department of administrative services, or an agency designated by the department of administrative services, is directed to investigate complaints received alleging that a state contractor is utilizing such training programs in violation of the contractor's obligations under the binding provisions of this section.  The department shall take appropriate enforcement action and provide remedial relief, as appropriate.

IV.  The heads of all agencies shall review their respective grant programs and identify programs for which the agency may, as a condition of receiving such a grant, require the recipient to certify that it will not use state funds or assets to promote any of the divisive concepts defined in RSA 10-C:1, II.

V.  Requirements for agencies.

(a)  The fair and equal treatment of individuals is an inviolable principle that must be maintained in the state workplace.  Agencies should continue all training that will foster a workplace that is respectful of all employees.  Accordingly:

(1)  The head of each agency shall use his or her authority under to ensure that the agency, agency employees while on duty status, and any contractors hired by the agency to provide training, workshops, forums, or similar programming, for purposes of this section, "training", to agency employees do not teach, advocate, act upon, or promote in any training to agency employees any of the divisive concepts listed in RSA 10-C:1; and

(2)  Agency diversity and inclusion efforts shall, first and foremost, encourage agency employees not to judge each other by their color, race, ethnicity, sex, or any other characteristic protected by federal or state law.

(b)  The commissioner of the department of administrative services, pursuant to RSA 541-A, shall develop regulations for the enforcement of the provisions of this statute.

(c) Each agency head shall:

    (1) Issue a policy incorporating the requirements of this chapter into agency operations, including by making compliance with the policy a provision in all agency contracts;

    (2) Request that the agency thoroughly review and assess not less than annually thereafter, agency compliance with the requirements of the policy in the form of a report submitted to the department of administrative services; and

    (3) Assign at least one senior political appointee responsibility for ensuring compliance with the requirements of the policy.

  VI.  Review of agency training.

   (a) All training programs for state agency employees relating to diversity or inclusion shall, before being used, be reviewed by the department of administrative services for compliance with the requirements of RSA 10-C:2, V.

   (b) If a contractor provides a training for agency employees relating to diversity or inclusion that teaches, advocates, or promotes the divisive concepts defined in RSA 10-C:1, II, and such action is in violation of the applicable contract, the agency that contracted for such training shall evaluate whether to pursue debarment of that contractor, consistent with applicable law and regulations.

 10-C:3  General Provisions.

  I.  Nothing in this chapter shall prevent agencies or contractors from promoting racial, cultural, or ethnic diversity or inclusiveness, provided such efforts are consistent with the requirements of this chapter.

  II.  Nothing in this chapter shall be construed to prohibit discussing, as part of a larger course of academic instruction, the divisive concepts listed in RSA 10-C:1, II in an objective manner and without endorsement.

  III.  If any provision of this chapter, or the application of any provision to any person or circumstance, is held to be invalid, the remainder of this chapter and the application of its provisions to any other persons or circumstances shall not be affected thereby.

 2  Effective Date.  This act shall take effect January 1, 2022.

Rep. Ammon, Hills. 40
March 3, 2021
2021-0611h
05/04

Amendment to HB 544

1 Amend RSA 10-C:1, I as inserted by section 1 of the bill by replacing it with the following:
2
3     I. "Contractor" means any and all persons, individuals, corporations, or businesses of any
4 kind that in any manner have entered into a contract to perform a service for, or perform a
5 subcontract pursuant to a contract to perform a service for, or with the state of New Hampshire.
6
7 Amend RSA 10-C:2, V(a)(1) as inserted by section 1 of the bill by replacing it with the following:
8
9     (1) The head of each agency shall ensure that the agency, agency employees while on
10 duty status, and any contractors hired by the agency to provide training, workshops, forums, or
11 similar programming to agency employees do not teach, advocate, act upon, or promote in any
12 training to agency employees any of the divisive concepts listed in RSA 10-C:1, II; and
13
14 Amend RSA 10-C:3 as inserted by section 1 of the bill by inserting after paragraph II the following
15 new paragraph and renumbering the original paragraph III to read as paragraph IV:
16
17     III Nothing in this chapter is meant to include as a "contract or subcontract" certain
18 government financial assistance, including but not limited to the taking or receiving of loans, tax
19 credits, tax incentives, tax abatements or gifts deriving from money sent from the federal
20 government or agency designed or meant to assist during or after a declared emergency, including
21 but not limited to health, weather, riot, civil disobedience or acts of foreign agents, or designed as
22 economic stimulus during economic emergency.



# HOUSE RECORD

**First Year of the 167th General Court**

**Calendar and Journal of the 2021 Session**

State of New Hampshire

Web Site Address: www.gencourt.state.nh.us

| Vol. 43 | Concord, N.H. | Friday, April 2, 2021 | No. 18 |

**Contains: House Deadlines; House Bills Amended by Senate; Committee Reports; Meetings and Notices; Revised Fiscal Notes**

# HOUSE CALENDAR

**MEMBERS OF THE HOUSE:**

The House will meet in session on Wednesday, April 7th at 9:00 a.m., Thursday, April 8th, at 9:00 a.m., and Friday, April 9th at 9:00 a.m. in the NH Sportsplex facility at 68 Technology Dr. in Bedford, NH.

Session day logistics, including arrival times, parking, entry, materials and lunch distribution will be similar to the previous event, and where necessary, updates and modifications have been made. Those details appear in the back of this House Calendar. House members can expect an email with any further details early next week.

I have discussed with the Democratic and Republican Leaders our need to work together to manage our time wisely during the House session days. While there may be disagreement on many issues, we all agree that we can complete our business in a timely manner if we work together with mutual respect and understanding.

The House Finance committee will offer a budget briefing for House members on Monday April 5th at 1:00 p.m. via Zoom webinar. As in prior budget years, members of the public may watch a livestream via YouTube. A link to the YouTube stream is published in a notice in this House Calendar. House members will receive a link to the webinar by email so they may raise their hand and ask questions of the Finance Committee and Legislative Budget Assistant, if desired.

The amendment to House Bill 1 adopted by the majority of the House Finance Committee is one that replaces the entire bill and is over 700 pages long. Rather than print 400 copies of that amendment for next week, the Legislative Budget Assistant's Office has posted a link to that amendment here: http://www.gencourt.state.nh.us/LBA/Budget/Capital_Budget_House/Week%20of%203-29/HB_1_H_Finance_COMBINED_33021.pdf All other amendments to bills will be printed in two addendum calendars.

Additionally, if you are interested in the other documents used throughout the entire House budget process, the LBA has a webpage with those available to you found here:http://www.gencourt.state.nh.us/LBA/Budget/fy2022_2023_budget.aspx

The New Hampshire Automobile Dealers Association will be sponsoring one of our session day's lunches next week at session. Typically the NHADA hosts an annual Crossover reception for all legislators and staff, however in this unusual time, we have not been able to attend the usual social events that may exist for legislators. These receptions go a long way in terms of allowing members across the whole chamber to socialize and get to know their colleagues, and I know I speak for myself when I say this has been missed. We are thankful to the NHADA for sponsoring this lunch.

I am happy to announce that captioning for House sessions is now available. The link to access captions is a separate link from the session streaming link and will be available on the General Court website before the start of each session.

Sherman A. Packard, Speaker of the House

---

### NOTICE

The **Finance** Committee will hold **budget briefings** on **HB 1-A**, making appropriations for the expenses of certain departments of the state for fiscal years ending June 30, 2022 and June 30, 2023, and **HB 2-FN-A-L**, relative to state fees, funds, revenues, and expenditures on April 5th at 1:00 pm. House members will receive secure Zoom links. Members of the public may attend using the following link: https://www.youtube.com/watch?v=MvMW6Lf-ltw.

Rep. Kenneth Weyler, Chairman
Finance Committee

Rep. John Sytek for Executive Departments and Administration. The last major expansion of the franchise – the right to vote and to hold office – occurred 50 years ago. That was the passage of the 26th amendment which granted that right to 18- to 21-year olds. Indeed, many in this chamber witnessed this history-making event. The committee felt that this bill commemorating the anniversary was fitting and appropriate. **Vote 18-0.**

**HB 345,** establishing a license for mushroom harvesters. **MAJORITY: OUGHT TO PASS WITH AMENDMENT. MINORITY: INEXPEDIENT TO LEGISLATE.**
Rep. Sallie Fellows for the **Majority** of Executive Departments and Administration. This bill legalizes the sale of safe varieties of wild harvested mushrooms in restaurants and markets. The Food and Drug Administration Food Code explicitly prohibits the sale of wild harvested mushrooms unless an oversight agency establishes an approval process for licensed harvesters. Some wild mushrooms are poisonous. Licensing will ensure those sold in NH are safe. The Department of Health and Human Services (DHHS) will oversee training programs, testing and licensing of harvesters, and will specify the authorized varieties. Harvesters must have permission to take wild mushrooms from someone else's land. This bill doesn't apply to cultivated mushrooms or picking wild mushrooms for personal consumption. DHHS supports this bill and indicated they can absorb the operational cost. The amendment simply adds a definition of mushrooms. **Vote 12-7.**
Rep. Tony Lekas for the **Minority** of Executive Departments and Administration. This bill would license wild mushroom harvesters. Wild mushrooms have been harvested for sale in New Hampshire for many years. Up to now that has not caused enough trouble for there to have been a call for regulating the practice in our state. That would likely still be the case except that, unfortunately, the Department of Health and Human Services chose to adopt the 2017 Food and Drug Administration Food Code into New Hampshire rule and the legislature accepted that action. There are reasons that there are separate states. What is necessary and appropriate for one state may not be for another. We should end the practice of adopting standards without carefully considering if they are all really necessary for New Hampshire. We should not be licensing additional professions just to deal with an earlier error.

**HB 417,** relative to the powers of the governor during a renewal of a declared state of emergency. **MAJORITY: OUGHT TO PASS WITH AMENDMENT. MINORITY: INEXPEDIENT TO LEGISLATE.**
Rep. Terry Roy for the **Majority** of Executive Departments and Administration. This bill, as amended, changes the emergency powers laws in three ways. First, it extends a declared emergency to 30 days, rather than 21, so that the common weather-related emergencies are not affected. Second, if a state of emergency is renewed, the legislature must meet to approve the extension and any executive orders issued during the emergency. If the legislature cannot meet, the state of emergency and the orders continue in force and are extended in 14-day increments until the legislature can meet. Thirdly, any gifts, grants or other funds obtained for emergency purposes must be accepted by the Governor and Council, rather than the governor alone, which requires Fiscal Committee involvement from amounts over $100,000. These changes go into effect after the end of the current emergency, and so are prospective only. These changes address the most common concerns about the current emergency powers statute, which was updated after the terrorist attacks on September 11, 2001 and never used for an extended period of time until the COVID-19 outbreak. This emergency raised concerns about imposing too much responsibility on the governor alone, and so this bill presents a plan to share the responsibility and provide policy oversight. **Vote 16-2.**
Rep. Peter Schmidt for the **Minority** of Executive Departments and Administration. This bill seeks to address widespread objections to a number of aspects of the Governor's emergency order regime, which is currently in effect in New Hampshire. The minority of the ED&A Committee recognizes and shares many of the majority's concerns, and also supports a review and revision of the existing emergency statute. Nevertheless, the minority opposes passage of HB 417 at this time for the following reasons. First, the bill is entirely prospective; it cures none of the actual or supposed abuses of the Governor's authority at this time. Hence, it has no urgency and should not be substituted for a truly deliberative investigation of the deficiencies of the existing statute, nor of any instances of gubernatorial overreach. Second, instead of this bill, a blue ribbon committee should be empaneled, not to assess blame, but to lay the basis for a wisely revised statute to more perfectly protect the state and its citizens in the future. Third, the bill mistakenly conflates every living NH citizen's experience and expectations of a state of emergency with the fundamentally different duration and reality of this pandemic, which is, in addition, by no means fully understood or resolved. Further, the bill creates a legislative oversight and control structure which the minority believes would likely be in its own way in a typical emergency, in other words, unnecessary, and very likely to hamstring effective emergency management in the case of a future pandemic, or nuclear emergency, in other words, unworkable and counterproductive. For these reasons, this bill should be found Inexpedient to Legislate.

**HB 544,** relative to the propagation of divisive concepts. **MAJORITY: OUGHT TO PASS WITH AMENDMENT. MINORITY: INEXPEDIENT TO LEGISLATE.**
Rep. Terry Roy for the **Majority** of Executive Departments and Administration. This bill is an anti-racism piece of legislation that would prohibit the teaching racist ideology to students and employees of state schools.

It would also bar mandatory racist ideology training to employees of state agencies and businesses who contract with the state to provide services to or on behalf of the state. The committee heard testimony that these trainings and teachings do currently occur in New Hampshire and seem to be becoming more of a trend both here and nationwide. The committee also heard testimony that the teaching and training of the concepts prohibited by this bill cause disharmony, resentment and hatred. The majority agrees. The bill does not prohibit teaching about racism and its negative effects throughout history on the people of New Hampshire and the United States. The majority believes teaching about actual history including institutional racism that has existed and the steps we have taken to eradicate it are important aspects of a proper education and a healthy and diverse workplace. The bill, simply put, prohibits teaching that one race is at fault in perpetuity for challenges and disadvantages faced by another race. The majority acknowledges that racism still exists and that we must always be on guard against it to challenge it whenever it rears its ugly head but the majority also believes in the inherent good of each individual Granite State citizen and in the greatness of this state and of the United States of America. Of all the nations on Earth, it is the United States that provides the most opportunity and legal protections to minorities of every race, creed and religion. **Vote 10-9.**

Rep. Sallie Fellows for the **Minority** of Executive Departments and Administration. In 2020 we all saw George Floyd die, Black Lives Matter demonstrations, and white supremacists' counter protests. Public interest led to an exponential growth in books, documentaries, zoom seminars, and courses about racism and bias. The function of this bill is to suppress teaching about racism and sexism. It does so by banning discussion of any "form of race or sex stereotyping." This prohibition applies to state and municipal governments, and all public schools, private schools and colleges receiving state funding. The ban also applies to the internal operations of businesses with state contracts, which would likely result in fewer bidders and higher costs for state projects. In this time of heightened awareness about racism, this bill will tarnish the image of New Hampshire as a great place to live and work. The minority believes it also violates the First Amendment's protection of free speech, which is why we oppose this bill.

**HB 575,** relative to licensure of applicants for cosmetology, esthetics, and manicuring through apprenticeship programs. **OUGHT TO PASS.**
Rep. Tony Lekas for Executive Departments and Administration. This bill would permit an applicant for a license as a cosmetologist, manicurist, or esthetician to complete the training requirement either in an apprenticeship program or a school. While current statute does permit an applicant to complete the training requirement through an apprenticeship it requires twice as many hours in an apprenticeship program than in a school. If this bill is adopted, the number of training hours would be the same for a school or apprenticeship program. The bill also makes it clear that the apprenticeship program must be one approved by the board. In current statute, approval is not required for apprenticeship programs for cosmetologists although it is required for manicurists and estheticians. In either case, the applicant must pass an examination conducted by the board. This would especially benefit those who must work and/or raise a family while training for a new career. It is often not possible for such people to put their lives on hold in order to attend a school full time. An apprenticeship program can offer more schedule flexibility and changing the hours required in such a program the same as those required in a school would reduce the burden on such people. Another potential benefit to an apprenticeship program is that the applicant is likely to receive more hands on practical training than in a school. **Vote 10-9.**

**HB 606,** exempting services provided without renumeration from license requirements for barbering, cosmetology, and esthetics. **MAJORITY: OUGHT TO PASS. MINORITY: INEXPEDIENT TO LEGISLATE.**
Rep. Mark Alliegro for the **Majority** of Executive Departments and Administration. Under current New Hampshire law, it is illegal to cut your daughter's hair or file your grandmother's fingernails. This bill remedies such regulatory overreach by stipulating that a person may provide barbering, cosmetology, or esthetics services without payment and not be in violation of the law. This bill does not affect licensure requirements for paid, professional service providers. Opponents warned that this change would put the public at risk from the unauthorized use of dangerous chemicals such as shampoo and hair coloring, or transmissible disease, but no evidence in support of this claim was presented during hearings or deliberation. It was also argued that selective law enforcement renders this bill unnecessary. It is not government's role to interfere with the highly personal acts mentioned in this summary. The adoption of HB 606 is a small step in restoring the inalienable right of caring for one another. **Vote 10-8.**
Rep. Jeffrey Goley for the **Minority** of Executive Departments and Administration. Supporters of this bill believe that under the current RSA a parent who cuts a child's hair or someone who helps a neighbor color their hair is breaking the law. But there is no documented evidence that this type of enforcement has ever been practiced. The bill as written would allow anyone to practice barbering, cosmetology, or esthetics provided they are is no remuneration. Testimony from professionals was that an untrained person doing these procedures may not be as conscientious about necessary sanitation or not trained in the possible dangers of chemicals involved and could subject the recipient to severe chemical burns or injuries. The minority believes this bill should be voted ITL as it is trying to solve a problem that does not exist.