# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW HAMPSHIRE

_____
                                            )
LOCAL, 8027 AFT-NEW HAMPSHIRE,              )
AFL-CIO, et al.,                            )
                                            )
          Plaintiffs,                       )
                                            )
     v.                                     )     Case No. 1:21-cv-1077-PB
                                            )
FRANK EDELBLUT, in his official             )
capacity only as the Commissioner           )
of the New Hampshire Department              )
of Education, et al.,                       )
                                            )
          Defendants.                       )
_____)

## MEMORANDUM OF LAW IN SUPPORT OF MOTIONS TO DISMISS

### Introduction

The primary questions before this Court are whether recently enacted antidiscrimination provisions violate, on their face, the Due Process Clause of the Fourteenth Amendment and the Free Speech Clause of the First Amendment. During the 2021 legislative session, after months of debate, negotiation, and amendments, the state legislature passed and Governor Christopher Sununu signed into law new antidiscrimination provisions that prohibit public employees and government programs, including primary and secondary public education programs, from teaching, advocating, or advancing the following:

> (a) That one's age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion or national origin is inherently superior to people of another age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin;
>
> (b) That an individual, by virtue of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical

disability, religion, or national origin, is inherently racist, sexist, or oppressive, whether consciously or unconsciously;

(c) That an individual should be discriminated against or receive adverse treatment solely or partly because of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin; or

(d) That people of one age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin cannot and should not attempt to treat others without regard to age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin.

N.H. Rev. Stat. Ann. § ("RSA") 193:40; *see also* RSA 354-A:31; RSA 354-A:32; RSA 354-A:33.

In this consolidated action, two groups of plaintiffs seek a declaration that the new antidiscrimination provisions are unconstitutional. They also seek to permanently enjoin the enforcement of those provisions. The first group of plaintiffs consists of Local 8027 AFT-New Hampshire, AFL-CIO and four educators (the "AFT plaintiffs"). The second group of plaintiffs consists of the National Education Association-New Hampshire, the Director of Diversity, Equity, Inclusion, and Justice for the Exeter Region Cooperative School District, and the Chief Equity Officer for the Manchester School District (the "NEA-NH plaintiffs").

All of the plaintiffs allege that the new antidiscrimination provisions, on their face, violate the Due Process Clause of the Fourteenth Amendment because they are unconstitutionally vague. ECF Doc. No. 30 ¶¶ 102–111; ECF Doc. No. 1 ¶¶ 154–159. The AFT plaintiffs also allege that: (1) the conflict between existing New Hampshire law and the new antidiscrimination provisions renders those new provisions unconstitutionally vague, ECF Doc. No. 30 ¶¶ 112–121; and (2) the new antidiscrimination provisions constitute a general violation of the AFT plaintiffs' constitutional rights protected by the First Amendment, ECF Doc. No. 30

¶¶ 122–132. The AFT plaintiffs further argue that the new antidiscrimination provisions violate state law. *See* ECF Doc. No. 30 ¶¶ 112–139.

All of the plaintiffs have asked this Court to declare that the new antidiscrimination provisions are unconstitutional and enjoin their enforcement. ECF Doc. No. 30, p. 51 (Prayers 1 and 2); ECF Doc. No. 1, p. 61. (Prayers A and B). The AFT plaintiffs appear to recognize, however, that a constitutional construction of the new antidiscrimination provisions exists, grounded in Attorney General John Formella's interpretation of the statutes. ECF Doc. No. 30 ¶¶ 6, 47, 49–64, 100, & p. 51. They therefore alternatively ask that this Court construe the new antidiscrimination provisions narrowly. ECF Doc. No. 30, p. 51 (Prayer 3).

For the reasons set forth below, all of the plaintiffs' claims fail as a matter of law. To the extent the AFT plaintiffs' claims arise under state law, they are barred by the Eleventh Amendment. The AFT plaintiffs have likewise failed to state a viable First Amendment claim, as the curricular and pedagogical speech upon which they premise that claim is not constitutionally protected. The plaintiffs' vagueness claims fail because the new antidiscrimination provisions not vague on their face. The language of the provisions, particularly when coupled with guidance issued by the Department of Education, the Commission for Human Rights, and the Department of Justice, demonstrates that the new antidiscrimination provisions provide a discernible, objective standard for what conduct is proscribed. The robust process available under the provisions further protects against arbitrary and discriminatory enforcement. The plaintiffs have accordingly failed to state a viable claim for relief, and their complaints should be dismissed in their entirety.

**Standard of Review**

When analyzing a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court assumes the truth of the plaintiffs' well-pleaded facts and draws all reasonable inferences in the plaintiffs' favor. *Barchock v. CVS Health Corp.*, 886 F.3d 43, 48 (1st Cir. 2018). "Well-pleaded facts must be non-conclusory and non-speculative." *Id.* (citation and quotation marks omitted). Thus, the Court need not assume the truth of a plaintiff's "legal conclusions and characterizations." *In re Ariad Pharm., Inc. Sec. Litig.*, 842 F.3d 744, 750 (1st Cir. 2016) (same omissions). Nor need it credit "bald conclusions, unrelieved rhetoric, and pejorative epithets." *Vigueira v. First Bank*, 140 F.3d 12, 15 (1st Cir. 1998). Dismissal is appropriate if the well-pleaded facts, when assumed true, fail to state a claim for relief. *Barchock*, 886 F.3d at 48. Put differently, "[i]f the factual allegations in the complaint are too meager, vague, or conclusory to `remove the possibility of relief from the realm of mere conjecture, the complaint is open to dismissal." *Id.* (same omissions). This same standard applies when, as here, a defendant also challenges a court's subject-matter jurisdiction under Rule 12(b)(1) on the basis of pleading sufficiency. *See Gordo-Gonzalez v. United States*, 873 F.3d 32, 35 (1st Cir. 2017).

**Background**

**A.    House Bill 544 in the New Hampshire House of Representatives.**

On January 6, 2021, the New Hampshire House of Representatives introduced House Bill 544, "An Act relative to the propagation of divisive concepts," and referred the bill to the Executive Departments and Administration committee. *See* Docket of HB544, General Court of New Hampshire – Bill Status System (attached as **Attachment A**).[1] As introduced, the bill added

---

[1] A court ruling on a motion to dismiss may consider "documents the authenticity of which are not disputed by the parties"; "official public records"; "documents central to the plaintiffs' claims"; and "documents sufficiently referred to in the complaint." *Ironshore Specialty Ins. Co. v. United States*, 871 F.3d 131, 135 (1st Cir. 2017) (citation and quotation marks omitted).

a chapter prohibiting the propagation of "divisive concepts." *See* HB 544 – As Introduced, 2021

Session, 21-0732 (attached as **Attachment B**). The original text of the bill defined "divisive

concept" to include the following concepts:

a)   One race or sex is inherently superior to another race or sex;

b)   The state of New Hampshire or the United States is fundamentally racist or
sexist;

c)   An individual, by virtue of his or her race or sex, is inherently racist, sexist, or
oppressive, whether consciously or unconsciously;

d)   An individual should be discriminated against or receive adverse treatment
solely or partly because of his or her race or sex;

e)   Members of one race or sex cannot and should not attempt to treat others
without respect to race or sex;

f)   An individual's moral character is necessarily determined by his or her race or
sex;

g)   An individual, by virtue of his or her race or sex, bears responsibility for
actions committed in the past by other members of the same race or sex;

h)   Any individual should feel discomfort, guilt, anguish, or any other form of
psychological distress on account of his or her race or sex; or

i)   Meritocracy or traits such as a hard work ethic are racist or sexist, or were
created by a particular race to oppress another race.

j)   The term "divisive concepts" includes any other form of race or sex
stereotyping or any other form of race or sex scapegoating.

**Attachment B** at 1–2.

Among other things, House Bill 544 proposed prohibiting the following: (1) the State of

New Hampshire from "teach[ing], instruct[ing], or train[ing] any employee, contractor, staff

member, student, or any individual or group, to adopt or believe any of the divisive concepts

defined" in the new statutes; (2) any contractor with the State of New Hampshire from "us[ing]

any workplace training that inculcates in its employees any form of race or sex stereotyping or

any form of race or sex scapegoating" including training on the divisive concepts; and (3) any

- 5 -

grantee of the State of New Hampshire from "us[ing] state funds or assets to promote any of the divisive concepts." *See* **Attachment B** at 2–3.

The House of Representatives' Executive Departments and Administration committee heard testimony in support of and in opposition to House Bill 544 across two days of hearings. *See* **Attachment A**. On March 24, 2021, the committee voted with ten in favor and nine opposed to recommend that House Bill 544 pass with an amendment that clarified the definition of contractor and what it means to be a contractor or grantee. *See* **Attachment A**; *see also* Amendment to HB 544, March 3, 2021, 2021-0611h (attached as **Attachment C**).

At the House of Representatives' April 8, 2021 session, that body voted to table House Bill 544 with 347 members voting to table and eighteen opposing the motion to table. *See* **Attachment A**. Before the motion to table occurred, however, the House of Representative's Finance committee voted to amend House Bill 2, the biennial budget's trailer bill, to incorporate, among other things, the text of House Bill 544. *See* Docket of HB2, General Court of New Hampshire – Bill Status System (attached as **Attachment D**). House Bill 2, including the text of House Bill 544, passed through the House of Representatives by a vote of 200 in favor and 181 opposed. **Attachment A** at 2.

**B.** **Removal of House Bill 544's language in the New Hampshire Senate and introduction of new antidiscrimination provisions into House Bill 2.**

House Bill 2, including the language of House Bill 544, was introduced in the New Hampshire Senate on April 1, 2021, and referred to the Senate's Finance committee. **Attachment D** at 3. The Senate Finance committee held hearings on all of House Bill 2, including House Bill 544's language, on May 4, 2021. *Id*. Many testified in opposition to including House Bill 544 in the budget trailer bill, including the New Hampshire affiliate of the American Civil Liberties Union, which expressed many of the same arguments made in both

complaints here. *See* Senate Finance Committee, Minutes, May 4, 2021 Hearing (attached as

**Attachment E**). Thereafter, the Senate Finance committee removed House Bill 544's language

entirely and replaced it with new antidiscrimination provisions. Amendment to HB 2-FN-A-

Local, Senate Finance, May 28, 2021, at 144–147 (attached as **Attachment F**). The new

legislation would prohibit public employees and government programs, including primary and

secondary public education programs, from teaching, advocating, or advancing the following:

> (a) That one's age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion or national origin is inherently superior to people of another age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin;

> (b) That an individual, by virtue of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin, is inherently racist, sexist, or oppressive, whether consciously or unconsciously;

> (c) That an individual should be discriminated against or receive adverse treatment solely or partly because of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin; or

> (d) That people of one age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin cannot and should not attempt to treat others without regard to age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin.

**Attachment F** at 147.

The new legislation abandoned the prohibition of "divisive concepts," ceased to apply to

contractors and grantees, and did not limit the academic freedom of professors and scholars at

public colleges and universities. *See* **Attachment F** at 144–147. The new legislation also

narrowed its proscriptions to permit "sensitivity trainings" grounded in the "inherent humanity

and equality of appall persons and the ideal that all persons are entitled to be treated with

equality, dignity, and respect," to permit "discussing, as part of a larger course of academic

instruction, the historical existence of ideas and subjects identified in this section," and to apply only to public employees performing work in their official capacities. *Id.* at 145.

In addition to removing House Bill 544's broad prohibition on "divisive concepts," in favor of a narrow set of antidiscrimination provisions, House Bill 2 provided for an enforcement system. It permitted those aggrieved by an alleged violation to file a complaint with the New Hampshire Commission for Human Rights or the superior court alleging that the school, school district, or government agency violated the new antidiscrimination provisions. *Id.* at 147. It also empowered the Board of Education to discipline licensees who had violated the new antidiscrimination provisions. *Id.*

On June 3, 2021, the Senate considered the amended version of House Bill 2, including the new antidiscrimination provisions, and voted in favor of passage with fourteen voting in favor of the bill and nine voting in opposition. **Attachment D** at 3–4. Because of the amendments made to House Bill 2 by the Senate, the House of Representatives sought a committee of conference. *Id.* at 4–5 The committee of conference made some changes to House Bill 2, but kept the new antidiscrimination provisions intact. *Id.* at 5. House Bill 2 passed both chambers of the state legislature and, on June 25, 2021, Governor Christopher Sununu signed it into law. *Id.*

## C.     Guidance produced by the Department of Education, Department of Justice, and the Commission for Human Rights.

In part based on concerns expressed by groups like NEA-NH, *see*, *e.g.*, ECF Doc. No. 1-18 at 2–4, the Department of Education, Commission for Human Rights, and Department of Justice (the "enforcing agencies") produced guidance regarding the scope and effect of the new antidiscrimination provisions. The enforcing agencies produced two sets of guidance documents, framed as "frequently asked questions." *See* Frequently Asked Questions: New discriminatory

practice prohibitions applicable to K-12 educational programs, Department of Education, Commission for Human Rights, and Department of Justice (hereinafter "Education FAQs") (attached as **Attachment G**); Frequently Asked Questions: New discriminatory practice prohibitions applicable to public employers and government programs, Department of Education, Commission for Human Rights, and Department of Justice (hereinafter "Employer FAQs") (attached as **Attachment H**). One set of frequently asked questions was designed to address the concerns of educators in K-12 programs and the other was designed to address the concerns of public employers and government programs.

In anticipation of complaints being filed with the Commission for Human Rights at the start of the school year, the Attorney General Formella also issued an opinion in relation to the new antidiscrimination provisions. Attorney General Opinion No. 2021-01, New Hampshire Department of Justice, Sept. 7, 2021 ("Attorney General Opinion 2021-01") (attached as **Attachment I**). That opinion elaborated on the guidance that had previously been issued and provided the Commission for Human Rights, which is the state agency charged with investigating and adjudicating complaints under the new antidiscrimination provisions, with a foundation upon which it could build any investigation of alleged violations or rule on any alleged violations. *See generally id.*

Additionally, to avoid the danger of two separate agencies reaching two different conclusions regarding the existence of discrimination, the enforcing agencies developed a protocol for evaluating complaints alleging a violation of the new antidiscrimination provisions by public educators. Consistent with the statutory language, the first step is for the aggrieved individual to either: (1) file a complaint with the Commission for Human Rights and avail themselves of that agency's processes or (2) file a lawsuit in the superior court. RSA 193:40, III.

In either circumstance, the complaint would be filed against the school or school district, not the individual teacher or administrator. *Id.* Only after the final determination, including the exhaustion of all appellate rights by the parties, that a violation of the antidiscrimination laws had occurred could the matter proceed to the second step. RSA 351-A:21, :21-a, :22. At that step, the Department of Education could commence disciplinary proceedings before the Board of Education to determine what sanction, if any, to impose upon the licensee. RSA 193:40, IV.

**D.    Procedural history.**

The AFT-NH plaintiffs initiated this action on December 13, 2021, by filing a 52-page complaint against the Commissioner of Education, the Chair of the Commission for Human Rights, and the Attorney General. ECF Doc. No. 30. The AFT-NH complaint contained the four counts identified above. *See id.* One week later, the NEA-NH plaintiffs filed their own 65-page complaint, naming the same three defendants as the AFT-NH complaint, plus the Executive Director of the Commission for Human Rights and the Commissioner of the Department of Labor. ECF Doc. No. 1. Despite its length, the NEA-NH complaint asserts a single count of vagueness. *See id.*

On January 12, 2022, the plaintiffs filed assented-to motions in both dockets seeking consolidation. *See, e.g.*, ECF Doc. No. 25. The Court held a hearing on the motion on March 8, 2022. During the hearing, the Court granted the motion to consolidate and directed the parties to file a case management order setting deadlines to brief the defendants' anticipated motion to dismiss. The parties filed a joint motion for entry of a case management order on March 21, 2022, which the Court granted in a margin order. Consistent with the deadline in that order, the defendants now move to dismiss both complaints in their entirety.

**Argument**

I.     **The Eleventh Amendment bars the AFT plaintiffs' claims to the extent they assert violations of or seek declarations under state law.**

"As a general matter, states are immune under the Eleventh Amendment from private suit in federal courts, absent their consent." *Wojcik v. Mass State Lottery Comm.*, 300 F.3d 92, 99 (1st Cir. 2002) (citation and quotation marks omitted). "[A] suit against a state official in his or her official capacity is not a suit against the official but rather a suit against the official's office." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989) (citation omitted). "As such, it is no different from a suit against the State itself." *Id.* (citations omitted). Accordingly, "neither a state agency nor a state official acting in his official capacity may be sued for damages in a section 1983 action." *Fantini v. Salem State Coll.*, 557 F.3d 22, 33 (1st Cir. 2009) (citation, quotation marks, and bracketing omitted).

The *Ex parte Young* doctrine provides "an important limit on the state sovereign-immunity principle." *Va. Office for Prot. & Advocacy v. Stewart*, 563 U.S. 247, 254 (2011) (citing *Ex parte Young*, 209 U.S. 123 (1908)). *Ex parte Young* "permits suits to proceed against state officers in their official capacities to compel them to comply with federal law." *Vaquieria Tres Monjitas, Inc. v. Irizarry*, 587 F.3d 464, 478 (1st Cir. 2009) (citation omitted). But the doctrine stands as a "narrow" exception to Eleventh Amendment immunity, *see P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc*., 506 U.S. 139, 146 (1993), "limited to [the] precise situation" where "a federal court commands a state official to do nothing more than refrain from violating federal law," *Va. Office for Prot. & Advocacy*, 563 U.S. at 255 (citations omitted). It

does not allow for claims based on purported violations of state, rather than federal, law. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984).[2]

Three of the AFT plaintiffs' claims appear to arise at least in part under New Hampshire law. In Count II, the AFT plaintiffs contend that the new antidiscrimination provisions conflict with or otherwise violate: Part I, Article 12 and Part II, Article 83 of the New Hampshire Constitution; RSA 193-E:2; RSA 189:11, I(j); and RSA chapter 98-E. ECF Doc. No. 30 ¶¶ 114, 116, 117, 119, 121. The AFT plaintiffs ask this Court to order the defendants to "cease and desist from engaging in the enforcement or any application of" the new antidiscrimination provisions, which they contend "simultaneously unconstitutionally impairs New Hampshire citizens' rights and *violates New Hampshire law*." ECF Doc. No. 30 ¶ 121 (emphasis added). Similarly, the AFT plaintiffs contend in Count III that the new antidiscrimination provisions violate, *inter alia*, "the established rights of Plaintiffs under the Free Speech Clause, Part I, Article 22 of the New Hampshire Constitution[,] and abridge the public policy of New Hampshire concerning the right of public employees to 'publicly discuss and give opinions as an individual on all matters concerning any government entity and its policies' as mandated by RSA Chapter 98-E:1." ECF Doc. No. 30 ¶ 124. They also contend that the challenged provisions are "considered a violation of the educator code of conduct." ECF Doc. No. 30 ¶ 126. In Count IV, the AFT plaintiffs seek a declaration—seemingly under the New Hampshire Constitution, ECF Doc. No. 30 ¶ 135—that the challenged provisions "pose[] an irreconcilable conflict with state educational provisions,

---

[2] Additionally, *Ex parte Young* "permits equitable relief against only those officials who possess authority to enforce a challenged state law." *Whole Woman's Health v. Jackson*, 142 S. Ct. 522, 534, 536 (2021); *see id.* at 540–41 (Thomas, J., concurring in part and dissenting in part); *id.* at 544–45 (Roberts, C.J., concurring in part and dissenting in part); *id.* at 547–50 (Sotomayor, J., concurring in part and dissenting in part); *see also Ex parte Young*, 209 U.S. at 157, 161. At this stage in the proceedings, the defendants do not press an argument that one or more of them lacks authority to enforce the antidiscrimination provisions. If, however, this case survives dismissal, the defendants reserve the right to pursue such an argument.

which must be resolved for the sake of New Hampshire's teachers and students," ECF Doc. No.
30 ¶ 137. They further request a declaration that the new antidiscrimination provisions "are
invalid and void under the Constitutions *of the State of New Hampshire* and the United States, or,
in the alternative," that the challenged provisions "are in conflict with the public policy of the
State of New Hampshire" and "are invalid under Part 2, Article 18-a, of the New Hampshire
Constitution because [they are] an invalid addition to a Budget Bill." ECF Doc. No. 30 ¶ 139(b),
(d), (e).

To the extent these arguments are intended to be freestanding claims or requests for
relief, they are barred under *Pennhurst*. A federal court may not, consistent with *Pennhurst*,
enjoin the enforcement of a state statute because it "violates" another provision of state law.
*Pennhurst*, 465 U.S. at 106. Indeed, the Court observed in *Pennhurst* that "it is difficult to think
of a greater intrusion on state sovereignty than when a federal court instructs state officials on
how to conform their conduct to state law." *Id.* If the AFT plaintiffs believe that the new
antidiscrimination provisions violate the State Constitution or one or more state statutes, or that
there is some other state-law-based reason why those provisions should be invalidated, they are
free to bring an action in state court. Under the *Ex parte Young* doctrine, they may only proceed
in this forum based on purported violations of *federal* law. Counts II, III, and IV of the AFT
plaintiffs' complaint should accordingly be dismissed to the extent they are premised on state-
law theories.

## II.     The AFT plaintiffs have failed to state a First Amendment claim because the new antidiscrimination provisions do not implicate protected speech.

In Count III of their complaint, the AFT plaintiffs bring what purports to be a
freestanding First Amendment claim. They do not identify under what First Amendment theory
they seek relief, and Count III is arguably deficient for this reason alone. *See Bell Atl. Corp. v.*

*Twombly*, 550 U.S. 544, 555 (2007) (observing that a complaint should "give the defendant fair notice of what the claim is and the grounds upon which it rests" (citation, quotation marks, and ellipsis omitted)). Ultimately, however, Count III fails for a more fundamental reason: the AFT plaintiffs do not identify any protected speech implicated by the new antidiscrimination provisions.

In *Garcetti v. Ceballos*, the Supreme Court held that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." 547 U.S. 410, 421 (2006). In reaching this holding, the Court observed that "[r]estricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen." *Id*. at 421–22. Rather, such speech "simply reflects the exercise of employer control over what the employer itself has commissioned or created" because "[w]hen [the employee] went to work and performed the tasks [the employee] was paid to perform, [the employee] acted as a government employee." *Id*. "The fact that [the employee's] duties sometimes require[] [the employee] to speak or write does not mean [the employee's] supervisors were prohibited from evaluating [the employee's] performance." *Id*.

The threshold question under *Garcetti* is whether the speech at issue is "made pursuant to the employee's official duties." *Id.* at 413. If the answer is yes, then the speech is not protected by the First Amendment. *See id.* at 421. The First Circuit has adopted a "two-step, context-specific inquiry" to assist in making this determination. *Decotiis v. Whittemore*, 635 F.3d 22, 31 (1st Cir. 2011) (quotation omitted). "First, a court must ask, 'what are the employee's official responsibilities?'" *Id.* In resolving this question, "the proper inquiry is practical rather than

- 14 -

formal, focusing on the duties an employee is actually expected to perform, and not merely those formally listed in the employee's job description." *Id.* (citation and quotation marks omitted). Second, a court must ask "'was the speech at issue made pursuant to those responsibilities?'" *Id.* The First Circuit has identified "several non-exclusive factors" that "are instructive" when resolving this question: (1) "whether the employee was commissioned or paid to make the speech in question"; (2) "the subject matter of the speech"; (3) "whether the speech was made up the chain of command"; (4) "whether the employee spoke at [the employee's] place of employment"; (5) "whether the speech gave objective observers the impression that the employee represented the employer when [the employee] spoke (lending it 'official significance')"; (6) "whether the employee's speech derived from special knowledge obtained during the course of . . . employment"; and (7) "whether there is a so-called citizen analogue to the speech." *Id.* at 32 (citations omitted).

Applying this two-step inquiry to the allegations in the AFT complaint demonstrates that AFT plaintiffs' First Amendment claim is premised on speech "made pursuant to [their] official duties." *Garcetti*, 547 U.S. at 421. Each of the individual AFT plaintiffs is a public employee. *See* ECF Doc. No. 30 ¶¶ 7, 8, 9, 10, 11. The institutional AFT plaintiff—Local 8027, AFT, AFL-CIO ("Local 8027")—alleges that it represents "approximately 3,400 public school teachers, school support staff, city and town employees, library employees, and higher education faculty," ECF Doc. No. 30 ¶ 12, all of whom are likewise public employees. Local 8027 does not purport to bring a First Amendment claim on its own behalf; rather, the AFT plaintiffs collectively allege that the new antidiscrimination provisions violate the First Amendment by "restricting [their] proper curricular discretion." ECF Doc. No. 30 ¶ 123. They contend that they have been "chilled from exercising their rights by threat of disciplinary action, private suit or loss of their teaching

license for violation of" the new antidiscrimination provisions. ECF Doc. No. 30 ¶ 125. In particular, three of the individual AFT plaintiffs express concerns about what they are allowed to teach under the new antidiscrimination provisions. *See* ECF Doc. No. 30 ¶¶ 7, 8, 9, 39, 40, 42, 56, 96.[3] The AFT complaint makes clear that these concerns are premised on RSA 193:40. ECF Doc. No. 30 ¶¶ 1, 26, 44, 46, 81, 82.

As discussed previously, RSA 193:40 prohibits an "educator"—meaning "a professional employee of any school district whose position requires certification by the state board [of education]," RSA 194:40, V—from "[t]eaching [d]iscrimination" as set forth in RSA 193:40, I(a) through (d). A "[v]iolation of this section by an educator shall be considered a violation of the educator code of conduct that justifies disciplinary sanction by the state board of education." RSA 193:40, IV. It is also under RSA 193:40 that "any person" may "initiate a civil action against a school or school district in superior court for legal or equitable relief, or with the New Hampshire commission for human rights as provided in RSA 354-A:34." RSA 193:40, III. These potential outcomes, the AFT plaintiffs contend, "chill [them] from exercising their rights" to "proper curricular discretion." ECF Doc. No. 30 ¶¶ 123, 125.

If an educator has such rights, they are not protected by the First Amendment. The allegations in the AFT complaint (as well as common sense) dictate that teaching is

---

[3]While the other two individual AFT plaintiffs identify as educators, they appear to base their claims entirely on conclusory assertions in the "parties" section of the complaint about what their children will be taught under the new antidiscrimination provisions. ECF Doc. No. 30 ¶¶ 10, 11. They do not otherwise provide any factual basis for their claims. It is far from clear how a parent's conclusory concerns about the education his or her child might receive confers that parent with standing to maintain a First Amendment claim based on "curricular discretion." ECF Doc. No. 30 ¶ 123. The defendants do not press this issue now, however, because "[i]t is sufficient for the case to proceed if at least one [plaintiff] has standing." *Save Our Heritage, Inc. v. F.A.A.*, 269 F.3d 49, 55 (1st Cir. 2001) (citation omitted). Nevertheless, "standing is 'an indispensable part of the plaintiff's case [and] each element must be supported with the manner and degree of evidence required at successive stages of the litigation.'" *People To End Homelessness, Inc. v. Develco Singles Apartments Assocs.*, 339 F.3d 1, 8 (1st Cir. 2003) (ellipsis omitted) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)). The defendants therefore reserve the right to press standing, as may be appropriate, in the future.

quintessentially one of "the duties [an educator] is actually expected to perform" such that it would constitute an "official responsibilit[y]." *Decotiss*, 635 F.3d at 32. To the extent teaching involves speech, it is speech that an "educator" is "commissioned or paid to make," typically occurring at the educator's "place of employment," and relating to the specific "subject matter" that the educator is authorized to teach. *See id.* Because an educator's curriculum is set by a combination of state statute, *see, e.g.*, RSA 193-E:2-a, Board of Education regulation, *see, e.g.*, N.H. Admin. R. Ed 306.26, 306.27, and the local education unit, *see, e.g.*, N.H. Admin. R. Ed 302.01, 302.02, 303.01, an "objective observer[]" would be hard-pressed to believe that an educator's speech in the classroom is made the capacity as a "citizen" rather than "pursuant to their official duties," *Decotiss*, 635 F.3d at 32. It is also apparent that an educator's speech in the classroom—which is often subject-matter specific—can derive from "special knowledge obtained during the course of [an educator's] employment," *Decotiss*, 634 F.3d at 32. And there is no clear "citizen analog" to the act of teaching in a public-school classroom, *see id.*; indeed, educators have to be certified by the State Board of Education and hired by their schools to perform their official roles, *see* RSA 189:39. In short, nearly all of the factors set forth in *Decotiis* weigh in favor of the conclusion that an educator's curricular choices are "made pursuant to [that educator's] official duties." *Garcetti*, 547 U.S. at 413, 421. Those choices are not entitled to First Amendment protection. *Id.* at 421.

This conclusion finds significant support in the decisions of several courts of appeals. For instance, in *Evans-Marshall v. Board of Education of Tipp City Exempted Village School District*, the Sixth Circuit held that "the First Amendment does not protect primary and second school teachers' in-class curricular speech[.]" 624 F.3d 332, 342 (6th Cir. 2010). In reaching this holding, the court observed that, "[a]s with any other individual in the community, [teachers

have] no more free-speech right to dictate the school's curriculum than [they have] to obtain a platform—a teaching position—in the first instance for communicating [their] preferred list of books and teaching methods." *Id*. at 340. For this reason, the court observed, "no relevant analogue exists between [a teacher's] in-class curricular speech and speech by private citizens." *Id.* at 340–41 (citation, quotation marks, and bracketing omitted). The court further recognized that, under state law, curriculum-related decisions are prescribed by elected officials, which provides a degree of public accountability with regard to those decisions. *Id.* at 341. The court noted that teachers may speak or write routinely during the course of their work but that fact alone does not make them "sovereigns unto themselves" when it comes to making curriculum-related decisions for their classrooms. *Id*. (quotation and brackets omitted). The court thus concluded that in light of *Garcetti*, the First Amendment does not "insulate" teachers from employer discipline, "even discipline prompted by [the teacher's] curricular and pedagogical choices." *Id*.

Similarly, in *Mayer v. Monroe County Community School Corporation*, the Seventh Circuit held that "the first amendment does not entitle primary and secondary teachers, when conducting the education of captive audiences, to cover topics, or advocate viewpoints, that depart from the curriculum adopted by the school system." 474 F.3d 477, 480 (7th Cir. 2007). The Seventh Circuit emphasized that a case involving a teacher's curricular choices is "easier [to resolve] than *Garcetti*" because "teachers hire out their own speech and must provide the service for which employers are willing to pay." *Id.* at 479. While the court acknowledged that "[m]ajority rule about what subjects and viewpoints will be expressed in the classroom has the potential to turn into indoctrination," it observed that "if indoctrination is likely, the power should be reposed in someone the people can vote out of office, rather than tenured teachers." *Id.*

at 479–80. The court noted that the teacher was permitted under the school's policy to "draw[]
out arguments from all perspectives, as long as she kept her opinion to herself." *Id.* at 480. The
court emphasized, however, that "[t]he Constitution does not entitle teachers to present personal
views to captive audiences against the instructions of elected officials." *Id.*

 As the Sixth Circuit observed in *Evans-Marshall*, several other circuits have applied pre-
*Garcetti* precedents to conclude that "[a] teacher's curricular and pedagogical choices are
categorically unprotected" by the First Amendment. 625 F.3d at 342; *see id.* at 642–43 (citing
*Panse v. Eastwood*, 303 F. App'x 933, 935 (2d Cir. 2008); *Lee v. York County Sch. Div.*, 484
F.3d 687, 694 n.11, 695, 697 (4th Cir. 2007); *Edwards v. Cal. Univ. of Pa.*, 156 F.3d 488, 491
(3d Cir. 1998) (Alito, J.)). Several circuits have likewise concluded that *Garcetti* applies to
elementary- and secondary-school employees in other contexts, including: to a school teacher's
speech about curriculum, *see Brammer-Hoetler v. Twin Peaks Charter Acad.*, 492 F.3d 1192,
1204 (10th Cir. 2007); to the filing of union grievances related to student discipline, *see
Weintraub v. Board of Educ. Of City School Dist. of New York*, 593 F.3d 196, 201–02 (2d Cir.
2010); to writing memoranda requesting information about the use of funds, *see Williams v.
Dallas Indep. Sch. Dist.*, 480 F.3d 689, 693–94 (5th Cir. 2007); and to placing signs or banners
in the classroom or on school bulletin boards, *see*, *e.g.*, *Johnson v. Poway Unified School Dist.*
658 F.3d 954, 970 (9th Cir. 2011); *Lee v. York County School Div.*, 484 F.3d 687, 698-99 (4th
Cir. 2007). As the Sixth Circuit noted, "[t]he common thread through all of these cases is that,
when it comes to in-class curricular speech at the primary and secondary school level, no other
court of appeals has held that such speech is protected by the First Amendment." *Evans-
Marshall* 624 F.3d at 343. The defendants have not identified any decision post-dating *Evans-
Marshall* that reaches a contrary conclusion.

In sum, the AFT plaintiffs' First Amendment claim is premised upon speech that is not entitled to First Amendment protection. Count III of the AFT complaint accordingly fails regardless of what First Amendment theory it is brought under. The Court should therefore dismiss Count III for failure to state a claim.

**III.     The plaintiffs' vagueness claims fail as a matter of law because the new antidiscrimination provisions set forth a discernible standard of conduct and protect against arbitrary or discriminatory enforcement.**

Both sets of plaintiffs contend that the new antidiscrimination provisions are void for vagueness. Because the plaintiffs contend their vagueness claims are "virtually identical," ECF Doc. No. 25 ¶ 4, the defendants address them together. The defendants further address these claims as facial vagueness challenges. While the NEA-NH complaint contains four stray references to an "as applied" vagueness claim, ECF Doc. No. 1 ¶¶ 13, 156, 158, Prayer B, the defendants do not take this to be a standalone claim. These references appear to have been added to the complaint as an afterthought, and the NEA-NH plaintiffs make no attempt to explain how the new antidiscrimination provisions have been applied to them in an unconstitutional manner. See *Twombly*, 550 U.S. at 555 ("[A] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions." (cleaned up)). "[B]ecause this is a pre-enforcement challenge, [an as-applied] claim would indeed be inappropriate." *Worman v. Healey*, 293 F. Supp. 3d 251, 268 (D. Mass. 2018), *aff'd* 922 F.3d 26 (1st Cir. 2019).

Moreover, the Supreme Court has made clear that when determining whether a claim is facial or as applied, "[t]he label is not what matters." *John Doe No. 1 v. Reed*, 561 U.S. 186, 194 (2010). Rather, the question is whether the "plaintiffs' claim and the relief that would follow . . . reach beyond the particular circumstances of these plaintiffs." *Id.* (citation omitted). If they do, then the plaintiffs must "satisfy [the] standards for a facial challenge to the extent of that reach."

*Id.* Here, the plaintiffs seek "injunctive relief restraining Defendants, their employees, agents, and successors in office from enforcing" the new antidiscrimination provisions. ECF Doc. No. 1, Prayer A. This is quintessential facial relief. *See John Doe No. 1*, 561 U.S. at 194 (noting that "an injunction barring the secretary of state from making referendum petitions available to the public" was a request for facial relief (quotation marks omitted)).[4]

### A.     The vagueness standard.

"Vague laws offend several important values." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). "First, because [courts] assume that man is free to steer between lawful and unlawful conduct, [they] insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." *Id*. "Vague laws may trap the innocent by not providing fair warning." *Id*. "Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them." *Id*. "A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application." *Id*. at 108–09. "To comport with the strictures of due process, a law must define an offense [1] with sufficient definiteness that ordinary people can understand what conduct is prohibited and [2] in a manner that does not encourage arbitrary and discriminatory enforcement." *URI Student Senate v. Town of Narragansett*, 631 F.3d 1, 13–14 (1st Cir. 2011) (quotation omitted).

Because the plaintiffs bring facial vagueness challenges, they must "demonstrate that the [new antidiscrimination provisions are] impermissibly vague in *all* of [their] applications."

---

[4] The defendants also take at face value the plaintiffs' representation that consolidation was appropriate in this case because both vagueness claims are "virtually identical." ECF Doc. No. 25 ¶ 4. Notably, the AFT plaintiffs do not purport to bring their vagueness claim as an as-applied challenge. *See generally* ECF Doc. No. 30.

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 497 (1982)

(emphasis added). To prevail, the plaintiffs must show "that the enactment is vague 'not in the

sense that it requires a person to conform his conduct to an imprecise by comprehensible

normative standard, but rather in the sense that no standard of conduct is specified at all.'" *Id.* at

495 n.7 (quoting *Coates v. City of Cincinnati*, 402 U.S. 611, 614 (1971)). A unconstitutionally

vague provision "'simply has no core.'" *Id.* (quoting *Smith v. Goguen*, 415 U.S. 566, 578

(1974)). In the context of civil, as opposed to criminal, statutes, the Supreme Court has been

more tolerant of imprecision in statutory language. *See Village of Hoffman*, 455 U.S. at 498–99

("The Court has also expressed greater tolerance of enactments with civil rather than criminal

penalties because the consequences of imprecision are qualitatively less severe.").

　　　"In evaluating a facial challenge to a state law, a federal court must, of course, consider

any limiting construction that a state court or enforcement agency has proffered." *Kolender v.*

*Lawson*, 461 U.S. 352, 354 (1983) (quotation omitted). The reviewing court may also turn to

dictionary definitions to determine the plain meaning of statutory terms and resolve any

ambiguity challenges. *Village of Hoffman Estates*, 455 U.S. at 501. So long as the "language of

proscription . . . 'conveys sufficiently definite warning as to the proscribed conduct when

measured by common understanding and practices,'" the statute is not deficient. *Precious Metals*

*Associates, Inc. v. Commodity Futures Trading Commission*, 620 F.2d 900, 907 (1st Cir. 1980)

(quoting *Jordan v. DeGeorge*, 341 U.S. 223, 231–32 (1951)).

## A.　　The new antidiscrimination provisions provide ample notice of what conduct they prohibit.

　　　The plaintiffs first contend that the new antidiscrimination provisions are vague because

they provide insufficient notice of the conduct they proscribe. Under this type of vagueness

challenge, "[w]hat renders a statute vague is not the possibility that it will sometimes be difficult

to determine whether the incriminating fact it establishes has been proved; but rather the indeterminacy of precisely what that fact is." *United States v. Williams*, 553 U.S. 285, 306 (2008). "[W]ords are rough-hewn tools, not surgically precise instruments. Consequently, some degree of inexactitude is acceptable in statutory language." *URI Student Senate*, 631 F.3d at 14. "The Constitution does not require impossible standards; all that is required is that the language conveys sufficient[l]y definite warning as to the proscribed conduct when measured by common understanding and practices." *Roth v. United States*, 354 U.S. 476, 491 (1957) (quotations and brackets omitted). "[L]ack of precision is not itself offensive to the requirements of due process," *id.*, and "'the fact that a statute requires some interpretation does not perforce render it unconstitutionally vague," *URI Student Senate*, 631 F.3d at 14 (quoting *IMS Health Inc. v. Ayotte*, 550 F.3d 42, 61 (1st Cir. 2008)).

The new antidiscrimination provisions set forth an objectively discernible standard of conduct. RSA 193:40 describes four categories of information that "[n]o pupil in any public school in this state shall be taught, instructed, inculcated or compelled to express belief in or support for[.]" RSA 193:40, I. While this language is worded in the passive voice, the New Hampshire Supreme Court has made clear that, when interpreting a New Hampshire statute, a court must "not consider words and phrases in isolation, but rather within the context of the statute as a whole, which enables [the court] to better discern the legislature's intent and to interpret statutory language in light of the policy or purpose sought to be advanced by the statutory scheme." *Doe v. Comm'r of N.H. Dep't of Health & Hum. Servs.*, 174 N.H. 239, 261 A.3d 968, 974 (2021). RSA 193:40 goes on to provide that "[v]iolation of this section *by an educator* shall be considered a violation of the educator code of conduct that justifies disciplinary sanction by the board of education." RSA 193:40, IV (emphasis added). Read in context, then, it

is clear that RSA 193:40 prohibits an educator from teaching, instructing, or inculcating any public school student, or otherwise compelling any public school student to express belief in, one or more of the proscribed categories of information.

The language of the other challenged provisions supports this reading. "When interpreting two statutes that deal with similar subject matter, [the New Hampshire Supreme Court] construe[s] them so that they do not contradict each other, and so that they will lead to reasonable results and effectuate the legislative purpose of the statutes." *Soraghan v. Mt. Cranmore Ski Resort, Inc.*, 152 N.H. 399, 405 (2005). RSA 354-A:31 provides that "[n]o public employer . . . shall teach, advocate, instruct, or train any employee, student, service recipient, contractor, staff member, inmate, or any other individual or group" the same information prohibited under RSA 193:40, IV. RSA 354-A:32 provides that "[n]o government program shall teach, advocate, or advance any one or more" of those same categories. RSA 354-A:33 provides that "[n]o public employee shall be subject to any adverse employment action, warning, or discipline of any kind for refusing to participate in any training, program, or other activity at which a public employer or government program advocates, trains, teaches, instructs, or compels participants to express belief in, or support for," one or more of the same categories. The use of active voice in each of these provisions confirms that the focus of the new antidiscrimination provisions is on the conduct of the person or entity conveying the information in question, not on the subjective belief of the person receiving it.

This construction finds further support in the guidance the enforcing agencies have issued with respect to the new antidiscrimination provisions. The Education FAQs expressly state that "[t]he mere fact that a lesson may make students, faculty or parents uncomfortable does not mean that the school has violated the [new antidiscrimination provisions]." Education FAQs

(**Attachment G**) at 2. Similarly, the Employer FAQs state that "[t]he mere fact that a training may make participants uncomfortable does not mean that the training has violated New Hampshire's anti-discrimination laws and does not give employees or participants the license to refuse to participate in the training without consequences." Employer FAQs (**Attachment H**) at 2. And Attorney General Opinion 2021-01 states: "It is important to note that although education related to racism, sexism, and other practices or ides that have harmed or continue to harm certain identified groups may make some parents, students, or faculty uncomfortable, that fact alone does not mean that a school has violated RSA 193:40." Attorney General Opinion 2021-01 (**Attachment I**) at 3. These statements further demonstrate that a violation of the new antidiscrimination provisions is determined by the actions of the educator or trainer, not the subjective beliefs of the student or trainee.

The enforcing agencies' guidance documents further resolve any ambiguity with respect to the word "inherent" as it used in the new antidiscrimination provisions. Although the enforcing agencies recognized that the plain meaning of the language in the new antidiscrimination provisions is clear on its own, they provided additional guidance on the term "inherent" because the legislature did not define that term. *See* Attorney General Opinion 2021-01 (**Attachment I**) at 6–7; Education FAQs (**Attachment G**) at 1–2; Employer FAQs (**Attachment H**) at 1–2. In doing so, the enforcing agencies consulted a standard dictionary and concluded that for the purposes of the new antidiscrimination provisions, "inherent" refers to characteristics that are "natural, biological, or innate, as opposed to being apparent accidental, or a characteristic created by extern action or external factors." Attorney General Opinion 2021-01 (**Attachment I**) at 6; *see also* Education FAQs (**Attachment G**) at 1; Employer FAQs (**Attachment H**) at 1. Notably, this understanding of "inherent" is reflected in the fact that RSA

193:40 does not prohibit "discussing, as part of a larger course of academic instruction, the historical existence of ideas and subjects identified in [RSA 193:40, I]." RSA 193:40, II. It is likewise reflected in the fact that RSA 354-A:29 does not "prohibit racial, sexual, religious, or other workplace sensitivity training based on the inherent humanity and equality of all persons and the ideal that all persons are entitled to be treated with equality, dignity, and respect." RSA 354-A:29, II.

The statutory language, FAQs, and Attorney General Opinion 2021-01 make unambiguously clear that the new antidiscrimination provisions *do not prohibit* education and training that: (1) discusses historic or current events; (2) discusses topics that may make people uncomfortable; (3) discusses how historical events or acts have effects that linger into the present day; (4) discusses how psychological development, messaging, or other phenomena may create implicit biases; or (5) discusses any other concepts so long as those concepts promote equality and the equal, respectful, and dignified treatment of all people. Attorney General Opinion 2021-01 (**Attachment I**) at 7–8; Education FAQs (**Attachment G**) at 2; Employer FAQs (**Attachment H**) at 2. The Education FAQs explicitly state:

> Nothing prohibits the teaching of historical subjects including, but not limited to: slavery, treatment of the Native American population, Jim Crow laws, segregation, treatment of women, treatment of LGBTQ+ people, treatment of people with disabilities, treatment of people based on their religion, or the Civil Rights movement. Nor does anything prohibit discussions related to current events including, but not limited to: the Black Lives Matter movement, efforts to promote equality and inclusion, or other contemporary events that impact certain identified groups.

Education FAQs (**Attachment G**) at 2. Attorney General Opinion 2021-01 and the FAQs also explicitly state that nothing prohibits training or education geared towards diversity, equity, equality, and inclusion, including implicit bias training. Attorney General Opinion 2021-01 (**Attachment I**) at 7; Employer FAQs (**Attachment H**) at 2. Attorney General Opinion 2021-01

further recognizes that government programs or schools may create resources to combat racism and that schools may teach about discrimination, its historical existence, and its role in creating disparities among different identified groups. Attorney General Opinion 2021-01 (**Attachment I**) at 7–8.

The plain language of the statutes coupled with the enforcing agencies' combination of general guidance and specific examples provides more than sufficient notice to the public of what does and does not constitute a violation of the new antidiscrimination provisions. *Williams*, 553 U.S. at 306; *Kolender*, 461 U.S. at 358. Under RSA 193:40, an educator may not teach, instruct, or inculcate a public school student, or otherwise compel any public school student to express the belief, that one identified group possesses natural, biological, or innate characteristics (as opposed to apparent or accidental characteristics) that: (1) make them superior or inferior to other identified groups or (2) make one identified group racist, sexist, or oppressive. RSA 193:40 further prohibits an educator from teaching, instructing, or inculcating a public school student, or otherwise compelling a public school student to express the belief, that any identified group can or should be treated unequally to any other identified group or that one identified group should be discriminated against or treated adversely. RSA 354-A:31 and :32 place similar prohibitions on public employers and government programs. These are "comprehensible normative standard[s]," *Village of Hoffman Estates*, 455 U.S. at 495 n.7, that "convey[] sufficient[l]y definite warning as to the proscribed conduct when measured by common understanding and practices," *Roth*, 354 U.S. at 491. In short, they are not vague.

The plaintiffs nonetheless profess confusion in their pleadings about whether the new antidiscrimination provisions prohibit various types of conduct. The AFT plaintiffs wonder whether a teacher can discuss subjects like affirmative action, New Hampshire's mandatory

retirement age for judges, the Americans with Disabilities Act, the Equal Rights Amendment and pay disparities, and how midnight voting in Crawford Notch fits within the larger historical narrative of voting rights. *See* ECF Doc. No. 30 ¶ 36. The AFT complaint further identifies a teacher who purports not to know whether the new antidiscrimination provisions prohibit teaching about the Rohingya and Uighur genocides, the Holocaust, the Black Lives Matter movement and "its connection to the past," and issues such as affirmative action, the Voting Rights Act, and the Equal Rights Amendment. *Id.* ¶¶ 39–40. The NEA-NH plaintiffs suggest they have received concerns from a teacher who "second guesses" responding to incidents of racism and bullying against Black and LGBTQ+ students, ECF Doc. No. 1 ¶ 18; an administrator who avoids using terms such as "anti-racist" or "anti-bias" during trainings with staff, *id.* ¶ 24; a teacher who will no longer allow students to "pick their own topics for research papers," *id.* ¶ 34; a teacher who abandoned a plan to ensure that "more experiences of Black, Indigenous, and other people of color were represented in their American history units and related materials," *id.* ¶ 34; and a teacher who now teaches world history "in a vacuum" rather than applying the material to the experiences and interests of the students "to limit the analogies students may draw to current events," *id.* The NEA-NH plaintiffs also express concerns about whether teachers or schools may continue to teach certain books. *Id.* ¶¶ 19, 34.

The statutory language, the FAQs, and Attorney General Opinion 2021-01 provide ample guidance with respect to these questions. RSA 193:40, II provides that "[n]othing in this section shall be construed to prohibit discussing, as part of a larger course of academic instruction, the historical existence of ideas and subjects identified in [RSA 193:40, I]." RSA 354-A:29, II provides that "[n]othing in this subdivision shall be construe to prohibit racial, sexual, religious, or other workplace sensitivity training based on the inherent humanity and equality of all persons

and the ideal that all persons are entitled to be treated with equality, dignity, and respect." The Education FAQs provide:

> Nothing [in the new antidiscrimination provisions] prohibits the teaching of historical subjects including, but not limited to, slavery, treatment of the Native American population, Jim Crow laws, segregation, treatment of women, treatment of LGBTQ+ people, treatment of people with disabilities, treatment of people based on their religion, or the Civil Rights movement. Nor does anything prohibit discussions related to current events including, but not limited to: the Black Lives Matter movement, efforts to promote equality and inclusion, or other contemporary events that impact identified groups.

Education FAQs (**Attachment G**) at 2. The Education FAQs further provide that "[n]othing prohibits schools from teaching about discrimination, including the historical existence of these ideas." *Id.*

Likewise, Attorney General Opinion 2021-01 reiterates that the new antidiscrimination provisions allow for "sensitivity training" that "promote[s] concepts of equality and the equal, respectful, and dignified treatment of all persons—particularly as they relate to the interactions of members of those identified groups with public employers and government programs." Attorney General Opinion 2021-01 (**Attachment I**) at 7. These trainings, the opinion makes clear, may include "implicit bias training" that "recognizes that biases develop over time through such means as personal experiences, messaging people may receive from the media, and other sources," may provide "Anti-Racist Resources," and may "include information designed to promote a better understanding of racism and how to combat racism." *Id.* The opinion further makes clear that the new antidiscrimination provisions do not prohibit schools from "(1) teaching about discrimination or how discrimination has existed throughout history" or "the role that discrimination may play in creating disparities among different identified groups," or "(2) creating web-based resources designed to promote a better understanding of racism, sexism, or other forms of oppression." *Id.*

Given the statutory language and the agency guidance, it is hard to conceive how the plaintiffs still harbor the confusion they profess in their pleadings. Indeed, many of their questions have been *directly* answered. For those that are not directly addressed, the plaintiffs (and, more generally, the public) have been provided a "sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices." *Precious Metals Associates, Inc.*, 620 F.2d 907 (quoting *Jordan*, 341 U.S. 231–32). Again, "[w]hat renders a statute vague is not the possibility it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved; but rather the indeterminacy of what precisely that fact is." *Williams*, 553 U.S. at 306. Even if the plaintiffs think some of their examples present close cases—a point the defendants would not concede—it is a "basic mistake" to conclude "that the mere fact that close cases can be envisioned renders a statute vague." *Id.* at 305. As the Second Circuit has observed, when a statute is "sufficiently clear to satisfy the Due Process Clause, [the] inability to supply precise answers regarding its hypothetical application is insufficient to render that [statute] unconstitutionally vague." *Keepers, Inc. v. City of Milford*, 807 F.3d 24, 38 (2d Cir. 2015).

The plaintiffs' contention that the new antidiscrimination provisions are vague insofar as they conflict with other state statutes and regulations is similarly misplaced. In preparing their guidance, the enforcing agencies recognized that they must endeavor to construe and enforce the statutes such that the new antidiscrimination provisions exist in harmony with existing statutes regarding mandatory curriculum in New Hampshire public schools, the State's anti-bullying laws, and other relevant state and federal laws. *See Commonwealth of Massachusetts v. Andrus*, 594 F.2d 872, 890 (1st Cir. 1979) ("Common sense dictates that two statutes be read, insofar as possible, in harmony with one another."); *Soraghan*, 152 N.H. at 405 ("When interpreting two

statutes that deal with a similar subject matter, we construe them so that they do not contradict each other, and so that they will lead to reasonable results and effectuate the legislative purpose of the statutes."). The Attorney General's Opinion reflects this well-established canon of construction by explicitly noting that any agency attempting to determine whether challenged conduct violated the new antidiscrimination provisions must construe the new provisions in a manner that avoids creating absurd or unjust results, such as unnecessarily negating the effect of other statutes. *See* Attorney General Opinion 2021-01 (**Attachment I**) at 5 n.3.

While the AFT plaintiffs contend that the new antidiscrimination provisions inhibit teachers from meeting the requirements of RSA 193-E:2, ECF Doc. No. 30 ¶¶ 63-73, both the statutory language, *see, e.g.*, RSA 193:40, II, and the enforcing agencies' guidance, *see* Employer FAQs (**Attachment H**) at 2; Education FAQs (**Attachment G**) at 2; Attorney General Opinion 2021-01 (**Attachment I**) at 3, 5–8, make clear that nothing in those provisions prevents or prohibits providing students with "[k]nowledge of civics and government, economics, geography, history, and Holocaust and genocide education" or, more generally, with an education that enables them "to participate in the democratic process and to make informed choices as responsible citizens." RSA 193-E:2, IV. Similarly, nothing in the statutory language or agency guidance prohibits a school district from providing instruction in "[h]ow intolerance, bigotry, antisemitism, and national, ethnic, racial, or religious hatred and discrimination have evolved in the past, and can evolve, into genocide and mass violence, such as the Holocaust, and how to prevent the evolution of such practices." RSA 189:11, I(j). Consistent with the New Hampshire Supreme Court's established canons of construction, the new antidiscrimination provisions must also be read so as not to prohibit enforcement of the state's anti-bullying laws or the obligation of schools and school districts to prevent discrimination against students. *See* RSA

193:38 (Discrimination in Public Schools); RSA 193-F:4 (Pupil Safety and Violence

Prevention); RSA 354-A:27 (Opportunity for Public Education Without Discrimination a Civil

Rights). The enforcing agencies' guidance likewise reflects that the new antidiscrimination

provisions must be read in a manner consistent with state and federal laws prohibiting

discrimination against disabled individuals. *See, e.g.* Education FAQs (**Attachment G**) at 2.[5]

Nor do the new antidiscrimination provisions conflict with RSA chapter 98-E. That

chapter provides that "a person employed as a public employee in any capacity shall have the full

right to publicly discuss and give opinions as an individual on all matters concerning any

government entity and its policies." RSA 98-E:1. By its plain terms, the protections under RSA

chapter 98-E are limited to when a public employee speaks "as an individual." *Id.* Under New

Hampshire Supreme Court precedent, "the relevant distinction [is] whether the [employee] spoke

as an individual or as a spokesperson for [the government], rather than whether he spoke as a

citizen or as a citizen who happens to be an employee of [the government]." *Appeal of Booker*,

139 N.H. 337, 341 (1995). For the reasons discussed in Section II above, an educator or other

public employee is not speaking "as an individual" when they are teaching in a public school

classroom or providing training on behalf of a government employer. Any restrictions the new

antidiscrimination provisions impose on what a public employee may say therefore do not

conflict with RSA chapter 98-E.

For all of these reasons, the new antidiscrimination provisions provide sufficient notice of

the conduct they proscribe to survive a facial vagueness challenge. The plaintiffs' vagueness

claims therefore fail as a matter of law to the extent they are based on a lack-of-notice theory.

---

[5] This interpretation would also be consistent with the new antidiscrimination provisions' plain language, which contains a section that prohibits teaching or advocating that "an individual should be discriminated against or receive adverse treatment solely or partly because of his or her . . . mental or physical disability." *See*, *e.g.*, RSA 193:40, I(3); RSA 354-A:32, III.

B.    **The new antidiscrimination provisions do not encourage arbitrary or discriminatory enforcement.**

The plaintiffs also contend that the new antidiscrimination provisions are unconstitutionally vague because they encourage arbitrary or discriminatory enforcement. This contention, too, fails as a matter of law. This second type of vagueness challenge arises out of "the requirement that a legislature establish minimal guidelines to govern law enforcement.'" *Kolender*, 461 U.S. at 358 (quoting *Smith v. Goguen*, 415 U.S. 566, 574 (1974)). Unsubstantiated fears that a statutory scheme "might be used to harass individuals with alternative lifestyles and views" are insufficient to support a claim that a statute creates a risk of discriminatory enforcement. *Village of Hoffman*, 455 U.S. at 503. When administrative regulations and processes exist to place checks upon arbitrary enforcement, there is no basis to sustain a complaint of vagueness. *See id.* at 504 (crediting the potential for administrative regulations and checks on the arbitrary enforcement of the law as a basis for rejecting a vagueness challenge).

As an initial matter, the plaintiffs' contention that the new antidiscrimination provisions encourage arbitrary or discriminatory enforcement fails for the same reasons that their lack-of-notice argument does. The statutory language and agency guidance "provide[] specific guidance that would allow individuals and . . . enforcement officials alike to determine" what conduct violates the statutes. *United States v. Zhen Zhou Wu*, 711 F.3d 1, 14 (1st Cir. 2013). For this reason alone, any arbitrary-enforcement-based argument fails.

But that argument also fails because the new antidiscrimination provisions embed multiple layers of adjudicatory review that *protects against* arbitrary and discriminatory enforcement. An individual who seeks to make a complaint under the new antidiscrimination provisions must begin just as any other individual wishing to make a discrimination complaint: with the Commission for Human Rights. RSA 354-A:34. The complaint is lodged against the

school or school district, not the teacher, administrator, or other staff person. RSA 193:40, III.

The complainant must provide a signed, verified complaint to begin the process. RSA 354-A:21,

I(a). After this occurs, one of the commissioners, with the assistance of staff, will investigate the

allegations, encourage the parties to resolve the dispute, and ultimately determine whether

probable cause supports the allegations or not. RSA 354-A:21, II(a). Throughout this stage of the

process, the complaint, the opposing party, and the allegations remain confidential. *Id*.

      If the commissioner finds that probable cause exists, the complaint becomes public and

the parties may proceed to a public hearing before the entire commission or remove the case for

a *de novo* trial in superior court. *Id*. After the matter is adjudicated, there is a right to appeal to

the New Hampshire Supreme Court to redress claims of legal error or other matters that warrant

appellate review. RSA 354:A:22, III. If the commissioner finds that probable cause is lacking,

then the process ends, subject to a deferential, judicial-review process that the complainant may

wish to pursue in the superior court. RSA 354-A:21, II(a). Only after an allegation of

discrimination has been deemed to be supported by probable cause, subjected to an

administrative hearing or civil trial, and, unless an appeal is waived, ruled upon by the New

Hampshire Supreme Court, does the finding of discrimination become final. RSA 354-A:22, III.

This process is identical should a complainant wish to initiate their case in the superior court

rather than the Commission for Humans Rights, save that the complaint would not be subject to

the confidentiality provisions accorded to parties in the Commission for Human Rights. RSA

354-A:21-a, I & II..

      It is only after a finding of discrimination becomes final that the Department of Education

may begin the process of bringing a claim before the Board of Education to determine whether

discipline against the licensed educator is warranted. RSA 193:40, IV. This enforcement

proceeding also brings with it a panoply of procedural safeguards. The process begins with a formal complaint, notice to the educator, an investigation, a formal report, and notification in writing of any proposed discipline. *See* N.H. Admin. R. Ed 511.01. An educator who does not agree with the proposed disciplinary finding is entitled to an adjudicatory hearing. *See* N.H. Admin. R. Ed 511.03. The adjudicatory hearing is a multi-level process with procedural protections akin to a judicial proceeding. *See* N.H. Admin. R. Ed 202–212. An educator is entitled to seek a rehearing of any adverse ruling and then take an appeal directly to the New Hampshire Supreme Court under RSA chapter 541. *See* N.H. Admin. R. Ed 213.02. This process provides further robust protection against arbitrary or discriminatory enforcement of the new antidiscrimination provisions.

In their complaints, the plaintiffs contend that the new antidiscrimination provisions are susceptible of arbitrary or discriminatory enforcement because politically motivated individuals and groups might use those provisions to target or harass educators with whose views they disagree. *See* ECF Doc. No. 30 ¶¶ 35, 47, 57, 108; ECF Doc. No. 1 ¶¶ 81, 116, 137. The Supreme Court has made clear, however, that a vagueness challenge does not turn on whether a law "might be used to harass individuals with alternative lifestyles and views." *Village of Hoffman Estates*, 455 U.S. at 503. A "speculative danger of arbitrary enforcement does not render [a law] void for vagueness." *Id.* The plaintiffs here do not provide any non-speculative basis to conclude that process described above—which involves two separate adjudicatory proceedings, the first of which is not brought against the educator at all—would fail to weed out the types of harassing or spurious complaints they appear to be concerned with.

In short, the plaintiffs cannot demonstrate that the new antidiscrimination provisions are vague because they encourage arbitrary and discriminatory enforcement. They have accordingly also failed to state a viable vagueness claim under such a theory. *Kolender*, 461 U.S. at 358.

**C.   If the Court believes questions of state statutory construction bear on the vagueness inquiry, then it should resolve those questions to avoid any constitutional problem or otherwise certify them to the New Hampshire Supreme Court.**

As previously noted, a federal court is required to "consider any limiting construction that a state court or enforcement agency has proffered" when assessing whether a state statute is facially vague. *Kolender*, 461 U.S. at 354 (quotation omitted). Here, as explained, the statutory language and agency guidance sufficiently demonstrate that the new antidiscrimination provisions are not vague on their face. The complaints should accordingly be dismiss.

If, however, the Court believes that the vagueness inquiry turns on an unresolved question of state law, then it should take one of two courses of action. First, the Court can "make an informed prophecy of what [the New Hampshire Supreme Court] would do in the same situation." *Galvin v. EMC Mort. Corp.*, 27 F. Supp. 3d 224, 227 (D.N.H. 2014). In doing so, the Court should apply the New Hampshire Supreme Court's well-established rule that it "will construe a statute to avoid conflict with constitutional rights wherever reasonably possible." *Doe*, 261 A.3d at 976 (citation and quotation marks omitted). Second, this Court is "permitted to certify questions of law to the New Hampshire Supreme Court when questions of New Hampshire law are determinative of the case, and there is no controlling precedent from the New Hampshire Supreme Court." *Old Republic Ins. Co. v. Stratford Ins. Co.*, 777 F.3d 74, 86 (1st Cir. 2015) (citing N.H. Sup. Ct. R. 34). This course of action is arguably preferable, as it would allow for a definitive construction of New Hampshire law from the State's highest court.

Again, the Court need not take either course of action because there is nothing unconstitutionally vague about the new antidiscrimination provisions. But if the Court has any doubts about vagueness, then it must refrain striking down the new antidiscrimination provisions before conclusively determining that "no construction can save [the provisions] from this claim of unconstitutionality[.]" *Screws v. United States*, 325 U.S. 91, 100 (1945).

## Conclusion

To the extent the AFT plaintiffs bring claims arising under state law, those claims are barred by the Eleventh Amendment. The AFT plaintiffs have likewise failed to state a freestanding First Amendment claim because they have not identified any protected speech implicated by the new antidiscrimination provisions. And both sets of plaintiffs have failed to state viable vagueness claims because the statutory text and the guidance produced by the enforcing agencies confirm that the new antidiscrimination provisions set forth a discernible standard of conduct and do not encourage arbitrary and discriminatory enforcement. For all of these reasons, and those stated above, the plaintiffs' respective complaints should be dismissed in their entirety.

Respectfully submitted,

FRANK EDELBLUT, in his official capacity
as Commissioner of the Department of
Education,

JOHN M. FORMELLA, in his
official capacity only as Attorney General
of the State of New Hampshire,

AHNI MALACHI, in her official capacity as
Executive Director of the Commission for
Human Rights,

CHRISTIAN KIM, in his official capacity as
Chair of the Commission for Human Rights,

   *and*

KENNETH MERRIFIELD, in his official
capacity as Commissioner of the Department of
Labor

By their attorney,

JOHN M. FORMELLA
ATTORNEY GENERAL


Date:  March 25, 2022     */s/ Samuel Garland*
           Samuel R.V. Garland, Bar #266273
           Assistant Attorney General
           Civil Bureau
           New Hampshire Dept. of Justice
           33 Capitol Street
           Concord, NH 03301
           (603) 271-3650
           Samuel.RV.Garland@doj.nh.gov

**Certificate of Service**

I hereby certify that a copy of the foregoing was served on all counsel of recording using the Court's electronic-filing service.

*/s/ Samuel Garland*
Samuel R.V. Garland