

Senate Finance
May 28, 2021
2021-1799s
08/10

Amendment to HB 2-FN-A-LOCAL

1    Amend the bill by replacing all after the enacting clause with the following:

2

3    1  Reimbursement of Sheriff's Offices.  Amend RSA 104:31, X-XI to read as follows:

4        X.  ***The judicial branch shall incorporate remote technology whenever possible to***

5    ***minimize the amount of physical transportation and security time associated with court***

6    ***hearings.***

7        ***XI.***  The [~~state~~] ***judicial branch*** shall reimburse the sheriff's office for court security,

8    within available funds appropriated by the legislature, $80 for each full day and $40 for each half

9    day, plus traveling expenses to attend any official business, for any person employed as a bailiff by

10    the sheriff's office.  For the purpose of this paragraph, a half day shall be defined as a day in which a

11    bailiff works 4 hours or less.  The [~~state~~] ***judicial branch*** shall reimburse the counties, within

12    available funds appropriated by the legislature, for all costs associated with employing court bailiffs,

13    if those costs are the result of job requirements imposed by federal and state governments.

14        [~~XI~~] ***XII***.  The [~~state~~] ***judicial branch*** shall reimburse the sheriff's office for prisoner

15    custody and control, within available funds appropriated by the legislature, $65 for each full day and

16    $35 for each half day, plus traveling expenses to attend any official business, for any person

17    employed as a sheriff for prisoner custody and control.  For the purpose of this paragraph, a half day

18    shall be defined as a day in which a sheriff works 4 hours or less.  The [~~state~~] ***judicial branch*** shall

19    reimburse the counties, within available funds appropriated by the legislature, for all costs

20    associated with employing sheriffs, if those costs are the result of job requirements imposed by

21    federal and state governments.   Billing for reimbursement of costs associated with video

22    arraignments shall not be allowed under this paragraph.  Custody and control of prisoners for the

23    purpose of video arraignments shall be the responsibility of the county in which the video

24    arraignment occurs, and such custody and control may be exercised by county correctional officers.

25    2  State Heating System Savings Account.  Amend RSA 21-I:19-ff to read as follows:

26    21-I:19-ff  State Heating System Savings Account.  There is hereby established the state heating

27    system savings account for the transfer of unexpended state heating system appropriations due to

28    reduced heating system costs resulting from the 26 state buildings served by the Concord Steam

29    project authorized in 2017, 2.  Notwithstanding RSA 21-I:19-e, at the end of each state fiscal year,

30    the commissioner of administrative services shall identify the unexpended appropriations in the

31    accounts and class lines for the 26 state buildings served by the replacement of the Concord Steam

32    facility.  The commissioner shall deposit such sums into the account established by this section.

**Amendment to HB 2-FN-A-LOCAL**
**- Page 2 -**

1    Funds in the state heating system savings account shall be nonlapsing and appropriated to the
2    department of administrative services for the biennium ending June 30, [2019] ***2021,*** and the fiscal
3    year ending [2020] ***June 30, 2022*** and may be used to pay principal and interest on bonds and notes
4    issued to fund the capital project for the heating of state facilities located at the Governor Hugh J.
5    Gallen state office park and state-owned buildings in downtown Concord.

6    3    Divisions of Procurement and Support Services; Planning and Management Functions.
7    Amend RSA 21-I:11,I(c)(4) to read as follows:

8            (4)    Supervising the [activities and functions of the bureau of] planning and
9    management ***functions of*** [under] RSA 21-I:12, II(a).

10   4    New Subparagraph; Graphic Services Fund Established; Department of Administrative
11   Services.    Amend RSA 21-I:12, I by inserting after subparagraph (e) the following new
12   subparagraph:

13           (f)(1)    There is hereby established in the state treasury a graphic services fund, which
14   shall be a revolving fund administered by the department of administrative services.  The fund shall
15   be nonlapsing and continually appropriated to the department of administrative services.  Revenue
16   received by the bureau of graphic services shall be deposited into this fund.

17           (2)    The graphic services fund shall be maintained at such a level as to cover the
18   necessary costs of the administration, management, operations, activities, positions, capital, or other
19   needs of the bureau of graphic services.  The department of administrative services may use any
20   excess amounts in the fund to fund the administration, management, operations, positions,
21   activities, capital, or other needs of the department or any of its divisions, bureaus, units, or
22   subunits.

23   5  Division of Plant and Property; Planning and Management.  Amend RSA 21-I:12, II to read as
24   follows:

25           II.  The division of plant and property shall [include the following internal organizational
26   units and functions]:

27           (a)    [A bureau of planning and management under the supervision of a classified
28   administrator of planning and management who shall be] Be responsible for the following functions
29   ***relative to planning and management***, in accordance with applicable laws:

30           (1)    Recommending assignment of office and office-related space, including rented
31   space, or space under consideration for rental, to the director, who shall report such
32   recommendations to the commissioner.

33           (2)    Preparing and maintaining an inventory of all physical space in real property
34   rented or leased for use by the state.  This inventory shall be made available to the comptroller in
35   order to assist the comptroller to comply with accounting principles.

36           (3)    Planning for any additional office space needs of the state in consultation with
37   the division of public works design and construction.

**Amendment to HB 2-FN-A-LOCAL**
**- Page 3 -**

1           (4)   Planning for any major renovation to state office buildings in consultation with
2 the division of public works design and construction.

3           (5)   Centrally managing all space rented by, or all proposed rentals of space by, state
4 agencies, and providing central administration and management of the processes by which space is
5 rented by state agencies, except as is otherwise provided by law.   Unless otherwise allowed by law,
6 agencies seeking to rent space shall do so only in consultation with the bureau of planning and
7 management.   The central management and administration provided by the bureau shall include
8 assisting agencies in their selection of property, in the formulation of rental documents, in the
9 preparation of notices, in agencies' solicitation of bids or proposals and selection of lessors, in space
10 planning, in office layout, and in such other matters as are necessary for effective central planning
11 and management relative to rented space but shall not include the power to enter into rental
12 agreements on behalf of an agency.

13        (b)   ***Include the following internal organizational units and functions:***

14           ***(1)***   A bureau of general services under the supervision of a classified administrator
15 of general services who shall be responsible for the following functions, in accordance with applicable
16 laws:

17           [(1)] ***(A)***   Providing support services, including but not limited to, mailing and
18 messenger services to state government.

19           [(2)] ***(B)***   Providing for the general maintenance of state-owned buildings and
20 grounds, except as otherwise provided by law.

21        [(c)] ***(2)***   A bureau of court facilities under the supervision of a classified administrator
22 who shall be responsible for the following functions, in accordance with applicable laws:

23           [(1)] ***(A)***   Providing suitable court facilities for the conduct of all court sessions held
24 within each judicial district and county, subject to the availability of appropriated funds, in
25 accordance with RSA 490-B.

26           [(2)] ***(B)***   Providing for the general maintenance of state-owned court buildings and
27 grounds, except as otherwise provided by law.

28        [(d)] ***(C)***   ***Be responsible for*** the department's functions relating to energy management,
29 managed by such personnel as may be assigned by the commissioner.

30        [(e)] ***(D)***   ***Be responsible for*** the department's support of facilities of the department of
31 health and human services managed by such personnel as may be assigned by the commissioner.

32   6   Department of Administrative Services; Payment and Procurement Card Fund.   Amend RSA
33 9-D:3, III to read as follows:

34      III.   All funds accumulated from rebates under RSA 9-D:2, I(a) or (b) shall be deposited in the
35 fund established in paragraph I.   Expenditures from the fund shall be restricted to the following
36 purposes:

Amendment to HB 2-FN-A-LOCAL
- Page 4 -

1    (a)   Paying the necessary costs of administration and management of the credit,
2    payment, or procurement card programs handled by the department of administrative services and
3    maintaining a working capital reserve in an amount, not to exceed $25,000, which is deemed
4    sufficient by the division of procurement and support services to cover the costs of the programs and
5    to pay amounts under [subparagraph] *subparagraphs* (b)(1) *and (2)*.

6    (b)   After deducting the foregoing amounts, making such payments, if any, that the
7    department of administrative services concludes are appropriately payable:

8    (1)   By an entity which is part of the state to any credit, payment, or procurement
9    card issuer under contracts secured by the division of procurement and support services pursuant to
10   RSA 21-I, including but not limited to payments for purchases and payments which must be made in
11   order for the state to obtain available rebates, or to avoid incurring, or to pay, interest, penalties, or
12   other costs imposed on the state by issues of credit, payment, or procurement cards.

13   (2)   [To the state's general fund or any federal, highway, turnpike, or liquor fund, as
14   a share of rebates obtained on credit card contracts under RSA 9-D:2.  The] *To the* department of
15   administrative services [shall pay any remaining] *to address its procurement-related needs or*
16   *expenses.  The department may use* rebate amounts to [the general] fund *its administration,*
17   *management, operations, positions, activities or capital, or other needs, or the needs of any*
18   *of its divisions, bureaus, units or subunits, relating to the procurement of goods or services*.

19   7   New Subparagraph; Graphic Services Fund.  Amend RSA 6:12, I(b) by inserting after
20   subparagraph (364) the following new subparagraph:

21   (365)   Moneys received by the department of administrative services, division of
22   procurement and support services, bureau of graphic services which shall be credited to the graphic
23   services fund established in RSA 21-I: 12, I (f).

24   8   Department of Administrative Services; Consolidation of Human Resources and Payroll
25   Functions.

26   I.   Notwithstanding any law or administrative rule to the contrary, the commissioner of
27   administrative services, with the prior approval of the fiscal committee of the general court and the
28   governor and council, may make such transfers of appropriation items and changes in allocations of
29   funds available for operational purposes to the department of administrative services from any other
30   agency necessary to effectuate the efficient consolidation or deconsolidation of human resources,
31   payroll, and business processing functions within state government.  Such business processing
32   functions shall include:

33   (a)  Accounts receivable;

34   (b)  Accounts payable;

35   (c)  Collection of fines, penalties, fees, restitution, remittances, and other moneys due to
36   the state; and

1    (d)  Such additional finance, accounting, and other functions and transactions that the
2    commissioner of administrative services determines may potentially achieve substantial efficiencies
3    from consolidation.

4    II.  The commissioner of administrative services may establish the number of total personnel
5    required for human resources, payroll, and business processing functions in the executive branch of
6    state government and, with the prior approval of the governor and council, may eliminate
7    unnecessary positions and may transfer positions to or from the department of administrative
8    services to or from any other agency if the commissioner of administrative services concludes that
9    such transfers or eliminations are necessary to effectuate the efficient consolidation or
10   deconsolidation of human resources, payroll, or business processing functions within state
11   government.  Such transfers may, if deemed appropriate by the commissioner of administrative
12   services, include the transfer of all associated books, papers, records, personnel files, and equipment,
13   including, but not limited to, work station and information technology equipment, and may, if
14   deemed appropriate by the commissioner of administrative services, include the transfer of any
15   unexpended appropriations for any of the foregoing, and any unexpended appropriations for salary,
16   payroll, benefits, support costs, or any other costs associated with the transferred personnel.  The
17   department of administrative services may also establish new full-time temporary positions within
18   the department, if the commissioner of administrative services deems it necessary to effectuate the
19   efficient consolidation or deconsolidation of human resources, payroll, or business processing
20   functions.

21   III.  The commissioner of administrative services may locate personnel whose positions have
22   been transferred in such work spaces as the commissioner determines will efficiently effectuate the
23   consolidation or deconsolidation of functions.  Such work spaces may include either space currently
24   owned or rented by the state, or space which may be rented by the commissioner utilizing amounts
25   which may be saved by the state as the result of the consolidation or deconsolidation of functions.

26   IV.  If the commissioner of administrative services consolidates, deconsolidates or, pursuant
27   to 2015, 276:2 or other law, has consolidated or deconsolidated, any human resources, payroll, or
28   business processing function and subsequently determines that such consolidation or deconsolidation
29   is not cost effective or beneficial to the interests of the state, the commissioner may, with the prior
30   approval of the fiscal committee of the general court, deconsolidate or reconsolidate, fully or
31   partially, any human resources, payroll, or business processing function within the executive branch
32   of state government.  As part of a deconsolidation, the commissioner, after consultation with the
33   heads of such executive branch agencies as may be affected, shall determine positions to be
34   transferred to another agency, shall determine positions to be transferred elsewhere within the
35   department of administrative services, or shall determine positions to be eliminated.

36   V.  Any unspent balance remaining of the $250,000 appropriation made by 2011, 224:86 to
37   the department of administrative services for the biennium ending June 30, 2013, for the purpose of

**Amendment to HB 2-FN-A-LOCAL**
**- Page 6 -**

1   selecting and retaining an independent business processing consultant to evaluate and make
2   recommendations relative to the consolidation of business processing functions within state
3   government, shall not lapse until June 30, 2023.  The department of administrative services may use
4   this balance to fund such projects, functions, or activities as the commissioner of administrative
5   services may direct relating to the efficiency of state government, including, but not limited to, the
6   selection and retention of an independent business processing consultant and/or other projects,
7   functions, or activities relating to the consolidation or deconsolidation of human resource, payroll,
8   and business processing functions.

9   9  New Paragraphs; Department of Administrative Services; State Employee Health Plan;
10   Application.  Amend RSA 21-I:30 by inserting after paragraph XVI the following new paragraphs:

11       XVII.  The cost sharing and plan design for unrepresented active state employees who
12   participate in the health plans offered by the state shall be the same as those for individuals covered
13   by the collective bargaining agreement between the state of New Hampshire and the State
14   Employees' Association of New Hampshire, Inc.  Changes to the above plan design cost sharing
15   provisions consistent with RSA 21-I:30, I are permitted with the prior approval of the fiscal
16   committee of the general court.  The cost sharing and plan designs for represented active state
17   employees who participate in the health plans offered by the state shall be in accordance with the
18   provisions of the collective bargaining agreements between the state and the employee organizations
19   representing those employees.

20       XVIII.  Agencies may use funds in existing class 60 budgets to pay any penalties imposed
21   under the employer shared responsibility for health coverage under section 4980H of the Internal
22   Revenue Code.

23   10  All Agencies; Electronic Mail.  Unless restricted by law or administrative rule, upon request
24   of an intended recipient, an agency may provide documents by electronic mailing in lieu of mail.

25   11  Department of Administrative Services; Funding and Staffing Resource Limitations.

26       I.  Due to inadequate funding and staffing resources at the department of administrative
27   services, the commissioner of the department of administrative services may suspend the obligations
28   or requirements under RSA 21-I:7-c as it applies to addressing performance and financial legislative
29   budget assistant audit findings from 2006, 2011, and 2014 regarding management of the employee
30   and retiree health benefit program, including establishing rules and operational policies for the
31   program, for each fiscal year of the biennium ending June 30, 2023.

32       II.  Due to inadequate funding and staffing resources at the department of administrative
33   services, the commissioner of the department of administrative services may suspend the following
34   requirements or obligations of the department for each fiscal year of the biennium ending June 30,
35   2023:

36       (a)  The provisions relating to identification and implementation of energy efficiency
37   projects in compliance with the governor's executive order 2016-03.

**Amendment to HB 2-FN-A-LOCAL**
**- Page 7 -**

(b)  The provisions relating to data analysis and the development of performance metrics for buildings and vehicles to monitor energy and water usage, use of fossil fuels, and greenhouse gas emissions in compliance with governor's executive order 2016-03.

(c)  Rulemaking required by RSA 21-I:14, V, standards for the provision of graphic services which will ensure efficiency and high quality work; RSA 21-I:14, VI, standards governing the purchasing and continuing ownership of graphic services equipment by agencies not exempted by RSA 21-I:12, I(e); RSA 21-I:14, VII, standards governing the allocation and use of state photocopiers by the agencies not exempted by RSA 21-I:12, I(e); RSA 21-I:14, XIII, management of the state employees and retiree group insurance program authorized by RSA 21-I:26 through 36 and the programs established in RSA 21-I:44-a and RSA 21-I:44-b; and RSA 21-I:14, XVI, public works services, including bidding for major projects as described in RSA 21-I:78, as authorized by RSA 21-I:80; RSA 21-I:81, and RSA 21-I:82, bidder qualifications, agency requests for public works services, charges and fees, selection of persons or entities to perform public works projects, public works construction and design, dispute resolution, and such other requirements or procedures relating to public works as are necessary for the division of public works design and construction to properly perform its duties and functions in accordance with applicable law.

12  Repeal.  2005, 291:3, V(c), relative to the memorandum of understanding with the commissioner of the department of health and human services for the purpose of delineating the functions to be assumed by the department of administrative services, is repealed.

13  Appropriation; Department of Administrative Services.  Any remainder of the sum of $1,300,000 appropriated for the fiscal year ending June 30, 2020 to the department of administrative services for the purpose of obtaining scheduling software under 2019, 346:244 shall not lapse until June 30, 2023.  The governor is hereby authorized to draw a warrant for said sum out of any money in the treasury not otherwise appropriated.

14  Retirement System; Medical Benefits.  Amend RSA 100-A:52, III-III-a to read as follows:

III.  In the case of group II members retired from state employment before July 1, 1991, and their beneficiaries who are eligible for coverage under this subdivision and also under the provisions of RSA 21-I:26-36, [the amount payable by] the retirement system *shall pay not less than the amounts provided in paragraph II* on account of such persons *and* shall [be paid] *pay those amounts* over to the state. [and] *Such payments shall be* used to pay for all or part of the medical benefits provided under RSA 21-I:26-36 for such persons, and the balance shall be paid by the state as provided in RSA 21-I:26-36.

III-a.  In the case of group II members retired from state employment on or after July 1, 1991, and their beneficiaries who are eligible for coverage under this subdivision and also under the provisions of RSA 21-I:26-36, [the amount payable by] the retirement system *shall pay not less than the amounts provided in paragraph II* on account of such persons *and* shall [be paid] *pay those amounts* over to the state. [and] *Such payments shall be* used to pay for all or part of the

**Amendment to HB 2-FN-A-LOCAL**
**- Page 8 -**

1   medical benefits provided under RSA 21-I:26-36 for such persons, and the state shall pay its portion

2   as provided in RSA 21-I:26-36.  If the cost of the premium for any retired group II member and

3   spouse, surviving spouse, or any other person entitled to benefits under paragraph I shall exceed the

4   maximum under paragraph II, and the state does not elect to pay the excess cost above the amount

5   to be paid under RSA 21-I:26-36, the excess cost shall be paid by the retiree or qualified surviving

6   spouse and may be deducted from retirement benefits as provided in RSA 100-A:51.  The state may

7   require, as a condition for coverage, that the retiree or surviving spouse apply for deduction of such

8   excess cost from retirement benefits as provided in RSA 100-A:51.

9       15  Retirement System; Medical Benefits.  Amend RSA 100-A:52-b, V and VI to read as follows:

10        V.  As of July 1, 2001, in the case of group I members retired from state employment before

11   July 1, 1991, and their beneficiaries who are eligible for coverage under this subdivision and also

12   under the provisions of RSA 21-I:26-36, [the amount payable by] the retirement system ***shall pay***

13   ***not less than the amounts provided in paragraph III*** on account of such persons ***and*** shall [be

14   paid] ***pay those*** over to the state***.*** [and] ***Such payments shall be*** used to pay for all of part of the

15   medical benefits provided under RSA 21-I:26-36 for such persons, and the balance shall be paid by

16   the state as provided in RSA 21-I:26-36.

17        VI.  As of July 1, 2001, in the case of group I members retired from state employment on or

18   after July 1, 1991, and their beneficiaries who are eligible for coverage under this subdivision and

19   also under the provisions of RSA 21-I:26-36, [the amount payable by] the retirement system ***shall***

20   ***pay not less than the amounts provided in paragraph III*** on account of such persons ***and*** shall

21   [be paid] ***pay those amounts*** over to the state***.*** [and] ***Such payments shall be*** used to pay for all or

22   part of the medical benefits provided under RSA 21-I:26-36 for such persons, and the state shall pay

23   its portion as provided in RSA 21-I:26-36.  If the cost of the premium for any retired group I member

24   and spouse, surviving spouse, or any other person entitled to benefits under paragraph I shall exceed

25   the maximum under paragraph III, and the state does not elect to pay the excess cost above the

26   amount to be paid under RSA 21-I:26-36, the excess cost shall be paid by the retiree or qualified

27   surviving spouse and may be deducted from retirement benefits as provided in RSA 100-A:51.  The

28   state may require, as a condition for coverage, that the retiree or surviving spouse apply for

29   deduction of such excess cost from retirement benefits as provided in RSA 100-A:51.

30       16  Retirement System; Medical Benefits.  Amend RSA 100-A:54, III(c) to read as follows:

31        (c)  The department of administrative services shall provide information as to the total

32   monthly premium cost for each participant to the retirement system for purposes of calculating this

33   deduction.  Deducted amounts, which shall be in addition to and notwithstanding any amounts

34   payable by the retirement system pursuant to RSA 100-A:52, RSA 100-A:52-a, and RSA 100-A:52-b,

35   shall be deposited in the employee and retiree benefit risk management fund.  ***The deductions***

36   ***pursuant to subparagraphs (a) and (b) shall be made prior to any payments made by the***

37   ***retirement system pursuant to RSA 100-A:52, RSA 100-A:52-a and RSA 100-A:52-b.***  In the

**Amendment to HB 2-FN-A-LOCAL**
**- Page 9 -**

1   event the retiree's monthly allowance is insufficient to cover the certified contribution amount, the
2   retirement system shall so notify the department of administrative services, which shall invoice and
3   collect from the retiree and/or each applicable spouse the remaining contribution amount.  Failure to
4   remit payment of the contribution amount in full within 30 days of billing shall be grounds for
5   terminating benefits, effective from the beginning of the billing period.  Reenrollment shall be
6   dependent upon payment of any outstanding contribution or other amounts within 6 months of the
7   termination date.  The department of administrative services shall provide notice of the termination
8   of benefits as provided in RSA 21-I:30, III.

9       17  Judicial Branch; Transfer Among Accounts and Classes.  Notwithstanding any provision of
10  law to the contrary, and subject to approval of the fiscal committee of the general court, for the
11  biennium ending June 30, 2023, the supreme court may transfer funds within and among all
12  accounting units within the judicial branch as the supreme court deems necessary and appropriate
13  to address budget reductions or to respond to changes in federal laws, regulations, or programs, and
14  otherwise as necessary for the efficient management of the judicial branch.  If the supreme court
15  intends to transfer funds which would otherwise meet the transfer requirements as set forth in RSA
16  9:17-d, prior approval of the fiscal committee of the general court shall be required for transfers of
17  $100,000 or more.

18      18  Judicial Branch; Reimbursement of Sheriff's Office for Court Security.  For the biennium
19  ending June 30, 2023, the state shall reimburse the sheriff's office for court security at the rates
20  provided in the collective bargaining agreement applicable to per diem court security officers
21  employed by the judicial branch to attend any official business, for any person employed as a bailiff
22  by the sheriff's office.

23      19  New Section; Sale of Lakes Region Facility.  Amend RSA 10 by inserting after section 10 the
24  following new section:

25      10:11  Sale of Lakes Region Facility.

26          I.  In this section, "lakes region facility" means all land, easements, buildings, structures,
27  and appurtenances owned or controlled by the state of New Hampshire in the city of Laconia
28  formerly known as the Laconia State School.

29          II.  Notwithstanding any other provision of law, the governor, with approval of the executive
30  council, shall have the sole authority to sell, convey, lease, rent, exchange, transfer, abandon, or
31  otherwise dispose of any of the property, whether tangible or intangible, at the lakes region facility
32  on such terms and conditions as the governor and executive council deem appropriate and without
33  regard to any other provision of law affecting or restricting the sale, conveyance, lease, rental,
34  exchange, transfer, abandonment or other disposal of state property.

35      20  Lakeshore Redevelopment Planning Commission; Definitions; Lakes Region Facility.  Amend
36  RSA 10:5, II to read as follows:

II.   In this subdivision, "commission" means the lakeshore redevelopment planning commission, and "lakes region facility" means the former Laconia state school land and buildings and training center property***, excluding the separate parcel identified as Ahern State Park, formerly Governor's State Park, which was transferred to the division of parks and recreation in November 1994 and preserved as a state park in perpetuity pursuant to RSA 216-H***.

21   Commissioner of Health and Human Services; Quarterly Reports.   During the biennium ending June 30, 2023, the commissioner of health and human services shall make quarterly reports to the governor, the speaker of the house of representatives, and the senate president on the status of estimated Medicaid payments in relation to actual costs.   Further contents of such reports shall be as specified by the governor.

22   Department of Health and Human Services; Unfunded Positions; Authorization. Notwithstanding any other provision of law to the contrary, the department of health and human services may fill unfunded positions during the biennium ending June 30, 2023, provided that the total expenditure for such positions shall not exceed the amount appropriated for personal services.

23   Department of Health and Human Services; Bureau of Adult and Elderly Services; Congregate Housing and Services.   Congregate housing provided for under the Medicaid waiver pursuant to RSA 151-E and congregate services provided for in RSA 161-F:37 are suspended for the biennium ending June 30, 2023.

24   Department of Health and Human Services; Foster Grandparent Program.   The reimbursements to the foster grandparent program through the senior volunteer grant program, established in RSA 161-F:40, are hereby suspended for the biennium ending June 30, 2023.

25   Department of Health and Human Services; Social Services Block Grant Cost of Living Adjustment to Income Levels.   Notwithstanding any other provision of law, for the biennium ending June 30, 2023, the department of health and human services shall raise the income eligibility for elderly and adult clients under the social services block grant program each January, by the percentage amount of the cost of living increase in social security benefits on a yearly basis provided such amount is consistent with federal law and regulations relative to the social services block grant income eligibility.

26   County Reimbursement of Funds; Limitations on Payments.   Amend RSA 167:18-a to read as follows:

167:18-a   County Reimbursement of Funds; Limitations on Payments.

I.   These expenditures shall in the first instance be made by the state, but each county shall make monthly payments to the state for the amounts due under this section within 45 days from notice thereof.

(a)   Counties shall reimburse the state for expenditures for recipients for whom such county is liable who are eligible for nursing home care and are receiving services from a licensed

1  nursing home, or in another New Hampshire setting as an alternative to a licensed nursing home

2  placement and are supported under the Medicaid home and community-based care waiver for the

3  elderly and chronically ill, as such waiver may be amended from time to time, to the extent of 100

4  percent of the non-federal share of such expenditures.  ***If at any point the Federal Medical***

5  ***Assistance Percentage increases, the counties' portion of the non-federal share shall be***

6  ***reduced by the amount of the increased federal percentage, if allowable under federal law***

7  ***and subject to any conditions on the funding.***  Expenditures shall not include payments made

8  for skilled care.

9  (b)  Counties shall not be liable for Medicaid recipients in state institutions, the Crotched

10  Mountain Rehabilitation Center, and intermediate care facilities (ICF) approved by the department

11  of health and human services and servicing developmentally impaired persons.

12  II.(a)  The total billings to all counties made pursuant to this section shall not exceed the

13  amounts set forth below for state fiscal years [2020-2021] ***2022-2023***:

14  (1) State fiscal year [2020] ***2022***, [$123,372,750] ***$129,362,411***.

15  (2) State fiscal year [2021] ***2023***, [$126,923,933] ***$131,849,659***.

16  (b)  The caps on total billings for fiscal years after fiscal year 2015 shall be established by

17  the legislature at least on a biennial basis.

18  III.(a)  ***The cap in total billings shall not exceed an annual increase of 2 percent in***

19  ***any year of the biennium.***

20  ***(b)***  The counties shall have an aggregate credit of $5,000,000 against amounts due

21  under this section for each fiscal year beginning July 1, 2008.  The credit shall be allocated as

22  follows:

23  (1)  For fiscal year 2009, $4,000,000 shall be allocated among the counties based upon

24  the proportion each paid for such expenditures in the prior fiscal year, and $1,000,000 shall be

25  allocated among the counties based upon their relative proportions of residents age 65 or older who

26  are Medicaid recipients.

27  (2)  For fiscal year 2010, $2,000,000 shall be allocated among the counties based upon

28  the proportion each paid for such expenditures in the prior fiscal year, and $3,000,000 shall be

29  allocated among the counties based upon their relative proportions of residents age 65 or older who

30  are Medicaid recipients.

31  (3)  For fiscal year 2011 and for each fiscal year thereafter, $5,000,000 shall be

32  allocated among the counties based upon their relative proportions of residents age 65 or older who

33  are Medicaid recipients.

34  ***(4)  For fiscal year 2021, in addition to the $5,000,000 allocated pursuant to***

35  ***subparagraph III(b)(3), a credit of $9,721,305 shall be allocated among the counties based***

36  ***upon their relative proportions of residents aged 65 years of age or older who are Medicaid***

37  ***recipients.***

**Amendment to HB 2-FN-A-LOCAL**
**- Page 12 -**

1       [(b)] *(c)* The credit shall be made available as soon as possible after the start of the fiscal

2 year. The department shall adopt county credit criteria in consultation with the county-state finance

3 commission and in accordance with the provisions of RSA 541-A. The total aggregate obligation of

4 the counties shall be reduced by the amount of the credit in each fiscal year.

5       IV. ***Budgeted general funds shall be applied to the funding of Medicaid long-term***

6 ***services and supports after the allocation of the credit and prior to any county funds.***

7       ***V.*** Notwithstanding the procedures of paragraphs I-III of this section, no county shall be

8 liable for total billings in fiscal year 2009 or fiscal year 2010 in an amount which would be greater

9 than the amount of liability projected for that fiscal year using the methodology for determining

10 county payments in former RSA 167:18-a, 167:18-b, and 167:18-f prior to its repeal together with the

11 amount of liability projected for that fiscal year using the repealed methodology for determining

12 county payments in RSA 169-B, 169-C, and 169-D.

13       [V.] ***VI.***(a) Any shortfall between the state audited Medicaid allowances incurred by the

14 state's county operated nursing homes and amounts otherwise reimbursed by federal 50 percent

15 Medicaid matching funds or other income, shall be certified as a public expenditure and be eligible

16 for additional federal funding match.

17       (b) The department of health and human services shall seek federal Medicaid assistance

18 match for any state audited county nursing home Medicaid expense which is not fully reimbursed

19 through rates. Any revenue realized through such a match shall be paid to the nursing homes which

20 incurred the unreimbursed expense.

21     27  Department of Health and Human Services; Prospective Repeal Regarding the Exemption

22 from Certain Transfer Procedures Extended. Amend 2018, 163:11, IV, as amended by 2019, 346:64

23 to read as follows:

24       IV. Section 10 of this act shall take effect [June 30, 2021] ***June 30, 2023***.

25     28  Effective Date. Section 27 of this act shall take effect June 30, 2021.

26     29  The New Hampshire Granite Advantage Health Care Trust Fund. Amend RSA 126-AA:3,

27 I(e)-(g) to read as follows:

28       (e) Funds received from the assessment under RSA 404-G; [and]

29       (f) ***Revenue from the Medicaid enhancement tax to meet the requirements***

30 ***provided in RSA 167:64; and***

31       ***(g)*** Funds recovered or returnable to the fund that were originally spent on the cost of

32 coverage of the granite advantage health care program.

33     30  New Subparagraph; Emergency Services for Children, Youth and Families Fund. Amend

34 RSA 6:12, I(b) by inserting after subparagraph (364) the following new subparagraph:

35       (365)  Moneys deposited in the emergency services for children, youth and families

36 fund established in RSA 170-G:4-h.

**Amendment to HB 2-FN-A-LOCAL**
**- Page 13 -**

31   New Section; Department of Health and Human Services; Establishing the Emergency Services for Children, Youth, and Families Fund.  Amend RSA 170-G by inserting after section 4-g the following new section:

170-G:4-h  Establishing the Emergency Services for Children, Youth, and Families Fund.  There is hereby established in the state treasury the emergency services for children, youth, and families fund.  The funds shall be used by the department to meet the immediate needs of children and families as required to ensure the department is making reasonable efforts to avoid the removal of children and support reunification.  The use of these funds shall be limited to instances when there are no other supports or services available to meet the immediate need in a timely manner.  The funds may be comprised of public funds, gifts, grants or donations or any other source of funds.  The fund shall be non-lapsing and shall be continually appropriated to the department for purposes funding emergency services administered by the department, or its providers, under RSA 169-B, RSA 169-C, RSA 169-D or under this chapter.

32   Parental Reimbursement; Child Services.  Amend 2020, 26:57, II-III to read as follows:

II.  Sections *12-29,* 30, 32, 33, 35, 44, 51-53 and 55 of this act shall take effect July 1, 2020.

III.  Sections 1-8, [12-29,] and RSA 169-C:12-f, III as inserted by section 54 of this act of shall take effect January 1, 2021.

33   New Hampshire Department of Health and Human Services; Elimination of Parental Reimbursement.  The department of health and human services shall be authorized to motion the court to terminate any court orders for parental reimbursement either for on-going repayment or arrears pursuant to implementation of 2020, 26:12 through 2020, 26:29 in existence as of the effective date of any court order rendered pursuant to this act.

34   Department of Health and Human Services; Program Eligibility; Additional Revenues.  For the biennium ending June 30, 2023, the department of health and human services shall not authorize, without prior consultation with the house health, human services and elderly affairs committee and the senate health and human services committee and the approval of the fiscal committee of the general court and governor and council, any change to program eligibility standards or benefit levels that might be expected to increase or decrease enrollment in the program or increase expenditures from any source of funds; provided, however, that no such prior approval shall be required if a change to a federal program in which the state is participating as of the effective date of this section is required by federal law.

35   Department of Health and Human Services; Change in Federal Match Revenue.  During the biennium ending June 30, 2023 any item submitted to the fiscal committee of the general court which increases a draw on federal funds, as a result of miscalculation of or change in the state's share of a federal match program in excess of $100,000 in an accounting unit, shall include an explanation stating if any general funds have been supplanted, and if so, for what purpose those

**Amendment to HB 2-FN-A-LOCAL**
**- Page 14 -**

1  supplanted general funds will be used, and the amount of supplanted general funds anticipated to
2  lapse.

3  36  Reproductive Health Facilities.  No state funds awarded by the department of health and
4  human services to a reproductive health care facility, as defined in RSA 132:37, I, shall be used to
5  provide abortion services.  This section shall not apply to funding available from the state pursuant
6  to Title XIX of the Social Security Act to the minimum extent necessary to comply with federal
7  conditions for the state's participation in the Medicaid program.

8  37  Title.  Sections 38-39 of this act may be known and cited as the "Fetal Life Protection Act."

9  38  Legislative Findings and Purpose.

10  I.  The general court finds that:

11  (a)  The prohibition of late-term abortion is supported by history and the common law.
12  The Hippocratic Oath as Literary Text:  A Dialogue Between Law and Medicine, 2 Yale J. Health
13  Policy L. & Ethics 299, 308 (discussing the Hippocratic Oath's prohibition on abortion); Digest of
14  Justinian:  Digest 4.48.8.8 (classifying abortion as a form of homicide); 2 Bracton on Laws and
15  Customs of England 341 (S. Thorne trans. 1968) (classifying abortion as a form of homicide
16  "especially if [the fetus] is quickened"); 1 W. Blackstone, Commentaries on the Law of England 125
17  (1773) (stating that the common law has historically prohibited abortion "as soon as an infant is able
18  to stir in the mother's womb.").  The New Hampshire supreme court has observed that "The common
19  law has always been most solicitous for the welfare of the fetus in connection with its inheritance
20  rights as well as protecting it under the criminal law." *Poliquin v. Donald*, 101 N.H. 104, 107 (1957).

21  (b)  The United States Supreme Court, in holding that the United States Constitution
22  protects abortion, also stated that "The pregnant woman cannot be isolated in her privacy.  She
23  carries an embryo and, later, a fetus… The situation therefore is inherently different from marital
24  intimacy [etc.]… it is reasonable and appropriate for a State to decide that at some point in time
25  another interest, that of… [fetal] life, becomes significantly involved.  The woman's privacy is no
26  longer sole and any right of privacy she possesses must be measured accordingly." *Roe v. Wade*, 410
27  U.S. 113, 159 (1973).

28  (c)  The *Roe* Court specifically rejected the view that "the woman's right is absolute and
29  that she is entitled to terminate her pregnancy at whatever time, in whatever way, and for whatever
30  reason she alone chooses." *Roe v. Wade*, 410 U.S. 113, 153 (1973).

31  (d)  The *Roe* Court affirmed that "For the stage subsequent to viability, the State in
32  promoting its interest in the potentiality of human life may, if it chooses, regulate, and even
33  proscribe, abortion except where it is necessary, in appropriate medical judgment, for the
34  preservation of the life or health of the mother." *Roe v. Wade*, 410 U.S. 113, 164-165 (1973).

35  (e)  The United States Supreme Court, in rejecting the trimester framework of *Roe*,
36  reaffirmed "the State's power to restrict abortions after fetal viability, if the law contains exceptions
37  for pregnancies which endanger the woman's life or health" and stated that "the State has legitimate

1  interests from the outset of the pregnancy in protecting… the life of the fetus that may become a
2  child." *Planned Parenthood v. Casey*, 505 U.S. 833, 846 (1992).

3      (f)  Already in 1973, the Supreme Court had observed that "Viability is usually placed at
4  about seven months (28 weeks) but may occur earlier, even at 24 weeks." *Roe v. Wade*, 410 U.S. 113,
5  160 (1973).  Since that time, however, there has been "dramatic improvement in survival for infants
6  born at the border of viability (≤24 weeks)." Barbara Luke and Morton B. Brown, The changing risk
7  of infant mortality by gestation, plurality, and race: 1989-1991 versus 1999-2001, Pediatrics, Dec.
8  2006, 118 (6): 2488-2497.

9      (g)  The Supreme Court has observed that "In some broad sense it might be said that a
10  woman who fails to act before viability has consented to the State's intervention on behalf of the
11  developing child." *Planned Parenthood v. Casey*, 505 U.S. 833, 870 (1992).

12      (h)  New Hampshire has historically seen the fetus as a separate entity from the mother
13  with distinct legal interests. *Bennett v. Hymers*, 101 N.H. 483, 485 (1958) ("We adopt the opinion
14  that the fetus from the time of conception becomes a separate organism and remains so throughout
15  its life."); N.H. Rev. State. Ann § 630:1-a: IV (stating that "the meaning of 'another' shall include a
16  fetus" under specified criminal laws).

17      (i)  "[R]espect for the dignity of human life" is a legitimate state purpose. *Gonzales v.*
18  *Carhart*, 550 U.S. 124, 157 (2007).  The United States Supreme Court has said that "Respect for
19  human life finds an ultimate expression in the bond of love the mother has for her child… While we
20  find no reliable data to measure the phenomenon, it seems unexceptionable to conclude some women
21  come to regret their choice to abort the infant life they once created and sustained." Id. at 159.

22      (j)  In addition, there is substantial medical evidence that a fetus by at least 20 weeks'
23  gestation has the capacity to feel pain during an abortion. K. Anand and P. R. Hickey, Pain and its
24  effects in the human neonate and fetus, N.E.J.M., 1987, 317:1321.

25      II.  Based on the findings in paragraph I, the general court's purposes in promulgating this
26  act are:

27      (a)  Based on the state's interest in protecting fetal life, to prohibit abortions at or after
28  24 weeks gestation, except in cases of a medical emergency.

29      (b)  To define "medical emergency" to encompass "significant health risks," namely those
30  circumstances in which a pregnant woman's life or a major bodily function is threatened. *Gonzales v.*
31  *Carhart*, 550 U.S. 124, 161 (2007).

32    39  New Subdivision; Fetal Life Protection Act.  Amend RSA 329 by inserting after section 42 the
33  following new subdivision:

34                  Fetal Life Protection Act

35    329:43  Definitions.  In this subdivision:

36      I.  "Abortion" means the act of using or prescribing any instrument, medicine, drug, or any
37  other substance, device, or means with the intent to terminate the clinically diagnosable pregnancy

**Amendment to HB 2-FN-A-LOCAL**
**- Page 16 -**

of a woman with knowledge that the termination by those means will with reasonable likelihood cause the death of the fetus. Such use, prescription, or means is not an abortion if done with the intent to:

(a) Save the life or preserve the health of the fetus;

(b) Remove a dead fetus caused by spontaneous abortion; or

(c) Remove an ectopic pregnancy.

II. "Attempt to perform" means an act or omission of a statutorily required act that, under the circumstances as the actor believes them to be, constitutes a substantial step in a course of conduct planned to culminate in the performance or inducement of an abortion.

III. "Conception" means the fusion of a human spermatozoon with a human ovum.

IV. "Gestational age" means the time that has elapsed since the first day of the woman's last menstrual period.

V. "Major bodily function" includes, but is not limited to, functions of the immune system, normal cell growth, and digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions.

VI. "Medical facility" means any public or private hospital, clinic, center, medical school, medical training institution, health care facility, physician's office, infirmary, dispensary, ambulatory surgical treatment center, or other institution or location wherein medical care is provided to any person.

VII. "Health care provider" means any person who provides health care services. The term includes but is not limited to medical doctors, doctors of osteopathy, nurses, or any employee of a medical facility.

VIII. "Pregnant" or "pregnancy" means the female reproductive condition of having one or more developing embryos or fetuses implanted in the uterus or elsewhere in the female body.

IX. "Probable gestational age" means what, in reasonable medical judgment, will with reasonable probability be the gestational age of the fetus at the time the abortion is considered, performed, or attempted.

X. "Reasonable medical judgment" means that medical judgment that would be made by a reasonably prudent physician in the community, knowledgeable about the case and the treatment possibilities with respect to the medical conditions involved.

XI. "Fetus" means an unborn offspring, from the embryo stage which is the end of the twentieth week after conception or, in the case of in vitro fertilization, the end of the twentieth week after implantation, until birth.

329:44 Prohibition.

I. Except in the case of a medical emergency as specifically defined in paragraph III, no abortion shall be performed, induced, or attempted by any health care provider unless a physician has first made a determination of the probable gestational age of the fetus. In making such a

**Amendment to HB 2-FN-A-LOCAL**
**- Page 17 -**

1  determination, the physician shall make such inquiries of the pregnant woman and perform or cause

2  to be performed all such medical examinations, imaging studies, and tests as a reasonably prudent

3  physician in the community, knowledgeable about the medical facts and conditions of both the

4  woman and the fetus involved, would consider necessary to perform and consider in making an

5  accurate diagnosis with respect to gestational age, provided, however, that the physician shall

6  conduct an obstetric ultrasound examination of the patient for the purpose of making the

7  determination.

8    II.  Except in a medical emergency as specifically defined in paragraph III, no health care

9  provider shall knowingly perform, induce, or attempt to perform an abortion upon a pregnant

10  woman when the probable gestational age of her fetus has been determined to be at least 24 weeks

11  or in the absence of a determination by a physician pursuant to paragraph I as to the fetus' probable

12  gestational age.

13    III.  For the purposes of this subdivision only, "medical emergency" means a condition in

14  which an abortion is necessary to preserve the life of the pregnant woman whose life is endangered

15  by a physical disorder, physical illness, or physical injury, including a life-endangering physical

16  condition caused by or arising from the pregnancy itself, or when continuation of the pregnancy will

17  create a serious risk of substantial and irreversible impairment of a major bodily function, as defined

18  in RSA 329:43, V, of the pregnant woman.

19  329:45  Reporting.

20    I.  Any health care provider who performs an abortion under this subdivision shall report, in

21  writing, to the medical facility in which the abortion is performed the reason for the determination

22  that a medical emergency existed.  The health care provider's written report shall be included in a

23  written report from the medical facility to the department of health and human services.  If the

24  abortion is not performed in a medical facility, the health care provider shall report, in writing, the

25  reason for the determination that a medical emergency existed to the department of health and

26  human services as part of the written report made by the health care provider to the department.

27  The health care provider and the medical facility shall retain a copy of the written reports required

28  under this section for not less than 5 years.

29  329:46  Criminal Penalties.

30    I.  Any health care provider who fails to perform the determination required in RSA 329:44,

31  I, under circumstances where the probable gestational age is less than 24 weeks, shall be guilty of a

32  misdemeanor.

33    II.  Any health care provider who knowingly performs or induces an abortion in violation of

34  any other provision of this subdivision shall be guilty of a class B felony and, in addition to any other

35  penalties the court may impose, be fined not less than $10,000 nor more than $100,000.

36  329:47  Civil Remedies.

**Amendment to HB 2-FN-A-LOCAL**
**- Page 18 -**

1       I. The woman, the father of the fetus if married to the mother at the time she receives an

2 abortion in violation of this subdivision, and/or, if the mother has not attained the age of 18 years at

3 the time of the abortion, the maternal grandparents of the fetus may in a civil action obtain

4 appropriate relief, unless the pregnancy resulted from the plaintiff's criminal conduct or, if brought

5 by the maternal grandparents, the maternal grandparents consented to the abortion.

6       II. Such relief shall include monetary damages for all psychological and physical injuries

7 caused by the violation of this subdivision.

8       329:48 Review by New Hampshire Board of Medicine.

9       I. A defendant health care provider accused of violating this subdivision may seek a hearing

10 before the board of medicine as to whether the health care provider's conduct was necessary to save

11 the life of the mother whose life was endangered by a physical disorder, physical illness, or physical

12 injury, including a life-endangering physical condition caused by or arising from the pregnancy itself;

13 and/or as to whether the continuation of the pregnancy would have created a serious risk of

14 substantial and irreversible impairment of a major bodily function, as defined in RSA 329:43, V, of

15 the pregnant woman.

16       II. The findings on this issue are admissible at the criminal and civil trials of the defendant.

17 Upon a motion of the defendant, the court shall delay the beginning of the trial for not more than 30

18 days to permit such a hearing to take place.

19       329:49 Construction. Nothing in this subdivision shall be construed as creating or recognizing a

20 right to abortion.

21       329:50 Severability. If any provision of this subdivision or the application thereof to any person

22 or circumstances is held invalid, such invalidity shall not affect other provisions or applications of

23 the subdivision which can be given effect without the invalid provision or application, and to this end

24 the provisions of this subdivision are declared to be severable.

25       40 Effective Date. Sections 37-39 of this act shall take effect January 1, 2022.

26       41 Appropriation; Department of Health and Human Services. There is hereby appropriated to

27 the department of health and human services the sum of $3,300,000, for the biennium ending June

28 30, 2023, for the purpose of implementing certain recommendations, from a financial review

29 conducted by Alvarez & Marsal, to streamline certain agency operations resulting in greater

30 efficiencies and accountability, and involving certain transformation projects over a 4-year period.

31 Additionally, the department may accept and expend any applicable federal funds, and any gifts,

32 grants, or donations that may be available for the purposes of this section. This appropriation shall

33 not lapse until June 30, 2023. The governor is authorized to draw a warrant for said sum out of any

34 money in the treasury not otherwise appropriated.

35       42 Health and Human Services; Suspension of Catastrophic Aid Payment to Hospitals. The

36 commissioner of the department of health and human services shall submit a Title XIX Medicaid

**Amendment to HB 2-FN-A-LOCAL**
**- Page 19 -**

1   state plan amendment to the federal Centers for Medicare and Medicaid Services to suspend all

2   catastrophic aid payments to hospitals effective for the biennium ending June 30, 2023.

3   43  Appropriation; Department of Military Affairs and Veterans Services; Support for Veterans

4   Mental Health and Social Isolation.  There is hereby appropriated to the department of military

5   affairs and veterans services the sum of $1,500,000 for the fiscal year ending June 30, 2021 for the

6   purposes of supporting services to combat struggles with mental health and social isolation.  This

7   appropriation shall not lapse until June 30, 2023.  The governor is authorized to draw a warrant for

8   said sum out of any money in the treasury not otherwise appropriated.

9   44  Effective Date.  Section 43 of this act shall take effect June 30, 2021.

10  45  New Subdivision; Controlled Drug Prescription Health and Safety Program.  Amend RSA

11  126-A by inserting after section 88 the following new subdivision:

12              Controlled Drug Prescription Health and Safety Program

13  126-A:89  Definitions.  In this subdivision:

14  I.(a)  "Chronic pain" means a state in which pain persists beyond the usual course of an acute

15  disease or healing of an injury, or that might or might not be associated with an acute or chronic

16  pathologic process that causes continuous or intermittent pain over months or years.  It also includes

17  intermittent episodic pain that might require periodic treatment.

18              (1)  For the purpose of this subdivision, chronic pain does not cover or in any way

19  determine treatment for pain from terminal disease.

20              (2)  For the purpose of this subdivision, chronic pain includes but may not be limited

21  to pain defined as "chronic," "intractable," "high impact," "chronic episodic," and "chronic relapsing."

22              (b)  A diagnosis of chronic pain made by a practitioner licensed in any of the states in the

23  United States or the District of Columbia and supported by written documentation of the diagnosis

24  by the treating practitioner shall constitute proof that the patient suffers from chronic pain.

25  II.   "Commissioner" means the commissioner of the department of health and human

26  services.

27  III.  "Controlled substance" means controlled drugs as defined in RSA 318-B:1, VI.

28  IV.  "Department" means the department of health and human services, established in RSA

29  126-A:4.

30  V.  "Dispense" means to deliver a controlled substance by lawful means and includes the

31  packaging, labeling, or compounding necessary to prepare the substance for such delivery.

32  VI.  "Dispenser" means a person or entity who is lawfully authorized to deliver a schedule II-

33  IV controlled substance, but does not include:

34              (a)  A licensed hospital pharmacy that dispenses less than a 48-hour supply of a schedule

35  II-IV  controlled  substance  from  a  hospital  emergency  department  or  that  dispenses  for

36  administration in the hospital;

37              (b)  A practitioner, or other authorized person who administers such a substance;

**Amendment to HB 2-FN-A-LOCAL**
**- Page 20 -**

1    (c)  A wholesale distributor of a schedule II-IV controlled substance or its analog;

2    (d)  A prescriber who dispenses less than a 48-hour supply of a schedule II-IV controlled
3    substance from a hospital emergency department to a patient; or

4    (e)  A veterinarian who dispenses less than a 48-hour supply of a schedule II-IV
5    controlled substance to a patient.

6    VII.  "Patient" means the person or animal who is the ultimate user of a controlled substance
7    for whom a lawful prescription is issued and for whom a controlled substance or other such drug is
8    lawfully dispensed.

9    VIII.  "Practitioner" means a physician, dentist, podiatrist, veterinarian, pharmacist, APRN,
10   physician assistant, naturopath, or other person licensed or otherwise permitted to prescribe,
11   dispense, or administer a controlled substance in the course of licensed professional practice.
12   "Practitioner" shall also include practitioners with a federal license to prescribe or administer a
13   controlled substance.

14   IX.  "Prescribe" means to issue a direction or authorization, by prescription, permitting a
15   patient to lawfully obtain controlled substances.

16   X.  "Prescriber" means a practitioner or other authorized person who prescribes a schedule
17   II, III, or IV controlled substance.

18   XI.  "Program" means the controlled drug prescription health and safety program that
19   electronically facilitates the confidential sharing of information relating to the prescribing and
20   dispensing of controlled substances listed in schedules II-IV, established by the department
21   pursuant to RSA 126-A:90.

22   126-A:90  Controlled Drug Prescription Health and Safety Program Established.

23   I.  The department shall design, establish, and contract with a third party for the
24   implementation and operation of an electronic system to facilitate the confidential sharing of
25   information relating to the prescribing and dispensing of schedule II-IV controlled substances, by
26   prescribers and dispensers within the state.

27   II.  The department may establish fees for the establishment, administration, operations and
28   maintenance of the program.  The program may also be supported through grants and gifts.  The fee
29   charged to individuals requesting their own prescription information shall not exceed the actual cost
30   of providing that information.

31   III.  Prescription information held by the program relating to any individual shall be deleted
32   3 years after the initial prescription was dispensed.  All de-identified data may be kept for statistical
33   and analytical purposes in perpetuity.

34   IV.  The commissioner shall establish an advisory council, as provided in RSA 126-A:96.

35   126-A:91  Controlled Drug Prescription Health and Safety Program Operation.

1      I.  The department shall develop a system of registration for all prescribers and dispensers of

2  schedule II-IV controlled substances within the state.   The system of registration shall be

3  established by rules adopted by the department, pursuant to RSA 541-A.

4      II.   All prescribers and dispensers authorized to prescribe or dispense schedule II-IV

5  controlled substances within the state shall be required to register with the program as follows:

6          (a)  Practitioners who prescribe but do not dispense schedule II-IV controlled substances

7  shall register with the program as a prescriber;

8          (b)  Practitioners who dispense but do not prescribe schedule II-IV controlled substances

9  shall register with the program as a dispenser unless exempted pursuant to RSA 126-A:89, VI; and

10          (c)  Practitioners who prescribe and dispense schedule II-IV controlled substances shall

11  register with the program as both a prescriber and a dispenser unless exempted pursuant to RSA

12  126-A:89, VI.

13      III.   Only registered prescribers, dispensers, or their designees, and federal health

14  prescribers and dispensers working in federal facilities located in New Hampshire, Massachusetts,

15  Maine, and Vermont shall be eligible to access the program.

16      IV.  The chief medical examiner and delegates may register and access the program.

17      V.  Each dispenser shall submit to the program the information regarding each dispensing of

18  a schedule II-IV controlled substance.  Any dispenser located outside the boundaries of the state of

19  New Hampshire and who is licensed and registered by the pharmacy board, established in RSA

20  318:2, shall submit information regarding each prescription dispensed to a patient who resides

21  within New Hampshire.

22      VI.  Each dispenser required to report under paragraph V of this section shall submit to the

23  program by electronic means information for each dispensing that shall include, but not be limited

24  to:

25          (a)  Dispenser's Drug Enforcement Administration (DEA) registration number.

26          (b)  Prescriber's DEA registration number.

27          (c)  Date of dispensing.

28          (d)  Prescription number.

29          (e)  Number of refills granted.

30          (f)  National Drug Code (NDC) of drug dispensed.

31          (g)  Quantity dispensed.

32          (h)  Number of days supply of drug.

33          (i)  Patient's name.

34          (j)  Patient's address.

35          (k)  Patient's date of birth.

36          (l)  Patient's telephone number, if available.

37          (m)  Date prescription was written by prescriber.

**Amendment to HB 2-FN-A-LOCAL**
**- Page 22 -**

1    (n)  Whether the prescription is new or a refill.

2    (o)  Source of payment for prescription.

3    VII.(a)   Except as provided in subparagraphs (b) and (c), each dispenser shall submit the
4    required information in accordance with transmission methods daily by the close of business on the
5    next business day from the date the prescription was dispensed.

6    (b)  Veterinarians shall submit the information required under subparagraph (a) no more
7    than 7 days from the date the prescription was dispensed.

8    (c)  Dispensers who have a federal Drug Enforcement Administration license, but who do
9    not dispense controlled substances may request a waiver from the requirements of subparagraph (a)
10   from the department.

11   VIII.  The program administrator may issue a waiver to a dispenser that is unable to submit
12   prescription information by electronic means.  Such waiver may permit the dispenser to submit
13   prescription information by paper form or other means, provided all information required by
14   paragraph VI is submitted in this alternative format and within the established time limit.

15   IX.  The program administrator may grant a reasonable extension to a dispenser that is
16   unable, for good cause, to submit all the information required by paragraph V within the established
17   time limits.

18   X.  Any dispenser who in good faith reports to the program as required by paragraphs V and
19   VI shall be immune from any civil or criminal liability as the result of such good faith reporting.

20   126-A:92  Confidentiality.

21   I.  Information contained in the program, information obtained from it, and information
22   contained in the records of requests for information from the program, is confidential, is not a public
23   record or otherwise subject to disclosure under RSA 91-A, and is not subject to discovery, subpoena,
24   or other means of legal compulsion for release and shall not be shared with an agency or institution,
25   except as provided in this subdivision.  This paragraph shall not prevent a practitioner from using or
26   disclosing program information about a patient to others who are authorized by state or federal law
27   or regulations to receive program information.

28   II.  The department shall establish and maintain procedures to ensure the privacy and
29   confidentiality of patients and patient information.

30   III.  The department may use and release information and reports from the program for
31   program analysis and evaluation, statistical analysis, public research, public policy, and educational
32   purposes, provided that the data are aggregated or otherwise de-identified at all levels of use.  The
33   department shall not acquire, use or release information from the program for these purposes unless
34   all patient-specific protected health information has been de-identified in accordance with section
35   164.514(b)(2) of the HIPAA Privacy Rule.

36   126-A:93  Providing Controlled Drug Prescription Health and Safety Information.

**Amendment to HB 2-FN-A-LOCAL**
**- Page 23 -**

1    I.  The program administrator may provide information in the prescription health and safety
2    program upon request only to the following persons:

3    (a)   By electronic or written request to prescribers, dispensers, and the chief medical
4    examiner and delegates within the state who are registered with the program:

5    (1)   For the purpose of providing medical or pharmaceutical care to a specific patient
6    with whom the requester has a practitioner-patient relationship.  This shall not include department
7    staff seeking to access the program for state, federal or private agency purposes, or on behalf of the
8    department or other requesting agency;

9    (2)   For reviewing information regarding prescriptions issued or dispensed by the
10   requester; or

11   (3)  For the purpose of investigating the death of an individual.

12   (b)  By written request, to:

13   (1)  A patient who requests his or her own prescription monitoring information.

14   (2)  The board of dentistry, the board of medicine, the board of nursing, the board of
15   registration in optometry, the board of podiatry, the board of veterinary medicine, and the pharmacy
16   board;  provided,  however,  that  the  request  is  pursuant  to  the  boards'  official  duties  and
17   responsibilities and the disclosures to each board relate only to its licensees and only with respect to
18   those licensees whose prescribing or dispensing activities indicate possible fraudulent conduct.

19   (3)   Authorized law enforcement officials on a case-by-case basis for the purpose of
20   investigation and prosecution of a criminal offense when presented with a court order based on
21   probable cause.  No law enforcement agency or official shall have direct access to query program
22   information.

23   (4)   A practitioner or consultant retained by the state to review the system
24   information of an impaired practitioner program participant or a referral who has agreed to be
25   evaluated or monitored through the program and who has separately agreed in writing to the
26   consultant's access to and review of such information.

27   (c)  By electronic or written request on a case-by-case basis to:

28   (1)   A controlled prescription drug health and safety program from another state;
29   provided, that there is an agreement in place with the other state to ensure that the information is
30   used or disseminated pursuant to the requirements of this state.

31   (2)   An entity that operates a secure interstate prescription drug data exchange
32   system for the purpose of interoperability and the mutual secure exchange of information among
33   prescription drug monitoring programs, provided that there is an agreement in place with the entity
34   to ensure that the information is used or disseminated pursuant to the requirements of this state.

35   II.   The program administrator shall notify the appropriate regulatory board listed in
36   subparagraph I(b)(2) and the prescriber or dispenser at such regular intervals as may be established
37   by the department if there is reasonable cause to believe a violation of law or breach of professional

**Amendment to HB 2-FN-A-LOCAL**
**- Page 24 -**

standards may have occurred.  The program administrator shall provide prescription information required or necessary for an investigation.

III.  The program administrator shall review the information to identify information that appears to indicate whether a person may be obtaining prescriptions in a manner that may represent misuse or abuse of schedule II-IV controlled substances.  When such information is identified, the program administrator shall notify the practitioner who prescribed the prescription.

IV.  The program administrator shall make a report, at least annually, commencing on November 1, 2021, to the senate president, the speaker of the house of representatives, the oversight committee on health and human services, established in RSA 126-A:13, the advisory council established in RSA 126-A:96 and the licensing boards of all professions required to use the program relative to the effectiveness of the program.

126-A:94  Unlawful Act and Penalties.

I.  Any dispenser or prescriber who fails to submit the information required in RSA 126-A:91 or knowingly submits incorrect information shall be subject to a warning letter and provided with an opportunity to correct the failure.  Any dispenser or prescriber who subsequently fails to correct or fails to resubmit the information may be subject to discipline by the appropriate regulatory board.

II.  Any dispenser or prescriber whose failure to report the dispensing of a schedule II-IV controlled substance that conceals a pattern of diversion of controlled substances into illegal use shall be guilty of a violation and subject to the penalties established under RSA 318-B:26 and the department's and appropriate regulatory board's rules as applicable.  In addition, such dispenser or prescriber may be subject to appropriate criminal charges if the failure to report is determined to have been done knowingly to conceal criminal activity.

III.  Any person who engages in prescribing or dispensing of controlled substances in schedule II-IV without having registered with the program may be subject to discipline by the appropriate regulatory board.

IV.  Any person, including department staff, authorized to receive program information who knowingly discloses such information in violation of this subdivision shall be subject to discipline by the appropriate regulatory board and to all other relevant penalties under state and federal law.

V.  Any person authorized to receive program information who uses such information for a purpose in violation of this subdivision shall be subject to disciplinary action by the appropriate regulatory board and to all other relevant penalties under state and federal law.

VI.  Unauthorized use or disclosure of program information shall be grounds for disciplinary action by the relevant regulatory board.

VII.  Any person who knowingly accesses, alters, destroys, or discloses program information except as authorized in this subdivision or attempts to obtain such information by fraud, deceit, misrepresentation, or subterfuge shall be guilty of a class B felony.

Amendment to HB 2-FN-A-LOCAL
- Page 25 -

1  126-A:95  Rulemaking.  The department shall adopt rules, pursuant to RSA 541-A, necessary to
2  implement and maintain the program including:

3      I.  The criteria for registration by dispensers and prescribers.

4      II.  The criteria for a waiver pursuant to RSA 126-A:91, VIII for dispensers with limited
5  electronic access to the program.

6      III.  The criteria for reviewing the prescribing and dispensing information collected by the
7  program.

8      IV.  The criteria for reporting matters to the applicable health care regulatory board for
9  further investigation.

10      V.  The criteria for notifying practitioners of individuals that are engaged in obtaining
11  controlled substances from multiple practitioners or dispensers.

12      VI.  Content and format of all forms required under this subdivision.

13  126-A:96  Advisory Council Established.

14      I.  There is hereby established an advisory council to carry out the duties under this
15  subdivision.  Members of the council shall not be compensated for serving on the council, or serve on
16  the council for more than one 5-year term except for the attorney general, or designee, or the
17  commissioner of the department of health and human services, or designee.  The members of the
18  council shall be as follows:

19          (a)  A member of the board of medicine, appointed by such board.

20          (b)  A member of the pharmacy board, appointed by such board.

21          (c)  A member of the board of dental examiners, appointed by such board.

22          (d)  A member of the New Hampshire board of nursing, appointed by such board.

23          (e)  A member of the board of veterinary medicine, appointed by such board.

24          (f)  A physician appointed by the New Hampshire Medical Society.

25          (g)  A dentist appointed by the New Hampshire Dental Society.

26          (h)  A chief of police appointed by the New Hampshire Association of Chiefs of Police.

27          (i)  A community pharmacist appointed jointly by the New Hampshire Pharmacists
28  Association, the New Hampshire Independent Pharmacy Association, and the New Hampshire
29  Association of Chain Drug Stores.

30          (j)  Two public members appointed by the governor's commission on alcohol and drug
31  abuse prevention, treatment, and recovery, one of whom may be a member of the commission.

32          (k)  A hospital administrator appointed by the New Hampshire Hospital Association.

33          (l)  A nurse practitioner appointed by the New Hampshire Nurse Practitioner
34  Association.

35          (m)  A veterinarian appointed by the New Hampshire Veterinary Medical Association.

36          (n)  The attorney general, or designee.

37          (o)  The commissioner of the department of health and human services, or designee.

1      (p)  A member of the senate, appointed by the president of the senate.

2      (q)  Two members of the house of representatives, appointed by the speaker of the house

3 of representatives.

4      II.  The council shall:

5      (a)  Make recommendations to the department relating to the design, implementation,

6 and maintenance of the program, including recommendations relating to:

7      (1)  Rules.

8      (2)  Legislation.

9      (3)  Sources of funding, including grant funds and other sources of federal, private, or

10 state funds;

11      (b)  Review the program's annual report and make recommendations to the department

12 regarding the operation of the program.

13      (c)  Provide ongoing advice and consultation on the implementation and operation of the

14 program, including recommendations relating to:

15      (1)  Changes in the program to reflect advances in technology and best practices.

16      (2)  Changes to statutory requirements.

17      (3)  The design and implementation of an ongoing evaluation component of the

18 program.

19      (d)  Advise the commissioner regarding the implementation of this subdivision.

20      (e)  Adopt rules necessary for the operation of the council.

21      (f)  Develop a mission statement for the program and strategic goals for its

22 implementation, develop metrics in conjunction with the legislative budget assistant to measure the

23 program's efficient operation, review the performance of the program against the metrics, and make

24 recommendations to the program and ensure they are incorporated.

25      III.  The council shall meet at least quarterly to effectuate its goals.  A chairperson shall be

26 elected by the members.  A majority of the members of the council constitutes a quorum for the

27 transaction of business.  Action by the council shall require the approval of a majority of the

28 members of the council.

29      IV.  Members of the advisory council, previously established in RSA 318-B:38, shall be

30 appointed as members of the advisory council established under this section to the extent possible.

31      126-A:97  Competency Requirements.  Except for veterinarians who shall complete continuing

32 education requirements in accordance with RSA 332-B:7-a, XV, all prescribers required to register

33 with the program who possess a United States Drug Enforcement Administration (DEA) license

34 number shall complete 3 contact hours of free appropriate prescriber's regulatory board-approved

35 online continuing education or pass an online examination, in the area of pain management and

36 addiction disorder or a combination, as a condition for initial licensure and license renewal.

37 Verification of successful completion of the examination or of the required continuing education shall

**Amendment to HB 2-FN-A-LOCAL**
**- Page 27 -**

1    be submitted to the prescriber's regulatory board with the licensee's application for initial licensure

2    or renewal.  A list of the prescriber's regulatory boards' approved continuing education courses and

3    online examinations in pain management and addiction disorder, shall be available on the

4    department of health and human service's Internet website.

5        46  Repeal.   OPLC; Controlled Drug Prescription Health and Safety Program.   RSA 318-B:31-

6    38, relative to the controlled drug prescription health and safety program, are repealed.

7        47  Reference Corrected.  Veterinary Board.  Amend RSA 332-B:3, I (b) to read as follows:

8            (b)   Representing the board on the advisory council established in RSA [318-B:38] **126-**

9    **A:96**;

10       48  Revenue Sharing; Suspension.  RSA 31-A, relative to revenue sharing with cities and towns

11    shall be suspended for the biennium ending June 30, 2023.

12       49  Liquor Commission; Processing of Merchant Cards.  For the biennium ending June 30, 2023,

13    the liquor commission, for purposes of supporting merchant card activity, may:

14          I.  Implement necessary business strategies in the event of a disaster or loss of services to

15    insure the continuity of the commission's business operations, including the processing of merchant

16    cards, which includes the ability to transfer funds from accounting unit 01-03-03-030010-7677 in

17    consultation with the commissioner of the department of information technology.  The commissioner

18    shall report to the fiscal committee of the general court within 30 days any instances where it would

19    need to implement such business strategies, including any costs and loss of revenue associated with

20    the disaster or loss of services and the implementation of such business strategies.

21         II.  Enter into contracts for technical and hosting services to support retail operations and

22    merchant card processing.  The commission shall comply with RSA 176:18 for any contracts entered

23    into to support retail operations and merchant card processing.

24        III.  Hire information technology technical support personnel to support its merchant card

25    activity and related technical support operations in retail stores.

26       50  Department of Education; Acceptance of Gifts.  For the biennium ending June 30, 2023, the

27    department of education may, subject to the approval of the governor and council, accept gifts,

28    contributions, and bequests of unrestricted funds from individuals, foundations, corporations, and

29    other organizations or institutions for the purpose of funding appropriations for New Hampshire

30    scholars made in accounting unit 06-56-56-562010-7534.

31       51  Certain Differential Aid Calculations; Fiscal Year 2022.

32         I.  Average Daily Membership in Attendance; Fiscal Year 2022.  The commissioner of the

33    department of education shall compare the average daily membership in attendance (ADMA),

34    defined in RSA 198:38, for each district and town for school year 2019-2020 and school year 2020-

35    2021.  The greater enrollment shall be used to calculate the cost of an opportunity for an adequate

36    education under RSA 198:40-a and relief funding under RSA 198:40-e for the fiscal year ending June

37    30, 2022.

**Amendment to HB 2-FN-A-LOCAL**
**- Page 28 -**

1    II.  When determining ADMA for third grade pupils scoring below proficiency on the reading

2    component of the state assessment as required by RSA 198:40-a, II(e) for the fiscal year ending June

3    30, 2022, the commissioner of the department of education shall compare the ADMA for this

4    category of differentiated aid in school year 2018-2019 and school year 2020-2021.  The greater

5    ADMA shall be used to calculate the cost of an opportunity for an adequate education under RSA

6    198:40-a, II(e) for the fiscal year ending June 30, 2022.

7    52  Conditional Differential Aid Calculation For Pupils Eligible for a Free or Reduced Price Meal;

8    Fiscal Year 2023.

9    I.  If, as of any of the dates set forth in RSA 198:41, V, VI, or VII, either (a) the state of New

10   Hampshire is in a declared state of emergency pursuant to RSA 4:45 as it relates to the COVID-19

11   pandemic or (b) the U.S. Department of Agriculture has not rescinded the Child Nutrition Covid-19

12   Waivers enacted in response to the pandemic, or both, then the department of education shall, in

13   consultation with the governor, determine whether the alternative differential aid calculation set

14   forth in paragraph II is required for fiscal year 2023 when making the required estimate or final

15   determination described in RSA 198:41, V, VI, or VII as applicable.

16   II.  Upon making a determination that the alternative differential aid calculation applies

17   pursuant to paragraph I, the department of education shall divide each pupil in the ADMA who is

18   eligible for a free or reduced price meal by the average daily member in attendance (ADMA), defined

19   in RSA 198:38, for each district and town for school year 2019-2020.  The percentage shall be applied

20   to the ADMA for school year 2021-2022 to establish a new calculation of ADMA for who is eligible for

21   a free or reduced price meal.  The greater of the ADMA of pupils who are eligible for a free or

22   reduced price meal for school year 2021-2022 and the new calculation based on the 2019-2020 school

23   year percentage shall be used to calculate the differential aid under RSA 198:40-a, II(b) and relief

24   aid under RSA 198:40-e.

25   53  New Section; Relief Funding.  Amend RSA 198 by inserting after section 40-d the following

26   new section:

27   198:40-e  Relief Funding.

28   I.  In a school district in which 48 percent or more of the ADMA is eligible to receive a free or

29   reduced-priced meal, an additional $600 for each pupil in the ADMA who is eligible for a free or

30   reduced-priced meal.

31   II.  In a school district in which at least 12 percent but less than 48 percent of the ADMA is

32   eligible to receive a free or reduced-priced meal, an amount equal to $150 plus $0.1250 for each 0.01

33   percent that its free or reduced-priced meal eligibility rate exceeds 12 percent, for each pupil in the

34   ADMA who is eligible for a free or reduced-priced meal.

35   III.  A school district in which less than 12 percent of the ADMA is eligible to receive a free or

36   reduced-priced meal shall receive no additional aid under this section.

**Amendment to HB 2-FN-A-LOCAL**
**- Page 29 -**

1     IV.  The department of education shall adjust aid to each district calculated under this

2     section to the statewide total of $17,500,000.  Adjustments under this paragraph shall be made on a

3     pro-rata basis.

4     54  Additional Aid to Education.  The governing body of a school district may call a special

5     meeting pursuant to RSA 197:3-a to determine how any adjustment in education aid shall be

6     budgeted.

7     55  Transfer; Education Trust Fund.  At the close of the fiscal year ending June 30, 2021, the

8     state treasurer shall transfer the sum of $35,000,000 from the education trust fund surplus to a

9     restricted account under the department of education for purposes of providing relief funding

10    pursuant to RSA 198:40-e for fiscal years 2022 and 2023.

11    56  Effective Date.  Section 55 of this act shall take effect June 30, 2021.

12    57  New Subparagraph.  Amend RSA 198:41, I by inserting after subparagraph (c) the following

13    new subparagraph:

14         (d)  Add the municipality's additional aid for relief funding pursuant to RSA 198:40-e.

15    58  Department of Education; State Maintenance of Equity; Biennium Ending June 30, 2023.

16     I.  For the biennium ending June, 30, 2023, the department of education shall determine, in

17    consultation with the governor, whether the state of New Hampshire is compliant with the state

18    maintenance of equity requirements of Section 2004(b) of the American Rescue Plan Act of 2021.  If

19    it is determined that the high-need and highest poverty local educational agencies as referenced in

20    Section 2004(b) and defined in Section 2004(d) of the American Rescue Plan Act of 2021 have

21    experienced a greater reduction in state aid per pupil than the state maintenance of equity

22    requirements permit under the American Rescue Plan Act for either fiscal year 2022 or 2023, the

23    department of education, with the approval of the fiscal committee of the general court, shall

24    increase state aid to such agencies to bring the state into compliance.

25     II.  If state aid is increased pursuant to paragraph I to achieve compliance with Section

26    2004(b) of the American Rescue Plan Act of 2021, the department of education shall determine if the

27    increase brings the state into compliance by eliminating an overall per-pupil reduction in state

28    funds, in which case the department shall issue the state aid on a prorated basis to the local

29    educational agency or agencies needing an increase in state aid in order to achieve compliance.

30     III.  Any state aid distributed under this section shall be an education grant in addition to

31    the state grant calculated under RSA 198:41 and shall be distributed to school districts accordingly.

32    Depending on how the United States Department of Education allows states to define "pupil" as it

33    relates to determining state aid per pupil under Section 2004(b) of the American Rescue Plan Act of

34    2021, the department of education may experience delays in accurately collecting pupil data to meet

35    the definition as defined by the United States Department of Education, thereby delaying the

36    calculation of the grant award.  If such delay occurs, the department of education may issue the

1  grants described in this section up to 120 days after the end of the applicable fiscal year being

2  assessed for compliance with federal law.

3      IV.  In seeking fiscal committee approval and establishing grants under this section, the

4  department of education may calculate the grants in manner that increases the likelihood of

5  compliance with Section 2004(b) of the American Rescue Plan Act of 2021 while utilizing the

6  minimum amount of state resources.  The department of education may also make minor rounding

7  adjustments to the grant awards under the condition all rounding adjustments are applied in a

8  consistent and uniform manner.

9      V.  In the event grants are required to be disbursed to districts, the commissioner of

10  education may request the fiscal committee of the general court to authorize additional funding.

11  Funds requested and approved shall be a charge to the education trust fund.  Such warrants for

12  payment shall be issued regardless of the balance of funds available in the education trust fund.  If

13  the balance in the education trust fund, after the issuance of any such warrant, is less than zero, the

14  comptroller shall transfer sufficient funds from the general fund to eliminate such deficit.  The

15  commissioner of the department of administrative services shall inform the fiscal committee and the

16  governor and council of such balance.  This reporting shall not in any way prohibit or delay the

17  distribution of any grant or transfer of funds authorized under this chapter.

18      59  Appropriation; Department of Education.  For the biennium ending June 30, 2023, the sum of

19  $3,000,000 is hereby appropriated to the department of education for the purpose of funding

20  operating costs for a state student data collection and reporting system.  Said appropriation shall be

21  a charge against the education trust fund.

22      60  Education Trust Fund Created and Invested.  Amend RSA 198:39, I to read as follows:

23      I.  The state treasurer shall establish an education trust fund in the treasury.  Moneys in

24  such fund shall not be used for any purpose other than to distribute adequate education grants to

25  municipalities' school districts and to approved charter schools pursuant to RSA 198:42, to provide

26  low and moderate income homeowners property tax relief under RSA 198:56-198:61, *to distribute*

27  *school building aid to school districts and approved chartered public schools pursuant to*

28  *RSA 198:15-b, to distribute tuition and transportation funds to school districts for students*

29  *attending career and technical education programs pursuant to RSA 188-E:9, to distribute*

30  *special education aid to school districts pursuant to RSA 186-C:18, to fund department of*

31  *education operating costs for a state student data collection and reporting system,* and to

32  fund kindergarten programs as may be determined by the general court.  The state treasurer shall

33  deposit into this fund immediately upon receipt:

34      (a)  Funds certified to the state treasurer by the commissioner of revenue administration

35  pursuant to RSA 77-A:20-a, relative to business profits taxes.

36      (b)  Funds certified to the state treasurer by the commissioner of revenue administration

37  pursuant to RSA 77-E:14, relative to business enterprise tax.

1     (c)  Funds collected and paid over to the state treasurer by the commissioner of revenue

2    administration pursuant to RSA 78-A:26, III relative to the tax on motor vehicle rentals.

3     (d)  Funds collected and paid over to the state treasurer by the department of revenue

4    administration pursuant to RSA 78:24, relative to tobacco taxes.

5     (e)  Funds certified to the state treasurer by the commissioner of revenue administration

6    pursuant to RSA 78-B:13, relative to real estate transfer taxes.

7     (f)  Funds collected and paid over to the state treasurer by the department of revenue

8    administration pursuant to RSA 83-F:7, I, relative to the utility property tax.

9     (g)  [Repealed.]

10     (h)  All moneys due the fund in accordance with RSA 284:21-j, relative to sweepstakes

11    and the lottery.

12     (i)  Tobacco settlement funds in the amount of $40,000,000 [annually] or, ***for any year***

13    ***in which the total tobacco settlement funds received by the state is less than $40,000,000,***

14    ***the total amount of tobacco settlement funds received by the state***.

15     (j)  The school portion of any revenue sharing funds distributed pursuant to RSA 31-A:4

16    which were apportioned to school districts in the property tax rate calculations in 1998.

17     (k)  Funds collected and paid over to the state treasurer by the lottery commission

18    pursuant to RSA 284:44, RSA 284:47, and RSA 287-I.

19     (l)  Any other moneys appropriated from the general fund.

20    61  Transfer; Education Trust Fund.  The comptroller shall transfer the following amounts from

21    the education trust fund to the public school infrastructure fund established in RSA 198:15-y:

22    $1,000,000 on July 1, 2021 and $1,000,000 on July 1, 2022.

23    62  Public School Infrastructure Fund.  Amend RSA 198:15-y to read as follows:

24    198:15-y  Public School Infrastructure Fund.

25     I.  The general court recognizes that there is a need to provide funding for infrastructure

26    projects for public elementary and secondary schools.  Therefore, it is the intent of this chapter to

27    designate certain surplus funds in the 2016-2017 biennial budget to provide grants to fund select

28    school infrastructure projects in accordance with this chapter.

29     II.  There is hereby established in the office of the state treasurer the public school

30    infrastructure fund which shall be kept distinct and separate from all other funds and which shall be

31    administered by the department of education.  After transferring sufficient funds to the revenue

32    stabilization reserve account to bring the balance of that account to $100,000,000, the state treasurer

33    shall transfer the remainder of the general fund surplus for fiscal year 2017, as determined by the

34    official audit performed pursuant to RSA 21-I:8, II(a), to the fund.  Any earnings on fund moneys

35    shall be added to the fund.  All moneys in the fund shall be nonlapsing and continually appropriated.

36    The department of education may retain up to 3 percent of the total annual appropriation of the

37    public school infrastructure fund on or after July 1, 2019, to be used to administer the public school

Amendment to HB 2-FN-A-LOCAL
- Page 32 -

1  infrastructure  program.  [Any unexpended or unencumbered balance as of June 30, 2021 shall be

2  transferred to the general fund.]

3      III.   The governor, in consultation with the public school infrastructure commission, may

4  authorize fund expenditures with approval of the fiscal committee of the general court and the

5  executive council.  Funds may be expended for the following purposes:

6      (a)   A school building or infrastructure proposal in which the condition of such school

7  building or portion thereof constitutes a clear and imminent danger to the life or safety of occupants

8  or other persons and requires remediation as soon as practicable.

9      (b)   A school building or infrastructure proposal in which a structural deficiency in the

10  function or operation of a school building or portion thereof presents a substantial risk to the life or

11  safety of the occupants or other persons and is more than a technical violation of the fire code, and

12  requires remediation as soon as practicable.

13      (c)   Support of fiber optic connections for schools to enhance and improve reliance on

14  Internet technology tools, provided matching funds are available.

15      (d)   Funding for the department of safety, division of homeland security and emergency

16  management's school emergency readiness program to improve security in public schools, after the

17  completion of a security assessment, and in consultation with municipal officials.

18      (e)   A school building or infrastructure proposal which is necessary to comply with

19  Americans with Disabilities Act (ADA) regulations.

20      (f)   ***Energy efficient school buses or other vehicles used for transportation of***

21  ***students.***

22      ***(g)***   Other school building or infrastructure needs the governor, in consultation with the

23  public school infrastructure commission, may identify, except for school building aid projects that are

24  otherwise prohibited by law.

25      ***IV.   In order for a school to be eligible for a grant from the public school***

26  ***infrastructure fund, the public school infrastructure commission in consultation with the***

27  ***department of education shall determine that the school has a need unmet by federal***

28  ***stimulus funds for the project.***

29  63  Repeal.  2017, 156:72, relative to the prospective repeal of the public school infrastructure

30  fund and commission, is repealed.

31  64  Department of Agriculture, Markets, and Food; Integrated Pest Management Program.

32  Amend RSA 430:50, II to read as follows:

33      II.   There is established a nonlapsing fund to be known as the integrated pest management

34  fund.  Twenty-five percent of the pesticide registration fees collected under RSA 430:38, III shall be

35  deposited in the fund.  The fund shall only be used to support the purposes of the integrated pest

36  management program ***and the division of pesticide control***.  The state treasurer may invest

37  moneys in the fund as provided by law and all interest received on such investment shall be credited

1   to the fund.  The commissioner shall be authorized to accept grants, gifts, and donations from any

2   public or private sources for deposit in the fund.

3   65   Department of Business and Economic Affairs; New Hampshire Economic Development

4   Fund.  Amend RSA 12-O:21 to read as follows:

5   12-O:21  New Hampshire Economic Development Fund.

6       I.  There is hereby established the New Hampshire economic development fund which shall

7   be administered by the commissioner of the department of business and economic affairs.  Said fund

8   shall be for the purpose of providing funds for grants, loans and other economic development

9   initiatives which shall be generally considered to be beneficial to the state's overall economy as

10  provided for in paragraph II.

11      II.  Said fund shall be distributed or expended by the commissioner with prior approval of

12  the fiscal committee of general court and the governor and council for any of the following purposes:

13          (a)  Business financing and expansion initiatives.

14          (b)  [Job] *Workforce recruitment* retention and creation.

15          (c)  International trade.

16          (d)  Research and development activities.

17          (e)  Other projects or programs recognized as being beneficial to business activity in New

18  Hampshire.

19      III.  To maximize the economic impact of expenditures from this fund, and to leverage

20  additional funding from other sources, the commissioner may contract with such organizations as,

21  but not limited to, the following:

22          (a)  [New Hampshire Business Development Corporation] *Chambers of commerce*.

23          (b)  [Small Business Investment Corporation] *Regional economic development or*

24  *planning organizations*.

25          (c)  Innovation Research Center.

26          (d)  Small Business Development Center.

27      IV.  All moneys *appropriated to the fund as well as moneys* returned to the department

28  as a result of contracts between the commissioner and any other party as authorized shall be

29  redeposited into the New Hampshire economic development fund.  In addition, the department may

30  accept gifts, grants, donations or other moneys for the purposes of this section.  Said moneys shall be

31  deposited into the New Hampshire economic development fund.

32  66  New Section; Department of Business and Economic Affairs; Director of Intergovernmental

33  Affairs.  Amend RSA 12-O by inserting after section 5 the following new section:

34  12-O:5-a  Director of Intergovernmental Affairs.

35      I.  There is established in the office of the commissioner the unclassified position of director

36  of intergovernmental affairs.  The director shall be qualified to hold that position by reason of

**Amendment to HB 2-FN-A-LOCAL**
**- Page 34 -**

1    education and experience and shall perform such duties as the commissioner from time to time may

2    authorize.

3          II.   The commissioner shall nominate for appointment by the governor, with the consent of

4    the council, this unclassified director of intergovernmental affairs who shall serve for a term of 4

5    years.

6          III.   The salary of the director of intergovernmental affairs shall be determined after

7    assessment and review of the appropriate temporary letter grade allocation in RSA 94:1-a, I(b) for

8    the position which shall be conducted pursuant to RSA 94:1-d and RSA 14:14-c.

9          IV.   Upon completion of the appointment of the first director of intergovernmental affairs,

10   position number 40049 shall be abolished to allow for the transition of this classified position with

11   its available appropriations into the unclassified position of director of intergovernmental affairs.

12   Funding shall be transferred into a new expenditure class number 11 within accounting unit 03-22-

13   22-220010-2007.

14   67   Repeal.  RSA 12-O:11-a, relative to the bureau of film and digital media, is repealed.

15   68   Reference Deleted.  Department of Business and Economic Affairs.  Amend RSA 12-O:2, I

16   to read as follows:

17         I.   There shall be a department of business and economic affairs under the executive

18   direction of a commissioner of business and economic affairs, consisting of a division of economic

19   development which shall include but not be limited to a bureau of workforce development, and a

20   division of travel and tourism development which shall include but not be limited to a bureau of

21   visitor service [and a bureau of film and digital media].  The department's purpose shall be to ensure

22   the efficient coordinated function of the department, economic development policies of the state of

23   New Hampshire and the collaborative participation of all related state departments, agencies, and

24   authorities.

25   69   Distribution of Meals and Rooms Tax; Division of Travel and Tourism Development.  The

26   provisions of RSA 12-O:11-b, crediting a portion of meals and rooms tax revenue to the division of

27   travel and tourism development, are hereby suspended for the biennium ending June 30, 2023.

28   70   Department of Corrections; Transfer Authority.  The following classes within the department

29   of corrections shall be exempt from the transfer restrictions in RSA 9:17-a, 9:17-c, classes 10-

30   personal services-perm classified, 11-personal services unclassified, 12-personal services-

31   unclassified, 18-overtime, 19-holiday pay, 50-personal service-temp/appointed and 60-benefits.  The

32   department is authorized to transfer funding in these classes within and amongst all accounting

33   units provided that any transfer of $100,000 or more shall require prior approval of the fiscal

34   committee of the general court and governor and council.  The provisions in this paragraph shall

35   remain in effect for the biennium ending June 30, 2023.

36   71   Equipment Purchases.  Amend RSA 622:28-a,V to read as follows:

**Amendment to HB 2-FN-A-LOCAL**
**- Page 35 -**

1    V.  All purchases of materials, supplies, and equipment into the inventory account shall be

2  made in accordance with the provisions of RSA 21-I:11 and any equipment purchase in excess of

3  [$5,000] *the approval threshold for contracts set by the governor and council manual of*

4  *procedures*, and made under the provisions of this section, shall require the prior approval of both

5  the fiscal committee of the general court and the governor and council.

6    72  Department of Environmental Services; Appropriation Extended.  Amend 2019, 346:304, I to

7  read as follows:

8    I.  The sum of $6,000,000 for the fiscal year ending June 30, 2020 is hereby appropriated to

9  the department of environmental services for the purpose of studying, investigating, and testing for

10  contamination caused by perfluorinated chemicals, and the preliminary design for a treatment

11  system for such contamination.  This appropriation shall not lapse until June 30, [2021] *2023*.  Such

12  appropriation shall be a charge against the drinking water and groundwater trust fund established

13  in RSA 6-D:1.

14    73  Effective Date.  Section 72 of this act shall take effect June 30, 2021.

15    74  State Aid Grants; Department of Environmental Services.

16    I.  Notwithstanding RSA 486, for the biennium ending June 30, 2023, no state aid grants

17  shall be made for any new infrastructure projects that would have otherwise been eligible for state

18  aid grants under RSA 486, RSA 486-A, or RSA 149-M, except that infrastructure projects that have

19  achieved substantial completion by December 31, 2019, shall be eligible for state aid grants, subject

20  to availability of funding and in accordance with other provisions of current law.  Nothing in this

21  section shall affect the provision of the future water supply land protection grants under RSA 486-A

22  if funding is available for such purposes.

23    II.  The sum of $15,576,939 for the fiscal year ending June 30, 2021 is hereby appropriated to

24  the department of environmental services for the purpose of funding payments on existing grants.

25  The governor is authorized to draw a warrant for said sum out of any money in the treasury not

26  otherwise appropriated.  Said appropriation shall not lapse until  June 30, 2023.

27    75  Effective Date.  Section 74 of this act shall take effect June 30, 2021.

28    76  Office of Professional Licensure and Certification; Renaming and Reorganizing of Divisions.

29  Amend RSA 310-A:1-a to read as follows:

30    310-A:1-a  Office of Professional Licensure and Certification; Division of [Technical Professions]

31  *Licensing and Board Administration* and Division of [Health Professions] *Enforcement*

32  Established.  There shall be an office of professional licensure and certification that shall consist of

33  the division of [technical professions] *licensing and board administration* and the division of

34  [health professions] *enforcement*.

35    I.  The [division of technical professions] *office of professional licensure and*

36  *certification* shall consist of each of the boards, councils, and commissions of:

37    (a)  Professional engineers under RSA 310-A:3.

1    (b)  Architects under RSA 310-A:29.

2    (c)  Land surveyors under RSA 310-A:55.

3    (d)  Natural scientists under RSA 310-A:81.

4    (e)  Foresters under RSA 310-A:100.

5    (f)  Professional geologists under RSA 310-A:120.

6    (g)  Landscape architects under RSA 310-A:142.

7    (h)  Court reporters under RSA 310-A:163.

8    (i)  Home inspectors under RSA 310-A:186.

9    (j)  Accountants under RSA 309-B:4.

10    (k)  Manufactured housing installers under RSA 205-D:2.

11    (l)  Real estate appraisers under RSA 310-B:4.

12    (m)  Electricians under RSA 319-C:4.

13    (n)  Board of manufactured housing under RSA 205-A:25.

14    (o)  Guardians ad litem under RSA 490-C:1.

15    (p)  Family mediators under RSA 328-C:4.

16    (q)  Real estate commission under RSA 331-A:5.

17    (r)  Septic system evaluators under RSA 310-A:206.

18    [II.  The division of health professions shall consist of each of the boards, councils,

19 commissions, and practices of:

20    (a)] *(s)*  Hearing care providers under RSA [137-F:3] ***326-F and RSA 328-F***.

21    [(b)] *(t)*  Examiners of nursing home administrators under RSA 151-A:3.

22    [(c)] *(u)*  Podiatry under RSA 315:1.

23    [(d)] *(v)*  Chiropractic examiners under RSA 316-A:2.

24    [(e)] *(w)*  Dental examiners under RSA 317-A:2.

25    [(f)] *(x)*  Registration of funeral directors and embalmers under RSA 325:2.

26    [(g)] *(y)*  Midwifery council under RSA 326-D:3.

27    [(h)] *(z)*  Licensed dietitians under RSA 326-H:7.

28    [(i)] *(aa)*  Optometry under RSA 327:2.

29    [(j)] *(bb)*  Naturopathic board of examiners under RSA 328-E:7.

30    [(k)] *(cc)*  Licensed allied health professionals under RSA 328-F:3.

31    [(l)] *(dd)*  Acupuncture licensing under RSA 328-G:3.

32    [(m)] *(ee)*  Psychologists under RSA 329-B:3.

33    [(n)] *(ff)*  Mental health practice under RSA 330-A:3.

34    [(o)] *(gg)*  Licensing for alcohol and other drug use professionals under RSA 330-C:3.

35    [(p)] *(hh)*  Electrologists under RSA 314:2-a.

36    [(q)] *(ii)*  Body art practitioners under RSA 314-A.

37    [(r)] *(jj)*  Ophthalmic dispensers under RSA 327-A:2.

1        [(s)] *(kk)*  Reflexology, structural integrators, and Asian bodywork therapists under RSA
2 328-H:6.

3        [(t)] *(ll)*  Massage therapists under RSA 328-B:5.

4        [(u)] *(mm)*  Medicine under RSA 329:2.

5        [(v)] *(nn)*  Nursing under RSA 326-B:3 and nursing assistant registry under RSA 326-
6 B:26.

7        [(w)] *(oo)*  Pharmacy under RSA 318:2.

8        [(x)] *(pp)*  Barbering, cosmetology, and esthetics under RSA 313-A:2.

9        [(y)] *(qq)*  Medical technicians under RSA 328-I:2.

10        [(z)] *(rr)*  Medical imaging and radiation therapists under RSA 328-J:1.

11        *(ss)  Board of veterinary medicine under RSA 332-B.*

12        *(tt)  Mechanical licensing board under RSA 153:27-a.*

13        [III.] *II.*  Administrative rules adopted pursuant to RSA 541-A governing the licensing
14 boards, commissions, and councils set forth in [paragraphs I and II] *paragraph I* shall remain in
15 effect until amended, expired, or repealed.

16     77  Temporary Licensing Process; Reference Change.  Amend RSA 310-A:1-f, I to read as follows:

17        I.  Health care professionals shall [be defined as] *include* those individuals licensed by the
18 boards, councils, and commissions within the [division of health professions] *office of professional*
19 *licensure and certification* as set forth in RSA 310-A:1-a, [II, with the exception of those licensed
20 pursuant to RSA 314, RSA 314-A, RSA 313, RSA 328-B, and RSA 328-H] *who perform specified*
21 *medical or ancillary services within the scope of his or her authority, as determined by the*
22 *executive director*.

23     78  Telemedicine; Reference Change.  Amend RSA 310-A:1-g, IV to read as follows:

24        IV.  Notwithstanding any provision of law to the contrary, an out-of-state healthcare
25 professional providing services by means of telemedicine or telehealth shall be required to be
26 licensed, certified, or registered by the appropriate licensing board within the [division of health
27 professions] *office of professional licensure and certification*.  This paragraph shall not apply to
28 out-of-state physicians who provide consultation services pursuant to RSA 329:21, II.

29     79  Office of Professional Licensure and Certification; Division Directors; Unclassified Positions
30 Established.  Amend RSA 310-A:1-c to read as follows:

31     310-A:1-c  Division Directors*; Pharmacy Compliance Investigators*.

32        I.  There is established in the office of professional licensure and certification 2 unclassified
33 directors:  The director of the division of [technical professions] *licensing and board*
34 *administration* and director of the division of [health professions] *enforcement*.  Each director
35 shall be qualified to hold that position by reason of education and experience and shall perform such
36 duties as the executive director from time to time may authorize.

1    II.  The executive director shall nominate for appointment by the governor, with the consent

2  of the council, each unclassified division director, each of whom shall serve for a term of 4 years.

3    ***III.  There are established in the office of professional licensure and certification***

4  ***the unclassified position of chief pharmacy compliance investigator and 2 unclassified***

5  ***pharmacy investigator positions.  Each investigator shall be qualified for the position by***

6  ***reason of education and experience, shall be nominated by the executive director for***

7  ***appointment by the governor and council, and shall serve at the pleasure of the executive***

8  ***director.  The chief pharmacy compliance investigator shall oversee pharmacy compliance***

9  ***and investigations, shall supervise the pharmacy compliance investigators, and shall***

10  ***perform such duties as the executive director from time to time may authorize.***

11    80  Office of Professional Licensure and Certification; Classified Positions Abolished; Funding

12  Transfered to Unclassified Positions.

13    I.  Upon the appointment of a chief pharmacy compliance investigator and 2 pharmacy

14  investigators to the office of professional licensure and certification, the following positions shall be

15  abolished to allow for the transition of these classified positions with their available appropriations

16  into the unclassified positions established in RSA 310-A:1-c, III.  Funding shall be transferred into

17  expenditure class 011, within accounting unit 01-21-21-216010-33020000.  The incumbents in the

18  abolished classified positions shall be offered the opportunity to seek the executive director's

19  nomination for the unclassified positions:

20        (a)  Pharmacy Board Compliance Investigator, 22008.

21        (b)  Pharmacy Board Compliance Investigator, 14337.

22        (c)  Program Specialist I/Assistant Pharmacy Inspector, 17094.

23    II.  The salary of the unclassified positions shall be determined after assessment and review

24  of the appropriate temporary letter grade allocation in RSA 94:1-a, I(b) for the positions which shall

25  be conducted pursuant to RSA 94:1-d and RSA 14:14-c.

26    81  Office of Professional Licensure and Certification; Fees.  Amend RSA 310-A:1-e, I to read as

27  follows:

28    I.(a)  The executive director of the office of professional licensure and certification shall

29  assess annual or biennial license, certification, and renewal fees, as well as any necessary

30  administrative fees for each professional regulatory board, council, or commission administered by

31  the office.  ***Such fees shall be sufficient to produce estimated revenues up to 125 percent of***

32  ***the total operating expenses for the office, as determined by averaging the operating***

33  ***expenses for the office for the previous 2 fiscal years.***

34        (b)  There is hereby established the office of professional licensure and certification fund

35  into which the fees collected under subparagraph (a) shall be deposited.  After paying all costs and

36  salaries associated with the office, moneys in this fund shall lapse to the general fund at the close of

37  each [fiscal year] ***biennium***.

**Amendment to HB 2-FN-A-LOCAL**
**- Page 39 -**

1    82  Mechanical Licensing Board; Transfer to Office of Professional Licensure and Certification.

2    Amend the introductory paragraph of RSA 153:27-a to read as follows:

3    153:27-a  Mechanical Licensing Board.  There is hereby established as a unit within the [division

4    of fire safety a mechanical licensing board] *office of professional licensure and certification*.

5    The term of office for the members appointed to the board shall be 3 years and until a successor is

6    appointed.  The initial appointed members of the board shall serve staggered terms.  Vacancies shall

7    be filled in the same manner and for the unexpired terms.  No member of the board shall be

8    appointed to more than 2 consecutive terms.  A member of the board shall serve as the board

9    secretary.

10   83  Appropriation; Internet Crimes Against Children Fund.  The sum of $250,000 for the fiscal

11   year ending June 30, 2022, and the sum of $250,000 for the fiscal year ending June 30, 2023, are

12   hereby appropriated to the New Hampshire Internet crimes against children fund established in

13   RSA 21-M:17.  The governor is authorized to draw a warrant for said sums out of any money in the

14   treasury not otherwise appropriated.

15   84  Attorney/Administrator.  Amend RSA 359-P:4 to read as follows:

16   359-P:4  Attorney/Administrator.  The director shall [hire/appoint a private] *hire an* attorney or

17   administrator who shall [collect gifts and contributions,] review applications for assistance

18   submitted pursuant to this chapter, make awards of assistance in accordance with the procedures of

19   this chapter, and report annually to the director commencing on February 1, [2017] *2022* and each

20   February 1 thereafter.  The director shall negotiate the attorney's or administrator's [compensation

21   which in any calendar year shall be no more than 10 percent of any private sector contributions

22   received in that calendar year] *salary and benefit level in accordance with similar levels*

23   *within the department*.

24   85  Appropriation; FRM Victims' Contribution Recovery Fund.  For the purpose of awarding

25   recovery assistance to victims of the FRM fraud, there is hereby appropriated the sum of $5,000,000

26   for the fiscal year ending June 30, 2022, and the sum of $5,000,000 for the fiscal year ending June

27   30, 2023, to the FRM victims' contribution recovery fund established in RSA 359-P:2.  The governor

28   is authorized to draw a warrant for said sums out of any money in the treasury not otherwise

29   appropriated.

30   86  Repeal of the Prospective Repeal of FRM Fund.  2016, 293:6, relative to the July 1, 2023

31   repeal of the FRM victims' contribution recovery fund in RSA 359-P:2, is repealed.

32   87  Revenue Stabilization Account; Cap.  Amend RSA 9:13-e, V to read as follows:

33         V.  If, after the requirements of paragraphs II-IV have been met and the balance remaining

34   in the revenue stabilization reserve account is in excess of an amount equal to 10 percent of the

35   actual general fund unrestricted revenues for the most recently completed fiscal [year] *biennium*,

36   then such excess, less any amounts deposited pursuant to RSA 7:6-e, shall be transferred, without

37   further action, to the general fund surplus account.

1    88  Appropriation; Department of Health and Human Services.  The sums of $12,401,552 in
2    fiscal year 2022 and $13,031,765 in fiscal year 2023 are hereby appropriated to the department of
3    health and human services for the purpose of funding one-time maintenance of the legacy Medicaid
4    management information system as the department transitions to new modular information
5    technology systems.  The department may accept and expend matching federal funds without prior
6    approval of the fiscal committee.  The governor is authorized to draw a warrant for said sum out of
7    any money in the treasury not otherwise appropriated.

8    89  Rate.  Amend RSA 77:1 to read as follows:

9    77:1  Rate.

10    *I.* The annual tax upon incomes shall be levied at the rate of 5 percent *for all taxable*
11    *periods ending before December 31, 2023.*

12    *II.  The annual tax upon incomes shall be levied at the rate of 4 percent for all*
13    *taxable periods ending on or after December 31, 2023.*

14    *III.  The annual tax upon incomes shall be levied at the rate of 3 percent for all*
15    *taxable periods ending on or after December 31, 2024.*

16    *IV.  The annual tax upon incomes shall be levied at the rate of 2 percent for all*
17    *taxable periods ending on or after December 31, 2025.*

18    *V.  The annual tax upon incomes shall be levied at the rate of 1 percent for all*
19    *taxable periods ending on or after December 31, 2026*.

20    90  Reference to Interest and Dividends Tax Deleted; 2027.  Amend RSA 14-B:8, III(q) to read as
21    follows:

22        (q)  New Hampshire taxes, specifying if business profits tax[,] *or* business enterprise
23    tax[, or interest and dividends tax].

24    91  Reference to Interest and Dividends Tax Deleted; 2027.  Amend RSA 15-A:5, I(d)(17) to read
25    as follows:

26        (17)  New Hampshire taxes, specifying if business profits tax[,] *or* business
27    enterprise tax[, or interest and dividends tax].

28    92  Reference to Interest and Dividends Tax Deleted; 2027.  Amend RSA 21-J:31 to read as
29    follows:

30    21-J:31  Penalty for Failure to File.  Any taxpayer who fails to file a return when due, unless an
31    extension has been granted by the department, shall pay a penalty equal to 5 percent of the amount
32    of the tax due or $10, whichever is greater, for each month or part of a month during which the
33    return remains unfiled.  The total amount of any penalty shall not, however, exceed 25 percent of
34    the amount of the tax due or $50, whichever is greater.  This penalty shall not be applied in any
35    case in which a return is filed within the extended filing period as provided in [RSA 77:18-b,]
36    RSA 77-A:9, RSA 77-E:8, RSA 83-C:6, RSA 83-E:5, RSA 84-A:7, or RSA 84-C:7, or the failure to file
37    was due to reasonable cause and not willful neglect of the taxpayer.  The amount of the penalty is

1   determined by applying the percentages specified to the net amount of any tax due after crediting

2   any timely payments made through estimating or other means.

3      93  Reference to Interest and Dividends Tax Deleted; 2027.   Amend RSA 21-J:33-a, I to read as

4   follows:

5         I.  If there is a substantial understatement of tax imposed under [RSA 77,] RSA 77-A,

6   RSA 77-E, RSA 78-A, RSA 78-C, RSA 82-A, RSA 83-C, RSA 83-E, or RSA 84-A for any taxable

7   period, there shall be added to the tax an amount equal to 25 percent of the amount of any

8   underpayment attributable to such understatement.

9      94  Reference to Interest and Dividends Tax Deleted; 2027.   Amend RSA 21-J:46, III to read as

10   follows:

11        III.  This section shall apply only to tax returns and associated payments under [RSA 77,]

12   RSA 77-A[,] and RSA 77-E.

13      95  References to Interest and Dividends Tax Deleted; 2027.   Amend RSA 71-C:4, I and II to

14   read as follows:

15        I.  On or before December 15 of every fiscal year the commissioner of the department of

16   revenue administration shall certify in a report to the general court and the governor an analysis of

17   each of the past fiscal year's tax expenditures as identified in RSA 71-C:2, and other credits allowed

18   under [RSA 77,] RSA 77-A, RSA 77-E, RSA 77-G, RSA 78, RSA 78-A, 78-B, RSA 82-A, RSA 83-E,

19   RSA 84-A, RSA 84-C, and RSA 400-A.

20        II.  The report shall be divided into the following parts:

21          (a)  Tax expenditures as determined by the joint committee on tax expenditure review

22   under RSA 71-C:3;

23          (b)  Potential liabilities against the state's revenues, specifically:

24             (1)  Other credits allowed under [RSA 77,] RSA 77-A, RSA 77-E, RSA 77-G, RSA 78,

25   RSA 78-A, RSA 78-B, RSA 82, RSA 82-A, RSA 83-E, RSA 84-A, RSA 84-C, and RSA 400-A against

26   the business profits tax imposed by RSA 77-A; and

27             (2)  Credit carryovers from overpaid taxes.

28      96  Education Tax Credit Scholarship Organizations; 2027.   Amend RSA 77-G:3 to read as

29   follows:

30      77-G:3  Contributions to Scholarship Organizations.   For each contribution made to a

31   scholarship organization, a business organization, business enterprise, or individual may claim a

32   credit equal to 85 percent of the contribution against the business profits tax due pursuant to RSA

33   77-A, against the business enterprise tax due pursuant to RSA 77-E, [against the tax on interest and

34   dividends under RSA 77,] or apportioned against each provided the total credit granted shall not

35   exceed the maximum education tax credit allowed.   Credits provided under this chapter shall not be

36   deemed taxes paid for the purposes of RSA 77-A:5, X.   The department of revenue administration

37   shall not grant the credit without a scholarship receipt.   No business organization, business

1    enterprise, or individual shall direct, assign, or restrict any contribution to a scholarship
2    organization for the use of a particular student or nonpublic school.  No business organization,
3    business enterprise, or individual shall receive more than 10 percent of the aggregate amount of tax
4    credits permitted in RSA 77-G:4.

5    97  Education Tax Credit Scholarship Organizations; 2027.  Amend RSA 77-G:5, I, (i)(2) to read
6    as follows:

7    (2)  Not knowingly award a scholarship to any lineal descendant or equivalent step-
8    person of any proprietor, partner, or member of any business organization, business enterprise, or
9    individual making a contribution to a scholarship organization and claiming a credit against the
10   business profits tax[,] *or* business enterprise tax, [or tax on interest and dividends,] nor any lineal
11   descendant or equivalent step-person of any officer, director, or owner of more than a 5 percent
12   interest in any business organization, business enterprise, or individual making a contribution to a
13   scholarship organization and claiming a credit against the business profits tax[,] *or* business
14   enterprise tax, [or tax on interest and dividends,] nor any employee who is among the highest-paid
15   20 percent of paid employees in any business organization, business enterprise, or individual making
16   a contribution to a scholarship organization and claiming a credit against the business profits tax[,]
17   *or* business enterprise tax[, or tax on interest and dividends].

18   98  Issuance of Electric Rate Reduction Bonds; 2027.  Amend RSA 369-B:5, VI to read as follows:

19   VI.  The exercise of the powers granted by this chapter shall be in all respects for the benefit
20   of the people of this state, for the increase of their commerce, welfare, and prosperity, and as the
21   exercise of such powers shall constitute the performance of an essential public function, neither any
22   electric utility, any affiliate of any electric utility, any financing entity, nor any collection or other
23   agent of any of the foregoing shall be required to pay any taxes or assessments upon or in respect of
24   any revenues or property received, acquired, transferred, or used by any electric utility, any affiliate
25   of any electric utility, any financing entity, or any collection or other agent of any of the foregoing
26   under the provisions of this chapter or upon or in respect of the income therefrom, and any rate
27   reduction bonds shall be treated as notes or bonds of a political subdivision of the state [for purposes
28   of RSA 77].

29   99  Repeals; Interest and Dividends Taxation; 2027.  The following are repealed:

30   I.  RSA 21-J:45, I(c), relative to reports on status of requested interest and dividends tax
31   refunds.

32   II.  RSA 77, relative to taxation of incomes.

33   III.  RSA 77-A:4-c, II(c), relative to the duty of a committee to study the taxation of
34   distributions received by investment organizations under the interest and dividends tax.

35   IV.  RSA 77-A:4, I, relative to an adjustment to the business profits tax for taxes under
36   RSA 77.

1     V.   RSA 195-H:10, relative to exemption from RSA 77 for income and distributions from

2     qualified tuition programs.

3     VI.   RSA 195-K:4, relative to exemption from RSA 77 for income and distributions in the

4     ABLE savings account program.

5     VII.   RSA 261:52-a, relative to notice that the interest and dividends tax may be due.

6     VIII.   RSA 391:3, relative to the taxation of common trust funds under RSA 77.

7     100   Returns for Interest and Dividends Taxes; 2027.   All persons who are liable for a tax under

8     RSA 77 as of December 31, 2026, who thereafter are no longer liable for a tax under RSA 77 because

9     of the passage of this act shall make a return of such taxes due the commissioner of revenue

10     administration in such manner and on such forms as the commissioner shall prescribe in rules

11     adopted under RSA 541-A.   The administrative provisions of RSA 77 shall remain in effect to permit

12     the audit and collection of taxes upon income taxable under RSA 77 which is received by persons

13     subject to taxation under that chapter through December 31, 2026, and to permit the distribution of

14     that revenue.   Persons who are liable for a tax under RSA 77 who do not report the payment of

15     federal income taxes on a calendar year basis are entitled to such proportion of the exemptions

16     allowed in RSA 77 as the reporting period bears to their taxable year.

17     101   Application; Repeal of RSA 77.   Paragraph II of section 99 shall apply to taxable periods

18     beginning after December 31, 2026.

19     102   Effective Date.

20     I.   Section 89 this act shall take effect January 1, 2022.

21     II.   Sections 90-100 of this act shall take effect January 1, 2027.

22     103   Imposition of Tax.   Amend RSA 78-A:6 to read as follows:

23     78-A:6   Imposition of Tax.

24     I.   A tax of [9] *8.5* percent of the rent is imposed upon each occupancy.

25     II.   A tax is imposed on taxable meals based upon the charge therefor as follows:

26     (a)   Four cents for a charge between $.36 and $.37 inclusive;

27     (b)   Five cents for a charge between $.38 and $.50 inclusive;

28     (c)   Six cents for a charge between $.51 and $.62 inclusive;

29     (d)   Seven cents for a charge between $.63 and $.75 inclusive;

30     (e)   Eight cents for a charge between $.76 and $.87 inclusive;

31     (f)   Nine cents for a charge between $.88 and $1.00 inclusive;

32     (g)   [Nine] *Eight and a half* percent of the charge for taxable meals over $1.00, provided

33     that fractions of cents shall be rounded up to the next whole cent.

34     II-a.   A tax of [9] *8.5* percent is imposed upon the gross rental receipts of each rental.

35     III.   The operator shall collect the taxes imposed by this section and shall pay them over to

36     the state as provided in this chapter.

1   104   Applicability.   RSA 78-A:6, as amended by section 103 of this act, shall be applicable to

2   taxable periods beginning on or after October 1, 2021.

3   105   Effective Date.  Sections 103-104 of this act shall take effect upon its passage.

4   106   Business Enterprise Tax; Returns.  Amend RSA 77-E:5, I to read as follows:

5        I.  Every business enterprise having gross business receipts in excess of [$200,000] **$250,000**

6   as defined by RSA 77-E:1, X, during the taxable period or the enterprise value tax base of which is

7   greater than [$100,000] **$250,000** shall, on or before the fifteenth day of the third month in the case

8   of enterprises required to file a United States partnership tax return, and the fifteenth day of the

9   fourth month in the case of all other business enterprises, following expiration of its taxable period,

10  make a return to the commissioner.  For tax years beginning January 1, 2015, the commissioner

11  shall biennially adjust these threshold amounts rounding to the nearest $1,000 based on the 2-year

12  (24-month) percentage change in the Consumer Price Index for All Urban Consumers, Northeast

13  Region as published by the Bureau of Labor Statistics, United States Department of Labor using the

14  amount published for the month of June in the year prior to the start of the tax year.  All returns

15  shall be signed by the business enterprise or by its authorized representative, subject to the pains

16  and penalties of perjury and the penalties provided in RSA 21-J:39.

17  107   Applicability.  RSA 77-E:5, I, as amended by section 106 of this act, shall be applicable to

18  taxable periods ending on or after December 31, 2022.

19  108   Effective Date.  Sections 106-107 of this act shall take effect January 1, 2022.

20  109   Business Enterprise Tax; Rate Reduced.  Amend RSA 77-E:2 to read as follows:

21  77-E:2  Imposition of Tax.

22       I.  For all taxable periods ending on or after December 31, 2019, a tax is imposed at the rate

23  of 0.6 percent upon the taxable enterprise value tax base of every business enterprise.

24       II.  For all taxable periods ending on or after December 31, [2021] **2022**, a tax is imposed at

25  the rate of [0.675] **0.55** percent upon the taxable enterprise value tax base of every business

26  enterprise.

27       [III.  For all taxable periods ending on or after December 31, 2021, a tax is imposed at the

28  rate of 0.5 percent upon the taxable enterprise value tax base of every business enterprise.

29       IV.  Upon completion of the audited comprehensive annual report performed pursuant to

30  RSA 21-I:8, II(a), the commissioner of the department of revenue administration shall report the

31  total amount of combined unrestricted general and education trust fund revenue collected for the

32  fiscal year ending June 30, 2020, as reported in the schedule of undesignated/unassigned fund

33  balance for the general fund and education fund, to the secretary of state with copies to the governor,

34  speaker of the house of representatives, the senate president, the fiscal committee of the general

35  court, and the director of the office of legislative services.  If the combined amount of general and

36  education trust fund revenue collected, not including sums appropriated to the education trust fund

37  in section 386 of this act, for the fiscal year ending June 30, 2020 is 6 percent or more below the

1    ~~official revenue estimates for said fiscal year, the tax shall be imposed at the rate in paragraph II~~
2    ~~and the rate in paragraph III shall not take effect.  If the combined amount of general and education~~
3    ~~trust fund revenue collected, not including sums appropriated to the education trust fund in section~~
4    ~~386 of this act, for the fiscal year ending June 30, 2020 is 6 percent or more above the official~~
5    ~~revenue estimates for said fiscal year, the tax shall be imposed at the rate in paragraph III and the~~
6    ~~rate in paragraph II shall not take effect.  If the combined amount of general and education trust~~
7    ~~fund revenue collected, not including sums appropriated to the education trust fund in section 386 of~~
8    ~~this act, for the fiscal year ending June 30, 2020 is not 6 percent or more below or above the official~~
9    ~~revenue estimates for said fiscal year, the tax shall continue to be imposed at the rate in paragraph~~
10   ~~I, and the rates in paragraphs II and III shall not take effect.]~~

11       110  Business Profits Tax; Rate Reduced; Contingency Deleted.  Amend RSA 77-A:2 to read as
12   follows:

13       77-A:2  Imposition of Tax.

14           I.  For all taxable periods ending on or after December 31, 2019, a tax is imposed at the rate
15   of 7.7 percent upon the taxable business profits of every business organization.

16           II.  [~~For all taxable periods ending on or after December 31, 2021, a tax is imposed at the~~
17   ~~rate of 7.9 percent upon the taxable business profits of every business organization.~~

18           ~~III.~~]  For all taxable periods ending on or after December 31, [~~2021~~] *2022*, a tax is imposed at
19   the rate of [~~7.5~~] *7.6* percent upon the taxable business profits of every business organization.

20           [~~IV.  Upon completion of the audited comprehensive annual report performed pursuant to~~
21   ~~RSA 21-I:8, II(a), the commissioner of the department of revenue administration shall report the~~
22   ~~total amount of combined unrestricted general and education trust fund revenue collected for the~~
23   ~~fiscal year ending June 30, 2020, as reported in the schedule of undesignated/unassigned fund~~
24   ~~balance for the general fund and education fund, to the secretary of state with copies to the governor,~~
25   ~~speaker of the house of representatives, the senate president, the fiscal committee of the general~~
26   ~~court, and the director of the office of legislative services.  If the combined amount of general and~~
27   ~~education trust fund revenue collected, not including sums appropriated to the education trust fund~~
28   ~~in section 386 of this act, for the fiscal year ending June 30, 2020 is 6 percent or more below the~~
29   ~~official revenue estimates for said fiscal year, the tax shall be imposed at the rate in paragraph II~~
30   ~~and the rate in paragraph III shall not take effect.  If the combined amount of general and education~~
31   ~~trust fund revenue collected, not including sums appropriated to the education trust fund in section~~
32   ~~386 of this act, for the fiscal year ending June 30, 2020 is 6 percent or more above the official~~
33   ~~revenue estimates for said fiscal year, the tax shall be imposed at the rate in paragraph III and the~~
34   ~~rate in paragraph II shall not take effect.  If the combined amount of general and education trust~~
35   ~~fund revenue collected, not including sums appropriated to the education trust fund in section 386 of~~
36   ~~this act, for the fiscal year ending June 30, 2020 is not 6 percent or more below or above the official~~

**Amendment to HB 2-FN-A-LOCAL**
**- Page 46 -**

1   ~~revenue estimates for said fiscal year, the tax shall continue to be imposed at the rate in paragraph~~

2   ~~I, and the rates in paragraphs II and III shall not take effect.]~~

3   111  Effective Date.  Sections 109-110 of this act shall take effect upon its passage.

4   112   New Section; Business Profits Tax; Clarification of PPP Loans.  Amend RSA 77-A by

5   inserting after section  3-b the following new section:

6   77-A:3-c   Clarification of Tax Treatment of Paycheck Protection Program (PPP) Loans.   In

7   determining gross business profits for any period, before net operating loss and special deductions,

8   notwithstanding any other provision of law, a business organization shall apply the provisions of the

9   United States Internal Revenue Code consistent with the following adjustments:

10   I.  No amount shall be included in the gross business income of the eligible recipient by

11   reason of forgiveness of indebtedness issued or created under the federal Paycheck Protection

12   Program (PPP) which was first established under the federal Coronavirus Aid, Relief, and Economic

13   Security Act (P.L. 116-136, enacted March 3, 2020) or issued or created under the federal PPP

14   Second Draw Loan Program established under the federal Consolidated Appropriations Act, 2021

15   (P.L. 116-260, enacted December 27, 2020).

16   II.  No deduction shall be denied, no tax attribute shall be reduced, and no basis increase

17   shall be denied, by reason of the exclusion from gross business income provided by paragraph I.

18   III.  This section shall apply to taxable years ending after March 3, 2020, corresponding with

19   the date of the enactment of the federal Coronavirus Aid, Relief, and Economic Security Act.

20   113  Meals and Rooms Tax; Disposition of Revenue; Fund Established.  Amend RSA 78-A:26 to

21   read as follows:

22   78-A:26  Disposition of Revenue.

23   I.  Beginning on July 1, 1995, and for each fiscal year thereafter, the department shall pay

24   over all revenue, except revenues identified in [~~paragraph III~~] *paragraphs II and III* of this

25   section, collected under this chapter to the state treasurer.  On or before September 15 of each year,

26   the department shall determine the cost of administration of this chapter for the fiscal year ending

27   on the preceding June 30, and it shall notify the state treasurer of these costs by a report certified by

28   them as to correctness.  After deducting the cost of administration of the chapter from the total

29   income, the state treasurer shall distribute the net income as follows:

30   (a)  The amount necessary to provide payments of principal and interest on the bonds

31   and notes authorized under RSA 198:15-a, II for the fiscal years ending June 30, 2009 through June

32   30, 2030; *and*

33   [(b)  [Repealed];

34   ~~(c)  Forty percent of the net income under the introductory paragraph of paragraph I of~~

35   ~~the most recent fiscal year to the unincorporated towns, unorganized places, towns, and cities.  The~~

36   ~~amount to be distributed to each such town, place, or city shall be determined by multiplying the~~

37   ~~amount to be distributed by a fraction, the numerator of which shall be the population of the~~

**Amendment to HB 2-FN-A-LOCAL**
**- Page 47 -**

1  unincorporated town, unorganized place, town or city and the denominator of which shall be the

2  population of the state.  The population figures shall be based on the latest resident population

3  figures furnished by the office of strategic initiatives; and

4  (d)] *(b)*  The remainder to the general fund.

5  II.  [Each fiscal year, the amount to be distributed shall be equal to the prior year's

6  distribution plus an amount equal to 75 percent of any increase in the income received from the

7  meals and rooms tax for the fiscal year ending on the preceding June 30, not to exceed $5,000,000,

8  until such time as the total amount distributed annually is equal to the amount indicated in

9  subparagraph I(c).

10  III.]  Beginning on July 1, 1999, and for each fiscal year thereafter, the department shall pay

11  over all revenue collected pursuant to RSA 78-A:6, II-a to the state treasurer for deposit in the

12  education trust fund established by RSA 198:39.

13  ***III.  On or before December 1, 2021 and each December 1 thereafter, 30 percent of the***

14  ***net income determined under the introductory paragraph of paragraph I of the most recent***

15  ***fiscal year, after deductions for the cost of administration and revenues deposited in the***

16  ***education trust fund pursuant to paragraph II, shall be deposited into the meals and***

17  ***rooms municipal revenue fund for distribution to the unincorporated towns, unorganized***

18  ***places, towns, and cities.  The amount to be distributed to each such town, place, or city***

19  ***shall be determined by multiplying the total amount to be distributed by a fraction, the***

20  ***numerator of which shall be the population of the unincorporated town, unorganized***

21  ***place, town, or city and the denominator of which shall be the population of the state.  The***

22  ***population figures shall be based on the latest resident population figures furnished by the***

23  ***office of strategic initiatives.***

24  ***IV.   There is hereby established in the treasury the meals and rooms municipal***

25  ***revenue fund.  Any money deposited into the meals and rooms municipal revenue fund***

26  ***shall be nonlapsing and continually appropriated to the state treasurer for distribution to***

27  ***the unincorporated towns, unorganized places, towns, and cities pursuant to paragraph***

28  ***III***.

29  114  New Subparagraph; Treasury; Application of Receipts.  Amend RSA 6:12, I(b) by inserting

30  after subparagraph (364 ) the following new subparagraph:

31  (365)  Moneys deposited in the meals and rooms municipal revenue fund established

32  in RSA 78-A:26, IV.

33  115  Reference Changed; Education Trust Fund.  Amend RSA 198:39, I(c) to read as follows:

34  (c)  Funds collected and paid over to the state treasurer by the commissioner of revenue

35  administration pursuant to RSA 78-A:26, [III] *II* relative to the tax on motor vehicle rentals.

36  116   Business Profits Tax; Credit Carry-forward Limited; Payments Due With Returns and

37  Estimates.  Amend RSA 77-A:7, I(b) to read as follows:

Amendment to HB 2-FN-A-LOCAL
- Page 48 -

1    (b)  If the return required by RSA 77-A:6, I shows an additional amount to be due, such
2    additional amount is due and payable on the prescribed payment date.  If such return shows an
3    overpayment of the tax due, the commissioner shall refund or credit the overpayment to the
4    taxpayer in accordance with RSA 21-J:28-a*, except that:*

5        *(1)  For taxable periods ending on or after December 31, 2022 a credit shall*
6    *only be allowed in an amount up to 500 percent of the total tax liability for the taxable*
7    *period and the remainder of the overpayment shall be refunded;*

8        *(2)  For taxable periods ending on or after December 31, 2025 a credit shall*
9    *only be allowed in an amount up to 250 percent of the total tax liability for the taxable*
10   *period and the remainder of the overpayment shall be refunded; and*

11       *(3)  For taxable periods ending on or after December 31, 2027 a credit shall*
12   *only be allowed in an amount up to 100 percent of the total tax liability for the taxable*
13   *period and the remainder of the overpayment shall be refunded.*

14   117   Business Enterprise Tax; Credit Carry-forward Limited; Payments Due With Returns.
15   Amend RSA 77-E:6, II to read as follows:

16       II.  If the return required by RSA 77-E:5, I shows an amount to be due, such amount is due
17   and payable on the prescribed payment date.  If such return shows an overpayment of the tax due,
18   the commissioner shall refund [such] *or credit the* overpayment to the business enterprise [or shall
19   allow the enterprise a credit against a subsequent payment or payment due, to the extent of the
20   overpayment, at the enterprise's option] *in accordance with RSA 21-J:28-a, except that:*

21       *(a)  For taxable periods ending on or after December 31, 2022 a credit shall only*
22   *be allowed in an amount up to 500 percent of the total tax liability for the taxable period*
23   *and the remainder of the overpayment shall be refunded;*

24       *(b)  For taxable periods ending on or after December 31, 2025 a credit shall only*
25   *be allowed in an amount up to 250 percent of the total tax liability for the taxable period*
26   *and the remainder of the overpayment shall be refunded; and*

27       *(c)  For taxable periods ending on or after December 31, 2027 a credit shall only*
28   *be allowed in an amount up to 100 percent of the total tax liability for the taxable period*
29   *and the remainder of the overpayment shall be refunded.*

30   118  New Section; Commission to Study Limiting the Business Tax Credit Carry Over.  Amend
31   RSA 77-A by inserting after section 7-a the following new section:

32   77-A:7-b  Commission to Study Limiting the Business Tax Credit Carry Over.

33       I.  There is a established a commission to study limiting the business tax credit carry over.
34   The members of the commission shall be as follows:

35       (a)  Four members of the house of representatives, appointed by the speaker of the house
36   of representatives with at least 2 members from the ways and means committee and one member
37   from the finance committee.

**Amendment to HB 2-FN-A-LOCAL**
**- Page 49 -**

1      (b)  One member of the senate, appointed by the president of the senate.

2      (c)  The treasurer for the state of New Hampshire, or designee.

3      (d)  The comptroller for the state of New Hampshire, or designee.

4      (e)  The commissioner for the department of revenue administration, or designee.

5      (f)  One member representing the accounting or auditing industry, appointed by the

6  governor.

7      II.  Legislative members of the commission shall receive mileage at the legislative rate when

8  attending to the duties of the commission.

9      III.  The commission's study shall include, but not be limited to, examining the credit carry

10  over for the business profits tax and business enterprise tax, the liability associated with the credit

11  carry over, and the impact of limiting the credit carry over may have on cash flow and liquidity, and

12  make recommendations on future limitations of the credit carry over.  The commission shall also

13  examine whether a business tax credit or other type of credit could be made available to those

14  entities using their credit carry over refund to invest in affordable housing development in New

15  Hampshire and make recommendations on how this type of program would be implemented.

16      IV.  The commission may solicit input from any person or entity the commission deems

17  relevant to its study.

18      V.  The members of the commission shall elect a chairperson from among the members.  The

19  first meeting of the commission shall be called by the first-named house member.  The first meeting

20  of the commission shall be held as soon as practical but not later than 30 days of the effective date of

21  this section.  Five members of the commission shall constitute a quorum.

22      VI.  The commission shall submit a report including its findings and any recommendations

23  for proposed legislation on or before November 1, 2021 to the speaker of the house of representatives,

24  the president of the senate, the house clerk, the senate clerk, the governor, and the state library.

25    119  Repeal.  RSA 77-A:7-b, relative to the commission to study limiting the business tax credit

26  carry over, is repealed.

27    120  Effective Date.

28      I.  Sections 116-118 of this act shall take effect upon its passage.

29      II.  Section 119 of this act shall take effect November 1, 2021.

30    121  New Hampshire Veterans' Home; Unfunded Positions; Authorization.  Notwithstanding any

31  other provision of law to the contrary, the New Hampshire veterans' home may fill unfunded

32  positions during the biennium ending June 30, 2023, provided that the total expenditure for such

33  positions shall not exceed the amount appropriated for personal services.

34    122  New Hampshire Veterans' Home; Transfer Among Accounts and Classes.  Notwithstanding

35  any provision of law to the contrary, for the biennium ending June 30, 2023, the commandant of the

36  New Hampshire veterans' home is authorized to transfer funds within and among all accounting

37  units within the home and to create accounting units and expenditure classes as required and as the

**Amendment to HB 2-FN-A-LOCAL**
**- Page 50 -**

1    commandant deems necessary and appropriate to address present or projected budget deficits, or to

2    respond to changes in federal law, regulations, or programs, and otherwise as necessary for the

3    efficient management of the home, including funding of unfunded positions, provided that if a

4    transfer does not include new accounting units or expenditure classes, only such transfers of

5    $100,000 or more shall require prior approval of the fiscal committee of the general court and the

6    governor and council.  The New Hampshire veterans' home shall be exempt from RSA 9:17-a, I and

7    RSA 9:17-c, subject to approval by the fiscal committee of the general court of any transfer of

8    appropriations from permanent personal services or employee benefits to any other use or purpose.

9    123  Wildlife Damage Control; Limitations for Persons Posting Property.  Amend RSA 207:22-a

10   to read as follows:

11   207:22-a  Limitations for Persons Posting Property.

12   *I.*  Any person whose land is posted pursuant to RSA 635:4 to prohibit hunting shall forfeit

13   the right to participate in the wildlife damage control program established pursuant to RSA 207:22-

14   c, or to receive payment pursuant to RSA 207:23-a, except that this limitation shall not apply in the

15   following circumstances:

16   [I.] *(a)*  To a person who posts only the person's land lying within 100 yards of a dwelling or

17   other farm or outbuildings contiguous to the person's dwelling and used regularly by the person, or

18   the person's family or tenant.

19   [II.] *(b)*  To any person whose land is posted for the protection of crops only during the closed

20   season for the type of game birds or animals for which the person seeks assistance from the wildlife

21   damage control program.

22   [III.] *(c)*   To any person who posts such person's land "Hunting by Permission Only",

23   provided that the names and addresses of the hunters who have received permission to hunt that

24   land in that year shall be furnished when requested by the executive director, and that in the

25   judgment of the executive director, the history of hunter access and hunter density represents a

26   good-faith effort by the landowner to allow hunting.

27   ***II.  Any person who has received payment pursuant to RSA 207:23-a shall forfeit the***

28   ***right to receive payment in a future year or growing season unless such person implements***

29   ***measures to prevent or mitigate future conflicts with bear that have been recommended in***

30   ***writing by the executive director or the executive director's agent.***

31   124  Damage by Bears.  Amend RSA 207:23-a to read as follows:

32   207:23-a  Damage by Bears [or Mountain Lions].

33   *I.*  [A person] ***Any person engaged in the husbandry and sale of at least $1,000 in***

34   ***agricultural products as defined in RSA 21:34-a*** who suffers loss or damage to livestock, bees,

35   orchards or growing crops, ***in an amount of $250 or more at the current wholesale value of the***

36   ***items,*** by bear [or mountain lion,] shall, if he ***or she*** claims damage therefor, notify the executive

37   director of fish and game in writing of such damage ***within 30 days of the discovery of such***

1    *damage.*  The executive director or [his] *the executive director's* agent shall investigate such
2    claim within 30 days from the receipt [by him] of notice of such damage, and [within one year] *in*
3    *accordance with RSA 541-A:29,* determine whether such damage was caused by bear [or mountain
4    lion], and appraise the amount to be paid*, and notify the claimant in writing of the*
5    *determination*.

6        *II.  If the person sustaining the damage claimed under this section is dissatisfied*
7    *with the finding of the executive director, such person shall notify the executive director in*
8    *writing, and an adjudicative proceeding shall be commenced pursuant to RSA 541-A:31.*

9        *III.  If the person sustaining the damage is dissatisfied with the decision of the*
10   *executive director following the adjudicative proceeding, a further appeal shall be*
11   *available in accordance with RSA 541.*

12       *IV.*  The executive director, [immediately upon making any appraisal of damage thereof]
13   *upon reaching final agreement with the claimant, or after the conclusion of an appeal*,
14   shall present [his] *a* certificate of the amount of appraisal to the governor, who is authorized to draw
15   [his] *a* warrant upon any money in the treasury not otherwise appropriated in payment therefor.

16       *V.  The executive director shall, in accordance with RSA 541-A, adopt rules to*
17   *administer this provision, to include:*

18       *(a)  Criteria to determine whether a person engaged in the husbandry and sale*
19   *of agricultural products as defined in RSA 21:34-a qualifies to be a claimant hereunder,*
20   *provided that any such person who shall document gross sales of any qualifying crop of at*
21   *least $1,000 in a calendar year shall be deemed to qualify as a claimant.*

22       *(b)  Procedures used to receive and document claims of damage by bear from*
23   *claimants, to include when the damage occurred, which qualifying crop is affected, and*
24   *what losses may be fairly attributed to action by such bear;*

25       *(c)  A method to determine the current wholesale value of items covered by this*
26   *section, to be used in the process of investigating and adjudicating any claim;*

27       *(d)  Procedures to be used in the conduct of adjudicative proceedings hereunder;*
28   *and*

29       *(e)  Criteria to be used to recommend preventive measures and mitigating*
30   *measures that claimants may use to prevent future harm, and that will be used to*
31   *determine whether claims in future years shall be allowed for payment.*

32   125  Repeal.  RSA 207:24, relative to an appeal from the executive director, is repealed.

33   126  Department of Information Technology; Unfunded Positions.  Notwithstanding any other
34   provision of law to the contrary, the department of information technology may fill unfunded
35   positions during the biennium ending June 30, 2023, provided that the total expenditure for such
36   positions shall not exceed the amount appropriated for personnel services.

37   127  Adult Parole Board; Establishment.  Amend RSA 651-A:3 to read as follows:

**Amendment to HB 2-FN-A-LOCAL**
**- Page 52 -**

1    651-A:3  Adult Parole Board; Establishment; Procedures.

2       I.  There shall be an adult parole board with [9] *5* members, ***2 of which shall be attorneys***

3    ***with active licenses***.  The members of the board shall be appointed by the governor with the

4    consent of the council for staggered terms of 5 years or until their successors are appointed.  No

5    member shall serve more than 2 consecutive terms.  A vacancy on the board shall be filled for the

6    unexpired term.

7       ***II.  The composition of the board shall be as follows:***

8       ***(a)  One member as chairman.***

9       ***(b)  Four additional members, to include:***

10       ***(1)  One member with law enforcement or corrections experience, either***

11    ***current or former.***

12       ***(2)  One member with criminal justice experience, which may be direct***

13    ***employment experience, current or former, in some capacity within the criminal justice***

14    ***system, or post-secondary school teaching, scholarship, and research pertaining to the***

15    ***criminal justice system.***

16       ***(3)  One at-large member who is either an attorney with an active New***

17    ***Hampshire license or a mental health professional with an active New Hampshire license;***

18       ***(4)  One at-large member without any categorical designation.***

19       ***III.***   The governor shall designate one member as chairman [and the chairman shall

20    designate one other member to serve as chairman in his absence].  ***The salary of the chairman***

21    ***shall be that established in RSA 94:1-a as grade GG, with appropriate step to be***

22    ***determined in accordance the provisions of RSA 94:1-d.  The chairman shall designate one***

23    ***other member to serve as temporary designee chairman in his or her absence, however, the***

24    ***designated chairman shall not receive the chairman's salary or employee status while***

25    ***serving in the chairman's absence.***  In the case of a revocation hearing an attorney of the board

26    shall be present at the hearing.  Board members shall be paid [$100 a day plus mileage at the state

27    employee rate while engaged in parole hearings or administrative meetings.] ***an annual stipend of***

28    ***$20,000 for each member, to be paid in equal installments on each state employee pay***

29    ***period date.  Board members shall be paid mileage at the state employee rate while***

30    ***engaged in parole hearings or administrative meetings.***

31       [II] ***IV.***  The board shall hold at least [24] ***36 days*** of parole hearings and ***36 days of parole***

32    ***revocation hearings*** each year and may hold more hearings as necessary.  Each parole ***and***

33    ***parole revocation*** hearing shall be held by a hearing panel consisting of exactly 3 members of the

34    board.  The board shall establish operating procedures which provide for rotation of board members

35    among hearing panels.

36       ***V.  In the event of a pandemic or other extraordinary occurrence declared an***

37    ***emergency by the governor that results in restricted movement or quarantining of inmates***

1 ***at any New Hampshire state prison facility, the parole board may conduct all hearings via***
2 ***teleconference or other video conference technology.***

3      128  Applicability.  On the effective date of section 127 of this act, the current chairman of the
4 adult parole board shall remain chairman and designate 4 current members who fit the criteria
5 outlined in RSA 651-A:3, II(b)(1)-(4) as inserted by section 127 of this act, to remain members of the
6 parole board according to their current terms.  In the event that there are not 4 members on the
7 existing board who meet the criteria outlined in RSA 651-A:3, II(b)(1)-(4), the chairman may
8 designate an existing member to temporarily occupy any open member vacancy until a new
9 appointment for the vacancy is nominated by the governor and confirmed by the executive council.
10 Any current members who remain on the board, including the current chairman, shall serve until
11 the expiration of their current terms or until a successor is appointed and qualified.

12      129  Workers' Compensation; Administration Fund.  Amend RSA 281-A:59, III to read as follows:
13      III.  Each insurance carrier and self-insurer, including the state, shall make payments to the
14 fund of its pro rata share of one fiscal year's costs to be appropriated out of the fund.  The governor is
15 authorized to draw a warrant for any sum payable by the state under this paragraph out of any
16 money in the treasury not otherwise appropriated.  The pro rata share shall be computed on the
17 basis which the total workers' compensation benefits, including medical benefits, paid by each
18 insurance carrier and self-insurer bore to the total workers' compensation benefits, including
19 medical benefits, paid by all insurance carriers and self-insurers in the [fiscal year ending in the]
20 preceding calendar year; provided, however, that no insurance carrier or self-insurer shall pay an
21 assessment of less than $100.  The commissioner shall assess each insurance carrier and self-insurer
22 as soon as possible after July 1 of each year.  Total assessments shall not exceed the amount
23 appropriated for the fund, which shall include the budget of the workers' compensation division of
24 the department of labor for the fiscal year in which the assessment is made and all other costs of
25 administering this chapter.  The balance in the fund at the beginning of the new fiscal year shall
26 proportionately reduce the assessments under this section.  The commissioner shall have the
27 authority to adopt rules, pursuant to RSA 541-A, relative to the manner in which such payments are
28 to be made.

29      130  Workers' Compensation; Special Fund for Second Injuries.  Amend RSA 281-A:55, III to
30 read as follows:
31      III.  Each insurance carrier and self-insurer shall, pursuant to rules adopted by the
32 commissioner, make payments to the fund in an amount equal to that proportion of 115 percent of
33 the total obligation of the fund during the preceding 12 months, less the amount of the net assets in
34 the fund as of March 31 of the current year, which the total workers' compensation benefits,
35 including medical benefits, paid by each insurance carrier and self-insurer bore to the total workers'
36 compensation benefits, including medical benefits, paid by all insurance carriers and self-insurers in
37 the [fiscal year ending in the] preceding calendar year.

**Amendment to HB 2-FN-A-LOCAL**
**- Page 54 -**

1    131   Workers' Compensation; Hearings and Awards.   Amend RSA 281-A:43, I(a) to read as
2    follows:

3        I.(a)  In a controversy as to the responsibility of an employer or the employer's insurance
4    carrier for the payment of compensation and other benefits under this chapter, any party at interest
5    may petition the commissioner in writing for a hearing and award.  The petition shall be sent to the
6    commissioner at the department's offices in Concord and shall set forth the reasons for requesting
7    the hearing and the questions in dispute which the applicant expects to be resolved.  The
8    commissioner or the commissioner's authorized representative shall schedule a hearing, either in
9    Concord or at a location nearest the employee as determined by the commissioner, by fixing its time
10   and place and giving notice at least 14 days prior to the date for which it is scheduled.  The hearing
11   date shall be set for a time not to exceed 6 weeks from the date the petition was received.  In those
12   instances where an expedited hearing is requested, the petition for hearing shall set forth the facts
13   in sufficient detail to support the request for an expedited hearing.  The commissioner, or his or her
14   authorized agent shall, in his or her discretion, determine whether the need exists for an expedited
15   hearing.  Any requests for an expedited hearing shall be periodically reviewed by the commissioner
16   to determine whether such requests are given proper attention.  The commissioner shall also identify
17   any overutilization by the requesting parties and responses given to such requests by the
18   commissioner.  An annual report of the expedited requests, responses, the number of continuances,
19   the reasons for such continuances, the number of requests for hearing, and the time within which
20   the hearings were held shall be made annually to the advisory council established in RSA 281-A:62.
21   The notice may be given in hand [or by certified mail, return receipt requested], *via first class*
22   *mail, or, upon consent of the parties, by electronic transmission*.  Continuances of any hearing
23   are discouraged; however, should a continuance be necessary, the parties requesting such
24   continuance shall file with the department a written petition for such continuance at least 7 days
25   prior to the hearing.  Failure to file such a petition shall bar any right to a continuance.  Thereafter,
26   a continuance may only be granted upon the commissioner's finding that a compelling need exists so
27   as to require a continuance.  At such hearing, it shall be incumbent upon all parties to present all
28   available evidence and the person conducting the hearing shall give full consideration to all evidence
29   presented.  In addition, the person conducting the hearing shall freely and comprehensively examine
30   all witnesses to determine the merits of the matter.  Also, the person conducting the hearing may
31   recess the hearing to a date certain and direct the parties, or either of them, to provide such further
32   information that may be necessary to decide the matter.  No later than 30 days after the hearing, the
33   commissioner or the commissioner's authorized representative shall render a decision and shall
34   forthwith notify the parties of it.  When appropriate, the commissioner, or his or her authorized
35   representative, may render a decision at the hearing.  Unless excused for good cause shown, *or a*
36   *party has not received notice,* failure of any or all parties at interest to appear at a duly scheduled
37   hearing or to petition for a continuance shall bar such parties from any further action concerning an

Amendment to HB 2-FN-A-LOCAL
- Page 55 -

1   adverse decision, a decision by default, or a dismissal of a petition for hearing and award.  ***The***

2   ***commissioner, or his or her authorized representative, shall serve notice of a pending***

3   ***default, default decision, or dismissal of a petition for hearing and award on the***

4   ***defaulting party via certified mail, return receipt requested.  Upon receipt of undeliverable***

5   ***certified mail, the commissioner, or his or her authorized representative, shall stay the***

6   ***proceedings for up to one year from the date of the receipt of undeliverable certified mail***

7   ***during which time the commissioner, or his or her authorized representative, shall make***

8   ***all reasonable attempts to provide notice to the defaulting party.  If notice cannot be***

9   ***provided within one year, the commissioner, or his or her authorized representative, shall***

10   ***render a decision in favor of the non-defaulting party.***

11      132  Unemployment Compensation; Contributions; Minimum Rate.  Amend RSA 282-A:82, II-III

12   to read as follows:

13      II.   There shall be subtracted in any calendar quarter from every employer's contribution

14   rate one percent whenever the unemployment compensation fund equals or exceeds [$275,000,000]

15   ***$350,000,000*** throughout the next preceding calendar quarter.

16      III.   There shall be subtracted in any calendar quarter from every employer's contribution

17   rate 1.5 percent whenever the unemployment compensation fund equals or exceeds [$300,000,000]

18   ***$400,000,000*** throughout the next preceding calendar quarter.

19      133  Unemployment Compensation; Contributions; Inverse Minimum Rate.  Amend RSA 282-

20   A:82-a, II-III to read as follows:

21      II.   There shall be added in any calendar quarter to every such employer's contribution rate

22   one percent whenever the unemployment compensation fund fails to equal or exceed [$275,000,000]

23   ***$350,000,000*** throughout the next preceding calendar quarter.

24      III.   There shall be added in any calendar quarter to every such employer's contribution rate

25   .5 percent whenever the unemployment compensation fund fails to equal or exceed [$300,000,000]

26   ***$400,000,000*** throughout the next preceding calendar quarter.

27      134  Repeal.  The following are repealed:

28      I.   RSA 282-A:84, relative to emergency power of the commissioner of the department of

29   unemployment security.

30      II.   RSA 282-A:84-a, relative to the emergency surcharge power of the commissioner of the

31   department of unemployment security.

32      135  Liability for Obstruction or Injury to Highway; Civil Liability.  Amend RSA 236:39 to read

33   as follows:

34      236:39  Civil Liability.

35      ***I.***  If any person, without authority, shall place any obstruction in a highway, or cause any

36   defect, insufficiency, or want of repair of a highway which renders it unsuitable for public travel, he

37   or she shall be liable to the state for all damages to the highway, including ***full and current***

1   replacement costs of protective barriers, ***and any structure or device that is part of the***
2   ***highway or turnpike system,*** when maintained by the state, or to the municipality for all damages
3   to a highway, including ***full and current*** replacement costs of protective barriers ***and any***
4   ***structure or device that is part of the highway***, when maintained by the municipality, and for
5   all damages and costs which the state or municipality shall be compelled to pay to any person
6   injured by such obstruction, defect, insufficiency, or want of repair as established through an
7   appropriate contribution claim or under the rules of joint and several liability.

8       ***II.  "Full and current replacement cost" as used in this section means actual or***
9   ***reasonable estimates of labor, including contracted labor, material, equipment, and***
10   ***overhead.  Such costs shall not be reduced for depreciation.***

11       136  Repeal.  1959; 286, relative to the Sandwich Notch and Dale Road in the towns of Sandwich
12   and Thornton, is repealed.

13       137  Department of Transportation; Disposal of Highway or Turnpike Funded Real Estate.
14   Amend the section heading for RSA 4:39-c to read as follows:

15       4:39-c  Disposal of Highway***, Federal,*** or Turnpike Funded Real Estate.

16       138  Department of Transportation; Disposal of Highway or Turnpike Funded Real Estate.
17   Amend RSA 4:39-c, III to read as follows:

18       III.  The proceeds from a sale, conveyance, transfer, or lease under this section shall be
19   credited to either the highway fund, ***restricted federal fund,*** or the turnpike fund, whichever fund
20   provided money for the original purchase.  ***Proceeds from a sale that results from money***
21   ***provided by the highway fund for payback of real property purchased with federal funds***
22   ***shall be credited to the department and shall be nonlapsing and continually appropriated***
23   ***to the department for the purposes of meeting federal obligations or reimbursing the***
24   ***highway fund for payment of federal obligations.***

25       139  New Paragraphs; New Hampshire Aeronautics Act; Definitions.  Amend RSA 422:3 by
26   inserting after paragraph XXVII the following new paragraphs:

27       XXVII-a.  "Small unmanned aircraft" means an unmanned aircraft as defined in federal
28   regulations, as amended.

29       XXVII-b.  "Small unmanned aircraft system" means a small unmanned aircraft and its
30   associated elements as defined in federal regulations, as amended.

31       140  New Paragraph; New Hampshire Aeronautics Act; Definitions.  Amend RSA 422:3 by
32   inserting after paragraph XXIX the following new paragraph:

33       XXX.  "Unmanned aircraft" means an aircraft as defined in federal regulations, as amended.

34       141  New Hampshire Aeronautics Act; Duties of the Commissioner.  Amend RSA 422:4, VI to
35   read as follows:

36       VI.  Effecting uniformity in the regulations pertaining to the operation of aircraft by
37   adopting uniform rules consistent with federal regulations and making noncompliance with federal

1   regulations a violation of state law, thereby enabling the law enforcement agencies of the state to
2   enforce the laws regulating the operation of aircraft.   For the purposes of this paragraph, aircraft
3   shall include ultralight vehicles [as defined in 14 C.F.R. part 103] *as defined in federal*
4   *regulations, as amended, and small unmanned aircraft systems as defined in RSA 422:3,*
5   *XXVII-b*.

6     142  Department of Transportation; Appropriation Amended.  Amend 2018;162:25, I to read as
7   follows:

8     I.  The sum of $20,000,000 is hereby appropriated to the department of transportation for the
9   fiscal year ending June 30, 2018, which shall be [nonlapsing and] expended for the purposes of
10   funding state red list bridge projects *and shall lapse to the highway fund on June 30, 2021*.
11   The governor is authorized to draw a warrant for said sum out of any money in the treasury not
12   otherwise appropriated.

13     143  Effective Date.  Section 142 of this act shall take effect on June 30, 2021.

14     144  Department of Safety; Fund Transfer; Unfunded Positions; Authorization.

15     I.  Notwithstanding the provisions of RSA 9:16-a, for the biennium ending June 30, 2023, the
16   department of safety may transfer funds between accounting units in classes 027-transfers to the
17   department of information technology, 028-transfers to general services, 064-retiree pension benefit
18   health insurance compensation, and 211-property and casualty insurance, upon approval of the
19   department of administrative services' budget office.

20     II.  Notwithstanding any other provision of law to the contrary, the department of safety may
21   fill unfunded positions during the biennium ending June 30, 2023, provided that the total
22   expenditure for such positions shall not exceed the amount appropriated for personal services.

23     145  New Section; Body-Worn Cameras.  Amend RSA 105-D by inserting after section 2 the
24   following new section:

25   105-D:3  Body-Worn and Dashboard Camera Fund.

26     I.   There is hereby established the body-worn and dashboard camera fund within the
27   department of safety for the purpose of encouraging local law enforcement agencies to equip officers
28   with body-worn cameras and agency vehicles with dashboard cameras.  All moneys in the fund shall
29   be nonlapsing and continually appropriated to the department of safety.

30     II.(a)  The fund shall provide matching grants to local law enforcement agencies to assist
31   agencies with the purchase, maintenance, and replacement of body-worn and dashboard cameras
32   and ongoing costs related to the maintenance and storage of data recorded by body-worn and
33   dashboard cameras.

34     (b)  The commissioner of the department of safety may also use the fund to pay for the
35   classified position of business administrator I established in the department of safety, division of
36   administration.

37     III.  All local law enforcement agencies shall be eligible to apply for grants from the fund.

**Amendment to HB 2-FN-A-LOCAL**
**- Page 58 -**

1    IV.  The fund shall be overseen by the commissioner of the department of safety and the
2    attorney general who shall, within 180 days of the effective date of this section, jointly establish a
3    process for the application for matching grants from the fund.  Such process shall be established in
4    rules adopted jointly by the commissioner of safety and attorney general in accordance with RSA
5    541-A.

6    V. The commissioner of the department of safety may charge administrative costs related to
7    this section to the fund.

8    146  Body-Worn and Dashboard Camera Fund; Appropriation.  The sum of $1,000,000 for the
9    fiscal year ending June 30, 2022 is hereby appropriated to the body-worn and dashboard camera
10    fund established in RSA 105-D:3.  The governor is authorized to draw a warrant for said sum out of
11    any money in the treasury not otherwise appropriated.

12    147  Body Worn Cameras Purchase; Appropriation; Department of Corrections.  There is hereby
13    appropriated to the department of corrections the sum of $720,000 for the fiscal year ending June 30,
14    2021 to fund the purchase of body worn cameras for corrections and probation and parole officers.
15    The governor is authorized to draw a warrant for said sum out of any money in the treasury not
16    otherwise appropriated.  This appropriation shall not lapse until June 30, 2023.

17    148  Effective Date.  Section 147 of this act shall take effect June 30, 2021.

18    149  Department of Safety; Position Created.  There is hereby established in the department of
19    safety, division of administration, the full-time classified position of business administrator I.  The
20    commissioner of the department of safety may use the body-worn and dashboard camera fund
21    established in RSA 105-D:3 to fund the position.

22    150  New Section; Complaints Alleging Law Enforcement Misconduct; Commission Established.
23    Amend RSA 105-D by inserting after section 2 the following new section:

24    105-D:2-a  Statewide Entity to Receive Complaints Alleging Misconduct Regarding Sworn and
25    Elected Law Enforcement Officers; Commission Established.

26    I. There is hereby established a commission to develop recommendations for legislation to
27    establish a single, neutral, and independent statewide entity to receive complaints alleging
28    misconduct regarding all sworn and elected law enforcement officers pursuant to recommendation
29    #16 in the final report issued by the New Hampshire commission on law enforcement accountability,
30    community and transparency.  The commission shall be composed of the following members:

31    (a) The attorney general, or designee, who shall be the chairperson of the commission.

32    (b) One member of the house of representatives, appointed by the speaker of the house.

33    (c) One member of the senate, appointed by the president of the senate.

34    (d)  The director of the New Hampshire police standards and training council, or
35    designee.

36    (e) The commissioner of safety, or designee.

**Amendment to HB 2-FN-A-LOCAL**
**- Page 59 -**

1    (f) Four additional members from the New Hampshire commission on law enforcement
2    accountability, community and transparency established in Executive Order 2020-11, appointed by
3    the attorney general. Two of these members shall be law enforcement members and 2 of these
4    members shall not be law enforcement members.

5    II. Legislative members of the commission shall receive mileage at the legislative rate when
6    attending to the duties of the commission.

7    III. The chairperson of the commission shall call the first meeting within 30 days of the
8    effective date of this section. Five members of the commission shall constitute a quorum.

9    IV. The commission shall submit a report containing its recommendations for legislation to
10   the governor, the speaker of the house of representatives, the president of the senate, and the state
11   library no later than November 1, 2021.

12   151 Appropriation; Statewide Entity to Receive Complaints of Misconduct. The sum of $100,000
13   for the fiscal year ending June 30, 2023 is hereby appropriated the department of administrative
14   services which shall be available to fund an independent statewide entity to receive complaints
15   alleging misconduct regarding all sworn and elected law enforcement officers established pursuant
16   to recommendation #16 in the final report issued by the New Hampshire commission on law
17   enforcement accountability, community and transparency. Any unexpended amount of said
18   appropriation shall lapse to the general fund on June 30, 2023. The governor is hereby authorized to
19   draw a warrant for said sum out of any money in the treasury not otherwise appropriated.

20   152 Contingency. If an independent statewide entity to receive complaints alleging misconduct
21   regarding all sworn and elected law enforcement officers as a result of recommendation #16 in the
22   final report issued by the New Hampshire commission on law enforcement accountability,
23   community, and transparency becomes law by July 1, 2022, then section 151 of this act shall take
24   effect July 1, 2022. If such an entity does not become law by July 1, 2022, then section 151 of this
25   act shall not take effect.

26   153 Effective Date. Section 151 of this act shall take effect as provided in section 152 of this act.

27   154 Department of Safety; Radio Infrastructure Equipment Purchases; Procurement.

28   I. The department of safety shall, in collaboration with the department of administrative
29   services, establish standards for radio infrastructure-related hardware, computers, software, related
30   licenses, media, documentation, support and maintenance services, and other related services.

31   II. Prior to an agency's issuance of a solicitation for the purchase of radio infrastructure-
32   related computer or radio hardware, software, related licenses, media, documentation, support and
33   maintenance services, and other related services including a request for proposal, request for
34   purchase, or other procurement documentation, the agency shall consult with and seek approval
35   from the department of safety, division of emergency services and communications.

Amendment to HB 2-FN-A-LOCAL
- Page 60 -

1    III.   The department of safety, division of emergency services and communications, shall

2    annually review and set dollar, or other, limits for purchases and contracts that require approval

3    from the director of the division of emergency services and communications before proceeding.

4    IV.   For purposes of this section, "agency" shall have the same meaning as in RSA 21-I:11,

5    II(b), but shall not include:

6        (a)  The university system of New Hampshire.

7        (b)  The court systems.

8        (c)  The legislature, secretary of state, and the state reporter.

9        (d)  The retirement system.

10       (e)  The community college system of New Hampshire.

11   155  New Paragraph; Office of the Chief Medical Examiner; Definitions.  Amend RSA 611-B:1 by

12   inserting after paragraph II the following new paragraph:

13       II-a.  "Associate medical examiner" means the licensed physician certified by the American

14   Board of Pathology as a qualified pathologist and appointed pursuant to RSA 611-B:3-a.

15   156  New Section; Office of the Chief Medical Examiner; Associate Medical Examiner.  Amend

16   RSA 611-B by inserting after section 3 the following new section:

17       611-B:3-a  Associate Medical Examiner.  There is hereby established within the office of the chief

18   medical examiner the position of associate medical examiner.  The associate medical examiner shall

19   be appointed in the same manner as the chief medical examiner as provided in RSA 611-B:2, and

20   shall be a licensed physician, certified by the American Board of Pathology as a qualified pathologist,

21   with training and experience in forensic medicine.  The associate medical examiner shall serve under

22   the professional direction and supervision of the chief medical examiner and deputy chief medical

23   examiner and shall act as the chief medical examiner whenever the chief medical examiner and

24   deputy chief medical examiner are absent, or unable to act for any cause.

25   157  Office of the Chief Medical Examiner; Acting Chief Medical Examiner.  Amend RSA 611-B:4

26   to read as follows:

27       611-B:4  Acting Chief Medical Examiner.  The chief medical examiner may designate in writing

28   an acting chief medical examiner who shall be a licensed physician, certified by the American Board

29   of Pathology as a qualified pathologist with training and experience in forensic medicine.  The acting

30   chief medical examiner shall act as the chief medical examiner whenever the chief medical

31   examiner*, [and the] deputy chief medical examiner, **and the associate medical examiner** are

32   absent, or unable to act [from] *for* any cause.

33   158    Department of Justice; Director of Diversity and Community Outreach; Position

34   Established.   There is established within the department of justice an unclassified position of

35   director of diversity and community outreach.  The director of diversity and community outreach

36   shall be qualified to hold the position by reason of education and experience, and shall be appointed

37   to serve for a term of 5 years.  The position shall assist the attorney general and deputy attorney

1   general to establish goals and milestones towards creating a more diverse, inclusive, and culturally

2   aware law enforcement community through efforts that increase equity and cultural awareness

3   among state, county, local prosecution, law enforcement and diverse communities to foster positive

4   relationships, understanding and respect.  The salary of the director of diversity and community

5   outreach shall be determined after assessment and review of the appropriate letter grade allocation

6   in RSA 94:1-a, I for positions which shall be conducted pursuant to RSA 94:1-d and RSA 14:14-c.

7   Funding shall be appropriated from expenditure class 014 within accounting unit 02-20-20-200010-

8   2601.

9   159  New Paragraph; Department of Justice; Attorney General Position Established.  Amend

10   RSA 21-M:3 by inserting after paragraph XII the following new paragraph:

11       XIII.  The attorney general, subject to the approval of the governor and council, may appoint

12   a permanent director of diversity and community outreach, within the limits of the appropriation

13   made for the appointment, who shall hold office for a term of 5 years.  Any vacancy in such position

14   may be filled for the unexpired term.  The director of diversity and community outreach may be

15   removed only as provided by RSA 4:1.

16   160  Effective Date.  Sections 158-159 of this act shall take effect January 1, 2023.

17   161  Judicial Council; Expenditures for Termination of Parental Rights Services.  In the event

18   that expenditures for termination of parental rights services are greater than amounts appropriated

19   in the operating budget, the judicial council may request, with prior approval of the fiscal committee

20   of the general court, that the governor and council authorize additional funding.  For funds

21   requested and approved, the governor is authorized to draw a warrant from any money in the

22   treasury not otherwise appropriated.

23   162  College Tuition Savings Plan; Advisory Commission.  Amend the introductory paragraph in

24   RSA 195-H:2, I(a) to read as follows:

25       I.(a)  There is established the New Hampshire college tuition savings plan advisory

26   commission which shall ensure the proper administration and management of the savings plan.  The

27   advisory commission shall ensure that the savings plan complies with the requirements of section

28   529 of the Internal Revenue Code of 1986, as amended, and any related federal law applicable to the

29   savings plan.  The commission shall also be responsible for ensuring the proper administration,

30   implementation, and management of the New Hampshire excellence in higher education endowment

31   trust fund established in RSA 6:38, and the governor's scholarship program and fund established in

32   [RSA 4-C:31-34] *RSA 195-H:11-14.  The commission, by a majority vote, may transfer funds*

33   *between the New Hampshire excellence in higher education endowment trust fund and the*

34   *governor's scholarship fund.*  The commission shall consist of the following members:

35   163  New Subdivision; Governor's Scholarship Program and Fund.  Amend RSA 195-H by

36   inserting after section 10 the following new subdivision:

37       Governor's Scholarship Program and Fund

Amendment to HB 2-FN-A-LOCAL
- Page 62 -

1    195-H:11  Definitions.  In this subdivision:

2    I.  "Eligible institution" means a postsecondary educational institution or training program

3    within the university system of New Hampshire as defined in RSA 187-A, a postsecondary

4    educational institution within the community college system of New Hampshire as defined in RSA

5    188-F, or a private postsecondary institution approved to operate in this state that:

6    (a)  Is approved by the higher education commission pursuant to RSA 21-N:8-a and

7    accredited by the New England Commission of Higher Education; and

8    (b)  Is a not-for-profit organization eligible to receive federal Title IV funds.

9    II.  "Eligible student" means a first-year, full-time, Pell Grant-eligible student who meets the

10   eligibility and residency requirements of RSA 195-H:13.  "First-year" means a student who has never

11   enrolled in an eligible institution.

12   III.  "Full-time" means an enrolled student who is carrying an academic course load that is

13   determined to be full-time by the eligible institution based on a standard applicable to all students

14   enrolled in a particular educational program.   The student's course load may include any

15   combination of courses, work, research, or special studies that the eligible institution considers

16   sufficient to classify the student as full-time.

17   195-H:12  Governor's Scholarship Program and Fund Established.

18   I.   There is hereby established the governor's scholarship program and the governor's

19   scholarship fund.  The program and fund shall be administered by the commission.  The fund shall

20   be kept distinct and separate from all other funds and shall be used to provide scholarships which a

21   recipient shall apply to the costs of an education at an eligible institution.  The funds shall be

22   distributed to an eligible institution based on the number of eligible students awarded a scholarship

23   and upon receipt of a request for reimbursement for such scholarship funds accompanied by

24   appropriate documentation.

25   II.  The state treasurer shall credit to the fund any appropriation relating to the governor's

26   scholarship fund made in each fiscal year to the commission.  The state treasurer shall invest the

27   fund in accordance with RSA 6:8.  Any earnings shall be added to the fund.

28   III.   All moneys in the fund shall be nonlapsing and continually appropriated to the

29   commission for the purposes of this subdivision.

30   IV.  The commission may institute promotional programs and solicit and receive cash gifts or

31   other donations for the purpose of supporting educational scholarships from the fund.   The

32   commission shall not solicit or accept real property.

33   V.  All gifts, grants, and donations of any kind shall be credited to the fund.

34   195-H:13  Eligibility.

35   I.  Any person who meets the following requirements shall be an eligible student:

36   (a)  A person shall meet the residency requirements of RSA 193:12; be a graduate of a

37   New Hampshire high school, public academy, chartered public school, New Hampshire private

1　preparatory high school, a high school-level home education program as defined in RSA 193-A; have

2　received a New Hampshire high school equivalency certificate; have completed at least 3 years of

3　high school in this state; be pursuing a certificate, associate, or bachelor degree at an eligible

4　institution in this state; and be eligible to receive a Pell grant; or

5　　　　　(b)  A person shall be a graduate of a preparatory high school outside of this state while a

6　dependent of a parent or legal guardian who is a legal resident of this state and who has custody of

7　the dependent; or

8　　　　　(c)  A person shall have a parent or guardian who has served in or has retired from the

9　United States Army, Navy, Air Force, Marine Corps, or Coast Guard within the last 4 years and is a

10　resident of this state; or

11　　　　　(d)  A person shall be a graduate of a high school, public academy, chartered public high

12　school, or a high school-level home education program outside of this state but have maintained his

13　or her primary residence in this state for not less than 5 years preceding the date of application for a

14　scholarship.

15　　　　　II.  A person shall meet the qualifications for academic performance or work experience as

16　established by the commission.

17　　　　　III.  A person shall not have been adjudicated delinquent or convicted or pled guilty or nolo

18　contendere to any felonies or any second or subsequent alcohol or drug-related offenses under the

19　laws of this or any other state, or under the laws of the United States, except that an otherwise

20　eligible person who has been adjudicated delinquent or has been convicted or pled guilty or nolo

21　contendere to a second or subsequent alcohol or drug-related misdemeanor offense shall be eligible

22　or continue to be eligible for a scholarship after the expiration of one academic year from the date of

23　adjudication, conviction, or plea.

24　195-H:14  Procedures.

25　　　　　I.  All scholarship funds shall be distributed to the eligible student by the eligible institution.

26　The institution shall include the scholarship in the student's financial aid package and may seek

27　subsequent reimbursement.  The state shall provide the reimbursements twice per year to each

28　eligible institution for the number of eligible students enrolled in the current semester or term who

29　are receiving a scholarship.  The institution shall submit the list of scholarship recipients to the

30　commission or its designee no later than November 30 and April 30 of each academic year, and shall

31　be reimbursed within 30 days of submission.

32　　　　　II.  An eligible student may receive a scholarship in the amount of $1,000 per year provided

33　he or she maintains at least a 2.0 grade point average.  An eligible student who earned the New

34　Hampshire scholar designation at the time of high school graduation may receive a scholarship in

35　the amount of $2,000 per year provided he or she maintains at least a 2.5 grade point average.  The

36　eligible institution shall not reduce any merit or need-based grant aid that would have otherwise

1  been provided to the eligible student.  An eligible student may receive an annual scholarship for a
2  maximum of 4 years.

3        III.  In the event the state does not reimburse the eligible institution for scholarship amounts
4  paid to an eligible student receiving an award, the eligible institution shall agree not to seek
5  additional payments from the eligible student and to absorb the loss of funds without any
6  consequence to the eligible student.

7        IV.  The commission shall adopt rules, pursuant to RSA 541-A, relative to awarding and
8  disbursing scholarship funds to an eligible student enrolled in an eligible institution.

9        V.  An eligible student, who initially attends a community college and transfers directly to an
10  eligible institution, without a break in attendance, shall remain an eligible student for a maximum
11  of 4 years of total eligibility.

12        VI.  The commission may hire staff or enter into a contract for services or personnel
13  necessary to administer the program.

14  164  Application of Receipts; Governor's Scholarship Program and Fund.  Amend RSA 6:12,
15  I(b)(336) to read as follows:

16        (336)  Moneys deposited into the governor's scholarship fund established in [RSA 4-
17  C:32] *RSA 195-H:12*.

18  165  Allied Health Professionals; Re-ordering of Definitions.   RSA 328-F:2 is repealed and
19  reenacted to read as follows:

20  328-F:2  Definitions.  In this chapter:

21        I.  "Athletic training" means "athletic training" as defined in RSA 326-G:1, III.

22        II.   "Board of directors" means the chairpersons or their appointees of all the governing
23  boards which shall be responsible for the administrative operation of the office of licensed allied
24  health professionals.

25        III.  "Genetic counseling" means genetic counseling as defined in RSA 326-K:1.

26        IV.  "Governing boards" means individual licensing boards of athletic trainers, occupational
27  therapy assistants, occupational therapists, recreational therapists, physical therapists, physical
28  therapist assistants, respiratory care practitioners, speech-language pathologists and hearing care
29  providers, and genetic counselors.

30        V.  "Hearing care providers" mean audiologists and hearing aid dealers as defined in RSA
31  326-F:1.

32        VI.  "Occupational therapy" means "occupational therapy" as defined in RSA 326-C:1, III.

33        VII.   "Office of licensed allied health professionals" means an agency of multiple governing
34  boards in professions of the allied health field.

35        VIII.   "Physical therapy" or "physiotherapy" means "physical therapy" or "physiotherapy" as
36  defined in RSA 328-A:2, IX.

37        IX.  "Recreational therapy" means "recreational therapy" as defined in RSA 326-J:1, III.

1       X.  "Respiratory care" means "respiratory care" as defined in RSA 326-E:1, X.

2       XI.   "Speech-language pathology" means "speech-language pathology" as defined in RSA

3  326-F:1.

4      166  Allied Health Professionals; Governing Boards; Hearing Care Providers.  Amend RSA 328-

5  F:3, I to read as follows:

6      I.  There shall be established governing boards of athletic trainers, occupational therapists,

7  recreational therapists, respiratory care practitioners, physical therapists, speech-language

8  pathologists*, hearing care providers,* and genetic counselors.

9      167  Allied Health Professionals; Governing Boards; Membership.  Amend RSA 328-F:4, I to

10  read as follows:

11      I.  Each governing board shall be composed of 5 persons, each to be appointed by the

12  governor with the approval of the council, to a term of 3 years*, except the speech-language*

13  *pathology and hearing care provider governing board which shall be composed of 6*

14  *members, each to be appointed by the governor with the approval of the council, to a term*

15  *of 3 years.*  Members shall serve until the expiration of the term for which they have been

16  appointed or until their successors have been appointed and qualified.  No board member shall be

17  appointed to more than 2 consecutive terms, provided that for this purpose only a period actually

18  served which exceeds 1/2 of the 3-year term shall be deemed a full term.  Any professional members

19  of all governing boards shall maintain current and unrestricted New Hampshire licenses.

20      168  Speech Language Pathology and Hearing Care Provider Governing Board; Membership.

21  Amend RSA 328-F:4, VIII to read as follows:

22      VIII.  The speech-language pathology *and hearing care provider* governing board shall

23  consist of 4 licensed speech-language pathologists who have actively engaged in the practice of

24  speech-language pathology in this state for at least 3 years*, one licensed individual in the field*

25  *of hearing care who has actively engaged in the practice,* and one public member.  At least

26  one speech-language pathologist shall be employed in an educational setting and at least one

27  employed in a clinical setting.

28      169  New Paragraph; Allied Health Professionals; Governing Boards; Duties; Registration.

29  Amend RSA 328-F:5 by inserting after paragraph I-a the following new paragraph:

30      I-b.  Issue initial registrations, conditional initial registrations, renewed registrations,

31  conditionally renewed registrations, reinstated registrations, and conditionally reinstated

32  registrations to businesses who are eligible if authorized to do so by the board's practice act.

33      170  New Paragraph; Allied Health Professionals; Governing Boards; Duties; Businesses.

34  Amend RSA 328-F:5 by inserting after paragraph II the following new paragraph:

35      II-a.  Investigate registered businesses and take necessary disciplinary action against them.

36      171  New Paragraph; Allied Health Professionals; Governing Boards; Rulemaking; Hearing Aid

37  Dealers.  Amend RSA 328-F:11 by inserting after paragraph II the following new paragraph:

**Amendment to HB 2-FN-A-LOCAL**
**- Page 66 -**

1       III.   The speech-language pathology and hearing care provider governing board shall adopt

2    rules on eligibility requirements and procedures for the issuance of registrations to hearing aid

3    dealers.

4    172  Allied Health Professionals; Governing Board; Fees.   Amend RSA 328-F:15, I to read as

5    follows:

6       I.  The board of directors shall establish fees for:

7         (a)   The processing of applications for initial and reinstatement of licensure, [or]

8    certification*, or registration*.

9         (b)  Initial licenses, [and] certifications*, and registrations*.

10        (c)  Renewal of licenses, [and] certifications*, and registrations*.

11        (d)  Late filing of applications for license renewal and renewal of certification.

12        (e)  Reinstatement of licenses, [and] certifications*, and registrations*.

13        (f)  Transcribing and transferring records.

14        (g)  The costs of a hearing by any governing board at which the issue is denial of, or

15    imposition of conditions on, an initial license or certification, including the per diem and mileage of

16    board members attending the hearing and the cost of a shorthand court reporter if one is used to

17    record the hearing.

18        ***(h)  The registration of hearing aid dealers.***

19    173   Allied Health Professionals; Governing Boards; Initial Licenses, Certifications, and

20    Registrations.   Amend RSA 328-F:18, IV to read as follows:

21       IV.   Initial licenses***, certifications, and registrations***, including conditional licenses***,***

22    ***certifications, and registrations*** that are the first license***, certificate, or registration*** issued to

23    the individual ***or hearing aid dealer***, and provisional licenses***, certifications, and registrations***

24    shall be:

25        (a)  Signed and dated by the chairperson of the governing board issuing them ***or his or***

26    ***her designee***.

27        (b)  Numbered consecutively and recorded.

28    174  Allied Health Professionals; License Provisions; Renewal.   Amend RSA 328-F:19 to read as

29    follows:

30    328-F:19  Renewal.

31       I.  Initial licenses and renewals shall be valid for 2 years, except that timely and complete

32    application for license renewal by eligible applicants shall continue the validity of the licenses being

33    renewed until the governing board has acted on the renewal application.   Licenses issued pursuant

34    to RSA 328-A, RSA 326-G, and RSA 326-J shall expire in even-numbered years and licenses issued

35    pursuant to RSA 326-C, RSA 326-E, RSA 326-F, and RSA 326-K shall expire in odd-numbered years.

36      ***I-a.  A license issued to a hearing care provider shall expire at 12:01 a.m. on July 1***

37    ***of the odd-numbered year next succeeding its date of issuance.   The governing board shall***

**Amendment to HB 2-FN-A-LOCAL**
**- Page 67 -**

1      ***notify the licensee, on or before May 1 of the renewal year, but failure of any licensee to***
2      ***receive this notification shall not relieve him or her of the obligation to comply with the***
3      ***rules of the governing board and this section. Timely submission of renewal applications***
4      ***shall be evidenced by postmark or, for applications delivered by hand, by date stamp or***
5      ***other record made at the time of delivery.***

6      II. Each governing board shall renew the licenses of applicants who meet the eligibility
7      requirements and complete the application procedure.

8      III. Applicants ***whose licenses expire on December 31 of the renewal year*** shall submit
9      completed applications for renewal on or before December 1 of the renewal year. Completed
10     renewal applications submitted between December 2 and December 31 of the renewal year shall be
11     accompanied by a late filing fee. Licenses shall lapse when completed renewal applications have not
12     been filed by December 31 of the renewal year, and their holders are not authorized to practice until
13     the licenses have been reinstated.

14     IV. The governing boards shall provide licensees ***whose licenses expire on December 31***
15     ***of the renewal year***, on or before November 1 of their renewal years, with materials needed to
16     complete their renewal applications, but failure of any licensees to receive these materials shall not
17     relieve them of the obligation to comply with the rules of the governing boards and this section.
18     Timeliness of submission of renewal applications shall be evidenced by postmark or, for applications
19     delivered by hand, by date stamp or other record made at the time of delivery.

20     V. Upon the request of a licensee who is a member of any reserve component of the armed
21     forces of the United States or the national guard and is called to active duty, the governing board
22     shall place the person's license on inactive status. The license may be reactivated within one year of
23     the licensee's release from active status by payment of the renewal fee and with proof of completion
24     of the most current continuing education requirement unless still within the renewal period.

25     175 Allied Health Professionals; License Provisions; Obligation to Report. Amend RSA 328-
26     F:25, I and II to read as follows:

27     I. Persons and entities regulated by the state, including but not limited to, licensees,
28     certified individuals, ***registrants,*** insurance companies, health care organizations, and health care
29     facilities shall report to the board of directors and the appropriate governing board any criminal
30     conviction of a licensee, [or] certified individual, ***registered hearing aid dealer,*** or any
31     determination by a regulatory agency indicating that a licensee, [or] certified individual, ***or***
32     ***registered hearing aid dealer*** has violated this chapter or the practice act of his or her governing
33     board. Persons and entities so reporting shall be immune from civil liability if the report is made in
34     good faith.

35     II. Every individual, agency, facility, institution or organization regulated by the state and
36     employing licensed allied health professionals ***or using the services of a registered hearing aid***
37     ***dealer*** within the state shall report to the appropriate governing board within 30 days any act by an

**Amendment to HB 2-FN-A-LOCAL**
**- Page 68 -**

1 individual licensed or certified by the board that appears to constitute misconduct. Persons and

2 entities so reporting shall be immune from civil liability if the report is made in good faith.

3 176 Allied Health Professionals; Unauthorized Practice. Amend RSA 328-F:27, II to read as

4 follows:

5 II. Practice of an allied health profession by any person who is not licensed [or], certified, *or*

6 *registered* to practice such profession shall constitute unauthorized practice. A business which

7 holds itself out, through advertising or in any other way, as providing an allied health service but

8 does not have available to supervise its services an allied health professional licensed [or], certified,

9 *or registered* to provide the services which the business purports to offer, is engaged in

10 unauthorized practice.

11 177 Speech Language Pathology Practice. Amend the chapter heading of RSA 326-F to read as

12 follows:

13 CHAPTER 326-F

14 SPEECH-LANGUAGE PATHOLOGY ***AND HEARING CARE PROVIDERS*** PRACTICE

15 178 Speech-Language Pathology and Hearing Care Providers Practice; Definitions. RSA 326-

16 F:1 is repealed and reenacted to read as follows:

17 326-F:1 Definitions. In this chapter and RSA 328-F:

18 I. "Audiologist" means any person who renders or offers to render to the public any service

19 involving the application of principles, methods, and procedures for the measurement of testing,

20 identification, appraisal, consultation, counseling, instruction, and research related to the

21 development and disorders of hearing and vestibular function for the purpose of diagnosing,

22 designing, and implementing programs for the amelioration of such disorders and conditions.

23 II. "Audiology" means the application of principles, methods, and procedures related to the

24 development and disorders of human communication, which disorders shall include any and all

25 conditions whether of organic or nonorganic origin, that impede the normal processes of human

26 communication and balance including, but not limited to, disorders of hearing, vestibular function,

27 and central auditory processing.

28 III. "Board" means the governing board of speech-language pathologists and hearing care

29 providers established in RSA 328-F.

30 IV. "Hearing aid" means any wearable instrument or device designed for or offered for the

31 purpose of or represented as aiding or compensating for impaired human hearing and any parts or

32 attachments, including ear molds, but excluding batteries and cords or accessories thereto, or

33 equipment, devices, and attachments used in conjunction with services provided by a public utility

34 company.

35 V. "Hearing aid dealer" means any person engaged in the testing of human hearing for the

36 purpose of selecting, fitting, or otherwise dealing in hearing aids.

1    VI.   "Otolaryngologist" means a physician licensed in the state of New Hampshire who

2    specializes in medical problems of the ear, nose, and throat, and is eligible for qualification by the

3    American Board of Otolaryngology as an otolaryngologist.

4    VII.  "Practice of audiology" means, but shall not be limited to:

5          (a)    Screening, identifying, assessing, interpreting, diagnosing, rehabilitating, and

6    preventing hearing disorders.

7          (b)    Rendering to individuals or groups of individuals, who are suspected of having

8    hearing disorders, basic and comprehensive audiological and vestibular site-of-lesion tests, including

9    otoscopic examinations, electrophysiologic test procedures, and auditory evoked assessment.

10         (c)    Rendering basic and comprehensive auditory and vestibular habilitative and

11   rehabilitative services, including aural rehabilitative assessment and therapy, vestibular

12   rehabilitative assessment and therapy, and speech and language screening.

13         (d)    Providing basic and comprehensive audiological and psychoacoustic evaluations for

14   the purpose of determining candidacy for amplification or assistive alerting/listening devices;

15   providing tinnitus evaluations and therapy; providing hearing aid fitting and orientation; taking ear

16   impressions; and providing hearing aid product dispensing, repair, and modification.

17         (e)    Providing preoperative evaluation and selection of cochlear implant candidacy and

18   post-implant rehabilitation.

19         (f)    Providing occupational hearing conservation.

20   VIII.  "Practice of speech-language pathology" means, but shall not be limited to:

21         (a)    Screening, identifying, assessing, interpreting, diagnosing, rehabilitating, and

22   preventing disorders of speech and language.

23         (b)    Screening, identifying, assessing, interpreting, diagnosing, and rehabilitating

24   disorders of oral-pharyngeal function and related disorders.

25         (c)    Screening, identifying, assessing, interpreting, diagnosing, and rehabilitating

26   cognitive communication disorders.

27         (d)    Assessing, selecting, and developing augmentative and alternative communication

28   systems and providing training in their use.

29         (e)    Providing aural rehabilitation and related counseling services to deaf or hard of

30   hearing individuals and their families.

31         (f)    Enhancing speech-language proficiency and communication effectiveness.

32         (g)    Screening of hearing and other factors for the purpose of speech-language evaluation

33   or the initial identification of individuals with other communication disorders.

34   IX.   "Rental or selling of hearing aids" means the selection, adaptation, and sale or rental of

35   hearing aids.  Also included is the making of impressions for ear molds and instruction pertaining to

36   the use of hearing aids.

**Amendment to HB 2-FN-A-LOCAL**
**- Page 70 -**

1    X.  "Sell" or "sale" means any transfer of title or of the right of use by sale, conditional sales
2  contract, lease bailments, hire-purchase or any other means, excluding wholesale transactions of
3  dealers and distributors.

4    XI.  "Speech-language assistant" means any person certified by the board who meets
5  minimum qualifications established by the board which are less than those established by this
6  chapter as necessary for licensing as a speech-language pathologist, and who does not act
7  independently but works under the direction and supervision of a speech-language pathologist
8  licensed under this chapter.

9    XII. "Speech-language pathologist" means any person who renders or offers to render to the
10  public any service involving the application of principles, methods, and procedures for the
11  measurement of testing, identification, appraisal, consultation, counseling, instruction and research
12  related to the development and disorders of speech, voice, or language for the purpose of diagnosing,
13  designing, and implementing programs for the amelioration of such disorders and conditions.

14    XIII.  "Speech-language pathology" means the application of principles, methods, and
15  procedures related to the development and disorders of human communication, which disorders shall
16  include any and all conditions whether of organic or nonorganic origin, that impede the normal
17  process of human communication including, but not limited to, disorders and related disorders of
18  speech, articulation, fluency, voice, verbal and written language, auditory comprehension, cognition,
19  communication, swallowing, and oral, pharyngeal or laryngeal sensorimotor competencies.

20    179  New Paragraph; Speech Language Pathology and Hearing Care Providers Practice;
21  Eligibility for Initial Licensure.  Amend RSA 326-F:3 by inserting after paragraph II the following
22  new paragraph:

23    III.  To be eligible for initial licensure as an audiologist an applicant shall:

24    (a)  Demonstrate sufficient evidence of good professional character and reliability to
25  satisfy the board that the applicant shall faithfully and conscientiously avoid professional
26  misconduct and otherwise adhere to the requirements of this chapter.

27    (b)  Possess at least a master's degree in audiology from an educational institution
28  approved by the board which consists of course work approved pursuant to rules adopted by the
29  board pursuant to RSA 541-A.

30    (c)  Complete a supervised postgraduate professional experience at an educational
31  institution or its cooperation programs, approved pursuant to rules adopted by the board pursuant to
32  RSA 541-A.

33    (d)  Pass an examination specified by the board in rules adopted under RSA 541-A.

34    (e)  Complete a supervised postgraduate professional experience.

35    (f)  If applicable, submit proof of licensure in another state in which the licensure
36  requirements are equivalent to or greater than those in this chapter.

Amendment to HB 2-FN-A-LOCAL
- Page 71 -

1    180   New Paragraph; Speech Language Pathology and Hearing Care Providers Practice;

2    Rulemaking.  Amend RSA 326-F:5 by inserting after paragraph VII the following new paragraph:

3        VIII.  The sale and fitting of hearing aids.

4    181   Speech Language Pathology and Hearing Care Providers Practice; Eligibility for Renewal of

5    Licenses.  Amend RSA 326-F:6, I to read as follows:

6        I.  ***For speech-language pathologists,*** have completed 30 hours of continuing education

7    which meet the requirements established by the board through rulemaking pursuant to RSA 541-A

8    and at least 50 percent of which are directly related to the practice of speech-language pathology.

9    ***For audiologists, have completed 20 hours of continuing education which meet the***

10    ***requirements established by the board through rulemaking pursuant to RSA 541-A.***

11    182   New Paragraphs; Speech-Language Pathology and Hearing Care Providers Practice;

12    Professional Identification.  Amend RSA 326-F:8 by inserting after paragraph IV the following new

13    paragraphs:

14        V.  No person shall practice audiology or represent oneself as an audiologist in this state,

15    unless such person is licensed in accordance with the provisions of this chapter.

16        VI.   No person shall represent oneself or use the following words to represent oneself:

17    audiologist, audiology, audiometry, audiometrist, audiological, audiometrics, hearing therapy,

18    hearing therapist, hearing clinic, hearing aid audiologist, or any other variation or synonym which

19    expresses, employs, or implies these terms or functions unless the person has been duly licensed as

20    an audiologist.

21    183   New Sections; Registration of Hearing Aid Dealers; Temporary Licensure for Audiologists;

22    Audiologists From Other Jurisdictions; Disclosure to Customers; Unsolicited Home Sales Prohibited;

23    Return of Hearing Aid; Deceptive Advertising Prohibited.  Amend RSA 326-F by inserting after

24    section 8 the following new sections:

25    326-F:9  Registration of Hearing Aid Dealers Required.  No person shall engage in the business

26    of selling or offering for rent hearing aids unless such person is registered in accordance with this

27    chapter and unless the registration of such person is current and valid.  The fee for an initial

28    registration under this section shall not exceed $300.  This section includes the selling or renting of

29    hearing aids by mail in this state by a person outside the state.  Registration certificates shall be

30    renewed biennially on or before June 30 upon payment of a renewal fee.

31    326-F:10  Temporary Licensure for Audiologists.

32        I.  A temporary license may be granted for up to 120 days to a person who has moved to this

33    state from another jurisdiction, if the person holds an audiologist's license in the other jurisdiction

34    and the other jurisdiction's requirements for licensure are greater than or equal to the requirements

35    in this state, and the person has applied for a license under this chapter.

36        II.  A temporary license issued under this section shall expire no later than 120 days after

37    issuance.  The date shall be stated on the license.

**Amendment to HB 2-FN-A-LOCAL**
**- Page 72 -**

1     326-F:11   Audiologists From Other Jurisdictions; Licensure.   The board may waive licensure

2     requirements for an applicant who:

3          I.   Is licensed by another jurisdiction where the requirements for licensure are greater than

4     or equal to those required in this state; and

5          II.   Is practicing audiology 20 days or less in New Hampshire in any calendar year.

6     326-F:12   Hearing Aid Dealer and/or Audiologist Disclosure to Customers.

7          I.   No hearing aid dealer or audiologist shall sell a hearing aid without presenting the

8     purchaser an itemized receipt, which shall include the following:

9          (a)   The name and address and signature of the purchaser.

10         (b)   The date of the sale.

11         (c)   The name and the regular place of business of the hearing aid dealer or dealer's

12    registration number or of the audiologist or audiologist's license number, and signature of the

13    registrant or licensee.

14         (d)   The make, model, serial number, and purchase price of the hearing aid and the

15    terms of the warranty.

16         (e)   An itemization of the total purchase price, including but not limited to the cost of the

17    aid, ear mold, and batteries and other accessories and any other services.

18         (f)   A statement as to whether the hearing aid is "new," "used" or "reconditioned."

19         (g)   The complete terms of the sale, including a clear and precise statement of the 30-day

20    money back guarantee required under RSA 326-F:14.

21         (h)   The name, address and telephone number of the consumer protection and antitrust

22    bureau, division of public protection, department of justice, with a statement that complaints which

23    arise with respect to the transaction may be submitted in writing to the consumer protection and

24    antitrust bureau.

25         (i)   The following statements in 10 point type or larger:  1) "This hearing aid will not

26    restore normal hearing nor will it prevent further hearing loss;" 2) "You have the right to cancel this

27    purchase or rental for any reason within 30 days after receiving the hearing aid."

28         II.   Each registrant or licensee shall keep records of every customer to whom such person

29    renders services or sells hearing aids, including a copy of the receipt as specified under paragraph I,

30    a record of services provided, any correspondence to or from a customer and any records required

31    under the rules for the hearing aid industry as promulgated by the United States Federal Trade

32    Commission on July 20, 1965, or as amended, or any rules for the hearing aid industry promulgated

33    by the United States Food and Drug Administration.   These records shall be preserved for at least 3

34    years after the date of transaction.

35     326-F:13   Unsolicited Home Sales Prohibited.   No hearing aid dealer or audiologist, employee or

36    agent thereof, shall canvass either in person or by telephone from house to house for the purpose of

**Amendment to HB 2-FN-A-LOCAL**
**- Page 73 -**

1    selling or renting a hearing aid without prior request from the prospective customer, a relative or
2    friend of the prospective customer.

3        326-F:14   Return of Hearing Aid; Cancellation Fee.   No hearing aid shall be sold to any person
4    unless accompanied by a 30-day written money back guarantee that if the person returns the
5    hearing aid in the same condition, ordinary wear and tear excluded, as when purchased, within 30
6    days from the date of delivery, the hearing aid dealer or audiologist may be entitled to a cancellation
7    fee of 5 percent of the purchase price.  In computing the actual purchase price, all rebates, discounts,
8    and other similar allowances provided to the seller shall be considered.  For the purpose of this
9    section, any consumer who initiates the return of a hearing aid within said 30-day period shall be in
10    compliance with this section.  The addressing of any claimed deficiency or return shall be resolved
11    within 90 days from date of delivery.

12        326-F:15   Deceptive Advertising Prohibited.

13        I.   No hearing aid dealer or audiologist, or employee or agent thereof, shall use or cause to be
14    used or promote the use of any advertising matter, promotional literature, testimonial, guarantee,
15    warranty, label, brand, insignia, or other representation, however disseminated or published, which
16    is misleading, deceptive, or untruthful.   All advertising by mail which offers free hearing testing or
17    other services by a hearing aid dealer or audiologist shall clearly state in such advertising that the
18    offers are made by a hearing aid dealer or audiologist.

19        II.   No hearing aid dealer, or employee or agent thereof, shall represent that the services or
20    advice of an individual licensed to practice medicine or of an individual certified as an audiologist
21    will be used or made available in the selection, fitting, adjustment, maintenance, or repair of hearing
22    aids where that is not true; or use or incorporate in any title or designation the words, "doctor,"
23    "otologist," "clinic," "clinical audiologist," "audiologist," "state licensed clinic," "state certified," "state
24    approved," "state registered," "certified hearing aid audiologist," or any term, abbreviation, or symbol
25    which would give the false impression that one is being treated medically or audiologically or that
26    the registrant's services have been recommended by the state.

27        III.   No hearing aid dealer or audiologist, or employee or agent thereof, shall use any
28    advertisement or any other representation which has the effect of misleading or deceiving
29    purchasers or prospective purchasers in the belief that any hearing aid or device, or part or
30    accessory thereof, is a new invention or involves a new mechanical or scientific principle when such
31    is not a fact.

32        IV.  No hearing aid dealer or audiologist, or employee or agent thereof, shall state or imply
33    that the use of any hearing aid will restore hearing to normal, or preserve hearing, or prevent or
34    retard the progression of a hearing impairment or make any false or misleading or medically or
35    audiologically unsupportable claims regarding the efficacy or benefits of hearing aids.

**Amendment to HB 2-FN-A-LOCAL**
**- Page 74 -**

V.   No hearing aid dealer or audiologist, or employee or agent thereof, shall advertise a particular model, type, or kind of hearing aid when the offer is not a bona fide effort to sell the product so offered as advertised.

VI.   No hearing aid dealer or audiologist, or employee or agent thereof, shall advertise that a hearing aid will be beneficial to persons with hearing loss, regardless of the type of loss.   No such dealer, employee, or agent shall advertise that a hearing aid will enable persons with hearing loss to consistently distinguish and understand speech sounds in noisy situations.

VII.   No hearing aid shall be sold to any person unless the packaging containing the hearing aid carries the following disclaimer in 10 point type or larger:   "This hearing aid will not restore normal hearing nor will it prevent further hearing loss."

326-F:16  Out-of-State Sales Regulated.

I.   No person shall conduct or operate a business outside of the state for the sale at retail of hearing aids to individuals within the state unless such business is registered with a permit issued by the board.

II.  The board shall issue a permit to such out-of-state business if the business discloses and provides proof:

(a)   That the business is in compliance with all applicable laws and rules in the state in which the business is located;

(b)  Of the operating locations and the names and titles of all principal corporate officers;

(c)   That the business complies with all lawful directions and requests for information from the board of all states in which it conducts business; and

(d)   That the business agrees in writing to comply with all New Hampshire laws and rules relating to the sale or dispensing of hearing aids.

III.   The board shall assess fees as established by rules adopted by the board, pursuant to RSA 541-A, for out-of-state hearing aid sales companies.

184  General Administration of Regulatory Boards and Commissions; Reciprocity Information.  Amend the introductory paragraph of RSA 332-G:12, I to read as follows:

I.  All boards or commissions[, including the board of hearing care providers established in RSA 137-F:3,] shall post information on their website relative to reciprocal licensure or certification for persons holding a current and valid license or certification for the practice of the regulated profession in another state.   Such information shall include a list of the states which the board or commission has determined to have license or certification requirements equal to, or greater than, the requirements of this state.   The posting shall also list states with which the board or commission has:

185  Repeals.   The following are repealed:

I.  RSA 137-F, relative to hearing care providers.

II.  RSA 310-A:1-a, II(a), relative to hearing care providers.

186  Transition; Rules; Hearing Care Providers.

I.  The rules adopted for hearing care providers under the former RSA 137-F in effect on the effective date of this act shall, to the extent practicable, continue and be effective and apply to hearing care providers until they expire or are amended or repealed.

II.  Registrations or licenses of hearing care providers under the former RSA 137-F shall be valid until they expire or are revoked or suspended as provided in RSA 326-F as amended by section 183 of this act.

187  New Chapter; Department of Energy.  Amend RSA by inserting after chapter 12-O the following new chapter:

CHAPTER 12-P

DEPARTMENT OF ENERGY

12-P:1  Definitions.  In this chapter:

I. "Commission" means the public utilities commission.

II.  "Commissioner" means the commissioner of energy.

III.  "Department" means the department of energy

12-P:2  Establishment; Purpose.

I.  There shall be a department of energy under the executive direction of a commissioner of energy and consisting of the divisions of administration, policy and programs, enforcement, and regulatory support.

II.  The purpose of this chapter is to improve the administration of state government by providing unified direction of policies, programs, and personnel in the field of energy and utilities, making possible increased efficiency and economies from integrated administration and operation of the various energy and utility related functions of the state government.

III.  In addition to its other functions, it shall be the duty of the department of energy to provide all necessary administrative support to the public utilities commission to assist the commission in carrying out its regulatory and adjudicative functions.

IV.  The department shall have the authority to investigate any matter that may come before the public utilities commission and to appear before the commission to advocate for the department's position and for the purposes of providing a complete record for consideration by the commission.

12-P:3  General Provisions.

I.  Upon the recommendation of the commissioner after consultation with division directors concerned, the governor and council are authorized to approve revisions in internal administrative departmental organization as the governor and council find from time to time may improve or make more economical the administration of the department.

II.  The department of energy is authorized to work with the department of business and economic affairs and the department of administrative services to coordinate the implementation of the establishment of the department, and to transfer appropriations and create the proper

**Amendment to HB 2-FN-A-LOCAL**
**- Page 76 -**

1    expenditure lines, if needed, for the establishment of their respective operations, including but not

2    limited to the relocation of personnel, work stations, books, papers, personnel record files, and

3    equipment, with the approval of the governor and council and of the director of personnel.

4        12-P:4  Commissioner; Deputy Commissioner; Directors

5        I.  The commissioner of the department of energy shall be appointed by the governor, with

6    the consent of the council, and shall serve for a term of 4 years.  The commissioner shall be qualified

7    to hold that position by reason of education and experience.  Directors of departmental divisions

8    shall be subject to the supervisory authority of the commissioner, which authority shall include

9    power to establish department and divisional policy as well as to control the actual operations of the

10    department and all divisions therein.  The commissioner is authorized to establish any advisory

11    committees and programs which the commissioner may deem necessary to carry out the mission and

12    operations of the department.

13        II.   The commissioner of energy shall nominate a deputy commissioner of energy for

14    appointment by the governor and council.  The deputy commissioner shall hold office for 4 years and

15    until a successor has been appointed and qualified.  The deputy commissioner shall be qualified to

16    hold that position by reason of education and experience.  The deputy commissioner shall perform

17    such duties as the commissioner may assign.  The deputy commissioner shall perform the duties of

18    the commissioner if for any reason the commissioner is unable to do so.

19        III.   Division directors shall be appointed to initial terms as stated below, and then

20    subsequently to terms of 4 years.  Terms notwithstanding, each division director shall serve until a

21    successor has been appointed and qualified.

22        (a)  The commissioner shall nominate for appointment by the governor and council a

23    director of the division of policy and programs for an initial term of one year.  All subsequent terms

24    shall be 4 years.  The director of the division of policy and programs shall be qualified to hold that

25    position by reason of education and experience.

26        (b)  The commissioner shall nominate for appointment by the governor and council a

27    director of the division of administration for an initial term of 2 years.  All subsequent terms shall be

28    4 years.  The director of the division of administration shall be qualified to hold that position by

29    reason of education and experience.

30        (c)  The commissioner shall nominate for appointment by the governor and council a

31    director of the division of enforcement for an initial term of 3 years.  All subsequent terms shall be 4

32    years.  The director of the division of enforcement shall be qualified to hold that position by reason of

33    education and experience.

34        (d)  The commissioner shall nominate for appointment by the governor and council a

35    director of the division of regulatory support for an initial term of 3 years.  All subsequent terms

36    shall be 4 years.  The director of the division of regulatory support shall be qualified to hold that

37    position by reason of education and experience.

**Amendment to HB 2-FN-A-LOCAL**
**- Page 77 -**

1    IV.  The salaries of the commissioner, the deputy commissioner, and each division director
2    shall be as specified in RSA 94:1-a.

3    12-P:5  Duties of Commissioner.  In addition to the powers, duties, and functions otherwise
4    vested by law in the commissioner of the department of energy, the commissioner, except as
5    otherwise provided in this chapter, shall:

6    I.  Represent the public interest in the administration of the functions of the department of
7    energy and be responsible to the governor, the general court, and the public for such administration.

8    II.  Provide for, in consultation with the commissioner of the department of administrative
9    services and the state treasurer, a system of accounts and reports which will ensure the integrity
10   and lawful use of all fees, funds, and revenues collected by the department, the use of which is
11   restricted by state or federal law.

12   III.  Have the authority to receive, administer, and internally audit all present and future
13   federal and state energy-related grant programs.

14   IV.  Have the authority to adopt rules, pursuant to RSA 541-A, necessary to assure the
15   continuance or granting of federal funds or other assistance intended to promote the administration
16   of this chapter, not otherwise provided for by law, and to adopt all rules necessary to implement the
17   specific statutes administered by the department or by any division or unit within the department,
18   whether the rulemaking authority delegated by the legislature is granted to the commissioner, the
19   department, or any administrative unit or subordinate official of the department.

20   V.  Have the authority to reorganize rules of the department to conform to the requirements
21   of RSA 541-A and the uniform drafting and numbering system adopted by the division of
22   administrative rules, office of legislative services.  Reference changes shall be limited to title,
23   chapter, part, and section designations and numbers and substitution of terms reflecting
24   reorganization of the department to the existing statutory structure, and shall be made subject to
25   review by the division of administrative rules, office of legislative services for consistency and
26   accuracy of such changes.  Such reference changes shall be integrated into the rules and such
27   amendments to the rules shall become effective when notice of these reference changes is published
28   by the director of legislative services in the rulemaking register.  Reference changes made prior to
29   July 1, 2022, shall be exempt from the procedures and requirements of RSA 541-A.  Changes
30   authorized under this section shall not affect the adoption or expiration date of rules changed under
31   this section.

32   VI.  Collect and account for all fees, funds, taxes, or assessments levied upon any person
33   subject to the jurisdiction of the department of energy and the public utilities commission.

34   VII.  Ensure that the department provides all necessary support to the public utilities
35   commission, the site evaluation committee, office of the consumer advocate, and any other entity
36   that is administratively attached to the department, provided that, other than for administrative
37   functions, department employees shall not communicate with the public utilities commission and its

1   staff in connection with any issue in a matter pending before the commission or the department,
2   except upon notice and opportunity for all parties to participate.

3   12-P:6  Division of Administration.  There is established within the department the division of
4   administration, under the supervision of an unclassified director of the division of administration.
5   The division, through its officials, shall be responsible for all functions, duties, and responsibilities
6   which may be assigned to it by the commissioner or laws enacted by the general court.

7   12-P:7  Division of Policy and Programs.  There is established within the department the division
8   of policy and programs, under the supervision of an unclassified director of the division of policy and
9   programs.  The division, through its officials, shall be responsible for all functions, duties, and
10  responsibilities which may be assigned to it by the commissioner or laws enacted by the general
11  court.  In addition, the division shall administer fuel assistance contracts and weatherization
12  contracts.  In administering fuel assistance and weatherization contracts, the division shall ensure
13  that when an individual applies for fuel assistance or weatherization, the individual shall be
14  provided with application forms and information about the Link-Up New Hampshire and Lifeline
15  Telephone Assistance programs, and shall be provided assistance in applying for these programs.

16  12-P:7-a  State Energy Strategy.

17      I.  The division of policy and programs, with approval of the commissioner, and with
18  assistance from an independent consultant and with input from the public and interested parties,
19  shall prepare a 10-year energy strategy for the state.  The division shall review the strategy and
20  consider any necessary updates in consultation with the senate energy and natural resources
21  committee and the house science, technology and energy committee, after opportunity for public
22  comment, at least every 3 years starting in 2021.  The state energy strategy shall include, but not be
23  limited to, sections on the following:

24      (a)  The projected demand for consumption of electricity, natural gas, and other fuels for
25  heating and other related uses.

26      (b)  Existing and proposed electricity and natural gas generation and transmission
27  facilities, the effects of future retirements and new resources, and consideration of possible
28  alternatives.

29      (c)  Renewable energy and fuel diversity.

30      (d)  Small-scale and distributed energy resources, energy storage technologies, and their
31  potential in the state.

32      (e)  The role of energy efficiency, demand response, and other demand-side resources in
33  meeting the state's energy needs.

34      (f)  The processes for siting energy facilities in the state and the criteria used by the site
35  evaluation committee in giving adequate consideration to the protection of the state's ecosystems
36  and visual, historic, and aesthetic resources in siting processes.

**Amendment to HB 2-FN-A-LOCAL**
**- Page 79 -**

1        (g)   The relationship between land use and transportation policies and programs on
2 electricity and thermal energy needs in the state.

3        (h)   New Hampshire's role in the regional electric markets, how the regional market
4 affects the state's energy policy goals, and how the state can most effectively participate at the
5 regional level.

6        II.   The strategy shall include a review of all state policies related to energy, including the
7 issues in paragraph I, and recommendations for policy changes and priorities necessary to ensure
8 the reliability, safety, fuel diversity, and affordability of New Hampshire's energy sources, while
9 protecting natural, historic, and aesthetic resources and encouraging local and renewable energy
10 resources.   The strategy shall also include consideration of the extent to which demand-side
11 measures including efficiency, conservation, demand response, and load management can cost-
12 effectively meet the state's energy needs, and proposals to increase the use of such demand resources
13 to reduce energy costs and increase economic benefits to the state.

14        III.   The strategy development process shall include review and consideration of relevant
15 studies and plans, including but not limited to those developed by the independent system operator
16 of New England (ISO-NE), the public utilities commission, the energy efficiency and sustainable
17 energy board, legislative study committees and commissions, and other state and regional
18 organizations as appropriate.   The strategy shall also include consideration of new technologies and
19 their potential impact on the state's energy future.

20   12-P:7-b  Office of Offshore Wind Industry Development Established.

21        I.   There is established in the department of energy the office of offshore wind industry
22 development. The office shall be under the supervision of a classified director of the office of offshore
23 wind industry development, who shall serve under the supervision of the commissioner.   The
24 director shall provide administrative oversight and ensure that the responsibilities of the office
25 described in this section are fulfilled.

26        II. The office of offshore wind industry development shall:

27        (a)   Support the work of the New Hampshire members of the Intergovernmental
28 Renewable Energy Task Force administered by the federal Bureau of Ocean Energy Management
29 (BOEM).

30        (b)  Support the work of the offshore wind commission established in RSA 374-F:10.

31        (c)   Assist the offshore wind commission to develop and implement offshore wind
32 development strategies including:

33            (1) Assessment of port facilities.

34            (2) Economic impact analyses.

35            (3) Supply chain analyses.

36            (4) Outcome and performance measurements.

Amendment to HB 2-FN-A-LOCAL
- Page 80 -

1       (d)    Collaborate with key state agencies and partners on offshore wind industry

2  development initiatives.

3       (e)  Coordinate offshore wind industry economic development policy, including:

4          (1)  Development of workforce.

5          (2)  Identification of and recruitment of offshore wind development employers.

6          (3)  Identification and recruitment of offshore wind supply chain employers.

7          (4)  Promotion of New Hampshire's benefits to the various components of the offshore

8  wind industry.

9          (5)  Provide updates and guidance to the general court with regard to policy and

10  funding.

11     12-P:8  Division of Enforcement.  There is established within the department the division of

12  enforcement, under the supervision of an unclassified director of the division of enforcement.  The

13  division, through its officials, shall be responsible for all functions, duties, and responsibilities which

14  may be assigned to it by the commissioner or laws enacted by the general court.

15     12-P:9  Division of Regulatory Support.  There is established within the department the division

16  of regulatory support, under the supervision of an unclassified director of the division of regulatory

17  support.  The division, through its officials, shall be responsible for all functions, duties, and

18  responsibilities which may be assigned to it by the commissioner or laws enacted by the general

19  court.  The division shall automatically be a party to all proceedings before the public utilities

20  commission.

21     12-P:10  Specific Answers.  The department or the commission may require any public utility or

22  entity subject to its jurisdiction to make specific answers to questions upon which the department or

23  commission may need information.

24     12-P:11  Transfer of Functions, Powers, Duties.  All of the functions, powers, duties, records,

25  personnel, and property of the public utilities commission incorporated in the statutes establishing

26  the department of energy and which replace the authority of the commission with the authority of

27  the department of energy, are hereby transferred, as of July 1, 2021, to the department of energy.

28     12-P:12  Prohibited Service.  No member of the commission shall render any professional service

29  for any public utility in this state, or any affiliate thereof, or act as attorney or render professional

30  service against any such public utility or affiliate; nor shall he or she be a member of a firm which

31  renders any such service; nor shall he or she directly or indirectly be a party to any contract with

32  any such public utility, except a contract for the transportation of telephone or telegraph messages,

33  or a contract for the purchase of water, gas, or electricity or for other similar service.

34     12-P:13  Pipeline Operation Safety.

35       I. The department of energy shall apply annually to the Pipeline and Hazardous Materials

36  Safety Administration of the United States Department of Transportation for authorization to take

**Amendment to HB 2-FN-A-LOCAL**
**- Page 81 -**

1  such actions on its behalf to oversee pipeline operation safety, security, monitoring, and compliance

2  through an inspection process.

3      II.  The department of energy shall report annually to the house science, technology, and

4  energy committee prior to October 1 on the status of pipeline safety, new and proposed projects, any

5  deficiency in state law that limits the department's ability to oversee interstate pipelines, or state

6  regulations for pipelines that do not meet the minimum federal standard.

7      12-P:14  Transfer of Rules, Orders, Approvals.  Existing rules, orders, and approvals of the

8  public utilities commission which are associated with any functions, powers, and duties, transferred

9  to the department of energy pursuant to RSA 12-P:11 or any other statutory provision, shall

10  continue in effect and be enforced by the commissioner of the department of energy until they expire

11  or are repealed or amended in accordance with applicable law.

12      12-P:15  Suppliers of Natural Gas and Aggregators of Natural Gas Customers; Rulemaking.

13      I.  The department is authorized to adopt rules, pursuant to RSA 541-A, establishing

14  requirements for suppliers of natural gas and the aggregators of natural gas customers, including

15  registration of such suppliers and aggregators before soliciting or doing business in the state,

16  registration fees, disclosure of information to customers, standards of conduct, submission to

17  commission jurisdiction for mediation and resolution of disputes, imposition of penalties for failure

18  to comply with commission requirements, and consumer protection and assistance requirements.

19      II.  The department of energy shall adopt rules under RSA 541-A which require all natural

20  gas companies to report to the department, the senate president, and the speaker of the house of

21  representatives, in a uniform manner, lost and unaccounted for gas for each year.

22      (a)  Such rules shall include a method using operational and billing data to determine the

23  total amount of lost and unaccounted for gas and to identify and measure each of its components.

24      (b)  The department may grant waivers from the rules as necessary for the development

25  of innovative projects to reduce lost and unaccounted for gas.  Such innovative projects shall be

26  intended to reduce costs to ratepayers and to reduce greenhouse gas emissions.  An application for a

27  waiver shall include the goals of the innovative project, the expected cost, the expected benefit to

28  ratepayers and the expected reduction in greenhouse gas emissions.

29      (c)  For the purposes of this paragraph, "lost and unaccounted for gas" shall mean an

30  amount of gas that is the difference between the total gas purchased by a gas company and the sum

31  of: (1) total gas delivered to customers; and (2) total gas used by a gas company in the conduct of its

32  operations.

33      III.  This section shall not in any way affect the utility or non-utility status of any supplier of

34  natural gas or aggregator of natural gas customers, nor shall it be construed to limit the

35  commission's and the department of energy's existing authority with regard to the regulation of gas

36  utilities or the scope of the commission's and the department's authority in considering whether to

Amendment to HB 2-FN-A-LOCAL
- Page 82 -

1  expand the availability of competitive natural gas supplies through the distribution system of gas

2  utilities.

3  188  Department of Energy; Interim Commissioner.  Until appointment of a commissioner under

4  RSA 12-P:4, the governor may initially designate an interim commissioner to serve for up to 60 days

5  from the effective date of this section.

6  189  Repeals.  The following are repealed:

7  I.  RSA 4-C, relative to the office of strategic initiatives; the governor's scholarship program

8  and fund, and state demography.

9  II.  RSA 4-E, relative to the state energy strategy.

10  III.  RSA 12-O:51 and 52, relative to the office of offshore wind industry development.

11  190  Office of Strategic Initiatives; Revolving Funds; Reference Change.  Amend RSA 6:12, I(b)

12  (79) to read as follows:

13  (79) Moneys deposited in the publications revolving fund under *RSA 12-O:60, I* [RSA

14  4-C:9-a].

15  191  Office of Strategic Initiatives; Revolving Funds; Reference Change.  Amend RSA 6:12,

16  I(b)(169)

17  (169)  Moneys deposited in the municipal and regional training fund under *RSA 12-*

18  *O:60, II* [RSA 4-C:9-a, II].

19  192  Organization of the Executive Branch.  Amend RSA 21-G:6-b, II to read as follows:

20  II.  The executive departments are as follows:

21  (a)  The department of administrative services.

22  (b)  The department of agriculture, markets, and food.

23  (c)  The department of banking.

24  (d)  The department of business and economic affairs.

25  (e)  The department of corrections.

26  (f)  The department of education.

27  (g)  The department of employment security.

28  *(h)  The department of energy.*

29  [(h)] *(i)*  The department of environmental services.

30  [(i)] *(j)*  The department of health and human services.

31  [(j)] *(k)*  The department of information technology.

32  [(k)] *(l)*  The department of insurance.

33  [(l)] *(m)*  The department of labor.

34  [(m)] *(n)*  The department of military affairs and veteran services.

35  [(n)] *(o)*  The department of natural and cultural resources.

36  [(o)] *(p)*  The department of revenue administration.

37  [(p)] *(q)*  The department of safety.

Amendment to HB 2-FN-A-LOCAL
- Page 83 -

1     [(q)] *(r)* The department of transportation.

2     193  Department of Energy; Unclassified Positions Established.

3     I.  The following positions are hereby established in the department of energy, shall be

4 qualified by reason of education or experience or both, and shall be appointed by the commissioner

5 and perform assigned duties according to applicable law.  Each position shall be temporarily

6 assigned to its respective unclassified salary letter grade, as follows:

| Labor Grade | Title | Job Code | Position # |
|---|---|---|---|
| GG | Director of Regulatory Support | 9U9962 | GV008 |
| GG | Director of Enforcement | 9U9963 | GV009 |
| GG | Director of Policy & Programs | 9U9964 | GV010 |
| GG | Director of Administration | 9U9966 | GV012 |
| HH | Deputy Commissioner of Energy | 9U9967 | GV013 |
| II | Commissioner of Energy | 9U9968 | GV020 |

14     II.  The permanent salaries of these positions shall be determined after assessment and

15 review of the appropriate letter grade allocation in RSA 94:1-a, I(b) for the positions which shall be

16 conducted pursuant to RSA 94:1-d and RSA 14:14-c.

17     194  Public Utilities Commission; Unclassified Positions Established.

18     I.  The following positions are hereby established in the public utilities commission, shall be

19 qualified by reason of education or experience or both in one or more of the following areas:

20 engineering, economics, accounting, finance, or law; and shall be appointed by the agency head and

21 perform assigned duties according to applicable law.  Each position shall be temporarily assigned to

22 its respective unclassified salary letter grade, as follows:

| Labor Grade | Title | Job Code | Position # |
|---|---|---|---|
| GG | Senior Advisor | 9U9969 | GV014 |
| GG | Senior Advisor | 9U9970 | GV015 |
| GG | Senior Advisor | 9U9971 | GV016 |
| GG | Senior Advisor | 9U9972 | GV017 |
| GG | Senior Advisor | 9U9973 | GV018 |
| GG | Senior Advisor | 9U9974 | GV019 |

30     II.  The permanent salaries of these positions shall be determined after assessment and

31 review of the appropriate letter grade allocation in RSA 94:1-a, I(b) for the positions which shall be

32 conducted pursuant to RSA 94:1-d and RSA 14:14-c.

33     195  New Subdivision; Department of Business and Economic Affairs; Office of Planning and

34 Development.  Amend RSA 12-O by inserting after section 52 the following new subdivision:

35              Office of Planning and Development

36     12-O:53  Office of Planning and Development.

**Amendment to HB 2-FN-A-LOCAL**
**- Page 84 -**

1       I.   There is established the office of planning and development within the department of

2 business and economic affairs.  The office of shall be under the supervision of a classified director of

3 the office of planning and development, who shall serve under the supervision of the commissioner.

4       II.   The office of planning and development shall:

5       (a)   Plan for the orderly development of the state and the wise management of the state's

6 resources.

7       (b)   Compile, analyze, and disseminate data, information, and research services as

8 necessary to advance the welfare of the state.

9       (c)   Encourage and assist planning, growth management, and development activities of

10 cities and towns and groups of cities and towns with the purpose of encouraging smart growth.

11       (d)   Encourage the coordination and correlation of state planning by agencies of state

12 government.

13       (e)   Participate in interstate, regional, and national planning efforts.

14       (f)   Administer federal and state grant-in-aid programs assigned to the office by statute

15 or executive order.

16       (g)   Participate and advise in matters of land use planning regarding water resources

17 and floodplain management.

18       (h)   Take a leadership role in encouraging smart growth and preserving farmland, open

19 space land, and traditional village centers.

20       (i)   Administer the following programs:  the statewide comprehensive outdoor recreation

21 plan, the national flood insurance program, and the land conservation investment program.  The

22 office shall employ necessary personnel to administer these programs.

23       (j)   Perform such other duties as the commissioner may assign.

24    12-O:54  State Development Plan.

25       I.   The office of planning and development, under the direction of the commissioner, shall:

26       (a)   Assist the commissioner in preparing, publishing, and revising the comprehensive

27 development plan required under RSA 9-A.

28       (b)   Coordinate and monitor the planning efforts of various state agencies and

29 departments to ensure that program plans published by such agencies are consistent with the

30 policies and priorities established in the comprehensive development plan.

31       (c)   Coordinate and monitor the planning efforts of the regional planning commissions to

32 ensure that the plans published by the commissions are consistent, to the extent practical, with the

33 policies and priorities established in the state development plan.

34       II.   In preparing the state development plan, the office of planning and development shall

35 consult with the chief executive officers of the various departments and agencies of state

36 government.  The office shall also consult with officials of regional planning commissions and

regional and local planning and development agencies, local officials, representatives of the business and environmental community, and the general public.

III.  All state agencies and departments shall provide the office of planning and development with information and assistance as required by the office to fulfill its responsibilities under paragraph I.  The office shall maintain the confidentiality of any information which is protected by law.

12-O:55  Data and Information Services.  The office of planning and development shall:

I.  Gather, tabulate, and periodically publish information on the location and pace of development throughout the state, including, but not limited to, population, housing, and building permit data.

II.  Initiate data coordination procedures as the state agency responsible for coordinating data collection and dissemination among the state, the private sector, and the various political subdivisions.

III.  Gather information for storage in a data bank concerning the data which is currently available within all state agencies.  This data shall be used to provide information which is useful in measuring growth and its impact and for statewide planning purposes in general.  The data available for dissemination shall include, but shall not be limited to, information for determining future demands for state services and demographic and economic statistics.  Any other state agency or department which initiates a data collection program shall inform the office of planning and development of its efforts so that the office may utilize that information for planning purposes in its dissemination program.

IV.  Cooperate with the department of environmental services in identifying potential sites for hazardous waste facilities.

V.  Develop and maintain a computerized geographic information system in support of state, regional, or local planning and management activities.

VI.  Cooperate with the Bureau of the Census and other federal agencies with the objective of improving access to the statistical products, data, and information of the federal government.

VII.  Annually estimate the resident population for all cities and towns of the state pursuant to RSA 78-A:25.

12-O:56  Policies and Plans.

I.  The office of planning and development shall formulate policies and plans for consideration by the commissioner and the governor which serve to integrate and coordinate resource and development activities affecting more than one state agency, level of government, or governmental function.  Such activities may include, but shall not be limited to, the following subject areas:

(a)  Water resources.

(b)  Transportation.

Amendment to HB 2-FN-A-LOCAL
- Page 86 -

1    (c)  Recreation and natural resources.

2    (d)  Solid waste and hazardous waste management.

3    (e)  Off-shore, coastal, and estuarine resources.

4    (f)  Housing.

5    (g)  Economic development.

6    (h)  Energy.

7    (i)  Shoreland protection.

8    (j)  Smart growth.

9    12-O:57   Program Established.   The director of the office of planning and development shall

10   establish a program of regional and municipal assistance within the office of planning and

11   development.  This program shall coordinate state, regional, and local planning efforts with the goal

12   of assuring delivery of efficient and effective assistance to local governments in areas related to

13   growth management and resource protection.

14   12-O:58  Responsibilities for Assistance.  The office of planning and development shall:

15   I.  Provide technical assistance and, within the limits of biennial legislative appropriations,

16   financial grants to regional planning commissions established under RSA 36:45-36:53 in support of:

17   (a)  Planning assistance to local units of government.

18   (b)  Preparation of regional plans.

19   (c)   Contributions to and coordination with statewide planning and management

20   activities, including the formulation and updating of the comprehensive state development plan

21   prepared pursuant to RSA 12-P:54.

22   II.  As requested and in cooperation with regional planning commissions, provide technical

23   assistance and information in support of the planning and growth management efforts of local units

24   of government, including training requested under RSA 673:3-a.   The office shall encourage

25   municipalities to first seek assistance from established regional planning commissions.

26   III.   Provide computer interface capability among and between each regional planning

27   commission, the office of strategic initiatives, and state data collection and storage sources.  The

28   computer interface capability shall be used by regional planning commissions to respond to

29   municipal requests for assistance in the preparation and amending of master plans and in the

30   evaluation of municipal infrastructure needs.  The computer interface capability shall also be used

31   by regional planning commissions to develop and update regional master plans, as provided in RSA

32   36:47.  The computer equipment used for the purposes of this paragraph shall be compatible and

33   able to interface with the office of planning and development's geographic information system, as

34   well as with other similar state computerized data collection and storage sources.

35   IV.  Provide technical assistance and information to municipalities with the cooperation of

36   other state and regional planning agencies in the following areas:

1     (a)   Use and application of geographic data available in the state's geographic
2 information system (GIS) for local planning and growth management purposes.

3     (b)   Recommending standard procedures for the establishment of accurate, large-scale
4 base mapping to support municipal administrative functions such as tax assessment, public facility
5 management and engineering.

6     12-O:59   Coordination at State Level.   The office of planning and development shall coordinate
7 efforts by state agencies to provide technical assistance to municipal governments in areas related to
8 growth management and resource protection.

9     12-O:60   Revolving Funds.   In order to enhance its ability to provide education and training
10 assistance to municipalities and regional agencies, the following nonlapsing revolving funds, which
11 shall not exceed $20,000 on June 30 of each year, shall be established in the office of planning and
12 development:

13     I. A revolving fund known as the publications revolving fund.

14     (a)   The moneys in this fund shall be used for the purposes of printing materials for
15 distribution.   A reasonable charge shall be established for each copy of a document.   This charge
16 shall be only in the amount necessary to pay the cost of producing such document.

17     (b)   The amount in the nonlapsing publications revolving fund shall not exceed $20,000,
18 on June 30 of each year and any amounts in excess of $20,000 on June 30 of each year shall be
19 deposited in the general fund as unrestricted revenue.

20     II. A revolving fund known as the municipal and regional training fund.

21     (a)   The moneys in this fund shall be used for the purpose of providing training to local
22 and regional officials.   A reasonable charge shall be established for such training.   This charge shall
23 be fixed to reflect the cost of payments to experts to provide the training, the cost of written training
24 material, rental of facilities, advertising and other associated costs.   Such training shall be
25 conducted in a geographically dispersed manner and scheduled with the convenience of part-time
26 officials in mind.

27     (b)   The amount in the nonlapsing municipal and regional training revolving fund shall
28 not exceed $20,000 on June 30 of each year and any amounts in excess of $20,000 on June 30 of each
29 year shall be deposited in the general fund as unrestricted revenue.

30     196 State Development Plan. Amend RSA 9-A:2 to read as follows:

31     9-A:2   [Office of Strategic Initiatives] *Office of Planning and Development*.   The office of
32 [strategic initiatives] *planning and development*, under the direction of the [governor]
33 *commissioner of business and economic affairs*, shall:

34     I.   Assist the [governor] *commissioner* in preparing, publishing and revising the
35 comprehensive development plan.

36     II.   Develop and maintain a technical data base of information to support statewide policy
37 development and planning.

**Amendment to HB 2-FN-A-LOCAL**
**- Page 88 -**

1        III.   Coordinate and monitor the planning efforts of various state agencies and departments

2    to ensure that program plans published by such agencies are consistent with the policies and

3    priorities established in the comprehensive development plan.

4        IV.   Coordinate and monitor the planning efforts of the regional planning commissions.

5    197  State Development Plan; References Changed.  Amend RSA 9-A:4 to read as follows:

6    9-A:4  Consultation With Other Agencies.

7        I.  In preparing the state development plan, the office of [strategic initiatives] ***planning and***

8    ***development*** shall consult with the chief executive officers of the various departments and agencies

9    of state government with responsibilities which are relevant to economic development.

10       II.  The office may also consult with officials of regional and local planning and development

11   agencies and representatives of business and industry.

12       III.   All state agencies and departments shall provide the office of [strategic initiatives]

13   ***planning and development*** with such information and assistance required by the office to fulfill

14   its responsibilities under RSA 9-A:2.  The office shall maintain the confidentiality of any information

15   which is protected by law.

16   198   Name Change; Office of Planning and Development.   Amend the following RSAs by

17   replacing "office of strategic initiatives" with "office of planning and development":  RSA 4-F:1; 12-

18   G:13; 17-M:2; 21-O:5-a; 21-P:48; 36:45; 36:46; 36:47; 36-B:1; 78-A:25; 78-A:26; 125-O:5-a; 126-A:4;

19   162-L:15; 162-L:19; 204-C:8; 216-A:3-c; 216-F:5; 217-A:3; 227-C:4; 227-G:2; 227-M:4; 233-A:2; 235:23;

20   238:20; 270:64; 270:71; 432:19; 482-A:32; 483:8; 483:10; 483-A:6; 483-A:7; 483-B:5; 483-B:12; 483-

21   B:16; 483-B:22; 485-A:4; 673:3-a; 674:3; 675:9.

22   199   Council on Resources and Development; Membership.   Amend RSA 162-C:1 to read as

23   follows:

24   162-C:1   Council Established.   There is established a council on resources and development

25   which shall include the following members:

26       I.  [The director or assistant director of the office of strategic initiatives who shall serve as

27   chairperson of the council.

28       II.] The commissioner or appropriate division director, department of business and economic

29   affairs, or designee***, who shall serve as chairperson of the council***.

30       [III.] ***II.***   The commissioner or assistant commissioner, department of environmental

31   services, or designee.

32       [IV.] ***III.***   The commissioner or appropriate division director, department of agriculture,

33   markets, and food, or designee.

34       [V.] ***IV.***   The executive director or appropriate division director, fish and game department,

35   or designee.

36       [VI.] ***V.***   The commissioner or assistant commissioner, department of safety, or designee.

**Amendment to HB 2-FN-A-LOCAL**
**- Page 89 -**

1         [~~VII.~~] ***VI.***  The commissioner of the department of health and human services or a member of
2  the senior management team, or designee.

3         [~~VIII.~~] ***VII.***  The commissioner or assistant commissioner, department of education, or
4  designee.

5         [~~IX.~~] ***VIII.***  The commissioner or assistant commissioner, department of transportation, or
6  designee.

7         [~~X.~~] ***IX.***  The commissioner or appropriate division director, department of natural and
8  cultural resources, or designee.

9         [~~XI.~~] ***X.***  The commissioner or appropriate division director, department of administrative
10  services, or designee.

11         [~~XII.~~] ***XI.***  The executive director or chairman of the New Hampshire housing finance
12  authority, or designee.

13    200  Name Change; Department of Energy.  Amend the following RSAs by replacing "office of
14  strategic initiatives" with "department of energy":  RSA 9-E:5; 12-K:2; 12-K:3; 12-K:6; 12-K:8; 12-
15  K:9; 38-D:6; 147-B:4; 162-H:10; 167:4-c; 369-B:2; 374:22-j.

16    201  Reference Changed: State Energy Strategy; Offshore Wind Commission.  Amend RSA 374-
17  F:10, I to read as follows:

18         I.  There is established a commission to investigate, in parallel with the work of the Gulf of
19  Maine Intergovernmental Renewable Energy Task Force established by the Bureau of Ocean Energy
20  Management (BOEM) study, the economic development opportunities for New Hampshire in supply
21  chain needs, port capabilities, workforce development, energy procurement, transmission and
22  storage, and fisheries and marine environment, to ensure the success of offshore wind in the Gulf of
23  Maine.  The commission may consider, at an appropriate time, in relation to the New Hampshire
24  state energy strategy, outlined in RSA [~~4-E~~] ***12-P***, if contracts with developers and utilities can
25  deliver lower costs to ratepayers.  The commission may coordinate with the advisory boards
26  established in Executive Order 2019-06 as to assist the commission in reaching its
27  recommendations.

28    202  Reference Changed; State Energy Policy; Least Cost Energy Planning.  Amend RSA 378:38,
29  VII to read as follows:

30         VII.  An assessment of plan integration and consistency with the state energy strategy under
31  RSA [~~4-E:1~~] ***12-P***.

32    203  Reference Changed; Motor Vehicle Waste Fee.  Amend the introductory paragraph of RSA
33  261:153, V to read as follows:

34         V.  Beginning July 1, 1989, in addition to each registration fee collected under paragraph I,
35  there may be collected an additional fee for the purposes of a town reclamation trust fund as
36  established in RSA 149-M:18.  Of this amount, $.50 shall be retained by the city official designated
37  by the city government or by the town clerk for administrative costs and the remaining amount shall

1  be deposited into the reclamation trust fund established by the town for the purpose of paying

2  collection and disposal fees for the town's motor vehicle waste and paying for the recycling and

3  reclamation of other types of solid waste.  For the purposes of this paragraph, "motor vehicle waste"

4  means "motor vehicle waste" as defined in RSA 149-M:18.  A town which collects such additional fees

5  shall not charge a disposal fee for motor vehicle waste at the town's solid waste disposal facility.  If a

6  town finds the additional fee is not sufficient to cover fees for collection and disposal of town motor

7  vehicle waste, it shall notify the office of [strategic initiatives] ***planning and development***.  The

8  office shall study the fee in accordance with RSA [4-C:1] ***12-O:53*** and make recommendations, if

9  necessary, for increases in the fee.  The additional fee schedule shall be graduated by class of vehicle

10  as follows:

11     204  Public Utilities Commission; Prohibition on Future Employment.  Amend RSA 363:12-b to

12  read as follows:

13     363:12-b  Prohibition on Future Employment.  No commissioner, ***or former*** executive director,

14  finance director, ***or*** general counsel[, or chief engineer] of the commission shall accept any

15  employment with any utility under the control of the commission until one year after he or she shall

16  become separated from the commission.

17     205  Repeal.  RSA 363:4-a, relative to duties of commissioners of the public utilities commission,

18  is repealed.

19     206  Public Utilities Commission; Prohibition on Future Employment.  Amend RSA 363:12-b to

20  read as follows:

21     363:12-b  Prohibition on Future Employment.  No commissioner, ***or former*** executive director,

22  finance director, ***or*** general counsel[, or chief engineer] of the commission shall accept any

23  employment with any utility under the control of the commission until one year after he or she shall

24  become separated from the commission.

25     207  Public Utilities Commission; Quorum.  Amend RSA 363:16 to read as follows:

26     363:16  Quorum.  A majority of the commission shall constitute a quorum to issue orders [or

27  adopt rules], and any hearing [or investigation] may be held or conducted by 2 commissioners or by a

28  single commissioner.

29     208  Public Utilities Commission; Request for Full Commission.  Amend RSA 363:17 to read as

30  follows:

31     363:17  Request for Full Commission.  No hearing [or investigation], except in accident cases,

32  shall be held or conducted by a single commissioner if any party whose interests may be affected

33  shall, 5 days before the date of hearing, file a request in writing that the same be held or conducted

34  by the full commission, or a majority thereof.  If no such request is filed, the commission may assign

35  one of its members or appoint a qualified member of its staff as examiner to hear the parties, report

36  the facts, and make recommendations to the commission.

37     209  Repeal.  The following are repealed:

**Amendment to HB 2-FN-A-LOCAL**
**- Page 91 -**

1    I.  RSA 363:18-a, relative to the authority of the public utilities commission to contract for
2    power.

3    II.  RSA 363:22-a, relative to pipeline operation safety.

4    210  Public Utilities Commission; Staff.  Amend RSA 363:27 to read as follows:

5    363:27  Staff[; Separation of Functions].

6    I.  In the exercise of the jurisdiction and performance of the duties prescribed by law, the
7    commission shall have the power, subject to the state personnel regulations and within the limits of
8    the appropriation for such purpose, to employ and fix the compensation of such regular staff,
9    including experts, as it shall deem necessary.  Notwithstanding any other provision of law, if the
10   expenditure of additional funds over budget estimates is necessary for the proper functioning of the
11   public utilities commission, the governor and council, with the prior approval of the fiscal committee
12   of the general court, upon request from the commission, may authorize an additional assessment
13   pursuant to RSA 363-A for such purpose.

14   II.  The staff of the commission shall be organized as the [commission] *chairperson*
15   determines best achieves its statutory responsibilities.

16   III.  [Executive Director and General Counsel.  The commission shall appoint an executive
17   director, who shall serve for a term of 4 years.  The commission shall also appoint a general counsel,
18   who shall serve for a term of 4 years and until a successor is appointed and qualified.]  *"Staff"*
19   *means the employees of the commission and any consultants and other contractors*
20   *retained by the commission for the purpose of assisting the commission and its employees*
21   *in providing advice or information, or for the purpose of supplementing the work of the*
22   *commission and its employees.*

23   [IV.  Director of Safety and Security.  The commission shall appoint a director of safety and
24   security, who shall serve a term of 4 years.  The director of safety and security shall be qualified to
25   hold that position by reason of education and experience and shall perform such duties as are
26   assigned by the chairman of the commission.]

27   211  Office of the Consumer Advocate; Attachment to Department of Energy.  Amend the
28   introductory paragraph of RSA 363:28, I to read as follows:

29   I.  The office of the consumer advocate shall be an independent agency administratively
30   attached to the [public utilities commission] *department of energy* pursuant to RSA 21-G:10.  The
31   office shall consist of the following:

32   212  Office of the Consumer Advocate; Attachment to Department of Energy.  Amend RSA
33   363:28, III to read as follows:

34   III.  The consumer advocate shall have authority to contract for outside consultants within
35   the limits of funds available to the office.  With the approval of the fiscal committee of the general
36   court and the governor and council, the office of the consumer advocate may employ experts to assist
37   it in proceedings before the public utilities commission, and may pay them reasonable compensation.

1    The [public utilities commission] *department of energy* shall charge a special assessment for any
2    such amounts against any utility participating in such proceedings and shall provide for the timely
3    recovery of such amounts for the affected utility.

4    213  Repeal.  RSA 363:30 through RSA 363:36, relative to participation of staff of the public
5    utilities commission in adjudicative proceedings, are repealed.

6    214  Public Utilities Commission; Complaints.  Amend RSA 363:39 to read as follows:

7    363:39  Complaints [to the Commission].  When complaints to the [public utilities commission]
8    *department of energy* are initiated by residential customers, the [commission] *department* shall
9    provide to the consumer advocate access to the complaint, by paper or electronically, with the
10   customer name blocked out, at the same time as the [commission] *department* forwards the
11   complaint to the utility in compliance with [commission] *department* rules.

12   215  Electric Vehicle Charging Stations Infrastructure Commission; Membership.  Amend RSA
13   4-G:1, II(a)(1) to read as follows:

14          (1)  [Office of strategic initiatives] *Department of energy*.

15   216  Electric Vehicle Charging Stations Infrastructure Commission; Duties.  Amend RSA 4-G:1,
16   III(f) to read as follows:

17          (f)  Changes needed to state laws, rules, and practices, including building codes*,*
18   *department of energy rules,* and public utilities commission rules, to further the development of
19   zero emission vehicle technology and infrastructure.

20   217  Maintenance of Funds Collected Pursuant to Electric Utility Restructuring Orders.  Amend
21   RSA 6:12-b to read as follows:

22   6:12-b  Maintenance of Funds Collected Pursuant to Electric Utility Restructuring Orders.  On
23   request of the [public utilities commission] *department of energy*, the state treasurer shall
24   maintain custody over funds collected by order of the public utilities commission consisting of only
25   that portion of the system benefits charge directly attributable to programs for low income customers
26   as described in RSA 374-F:4, VIII(c).  All funds received by the state treasurer pursuant to this
27   section shall be kept separate from any other funds and shall be administered in accordance with
28   terms and conditions established by the [public utilities commission] *department of energy*.  Plans
29   for the administration of such funds shall be approved by the fiscal committee of the general court
30   and the governor and council prior to submission to the [public utilities commission] *department of*
31   *energy*.  Appropriations and expenditures of such funds in fiscal years 2002 and 2003 shall be
32   approved by the fiscal committee of the general court and the governor and council prior to
33   submission to the [public utilities commission] *department of energy*.  For each biennium
34   thereafter, appropriations and expenditures of such funds shall be made through the biennial
35   operating budget.

36   218  Energy Efficiency and Clean Energy Districts.  Amend RSA 53-F:6, I to read as follows:

**Amendment to HB 2-FN-A-LOCAL**
**- Page 93 -**

1    I.  Improvements financed pursuant to an agreement under this chapter shall be based upon

2    an audit performed by a person who has been certified as a building analyst by the Building

3    Performance Institute or who has obtained other appropriate certification as determined by the

4    [public utilities commission] *department of energy* or another appropriate New Hampshire-based

5    entity.  The audit shall identify recommended energy conservation and efficiency and clean energy

6    improvements; provide the estimated energy cost savings, useful life, benefit-cost ratio, and simple

7    payback or return on investment for each improvement; and provide the estimated overall difference

8    in annual energy costs with and without recommended improvements.  Financed improvements

9    shall be consistent with the audit recommendations.  The cost of the audit may be included in the

10   total amount financed under this chapter.

11   219  Enhanced 911 Commission; Membership.  Amend the introductory paragraph of RSA 106-

12   H:3, I(a) to read as follows:

13   (a)  There is hereby established an enhanced 911 commission consisting of 19 members,

14   including the director of the division of fire standards and training and emergency medical services

15   or designee, the [chairman of the public utilities commission] *commissioner of the department of*

16   *energy* or designee, the commissioner of the department of safety or designee, a public member, a

17   police officer experienced in responding to emergency calls, a representative of the disabled

18   community, and one active member recommended by each of the following organizations, nominated

19   by the governor with the approval of the council:

20   220  Energy Efficiency and Sustainable Energy Board; Membership.  Amend RSA 125-O:5-a,

21   II(b) to read as follows:

22   II.  The members of the board shall be as follows:

23   (a)  The chairman of the public utilities commission, or designee.

24   (b)  The [director of the office of strategic initiatives] *commissioner of the department*

25   *of energy*, or designee.

26   (c)  The consumer advocate, or designee.

27   (d)  The commissioner of the department of environmental services, or designee.

28   (e)  The commissioner of the department of business and economic affairs, or designee.

29   (f)   The president of the Business and Industry Association of New Hampshire, or

30   designee.

31   (g)  The executive director of the New Hampshire Municipal Association, or designee.

32   (h)  The executive director of New Hampshire Legal Assistance, or designee.

33   (i)   The president of the Homebuilders ampersand Remodelers Association of New

34   Hampshire, or designee.

35   (j)   Two members of the house science, technology and energy committee appointed by

36   the speaker of the house of representatives.

1        (k)   One member of the senate energy, environment and economic development

2   committee, appointed by the president of the senate.

3        (l)  Three representatives from not-for-profit groups representing energy, environmental,

4   consumer, or public health issues and knowledgeable in energy conservation policies and programs,

5   appointed by the [chairman of the public utilities commission] *commissioner of the department of*

6   *energy*.

7        (m)  The commissioner of the department of administrative services, or designee.

8        (n)  The state fire marshal, or designee.

9        (o)  The executive director of the New Hampshire housing finance authority, or designee.

10   III.  The board shall include, as nonvoting participants, the following:

11        (a)  One representative from each utility-administered electric and natural gas energy

12   efficiency program appointed by the [chairman of the public utilities commission] *commissioner of*

13   *the department of energy*.

14        (b)  A representative of energy services companies delivering energy efficiency services to

15   residential and business customers, appointed by the [chairman of the public utilities commission]

16   *commissioner of the department of energy*.

17        (c)  A representative of a business or association of businesses selling or installing

18   sustainable or renewable energy systems, appointed by the [chairman of the public utilities

19   commission] *commissioner of the department of energy*.

20        (d)  A representative from the investment community with expertise in efficiency

21   investments and financing, appointed by the [chairman of the public utilities commission]

22   *commissioner of the department of energy*.

23        IV.  The chairman of the public utilities commission shall call the first meeting of the board.

24   The board shall elect a chairperson from among its members.  Seven members of the board shall

25   constitute a quorum.  The board shall make an annual report on December 1 to the governor, the

26   speaker of the house of representatives, the president of the senate, the house science, technology

27   and energy committee, the senate energy, environment and economic development committee, *the*

28   *department of energy,* and the public utilities commission, to provide an update on its activities

29   and recommendations for action including possible legislation.

30        V.  The board shall be administratively attached to the [public utilities commission]

31   *department of energy* under RSA 21-G:10.

32   221  State Building Code Review Board; Membership.  Amend RSA 155-A:10, I(k) to read as

33   follows:

34        (k)   One representative from the New Hampshire [public utilities commission]

35   *department of energy*, nominated by the [chairman of the commission] *commissioner of the*

36   *department of energy*.

222  Nuclear Decommissioning Financing Committee; Membership.  Amend RSA 162-F:15, II to read as follows:

II.  Each committee shall consist of one person who is a resident of the town or city in which the facility is located and who shall be appointed by the selectmen of the town or the mayor and council of the city, the chairman of the public utilities commission, *the commissioner of the department of energy,* one senator, to be appointed by the senate president, one house member, to be appointed by the speaker of the house of representatives, the state treasurer or designee, the commissioner of the department of health and human services or designee, *and* the commissioner of the department of safety or designee[, and the director of the governor's office of energy and community services or designee].

223  Conduct of Studies Concerning Changes in Laws and Regulations with a View to Atomic Development.  Amend RSA 162-B:3, IV to read as follows:

IV.  The public utilities commission *and the department of energy*, particularly as to the transportation of special nuclear materials and by-product materials by common carriers or public or private air carriers not in interstate commerce and as to the participation by public utilities subject to [its] *their* jurisdiction in projects looking to the development of production or utilization facilities for industrial or commercial use.

224  New Hampshire Building Code; Energy Code Compliance Form.  Amend RSA 155-A:10-a to read as follows:

155-A:10-a  Energy Code Compliance Form.  The state building code review board shall prescribe by rule and make available to the public, in electronic formats, a simplified residential energy code compliance form based upon the energy provisions in the International Residential Code and the International Energy Conservation Code identified in RSA 155-A:1.  The correctly completed form shall be accepted by all code enforcement authorities within the state of New Hampshire as one method of verification that the applicable project meets the code requirements.  Completed compliance forms shall be submitted to the building official in those municipalities that have adopted an enforcement mechanism under RSA 674:51. For municipalities without an adopted code enforcement mechanism, completed compliance forms shall be submitted to the New Hampshire [public utilities commission] *department of energy*, on behalf of the building code review board, for verification that the applicable project meets the code requirements.  The [public utilities commission] *department of energy* shall then forward the reviewed compliance forms to the municipality for retention in property records.

225  Organization of Nuclear Decommissioning Financing Committees.  Amend RSA 162-F:17, I to read as follows:

I.  The temporary chairman of each committee formed, who shall be the [chairman of the public utilities commission] *commissioner of the department of energy*, shall call an organizational meeting within 90 days of formation.  At the organizational meeting, the committee

1   shall select a chairman to serve for a 3-year term, elect such other officers as the members shall

2   determine, and establish a schedule of meetings for determining the requirements of the

3   decommissioning fund.

4       226  Decommissioning of Nuclear Electric Generating Facilities; Report; Public Hearing.  Amend

5   RSA 162-F:21, III-IV to read as follows:

6       III.   Each committee shall rely on all available data and experience in determining the

7   amount of such fund including, but not limited to, information from the Nuclear Regulatory

8   Commission; the public utilities commission; *the department of energy,* the owner or owners of the

9   facility; municipal and regional planning commissions and municipal governing bodies; and relevant

10  construction cost indices.  The committee shall publish a transcript of all proceedings during which

11  information was presented or offered into testimony, and a detailed analysis of the facts and figures

12  used in determining the amount of the fund.

13      IV.   Following the committee's deliberation and prior to final hearing, the plan for scheduled

14  payments into the fund and relevant evidence, including the transcripts and analysis published

15  pursuant to RSA 162-F:21, III, shall be available for public review in the clerk's office of the city or

16  town where the facility is located and in the office of the [public utilities commission] *department of*

17  *energy* at least 30 days prior to the one or more public hearings on the committee's proposed plan.

18  At least one hearing shall be held in the city or town where the facility is located.  A notice of the

19  time and place of each hearing shall be posted in 2 appropriate public places in the city or town

20  where the facility is located and shall be printed at least twice in a newspaper of general circulation

21  for that city or town and in a newspaper of state-wide circulation 2 weeks prior to each hearing.

22  Testimony presented at the hearings held pursuant to this paragraph shall be taken into

23  consideration by the committee when it formalizes the payment schedule plan.  All testimony shall

24  be transcribed and made a permanent record.

25      227  Site Evaluation Committee; Membership; Administrative Attachment.  Amend RSA 162-

26  H:3, IV to read as follows:

27      IV.   The committee shall be administratively attached to the [public utilities commission]

28  *department of energy* pursuant to RSA 21-G:10.

29      228  Committee Established.  There is established a committee to study necessary revisions to

30  the site evaluation committee.

31      I. The members of the committee shall be as follows:

32        (a)  Two members of the senate, appointed by the president of the senate.

33        (b)   Three members of the house of representatives, at least one of whom shall be a

34  member of the science, technology, and energy committee, one of whom shall be a member of the

35  finance committee, and at least one of whom shall be a member of the minority party, appointed by

36  the speaker of the house of representatives.

Amendment to HB 2-FN-A-LOCAL
- Page 97 -

II.  Members of the committee shall receive mileage at the legislative rate when attending to the duties of the committee.

III.  The committee shall:

(a)  Evaluate the current structure, processes, authorities, funding, and functions of the site evaluation committee and whether the statutory purpose and original legislative intent of the site evaluation committee is being achieved.

(b)  Review the structure, processes, authorities, funding, and functions of public bodies with jurisdiction over siting large energy facilities that have been established by other states.

(c)  Consider the site evaluation committee's relationship to the department of energy and other state agencies.

(d)  Review the timeliness of site evaluation committee decisions, the on-going enforcement of certificates issued by the site evaluation committee, public input to the orderly siting of energy infrastructure, and any changes required to minimize delays siting energy infrastructure.

(e)  Make recommendations for legislation to restructure the site evaluation committee no later than October 1, 2021.

IV.  The members of the study committee shall elect a chairperson from among the members. The first meeting of the committee shall be called by the first-named senate member.  The first meeting of the committee shall be held within 45 days of the effective date of this section.  Three members of the committee shall constitute a quorum.

V.  The committee shall report its findings and any recommendations for proposed legislation to the president of the senate, the speaker of the house of representatives, the senate clerk, the house clerk, the governor, and the state library on or before October 1, 2021.

229  Minimum Energy Efficiency Standards for Certain Products; Definitions.  Amend RSA 339-G:1, II to read as follows:

II.  [*"Commission" means the public utilities commission.*] ***"Department" means the department of energy.***

230  Reference Change; Minimum Energy Efficiency Standards for Certain Products; Department.  Amend the following RSA provisions by replacing the term "commission" with "department":  339-G:3, III(b), 339-G:4, II, 339-G:5, 339-G:6, 339-G:7, 339-G:8, 339-G:9.

231  Gas Companies; When Public Utilities.  Amend RSA 362:4-b, III to read as follows:

III.  Nothing in this section prevents the [commission] ***department of energy*** from monitoring or enforcing the provisions of federal pipeline safety standards relative to liquefied petroleum gas systems pursuant to the Natural Gas Pipeline Safety Act.

232  New Paragraph; Limited Electrical Energy Producers Act; Definitions.  Amend RSA 362-A:1-a by inserting after paragraph II-d the following new paragraph:

II-e.  "Department" means the New Hampshire department of energy.

1    233  Reference Change; Net Energy Metering; Department of Energy.  Amend the following RSA

2    provisions by replacing the term "commission" with "department": 362-A:9, X-XII.

3    234  Net Energy Metering.  Amend RSA 362-A:9, XIV to read as follows:

4        XIV.(a)  A customer-generator may elect to become a group host for the purpose of reducing

5    or otherwise controlling the energy costs of a group of customers who are not customer-generators.

6    The group of customers shall be located within the service territory of the same electric distribution

7    utility as the host.  The host shall provide a list of the group members to the commission and the

8    electric distribution utility and shall certify that all members of the group have executed an

9    agreement with the host regarding the utilization of kilowatt hours produced by the eligible facility

10    and that the total historic annual load of the group members together with the host exceeds the

11    projected annual output of the host's facility.  The [commission] *department* shall verify that these

12    group requirements have been met and shall register the group host.  The [commission] *department*

13    shall establish the process for registering hosts, including periodic re-registration, and the process by

14    which changes in membership are allowed and administered.  Net metering tariffs under this section

15    shall not be made available to a customer-generator group host until such host is registered by the

16    [commission] *department*.

17        (b)  Except as provided in subparagraph (c), the provisions of this section shall apply to a

18    group host as a customer-generator.

19        (c)  Notwithstanding paragraph V, a group host shall be paid for its surplus generation at

20    the end of each billing cycle at rates consistent with the credit the group host receives relative to its

21    own net metering under either subparagraph IV(a) or (b) or alternative tariffs that may be

22    applicable pursuant to paragraph XVI.  Alternatively, a group host may elect to receive credits on

23    the customer electric bill for each member and the host, with the utility being allowed the most cost-

24    effective method of doing so according to an amount or percentage specified for each member on PUC

25    form 909.09 (Application to Register or Re-register as a Host), along with a 3 cent per kwh addition

26    from July 1, 2019 through July 1, 2021 and a 2.5 cent per kwh addition thereafter for low-moderate

27    income community solar projects, as defined in RSA 362-F:2, X-a.  On or before July 1, 2022, the

28    [commission] *department* shall report on the costs and benefits of such an addition and the

29    development of the market for low-moderate income community solar projects, and provide a

30    recommendation on whether the addition shall be increased or decreased.  The [commission]

31    *department* shall report on the costs and benefits of low-moderate income community solar projects,

32    as defined in RSA 362-F:2, X-a on or before June 1, 2020.  The [commission] *department* shall

33    authorize at least 2 new low-moderate income community solar projects, as defined in RSA 362-F:2,

34    X-a, each year in each utility's service territory beginning January 1, 2020.  On an annual basis, for

35    all group host systems except for residential systems with an interconnected capacity under 15

36    kilowatts, the electric distribution utility shall calculate a payment adjustment if the host's surplus

37    generation for which it was paid is greater than the group's total electricity usage during the same

1    time period. The adjustment shall be such that the resulting compensation to the host for the

2    amount that exceeded the group's total usage shall be at the utility's avoided cost or its default

3    service rate in accordance with subparagraph V(b) or paragraph VI or alternative tariffs that may be

4    applicable pursuant to paragraph XVI. The utility shall pay or bill the host accordingly.

5         (d)  [Repealed.]

6         (e)  The ***department is authorized to petition the*** commission [is authorized] to assess

7    fines against, revoke the registration of, and prohibit from doing business in the state, any group

8    host which violates the requirements of this paragraph and rules adopted pursuant to this

9    paragraph. ***The commission is authorized to grant or deny such petitions.***

10    235  Repeal. RSA 362-F:2, IV, relative to the definition of "commission" as it pertains to electric

11    renewable portfolio standards, is repealed.

12    236  Electric Renewable Energy Classes; Reference Changed. Amend RSA 362-F:4, I(i)-(k) to

13    read as follows:

14         (i)  The incremental new production of electricity in any year from an eligible biomass or

15    methane source or any hydroelectric generating facility licensed or exempted by Federal Energy

16    Regulatory Commission (FERC), regardless of gross nameplate capacity, over its historical

17    generation baseline, provided the [commission] ***department of energy*** certifies demonstrable

18    completion of capital investments attributable to the efficiency improvements, additions of capacity,

19    or increased renewable energy output that are sufficient to, were intended to, and can be

20    demonstrated to increase annual renewable electricity output. The determination of incremental

21    production shall not be based on any operational changes at such facility but rather on capital

22    investments in efficiency improvements or additions of capacity.

23         (j)  The production of electricity from a class III or IV source that has begun operation as

24    a new facility by demonstrating that 80 percent of its resulting tax basis of the source's plant and

25    equipment, but not its property and intangible assets, is derived from capital investment directly

26    related to restoring generation or increasing capacity including department permitting requirements

27    for new plants. Such production shall not qualify for class III or IV certificates. Commencing July 1,

28    2013, a class III source eligible as a class I source under this subparagraph or subparagraph (i) may

29    submit a notice to the [commission] ***department of energy*** electing to be a class III source instead

30    of a class I source. Once such notice is given, the production from such a source shall qualify for

31    class III certificates, provided the source meets the other requirements of a class III eligible biomass

32    technology.

33         (k)  The production of electricity from any fossil-fueled generating facility that originally

34    commenced operation prior to January 1, 2006, if after January 1, 2012 such facility co-fires with

35    class I eligible biomass fuels to displace the combustion of an amount of fossil fuels. The portion of

36    the total electrical energy output that qualifies as class I from a facility in a given time period shall

37    be the fraction of electrical production derived from the combustion of biomass fuels based on the

1    heat input at the facility in that time period as determined by the [commission] *department of*
2    *energy* in consultation with the department.   To qualify under this paragraph, the electricity
3    generation facility that co-fires with biomass fuels shall:

4               (1)   Either have a quarterly average nitrogen oxide (NOx) emission rate, as measured
5    and verified under RSA 362-F:12, of less than or equal to 0.075 pounds/million British thermal units
6    (lbs/Mmbtu) or be a participant in a plan approved by the department for reductions in NOx from
7    other emission sources.   The quantity of reductions required shall be the fraction of electrical
8    production derived from the combustion of biomass fuels, as determined under this paragraph,
9    multiplied by the difference between the generation unit's NOx emissions rate and the 0.075
10   lbs/Mmbtu rate.   The plan shall contain reductions, in the aggregate or individually, in NOx
11   emissions from other emission sources under the jurisdiction of the department and demonstrate
12   that the reductions will be quantifiable.   The department shall expeditiously review the plan and, if
13   approved, provide such information as it deems relevant to the [commission] *department of energy*.
14   The application submitted to the [commission] *department of energy* under RSA 362-F:11 shall
15   inform the [commission] *department of energy* of the plan and the [commission] *department of*
16   *energy* shall certify the source in accordance with the plan approved by the department; and

17              (2)   Either have an average particulate emission rate, as measured and verified
18   under RSA 362-F:12, of less than or equal to 0.02 lbs/Mmbtu or be a participant in a plan approved
19   by the department for reductions in particulate matter emissions from emission sources owned by or
20   affiliated with the co-firing entity.   The quantity of reductions required shall be the fraction of
21   electrical production derived from the combustion of biomass fuels, as determined under this
22   paragraph, multiplied by the difference between the generation unit's particulate matter emissions
23   rate and the 0.02 lbs/Mmbtu rate.   The plan shall contain reductions, in the aggregate or
24   individually, in particulate matter emissions from other emission sources under the jurisdiction of
25   the department and demonstrate that the reductions will be quantifiable.   The department shall
26   expeditiously review the plan and, if approved, provide such information as it deems relevant to the
27   [commission] *department of energy*.   The application submitted to the [commission] *department*
28   *of energy* under RSA 362-F:11 shall inform the [commission] *department of energy* of the plan and
29   the [commission] *department of energy* shall certify the source in accordance with the plan
30   approved by the department.

31   237  Electric Renewable Energy Classes; Reference Change.  Amend RSA 362-F:4, IV-VI to read
32   as follows:

33              IV.(a)  Class IV (Existing Small Hydroelectric) shall include the production of electricity from
34   hydroelectric energy, provided the facility:

35              (1)  Began operation prior to January 1, 2006;

36              (2)   When required, has documented applicable state water quality certification
37   pursuant to section 401 of the Clean Water Act for hydroelectric projects; and

**Amendment to HB 2-FN-A-LOCAL**
**- Page 101 -**

1      (3)  Either:

2      (A)  Has a total nameplate capacity of 5 MWs or less as measured by the sum of

3 the nameplate capacities of all the generators at the facility and has actually installed both

4 upstream and downstream diadromous fish passages and such installations have been approved by

5 the Federal Energy Regulatory Commission, or;

6      (B)  Has a total nameplate capacity of one MW or less as measured by the sum of

7 the nameplate capacities of all generators at the facility, is in compliance with applicable Federal

8 Energy Regulatory Commission fish passage restoration requirements, and is interconnected with

9 an electric distribution system located in New Hampshire.

10      (b)(1)  Notwithstanding subparagraph (a), the [commission] ***department of energy*** shall

11 re-certify as class IV renewable energy sources the facilities named in ***public utilities*** commission

12 order numbers 24,940 and 24,952.  These facilities are:

13      (A)  The Canaan, Gorham, Hooksett, and Jackman hydroelectric facilities [owned

14 by Public Service Company of New Hampshire], which had been previously certified by the ***public***

15 ***utilities*** commission on September 23, 2008; and

16      (B)  The North Gorham and Bar Mills projects owned by FPL Energy Maine

17 Hydro, LLC which had been previously certified by the ***public utilities*** commission on October 30,

18 2008.

19      (2)  These facilities shall not qualify or be certified as class IV renewable energy

20 sources after March 23, 2009, unless they meet the requirements of subparagraph (a).  Such

21 facilities shall be eligible for class IV renewable energy certificates for all electricity generated

22 between the effective date of each facility's original certification by the ***public utilities*** commission

23 through March 23, 2009.  Such certificates shall have the same validity as any other class IV

24 certificate issued under RSA 362-F, and may be sold, exchanged, banked, and utilized accordingly.

25      V.  For good cause, and after notice and hearing, the commission may accelerate or delay by

26 up to one year, any given year's incremental increase in class I or II renewable portfolio standards

27 requirement under RSA 362-F:3.

28      VI.  After notice and hearing, the [commission] ***department of energy*** may modify the class

29 III and IV renewable portfolio standards requirements under RSA 362-F:3 for calendar years

30 beginning January 1, 2012 such that the requirements are equal to an amount between 85 percent

31 and 95 percent of the reasonably expected potential annual output of available eligible sources after

32 taking into account demand from similar programs in other states.

33      238 Renewable Energy Certificates.  Amend RSA 362-F:6, V to read as follows:

34      V.  A qualified producer of useful thermal energy shall provide for the metering of useful

35 thermal energy produced in order to calculate the quantity of megawatt-hours for which renewable

36 energy certificates are qualified, and to report to the [public utilities commission] ***department of***

37 ***energy*** under rules adopted pursuant to RSA 362-F:13.  Monitoring, reporting, and calculating the

**Amendment to HB 2-FN-A-LOCAL**
**- Page 102 -**

1   useful thermal energy produced in each quarter shall be expressed in megawatt-hours, where each

2   3,412,000 BTUs of useful thermal energy is equivalent to one megawatt-hour.

3   239  Electric Renewable Portfolio Standard; Information Collection; Reference Change.  Amend

4   RSA 362-F:8 to read as follows:

5   362-F:8  Information Collection.

6        I.  By July 1 of each year, each provider of electricity shall submit a report to the

7   [commission] *department of energy*, in a form approved by the [commission] *department of*

8   *energy*, documenting its compliance with the requirements of this chapter for the prior year.  The

9   [commission] *department of energy* may investigate compliance and collect any information

10  necessary to verify and audit the information provided to the [commission] *department of energy*

11  by providers of electricity.

12       II.  The [commission] *department of energy* shall adopt rules governing the reporting

13  requirements under paragraph I that are designed to minimize the administrative costs and burden

14  on electricity providers.

15       III.  Beginning October 1, 2019 and by October 1 of each subsequent year, the [commission]

16  *department of energy* shall disclose the information collected under paragraph I as public

17  information in the [commission's] *department of energy* annual report pursuant to RSA 362-F:10,

18  IV.  No information shall be disclosed to the public that is confidential as defined by [public utilities

19  commission] *department of energy* or NEPOOL Generation Information System rules.

20       IV.  The [commission] *department of energy* shall provide as part of the annual renewable

21  energy fund report, pursuant to RSA 362-F:10, IV, renewable portfolio standard compliance costs

22  and  average  electric  rate  impact;  renewable  energy  certificate  versus  alternative  compliance

23  payments comparison; and alternative compliance payments by class and provider of electricity.  The

24  report shall also include the number of renewable energy certificates that were purchased during the

25  prior compliance year by class.

26       V.  The [commission] *department of energy* shall complete the rulemaking process and

27  submit requests to the administrator of the NEPOOL Generation Information System that are

28  necessary to implement this section no later than April 1, 2019.

29  240  Electric Renewable Portfolio Standard; Renewable Energy Fund.  Amend RSA 362-F:10 to

30  read as follows:

31  362-F:10  Renewable Energy Fund.

32       I.  There is hereby established a renewable energy fund.  This *nonlapsing* special fund shall

33  be [nonlapsing] *continually appropriated to the commission to be expended in accordance*

34  *with this section*.  The state treasurer shall invest the moneys deposited therein as provided by

35  law.  Income received on investments made by the state treasurer shall also be credited to the fund.

36  All payments to be made under this section shall be deposited in the fund.  Any remaining moneys

37  paid into the fund under paragraph II of this section, excluding class II moneys, shall be used by the

Amendment to HB 2-FN-A-LOCAL
- Page 103 -

1  [commission] *department of energy* to support thermal and electrical renewable energy initiatives.

2  Class II moneys shall primarily be used to support solar energy technologies in New Hampshire.  All

3  initiatives supported out of these funds shall be subject to audit by the [commission] *department of*

4  *energy* as deemed necessary.  All fund moneys including those from class II may be used to

5  administer this chapter, but all new employee positions shall be approved by the fiscal committee of

6  the general court.  No new employees shall be hired by the [commission] *department of energy* due

7  to the inclusion of useful thermal energy in class I production.

8  II.  In lieu of meeting the portfolio requirements of RSA 362-F:3 for a given year if, and to the

9  extent sufficient certificates are not otherwise available at a price below the amounts specified in

10  this paragraph, an electricity provider may, at the time of report submission for that year under RSA

11  362-F:8, make payment to the [commission] *department of energy* at the following rates for each

12  megawatt-hour not met for a given class obligation through the acquisition of certificates:

13  (a)  Class I-$55, except for that portion of the class electric renewable portfolio standards

14  to be met by qualifying renewable energy technologies producing useful thermal energy under RSA

15  362-F:3 which shall be $25 beginning January 1, 2013.

16  (b)  Class II-$55.

17  (c)  Class III-$31.50.

18  (d)  Class IV-$26.50.

19  III.(a)  Beginning in 2013, the [commission] *department of energy* shall adjust these rates

20  by January 31 of each year using the Consumer Price Index as published by the Bureau of Labor

21  Statistics of the United States Department of Labor for classes III and IV and 1/2 of such Index for

22  classes I and II.

23  (b)  In lieu of the adjustments under subparagraph (a) for class III in 2015 and 2016, the

24  class rate in each of those years shall be $45.  In lieu of the adjustments under subparagraph (a) for

25  class III in 2017, 2018, and 2019, the class rate in each of those years shall be $55.

26  (c)  By January 31, 2020 the [commission] *department of energy* shall compute the

27  2020 class III rate to equal the rate that would have resulted in 2020 by the application of

28  subparagraph (a) to the 2013 rate and each subsequent year's rate to 2020.

29  (d)  In 2021 and thereafter, the class III rate shall be determined by application of

30  subparagraph (a) to the prior year's rate.

31  IV.  The [commission] *department of energy* shall make an annual report by October 1 of

32  each year, beginning in 2009, to the legislative oversight committee to monitor the transformation of

33  delivery of electric services established under RSA 374-F:5, the house science, technology and energy

34  committee, and the senate energy and natural resources committee detailing how the renewable

35  energy fund is being used and any recommended changes to such use.  The report shall also include

36  information on the total peak generating capacity that is net energy metered under RSA 362-A:9

37  within the franchise area of each electric distribution utility, and the percentage this represents of

**Amendment to HB 2-FN-A-LOCAL**
**- Page 104 -**

1   the amount that is allowed to be net metered within each franchise area.  Information shall be
2   provided on net metered group host registrations and the associated customer groups, including
3   number and location of group host facilities, generation by renewable source and size of facility, and
4   group load served by such facilities.

5        V.  The [public utilities commission] ***department of energy*** shall make and administer a
6   one-time incentive payment of $3 per watt of nominal generation capacity up to a maximum
7   payment of $6,000, or 50 percent of system costs, whichever is less, per facility to any residential
8   owner of a small renewable generation facility, that would qualify as a Class I or Class II source of
9   electricity, begins operation on or after July 1, 2008, and is located on or at the owner's residence.

10      VI.  Such payments shall be allocated from the renewable energy fund established in
11  paragraph I, as determined by the [commission] ***department of energy*** to the extent funding is
12  available up to a maximum aggregate payment of 40 percent of the fund over each 2-year period
13  commencing July 1, 2010.

14      VII.  The [commission] ***department of energy*** shall, after notice and hearing, by order or
15  rule establish an application process for the incentive payment program established under
16  paragraph V.  The application process shall include verification of costs for parts and labor,
17  certification that the equipment used meets the applicable safety standards of the American
18  National Standards Institute (ANSI) or Underwriters Laboratory (UL) or similar safety rating
19  agency, and that the facility meets local zoning regulations, and receives any required inspections.

20      VIII.  The [commission] ***department of energy*** may, after notice and hearing, by order or
21  rule, establish additional incentive or rebate programs and competitive grant opportunities for
22  renewable thermal and electric energy projects sited in New Hampshire.

23      IX.  For good cause the [commission] ***department of energy*** may, after notice and hearing,
24  by order or rule, modify the program, including reducing the incentive level, created under RSA 362-
25  F:10, V.

26      X.  Consistent with RSA 362-F:10, VI, the [commission] ***department of energy*** shall, over
27  each 2-year period commencing July 1, 2010, reasonably balance overall amounts expended,
28  allocated, or obligated from the fund, net of administrative expenditures, between residential and
29  nonresidential sectors.  Funds from the renewable energy fund awarded to renewable projects in the
30  residential sector shall be in approximate proportion to the amount of electricity sold at retail to that
31  sector in New Hampshire, and the remaining funds from the renewable energy fund shall be
32  awarded to projects in the nonresidential sector which include commercial and industrial sited
33  renewable energy projects, existing generators, and developers of new commercial-scale renewable
34  generation in New Hampshire, provided no less than 15 percent of the funds shall annually benefit
35  low-moderate income residential customers, including, but not limited to, the financing or leveraging
36  of financing for low-moderate income community solar projects in manufactured housing
37  communities or in multi-family rental housing.

**Amendment to HB 2-FN-A-LOCAL**
**- Page 105 -**

XI.  The [commission] *department of energy* shall issue requests for proposals that provide renewable projects in the nonresidential sector, which include commercial and industrial sited renewable energy projects, existing generators, and developers of new commercial-scale renewable generation in New Hampshire, with opportunities to receive funds from the renewable energy fund established under RSA 362-F:10.  The requests for proposals shall provide such opportunities to those renewable energy projects that are not eligible to participate in incentive and rebate programs developed by the [commission] *department of energy* under RSA 362-F:10, V and RSA 362-F:10, VIII.  The [commission] *department of energy* shall issue a request for proposals no later than March 1, 2011 and annually thereafter, and select winning projects in a timely manner.

241  References Change; Electric Renewable Portfolio Standards; Department of Energy.  Amend the following RSA provisions by replacing "commission" with "department of energy":  362-F:5, 362-F:6, I-IV, 362-F:9, 362-F:11, 362-F:12, 362-F:13, 362-F:14.

242  Expenses of the Public Utilities Commission Against Certain Utilities.  Amend RSA 363-A:1 to read as follows:

363-A:1  Ascertainment of Expenses.  The [public utilities commission] *department of energy* shall annually, after the close of the fiscal year, ascertain the total of its expenses *attributable to support of the public utilities commission and to performance of all duties and responsibilities transferred to the department from the public utilities commission, in addition to the total of the public utilities commission's expenses* during such year incurred in the performance of its duties relating to public utilities as defined in RSA 362 and other entities subject to its regulatory and enforcement authority and relating to the office of the consumer advocate.  In the determination of such expenses there shall be excluded the expenses which have been or may be charged and recovered under the provisions of RSA 365:37, RSA 365:38, and RSA 374-F:7, I.

243  Expenses of Public Utilities Commission Against Certain Utilities; Assessment.  Amend RSA 363-A:2, III-IV to read as follows:

III.  Each entity described in subparagraph I(e) shall be assessed the sum of $10,000 on an annual basis and shall pay such assessed sum to the [commission] *department of energy*.  Each electric load aggregator, and each aggregator of natural gas customers shall be assessed the sum of $2,000 on an annual basis and shall pay such assessed sum to the [commission] *department of energy*.  Each telecommunications carrier voluntarily registered with the commission shall be assessed the sum of $1,000 on an annual basis and shall pay such sum to the [commission] *department of energy*.

IV.  The expenses of the [commission] *department of energy and the public utilities commission, and the office of the consumer advocate*, less the total of the assessed sums paid [to the commission] pursuant to paragraph III, shall be allocated to each utility and other assessed entity in direct proportion as the revenue calculation for such utility or other assessed entity relates

1    to the total of all such revenue calculations as a whole, except as otherwise provided in paragraph V.

2    Each such expense allocation shall be assessed against each public utility and other assessed entity

3    in an amount equal to its proportionate share as determined under this section, except that the

4    expense allocation attributed to each entity described in subparagraph I(e) shall be imputed to and

5    included in the expense allocation to each electric or natural gas distribution utility or rural electric

6    cooperative for which a certificate of deregulation is on file with the commission, in correspondence

7    to the revenue portion reported pursuant to paragraph II as having been received from the

8    distribution customers of such distribution utility or the members of such rural electric cooperative

9    for which a certificate of deregulation is on file with the commission.

10    244   Expenses of Public Utilities Commission Against Certain Utilities; Certification of

11    Assessment; Collection.  Amend RSA 363-A:3 and RSA 363-A:4 to read as follows:

12    363-A:3  Certification of Assessment.  It shall be the duty of the [public utilities commission]

13    ***department of energy*** to calculate the amount to be assessed against each such public utility and

14    each other entity subject to assessment in accordance with RSA 363-A:1 and RSA 363-A:2.  At the

15    beginning of each fiscal year, the [public utilities commission] ***department of energy*** shall estimate

16    [its] ***the*** total expenses for the fiscal year, and then, based on such estimate, shall calculate the

17    amount to be assessed quarterly on August 10, October 15, January 15, and April 15 of that fiscal

18    year, against each such public utility and other assessed entity in accordance with RSA 363-A:1 and

19    RSA 363-A:2.  The [public utilities commission] ***department of energy*** shall then make a list

20    showing the amount due on August 10, October 15, January 15, and April 15 of that fiscal year from

21    each of the several public utilities and other entities assessed under the provisions hereof, and,

22    together with a statement of the full name and mailing address of each such public utility and other

23    assessed entity, shall certify the same.  After the close of each fiscal year, the [public utilities

24    commission] ***department of energy*** shall ascertain [its] ***the*** actual total expenses in accordance

25    with RSA 363-A:1 and RSA 363-A:2, and then shall adjust the assessment for the first quarterly

26    payment of the new fiscal year for each such public utility or other assessed entity for any

27    underpayment or overpayment by each such public utility or other assessed entity for the prior fiscal

28    year.

29    363-A:4  Collection.  Upon the completion of each such list, on or before August 10, October 10,

30    January 10, and April 10 of each fiscal year, the [public utilities commission] ***department of energy***

31    shall bill each public utility and each other entity subject to assessment for the quarterly amount

32    assessed against it within 10 working days.  Such bill shall be sent registered mail, and shall

33    constitute notice of assessment and demand for payment.  Payment shall be made to the [public

34    utilities commission] ***department of energy*** within 30 days after the receipt of the bill.  After the

35    expiration of 30 days from the receipt of an original bill, the [public utilities commission]

36    ***department of energy*** may add to the assessment a late penalty fee and may commence an action

37    at law for the recovery of the assessment.  Within 30 days of the assessment for the first quarterly

**Amendment to HB 2-FN-A-LOCAL**
**- Page 107 -**

1     payment, each public utility or other assessed entity which has any objection to the amount assessed

2     against it for the prior fiscal year shall file with the [commission] ***department*** its objection in

3     writing, setting out in detail the grounds upon which it is claimed that said assessment is excessive,

4     erroneous, unlawful, or invalid.  If such objections are filed, the [commission] ***department***, after

5     reasonable notice to the objecting public utility or other assessed entity, shall hold a hearing on such

6     objections, and if the [commission] ***department*** finds that said assessment or any part thereof is

7     excessive, erroneous, unlawful, or invalid, the [commission] ***department*** shall reassess the amount

8     to be paid by such public utility or other assessed entity, and shall order that an amended bill be

9     sent to such public utility or other assessed entity in accordance with such reassessment.  The

10     [public utilities commission] ***department of energy*** shall not commence an action at law for

11     recovery of any assessment for the first quarterly payment until any such objection has been

12     resolved.

13     245  Public Utility Recovery of Assessment Costs.  Amend RSA 363-A:6, I to read as follows:

14         I.  Assessment amounts determined with reference to the revenues of competitive electric

15     power suppliers and all assessments against regulated electric distribution utilities and electric

16     cooperatives for which a certificate of deregulation is on file with the [commission] ***department***

17     shall be collected from electric customers through the distribution rates of the respective electric

18     distribution utility or rural electric cooperative for which a certificate of deregulation is on file with

19     the [commission] ***department***; provided that an amount equal to the amount assessed directly to a

20     competitive electric power supplier under RSA 363-A:2, III shall be collected from the energy service

21     or default service customers of each electric distribution utility or rural electric cooperative for which

22     a certificate of deregulation is on file with the [commission] ***department***.

23     246  Complaints to and Proceedings Before the Department of Energy and the Commission.

24     Amend the chapter title of RSA 365 to read as follows:Amend the chapter title of RSA 365 to read as

25     follows:

26               COMPLAINTS TO[,] ***THE DEPARTMENT OF ENERGY***

27                  AND PROCEEDINGS BEFORE[,] THE COMMISSION

28     247  Complaint Against Public Utilities.  Amend RSA 365:1 to read as follows:

29     365:1  Complaint Against Public Utilities.  Any person may make complaint to the [commission]

30     ***department of energy*** by petition setting forth in writing any thing or act claimed to have been

31     done or to have been omitted by any public utility in violation of any provision of law, or of the terms

32     and conditions of its franchises or charter, or of any order of the commission.

33     248  Complaints to the Department of Energy and Proceedings Before the Commission.  Amend

34     RSA 365:2 through RSA 365:7 to read as follows:

35     365:2  Order.  Thereupon the [commission] ***department of energy*** shall cause a copy of said

36     complaint to be forwarded to the public utility complained of, which may be accompanied by an

1   order, requiring that the matters complained of be satisfied, or that the charges be answered in

2   writing within a time to be specified by the [commission] *department*.

3   365:3   Reparation.   If the public utility complained of shall make reparation for any injury

4   alleged and shall cease to commit or to permit the violation of law, franchise, or order charged in the

5   complaint, and shall notify the [commission] *department of energy* of that fact before the time

6   allowed for answer, the [commission] *department* shall not be required to take any further action

7   upon the charges.

8   365:4   Investigation.   If the charges are not satisfied as provided in RSA 365:3, and it shall

9   appear to the [commission] *department of energy* that there are reasonable grounds therefor, it

10  shall investigate the same in such manner and by such means as it shall deem proper[, and, after

11  notice and hearing, take such action within its powers as the facts justify]. *After investigation, the*

12  *department of energy may bring proceedings on its own motion before the public utilities*

13  *commission, with respect to any complaint or violation of any provision of law, rule, terms*

14  *and conditions of its franchises or charter, or any order of the commission.*

15  365:5   Independent Inquiry.   The commission, on its own motion or upon petition of a public

16  utility, *and the department of energy* may investigate or make inquiry in a manner to be

17  determined by it as to any rate charged or proposed or as to any act or thing having been done, or

18  having been omitted or proposed by any public utility; and [the commission or] shall make such

19  inquiry in regard to any rate charged or proposed or to any act or thing having been done or having

20  been omitted or proposed by any such utility in violation of any provision of law or order of the

21  commission *or the department*.

22  365:6   Inspection.   [The] *Both the* commission *and the department of energy* may at any time

23  personally, or by its experts or agents, inspect the property, works, system, plant, devices, appliances

24  and methods used by any public utility, or its books, papers and records.

25  365:7   Authority to Inspect.   Any expert or agent of the *department of energy or the*

26  commission, who shall make a demand on behalf of the commission *or the department* to be

27  allowed to inspect as provided in RSA 365:6, shall produce written authority to make such inspection

28  signed by the [secretary or assistant secretary or some member] *chairperson* of the commission *or*

29  *the commissioner of the department of energy*.

30  249   Proceedings Before the Public Utilities Commission.   Amend RSA 365:8, I(j) to read as

31  follows:

32          (j)   Standards and procedures for determination and recovery of rate [case] *proceedings*

33  expenses.

34  250   Proceedings Before the Public Utilities Commission.   Amend RSA 365:8, II to read as

35  follows:

36          II.   Where the commission has adopted rules in conformity with this section, [complaints to

37  and] proceedings before the commission shall not be subject to RSA 541-A:29 or RSA 541-A:29-a.

Amendment to HB 2-FN-A-LOCAL
- Page 109 -

1    251  Repeal.  The following are repealed:

2        I.  RSA 365:8-a, relative to suppliers of natural gas an aggregators of natural gas customers.

3        II.  RSA 374-F:4, III, relative to certain compliance filings filed with the public utilities

4    commission.

5    252  Complaints to Department of Energy and Public Utilities Commission; Expense of

6    Investigations; Rate Proceeding.  Amend RSA 365:37 and 365:38 to read as follows:

7    365:37  Expense of Investigations.

8        I.  Whenever any investigation *by the commission or the department of energy* shall be

9    necessary to enable the commission to pass upon any petition for authority to issue stocks, bonds,

10   notes, or other evidence of indebtedness, for authority to operate as a public utility or to expand

11   operations as a public utility, to make extensions into new territory, to discontinue service, to

12   condemn property for flowage rights and dam construction, or for authority to sell, consolidate,

13   merge, transfer, or lease the plant, works, or system of any public utility, or any part of the same, or

14   for any other matter which requires the [commission's] approval *of the commission or the*

15   *department of energy*, the petitioner shall pay to the [commission] *department of energy* the

16   expense involved in the investigation of the matters covered by said petition, including the amounts

17   expended for experts, accountants, or other assistants.  Such expense shall not include any part of

18   the salaries or expenses of the commissioners or of employees of the commission or *department of*

19   *energy or*, unless the proceeding is being conducted pursuant to RSA 38, the fees of experts

20   testifying as to values in condemnation proceedings.

21       II.  Whenever the commission institutes a proceeding, or when more than one utility subject

22   to the jurisdiction of the commission shall be involved in a proceeding in which the commission *or*

23   *the department of energy* requires the assistance of experts, accountants or other assistants,

24   regardless of whether they petitioned the commission in the first instance, the commission *and the*

25   *department of energy* may assess the costs of experts, accountants or other assistants hired by the

26   commission *or the department of energy* against the utilities and any other parties to the

27   proceeding.  The commission *and the department of energy* shall not, however, assess any such

28   costs against the office of the consumer advocate or against any voluntary corporation, not-for-profit

29   organization, or any municipality unless the municipality is involved in a proceeding before the

30   commission pursuant to RSA 38.  In the case of a utility, the assessment of those costs shall be based

31   on the annual revenues of the participating utilities in the same manner as issued in assessing the

32   annual operating expenses of the commission *and the department of energy*, or as appropriate

33   and equitable on a case by case basis.  In the case of a party who is not a utility, the assessment of

34   those costs shall be as appropriate and equitable on a case by case basis.  Such expenses shall not

35   include any part of the salaries or expenses of the commissioners or of employees of the commission

36   *or of employees of the department of energy* or, unless the proceeding is being conducted

37   pursuant to RSA 38, the fees of experts testifying as to values in condemnation proceedings.

1    III.   For investigations or proceedings involving the acquisition, merger, transfer, sale, or

2    lease of the works or system of a public utility, the commission **and the department of energy**

3    shall not enter into a contract with experts, accountants, or other assistants in an amount greater

4    than [$250,000] **$10,000**, including any contract extension, without the approval of the governor and

5    council.   For all other investigations or proceedings, the commission **and the department of energy**

6    shall not enter into a contract with experts, accountants, or other assistants in an amount greater

7    than [$100,000] **$10,000**, including any contract extension, without the approval of governor and

8    council.

9    365:38   Rate Proceeding.   Whenever any investigation **or proceeding** shall be necessary to

10   enable the commission to pass upon the reasonableness of the rates or charges by a public utility, the

11   utility[, upon order of the commission,] shall pay to the [commission its] **department of energy the**

12   expenses involved in the investigation, including the amounts expended by [it] **the commission and**

13   **the department of energy** for attorneys, experts, accountants, or other assistants, but not

14   including any part of the salaries or expenses of the commissioners or of employees of the

15   commission **or department of energy**; provided, that the amount charged to the utility [by the

16   commission] in any such case shall not exceed 3/4 of one percent of the existing valuation of the

17   utility investigated, such expenses with 6 percent interest to be charged by the utility to operating

18   expenses and amortized over such period as the commission shall deem proper and allowed for in the

19   rates to be charged by the utility.

20   253   Complaints to Department of Energy and Public Utilities Commission; Penalty Against

21   Utility.  Amend RSA 365:41 to read as follows:

22   365:41  Penalty Against Utility.  Any public utility which shall violate any provisions of this title,

23   or fails, omits or neglects to obey, observe or comply with any order, direction or requirement of the

24   commission **or the department of energy**, shall be subject to a civil penalty, as determined by the

25   commission, not to exceed $250,000 or 2.5 percent of the annual gross revenue that the utility

26   received from sales in the state, whichever is lower.  Such penalties shall be applied to the benefit of

27   the utility's ratepayers through a credit to bills, or, if the credit is of an amount determined by the

28   commission to be insignificant on a per customer basis, to programs that benefit low income

29   ratepayers.   No portion of any fine, nor any costs associated with an administrative or court

30   proceeding which results in a fine pursuant to this section, shall be considered by the commission in

31   fixing any temporary, permanent, or emergency rates or charges of such utility.

32   254   Affiliates of Public Utilities; Department of Energy.  Amend RSA 366:2 through 366:9 to

33   read as follows:

34   366:2  Sale of Securities to or by Employees.  No public utility shall, without the approval of the

35   [commission] **department of energy**, permit any employee to sell, offer for sale, or solicit the

36   purchase of any security issued by an affiliate during such hours as such employee is engaged to

37   perform any duty of such public utility; nor shall any public utility by any means or device

1  whatsoever require any employee to purchase or contract to purchase any of its securities or those of

2  any other person or corporation; nor shall any public utility require any employee to permit the

3  deduction from his wages or salary of any sum as a payment or to be applied as a payment on any

4  purchase or contract to purchase any security of such public utility or of any other person.

5      366:3  Filing of Contracts.  The original or a verified copy of any contract or arrangement and of

6  any modification thereof or a verified summary of any unwritten contract or arrangement, the

7  consideration of which exceeds $500, hereafter entered into between a public utility and an affiliate

8  providing for the furnishing of managerial, supervisory, construction, engineering, accounting,

9  purchasing, financial, or any other services either to or by a public utility or an affiliate shall be filed

10  by the public utility with the [commission] ***department of energy*** within 10 days after the date on

11  which the contract is executed or the arrangement entered into.  The [commission] ***department*** may

12  also require a public utility to file in such form as the [commission] ***department*** may require full

13  information with respect to any purchase from or sale to an affiliate, whether or not made in

14  pursuance of a continuing contract or arrangement.

15      366:4  Failure to File.  Any contract or arrangement not filed with the [commission] ***department***

16  ***of energy*** pursuant to RSA 366:3 shall be unenforceable in any court in this state and payments

17  thereunder may be disallowed by the [commission] ***department*** unless the later filing thereof is

18  approved in writing by the [commission] ***department***.  ***The commission shall disallow payment***

19  ***if recommended by the department.***

20      366:5  Investigation and Proof.  The [commission] ***department of energy*** shall have full power

21  and authority to investigate any such contract, arrangement, purchase, or sale and[, if] ***initiate a***

22  ***proceeding related thereto before the commission.  If*** the commission after notice and hearing

23  shall find any such contract, arrangement, purchase, or sale to be unjust or unreasonable, the

24  commission may make such reasonable order relating thereto as the public good requires.  In any

25  such investigation, the burden shall be on the public utility and affiliate to prove the reasonableness

26  of any such contract, arrangement, purchase, or sale with, from, or to an affiliate.  If the public

27  utility shall fail to satisfy the commission of the reasonableness of any such contract, arrangement,

28  purchase, or sale, the commission may disapprove the same and disallow payments thereunder or

29  such part of any such payment as the commission shall find to be unjust or unreasonable.  No

30  payment disallowed by the commission shall be capitalized or included as an operating cost of the

31  public utility in the fixing of rates or as an asset in fixing a rate base.  If in any such investigation

32  the public utility or affiliate shall unreasonably refuse to comply with any request of the commission

33  ***or the department*** for information with respect to relevant accounts and records, whether of such

34  public utility or any affiliate, any portion of which may be applicable to any transaction under

35  investigation, so that such parts thereof as the commission ***or the department*** may deem material

36  may be made part of the record, such refusal shall justify the commission in disapproving the

37  transaction under investigation and disallowing payments in pursuance thereof.

**Amendment to HB 2-FN-A-LOCAL**
**- Page 112 -**

1    366:6  Summary Order in Certain Cases.  If as a result of an investigation *or proceeding* in

2    accordance with RSA 366:5 the commission shall find that any public utility is making any payment

3    or about to make any payment or doing or about to do any other thing which substantially threatens

4    or impairs the ability of the public utility to render adequate service at reasonable rates or otherwise

5    to discharge its duty to the public, the commission may apply to the superior court for an order

6    directing the public utility to cease making any such payment or doing such other thing; and,

7    thereupon, the court shall make such order as the public good may require.

8    366:7  Disallowance of Charges Under Existing Contracts.  In any proceeding whether upon the

9    *department's initiation or* commission's own motion or upon complaint involving the rates or

10   practices of any public utility, the commission may disallow the inclusion in the accounts of a public

11   utility of any payments or compensation to an affiliate for any services rendered, or property

12   furnished, under existing contracts or arrangements with an affiliate unless such public utility shall

13   establish the reasonableness of such payment or compensation.

14   366:8   Annual Reports.   Every public utility annually reporting to the commission *or*

15   *department of energy* under RSA 374 shall also annually report the name and address of, and the

16   number of shares held by, its officers and directors and each holder of one percent or more of the

17   voting capital stock of the reporting public utility according to its records.

18   366:9  Information Concerning Control.  The commission *or department of energy* may also

19   require such other information as to the direct or indirect control of a public utility or affiliate from a

20   public utility, affiliate, or other person as may be reasonably required for the effective enforcement of

21   this chapter.

22   255  References Change; Service Equipment of Public Utilities; Department of Energy.  Amend

23   the following RSA provisions by replacing "commission" with "department of energy":  370:2, 370:8,

24   370:9.

25   256  Service Equipment of Public Utilities; Units of Service.  Amend RSA 370:1 to read as

26   follows:

27   370:1  Units of Service.  The [public utilities commission] *department of energy* may ascertain,

28   determine and fix, for each kind of public utility, suitable and convenient standard commercial units

29   of service, product or commodity, which units shall be lawful units for the purposes of this chapter.

30   257  Service Equipment of Public Utilities; Department of Energy.  Amend RSA 370:3 through

31   370:7 to read as follows:

32   370:3  Meters.  The [commission] *department of energy* may ascertain, determine and fix

33   reasonable rules, regulations, specifications and standards to secure the accuracy of all meters and

34   appliances for measurement, and every public utility is required to carry into effect all orders issued

35   by the [commission] *department* relative thereto.

36   370:4  Service Inspections.  The [commission] *department of energy* may provide for the

37   inspection of the manner in which every public utility conforms to the reasonable regulations

1  prescribed by the [commission] *department* for examination and testing of its service, product or
2  commodity, and for the measurement thereof, and may supplement such inspections by
3  examinations and testing.

4  370:5  Inspection of Meters.  The [commission] *department of energy* may provide for the
5  inspection of the manner in which every public utility has carried into effect the reasonable rules,
6  regulations, specifications and standards fixed by [orders of the commission] *rules adopted by the*
7  *department* relative thereto, and may examine and test any meters and appliances for
8  measurements under such reasonable rules and regulations as it may prescribe.

9  370:6  Testing Appliances.  The [commission] *department* may provide for the examination and
10  testing of any appliances used for the measuring of any service, product or commodity of a public
11  utility.

12  370:7  At Consumer's Request.  Any consumer or user may have any such appliance tested by the
13  [commission] *department of energy*.  The [commission] *department* may declare and establish
14  reasonable fees to be paid for examining and testing such appliances on the request of consumers or
15  users, the fee to be paid by the consumer or user at the time of his request; but, if the measuring
16  appliance be found unreasonably defective or incorrect to the disadvantage of the consumer or user,
17  the [commission] *department* shall repay such fee to the consumer or user and collect the same
18  from the public utility.

19  258  Rights in Public Waters and Lands; License by Notification of New Attachments on Existing
20  Utility Poles.  Amend RSA 371:17-a to read as follows:

21  371:17-a  License by Notification of New Attachments on Existing Utility Poles.  Whenever it is
22  necessary, in order to meet the reasonable requirements of service to the public, that any public
23  utility other than electric or gas should construct a cable, conduit, or wires and fixtures upon an
24  existing line of poles or towers over, under, or across any of the public waters of this state, or over,
25  under, or across any of the land owned by this state, the public utility shall file written notification
26  with the [commission] *department of energy* for a license to construct and maintain such cable,
27  conduit, or wires and fixtures.  In this section, "public waters" means all ponds of more than 10
28  acres, tidewater bodies, and such streams or portions thereof as the commission may prescribe.
29  Every corporation and individual desiring to cross any public waters or land for the purposes of this
30  section shall file written notification in the same manner prescribed for a public utility.  The
31  notification shall include a description of the specific geographic and pole locations of the crossing
32  and verification that there is a valid pole attachment license or that an application for a pole
33  attachment license has been submitted to the utility or utilities that own such poles or towers.  The
34  notification shall include an affidavit signed by the responsible officer confirming that the crossing
35  shall be completed in compliance with such pole attachment license and the National Electrical
36  Safety Code.  Upon receipt of such notification, no further inquiries or investigations by the
37  [commission] *department of energy* shall be required in granting the requested license.

Amendment to HB 2-FN-A-LOCAL
- Page 114 -

1    259  Rights in Public Waters and Lands; Hearing; Order.  Amend RSA 371:20 to read as follows:

2    371:20  Hearing; Order.  ***Whenever a hearing shall be necessary,*** the commission shall hear

3    all parties interested; and, in case it shall find that the license petitioned for, subject to such

4    modifications and conditions, if any, and for such period as the commission may determine, may be

5    exercised without substantially affecting the public rights in said waters or lands, it shall render

6    judgment granting such license.  Provided, however, that such license may be granted ***by the***

7    ***department of energy*** without hearing when all interested parties are in agreement and in cases

8    involving filings made under RSA 371:17-a and RSA 371:17-b.  [The executive director of the

9    commission may issue licenses under RSA 371:17-a and RSA 371:17-b.]

10   260  References Changed; Proceedings to Acquire Property or Rights; Rights in Public Waters

11   and Lands; Department of Energy.  Amend the following RSA provisions by replacing "commission"

12   with "department of energy": 371:17, 371:18, 371:19.

13   261  Extent of Power.  Amend RSA 374:3 to read as follows:

14   374:3  Extent of Power.  The public utilities commission ***and department of energy*** shall have

15   the general supervision of all public utilities and the plants owned, operated or controlled by the

16   same so far as necessary to carry into effect the provisions of this title.

17   262  Supervisory Power of Department of Energy and Public Utilities Commission.  Amend the

18   subdivision heading following RSA 374:3-b to read as follows:

19                    Supervisory Power of Department of [Transportation]

20                    ***Energy and Public Utilities Commission***

21   263  Duties.  Amend RSA 374:4-374:5-a to read as follows:

22   374:4  Duty to Keep Informed.  The commission ***and the department of energy*** shall have

23   power, and it shall be [its] ***their*** duty, to keep informed as to all public utilities in the state, their

24   capitalization, franchises and the manner in which the lines and property controlled or operated by

25   them are managed and operated, not only with respect to the safety, adequacy and accommodation

26   offered by their service, but also with respect to their compliance with all provisions of law, orders of

27   the commission and charter requirements.

28   374:5  Additions and Improvements.  For the purpose of enabling the commission ***and the***

29   ***department of energy*** to perform [its] ***their*** duty to keep informed as provided in RSA 374:4, every

30   public utility, before making any addition, extension, or capital improvement to its fixed property in

31   this state, except under emergency conditions, shall report to the commission ***and the department***

32   ***of energy*** the probable cost of such addition, extension, or capital improvement whenever the

33   probable cost thereof exceeds a reasonable amount to be prescribed by general or special order of the

34   commission.  For this purpose, the commission may classify public utilities according to the amount

35   of their respective fixed capital accounts, and prescribe a reasonable limitation for each such

36   classification.  In no case shall the minimum amount prescribed be less than 1/4 of one percent of

37   such fixed capital account as of December 31 of the preceding year, or $10,000, whichever is the

1  smaller amount.  Reports shall be filed in writing [~~with the commission~~] within such reasonable time
2  as may be prescribed by the commission before starting actual construction on any addition,
3  extension, or improvement.  The commission shall have discretion to exclude the cost of any such
4  addition, extension, or capital improvement from the rate base of said utility where such written
5  report thereof shall not have been filed in advance as herein provided.

6  374:5-a  Power to Hire Consultants Firm.  The commission **and the department of energy** may
7  utilize and employ a consultant firm to provide it with technical assistance in evaluating cost factors
8  relating to the effective use of substantial investments of utilities regulated by the commission.

9  264  Investigation of Other Utilities; Orders; Violation.  Amend RSA 374:7-374:7-a to read as
10  follows:

11  374:7  Investigation of Other Utilities; Orders.  The commission **and the department of energy**
12  shall have power to investigate and ascertain, from time to time, the quality of gas supplied by
13  public utilities and the methods employed by public utilities in manufacturing, transmitting or
14  supplying gas or electricity for light, heat or power, or in transmitting telephone and telegraph
15  messages, or supplying water, and, after notice and hearing thereon, shall have power to order all
16  reasonable and just improvements and extensions in service or methods.

17  374:7-a  Violation.

18  I.  Any person who knowingly or willfully violates any provision of RSA 370:2 or any
19  standards or rules adopted under it by the public utilities commission **or the department of**
20  **energy**, relative to gas pipelines and liquefied petroleum gas systems pursuant to the Natural Gas
21  Pipeline Safety Act, shall be subject to a civil penalty not to exceed the maximum civil penalty under
22  49 U.S.C. section 60122(a), as amended.

23  II.  Any person who otherwise violates any provision of RSA 370:2 or any standards or rules
24  adopted under it by the public utilities commission **or the department of energy**, relative to gas
25  pipelines and liquefied petroleum gas systems pursuant to the Natural Gas Pipeline Safety Act,
26  shall be subject to a civil penalty not to exceed the maximum civil penalty under 49 U.S.C. section
27  60122(a), as amended.

28  III.  **The department of energy shall assess and enforce civil penalties related to this**
29  **section.**  Any civil penalty assessed under this section may be [~~compromised~~] **appealed to the**
30  **public utilities commission, and the commission may uphold, reverse, or compromise such**
31  **civil penalty** [~~by the public utilities commission~~].  In determining the amount of the penalty, **the**
32  **outcome of an appeal,** or the amount agreed upon in compromise, the appropriateness of the
33  penalty to the size of the business of the person charged, the gravity of the violation, the good faith of
34  the person charged in attempting to achieve compliance, after notification of a violation, the degree
35  of culpability of the person, the history of prior violations, the effect of the penalty on the person, and
36  any other identifiable factor related to the circumstances of the person and the nature and
37  circumstances of the violation, shall be considered.  The amount of the penalty, when finally

1    determined, or the amount agreed upon in compromise, may be deducted from any sums owing by

2    the state to the person charged or may be recovered in a civil action in the state courts.

3    265  Public Utilities; Reports; Filing.  Amend RSA 374:15 to read as follows:

4    374:15   Filing.   Every public utility shall file with the commission ***and the department of***

5    ***energy*** reports at such times, verified by oath in such manner, and setting forth such statistics and

6    facts, as may be required by the commission ***or the department of energy***.

7    266  Public Utilities; Reports.  Amend RSA 374:17-374:19 to read as follows:

8    374:17  Neglect to Report.  If any public utility shall neglect or refuse to make and file any report

9    within a time specified by the commission ***or the department of energy***, or shall neglect or refuse

10    to make specific answer to any question lawfully asked by the commission ***or the department of***

11    ***energy***, it shall forfeit to the state the sum of $100 for each day it shall continue to be in default with

12    respect to such report or answer, unless it shall be excused [by the commission] from making such

13    report or answer, or unless the time for making the same shall be extended [by the commission].

14    374:18  Production of Books, Etc.  The commission, by order, ***or the department of energy,*** may

15    require any public utility to produce within the state, at such time and place as it may designate,

16    any accounts, records, memoranda, books***,*** or papers kept in any office or place without the state, or

17    verified copies thereof, in order that an examination thereof may be made by ***or under the***

18    ***direction of*** the commission or [under its direction] ***the department of energy***.

19    374:19  False Statements, Etc.  No public utility shall willfully make any false statement or false

20    entry in any report to the commission ***or the department of energy***, or in any answer to any

21    question lawfully asked by the commission ***or the department of energy***.

22    267  Service Territories; Department of Energy Jurisdiction.  Amend RSA 374:22-e to read as

23    follows:

24    374:22-e  Service Territories; [Commission] ***Department of Energy*** Jurisdiction.

25        I.  If 2 or more telephone utilities find that they provide the same service in the same area or

26    that existing maps create overlapping service territories, the [commission] ***department of energy***,

27    upon application by one or both of the affected utilities, shall define, alter, or establish service

28    territories.  In establishing or altering service territories, the [commission] ***department of energy***

29    shall consider the following:

30        (a)  Existing service areas;

31        (b)   Any voluntary agreements between or among 2 or more such telephone utilities

32    which define the service territories of those utilities;

33        (c)  Consistency with the orderly development of the region;

34        (d)  Natural geographical boundaries;

35        (e)  Compatibility with the interests of all consumers; and

36        (f)  All other relevant factors.

Amendment to HB 2-FN-A-LOCAL
- Page 117 -

II.  The [commission] *department of energy* shall have power to exercise the jurisdiction conferred in this section only after due notice to all interested parties and hearing.   After consideration of the factors established by paragraph I of this section, and after making findings that the service territories established or altered are consistent with the public good, the [commission] *department of energy* shall establish the service territory of each telephone utility.   The service territory thus established shall be sufficiently definite and precise so that its boundaries may be accurately determined.

268  Service Territories Served by Certain Telephone Utilities.  Amend RSA 374:22-g to read as follows:

374:22-g  Service Territories Served by Certain Telephone Utilities.

I.  To the extent consistent with federal law and notwithstanding any other provision of law to the contrary, all telephone franchise areas served by a telephone utility that provides local exchange service, subject to the jurisdiction of the [commission] *department of energy*, shall be nonexclusive.  The [commission] *department of energy*, upon petition or on its own motion, shall have the authority to authorize the providing of telecommunications services, including local exchange services, and any other telecommunications services, by more than one provider, in any service territory, when the [commission] *department of energy* finds and determines that it is consistent with the public good unless prohibited by federal law.

II.   In determining the public good, the commission shall consider the interests of competition with other factors including, but not limited to, fairness; economic efficiency; universal service; carrier of last resort obligations; the incumbent utility's opportunity to realize a reasonable return on its investment; and the recovery from competitive providers of expenses incurred by the incumbent utility to benefit competitive providers, taking into account the proportionate benefit or savings, if any, derived by the incumbent as a result of incurring such expenses.

III.  The *department of energy* shall adopt rules, pursuant to RSA 541-A, relative to the enforcement of this section.

269  Shared Tenant Services Authorized; Limited Regulation; Rulemaking.  Amend RSA 374:22-l and m to read as follows:

374:22-l  Shared Tenant Services Authorized; Limited Regulation.

I.  The [public utilities commission] *department of energy* shall authorize the provision of shared tenant services by providers meeting the minimum requirements established by the [commission] *department of energy* to operate shared tenant services networks.

II.  Providers of shared tenant services shall be subject to the following limited regulation by the [commission] *department of energy*:

(a)  Providers of shared tenant services shall disclose to tenants and prospective tenants all pricing information relative to their services in the manner prescribed by the [commission] *department of energy*.

1    (b)  Providers of shared tenant services shall disclose to tenants and prospective tenants
2    that they can at their option obtain basic exchange and other service from an authorized local
3    telephone utility rather than from the shared tenant services provider.

4    (c)  Without penalty and in accordance with the rules of the [commission] ***department of***
5    ***energy***, telephone number retention and access to telecommunications services shall be permitted by
6    providers of shared tenant services and authorized local telephone utilities into and out of shared
7    tenant services properties.

8    (d)  The [commission] ***department of energy*** shall have jurisdiction to hear matters
9    pertaining to the unauthorized provision of shared tenant services, violations of [commission]
10   ***department*** rules relating to shared tenant services, and customer complaints against shared
11   tenant services providers.

12   374:22-m  Rulemaking.  The [public utilities commission] ***department of energy*** shall adopt
13   rules, pursuant to RSA 541-A, relative to:

14   I.   Minimum requirements for shared tenant services, including disclosure of available
15   options and terms and prices of shared tenant services.

16   II.  Customer access to services of authorized local telephone utilities.

17   III.  Telephone number retention and recovery of costs, if any, associated with number
18   retention.

19   IV.  The charges a local telephone utility establishes for a shared tenant services provider to
20   purchase services for use by the provider's tenants.

21   V.   Procedures for complaints to the [commission] ***department*** regarding shared tenant
22   services.

23   270  Regulation of Competitive Telecommunications Providers Limited; Affordable Telephone
24   Service; Public Interest Payphones.  Amend RSA 374:22-o-374:22-p to read as follows:

25   374:22-o  Regulation of Competitive Telecommunications Providers Limited.  Any person or
26   business entity authorized by the [commission] ***department of energy*** to engage in business as a
27   competitive local exchange carrier and any competitive toll provider having less than a 10 percent
28   share of toll revenue in New Hampshire shall not be required to seek prior [commission]
29   ***department*** approval of financings or corporate organizational changes, including, without
30   limitation, mergers, acquisitions, corporate restructurings, issuance or transfer of securities, or the
31   sale, lease, or other transfer of assets or control.  Nothing in this section shall exempt any such
32   competitive telecommunications service provider from such advance notice as the [commission]
33   ***department*** may prescribe or from the requirements of RSA 374:28-a or RSA 378:46.

34   374:22-p  Affordable Telephone Service; Rulemaking; Standards.

35   I.(a)  For the purposes of this section, "Federal Telecommunications Act" means the federal
36   Telecommunications Act of 1996, Public Law 104-104, 110 Stat. 56.

37   (b)  For purposes of this section "basic service" means:

Amendment to HB 2-FN-A-LOCAL
- Page 119 -

1    (1)  Safe and reliable single-party, single line voice service;

2    (2)  The ability to receive all noncollect calls, at telephone lines capable of receiving

3    calls, without additional charge;

4    (3)  The ability to complete calls to any other telephone line, which is capable of

5    receiving calls, in the state;

6    (4)  The opportunity to presubscribe to interLATA toll carriers;

7    (5)  The opportunity to presubscribe to intraLATA toll carriers;

8    (6)  Dialing parity;

9    (7)  Number portability;

10   (8)  Enhanced 911, pursuant to the requirements of the department of safety, bureau

11   of emergency communications, or its successor agency;

12   (9)  Access to statewide directory assistance;

13   (10)  Telecommunications relay service (TRS);

14   (11)  A published directory listing, at the customer's election;

15   (12)  A caller identification blocking option, on a per-call basis;

16   (13)  A caller identification line blocking option that is available to all customers

17   without a recurring charge and is provided upon customer request without charge to customers who

18   have elected nonpublished telephone numbers and is available without a nonrecurring charge to

19   customers who certify that caller identification threatens their health or safety and is available

20   without a nonrecurring charge when requested with installation of basic service;

21   (14)  A blocking option for pay-per-call calls, such as blocking all 900 or all 976 area

22   code calls;

23   (15)  The ability to report service problems to the customer's basic service provider on

24   a 24-hour basis, 7 days a week; and

25   (16)  Automatic Number Identification (ANI) to other carriers which accurately

26   identifies the telephone number of the calling party.

27   (c)  Any combination of basic service along with any other service or feature offered by

28   the telecommunications service provider is nonbasic service and shall not be regulated by the

29   commission.

30   (d)  Any telecommunications service provider which is not an incumbent local exchange

31   carrier shall not be required to provide basic service.

32   II.  Subject to RSA 362:6, the [commission] *department of energy* shall require every

33   provider of intrastate telephone service to participate in outreach programs designed to increase the

34   number of low-income telephone customers on the network through increased participation in any

35   universal service program approved by the [commission] *department* and statutorily established by

36   the legislature.  Statewide outreach programs shall continue until further order of the [commission]

37   *department*.

Amendment to HB 2-FN-A-LOCAL
- Page 120 -

III.   The [commission] *department of energy* shall seek to ensure that affordable basic telephone services are available to consumers throughout all areas of the state at reasonably comparable rates.

IV.(a)   The [commission] *department of energy* shall [develop draft] *maintain and update* rules to implement this section and shall, after the statutory establishment of a universal service fund, require every provider of intrastate telephone services to contribute to a state universal service fund to support programs consistent with the goals of applicable provisions of this title and the Federal Telecommunications Act.

(b)   If the [commission] *department of energy*, upon statutory establishment of a universal service program, establishes a state universal service fund pursuant to this section, the [commission] *department* shall contract with an appropriate independent fiscal agent that is not a state entity to serve as administrator of the state universal service fund.  Program administration shall be designed in the most cost-effective manner possible.  Funds contributed to a state universal service fund are not state funds and therefore are not subject to provisions of law relating to the general fund.  Rules and any state universal service fund requirements established by legislative enactment and by the [commission] *department* pursuant to this section shall:

(1)   Be reasonably designed to maximize federal assistance available to the state for universal service purposes.

(2)   Meet the state's obligations under the Federal Telecommunications Act.

(3)   Be consistent with the goals of the Federal Telecommunications Act.

(4)   Ensure that any requirements regarding contributions to a state universal service fund be nondiscriminatory and competitively neutral.

(5)   Require explicit identification on customer's bills of contributions to and in the event of fund termination, refunds from, any state universal service fund established pursuant to the section.

(6)   Allow consideration in appropriate rulemaking proceedings of contributions to and in the event of fund termination, refunds from, any state universal service fund established pursuant to this section.

(c)   For purposes of this section, "providers of intrastate telephone services" includes providers of radio paging service and, subject to the provisions of the Federal Communications Act as amended and codified at 47 U.S.C. sec. 332(c)(3)(A), mobile telecommunications services.

(d)   Prior to requiring that providers of intrastate telephone service contribute to a state universal service fund and prior to statutory establishment of a universal service fund, the [commission] *department of energy* shall report to the general court its determination of the expected program costs, the amount and type of the funding mechanism, the number of people proposed to be served, the level of proposed service, and the administrative design of the proposed fund.

1       V.  The [commission] *department of energy*, annually, shall assess the penetration rate of

2 basic telephone services.  If this penetration rate ever falls below the national average penetration

3 rate, the [commission] *department* shall commence an investigation and take steps to enhance

4 telephone market penetration.  The [commission] *department*, annually, shall assess the success of

5 any action taken by the [commission] *department* to achieve the purpose of this section.  The public

6 policy goal should be to raise the low income penetration level as close as reasonably possible to the

7 statewide average.

8       VI, VII.  [Repealed.]

9       VIII.  Notwithstanding the provisions of RSA 374:1-a:

10       (a)  Incumbent local exchange carriers, whether qualified as an excepted local exchange

11 carrier or otherwise, may not discontinue residential basic service, regardless of technology used, in

12 any portion of their franchise area unless the [commission] *department of energy* determines that

13 the public good will not be adversely affected by such withdrawal of service;

14       (b)  Rates for basic service of incumbent local exchange carriers which qualify as

15 excepted local exchange carriers may not increase by more than 5 percent for Lifeline Telephone

16 Assistance customers and by more than 10 percent for all other basic service customers in each of

17 the 8 years after the effective date of this paragraph or the effective date of an existing alternative

18 plan of regulation, except for additional rate adjustments, with [public utilities commission]

19 *department of energy* review and approval, to reflect changes in federal, state, or local government

20 taxes, mandates, rules, regulations, or statutes; and

21       (c)  Incumbent local exchange carriers which qualify as excepted local exchange carriers

22 shall report the rates for basic service to the [commission] *department of energy* within 60 days of

23 the effective date of this paragraph and upon any changes to the rates.

24     271  Pole Attachments.  Amend RSA 374:34-a to read as follows:

25     374:34-a  Pole Attachments.

26       I.  In this subdivision, a "pole" means any pole, duct, conduit, or right-of-way that is used for

27 wire communications or electricity distribution and is owned in whole or in part by a public utility,

28 including a rural electric cooperative for which a certificate of deregulation is on file with the

29 commission pursuant to RSA 301:57.

30       II.  Whenever a pole owner is unable to reach agreement with a party seeking pole

31 attachments, the commission shall regulate and enforce rates, charges, terms, and conditions for

32 such pole attachments, with regard to the types of attachments regulated under 47 U.S.C. section

33 224, to provide that such rates, charges, terms, and conditions are just and reasonable.  This

34 authority shall include but not be limited to the state regulatory authority referenced in 47 U.S.C.

35 section 224(c).

36       III.  The [commission] *department of energy* shall adopt rules under RSA 541-A to carry

37 out the provisions of this section, including appropriate formula or formulae for apportioning costs.

1    IV.   In exercising its authority under this subdivision, the [commission] *department of*
2    *energy* shall consider the interests of the subscribers and users of the services offered via such
3    attachments, as well as the interests of the consumers of any pole owner providing such
4    attachments.

5    V.   Nothing in this subdivision shall prevent parties from entering into pole attachment
6    agreements voluntarily, without commission approval.

7    VI.   Any pole owner shall provide nondiscriminatory access to its poles for the types of
8    attachments regulated under this subdivision.   A pole owner may deny access to its poles on a
9    nondiscriminatory basis where there is insufficient capacity and for reasons of safety, reliability, and
10   generally applicable engineering purposes.

11   VII.   The commission shall have the authority to hear and resolve complaints concerning
12   rates, charges, terms, conditions, voluntary agreements, or any denial of access relative to pole
13   attachments.

14   VIII.   The [commission] *department of energy* shall retain its authority to regulate the
15   safety, vegetation management, emergency response, and storm restoration requirements for poles,
16   conduits, ducts, pipes, pole attachments, wires, cables, and related plant and equipment of public
17   utilities and other private entities located within public rights-of-way and on, over, or under state
18   lands and water bodies.

19   272  Repeals.  The following are repealed:

20   I. RSA 374:35, relative to transmitting electricity out of the state.

21   II.  RSA 374:36, relative to investigations and orders.

22   273  Investigation of Accidents.  Amend RSA 374:37-374:40 to read as follows:

23   374:37  By [Commission] *Department*.   The [commission] *department of energy* shall
24   investigate the causes of all accidents in connection with the operation of public utilities in the state,
25   which, in the opinion of the commission *or the department of energy*, ought to be investigated.

26   374:38  Manner.  Any such investigation may be made by the [full commission] *department of*
27   *energy* [, or by a single commissioner, or by an agent of the commission,] in such manner as the
28   [commission] *department of energy* may determine.

29   374:39  Reports.   Every public utility shall report to the *department of energy and the*
30   commission accidents occurring in connection with the operation of its business wherein loss of life
31   occurs or any person is injured, or of such a nature as to endanger the safety, health or property of
32   its consumers or the public, as and whenever directed by such rules and regulations as the
33   *department of energy and the* commission may prescribe.

34   374:40  Publicity.   Reports of accidents filed under RSA 374:39 shall not be made public
35   otherwise than in the published reports of the commission *or the department of energy*.

36   274  New Paragraph; Definitions.  Amend RSA 374:48 by inserting after paragraph II the
37   following new paragraph:

**Amendment to HB 2-FN-A-LOCAL**
**- Page 123 -**

1        II-a.  "Department" means the department of energy.

2        275  Rulemaking.  Amend the introductory paragraph of RSA 374:50 to read as follows:

3        The [commission] *department* shall adopt rules, pursuant to RSA 541-A, relative to:

4        276  Civil Penalty.  Amend RSA 374:55 to read as follows

5        374:55  Civil Penalty.

6        I.  Proof that an excavation has been made without compliance with the notice requirement of RSA 374:51 and that damage to an underground facility has occurred shall be prima facie evidence in any court or administrative proceeding that the damage was caused by the negligence of the excavator.

II.  Any excavator who does not give notice of or identify the proposed excavation area as required by RSA 374:51 or rules of the [commission] *department* regarding tolerance zones and marking procedures shall be subject to the penalties in paragraph VIII, in addition to any liability for the actual damages.

III.  Any operator which does not mark the location of its underground facilities as required by RSA 374:53 or rules of the [commission] *department* regarding tolerance zones and marking procedures shall be subject to the penalties in paragraph VIII.

IV.  If underground facilities are damaged because an operator does not mark its underground facilities as required by RSA 374:53, the operator shall be subject to the penalties in paragraph VIII, liable for damages sustained to its facilities and, in addition, shall be liable for any damages incurred by the excavator as a result of the operator's failure to mark such facilities.

V.  If marked underground facilities are damaged, the excavator shall be subject to the penalties in paragraph VIII and liable for the cost of repairs for the damage.

VI.  Any excavator who damages an underground facility and fails to notify the operator, or backfills the excavation without receiving permission, as required by RSA 374:54, shall be subject to the penalties in paragraph VIII.

VII.  The [commission] *department* or any [commission] *department* employee, involved in an underground facility damage prevention program approved by the [commission] *department* and designated by the [commission] *department*, may enforce violations of this subdivision.  Any excavator or operator that violates this subdivision shall be subject to the penalties in paragraph VIII.  In addition, the [commission] *department* may assess the excavator for expenditures made to collect the civil penalty.  Any excavator or operator which suffers damage resulting from violation of this subdivision may petition the [commission] *department* to initiate an enforcement action.

VIII.  Any excavator or operator that does not comply with RSA 374:51 through 374:54 shall be required either to complete an underground facility damage prevention program approved by the [commission] *department*, or to pay a civil penalty of up to $500.  The civil penalty may be up to $5,000 if the excavator or operator previously violated RSA 374:51 through 374:54 within the prior 12 months or if the violation results in bodily injury or property damages exceeding $50,000,

1   excluding utility costs.  This paragraph shall not apply to a homeowner excavating on his or her own
2   property or to a legal occupant of residential property excavating on the property of his or her
3   primary residence with the permission of the owner.

4   277  Telephone Number Conservation and Area Code Implementation Policy Principles.  Amend
5   RSA 374:59 to read as follows:

6   374:59  Telephone Number Conservation and Area Code Implementation Policy Principles.

7      I.  In this section:

8      (a)  [~~"Commission"~~] *"Department"* means the [~~public utilities commission~~] *department*
9   *of energy*.

10      (b)  "Geographic split" means the division of an area code into typically 2 areas each
11   served by its own area code.

12      (c)  "Overlay" means the addition of a new area code serving the same geographic area as
13   the existing area code.

14      II.  The [~~commission~~] *department* should promote and adopt telephone number conservation
15   measures to the maximum extent allowed by federal law for area code 603 and any subsequently
16   assigned New Hampshire area codes.

17      III.  The [~~commission~~] *department* should adopt measures, to the maximum extent
18   allowable by federal law and availability of technology, to provide that all customers of all suppliers
19   have equitable access to all currently available unassigned telephone numbers and equitable access
20   to numbers that have not been assigned to a customer which are available for porting to a second
21   supplier.  Blocks of telephone numbers that are currently assigned but may be retrievable if
22   thousands number block pooling becomes available should be assigned on an equitable basis to all
23   suppliers.

24      IV.  The [~~commission~~] *department* should adopt measures, to the maximum extent
25   allowable by federal law and availability of technology, to provide for local number portability by all
26   suppliers of local exchange service.

27      V.  To the extent that any one competitor is responsible for managing a pool of numbers
28   which is to be assigned to customers of that competitor and other competitors, the [~~commission~~]
29   *department* should adopt policies to require that the assignment and management of the numbers
30   be kept segregated from the marketing portion of that competitor.

31      VI.  When determining whether to implement a new area code via geographic split or overlay
32   the [~~commission~~] *department* should consider, but not be limited to, the following criteria when
33   determining the public interest:

34      (a)  Which method best minimizes customer disruption from having to change numbers;

35      (b)  Which method is the least costly for business and residents;

36      (c)  Which method best minimizes customer confusion;

37      (d)  Which method is the least costly for providers to implement;

1        (e)  Which method most effectively conserves the total pool of telephone numbers once a
2  new area code is created;

3        (f)  Which method minimizes geographic controversy;

4        (g)  Which method is most equitable to every resident and business in New Hampshire;

5        (h)  Which method minimizes repeating the disruption of area code changes in the future;

6        (i)  Which method best ensures public safety;

7        (j)  Which method is more competitively neutral; and

8        (k)    Which method utilizes best available technology and comprehensive
9  telecommunications planning.

10       278  Renewable Energy and Energy Efficiency Project Loan Programs.  Amend RSA 374:61 to
11  read as follows:

12       374:61  Renewable Energy and Energy Efficiency Project Loan Programs.  A public utility may
13  seek [commission] authorization ***from the department of energy***, either individually or in
14  combination with other public utilities, to establish loan, financing, or cost amortization programs
15  for owners and tenants of residential, public, nonprofit, and business property to finance or
16  otherwise amortize cost effective fuel neutral renewable energy and energy efficiency investments
17  and improvements to the owner's or tenant's premises.  The total amount loaned in such programs
18  shall not exceed $5,000,000.  The [commission] ***department*** shall authorize terms, conditions, and
19  tariffs for the repayment of such loans and financed or underwritten investments and improvements
20  through charges billed through and that run with the meter or meters assigned to the location where
21  the investments are located, provided that such investments or improvements to a tenant's premises
22  are only made with the written consent of the owner or the owner's authorized management
23  representative.  Pursuant to RSA 477:4-h, the owner, seller, lessor, or transferor of any real property
24  subject to unamortized or ongoing charges under such a tariff shall disclose such fact to a prospective
25  buyer, lessee, or occupant who might be responsible for paying such charges as a condition of utility
26  service.  A public utility may not finance these loan, financing, or cost amortization programs
27  through its rate base, nor earn its regulated rate of return on such program investments and
28  improvements to the owner's or tenant's premises, unless such investment is approved as part of a
29  strategy for minimizing transmission and distributions costs pursuant to RSA 374-G.

30       279  Electric Utility Restructuring; Purpose.  Amend RSA 374-F:1, III to read as follows:

31       III.  The following interdependent policy principles are intended to guide the New
32  Hampshire public utilities commission ***and the department of energy*** in implementing a statewide
33  electric utility industry restructuring plan, in establishing interim stranded cost recovery charges, in
34  approving each utility's compliance filing, in streamlining administrative processes to make
35  regulation more efficient, and in regulating a restructured electric utility industry.  In addition,
36  these interdependent principles are intended to guide the New Hampshire general court and the

1   department of environmental services and other state agencies in promoting and regulating a

2   restructured electric utility industry.

3      280  New Paragraph; Definitions.  Amend RSA 374-F:2 by inserting after paragraph I-a the

4   following new paragraph:

5      I-b.  "Department" means the department of energy.

6      281  Restructuring Policy Principles; Implementation.  Amend RSA 374-F:3 and 374-F:4 to read

7   as follows:

8   374-F:3  Restructuring Policy Principles.

9      I.  System Reliability.  Reliable electricity service must be maintained while ensuring public

10   health, safety, and quality of life.

11      II.  Customer Choice.  Allowing customers to choose among electricity suppliers will help

12   ensure fully competitive and innovative markets.  Customers should be able to choose among options

13   such as levels of service reliability, real time pricing, and generation sources, including

14   interconnected self generation.  Customers should expect to be responsible for the consequences of

15   their choices.  The [commission] *department* should ensure that customer confusion will be

16   minimized and customers will be well informed about changes resulting from restructuring and

17   increased customer choice.

18      III.  Regulation and Unbundling of Services and Rates.  When customer choice is introduced,

19   services and rates should be unbundled to provide customers clear price information on the cost

20   components of generation, transmission, distribution, and any other ancillary charges.  Generation

21   services should be subject to market competition and minimal economic regulation and at least

22   functionally separated from transmission and distribution services which should remain regulated

23   for the foreseeable future.  However, distribution service companies should not be absolutely

24   precluded from owning small scale distributed generation resources as part of a strategy for

25   minimizing transmission and distribution costs.  Performance based or incentive regulation should

26   be considered for transmission and distribution services.  Upward revaluation of transmission and

27   distribution assets is not a preferred mechanism as part of restructuring.  Retail electricity suppliers

28   who do not own transmission and distribution facilities, should, at a minimum, be registered with

29   the [commission] *department*.

30      IV.  Open Access to Transmission and Distribution Facilities.  Non-discriminatory open

31   access to the electric system for wholesale and retail transactions should be promoted.

32   Comparability should be assured for generators competing with affiliates of groups supplying

33   transmission and distribution services.  Companies providing transmission services should file at the

34   FERC or with the commission, *or with the department of energy,* as appropriate, comparable

35   service tariffs that provide open access for all competitors.  The commission *and the department*

36   should monitor companies providing transmission or distribution services and take necessary

37   measures to ensure that no supplier has an unfair advantage in offering and pricing such services.

1    V.  Universal Service.

2    (a)   Electric service is essential and should be available to all customers.  A utility

3    providing distribution services must have an obligation to connect all customers in its service

4    territory to the distribution system.  A restructured electric utility industry should provide adequate

5    safeguards to assure universal service.   Minimum residential customer service safeguards and

6    protections should be maintained.  Programs and mechanisms that enable residential customers

7    with low incomes to manage and afford essential electricity requirements should be included as a

8    part of industry restructuring.

9    (b)   As competitive markets emerge, customers should have the option of stable and

10   predictable ceiling electricity prices through a reasonable transition period, consistent with the near

11   term rate relief principle of RSA 374-F:3, XI.  Upon the implementation of retail choice, transition

12   service should be available for at least one but not more than 5 years after competition has been

13   certified to exist in at least 70 percent of the state pursuant to RSA 38:36, for customers who have

14   not yet chosen a competitive electricity supplier.  Transition service should be procured through

15   competitive means and may be administered by independent third parties.  The price of transition

16   service should increase over time to encourage customers to choose a competitive electricity supplier

17   during the transition period.  Such transition service should be separate and distinct from default

18   service.

19   (c)   Default service should be designed to provide a safety net and to assure universal

20   access and system integrity.  Default service should be procured through the competitive market and

21   may be administered by independent third parties.  Any prudently incurred costs arising from

22   compliance with the renewable portfolio standards of RSA 362-F for default service or purchased

23   power agreements shall be recovered through the default service charge.  The allocation of the costs

24   of administering default service should be borne by the customers of default service in a manner

25   approved by the commission.  If the commission determines it to be in the public interest, the

26   commission may implement measures to discourage misuse, or long-term use, of default service.

27   Revenues, if any, generated from such measures should be used to defray stranded costs.

28   (d)   The commission should establish transition and default service appropriate to the

29   particular circumstances of each jurisdictional utility.

30   (e)   Notwithstanding any provision of subparagraphs (b) and (c), as competitive markets

31   develop, the commission may approve alternative means of providing transition or default services

32   which are designed to minimize customer risk, not unduly harm the development of competitive

33   markets, and mitigate against price volatility without creating new deferred costs, if the commission

34   determines such means to be in the public interest.

35   (f)(1)  For purposes of subparagraph (f), "renewable energy source" (RES) means a source

36   of electricity, as defined in RSA 362-F:2, XV, that would qualify to receive renewable energy

1  certificates under RSA 362-F, whether or not it has been designated as eligible under RSA 362-F:6,

2  III.

3       (2)  A utility shall provide to its customers one or more RES options, as approved by

4  the commission, which may include RES default service provided by the utility or the provision of

5  retail access to competitive sellers of RES attributes.  Costs associated with selecting an RES option

6  should be paid for by those customers choosing to take such option.  A utility may recover all

7  prudently incurred administrative costs of RES options from all customers, as approved by the

8  commission.

9       (3)  RES default service should have either all or a portion of its service attributable

10  to a renewable energy source component procured by the utility, with any remainder filled by

11  standard default service.  The price of any RES default service shall be approved by the commission.

12       (4)  Under any option offered, the customer shall be purchasing electricity generated

13  by renewable energy sources or the attributes of such generation, either in connection with or

14  separately from the electricity produced.  The regional generation information system of energy

15  certificates administered by the ISO-New England and the New England Power Pool (NEPOOL)

16  should be considered at least one form of certification that is acceptable under this program.

17       (5)  A utility that is required by statute to provide default service from its generation

18  assets should use any of its owned generation assets that are powered by renewable energy for the

19  provision of standard default service, rather than for the provision of a renewable energy source

20  component.

21       (6)  Utilities should include educational materials in their normal communications to

22  their customers that explain the RES options being offered and the health and environmental

23  benefits associated with them.  Such educational materials should be compatible with any

24  environmental disclosure requirements established by the [commission] ***department***.

25       (7)  For purposes of consumer protection and the maintenance of program integrity,

26  reasonable efforts should be made to assure that the renewable energy source component of an RES

27  option is not separately advertised, claimed, or sold as part of any other electricity service or

28  transaction, including compliance with the renewable portfolio standards under RSA 362-F.

29       (8)  If RES default service is not available for purchase at a reasonable cost on behalf

30  of consumers choosing an RES default service option, a utility may, as approved by the commission,

31  make payments to the renewable energy fund created pursuant to RSA 362-F:10 on behalf of

32  customers to comply with subparagraph (f).

33       (9)  The commission shall implement subparagraph (f) through utility-specific filings.

34  Approved RES options shall be included in individual tariff filings by utilities.

35       (10)  A utility, with commission approval, may require that a minimum number of

36  customers, or a minimum amount of load, choose to participate in the program in order to offer an

37  RES option.

Amendment to HB 2-FN-A-LOCAL
- Page 129 -

1      VI.  Benefits for All Consumers.  Restructuring of the electric utility industry should be
2 implemented in a manner that benefits all consumers equitably and does not benefit one customer
3 class to the detriment of another.  Costs should not be shifted unfairly among customers.  A
4 nonbypassable and competitively neutral system benefits charge applied to the use of the
5 distribution system may be used to fund public benefits related to the provision of electricity.  Such
6 benefits, as approved by regulators, may include, but not necessarily be limited to, programs for low-
7 income customers, energy efficiency programs, funding for the electric utility industry's share of
8 commission **and department** expenses pursuant to RSA 363-A, support for research and
9 development, and investments in commercialization strategies for new and beneficial technologies.
10 Legislative approval of the New Hampshire general court shall be required to increase the system
11 benefits charge.  This requirement of prior approval of the New Hampshire general court shall not
12 apply to the energy efficiency portion of the system benefits charge if the increase is authorized by
13 an order of the commission to implement the 3-year planning periods of the Energy Efficiency
14 Resource Standard framework established by commission Order No. 25,932 dated August 2, 2016,
15 ending in 2020 and 2023, or, if for purposes other than implementing the Energy Efficiency Resource
16 Standard, is authorized by the fiscal committee of the general court; provided, however, that no less
17 than 20 percent of the portion of the funds collected for energy efficiency shall be expended on low-
18 income energy efficiency programs.  Energy efficiency programs should include the development of
19 relationships with third-party lending institutions to provide opportunities for low-cost financing of
20 energy efficiency measures to leverage available funds to the maximum extent, and shall also
21 include funding for workforce development to minimize waiting periods for low-income energy audits
22 and weatherization.

23      VII. Full and Fair Competition.  Choice for retail customers cannot exist without a range of
24 viable suppliers.  The rules that govern market activity should apply to all buyers and sellers in a
25 fair and consistent manner in order to ensure a fully competitive market.

26      VIII.  Environmental Improvement.  Continued environmental protection and long term
27 environmental sustainability should be encouraged.  Increased competition in the electric industry
28 should be implemented in a manner that supports and furthers the goals of environmental
29 improvement.  Over time, there should be more equitable treatment of old and new generation
30 sources with regard to air pollution controls and costs.  New Hampshire should encourage equitable
31 and appropriate environmental regulation, based on comparable criteria, for all electricity
32 generators, in and out of state, to reduce air pollution transported across state lines and to promote
33 full, free, and fair competition.  As generation becomes deregulated, innovative market-driven
34 approaches are preferred to regulatory controls to reduce adverse environmental impacts.  Such
35 market approaches may include valuing the costs of pollution and using pollution offset credits.

36      IX.  Renewable Energy Resources.  Increased future commitments to renewable energy
37 resources should be consistent with the New Hampshire energy policy as set forth in RSA 378:37

Amendment to HB 2-FN-A-LOCAL
- Page 130 -

and should be balanced against the impact on generation prices.  Over the long term, increased use of cost-effective renewable energy technologies can have significant environmental, economic, and security benefits.  To encourage emerging technologies, restructuring should allow customers the possibility of choosing to pay a premium for electricity from renewable resources and reasonable opportunities to directly invest in and interconnect decentralized renewable electricity generating resources.

X.  Energy Efficiency.  Restructuring should be designed to reduce market barriers to investments in energy efficiency and provide incentives for appropriate demand-side management and not reduce cost-effective customer conservation.  Utility sponsored energy efficiency programs should target cost-effective opportunities that may otherwise be lost due to market barriers.

XI.  Near Term Rate Relief.  The goal of restructuring is to create competitive markets that are expected to produce lower prices for all customers than would have been paid under the current regulatory system.  Given New Hampshire's higher than average regional prices for electricity, utilities, in the near term, should work to reduce rates for all customers.  To the greatest extent practicable, rates should approach competitive regional electric rates.  The state should recognize when state policies impose costs that conflict with this principle and should take efforts to mitigate those costs.  The unique New Hampshire issues contributing to the highest prices in New England should be addressed during the transition, wherever possible.

XII.  Recovery of Stranded Costs.

(a)  It is the intent of the legislature to provide appropriate tools and reasonable guidance to the commission in order to assist it in addressing claims for stranded cost recovery and fulfilling its responsibility to determine rates which are equitable, appropriate, and balanced and in the public interest.  In making its determinations, the commission shall balance the interests of ratepayers and utilities during and after the restructuring process.  Nothing in this section is intended to provide any greater opportunity for stranded cost recovery than is available under applicable regulation or law on the effective date of this chapter.

(b)  Utilities should be allowed to recover the net nonmitigatable stranded costs associated with required environmental mandates currently approved for cost recovery, and power acquisitions mandated by federal statutes or RSA 362-A.

(c)  Utilities have had and continue to have an obligation to take all reasonable measures to mitigate stranded costs.  Mitigation measures may include, but shall not be limited to:

(1)  Reduction of expenses.

(2)  Renegotiation of existing contracts.

(3)  Refinancing of existing debt.

(4)  A reasonable amount of retirement, sale, or write-off of uneconomic or surplus assets, including regulatory assets not directly related to the provision of electricity service.

1      (d)  Stranded costs should be determined on a net basis, should be verifiable, should not

2    include transmission and distribution assets, and should be reconciled to actual electricity market

3    conditions from time to time.  Any recovery of stranded costs should be through a nonbypassable,

4    nondiscriminatory, appropriately structured charge that is fair to all customer classes, lawful,

5    constitutional, limited in duration, consistent with the promotion of fully competitive markets and

6    consistent with these principles.  Entry and exit fees are not preferred recovery mechanisms.

7    Charges to recover stranded costs should only apply to customers within a utility's retail service

8    territory, except for such costs that have resulted from the provision of wholesale power to another

9    utility.  The charges should not apply to wheeling-through transactions.

10      XIII.  Regionalism.  New England Power Pool (NEPOOL) should be reformed and efforts to

11    enhance competition and to complement industry restructuring on a regional basis should be

12    encouraged.  New Hampshire should work with other New England and northeastern states to

13    accomplish the goals of restructuring.  Working with other regional states, New Hampshire should

14    assert maximum state authority over the entire electric industry restructuring process.  While it is

15    desirable to design and implement a restructured industry in concert with the other New England

16    and northeastern states, New Hampshire should not unnecessarily delay its timetable.  Any pool

17    structure adopted for the restructured industry should not preclude bilateral contracts with pool and

18    non-pool services and should not preclude ancillary pool services from being obtained from non-pool

19    sources.

20      XIV.  Administrative Processes.  The commission **and the department** should adapt [its]

21    **their** administrative processes to make regulation more efficient and to enable competitors to adapt

22    to changes in the market in a timely manner.  The market framework for competitive electric service

23    should, to the extent possible, reduce reliance on administrative process.  New Hampshire should

24    move deliberately to replace traditional planning mechanisms with market driven choice as the

25    means of supplying resource needs.

26      XV.  Timetable.  The commission should seek to implement full customer choice among

27    electricity suppliers in the most expeditious manner possible, but may delay such implementation in

28    the service territory of any electric utility when implementation would be inconsistent with the goal

29    of near-term rate relief, or would otherwise not be in the public interest.

30      374-F:4  Implementation.

31      I.  The commission is authorized to require the implementation of retail choice of electric

32    suppliers for all customer classes of utilities providing retail electric service under its jurisdiction.

33    The commission shall require such implementation at the earliest date determined to be in the

34    public interest by the commission.  However, in no event may the implementation be delayed beyond

35    July 1, 1998 without legislative approval or a finding of public interest by the commission that delay

36    is required due to events beyond the control of the commission or that implementation of retail

37    choice within the service territory of any electric utility would be inconsistent with the goal of near-

Amendment to HB 2-FN-A-LOCAL
- Page 132 -

1   term rate relief or would otherwise not be in the public interest.  In the event that implementation of
2   retail choice is delayed in the service territory of an electric utility, the electric utility shall continue
3   to provide reliable retail service at the lowest reasonable cost in accordance with state law.   In
4   addition, at the earliest practical date, the commission should make effective the unbundling of
5   components of rates into at least distribution, transmission, and generation for each jurisdictional
6   utility.

7       II.   Upon the effective date of this chapter, the commission shall undertake a generic
8   proceeding to develop a statewide industry restructuring plan in accordance with the above
9   principles, and shall, after public hearings, issue a final order no later than February 28, 1997.  In
10  its order, the commission shall establish the interim stranded cost recovery charge for each electric
11  utility as provided in paragraph VI.

12      III.   The commission shall require all electric utilities subject to its jurisdiction to submit
13  compliance filings *to the department of energy*, which shall include open access tariffs and such
14  other information as the commission may require, no later than June 30, 1997.  The [commission]
15  ***department*** shall investigate and *the commission* shall approve utility compliance filings, subject
16  to modification by the commission if necessary, after public hearing and subject to a finding that the
17  filings are in the public interest and substantially consistent with the principles established in this
18  chapter.

19      IV.   A utility having less than a 50 percent share of statewide retail electric distribution
20  sales (measured in kilowatt hours per year) may seek a ruling by the commission that it is in the
21  public interest that implementation of such utility's compliance filing be deferred until compliance
22  filings representing 70 percent of retail electric sales have been or are being implemented.

23      V.  The commission is authorized to allow utilities to collect a stranded cost recovery charge,
24  subject to its determination in the context of a rate case or adjudicated settlement proceeding that
25  such charge is equitable, appropriate, and balanced, is in the public interest, and is substantially
26  consistent with these interdependent principles.  The burden of proof for any stranded cost recovery
27  claim shall be borne by the utility making such claim.

28      VI.(a)   In order to facilitate the rapid transition to full competition, the commission is
29  authorized, in its generic restructuring order as provided in paragraph II, to set, without a formal
30  rate case proceeding, an interim stranded cost recovery charge for each electric utility.  Such interim
31  stranded cost recovery charges shall be effective for not more than 2 years from the implementation
32  of utility compliance filings and shall be based on the commission's preliminary determination of an
33  equitable, appropriate, and balanced measure of stranded cost recovery that takes into account the
34  near term rate relief principle, is in the public interest, and is substantially consistent with these
35  interdependent principles.  The commission shall also consider the potential for future rate impacts
36  due to possible differences between interim stranded cost recovery charges and charges that may
37  finally be approved for stranded cost recovery.

1    (b)  Any utility may seek adjustment of the interim stranded cost recovery charge at any

2    time based on severe financial hardship, as determined by the commission.  The setting of an interim

3    stranded cost recovery charge shall establish no legal, factual, or policy precedent with respect to the

4    final determination of stranded cost recovery by the commission in any subsequent administrative or

5    judicial proceeding.

6         VII.  The interim stranded cost recovery charge established for a utility as provided in

7    paragraph VI may also be adjusted based upon the outcome of rate case proceedings to adjudicate

8    claims for stranded cost recovery pursuant to paragraph V of this section.  Any amounts approved by

9    the commission for stranded cost recovery shall be net of amounts previously collected through

10   interim stranded cost recovery charges.

11        VIII.(a)  The commission is authorized to order such charges and other service provisions and

12   to take such other actions that are necessary to implement restructuring and that are substantially

13   consistent with the principles established in this chapter.  The commission is authorized to require

14   that distribution and electricity supply services be provided by separate affiliates.

15        (b)  [Repealed.]

16        (c)  The portion of the system benefits charge due to programs for low-income customers

17   shall not exceed 1.5 mills per kilowatt hour.  If the commission determines that the low-income

18   program fund has accumulated an excess of $1,000,000 and that the excess is not likely to be

19   substantially reduced over the next 12 months, it shall suspend collection of some or all of this

20   portion of the system benefits charge for a period of time it deems reasonable.

21        (d)  [Repealed.]

22        (e)   Targeted conservation, energy efficiency, and load management programs and

23   incentives that are part of a strategy to minimize distribution costs may be included in the

24   distribution charge or the system benefits charge, provided that system benefits charge funds are

25   only used for customer-based energy efficiency measures, and such funding shall not exceed 10

26   percent of the energy efficiency portion of a utility's annual system benefits charge funds.  A proposal

27   for such use of system benefits charge funds shall be presented to the commission for approval.  Any

28   such approval shall initially be on a pilot program basis and the results of each pilot program

29   proposal shall be subject to evaluation by the commission.

30        (f)  Beginning in 2000, the commission *and the department* shall submit a report to the

31   legislative oversight committee to monitor the transformation of delivery of electric services by

32   October 1 of each year.  The report shall concern the results and effectiveness of the system benefits

33   charge.

34        (g)  [Repealed.]

35        VIII-a.  Any electric utility that collects funds for energy efficiency programs that are subject

36   to the commission's approval, shall include in its plans to be submitted to the commission program

37   design, and/or enhancements, and estimated participation that maximize energy efficiency benefits

1   to public schools, including measures that help enhance the energy efficiency of public school

2   construction or renovation projects that are designed to improve indoor air quality.  The report

3   required under RSA 374-F:4, VIII(f) shall include the results and effectiveness of the energy

4   efficiency programs for schools and, in addition to other requirements, be submitted to the

5   commissioner of the department of education.

6       IX.   An electricity supplier shall be eligible to compete, subject to necessary limitations

7   established by the commission, for open access customers only if affiliated utilities file comparable

8   open access transmission and distribution rates with the FERC or the commission, or both as

9   appropriate, for all of their transmission facilities in New Hampshire and to the extent practicable,

10   all of their distribution facilities in New Hampshire.

11       X.   Nothing in this chapter shall be construed to prohibit the commission from otherwise

12   exercising its lawful authority under title 34, in proceedings which relate to the introduction of

13   competition in the retail electric utility industry including the retention of experts and consultants to

14   assist the commission in its investigations and the assessment of such costs against utilities and any

15   other parties to the proceedings, consistent with RSA 365:37 and RSA 365:38.

16       XI.   Any administrative or adjudicative proceeding or public hearing relating to this chapter

17   shall be subject to the provisions of RSA 541-A.

18       XII.   To the extent that the provisions of this chapter are applicable to rural electric

19   cooperatives for which a certificate of deregulation is on file with the commission, the commission

20   shall exercise its authority with regard to such deregulated rural electric cooperatives only when and

21   to the extent that the commission finds, after notice and hearing, that such action is required to

22   ensure that such deregulated rural electric cooperatives do not act in a manner which is inconsistent

23   with the restructuring policy principles of RSA 374-F:3.  The commission shall have the authority to

24   require that such deregulated rural electric cooperatives participate in proceedings, answer

25   commission ***and department*** for information and file such reports as may be reasonably necessary

26   to permit the commission to make an informed finding concerning the relevant restructuring policy

27   principle actions of such deregulated rural electric cooperatives.  Absent such a finding by the

28   commission, the active role of assuring that the restructuring policy principles are appropriately

29   addressed within their service territories shall be reserved to the deregulated rural electric

30   cooperatives.  Notwithstanding the foregoing, deregulated rural electric cooperatives shall be subject

31   to the commission's jurisdiction with regard to those provisions of RSA 374-F pertaining to stranded

32   cost recovery, customer choice, open access tariffs, default service, energy efficiency, and low income

33   programs to the same extent as other public utilities.

34       282   Electric Utility Restructuring; Ratepayer Protection.  Amend RSA 374-F:4-b to read as

35   follows:

36       374-F:4-b  Ratepayer Protection.

1       I.  Within 60 days of the effective date of this section, the commission shall initiate a

2    proceeding to develop rules to allow residential and small commercial customers to choose how they

3    receive communication from competitive electric suppliers and to implement the provisions of this

4    section.  Where the commission has adopted rules in conformity with this section, complaints to and

5    proceedings before the commission shall not be subject to RSA 541-A:29 or RSA 541-A:29-a.

6       II.  [~~Within 120 days of the effective date of this section, the commission shall redesign its~~

7    ~~website to~~] ***The department of energy shall*** enable residential and small commercial customers to

8    compare standard pricing policies and charges and to require competitive electric suppliers to input

9    such information ***on the department's website***.  Such information shall be input no less frequently

10    than once per month, unless there is no change in such information.  [~~Such redesign shall:~~

11          ~~(a)  Reflect the best practices of similar commission websites in other states and develop~~

12    ~~a process for removal of a competitive electric supplier's listings from such Internet website based on~~

13    ~~protocols established by the commission to ensure compliance with this section and to address~~

14    ~~customer complaints.~~

15          ~~(b)  Emphasize:~~

16          ~~(1)  Uniformity in the way competitive electric suppliers provide information for each~~

17    ~~category on the commission's website.~~

18          ~~(2)  Ease of use by customers.~~

19          ~~(3)  Ease of selecting and purchasing a specific contract from a competitive electric~~

20    ~~supplier shown on the commission's website.~~

21          ~~(c)  Include separate input boxes for the following information:~~

22          ~~(1)  A link to the provider's web page.~~

23          ~~(2)  Contract durations.~~

24          ~~(3)  Whether the contract has variable or fixed rates, or both, and when such rates~~

25    ~~apply.~~

26          ~~(4)  Cancellation charges.~~

27          ~~(5)  Rates.~~

28          ~~(6)  Other relevant information.~~]

29       III.  [~~On or before July 1, 2017, and every 2 years thereafter, the commission~~] ***The***

30    ***department of energy*** shall review its website ***every 2 years*** and ensure that the site remains an

31    efficient tool for the comparison of pricing policies and charges among competitive electric suppliers.

32       IV.  Unless the contract specifies a month-to-month variable rate, no competitive electric

33    supplier shall charge a residential customer a variable rate, including during a contract term or

34    following the expiration of a contract, without first providing written notification in a form approved

35    by the commission of the nature of such variable rate 45 days prior to the commencement of the

36    variable rate.  The residential customer shall select the method of written notification at the time

**Amendment to HB 2-FN-A-LOCAL**
**- Page 136 -**

1    the contract is signed.  Such customer shall have the option to change the method of notification at

2    any time during the contract.

3         V.  Competitive electric suppliers shall retain records of any of the notices required in this

4    section for a period of not less than 2 years and shall make such records available to the commission

5    upon its request.

6        283  Oversight Committee; Report.  Amend RSA 374-F:5, III to read as follows:

7         III.  The committee shall provide an interim report on or before April 1, and an annual report

8    on or before November 1 to the governor, the speaker of the house, the senate president, the state

9    library, [and] the public utilities commission*, and the department of energy* on activities before

10    the public utilities commission and other cognizant state agencies in regard to evolving changes in

11    the provision of electric services to New Hampshire customers, including modernization of the

12    electric grid, development of technologies for electric storage, electrification of transportation, the

13    growth of distributed generation, the commission's role in a deregulated market, and such matters

14    as may arise that may present opportunities to improve the delivery of electric services or to reduce

15    cost.

16        284  Competitive Electricity Supplier Requirements; Participation in Regional Activities.  Amend

17    RSA 374-F:7 and 374-F:8 to read as follows:

18    374-F:7  Competitive Electricity Supplier Requirements.

19         I.  Competitive energy suppliers are not public utilities pursuant to RSA 362:2, though a

20    competitive energy supplier may seek public utility status from the [commission] *department* if it

21    so chooses.  Notwithstanding a competitive energy supplier's non-utility status, the [commission]

22    *department* is authorized to establish requirements, excluding price regulation, for competitive

23    electricity suppliers, including registration, registration fees, customer information, disclosure,

24    standards of conduct, and consumer protection and assistance requirements.  Unless electing to do

25    so, an electricity supplier that offers or sells at retail to consumers within this state products and

26    services that can lawfully be made available to such consumers by more than one supplier shall not,

27    because of such offers or sales, be deemed to be a public utility as defined by RSA 362:2.  These

28    requirements shall be applied in a manner consistent with the restructuring principles of this

29    chapter to promote competition among electricity suppliers.

30         II.  Aggregators of electricity load that do not take ownership of power or other services and

31    do not represent any supplier interest are not public utilities pursuant to RSA 362:2, but shall notify

32    the [commission] *department* of their intent to do business.  Municipalities that aggregate electric

33    power or energy services for their citizens pursuant to RSA 53-E are not public utilities pursuant to

34    RSA 362:2 and are not subject to the provisions of paragraph III and RSA 374-F:4-b.

35         III.  The *department may investigate and petition the* commission [may] *to* assess fines

36    against, revoke the registration of, order the rescission of contracts with residential customers of,

1    order restitution to the residential customers of, and prohibit from doing business in the state any

2    competitive electricity supplier, including any aggregator or broker, which is found to have:

3            (a)   Engaged in any unfair or deceptive acts or practices in the marketing, sale, or

4    solicitation of electricity supply or related services;

5            (b)   Violated the requirements of this section or any other provision of this title

6    applicable to competitive electricity suppliers; or

7            (c)  Violated any rule adopted by the [commission] *department* pursuant to paragraph V

8    and RSA 374-F:4-b.

9            IV.   As a condition of operation, for a 2-year interim period from the date that competition is

10   implemented in one or more areas of the state, competitive energy suppliers and load aggregators

11   shall submit to the jurisdiction of the commission for mediation and resolution of disputes between

12   customers and competitive energy suppliers or aggregators.   Municipalities that aggregate electric

13   power or energy service for their citizens pursuant to RSA 53-E are not subject to this paragraph.

14           V.   The [commission] *department* shall adopt rules, under RSA 541-A, to implement this

15   section.   Where the [commission] *department* has adopted rules in conformity with this section,

16   complaints to and proceedings before the commission shall not be subject to RSA 541-A:29 or RSA

17   541-A:29-a.

18           374-F:8  Participation in Regional Activities.  The [commission] *department* shall advocate for

19   New Hampshire interests before the Federal Energy Regulatory Commission and other regional and

20   federal bodies.  The commission shall participate in the activities of the New England Conference of

21   Public Utility Commissioners, *and* the National Association of Regulatory Utility Commissioners,

22   and the *department shall participate in the activities of the* New England States Committee on

23   Electricity, or other similar organizations, and work with the New England Independent System

24   Operator and NEPOOL to advance the interests of New Hampshire with respect to wholesale

25   electric issues, including policy goals relating to fuel diversity, renewable energy, and energy

26   efficiency, and to assure nondiscriminatory open access to a safe, adequate, and reliable

27   transmission system at just and reasonable prices.  The [commission] *department* shall advocate

28   against proposed regional or federal rules or policies that are inconsistent with the policies, rules, or

29   laws of New Hampshire.   In its participation in regional activities, the commission *and the*

30   *department* shall consider how other states' policies will impact New Hampshire rates and work to

31   prevent or minimize any rate impact the commission *or department* determines to be unjust or

32   unreasonable.

33           285  Offshore Wind and Port Development; Commission Established; Membership.  Amend RSA

34   374-F:10, II(c) to read as follows:

35           (c)  The [director of the office of strategic initiatives] *commissioner of the department*

36   *of energy*, or designee.

Amendment to HB 2-FN-A-LOCAL
- Page 138 -

1   286  Reference Changed; Office of Offshore Wind Industry Development.  Amend RSA 374-F:10,
2   VI to read as follows:

3       VI.  The commission shall receive staff support and other services, including research and
4   facilities assessments, from the department of [business and economic affairs] *energy*, office of
5   offshore wind industry development established in RSA [12-O:51 ] *12-P:7-b*.

6   287  Definitions  Amend RSA 374-H:1, I to read as follows:

7       I.  ["Commission"] *"Department"* means the [public utilities commission] *department of*
8   *energy*.

9   288  Investigation of Energy Storage.  Amend RSA 374-H:2 to read as follows:

10  374-H:2  [Commission] *Department* Investigation of Energy Storage.

11      I.  Within 30 days of the effective date of this chapter, the [commission] *department* shall
12  [initiate a proceeding to investigate] *conduct an investigation into* ways to enable energy storage
13  projects to receive compensation for avoided transmission and distribution costs, including but not
14  limited to avoided regional and local network service charges, while also participating in wholesale
15  energy markets.  The [commission] *department* shall investigate how this might be done for both
16  utility-owned and non-utility-owned energy storage projects, as well as for both behind-the-meter
17  storage and front-of-the-meter storage.

18      II.  The [commission's investigative proceeding] *department's investigation* shall
19  specifically consider the following:

20      (a)  How public policy can best help establish accurate and efficient price signals for
21  energy storage projects that value their ability to avoid transmission and distribution costs while
22  simultaneously reducing wholesale electricity market prices.

23      (b)  How to compensate energy storage projects that participate in wholesale electricity
24  markets for avoided transmission and distribution costs in a manner that provides net savings to
25  consumers.

26      (c)  How best to encourage both utility and non-utility investments in energy storage
27  projects.

28      (d)  The costs and benefits of a potential bring your own device program; how such a
29  program might be implemented; any statutory or regulatory changes that might be needed to create,
30  facilitate, and implement such a program; and whether such a program should include all
31  distributed energy resources or be limited to distributed energy storage projects.

32      (e)  Any statutory changes the general court should implement, including but not limited
33  to changes to or exceptions from RSA 374-F or RSA 374-G, to enable energy storage projects to
34  receive appropriate compensation for avoided transmission and distribution costs while also
35  participating in wholesale energy markets.

36      (f)  Any other topic the [commission] *department* reasonably believes it should consider
37  in order to diligently conduct the proceeding.

III.  The [commission] *department* shall report its findings and recommendations to the standing committees of the house of representatives and senate with jurisdiction over energy and utility matters no later than 2 years after initiating the proceeding.  The report shall identify ways any recommended statutory changes can minimize any potential conflict with the restructuring policy principles of RSA 374-F.

289  Fixing of Rates by Commission; Energy Policy Act Standards.  Amend RSA 378:7 and 378:7-a to read as follows:

378:7  Fixing of Rates by Commission.  Whenever the commission shall be of opinion, after a hearing had upon its own motion *or on motion of the department of energy* or upon complaint, that the rates, fares or charges demanded or collected, or proposed to be demanded or collected, by any public utility for service rendered or to be rendered are unjust or unreasonable, or that the regulations or practices of such public utility affecting such rates are unjust or unreasonable, or in any wise in violation of any provision of law, or that the maximum rates, fares or charges chargeable by any such public utility are insufficient, the commission shall determine the just and reasonable or lawful rates, fares and charges to be thereafter observed and in force as the maximum to be charged for the service to be performed, and shall fix the same by order to be served upon all public utilities by which such rates, fares and charges are thereafter to be observed.  The commission shall be under no obligation to investigate *or hear* any rate matter which it has investigated within a period of 2 years, but may do so within said period at its discretion.

378:7-a  Energy Policy Act Standards.  [The commission] ***Consistent with their statutory authority, the commission and the department of energy*** may establish requirements for net metering, fuel diversity, fossil fuel generation efficiency, advanced metering, time-based rates, and interconnection with on-site generation facilities of customers in a manner not inconsistent with section 111 of the Public Utility Regulatory Policies Act of 1978 (16 U.S.C. Chapter 46) as amended by the Energy Policy Act of 2005.

290  Contracts for Advertising.  Amend RSA 378:24 to read as follows:

378:24  Contracts for Advertising.  All advertising contracts of public utilities shall be made at regular, established, commercial advertising rates; and such contracts shall be open to inspection by the commission *and the department of energy* at all times.

291  Filing; Inspection; Temporary Rates.  Amend RSA 378:26 and 378:27 to read as follows:

378:26  Filing; Inspection.  A copy of such list for the preceding year shall be filed with the commission *and the department of energy*, in such form and under such regulations as [the commission] *they* may prescribe.  Such list, together with the books, records and papers of the carrier so far as relevant, shall be open at all times to the inspection of the commission, who shall examine the same whenever they deem it necessary to the due enforcement of this title.

378:27  Temporary Rates.  In any proceeding involving the rates of a public utility brought either upon motion of the commission *or the department of energy* or upon complaint, the commission

1  may, after reasonable notice and hearing, if it be of the opinion that the public interest so requires,

2  immediately fix, determine, and prescribe for the duration of said proceeding reasonable temporary

3  rates; provided, however, that such temporary rates shall be sufficient to yield not less than a

4  reasonable return on the cost of the property of the utility used and useful in the public service less

5  accrued depreciation, as shown by the reports of the utility filed with the commission **and the**

6  **department of energy**, unless there appears to be reasonable ground for questioning the figures in

7  such reports.

8       292  Multi-use Data Energy Platform.  Amend RSA 378:50-378:52 to read as follows:

9       378:50  Definitions.  In this subdivision:

10          I. "Data sharing" means providing data and accessing data provided by others.

11          II. "Individual customer data" means the customer's name, address, opt-in status pursuant

12  to RSA 374:62, energy usage as recorded by meters supplied by electric and natural gas utilities, and

13  other data segments established and authorized by the [commission] **department of energy**.

14          III. "Third party" means:

15              (a) Any service provider within the meaning of RSA 363:37, II other than a utility; and

16              (b) The office of the consumer advocate established pursuant to RSA 363:28.

17       378:51  Online Energy Data Platform Established.

18          I. The [commission] **department of energy** shall require electric and natural gas utilities to

19  establish and jointly operate a statewide, multi-use, online energy data platform.  The data platform

20  shall:

21              (a)  Consist of a common base of energy data for use in wide range of applications and

22  business uses.

23              (b) Adhere to specific and well-documented standards.

24              (c) Provide a user-friendly interface.

25              (d)  Adhere to a common statewide logical data model that defines the relationships

26  among the various categories of data included in the platform.

27              (e) Allow for sharing of individual customer data consistent with the opt-in requirements

28  for third-party access specified in RSA 363:38.

29              (f) Protect from unauthorized disclosure the personally identifying information of utility

30  customers in a manner that advances applicable constitutional and statutory privacy rights,

31  including the protections of RSA 363:38.

32              (g)  Provide for the voluntary participation of municipal utilities and deregulated rural

33  electric cooperatives in data sharing and the operation of the online energy data platform, subject to

34  terms, conditions, and cost sharing which are reasonable and in the public interest.

35          II.  The commission shall open an adjudicative proceeding within 90 days of the effective

36  date of this subdivision, to which all electric and natural gas utilities shall be mandatory parties, to

37  determine:

Amendment to HB 2-FN-A-LOCAL
- Page 141 -

1      (a)  Governance, development, implementation, change management, and versioning of
2  the statewide, multi-use, online energy data platform.

3      (b)  Standards for data accuracy, retention, availability, privacy, and security, including
4  the integrity and uniformity of the logical data model.

5      (c)  Financial security standards or other mechanisms to assure compliance with privacy
6  standards by third parties.

7      III.  The [commission] *department of energy* shall defer the implementation of the
8  statewide, multi-use, online energy data platform pursuant to paragraph I if [it] *the commission*
9  determines that the cost of such platform to be recovered from customers is unreasonable and not in
10  the public interest.

11      IV.  The [commission] *department of energy* may adopt *additional* rules pursuant to RSA
12  541-A as necessary to implement this section.

13  378:52  Platform Requirements.  The utilities shall:

14      I.  Design and operate the energy data platform to provide opportunities for utilities, their
15  customers, and third parties to access the online energy data platform and to participate in data
16  sharing.

17      II.  Require, as a condition of accessing the online energy data platform, that a third party
18  complete a qualification and registration process to ensure that any customer data downloaded from
19  the platform remains in a safe, secure environment according to data privacy standards established
20  by the [commission] *department of energy*.

21      III.  Administer the online energy data platform in a manner consistent with RSA 363:38.

22  293  Regional Greenhouse Gas Initiative; Energy Efficiency Fund and Use of Auction Proceeds.
23  Amend RSA 125-O:23 to read as follows:

24  125-O:23  Energy Efficiency Fund and Use of Auction Proceeds.

25      I.  There is hereby established an energy efficiency fund.  This nonlapsing, special fund shall
26  be continually appropriated to the [commission] *department of energy* to be expended in
27  accordance with this section.  The state treasurer shall invest the moneys deposited therein, as
28  provided by law.  Income received on investments made by the state treasurer shall also be credited
29  to the fund.  All programs supported by these funds shall be subject to audit by the [commission]
30  *department of energy* as deemed necessary.  A portion of the fund moneys shall be used to pay for
31  [commission] *department of energy* and department *of environmental services* costs to
32  administer this subdivision, including contributions for the state's share of the costs of the RGGI
33  regional organization.  No fund moneys shall be used by the [commission] *department of energy* or
34  the department *of environmental services* to contract with outside consultants.  The *department*
35  *of energy* [commission] shall transfer from the fund to the department *of environmental services*
36  such costs as may be budgeted and expended, or otherwise approved by the fiscal committee of the

1   general court and the governor and council, for the department's cost of administering this

2   subdivision.

3       II.  All amounts in excess of the threshold price of $1 for any allowance sale shall be rebated

4   to all retail electric ratepayers in the state on a per-kilowatt-hour basis, in a timely manner to be

5   determined by the commission.

6       III.  All remaining proceeds received by the state from the sale of allowances, excluding the

7   amount used for [commission] *department of energy* and department *of environmental services*

8   administration under paragraph I, shall be allocated by the commission as follows:

9       (a)  At least 15 percent to the low-income core energy efficiency program.

10      (b)  Beginning January 1, 2014, up to $2,000,000 annually to utility core programs for

11  municipal and local government energy efficiency projects, including projects by local governments

12  that have their own municipal utilities.  Funding elements shall include, but not be limited to,

13  funding for direct technical and project management assistance to identify and encourage

14  comprehensive projects and incentives structured to assist municipal and local governments funding

15  energy efficiency projects.  In calendar years 2014, 2015, and 2016, any unused funds allocated to

16  municipal and local government projects under this paragraph remaining at the end of the year shall

17  roll over and be added to the new calendar year program funds and continue to be made available

18  exclusively for municipal and local government projects.  Beginning in calendar year 2017, and all

19  subsequent years, funds allocated to municipal and local government projects under this paragraph

20  shall be offered first to municipal and local governments as described in this paragraph for no less

21  than 4 full calendar months.  If, at the end of this time, municipal and local governments have not

22  submitted requests for eligible projects that will expend the funds allocated to municipal and local

23  government projects under this paragraph within that program year, the funds shall be offered on a

24  first-come, first-serve basis to business and municipal customers who fund the system benefits

25  charge.

26      (c)  The remainder to all-fuels, comprehensive energy efficiency programs administered

27  by qualified parties which may include electric distribution companies as selected through a

28  competitive bid process.  The funding shall be distributed among residential, commercial, and

29  industrial customers based upon each customer class's electricity usage to the greatest extent

30  practicable as determined by the commission.  Bids shall be evaluated based on, but not limited to,

31  the following criteria:

32      (1)  A benefit/cost ratio analysis including all fuels.

33      (2)  Demonstrated ability to provide a comprehensive, fuel neutral program.

34      (3)  Demonstrated infrastructure to effectively deliver such program.

35      (4)  Experience of the bidder in administering energy efficiency programs.

36      (5)  Ability to reach out to customers.

37      (6)  The validity of the energy saving assumptions described in the bid.

1    IV.   The [electric] division of *policy and programs of* the [commission] *department of*
2    *energy* shall conduct a competitive bid process for the selection of programs to be funded under
3    subparagraph III(c), with such funding to begin January 1, 2015.  The [commission] *department of*
4    *energy* may petition the governor and council to extend existing contracts until such time as the
5    competitive bids are approved by the governor and council, but in no event later than July 1, 2015.
6    The competitive bid process shall be repeated every 3 years thereafter.   Before extending any
7    existing program, public comment on the proposed extension shall be accepted.

8    V.   Each entity receiving funding under subparagraph III(c) shall file an annual report on
9    the performance of the entity's program.  The [commission] *department of energy* shall establish
10   the format, content, and the methodologies used to provide the content of the reports.   The
11   [commission] *department of energy* shall make use of, as applicable and appropriate, the
12   monitoring and verification requirements used in the natural gas and electric utility core programs.
13   The annual reports shall be delivered to the governor, the president of the senate, the speaker of the
14   house of representatives, the chairmen of the senate and house standing committees with
15   jurisdiction over energy matters, *the commissioner of the department of energy* and the
16   [chairman] *chairperson* of the public utilities commission.  The reports shall include, but not be
17   limited to, the following:

18        (a)  Program expenditures, including direct customer installation costs.

19        (b)   Resulting actual and projected energy savings by fuel type and associated $CO_2$
20   emissions reductions.

21        (c)  Any measurement and verification data that corroborate projected savings.

22        (d)  The number of customers served by the programs.

23        (e)   Other data as required by the commission in order to determine program
24   effectiveness.

25   294  New Paragraph; Bank Commissioner; Public Deposit Investment Pool.  Amend RSA 383:22
26   by inserting after paragraph IV the following new paragraph:

27        V.   The commissioner shall charge the public deposit investment pool any actual costs
28   incurred by the department for the operation of the pool as well as any expenses of department
29   personnel assisting in the operation of the pool.  The cost for personnel assisting in the operation of
30   the pool shall be determined in accordance with the per diem examination charge established in RSA
31   383:11, I, provided that the requirement that no entity shall be charged or pay less than one full day
32   shall not apply.  The private investment advisor retained under paragraph II shall be responsible for
33   processing any invoice submitted for the actual costs incurred by the department and the expenses of
34   department personnel under this paragraph.

35   295  Tax Expenditure Report; Weighted Apportionment Factors Removed.  Amend RSA 71-C:2 to
36   read as follows:

**Amendment to HB 2-FN-A-LOCAL**
**- Page 144 -**

1    71-C:2  Tax Expenditures Specified.  Tax expenditures include, but may not be limited to, the
2    community development finance authority investment tax credit as computed in RSA 162-L:10; the
3    economic revitalization zone tax credit as computed in RSA 162-N:6; the research and development
4    tax credit under RSA 77-A:5, XIII; the Coos county job creation tax credit under RSA 77-E:3-c; the
5    education tax credit as computed in RSA 77-G:4; [the weighted apportionment factors under RSA 77-
6    A:3, II(a);] *the regional career and technical education center tax credit pursuant to RSA*
7    *188-E:9-a;* and the exemption for qualified regenerative manufacturing companies allowed under
8    RSA 77-A:1, I and RSA 77-E:1, III.

9    296  New Paragraph; Unemployment Compensation; Fraud Detection.  Amend RSA 282-A:118
10   by inserting after paragraph VII the following new paragraph:

11        VIII.   That for the purpose of preventing and detecting fraud in the unemployment
12   compensation system as well as efficiently coordinating and streamlining integrity improvement
13   efforts, the commissioner of the department of employment security may enter into an agreement
14   with the National Association of State Workforce Agencies' Center for Employment Security
15   Education and Research, Inc. (CESER) as agent for the United States Department of Labor
16   (USDOL) for participation in the Integrity Data Hub (IDH).  The department's participation in IDH
17   and any resulting use of confidential data by USDOL and CESER shall be in accordance with all
18   state laws, federal laws as well as state and federal regulations pertaining to prevention and
19   detection of fraud, waste, and abuse in the unemployment compensation system.  The information
20   thus provided by the department to the IDH shall be used solely for administration of state and
21   federal unemployment compensation laws.  Information under this paragraph shall only be provided
22   upon a finding by the commissioner that sufficient guarantees of continued confidentiality are in
23   place.

24   297   New Subdivision; State Commission on Human Rights; Right to Freedom From
25   Discrimination in Public Workplaces and Education.  Amend RSA 354-A by inserting after section 28
26   the following new subdivision:

27        Right to Freedom from Discrimination in Public Workplaces and Education

28   354-A:29  Right to Freedom from Discrimination in Public Workplaces and Education.

29        I.  The general court hereby finds and declares that practices of discrimination against any
30   New Hampshire inhabitants because of age, sex, gender identity, sexual orientation, race, creed,
31   color, marital status, familial status, mental or physical disability, religion, or national origin are a
32   matter of state concern, that discrimination based on these characteristics not only threatens the
33   rights and proper privileges of New Hampshire inhabitants but menaces the institutions and
34   foundation of a free democratic state and threatens the peace, order, health, safety and general
35   welfare of the state and its inhabitants.

Amendment to HB 2-FN-A-LOCAL
- Page 145 -

1    II.   Nothing in this subdivision shall be construed to prohibit racial, sexual, religious, or
2  other workplace sensitivity training based on the inherent humanity and equality of all persons and
3  the ideal that all persons are entitled to be treated with equality, dignity, and respect.

4    III.   Nothing in this subdivision shall be construed to limit the academic freedom of faculty
5  members of the university system of New Hampshire and the community college system of New
6  Hampshire to conduct research, publish, lecture, or teach in the academic setting.

7  354-A:30  Definitions.  In this subdivision:

8    I.  "Government program" means any activity undertaken by a public employer, both as an
9  employer and in performance of its government function.

10    II.  "Public employee" means any person working on a full-time or part-time basis for the
11  state, or any subdivision thereof, including, but not limited to counties, cities, towns, precincts,
12  water districts, school districts, school administrative units, or quasi-public entities.

13    III.  "Public employer" includes the state or any subdivision thereof, including, but not
14  limited to counties, cities, towns, precincts, water districts, school districts, school administrative
15  units, or quasi-public entities.

16  354-A:31  Prohibition on Public Employers.  No public employer, either directly or through the
17  use of an outside contractor, shall teach, advocate, instruct, or train any employee, student, service
18  recipient, contractor, staff member, inmate, or any other individual or group, any one or more of the
19  following:

20    I.  That people of one age, sex, gender identity, sexual orientation, race, creed, color, marital
21  status, familial status, mental or physical disability, religion, or national origin, are inherently
22  superior or inferior to people of another age, sex, gender identity, sexual orientation, race, creed,
23  color, marital status, familial status, mental or physical disability, religion, or national origin;

24    II.  That an individual, by virtue of his or her age, sex, gender identity, sexual orientation,
25  race, creed, color, marital status, familial status, mental or physical disability, religion, or national
26  origin is inherently racist, sexist, or oppressive, whether consciously or unconsciously;

27    III.  That an individual should be discriminated against or receive adverse treatment solely
28  or partly because of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital
29  status, familial status, mental or physical disability, religion, or national origin; or

30    IV.  That people of one age, sex, gender identity, sexual orientation, race, creed, color,
31  marital status, familial status, mental or physical disability, religion, or national origin cannot and
32  should not attempt to treat others equally and/or without regard to age, sex, gender identity, sexual
33  orientation, race, creed, color, marital status, familial status, mental or physical disability, religion,
34  or national origin.

35  354-A:32  Prohibition on the Content of Government Programs and Speech.  No government
36  program shall teach, advocate, or advance any one or more of the following:

Amendment to HB 2-FN-A-LOCAL
- Page 146 -

1       I.  That people of one age, sex, gender identity, sexual orientation, race, creed, color, marital
2  status, familial status, mental or physical disability, religion, or national origin are inherently
3  superior or inferior to people of another age, sex, gender identity, sexual orientation, race, creed,
4  color, marital status, familial status, mental or physical disability, religion, or national origin;

5       II.  That an individual, by virtue of his or her age, sex, gender identity, sexual orientation,
6  race, creed, color, marital status, familial status, mental or physical disability, religion, or national
7  origin, is inherently racist, sexist, or oppressive, whether consciously or unconsciously;

8       III.  That an individual should be discriminated against or receive adverse treatment solely
9  or partly because of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital
10  status, familial status, mental or physical disability, religion, or national origin; or

11       IV.  That people of one age, sex, gender identity, sexual orientation, race, creed, color,
12  marital status, familial status, mental or physical disability, religion, or national origin cannot and
13  should not attempt to treat others equally and/or without regard to age, sex, gender identity, sexual
14  orientation, race, creed, color, marital status, familial status, mental or physical disability, religion,
15  or national origin.

16       354-A:33  Protection for Public Employees.  No public employee shall be subject to any adverse
17  employment action, warning, or discipline of any kind for refusing to participate in any training,
18  program, or other activity at which a public employer or government program advocates, trains,
19  teaches, instructs, or compels participants to express belief in, or support for, any one or more of the
20  following:

21       I.  That people of one age, sex, gender identity, sexual orientation, race, creed, color, marital
22  status, familial status, mental or physical disability, religion, or national origin are inherently
23  superior or inferior to people of another age, sex, gender identity, sexual orientation, race, creed,
24  color, marital status, familial status, mental or physical disability, religion, or national origin;

25       II.  That an individual, by virtue of his or her age, sex, gender identity, sexual orientation,
26  race, creed, color, marital status, familial status, mental or physical disability, religion, or national
27  origin, is inherently racist, sexist, or oppressive, whether consciously or unconsciously;

28       III.  That an individual should be discriminated against or receive adverse treatment solely
29  or partly because of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital
30  status, familial status, mental or physical disability, religion, or national origin; or

31       IV.  That people of one age, sex, gender identity, sexual orientation, race, creed, color,
32  marital status, familial status, mental or physical disability, religion, or national origin cannot and
33  should not attempt to treat others equally and/or without regard to age, sex, gender identity, sexual
34  orientation, race, creed, color, marital status, familial status, mental or physical disability, religion,
35  or national origin.

1    354-A:34  Remedies.  Any person aggrieved by an act made unlawful under this subdivision may

2    pursue all of the remedies available under RSA 354-A, RSA 491, RSA 275-E, or RSA 98-E, or any

3    other applicable common law or statutory cause of action.

4    298  New Section; Prohibition on Teaching Discrimination.  Amend RSA 193 by inserting after

5    section 39 the following new section:

6    193:40  Prohibition on Teaching Discrimination.

7        I.  No pupil in any public school in this state shall be taught, instructed, inculcated or

8    compelled to express belief in, or support for, any one or more of the following:

9        (a)  That one's age, sex, gender identity, sexual orientation, race, creed, color, marital

10    status, familial status, mental or physical disability, religion or national origin is inherently superior

11    to people of another age, sex, gender identity, sexual orientation, race, creed, color, marital status,

12    familial status, mental or physical disability, religion, or national origin;

13        (b)  That an individual, by virtue of his or her age, sex, gender identity, sexual

14    orientation, race, creed, color, marital status, familial status, mental or physical disability, religion,

15    or national origin, is inherently racist, sexist, or oppressive, whether consciously or unconsciously;

16        (c)  That an individual should be discriminated against or receive adverse treatment

17    solely or partly because of his or her age, sex, gender identity, sexual orientation, race, creed, color,

18    marital status, familial status, mental or physical disability, religion, or national origin; or

19        (d)  That people of one age, sex, gender identity, sexual orientation, race, creed, color,

20    marital status, familial status, mental or physical disability, religion, or national origin cannot and

21    should not attempt to treat others without regard to age, sex, gender identity, sexual orientation,

22    race, creed, color, marital status, familial status, mental or physical disability, religion, or national

23    origin.

24        II.  Nothing in this section shall be construed to prohibit discussing, as part of a larger

25    course of academic instruction, the historical existence of ideas and subjects identified in this

26    section.

27        III.  Any person claiming to be aggrieved by a violation of this section, including the attorney

28    general, may initiate a civil action against a school or school district in superior court for legal or

29    equitable relief, or with the New Hampshire commission for human rights as provided in RSA 354-

30    A:34.

31        IV.  Violation of this section by an educator shall be considered a violation of the educator

32    code of conduct that justifies disciplinary sanction by the state board of education.

33        V.  For the purposes of this section, "educator" means a professional employee of any school

34    district whose position requires certification by the state board pursuant to RSA 189:39.

35    Administrators, specialists, and teachers are included within the definition of this term.

299  Severability.  If any provision of sections 297-298, or the application of any provision to any person or circumstance is held to be invalid, the remainder of such sections, and their application to any other persons or circumstances shall not be affected thereby.

300  Effective Date.  Sections 297-299 of this act shall take effect upon passage.

301  Application of Emergency Orders.

I.  The state hereby recognizes that the issuance of multiple executive orders may have created undue hardship or confusion and contributed to the stressful environment for business operations, particularly small business entities.  The penalties associated with violations of these orders, while issued in the interest of public health, should not unduly penalize law-abiding businesses.

II.  Notwithstanding any provision of law to the contrary, state, county, and local jurisdictions shall not enforce, and shall reverse, any violation of the governor's emergency orders regarding the COVID-19 pandemic.

III.  Any business fines issued under executive or emergency orders issued in response to COVID-19 or in accordance with RSA 4:47 shall be refunded.  The governor is hereby authorized to draw a warrant for up to $10,000 for this purpose out of any money in the treasury not otherwise appropriated.

IV.  The attorney general shall request that the court dismiss any pending enforcement action related to violation of an emergency order issued by the governor in response to the COVID-19 pandemic.

V.  Any record of violation or written warning for such violations shall be expunged if requested in writing, and such records shall not be admissible in any subsequent or future court proceeding.  Notwithstanding the provisions of RSA 651:5, IX, there shall be no charge to the petitioner for expungement of these records.

302  New Sections; Animal Records Database.  Amend RSA 437 by inserting after section 8 the following new sections:

437:8-a  Animal Records Database Established.

I.  The department of agriculture, markets, and food shall design, establish, and contract with a third party for the implementation and operation of an electronic system to facilitate the handling of animal records.

II.  The department shall maintain a reporting system capable of receiving electronically transmitted records from veterinarians.  The commissioner shall adopt rules under RSA 541-A to govern methods of obtaining, compiling, and maintaining such information he or she deems necessary to manage such database including procedures for providing authorized access.  The commissioner shall also ensure that the database is secure from unauthorized access or use.

III.  The commissioner may issue a waiver to a veterinarian who is unable to submit information by electronic means.  Such waiver may permit the veterinarian to submit information by

**Amendment to HB 2-FN-A-LOCAL**
**- Page 149 -**

1    paper form or other means, provided all information required by RSA 437:8 is submitted in this
2    alternative format and within the established time limit.

3         IV.  The commissioner may grant a reasonable extension to a veterinarian who is unable, for
4    good cause, to submit all the information required by RSA 437:8 within the established time limits.
5    Any veterinarian who in good faith reports to the program as required by RSA 437:8 shall be
6    immune from any civil or criminal liability as the result of such good faith reporting.

7         V.  There is established a nonlapsing fund to be known as the animal records database fund
8    in the department of agriculture, markets, and food which shall be kept distinct and separate from
9    all other funds.  All moneys in the animal records database fund shall be nonlapsing and continually
10   appropriated to the commissioner, and except as otherwise provided in law, shall be used for the
11   purpose of administering and maintaining the animal records database established in this section.
12   The database fund shall draw moneys only from grants and appropriations.

13        VI.  Notwithstanding paragraph V, the fund shall be initiated by transfers from the
14   agricultural product and scale testing fund established under RSA 435:20, IV, as provided in RSA
15   435:20, V.

16    437:8-b  Confidentiality.

17         I.  Information submitted to the animal records database is exempt from public disclosure,
18   and shall not be subject to discovery, subpoena, or other means of legal compulsion for release.
19   Disclosure to local, state, and federal officials is not public disclosure.  This exemption shall not
20   affect the disclosure of information used in official local, state, or federal animal health
21   investigations or pet vendor license investigations under this chapter.  Database records,
22   information, or lists may be made available pursuant to a court order on a case-by-case basis.  Any
23   information, record, or list received pursuant to this paragraph shall not be transferred or otherwise
24   made available to any other person or listed entity not authorized under this paragraph.

25        II.  The department shall establish and maintain procedures to ensure the privacy and
26   confidentiality of animal and animal owner information.

27       III.  The department may use and release information and reports from the program for
28   program analysis and evaluation, statistical analysis, public research, public policy, and educational
29   purposes, provided that the data are aggregated or otherwise de-identified.

30       IV.  No animal records database records, information, or lists shall be sold, rented,
31   transferred, or otherwise made available in whole or in part, in any form or format, directly or
32   indirectly, to another person.

33        V.  Certificates of transfer shall be removed from the animal records database after 4 years.

34       VI.  Any person who knowingly accesses, alters, destroys, publishes, or discloses animal
35   records database information except as authorized in this section or attempts to obtain such
36   information by fraud, deceit, misrepresentation, or subterfuge shall be guilty of a class B felony.

1      VII.   Nothing in this section shall limit the right of a person damaged by a violation to
2 pursue any other appropriate cause of action.

3      303   Certificates of Transfer for Dogs and Cats.   RSA 437:8 is repealed and reenacted to read as
4 follows:

5      437:8   Certificates of Transfer for Dogs, Cats, and Ferrets.

6      I.   For purposes of this chapter, an official certificate of transfer means an electronic record
7 electronically submitted to the animal records database by a licensed veterinarian, containing the
8 name and address of the entity transferring ownership of the dog, cat, or ferret, the age, gender,
9 breed, microchip number, tattoo number, ear tag number, or physical description of the dog, cat, or
10 ferret, and the certification by the veterinarian that the dog, cat, or ferret is free from evidence of
11 communicable diseases or internal or external parasites.   A list of all vaccines and medication
12 administered to the dog, cat, or ferret shall be included in or attached to the certificate.   An official
13 certificate of transfer is distinct from a federal certificate of veterinary inspection and is not
14 interchangeable with a certificate of veterinary inspection .

15      II.   The electronically submitted certificate of transfer shall be considered the official
16 certificate of transfer.   A copy of the certificate of transfer of the dog, cat, or ferret offered for
17 transfer by a licensee shall be kept on the premises where dogs, cats, and ferrets are displayed, and
18 made available for inspection by the department, local officials, or a member of the public upon
19 request up to one year after the animal has left the facility.   The public shall be informed of their
20 right to inspect a copy of the certificate of transfer for each dog, cat, or ferret offered for transfer by a
21 sign prominently displayed in the area where dogs, cats, or ferrets are displayed.   Upon transfer of a
22 dog, cat, or ferret, a copy of that animal's certificate of transfer shall be given to the transferee in
23 addition to any other documents which are customarily delivered to the transferee.

24      III.   For purposes of this chapter, an official certificate of transfer waiver means an electronic
25 record electronically submitted to the animal records database provided in lieu of an official
26 certificate of transfer for a dog, cat, or ferret that has failed the examination for an official certificate
27 of transfer because of a non-contagious illness, feline leukemia, or feline immunodeficiency virus.
28 The waiver shall contain the name and address of the entity transferring ownership of the dog, cat,
29 or ferret; the age, gender, breed, microchip number, tattoo number, ear tag number, or physical
30 description of the dog, cat, or ferret; the reason for failure of the examination for the official
31 certificate of transfer; and the signature of the transferee indicating that the transferee has
32 knowledge of the dog's, cat's, or ferret's non-contagious medical condition.   A list of all vaccines and
33 medication administered to the dog, cat, or ferret shall be included in or attached to the certificate of
34 transfer waiver.   The waiver shall be submitted electronically to the animal records database by a
35 New Hampshire licensed veterinarian.

36      IV.   No person, firm, corporation, or other entity shall ship or bring into the state of New
37 Hampshire, to offer for transfer in the state of New Hampshire, any cat, dog, or ferret less than 8

**Amendment to HB 2-FN-A-LOCAL**
**- Page 151 -**

1   weeks of age.  No person, firm, corporation, or other entity shall offer for transfer any cat, dog, or
2   ferret less than 8 weeks of age.

3       V.  Once a dog, cat, or ferret intended for transfer has entered the state, it shall be held at
4   least 48 hours at a facility licensed under RSA 437 or at a facility operated by a licensed veterinarian
5   separated from other animals on the premises before being offered for transfer.

6       VI.  No animal shelter shall transfer any dog, cat or ferret that is received from outside of the
7   state until the quarantine requirements in 437:8, V have been met and without an official transfer
8   certificate.  Animal shelter facilities, as defined in RSA 437:1, I, are exempt from the requirements of
9   this section relative to transferring dogs, cats, and ferrets except that:

10          (a)  All animal shelter facilities shall have on premises a microchip scanner and shall
11  maintain a file of recognized pet retrieval agencies, including but not limited to national tattoo or
12  microchip registries.

13          (b)  Where an owner is not known, all animal shelter facilities shall inspect for tattoos,
14  ear tags, or other permanent forms of positive identification and shall scan for a microchip upon
15  admission of an unclaimed or abandoned animal as defined in RSA 437:18, IV and prior to
16  transferring ownership of an unclaimed or abandoned animal.

17      VII.  No dog, cat, or ferret shall be offered for transfer by a licensee or by any individual
18  without first being protected against infectious diseases using vaccines approved by the state
19  veterinarian.  No dog, cat, or ferret shall be offered for transfer by a licensee or by any individual
20  unless accompanied by a copy of the official certificate of transfer or official certificate of transfer
21  waiver issued by a licensed veterinarian within the prior 14 days.  No transfer shall occur unless the
22  transferred animal is accompanied by a copy of the official certificate of transfer or official certificate
23  of transfer waiver.  The official certificate of transfer or official certificate of transfer waiver shall
24  reside in the animal records database.  Copies shall be provided to the veterinarian, transferor, and
25  the transferee, who shall retain copies for their records.  The transferor shall retain a copy for his or
26  her records.  If an official certificate of transfer or official certificate of transfer waiver is produced, it
27  shall be prima facie evidence of transfer.

28      304  New Subparagraph; Animal Records Database Fund.  Amend RSA 6:12, I(b) by inserting
29  after subparagraph (364) the following new subparagraph:

30              (365)  Moneys deposited in the animal records database fund established in RSA
31  437:8-a, V.

32      305  New Paragraph; Agricultural Product and Scale Testing Fund; Transfer Authority.  Amend
33  RSA 435:20 by inserting after paragraph IV the following new paragraph:

34      V.  The commissioner shall transfer funds from the agricultural product and scale testing
35  fund established under RSA 435:20, IV to the animal records database fund established in RSA
36  437:8-a to develop and make operational the animal records database.  The commissioner shall
37  certify to the secretary of state and the director of the office of legislative services the date on which

Amendment to HB 2-FN-A-LOCAL
- Page 152 -

1  the animal records database is operational.  For 2 years after such certification, if needed for
2  database operation and maintenance, the commissioner may continue to transfer additional funds
3  from the agricultural product and scale testing fund to the animal records database fund for this
4  purpose.

5  306  Repeal.  RSA 435:20, V, relative to the authority of the commissioner of the department of
6  agriculture, markets, and food to transfer funds from the agricultural product and scale testing fund,
7  is repealed.

8  307  Applicability; Effective Dates.

9      I.  Section 303 of this act shall take effect 90 days after the commissioner of the department
10  of agriculture, markets, and food certifies to the secretary of state and the director of the office of
11  legislative services that the animal records database established in RSA 437:8-a is operational.

12      II.  Section 306 of this act shall take effect 2 years from the date on which the commissioner
13  of the department of agriculture, markets, and food certifies to the secretary of state and the director
14  of the office of legislative services, that the animal records database established in RSA 437:8-a is
15  operational.

16  308  Appropriation.  The sum of $250,000 for the fiscal year ending June 30, 2023 is hereby
17  appropriated to the department of agriculture, markets, and food for the maintenance of the animal
18  records database.  These appropriations are in addition to any other funds appropriated to the
19  department of agriculture, markets, and food.  The governor is authorized to draw a warrant for said
20  sum out of any money in the treasury not otherwise appropriated.

21  309   Position Established.   The classified position of IT manager III is established in the
22  department of information technology to develop and administer the animal records database
23  established in RSA 437:8-a.

24  310  Effective Date.

25      I.  Section 302 of this act shall take effect upon its passage.

26      II.  Section 303 of this act shall take effect as provided in paragraph I of section 307 of this
27  act.

28      III.  Section 306 of this act shall take effect as provided in paragraph II of section 307 of this
29  act.

30  311  Community College System of New Hampshire; Dual and Concurrent Enrollment Program.
31  Amend RSA 188-E:25 through 188-E:29 to read as follows:

32  188-E:25  Definitions.  In this subdivision:

33      I. ***"CCSNH" means the community college system of New Hampshire.***

34      ***II.*** "Concurrent enrollment" means courses taught at the high school by high school teachers
35  approved by [the community college system of New Hampshire (CCSNH)] ***CCSNH*** in which high
36  school students earn both high school and college or university credit while students are still
37  attending high school or a career technical education center.

**Amendment to HB 2-FN-A-LOCAL**
**- Page 153 -**

1   [II.] *III.*  "Dual enrollment" means college courses taught by instructors from [the community
2   college system of New Hampshire (CCSNH)] *CCSNH* in which high school students earn college
3   credit while students are still enrolled in high school or a career technical education center.

4   188-E:26  Program Established.  There is established a dual and concurrent enrollment program
5   in [the department of education] *CCSNH*.  Participation in the program shall be offered to high
6   school and career technical education center students in grades 10 through 12.  The program shall
7   provide opportunities for qualified New Hampshire high school students to gain access and support
8   for dual and concurrent enrollment in STEM (science, technology, engineering, and mathematics)
9   and STEM-related courses that are fundamental for success in postsecondary education and to meet
10  New Hampshire's emerging workforce needs.

11  188-E:27  Enrollment Requirements.

12        I.  An interested high school student in grades 10 through 12 may enroll in a course that is
13  designated by [the] CCSNH as part of the dual and concurrent enrollment program.

14        II.  A student in the program shall be provided funding for enrollment in no more than 2 dual
15  or concurrent enrollment courses taken in grade 10, no more than 2 dual or concurrent enrollment
16  courses taken in grade 11, and no more than 2 dual or concurrent enrollment courses taken in grade
17  12.  A student may take more than 2 dual or concurrent enrollment courses per year at his or her
18  own expense.

19        III.(a)   The state shall pay the current rate of concurrent enrollment tuition, which is
20  established at $150 per course, to the CCSNH institution where a high school or career and technical
21  education student successfully completes the concurrent enrollment course.

22        (b)   The state shall pay the current rate of dual enrollment tuition, which is established
23  at 1/2 the regular cost of the course, to the CCSNH institution where a high school or career and
24  technical education student successfully completes a dual enrollment course and [the] CCSNH shall
25  accept such amount as full payment for course tuition.

26        IV.  Each high school should provide a designated individual to serve as the point of contact
27  on matters related to the program, including but not limited to, student counseling, support services,
28  course scheduling, managing course forms and student registration, program evaluation, course
29  transferability, and assisting with online courses.  Each high school shall annually notify all high
30  school students and their parents of dual and concurrent enrollment opportunities.

31  188-E:28  School Board Policy.

32        I.  No later than July 1, 2018, the school board of each school district shall develop and adopt
33  a policy permitting students residing in the district who are in grade 11 or 12 to participate in the
34  dual and concurrent enrollment program.  The policy shall, at a minimum, include compliance with
35  measurable educational standards and criteria approved by [the] CCSNH and that meet the same
36  standard of quality and rigor as courses offered on campus by [the] CCSNH.  The policy shall also
37  comply with the standards for accreditation and program development established by the National

**Amendment to HB 2-FN-A-LOCAL**
**- Page 154 -**

1   Alliance for Concurrent Enrollment Partnerships.  The policy shall include, but not be limited to,
2   student eligibility criteria, standards for course content, standards for faculty approval, program
3   coordination and communication requirements, tuition and fees, textbooks and materials, course
4   grading policy, data collection, maintenance, and security, revenue and expenditure reporting, and
5   process for renewal of the agreement.

6        II.  The department of education and [the] CCSNH shall develop and approve a model dual
7   and concurrent enrollment agreement that shall be used by the CCSNH and the school board of a
8   school district participating in the dual and concurrent enrollment agreement program.  The model
9   agreement shall include standards established by [the] CCSNH, shall include elements, standards,
10  and criteria that have been approved by the department of education and CCSNH, and shall serve as
11  the framework for the development, implementation, and administration of the dual and concurrent
12  enrollment program in each school district by clearly defining the procedures related to concurrent
13  and dual enrollment of high school students in college classes.  [The department] *CCSNH* shall
14  further develop guidelines for the program relating to reporting, accountability, and payment of
15  available funds to [the] CCSNH.

16  188-E:29  Budget Requests.

17       *I*.  The [commissioner of the department of education] *chancellor of CCSNH, or his or her*
18  *designee,* shall submit expenditure requests in accordance with RSA [9:4] *9:4-e* to fund the dual and
19  concurrent enrollment program established in this subdivision.

20       *II.  In the event expenditures by CCSNH for the dual and concurrent enrollment*
21  *program exceed amounts appropriated by the state, the chancellor, or his or her designee,*
22  *may request the fiscal committee of the general court authorize additional funding.*
23  *Amounts requested under this paragraph shall be limited to direct program costs and*
24  *shall not include costs relative to program administration.  For funds requested and*
25  *approved, the governor is authorized to draw a warrant from any money in the treasury*
26  *not otherwise appropriated.*

27       312  Dual and Concurrent Enrollment Program; Appropriation.  The sums of $1,500,000 for the
28  fiscal year ending June 30, 2022, and $1,500,000 for the fiscal year ending June 30, 2023, are hereby
29  appropriated to community college system of New Hampshire for the purpose of funding and
30  administering the dual and concurrent enrollment program under RSA 188-E:26.   This
31  appropriation shall be in addition to any other funds appropriated to the community college system
32  of New Hampshire.  The governor is authorized to draw a warrant for said sums out of any money in
33  the treasury not otherwise appropriated.  Said appropriation shall not lapse.

34       313  School Building Aid; Annual Grant for Leased Space.  Amend the introductory paragraph of
35  RSA 198:15-hh, I to read as follows:

36       I.  The amount of the annual grant for a lease to any school district duly organized, any city
37  maintaining a school department within its corporate organization, any cooperative school district as

**Amendment to HB 2-FN-A-LOCAL**
**- Page 155 -**

1    defined in RSA 195:1, or any receiving district operating an area school as defined in RSA 195-A:1,
2    shall be a sum equal to 30 percent of the amount of the annual payment of the lease incurred, for the
3    cost of leasing permanent space in a building or buildings not owned by the school district or school
4    administrative unit which is used for the operation of a high school vocational technical education
5    program, to the extent approved by the state board of education.  For the purposes of this section,
6    the amount of the annual grant for a lease to a vocational technical education center shall be
7    calculated in the same manner as a cooperative school district.  The amount of the annual grant for a
8    chartered public school authorized under RSA 194-B:3-a shall be a sum equal to 30 percent of the
9    annual lease payment incurred for the cost of leasing space; provided that no annual grant for leased
10    space provided to a chartered public school in accordance with this section shall exceed [$30,000]
11    *$50,000* in any fiscal year.  The total amount of grants to schools pursuant to this section shall not
12    exceed the state appropriation for leased space.  If the amount appropriated is insufficient therefor,
13    the appropriation shall be prorated proportionally among the schools eligible for a grant.  Such lease
14    agreements shall be eligible for grants under this section, provided all of the following conditions
15    apply:

16        314  New Paragraph; Ten Year Plan for Grant Projects.  Amend RSA 198:15-a by inserting after
17    paragraph IV the following new paragraph:

18        V.  The department of education shall develop and maintain a 10-year school facilities plan of
19    potential school building grant projects.  Potential projects shall include, but not be limited to,
20    criteria pursuant to RSA 198:15-c, II(b).  The 10-year plan is intended to create a method to identify
21    and enhance school facilities in a safe, healthy, and efficient manner while providing adequate
22    learning environments for New Hampshire's students.  The 10-year plan shall be updated every
23    biennium to provide the department a summary of projects and school facility capital expenditures
24    that are anticipated for the next 10 years.  The state board of education shall adopt rules pursuant to
25    RSA 541-A relative to this paragraph.  The plan shall identify new construction, renovation, and
26    emergency projects, and describe the overall condition of projects contained in the plan.

27        315  New Paragraph; Kindergarten Adequate Education Grants.  Amend RSA 198:48-b by
28    inserting after paragraph II the following new paragraph:

29        III.  For the fiscal year ending June 30, 2021, and every fiscal year thereafter, the amount
30    necessary to fund the grants under this section is hereby appropriated to the department from the
31    education trust fund established in RSA 198:39.  If the balance in the education trust fund is less
32    than zero, the governor is authorized to draw a warrant for sufficient funds to eliminate such deficit
33    out of any money in the treasury not otherwise appropriated.  The commissioner of the department
34    of administrative services shall inform the fiscal committee and the governor and council of such
35    balance.  This reporting shall not in any way prohibit or delay the distribution of kindergarten
36    adequate education grants.

**Amendment to HB 2-FN-A-LOCAL**
**- Page 156 -**

316  Appropriation; Department of Education.  The sum of $1,906,313 for the fiscal year ending June 30, 2021 is hereby appropriated to the department of education for the purpose of funding and distributing additional adequate education grants under RSA 198:48-b, I and II.  Of this appropriation, $840,039 shall be for payments for those districts that would have been eligible for said grants had the provisions of RSA 198:48-b, I and II, been in effect for the fiscal year ending June 30, 2020.  Said appropriation shall be a charge against the education trust fund and shall not lapse.

317  Effective Date.  Sections 315 and 316 of this act shall take effect June 30, 2021.

318  School Planning Committees; Vacancies.  Amend RSA 671:33 to read as follows:

671:33  Vacancies.

I.  Vacancies among members of cooperative or area school planning committees shall be filled by the moderator for the unexpired term.

II.(a)  The school board shall fill vacancies occurring on the school board, except as provided in subparagraph (b), and in all other district offices for which no other method of filling a vacancy is provided.  Appointees of the school board shall serve until the next district election when the voters of the district shall elect a replacement for the unexpired term.  In the case of a vacancy of the entire membership of the school board, or if the remaining members are unable, by majority vote, to agree upon an appointment, the selectmen of the town or towns involved shall appoint members by majority vote in convention.

(b)  In a cooperative school district, the remaining school board members representing the same town or towns as the departed member shall fill a vacancy on the school board, provided that there are at least 2 such members.  *A member-at- large shall also be included as a representative of the same town.*  If there are less than 2 remaining members on the cooperative school board representing the same town or towns as the departed member, or if the remaining members are unable, by majority vote, to agree upon an appointment, the selectmen of the town or towns involved shall fill the vacancy by majority vote in convention.  If the selectmen are unable to fill the vacancy then the cooperative school district moderator shall make the appointment.  A member appointed to fill a vacancy under this subparagraph shall serve until the next district election when the voters of the district shall elect a replacement for the unexpired term.

III.  Vacancies in the office of moderator shall be filled by vote at a school meeting or election, provided that, until a replacement is chosen, the school district clerk shall serve as moderator or shall appoint a moderator pro tempore.

IV.  In a cooperative school district, the remaining budget committee members representing the same town or towns as the departed member shall fill a vacancy on the budget committee, provided that there are at least 2 such members.  *A member-at- large shall also be included as a representative of the same town.*  If there are less than 2 remaining members on the budget committee representing the same town or towns as the departed member, or if the remaining

1    members are unable, by majority vote, to agree upon an appointment, the selectmen of the town or

2    towns involved shall fill the vacancy by majority vote in convention.  If the selectmen are unable to

3    fill the vacancy then the cooperative school district moderator shall make the appointment.  If the

4    vacancy is for the cooperative school board representative to the cooperative school district budget

5    committee, such vacancy shall be filled by the cooperative school board.  A member appointed to fill a

6    vacancy under this subparagraph shall serve until the next district election when the voters of the

7    district shall elect a replacement for the unexpired term.

8    319  Appropriation; Department of Transportation.

9         I.  There is hereby appropriated to the department of transportation the sum of $11,000,000

10    for the biennium ending June 30, 2023, which shall be expended pursuant to this section.  The

11    governor is authorized to draw a warrant for said sum out of any money in the treasury not

12    otherwise appropriated.

13         II.  The sum appropriated in this section shall be allocated as follows:

14         (a)  $5,000,000 for the highway and bridge betterment program established in RSA

15    235:23-a.

16         (b)  $6,000,000 for the acquisition of fleet vehicles and equipment.

17    320  Appropriation; Department of Education.

18         I.  There is hereby appropriated to the department of education the sum of $30,000,000, for

19    the fiscal year ending June 30, 2021, for school building aid on new projects under RSA 198:15-a.

20    This appropriation shall be a charge against the education trust fund and shall not lapse until June

21    30, 2023.

22         II.  The $50,000,000 cap on school building aid grants for construction or renovation projects

23    approved by the department of education under RSA 198:15-a, IV shall be suspended for the

24    biennium ending June 30, 2023.

25    321  Section 320 of this act shall take effect June 30, 2021.

26    322   Education Tax Revenue; Fiscal Year 2023.  For the fiscal year ending June 30, 2023, and

27    notwithstanding RSA 76:3, the commissioner of the department of revenue administration shall set

28    the education tax rate at a level sufficient to generate revenue of $263,000,000 when imposed on all

29    persons and property taxable pursuant to RSA 76:8, except property subject to tax under RSA 82 and

30    RSA 83-F.  The education property tax rate shall be effective for tax periods beginning on or after

31    April 1, 2022.  The rate shall be set to the nearest 1/2 cent necessary to generate the revenue

32    required in this section.

33    323  Supplemental Education Payment; Fiscal Year 2023.  The commissioner of education, in

34    consultation with the commissioner of the department of revenue administration, shall determine if

35    any municipality's total education grant pursuant to RSA 198:41, including all statewide education

36    property tax raised and retained locally, is decreased due to the statewide education property tax

37    reduction in  section 322 of this act.  Any amounts identified shall be paid to impacted municipalities

**Amendment to HB 2-FN-A-LOCAL**
**- Page 158 -**

1    pursuant to the distribution schedule under RSA 198:42.  The governor is authorized to draw a

2    warrant from the education trust fund to satisfy the state's obligation under this section.

3        324  Effective Date.  Sections 322 and 323 of this act shall take effect July 1, 2021.

4        325  Department of Health and Human Services; Child Care Services.  The commissioner of the

5    department of health and human services shall be responsible for determining, on an ongoing basis

6    through June 30, 2023, whether there is sufficient funding in account 05-95-42-421110-2977, class

7    536, to fund employment-related child care services to avoid a wait list.  If at any time the

8    commissioner determines that funding is insufficient, he or she shall, to the extent allowed by

9    applicable federal regulations, utilize available federal Temporary Assistance to Needy Families

10   reserve funds to cover the amount of the shortfall.  The department shall report quarterly to the

11   fiscal committee of the general court on any funds expended on employment-related child care

12   services, including funds budgeted in account 05-95-42-421110-2977 as well as federal Temporary

13   Assistance to Needy Families funds authorized by this section.  The department shall provide

14   enrollment-based reimbursement, rather than attendance-based payment, to child care providers

15   who accept child care scholarships through the Child Care and Development Fund (CCDF) for the

16   fiscal year ending June 30, 2022 using, to the extent allowable by applicable federal regulations,

17   federal recovery funds.   No state general funds shall be used to make enrollment-based

18   reimbursement payments to providers.

19       326  Statement of Findings.  The general court finds that:

20       I.   Placement in corrections settings can be harmful to children and lead to increased

21   delinquency and adult criminal behavior.  It should therefore be reserved for those circumstances in

22   which the safety of a child or of the community requires such confinement.

23       II.   Placement of children who are not serious violent offenders in settings other than the

24   Sununu Youth Services Center (SYSC) complies with The Families First Act, PL 115-123, and the

25   New Hampshire system of care established pursuant to 2019; 44 (SB 14), which prioritize

26   community-based treatment of children.

27       III.  This act is in furtherance of these goals.

28       327  Appropriation; Department of Health and Human Services; Sununu Youth Services Center.

29   The sum of $10,400,000 for the fiscal year ending June 30, 2022 and the sum of $9,922,157 for the

30   fiscal year ending June 30, 2023, are hereby appropriated to the department of health and human

31   services for the purpose of operating the Sununu youth services center as the department transitions

32   to an replacement facility.  Of the amount appropriated for the fiscal year ending June 30, 2022,

33   $9,000,000 shall be state general funds and $1,400,000 shall be other funds. Of the amount

34   appropriated in the fiscal year ending June 30, 2023, $9,000,000 shall be state general funds and

35   $922,157 shall be other funds.  Such funds shall not lapse until June 30, 2023.  The governor is

36   authorized to draw a warrant for the sums out of any money in the treasury not otherwise

37   appropriated.

Amendment to HB 2-FN-A-LOCAL
- Page 159 -

328  Transfer of Funds for Operation of the Sununu Youth Services Center.  Notwithstanding RSA 9:16-a and RSA 9:16-c, for the biennium ending June 30, 2023, prior approval of the fiscal committee of the general court shall be required for any transfer of funds required for the operation of the Sununu youth services center.

329  Findings; Sununu Youth Services Center.  The general court finds that the current Sununu youth services center shall be closed no later than March 1, 2023 and the opening of a replacement facility shall occur no later than March 1, 2023.

330  Committee Established.

I.  There is established a committee to develop a plan for the closure and replacement of the Sununu youth services center.  The members of the committee shall be as follows:

(a)  Three members of the house of representatives, each of whom shall be from a standing committee having jurisdiction over juvenile justice, appointed by the speaker of the house of representatives.

(b)  Two members of the senate, appointed by the president of the senate.

II.  In addition, the legislative members of the committee shall seek input and expert advice from, but not limited to, the following:

(a)  The department of health and human services.

(b)  The office of the child advocate.

(c)  The Disabilities Rights Center.

(d)  The National Alliance on Mental Illness.

(e)  New Futures.

(f)  Any other group or organization the committee deems necessary.

III.  Legislative members of the committee shall receive mileage at the legislative rate when attending to the duties of the committee.

IV.  The committee shall develop a plan for the closure and replacement of the Sununu youth services center, including cost estimates for the construction and operation of a new facility.  The committee's plan for a replacement facility shall meet the following requirements:

(a)  It shall be operated by the department of health and human services.

(b)  It shall be designed to meet the unique needs of up to 18 youth at a time who are at the facility pursuant to RSA 169-B:14, detention; RSA 169-B:19, commitment; RSA 169-B:24, transfer to superior court, RSA 169-B:32; RSA 651:17-a, service of adult sentence of incarceration at the youth development center, and 169-A, interstate compact on juveniles.

(c)  It shall accommodate requirements to separate youth by gender, treatment needs, court order, safety, and security.  The facility shall include 3 separate residential spaces, each including capacity for 6 youth.

(d)  It shall have capacity to provide services to meet the medical, physical, and behavioral health needs of all potentially eligible youth.

Amendment to HB 2-FN-A-LOCAL
- Page 160 -

1       (e)  It shall have space for 18 beds, including space for flexibility to meet the needs of all
2  genders, safety and security, crisis stabilization and admissions and discharges.

3       (f)  It shall have adequate space to meet the educational needs of all youth potentially
4  eligible, including youth with special education needs.

5       (g)  It shall have adequate space for indoor and outdoor recreation.

6       (h)  It shall have the capacity to meet the nutritional needs of all youth.

7       (i)  It shall have necessary elements to be architecturally secure and equipped with video
8  surveillance.

9       (j)  The opening of the replacement facility shall be no later than March 1, 2023.

10       V.   The committee shall prepare legislation relative to the implementation of the plan
11  developed in paragraph IV for submission for the 2022 legislative session.

12       VI.  The members of the study committee shall elect a chairperson from among the members.
13  The first meeting of the committee shall be called by the first-named senate member.  The first
14  meeting of the committee shall be held within 30 days of the effective date of this section.  Four
15  members of the committee shall constitute a quorum.

16       VII.  The committee shall issue their final report to speaker of the house of representatives,
17  the senate president, the senate clerk, the house clerk, the governor, and the state library on or
18  before November 1, 2021 and submit the plan to the joint fiscal committee for approval.

19       331   Department  of  Health  and  Human  Services;  Closed  Loop  Referral  System.
20  Notwithstanding any other provision of the law to the contrary, there shall be no further expansion
21  of the "closed loop referral" system by the department of health and human services beyond that
22  which has been or will be implemented pursuant to the sole source grant agreement to Unite USA
23  Inc.  of  Nashua  in  the  amount  of  $700,000  dated  October  19,  2020.   Before  the  department
24  undertakes any further utilization of the closed loop referral system beyond that authorized by the
25  preceding sentence, the legislative oversight committee on health and human services, established in
26  RSA 126-A:13, shall conduct a comprehensive review of the information intended to be stored in the
27  master index file or accessed using the master indexes within and between the closed loop referral
28  system and other interconnected systems.  Further, the oversight committee shall assess the privacy
29  protections  and  access/release  limitations  afforded  by  this  system,  and  the  adequacy  of  the
30  procedures utilized by the system to insure that persons using it have given informed consent to the
31  ("opt-in")  release  of  their  personally  identifiable  information  available  through  the  system  of
32  systems.  The department shall provide all requested data and information regarding the closed loop
33  referral system and systems with which it is intended to interconnect within one week of the request
34  by the oversight committee. The oversight committee shall report its findings and recommendations,
35  if  any,  to  the  legislature,  the  governor,  and  the  department  of  health  and  human  services  by
36  November 1, 2021.  The department of health and human services is prohibited from accessing an
37  individual's information from the closed loop referral system who is not receiving services funded

through a department of health and human services program.  Within 48 hours of becoming aware of a data breach, Unite USA Inc. shall begin the process of notification by first class mail to all individuals impacted by the data breach.  Any individual whose information is intended to be included in the closed loop referral shall retain the right to opt in to the system on each referral and retain the right to revoke consent to be in the system at any time.

332  American Rescue Plan Act; Unanticipated Revenue.  Funds received by municipalities from the American Rescue Plan Act of 2021 may be considered unanticipated revenue under RSA 31:95-b and may be accepted and expended pursuant to RSA 31:95-b, II-IV whether or not a political subdivision has adopted the provisions of RSA 31:95-b.

333  Salary Schedules.  RSA 99:1-a is repealed and reenacted to read as follows:

99:1-a   Salary Schedules.   The department of administrative services shall develop and implement for the executive branch such salary schedules as authorized by collective bargaining agreements between the state and an employee organization and subject to appropriation.   The department shall apply the appropriate salary schedules to all unrepresented employees.   The department shall post base salary schedules on its public Internet website.

334  Corrections Officers' Salaries.

I.  Effective July 2, 2021, part-time corrections officers and corrections officer corporals shall be compensated in accordance with the salary schedule applicable to full-time corrections officers and corrections officer corporals.

II.  Effective July 2, 2021, corrections officer majors shall be compensated in accordance with the salary schedule applicable to corrections officer lieutenants, sergeants and captains.

335  Parking; Concord.  The department of administrative services is authorized to spend such funding as appropriated for additional parking for full-time and part-time employees who are assigned to the downtown Concord area and who are not provided a state-provided parking space for their personal vehicle.

336  Compensation for Certain State Officers; Unclassified State Employees; July 2, 2021.  RSA 94:1-a, I (a) is repealed and reenacted to read as follows:

I.(a)  The following salary ranges shall apply to the following grades:

| GRADE | STEP 01 | STEP 02 | STEP 03 | STEP 04 | STEP 05 | STEP 06 | STEP 07 |
|-------|---------|---------|---------|---------|---------|---------|---------|
| AA | 56,082.00 | 59,748.00 | 63,388.00 | 67,054.00 | 70,694.00 | 74,360.00 | 78,026.00 |
| BB | 58,318.00 | 62,114.00 | 65,910.00 | 69,732.00 | 73,528.00 | 77,324.00 | 81,120.00 |
| CC | 61,022.00 | 65,000.00 | 68,978.00 | 72,982.00 | 76,960.00 | 80,938.00 | 84,942.00 |
| DD | 64,246.00 | 68,432.00 | 72,644.00 | 76,830.00 | 81,042.00 | 85,228.00 | 89,414.00 |
| EE | 68,042.00 | 72,488.00 | 76,934.00 | 81,406.00 | 85,852.00 | 90,298.00 | 94,744.00 |
| FF | 72,748.00 | 77,506.00 | 82,264.00 | 87,048.00 | 91,806.00 | 96,564.00 | 101,322.00 |
| GG | 78,520.00 | 83,668.00 | 88,816.00 | 93,964.00 | 99,112.00 | 104,260.00 | 109,408.00 |
| HH | 85,514.00 | 91,104.00 | 96,720.00 | 102,336.00 | 107,952.00 | 113,568.00 | 119,184.00 |

| # | Grade | | | | | | |
|---|---|---|---|---|---|---|---|
| 1 | II | 90,402.00 | 96,330.00 | 102,284.00 | 108,212.00 | 114,166.00 | 120,094.00 | 126,048.00 |
| 2 | JJ | 95,290.00 | 101,556.00 | 107,822.00 | 114,088.00 | 120,354.00 | 126,620.00 | 132,886.00 |
| 3 | KK | 97,734.00 | 104,156.00 | 110,578.00 | 117,026.00 | 123,448.00 | 129,870.00 | 136,318.00 |
| 4 | LL | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 140,634.00 |
| 5 | MM | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 145,392.00 |
| 6 | NN | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 150,956.00 |
| 7 | OO | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 157,482.00 |
| 8 | PP | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 165,282.00 |
| 9 | QQ | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 174,668.00 |

10  337  Salary Wages for Councilors and Commissioners; July 2, 2021.  RSA 94:1-a, II is repealed

11  and reenacted to read as follows:

12  II.  The salary wages for the positions set forth below shall be as follows commencing July 2,

13  2021:

| | Maximum |
|---|---|
| 14 | |
| 15  Governor's councilors | $17,732.00 |
| 16  Racing and charitable gaming commissioners | $13,754.00 |
| 17  Sweepstakes commission, chairman | $19.994.00 |
| 18  Sweepstakes commission, members | $11,258.00 |

19  338  Compensation for Certain State Officers; Unclassified State Employees; July 1, 2022.  RSA

20  94:1-a, I (a) is repealed and reenacted to read as follows:

21  I.(a)  The following salary ranges shall apply to the following grades:

| # | GRADE | STEP 01 | STEP 02 | STEP 03 | STEP 04 | STEP 05 | STEP 06 | STEP 07 |
|---|---|---|---|---|---|---|---|---|
| 22 | | | | | | | | |
| 23 | AA | 56,732.00 | 60,424.00 | 64,142.00 | 67,834.00 | 71,526.00 | 75,218.00 | 78,936.00 |
| 24 | BB | 58,994.00 | 62,842.00 | 66,690.00 | 70,538.00 | 74,386.00 | 78,234.00 | 82,082.00 |
| 25 | CC | 61,724.00 | 65,754.00 | 69,784.00 | 73,814.00 | 77,844.00 | 81,874.00 | 85,904.00 |
| 26 | DD | 65,000.00 | 69,238.00 | 73,476.00 | 77,740.00 | 81,978.00 | 86,216.00 | 90,454.00 |
| 27 | EE | 68,822.00 | 73,320.00 | 77,844.00 | 82,342.00 | 86,840.00 | 91,338.00 | 95,862.00 |
| 28 | FF | 73,580.00 | 78,416.00 | 83,226.00 | 88,062.00 | 92,872.00 | 97,682.00 | 102,518.00 |
| 29 | GG | 79,430.00 | 84,630.00 | 89,856.00 | 95,056.00 | 100,256.00 | 105,482.00 | 110,682.00 |
| 30 | HH | 86,502.00 | 92,170.00 | 97,838.00 | 103,532.00 | 109,200.00 | 114,894.00 | 120,562.00 |
| 31 | II | 91,442.00 | 97,448.00 | 103,454.00 | 109,460.00 | 115,492.00 | 121,498.00 | 127,504.00 |
| 32 | JJ | 96,408.00 | 102,726.00 | 109,070.00 | 115,414.00 | 121,758.00 | 128,102.00 | 134,446.00 |
| 33 | KK | 98,852.00 | 105,352.00 | 111,878.00 | 118,378.00 | 124,878.00 | 131,378.00 | 137,878.00 |
| 34 | LL | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 142,272.00 |
| 35 | MM | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 147,082.00 |
| 36 | NN | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 152,724.00 |
| 37 | OO | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 159,302.00 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| PP | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 167,206.00 |
| QQ | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 176,696.00 |

339  Salary Wages for Councilors and Commissioners; July 1, 2022.  RSA 94:1-a, II is repealed and reenacted to read as follows:

II.  The salary wages for the positions set forth below shall be as follows commencing July 1, 2022:

| | Maximum |
|---|---|
| Governor's councilors | $17,940.00 |
| Racing and charitable gaming commissioners | $13,910.00 |
| Sweepstakes commission, chairman | $20,228.00 |
| Sweepstakes commission, members | $11,388.00 |

340  Department of Justice; Attorney Salaries; July 2, 2021.  RSA 94:1-a, I(c) is repealed and reenacted to read as follows:

I.(c)  For attorney positions in the department of justice, except for the attorney general and deputy attorney general, the following shall apply commencing on July 2, 2021:

| | Minimum | Market anchor | Maximum |
|---|---|---|---|
| | $54,617 | | $126,532 |
| Attorney | | $65,838 | |
| Assistant attorney general | | $89,682 | |
| Senior assistant attorney general | | $110,722 | |
| Associate attorney general | | $121,943 | |

341  Department of Justice; Attorney Salaries; July 1, 2022.  RSA 94:1-a, I(c) is repealed and reenacted to read as follows:

I.(c)  For attorney positions in the department of justice, except for the attorney general and deputy attorney general, the following shall apply commencing on July 1, 2022:

| | Minimum | Market anchor | Maximum |
|---|---|---|---|
| | $55,252 | | $128,001 |
| Attorney | | $66,603 | |
| Assistant attorney general | | $90,723 | |
| Senior assistant attorney general | | $112,007 | |
| Associate attorney general | | $123,359 | |

342  Legislative Employees; July 2, 2021.  Legislative employees shall receive 1.16 percent salary increases effective July 2, 2021, if such increases are approved by the appointing authority.

343  Legislative Employees; July 1, 2022.  Legislative employees shall receive 1.16 percent salary increases effective July 1, 2022, if such increases are approved by the appointing authority.

344  Judicial Salaries; July 2, 2021. RSA 491-A:1 is repealed and reenacted to read as follows:

491-A:1  Salaries Established.  The salaries for the positions set forth below shall be as follows:

| 1 | Chief justice, supreme court | $183,394 |
| 2 | Associate justices, supreme court | $177,878 |
| 3 | Chief justice, superior court and administrative | |
| 4 | judges appointed pursuant to supreme | |
| 5 | court rule 54 | $177,878 |
| 6 | Associate justices, superior court | $166,825 |
| 7 | District court justices prohibited | |
| 8 | from practice pursuant to | |
| 9 | RSA 502-A:21 | $166,825 |
| 10 | Probate judges prohibited from | |
| 11 | practice pursuant to RSA 547:2-a | $166,825 |

12    345  Judicial Salaries; July 1, 2022.  RSA 491-A:1 is repealed and reenacted to read as follows:

13    491-A:1  Salaries Established.  The salaries for the positions set forth below shall be as follows:

| 14 | Chief justice, supreme court | $185,522 |
| 15 | Associate justices, supreme court | $179,942 |
| 16 | Chief justice, superior court and administrative | |
| 17 | judges appointed pursuant to supreme | |
| 18 | court rule 54 | $179,942 |
| 19 | Associate justices, superior court | $168,761 |
| 20 | District court justices prohibited | |
| 21 | from practice pursuant to | |
| 22 | RSA 502-A:21 | $168,761 |
| 23 | Probate judges prohibited from | |
| 24 | practice pursuant to RSA 547:2-a | $168,761 |

25    346  Judges; State Employee Health Plan; Application.  The cost sharing and plan design for
26    judges who participate in the health plans offered by the state shall be the same as those for
27    individuals covered by the collective bargaining agreement between the state of New Hampshire and
28    the State Employees' Association of New Hampshire, Inc.

29    347  Judicial Employees; July 2, 2021.  All unrepresented judicial employees shall receive 1.16
30    percent salary increases on July 2, 2021.

31    348  Judicial Employees; July 1, 2022.  All unrepresented judicial employees shall receive 1.16
32    percent salary increases on July 1, 2022.

33    349  Appropriations.

34        I.   The following sums are appropriated from the following sources for the purposes of
35    sections 333 -352 of this act for the fiscal year ending June 30, 2022:

36                                                    FY 2022

37            All      Liquor       General      Federal     Highway     Turnpike     Fish & Game          Other

**Amendment to HB 2-FN-A-LOCAL**
**- Page 165 -**

$12,592,000   $400,000   $5,750,000   $1,773,000   $1,265000   $235,000   $99,000   $3,070,000

II.   The following sums are appropriated from the following sources for the purposes of sections 333-352 of this act for the fiscal year ending June 30, 2023:

FY 2023

| All | Liquor | General | Federal | Highway | Turnpike | Fish & Game | Other |
|---|---|---|---|---|---|---|---|
| $23,208,000 | $800,000 | $10,250,000 | $3,484,000 | $2,486,000 | $455,000 | $183,000 | $5,550,000 |

III.   The department of administrative services is authorized to make any rounding adjustments of up to +$.01 per hour as needed to properly process the employee's payroll within the currently designed human resources/payroll system (NH FIRST).

350  Longevity Pay.  Amend RSA 94:4 to read as follows:

94:4  Longevity Pay.  Any state official who has completed 10 years of service for the state shall be paid, in addition to his or her statutory salary the sum of [$300] *$350* annually and an additional [$300] *$350* for each additional 5 years of state service.  Any state official who transfers, without a break in service, to a position in the classified system may transfer all time served for purposes of longevity pay.

351  Longevity Pay for Regular Classified Employees.  Amend RSA 99:5 to read as follows:

99:5  Longevity Payment for Regular Classified Employees.  Any regular classified employee of the state who has completed 10 years of continuous service for the state other than a law enforcement employee, shall be paid, in addition to the salary to which he or she is entitled by the classification plan, the sum of [$300] *$350* annually and an additional [$300] *$350* for each additional 5 years of continuous state service.  The additional compensation provided by the provisions of this section shall not affect the maximums set by the classification plan and the receipt of said long service payments shall not prohibit the recipient from receiving the yearly increments to which he or she may be otherwise entitled within his or her classification ranges.  Any regular classified employee who transfers, without a break in service, to a position in the unclassified system may transfer all time served for purposes of longevity pay.

352  Longevity Pay for New Hampshire State Troopers.  Amend RSA 99:5-a to read as follows:

99:5-a  Longevity Payments for New Hampshire State Troopers and State Trooper Command Staff.  Any state trooper or eligible state trooper command staff member who has completed 10 years of continuous service for the state shall be paid, in addition to the salary to which he or she is entitled by the classification plan, the sum of [$300] *$350* annually and an additional[ $300] *$350* for each additional 5 years of continuous law enforcement service.  The additional compensation provided by the provisions of this section shall not affect the maximums set by the classification plan and the receipt of said long service payments shall not prohibit the recipient from receiving the yearly increments to which he or she may be otherwise entitled within his or her classification ranges. Any state trooper or eligible state trooper command staff member who transfers, without a

1    break in service, to a position in the unclassified system may transfer all time served for purposes of

2    longevity pay.

3        353  Repeals.  The following are repealed:

4           I.  RSA 99:1-b, relative to New Hampshire state trooper salaries.

5           II.  RSA 99:3, relative to increases in salary.

6        354  Effective Date.

7           I.  Sections 336, 337, 340, 342, 344, and 347 of this act shall take effect July 2, 2021.

8           II.  Sections  338, 339, 341 343, 345 and 348 of this act shall take effect July 1, 2022.

9        355  Department of Administrative Services; Rehiring of Laid Off Classified State Employees.

10          I.   For purposes of this section, "laid off" means any person in a classified position as

11    described in RSA 21-I:49 who receives written notice of the state's intent to lay him or her off or who

12    is laid off between July 1, 2021 and June 30, 2023, as a result of reorganization or downsizing of

13    state government.

14          II.  It is the intent of the general court that any classified position which becomes available

15    in a department or establishment, as defined in RSA 9:1, shall be filled, if possible, by a state

16    employee laid off, as defined in paragraph I, if such person is not currently employed by the state of

17    New Hampshire, if he or she meets the minimum qualifications for the position, and if he or she does

18    not receive a promotion as a result of the rehire.

19          III.  The head of each department or agency shall submit the name and classification of any

20    individual laid off between July 1, 2021 and June 30, 2023, to the director of the division of

21    personnel within 10 days of the layoff.

22        356  New Subdivision; Granite State Paid Family Leave Plan.  Amend RSA 21-I by inserting

23    after section 95 the following new subdivision:

24                     Granite State Paid Family Leave Plan

25    21-I:96  Granite State Paid Family Leave Plan.  There is hereby established the granite state

26    paid family leave plan, which shall be implemented under this subdivision and as provided in RSA

27    282-B and RSA 77-E.

28    21-I:97  Purpose and Policy.  The purpose of this subdivision is to leverage the purchasing power

29    and economies of scale available to the state when it is acting as purchaser on behalf of state

30    employees and to align this purchasing initiative with a business tax incentive in order to make

31    available to all other public and private employers in the state, on a voluntary basis, advantageously

32    priced family and medical leave insurance (FMLI) wage replacement benefits.  By purchasing FMLI

33    coverage for state employees through the medium of commercial insurance, by linking that contract

34    with a contract to make the same coverage available statewide, by acting as premium aggregator for

35    individuals whose employers do not sponsor such coverage, and by introducing a new business tax

36    incentive, the state will position itself to create a market for advantageously priced FMLI benefits.

37    It is the intent of this subdivision to significantly increase the number of employees in the state who

**Amendment to HB 2-FN-A-LOCAL**
**- Page 167 -**

1    receive FMLI wage replacement benefits.  The social benefits of increasing the rate of FMLI coverage

2    include attracting and retaining workers, including younger workers, to the state, enabling parents

3    to bond with biological, adopted, or foster children, helping to meet the needs of an aging population,

4    promoting workplace stability, and enhancing worker retention and productivity.  While many larger

5    employers provide paid FMLI benefits through self-insurance, this is not feasible for most mid-sized

6    and smaller businesses.  The general court therefore finds that it is in the public interest for the

7    state to strategically use its purchasing power and tax expenditure authority to establish a

8    marketplace in the state for advantageously priced FMLI wage replacement benefits.

9    21-I:98  Definitions.  In this subdivision:

10    I.  "Child" has the same meaning as "son or daughter" in 29 U.S.C. section 2611(12).

11    II.  "Commissioner" means the commissioner of the department of administrative services.

12    III.  "Department" means the department of administrative services.

13    IV.  "Family and medical leave" means leave from work:

14    (a)  Because of the birth of a child of the employee, within the past 12 months;

15    (b)  Because of the placement of a child with the employee for adoption or fostering

16    within the past 12 months;

17    (c)  Because of a serious health condition of a family member; or

18    (d)  Because of any qualifying exigency arising from foreign deployment with the armed

19    forces, or to care for a service member with a serious injury or illness as permitted under the federal

20    Family and Medical Leave Act, 29 U.S.C. section 2612(a)(1)(E) and 29 C.F.R. section 825.126(a)(1)-

21    (8), as they existed on October 19, 2017, for family members as defined in paragraph VI.

22    V.  "Family and Medical Leave Act" means the federal Family and Medical Leave Act of

23    1993, Pub.L. 103-3, 29 U.S.C. section 2601 et seq.

24    VI.  "Family member" means a "child" as defined in paragraph I, a biological, adoptive, or

25    foster parent, stepparent, or legal guardian of the child or the child's spouse or domestic partner, a

26    biological, adoptive, or foster grandparent or step grandparent, or a spouse or domestic partner.

27    VII.  "FMLI" means family and medical leave insurance providing wage replacement benefits

28    under specified conditions.

29    VIII.  "Serious health condition" means any illness of a family member covered by the Family

30    and Medical Leave Act including treatment for addiction as prescribed by a treating clinician,

31    consistent with American Society of Addiction Medicine criteria, as well as treatment for a mental

32    health condition, consistent with American Psychiatric Association criteria.

33    IX.  "State rate" means the per employee premium amount that is charged by the successful

34    bidder for the state contract for FMLI coverage for state government employees as provided in this

35    subdivision.  The state rate shall be expressed as a percentage of wages.

36    21-I:99  Contracting and Administrative Authority.

Amendment to HB 2-FN-A-LOCAL
- Page 168 -

1    I.  The commissioner may solicit information about, seek proposals for, negotiate, enter into,
2   and administer group insurance contracts with duly authorized accident and life insurance carriers
3   as necessary and appropriate to provide to qualifying state employees, at state expense and at no
4   cost to such employees, an FMLI plan of wage replacement as described in this subdivision.  The
5   provision of this coverage shall be considered a matter of legislatively established public policy that
6   is designed to benefit all employers and employees in the state and that is "confined exclusively to
7   the public employer by statute" as provided in RSA 273-A:1, XI and shall not be subject to collective
8   bargaining.  Nothing in this subdivision shall be construed to invalidate any portion of a collective
9   bargaining agreement entered into by the state.

10    II.  The state shall provide to all permanent state employees wage replacement coverage for
11   qualified leave, which shall be available for the same types of leave as protected under the Family
12   and Medical Leave Act except leave for a health condition of the employee.  This shall include leave
13   for:

14     (a)  The birth of a child and the care of the newborn child within one year of birth;

15     (b)  The placement with the employee of a child for adoption or foster care and the care of
16   the newly placed child within one year of placement;

17     (c)  Caring for the employee's spouse, child, or parent who has a serious health condition;
18   or

19     (d)  Any qualifying exigency arising out of the fact that the employee's spouse, child, or
20   parent is a covered military member on covered active duty, or caring for a covered service-member
21   with a serious injury or illness if the eligible employee is the service-member's spouse, child, parent,
22   or next of kin.

23    III.  Subject to any changes authorized under RSA 21-I:103, the wage replacement benefits
24   under this FMLI plan shall be structured as follows:

25     (a)  Eligible employees shall receive 60 percent of their average weekly wage.

26     (b)  The maximum duration of wage replacement shall be 6 weeks per year, with no
27   minimum duration required.

28     (c)  Wages used to determine the 60 percent FMLI coverage shall be capped at the
29   amount of the Social Security taxable wage maximum as amended from time to time.

30    IV.  Except as provided in RSA 21-I:100, III regarding individual pool coverage, the
31   commissioner shall establish, through his or her discretionary authority in administering the
32   request for information and the request for proposals process, the following additional elements of
33   the benefit structure consistent with the purposes and policy of this subdivision:

34     (a)  The base period by which the average weekly wage shall be determined.

35     (b)  The tenure requirement, expressed in terms of months of work, before an employee is
36   eligible to be covered provided, however, that no tenure requirement shall apply to an employee who
37   has already met the requirement and then changes jobs.

Amendment to HB 2-FN-A-LOCAL
- Page 169 -

1      (c)   A waiting period or elimination period provided, however, that a waiting or

2 elimination period shall not be a required element of the benefit structure, and the commissioner

3 shall have authority to implement a plan with no such requirement.

4      21-I:100  State Employee Coverage Linked to Coverage Offerings for Other Employers and for

5 Individual Employees.  The commissioner shall include in the request for proposals for FMLI

6 benefits for state employees a requirement that the winning bidder shall, as a condition of the state

7 contract, also offer the same FMLI coverage to other public employers, private employers with more

8 than 50 employees, and individual employees on the following terms:

9      I.  Private and public non-state employers shall receive a rate that is derived from the state

10 rate through the application of rating factors that are actuarially justified and specified in the bid

11 response.

12      II.  Employers with more than 50 employees who choose to sponsor coverage for their

13 employees shall contract directly with the winning bidder.

14      III.  Individuals who work for employers who choose not to offer FMLI coverage under this

15 subdivision or who fail to meet minimum participation requirements and who do not offer an FMLI

16 benefit that is at least equivalent to the granite state paid family leave plan shall have the

17 opportunity to contract indirectly with the winning bidder through the purchasing pool for family

18 and medical leave insurance authorized under RSA 282-B and administered by the department of

19 employment security.  The pool may be experience rated.  Coverage through the pool shall include a

20 7-month waiting period, a one-week elimination period, and a 60-day annual open enrollment period

21 as established by the commissioner in the procurement process.  Premiums for individual pool

22 coverage shall not exceed $5 per subscriber per week.

23      IV.  The commissioner shall establish, through his or her discretionary authority in

24 administering the request for information and the request for proposals process, the following

25 additional elements of the benefit structure and plan administration specifically for employees of

26 sponsoring non-state employers consistent with the purposes and policy of this subdivision:

27      (a)  The minimum participation requirement.

28      (b)  The parameters for open enrollment periods.

29      (c)  Procedures for contributory plans, partially contributory plans, and non-contributory

30 plans.

31      (d)  Procedures for payroll deduction and premium remittance for employers with more

32 than 50 employees.

33      21-I:101  Conditions of Non-State Employer Participation.  Participation in the plan by non-state

34 employers shall be voluntary.  In addition, non-state employers may choose to provide FMLI at no

35 cost to their employees or on a contributory or partially contributory basis.

36      21-I:102  Procurement Process.  The commissioner may issue a request for information or a

37 request for proposals to secure FMLI coverage for all eligible employees of the state of New

1   Hampshire and to make advantageously priced coverage available to all other private employers
2   with more than 50 employees and public employers in the state as provided in this subdivision.  The
3   department, the department of employment security, and the department of insurance shall jointly
4   evaluate the proposals received in response to the request for proposals.  The department shall
5   contract with an insurance carrier or carriers to provide FMLI coverage.  The contract with the
6   winning bidder shall be subject to governor and council approval.  The selected insurance carrier
7   shall be licensed by the state of New Hampshire and in good standing.  The selected insurance
8   carrier shall be subject to all applicable insurance laws and regulations of the state of New
9   Hampshire, and the rates and forms for the FMLI contracts shall be filed for approval with the
10  insurance commissioner.

11      21-I:103  Commissioner Discretion to Adjust Initial FMLI Benefit Structure.  In exercising
12  authority under this subdivision to contract for FMLI coverage for state employees and also for the
13  availability of advantageously priced FMLI coverage for employees of all non-state employers, the
14  commissioner shall have discretionary authority in initiating this program to make changes to the
15  benefit structure of the FMLI plan under RSA 21-I:99, III and may retain a consulting actuary or
16  other benefit advisors in support of this discretionary determination.  This discretionary authority
17  shall be exercised in consideration of the stated purposes and policy goals of this subdivision and of
18  the counsels of the FMLI advisory board established in RSA 21-I:104.  Any such changes made under
19  this paragraph shall be subject to approval by the governor and council and the legislative fiscal
20  committee prior to implementation and shall be offered by the legislative fiscal committee as an
21  amendment to this subdivision in the next regular session of the general court.

22      21-I:104  Family and Medical Leave Insurance Advisory Board.  There is hereby established the
23  family and medical leave insurance advisory board, which shall be administratively attached to the
24  department, and which shall hereinafter be called the FMLI advisory board.  The FMLI advisory
25  board shall consist of 9 members to be appointed, with the exception of the legislative members, by
26  the governor.  Three of the appointees shall be persons who, because of their vocations, employment,
27  or affiliations, shall represent employers; 3 shall be persons who, because of the vocations,
28  employment, or affiliations, shall represent employees; one shall be a senator appointed by the
29  senate president; one shall be a representative appointed by the speaker of the house of
30  representatives; the remaining appointee, who shall be appointed as chairman, shall be a person
31  whose training and experience qualify her or him to successfully resolve the problems of FMLI
32  procurement, eligibility, benefit design, and program administration.  The advisory board shall meet
33  no later than 45 days after each calendar quarter and aid the commissioner in formulating policies
34  and discussing problems related to the implementation and administration of this subdivision and
35  RSA 282-B and in assuring impartiality and freedom from political influence in the solution of such
36  problems.  Advisory board meetings shall provide opportunity for public comment.

37      21-I:105  Report and Outreach.

Case 1:21-cv-01077-PB   Document 36-7   Filed 03/25/22   Page 171 of 215

I.  Working in coordination with the commissioner of administrative services as provided in RSA 282-B:6, I, the department shall produce, on an annual basis, a summary report on the granite state paid family leave plan.  This report shall be made public and delivered to the governor, the senate president, and the speaker of the house of representatives.  It shall include, but not be limited to, a description of progress in carrying out the processes contemplated under this subdivision, progress in improving the rate of FMLI coverage of employees in the state, and recommendations for more fully achieving the purposes and policy goals of this subdivision.

II.  Working in coordination with the department of employment security as provided in RSA 282-B:6, II, the department shall develop and implement an outreach program to ensure that employers who might benefit from sponsoring FMLI coverage for their employees and individuals who may be eligible to receive FMLI coverage under this subdivision are made aware of this program.   Outreach information shall explain in an easy to understand format, eligibility requirements, benefit structures, and the process for accessing coverage, enrolling individuals, and qualifying for the business tax credit provided for in RSA 77-E:3-d.

21-I:106  Rulemaking.  The commissioner may adopt rules, pursuant to RSA 541-A, as deemed necessary for the implementation of this chapter.

21-I:107  Appropriation and Funding Transfer.  The state treasurer shall transfer funds from the general fund to the department of administrative services for payment of the administrative and implementation costs associated with this chapter.

21-I:108  Program Start-up.  The request for proposals for FMLI coverage as described in this subdivision shall be issued no later than January 1, 2022.  The FMLI coverage shall be in place for state government employees and available for purchase by other public and private employers with more than 50 employees and individuals by October 1, 2022.

357  Insurance; Allocation of State Premium Tax.  Amend RSA 400-A:32, III to read as follows:

III.(a)  Except as provided in [subparagraph (b)] *subparagraphs (b) and (c)*, the taxes imposed in paragraphs I and II of this section shall be promptly forwarded by the commissioner to the state treasurer for deposit to the general fund.

(b)  Taxes imposed attributable to premiums written for medical and other medical related services for the newly eligible Medicaid population as provided for under RSA 126-AA shall be deposited into the New Hampshire granite advantage health care trust fund established in RSA 126-AA:3.  The commissioner shall notify the state treasurer of sums for deposit into the New Hampshire granite advantage health care trust fund no later than 30 days after receipt of said taxes.  The moneys in the trust fund may be used for the administration of the New Hampshire granite advantage health care program, established in RSA 126-AA.

*(c)  Taxes imposed on premiums written by duly authorized insurance companies for family and medical leave insurance written in connection with the administration of RSA 21-I:96 through RSA 21-I:108 or RSA 282-B shall be deposited into*

1 ***the FMLI premium stabilization trust fund established in RSA 282-B:5.  The commissioner***

2 ***shall notify the state treasurer of sums for deposit into the FMLI premium stabilization***

3 ***trust fund no later than 30 days after receipt of said taxes.***

4 358  New Chapter; Purchasing Pool for Family and Medical Leave Insurance.  Amend RSA by

5 inserting after chapter 282-A the following new chapter:

6 CHAPTER 282-B

7 PURCHASING POOL FOR FAMILY AND MEDICAL LEAVE INSURANCE

8 282-B:1  Purpose.  The purpose of this chapter is to establish a group purchasing mechanism

9 whereby individuals who work for employers with more than 50 employees who do not to offer either

10 family and medical leave insurance (FMLI) coverage under the granite state paid family leave plan

11 as authorized under RSA 21-I:96 through RSA 21-I:108 or an FMLI benefit that is at least

12 equivalent to such coverage will have the opportunity to purchase granite state paid family leave

13 plan coverage through a mechanism established by the state in conjunction with the state

14 government employee FMLI plan.

15 282-B:2  Definitions.  In this chapter:

16 I. "Child" has the same meaning as "son or daughter" in 29 U.S.C. section 2611(12).

17 II. "Commissioner" means the commissioner of the department of employment security.

18 III. "Department" means the department of employment security.

19 IV.  "Employer" has the same definition as relevant provisions of RSA 282-A:8, except as

20 provided in RSA 282-A:9.

21 V. "Employment" means wages paid for services by an employer that is covered by this

22 chapter.

23 VI. "Family and medical leave" means leave from work:

24 (a)  Because of the birth of a child of the employee, within the past 12 months;

25 (b)  Because of the placement of a child with the employee for adoption or fostering

26 within the past 12 months;

27 (c)  Because of a serious health condition of a family member; or

28 (d)  Because of any qualifying exigency arising from foreign deployment with the armed

29 forces, or to care for a service member with a serious injury or illness as permitted under the federal

30 Family and Medical Leave Act, 29 U.S.C. section 2612(a)(1)(E) and 29 C.F.R. section 825.126(a)(1)

31 through (8), as they existed on October 19, 2017, for family members as defined in paragraph VIII.

32 (e)  A serious health condition of the employee that isn't related to employment and their

33 employer does not offer Short Term Disability insurance.

34 VII.  "Family and Medical Leave Act" means the federal Family and Medical Leave Act of

35 1993, Pub.L. 103-3, 29 U.S.C. section 2601 et seq.

**Amendment to HB 2-FN-A-LOCAL**
**- Page 173 -**

1    VIII.  "Family member" means a child, a biological, adoptive, or foster parent, stepparent, or

2    legal guardian of the child or the child's spouse or domestic partner, a biological, adoptive, or foster

3    grandparent or step grandparent, or a spouse or domestic partner.

4    IX.  "FMLI" means family and medical leave insurance providing wage replacement benefits

5    under specified conditions.

6    X.  "Individual Pool" means the pooled purchasing mechanism established in this chapter for

7    the purpose of providing individual employees of employers who do not sponsor qualifying FMLI

8    coverage the option to purchase such coverage on an individual basis.

9    XI.  "Serious health condition" means any illness covered by the federal family and medical

10   leave act including treatment for addiction as prescribed by a treating clinician, consistent with

11   American Society of Addiction Medicine criteria, as well as treatment for a mental health condition,

12   consistent with American Psychiatric Association criteria.

13   282-B:3  Employer and Employee Rights and Responsibilities.

14   I.  Individuals who are employed by private employers with more than 50 employees who do

15   not  offer either FMLI coverage under the granite state paid family leave plan under RSA 21-I:96 -

16   RSA 21-I:108 or an FMLI benefit that is at least equivalent to such coverage will have the

17   opportunity to purchase granite state paid family leave plan coverage through the individual pool.

18   The individual pool shall operate by payroll deduction for employees of employers with more than 50

19   employees whereby premiums are paid into an FMLI premium fund administered by the department

20   as provided in this chapter and established in coordination with the commissioner of administrative

21   services under RSA 21-I:96 through RSA 21-I:108.

22   II.  Individuals employed by employers with more than 50 employees opting into the

23   individual pool shall be required to make their premium remittances by payroll deduction.  All

24   private employers with more than 50 employees who have employees who have individually opted

25   into this pooled purchasing mechanism shall remit FMLI premium payments to the department in a

26   manner as directed by the commissioner.

27   III.  Employers with fewer than 50 employees who wish to purchase FMLI coverage through

28   the granite state paid family leave plan shall have the opportunity to purchase such coverage by

29   making premium remittances into an FMLI premium fund administered by the department as

30   provided in this chapter and established in coordination with the commissioner of administrative

31   services acting pursuant to RSA 21-I:96.

32   282-B:4  FMLI Premium Fund Established.  There is established the FMLI premium fund for

33   deposits of insurance premium payments paid pursuant to RSA 282-B:3 and for remittance of such

34   premiums to the FMLI carrier or carriers participating in the twin state voluntary leave plan.  The

35   department shall develop standard enrollment procedures in coordination with participating carriers

36   and shall transmit enrollment and eligibility information to such carriers on a timely basis.  The

37   department shall establish procedures and mechanisms for the billing and collection of premiums

1  from employers.  The department shall specify in contracts with participating carriers how all
2  premiums shall be transmitted and the frequency of that transmission and how penalties and grace
3  periods on late payments of premiums shall be calculated.  The department may contract with
4  qualified, independent vendors for the services necessary to carry out some or all of the duties under
5  this paragraph.

6  282-B:5  FMLI Premium Stabilization Trust Fund Established.

7  I.  There is established the FMLI premium stabilization trust fund which shall be held and
8  accounted for separately from all other funds.  Interest, dividends, and other earnings of the fund
9  shall be added to the fund.  Deposits into the fund shall be limited exclusively to:

10  (a)  Premium taxes imposed on premiums written by duly authorized insurance
11  companies for family and medical leave insurance written in connection with the administration of
12  RSA 21-I:96 through RSA 21-I:108 or RSA 282-B as provided in RSA 400-A:32, III(c); and

13  (b)  Gifts, grants, and donations.  The moneys in the fund shall not be subject to any
14  state taxes and shall not be subject to any federal taxes to the extent allowed by applicable federal
15  law.

16  II.  The moneys in the fund shall constitute a premium stabilization reserve and shall be
17  used exclusively for the purpose of assuring that the premiums charged to participants in the
18  individual pool remain stable from year to year and do not exceed 5 dollars per subscriber per week.
19  The fund shall be administered by the commissioner, who shall be authorized to make such periodic
20  payments to participating FMLI carriers as are necessary to meet the purposes of this paragraph.
21  The department is authorized to contract with qualified, independent vendors for the services
22  necessary to carry out some or all of the duties under this paragraph.

23  282-B:6  Report and Outreach.

24  I.  Working in coordination with the commissioner of administrative services as provided in
25  RSA 21-I:105, I the department shall produce, on an annual basis, a summary report on the granite
26  state paid family leave plan.  The report shall be made public and delivered to the governor, the
27  senate president, and the speaker of the house of representatives.  It shall include but not be limited
28  to, a description of progress in implementing the provisions of this chapter, payments into and out of
29  the fund, the number of employees in the state participating in the purchasing mechanism, and
30  recommendations for improvement of the program and for further increasing the rate at which New
31  Hampshire employees have FMLI coverage.

32  II.  Working in coordination with the department of administrative services as provided in
33  RSA 21-I:105, II, the department shall develop and implement an outreach program to ensure that
34  individuals who may be eligible to receive FMLI benefits under this chapter or under RSA 21-I:96
35  through RSA 21-I:108 are made aware of these benefits.  Outreach information shall explain in an
36  easy to understand format, eligibility requirements, benefit structures, and the process for accessing
37  coverage and enrolling.

1   282-B:7  Rulemaking.  The commissioner may adopt rules, pursuant to RSA 541-A, as deemed
2   necessary for the implementation of this chapter.

3   282-B:8  Appropriation and Funding Transfer.  The state treasurer shall transfer funds from the
4   general fund to the department of employment security for payment of the administrative and
5   implementation costs associated with this chapter.

6   282-B:9  Implementation.  The individual pool shall be operational and available for use by
7   individuals on a timetable that is sufficient to ensure that FMLI coverage shall be available for
8   purchase by January 1, 2022.

9   282-B:10  Application; Employers with Fewer than 50 Employees.  No provision of this chapter
10  shall require employers with fewer than 50 employees to offer family medical leave or process payroll
11  deductions on behalf employees choosing to participate in the program as individuals.

12  359  New Section; Family Medical Leave Insurance; Discrimination in the Workplace.  Amend
13  RSA 275 by inserting after section 37-c the following new section:

14  275:37-d  Family and Medical Leave Insurance.  If an employer has 50 or more employees and
15  sponsors family and medical leave insurance pursuant to RSA 21-I:96, then any employee of that
16  employer who takes family or medical leave and accesses wage replacement benefits under such
17  family and medical leave insurance coverage shall be restored to the position she or he held prior to
18  such leave or to an equivalent position by her or his employer consistent with the job restoration
19  provisions of the federal Family and Medical Leave Act of 1993, Public Law 103-3, 29 U.S.C. section
20  2601 et seq.  Such employers shall continue to provide health insurance to employees during the
21  leave.  However, employees shall remain responsible for any employee-shared costs associated with
22  the health insurance benefits.  Such employers shall not discriminate or retaliate against any
23  employee for accessing family or medical leave wage replacement benefits.  Employers of employees
24  participating in the granite state paid family leave plan may require that paid leave taken under
25  this program be taken concurrently or otherwise coordinated with leave allowed under the terms of a
26  collective bargaining agreement or other established employer policy or the Family and Medical
27  Leave Act, as applicable.

28  360  New Subparagraphs; Application of Receipts.  Amend RSA 6:12, I(b) by inserting after
29  subparagraph (364) the following new subparagraphs:

30          (365)  Moneys deposited in the FMLI premium fund established in RSA 282-B:4.

31          (366)  Moneys deposited in the FMLI premium stabilization trust fund established in
32  RSA 282-B:5.

33  361  New Section; Business Enterprise Tax; Granite State Paid Family Leave Plan Tax Credit.
34  Amend RSA 77-E by inserting after section 3-d the following new section:

35  77-E:3-e  Granite State Paid Family Leave Plan Tax Credit.  There shall be a tax credit allowed
36  against the tax due under this chapter in an amount equal to 50 percent of the premium paid by a

1    sponsoring employer for family and medical leave insurance coverage offered to employees pursuant

2    to RSA 21-I:100 for the taxable period in which the premium is paid.

3        362  Annual and Sick Leave; Executive Branch.  Amend RSA 94:3-a to read as follows:

4        94:3-a  Annual and Sick Leave for Unclassified Legislative Employees **and Executive Branch**

5    **Unclassified and Nonclassified Employees**.

6            I.  Annual Leave.  All full-time, nonelective unclassified legislative officials and employees

7    shall accumulate annual or biennial leave to the extent authorized for each position by the

8    appointing authority.  If, at the time of his separation from service, such an official or employee has

9    credit for unutilized annual leave time, he shall be paid for such time at the same rate he was

10    receiving at the time of his separation.

11           II.  Sick Leave.  All full-time, nonelective unclassified legislative officials and employees,

12    shall accumulate sick leave credit to the extent authorized for each position by the appointing

13    authority.  All unutilized sick leave credit shall lapse at the time of separation from service, except

14    that should such an official or employee die while in service, his estate shall be paid for any

15    unutilized sick leave credit at the same rate the official or employee was receiving at the time of his

16    death.

17           III.  Transfer of Credit**; Legislative**.  Any official or employee who transfers without a break

18    in service, from the classified service to a full-time, nonelective, unclassified legislative position may

19    transfer all the days of sick leave credit and annual leave credit that he has accumulated in the

20    classified service.   Any full-time, nonelective unclassified legislative official or employee who

21    transfers, without a break in service, to the classified service may transfer all the days of sick leave

22    credit and annual leave credit that he has accumulated in the unclassified service pursuant to this

23    section.  The rate of accrual for all sick and annual leave shall be the same as the rate immediately

24    prior to the transfer.

25           ***III-a.  Transfer of Credit; Executive.  Any official or employee who transfers without***

26    ***a break in service, from the classified service to an unclassified or nonclassified executive***

27    ***branch position shall retain all annual leave, sick leave, longevity pay, and bonus leave***

28    ***already accumulated in the classified system.  Such leave, longevity pay, and bonus time***

29    ***shall not be paid out until the employee's cessation of employment and shall be carried***

30    ***forward if the employee again transfers into the classified service.***

31           IV.  The appointing authority may deny compensation to any legislative official or employee

32    for any annual leave time or sick leave time taken in excess of annual leave time or sick leave time

33    accumulated pursuant to this section.

34        363  Terminal Pay.  RSA 94:9 is repealed and reenacted to read as follows:

35        94:9  Terminal Pay.

36            I.  Any full-time state official or employee other than those in the state classified system who

37    retires, resigns, dies in office, or is terminated as a result of not being reappointed, shall receive

**Amendment to HB 2-FN-A-LOCAL**
**- Page 177 -**

1   upon such cessation of employment 3 days' salary for each year of employment in nonclassified or
2   unclassified service.

3        II.   Terminal Pay; Leave Time and Longevity Pay.  Any full-time state official or employee
4   other than those in the state classified system who retires, resigns, dies in service, or is terminated
5   shall receive termination pay that includes any unused annual leave, bonus leave, or longevity pay
6   accumulated from their service as member of the classified system.

7        III.   Terminal Pay; Sick Time.  Any full-time state official or employee other than those in
8   the state classified system who retires shall receive termination pay that includes unused sick leave
9   accumulated while a member of the classified system.  The calculation of such unclassified sick leave
10  payout shall be according to the calculations of sick leave upon termination of service of a
11  confidential classified employee as specified in the rules of the division of personnel.

12       IV.   The governor is authorized to draw warrants for the sums necessary to make the
13  payments under this section, which shall be a charge against the general fund or such special fund
14  as may be appropriate.

15       364   New Paragraph; Administrative Services; Rulemaking; Executive Branch Employees.
16  Amend RSA 21-I:14 by inserting after paragraph XVII the following new paragraph:

17       XVIII.   Employees serving in executive branch unclassified positions relating to:

18            (a)   Annual Leave;

19            (b)   Sick Leave;

20            (c)   Transfers between positions within the executive branch and across branches of state
21  government; and

22            (d)   Termination and payouts upon termination of employment.

23       365   Report; Executive Branch Employees.   The commissioner of the department of
24  administrative services shall report to the fiscal committee of the general court on the progress of
25  the adoption of administrative rules under RSA 21-I:14, XVIII, relating to employees serving in
26  executive branch unclassified positions, not later than April 30, 2022.

27       366   Abolished Positions.  All classified full-time positions which were vacant prior to July 1,
28  2018 and remain vacant as of July 1, 2021 shall be abolished on September 30, 2021.  Executive
29  branch agencies, as defined in RSA 9:1, shall identify such positions using the last vacancy report
30  from the state human resources system produced before June 30, 2021.  Positions on such report
31  that have been filled as of July 1, 2021, or for which and offer has been extended and accepted, shall
32  not be abolished.  Each executive agency shall prepare a list of positions to be abolished for
33  submission to the department of administrative services on or before September 1, 2021.  For each
34  position the list shall include the amounts appropriated by fiscal year for salary and benefits and the
35  source of funds for such appropriations.  The department of administrative services shall transfer
36  the unexpended general fund appropriations for the abolished positions to the salary adjustment
37  fund in RSA 99:4 and the benefit adjustment account in RSA 9:17-c.  The department of

**Amendment to HB 2-FN-A-LOCAL**
**- Page 178 -**

1   administrative services shall submit a report of the abolished positions and transferred
2   appropriations to the legislative fiscal committee by December 31, 2021.  Individual exceptions to
3   these provisions may be requested by any department in writing to the governor, and any such
4   exception granted by the governor shall be transmitted to the fiscal committee of the general court.
5   This section shall not apply to any positions at the department of health and human services which
6   the department intends to use toward meeting required budget reductions.

7      367  Appropriation: Department of Agriculture, Markets, and Food; Cost of Care Fund.  The sum
8   of $100,000 for the fiscal year ending June 30, 2021 is hereby appropriated to the department of
9   agriculture, markets, and food to fund the cost of care fund established in RSA 437-B:1.  The
10   governor is authorized to draw a warrant for said sums out of any money in the treasury not
11   otherwise appropriated.

12      368  Effective Date.  Section 367 of this shall take effect on June 30, 2021.

13      369    Department of Agriculture, Markets, and Food; Disease Data Manager; Position
14   Established; Appropriation.

15      I.  There is hereby established with the department of agriculture, markets, and food, a Word
16   Processor I position.  Such position shall enter and compile test data needed to demonstrate to the
17   USDA that the state is performing adequate testing in order to maintain its status as a TB and
18   Brucellosis-free state.

19      II.  The sum of $53,000 for the fiscal year ending June 30, 2022, and the sum of $58,000 for
20   the fiscal year ending June 30, 2023, are hereby appropriated to the department of agriculture,
21   markets, and food for the purpose of funding the position in paragraph I.  The governor is authorized
22   to draw a warrant for said sums out of any money in the treasury not otherwise appropriated.

23      370  Department of Justice; Positions Established and Reclassified.

24      I.  Position Reclassification; Department of Justice.  The position of attorney II, position
25   #14956, transferred to the department of justice in fiscal year 2021 from the department of health
26   and human services accounting unit 05-95-95-952010-5680 to the department of justice accounting
27   unit 02-20-20-201010-2620 and fully funded by the department of health and human services, shall
28   be designated as an unclassified position.

29      II.  There is established within the department of justice the unclassified position of
30   assistant attorney general.  The salary for the position shall be set forth in RSA 94:1-c.

31      III.  Upon reclassification of the position and appointment of the assistant attorney general,
32   position #14956 shall be abolished to allow for the transition of its available appropriations into the
33   unclassified position of assistant attorney general.  Funding shall be transferred into the proper
34   unclassified expenditure class for the civil law accounting unit.  The incumbent in the abolished
35   position shall be offered the opportunity to seek the attorney general's nomination for the
36   unclassified position of assistant attorney general.

Amendment to HB 2-FN-A-LOCAL
- Page 179 -

1    371  National Guard Enlistment Incentive Program.  The subdivision heading before RSA 160-

2    B:60 is repealed and reenacted to read as follows:

3                 National Guard Enlistment Incentive Program

4    372   National Guard Enlistment Incentive Program.   RSA 110-B:60-62 are repealed and

5    reenacted to read as follows:

6    110-B:60  New Hampshire National Guard Enlistment Incentive Program Established.  For the

7    purpose of encouraging enlistment in the national guard there is hereby established a New

8    Hampshire national guard enlistment incentive program.  This program authorizes a cash incentive

9    up to $500 to current members of the New Hampshire national guard in the pay grades of E-1 to O-3

10    or any former member of the New Hampshire national guard for each new or prior service recruit

11    that they bring into the New Hampshire national guard.

12    110-B:61  Revenue for Enlistment Incentive Program.

13         I.  There is hereby established a fund to be known as national guard enlistment incentive

14    program fund.  Any appropriations received shall be deposited in the fund.  Moneys in the fund and

15    any interest earned on the fund shall be used for the purpose of encouraging enlistment in the

16    national guard and shall not be used for any other purpose.  The adjutant general shall oversee

17    expenditures from the fund.  The moneys in the fund shall be nonlapsing.

18         II.  In addition to any moneys appropriated, the New Hampshire national guard enlistment

19    incentive program fund may consist of an annual appropriation, as determined by the general court,

20    to be awarded in accordance with written policies promulgated by the adjutant general under RSA

21    110-B:62.

22    110-B:62  Oversight and Administration.  The adjutant general shall adopt rules pursuant to

23    RSA 541-A relative to the administration of the enlistment incentive program and relative to its

24    execution by the New Hampshire Army and Air National Guard recruiting offices in coordination

25    with the department of military affairs and veterans services.

26    373  New Subparagraph; National Guard Enlistment Incentive Program Fund.  Amend RSA

27    6:12, I(b) by inserting after subparagraph (364) the following new subparagraph:

28         (365)  Moneys deposited in the national guard enlistment incentive program fund

29    established in RSA 110-B:61.

30    374  Reference to National Guard Scholarship Fund Removed.  Amend RSA 110-B:55, I to read

31    as follows:

32         I.  Fines may be paid to a military court or to an officer executing its process.  The amount of

33    any fine imposed may be noted upon any state roll or account for pay of the delinquent and deducted

34    from any pay or allowance due or thereafter to become due them, until said fine is liquidated; or the

35    same may be collected with lawful costs of collection, as in the case of executions issued in action

36    founded upon torts.   [Fines shall be paid over to the state treasurer and credited to the New

37    Hampshire national guard recruitment and retention scholarship fund under RSA 110-B:60.]

**Amendment to HB 2-FN-A-LOCAL**
**- Page 180 -**

1   375  Reference to National Guard Scholarship Fund Removed.  Amend RSA 110-B:29 to read as

2   follows:

3   110-B:29  Use of Armories or Other National Guard Facilities.

4   [I.]  All New Hampshire national guard facilities shall be primarily for the military duty,

5   instruction, and training of the national and state guard and for the storage and maintenance of

6   military property.  Other use of national guard facilities may be authorized by the adjutant general

7   and shall be governed by rules and regulations promulgated under this section.

8   [II.  Rental fees for the use of national guard facilities shall be fixed by the adjutant general

9   and shall be declared as revenue and paid to the adjutant general subject to the provisions of RSA

10  110-B:61.]

11  376  Repeal.  RSA 110-B:63, relative to the national guard scholarship program, is repealed.

12  377  Appropriation: Department of Military Affairs and Veterans Services; National Guard

13  Enlistment Incentive Fund.  The sum of $25,000 for the fiscal year ending June 30, 2021 is hereby

14  appropriated to the department of military affairs and veterans services to fund the national guard

15  enlistment incentive fund established in RSA 110-B:61.  Such appropriation shall be nonlapsing.

16  The governor is authorized to draw a warrant for said sums out of any money in the treasury not

17  otherwise appropriated.

18  378  Effective Date.  Section 377 of this act shall take effect June 30, 2021.

19  379  Insurance Department; Positions Established.

20  I.  There is established within the insurance department the unclassified position of director

21  of life and health.  The director of life and health shall be qualified to hold that position by reason of

22  education and experience and shall perform such duties and exercise such powers as the

23  commissioner may authorize.

24  II.  The salary of the director of life and health shall be determined after assessment and

25  review of the appropriate temporary letter grade allocation in RSA 94:1-a, I(b) for the position which

26  shall be conducted pursuant to RSA 94:1-d and RSA 14:14-c.  Upon completion of this action and

27  appointment of the director of life and health, position #16733 shall be abolished to allow for the

28  transition of this classified position within its available appropriations into the unclassified position

29  of director of life and health.  Funding shall be transferred into a new expenditure class 011, within

30  accounting unit 02-24-24-240010-2520.  The incumbent in the abolished position shall be offered the

31  position of director of life and health.

32  III.  There is established within the insurance department the position of director of property

33  and casualty.  The director of property and casualty shall be qualified to hold that position by reason

34  of education and experience and shall perform such duties and exercise such powers as the

35  commissioner may authorize.

36  IV.  The salary of the director of property and casualty shall be determined after assessment

37  and review of the appropriate temporary letter grade allocation in RSA 94:1-a, I(b) for the position

1   which shall be conducted pursuant to RSA 94:1-d and RSA 14:14-c.  Upon completion of this action

2   and appointment of the director of property and casualty, position #19998 shall be abolished to allow

3   for the transition of this classified position with its available appropriations into the unclassified

4   position of director of property and casualty.  Funding shall be transferred into a new expenditure

5   class 011, within accounting unit 02-24-24-240010-2520.  The incumbent in the abolished position

6   shall be offered the position of director of property and casualty.

7       380  Insurance Department; Department Positions.  Amend RSA 400-A:6, VII to read as follows:

8       VII.  The commissioner shall appoint, as the commissioner's assistants, a director of financial

9   regulation, ***a director of life and health,*** a director of health economics, a director of health care

10   analytics, a general counsel, an insurance fraud director, a senior insurance fraud investigator, ***a***

11   ***director of property and casualty,*** a property and casualty actuary, a chief property and casualty

12   actuary, a workers' compensation analyst, a chief life, accident and health actuary, a compliance and

13   enforcement counsel, a chief financial examiner, a communications director, and a health reform

14   coordinator, each of whom shall serve at the pleasure of the commissioner.  The director of financial

15   regulation, ***director of life and health,*** director of health economics, director of health care

16   analytics, general counsel, insurance fraud director, senior insurance fraud investigator, ***director of***

17   ***property and casualty,*** property and casualty actuary, chief property and casualty actuary,

18   workers' compensation analyst, chief life, accident and health actuary, compliance and enforcement

19   counsel, chief financial examiner, communications director, and health reform coordinator, shall

20   perform such duties and exercise such powers as the commissioner may authorize.

21       381  Appropriation; Business Finance Authority; Grants to Regional Economic Development

22   Corporations.  The sum of $200,000 is hereby appropriated for the fiscal year ending June 30, 2022,

23   and the sum of $200,000 is hereby appropriated for the fiscal year ending June 30, 2023 to the

24   business finance authority for the purpose of providing equal grants to regional economic

25   development corporations in furtherance of the objectives set forth in RSA 162-A:1.  The governor is

26   authorized to draw a warrant for said sums out of any money in the treasury not otherwise

27   appropriated.  Funds appropriated to the authority under this section shall be excluded from the

28   repayment provisions of RSA 162-A:30.

29       382  Appropriation; Affordable Housing Fund.  The sum of $25,000,000 for the fiscal year ending

30   June 30, 2021, is hereby appropriated to the housing finance authority for deposit in the affordable

31   housing fund established in RSA 204-C:57, for the purpose of providing financing or state matching

32   funds for affordable housing.  The appropriation shall be in addition to any other funds appropriated

33   to the housing finance authority.  The governor is authorized to draw a warrant for said sum out of

34   any money in the treasury not otherwise appropriated.

35       383  Effective Date.  Section 382 of this act shall take effect June 30, 2021.

36       384  Department of Natural and Cultural Affairs; Bureau of Trails; Grant in Aid.

Amendment to HB 2-FN-A-LOCAL
- Page 182 -

I.   For the biennium ending June 30, 2023 and notwithstanding any provision of law or administrative rule to the contrary, the limitations on percentages of grant-in-aid administered by the bureau of trails, division of parks and recreation, for the development and maintenance of OHRV trails on private, state, federal, or municipal lands for the grant period of June 1, 2021 to May 31, 2022 shall be as follows:

(a)  90 percent of the cost of renting equipment required to complete a project.

(b)  90 percent of the cost of purchasing trail grooming equipment.

(c)  90 percent of the cost of reconditioning trail grooming equipment.

(d)  90 percent of the cost of operations for summer trail grading.

II.   Except as expressly provided above, all other administrative rules regarding the administration of this grant in aid program remain in full force and effect.

385  Appropriation; Hampton Beach Area Commission.  The sum of $20,000 for the fiscal year ending June 30, 2021 is hereby appropriated to the Hampton Beach area commission to be credited to the Hampton Beach master plan fund under RSA 216-J:5 for the purpose of updating the environmental components of the master plan.  The governor is authorized to draw a warrant for said sum out of any money in the treasury not otherwise appropriated.

386  Effective Date.  Section 385 of this act shall take effect June 30, 2021.

387  Substance Abuse Enforcement Program; Appropriations.

I.  The sum of $587,700 for the fiscal year ending June 30, 2021 is hereby appropriated to the department of safety.  This sum shall be expended as follows:

(a)  $171,600 shall be expended for the purpose of funding overtime at the state forensic laboratory as a result of increased caseloads attributable to narcotics related enforcement and investigations, with no more than 50 percent of the appropriation expended in each fiscal year of the biennium ending June 30, 2023.

(b)  $416,100 shall be expended for the purpose of funding overtime at the state police for narcotics related enforcement and investigations, with no more than 50 percent of the appropriation expended in each fiscal year of the biennium ending June 30, 2023.

II.  The sum of $2,400,000 for the fiscal year ending June 30, 2021 is hereby appropriated to the department of safety to disburse grants to county and local law enforcement agencies for the purpose of funding overtime costs for county and local law enforcement officers performing law enforcement activities attributable to the substance abuse enforcement program established in RSA 21-P:66.  No more than 50 percent of the appropriation shall be expended in each fiscal year of the biennium ending June 30, 2023.

III.  The governor is authorized to draw a warrant for said sums out of any money in the treasury not otherwise appropriated.

IV.  No appropriation made in this section shall lapse until June 30, 2023.

388  Effective Date.  Section 387 of this act shall take effect June 30, 2021.

**Amendment to HB 2-FN-A-LOCAL**
**- Page 183 -**

1     389  Fire Standards and Training and Emergency Medical Services Fund; Appropriation.  There

2     is hereby appropriated to the fire standards and training and emergency medical services fund

3     established under RSA 21-P:12-d, the sums of $300,000 for the fiscal year ending June 30, 2022 and

4     $300,000 for the fiscal year ending June 30, 2023.  The governor is authorized to draw a warrant for

5     said sums out of any money in the treasury not otherwise appropriated.

6     390  Department of Safety; Appropriation.  There is hereby appropriated to the department of

7     safety, division of fire standards and training and emergency medical services, the sums of $200,000

8     for the fiscal year ending June 30, 2022 and $200,000 for the fiscal year ending June 30, 2023.  Such

9     sums shall be used for the purpose of funding additional part-time instruction or increasing the

10    tuition discount provided to New Hampshire emergency service personnel for certain programs

11    through administrative rulemaking.   Such appropriations shall be a charge against the fire

12    standards and training and emergency medical services fund established pursuant to RSA 21-P:12-d.

13    391  General Fund Transfer to Highway Fund.  The sum of $50,000,000 for the fiscal year ending

14    June 30, 2022, is hereby appropriated to the highway fund. This appropriation shall not lapse.  The

15    governor is authorized to draw a warrant for said sum out of any money in the treasury not

16    otherwise appropriated.

17    392  Appropriation; Department of Transportation.  There is hereby appropriated to the

18    department of transportation the sum of $7,000,000 for the fiscal year ending June 30, 2021, for the

19    purpose of the Conway Bypass right-of-way payback to the federal highway administration,

20    understanding the department will continue to negotiate with the federal highway administration on

21    a specific payback plan. This appropriation shall not lapse.  The governor is authorized to draw a

22    warrant for said sum out of any money in the treasury not otherwise appropriated.

23    393  Effective Date.  Section 392 of this act shall take effect June 30, 2021.

24    394  Department of Transportation; Removal of Toll Booths.  Notwithstanding any provision of

25    law to the contrary, the commissioner of the department of transportation shall remove the

26    northbound and southbound toll booths on exit 10 on the F.E. Everett turnpike in the town of

27    Merrimack.

28    395  Department of Transportation; Town of Tilton; Appropriation.

29        I.  The project named Tilton, project number 29753, to reconstruct and re-classify 1.97 miles

30    of Calef Hill Road shall be added to the 10-year transportation improvement plan with engineering

31    totaling $350,000 in fiscal year 2022 and construction totaling $2,900,000 for the biennium ending

32    June 30, 2023.

33        II.  There is hereby appropriated $3,250,000 in the fiscal year ending June 30, 2022, to the

34    department of transportation for funding the project identified in paragraph I.   The governor is

35    authorized to draw a warrant for said sum out of any money in the treasury not otherwise

36    appropriated.  Amounts appropriated under this section shall not lapse.

**Amendment to HB 2-FN-A-LOCAL**
**- Page 184 -**

396   Appropriation; Department of Transportation.   There is hereby appropriated to the department of transportation the sum of $5,000,000 for the fiscal year ending June 30, 2022 for the purpose of leveraging federal discretionary grants on transportation projects with required state cash match.  Such appropriation shall not lapse.  The governor is authorized to draw a warrant for said sum out of any money in the treasury not otherwise appropriated.

397   Appropriation to the Department of Health and Human Services for Child Welfare Behavioral Health Services.  Lapse Extension.  Amend 2019, 346:347 to read as follows:

346:347  Appropriation; Department of Health and Human Services; Child Welfare Behavioral Health Services.  The sum of $6,084,000 for the fiscal year ending June 30, 2020, and the sum of $13,164,000 for the fiscal year ending June 30, 2021, are hereby appropriated to the department of health and human services for the purposes of sections 330-346 of this act.  ***The $13,164,000 appropriation for fiscal year 2021 shall not lapse until June 30, 2022.***  Notwithstanding RSA 14:30-a, VI, the department may accept and expend any federal fund match to the appropriation in this section without prior approval of this fiscal committee of the general court.  The governor is authorized to draw a warrant for said sums out of any money in the treasury not otherwise appropriated.

398  Effective Date.  Section 397 of this act shall take effect June 30, 2021.

399  Annual Report on State Mental Health Plan; Child Welfare Component.  Amend RSA 126-A:5, XXXIII to read as follows:

XXXIII.*(a)*  On or before September 1, 2019, the commissioner shall submit a report on the New Hampshire 10-year mental health plan of 2018 containing the priorities for implementation of the plan to the oversight committee on health and human services, established under RSA 126-A:13, the chairpersons of the house and senate policy committees with jurisdiction over health and human services matters, the president of the senate, the speaker of the house of representatives, [and] the governor***, and the office of the child advocate established in RSA 21-V***.  The commissioner shall submit a report on or before September 1, 2020 and annually thereafter on the status of the implementation of the 10-year mental health plan including, but not limited to, unmet benchmarks and recommendations for any necessary barrier resolution or necessary adjustments or modifications to the plan to better serve New Hampshire citizens, to the oversight committee on health and human services and the chairpersons of the house and senate policy committees with jurisdiction over health and human services matters.  The annual report shall include any recommendations by the commissioner for legislation as needed or appropriate in achieving important benchmarks in fully implementing the 10-year mental health plan.

***(b)  As part of the annual report required by this paragraph, the commissioner of the department of health and human services, in conjunction with the commissioner of the department of education, shall issue a joint report on the implementation of 2019, 44 (SB 14), relative to child welfare.  This portion of the report shall address in detail the***

1    *implementation status of each section of 2019, 44 (SB 14) and include all information*
2    *related to progress toward full implementation of a system of care under RSA 135-F. The*
3    *report shall also address the following:*

4            *(1)   The total cost of children's behavioral health services.*

5            *(2)   The identification of barriers and service gaps in the array of children's*
6    *behavioral health services, along with a description of efforts and plans to fill those gaps.*

7            *(3)   The availability of mobile crisis and stabilization services in each part of*
8    *the state and plans to fill any gaps.*

9            *(4)   Changes to statutes, administrative rules, policies, practices, and*
10   *managed care and provider contracts which will be necessary to fully implement the*
11   *system of care.*

12           *(5)   Shortfalls in workforce sufficiency affecting full implementation of the*
13   *system of care as well as efforts and plans for addressing those shortfalls.*

14           *(6)   Numbers of children and youth awaiting services in various categories.*

15           *(7)   Plans to coordinate the system of care with existing efforts addressing*
16   *early childhood interventions, primary prevention, and primary care integration.*

17           *(8)   Plans to develop and/or coordinate a cross-system assessment tool and*
18   *data collection system to measure outcomes, including but not limited to status upon exit*
19   *from the system of care, measured treatment results, recidivism, and other returns to the*
20   *service system.*

21       400  Repeal.  RSA 135-F:6, relative to reporting requirements on the system of care for children's
22   mental health, is repealed.

23       401  System of Care for Children's Mental Health; Duties of the Commissioner of Health and
24   Human Services; Reference Change.  Amend the introductory paragraph of RSA 135-F:4, II to read
25   as follows:

26       II.  Develop a plan for full establishment and maintenance of a system of care.  Such plan
27   shall be reviewed and amended annually.  It shall include sufficient detail to allow compliance with
28   the reporting requirements of RSA [135-F:6] *126-A:5, XXXIII*, and shall address at least the
29   following elements:

30       402   System of Care for Children's Mental Health; Duties of the Commissioner of the
31   Department of Education; Reference Change.  Amend the introductory paragraph of RSA 135-F:5, II
32   to read as follows:

33       II.  Develop a plan for full support and participation of the department of education in the
34   establishment and maintenance of a system of care.  Such plan shall be reviewed and amended
35   annually.  It shall include sufficient detail to allow compliance with the reporting requirements of
36   RSA [135-F:6] *126-A:5, XXXIII*, and shall address at least the following elements:

**Amendment to HB 2-FN-A-LOCAL**
**- Page 186 -**

403   Department of Health and Human Services; Contracts and Procurement Unit; Positions Established.  There are hereby established within the department of health and human services for the biennium ending June 30, 2023, 8 full-time, classified positions in the office of business operations, contracts and procurement unit.

404   Appropriation; Department of Health and Human Services; Contracts and Procurement Unit.  The sum of $644,260 for the fiscal year ending June 30, 2022, and the sum of $810,607 for the fiscal year ending June 30, 2023, are hereby appropriated to the department of health and human services for the purpose of funding positions in the office of business operations, contracts and procurement unit.  The governor is authorized to draw a warrant for said sums out of any money in the treasury not otherwise appropriated.

405   Duties of the Department of Health and Human Services; Administration of State Food Stamp Program; Reference to SNAP (Supplemental Nutrition Assistance Program) Added.  Amend RSA 161:2, XIII to read as follows:

XIII. Food Stamp Program.  Develop and administer a food stamp program within the state*, also known as SNAP, the Supplemental Nutritional Assistance Program,* under the provisions of the Federal Food Stamp Act of 1964, as amended, and in accordance with Federal Regulations duly promulgated by the United States Department of Agriculture and the United States Department of Health, Education and Welfare.

*XIII-a.  SNAP Incentive Programs.  Implement SNAP incentive programs enabling beneficiaries of the federal Supplemental Nutrition Assistance Program to receive a dollar-for-dollar match for fresh fruits and vegetables, with an emphasis on locally grown, at participating farmer's markets, farm stands, mobile markets, community supported agriculture sites, grocery stores, or other participating direct food retailers.*

406   New Paragraph; Department of Health and Human Services; Rulemaking.  Amend RSA 161:4-a by inserting after paragraph XI the following new paragraph:

XI-a.  The implementation of SNAP incentive programs under RSA 161:2, XIII-a.

407   Department of Health and Human Services; Appropriation.  The sum of $150,000 for the biennium ending June 30, 2023 is hereby appropriated to the department of health and human services for the SNAP incentive programs under RSA 161:2, XIII-a.  The governor is authorized to draw a warrant for said sum out of any money in the treasury not otherwise appropriated.

408   Prospective Repeal Regarding Eligibility for Services Extended.  Amend 2011, 209:6, I, as amended by 2013, 140:1, I, as amended by 2015, 276:41, I, as amended by 2017, 156:85, I, as amended by 2019, 346:61, I, to read as follows:

I. Section 5 of this act shall take effect July 1, [2021] *2023*.

409   New Paragraph; Rulemaking; Exception Added; Cost-of-living Adjustment.  Amend RSA 541-A:21 by inserting after paragraph III-a the following new paragraph:

Case 1:21-cv-01077-PB   Document 36-7   Filed 03/25/22   Page 187 of 215

III-b.   Rules adopted relative to the cost of living adjustment in social security benefits contained within the Social Services Block Grant program shall be exempt from the provisions of RSA 541-A:5 through RSA 541-A:14, provided that recipients receive proper notice that the income level has been adjusted.

410  Eligibility for Home and Community-Based Services; Suspension.  RSA 151-E:18, regarding presumptive eligibility for home and community-based services, shall be suspended for the biennium ending June 30, 2023.

411  Social Security Act Waiver Programs; Committee Established.

I.   There is established a committee to study achieving parity in reimbursement among organizations that provide Social Security Act Section 1915(c) waiver programs.  The members of the committee shall be as follows:

(a)   Two members of the senate finance committee, one of whom shall be from the majority party and one of whom shall be from the minority party, appointed by the president of the senate.

(b)  Two members of the house of representatives finance committee, one of whom shall from the majority party and one of whom shall be from the minority party, appointed by the speaker of the house of representatives.

II.   Members of the committee shall receive mileage at the legislative rate when attending to the duties of the committee.

III.(a)  The committee shall examine the issue of achieving parity in reimbursement among organizations that provide services under Social Security Act Section 1915(c) waiver programs and the potential solutions and impact of such reimbursement parity on the state and its counties, the contracting organizations, and clients.

(b)   The study shall include a comparison between all Social Security Act Section 1915(c) waiver reimbursements, including reimbursement for providers in the following program areas: choices for independence, developmental services, in-home support, and acquired brain disorder services.

IV.   The committee shall meet in duly noticed public meetings, take testimony when the committee determines it is appropriate, and may accept and solicit information from any person or entity the committee deems relevant to its study.

V.  The members of the study committee shall elect a chairperson from among the members. The first meeting of the committee shall be called by the first-named senate member.  The first meeting of the committee shall be held within 45 days of the effective date of this section.  Three members of the committee shall constitute a quorum.

VI.   The committee shall report its findings and any recommendations for proposed legislation to the president of the senate, the speaker of the house of representatives, the senate clerk, the house clerk, the governor, and the state library on or before November 15, 2022.

**Amendment to HB 2-FN-A-LOCAL**
**- Page 188 -**

1    412  Appropriation; Department of Health and Human Services; Transitional Housing Beds.

2    There is hereby appropriated to the department of health and human services the sum of $6,000,000

3    for the fiscal year ending June 30, 2021, which shall be nonlapsing until June 30, 2023, for the

4    purposes of increasing rates paid for transitional housing beds and for funding new transitional

5    housing beds for forensic patients and/or patients with complex behavioral health conditions

6    including those transitioning from the New Hampshire hospital.  In addition, any unspent funds

7    from the appropriation made under 2019, 346:221 may be used for the purposes of this section.  The

8    governor is authorized to draw a warrant for said sum out of any money in the treasury not

9    otherwise appropriated.

10    413  Effective Date.  Section 412 of this act shall take effect June 30, 2021.

11    414  Health and Human Services; State Loan Repayment Program.  Of the funds appropriated to

12    account 05-95-90-901010-7965, Rural Health & Primary Care, class 103 for the biennium ending

13    June 30, 2021, $1,533,566 shall not lapse until June 30, 2023 and shall be treated as restricted

14    revenue for the purpose of funding the state loan repayment program.  The department of health

15    and human services is authorized to accept and expend any matching federal funds for the purposes

16    of this section without prior approval of the fiscal committee of the general court.

17    415  Effective Date.  Section 414 of this act shall take effect June 30, 2021.

18    416  Department of Health and Human Services; Division of Medicaid Services.  Any funds

19    appropriated to activity 05-95-47-470010, division of medicaid services, for the biennium ending

20    June 30, 2021 shall not lapse until June 30, 2023, and shall be treated as restricted revenue for the

21    purpose of funding expenditures in account 05-95-47-470010-7948, medicaid care management.  The

22    department of health and human services is authorized to accept and expend any matching federal

23    funds for the purposes of this section without prior approval of the fiscal committee of the general

24    court.

25    417  Effective Date.  Section 416 of this act shall take effect June 30, 2021.

26    418  Appropriation; Department of Health and Human Services.  There is hereby appropriated to

27    the department of health and human services the sum of $30,000,000 for the fiscal year ending June

28    30, 2021 for the purpose of constructing a 24-bed forensic psychiatric hospital.   The sum

29    appropriated shall be nonlapsing, provided that any unexpended amount following construction shall

30    lapse to the general fund.  The governor is authorized to draw a warrant for said sum out of any

31    money in the treasury not otherwise appropriated.

32    419  Effective Date.  Section 418 of this act shall take effect June 30, 2021.

33    420  Waiver/Nursing Facility Payments.

34        I.  Notwithstanding RSA 167:18-a or any other provision of law to the contrary, any funds

35    appropriated to activity 05-95-48-482010, waiver and nursing facilities, for the biennium ending

36    June 30, 2021 shall not lapse until June 30, 2023, and shall be treated as restricted revenue for the

37    purpose of funding expenditures contained in the operating budget for the fiscal year ending June

1    30, 2022  in account 05-95-48-482010-2152, waiver/nursing facility payments – county participation.

2    The department of health and human services is authorized to accept and expend any matching

3    federal funds for the purposes of this section without prior approval of the fiscal committee of the

4    general court.

5    421  Effective Date.  Section 420 of this act shall take effect June 30, 2021.

6    422  Home Visiting Program.  Amend RSA 167:68-a to read as follows:

7    167:68-a  Home Visiting Programs.  Home visiting programs for children and their families

8    established pursuant to this subdivision shall be made available to all Medicaid eligible [children

9    and] pregnant women*, infants, and families with children up to age one,* without restriction.

10   The commissioner shall adopt rules, pursuant to RSA 541-A, relative to administering this section.

11   423  Rulemaking; Home Visiting Program.  Amend RSA 167:3-c, XV to read as follows:

12   XV.  Procedures for making the home visiting program available to all Medicaid eligible

13   [children and] pregnant women*, infants, and families with children up to age one* pursuant to

14   RSA 167:68, II(e).

15   424  Graduate Medical Education Payments Suspended.  The commissioner of the department of

16   health and human services shall submit a Title XIX Medicaid state plan amendment to the federal

17   Centers for Medicare and Medicaid Services to suspend the provision of direct and indirect graduate

18   medical education payments to hospitals as provided in 42 C.F.R. section 413.75 for the biennium

19   ending June 30, 2023.  Upon approval of the state plan amendment, and as of the effective date of

20   the state plan amendment, any obligations for payment of direct and indirect graduate medical

21   education shall be suspended for the biennium ending June 30, 2023.

22   425  Department of Health and Human Services; Juvenile Diversion; Supplemental

23   Appropriation.  The sum of $300,000 for the fiscal year ending June 30, 2022, and the sum of

24   $300,000 for the fiscal year ending June 30, 2023 are hereby appropriated to the department of

25   health and human services for the purpose of extending existing grants to the certified juvenile

26   diversion providers who provide diversion services pursuant to RSA 169-B:10.  Any unexpended

27   funds remaining from the appropriation made in 2019, 346:371 shall not lapse and may be used for

28   the purposes of this section.  The governor is authorized to draw a warrant for said sums out of any

29   money in the treasury not otherwise appropriated.

30   426  New Paragraph; Delinquent Children; Juvenile Diversion.  Amend RSA 169-B:10 by

31   inserting after paragraph II-a the following new paragraph:

32   II-b.  Consistent with the referral procedures established pursuant to paragraph II-a, the

33   department of health and human services, division for children, youth and families, shall have the

34   authority establish procedures for the state-funded diversion programs.

35   427  Statement of Purpose.  To improve overall health, promote savings in the state's Medicaid

36   managed care program, and prevent future health conditions caused by oral health problems, and

37   based on the recommendation of the working group convened pursuant to 2019, 346:225, the general

**Amendment to HB 2-FN-A-LOCAL**
**- Page 190 -**

1   court hereby determines that it is in the best interest of the state of New Hampshire to extend

2   dental benefits under the Medicaid managed care program to individuals 21 years of age and over.

3       428  New Paragraph; Medicaid Managed Care Program; Dental Benefits.  Amend RSA 126-A:5

4   by inserting after paragraph XIX the following new paragraph:

5       XIX-a.(a)(1)   The commissioner shall pursue contracting options to administer the state's

6   Medicaid dental program with the goals of improving access to dental care for Medicaid populations,

7   improving health outcomes for Medicaid enrollees, expanding the provider network, increasing

8   provider capacity, and retaining innovative programs that improve access and care through a value-

9   based care model.

10       (2)   The commissioner shall issue a request for information to assist in selecting the

11   administrative model for the state's Medicaid dental program.  Such model shall be either a model

12   administered by a dental managed care organization or a model administered by the state's current

13   medical managed care organizations.  The commissioner shall obtain the requested information from

14   both the current medical managed care organizations and any interested dental managed care

15   organization.  The administrative model selected shall demonstrate the greatest ability to satisfy the

16   state's need for value, quality, efficiency, innovation, and savings.  The request for information shall

17   be released no later than November 1, 2021.  The request for information shall address improving

18   health outcomes, expanding the provider network, increasing capacity of providers, integrating a

19   value-based care model, and exploring innovative programs for children and adults.

20       (3)   If the model administered by a dental managed care organization is selected, the

21   commissioner shall issue a 2-year request for proposals, with 2 optional one-year extensions, to enter

22   into contracts with the vendor that demonstrates the greatest ability to satisfy the state's need for

23   value, quality, efficiency, innovation, and savings.  The state plan amendment shall be submitted to

24   the Centers for Medicare and Medicaid Services (CMS) within the quarter of the program effective

25   date.  Implementation of a procured contract shall begin January 1, 2023 for the adult benefit.  The

26   department, in consultation with oral health stakeholders, will determine the value of

27   implementation of the pediatric dental benefit in a value-based benefit plan.  Implementation of the

28   pediatric benefit will occur on a date that follows the successful implementation of the adult dental

29   benefit.  The commissioner shall establish a capitated rate for the appropriate model for the contract

30   that is full risk to the vendor.  In contracting for a dental managed care model and the various rate

31   cells, the department shall ensure no reduction in the quality of care of services provided to enrollees

32   in the managed care model and shall exercise all due diligence to maintain or increase the quality of

33   care provided.  The department shall seek, with the review of the fiscal committee of the general

34   court, all necessary and appropriate state plan amendments and waivers to implement the

35   provisions of this paragraph.  The program shall not commence operation until such state plan

36   amendments or waivers have been approved by CMS.  All necessary state plan amendments and

37   waivers shall be submitted within the quarter of the program effective date.

1    (4)   The commissioner shall adopt rules, pursuant to RSA 541-A, if necessary, to

2    implement the provisions of this paragraph.

3    (b)   Any vendor awarded a contract pursuant to this paragraph shall provide the

4    required dental services to children with an implementation date to be determined by the

5    department after the successful implementation of the adult benefit and the following dental

6    services to individuals 21 years of age and over, reimbursed under the United States Social Security

7    Act, Title XIX, or successors to it:

8    (1)   Preventive dental services including examinations, necessary x-rays or other

9    imaging, prophylaxis, topical fluoride, oral hygiene instruction, behavior management and smoking

10   cessation counseling, and other services as determined by the commissioner.

11   (2)  Restorative treatment to restore tooth form and function.

12   (3)   Periodontal treatment and oral and maxillofacial surgery to relieve pain,

13   eliminate infection, or prevent imminent tooth loss.

14   (4)  Removable prosthodontics to replace missing teeth subject to medical necessity.

15   (c)   In this paragraph, "dental managed care organization" means any dental care

16   organization, dental service organization, health insurer, or other entity licensed under Title

17   XXXVII, that provides, directly or by contract, dental care services covered under this paragraph

18   rendered by licensed providers and that meets the requirements of Title XIX or Title XI of the

19   federal Social Security Act.

20   429  Dental Benefit; Appropriation.   The sum of $1,460,000 is hereby appropriated to the

21   department of health and human services for the fiscal year ending June 30, 2023 for the purposes of

22   implementing the dental benefit described in section 428 of this act.  The governor is authorized to

23   draw a warrant for said sum out of any money in the treasury not otherwise appropriated.   The

24   department is authorized to accept and expend matching federal funds for the purposes of this

25   program without prior approval of the fiscal committee of the general court.

26   430  Home Visiting Programs; Limitation.  The home visiting programs available to all Medicaid

27   eligible children and pregnant women as required by RSA 167:68-a, shall be subject and limited to

28   available appropriations for the biennium ending June 30, 2023.

29   431   Department of Health and Human Services; Income Eligibility for "In and Out Medical

30   Assistance;" Suspension.  Chapter 39:1 Laws of 2020 requiring the department of health and human

31   services to amend the income standard used for eligibility for the "in and out medical assistance"

32   policy, shall be suspended for the biennium ending June 30, 2023.

33   432  Medicaid to Schools Program; Fiscal Committee Approval of Supplemental Funding.  For

34   the biennium ending June 30, 2023, in the event funds appropriated in accounting unit 05-95-47-

35   0010-7207 Medicaid to schools are insufficient, the department of health and human services may

36   accept and expend additional federal funds with the prior approval of the fiscal committee of the

37   general court.  Any request to the fiscal committee shall include a detailed explanation of the types

1  of assistance the department is providing to school districts to ensure eligibility for reimbursement

2  under the Medicaid to schools program.

3  433  Appropriation; Department of Health and Human Services; Grants to Support Senior

4  Centers; Supports for Mental Health and Social Isolation.  There is hereby appropriated to the

5  department of health and human services the sum of $1,500,000, for the fiscal year ending June 30,

6  2021, for the purpose of providing grants to senior centers or other organizations serving senior

7  citizens for purposes of supporting services to combat struggles with mental health and social

8  isolation.  This appropriation shall not lapse until June 30, 2023.  The governor is authorized to

9  draw a warrant for said sum out of any money in the treasury not otherwise appropriated.

10  434  Effective Date.  Section 433 of this act shall take effect June 30, 2021.

11  435  New Hampshire Veterans' Home; Appropriation.  The sum of $80,000 for the fiscal year

12  ending June 30, 2021 is hereby appropriated to the veterans' home for the purpose of funding the

13  veterans' home master plan update.  The governor is authorized to draw a warrant for said sums out

14  of any money in the treasury not otherwise appropriated and the appropriation shall not lapse until

15  June 30, 2023.

16  436  Effective Date.  Section 435 of this act shall take effect June 30, 2021.

17  437  Appropriation; Lottery Commission.  There is hereby appropriated to the lottery commission

18  the sum of $2,715,000 for the fiscal year ending June 30, 2021 for the purpose of paying the total

19  principal balance on the commercial mortgage on its headquarters building.  The governor is

20  authorized to draw a warrant for said sum out of any money in the treasury not otherwise

21  appropriated.  Any unexpended amount of the appropriation shall lapse to the general fund on June

22  30, 2022.

23  438  Effective Date.  Section 437 of this act shall take effect June 30, 2021.

24  439  Keno License; Fee.  Amend RSA 284:44, I to read as follows:

25  I.  The license fee for a commercial premises keno license issued under RSA 284:46 shall be

26  [$500] *$100* per year.  Such fee shall be submitted to the lottery commission at the time the

27  application is made and shall be refunded if the application is denied.

28  440  Pari-Mutuel Pools on Historic Horse Races; Date Change to May 1, 2021.  Amend RSA

29  284:22-b, II to read as follows:

30  II.  In order to be eligible for a license to sell pari-mutuel pools on historic races, an applicant

31  shall have been game operator employer licensed under RSA 287-D as of May 1, [2020] *2021* and

32  still licensed as of the effective date of this section, provided such sales are within the enclosure of a

33  facility at which the licensee holds its licensed activities under RSA 287-D, and that such facility is

34  located within the city or town in which the licensee held its license on May 1, [2020] *2021*.  An

35  application that is approved by the lottery commission, and a license that is granted shall not be

36  permitted to be transferred or sold.

Amendment to HB 2-FN-A-LOCAL
- Page 193 -

1     441  Applicability.  Section 440 of this act shall take effect one minute after the effective date of

2     HB626-FN of the 2021 regular legislative session.  If HB626-FN does not become law, section 440 of

3     this act shall not take effect.

4     442  Effective Date.

5          I.  Section 440 of this act shall take effect as provided in section 441 of this act.

6          II.  Section 441 of this act shall take effect upon its passage.

7     443  Governor's Scholarship Fund; Appropriation.  The sum of $6,000,000 for the fiscal year

8     ending June 30, 2021 is hereby appropriated to the governor's scholarship fund established under

9     RSA 195-H:12.  Such funds shall not lapse.  The governor is authorized to draw a warrant for said

10    sum out of any money in the treasury not otherwise appropriated.

11    444  Effective Date.  Section 443 of this act shall take effect June 30, 2021.

12    445  New Chapter; Education Freedom Accounts.  Amend RSA by inserting after chapter 194-D

13    the following new chapter:

CHAPTER 194-E

EDUCATION FREEDOM ACCOUNTS

16    194-E:1  Definitions.  In this chapter:

17         I.  "Adequate education grant" means the grant calculated under RSA 198:41.

18         II.  "Curriculum" means the lessons and academic content taught in a specific course,

19    program, or grade level.

20         III.  "Department" means the department of education.

21         IV.  "Education freedom account" or "EFA" means the account to which funds are allocated

22    by the scholarship organization to the parent of an EFA student in order to pay for qualifying

23    education expenses to educate the EFA student under this chapter.

24         V.  "Education service provider" means a person or organization that receives payments from

25    education freedom accounts to provide educational goods and services to EFA students.

26         VI.  "Eligible student" means a resident of this state who is eligible to enroll in a public

27    elementary or secondary school and whose annual household income at the time the student applies

28    for the program is less than or equal to 300 percent of the federal poverty guidelines as updated

29    annually in the Federal Register by the United States Department of Health and Human Services

30    under 42 U.S.C. section 9902(2).  No income threshold need be met in subsequent years, provided the

31    student otherwise qualifies.  Students in the special school district within the department of

32    corrections established in RSA 194:60 shall not be eligible students.

33         VII.  "EFA student" means an eligible student who is participating in the EFA program.

34         VIII.  "Full-time" means more than 50 percent of instructional time.

35         IX.  "Remote or hybrid" shall mean any public school that is not providing instruction in-

36    person where the student or the educator are both not physically present in the traditional

37    classroom due to full-time or part-time classroom closure.

X.  "Parent" means a biological or adoptive parent, legal guardian, custodian, or other person with legal authority to act on behalf of an EFA student.

XI.  "Program" means the education freedom account program established in this chapter.

XII.  "Scholarship organization", means a scholarship organization approved under RSA 77:G, that administers and implements the EFA Act.

194-E:2  Program.

I.  The commissioner of the department of education shall transfer to the scholarship organization the per pupil adequate education grant amount under RSA 198:40-a, plus any differentiated aid that would have been provided to a public school for that eligible student.  The transfers shall be made in accordance with the distribution of adequate education grants under RSA 198:42.

II.  Parents of an EFA student shall agree to use the funds deposited in their student's EFA only for the following qualifying expenses to educate the EFA student:

(a)  Tuition and fees at a private school.

(b)  Tuition and fees for non-public online learning programs.

(c)  Tutoring services provided by an individual or a tutoring facility.

(d)  Services contracted for and provided by a district public school, chartered public school, public academy, or independent school, including, but not limited to, individual classes and curricular activities and programs.

(e)  Textbooks, curriculum, or other instructional materials, including, but not limited to, any supplemental materials or associated online instruction required by either a curriculum or an education service provider.

(f)  Computer hardware, Internet connectivity, or other technological services and devices, that are primarily used to help meet an EFA student's educational needs.

(g)  Educational software and applications.

(h)  School uniforms.

(i)  Fees for nationally standardized assessments, advanced placement examinations, examinations related to college or university admission or awarding of credits and tuition and/or fees for preparatory courses for such exams.

(j)  Tuition and fees for summer education programs and specialized education programs.

(k)  Tuition, fees, instructional materials, and examination fees at a career or technical school.

(l)  Educational services and therapies, including, but not limited to, occupational, behavioral, physical, speech-language, and audiology therapies.

(m)  Tuition and fees at an institution of higher education.

(n)  Fees for transportation paid to a fee-for-service transportation provider for the student to travel to and from an education service provider.

**Amendment to HB 2-FN-A-LOCAL**
**- Page 195 -**

1    (o)  Any other educational expense approved by the scholarship organization.

2    III.  The funds in an EFA may only be used for educational purposes in accordance with
3    paragraph II.

4    IV.  EFA funds shall not be refunded, rebated, or shared with a parent or EFA student in
5    any manner.  Any refund or rebate for goods or services purchased with EFA funds shall be credited
6    directly to the student's EFA.

7    V.  Parents may make payments for the costs of educational goods and services not covered
8    by the funds in their student's EFA.  However, personal deposits into an EFA shall not be permitted.

9    VI.  Funds deposited in an EFA shall not constitute taxable income to the parent or the EFA
10   student.

11   VII.  An EFA shall remain in force, and any unused funds shall roll over from quarter-to-
12   quarter and from year-to-year until the parent withdraws the EFA student from the EFA program or
13   until the EFA student graduates from high school, unless the EFA is closed because of a substantial
14   misuse of funds.  Any unused funds shall revert to the education trust fund established in RSA
15   198:39 and be allocated to fund other EFAs.

16   VIII.  Nothing in this chapter shall be construed to require that an EFA student must be
17   enrolled, full- or part-time, in either a private school or nonpublic online school.

18   IX.  A home education program pursuant to RSA 193-A:5 is terminated upon the
19   commencement of a student's participation in an EFA program.  A parent shall provide notification
20   pursuant to RSA 193-A:5 when a student starts participating in an EFA program.

21   194-E:3  Application for an Education Freedom Account.

22   I.  A parent may apply to the scholarship organization to establish an EFA for an eligible
23   student.  The scholarship organization shall accept and approve applications for the fall and spring
24   semesters each year and shall establish procedures for approving applications in an expeditious
25   manner.

26   II.  The scholarship organization shall create a standard form that parents can submit to
27   establish their student's eligibility for the EFA program and shall ensure that the application is
28   publicly available and may be submitted through various sources, including the Internet.

29   III.  The scholarship organization shall approve an application for an EFA if:

30   (a)  The parent submits an application for an EFA in accordance with application
31   procedures established by the scholarship organization.

32   (b)  The student on whose behalf the parent is applying is an eligible student.

33   (c)  Funds are available for the EFA.

34   (d)  The parent signs an agreement with the scholarship organization:

35   (1)  To provide an education for the eligible student in the core knowledge domains
36   that include science, mathematics, language, government, history, health, reading, writing, spelling,

**Amendment to HB 2-FN-A-LOCAL**
**- Page 196 -**

1  the history of the constitutions of New Hampshire and the United States, and an exposure to and
2  appreciation of art and music.

3         (2)  Not to enroll the eligible student as a full-time student in their resident district
4  public school while participating in the EFA program.

5         (3)  To provide an annual record of educational attainment by:

6         (A)  Having the student take a nationally-standardized, norm-referenced
7  achievement test and to provide the results to the scholarship organization by the end of each school
8  year which the scholarship organization shall make available to the department as aggregate scores;
9  or

10         (B)  Having the student take the statewide student assessment test pursuant to
11  RSA 193-C:6; or

12         (C)  Maintaining a portfolio including, but not limited to, a log which designates
13  by title the reading materials used; samples of writings, worksheets, workbooks, or creative
14  materials used or developed by the student.  The parent shall have a certified teacher or a teacher
15  currently teaching in a nonpublic school, who is selected by the parent, evaluate the student's
16  educational progress upon review of a portfolio and discussion with the parent or student.

17         (4)  To use the funds in the EFA only for qualifying expenses to educate the eligible
18  student as established by the EFA program.

19         (5)  To comply with the rules and requirements of the EFA program.

20      IV.  The signed agreement between the parent and the scholarship organization shall satisfy
21  the compulsory school attendance requirements of RSA 193:1.

22      V.  The scholarship organization shall annually renew a student's EFA if funds are available.

23      VI.  Upon notice to the scholarship organization, an EFA student may choose to stop
24  receiving EFA funding and enroll full-time in a public school.

25      (a)  Enrolling as a full-time student in the resident district public school shall result in
26  the immediate suspension of payment of additional funds into the student's EFA.  However, an EFA
27  that has been open for at least one full school year shall remain open and active for the parent to
28  make qualifying expenditures to educate the student from funds remaining in the EFA.  When no
29  funds remain in the student's EFA, the scholarship organization may close the EFA.

30      (b)  If an eligible student decides to return to the EFA program, payments into the
31  student's existing EFA may resume if the EFA is still open and active.  A new EFA may be
32  established if the student's EFA was closed.

33      194-E:4  Authority and Responsibilities of the Scholarship Organization.  The scholarship
34  organization shall have the following additional duties, obligations, and authority:

35      I. The scholarship organization shall maintain an updated list of education service providers
36  and shall ensure that the list is publicly available through various sources, including the Internet.

**Amendment to HB 2-FN-A-LOCAL**
**- Page 197 -**

II.   The scholarship organization shall provide parents with a written explanation of the allowable uses of EFA funds, the responsibilities of parents, the duties of the scholarship organization, and the role of any financial management firms that the scholarship organization may contract with to administer any aspect of the EFA program.

III.   The scholarship organization shall ensure that parents of students with disabilities receive notice that participation in the EFA program is a parental placement under 20 U.S.C. section 1412, Individuals with Disabilities Education Act (IDEA), along with an explanation of the rights that parentally placed students possess under IDEA and any applicable state laws.

IV.   The scholarship organization shall, in cooperation with the department, determine eligibility for differentiated aid subject to any applicable state and federal laws.

V.   The scholarship organization may withhold from deposits or deduct from EFAs an amount to cover the costs of administering the EFA program, up to a maximum of 10 percent annually.

VI.   The scholarship organization shall implement a commercially viable system for payment of services from EFAs to education service providers by electronic or online funds transfer.

(a)   The scholarship organization shall not adopt a system that relies exclusively on requiring parents to be reimbursed for out-of-pocket expenses, but rather shall provide maximum flexibility to parents by facilitating direct payments to education service providers.  Scholarship organizations may pre-approve requests for reimbursements for qualifying expenses, including expenses pursuant to RSA 194-E:2, II, but shall not disperse funds to parents without receipt that such pre-approved purchase has been made.

(b) A scholarship organization may contract with a private institution or organization to develop the payment system.

VII.   The scholarship organization may also seek to implement a commercially viable system for parents to publicly rate, review, and share information about education service providers, ideally as part of the same system that facilitates the electronic or online funds transfers.

VIII.   If an education service provider requires partial payment of tuition or fees prior to the start of the academic year to reserve space for an EFA student admitted to the education service provider, such partial payment may be paid by the scholarship organization, if funds are available, prior to the start of the school year in which the EFA is awarded and deducted in an equitable manner from subsequent quarterly EFA deposits to ensure adequate funds remain available throughout the school year; but if an EFA student decides not to use the education service provider, the partial reservation payment shall be returned to the scholarship organization by such education service provider and credited to the student's EFA.

IX.  The scholarship organization shall continue making deposits into a student's EFA until:

(a)   The scholarship organization determines that the EFA student is no longer an eligible student.

Amendment to HB 2-FN-A-LOCAL
- Page 198 -

1    (b)   The scholarship organization determines that there was substantial misuse of the
2    funds in the EFA.

3    (c)   The parent or EFA student withdraws from the EFA program.

4    (d)   The EFA student enrolls full-time in the resident district public school.

5    (e)   The EFA student graduates from high school.

6    X.   The scholarship organization may conduct or contract for the auditing of individual EFAs,
7    and shall at a minimum conduct random audits of EFAs on an annual basis.

8    XI.   The scholarship organization may make any parent or EFA student ineligible for the
9    EFA program in the event of intentional and substantial misuse of EFA funds.

10    (a)   The scholarship organization shall create procedures to ensure that a fair process
11    exists to determine whether an intentional and substantial misuse of EFA funds has occurred.

12    (b)   If an EFA student is free from personal misconduct, that student shall be eligible for
13    an EFA in the future if placed with a new guardian or other person with the legal authority to act on
14    behalf of the student.

15    (c)   The scholarship organization may refer suspected cases of intentional and
16    substantial misuse of EFA funds to the attorney general for investigation if evidence of fraudulent
17    use of EFA funds is obtained.

18    (d)   A parent or EFA student may appeal the scholarship organization's decision to deny
19    eligibility for the EFA program to the department.

20    XII.   The scholarship organization may bar an education service provider from accepting
21    payments from EFAs if the scholarship organization determines that the education service provider
22    has:

23    (a)   Intentionally and substantially misrepresented information or failed to refund any
24    overpayments in a timely manner.

25    (b)   Routinely failed to provide students with promised educational goods or services.

26    XIII.   The scholarship organization shall create procedures to ensure that a fair process
27    exists to determine whether an education service provider may be barred from receiving payments
28    from EFAs.

29    (a)   If the scholarship organization bars an education service provider from receiving
30    payments from EFAs, it shall notify parents and EFA students of its decision as quickly as possible.

31    (b)   Education service providers may appeal the scholarship organization's decision to bar
32    them from receiving payments from the EFA to the department.

33    XIV.   The scholarship organization may accept gifts and grants from any source to cover
34    administrative costs, to inform the public about the EFA program, or to fund additional EFAs.

35    XV.   The department shall adopt rules that are necessary for the administration of this
36    chapter.

XVI.  The scholarship organization shall adopt policies or procedures that are necessary for the administration of this chapter.  This may include policies or procedures:

(a)  Establishing or contracting for the establishment of an online anonymous fraud reporting service.

(b)  Establishing an anonymous telephone number for fraud reporting.

(c)  Requiring a surety bond for education service providers receiving more than $100,000 in EFA funds.

(d)  Refunding payments from education service providers to EFAs.

(e)  Ensuring appropriate use and rigorous oversight of all funds expended under this program.

XVII.  The scholarship organization shall not exclude, discriminate against, or otherwise disadvantage any education provider with respect to programs or services under this section based in whole or in part on the provider's religious character or affiliation, including religiously based or mission-based policies or practices.

194-E:5  Parent and Education Service Provider Advisory Commission.

I.  There is established the parent and education service provider advisory commission to assist the scholarship organization by providing recommendations about implementing, administering, and improving the EFA program.

II.  The commission shall consist of 7 members who shall be parents of EFA students or education service providers and shall represent no fewer than 4 counties in the state.  The members shall be appointed by the director of the scholarship organization and serve at the director's pleasure for one calendar year after which they may be reappointed.  The director of the scholarship organization, or designee, shall serve as a non-voting chairperson of the commission.  The commissioner of the department of education, or designee, shall serve as a non-voting member of the commission.

III.  The scholarship organization may request the commission to meet, in person or virtually, to review appeals of education service provider denials pursuant to RSA 194-E:4, XI and to provide a recommendation to the scholarship organization as to whether an education service provider should be allowed to receive, or continue receiving, payments from EFAs.

194-E:6  Requirements for Education Service Providers.

I.  The scholarship organization may approve education service providers on its own initiative, at the request of parents, or by notice to the scholarship organization provided by prospective education service providers.

II.  A prospective education service provider that wishes to receive payments from EFAs shall:

(a)  Submit notice to the scholarship organization that it wishes to receive payments from EFAs.

Amendment to HB 2-FN-A-LOCAL
- Page 200 -

1    (b)  Agree not to refund, rebate, or share EFA funds with parents or EFA students in any
2    manner, except that funds may be remitted or refunded to an EFA in accordance with procedures
3    established by the scholarship organization.

4    (c)  Comply with all state and federal anti-discrimination laws.

5    194-E:7  Independence of Education Service Providers.

6    I.  Nothing in this chapter shall be deemed to limit the independence or autonomy of an
7    education service provider or to make the actions of an education service provider the actions of the
8    state government.

9    II.  Education service providers shall be given maximum freedom to provide for the
10   educational needs of EFA students without governmental control.

11   III.  Nothing in this chapter shall be construed to expand the regulatory authority of the
12   state, its officers, or any school district to impose any additional regulation of education service
13   providers beyond those necessary to enforce the requirements of the EFA program.

14   IV.  Any education service provider that accepts payment from an EFA under this chapter is
15   not an agent of the state or federal government.

16   V.  An education service provider shall not be required to alter its creed, practices,
17   admissions policy, or curriculum in order to accept payments from an EFA.

18   194-E:8  Responsibilities of Public Schools and School Districts.  A public school, or school
19   district, that previously enrolled an EFA student shall provide a private school that is also an
20   education service provider and that has enrolled an EFA student with a complete copy of the ESA
21   student's school records, in a timely manner, while complying with 20 U.S.C. section 1232g, the
22   Family Educational Rights and Privacy Act of 1974.

23   194-E:9  Legal Proceedings.

24   I.  In any legal proceeding challenging the application of this chapter to an education service
25   provider, the state bears the burden of establishing that the law is necessary and does not impose
26   any undue burden on the education service provider.

27   II.  No liability shall arise on the part of the scholarship organization or the state or of any
28   public school or school district based on the award of or use of an EFA pursuant to this chapter.

29   III.  If any part of this chapter is challenged in a state court as violating either the state or
30   federal constitutions, parents of eligible and/or EFA students shall be permitted to intervene as of
31   right in such lawsuit for the purposes of defending the EFA program's constitutionality.  However,
32   for the purposes of judicial administration, a court may require that all parents file a joint brief, so
33   long as they are not required to join any brief filed on behalf of any named state defendant.

34   IV.  If any provision of this chapter, or the application thereof to any person or
35   circumstances, is held invalid, such invalidity shall not affect other provisions or applications of this
36   chapter which can be given effect without the invalid provision or application, and to this end the
37   provisions of this chapter are declared to be severable.

194-E:10 Phase-Out Grants.

    I.  For each school district, the commissioner shall calculate the amount of the reduction in adequate education grants pursuant to RSA 194-E:2, I for each student receiving an EFA under this chapter.  In the first year of the grant reduction, the commissioner shall calculate 50 percent of the reduction for each student and shall disburse that amount to the district as a district funding phaseout grant.  In the second year of the grant reduction, the commissioner shall calculate 25 percent of the reduction for each student and shall disburse that amount to the district as a district funding phase-out grant.  All district funding phase-out grants shall be included in the September 1 disbursement required pursuant to RSA 198:42.

    II.  The phase-out grants will terminate for new EFA students receiving an EFA effective July 1, 2026.

194-E:11  Appropriation From Education Trust Fund.  The amount necessary to fund any grants or transfers of funds authorized under this chapter is hereby appropriated to the department from the education trust fund created under RSA 198:39.  The governor is authorized to draw a warrant from the education trust fund to satisfy the state's obligation under this section.  Such warrant for payment shall be issued regardless of the balance of funds available in the education trust fund.  If the balance in the education trust fund, after the issuance of any such warrant, is less than zero, the comptroller shall transfer sufficient funds from the general fund to eliminate such deficit.  The commissioner of the department of administrative services shall inform the fiscal committee and the governor and council of such balance.  This reporting shall not in any way prohibit or delay the distribution of any grant or transfer of funds authorized under this chapter.

194-E:12  Legislative Oversight Committee Established.  There is established an education freedom savings account oversight committee.

    I. The members of the committee shall be as follows:

        (a)  Two members of the senate, one of whom shall be a member of the majority party and one of whom shall be a member of the minority party, appointed by the president of the senate.

        (b)  Three members of the house of representatives, one of whom shall be a member of the majority party and one of whom shall be a member of the minority party, appointed by the speaker of the house of representatives.

    II.  Members of the committee shall receive mileage at the legislative rate when attending to the duties of the committee.

    III.  The committee shall monitor the implementation of RSA 194-E, including the impact of state education funding to local district schools, and make recommendations for any legislative changes to the education freedom savings account program.

    IV.  The members of the study committee shall elect a chairperson from among the members. The first meeting of the committee shall be called by the first-named senate member.  The first

Amendment to HB 2-FN-A-LOCAL
- Page 202 -

1   meeting of the committee shall be held within 45 days of the effective date of this section.   Three

2   members of the committee shall constitute a quorum.

3       V.   The committee shall submit a report on or before November 30, 2022, and each year

4   thereafter, to the general court including findings, recommendations, and any corrective or technical

5   improvements that the education freedom account program may require.

6       446  Duty of Parent; Compulsory Attendance by Pupil.  Amend RSA 193:1, I(g) and (h) to read as

7   follows:

8           (g)   The pupil has been accepted into an accredited postsecondary education program;

9   [or]

10          (h)   The pupil obtains a waiver from the superintendent, which shall only be granted

11  upon proof that the pupil is 16 years of age or older and has an alternative learning plan for

12  obtaining either a high school diploma or its equivalent.

13              (1)   Alternative learning plans shall include age-appropriate academic rigor and the

14  flexibility to incorporate the pupil's interests and manner of learning.  These plans may include, but

15  are not limited to, such components or combination of components of extended learning opportunities

16  as independent study, private instruction, performing groups, internships, community service,

17  apprenticeships, and on-line courses.

18              (2)   Alternative learning plans shall be developed, and amended if necessary, in

19  consultation with the pupil, a school guidance counselor, the school principal and at least one parent

20  or guardian of the pupil, and submitted to the school district superintendent for approval.

21              (3)   If the superintendent does not approve the alternative learning plan, the parent

22  or guardian of the pupil may appeal such decision to the local school board.  A parent or guardian

23  may appeal the decision of the local school board to the state board of education consistent with the

24  provisions of RSA 21-N:11, III; *or*

25          *(i)   The pupil is enrolled in the education freedom account program pursuant to*

26  *RSA 194-E and is therefore exempt from this requirement*.

27      447  Effective Date.  Sections 445 and 446 of this act shall take effect 60 days after its passage.

28      448  Town of Haverhill; Woodsville Fire District.  Amend 1887, 204:3, as amended by 1899,

29  196:2; 1990, 37:1; and 2009, 147:1 to read as follows:

30      SECT. 3.  Said district at each annual meeting shall elect by ballot a moderator, a clerk, one

31  auditor, a treasurer, and three commissioners.  All of said officers shall be elected by a majority vote

32  of all the voters present and voting at the annual meeting.  Said officers shall exercise in relation to

33  district meetings the like powers to those of moderator, clerk, and selectmen of towns.   The

34  commissioners shall have within the district all the powers of the mayor and aldermen of any city

35  respecting highways, sidewalks, and sewers.  They shall control and direct the expenditure of all

36  moneys raised under authority of the district and by the town of Haverhill for expenditure in the

37  district.  They shall have sole authority to appoint a highway surveyor in said district, and in default

1   of such appointment shall themselves perform the duties of that office.   The surveyor or

2   commissioners performing the duties of highway surveyor in the district shall give bond to the town

3   to account for all money coming into their hands, and for the proper care and custody of the property

4   of the town or district which may come into their custody or control, and shall be deemed officers of

5   the town.  Nothing in this act shall be construed to impose any distinct or special liability upon the

6   district respecting highways within its limits.  ***Nothing in this section shall preclude the***

7   ***Woodsville fire district from maintaining the roads within the precinct at its own expense***.

8   Vacancies that may occur in the office of commissioner in the district shall be filled by appointment

9   of the remaining commissioners or commissioner, but any commissioner appointed to fill a vacancy

10  shall hold office only until the next annual district meeting.  Commissioners shall be residents of the

11  district.   [The money appropriated for the distribution of highway funds in the district which is

12  attributable to the town of Haverhill shall be determined by a fraction, the numerator of which shall

13  be the assessed valuation of the properties in the district, and the denominator of which shall be the

14  assessed valuation of the properties in the entire town of Haverhill as determined annually from the

15  town MS-1 form.   The town of Haverhill shall appropriate the percentage represented by such

16  fraction for distribution to the highway fund in care of the Woodsville fire district commissioners.]

17  ***Highway block grant funds shall be distributed in accordance with the department of***

18  ***transportation formula.   Any appropriations to the Woodsville fire district shall be as***

19  ***directed by warrant articles duly voted by the voters present and voting at each annual***

20  ***Haverhill town meeting.***

21      449  Financial Audit Requirement.  No later than one year after the effective date of section 448

22  of this act, the Woodsville fire district shall provide financial audits by a certified public accountant

23  approved by the department of revenue administration that is compliant with generally accepted

24  accounting practices (GAAP), of all funds received from the town of Haverhill and all other sources

25  including state and federal funds, and of all funds expended by the fire district, for each calendar

26  year commencing January 1, 2015 to the effective date of section 448 of this act, as directed by the

27  department of revenue administration.  The department of revenue administration shall approve the

28  scope of the audit and shall receive monthly updates from the certified public accountant and the

29  Woodsville fire district on the status of the audit while it is in progress.  The results of the audit

30  shall be published on the town of Haverhill website within 60 days of delivery by the certified public

31  accountant to the Woodsville fire district and the department of revenue administration.  The audit

32  shall be at the expense of the Woodsville fire district.  Reimbursement of any expenses related to the

33  audit incurred by the department of revenue administration shall be in accordance with the

34  provisions of RSA 21-J:22.  The department of revenue administration may levy a fine of $250 per

35  day against the Woodsville fire district for every day of noncompliance with section 448 of this act

36  beyond one year from the effective date of section 448 of this act.  The commissioner may waive such

1  fine at his or her discretion, subject to the good faith efforts of the Woodsville fire district to comply

2  with all relevant laws and the provisions of section 448 of this act.

3     450  Effective Date.  Sections 448 and 449 of this act shall take effect upon its passage.

4     451  Findings.

5     I.  On March 13, 2020, the governor signed the first declaration of a state of emergency due

6  to COVID-19.  As of January 1, 2021, this order has been extended 14 times.

7     II.  Between March 26, 2020 and June 16, 2020, a "Stay at Home" order had been in-place

8  under the authority of the governor as measure to prevent the spread of COVID-19.  This order

9  included the closing of schools, prohibited gatherings of 10 or more people, and limited business

10  operations that were not considered essential.

11     III.  Between March and August of 2020, 449 New Hampshire business closed temporarily or

12  permanently, with 280 remaining closed.

13     IV.  New Hampshire began "reopening" on May 11, 2020 with restrictions, some of which

14  remain in place today and continue to impact the micro enterprise sector, those businesses with

15  between 1 and 5 employees including the proprietor.  According to the Small Business

16  Administration, Office of Advocacy, there are 25,478 business with between 1-19 employees and

17  101,795 non-employer businesses.

18     V.  It is incumbent upon the state government to take prompt, proactive, and continuing

19  action to protect the economic health of New Hampshire communities through building out the

20  infrastructure and sustainability of micro enterprises.

21     452  New Subdivision; COVID-19 Micro Enterprise Relief Fund.  Amend RSA 12-O by inserting

22  after section 52 the following new subdivision:

23                      COVID-19 Micro Enterprise Relief Fund

24  12-O:53  COVID-19 Micro Enterprise Relief Fund.

25     I.  There is established in the office of the state treasurer a fund to be known as the COVID-

26  19 micro enterprise relief fund.  Notwithstanding RSA 4:45, RSA 4:47, RSA 21-P:43, or any other law

27  to the contrary, to the extent permissible under federal law $1 of any federal funds received by the

28  state in response to the COVID-19 public health emergency shall be deposited into the fund,

29  provided that at no time shall the balance of the fund exceed $1 in any fiscal year.

30     II.  Funds shall be disbursed at the discretion of the commissioner to the 10 New Hampshire

31  regional economic development corporations to be awarded to local or regional micro enterprises.

32  Each regional development corporation shall receive up to $1.  Each regional development economic

33  council shall be authorized to assess an administrative fee up to 10 percent of the funds received

34  through the state to manage this grant program.  Any regional economic development corporation

35  that does not award all of the funds received in grants to local micro enterprises shall return the

36  funds to micro enterprise relief fund at the department of business and economic affairs for

37  redistribution at the discretion of the commissioner.

III.  With each award, an agreement for technical assistance shall be put in place between the regional development corporation, the New Hampshire small business development center, and the micro enterprise to support the implementation of the funds.   18 months after the implementation of the program, the regional economic development councils will prepare and submit reports to the commissioner, that include the number of grants and the amounts, and the use of each grant by the recipient.  The commissioner shall compile these reports and submit a compiled report to the speaker of the house of representatives, the senate president, the house clerk, the senate clerk, the state library, and the governor.

IV.  Regional economic development corporations shall award one-time grants of up to $1 to support one or more areas of need, including development of e-commerce capabilities, upgrading business practices, or maintaining storefront presence.   The regional economic development corporations shall ensure micro enterprises awarded grants pursuant to this subdivision are provided such assistance as may be necessary to support implementation of any grants awarded.

V.  For purposes of this subdivision, "micro enterprise" shall mean an entity with 10 or fewer employees, including any proprietor, that has been in business prior to March 13, 2020, when the governor signed the first declaration of a state of emergency due to COVID-19 and that has demonstrated a financial impact during the COVID-19 public health emergency, such as temporary closure, reduction in workforce, or loss of revenue of 50 percent or greater when compared to the same time period during the previous year.  Financial statements demonstrating losses, closures, or reduction in workforce shall be supplied as part of the application process.

453  New Subparagraph; Application of Receipts; COVID-19 Micro Enterprise Relief Fund. Amend RSA 6:12, I(b) by inserting after subparagraph (364) the following new subparagraph:

(365)  Moneys deposited into the COVID-19 micro enterprise relief fund established in RSA 12-O:53.

454  Purpose Statement.  Independent live venues are important entertainment hubs and economic multipliers for New Hampshire's local economies.  They serve as critical tax bases as employers and tourism destinations and as revenue generators for neighboring businesses such as restaurants, hotels, and retail.  The cultural impact of New Hampshire's independent live venues is difficult to calculate and serves as an important draw for young people to the state.  Unfortunately, these businesses were among the first to close as COVID-19 spread across the country, will likely be the last to reopen, and will take years to recover if they can stay in business at all.  Smaller venues with a capacity of 300 or less are being impacted the most by the COVID-19 economic and public health crisis.  Sections 455-458 of this act provides targeted assistance and long-term planning support and recognizes the importance of independent live venues to New Hampshire's economy.

455  Council on the Arts; Declaration of Policy.  Amend RSA 19-A:1 to read as follows:

19-A:1  Declaration of Policy.  It is hereby found that many of our citizens lack the opportunity to view, enjoy or participate in living theatrical performances, musical concerts, operas, dance and

**Amendment to HB 2-FN-A-LOCAL**
**- Page 206 -**

1   ballet recitals, art exhibits, examples of fine architecture, and the performing and fine arts
2   generally.  It is hereby further found that, with increasing leisure time, the practice and enjoyment
3   of the arts are of increasing importance and that the general welfare of the people of the state will be
4   promoted by giving further recognition to the arts as a vital aspect of our culture and heritage and as
5   a valued means of expanding the scope of our educational programs.  ***It is hereby further found***
6   ***that arts organizations and businesses are important entertainment hubs and economic***
7   ***multipliers for New Hampshire's local economies.  They serve as critical tax bases as***
8   ***employers and tourism destinations and as revenue generators for neighboring businesses***
9   ***such as restaurants, hotels, and retail.  The cultural impact of New Hampshire's creative***
10  ***sector is difficult to calculate and serves as an important draw for young people to the***
11  ***state.***  It is hereby declared to be the policy of the state to join with private patrons and with
12  institutions and professional organizations concerned with the arts to insure that the role of the arts
13  in the life of our communities will continue to grow and will play an ever more significant part in the
14  welfare and educational experience of our citizens.   It is further declared that all activities
15  undertaken by the state in carrying out this policy shall be directed toward encouraging and
16  assisting rather than in any ways limiting the freedom of artistic expression that is essential for the
17  well-being of the arts.

18      456  Council on the Arts; Report.  Amend RSA 19-A:7 to read as follows:

19      19-A:7 Reports.   The council shall make biennial reports to the governor and council.  ***The***
20  ***council's strategic plan and biennial report under this section shall address the activities***
21  ***related to the save our granite stages fund created under RSA 19-A:15.***

22      457  New Subdivision; Council on the Arts; Save Our Granite Stages Fund.  Amend RSA 19-A by
23  inserting after section 14 the following new subdivision:

24                          Save Our Granite Stages Fund

25      19-A:15  Save Our Granite Stages Fund.  There is hereby established the save our granite stages
26  fund, which shall be appropriated for fiscal year 2022 to the New Hampshire state council on the
27  arts for the purpose of providing grants to both non-profit and for-profit live venues that did not
28  receive a grant from the federal Shuttered Venue Operators (SVO) program, which was established
29  by Economic Aid to Hard-Hit Small Businesses, Nonprofits and Venues Act (P.L. 116-260).  The fund
30  shall be nonlapsing and kept separate and distinct from all other funds.  Notwithstanding any other
31  provision of law, $1 of any discretionary federal funds received by the state in response to the
32  COVID-19 public health emergency shall be deposited into the fund.   In addition to state
33  appropriations, the council may accept grants, gifts, and donations for deposit in the fund.

34      458  New Subparagraph; Dedicated Funds; Save our Granite Stages Fund.  Amend RSA 6:12,
35  I(b) by inserting after subparagraph (364) the following new subparagraph:

36                  (365)  Moneys deposited in the save our granite stages fund under RSA 19-A:15.

**Amendment to HB 2-FN-A-LOCAL**
**- Page 207 -**

1    459  Repeal.  RSA 19-A:15 and RSA 6:12, I(b)(365), relative to the save our granite stages fund,

2    as inserted by sections 457 and 458 of this act, respectively, are repealed.

3    460  Effective Date.

4        I. Section 459 of this act shall take effect June 30, 2023.

5        II.  Sections 451 through 458 of this act shall take effect upon its passage.

6    461  Effective Date.  Unless otherwise specified, the remainder of this act shall take effect July 1,

7    2021.

**Amendment to HB 2-FN-A-LOCAL**
**- Page 208 -**

2021-1799s

AMENDED ANALYSIS

This bill:

1.  Requires the judicial branch to reimburse the sheriff's offices for costs of court security and prisoner custody and control, within available funds appropriated by the legislature, and requires remote technology whenever possible.

2.  Makes a transfer of unexpended funds to the state heating system savings account.

3.  Eliminates the bureau of planning and management functions and moves such functions to the division of plant and property.

4.  Establishes the graphic services fund in the department of administrative services.

5.  Consolidates human resources and payroll functions in the department of administrative services.

6.  Repeals the memorandum of understanding with the commissioner of the department of health and human services for the purpose of delineating the functions to be assumed by the department of administrative services.

7.  Extends the date on which an appropriation to the department of administrative services for scheduling software lapses.

8.  Directs the payment of state employee medical benefits payments from the retirement system.

9.  Clarifies the administration of the retirement system of payments made for medical benefits of state retirees.

10.  Enables the supreme court to transfer funds.

11.  Provides for the state to reimburse the sheriff's offices for court security for the biennium.

12.  Enables the sale of the lakes region facility in Laconia.

13.  Requires the commissioner of the department of health and human services to make quarterly reports on the status of estimated Medicaid payments in relation to actual costs.

14.  Suspends congregate housing and services and the foster grandparent program for the biennium ending June 30, 2023.

15.  Establishes the emergency services for children, youth, and families fund and eliminates certain parental reimbursements.

16.  Prohibits the distribution of state funds awarded by the department of health and human services to a reproductive health care facility for provision of abortion services, and prohibits a health care provider from performing an abortion if the gestational age of the fetus is at least 24 weeks unless there is a medical emergency.

**Amendment to HB 2-FN-A-LOCAL**
**- Page 209 -**

17.  Makes an appropriation to the department of health and human services for streamlining agency operations.

18.  Requiring the commissioner of the department of health and human services to submit an amendment to the Centers for Medicare and Medicaid Services to suspend all catastrophic aid payments to hospitals for the biennium.

19.  Enables the department of military affairs and veterans services to provide support for veterans' mental health and preventing social isolation.

20.  Transfers the controlled drug prescription health and safety program to the department of health and human services.

21.  Suspends revenue sharing with cities and towns for the biennium.

22.  Enables the liquor commission to process merchant cards.

23.  Enables the department of education to accept gifts, contributions, and bequests for the New Hampshire scholars program.

24.  Provides for increased education grants to bring the state into compliance with the American Rescue Plan Act of 2021 .

25.  Makes transfers to the education trust fund.

26. Makes an appropriation from the education trust fund to the department of education to fund operating costs for a student data collection and reporting system.

27.  Authorizes expenditures for energy efficient school buses.

28.  Establishes the position of director of intergovernmental affairs in the department of business and economic affairs.

29.  Repeals the bureau of film and digital media.

30.  Suspends the crediting of meals and rooms tax revenue to the division of travel and tourism.

31.  Enables the department of corrections to transfer funds.

32.  Changes the approval threshold for contracts set by the governor and council manual of procedures.

33.  Prohibits the dispersing of sate aid grants for certain new infrastructure projects in the department of environmental services.

34.  Renames the divisions of the office of professional licensure and certification and establishes pharmacy compliance investigator positions within the office.

35.  Makes an appropriation to the New Hampshire Internet crimes against children fund.

36.  Makes an appropriation to the FRM victims recovery fund and removes the prospective repeal of the fund.

37.  Provides for transfer of funds to the revenue stabilization reserve account  based on the most recently completed fiscal biennium.

38.  Makes an appropriation to the department of health and human services for the purpose of funding one-time maintenance of the Medicaid management information system.

39.  Reduces the tax rate of, and in 2027 eliminates, the interest and dividends tax.

40.  Reduces the tax rate of the meals and rooms tax.

41.  Establishes the meals and rooms municipal revenue fund for the distribution of meals and rooms tax revenues by the state treasurer to towns, cities, and places.

42.  Increases the filing threshold for the business enterprise tax and reduces the rate of the tax; and reduces the rate of the business profits tax.

43.  Limits the amount of the credit allowed against overpayment of the business profits tax and the business enterprise tax and establishes a commission to study limiting the business tax credit carry over.

44.  Excludes under the business profits tax the  business income of a taxpayer received by reason of forgiveness of indebtedness issued or created under the federal Paycheck Protection Program (PPP).

45.  Allows the New Hampshire veterans' home to transfer funds within accounting units for the biennium ending June 30, 2023.

46.  Revises the procedure for compensation for loss of agricultural products or livestock due to bears.

47.  Authorizes the department of information technology to fill unfunded positions.

48.  Modifies the composition and operation of the adult parole board and permits remote meetings during a pandemic or other declared state of emergency.

49.  Requires employer pro rata payments to the workers' compensation administration fund to be based on the preceding calendar year ratios and amends the payment of per diems to workers' compensation appeals board members.

50.  Amends the unemployment compensation fund balance necessary to trigger increases or decreases in employer contributions to the fund and repeals the emergency surcharge power of the commissioner of the department of employment security.

51.  Imposes liability on any person who renders any highway unsuitable for public travel, including full and current replacement cost.

52.  Provides that proceeds from a sale that results from money provided by the highway fund for payback of real property purchased with federal funds shall be credited to the department of transportation for the purpose of meeting federal obligations or reimbursing the highway fund for payment of federal obligations.

53.  Adds definitions relating to small unmanned aircraft and small unmanned aircraft systems to the New Hampshire aeronautics act.

54.  Amends an appropriation to the department of transportation for the 2018 fiscal year and provides that it lapse to the highway fund and be expended for the purpose of funding state red list bridge projects.

55.   Establishes a body-worn and dashboard camera fund and makes appropriations; establishes a classified business administrator I position in the department of safety; and establishes a commission to develop recommendations for legislation to establish a single, neutral, and independent statewide entity to receive complaints alleging misconduct regarding all sworn and elected law enforcement officers.

56.   Requires the department of safety, in collaboration with the department of administrative services, to establish standards for radio infrastructure-related hardware, computers, software, related licenses, media, documentation, support and maintenance services.

57.   Establishes within the department of justice an unclassified position of director of diversity and community outreach.

58.   Authorizes the judicial council to request additional funding expenditures for termination of parental rights services that are greater than amounts appropriated in the operating budget.

59.   Moves the governor's scholarship program and fund from the office of strategic initiatives to the college tuition savings plan and authorizes the college tuition savings plan advisory commission to transfer funds between the governor's scholarship fund and the New Hampshire excellence in higher education endowment trust fund.

60.   Transfers the regulation of audiologists and hearing aid dealers to the governing board of speech language pathology.

61.   Establishes the department of energy, to govern energy and utilities matters, and have oversight on matters under the public utilities commission.

62.   Administratively attaches the public utilities commission to the department of energy and makes corresponding changes to existing laws relating to the organization and duties of the public utilities commission to reflect this change.

63.   Transfers certain duties from the public utilities commission to the department of energy.

64.   Adds the commissioner of the department of energy to the New Hampshire site evaluation committee.

65.   Requires that the department of energy advocate for New Hampshire in regional activities concerning competitive electricity suppliers.

66.   Requires that the department of energy require electric and gas utilities to operate an online energy data platform and, in conjunction with the public utilities commission, implement a statewide electric utility restructuring plan.

67.   Requires the bank commissioner to charge the public deposit investment pool for actual costs incurred by the banking department to operate the pool.

68.   Removes the consideration of weighted apportionment factors under the business profits tax from inclusion in the tax expenditure report and includes the regional career and technical education center tax credit.

69.   Allowing the department of employment security to participate in a department of labor information hub to combat fraud and waste.

70.   Establishes and describes a right to freedom from certain types of discrimination based on age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin in public workplaces and education.

71.   Requires violations of the governor's emergency orders regarding the Covid-19 pandemic to be reversed.

72.   Creates a database for animal records; renames animal health certificates as certificates of transfer; authorizes the commissioner of the department of agriculture, markets, and food to transfer money to and from certain funds in order to establish the animal record database and to repay monies transferred from other funds; and establishes a position in the department of information technology for the building and management of the animal records database.

73.   Establishes the dual and concurrent enrollment program in the community college system of New Hampshire and amends the administrative responsibilities for the program.

74.   Makes an appropriation to the community college system of New Hampshire for the dual and concurrent enrollment program.

75.   Increases the limit on the amount of the annual grant for leased space provided to a chartered public school.

76.   Requires the department of education to develop and maintain a 10-year plan for school building grant projects.

77.   Provides that the amount necessary to fund kindergarten adequate education grants shall be appropriated from the education trust fund; authorizes the governor to draw a warrant to eliminate a deficit if the balance in the education trust fund falls below zero; and makes an appropriation to the department of education for fiscal year 2020 kindergarten funding.

78.   Provides that members-at-large are included as representatives of the same town as a deceased member of a school planning committee for the purpose of filling vacancies.

79.   Makes an appropriation to the department of transportation for the highway and bridge betterment program and the acquisition of fleet vehicles.

80.   Makes an appropriation to the department of education for school building aid payments to school districts and suspends the cap on school building aid grants for the biennium ending June 30, 2023.

81.   Reduces the amount of education tax revenue to be raised for the 2023 fiscal year.

82.   Requires the department of health and human services to fund employment-related child care services without a wait list and to provide enrollment-based reimbursement to certain child care providers for the fiscal year ending June 30, 2022 without using general funds.

83.   Makes an appropriation to the department of health and human services to operate the Sununu youth services center and closes the Sununu youth services center in 2023.

84.   Establishes a committee to develop a plan for the closure and replacement of the Sununu youth services center.

85.   Limits further expansion of the closed loop referral system by the department of health and human services pending review of the system by the legislative oversight committee on health and human services.

**Amendment to HB 2-FN-A-LOCAL**
**- Page 213 -**

86.  Allows political subdivisions to treat funds received pursuant to the American Rescue Plan Act of 2021 as unanticipated revenue under RSA 31:95-b.

87.  Established salaries and salary schedules for certain state officers, and classified and unclassified state employees.

88.  Provides that positions in state government which become available as a result of reorganization or downsizing of state government be filled, if possible, by laid off state employees.

89.  Establishes the granite state paid family leave plan.

90.  Establishes procedures and rulemaking for executive branch employee annual leave, sick leave, transfer credit, and terminal pay.

91.  Abolishes classified full-time positions which were vacant prior to July 1, 2018 and remain vacant as of July 1, 2021.

92.  Makes an appropriation to the department of agriculture, markets, and food to fund the cost of care fund; establishes a disease data manager position in the department and makes an appropriation for the position.

93.  Establishes the unclassified position of assistant attorney general in the department of justice.

94.  Creates the National Guard enlistment incentive program and makes an appropriation therefor.

95.  Establishes the positions of director of life and health and director of property and casualty within the insurance department.

96.  Makes an appropriation to the business finance authority to provide grants to regional economic development corporations.

97.  Makes an appropriation to the affordable housing fund.

98.  Makes limitations on the grant in aid program administered by the bureau of trails, division of parks and recreation, in the department of natural and cultural affairs for OHRV trails.

99.  Makes an appropriation to the Hampton Beach area commission for environmental master plan updates.

100.  Appropriates funds to the department of safety for overtime costs at the state forensic laboratory; to the state police for narcotics-related enforcement; and to disburse grants to county and local law enforcement agencies for the purpose of funding overtime costs for county and local law enforcement officers performing law enforcement activities attributable to the substance abuse enforcement program.

101.  Appropriates funds to the fire standards and training and emergency medical services fund for the 2022 and 2023 fiscal years, and to the department of safety, division of fire standards and training and emergency medical services, to fund additional part-time instruction or increase the tuition discount for certain emergency service personnel.

102.  Transfers funds from the general fund to the highway fund.

**Amendment to HB 2-FN-A-LOCAL**
**- Page 214 -**

103.  Appropriates $7,000,000 to the department of transportation for the Conway Bypass right-of-way payback to the federal highway administration.

104.  Directs the commissioner of the department of transportation to remove toll booths on exit 10 in Merrimack.

105.  Appropriates $3,250,000 to the department of transportation for a project in Tilton.

106.  Makes an appropriation to the department of transportation for matching grants.

107.  Extends a prior appropriation to the department of health and human services for child welfare behavioral health services.

108.  Requires that the New Hampshire 10-year mental health plan include a report on implementation of 2019, 44 (SB 14), relative to child welfare.

109.  Establishes positions in the department of health and human services contracts and procurement unit and makes an appropriation for this purpose.

110.  Requires the department of health and human services to implement SNAP health incentive programs and makes an appropriation to the department for this purpose.

111.  Extends the prospective repeal relative to the waitlist for community mental health services.

112.  Adds an exception for rulemaking by the department of health and human services for cost of living adjustments in social security benefits contained within the Social Services Block Grant program.

113.  Continues the suspension of RSA 151-E:18, regarding presumptive eligibility for long-term care home and community-based services, from HB 4, Chapter 346:69 Laws of 2019.

114.  Establishes a committee to study parity in reimbursement among organizations that provide Social Security Act waiver programs.

115.  Makes an appropriation to fund transitional housing beds and to increase rated paid for transitional housing beds, and allows funds appropriated in 2019 to be used to for these purposes.

116.  Restricts a portion of rural health & primary care funding for the state loan repayment program.

117.  Changes the lapse period for certain funds appropriated to the department of health and human services, division of medicaid services and requires such funds to be treated as restricted revenue.

118.  Makes an appropriation to the department of health and human services for the construction of a forensic psychiatric hospital.

119.  Provides that certain waiver/nursing facility funds shall be treated as restricted revenue for funding expenditures for waiver/nursing facilities-county participation.

120.  Provides that the home visiting program shall be available to all Medicaid eligible pregnant women, infants, and families with children up to age one.

121.  Suspends graduate medical education payments for the biennium ending June 30, 2023.

**Amendment to HB 2-FN-A-LOCAL**
**- Page 215 -**

122.   Makes a supplemental appropriation to the department of health and human services for juvenile diversion programs and provides that the department of health and human services shall establish procedures for administration of the state-funded programs.

123.   Requires the commissioner of the department of health and human services to solicit information and to contract with dental managed care organizations to provide dental care to persons under the Medicaid managed care program and makes an appropriation for the dental benefit for 2023 fiscal year.

124.   Limits the home visiting program to available appropriations for the biennium ending June 30, 2023.

125.   Suspends certain income eligibility standards for in-and-out medical assistance for the biennium ending June 30, 2023.

126.   Allows the department of health and human services to accept and expend additional federal funds with the prior approval of the fiscal committee for the Medicaid to schools program.

127.   Makes an appropriation to the department of health and human services to provide grants to senior centers or other organizations serving senior citizens.

128.   Makes an appropriation to the lottery commission for the purpose of paying off the commercial mortgage on the building serving as the lottery commission's headquarters.

129.   Lowers Keno license fees.

130.   Makes an appropriation from the education trust fund to the department of education to fund operating costs for a student data collection and reporting system.

131.   Makes an appropriation to the governor's scholarship fund.

132.   Establishes the education freedom account program which permits the treasurer to transfer adequate education grants, plus any differentiated aid that would have been provided to a public school, to a scholarship organization for disbursement to parents to be used for certain educational purposes; appropriates the funds authorized under this program from the education trust fund; and authorizes the comptroller to transfer funds from the general fund to eliminate any deficit in the education trust fund created by the payment of grants or transfers of funds under the program.

133.   Modifies the law on the operation and funding of the Woodsville fire district and directs that appropriations to the Woodsville fire district shall be as directed by warrant articles duly voted at each annual Haverhill town meeting.

134.   Establishes a COVID-19 micro enterprise relief fund.

135.   Provides for the support and promotion of New Hampshire's live performance industry by the council on the arts.