# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| LOCAL 8027, AFT-NEW HAMPSHIRE, AFL-CIO, RYAN RICHMAN, JOHN DUBE and JOCEYLN MERRILL, teachers in the New Hampshire Public Schools, and KIMBERLY GREEN ELLIOTT and MEGHAN EVELYN DURDEN, parents or guardians of children in the New Hampshire public schools. <br>    Plaintiffs, <br>      v. <br>FRANK EDELBLUT, in his Official Capacity as Commissioner of the DEPARTMENT OF EDUCATION ("DOE"), CHRISTIAN KIM in his Official Capacity as the Chair of the NEW HAMPSHIRE COMMISSION ON HUMAN RIGHTS, and JOHN FOMELLA in his Official Capacity as ATTORNEY GENERAL of the State of New Hampshire. <br>    Defendants. <br>---------------------------------------------------------------------- <br>ANDRES MEJIA, <br>CHRISTINA KIM PHILIBOTTE, and <br>NATIONAL EDUCATION ASSOCIATION-NEW HAMPSHIRE, <br>    Plaintiffs, <br>      v. <br>FRANK EDELBLUT, in his official capacity only as the Commissioner of the New Hampshire Department of Education, <br>JOHN M. FORMELLA, in his official capacity only as the Attorney General of the State of New Hampshire, <br>AHNI MALACHI, in her official capacity only as the Executive Director of the New Hampshire Commission for Human Rights, <br>CHRISTIAN KIM, in his official capacity <br>only as the Chair of the New Hampshire Commission for Human Rights, <br>KEN MERRIFIELD, in his official capacity only as the Commissioner of the Department of Labor, <br>    Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)  Civil No. 1:21-cv-01077-PB |

# PLAINTIFFS' JOINT MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ........................................................................................ ii

INTRODUCTION .................................................................................................... 1

STATEMENT OF FACTS ........................................................................................ 3

    A.    Background and Legislative History ........................................................ 3

    B.    Subsequent Attempts to Clarify and Enforce the Statute........................ 6

STANDARD FOR A MOTION TO DISMISS .......................................................... 9

ARGUMENT ........................................................................................................... 9

    A.    The Statute Fails To Provide People of Ordinary Intelligence a Reasonable Opportunity To Understand The Conduct It Prohibits ......................... 13

        (i)    The First And Second Banned Concepts .................................... 15

        (ii)    The Third And Fourth Banned Concepts................................... 18

    B.    Subsequent Guidance By The Attorney General Does Not And Cannot Cure the Unconstitutionally Vague Terms Of The Statute................................. 21

        (i)    The "Guidance" Documents Carry No Authoritative Weight ................. 22

        (ii)    The "Guidance" Documents Amplify the Ambiguity .............................. 23

    C.    The Statute Independently Violates Due Process Because It Will Be (And Has Been) Arbitrarily and Discriminatorily Enforced.......................... 29

        (i)    The Statute Lacks Any Enforcement Standards or Procedures ............... 29

        (ii)    The Statute Is Already Being Enforced To Cover More Than Anti-Discrimination Concepts.......................................................... 36

    D.    This Court Should Not (and Need Not) Certify Questions to the New Hampshire Supreme Court................................................................... 39

CONCLUSION........................................................................................................ 42

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Arizonans for Official English v. Arizona,*
  520 U.S. 43 (1977)............................................................................................40

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009)...........................................................................................9

*Baggett v. Bullitt,*
  377 U.S. 360 (1964).....................................................................................40, 41

*Bd. of Airport Comm'rs v. Jews for Jesus,*
  482 U.S. 569 (1987).....................................................................................40, 41

*Bouie v. City of Columbia,*
  378 U.S. 347 (1963)...........................................................................................10

*Connally v. General Const. Co.,*
  269 U.S. 385 (1926).....................................................................................10, 13

*Petition of Dunlap,*
  134 N.H. 533 (1991).........................................................................................12

*Gallo Motor Center Corp. v. Mazda Motors of America, Inc.,*
  172 F. Supp 2d 292 (D. Mass. 2001).................................................................27

*Giragosian v. Ryan,*
  547 F.3d 59 (1st Cir. 2008)..............................................................................9

*Grayned v. City of Rockford,*
  408 U.S. 104 (1972)................................................................................ *passim*

*Hess v. Turner,*
  129 N.H. 491 (1987).........................................................................................23

*Hynes v. Mayor of Oradell,*
  425 U.S. 610 (1976)...........................................................................................10

*Ironshore Specialty Ins. Co. v. United States,*
  871 F.3d 131 (1st Cir. 2017)............................................................................26

*Johnson v. United States,*
  576 U.S. 591 (2015)................................................................................ *passim*

*Kolender v. Lawson,*
    461 U.S. 352 (1983)...................................................................................................... *passim*

*Manning v. Caldwell for City of Roanoke,*
    930 F.3d 264 (4th Cir. 2019) ....................................................................................35

*Nat'l Ass'n of Mfrs. v. Dep't of Def.,*
    138 S. Ct. 617 (2018)..................................................................................................2

*Nat'l Org. for Marriage v. McKee,*
    649 F.3d 34 (1st Cir. 2011) ......................................................................................14

*New England Greyhound Lines v. Powers,*
    108 F. Supp. 953 (D.R.I. 1952).................................................................................22

*Perkins v. Bd. of Dirs. of Sch. Admin. Dist.,*
    686 F.2d 49 (1st Cir. 1982).......................................................................................11

*Raleigh & Gaston R. Co. v. Reid,*
    80 U.S 269 (1872).....................................................................................................27

*Rhode Island Med. Soc. v. Whitehouse,*
    66 F. Supp. 2d 288 (D.R.I. 1999), *aff'd*, 239 F.3d 104 (1st Cir. 2001) ..................22

*Santa Cruz Lesbian and Gay Community Center v. Trump,*
    508 F. Supp. 3d 521 (N.D. Calif, Dec. 22, 2020) ........................................... *passim*

*Sessions v. Dimaya,*
    138 S. Ct. 1204 (2018) (Gorsuch, J., concurring)....................................10, 11, 23

*Smith v. Goguen,*
    415 U.S. 566 (1974)..................................................................................................10

*Stenberg v. Carhart,*
    530 U.S. 914 (2000)..................................................................................................22

*U.S. v. Dávila-Reyes,*
    23 F.4th 153 (1st Cir. 2022)................................................................................21, 23

*United States v. Davis,*
    139 S. Ct. 2319 (2019)........................................................................................1, 21, 23

*United States v. Hernandez-Ferrer,*
    599 F.3d 63 (1st Cir. 2010).......................................................................................27

*United States v. Isaacson,*
    No. 09-cv-332-JL, 2011WL 2783993 (D.N.H. July 15, 2011)................................9

*United States v. Reese*,
    92 U.S. 214 (1875)...................................................................................................29

*VAMOS, Concertación Ciudadana, Inc. v. Puerto Rico*,
    494 F. Supp. 3d 104 (D.P.R. 2020)........................................................................23

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*,
    455 U.S. 489 (1982)...............................................................................................11

*Vt. Right to Life Comm. v. Sorrell*,
    221 F.3d 376 (2d Cir. 2000)...................................................................................41

*Warburton v. Thomas*,
    136 N.H. 383 (1982).................................................................................................5

**Statutes**

N.H. Rev. Stat. § 189:11 ...............................................................................................15

N.H. Rev. Stat. § 193:38 ...............................................................................................12

N.H. Rev. Stat. § 193:40 ......................................................................................*passim*

N.H. Rev. Stat. § 354-A:1 .............................................................................................12

N.H. Rev. Stat. § 354-A:21 ...........................................................................................30

N.H. Rev. Stat. § 354-A:27 ...........................................................................................12

N.H. Rev. Stat. § 354-A:28 ...........................................................................................12

N.H. Rev. Stat. § 354-A:29 ...............................................................................1, 28, 31

N.H. Rev. Stat. § 354-A:30 .............................................................................................1

N.H. Rev. Stat. § 354-A:31 ...................................................................................*passim*

N.H. Rev. Stat. § 354-A:32 ...................................................................................*passim*

N.H. Rev. Stat. § 354-A:33 ...................................................................................*passim*

N.H. Rev. Stat. § 354-A:34 .............................................................................................1

**Other Authorities**

Alexander LaCasse, "*Divisive concepts ban is NH law.  Will it affect the way
    teachers do their jobs?" Portsmouth Herald*, (July 9, 2021), *available at*
    https://www.seacoastonline.com/story/news/local/2021/07/10/new-hampshire-
    education-divisive-concepts-ban-nh-law-affects-schools/7915398002/...................7

Eileen O'Grady, "*N.H lawmakers debate banning schools from teaching about systemic racism and sexism*," Concord Monitor, February 18, 2021 .......................................4

Frank Edelblut, "*Education's Sacred Trust*,".(Apr. 15, 2022), https://www.education.nh.gov/news/educations-sacred-trust...................................................38

Governor's Advisory Council on Diversity and Inclusion Letter to the Governor, dated June 2, 2021, *available at* https://www.governor.nh.gov/sites/g/files/ehbemt336/files/inline-documents/sonh/gacd-hb-2-letter-to-governor.pdf ..................................................14

Merriam-Webster's Collegiate Dictionary (10 ed.), available at https://www.merriam-webster.com/dictionary/creed?utm_campaign=sd&utm_medium=serp&utm_source=jsonld..................................................................................17

*New Hampshire Opinion of the Justices*, 126 N.H. 490 (1985) ......................................5

Opinion of the Attorney General No. 92-6, 1992 WL 31636 (N.H.A.G.).......................5

*Portsmouth Herald* (July 9, 2021), *available at* https://www.seacoastonline.com/story/news/local/2021/07/10/new-hampshire-education-divisive-concepts-ban-nh-law-affects-schools/7915398002/...................................7

Sarah Gibson, "*N.H.'s top education official accuses teachers of 'knowingly dismantling' family values,"* NHPR, Apr. 21, 2021, https://www.nhpr.org/nh-news/2022-04-21/new-hampshires-top-education-official-accuses-teachers-of-knowingly-dismantling-family-values ......................................................8

Senate Finance Committee, May 27, 2021 HB2 Deliberations (at 27:13), https://www.youtube.com/watch?v=0AbLc51xKrU .................................................7

Plaintiffs in the first above-captioned action (the "AFT Plaintiffs" or the "AFT action") and Plaintiffs in the second above-captioned action (the "Mejia Plaintiffs," or "Mejia action") each filed separate complaints in this consolidated action seeking declaratory and injunctive relief challenging the provisions of New Hampshire sections 297 and 298 of 2021 House Bill 2 ("HB2"), codified at N.H. Rev. Stat. Ann. ("RSA") 354-A:29, RSA 354-A:30, RSA 354-A:31, RSA 354-A:32, RSA 354-A:33, RSA 354A:34, and RSA 193:40.  These provisions, enacted on June 25, 2021, are known as the "Banned Concepts Act" or "Divisive Concepts Act" (herein referred to as the "Statute").[1]

Each Complaint challenged the Statute as void for vagueness under the Fourteenth Amendment's Due Process Clause.  The AFT Complaint has additional counts, including a challenge to the Statute predicated on abridgment of the First Amendment.  In consolidating the proceedings on consent, the Court urged Plaintiffs to avoid repetition to the extent possible.  This joint submission addresses Defendants' motion to dismiss Plaintiffs' void for vagueness challenge, as pled in the Mejia Complaint and under Count I of the AFT Complaint.

## INTRODUCTION

The law respecting void for vagueness is clear: A "vague law is no law at all." *United States v. Davis,* 139 S. Ct. 2319, 2323 (2019). When presented with such a law, the role of this Court "is not to fashion a new, clearer law to take its place, but to treat the law as a nullity and invite [the legislature] to try again." *Id.*

The Statute challenged here has all of the hallmarks of an impermissibly vague law. It fails to give a person of ordinary intelligence a reasonable opportunity to know what is

---

[1] On March 8, 2022, this Court issued an order, on consent of all parties, to consolidate the *Local 8027, AFT-New Hampshire, AFL-CIO et al v. Frank Edelblutt, et al.*, before Judge Laplante and the *Andres Mejia et al v. Frank Edelblut et al.* actions into a single proceeding before this Court in the interests of judicial economy.

prohibited; it invites arbitrary and discriminatory enforcement; and it tramples upon important freedoms and protections of those who must attempt to comply with it. *See Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972).  Here, these aspects of the Statute are not an accident. They are in many ways the very purpose of the Statute's enactment: to make educators fearful and uncertain in the performance of their jobs, as well as to drive certain viewpoints and ideas (and in some cases, even certain books) from the marketplace of ideas—all while maintaining a veneer of plausible deniability.

The Defendants' motion to dismiss exemplifies the last part of this strategy by calmly assuring the Court that the Statute does next-to-nothing, that the statements of the very legislators who passed the Statute trumpeting its censorious effects can be ignored, that the frantic and clumsy efforts of regulators to make sense of the law should be reassuring, and that everything that educators fear teaching in light of the Statute's vague text is completely untouched.  In the process, Defendants scarcely mention the implications of the Statute's enforcement mechanism, which not only threatens to impose revocation of an educator's teaching certificate—a career "death penalty"—but also requires educators to inform on their colleagues for suspected violations lest they face the same penalty.  Most troubling, it empowers private parties with no nexus to specific students or schools to file formal complaints and initiate suit.  In sum, it places a target on the back of every teacher and, as averred in the challenged pleadings and shown below, has already encouraged politically incentivized "bounty hunters" and other groups to target teachers.  *See, e.g.*, AFT Compl. ¶¶ 6-10; Mejia Compl. ¶¶ 139-144.

What Defendants never get around to saying is what the Statute actually *prohibits*. It is a cardinal rule that statutes are not meant to be meaningless.  *See Nat'l Ass'n of Mfrs. v. Dep't of Def.*, 138 S. Ct. 617, 632 (2018).  And yet Defendants cannot identify a single course, a single

book, or a single concept currently taught in New Hampshire schools that exemplifies the problem supposedly addressed by the Statute. Why not? Because once they do, the game is up. It will become clear to this Court that identifying what may be banned and punished under the Statute is subject to the standardless, subjective and political whims of regulators.

This Court should deny the Defendants' motion to dismiss. Once this case enters discovery, and the mechanisms for the Statute's interpretation and political enforcement are exposed, the Statute's unconstitutional vagueness will become even more readily apparent.

## STATEMENT OF FACTS

### A.     *Background and Legislative History*

On December 22, 2020, a federal court issued a nationwide preliminary injunction barring enforcement of a Presidential Executive Order prohibiting workplace training implicating a sweeping list of "divisive concepts" and conditioning federal funding on certification that the recipient would not use the funds to promote "divisive concepts." *Santa Cruz Lesbian and Gay Community Center v. Trump*, 508 F. Supp. 3d 521 (N.D. Calif, Dec. 22, 2020) (hereinafter "*Santa Cruz*"). The Executive Order followed the President's establishment of the "1776 Commission," a group created to oppose Critical Race Theory, the New York Times' 1619 Project, and Howard Zinn's *A People's History of the United States*.  AFT Compl. ¶ 27; Mejia Compl., Ex. 6.  In effect, the Executive Order sought to restrict speech about systemic racism, sexism, implicit bias, and other topics that shed light on race and gender in the United States. Mejia Compl. ¶ 63.  The *Santa Cruz* court squarely rejected that Presidential effort to censor content, finding that the Executive Order was "void for vagueness" and "chilled free speech," warranting injunctive relief.  *Santa Cruz*, 508 F. Supp. 3d at 539.

The nationwide injunction and accompanying ruling ignited a storm of protest from the President's supporters, who, within days, pressed like-minded state legislatures in various states

to enact legislation proscribing the same "divisive concepts," both as to workplace training and education.  AFT Compl. ¶¶ 28-30.  Substantially similar measures to those challenged in *Santa Cruz*, particularly relating to educational curricula, were promptly proposed in a variety of states, including New Hampshire, and a number of variations were thereafter enacted.  *See* Mejia Compl. ¶ 65.  This proceeding seeking injunctive and declaratory relief challenges the New Hampshire version.

Shortly following the *Santa Cruz* decision and nationwide injunction, New Hampshire House Bill 544 ("HB544") was introduced on January 12, 2021, as one of several orchestrated "retributive" or "corrective" measures.  *See* Filed Legislative History of HB544 at 0002. Lacking the support of Governor Sununu, who had publicly threatened to veto the bill if enacted (*see* Filed Legislative History of HB544 at 0425-26) the measure—which was approved by the House Executive Departments and Administration Committee on March 4, 2021—was later tabled by the House of Representatives on April 6, 2021, after being inserted into the House's proposed budget at around the same time.  *See* AFT Compl. ¶ 79; Mejia Compl.69.

HB544 defined and prohibited the dissemination of "divisive concepts" in much the same way as the Executive Order enjoined by *Santa Cruz*.  It prohibited the teaching of so-called "divisive concepts" in all state/local agencies and threatened to financially penalize anyone who taught the exceedingly ambiguous universe of supposed "divisive concepts."  Disingenuously framed under the banner of national "unity," the bill's chief sponsor unapologetically indicated at the legislative hearing that he did not believe in systemic racism and likened individuals who conduct diversity and inclusion trainings to "snake oil salesman."  Eileen O'Grady, "*N.H. lawmakers debate banning schools from teaching about systemic racism and sexism*," Concord Monitor, February 18, 2021.  The chief sponsor further argued that this legislation was necessary

to address "critical race theory" and, more specifically, to ban certain "diversity training or inclusion training[s]" that "propose to cure a disease but in actuality it's even making it worse." *See* Mejia Compl. ¶¶ 67; *see also id.* at ¶ 70 (another legislator explained that the legislation was needed to address, for example, a staff training in a school district that referenced "white privilege," as well as programs at one New Hampshire university where employers and managers discussed "unconscious bias").  The text of the proposed law, for example, banned any form of "race or sex scapegoating" and any other teaching concept that "[a]ny individual should feel discomfort, guilt, anguish, or any other form of psychological distress on account of his or her race or sex."  *See* Filed Legislative History of HB544 at 0005, 06 (HB544 as introduced).

Meanwhile, the 2022-23 State Biennial Budget had to be adopted before the new fiscal year, otherwise state operations would cease.  *See* AFT Compl. ¶ 80.  Governor Sununu was on record stating that the "divisive concepts" had to be included in the Budget Bill (HB2) to get sufficient House votes to pass HB1 (the Budget measure).  *See* AFT Compl. ¶ 80.[2]  In late May 2021, with the deadline for adopting the Budget Bill looming as the Senate was considering the House's proposed budget containing HB544, a last-minute *quid pro quo* solution suddenly "materialized" to avoid a shutdown of State operations under which HB544's provisions were salvaged for inclusion in the HB2 Budget trailer and expanded upon.  *See* AFT Compl. ¶¶ 80-81; Mejia Compl. ¶ 72.  The full Senate approved the change on June 3, 2021, which ultimately became law on June 25, 2021 following the Governor's signature approving HB2.  *See* Filed Legislative. History of HB2 at 968973, 997-1001 (Senate version).

---

[2] By way of background only, *see* Opinion of the Attorney General No. 92-6, 1992 WL 31636 (N.H.A.G.); *New Hampshire Opinion of the Justices*, 126 N.H. 490 (1985); *Cf. Warburton v. Thomas*, 136 N.H. 383, 394-399 (1982). Presciently, the New Hampshire Constitution (N.H. Const. Pt. 2, arts. 3, 18-a) bars such amendments or footnotes from last minute inclusion in "all sections of all budget bills" recognizing that they are a vehicle for deception.  *See id* at art. 18-a.

Artfully cast in high-minded but deliberately ambiguous terms, the eleventh-hour enactment of the Teaching Discrimination Statute as part of HB2 in the Senate was trumpeted as an "anti-discrimination" measure and captioned "193:40 Prohibition on Teaching Discrimination."  The revised language was then joined with the Contemporaneous Amendments, ("354-A:29 Right to Freedom from Discrimination in Public Workplaces and Education," "354-A:31 Prohibition on Public Employers," "354-A:33 Protection for Public Employees," and "354-A:34 Remedies"), into a single Bill (HB2) which not only impacted schools, but all local and state agencies (police departments, prosecutorial trainings, etc.).  But the drafters of this new version in the Senate could not conceal its origins.  The four banned concepts in this new version were functionally identical to four of the ten "divisive concepts" in the House's version of HB544 in HB2, as well as in the Presidential Executive Order that were later enjoined in *Santa Cruz* on vagueness grounds.  And the Senate's version went even further to expand the law's scope to not just include "race and sex" covered in HB544 and the Presidential Executive Order, but also "age, . . . gender identity, sexual orientation, . . . creed, color, marital status, familial status, mental or physical disability, religion or national origin." *See, e.g.*, RSA 354-A:32.  The Senate also added more draconian penalty provisions specifically targeting certified educators by mandating that violations of the law *shall* be punishable under the Educator Code of Conduct, even if the violation was inadvertent or negligent.  *See* RSA 193:40, IV; Mejia Compl. ¶ 73.  The end result was a redundant, unworkable and purposefully ambiguous measure that impermissibly censors what teachers may teach and students can learn.

B.    *Subsequent Attempts to Clarify and Enforce the Statute*

Following the Statute's enactment, Defendants repeatedly validated Plaintiffs' vagueness concerns with unsuccessful attempts to clarify it.  Defendants made three distinct attempts to explain the Statute following significant criticism from educators, advocates, and the media

concerning the Statute's vagueness and its chilling effect on instruction and free speech rights.[3]

When two highly-publicized July 2021 Guidance FAQs issued by Defendants failed to stem the

tide of criticism and confusion, *see* Mejia Compl., Ex. 19, the Attorney General on September 7,

2021 issued his one and only formal Opinion of that year, expressly acknowledging that many

citizens still "*voiced concerns that these new statutes are confusing and that public employers*

*and schools will struggle to understand the scope of the new prohibitions*."  *See* Mejia Compl.,

Ex. 20 (Opinion No. 2021-01 of the Attorney General) (emphasis added).  Respectfully, the

above-quoted damning admission of the Attorney General says it all, especially on this early-

stage motion to dismiss.

  To be clear, notwithstanding this admission of the Statute's confusing nature and the

labeling of the Statute as an "anti-discrimination" law, several of the bill's supporters outlined

their view that, like HB544 and the Presidential Executive Order enjoined in *Santa Cruz*, the

Statute was intended to implicate instruction related to race, diversity, and inclusion.  For

example, when the Senate version was introduced to the Senate Finance Committee on May 27,

2021, supporter Senator Bob Giuda made clear that "[I]t is designed . . . to ensure that the minds

of the future generations of our state are not being unduly influenced by advocacy for such toxins

as critical race theory."[4]

---

[3] *E.g.*, Alexander LaCasse, "*Divisive concepts ban is NH law.  Will it affect the way teachers do their jobs?*" *Portsmouth Herald*, (July 9, 2021), *available at* https://www.seacoastonline.com/story/news/local/2021/07/10/new-hampshire-education-divisive-concepts-ban-nh-law-affects-schools/7915398002/.

[4] Senate Finance Committee, May 27, 2021 HB2 Deliberations (at 27:13), https://www.youtube.com/watch?v=0AbLc51xKrU.  Statements from at least one prominent supporter after the enactment of the challenged law further confirm the Statute's intended scope to impact diversity, equity, and inclusion instruction.  During the January 11, 2022 testimony of Chairman of the House Education Committee Rick Ladd on a bill designed to expand the challenged law to public colleges, he explained the Statute's intended scope, critiqued "critical race theory," and noted that "any instructor aligning and communicating one's own vision of race's relations with a national narrative that use diversity and inclusion as its platform is unacceptable." https://www.youtube.com/watch?v=BnurMJaLYJU (starting at 4:54:04).

But, aside from public posturing, Defendants have been unwilling or unable to answer basic questions about whether *specific texts* are prohibited under the Act—a tactic that has the effect of maximizing the law's chill.  *See* Mejia Compl. ¶¶ 121-22, Ex. 18 (NEA-NH letters). And, despite having the authority to do so, the Human Rights Commission has declined to release to the public and educators the details of any complaints in which the Commission has concluded that there was no violation—details which would help educate teachers as to what Defendants believe is prohibited under the Act.  In short, Defendants have deliberately chosen to leave educators in the dark.  In all of this uncertainty, political groups such as "Moms for Liberty" have filled the void of enforcement, publicly offering a $500 "bounty" to any individual offering information concerning a teacher's violation of the new law.  *See* AFT Compl. ¶ 45.

Further, the Department of Education—as one of *five* bodies that has *independent* enforcement authority under the law (along with the state courts, the Department of Justice, Human Rights Commission, and Department of Labor)—has apparently elected to conduct its own investigations under the Statute.[5]  This independent enforcement of the Educator Code of Conduct by the Department of Education is consistent with (and mandated by) its own administrative rules, *see infra* note 18, and is inconsistent with Defendants' representation that the Department of Education can only take action after the Human Rights Commission makes "a finding of discrimination."  *See* Mov. Br. at 34.  Discovery is needed to investigate how this diffusion of responsibility compounds the law's arbitrary and discriminatory enforcement.  *See, e.g.,* AFT Compl. ¶ 9; Mejia Compl. ¶¶ 34, 147.

---

[5] Sarah Gibson, "*N.H.'s top education official accuses teachers of 'knowingly dismantling' family values,"* NHPR, Apr. 21, 2021 ("But the Department of Education continues to investigate when parents email or call with complaints about classroom curriculum and teacher bias. In some cases, parents report concerns directly to the Department of Education after having attempted to contact teachers and administrators. Other times, they go straight to Edelblut, who has made a habit of sharing his cell phone number with parents."), https://www.nhpr.org/nh-news/2022-04-21/new-hampshires-top-education-official-accuses-teachers-of-knowingly-dismantling-family-values.

## STANDARD FOR A MOTION TO DISMISS

To survive a motion to dismiss under Rule 12(b)(6), a complaint must make factual allegations sufficient to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. "In analyzing whether dismissal is appropriate, the court must accept as true all well-pleaded facts set forth in the complaint and must draw all reasonable inferences in the plaintiff's favor." *United States v. Isaacson*, No. 09-cv-332-JL, 2011 WL 2783993, at *1 (D.N.H. July 15, 2011) (Laplante, J.) (citing *Tasker v. DHL Ret. Sav. Plan*, 621 F.3d 34, 38 (1st Cir. 2010)). Under Rule 12(b)(6), this Court may consider "facts and documents that are part of or incorporated into the complaint," as well as "documents incorporated by reference in [the complaint], matters of public record, and other matters susceptible to judicial notice." *Giragosian v. Ryan*, 547 F.3d 59, 65 (1st Cir. 2008) (citations omitted).

## ARGUMENT

An enactment is void for vagueness if its "prohibitions are not clearly defined." *Grayned*, 408 U.S. at 108. A statute can be impermissibly vague for either of several independent reasons, including failure to "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly" and "if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them." *Id*. (internal citations omitted). Of these requirements, Justice O'Connor observed for the Court in *Kolender v. Lawson*, "the more important aspect of vagueness doctrine is . . . the requirement that a legislature establish minimal guidelines to govern law enforcement." 461 U.S. 352, 358 (1983) (quoting *Smith v. Goguen*, 415 U.S. 566, 574 (1974)) (internal

quotation marks omitted).  Thus, even a law that is not formally vague may violate due process if it is too easily susceptible to abuse by government officials.  In sum, "[a]s one court put it, all laws ought to be expressed in such a manner as that its meaning may be unambiguous, and in such language as may be readily understood by those upon whom it is to operate." *Sessions v. Dimaya*, 138 S. Ct. 1204, 1226 (2018) (Gorsuch, J., concurring) (quoting *McConvill v. Mayor and Aldermen of Jersey City*, 39 N.J.L. 38, 42 (1876)) (internal quotation marks and citations omitted); *see also Smith v. Goguen*, 415 U.S. at 573.6

Though the existence of protected speech is not a requirement for the applicability of the vagueness doctrine, where—as argued in AFT's contemporaneous filing—speech and expression are implicated, "[t]he general test of vagueness applies with particular force."  *Hynes v. Mayor of Oradell*, 425 U.S. 610, 620 (1976); *see also Smith v. Goguen*, 415 U.S. at 573.  This is because "[u]ncertain meanings inevitably lead citizens to steer far wider of the unlawful zone than if the boundaries of the forbidden areas were clearly marked."  *Grayned*, 408 U.S. at 109.

Notably, Defendants recite the relevant "vagueness" principles but argue that the Statute should enjoy a "more tolerant" standard of review because the statute is civil, not criminal and that it must be vague in all of its applications to be constitutionally infirm.  *See* Mov. Br. at 22 (citing *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498-99 (1982)).  Defendants are wrong.

---

6 The Supreme Court has frequently concluded that certain terms in common usage are vague and their inclusion voids the relevant law. *See, e.g.*, *Johnson v. United States,* 576 U.S. 591 (2015) ("conduct that presents a "serious potential risk of physical injury to another" held void for vagueness*"); *Kolender v. Lawson*, 461 U.S. 352 (1983) ("credible and reliable" held void for vagueness); *Smith v. Goguen,* 415 U.S. 566 (1974) (Massachusetts' "contemptuous" treatment of flag statute held void for vagueness); *Connally v. General Const. Co.*, 269 U.S. 385 (1926) ("*locality*" for purposes of determining prevailing wages); *Bouie v. City of Columbia*, 378 U.S. 347 (1963). Any number of terms of common usage in the Statute have ambiguous and uncertain meanings in the law, as discussed *infra* at Part A, particularly in the classroom setting.

First, as Justice Gorsuch observed in his concurrence in *Sessions*, historical analysis of the void for vagueness doctrine demonstrates that the vagueness precept has long been applied equally in civil and criminal contexts since "civil laws regularly impose penalties far more severe than those found in many criminal statutes." *Sessions*, 138 S. Ct. at 1228-31.  These civil penalties include, like those in the challenged Statute here, "remedies that strip persons of their professional licenses and livelihoods"—livelihoods for which there is also a property interest protected under the Fourteenth Amendment's Due Process Clause where state law provides a process for termination or decertification. *See id*. at 1229; *Perkins v. Bd. of Dirs. of Sch. Admin. Dist*., 686 F.2d 49, 52 (1st Cir. 1982).

Second, in *Johnson v. United States*, 576 U.S. 591, 602-03 (2015), decided decades after *Village of Hoffman*, the Supreme Court rejected *Village of Hoffman*'s premise, namely, that "[t]o succeed [on a vagueness claim] . . . the complainant must demonstrate that the law is impermissibly vague in all of its applications. . . ." *Village of Hoffman*, 455 U.S. at 497 (emphasis added). To quote Justice Scalia's majority opinion in *Johnson*, "our holdings squarely contradict the theory that a vague provision is constitutional merely because there is some conduct that clearly falls within the provision's grasp."  576 U.S. at 602.  As the Court held, "[i]t seems to us that the dissent's supposed requirement of vagueness in all applications is not a requirement at all, but a tautology: If we hold a statute to be vague, it is vague in all its applications. . . ." *Id*. at 603.

Aside from advocating for a less vigorous vagueness standard that is inconsistent with case law, Defendants fail to distinguish, discuss or even cite to the most applicable recent vagueness decision, *Santa Cruz*, with statutory language that is virtually identical in key respects

11

to the Statute.  As in *Santa Cruz*, the banned concepts here are "so vague that it is impossible for

Plaintiffs to determine what conduct is prohibited."  *Santa Cruz*, 508 F. Supp. 3d at 539.

Some of the confusion deliberately baked into the Statute stems from the fact that the

Statute purports to be aimed at banning discrimination.  But discrimination against suspect

classes is already illegal under New Hampshire law, including the proscription against

discrimination in the classroom. Thus, New Hampshire law has long demanded, including

through a recent 2019 law, that discrimination be barred from New Hampshire's public schools,

mandating instead that schools and education are neither the vehicles for nor a means by which

discrimination may lawfully be advanced.  RSA 354-A:27 unequivocally bars:

> [D]iscrimination in public schools because of . . . age, sex, gender
> identity, sexual orientation, race, color, marital status, familial
> status, disability, religion, or national origin.

RSA 354-A:27.  Indeed, a statutory mechanism has already long been in place to address claims

of discriminatory conduct and content in a public-school context. *See* RSA Chapter 354-A; RSA

354-A:28; RSA 193:38; *Petition of Dunlap,* 134 N.H. 533, 539 (1991).[7]  The Statute cannot

honestly be construed in harmony with existing non-discrimination laws without an

interpretation and recognition that there is clearly additional, politically-driven content that the

Legislature intended to proscribe.  *See also* AFT Opposition Brief, Point I.

The Statute suffers from the same constitutional defects as in *Santa Cruz*.  It casts a chill

on Plaintiffs' instruction through ambiguous and unworkable language that fails to put Plaintiffs

on notice of precisely what is barred under the Statute.  Defendants' efforts to cure the Statute's

vagueness with three separate, subsequently issued guidance documents only amplifies the

---

[7] Discrimination against students by educators is also already a violation of the Educator Code of Conduct.  *See*
N.H. Code Admin. R. Ed ("Ed"). 510.02(b)(1) ("Unprofessional conduct shall include, but not be limited to . . .
Discrimination against a student as specified in RSA 354-A:1").

ambiguity.  The Statute is also void for vagueness on the independent ground that its arbitrary enforcement inappropriately jeopardizes New Hampshire educators' livelihood and ability to teach and work by reason of its lack of clarity.

### A. The Statute Fails To Provide People of Ordinary Intelligence a Reasonable Opportunity To Understand The Conduct It Prohibits

The Statute is unconstitutionally vague on its face because it fails to provide fair notice of what educators can and cannot include in their courses.  Where, as here, a vague law is open to multiple interpretations or people may disagree on its meaning, the law's constitutionality is undermined since what matters is whether people of reasonable intelligence *agree* on its meaning. *See Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391 (1926) (a law must be "sufficiently explicit to inform those who are subject to it what conduct on their part will render them liable to its penalties," as opposed to being "so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application").  Defendants' main argument is that the statutory text "coupled with" subsequently issued guidance documents provides sufficient clarity. *See* Mov. Br. At 3.  Yet, that heavy reliance on material outside the text of the law underscores how the Statute's text itself fails to provide ordinary people of reasonable intelligence fair notice of what is prohibited.  *See Johnson,* 576 U.S. at 598-99.

In one such guidance document, the Attorney General recognizes that the public is legitimately confused about the text of the Statute's meaning.  *See* AFT Compl. ¶ 53; Mejia Compl., Ex. 20 at 1.  The Attorney General's Opinion opens with the following significant acknowledgment:

> Some have voiced concerns that these new statutes are confusing and that public employers and schools will struggle to understand the scope of the new prohibitions.

*See* Attorney General Opinion, at 1 (citing *Governor's Advisory Council on Diversity and Inclusion,* dated June 2, 2021); *see also* Mejia Compl., Ex. 17 at 5 (June 2, 2021 Advisory Council letter to Governor noting that various provisions create "confusion over what is permitted and what is prohibited").  Importantly, the Governor's Advisory Council—the State entity charged with advising the Governor on addressing discrimination—concluded that HB2 was "ambiguous and contradictory" and likely to censor New Hampshire schools.[8]  That these presumably sophisticated and intelligent Gubernatorial appointees recognized, in the Attorney General's words, the "confusion" wrought by the Statute and thought the law was "ambiguous" speaks volumes.  After all, it is fundamentally unfair to punish "ordinary citizens" who do not, and cannot, have reasonable warning as to what is prohibited by the Statute, especially where those responsible for guiding executive action proclaim it to be confusing.  *See Nat'l Org. for Marriage v. McKee*, 649 F.3d 34 (1st Cir. 2011).  Indeed, ten Advisory Council members resigned in protest against enactment of the Statute. *See* Mejia Compl., ¶ 79; *see id.*; Ex. 17.

The vague provisions of the Statute leave Plaintiffs with an unconstitutional Hobson's choice: either avoid important topics in classroom discussions and instructions related to race, gender, gender identity, sexual orientation, and disability—including topics like systemic racism and even current events, such as the oppression of the Ukrainian people—or risk losing their licenses and livelihoods for violating the Statute. *See* AFT Compl. ¶ 38.

This forced and impossible decision is neither theoretical nor inconsequential.  *See* AFT Compl. ¶¶ 7, 9-11.  Consider the quandary faced by social studies teachers just *this week* confronted with student questioning after the contemporary racism-fueled massacre in Buffalo

---

[8] Mejia Compl., Ex. 17 (Governor's Advisory Council on Diversity and Inclusion Letter to the Governor, dated June 2, 2021, *available at*  https://www.governor.nh.gov/sites/g/files/ehbemt336/files/inline-documents/sonh/gacd-hb-2-letter-to-governor.pdf).

on May 14, 2022.  Teachers may be asked "why did the shooter believe he was superior to the

victims?" "What is white supremacy, what are its origins, and what are the arguments advanced

for and against it?"  "What is the replacement theory?"  "Has anything like this happened before

and, if so when and why?" "What can be done to stop events like this?" Imagine the lesson plan

that teachers would have to prepare to address the subject or even prepare for these questions

following this horrible event.  And what teacher, despite the mandates of New Hampshire's

Instruction in National and State History and Government statute (*see* RSA 189:11(I)(j)), would

risk responding to such questions or addressing the underlying concerns in light of the ambiguity

of the Statute, particularly on issues of contemporary racism and oppression, and the draconian

penalties they would face (both by the text of the Statute and from the politically charged

"bounty hunters" looking to ostracize teachers and charge supposed violators of the Statute).

*See*, *e.g.*, *infra* Part C.

Because of the Statute's vagueness, educators across the State have pulled books from

curricula and avoided discussing and instructing on concepts that are necessary for students

preparing to take their place as full participants in our increasingly complex and diverse society.

Defendants offer no response to Plaintiffs' well-pled allegations that the Statute has caused New

Hampshire teachers to shy away from instruction and training on race and other topics.  *See, e.g.,*

AFT Compl. ¶¶ 9, 10; Mejia Compl. ¶¶ 34, 147.

(i)     The First And Second Banned Concepts

A closer review of the statutory language in light of the *Santa Cruz* decision further

underscores the confusion wrought by the Statute's plain language.  Take, for example, the

Statute's first two banned concepts.  The first banned concept provides that: "[n]o pupil in any

public school in this state shall be taught"—and "[n]o public employer . . . shall teach, advocate,

instruct, or train"—

15

> [t]hat people of one age, sex, gender, identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion or national origin *are inherently superior or inferior* to people of another age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, national origin.

*See* RSA 193:40, I(a); RSA 354-A:31, I; RSA 354-A:32, I; RSA 354-A:33, I (emphasis added).

Similarly, the second banned concept provides that: "[n]o pupil in any public school in this state shall be taught"—and "[n]o public employer . . . shall teach, advocate, instruct, or train"—"[t]hat an individual, by virtue of his or her age, sex, gender identity, sexual orientation, race, creed, marital status, familial status, mental or physical disability, religion or national origin is inherently racist, sexist, or oppressive, whether consciously or unconsciously." *See* RSA 193:40, I(b); RSA 354-A:31, II; RSA 354-A:32, II; RSA 354-A:33, II.  The *Santa Cruz* court determined that analogous provisions in President Trump's Executive Order were vague on their face given Plaintiffs' allegations that "training on unconscious bias is critical" to their work, and Plaintiffs "do not know whether they can continue with this critical training" under the Executive Order.  *See Santa Cruz*, 508 F. Supp at 543-44.

Plaintiffs and teachers in the classroom are now confronting the same dilemma in their day-to-day work.  For example, Plaintiff Christina Kim Philibotte, the Chief Equity Officer for the Manchester School District, and Andres Mejia, the Director of Diversity, Equity, Inclusion, and Justice at the Exeter Region Cooperative School District have no idea whether this specific prohibition in the Statute's text includes concepts like "unconscious" or "implicit bias" that have (i) become important components to trainings and education addressing diversity, equity, and inclusion, and (ii) been targeted by proponents of the law.  *See* Mejia Compl. ¶¶ 17, 25, 89. Likewise, English teacher Plaintiff Jocelyn Merrill "has avoided any discussion of racism's systemic impact with her students."  *See* AFT Compl. ¶ 9.  And the chill extends beyond

diversity and inclusion to current world events.  Plaintiff Ryan Richmond, for example, often asks his students to bring stories in from the news for discussion, and "[n]ine times out of 10, they are stories about oppression," and include discussion about whether one group of people have oppressed another group of people.  *See* AFT Compl. ¶ 39.  This type of instruction can be vital for the provision of a quality education and thriving democracy for all Granite Staters, and particularly Granite Staters of color.  *See* Mejia Compl. ¶ 153.  However, it is unclear based on the Statute's terms whether it goes so far as to potentially bar such discussion.  Under the first and second banned concepts, teachers and educators remain likewise uncertain about whether a teacher can:

- Discuss Ukraine's martial law requiring men to stay in the country and potentially face conscription in the war against Russia, while women may leave Ukraine?  Or why similar distinctions between men and women in the military exist in the United States and worldwide?;

- Discuss the failure of all states to ratify the Equal Rights Amendment, and whether other measures should be taken to ensure women are treated equally with their male counterparts? Perhaps more simply, can a teacher posit that women today, by virtue of their gender, are inappropriately paid less than men?;

- Explain to elementary school children that the maturity and acquired skills of adults is superior to theirs and that explains why they cannot get drivers licenses or get married;

- Explain that an 18-year-old public school student or graduating PhD having finished his/her studies of various levels of mathematics, will be superior in his/her understanding of certain mathematical concepts to that of an entry level child learning how to count or like basics.

It merits noting that the Statute prohibits teaching that an individual by virtue of his *creed* is oppressive.  "Creed" is commonly defined simply as a "set of fundamental beliefs."[9] Particularly relevant today, can educators teach that Vladimir Putin, by virtue of his inherent

---

[9] "Creed", in Merriam-Webster's Collegiate Dictionary (10 ed.), available at https://www.merriam-webster.com/dictionary/creed?utm_campaign=sd&utm_medium=serp&utm_source=jsonld

anti-democratic or autocratic belief system (or "creed") is oppressing the Ukrainian people?  Or is that topic now banned?  None of these scenarios have been answered in the Defendants' moving papers.

        (ii)    <u>The Third And Fourth Banned Concepts</u>

Under the Statute's third banned concept, "[n]o pupil in any public school in this state shall be taught"—and "[n]o public employer … shall … train"—"[t]hat an individual _should be discriminated against or receive adverse treatment solely or partly_ because of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin."  *See* RSA 193:40, I(c); RSA 354-A:31, III; RSA 354-A:32, III; RSA 354-A:33, III (emphasis added).  Similarly, under the Statute's fourth banned concept, "[n]o pupil in any public school in this state shall be taught"—and "[n]o public employer . . . shall . . . train"—"[t]hat people of one age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin _cannot and should not attempt to treat others equally and/or without regard to_ age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin."  *See* RSA 193:40, I(d); RSA 354-A:31, IV; RSA 354-A:32, IV; RSA 354-A:33, IV (emphasis added).

Both of these bans plausibly encompass a massive amount of teaching and instruction implicating, race, gender, age, sexual orientation, and disability, among other things, including instruction on the following:

- An educator discussing and engaging in instruction on whether New Hampshire's mandatory 70-year-old retirement age (since 1792) for judges and like requirements in other states should be lowered or increased.  *See* AFT Compl. ¶ 36.  This instruction plausibly violates the third banned concept banning teaching that an individual "should be discriminated against" on the basis of age and the fourth banned concept banning teaching that people of one group should not attempt to treat others without regard to age.  *See* RSA 193:40, I(c)-(d).

18

- An educator discussing and engaging the question of affirmative action—which asks for one racial group to be treated differently from another to remedy the results of prior discrimination. *See* AFT Compl. ¶ 36. This instruction plausibly violates the third banned concept banning teaching that an individual "should be discriminated against" on the basis of race and the fourth banned concept banning teaching that people of one group should not attempt to treat others without regard to race. *See* RSA 193:40, I(c)-(d).

- An educator discussing, in the context of the history of the Americans with Disability Act, individuals with disabilities being entitled to reasonable accommodations so they can more equitably live in society. *See* AFT Compl. ¶ 36. Thus, this instruction plausibly violates the third banned concept banning teaching that an individual "should be discriminated against" on the basis of disability (in this case, favorably) and the fourth banned concept banning teaching that people of one group should not attempt to treat others without regard to disability. *See* RSA 193:40, I(c)-(d).

- A teacher discussing or engaging in instruction on the reasons why in our country's entire history—including historical and current systemic racism—it took until 2022 for a Black woman to become a United Supreme Court Justice.

- A teacher discussing or engaging in instruction on the reasons why in our country's entire history—including historical and current systemic sexism—no woman has ever been President.

Defendants do not meaningfully engage with the examples in the AFT or Mejia Complaints. Instead, they offer interpretations of their own that deflect and default to the portion of the Statute stating that nothing in the Statute "prohibit[s] discussing, as part of a larger academic instruction, the *historical existence* of ideas and subjects" in the RSA 193:40, I. (emphasis added). *See* 354-A:29, I; *see also* Mov. Br. at 28. On more focused review, however, all that the precise language of the Statute does is permit the discussion of the "historical existence" of (or what historically existed or occurred at such and such a point in time) respecting sensitive topics like Jim Crow and other types of discrimination. Even under Defendants' interpretation emphasizing the "historical existence of ideas," it plausibly does not allow for discussion of its scope and painful impact at that juncture or thereafter, its effect on our nation's moral fiber by dehumanizing people, or the measures available to address ongoing

19

inequity.  This is precisely where the danger of the Statute's ambiguity lies.  Teachers in New Hampshire know that effective education is not merely about the "historical existence of ideas and subjects."  Rather, effective education is about guiding students to apply the lessons of the past to the world of the present, their hopes for the future, and their own personal experiences. Students not only learn about the world around them in this way, but also acquire a sense of belonging and the ability to project the lessons taught to help address an uncertain future.  Yet, this is precisely the type of instruction that the Statute chills.  Teachers must now attempt to discern where instruction crosses the line between permissible instruction about the past existence of discrimination and present reality.

Moreover, Defendants' attempt to salvage the broad statutory language providing that "[n]o pupil in any public school in this state *shall be taught*, instructed, inculcated, or compelled to express belief in or support for [the banned concepts]" by arguing that it narrowly applies to instruction taught by teachers lacks merit.  *See* Mov. Br. at 23.  The Legislature is capable of using active language limiting the Statute's reach to instruction specifically taught by teachers, but refused to do so in the portion of the Statute governing teacher conduct.  *See* RSA 354-A:31 ("[n]o public employer . . . shall teach. . . ."); RSA 354-A:32 ("[n]o government program shall teach. . . .").  Instead, lawmakers intentionally used the passive voice, "shall be taught," plausibly covering a myriad of circumstances where teacher-led instruction veers into a student discussion on banned topics, or broad homework assignments that result in the student reaching for a book containing proscribed material or even a discussion with a librarian as to what publication addresses a specific proscribed subject.  *See* Mejia Compl. ¶ 134.[10]  After all, classroom discussions where students are giving presentations and instructing others are coordinated by

---

[10] The Legislature also chose not to define teaching at all, purposefully leaving a gaping hole of ambiguity for educators to try to decipher whether even casual conversation with students could be interpreted as "teaching."

educators who are arguably now crossing a line when classroom discourse covers any of the banned concepts.  As one prominent education expert recently observed in describing the statute's ambiguity:

> Classroom discussions present a particular risk because a teacher cannot predict what students might say and because the definition of 'taught' is so broad. . . . [I]f a student were to assert that the prohibitions and penalties in the new law are motivated by racism or sexism, which some critics have argued, permitting such discussion to continue could be construed as a violation of the statute.

*See* Mejia Compl. ¶¶ 134-35, 136.

RSA 193:40's most plausible interpretation is that it is not textually limited to classroom instruction exclusively spoken by educators.  RSA 193:40 places no limitation on who provides the information to students.  It does not even clearly fix the situs of such communication.  While Defendants may wish this Court to bless their rewrite of the Statute, this is something this Court may not do.  It is "up to" the New Hampshire legislature "to narrow the language of" the Statute "if it so chooses."  *See U.S. v. Dávila-Reyes*, 23 F.4th 153, 193 (1st Cir. 2022); *see also United States v. Davis*, 139 S. Ct at 2323.  Indeed, the use of the active voice elsewhere in RSA 354-A:31 ("[n]o public employer . . . shall teach. . . .") and RSA 354-A:32 ("[n]o government program shall teach. . . .") shows that the legislature was fully capable of using more active language to limit the Statute's reach to instruction taught specifically by teachers, but refused to do so in the portion of the Statute specifically governing teacher conduct.

## B.     Subsequent Guidance By The Attorney General Does Not And Cannot Cure the Unconstitutionally Vague Terms Of The Statute

Recognizing the Statute's ambiguity, Defendants pin their hopes for dismissal on three "guidance" documents that attempt—but fail—to clarify the Statute.  *See, e.g.,* Mov. Br. at 3.  On July 21, 2021, Department of Education Commissioner Edelblut, Commission for Human Rights

Executive Director Ahni Malach, and the Department of Justice announced the release of two FAQs related to House Bill 2.  *See* Mejia Compl., Ex. 19.  Two months later, the Attorney General issued Opinion No. 2021-01, which attempted (but failed) to further clarify the Statute in light of concerns that the "new statutes [still] are confusing and that public employers and schools will struggle to understand the scope of the new prohibitions." *See* Mejia Compl., Ex. 20 at 1.  Significantly, the Attorney General Opinion has not been posted to Defendant Edelblut's Department of Education website, though complaint forms and other missives designed to facilitate complaints have been published.[11]

(i)    The "Guidance" Documents Carry No Authoritative Weight

Defendants' "guidance" is entitled to no authoritative weight because, as is the case here, state courts are also independently charged with enforcing the Statute and any person may bring a private action under the Statute in Superior Court.  *See Stenberg v. Carhart*, 530 U.S. 914, 940 (2000) (Breyer, J.) ("[O]ur precedent warns against accepting as authoritative an Attorney General's interpretation of state law when the Attorney General does not bind state courts or local law enforcement authorities.") (internal quotation marks and citations omitted). As another district court in the First Circuit put it, "[t]his is a nation of laws, not legislative history or attorney general opinions."  *Rhode Island Med. Soc. v. Whitehouse*, 66 F. Supp. 2d 288, 294 (D.R.I. 1999), *aff'd*, 239 F.3d 104 (1st Cir. 2001); *see also New England Greyhound Lines v. Powers,* 108 F. Supp. 953, 955 (D.R.I. 1952) ("The opinion of the Attorney General on this point was advisory only and not conclusively binding upon the parties.").

---

[11] Indeed, the Department of Education's omission of the Attorney General opinion suggests the distinct possibility that regulators are not speaking with a cogent and consistent voice, but offering differing interpretations of the Statute based on their understandings and policies.  All of this compounds the confusion.

In fact, in *Hess v. Turner*, 129 N.H. 491, 492 (1987), the New Hampshire Supreme Court expressly rejected the argument advanced here, namely, that an Attorney General's Opinion in New Hampshire can be read into, or substitute for, the judicial interpretation of a statute.  In a case involving similar statutory interpretation, the New Hampshire Supreme Court held that "the way the attorney general chooses, in his discretion, to implement RSA 265:87, does not determine for us what the statute compels the State to do."  *Id*.  Thus, the weight of authority shows that the plain reading of the Statute alone, not the guidance documents, should be considered when interpreting the Statute.  What Defendants cannot do is use subsequent regulation or guidance authority to save a law that, on its face, "flouts the constitution." *VAMOS, Concertación Ciudadana, Inc. v. Puerto Rico*, 494 F. Supp. 3d 104, 126-27 (D.P.R. 2020); *see also Dávila-Reyes*, 23 F.4th at 193 ("we have no license to rewrite [the statute] to satisfy constitutional requirements").  Indeed, as the Supreme Court has directed, the task then is "to treat the law as a nullity. . . ." *United States v. Davis*, 139 S. Ct. at 2323*; see also Sessions*, 138 S. Ct at 1223, 1226-29 (Gorsuch, J., concurring).

(ii)    The "Guidance" Documents Amplify the Ambiguity

Setting aside Defendants' efforts to re-write the Statute through the FAQs and the Attorney General Opinion, the "guidance" documents only amplify the Statute's ambiguity rather than set forth an objectively discernible standard of conduct, as Defendants suggest.  *See* Mov. Br. at 23.[12]  In *Johnson*, Justice Scalia found that "persistent efforts" by administrative

---

[12] For the most part, the guidance merely parrots or paraphrases the Statute. It also provides some examples (that are also found in the Statute itself) of conduct that is permitted. But it fails to provide even a single example of specific conduct prohibited by the law. The Defendants' Motion similarly misses the mark by providing numerous examples of permitted activities, *see, e.g*., Mov. Br. at 24 (lessons that merely make students or parents "uncomfortable" are permitted), but when it comes time to explain what is prohibited, the Defendants merely repeats the vague statutory text, *id*. at 24 and 27 (quoting the statute to describe prohibited conduct). Quoting the statute's vague text is insufficient to cure its vagueness.

23

officers to establish standards for an indeterminate immigration statute "can provide evidence of [the statute's] vagueness."  576 U.S. at 598.

In fact, repeated efforts "trying to derive meaning" from a statute have been said to convince the court "that we have embarked upon a failed enterprise." *Id.* at 601-02.  The *Santa Cruz* court reached the same conclusion, holding that subsequently issued DOL FAQs similar to the guidance documents at issue here blurred the line between prohibited and not prohibited conduct, thereby "pos[ing] a danger of arbitrary and discriminatory application."  *Santa Cruz* at 544.  The court emphasized that the DOL FAQs prohibited unconscious or implicit bias training "to the extent it *teaches or implies* that an individual, by virtue of his or her race, sex, and/or national origin, is racist, sexist, oppressive, or biased whether consciously or unconsciously."  *Id.* (quoting DOL FAQs) (emphasis in original).  However, the FAQs confusingly permitted the same training where it is designed to "*inform* workers, or foster discussion, about preconceptions, opinions, or stereotypes. . . ."  *Id.* (emphasis in original).

The Statute's FAQs similarly obscure the line between teaching, instructing, inculcating or compelling (prohibited) and discussing (not prohibited).  *See* Mejia Compl., Ex. 19 at 2.  They permit "discussing" the "historical existence of ideas and subjects identified in RSA 193:40, I" or "the historical existence of ideas and subjected [sic] identified in the new law."  *See id.* at 2-4. However, the statutory language does not distinguish between discussion of these topics and prohibited conduct—like "taught [teach]," "instruct[]," "inculcat[e]," or "compel."

The Attorney General's September 7, 2021 Opinion fares no better.  *See* Mejia Compl., Ex. 20.  The Opinion states that the Statute does not prohibit "discussing or teaching students about the historical existence of ideas related to the four prohibited subjects, such as the history of discrimination."  *Id.* at 6.  But, just like the Statute and July 2021 FAQs, the Opinion fails to

help teachers understand when a "discussion" of the history or racism could cross the line into teaching, instructing, inculcating banned by the Statute.  Indeed, the guidance does not offer one specific example of a book, lesson or training that is banned under the Statute.  Teachers are therefore left entirely unsure when "discussions" cross the line into prohibited "instruct[ions]," or "inculat[ions]."  What if student-led discussion about the Black Lives Matter movement or the oppression of Ukrainians begins, and a teacher is asked a direct question about systemic racism or Russian oppression by a student?  Does answering the student's question cross the prohibited line into "instruct[ing]"?  Should the teacher refuse to answer the question?  Visibly absent from Defendants' guidance documents is any clarity on these subjects, perhaps because its authors were similarly unable to agree on appropriate guidance.  *See supra* n. 11.

As another clear example of added confusion, the FAQ issued by the Department of Education, Commission on Human Rights and Department of Justice suggests that material imparted during extra-curricular activities is included among the coverage of the Statute's prohibitions (whether on school premises or outside of the school property).  *See* Mejia Compl., Ex. 19 at 5 ("*The prohibitions apply to all activities carried out by public schools in their role as public schools, including extracurricular activities that are part of the public school's work.*").  There is no such suggestion in the Statute.  RSA 193:40(I) starts by limiting its proscriptions to "pupil[s] in any public school" being "taught, instructed, inculcated or compelled to express belief in. . . ."  How can it be said with any degree of certainty that extra-curricular activities ranging from baseball games, swimming or other sports to chess or orchestra are covered by the law, as the FAQ suggests?  Instead, the FAQ tells educators that the regulated activities (teaching, instructing, inculcating, or compelling to express belief in) sweep in a breathtaking range of conduct inside and outside the classroom, directly contradicting assurances by the

Defendants that the scope of the Statute is narrowly drawn.  The impact of the broadened application has real world consequences.  Two of the AFT Plaintiffs have been accused of violating the Statute simply because they signed a Petition outside the classroom supporting the right of teachers to teach and students to learn.  *See* AFT Compl. ¶ ¶ 8,9; *see also* Ex. A (No Left Turn Letter in Education Letter)[13].

Moreover, the Attorney General's opinion exacerbates the vagueness and chilling effect of the Act by declaring that a violation may occur, not just because of the content of a lesson or instructional material, but also because of implications and inferences that a student or trainee may *subjectively* draw from the material.  For example, the opinion explains that, while it may be permissible to provide "Anti-Racist Resources," those resources may not be offered in a way that "may imply that white people . . . are in need of anti-racist resources."  This creates an impossible standard for educators to comply with, and requires them to censor their lessons based on implications that may be subjectively drawn from what they teach.

In its moving brief, Defendants point to the language of the FAQs and Attorney General Opinion as providing "ample guidance" with respect to the question, for example, of whether teachers can teach about the Rohingya and Uighur genocides, because the guidance documents suggest that Statute does not prohibit the "historical existence of ideas and subjects."  *See* Mov. Br. at 28.  The Attorney General's response does not answer the question.  The point of the Rohingya genocide example in the AFT Complaint—and the genocide is not historical, but rather still ongoing—is whether a teacher can teach, in this context, that one group of people is inherently oppressive over another.  To be clear, can a teacher teach *today*, *yesterday or*

---

[13] As recognized by Defendants, a court ruling on a motion to dismiss may consider "documents the authenticity of which are not disputed by the parties"; "official public records"; "documents central to the plaintiffs' claims"; and "documents sufficiently referred to in the complaint."  *Ironshore Specialty Ins. Co. v. United States*, 871 F.3d 131, 135 (1st Cir. 2017) (citation and quotation marks omitted).

*tomorrow* the nature, scope, impact of or prospects for solution of the Rohingya and Uighur genocides (or even address the foregoing points with respect to Russian atrocities against Ukrainian citizens or Russia's seeming view that its peoples and policies are superior to those of the Ukrainians and therefore inherently entitled to dominate)? Yet again, Defendants' silence on this point is telling.  By refusing to answer direct questions raised about conduct that appears to be captured by the Statute's sweeping vague prohibitions, Defendants reinforce the basis for the claim that educators cannot distinguish permissible discussion from unlawful instruction.[14]

The closest Defendants get to answering whether teachers can connect historical wrongs of the past with current problems of the present, let alone potential solutions, is when it points to language in the FAQs that a teacher may teach about "the role that discrimination may play in creating disparities among different identified groups."  That "instruction" creates as many questions as it answers.  *See* Mov. Br. at 29.

Defendants' reliance on guidance documents to narrow the term "inherent" to its dictionary definition also highlights the Statute's ambiguity.  *See* Mov. Br. at 25-26; Mejia Compl., Ex. 20 at 6. Setting aside that the divisive concepts in *Santa Cruz* also used the term "inherent," Defendants' reliance on multiple definitions of "inherent" to rewrite (and narrow) the scope of the Statute fails and, at best, highlights how the Statute is susceptible to multiple, conflicting interpretations.  The July 21, 2021 FAQs provided that the term "means

---

[14] The "historical existence" exception to the Statute is also illustrative of the Statute's impermissibly broad sweep. *Expressio unius est exclusio alterius*, the familiar rule of statutory construction directly applicable here, makes clear that the express citation of a single exception to a statutory proscription (here the "historical existence" exception), limits that safe harbor solely to that cited item.  *See Gallo Motor Center Corp. v. Mazda Motors of America, Inc.*, 172 F. Supp 2d 292, 294 (D. Mass. 2001) ("*Expressio unius est exclusio alterius* literally means that to include one thing implies the exclusion of the  alternative"). *See also Raleigh & Gaston R. Co. v. Reid,* 80 U.S 269, 270 (1872) (" When a statute limits a thing to be done in a particular mode, it includes a negative of any other mode"); *United States v. Hernandez-Ferrer*, 599 F.3d 63, 67-68 (1st Cir. 2010). More simply stated, if the Statute *permits* the teaching of the "historical existence" of discrimination, established and accepted canons of construction direct that such permission be read to *prohibit* the teaching of discrimination beyond mere historical existence.

characteristics that are natural, biological or innate as opposed to characteristics that are merely apparent, accidental, or based on external factors." *See* Mejia Compl., Ex. 19. Recognizing that this definition still remained unclear, the Attorney General's Opinion subsequently expanded on the definition. The Attorney General stated that "inherent" means "structural or involved in the construction or essential character of something: belonging by nature *or settled habit*: intrinsic, essential." In other words, the Attorney General acknowledges that the dictionary definition of "inherent" includes a characteristic—whether it be racism, sexism, or otherwise—that is not "intrinsic" or "essential" but, supposedly, also developed by "settled habit." But how can one seriously expect educators to distinguish between racist or sexist beliefs that are developed through "settled habit" (or even know what those "settled habits" are) and those developed through external factors?

Finally, Defendants' "rewrite" of the Statute – disallowed by Supreme Court precedent – also leaves teachers and DEI educators confused about the Statute's provision stating that "sensitivity trainings" are allowed but only if based on "the inherent humanity and equality of all persons. . . ." RSA 354-A:29, II (emphasis added). Can educators interpret the Statute to allow for discussions of "white privilege" or "implicit bias" and whether they are connected to historical events? See Mejia Compl. ¶ 119 (noting that the guidance does not include or reference classroom instruction to students, nor does the "guidance" reference specific concepts like "systemic racism" and "anti-racism" that have become staples in DEI instruction). Nothing in the statutory language or Defendants' guidance answers this question directly. What does "inherent humanity" teach under the circumstances?[15] Educators are therefore left to guess about

---

[15] And is the term "inherent humanity" sufficiently definite when in the cases cited in fn. 6, *supra,* the Supreme Court ruled similar broad terms were not?

when permitted "sensitivity training" crosses the line by straying into ideas now prohibited by the second banned concept.

### C.   The Statute Independently Violates Due Process Because It Will Be (And Has Been) Arbitrarily and Discriminatorily Enforced

The gravamen of Defendants' argument is that "speculative danger of arbitrary enforcement does not render the Statute void for vagueness" because "unsubstantiated fears" are insufficient to support a claim that a statute creates such a risk.  *See* Mov. Br. at 33.  Not only is that not the law, [16] the harassment launched at teachers under this Statute is, tragically, far from hypothetical.  *See* AFT Compl. ¶¶ 8-9; *see also* Ex. A (No Left Turn in Education Letter).  Indeed, the Statute delegates enforcement authority to multiple political entities and private actors *without any standards or procedures to guide their enforcement.  See* Mov. Br. at 33; *see also Kolender,* 461 U.S. at 358.  Commissioner Edelblut and, importantly, private citizens are now empowered to exploit the Statute's intentionally vague language to expand the scope of proscribed conduct and to harass teachers without any of the constraints demanded in *Kolender*.

### (i)   The Statute Lacks Any Enforcement Standards or Procedures

Defendants make much of the fact that there are "multiple layers of adjudicatory review" for alleged violations of the Statute.  *See* Mov. Br. at 33.  That may be true, but it is not the pertinent legal question.  To avoid unconstitutional vagueness, within the layers of adjudicatory review, there must be "narrow, definite and objective standards" to guide agency discretion.  *See Grayned*, 408 U.S. at 108 ("If arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them."); *see also Kolender*, 461 U.S. at 357-58 (finding that of principal concern in the void for vagueness doctrine is that the legislature

---

[16] "The Constitution does not permit a legislature to set a net large enough to catch all possible offenders, and leave it to the courts to step inside and say who could be rightfully detained, and who should be set at large." *United States v. Reese,* 92 U.S. 214, 221 (1875).

establish "minimal guidelines" to govern enforcement).  Far from "protect[ing] *against* arbitrary and discriminatory enforcement," as Defendants suggest, the fragmented and multiple layers of enforcement only serve to create many more opportunities for arbitrary and discriminatory enforcement.  *See Grayned*, 408 U.S. at 108 ("[I]f arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them.").

As set forth below, the Statute leaves teachers' fates at the whim of various political agencies and private actors who lack clear standards to guide their decision-making.

Defendants do not specify—or provide Plaintiffs with sufficient tools to determine—what books, lesson plans, or trainings violate the Statute.  Despite repeated requests, Defendants have been unwilling or unable to answer basic questions about whether specific texts are covered under the Statute.  Are the books *Stamped (For Kids): Racism, Antiracism, and You* (which was adapted by Sonja Cherry-Paul from the work of Dr. Ibram X. Kendi) and *This Book is Anti-Racist* by Tiffany Jewell covered under the Statute?  Defendants have declined to answer such questions including in their Motion—a tactic, whether deliberate or not, that has the effect of maximizing the Statute's chill.  *See* Mejia Compl. ¶¶ 121-122 (noting that neither Attorney General Formella nor Commissioner Edelblut directly responded to the NEA-NH August 5, 2021 request asking whether *Stamped* or any other specific texts were covered under the Statute).  Despite having the authority to do so, the Human Rights Commission has also declined to release to educators and the public under New Hampshire's Right-to-Know Law the details of any complaints in which the Commission has concluded that there was no violation—details which would obviously be useful for teachers and help guide them in the context of specific examples as to what is not covered under the Statute.  *See* RSA 354-A:21, II(a) ("the commission may publish the facts in the case of any complaint which has been dismissed"); *see also* N.H. Admin.

R. Hum 219.04(b).  These examples, standing alone, demonstrate that the Statute does not, as claimed, "set forth an objectively discernible standard of conduct."  *See* Mov. Br. at 23.  When analyzed in connection with the Statute's other deficiencies, *supra* Parts A-B, the potential for arbitrary and discriminatory enforcement is obvious.[17]

Those risks are compounded by the various political entities that have been delegated enforcement authority under the Statute.  The Statute empowers multiple entities—the Department of Justice, the Human Rights Commission, the Department of Education, and the Department of Labor—to enforce the Statute independently from one another.  But each entity has different priorities influencing their views of what can and cannot be taught under the statute. *See supra* n. 11.  For example, notwithstanding any informal process Defendants have created (under which the Commission is the initial arbiter of complaints), there is nothing in the Statute that prohibits the Commission from rejecting a complaint under RSA 354-A:29-34, with the Department of Education electing to proceed with a decertification action under RSA 193:40, IV for the same complaint.

Indeed, notwithstanding whatever nonbinding and *ad hoc* enforcement regime the Defendants have attempted to cobble together in representing that complaints will first be processed by the Human Rights Commission, regulations make clear that the Department of

---

[17] To be clear, Plaintiffs have not had discovery or access to records relevant to their challenge.  However, several documents discussed herein, *see infra*, pp. 36-40, already indicate that troves of material exist in Defendants' non-privileged records, including public statements, communications made to and by Defendant Edelblut, and official agency documents released by Defendant Edelblut. Thus, Dr. Michael Breen submitted his formal complaint against 4 teachers for alleged violation of the Statute and a copy was sent to the AFT-Plaintiffs. Together with the outrageous "Bounty" on assertedly offending teachers (*see infra,* pp. 37-38), the complaint portends the existence of a hoard of Department of Education non-privileged records supporting Plaintiffs' claims herein. Additionally, one of dozens of documents released by Defendant Edelblut on or about April 14, 2022 show investigative activities concerning such complaints. *See* Ex. B (Edelblut Opinion Piece). Despite the foregoing, Plaintiffs are limited at this stage by the lack of discovery and cannot fully document their "as applied" claim, which is preserved. Additionally, just as Defendants' make repeated reference to New Hampshire statutory and decisional authorities for illustrative, comparative or like purposes in support of their motion to dismiss (*See e.g.*, Mov. Br. at 31-32), reference is similarly made herein to the New Hampshire Constitution, regulation and caselaw.

Education has the unique and independent authority—and, in fact, is required—to investigate violations of the Educator Code of Conduct.  In other words, contrary to the Defendants' conclusion that the Department of Education can only take action "after a finding of discrimination becomes final," *see* Mov. Br. at 34-35, the Department of Education can take action independent of any decision the Human Rights Commission may make.[18]

The Statute also expressly permits the Department of Justice to take court action on its own, independent of any decision of the Human Rights Commission or Department of Education.  *See* RSA 193:40, III.  Empowering various entities to enforce the Statute without any governing standards makes educators susceptible to politically motivated and arbitrary enforcement.  The absence of clear guidance assumes added significance given the distinct possibility that those charged with enforcement may not address relevant issues in the same fashion.  *See supra* n. 11.

More troubling, the enforcement process outlined by the Defendants with purported "procedural safeguards" is not the only method to enforce the Statute.  *See* Mov. Br. at 35.  By its plain terms, any individual can bring a private cause of action in Superior Court.  Section 354-A:34 provides that: "*Any person* aggrieved by an act made unlawful under this subdivision may pursue all remedies available under RSA 354-A, RSA 491."  In turn, RSA 193:40, III provides

---

[18] The Department of Education has the _sole_ authority to enforce the Educator Code of Conduct, and it has little discretion in investigating a possible violation of the challenged Statute and issuing a sanction if there is a perceived violation.  As Ed 511.01(a) states, "[a] case _shall_ be opened when a complaint of possible misconduct against a credential holder has come to the attention of the department either through direct reporting or other means." (emphasis added).  Further, an investigation _shall_ be opened under the challenged Statute if there is a "possible violation."  *See* Ed 511.01(b) (emphasis added) (also attached at Mejia Compl., Ex. 2).  And if a violation is found it _shall_ be a violation of the Educator Code of Conduct under RSA 193:40, IV.  "If the investigation finds a credential holder in violation of a rule of the code of conduct as specified in Ed 510.01 through Ed 510.04, the department _shall_ propose a form of discipline as follows: a.  Suspension; b.  Revocation; or c.  Reprimand."  Ed 511.01(j)(2) (emphasis added).  In sum, this all means that the Department of Education cannot turn a blind eye to a report under the Statute.  The Department is required to investigate it and conclude whether a violation has occurred no matter how minor or trivial the offense.

that: "*Any person* claiming to be aggrieved by a violation of this section [governing teaching banned concepts in schools], including the attorney general, may initiate a civil action against a school or school district in superior court." Thus, anyone can report a school, school district, or even teacher, for teaching history, economics or civics that references systemic discrimination or subjects that do not conform to their own personal views of the world.  AFT Compl. ¶ 96.

Commissioner Edelblut added fuel to the fire by publishing a website on November 12, 2021 that invites members of the public to easily file online complaints against teachers under the Statute.  *See* AFT Compl. ¶ 96; Mejia Compl. ¶ 139.[19]  Immediately following the website's release, an extremist group called "Moms for Liberty" offered a $500 bounty for any teacher violating the Statute.  *See* Mejia Compl. ¶ 144.  None of the procedural safeguards or "multiple layers of adjudicatory review" outlined by Defendants will protect (indeed, none has protected) a school or teacher from self-censoring to avoid being the subject of these complaints.  *See* AFT Compl. ¶¶ 7, 9.

The Statute also invites teachers to turn against their colleagues as government informants and enforcers of the Statute's vague restrictions.  A licensed educator's failure to report a suspected violation of the Code of Conduct is itself punishable as a violation of the Code. *See* Ed 510.05(a) (stating that "[a]ny credential holder shall report any suspected violation of the code of conduct following the school, school district, or SAU reporting procedures"); *id.* 510.05(f) (stating that, "[i]f the department has reason to suspect that any violation of the code of conduct enumerated in Ed 510.01 through Ed 510.04 was known by a credential holder and not reported, the department shall undertake an investigation, as enumerated in Ed 511.01, against

---

[19] One pertinent area for needed discovery is thus illustrated: what complaints were filed, what was done in response, what role did Commissioner Edelblut play in connection with the complaints, what results were discerned and reported, and what action was taken.

that credential holder as required by Ed 510.05(a), (b), or (c)"). As a result, educators must risk their livelihood on their best guess of the Statute's inscrutable restrictions—not only when it comes to their own teaching, but also in deciding whether to report and jeopardize the career of a fellow teacher.

Further, the prospect of an educator needing to file a report will be constant, especially considering that educators cannot parse the Statute with enough specificity to be sure that they have no suspicion of any conduct which violates the Statute.  All of these remedies are costly and time consuming for educators to defend.  But Defendants' response is to simply ignore the harassment, obscenities, and vicious attacks that Plaintiffs continue to endure.  *See* AFT Compl. ¶¶ 3, 8.  The result is considerable personal burden and added expense.

Faced with daunting legal proceedings and impending public scrutiny, educators will shy away from topics or material that could be misinterpreted as violations of the Statute.  Even if a complaint in any of these venues is ultimately dismissed, educators will still be subjected to the process of defending themselves.  The threat of lengthy legal proceedings and public scrutiny influences educator choices and causes them to shy away from any topic or material which could be misinterpreted as a violation of the Statute.

This is all to say nothing of the occupational and professional "death penalty" now facing teachers: having their educators' licenses revoked for non-compliance with the law.  In particular, the Statute states that: "[v]iolation of this section by an educator *shall* be considered a violation of the educator code of conduct that justifies disciplinary sanction by the state board of education." RSA 193:40, IV (emphasis added); *see also* RSA 193:40, V (establishing that this section extends to "[a]dministrators, specialists, and teachers"). Violations of the Educator Code of Conduct can lead to the revocation of an educator's license to work in the state (and impact

the likelihood they could obtain a license in another state). *See* Mejia Compl., at Exhibit 2 (N.H. Code Admin. R. Ed 511.02 addressing sanctions). A teacher's entire professional life therefore depends on interpreting an indecipherable statute to avoid a myriad of enforcement regimes arbitrarily applying the law.

All of this only confirms the appropriateness of denying Defendants' motion to dismiss and allowing the parties to proceed to discovery in this case. Courts cannot effectively evaluate a constitutional challenge by abstracting the challenged statute from the broader procedural context in which it is enforced. Thus, even in the context of a purely facial vagueness challenge, courts must be free to evaluate the challenged statutory provisions "in their context and with a view to their place in the overall statutory scheme." *Manning v. Caldwell for City of Roanoke*, 930 F.3d 264, 273 (4th Cir. 2019) (holding that the challenged statute permitting civil interdiction of "habitual drunkards" must be considered quasi-criminal in nature, even though the statute itself did not define criminal penalties, because it was a necessary predicate for imposing the increased criminal penalties) (quoting *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989)). The instant case is not an academic exercise. The Statute must be viewed in the context of the overall enforcement scheme, which only enhances the likelihood of arbitrary and discriminatory enforcement given the Statute's multiple and independent enforcement mechanisms.

The Supreme Court itself has rested its analysis of facial excessive discretion claims on extrinsic enforcement evidence. In *Johnson v. United States*, 576 U.S. 591 (2015), the Court cited a string of Supreme Court and lower court decisions inconsistently applying the Armed Career Criminal Act to support its conclusion that the ACCA's residual clause invites arbitrary or discriminatory enforcement. *See id.* at 597–602. And in *Kolender*, 461 U.S. at 360, the

Supreme Court cited California's representation at oral argument about how the State's anti-loitering statute operated in practice to support its conclusion that the statute conferred excessive discretion on police officers.  Relatedly, Plaintiffs have also challenged the vagueness of the Statute as applied to educators in the context of how educators will uniquely be subject to enforcement under the Act.  This further necessitates discovery on how the Department of Education and Human Rights Commission plan on enforcing the Statute as to educators, and how they have enforced (or refrained from enforcing) the Statute since its enactment.  Also germane is discovery on the enforcement regime the Department of Education more broadly has implemented to investigate complaints under the Educator Code of Conduct.

(ii) The Statute Is Already Being Enforced To Cover More Than Anti-Discrimination Concepts

While Plaintiffs do not have pre-discovery access to records of the various agencies involved in the enforcement of the Statute, there is already substantial evidence demonstrating that the Statute is being enforced to limit speech far more broadly than "anti-discrimination" concepts.  The absence of any procedural guardrails in the Statute has emboldened private citizens to threaten teachers with disciplinary action based on their own understanding of concepts banned by the Statute.

To illustrate, Plaintiffs have been furnished with a copy of a complaint letter filed against a number of teachers, including Plaintiff Jocelyn Merrill, a teacher and parent of a New Hampshire public school student. The complainant, Dr. Michael Breen, New Hampshire's Director of a national advocacy group called "No Left Turn in Education," demands that Ms. Merrill be investigated and disciplined for engaging in ongoing violation of New Hampshire's Educator Codes of Conduct" by signing a Zinn Petition opposing the Statute.  *See* Ex. A (No Left Turn in Education Letter).  Ms. Merrill had signed a petition pledging support for honest

36

teaching and opposition to the Statute – but there is no claim that she did so in a classroom, or in a school, or even in the presence of a "pupil," the essential statutory predicate (according the Defendants).  Dr. Breen's complaint demonstrates that even a highly educated New Hampshire citizen with no asserted nexus to any school, student or teacher, let alone Ms. Merrill, reads the Statute as authorizing him to seek disciplinary action against a teacher and parent for conduct not even within the four walls of the school or classroom and with no nexus to any particular school, student or teacher.  And, it apparently matters not that petition signing does not fall within the limited predicate language of the Statute (RSA 193:40, I) proscribing what may not  "be taught, instructed, inculcated or compelled. . . ."

Plaintiff John Dube also alleges that his mere signing of the Zinn Petition pledging to teach honest history subjected him to harassment by New Hampshire extremist groups, online abuse, threats and obscenities.  The harassment became so extreme that Mr. Dube contacted the FBI and was required to install security cameras at his own home for protection.  AFT Compl. ¶ 8.  In short, the risk of arbitrary and discriminatory enforcement under the Statute is not an "unsubstantiated fear."  The Statute's vague and ambiguous language is placing educators in dangerous situations every day.

It is also likely being enforced discriminatorily by state agencies.  Consistent with the Department of Education's independent enforcement authority referenced above, the Department has apparently elected to conduct its own investigations, including potentially under the Statute.[20]  This enforcement is consistent with a recent Op-Ed from Defendant Commissioner Frank Edelblut, one of the architects and drivers of the Statute, which provides unmistakable proof that the law was designed to advance a political agenda, not combat discrimination in the

---

[20] *See supra* note 17.

classroom.  In the Op-Ed, Commissioner Edelblut attacks educators, calling them "activist," comparing them to the Disney Corporation and insisting that educators in New Hampshire have imposed their own personal value system on the State's children in an effort to undermine "values of families."  In support of the argument, the Commissioner provides a 74-page document of examples drawn from the Department of Education files that, he suggests, "exemplifies actual instructional material from New Hampshire schools that parents have identified as conflicting with their values."[21]  While there is no citation to actual formal complaints filed, the text messages and emails included in the 74-page document – including emails from an investigator charged with looking at potential violations – suggests that parents have complained of this type of teacher conduct in the wake of the Statute and the new DOE/Human Rights Division complaint system and receptivity.

The material is enlightening and only confirms why discovery is necessary to assess how various State agencies are enforcing the Statute. While the Attorney General's Opinion and FAQ's and the Defendants' moving brief insist that the Statute does not prevent the teaching of implicit bias, inequality today, the importance of racial sensitivity or the historical existence of discrimination, Commissioner Edelblut's "topics" of complaints demonstrates that these areas are precisely the targeted subject of the law.  As an example, "Topic One" cited by Commissioner Edelblut, contains an *Equity & Diversity in the U.S. Quiz* which asks students a series of questions about the state of our country.  The quiz asks, for example,

- How many cents for every dollar African American and Latina women earn in the US as compared with white males?

---

[21]These include teachers identifying and explaining their own preferred pronouns, educators asking if students have preferred pronouns (which is often a part of school policy), and photos of the book *Stamped: Racism, Antiracism, and You*, which the Commissioner seems to view as violating the Statute but will not expressly state so when asked directly.  *See* Ex.  B (Frank Edelblut, "*Education's Sacred Trust*"(Apr. 15, 2022), https://www.education.nh.gov/news/educations-sacred-trust.).

- What percentage of illicit drug users in the US are African American as compared with the percentage of African Americans that are confined in state prisons for drug offenses?

- How the poorest 90% of the country have fared while corporate profits and the average house income of the top .01% have skyrocketed?

- What percentage of incidents of homophobia go unreported?

- How many anti-Muslim organizations are operating in the United States?

That these types of important questions have been flagged by Commissioner Edelblut as objectionable "activist educator" material underscores how broadly the Commissioner of Education believes the Statute reaches or can be unilaterally forced and how justifiably worried educators are about being the subject of a complaint.  The issues Mr. Edelblut cites are important topics about our country that should be explored by our educators along with our students.  The Commissioner seeks to censor it. What is at issue is the wide ranging discretion afforded by a vague Statute and his demonstrated willingness to exploit it.  To quote Justice O'Connor, "we have recognized recently that the more important aspect of the vagueness doctrine is not actual notice, but the other principal element of the doctrine—the requirement that a legislature establish minimal guidelines to govern law enforcement."  *Kolender*, 461 U.S. at 357-58.  Absent minimal guidelines, "a standardless sweep allows policemen, prosecutors, and juries to pursue their personal predilections."  *Id.*

### D.     This Court Should Not (and Need Not) Certify Questions to the New Hampshire Supreme Court.

Finally, Defendants argue that, if "the Court believes that the vagueness inquiry turns on an unresolved question of state law, then it should" either "make an informed prophecy of what the New Hampshire Supreme Court would do" or "certify questions of law to the New Hampshire Supreme Court."  *See* Mov. Br. at 36.  This argument fails for several reasons.

Here, Defendants' suggestion that certification to the New Hampshire Supreme Court is an appropriate way to address "any doubts about vagueness" is incorrect because certification would improperly rewrite the Statute.  *See* Mov. Br. at 36.  The words of the District Court of South Carolina in *Integon Gen. Ins. Co. v. Bartkowiak ex rel. Bartkowiak* are applicable here: "this [certification] request is based upon 'a misconception of the purpose of certification, which is not to permit a party to seek to persuade the state court to change what appears to be present law.'"  No. 7:09-CV-03045-JMC, 2010 WL 4156471, at *6 n.2 (D.S.C. Oct. 19, 2010) (unreported) (quoting *Cantwell v. Univ. of Massachusetts*, 551 F.2d 879, 880 (1st Cir. 1977) and citing 36 *C.J.S. Federal Courts* § 81 (2010)).

The United States Supreme Court's decision in *Baggett v. Bullitt*, 377 U.S. 360 (1964), is instructive.  There, in a First and Fourteenth Amendment vagueness challenge to two Washington laws that required teachers to swear a loyalty oath as a condition of employment, the Court held that abstention pending state court review would serve no purpose, and deemed the statutes unconstitutional on their face.[22]  The Court explained that waiting for any guidance from the state courts would be unhelpful because the challenged loyalty oath was not "open to one or a few interpretations, but to an indefinite number."  *Id.* at 378; *see also Bd. of Airport Comm'rs v. Jews for Jesus*, 482 U.S. 569, 575-76 (1987) (in a First Amendment challenge to an airport speech resolution, holding that, as in *Baggett*, "it is difficult to imagine that the resolution could be limited by anything less than a series of adjudications").

As in *Baggett*, it is difficult to see how any construction by the New Hampshire Supreme Court of the Statute—such as how to parse the scope of whether certain instruction improperly teaches that an individual "is inherently racist, sexist, or oppressive, whether consciously or

---

[22] *See Arizonans for Official English v. Arizona*, 520 U.S. 43, 75 (1977) ("Certification today covers territory once dominated by a deferral device called 'Pullman abstention' . . . .").

unconsciously," see RSA 193:40, I(b)—"could eliminate the vagueness from these terms" or meaningfully assist teachers and diversity administrators in interpreting the Act. *Baggett*, 377 U.S. at 378. Like the teacher loyalty oaths in *Baggett*, the Statute is not "open to one or a few interpretations, but to an indefinite number," and "[i]t is fictional to believe that anything less than extensive adjudications, under the impact of a variety of factual situations, would bring the [Statute] within the bounds of permissible constitutional certainty." *Id.* at 377-78. For example, in the event of certification, the New Hampshire Supreme Court would be addressing the interpretation of the Statute in the abstract, and not in the context of the potentially thousands of statements by educators and potentially thousands of assigned books that could implicate the Act. As in *Baggett*, construction of the Statute "in the state court, abstractly and without reference to concrete, particularized situations so necessary to bring into focus the impact of the terms on constitutionally protected rights of speech . . . [would] hold little hope of eliminating the issue of vagueness. . . ." *See id.* at 378. The perils and inadequacies of such abstract rewriting in a vacuum are particularly evident when reviewing Defendants' multiple attempts, in a similar vacuum, to clarify what the Statute means—attempts that have raised more questions than answers and have only compounded the Act's ambiguity. *See supra* Part B.[23]

---

[23] Certification is also inapt where, as here, deference to the state court would deprive Plaintiffs of prompt federal court relief to remedy the Statute's continued infringement on their federal constitutional rights. *See, e.g., Bd. of Airport Comm'rs*, 482 U.S. at 575-76 (noting that "the chilling effect of the resolution on protected speech in the meantime [as state courts engage in adjudications under the statute] would make such a case-by-case adjudication intolerable"); *Vt. Right to Life Comm. v. Sorrell*, 221 F.3d 376, 386 (2d Cir. 2000) (rejecting state court abstention where "any further delay would result in the inhibition of 'mass media activities'" that the plaintiff "may be considering for the coming election season").

**CONCLUSION**

For the foregoing reasons, the Motion to Dismiss should be denied.


Dated: May 20, 2022

                           Respectfully submitted,


                           By:   */s/ Peter J. Perroni*
                                 NOLAN PERRONI, PC
                                 NH Bar No. 16250
                                 73 Princeton Street
                                 North Chelmsford, MA  01863
                                 978-454-3800
                                 peter@nolanperroni.com


STROOCK & STROOCK & LAVAN LLP
Charles G. Moerdler, Esq.*
David J. Kahne, Esq.*
Elizabeth Milburn, Esq.*
180 Maiden Lane
New York, New York 10038
(212) 806-5400
cmoerdler@stroock.com

SELENDY & GAY PLLC
Faith Gay, Esq.*
1290 6th Avenue
New York, NY 10104
(212) 390-9000
fgay@selendygay.com

*Co-Counsel for Local 8027, AFT-New
Hampshire, AFL-CIO, Ryan Richman,
John Dube and Jocelyn Merrill,
teachers in the New Hampshire Public Schools,
and Kimberly Green Elliot and Meghan Evelyn
Durden parents or guardians of children in the
New Hampshire public schools,*

ANDRES MEJIA AND CHRISTINA KIM PHILIBOTTE,

By and through their attorneys,

*/s/ Gilles R. Bissonnette*
Gilles R. Bissonnette (N.H. Bar. No. 265393)
Henry R. Klementowicz (N.H. Bar No. 21177)
SangYeob Kim (N.H. Bar No. 266657)
AMERICAN CIVIL LIBERTIES UNION OF NEW HAMPSHIRE
18 Low Avenue, Concord, NH 03301
Tel. 603.224.5591
gilles@aclu-nh.org

*/s/ Chris Erchull*
Chris Erchull (N.H. Bar No. 266733)
GLBTQ LEGAL ADVOCATES & DEFENDERS
18 Tremont, Suite 950
Boston, MA 02108
Tel.: 617.426.1350
cerchull@glad.org

Pamela E. Phelan (N.H. Bar No. 10089)
Sarah J. Jancarik (N.H. Bar No. 272310)
DISABILITY RIGHTS CENTER-NEW HAMPSHIRE
64 N Main St, Ste 2
Concord, NH 03301-4913
Tel.: 603.228.0432
Sarahj@drcnh.org

William E. Christie (N.H. Bar No. 11255)
S. Amy Spencer (N.H. Bar No. 266617)
SHAHEEN & GORDON, P.A.
107 Storrs Street
P.O. Box 2703
Concord, NH 03302
Tel.: 603.225.7262
wchristie@shaheengordon.com
saspencer@shaheengordon.com

*Co-counsel for Plaintiffs Andres Mejia and Christina Kim Philibotte*

*/s/ Morgan C. Nighan*
Morgan C. Nighan (N.H. Bar No. 21196)
NIXON PEABODY LLP
Exchange Place
53 State Street
Boston, MA 02109-2835
Tel.: 617.345.1031
mnighan@nixonpeabody.com

*/s/ David A. Vicinanzo*
David A. Vicinanzo (N.H. Bar No. 9403)
NIXON PEABODY LLP
900 Elm Street, 14th Floor
Manchester, NH 03101
Tel.: 603.628.4000
dvicinanzo@nixonpeabody.com

Travis Hill*
NIXON PEABODY LLP
55 West 46th Street
New York, NY 10036-4120
Tel.: 212.940.3131
thill@nixonpeabody.com

Emerson Sykes*
Speech, Privacy, and Technology Project
Leah Watson*
Sarah Hinger*
Racial Justice Program
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
Tel.: 212.549.2500
esykes@aclu.org
lwatson@aclu.org
shinger@aclu.org

NATIONAL EDUCATION ASSOCIATION-NEW HAMPSHIRE,

By and through its attorneys,

<u>*/s/ Jason Walta*</u>
Alice O'Brien*
Jason Walta*
NATIONAL EDUCATION ASSOCIATION
1201 Sixteenth St. NW
Washington, DC 20036
Tel: 202.822.7035
aobrien@nea.org
jwalta@nea.org

Esther K. Dickinson (N.H. Bar No. 20764)
Lauren Snow Chadwick (N.H. Bar No. 20288)
Staff Attorneys
NATIONAL EDUCATION ASSOCIATION-
   NEW HAMPSHIRE
9 South Spring Street
Concord, NH 03301-2425
Tel.: 603.224.7751
edickinson@nhnea.org
lchadwick@nhnea.org

Nathan R. Fennessy (N.H. Bar No. 264672)
Rue K. Toland (N.H. Bar No. 269021)
PRETI FLAHERTY BELIVEAU & PACHIOS LLP
57 North Main Street
Concord, NH 03301
Tel.: 603.410.1500
nfennessy@preti.com
rtoland@preti.com

*Admitted *pro hac vice*.

*Co-Counsel for National Education Association-New Hampshire*

44