**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW HAMPSHIRE**

| | | |
|---|---|---|
| LOCAL 8027, AFT-NEW HAMPSHIRE, AFL-CIO, RYAN RICHMAN, JOHN DUBE and JOCEYLN MERRILL, teachers in the New Hampshire Public Schools, and KIMBERLY GREEN ELLIOTT and MEGHAN EVELYN DURDEN, parents or guardians of children in the New Hampshire public schools. | ) ) ) ) ) ) | |
| Plaintiffs, | ) | |
| v. | ) | |
| FRANK EDELBLUT, in his Official Capacity as Commissioner of the DEPARTMENT OF EDUCATION ("DOE"), CHRISTIAN KIM in his Official Capacity as the Chair of the NEW HAMPSHIRE COMMISSION ON HUMAN RIGHTS, and JOHN FOMELLA in his Official Capacity as ATTORNEY GENERAL of the State of New Hampshire. | ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |
| ------------------------------------------------------------------------- | ) | Civil No. 1:21-cv-01077-PB |
| ANDRES MEJIA, CHRISTINA KIM PHILIBOTTE, and NATIONAL EDUCATION ASSOCIATION-NEW HAMPSHIRE, | ) ) ) ) | |
| Plaintiffs, | ) | |
| v. | ) | |
| FRANK EDELBLUT, in his official capacity only as the Commissioner of the New Hampshire Department of Education, | ) ) ) | |
| JOHN M. FORMELLA, in his official capacity only as the Attorney General of the State of New Hampshire, | ) ) | |
| AHNI MALACHI, in her official capacity only as the Executive Director of the New Hampshire Commission for Human Rights, | ) ) ) | |
| CHRISTIAN KIM, in his official capacity only as the Chair of the New Hampshire Commission for Human Rights, | ) ) ) | |
| KEN MERRIFIELD, in his official capacity only as the Commissioner of the Department of Labor, | ) ) | |
| Defendants. | ) | |

**AFT PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO**
**DEFENDANTS' MOTION TO DISMISS**
**COUNTS II - IV OF THE AFT COMPLAINT**

**TABLE OF CONTENTS**

<u>Page</u>

TABLE OF AUTHORITIES ................................................................................................. ii

ARGUMENT ........................................................................................................................1

POINT I       COUNT II OF THE AFT COMPLAINT STATES A COGNIZABLE
CLAIM: THE STATUTE IS INVALID UNDER THE FOURTEENTH
AMENDMENT ................................................................................................1

POINT II      COUNT III OF THE AFT COMPLAINT AVERS A COGNIZABLE
CLAIM THAT THE STATUTE IS INVALID BECAUSE IT ABRIDGES
THE FIRST AMENDMENT FREE SPEECH RIGHTS OF STUDENTS
AND TEACHERS ............................................................................................6

            A.      The Statute Impairs Teachers First Amendment Rights ............................9

            B.      The Statute Violates Students' First Amendment Right to Receive
Information ............................................................................................15

            C.      The Statute Has a Chilling Effect on Teachers' Speech Outside
The Classroom .......................................................................................20

POINT III     DEFENDANTS' MOTION TO DISMISS COUNTS 2-4
OF THE AFT COMPLAINT LACKS MERIT. .......................................24

            A.      All of AFT Plaintiffs' Claims Are Federal Causes of Action
Asserted Against Individual State Actors and Are Thus Cognizable ........26

            B.      Counts II, III and IV Allege a Federal Cause of Action with
Reference to State Law and Thus Are Not Barred by the Eleventh
Amendment ............................................................................................27

CONCLUSION ...................................................................................................................30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adams v. Trustees of the Univ. of North Carolina-Wilmington*,
  640 F.3d 550 (4th Cir. 2011) ................................................................11

*Arce v. Douglas*,
  793 F.3d 968 (9th Cir. 2015) ................................................................17

*Asociacion De Subscripcion Conjunta Del Seguro De Responsabilidad
  Obligatorio v. Flores Galarza*,
  484 F.3d 1 (1st Cir. 2007) ....................................................................25

*Auburn Police Union v. Carpenter*,
  8 F.3d 886 (1st Cir. 1993) ....................................................................22

*Baggett v. Bullitt*,
  377 U.S. 360 (1964) ...............................................................................7

*Bd. of Educ. Island Trees Union Free Sch. Dist. No. 26 v. Pico*,
  457 U.S. 853 (1982) .............................................................15, 16, 17, 19

*Brammer-Hoelter v. Twin Peaks Charter Academy*,
  602 F.3d 1175 (10th Cir. 2010) ............................................................22

*Cintron v. State Bd. of Ed.*,
  384 F. Supp. 674 (D.P.R. 1974).............................................................13

*Decotiis v. Whittemore*,
  635 F.3d 22 (1st Cir. 2011) .........................................................8, 11, 14

*Demers v. Austin*,
  746 F.3d 402 (9th Cir. 2014) ................................................................10

*Doe v. Meyers*,
  No. 18-CV-1039-JD, 2019 WL 4060068 (D.N.H. Aug. 28, 2019) ........................25

*Doe v. Shibinette*,
  16 F.4th 894 (1st Cir. 2021)...........................................................28, 29

*FCC v. Fox Television Stations, Inc.*,
  567 U.S. 239 (2012)................................................................................7

*Garcetti v. Ceballos*,
  547 U.S. 410 (2006)....................................................................... *passim*

*Gonzalez v. Douglas*,
  269 F. Supp.3d 948 (D. Ariz. 2017) ..............................................................17, 19

*Grayned v. City of Rockford*,
  408 U.S. 104 (1972)......................................................................................4, 7

*Griswold v. Connecticut*,
  381 U.S. 479 (1965)..............................................................................6, 16, 17

*Griswold v. Driscoll*,
  616 F.3d 53 (1st Cir. 2010)...............................................................................16

*Hafer v. Melo*,
  502 U.S. 21 (1991)........................................................................................24, 25

*Hague v. Massachusetts Dep't of Elementary & Secondary Educ.*,
  No. CIV.A. 10-30138-DJC, 2011 WL 4073000 (D. Mass. Sept. 12, 2011)...........................21

*Hazelwood School District v. Kuhlmeier*,
  484 U.S. 260 (1988)........................................................................................11

*Janus v. AFSCME*,
  138 S. Ct. 2448 (2018)....................................................................................22

*Johnson v. Poway Unified Sch. Dist.*,
  658 F.3d 954 (9th Cir. 2011) ............................................................................10

*Keyishian v. Board of Regents*,
  385 U.S. 589 (1967)......................................................................................8, 13

*Kolender v. Lawson*,
  461 U.S 352 (1983)........................................................................................2, 6

*Lane v. Franks*,
  573 U.S. 228 (2014).........................................................................................14

*Lee v. York Cnty. Sch. Div.*,
  418 F. Supp. 2d 816 (E.D. Va. 2006), *aff'd*, 484 F.3d 687 (4th Cir. 2007)...........................11

*Liverman v. City of Petersburg*,
  844 F.3d 400 (4th Cir. 2016) ...........................................................................22

*Londonderry Sch. Dist. SAU No. 12 v. State*,
  154 N.H. 153 (2006) ........................................................................................3

*Luethje v. Peavine School District of Adair Cnty.*,
  872 F.2d 352 (10th Cir. 1989) ..........................................................................22

*Mahanoy Area School Dist. v. B. L. by and through Levy,*
    141 S. Ct. 2038 (2021) ................................................................................6, 9, 21

*Martin v. City of Struthers,*
    319 U.S. 141 (1943) ..............................................................................................15

*Meriwether v. Hartop,*
    992 F.3d 492 (6th Cir. 2021) ..............................................................................10

*Moonin v. Tice,*
    868 F.3d 853 (9th Cir. 2017) ..............................................................................22

*Pennhurst State School & Hosp. v. Halderman,*
    465 U.S. 89 (1984) ................................................................................................27

*Pickering v. Board of Ed. of Tp. High School Dist. 205, Will County, Illinois,*
    391 U.S. 563 (1968) ..............................................................................11, 22, 24

*Pratt v. Indep. Sch. Dist. No. 831, Forest Lake, Minn.,*
    670 F.2d 771 (8th Cir. 1982) ..............................................................................17

*Providence Firefighters Loc. 799 v. City of Providence,*
    26 F. Supp. 2d 350 (D.R.I. 1998) ......................................................................23

*Reed v. Town of Gilbert,*
    576 U.S. 155 (2015) ..........................................................................................6, 7

*Ricciuti v. Gyzenis,*
    834 F.3d 162 (2d Cir. 2016) ................................................................................14

*Rideout v. Gardner,*
    123 F.Supp.3d 218 (D.N.H. 2015) ..................................................................6, 7

*Santa Cruz Lesbian and Gay Community Center v. Trump,*
    508 F. Supp. 3d 521 (N.D. Calif, Dec. 22, 2020) ..........................................19

*Scheck v. Baileyville School Comm.,*
    530 F. Supp. 679 (D. Me. 1982) ........................................................................16

*Sessions v. Dimaya,*
    138 S. Ct 1204 (2018) ............................................................................................4

*Silano v. Sag Harbor Union Free Sch. Dist. Bd. of Educ.,*
    42 F.3d 719 (2d Cir.1994) ..................................................................................11

*Silva v. Univ. of N.H.,*
    888 F. Supp. 293 (D. N.H. 1993) ................................................................11, 12

*Simon & Schuster v. Members of New York State Crime Victims Control Board,*
  502 U.S. 105 (1991)............................................................................................7

*Snyder v. Phelps,*
  562 U.S. 443 (2011)..........................................................................................14

*Stanley v. Georgia,*
  394 U.S. 557 (1969)..........................................................................................15

*Sweezy v. State of N.H. by Wyman,*
  354 U.S. 234 (1957)............................................................................................8

*Tinker v. Des Moines Sch. Dist.,*
  393 U.S. 503 (1969).............................................................................6, 7, 8, 11

*Town of Barnstable v. O'Connor,*
  786 F.3d 130 (1st Cir. 2015) ............................................................................25

*United States v. Nat'l Treasury Emps. Union,*
  513 U.S. 454 (1995)..........................................................................................22

*Vega v. Semple,*
  963 F.3d 259 (2d Cir. 2020)..............................................................................27

*Virgil v. Sch. Bd. of Columbia Cnty., Fla.,*
  862 F.2d 1517 (11th Cir. 1989) ...................................................................17, 18

*Wagner v. City of Holyoke,*
  100 F. Supp. 2d 78 (D. Mass. 2000) ................................................................13

*Ward v. Hickey,*
  996 F.2d 448 (1st Cir. 1993).......................................................................11, 13

*Will v. Mich. Dep't of State Police,*
  491 U.S. 58 (1989)............................................................................................24

*Wojcik v. Massachusetts State Lottery Com'n,*
  300 F.3d 92 (1st Cir. 2002)...............................................................................26

*Ex parte Young,*
  209 U.S. 123 (1908)...............................................................................25, 26, 27

**Statutes**

28 U.S.C. § 2201................................................................................................24

N.H. Rev. Stat § 354-A:29...................................................................................1

N.H. Rev. Stat. § 126-K:3....................................................................................5

N.H. Rev. Stat. § 160-B:6 ......................................................................................5

N.H. Rev. Stat. § 169-D:1 .....................................................................................5

N.H. Rev. Stat. § 169-D:22 ...................................................................................5

N.H. Rev. Stat. § 178:20-a ....................................................................................5

N.H. Rev. Stat. § 189:11 ..........................................................................2, 3, 4, 17

N.H. Rev. Stat. § 189:13 .....................................................................................4, 6

N.H. Rev. Stat. § 189:29-b(II) ...............................................................................5

N.H. Rev. Stat. § 193:40 ...............................................................................1, 4, 5

N.H. Rev. Stat. § 193-E:2-a(V)(a) ......................................................................12

N.H. Rev. Stat. § 263:56-b ....................................................................................5

N.H. Rev. Stat. § 284:21-h(II)(e)(i) ......................................................................5

N.H. Rev. Stat. § 354-A:30 ....................................................................................1

N.H. Rev. Stat. § 354-A:31 ....................................................................................1

N.H. Rev. Stat. § 354-A:32 ....................................................................................1

N.H. Rev. Stat. § 354-A:33 ....................................................................................1

N.H. Rev. Stat. § 354A:34 .....................................................................................1

In accordance with the Court's request and to minimize repetition, simultaneously herewith the AFT Plaintiffs have, together with the Mejia Plaintiffs, submitted their joint memorandum in opposition to Defendants' motion dismiss Count I of the AFT Plaintiffs' Complaint and the entirety of the Mejia Plaintiffs' Complaint (hereinafter the "Joint Submission").[1]  At issue there is Plaintiffs' joint challenge to the provisions of  New Hampshire sections 297 and 298 of 2021 House Bill 2 ("297 and 298" or "HB2"), codified at N.H. Rev. Stat. Ann. ("RSA") 354-A:29, RSA 354-A:30, RSA 354-A:31, RSA 354-A:32, RSA 354-A:33, RSA 354A:34, and RSA 193:40 (the "Statute"),[2] all enacted June 25, 2021, as void for vagueness in violation of the Fourteenth Amendment of the United States Constitution.

Here, the AFT Plaintiffs oppose the portion of Defendants' motion to dismiss addressed to Counts 2 to 4 of the AFT Complaint and demonstrate that cognizable claims are there stated. The dismissal motion should therefore be denied.

**ARGUMENT**

**POINT I**

**COUNT II OF THE AFT COMPLAINT STATES A COGNIZABLE CLAIM: THE STATUTE IS INVALID UNDER THE FOURTEENTH AMENDMENT.**

In the Joint Submission we addressed the Statute's invalidity under the Fourteenth Amendment's void for vagueness proscription *based on the language employed* in the text of the Statute.  Here, the ground for that challenge is accentuated in that the Statute's language, which

---

[1] Abbreviations employed herein are the same as those used in the accompanying Joint Submission by Plaintiffs.  On March 8, 2022, this Court, in the interests of judicial economy, issued an order, on consent of all parties, to consolidate the *Local 8027, AFT-New Hampshire, AFL-CIO et al v. Frank Edelblutt, et al*., then before Judge Laplante (the "AFT action") and the *Andres Mejia et al v. Frank Edelblut et al*. action (the "Mejia action") into a single proceeding before this Court.

[2] Together those enactments have come to be known as the "Banned Concepts Act" or "Divisive Concepts Act" and are collectively referred to herein as the "Statute."

abridges Fourteenth Amendment guarantees (*see* Joint Submission, Parts A-C), also conflicts with other extant laws, thereby (i) compounding the confusion that an ordinary citizen encounters by trying (usually on the spur of the moment) to discern what the law requires and which law to follow and (ii) because most of the conflicting statutes or regulations promulgated thereunder impose penalties *whichever path the teacher opts to follow* – an impermissible Hobson's choice.

Certainly few measures could be more confusing to the ordinary citizen or create a greater opportunity for arbitrary enforcement than when one statutory provision says "stop" and the other commands "go."  And if the alternatives each impose sanctions, that creates an intolerable affront in a free society.  That is especially the case where teachers are called upon to decide in the middle of their lessons (*e.g.*, in response to a student's question) which of two conflicting statutes must be followed and which to ignore, thereby potentially placing their careers in jeopardy, regardless of the path they follow.  *See Kolender v. Lawson,* 461 U.S. 352, 358, 360 (1983).

Perhaps the most glaring illustration involves RSA 189:11(I)(j) of the State's Education Law, which explicitly mandates that educators teach on the evolution of intolerance, bigotry, antisemitism, and national, ethnic, racial or religious hatred and discrimination and how to prevent the evolution of such practices.  *See* RSA 189:11(I)(j).  Specifically, New Hampshire law mandates that the public school instruct:

> *How* intolerance, bigotry, antisemitism, and national, ethnic, racial, or religious hatred and discrimination *have evolved* in the past [not just that they historically existed], and *can evolve*, into genocide and mass violence, such as the Holocaust, and *how to prevent the evolution of such practices.*

*Id.* (emphasis added).[3]  Yet, the Statute limits discussion on these topics simply and, as noted in

the Joint submission, *solely* to the "historical *existence* of these ideas," precluding "how" such

discriminatory practices have evolved in the past, "can evolve" and "how to prevent" their

evolution, a far wider and enhanced scope of learning than the mere "historical existence" of the

stated discriminatory practices.[4]  *See* Mejia Compl., Ex. 19 at 5.  These inconsistencies leave

teachers with the impossible task of reconciling two laws directly at odds with each other.  Take

Jim Crow, for example.  On the one hand, the State's education law requires educators to explain

Jim Crow's roots in slavery, continuing worldwide negative impact and how to prevent the

evolution of racial discrimination over time.  On the other hand, the Statute limits their

curriculum to solely discussing the static and "historical existence" of Jim Crow.  The Statute

now leaves teachers entirely uncertain about whether they can discuss how the Jim Crow laws

worked, who benefited, how it impacted the lives of generations past and present, and its

continuing impact on our society and nation, not to mention how its remnants (such as they may

be) can be put to final rest.  More to the point, what teacher would risk their livelihood and

profession by discussing more than just the "historical existence" of Jim Crow in an effort to

comply with New Hampshire's legal mandate to teach about its evolution (*see* RSA

189:11(I)(j))?  Few commonsense teachers would be so foolhardy in light of this politicized New

Hampshire environment, replete with "bounty hunters" sponsored by Moms of Liberty and "No

left Turn" complaints being launched against teachers.  *See* Joint Submission, Part C; *see id.*, Ex.

A.  Yet, in opting for the path of least resistance, the teacher will fail to give students the

---

[3] Solely by way of background, we note that the Educational Curriculum provisos were advanced by the Office of the Attorney General in an effort to resolve the problems presented in the *Claremont Trilogy* litigations and their progeny, including RSA 189:11(I)(j).  *See Londonderry Sch. Dist. SAU No. 12 v. State,* 154 N.H. 153 (2006).

[4] *See* Joint Submission at n. 14 (discussing how, as an established rule of statutory construction in federal jurisprudence, the doctrine *expressio unius est exclusio alterius* limits the Statutes "historical existence" exclusion to *preclude* any other exemption to the Statute or exclusionary construction).

adequate instruction prescribed and risks being sanctioned for failing to do that.  *See* RSA §

189:11(I)(j)) and RSA 189:13 ("The school board may dismiss any teacher . . . who does not

conform to regulations prescribed. . . .").  That is an impossible choice that the Statute compels

but the Supreme Court has ruled is constitutionally proscribed. *See Grayned v. City of Rockford*,

408 U.S. 104, 108 (1972); *Sessions v. Dimaya,* 138 S. Ct 1204, 1223, 1226-29 (2018) (Gorsuch,

J., concurring)

Notably, Defendants' submissions in this action and subsequent guidance documents

point to another Hobsons' choice now plaguing teachers in light of the Statute.  In July 2021,

following criticism of the Statute (*see* Mejia Compl, Ex. 20 at 1), the Department of Education,

the Commission on Human Rights and the Department of Justice issued the FAQ's discussed

under Point I.  FAQ 8 provides in relevant part:

8. Does this law apply to all school activities or just teaching?

The prohibitions apply to all activities carried out by public schools in their role as public
schools, *including extra-curricular activities that are part of the public school's work. . .*

Mejia Compl., Ex. 19 at 5.  Seemingly, the FAQ adopts the view that the Statute is not situs-

specific (*i.e.*, in school or on school property), by extending its proscriptions to extra-curricular

activities.  It remains unclear whether that includes or excludes the "away" baseball game or

swimming competition or like off-campus activities.  Does that mean that a teacher can respond

during off-premises extracurricular events to student questions concerning, for example, the

arguments advanced for and against pay disparities between male and female athletes in

competitive sports (*Cf.* RSA 193:40) or whether students with disabilities should be afforded

distinct treatment in competitive sports or other extra-curricular activities?  Indeed, the

appropriateness of including extra-curricular activities within the rubric of the Statute is far from

clear given that RSA 193:40 starts with the express limitation that it applies to pupils "in public

school" being "taught, instructed, inculcated or compelled to express belief in. . . ."  Again, a real-world conflict is posed with attendant potential for confusion by reason of vagueness.[5]

Lastly, the ample conflicts posed by the Statute are further exemplified by RSA 193:40's bans on age-related discussions notwithstanding New Hampshire laws specifically providing for age caps or minimums on certain activities.  The Statute prohibits discussing whether one's age makes one superior in any way to another, yet New Hampshire laws, like many state laws, clearly discriminate on the basis of age.[6]

To be clear, we do not mean to suggest that this Court should choose between the conflicting statutory requirements; *we do not*.  The AFT Plaintiffs merely point to these inconsistencies as illustrative of the Hobsons' choice facing educators first by the vagaries of the language employed in the Statute itself and then by that Statute's added source of confusion—its inherent conflict with extant laws that require persons of ordinary intelligence to navigate the added infirmity of an already vague and confusing law and potentially penalize whichever path the teacher follows; for, in every instance noted, one choice or the other is sanctionable. *See, e.g.* RSA 189:13.  And that peril is compounded by the absence of any discernible "guardrails" for

---

[5] Similarly, the Statute bars under RSA 193:40(I)(c) any discrimination based on the inherent superiority of certain students or adverse treatment of those suffering mental disabilities, by proscribing any discrimination unfavorable to the latter. Yet, RSA 189:29-b(II) distinguishes between and makes possible discriminatory treatment favoring those students who are "gifted" (i.e., those possessed of unique academic, artistic, or athletic potential) and those who may not be thus favored by reason of their mental or physical disabilities, by requiring that "every New Hampshire public school shall submit to the department of education . . . an annual narrative report detailing the policies, programs, and procedures that are in place to identify and accommodate the unique needs of gifted and talented students. If no such policies, programs, or procedures exist, the report shall so state." The Department of Education is then directed to make public reports thereon available on its website, RSA 189:29-b(III), for the obvious purpose of facilitating change. Again, how is that conflict other than an impermissible Hobsons' choice?

[6] *See RSA 126-K:3* (Proof of Age Purchaser)*; RSA 160-B:6(III), (IX)* (Requirements for Sale of Fireworks); *RSA 169-D:1* (relating to children in need of services); *RSA 169-D:22* (Limitations of Authority Conferred); *RSA 263:56-b* (relating to revocation of drivers licenses); *RSA 284:21-h(II)(e)(i)*(relating to purchase and sale of lottery tickets); *RSA 178:20-a(II)(c)* (limiting on premises cigar, beverage, and liquor licenses).  Accordingly, what can teachers say to students on these subjects, especially in response to questions like: "why is it fair that I cannot buy a lottery ticket or drive a car?"

enforcement. *See Kolender,* 461 U.S at 358, 360.  The Statute is void for vagueness on multiple grounds.  At the very least, a cognizable claim for relief is stated defeating Defendants' dismissal motion.

<u>**POINT II**</u>

**COUNT III OF THE AFT COMPLAINT AVERS A COGNIZABLE CLAIM THAT THE STATUTE IS INVALID BECAUSE IT ABRIDGES THE FIRST AMENDMENT FREE SPEECH RIGHTS OF STUDENTS AND TEACHERS**

Defendants' arguments that the AFT Plaintiffs have failed to a state a First Amendment claim are without merit and against the weight of authority.  *See* Mov. Br. at 13.  Our public schools have long been recognized as "nurseries of democracy."  *Mahanoy Area School Dist. v. B. L. by and through Levy*, 141 S. Ct. 2038, 2046 (2021).  But "[o]ur representative democracy only works if we protect the marketplace of ideas" and ensure that "free exchange facilitates an informed public opinion."  *Id.*  "The Nation's future [therefore] depends upon leaders trained through wide exposure to that robust exchange of ideas which discovers truth out of a multitude of tongues, (rather) than through any kind of authoritative selection."  *Tinker v. Des Moines Sch. Dist.*, 393 U.S. 503, 512 (1969).  Accordingly, the Supreme Court has recognized that "the State may not, consistently with the spirit of the First Amendment, contract the spectrum of available knowledge."  *Griswold v. Connecticut*, 381 U.S. 479, 482 (1965); *see also Tinker*, 393 U.S. at 511 (stating that public schools "may not be enclaves of totalitarianism").

In general, content-based restrictions are held to a heightened standard under the First Amendment.  *See Rideout v. Gardner*, 123 F.Supp.3d 218, 228 (D.N.H. 2015) (Barbadero, J.) (applying strict scrutiny to content-based restrictions on taking or disclosing photos of completed voter ballots); *see also Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015) ("Government regulation of speech is content based if a law applies to particular speech because of the topic

6

discussed or the idea or message expressed.").[7]   The court's analysis of speech restrictions in the

context, as here, of a void for vagueness challenge is even more exacting.  *FCC v. Fox Television*

*Stations, Inc.*, *supra*, 567 U.S. 239, 253-254 (2012).  That is because "where a vague statute

abuts upon sensitive areas of basic First Amendment freedoms" it "operates to inhibit the

exercise of those freedoms."  *Grayned*, 408 U.S. at 109 (internal quotation marks and citations

omitted); *see also Baggett v. Bullitt,* 377 U.S. 360, 372 (1964).  The efforts of a narrow segment

of the New Hampshire legislature to enact this sweepingly vague legislation censoring speech

based on political partisanship undermine these bedrock First Amendment principles.

　　　The chilling effect on public school classrooms (and even outside the schoolhouse)

plainly undermines students' access to free-flowing ideas and opinions necessary to prepare them

as informed citizens in our democracy.  Students and teachers do not "shed their constitutional

rights to freedom of speech or expression at the schoolhouse gate."  *Tinker*, 393 U.S. at 506.

Both have protected speech rights.  Notably, Defendants ignore those of students to receive

information and learn.  Instead, Defendants focus solely on those of teachers. Accordingly we

first address teachers' free speech rights in the context of scholarship and teaching and then turn

to those in the context of the beneficiaries of scholarship and teaching— students.

---

[7] To determine whether a general statute restricting free speech is constitutional, this Court, citing *Reed v. Town of Gilbert* 576 U.S. 155 (2015), made clear the applicable test "for resolving conflicts between speech rights and governmental interests," is that "[c]ontent-based restrictions are subject to strict scrutiny." *See Rideout v. Gardner*, 123 F.Supp.3d 218, 228 (D.N.H. 2015) (Barbadero, J.), *aff'd*  838 F.3d 65 (1st Cir. 2016) (applying strict scrutiny to content-based restrictions on taking or disclosing photos of completed voter ballots).  The definition of whether a statutory or like restriction is content-based has also been clearly stated: "[g]overnment regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed." *Reed,* 576 U.S. at 163*; see also Simon & Schuster v. Members of New York State Crime Victims Control Board,* 502 U.S. 105, 116 (1991); *Rideout,* 123 F. Supp. 3d at 229.  To the extent the Statute applies to teacher speech as private citizens outside of school, the Statute's terms can only be read as content-based and would be subject to strict scrutiny.

Defendants' challenge to the AFT Plaintiffs' First Amendment claim is premised on the mistaken notion that teachers waive their free speech rights simply by reason of their public employment.  That premise turns upon unfounded reliance on cases holding that the First Amendment does not protect the speech of public employees under *Garcetti v. Ceballos,* 547 U.S. 410 (2006).[8]  Yet, the *Garcetti* limitation upon First Amendment protections simply does not apply in cases such as this.  As Justice Kennedy, writing for the Court in *Garcetti* made clear, neither the Court's analysis nor its holding apply to "scholarship or teaching" because "expression related to academic scholarship or classroom instruction implicates additional constitutional interests. . . ." that the *Garcetti* Court did not consider.  *Id.* at 425.  Instead, what continues to control, from the concurrent standpoint of teacher and student speech, is *Tinker.* 393 U.S. at 506 (" First Amendment rights, applied in light of the special characteristics of the school environment, are available to teachers and students. . . .  This has been the unmistakable holding of this Court for almost 50 years.");[9] *see also Sweezy v. State of N.H. by Wyman,* 354 U.S. 234, 250 (1957) ("Teachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise our civilization will stagnate and die").[10]  Just

---

[8] Indeed, the First Circuit has observed that "[n]othing in *Garcetti* or the decisions interpreting it can fairly be read to suggest that all speech tangentially or broadly relating to the work of a public employee is per se unprotected." *Decotiis v. Whittemore*, 635 F.3d 22, 33 (1st Cir. 2011).

[9] In terms apt here, the *Tinker* Court cautioned: "In our system, state-operated schools may not be enclaves of totalitarianism. . . .  Students in school as well as out of school are 'persons' under our Constitution. They are possessed of fundamental rights which the State must respect, just as they themselves must respect their obligations to the State. In our system, students may not be regarded as closed-circuit recipients of only that which the State chooses to communicate. They may not be confined to the expression of those sentiments that are officially approved." *Id.* at 511.

[10] *See also Keyishian v. Board of Regents,* 385 U.S. 589, 603 (1967) ("The vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools. . . .  The classroom is peculiarly the marketplace of ideas. The Nation's future depends upon leaders trained through wide exposure to that robust exchange of ideas which discovers truth out of a multitude of tongues, (rather) than through any kind of authoritative selection.") (internal citations omitted).

last year, the current Supreme Court, reaffirmed *Tinker's* premise in rejecting an attempt to constrain off-campus speech.  *Mahanoy Area School District v. B.L. by and through Levy,* 141 S. Ct. 2038 (2021).[11]

Thus posited, Defendants' motion challenging whether AFT Plaintiffs' First Amendment claim is cognizable fails—resting as it does on an unfounded premise.  However, in the interests of completeness we demonstrate that, upon careful analysis, both students and teachers have protectable constitutional interests, one in receiving speech and learning (*i.e.*, scholarship) and the other in providing teaching consistent with academic standards.  Even if teachers, as public employees, were the only challengers–and they are not–the First Circuit has not applied *Garcetti* to teachers' free speech claims (because the above-stated additional constitutional interests, not present in customary public employee-speech cases) must be accounted for in the classroom.  Second, even if *Garcetti* did apply to classroom settings, the Statute's reach extends to extracurricular activities that do not implicate teachers performing their jobs as public employees in the classroom and also impacts matters of public concern.  Third, Defendants wholly ignore the Statute's infringement on New Hampshire *students'* First Amendment rights to receive information and ideas under well-settled Supreme Court precedent.

**The Statute Impairs Teachers First Amendment Rights**

Predictably, Defendants assert in conclusory fashion that teachers are public employees and therefore their speech under the *Garcetti* precedent is not entitled to any First Amendment

---

[11] Justices Alito and Gorsuch in their concurrence in *Mahanoy* pose the apt and unresolved issue as to the validity and appropriateness of speech constraints in public schools, which they state educate some 90% of the nation's students (particularly those unable to afford private schools). Here, students in private schools or in home study are not thus constrained by the challenged Statute or the by the laws applicable to those students, their teachers or the schools themselves. 141 S. Ct. at 2051-52.

protection.  But the analysis requires a far closer reading of both the breadth and impact of the Statute and the more specific school-based First Amendment case law in the First Circuit.

Tellingly absent from Defendant's recitation of *Garcetti* is any First Circuit case involving the application of *Garcetti* to teachers in the classroom.  That is for good reason. *Garcetti* involved a claim by a district attorney that the First Amendment prohibited his superiors from transferring him to a less desirable position as a consequence of a memo he wrote criticizing the veracity of an affidavit underlying a search warrant used to gather evidence in his case.  *Garcetti,* 547 U.S. 410.  The Supreme Court had no occasion in *Garcetti* to examine the intersection of public employee speech in the workplace with the well-established and existing First Amendment precedent concerning speech in the classroom.  In fact, in response to strong arguments made by Justice Souter in his dissenting opinion, the majority opinion in *Garcetti expressly carved out schools* from its ruling, stating that "*[w]e need not, and for that reason do not, decide whether the analysis we conduct today would apply in the same manner to a case involving speech related to scholarship or teaching.*"  *Id.* at 425 (emphasis added).  For this reason, district and circuit courts around the country have declined to extend the holding of *Garcetti* to schools (albeit mostly in the higher education context, which nevertheless proves instructive here).  *See, e.g.*, *Meriwether v. Hartop*, 992 F.3d 492, 504 (6th Cir. 2021) (holding "the Supreme Court's prior decisions," which "have 'long recognized that given the important purpose of public education and the expansive freedoms of speech and thought'" provided better "guidance" than *Garcetti*); *Demers v. Austin*, 746 F.3d 402, 412 (9th Cir. 2014) ("We conclude that *Garcetti* does not—indeed, consistent with the First Amendment, cannot—apply to teaching and academic writing that are performed 'pursuant to the official duties' of a teacher and professor."); *Johnson v. Poway Unified Sch. Dist.*, 658 F.3d 954, 968 (9th Cir. 2011) (declining

to apply *Garcetti* when assessing the legality of the government's curtailment of K-12 teachers' speech); *Adams v. Trustees of the Univ. of North Carolina-Wilmington*, 640 F.3d 550 (4th Cir. 2011) (declining to extend *Garcetti* to academic speech).[12]

While Defendants in their motion to dismiss have cherry-picked cases from the Seventh and Sixth Circuits, the one First Circuit case actually cited, *Decotiis v. Whittemore*, 635 F.3d 22 (2011), involved an independent contractor *speech therapist, not a classroom teacher or his/her students.*  In cases involving speech by *teachers* in the classroom, the First Circuit has analyzed restrictions on teachers' instructional speech by analyzing whether: (1) the regulation is reasonably related to a legitimate pedagogical concern; and (2) the school provided the teacher with notice of what conduct was prohibited."  *Ward v. Hickey*, 996 F.2d 448, 452 (1st Cir. 1993) (citing *Keyishian v. Board of Regents*, 385 U.S. 589, 87 S. Ct. 674 (1967)).[13]  Under this analysis, Defendants cannot sustain their burden to show that the Statute is a constitutionally permissible regulation.

First, Defendants fail to establish that the Statute is related to a legitimate pedagogical concern.  Courts consider the following factors when conducting this analysis: the "age and sophistication of the students, the relationship between teaching method and valid educational objective, and the context and manner of the presentation."  *Id.* at 453; *see also Silano v. Sag Harbor Union Free Sch. Dist. Bd. of Educ.*, 42 F.3d 719, 722 (2d Cir.1994).  In *Silva v. Univ. of*

---

[12] Indeed, in *Pickering v. Board of Ed. of Tp. High School Dist. 205, Will County, Illinois,* 391 U.S. 563 (1968), the Supreme Court stressed the free speech right of teachers "to speak on issues of public importance" holding that absent falsity, such speech "may not furnish the basis for his dismissal from public employment" even where is implicates superiors. *Id* at 574-75.

[13] This standard has sometimes been referred to as the "*Tinker-Hazelwood*" standard.  *See, e.g., Lee v. York Cnty. Sch. Div.,* 418 F. Supp. 2d 816, 821 (E.D. Va. 2006), *aff'd*, 484 F.3d 687 (4th Cir. 2007).  While *Hazelwood School District v. Kuhlmeier*, 484 U.S. 260 (1988), is relevant, *Tinker* controls here.  *See supra,* pp. 8-9.  *Hazelwood* involved extra-curricular activities and also left open the possibility for a *Tinker* challenge by not broadly ruling that the school district's decision on curriculum content was presumptively correct.

*N.H.*, 888 F. Supp. 293 (D. N.H. 1993), for example, the District of New Hampshire found that disciplining a University professor for sexually inappropriate and explicit language in the classroom under the College's new sexual harassment policy violated the First Amendment. The court reasoned that the policy was not "reasonably related to the legitimate pedagogical purpose of providing a congenial academic environment because it employs *an impermissibly subjective standard* that fails to take into account the nation's interest in academic freedom." *Id.* at 314 (emphasis added). The court relied on Supreme Court precedent holding that "[t]he Nation's future depends upon leaders trained through wide exposure to [a] robust exchange of ideas which discovers truth out of a multitude of tongues, rather than through any kind of authoritarian selection." *Id.* (internal quotation marks and citations omitted).[14]

The legislative history here evidences that the Statute's goal (as pressed by its sponsors) was to censor speech based on subjective partisan beliefs and little, if anything else. *See* Joint Submission at pp. 3-7. In favoring partisan ideals over legitimate pedagogical interests (*e.g.*, as expressed in the statutory curriculum, legislators failed to account for the nation's long-standing objective to foster academic freedom (let alone consider any of the factors required by the First Circuit)). Rather, the statutory language paints a broad brush of censorship across all age groups and academic settings and fails to evidence any effort by legislators to tailor a specific ban to students' educational needs.

---

[14] While Defendants may attempt to make a distinction between K-12 school and higher education, that distinction should be made on a case-by-case or issue-by-issue basis focusing on subject matter, age and maturity of affected students and like relevant characteristics. New Hampshire law expressly affords teacher the opportunity then to craft appropriate guardrails by giving them joint responsibility, together with local school boards, for curriculum content, as well as scope, organization and the materials to be used. *See* RSA 193-E:2-a(V)(a), but the prohibitions of the Statute do not contain like protections. Moreover the question of the doctrinal application of *Garcetti* to schools should not – and does not – depend on the age of the students.
.

Second, the Statute does not give adequate notice of the conduct proscribed.  *See* Joint

Submission, Parts A-B; *see also Ward*, 996 F.2d. at 454.  The relevant inquiry in this Circuit is

whether it was "reasonable for the school to expect the teacher to know that [their] conduct was

prohibited[.]"  *Ward*, 996 F.2d at 454.  In *Keyishian v. Board of Regents*, the Supreme Court

made clear that: "When one must guess what conduct or utterance may lose him his position, one

necessarily will steer far wider of the unlawful zone. . . .  The danger of that chilling effect upon

the exercise of vital First Amendment rights must be guarded against by sensitive tools which

clearly inform teachers what is proscribed."  385 U.S. at 604.

As demonstrated in the Joint Submission, the Statute is unconstitutionally vague,

provides insufficient notice, and requires AFT Plaintiffs to "guess at what speech or expressive

conduct may run afoul of a regulation or statute," meaning that they "may be overly cautious in

his or her words and deeds."  *Wagner v. City of Holyoke*, 100 F. Supp. 2d 78, 84 (D. Mass.

2000); *see also* Joint Submission. at Parts A-B.  The danger in the First Amendment context is

that "[t]hose . . . sensitive to the perils posed by . . . indefinite language, avoid the risk . . . only

by restricting their conduct to that which is unquestionably safe.  Free speech may not be so

inhibited."  *Id.* (quoting *Baggett v. Bullitt*, 377 U.S. 360, 372 (1964)); *see also Cintron v. State

Bd. of Ed.*, 384 F. Supp. 674, 678 (D.P.R. 1974) ("[G]overnment regulation must not be vague,

inhibiting conduct outside of the forbidden zone; and it must not be overbroad, sweeping within

its prohibitions protected activity.").  Accordingly, because it is not related to legitimate

pedagogical interests and because it fails to provide teachers with notice as what speech is

prohibited, the Statute violates the First Amendment.

Finally, even if *Garcetti* did apply, the Statute is still constitutionally infirm.  As an initial

matter, as the cases cited by Defendants make clear, "[n]avigating the shoals of the standard

articulated by the Supreme Court in *Garcetti v. Ceballos,* 547 U.S. 419 (2006), has proven to be tricky business, and particularly so in the context of a motion to dismiss, because the inquiry is so highly fact intensive and context specific." *Decotiis*, 635 F.3d at 26.

Thus, should the Court decide the *Garcetti* framework applies, further discovery is needed to determine, for example, whether the Statute exclusively applies to teachers in their official capacities and only to those who teach public school students, whether statutory construction and enforcement have employed the *Kolender*-mandated guardrails or whether enforcement has been inappropriately motivated.[15] *See Ricciuti v. Gyzenis*, 834 F.3d 162, 164 (2d Cir. 2016) (denying employer's motion for summary judgment on police officer's First Amendment retaliation claim because determinations about whether plaintiff spoke pursuant to her official duties was a question of fact for trial).

Moreover, it cannot reasonably be disputed that the Statute implicates matters of public concern.  Speech touching on "the political and moral conduct of the United States and its citizens, the fate of our Nation, homosexuality in the military, and scandals involving the Catholic clergy" are matters of public concern because of their "public importance." *Snyder v. Phelps*, 562 U.S. 443, 454 (2011) (Roberts, CJ.); *see also Lane v. Franks*, 573 U.S. 228, 240 (2014) (finding that matters of public concern include "political, social, or other concern to the community" in their everyday lives) (internal quotation marks and citations omitted)*.*  The Statute here precludes teachers from discussing "broad issues of interest to society at large." *Snyder*, 562 U.S. at 454.  Its vague language seemingly bars discussion about oppressive regimes taking root around the world, systemic racism, sexism, implicit bias, race and gender in the United States.  These topics are clearly of public import given the broad political and social

---

[15] *See* Joint Submission at Part C.

movements coalescing in the United States today around race and gender.  Otherwise, state legislators nationwide would not be passing similar statutes.  Thus, even under the *Garcetti* standard, Plaintiffs have stated a claim for a violation of the First Amendment.

**B.**      **The Statute Violates Students' First Amendment Right to Receive Information**

The complete answer to Defendants' *Garcetti*-based argument is that *students* are not public employees, they do not check their constitutional rights at the schoolhouse door, and First Amendment rights extend to their receipt of ideas, information and tutelage.

Defendants' unduly narrow reading of the AFT Complaint fails to account for AFT Plaintiffs' allegations demonstrating that the Statute violates *students'* First Amendment rights to receive information.  AFT Compl. ¶ 2.  It is well-settled that the First Amendment protects not only the free speech rights of teachers and parents, but also the rights of public school students to receive information and ideas.  *Stanley v. Georgia*, 394 U.S. 557, 564 (1969); *see also Martin v. City of Struthers*, 319 U.S. 141, 143 (1943) (free speech guarantee "embraces the right to distribute literature . . . and necessarily protects the right to receive it.")

The Supreme Court's seminal case, *Bd. of Educ. Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 866-68 (1982) (hereinafter "*Pico*"), recognized a corollary to traditional First Amendment analysis.  In a case involving the banning of certain books, the Court held that "the right to receive ideas is a necessary predicate to the recipient's meaningful exercise of his own rights of speech, press and freedom," and that students are protected from having their access to information censored based on illegitimate purposes, such as "political orthodoxy."  *Id.* at 866-67.  Under this Supreme Court precedent, the Constitution does not permit the official suppression of ideas based on "narrowly partisan or political" interests, "racial animus," or a desire to "deny [students] access to ideas with which [the school or school district]

disagree[].  *Id*. at 870-72.  Public schools are "vitally important in the preparation of individuals for participation as citizens, and as vehicles for inculcating fundamental values necessary to the maintenance of a democratic political system."  *Id.* at 864.

Courts in the First Circuit have followed *Pico* to prevent schools from restricting student access to information with which school districts may simply have a political disagreement. *Scheck v. Baileyville School Comm*., 530 F. Supp. 679 (D. Me. 1982), is particularly relevant in this regard.  There, the district court considered a First and Fourteenth Amendment challenge to the constitutionality of banning the book "365 Days" from the Woodland High School library. Plaintiffs, parents of students, sought declaratory relief that the ban was unconstitutional.  The court agreed, recognizing that "the right to receive information and ideas has been recognized by the United States Supreme Court in a variety of contexts."  Apt here, the court explained the particular importance of the right to receive information in the public school context: "[t]he public school remains a most important public resource in the training and development of youth for citizenship and individual fulfillment. . . .  The right to receive information and ideas is nowhere more vital than in our schools and universities."  *Id*.[16]

---

[16] *Griswold v. Driscoll*, 616 F.3d 53 (1st Cir. 2010), is not at odds with this reasoning.  There, the First Circuit considered a challenge by the Turkish American Association, teachers, parents and students to an advisory curriculum guide posted on the school board's website about the Armenian Genocide without any references to the "contra-genocide perspective."  The First Circuit's holding that the school curriculum guide was not a "virtual school library" under *Pico* is distinguishable.  The exclusion of references to the contra-genocide in the curriculum guide in *Griswold* was effectuated by the school board in its discretion.  Here, however, the New Hampshire legislature has mandated (albeit vaguely) what a teacher may not teach in school, removing any discretion from the school board to regulate teaching on certain divisive topics.  The chilling effect of the legislation is therefore far more profound.  Moreover, unlike in *Griswold* where the plaintiffs were asking for their historical perspective to be *included* in the curriculum, the State is affirmatively *excluding* teaching and speech on particular topics.  The distinction means that a teacher could still answer a student's question about the contra-genocide, but not about critical race theory.  Indeed, the *Griswold* decision expressly cautioned against such blanket limitations on school curricula because it would foreclose on open enquiry in the classroom:

> The appellants' argument, if adopted, might actually have the effect of foreclosing future opportunities for open enquiry in the classroom. A ruling in their favor might induce school boards to limit the permissible materials for teaching any subject likely to generate heat, simply to foreclose suits under *Pico* when they modified references or specifications later. . . .  Regardless, a non-exclusive guide to teachers does not resemble a covert library whose shelves limit how far its

In light of national efforts to restrict certain types of teaching, courts have recognized that the *Pico* decision extends beyond the library into the classroom and instructional material.  In *Arce v. Douglas*, 793 F.3d 968 (9th Cir. 2015), for example, the Ninth Circuit examined a statute that banned certain ethnic studies programs because they promoted "ethnocentrism" or "reverse racism."  *Id.* at 973.  Programs could not include courses or classes promoting resentment towards a race or class of people or advocating for ethnic solidarity instead of treatment of pupils as individuals.  Under a challenge that the curricular decision restricted the students' First Amendment right to information, the Ninth Circuit, relying on *Pico*, held that "limitations on school curricula that restrict a student's access to materials otherwise available may be upheld only where they are reasonably related to legitimate pedagogical concerns."  *Id.* at 983.  On remand, the district court found that the curricular decision were based on illegitimate and racial motives and were therefore unconstitutional.  *Gonzalez v. Douglas*, 269 F. Supp.3d 948, 972-74 (D. Ariz. 2017).

Similarly, in *Pratt v. Indep. Sch. Dist. No. 831, Forest Lake, Minn.*, 670 F.2d 771 (8th Cir. 1982), the Eighth Circuit found that a local school board violated students' First Amendment right to receive information by removing a film from the school's curriculum because the board objected to the ideas expressed in the film.  *Id.* at 777 (holding that "to avoid a finding that it acted unconstitutionally, the board must establish that a substantial and reasonable governmental interest exists for interfering with the students' right to receive information").  In *Virgil v. Sch.*

---

intended student patrons can range around on their own, and there is no apparent reason to treat the Guide's open-ended character as entailing a limit on the Commonwealth's discretion to modify it.

*Id.* at 59-60.  Parenthetically, the curriculum rationale advanced in *Griswold* would be factually inapplicable here, since the State-mandated curriculum in New Hampshire (*see* RSA 189:11(I)(J)), is directly at odds with the Statute.  *See supra* at 2-4.

*Bd. of Columbia Cnty., Fla*., 862 F.2d 1517, 1522-23 (11th Cir. 1989), the Eleventh Circuit also rejected the proposition that school officials have an unfettered right to remove a textbook from a curriculum.  The court held that to pass constitutional muster, the removal decision must have been reasonably related to a legitimate pedagogical concern.  *Id*. at 1522.

Perhaps recognizing this damaging precedent, Defendants side-step AFT Plaintiffs' well-pled allegations showing that the Statute deprives New Hampshire students of access to diverse texts and discussions based on partisan ideology lacking any legitimate pedagogical purpose. Each year, New Hampshire seniors prepare for the workforce, college, or whatever else may lay ahead, with the assurance that they have acquired the necessary skills to thrive in our complex and ever-changing world.  AFT Compl. ¶ 25.  As alleged in AFT Plaintiffs' Complaint, the Statute impedes New Hampshire students' right to this basic adequate education by spreading fear and uncertainty amongst teachers about what may be taught.  AFT Compl. ¶¶ 2-3, 7.  To illustrate, at a time when Russia, asserting its superiority, seeks to dominate Ukraine and chaos and terror abound, and when China continues to coerce the Uighurs, can teachers teach the vice of domination and war in that context and can students learn that war and cruelty are not romantic ideals? Dare teachers attempt to impart that knowledge in an appropriate context?

Students are therefore being deprived of their constitutionally recognized right to access information and ideas.  Plaintiff Kimberly Green Elliott has already observed a noticeable difference in the quality of her son's education given his teacher's self-censorship on certain controversial subjects.  AFT Compl. ¶ 10.  Plaintiff Meghan Evelyn Durden believes the Statute will prevent her daughter from receiving a full and robust education.  AFT Compl. ¶ 11. Students are entitled to—and should expect—a full and robust exchange of ideas in the classroom, uncorrupted by political censorship and extremist partisanship.  AFT Compl. ¶¶ 2-3.

Yet, the Statute is placing them at a competitive disadvantage because they are not receiving a sufficiently comprehensive education.  AFT Compl. ¶ 7.

The Statute censors students' access to information based solely on the political orthodoxy of its drafters.  As the Supreme Court recognized, the "First Amendment does not tolerate laws that cast a pall of orthodoxy over the classroom."  *Pico*, 457 U.S. at 870 (internal quotation marks and citations omitted).  Just as the Supreme Court held in *Pico* that school boards could not exercise their discretion to remove books in a "narrowly partisan or political manner," New Hampshire cannot cull ideas and discussions in its classrooms that are at odds with its political ideology (or, more appropriately, at odds with the ideology of an unduly and momentarily powerful few empowered by a budgetary deadline).  In direct contravention of *Pico*, New Hampshire legislators outright banned topics unfavorable to their base because they were "motivated by party affiliation."  *Id*. at 870-71.  Defendants' efforts to mask the Statute as an "antidiscrimination" measure is yet another blatant attempt to conceal the law's illicit motives.  *See Gonzalez*, 269 F. Supp. 3d at 973 (rejecting Arizona school district's argument that policy to reduce racism in schools was a legitimate pedagogical objective as pretextual because the statute was in fact enacted and enforced based on racial animus).  The Statute's legislative history speaks for itself.  The State sought to ban racial, gender and other related topics deemed unpopular by some once President Trump's Executive Order proved unsuccessful in California federal court.  *See Santa Cruz Lesbian and Gay Community Center v. Trump,* 508 F. Supp. 3d 521 (N.D. Calif, Dec. 22, 2020); *see also* Joint Submission at pp. 3-4.  This political gamesmanship violates the constitutional rights of students to access information and ideas in a non-partisan manner.  At the very least, additional discovery is needed to ascertain whether HB2 is narrowly partisan and motivated by political orthodoxy.

### C.    The Statute Has a Chilling Effect on Teachers' Speech Outside The Classroom

In addition to improperly applying the *Garcetti* framework and ignoring the allegations concerning a *students'* right to receive information, Defendants' motion to dismiss is based on the faulty premise that the Statute only concerns curricular and pedagogical speech inside the classroom.  *See* Mov. Br. at 3, 13-15. That, of course, conflicts with the FAQ 8 representation by these same Defendants that extracurricular activities are included under the Statute. *See* Mejia Compl., Ex. 19.  In any event, Defendants' narrow reading of AFT Plaintiffs' claims is unsupported.  AFT demonstrated throughout their Complaint that the Statute imposes a far more sweeping restriction on AFT Plaintiffs' speech rights, not solely as public employees, but also as private citizens.

The broad mechanisms available to politically motivated *private citizens* to deputize the Statute's vague language extends the Statute's reach beyond the four walls of the classroom. AFT Compl. ¶ 3.  AFT Plaintiffs alleged in their Complaint, for example, that teachers "have been made the subject of online harassment, obscenities, and vicious attacks" given the political intimidation confronting them under the Statute's enforcement mechanisms.  AFT Compl. ¶ 3. "Moms for Liberty" has announced a $500 bounty for anyone reporting on a teacher violating the Statute.  AFT Compl. ¶ 45; *see also* Joint Submission, Ex. B (No Left Turn in Education Letter).  U.S. History and AP U.S. History teacher John Dube worries for his personal safety at home.  He has been targeted by a rightwing New Hampshire group pledging to shame teachers that signed on to an online petition simply promising to teach "honest" history.  AFT Compl. ¶ 8. The threats have precipitated an FBI investigation and required him to install personal security and safety equipment at his home.  AFT Compl. ¶ 8. Jocelyn Merrill has been made the subject of a letter complaint to her school district for signing a petition outside the classroom that

promised to teach honest history.  What teacher would risk discussing a banned concept at the supermarket, hair dresser, or movie theater now that a private right of action places an all-encompassing target on their back?  Teachers must now think twice before discussing these subjects in their everyday lives.  These allegations of "threats, coercion and intimidation" chilling speech outside the classroom are, at least, sufficient to survive dismissal at the pleadings stage.  *Hague v. Massachusetts Dep't of Elementary & Secondary Educ.*, No. CIV.A. 10-30138-DJC, 2011 WL 4073000, at *3 (D. Mass. Sept. 12, 2011) (denying motion to dismiss because plaintiffs' allegations of threats, coercion and intimidation infringing on their First Amendment rights were neither speculative nor remote).

In fact, Defendants have openly acknowledged that the Statute applies to speech outside the four corners of the classroom.  The FAQ, the document (co-authored by the Attorney General) that Defendants rely upon to clarify the constitutionally vague Statute, indicates that the prohibitions in the law "apply to all activities carried out by public schools in their role as public schools, *including extra-curricular activities* that are part of the public school's work."  Mejia Compl., Ex. 19 at 5 (emphasis added).  The Statute targets extra-curricular speech and speech not necessarily part of a general course of instruction.  *See Mahonoy Area Sch. Dist.*, 141 S. Ct. at 2046 (noting that the First Amendment leeway typically granted to schools is diminished for off-campus speech).  Accordingly, Defendants' blanket reliance on *Garcetti* to argue that the Statute does not implicate protected speech because it applies solely to AFT Plaintiffs' speech in the *classroom* is inconsistent with Defendants' own guidance and public representations.  *See* Mov. Br. at 17.

In cases like this one, the Supreme Court has made clear that public employees do not relinquish "the First Amendment rights they would otherwise enjoy as citizens to comment on

matters of public interest." *United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454, 465 (1995) (hereinafter "*NTEU*") (quoting *Pickering v. Board of Ed. of Township High School Dist. 205, Will Cty.*, 391 U.S. 563, 568 (1968)).  And where, as here, a law operates as a broad, prior restraint "chill[ing] potential speech before it happens," more exacting scrutiny is required than the *Pickering* standard used in traditional retaliation cases.  *Id.* at 468; *see also See Janus v. AFSCME*, 138 S. Ct. 2448, 2472 (2018) ("A speech restrictive law with widespread impact . . . gives rise to far more serious concerns than could any single supervisory decision," thereby requiring the government to shoulder "a correspondingly heavier burden") (internal quotation marks and citations omitted); *Auburn Police Union v. Carpenter*, 8 F.3d 886, 903 (1st Cir. 1993) (holding that prior restraint of citizen speech "comes to [the] Court bearing a heavy presumption against constitutional validity").[17]  *NTEU*'s more exacting standard applies to prior restraints in public schools.  *See Brammer-Hoelter v. Twin Peaks Charter Academy*, 602 F.3d 1175, 1180-84 (10th Cir. 2010) (holding that a school policy directing "teachers not [to] discuss school matters with anyone" was unconstitutional); *Luethje v. Peavine School District of Adair Cnty.*, 872 F.2d 352, 353 (10th Cir. 1989) (holding that a school board policy instructing cafeteria workers not to "take any school problems other places" or "discuss it with others" was unconstitutional).

Defendants also fail to advance any substantial government interest justifying such sweeping restrictions on speech.  Where the government defends a prior restraint it must do so by demonstrating that the "recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way."  *NTEU,* 513 U.S. at 475; *see also*

---

[17] Courts in other circuits have routinely struck down rules imposing a broad swath of limitations on speech like the Statute here.  *See Liverman v. City of Petersburg*, 844 F.3d 400, 408 (4th Cir. 2016) (holding that a police department's social media policy forbidding the dissemination of information on social media critical of the police was unconstitutional); *Moonin v. Tice*, 868 F.3d 853, 859 (9th Cir. 2017) (holding unconstitutional K9's policy expressly stating that all communications by line employees with outside persons about work needed to be approved by the chain of command).

*Providence Firefighters Loc. 799 v. City of Providence*, 26 F. Supp. 2d 350, 356 (D.R.I. 1998) (finding that defendants have no substantial interest that requires such sweeping censorship, except vague "speculation about the pernicious effects" of speech that the Supreme Court explicitly rejected).  The scant substantive legislative history supporting the Statute's passage is telling here.  There is no legitimate reason or justification provided supporting the Statute's broad reach to myriad topics targeting teacher speech, particularly outside the classroom. Instead, the record shows that the Statute's predecessor—HB544—was directly modelled on and copied from former President Trump's unconstitutional Executive Order.  That context, along with the sponsor's outspokenness on the issues of  systemic racism and diversity and inclusion, illustrates the true motives behind the Statute's passage: wholesale silencing of uncomfortable ideas based on narrowly partisan interests.  AFT Compl. ¶ 79.  Finally, the claim that anti-discrimination is the premise behind the challenged Statute is entirely pretextual.  New Hampshire has, as we have shown in the Joint Submission, a robust and historic array of enforced and enforceable anti-discrimination laws that give lie to Defendants' claim.

Any suggestion that the Statute abandoned the "divisive concepts" prohibition in favor of broader provisions to truly combat discrimination is unfounded.  Defendants do not dispute that legislature openly declared the purpose of the law was to limit the discussion of certain subjects in the classroom, nor can they refute the strictly partisan vote that bypassed normal legislative procedure.  AFT Compl. ¶¶ 78-81.  Indeed, discovery will readily prove that point. There is likewise no mention in the legislative record of specific unaddressed discrimination in New Hampshire that needed fixing by the Statute.

In sum, it cannot seriously be suggested that the Statute survives the heightened review necessary for restrictions on free speech, or that this Statute was tailored to further a pedagogical

interest and most narrowly impinge on students and teachers rights while, supposedly, addressing unstated but supposedly still open discrimination issues or the discordant views of some.

## POINT III

### DEFENDANTS' MOTION TO DISMISS COUNTS 2-4 OF THE AFT COMPLAINT LACKS MERIT

Count IV of the AFT Complaint seeks declaratory relief invalidating the Statute pursuant to 28 U.S.C. § 2201 on the ground that the Statute is void and unenforceable for the reasons stated in Counts I-III of the AFT Complaint. The AFT Complaint maintains that declaratory relief is appropriate and necessary. Defendants do not separately challenge the potential applicability or appropriateness of such relief or the Court's power to grant such relief subject to the merits of Counts II and III. Hence, Count IV turns upon the Court's determination of the cognizability of Counts II and III and its determination as to the relief to be granted thereunder. Dismissal *in vacuo* and at this juncture thus is inappropriate.

Defendants also invoke Eleventh Amendment sovereign immunity to support dismissal, maintaining that "Counts II, III and IV of the [AFT] complaint should be . . . dismissed to the extent they are premised on state law." (Mov. Br. 13). While the general proposition they rely upon – that the Eleventh Amendment immunizes the States from certain private suits in federal courts– is to some (wholly inapplicable) extent correct, the Supreme Court has ruled that in cases such as this Defendants' application is improper.

Preliminarily, it merits note that *Will v. Mich. Dep't of State Police,* 491 U.S. 58, 71 (1989), with which Defendants open their argument (*see* Mov. Br. at 11), was a § 1983 *damages action* under the FELA.  The Supreme Court subsequently held *Will* inapplicable to its Eleventh Amendment jurisprudence involving, as here, "a rule of constitutional law" challenge seeking injunctive and declaratory relief instead of damages from the public treasury.  *Hafer v. Melo,* 502

U.S. 21, 29-30 (1991). In such cases, Justice O'Connor writing for a unanimous Supreme Court, dispositively wrote "[t]he Eleventh Amendment does not bar such suits. . . ." *Id.* at 31.[18]

Even in the absence of the foregoing rulings, Defendants' argument that the Eleventh Amendment applies "to the extent the AFT Plaintiffs assert violations of or seek declarations under state law" lacks merit. *See* Mov. Br. at 11-13. The AFT Plaintiffs' claims specifically charge violation of the First and Fourteenth Amendments under the United States Constitution. *See* AFT Compl. ¶¶ 102-39. Rather, AFT Plaintiffs' federal claims fall squarely within the exception to sovereign immunity under the Eleventh Amendment articulated over a century ago in *Ex parte Young*, 209 U.S. 123, 155 (1908).

Thus, *Ex parte Young* "allows a way around the bar to federal jurisdiction . . . in cases where prospective declaratory or injunctive relief is sought under federal law." *Asociacion De Subscripcion Conjunta Del Seguro De Responsabilidad Obligatorio v. Flores Galarza*, 484 F.3d 1, 24 (1st Cir. 2007). "In determining whether the doctrine of *Ex parte Young* avoids an Eleventh Amendment bar to suit, a court need only conduct a straightforward inquiry into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Town of Barnstable v. O'Connor*, 786 F.3d 130, 139 (1st Cir. 2015) (internal quotation marks and citations omitted); *see also Flores Galarza*, 484 F.3d at 24 ("While the Eleventh Amendment prohibits a party from bringing suit against a state in federal court, it does not prohibit a party from bringing suit against a state officer in federal court for prospective declaratory or injunctive relief under federal law."); *Doe v. Meyers*, No. 18-CV-1039-JD, 2019 WL 4060068, at *3 (D.N.H. Aug. 28, 2019) ("[A] state official who is violating

---

[18] Justice O'Connor also observed: "[S]ince *Ex parte Young*, 209 U.S. 123 (1908)," we said, "it has been settled that the Eleventh Amendment provides no shield for a state official confronted by a claim that he had deprived another of a federal right under the color of state law." *Hafer*, *supra*, 502 U.S. at 30.

federal law is not acting as the state for purpose of the Eleventh Amendment, and the court can order the official to stop violating federal law.").[19]

A straightforward analysis of AFT Plaintiffs' claims demonstrates that they clearly fall within the ambit of the exception to sovereign immunity provided by *Ex parte Young.*

### A.     All of AFT Plaintiffs' Claims Are Federal Causes of Action Asserted Against Individual State Actors and Are Thus Cognizable

All of the AFT Plaintiffs' claims assert federal causes of action under the First and Fourteenth Amendments of the U.S. Constitution against individual state actors seeking injunctive or declaratory relief to preclude conduct violative of Constitutional strictures.  *See, e.g.,* AFT Complaint ¶¶ 102-11, 122-32.

Indeed, Defendants effectively concede that Count I is exempt from dismissal under the Eleventh Amendment because it seeks to enjoin Defendants' continuing violations of AFT Plaintiffs' due process rights under the Fourteenth Amendment of the U.S. Constitution.  *See* Mov. Br. at 12.  The gravamen of Count I is that the Statute must be struck down because it is vague in that it does not clearly define for teachers what they are prohibited from teaching in the classroom (and, in consequence, what students are barred from learning).  *See* AFT ¶¶ 102-11.  It also follows that the Count II challenge is likewise exempt. Count II simply buttresses Count I's Fourteenth Amendment challenge by *adding* that the Statute's vagueness under federal law is *heightened* by the conflict between the Statute and State law and by severely sanctioning teachers faced with two conflicting statutes governing their ability to teach.  *See supra* Point 1. Stated otherwise, Count II avers that the Statute is void for vagueness under the due process clause of the Fourteenth Amendment for the added reason that its vagueness or lack of clarity is

---

[19] The First Circuit case cited by Defendants, *Wojcik v. Massachusetts State Lottery Com'n,* 300 F.3d 92, 99, 101 (1st Cir. 2002), was likewise a damages action because of plaintiff's employment termination.

illustrated by the conundrum the Statute poses: compliance with one violates the other and thus the teacher is confronted with an impermissible Hobsons' choice.  *See* AFT Complaint ¶ 120.

There can be no real dispute that Count III, alleging that Defendants violated AFT Plaintiffs' freedom of speech under the First Amendment of the U.S. Constitution, is also a federal claim.  *See* AFT Complaint ¶¶ 122-32.  Likewise, Count IV plainly seeks declaratory and injunctive relief from Defendants for their continuing violations of the U.S. Constitution's free speech and due process guarantees.  *See* AFT Complaint ¶ 139 (stating that "the Teaching Discrimination Statute and any Regulations promulgated thereunder, are invalid and void under . . .  the Constitution of the . . . United States. . . .").

### B.     Counts II, III and IV Allege a Federal Cause of Action with Reference to State Law and Thus Are Not Barred by the Eleventh Amendment

Defendants' argument that Counts II, III, and IV are barred by the Eleventh Amendment under the *Pennhurst* doctrine because those claims reference state law is against the weight of authority.  *See* Motion to Dismiss at 12.  The *Pennhurst* doctrine precludes a federal court from enjoining state officials on the basis of *state* law, notwithstanding the *Ex parte Young* exception to sovereign immunity.  *See Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89 (1984). It is well-settled, however, that *Pennhurst* does not prohibit parties from citing or relying on state law in furtherance of their federal constitutional claims.  *See Vega v. Semple*, 963 F.3d 259, 283 (2d Cir. 2020) (holding that the district court correctly observed that dismissal was not warranted based on plaintiffs' citation to "state standards merely as evidence that helps inform the [federal constitutional] analysis, and not as a mandate that they seek to enforce via injunctive relief"). Thus, *Pennhurst* does not compel dismissal of claims for prospective relief against state officers in their official capacity for alleged violations of federal law simply because the party seeking such relief refers to state law in order to bolster their federal claim.

*Doe v. Shibinette*, 16 F.4th 894 (1st Cir. 2021), is dispositive.  There, a class of plaintiffs

sued the Commissioner of the New Hampshire Department of Health and Human Services under

the Fourteenth Amendment on the ground that defendants violated their due process rights by

involuntarily holding them at private hospitals without a probable cause hearing within a

reasonable time.  The defense argued that plaintiffs' federal claims were predicated state law

claims because of references in the complaint to New Hampshire's law requiring probable cause

hearings within a 3-day period.  The First Circuit disagreed, reasoning that:

> [E]ven if New Hampshire law were different than it now is with
> respect of the duty of the Commissioner to provide for a probable
> cause hearing within three days . . ., they would still be entitled
> under the Fourteenth Amendment to an injunction directing the
> Commissioner to provide probable cause hearings within the time
> that they contend due process demands that such hearings be held.
> They are thus plainly seeking more than just a direction that state
> officials must conform their conduct to state law.

*See id.* at 903-904.  Thus, the First Circuit has made clear that sovereign immunity does not

necessitate dismissal of a complaint relying on state law to support the federal cause of action.

*Shibinette's* reasoning applies with equal force here to Counts II, III and IV.  Take, for

example, Count III.  Count III is a freedom of speech claim grounded in the First Amendment of

the U.S. Constitution.  The wrong charged is violation of a federal constitutional mandate. This

federal constitutional principle is independent of what state law requires. The state law is in

essence the justification or excuse Defendants offer for violating the U.S. Constitution.  *See* AFT

Complaint ¶¶ 124-32.  Those state policies and laws underscore the myriad ways in which the

Statute places AFT Plaintiffs' constitutionally protected freedom of speech rights under assault

in the classroom on a regular basis given the constant threat of disciplinary action abridging the

U.S. Constitution, which we seek here to enforce.  *See id.* ¶¶ 126-27.

28

Count II is a vagueness claim under the U.S. Constitution that references a *heightened* wrong or *additional* abridgment of Fourteenth Amendment guarantees (not in any way a diminution of the impermissible vagueness pled under Count I and which Defendants acknowledge is immune from Eleventh Amendment challenge). That expanded wrong results from the constitutionally proscribed *added* vagueness and confusion, with attendant penalties, that the ordinary citizen encounters in trying to determine which of two conflicting paths to follow or inconsistent requirements that must be adhered to in order to avoid serious penalties and the potential for impermissible arbitrary enforcement.

Concisely put, the right sought to be enforced and wrong charged is abridgment of federal constitutional guarantees which Defendants seek to excuse or warrant by invoking a proscribed justification, one borne of direct conflict and the confusion it generates. *See* AFT Complaint ¶¶ 112-21. Again, it is the Federal Constitution we seek to enforce against Defendant's prospective and continuing abridgment.

Likewise, AFT Plaintiffs' reliance on state educational standards in support of declaratory and injunctive relief under Count IV was used to bolster their federal claim, not to assert independent violations of state law. *See id.* ¶¶ 133-39. *Shibinette* demonstrates that there is no bar to a federal court relying on state law for guidance when assessing what constitutes a vague statute or chilling speech under the U.S. Constitution.

## <u>CONCLUSION</u>

For the foregoing reasons, the Motion to Dismiss addressing AFT Plaintiffs' claims

should be denied.

Dated: May 20, 2022

Respectfully Submitted,

<u>/s/ Peter J. Perroni</u>
NOLAN PERRONI PC
NH Bar. No. 16250
73 Princeton Street
North Chelmsford, MA 01863
(978) 454-3800
peter@nolanperroni.com

STROOCK & STROOCK & LAVAN LLP
Charles G. Moerdler, Esq.*
David J. Kahne, Esq.*
Elizabeth C. Milburn, Esq.*
180 Maiden Lane
New York, New York 10038
(212) 806-5400
cmoerdler@stroock.com
dkahne@stroock.com
ecmilburn@stroock.com

SELENDY & GAY PLLC
Faith Gay, Esq.*
1290 6th Avenue
New York, NY 10104
(212) 390-9000
fgay@selendygay.com

*Co-Counsel for Local 8027, AFT-New
Hampshire, AFL-CIO, Ryan Richman,
John Dube and Jocelyn Merrill,
teachers in the New Hampshire Public Schools,
and Kimberly Green Elliot and Meghan Evelyn
Durden parents or guardians of children in the
New Hampshire public schools*