1                    UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF NEW HAMPSHIRE
2

3      * * * * * * * * * * * * * * * * *
                                       *
4      LOCAL, 8027 AFT-NEW HAMPSHIRE,  *
       AFL-CIO, ET AL.,                *
5                                      *
                        Plaintiffs.    *
6                                      *
                   v.                  *  No. 1:21-cv-1077-PB
7                                      *  September 14, 2022
                                       *  1:00 p.m.
8      FRANK EDELBLUT, IN HIS OFFICIAL *
       CAPACITY ONLY AS THE            *
9      COMMISSIONER OF THE NEW         *
       HAMPSHIRE DEPARTMENT OF         *
10     EDUCATION, ET AL.,              *
                                       *
11                      Defendants.    *
                                       *
12     * * * * * * * * * * * * * * * * *

13                 TRANSCRIPT OF MOTION HEARING
             BEFORE THE HONORABLE PAUL J. BARBADORO
14

15     APPEARANCES:

16     For the Plaintiffs:      Charles Moerdler, Esq.
                                David Kahne, Esq.
17                              Elizabeth Clarke Milburn, Esq.
                                Stroock Stroock & Lavan LLP
18
                                Gilles R. Bissonnette, Esq.
19                              American Civil Liberties Union
                                of New Hampshire
20
                                Peter J. Perroni, Esq.
21                              Nolan Perroni, P.C.

22     For the Defendants:      Samuel R. V. Garland, Esq.
                                N.H. Attorney General's Office (Civil)
23
       Court Reporter:          Brenda K. Hancock, RMR, CRR
24                              Official Court Reporter
                                United States District Court
25                              55 Pleasant Street
                                Concord, NH 03301
                                (603) 225-1454

1                    P R O C E E D I N G S

2              THE CLERK:  All rise for the Honorable Court.  Please

3     be seated.

4              This Court is in session and has for consideration

5     hearings on Motions to Dismiss in civil matter 21-cv-1077-PB,

6     Local 8027, et al. versus New Hampshire Department of Education

7     Commissioner, et al.

8              THE COURT:  All right.  Welcome, everybody.  It's a

9     big courtroom.  This is the first day I've had my courtroom

10    restored to normalcy after two years of pandemic construction

11    work in here.  I actually can see the people who are going to

12    be arguing in front of me, which is great, because part of the

13    time I'm, like, looking around barriers to see if I can see the

14    advocates when they're talking.

15             So, my thanks to everybody who has worked to put the

16    courtroom back together today.  This is a good a day for it,

17    because there are some other people here, which usually is not

18    the case.

19             So, let me lay out for you how I want to proceed.  As

20    the litigants know, there are two lawsuits here.  One of the

21    lawsuits asserts only a vagueness claim.  The other lawsuit has

22    two vagueness counts, a First Amendment count and another count

23    that I don't think does anything that's really distinct.

24             The way I want to proceed is to address the vagueness

25    claim first.  I want to give the defendant an opportunity to

1   outline their argument with respect to vagueness.  I note that

2   one of the complaints includes two counts on vagueness.  I will

3   let you know that I don't construe those as setting forth

4   distinct causes of action.  Rather, I see them as asserting

5   additional theories as to why the statute is vague.

6          So, when your turn comes you should feel free to argue

7   either of those two counts on vagueness; and the Attorney

8   General's Office, to the extent it wants to in its initial

9   presentation, can present on that count as well.  So, Count One

10  in the first complaint and Count One and Two of the second

11  complaint.

12         So, I'll hear the Attorney General's Office.

13         Perhaps it makes sense for whoever is going to

14  advocate for the party that just has the one-count complaint to

15  go next, unless you've internally arranged for a different

16  order, and then have the other plaintiffs' counsel say anything

17  they want to say to supplement.  I'll give the Attorney

18  General's Office a brief opportunity to reply.

19         People who know me know I also ask questions to people

20  out of order, so just be ready for that.

21         And then we'll go into the First Amendment claim that

22  is only asserted in one of the two actions.  I'll hear the

23  Attorney General's Office as to why that should be dismissed

24  and hear the response from the other side.  So, we'll go that

25  way.

1          So, Counsel, you're up, and tell me why you believe

2     the vagueness counts in the two complaints should be dismissed.

3          MR. GARLAND:  Thank you, your Honor.  I was planning

4     to treat them together as well, so that's a helpful

5     clarification.

6          So, under U.S. Supreme Court case law, First Circuit

7     case law and case law this court has also applied frequently,

8     the real threshold question or, really, the thrust of a

9     vagueness claim is, when it's brought as a facial matter, is,

10     is there no discernible standard of conduct in the statute.

11          THE COURT:  Wow, you're going to start right up and

12     get questioned really closely about that assertion.

13          MR. GARLAND:  I anticipated I would be, your Honor.

14          THE COURT:  You make that claim in your initial brief.

15     The defendants respond and say, Whoa, you've forgotten Johnson

16     and Dimaya in which the --

17          Folks can come in.  Can we -- there's a bunch of

18     people that want to come in.

19          THE CLERK:  There is an overflow courtroom.

20          THE COURT:  Oh.  If there are not seats here, there is

21     another courtroom where things will be broadcast.

22          THE CLERK:  Courtroom 1.

23          THE COURT:  But if you can find a seat, you're welcome

24     to come and sit.

25          So, as I was saying, the defendants say you've

1   completely ignored more recent Supreme Court case law in

2   Johnson and Dimaya which specifically rejects the theory on

3   which you're basing your motion, and in your reply you don't

4   even address that argument.

5        So, now is your chance.  Tell me why you've left me in

6   suspense as to why the plaintiffs are wrong in claiming that in

7   Johnson and Dimaya the Supreme Court expressly said, This is

8   not our test for vagueness challenges.

9        MR. GARLAND:  Understood, your Honor.  It was

10  certainly not my intention to leave you in suspense.

11       But I think Johnson and Dimaya are kind of, my

12  understanding of them is they are largely one-off cases that

13  dealt with the categorical rule that was being challenged in

14  those cases, and that subsequent to those cases this court, the

15  First Circuit as well, has applied the general standard to

16  vagueness challenges, facial vagueness challenges, that don't

17  implicate criminal statutes or sentencing laws that have kind

18  of that, the unique categorical approach --

19       THE COURT:  Well, you're saying two things that I'm

20  hearing:  Johnson and Dimaya are one-off cases, they only apply

21  to Johnson and Dimaya and nothing else, but then it seems like

22  you're suggesting a categorical distinction between criminal

23  and civil?  Is that what you're saying?

24       MR. GARLAND:  I'm not, your Honor.  Forgive me.  I may

25  be misusing the term, but I was referencing the specific

1    provisions that Johnson and Dimaya concern which -- I'm

2    forgetting the term of art for the sentencing and the felony --

3    forgive me.

4         I'm not trying to draw a categorical distinction, your

5    Honor, no.  But I do think when you're dealing with a statute

6    that has civil application the First Circuit and this court

7    have continued to apply the no-discernible-standard test.  I

8    think I would have to identify the specific --

9         THE COURT:  I don't think -- I've searched, because

10   you didn't give me anything in your brief.  I can find no First

11   Circuit case that squarely takes on the Johnson and Dimaya

12   statements and concludes that, oh, those cases are limited to

13   civil -- criminal, or those cases are limited to their facts.

14   If you've got one, tell me which one I should look at, because

15   I didn't find one of those.

16        MR. GARLAND:  It may be true, your Honor, and I will

17   defer to you, unless I can find one otherwise, that they

18   haven't specifically conducted that analysis.  I do believe,

19   and I'm going to have to find a case for you, and so forgive

20   me, and I'll certainly correct the record if I'm wrong about

21   this, that the First Circuit has applied the general vagueness,

22   the pre-Johnson and Dimaya vagueness test, and I'm certain that

23   this Court has.  I know that it's not binding on you, but Judge

24   Laplante did recently in a case that both Attorney Bissonnette

25   and I were --

1          THE COURT:  I mean, I have unlimited respect for Judge

2     Laplante, but this is not a court that has the ability to bind

3     other judges.  I have to make my own independent determination

4     on that.

5          Okay.  And I think you're aware that other courts have

6     rejected the view that -- other Circuits have rejected the view

7     that you're advancing, that that standard survives Johnson and

8     Dimaya.  Do you disagree with that?

9          MR. GARLAND:  I don't dispute that, your Honor.  I

10    believe also that the D.C. Circuit has applied the previous

11    standard post Johnson and Dimaya.

12         THE COURT:  But without taking on the Johnson and

13    Dimaya statement, yeah.  The problem is -- I mean, let's go

14    back and just revisit Johnson briefly.  Johnson, as you know,

15    is an opinion by Justice Scalia, who's always quite clear in

16    what he says and what he means, and he specifically says, I'm

17    quoting now:

18         In all events, although statements in some of our

19    opinions could be read to suggest otherwise, our holdings

20    squarely contradict the theory that a vague provision is

21    constitutional merely because there is some conduct that

22    clearly falls within the provision's reach.

23         He then goes on to cite two prior Supreme Court cases

24    for that proposition, and he says, These decisions refute any

25    suggestion that the existence of some obviously risky crimes

1    establishes the residual clause's constitutionality.

2         I mean, that isn't a statement saying that <u>Johnson</u> and

3    <u>Dimaya</u> are -- these are unique cases to which this standard

4    doesn't apply but it applies to others.  It simply says, Our

5    prior holdings do not hold that something -- and, as the court

6    goes on to explain, and this is the problem I'm having, I think

7    you will agree with this, if that is the standard, then the

8    only facial vagueness challenge that a court could ever sustain

9    to a statute is to a statute that is incomprehensible in all of

10   its possible applications.  It's essentially a statute that is

11   nonsensical, because, as the Court acknowledges, every statute

12   is going to have some applications that will be not vague, and

13   this statute has applications that would not be vague.

14        So, if you're right about the standard, I think you

15   win.  Maybe they can explain why I'm wrong about that.  But I

16   think you're wrong about the standard, so that's why you need

17   to really defend this proposition, because I think, if you're

18   right about it, it's hard for me to see how this statute is

19   vague in all possible applications.

20        For example, if a teacher decided to put up White

21   nationalist posters in her classroom and teach White

22   nationalism, that White people are inherently superior to Black

23   people, does anybody say it's unclear that that statute would

24   prohibit that?  I mean, it clearly prohibits that.

25        So, there are applications of the statute that would

1    be not vague.  So, if you're right about the standard, it seems
2    you win, but it seems like, to me, like you're wrong about the
3    standard.
4           So, what would you like to say?
5           MR. GARLAND:  Understood, your Honor.  I think my
6    response to that would be we had presented a particular legal
7    argument in our motion, and we haven't briefed the other one,
8    and I don't want to do that in an abstract sense, and I
9    understand we received the invitation to do so and maybe missed
10   the mark.
11          What I would say, though, is I do not read Johnson and
12   Dimaya for the proposition that a law that can be read as a
13   matter of statutory construction subject to guidance from the
14   enforcing agencies in a way that is understandable, largely
15   understandable, can be defeated by coming up with hypothetical
16   examples where it's inapplicable.
17          THE COURT:  I agree with you that -- so facial
18   challenges like this one are much harder to establish than an
19   as-applied challenge, and the plaintiffs have not elected to
20   present me with an as-applied challenge, but that is a -- it
21   would be much easier for the Court to look at a case in which a
22   plaintiff seeks pre-enforcement review and says, I want to
23   teach implicit bias, and this is how I teach implicit bias, and
24   I can't tell whether the statute would subject me to losing my
25   teaching credential if I taught it, and for that reason it's

1    unconstitutional as applied in this context.

2          The typical as-applied challenge is much easier for a

3    court to address.  A facial challenge, I agree with you the

4    plaintiffs cannot win merely by positing kind of bizarre

5    hypotheticals and saying it might be vague in that context.

6          One example that strikes me as kind of bizarre that is

7    a fifth-grade teacher who explains to her students that, Well,

8    you're not mature enough to drive; you have to develop maturity

9    to reach a driving age.  That would be a violation of the

10   statute.  That seems to be pretty far-fetched, and I don't

11   think I need to take on every hypothetical that the plaintiffs

12   could possibly think up because lawyers have unlimited

13   creativity, and I'm not going to engage in 45 hypothetical

14   situations.

15         But we have more than that here.  We have some real

16   significant issues, like implicit bias, which is something that

17   is clearly of concern to the teachers here, to the

18   administrators here, it was of concern to the -- obviously of

19   concern to the drafters of the legislation, because they talk

20   about unconscious bias.  It was a concern to the drafters of

21   the comments.

22         So, I think we have to -- we say, yes, I'm not going

23   to address and resolve every hypothetical.  A statute is not

24   vague if it is vague in a single application that has no real

25   bearing to the core issues that the statute addresses, but it

1   doesn't have to be vague in all applications if I follow the

2   direction of Justice Scalia in Johnson and, I believe, Justice

3   Kagan in Dimaya.  And so, that's why I think the foundational

4   principle on which your motion rests is at least concerning to

5   me because of the argument that the plaintiffs present.

6           MR. GARLAND:  Understood, your Honor.  One additional

7   point I'd make on that, and I'm happy to address some of what

8   may be closer hypotheticals, is, I also don't read Johnson and

9   Dimaya to contemplate that this is anything other than a legal

10  issue, and so if the -- your criticism is well taken, and if

11  you determine, You haven't presented me with the right

12  argument, I can't grant your motion, I understand that, but I

13  don't think it means that this case proceeds on into full-blown

14  discovery.  I think the question still is, is the text of this

15  statute sufficient, and, though I would have to ask it with my

16  tail between my legs, I think it's still something susceptible

17  to briefing.

18          THE COURT:  No, you should proceed with your argument.

19  I'm just saying that's a theoretical, a foundational concern

20  that I have that I've struggled with when I've tried to make

21  sense of the argument.  But you clearly maintain that argument

22  for purposes of pressing your case, and you're entitled to

23  develop it further if the case proceeds further.  But I still

24  have to decide whether the statute is unconstitutionally vague

25  on its face, so I still have to engage in this.

1          So, let me ask you do you agree that cases like one of

2     the cases you rely most heavily on, Hoffman, talk about factors

3     that can affect a facial vagueness challenge?  The Flipside

4     case, Hoffman, do you remember that one?

5          MR. GARLAND:  Yes, I do.

6          THE COURT:  So, that case identifies things like, if a

7     statute could be applied in ways that impinge upon First

8     Amendment protected rights, that is more likely to be a statute

9     that is going to be found unconstitutionally vague, right?

10    Vague in all of its application standard doesn't apply in that

11    context.  Do you agree with that?

12         MR. GARLAND:  I do agree with that, your Honor.

13         THE COURT:  Do you also agree that that case says that

14    whether a statute has a *scienter* requirement can be important

15    in determining whether something is vague or not?

16         MR. GARLAND:  I agree with that, your Honor, yes.

17         THE COURT:  Okay.  Do you agree that this statute,

18    these statutes -- when I say "statute" I mean all of the

19    sections in 354-A, the educational provision, in particular --

20    that none of those statutes have a *scienter* requirement

21    attached to them?

22         MR. GARLAND:  They don't have a -- yes, your Honor, I

23    agree with that insofar as it doesn't say "knowing," it doesn't

24    say "purposely," et cetera.

25         THE COURT:  So, let's get to what -- I understand your

1   concern, because some of the plaintiffs' briefing is to, like,

2   spin out 30 different hypotheticals, and some of them seem to

3   me quite far-fetched, but I can let you know of my core

4   concern.  This statute doesn't have a *scienter* requirement

5   attached to it, and it seems to me that the Attorney General's

6   Office is asserting that the statute can be violated even if

7   you don't expressly advocate a banned concept, if you advocate

8   in a way that implies that a banned concept is true.  Do you

9   think the statute could be construed to be violated if an

10  educator in teaching implies that a banned concept is true?

11          MR. GARLAND:  That certainly is not my understanding

12  of it, your Honor.

13          THE COURT:  Okay.  Let me show you what I'm concerned

14  about here.  So, your office, your boss, issued a formal AG's

15  opinion interpreting the statute, right?

16          MR. GARLAND:  Yes, your Honor.

17          THE COURT:  Okay.  And if we go and look at that

18  provision, and we look specifically at the provision that

19  discusses the sensitivity training safe harbor -- do you know

20  what I'm talking about?  It's at page 7 of 9.

21          MR. GARLAND:  Yes.  I'm familiar, your Honor, yes.

22          THE COURT:  Okay.  So, if we go halfway down the page

23  I'll read the key portions of it slowly, just so you'll

24  understand my concern.

25              "'Sensitivity training' includes implicit bias

1   training.  Implicit bias training is premised on teaching

2   people about biases they may have of which they are not

3   consciously aware and helping them become aware of those biases

4   so as to encourage treating others with dignity and respect and

5   to avoid treating others less equally.  Implicit bias training

6   recognizes that biases develop over time through such means as

7   personal experiences, messaging people may receive from media

8   and other sources.  Implicit bias training does not violate

9   Section 297 unless it includes concepts of group superiority or

10  inferiority based on inherent or innate group characteristics

11  or concepts that an identified group should be treated

12  unequally or discriminated against."

13          And then in the second paragraph it goes on to talk

14  about the sensitivity training safe harbor in the statute, and

15  what concerns me is the final couple of sentences in that

16  paragraph.  But if someone -- I guess I have to read the

17  sentence above.

18          "For example, a public employer or government program

19  may create a web-based resource entitled, 'Anti-Racist

20  Resources,' and include information designed to promote a

21  better understanding of racism and how to combat racism.  But,

22  if that web-based resource stated that it was designed to

23  'serve as a resource to white people' or to 'serve as a

24  resource for our white employees,' then it could violate

25  Section 297 because it may imply that White people

1    specifically, and for no other reason, are in need of

2    anti-racist resources-resources that could benefit people from

3    all backgrounds."

4            That suggests the Attorney General is saying to

5    people, educators or people who offer sensitivity training,

6    that if you do something that implies that a banned concept is

7    true you could be subject to discipline for violating the

8    statute.  Now, the statute doesn't say that by its terms, but

9    that's how the Attorney General interprets the statute, and

10   that seems to broaden quite expansively, especially when you

11   note that there's no *scienter* requirement.  So, a person could

12   unknowingly teach something that does not expressly advocate a

13   banned concept but that could be understood to imply, even

14   though they do it unknowingly, and they could be disciplined

15   for violating the teacher ethics code.

16           That's where my core concern is.  I think a lot of the

17   things the plaintiffs say, lawyers do what lawyers do, but I

18   think that is -- the core concern I have is, to the extent that

19   the statute can be read and the Attorney General appears to

20   read it to prohibit conduct that does not expressly advocate a

21   banned concept, since there's no *scienter* requirement to the

22   statute, that leaves educators in great doubt as to whether

23   their conduct may comply or not.

24           That's my core concern.  Please feel free to take

25   whatever time you need to answer it.

1           MR. GARLAND:  Absolutely, your Honor.  I have a number

2     of responses to that.  I want to engage with it head on, but

3     then also I have a couple of other points I'd like to make with

4     respect to it.

5           The first is I do not understand, based on my

6     representation to you as a Department of Justice official, that

7     that statement is designed to expand the scope of the statute

8     at all to a world where people who perceive or this subjective

9     perception would be what governs the conduct.  I think our

10    view, as we've laid out hopefully fairly clearly in our

11    briefing, and that the FAQs and the Attorney General's Opinion

12    otherwise identified, is the affirmative act.  It is the

13    affirmative act of doing this.  You use the word "advocate" I

14    think as a fine way to put it.  And so, to the extent that

15    specific portion of this opinion --

16          THE COURT:  Yeah, if you read the statute narrowly and

17    literally, what it bans is -- I want to use the term "advocate"

18    because different statutes use a different litany of things,

19    but I think "advocating" is a good way to describe it, that

20    something is, that something is not, that something should or

21    should not be, and then it makes those statements about what

22    that is or that should be or should not be, et cetera.

23          And if that's all and only what they did it's quite a

24    very narrow statute, but if it could encompass within its sweep

25    conduct that is unintentional but that is deemed by someone to

imply the advocacy of a concept, it becomes quite problematic.

That's where I'm concerned, and, since the Attorney General issues an official legal opinion in which he states that there can be violations by conduct that does not state but that implies, doesn't that give teachers good reason to fear that it might be applied in that way to them?

MR. GARLAND:  Your point is well taken, your Honor.  I do not understand that to have been the intent at all of this Opinion, and it certainly isn't the position I'm here advocating today.

THE COURT:  I think what we do have to make clear today is not the day in which this issue would be necessarily resolved.  If I were to grant your motion in its entirety, the case would be resolved.  If I were to deny your motion, it would be only to say that this states a plausible claim that it is unconstitutionally vague, and it's possible that, as things develop, we would probably next revisit it on cross-motions for summary judgment after some limited discovery has occurred.

So, it doesn't necessarily follow.  That's my concern. Whether you've addressed it sufficiently as to justify dismissal at the 12(b)(6) stage is one thing.  If you haven't, we just go on to the next stage.

MR. GARLAND:  Understood, your Honor, and I think I have two specific responses to that.  They're related.  The first one is we haven't presented this to you as largely a

1    legal question, there's no cross-motion seeking judgment on it,

2    but we present it to you as a matter of statutory construction,

3    and we've used our Guidance documents and the Attorney

4    General's Opinion to put in front of you a construction that we

5    believe survives a facial challenge as a matter of law.

6          But, as a federal judge or any other judge that's

7    considering this, you are able to, it is certainly within your

8    power to say, You know what?  I agree with everything you said,

9    but I don't agree with that statement.  To the extent that

10   statement could be read in the manner that you've expressed

11   concern about, that creates problems and as a matter --

12         THE COURT:  Well, we all agree that, I think we would

13   all agree, that I do not have the power to rewrite the statute

14   to save it, and I wouldn't try to do that.  But I do agree with

15   you to the extent that you're suggesting in order to address

16   their vagueness challenge you have to construe the statute,

17   right?  And so what you're saying is, if you adopted a

18   sufficiently narrow construction, then you wouldn't have the

19   vagueness problem that you're raising.

20         MR. GARLAND:  I think that's right, your Honor, and I

21   think what you could very well do in a memorandum order would

22   be to say, you know, I have acknowledged at oral argument or I

23   brought up at oral argument that this particular provision in

24   the AG's Guidance could create a problem as a matter of

25   statutory construction, based on the verbs that are used in the

1   statute, consistent with the doctrine of constitutional

2   avoidance, I reject that that is a plausible construction or is

3   an appropriate construction because it creates issues that,

4   frankly, judges don't create when they're construing statutes.

5         THE COURT:  Right.  But, again, we have to draw the

6   line.  A judge can't and shouldn't try to save a statute --

7   this isn't a constitutional avoidance kind of claim where I

8   have some duty to construe the statute to try to save it.  It's

9   either vague or it isn't.  I just have to say what it means.

10  And I agree with you, if I said that it meant only conduct that

11  expressly advocates and not anything by implication it would be

12  a far narrower statute and probably of far less concern to the

13  plaintiffs.  But that's not what the statute says.  I would

14  have to give it that construction, and certainly I shouldn't

15  disregard an official Attorney General opinion that construes

16  the statute more broadly than I think it should be -- that I

17  would have to think it's construed to adopt your argument here.

18  See what I'm saying?

19        MR. GARLAND:  I do, your Honor, but I do think it is

20  within your power, and I believe there's a good deal of Supreme

21  Court case law that supports the proposition that facial

22  invalidation is strong medicine; that you aren't required to

23  read it in a way that the language doesn't support, but, to the

24  extent there are plausible readings one way or the other, you

25  can elect the narrower one.  You can also certify the question,

1   which we've raised the specter of, but I think ultimately it's

2   well within your power sitting in this proceeding.

3          THE COURT:  Yeah.  The problem with me is that my

4   construction would not be authoritative.  It might be helpful

5   for people to know what I think about it, but what ultimately

6   matters is what the New Hampshire Supreme Court thinks about

7   it.  They have the final word on what the statute means, not

8   me.

9          If you wanted to go on, I did have another question

10  for you on a different topic, but do you have anything else you

11  want to say in support of the vagueness argument?  Of course,

12  I'll give you a chance to reply after the other side's

13  argument.

14          MR. GARLAND:  I have two very relatively small points

15  on what we were just discussing.  The first is that I think the

16  language of the statute itself does support the proposition --

17  this is really dealing with, as you term it, advocacy, and if

18  you look at 193:40 it talks about the express belief in or

19  support for, which I do think contemplates an affirmative act.

20  It doesn't say "knowingly," it doesn't say "purposefully," and

21  I acknowledge that, but I do think it contemplates some

22  affirmative act, not some perception or inference from the act.

23          And so, I do think the construction you've identified

24  that creates fewer problems, which I -- the construction I

25  intended to advocate today is one that is supported by the

1   explicit statutory text, so I don't think you'd be rewriting

2   the statute to adopt that in an order.

3          THE COURT:  You say that I could -- I just want to be

4   sure that I've got your position.  You believe that I have the

5   power to, and you would not object if I were to, construe that

6   statute to say it only applies to advocacy written broadly to

7   encompass all the various kinds of things that expressly

8   advocates one of the banned concepts, and that it cannot be

9   violated based on someone advocating a banned concept by

10  implication; they have to do it expressly.

11         MR. GARLAND:  Yes, your Honor, and I think that's

12  consistent with 99 percent of the argument I've tried to make.

13         THE COURT:  That would require me to reject that

14  portion of the Attorney General's Opinion when he says

15  something different from that.

16         MR. GARLAND:  I understand, your Honor.

17         THE COURT:  Okay.  All right.  So, what else do you

18  have?

19         MR. GARLAND:  The only other point I would make with

20  respect to that portion of vagueness, your Honor, is that, to

21  the extent there were some concern kind of around the margins,

22  understanding you've identified Johnson and Dimaya as from a

23  standard standpoint about whether implied conduct could violate

24  it, I still am not sure that makes the statute facially vague.

25  I think that's a question that could get resolved really

1    through an as-applied challenge, to the extent it were ever

2    enforced in that manner.

3           And so, I disagree, and I've said today and I'm saying

4    this explicitly, that it should get to inferred conduct or

5    implied conduct, but, to the extent that were a concern, I'm

6    not sure it's a concern that couldn't be sufficiently resolved

7    on a case-by-case basis that would require you to reject the

8    statute outright.

9           THE COURT:  Yeah.  The problem is what is the standard

10   against which you identify when something crosses the line into

11   implying, especially when there's no requirement for *scienter*.

12   You can cross the line unknowingly and be subject to

13   discipline.  So, that's where you would want to have some kind

14   of guidance as to when something is deemed to imply versus not

15   imply something.  That's, I think, the principal problem.

16          I doubt any of the plaintiffs are going to get up and

17   say, I want permission to advocate one of the banned concepts

18   expressly and literally.  What they're concerned about is, I'm

19   afraid in doing my ordinary teaching someone's going to haul me

20   up on charges by implying that I've advocated a banned concept.

21   I think that's got to be what their core concern is.

22          Maybe the plaintiffs have some -- they want to

23   advocate specifically some banned concept, but it doesn't sound

24   like that's what's taught in the schools to me, and so I'm not

25   sure anybody is going to stand up and say, Well, that's what I

1    want to teach.  They want to teach things that someone might

2    argue by implication strays into a banned concept, such as --

3    you're well aware of what implicit bias training is like, and

4    my understanding of implicit bias training is that it teaches

5    that people are prone to stereotypical thinking, they're prone

6    to in-group and out-group stereotyping, and that that can cause

7    people to unconsciously treat people differently based on their

8    race.  Well, you say implicit bias training is fine, but when

9    does it stray into something that is a banned concept if a

10   banned concept can include everything that implies?  So, that's

11   my concern.

12          But let me ask you about -- I'd ask you, since you've

13   asked me to interpret the statute, let me ask you to put on

14   your statutory construction hat and construe the fourth banned

15   concept for me, because that's the one that I have the most

16   difficulty with.  I've spent several days kind of parsing it

17   and trying to think about what it means, and I'm interested in

18   what you say it means.

19          So, you can pick any -- the banned concepts are the

20   same in all of the statutes, I think, but if you want to take

21   the education provision, the specific education provision, you

22   can do that, if you want to do one of them, but just help me

23   understand what you think the fourth concept discusses.

24          MR. GARLAND:  Yes, your Honor.  And I acknowledge that

25   I believe in the Honeyfund case the judge identified really the

1    triple negative in a comparable Florida statute as creating a

2    problem.  How I would read it, and this is actually taken

3    directly from part one of I think both sets of Frequently Asked

4    Questions, is that advocacy that persons in one of the

5    identified groups should not treat members of another -- other

6    identified group equally.  So, it isn't saying -- it's not

7    advocating for a --

8            THE COURT:  Well, let's separate -- it does two

9    things.  It says "cannot," and it says "should not," right?

10   Let's focus on "cannot" first, because you can violate it by

11   advocating that -- and I'll use -- for clarity sake I'll just

12   focus on race, okay?

13           So, the fourth banned concept with respect to "cannot"

14   says, as I'm understanding it, that people of one race cannot

15   treat others without regard to their race, and that seems to be

16   starting to implicate -- if we put in the words "can have

17   difficulty in treating people," that sounds like the core of

18   what implicit bias is.  So, I wouldn't say that, at least the

19   implicit bias training that I'm familiar with doesn't say that

20   someone cannot do it, but they try to teach you about implicit

21   bias so that you can become aware of the potential and

22   hopefully avoid engaging in that kind of stereotypical

23   thinking.

24           But that statute appears -- that provision, the fourth

25   concept on "cannot" seems, if anything, to be even broader than

1    the second concept, because the second concept has a limiting

2    term "inherently" in it.  "Inherently" is important, because

3    that is not my understanding of what implicit bias is.  It's

4    not an inherent characteristic of being White that produces

5    implicit bias.  So, the third concept at least has another

6    limiting term in it, but that term is not in the fourth concept

7    at all.

8           So, if it teaches that something cannot, a White

9    person cannot treat a Black person equally and cannot may imply

10   that they cannot because they're teaching that it often happens

11   that they have difficulty in doing it, then someone who is

12   trying to teach implicit bias the way it's supposed to be

13   taught and the way, according to your Frequently Asked

14   Questions, you want it to be taught, could still result in

15   charges being brought against somebody.  That's the concern.

16          MR. GARLAND:  I understand the concern, your Honor.  I

17   think the race example is probably a good one, because my

18   understanding, and the position that I'm here taking today, is

19   this is basically -- I'm sure the Court is familiar with the

20   concept of colorblindness, as kind of a -- that you shouldn't

21   treat anybody differently because -- like you should

22   functionally be blind to the race of a person.  And my

23   understanding of this provision is it's saying you can't tell

24   someone they can't do that.  That's it, that it's not requiring

25   that somebody do anything beyond that, that it prohibits only

1    that sort of conduct, that this idea of this theory that --

2         THE COURT:  All right.  Students come into the

3    classroom and ask the teacher, Can we talk about reparations as

4    an issue?  Can the teacher talk about reparations, talk about

5    the thinking behind it, and if they were to advocate that

6    reparations is a good thing, wouldn't that violate the fourth

7    concept?  And if they advocate -- even if they don't advocate,

8    if they discuss the reparations movement in ways that could

9    imply agreement with that concept, then they might violate it,

10   right?

11        MR. GARLAND:  I don't think so, your Honor.  I think

12   that that, frankly, has the prohibition backwards; that it's

13   not prohibiting conversations where something raising conscious

14   would be -- you know, affirmative action I think is another

15   example.

16        THE COURT:  Reparations -- doesn't reparations involve

17   treating people differently because of their race?

18        MR. GARLAND:  And I don't think this prohibits a

19   discussion around that topic, your Honor.

20        THE COURT:  It prohibits advocating that they should

21   not be treated differently because of their race, doesn't it?

22        MR. GARLAND:  I'm going to think about how you phrased

23   that.

24        THE COURT:  See, that you and I are having so much

25   trouble even communicating about the fourth concept may tell us

1    something about the challenge.  First, we're both lawyers, and

2    we do statutory interpretation for a living, but if we're

3    having this much trouble about it, do you think a person of

4    ordinary intelligence looking at it with no special skills in

5    the law could clearly discern what that provision means or

6    doesn't mean?

7              MR. GARLAND:  I understand the point you're making,

8    your Honor.  I do think the guidance we provided does provide

9    that clarification.  You may disagree, but I think it really is

10   the idea that it's not prohibiting --

11             THE COURT:  So, I appreciate your effort with

12   Frequently Asked Questions, but those aren't regulations, those

13   aren't law.  That's just informal guidance that the issuer

14   could withdraw at any time, disregard, change, without any

15   consequence, really, right?

16             MR. GARLAND:  Yes, your Honor.

17             THE COURT:  Okay.  So, that's different from a

18   regulation.  If an agency -- like if the Human Rights

19   Commission issued regulations interpreting this provision, then

20   arguably it would have some force of law if it was a

21   permissible interpretation of an otherwise vague statute, but I

22   can't really attach too, too much weight to the Frequently

23   Asked Questions responses, because they don't have the force of

24   law.

25             MR. GARLAND:  You can certainly attach persuasive

1       value, your Honor, and I think there are a number of cases

2       that, you know, if you were grappling between two plausible

3       constructions, again, that's all you'd be able to do, and you

4       say this one creates a problem and this one doesn't, I think

5       you can turn to the Guidance to find that plausible

6       construction, if you agree that it's plausible.

7              The other point I'd make with respect to this, and I

8       don't want to go too far down this road, but I do want to make

9       a point that we should have made in our briefing, and I

10      apologize for not.  There is a severance provision in the

11      statute.  So, they're asking for a strong remedy of striking

12      down the entire law.  They are not asking for any sort of

13      targeted relief, but the law itself has one.  We haven't

14      briefed that.

15             THE COURT:  Okay.  So, fair point to this extent:

16      I've been looking at the severance provision, but you did not

17      argue that that -- you might have argued that, even if the

18      first section is invalid, the second section survives, but the

19      plaintiffs haven't had a chance at this stage to engage with

20      you on that, and I would not grant, in part, dismissal at this

21      stage, because the plaintiffs haven't had any chance to brief a

22      specific argument about severance.

23             We may have to confront severance down the road later

24      on, and you've perfectly preserved that argument for later, but

25      I don't want the plaintiffs to feel that they have to respond

1    to something you throw out in oral argument like this, because

2    that would be a very complicated set of briefing that would

3    have to be used.  The appropriate time to invoke that would be

4    after I -- if I didn't dismiss the case in whole, to then,

5    after appropriate briefing, hear argument about, Well, even if

6    you didn't dismiss it entirely you should dismiss it in part,

7    and then they would have a chance to engage.

8            So, you've preserved the issue, but I'm not going to

9    take it up on the current motion.

10           MR. GARLAND:  And I apologize.  I wasn't advocating

11   that, your Honor.  We've moved to dismiss the case in its

12   entirety, and that's what we've asked you for.  And I do think,

13   in light of the Frequently Asked Questions, which I do believe

14   are a plausible basis to read the statute and resolve the

15   ambiguity you're identifying, that provides a basis for the

16   relief we're asking for.

17           THE COURT:  Okay.  Thank you.  I appreciate it.

18           MR. GARLAND:  Thank you.

19           THE COURT:  So, let me hear from plaintiffs, whichever

20   plaintiff wants to go first.

21           MR. MOERDLER:  May it please the Court, my name is

22   Charles Moerdler.  I am from the firm of Stroock & Stroock &

23   Lavan.  I'm here with Peter Perroni, my colleagues David Kahne

24   and Elizabeth Milburn, and we represent the AFT plaintiffs.

25           First, I would apologize to the Court if I sound a

1    little raspy and confused, but it's that time of year for

2    colds.

3              THE COURT:  That's fine.  That's fine.

4              MR. MOERDLER:  Your Honor, let me tell you, if I may,

5    the areas I would like to touch upon --

6              THE COURT:  Mm-hmm.

7              MR. MOERDLER:  And the questions I would like to

8    address, including each and every one of those that you put to

9    my adversary, because they were as if you had read my outline

10   in some --

11             THE COURT:  Well, I read your brief.

12             MR. MOERDLER:  That's it.  Your Honor, let me, if I

13   may, make two points at the outset.

14             The first is this is the third case in the District

15   Courts passing upon these four bans.  The first, of course, was

16   Santa Cruz.  Each of these bans *in haec verba* were in Santa

17   Cruz.  The second was Honeyfund, decided just a few weeks ago

18   in the State of Florida, and, again, the same four bans, with

19   one word difference.  So that you have here potentially,

20   potentially, an issue as to the weight that ought appropriately

21   to be given to those decisions if *stare decisis* survives after

22   recent decisions of another court.  But, to the extent it does,

23   then it is clear here that what must happen is some weight has

24   to be given to them, and I'm sure the Court will do what it

25   thinks appropriate.

1          THE COURT:  To the extent it's persuasive.  But we

2     trial judges have busy dockets, and we do the best we can

3     sitting alone, and we make our decisions, and I don't expect my

4     colleagues to give much weight to what I do, and I tend to look

5     at what other people do only to the extent it's persuasive.

6     The Courts of Appeals have months to study issues, they have

7     three-judge panels, so I tend to look more closely to Circuit

8     and Supreme Court precedent.

9          MR. MOERDLER:  I understand.

10         THE COURT:  But I, of course, will read them and give

11    them the weight they're due for their persuasiveness.

12         MR. MOERDLER:  All right.  The second point I wanted

13    to make to you is a standard on this motion.  This is simply a

14    motion to dismiss.  We did not seek a preliminary injunction

15    for two reasons.  The first reason, the most important one, is

16    the issue here is of critical importance to the educational

17    system of the United States, no ifs, no ands, no buts, no

18    maybes; there are no reservations on that statement.  Because

19    of that, we believe a complete record is indispensable and can

20    only be had by limited discovery followed either by a bench

21    trial or summary judgment at which your Honor can have a full

22    record to make a decision.

23         THE COURT:  You probably spoke to Mr. Bissonnette at

24    some point, since he's litigated in front of me on preliminary

25    injunctions, and he also knows that I tend to be very cautious

1    about granting preliminary relief, and what I ordinarily do is

2    let's have an accelerated discovery period and combine the

3    preliminary and the permanent, because I don't like to make

4    decisions on the fly without having a chance to think through

5    them, and I don't like people coming to me and making

6    dispositive arguments without them having a full opportunity to

7    develop.  So, I certainly grant preliminary relief on occasion,

8    but on an important issue like this I would have insisted that

9    we all take the time we need to think about it before we make

10   any decisions.

11          MR. MOERDLER:  Let me just, so that the record is

12   complete for your Honor, call to your Honor's attention a First

13   Circuit rule which I've not seen really repeated too much.  It

14   was in the Asociacion case decided in 2004.  A dismissal on the

15   pleadings will be upheld only if it appears beyond doubt that

16   plaintiff cannot prove any set of facts in support of its

17   claims which would entitle it to any relief.  And against that

18   background, the discussion that just preceded mine raises the

19   question in direct proportion.

20          I wanted those preliminaries before I go to this

21   issue.

22          THE COURT:  Can I ask you, so I have put the case to

23   your opponent that the foundational argument -- the foundation

24   for his vagueness argument is based on a standard that the

25   Supreme Court appears to have rejected in Johnson and Dimaya.

1          MR. MOERDLER:  It's done it in three cases, your

2     Honor.

3          THE COURT:  Okay, so maybe three.  I got two of them.

4     But of the two or three where they rejected it, and I'm going

5     to carefully consider what Mr. Garland said to me today about

6     this, and there are other Circuit Court cases that have

7     explored this issue that I will address, even though they

8     weren't in the parties' briefing, but I would ask you, that

9     standard -- and part of the reason why I doubt that that is the

10    standard is because, in my view, that's a standard that, except

11    in cases where constitutional conduct is implicated or the

12    exact facts of <u>Johnson</u>, it would be impossible to bring a

13    facial vagueness challenge, because every statute that I can

14    think of that might be challenged on vagueness grounds has at

15    least one application that's not vague, and this statute

16    appears to have one or more applications that would not be

17    vague.

18          Lawyers don't like to concede anything.  Maybe you

19    will refuse to do it, but would you agree that this statute has

20    some applications that would not be vague such as --

21          MR. MOERDLER:  Your Honor, I don't get to that point,

22    if I may.

23          THE COURT:  I know, but I'm entitled to ask you to get

24    to that point.

25          MR. MOERDLER:  You certainly are, and you're certainly

1    entitled to an answer from me.  But, if I may, let me get first

2    to what the basic -- the premise of the three cases is.

3            The third case was in 2019.  It's a lengthy opinion by

4    Judge Gorsuch, concurred in by six members of the Court.  It's

5    United States against Davis, reported at 139 Supreme Court

6    2319, and if I may read just one sentence from his opinion.  I

7    think it's only one.

8            When Congress passes a vague law, the role of the

9    courts under our *Constitution* is not to fashion a new or

10   clearer law *in haec verba* or otherwise.

11           THE COURT:  I'm with you on that.  I think Mr. Garland

12   agrees.

13           MR. MOERDLER:  But the problem is there are two ways

14   of fashioning a newer and clearer law, and those who have

15   clerked for the Court understands that.  One is by rewriting

16   it, and the other is by interpreting it, and so this case can

17   very easily raise that question in full frame:  Can you, by an

18   interpretation that -- I'm going to prove that in terms of

19   their interpretation of a section of this law, two sections, in

20   fact, that you can actually rewrite the law through

21   interpretation.

22           Let me give you an example, if I may.  You search this

23   law anywhere, and you do not see the words, *in haec verba* or

24   otherwise, of it being extended beyond the classroom.  To the

25   contrary, the first few words of this statute are, A pupil in

1     any, any state --

2          THE COURT:  Well, the Attorney General's Office agrees

3     that it applies outside of the classroom.

4          MR. MOERDLER:  And I say it does not.

5          THE COURT:  They say it can be construed to cover

6     conduct outside of the classroom.

7          MR. MOERDLER:  And that's exactly where we come to

8     part, because I don't believe, maybe I am wrong, that by

9     construction you can turn "yes" into "no," "stop" into "go."

10    The idea --

11         THE COURT:  Where do you find the limiting language

12    that would render the statute inapplicable to a coach, say, or

13    coaching a football team in an away game and having

14    communications with students there?  What is there in the

15    statute that you say makes it inapplicable to that conduct?

16         MR. MOERDLER:  If I may, the first four words come

17    right down to the point.  Let me, if I may:  "No pupil in any

18    public school..."  If it were written to be anything outside of

19    the public school it would read, No public school pupil in this

20    state shall be taught...  That's the English language.  Pause

21    it again, if I may --

22         THE COURT:  You mean physically on school grounds?

23         MR. MOERDLER:  Correct.  It's classroom.

24         THE COURT:  Okay.  There's certainly another way to

25    read that term.  I don't think that's the only way.

1          MR. MOERDLER:  May come into vagueness.

2          THE COURT:  Okay.  That it could be read narrowly to

3     apply only on school property?

4          MR. MOERDLER:  No, no.  I'm in the classroom.  I'm

5     even beyond the property.  It's in the classroom.  It's a

6     classroom definition.  Yes, maybe the hallways and maybe a

7     study hall as in -- it is curriculum intended.

8          THE COURT:  Well, if that's true -- I don't know if

9     you're making the First Amendment argument.

10         MR. MOERDLER:  No.

11         THE COURT:  Whoever is making that will then have to

12    deal with the argument that, Oh, if it's only limited to

13    curricular work, that's very clear, Garcetti applies, it's

14    government speech, the First Amendment doesn't apply.

15         So, whoever you delegate that task to, get ready

16    because your colleague is telling me it only applies in the

17    classroom, so it's only curricular and we all, you know,

18    courts, multiple Circuits have said Garcetti applies, it's not

19    First Amendment.

20         But you made your point.  I understand it.  So, why

21    don't you go on with --

22         MR. MOERDLER:  If I may, your Honor, I will deal with

23    precisely that issue when I get to the First Amendment.

24         THE COURT:  Okay.  Go ahead.

25         MR. MOERDLER:  But here I was trying to parse language

1   for a purpose, and I did not wish to give any offense in doing

2   so.  It was simply and solely to show that rewriting a statute

3   doesn't mean adding or deleting words.  It can be how it is

4   interpreted.

5         Let me give you one that's a little clearer.  All

6   right?

7         There is nothing in here that says extracurricular

8   activities are covered, and yet the opinion of the Attorney

9   General says that.  Now, let me go to that point, because it

10  becomes very important.

11        Johnny is on the swimming team.  Johnny is swimming.

12  He comes out of the pool and a teacher -- let's make it even

13  more ridiculous -- a teacher, not his own, he sees and says,

14  Hey, by the way, did you see the story on the Ukraine?  What's

15  the story between the Russians being oppressive and anti-human

16  in oppressing the Ukrainians?  Now you have the superiority

17  clause of the statute coming into play.  If it were done in the

18  courtroom, I mean, in the schoolhouse you're within the words

19  of the statute, but is it intended to be there?  I think not.

20  And if one reads --

21        THE COURT:  You're giving heavy weight to the word

22  "in," right?

23        MR. MOERDLER:  Yes.

24        THE COURT:  And you say it can only be read one way,

25  and that means physically on the school grounds.  But the issue

1    you raise seems to me to have greater potency when talking

2    about First Amendment, because, even if Garcetti applies,

3    Garcetti doesn't apply to every word that a teacher could speak

4    to a pupil, and so if they run into the pupil at the grocery

5    store with their parent and say something, that is unlikely to

6    be deemed not First Amendment speech.  So, it does have bearing

7    on that issue, but I don't think it's of central importance to

8    the particular vagueness argument we're discussing now.

9            MR. MOERDLER:  Let me, then, deal with the second part

10   of the presentation in that regard.  The focus has been on this

11   being a facial challenge.  At the time the complaint was filed,

12   both complaints, neither of us had any particular documents

13   that would tell us what the position of the State was, what the

14   position of the public was, et cetera.  Let me pause on that

15   sentence.

16           With respect, I do not believe that I, the lawyer who

17   has gone to law school for the purpose of understanding the

18   law, am the right person whose interpretation should at the end

19   of the day carry how it is to be construed, vaguely or

20   otherwise, as contrasted with the ordinary public.  In about

21   two minutes I will show you that since the complaint was filed

22   we now have a beginning of a peek as to how the ordinary public

23   regards it and thereby underscoring the absolute need for

24   discovery and the absolute need for understanding our point in

25   our brief that this is also as applied.

1          THE COURT:  I'm less interested, frankly, in how the

2    public, what they may deem a violation of the statute.  I'm

3    very interested in what the people who enforce the statute say.

4    And so, if you've got -- has the Human Rights Commission passed

5    on this?  Has a court passed on this?  Has the Department of

6    Education -- you in one of your complaints note that one of the

7    named plaintiffs had someone complain about the fact that they

8    signed a petition.  Now, you and I know, and I doubt

9    Mr. Garland would disagree, that that conduct is

10   constitutionally protected, it is not conduct for which they

11   can be disciplined under the statute, and it is completely

12   unreasonable to suggest otherwise.

13          You would agree with that, right, Mr. Garland?

14          MR. GARLAND:  Absolutely, your Honor.

15          THE COURT:  So, that some person thinks that that's

16   complainable under the statute doesn't really tell me anything.

17   What matters is the people who actually have to enforce the

18   statute.

19          MR. MOERDLER:  But you cannot leave without weight the

20   chilling effect that it has on any human being.  For example,

21   if Johnny asks the teacher a question, What is implicit bias?,

22   and the teacher has seconds to answer that question, clearly

23   the statute will have, certainly on all the publicity it's

24   attracted, some significant effect on the teacher being able to

25   respond, being able to deal with it and deal with learning.

1    And the complaint calls attention to the fact that there have

2    been those instances already where teachers feel that they

3    cannot teach adequately.

4           Can I respond to a question, What was Brown against

5    the Board of Education?, or am I violating the statute?

6           THE COURT:  With respect to you folks, I understand

7    your lawyers have to advocate, but some of that stuff seems to

8    me to be completely farfetched.  No teacher could be subject to

9    discipline under the statute for talking about Brown v. Board

10   of Education.  I think I've identified what my core concern is.

11   Maybe you have others.

12          But the problem is not that they won't be able to talk

13   about the Civil Rights Movement or something like that.  The

14   problem is that, to the extent they engage in conduct that

15   could be understood by somebody other than them to imply

16   advocacy of one of the banned concepts, that they could be

17   subject to dismissal for conduct that they don't intend to

18   engage in that they can't know by reading the statute is

19   clearly barred, that's where it starts to have problems.

20          MR. MOERDLER:  And so, let me take what you have just

21   said and take it to one step further as to the problem.

22          By statute in this state the teachers are required to

23   teach how bias came into being, intolerance, discrimination and

24   the like.  What it was by statute and how can we prevent it,

25   that in and of itself is a direct conflict with the statute.

1           And to make that point, because you obviously

2   frequently are called upon to resolve conflicting statutes, let

3   me point out to you that as recently as July of this year that

4   mandate was expanded as to what they have to teach.  Now put

5   myself in the position.  Can I teach and comply with the

6   statute; can I not teach and comply with the other statute?

7           THE COURT:  Again, let's go back to some of my

8   threshold concerns, because, to the extent I have a concern --

9           MR. MOERDLER:  All right.

10          THE COURT:  -- it's really a good idea for you to try

11  to address my concerns.

12          MR. MOERDLER:  I agree.

13          THE COURT:  Okay.  So, I come back to the standard,

14  the standard about vague in all of its applications.  Do you

15  agree that this statute is not vague in all of its

16  applications, and, if you don't agree with that, how do you

17  answer my hypothetical, which it seems to me to be clear and

18  not vague that you can't advocate White supremacy in the

19  classroom without violating the statute?  If you disagree with

20  that and say, Oh, no, somebody could advocate White supremacy

21  and not violate the statute, show me how that's so.  Put on

22  your statutory construction hat and tell me how -- but if you

23  agree with me, just tell me first.  Do you agree or not --

24          MR. MOERDLER:  I do not totally agree.

25          THE COURT:  -- that if the statute is vague -- that if

1   the standard is vague in all of its applications then the

2   vagueness claim fails?

3          MR. MOERDLER:  No.  It's the exact opposite.  If it's

4   vague in all of its applications, it falls.

5          THE COURT:  No.

6          MR. MOERDLER:  And if it's vague in some it falls.

7   That's what Johnson precisely says.

8          THE COURT:  Okay.  Well, you won't answer it.  That's

9   okay.  You want to move on to the next point?

10          MR. MOERDLER:  Well, I'd like to answer the balance of

11   that, Judge.  I'm going to make the assumption that the theory

12   is that, if it's vague in all of its applications or if it's

13   not vague in all of its applications, again I have to say to

14   you what do you tell the teacher when the statute says you must

15   teach precisely the subject you're barred?

16          THE COURT:  If the statute requires you to teach

17   something that you're barred from teaching, that would be a

18   problem.

19          MR. MOERDLER:  That's the point I'm making.  That was

20   the point I was making.

21          THE COURT:  I understand.  All right.  What else have

22   you got?

23          MR. MOERDLER:  All right.  Your Honor, let me, if I

24   may, talk to you about the second aspect of the statute that

25   has not been touched upon today, and that is enforcement.  The

1    statute in plain and precise terms, in terms of its application

2    by the Supreme Court and by all of the courts, focuses very

3    heavily on enforcement.  If you do not have guardrails that

4    limit how it can be enforced, why it can be enforced, when it

5    can be enforced and what can be enforced, according to two

6    United States Supreme Court cases -- pardon me -- three,

7    according to all of them a law must be sufficiently explicit,

8    but it must be stated in such terms and with sufficient

9    guardrails as to limit arbitrary and discriminatory

10   enforcement.  And that is Kolender against Lawson and City of

11   Chicago against Morales decided in 1999.

12          And in cases subsequent to those in the Circuits that

13   has been a major element, more so than the language, because,

14   as I believe it was Justice Kagan recently pointed out, it is

15   not in our province to leave to the policeman one

16   interpretation of the law and leave to the judge another.  It

17   is our requirement that they both look at it and know what they

18   can enforce and how.  Most of the time this has come up in the

19   loitering context or in the reliable identification --

20          THE COURT:  I get it.  That's one of the important

21   considerations in the vagueness doctrine, is you want to have a

22   law that gives fair notice and then a law that is not prone to

23   selective enforcement left entirely to the unfettered

24   discretion of the enforcer.  I'm well aware of those concepts.

25          MR. MOERDLER:  Let me, then, go back to adding a third

1    piece to this, which your Honor touched on in another context,

2    and that is three Supreme Court cases.

3           THE COURT:  Can I just stop you, though?

4           Mr. Garland, on remedy you made an assertion, and I

5    may have misinterpreted you, but I think the plaintiffs

6    disagree with, that is, you seem to say this statute disallows

7    a complaint to the Department of Education until someone has

8    complied with the Human Rights Commission review process.  Are

9    you making that claim?

10          MR. GARLAND:  So, your Honor, in reading my reply we

11   may have overstated, and I apologize for that, and I would

12   certainly retract the statement that it is required by the

13   statute to operate that way.  I can tell you it is operating

14   that way.  The Department of Education is not proceeding with

15   anything until the Human Rights Commission has passed on the

16   conduct --

17          THE COURT:  Because I have looked at your regulations

18   on the Department of Education, and I do not see anything in

19   those regulations that permits the Department of Education to

20   refuse to entertain a teacher misconduct allegation simply

21   because the person making the complaint has not first gone to

22   the Human Rights Commission.

23          So, are you saying that the Department of Education as

24   a matter of practice is simply declining to consider any

25   allegation that these statutes are being violated by any

1    teacher until and unless that person making the complaint has

2    gone to the Human Rights Commission?

3            MR. GARLAND:  Your Honor, as a matter of practice,

4    yes, that's what's happening.

5            THE COURT:  But you understand that only aggrieved

6    people can go to the Human Rights Commission.  So, if you're

7    just a citizen who has read about Ms. Smith teaching prohibited

8    concepts in the school and you want to complain, you can make a

9    complaint to the Department of Education, but you're not an

10   aggrieved person under 354-A who has standing to bring suit.

11   The New Hampshire Supreme Court has rejected that in other

12   contexts.  You're not an aggrieved person.  You can't sue

13   because you've read in the newspaper that Ms. Smith is teaching

14   prohibited concepts.  You can complain to the Department of

15   Education, but you can't sue.

16           And you're telling me the Department of Education

17   simply would not consider that kind of complaint?

18           MR. GARLAND:  I'm telling you -- no, certainly the

19   Department of Education can receive those complaints.  It won't

20   act as a matter of investigative and enforcement authority

21   until the HRC --

22           THE COURT:  That's a matters of their discretionary

23   judgment, not that the statute requires it.

24           MR. GARLAND:  Your Honor, yes.  May I make one more

25   point?

1           THE COURT:  Yes.

2           MR. GARLAND:  That is how as a matter of practice,

3   candidly to the Court, it is operating.  I don't think it's

4   crucial to the vagueness, resolving the --

5           THE COURT:  I don't think it's crucial, but I did

6   think you had over-claimed the actual process, so I wanted to

7   clarify it.

8           MR. GARLAND:  I apologize for that.

9           THE COURT:  No.  No apology needed.

10          Counsel, go ahead.

11          MR. MOERDLER:  Your Honor, I must respectfully point

12  out that the Attorney General is misinformed.  I am now going

13  to tell you that we were able to look behind the curtain and

14  get our first piece of information, and it's in this record

15  that shows they do investigate them, they do comment on them.

16          THE COURT:  Why don't you show me the exhibit number

17  so I can look at it.

18          MR. MOERDLER:  Here it is (indicating).

19          THE COURT:  Okay.  What exhibit?

20          MR. MOERDLER:  It is -- the Department of Education's

21  own website has on it a report, an op-ed article by the

22  Commissioner, and in that article he refers to a bunch of

23  documents that he has attached to it.  So, you go behind that

24  and you look at the documents, and they are 72 pages in number.

25  The first one is a quiz that discusses how teachers -- pardon

1   me -- how people --

2           THE COURT:  Just for the record -- Counsel, you guys

3   know where in the record it is?

4           MR. MOERDLER:  It's an exhibit.

5           MR. KAHNE:  Exhibit B.

6           THE COURT:  Exhibit B to?

7           MR. KAHNE:  To the joint memorandum.

8           THE COURT:  The joint memorandum.  Okay.

9           MR. KAHNE:  It's ECF 45-1.

10          THE COURT:  So, the other side has this?

11          MR. KAHNE:  Yes.

12          MR. GARLAND:  I do, your Honor.

13          THE COURT:  All right.  Good.  Thank you.

14          MR. MOERDLER:  It discusses -- this is a quiz.  It's a

15  survey or a quiz:  "U.S. Census data shows that

16  African-American and Latina women earn how much more (sic) for

17  every dollar that a White man earns?"  And then they give them

18  a whole bunch of choices.

19          "Identify the source of this quote:  We have deluded

20  ourselves into believing the myth that capitalism grew and

21  prospered out of the protestant ethic of hard work and

22  sacrifices.  Capitalism was built on the exploitation of black

23  slaves and continues to thrive on the exploitation of the poor,

24  both black and white, both here and abroad."  And then it says

25  who is the author, and it gives you names.

1          It goes on and on in these veins for four pages of

2    those kind of questions, touching upon implicit bias and every

3    other thing that you've talked about so far.

4          Then it attaches a confidential report of the Chief

5    Investigator of the Department of Education named Mr. Richard

6    Farrell, dated April 22 -- 2022.  Now, understand that's long

7    after the complaint, and that's what we thought was going to be

8    found, and we thought that it would show what they were doing

9    and how they were doing it.  And this is only one that we have

10   found so far that the State put on a website, a state-funded

11   website, and let me read to you a beginning of that.

12         Good morning, Rich.  We've had an opportunity to

13   review the material that you sent, that includes those

14   questionnaires, and have the following information for you in

15   response to your inquiry:  First and foremost, the activities

16   identified are from the Human Relations Course at, redacted

17   school name.  After review with the principal, curriculum

18   coordinator and assistant superintendent, we have determined

19   that these activities do fall within the scope of the course.

20         And, For your information, we have attached a copy of

21   the syllabus.  You'll also notice that this syllabus includes a

22   form for parental notification as well as an invitation for

23   parents to review class assignments...

24         And it goes on and on and then concludes with the

25   following statement:

1          Should any further such objections be received the

2     District will handle them in accordance with our policy, IGE --

3     I have no idea what that one is.

4          THE COURT:  Are you reading this to me because you

5     want me to assume that they are investigating?

6          MR. MOERDLER:  They say so.

7          THE COURT:  Okay.  Do you agree that that's evidence

8     that they're investigating?

9          MR. GARLAND:  Your Honor, I don't.  I would ask that

10    you take a look at it.

11         THE COURT:  I can't absorb something he read to me.

12    I'll have to read it.  I'm going to take a break in a minute,

13    but I want to -- is the other side, the other plaintiff

14    presenting any vagueness argument, or are you just going to

15    rest on theirs?

16         MR. BISSONNETTE:  Yes, your Honor.

17         THE COURT:  Okay.  So, I'll give you, Counsel, another

18    ten minutes, and then I'm going to give the other side an

19    opportunity to argue vagueness, and then I will a take a break.

20         MR. MOERDLER:  Your Honor, I'm going to truncate it so

21    that you do not -- but I want you to know it concludes with a

22    statement:  We have reviewed this material through the lens of

23    the Divisive Concepts law.

24         Now, this was a report to the Chief Investigator, who

25    then sends it on to the Commissioner of Education and asks him

1    to review what to do.  If that isn't an investigation, I don't

2    know what is.

3            THE COURT:  Okay.  Good.

4            MR. MOERDLER:  All right.  Now, I have two other

5    points I'd like to make to you on enforcement.  It starts, I

6    believe, with an FAQ in the Guidelines, because I do want to

7    focus on the Guidelines briefly.

8            The Guidelines pertaining in Exhibit 19 state in FAQ

9    Number 8:  Does this law apply to all activities or just

10   teaching?  And it answers that question as follows:  The

11   prohibitions apply to all school activities carried out by the

12   public in their role as public schools, including those that

13   are part of the public school's work.

14           This foundational confusion caused the result that you

15   mentioned earlier of four teachers being the subject of a

16   complaint, having signed a petition outside of the school.  It

17   is the one that Mr. Bissonnette will address in connection with

18   another one of these document revelations and why we have said

19   to you from the outset and believe most sincerely this case

20   cries out for discovery of the documents behind it.

21           The history of this, and that's why I wanted to

22   mention this, when you have the author of the bill, when you

23   have the Chairman of the Committee both stating its purpose was

24   to address issues that involve CTR and a whole bunch of other

25   things that are disguised behind the background of this, that

1   it was the purpose of it, that we will end it by this statute,

2   tells you where they're going.  And then, when you see the

3   Commissioner direct that path by putting on his website right

4   next to this kind of a report the complaint form so that people

5   can complain to him or to the Human Rights Commission, with

6   respect, enforcement is, at the very least, vague and unclear.

7          Mr. Garland, a highly respected, totally principled

8   lawyer, says to you in a brief, We have a protocol as to how

9   it's to be enforced.  There is no protocol that we have seen.

10  They may have had conversations, but, if they have, the

11  Department of Education is investigating them every day; and,

12  as Mr. Bissonnette will show you, he has written to Human

13  Rights to find out what they've turned down, and Human Rights

14  won't even answer him, even though the law explicitly directs

15  it, allows it to put out all of the complaints to dismiss.

16         Your Honor, there is much more I could say, but

17  there's only one thing that I think I would like to stress

18  again, and, in doing so, let me make a point.  I say it not to

19  give any kind of controversial aspect to it.

20         This statute has a counterpart which one cannot forget

21  either in the First Amendment context but here now in this

22  context.  The other statute, 189:11, is what an explicit

23  statute does.  It says -- and, by the way, these same kind of

24  words were used in the July guidance from the Department of

25  Education.  They are how intolerance, bigotry, et cetera have

1    evolved in the past, can evolve, and how do you prevent it

2    under the statute as construed by the Guidance, assuming that

3    the Guidance has weight, and we will need not press that beyond

4    the briefs, because it's laid out there.  But how do you

5    possibly say I can prevent all forms of bias by the following

6    course of action, whether it be training, education or the

7    like, in order to comply with 189:11 without immediately

8    violating the precise language of 193?

9           And I thank the Court for its courtesy.

10          THE COURT:  All right.  Thank you.  Let me ask my

11   reporter.

12          (The Court conferred with the court reporter)

13          THE COURT:  Mr. Bissonnette, go ahead.

14          MR. BISSONNETTE:  Thank you, your Honor.

15          THE COURT:  So, let me ask you the same question I

16   asked your counterpart to see if you are willing to give me an

17   unequivocal answer on it.

18          MR. BISSONNETTE:  Yes, your Honor.

19          THE COURT:  I've explained my concerns about the

20   standard that the State's brief is based on, the vagueness in

21   all respects, all-applications test, but if that test applies,

22   it would seem that this statute is not vague under that test,

23   because there is at least one application on which it's not

24   vague, and I've pointed to what I think is a pretty clear

25   application, I can't imagine any of your clients would disagree

1   with this, that it's a problem if a teacher tries to promote

2   White supremacy as a part of their curriculum, and that would

3   violate the statute, and that's a clear violation, and if

4   vagueness, facial vagueness and its challenges fail unless it's

5   vague in all applications, then it would appear this case would

6   -- I'm not going to force you to make that concession, but if

7   you're not willing to make it, just give me some kind of

8   understanding of why I might be misguided.

9        MR. BISSONNETTE:  Your Honor, I see exactly where

10  you're going with this, and I completely understand.  I think

11  there probably is one application of the statute in which it

12  would not be vaguely applied, and that is if a teacher said,

13  and I'm looking at Banned Concept 1, a White person is

14  inherently superior or inferior to some other category.  That

15  is really probably the only application, a literal textual

16  application of the statute in which perhaps this statute

17  could -- is not --

18        THE COURT:  I raise this with you, because it points

19  out the problem with this standard of vagueness.  The vague in

20  all application standard eviscerates facial challenges.  Now,

21  maybe as a matter of policy the Court will want to do that,

22  because Justice Thomas, for example, continues to say that's

23  the right standard, and what that really means is only

24  incomprehensible statutes can be challenged on their face; and

25  there still will be opportunities to challenge on vagueness

1    grounds, but it is only in applied challenges, which you

2    haven't brought.

3         MR. BISSONNETTE:  Well, two points I would like to

4    make on that.  So, obviously, to echo some of the prior

5    argument that you heard this afternoon, the standard is not the

6    standard, in our view, that the State has proffered in this

7    particular case.  It is not in all its applications.  The

8    Johnson versus United States, the United States case, squarely

9    addresses -- Honeyfund, in fact, tangentially addresses it,

10   where that court says defendants may be right that some of the

11   prohibited concepts are not vague, but some certainly are, and

12   then presume to enjoin, preliminarily enjoin the statute in its

13   entirety.  And I think that is, frankly, the same analysis

14   here, assuming we were even asking this Court today to enjoin

15   the statute, which we are not.  We are asking this Court simply

16   for the opportunity to proceed to discovery on some discrete

17   things that I would like to explain to this Court why we think

18   it's essential.

19         As to your question, though, about are you making an

20   as-applied challenge in this case, we are, and I want to

21   explain the contours of that as-applied challenge.  So, setting

22   aside that we believe certainly at this pleading stage that we

23   meet the standard for a facial challenge, our as-applied

24   challenge particularly applies to educators with respect to the

25   unique enforcement regime that applies to them that actually

1    doesn't apply, necessarily, to other public officials.

2         THE COURT:  Well, in a typical as-applied enforcement

3    challenge, and you may have brought these in front of me,

4    certainly others have, I have held that a pre-enforcement

5    challenge can be ripe in certain circumstances, and it

6    typically involves someone who has a real threat of having some

7    serious consequence apply to them.  They made clear to the

8    Court, This is what I want to do, and this is why I have a

9    legitimate fear that this is going to happen to me if I do it,

10   and I need you to tell me whether this statute is

11   unconstitutionally vague as applied so that I can do it without

12   fear of losing my teaching license.  That's a typical

13   as-applied challenge.

14        You say you presented that here?  I didn't see it in

15   your complaint.

16        MR. BISSONNETTE:  Yes.  The complaint that the Mejia,

17   Philibotte and NEA plaintiffs have brought have said that this

18   is a facial and as-applied challenge.

19        THE COURT:  They use the word.

20        MR. BISSONNETTE:  And I understand that, and in

21   responding to the critique of the State that, Hey, you're only

22   bringing a facial challenge, we finesse that with a little bit

23   more clarity, wanting to explain that, unlike the types of

24   cases that you're kind of referring to here, our as-applied

25   challenge here is focusing on the unique application to

1   educators, not from a text perspective that you're referring to

2   here, I have a fear that this is going to be applied to me

3   because I want to teach a certain book, but because of the

4   unique prospect for arbitrary or discriminatory enforcement

5   that apply to teachers in particular, and that is because of

6   the issue that you just flagged just a few minutes ago, which

7   is the fact that the Department of Education has unique and

8   inherent enforcement power under this particular statute.

9           Setting aside the lack of a *scienter* requirement,

10  setting aside the fact that there's also a duty-to-report

11  obligation that exists within the Department of Education

12  rules, the department of obligation (sic) is obligated to take

13  up any complaint that comes to its office.  The department of

14  obligation (sic) is obligated to investigate, and the

15  Department of Education is obligated to take action if it

16  believes that a violation has occurred.

17          So, again, the chief ambiguity problem in this case as

18  applies to teachers and more broadly, to some extent, is the

19  fact that you have vague terms.  But it's not just vague terms;

20  it's combined with the prospect of the career death penalty for

21  educators, and I don't mean that to be hyperbolic.

22          THE COURT:  I agree with you that that's highly

23  relevant to the vagueness challenge.  The Supreme Court has

24  made clear that vagueness challenges can be brought to civil

25  statutes, but I think, and Justice Gorsuch in his concurring

1    opinion in <u>Dimaya</u> and perhaps in the majority opinion your

2    colleague referenced, has suggested that there shouldn't be any

3    different standard from a criminal to a civil vagueness

4    challenge, but I think it continues to matter what kind of

5    vagueness challenge.  If you have a regulation that applies, an

6    economic regulation to big business, such as the Sherman

7    Antitrust Act, that bars unreasonable restraints and trade,

8    that sounds on the surface really, really vague, but it is not

9    unconstitutionally vague.

10           MR. BISSONNETTE:  Sure.

11           THE COURT:  Businesses can plan and can do their

12   research, but where individual teachers face career death if

13   they're deemed to be in violation of this provision, not just

14   loss of job but loss of certification, that is a very severe

15   consequence that makes it much more like a criminal statute

16   that should justify a higher level of review on terms of

17   vagueness.  I think that's the most important point to make,

18   that the teacher statute is different from the other provisions

19   which don't apply potentially to educators directly; they apply

20   to government programs.

21           MR. BISSONNETTE:  Yes.

22           THE COURT:  And those statutes, to the extent they're

23   applied outside of the educator context, are arguably less

24   concerning.  It's the attempt to threaten the livelihoods of

25   offending teachers that is the particular problem.

1      MR. BISSONNETTE:  Absolutely, your Honor, and I think

2   that the standard on vagueness is critical here.  And not only,

3   your Honor, did you highlight the lack of a *scienter*

4   requirement and how the Hoffman case, in particular, says,

5   Gosh, if you don't have a *scienter* requirement we need to be

6   really careful here and really conscious of --

7      THE COURT:  I referenced that one, because that's one

8   that the AG's Office relies on.

9      MR. BISSONNETTE:  Absolutely.  But Hoffman actually

10   says something else that I think is material and where the

11   career death penalty kind of component comes in here.  The

12   court there also essentially says that the seriousness of the

13   penalty is a consideration, and that's the issue that we have

14   here in the Sessions case, the case that we've been referring

15   to.  There you didn't have a criminal penalty, necessarily, you

16   had a criminal statute but with civil deportation consequences,

17   and what the Supreme Court there says is, Oh, boy that is such

18   a severe penalty that we need to engage in a more robust

19   vagueness analysis.

20      The same is true here.  We have a statute that lacks a

21   *scienter* requirement, we have a statute with drastic career

22   ramifications, pursuant to a regime where the DOE is obligated

23   to take action and respond to every complaint that goes through

24   its office.

25      And this is why, your Honor, I think the order of

1    operations piece I don't want to gloss over.  I actually think

2    it's incredibly important in this case.  You have the

3    Department of -- much respect for Department of Justice, by the

4    way.  I litigate against them all the time, and they do a great

5    job, but they have represented publicly in pleadings before

6    this Court, Don't worry about this, don't worry about the

7    unique Department of Education enforcement capability of the

8    statute, because we have essentially manufactured a regime

9    where they don't look at it, even though that regime conflicts

10   with the very regulations that the Department of Education is

11   obligated to --

12       THE COURT:  Just to save time, I wanted to clarify

13   that the State was over-claiming the way that regime worked,

14   but the way it actually works I don't attach significance to it

15   from the government's perspective, because it's essentially at

16   the sufferance of the head of the Education Department.  To the

17   extent you don't want to do that anymore, you just stop.  So,

18   even if they have some unofficial practice of not entertaining

19   anything, they could change that any time they wanted.  They

20   just could decide, Well, today we're doing it differently.

21       MR. BISSONNETTE:  I think that's right.  At the

22   statute's core, your Honor, and I'll close the loop on

23   enforcement and arbitrary enforcement, which is an independent

24   component of vagueness, is that you really have five bodies

25   that can adjudicate complaints under the statute.  You have the

1    Department of Education, Department of Labor, Department of

2    Justice, Human Rights Commission, and independent of that

3    Superior Court, the State Super Court.  So, to me, again, all

4    of this highlights --

5            THE COURT:  Am I correct in assuming, so that we don't

6    overstate this, that individual educators, the only enforcement

7    that they experience directly is at the Department of Education

8    complaint level?  They can't be sued individually in the Human

9    Rights Commission.

10           MR. BISSONNETTE:  No.

11           THE COURT:  They can't be sued in Super Court

12   individually.  They can't get damages awarded against them.

13   You think they can.

14           MR. BISSONNETTE:  Absolutely, your Honor.

15           THE COURT:  Tell me how that is so.

16           Do you disagree with that?

17           MR. GARLAND:  I disagree, your Honor.

18           THE COURT:  Yeah, okay.

19           MR. BISSONNETTE:  I have never, frankly, heard that

20   position from the Department of Justice.

21           THE COURT:  I'll explain to you why.  So, the Human

22   Rights Commission -- there's a Supreme Court, New Hampshire

23   Supreme Court case, the case is Cooper against -- no, I don't

24   have it in front of me.  I'll find it at the break.

25           There is a New Hampshire Supreme Court case that

1    defines what an aggrieved person is, and so that limits who can

2    bring the claim, and then there's nothing in the statute that

3    allows for liability for a Human Rights Commission violation

4    against an individual teacher.  It's a liability against the

5    school district that you can bring.  If I've got that wrong,

6    you'll let me know.

7            So, the case about whether you can be -- thank you.  I

8    thank my clerk for bringing it to my attention.

9            The case in which the Supreme Court has defined what

10   an aggrieved party is for purposes of 354-A is State versus

11   Hynes, 159 New Hampshire at 187.  Oh, wait a minute.  I'm

12   sorry.  I've got the wrong case here.  Let me check.

13                            (Pause)

14           THE COURT:  This is the case, yeah, State against

15   Hynes, 159 New Hampshire 187.

16           But then I turn to the -- where in the language of the

17   statute, we'll call it the banned concept statute, does it say

18   a Human Rights Commission complaint can be brought against an

19   individual teacher?

20           MR. BISSONNETTE:  Well, the statute says that, you

21   know, all rights and remedies that exist under the Human Rights

22   Commission statute apply in this particular instance.  I'm

23   going to look at your case to make sure I don't want to

24   overstate the law.

25           But here is one potential concern:  Even if -- sorry.

1          THE COURT:  You don't litigate in this area, but I've

2     spent a lifetime dealing with employment discrimination cases,

3     and, in fact, until the New Hampshire Supreme Court decided the

4     Fuller case, the Fuller Ford case, the Federal Court here

5     recognized you couldn't bring claims against individual people

6     under 354-A, and the New Hampshire Supreme Court disagreed with

7     that in one of my cases that I certified to them, that's the

8     Fuller case, and said those individuals can be liable under an

9     aiding and abetting theory, which is in the statute, but the

10     aiding and abetting theory doesn't apply to this particular

11     provision.

12          So, I do not think at least -- I do not see anything

13     in 354-A that allows a claim to be maintained against an

14     individual teacher, and the statute itself talks about -- the

15     education statute says you can bring a claim against a school

16     district but not the teacher in the Human Rights Commission.

17     So, I don't know how you could possibly get relief against an

18     individual teacher except through a Department of Education

19     complaint.  I don't diminish that, I think that's hugely

20     significant, but your briefing suggested that it could, and I'm

21     just not sure how that's so.

22          MR. BISSONNETTE:  Sure.  The guidance itself, the July

23     FAQ guidance, basically makes clear that, if you think there is

24     a violation, you could file a complaint with the Human Rights

25     Commission.  You can file a complaint --

1          THE COURT:  Against the school district, yes, you can.

2          MR. BISSONNETTE:  And the department of -- well, the

3     Human Rights Commission.  You could file a lawsuit with the

4     Human Rights Commission.  You could file a lawsuit in court.

5          But, regardless of who the defendant is, I actually

6     think, to get really practical here, because I think being

7     practical here is really important, the teacher becomes the

8     subject of that complaint regardless of who the defendant is.

9     Let's say the defendant is the school district.  The school

10    district gets sued because of how a teacher behaved.  The

11    teacher is getting wrapped up into that litigation.

12         THE COURT:  I agree with that.

13         MR. BISSONNETTE:  And so, I actually -- I'm trying to

14    kind of think from a practical perspective.  A teacher's

15    behavior does implicate enforcement, regardless of who the

16    defendant is, in five separate forums, and I think that's

17    critical, because at its core it's that nature of the

18    enforcement, regardless of who the defendant is, that creates

19    this chill.

20         I want to kind of ground this case a little bit into

21    the practical reality of what is occurring, and I know, your

22    Honor, that either you're skeptical of hypotheticals -- I've

23    been in cases before where you've told me that, and I'm well

24    aware of that.

25         THE COURT:  Well, no.  Judges love to ask

1      hypotheticals.  They don't like hypotheticals being put to

2      them.

3              MR. BISSONNETTE:  I know.  I hear you.  I hear you.

4              But I want to explain, actually, why hypotheticals

5      matter, and actually in Santa Cruz and in Honeyfund the courts'

6      posturing of questions was actually part of those courts'

7      analyses in concluding that the statutes are ambiguous.

8              But why kind of this asking of questions is key,

9      because these incidents come up in a million different factual

10     circumstances in schools every day across the State of New

11     Hampshire:  Is this book covered, is that covered?

12             THE COURT:  Do any of your clients -- are they seeking

13     permission to expressly teach any of the banned concepts?

14             MR. BISSONNETTE:  No.  What they're asking, your

15     Honor, is --

16             THE COURT:  Their concern is that it will be

17     interpreted broadly to potentially encompass legitimate conduct

18     that they want to engage in and do engage in every day.

19             MR. BISSONNETTE:  Yes.

20             THE COURT:  I get that completely.  I don't have any

21     sense that any teacher wants to expressly advocate a banned

22     concept.  What I do get is they want to teach history, they

23     want to teach the Civil Rights Movement, they want to teach

24     about racism, they want to teach about sexism, they want to

25     teach about implicit bias, the administrators want to do

1    sensitivity training.  They want to do all those things without

2    expressly advocating any banned concept, and if the statute

3    made it absolutely clear that they could not be subject to

4    discipline unless they expressly and intentionally engaged in

5    teaching those concepts, we might have a very different case.

6    The problem is the statute doesn't -- it allows people to be

7    found liable even though they've acted unintentionally, and it,

8    at least according to the Attorney General, allows people to be

9    liable not because they say something, because they imply

10   something.

11            MR. BISSONNETTE:  Mm-hmm.

12            THE COURT:  You combine those two things together, and

13   it creates a problem.  That's what I see is the --

14            MR. BISSONNETTE:  I'm not going to disagree with you

15   at all, but I do think the harm is a little bit greater than

16   that.

17            There have been specific questions raised of the

18   Department of Justice, the Department of Education, Hey, we got

19   your guidance, and this is actually attached to the Mejia

20   complaint, but we have specific questions, you know, in

21   concrete terms, because this is the way the statute comes up in

22   the classroom every day, you know?  And let me just give you

23   another example.

24            THE COURT:  Give me an example.

25            MR. BISSONNETTE:  Sure.

1      THE COURT:  And then you construe the statute and tell

2      me how the statute can be construed to prohibit that.

3      MR. BISSONNETTE:  A complaint has been filed against

4      the Exeter School District for their collaboration with the

5      Racial Unity Team that is discussing issues like power,

6      privilege, implicit bias, work that's central to school's work

7      to help --

8      THE COURT:  But give me an example of what they did.

9      MR. BISSONNETTE:  One of the complaints that was

10     raised, in addition to just the sheer fact that privilege is

11     being discussed in schools, is that the book *To Kill a*

12     *Mockingbird* was being taught with a focus on underrepresented

13     characters.  This is what we're --

14     THE COURT:  Show me how that could be deemed to -- I

15     know *To Kill a Mockingbird*.  I thought you were going to bring

16     a more contemporary example --

17     MR. BISSONNETTE:  I have them, too, your Honor.

18     THE COURT:  -- like *How to Be an Anti-Racist* and say,

19     Okay, that's a subject of a violation.

20     But if you want to do *To Kill a Mockingbird*, show me

21     how you could construe the statute to make the teaching of *To*

22     *Kill a Mockingbird* unlawful under the banned concept statute.

23     MR. BISSONNETTE:  It's not just the teaching of the

24     book; it's how you talk about it, particularly if you talk

25     about it in connection to contemporary events.  Tom Robinson --

1          THE COURT:  Show me how it could -- you're now charged

2     with construing the statute.

3          MR. BISSONNETTE:  Sure.

4          THE COURT:  How could it be construed to make that

5     conduct unlawful?

6          MR. BISSONNETTE:  It could be construed that way

7     because a complainant has basically said that it could be

8     construed that way.

9          THE COURT:  No.  I'm sorry.

10         MR. BISSONNETTE:  Sure.

11         THE COURT:  We can't give statutory construction power

12    to whatever citizen in the state, because there are people that

13    have very unusual views about things.  So that somebody thinks

14    something violates a statute is not evidence that it violates a

15    statute.

16         MR. BISSONNETTE:  Can I challenge you on that just

17    very briefly?

18         THE COURT:  Yes.

19         MR. BISSONNETTE:  I understand you feel strongly on

20    that, your Honor, but one of the problems with the statute is

21    that --

22         THE COURT:  People who think -- the average person on

23    the street does not have the power to give force to a

24    construction.  It's the governmental agencies that apply it and

25    courts that interpret it that have that power.  They don't have

1   any power, and they have strange views.  I've had many unusual

2   statutory construction views propounded, sometimes by lawyers,

3   but they don't mean anything unless and until somebody adopts

4   that construction.  So, that's why I'm asking you --

5          MR. BISSONNETTE:  No, I understand.

6          THE COURT:  -- tell me how you would construe it to

7   ban the teaching -- I can't see how somebody could ever say

8   credibly it violates the statute to teach *To Kill a*

9   *Mockingbird*.

10          MR. BISSONNETTE:  It's not just -- again, your Honor,

11  it's not just teaching it.  We have to kind of, I think, get a

12  little bit more granular, and I'll get to that, but just to

13  kind of push back ever so slightly, the problem with the

14  statute --

15          THE COURT:  I have a vigorous, very explicit memory of

16  sixth grade when *To Kill a Mockingbird* was taught in my class

17  and we were discussing it together in class, so I actually

18  remember from sixth grade that particular discussion.  I just

19  don't know, though, that -- I can't in any way see how it would

20  have violated the statute.

21          MR. BISSONNETTE:  The concern, though, your Honor, and

22  why the perception of the public matter, and this is why I'm

23  just slightly pushing back, is because it's not just the

24  Department of Education, Department of Justice, the Human

25  Rights Commission and Department of Labor that enforce it.  It

1    is State courts that have an independent obligation to evaluate

2    the text and hear complaints.  So, this regime falls outside

3    the enforcement authority of those that issue the guidance in

4    this case; so the public perception, in my view, actually is

5    really important because individuals essentially have the

6    ability to bring private rights of action independent of any

7    guidance that has been issued.

8         THE COURT:  Yeah.  I do think, though, again, I want

9    to emphasize this, there's a tone in your briefs that this

10   statute is very different from what it is.  This is not a

11   bounty statute.  This is not a statute where the Legislature

12   has purported to give standing to the average citizen to go

13   after people that they think are violating the law.  This

14   statute does not do that.  It allows aggrieved parties to sue.

15   Aggrieved parties have a definition under the human rights

16   statute, and they have a definition under standing law in

17   Superior Court, and they do not entitle people to be bounty

18   hunting.

19        So, to the extent you say that, I say back it up,

20   because that's not what I understand the statute does.  It does

21   many things, but it doesn't do that.

22        MR. BISSONNETTE:  Fair enough, your Honor.  I think

23   the only point that I was trying to make is that individuals

24   have the ability to go to court outside the enforcement

25   mechanisms that have been put forth by the State, which we may

1   disagree on that, but I actually think that's incredibly

2   important in this particular case.

3          And I actually can present to you, again, if the Court

4   is interested, the *To Kill a Mockingbird* reference, a complaint

5   that actually has been filed, it was publicly put out on

6   Twitter, and why I think this example has meaning.  So, I'd be

7   happy to present it to the Court.

8          THE COURT:  Do you have any evidence yet of anyone

9   being disciplined for violating the statute, anyone having been

10  the subject of a successful Human Rights Commission case or a

11  lawsuit for violating the statute?  I haven't seen that, but it

12  may exist.  Do you have any of that?

13         MR. BISSONNETTE:  So, we do know of, and it's very

14  spotty, because I only have what's been voluntarily produced, I

15  have examples of at least three complaints, including this one,

16  that's not part of the record that I could present to the

17  Court.

18         The Human Rights Commission has publicly represented

19  that it hasn't docketed any complaints into, like, the active

20  prosecutorial stage.  But this is all the more reason, your

21  Honor, why discovery is necessary in this particular case,

22  particularly where an element or a factor of vagueness is the

23  notion of enforcement.  So, here I actually think the

24  complaints are vital to learn about in discovery, because we

25  get to learn, we should be able to learn, whether or not the

1    Human Rights Commission is interpreting the statute consistent

2    with its own guidance.  And we also --

3            THE COURT:  I'm going to ask you to wrap up.

4            MR. BISSONNETTE:  Sure.

5            THE COURT:  And then I'm going to let Mr. Garland have

6    a brief response, and then we'll take a break, come back and

7    deal with the First Amendment argument.

8            I'm sorry to cut you off.

9            MR. BISSONNETTE:  No, I understand.  I've been talking

10   for a while.  I think we're fine your Honor.  Thank you very

11   much.  I appreciate it.

12           THE COURT:  Okay.  Mr. Garland, briefly, and then

13   we'll take a break.

14           MR. GARLAND:  I'll be very brief, your Honor, and I'll

15   speak from here, if that's okay.  We believe we've put forth a

16   construction that saves the statute from any facial vagueness

17   challenge.  You have indicated some reservations that appear to

18   be reservations as a matter of statutory construction.  To the

19   extent you are uneasy with whether it's within -- either

20   consistent with the statute to construe away the problem you've

21   identified, or whether that would have any sort of binding

22   effect and really resolve the problem, there is a clear

23   solution short of discovery.  I don't see what discovery does

24   here.

25           New Hampshire Supreme Court can say what the statute

1   means; it can resolve any ambiguity.  We put that as an

2   alternative argument in our brief.  I don't think it's

3   necessary, in light of the arguments I've presented, but it

4   exists as an option.

5           THE COURT:  Okay.  I appreciate that.  Thank you for

6   the good argument you guys have presented so far, and we'll

7   take about a 15-minute break, come back, and we'll finish up

8   with the First Amendment arguments.

9           THE CLERK:  All rise.

10                  (Recess taken from 2:43 p.m. to 3:02 p.m.)

11          THE CLERK:  All rise for the Honorable Court.  Please

12  be seated.  This hearing is back in session.

13          THE COURT:  All right.  Did you want to say something,

14  sir?

15          MR. MOERDLER:  Yes, your Honor.  I think we were

16  supposed to speak to the First Amendment claim.

17          THE COURT:  Yeah.  I was going to ask Mr. Garland to

18  go first.  He's the moving party.

19          MR. MOERDLER:  Oh, I'm so sorry.  I apologize.

20          THE COURT:  No.  I'm sorry if I wasn't clear.  That's

21  okay.  As the moving party, I thought I would give him his shot

22  and then hear your response.

23          So, Mr. Garland, what do you want to say?

24          MR. GARLAND:  Thank you, your Honor.  I think, just

25  based upon the colloquy during the vagueness portion of this,

1    you understand our position.  We think <u>Garcetti</u> sets forth the

2    standard.  We think that, as long as the speech is a speech

3    that's being governed as speech pursuant to an official

4    capacity, it is not subject to protection.

5         THE COURT:  So, you know what the question is for you,

6    right?  The plaintiffs make no secret in their brief.  Their

7    brief is that this case's First Amendment claim is governed by

8    the First Circuit's decision in <u>Ward</u>, <u>Garcetti</u> does not provide

9    the controlling standard, <u>Ward</u> does, and under <u>Ward</u> they have a

10   viable First Amendment claim.

11        Your argument is that <u>Ward</u> should not govern, that

12   <u>Garcetti</u> has displaced it, and under the <u>Garcetti</u> framework, at

13   least to the extent that the plaintiffs are seeking relief with

14   respect to speech they undertake in their capacity as

15   government employees, they have no First Amendment right, and

16   the claim fails.  That argument hinges on your contention that

17   <u>Ward</u> doesn't provide the correct standard, <u>Garcetti</u> does.

18        So, tell me why <u>Ward</u> provides the correct standard.

19        MR. GARLAND:  <u>Ward</u> doesn't, your Honor, is our

20   position.

21        THE COURT:  <u>Ward</u> doesn't.  Excuse me.

22        MR. GARLAND:  So, I think we set this forth in our

23   reply, and I don't want to belabor it; I know we've been going

24   on for a while.  I understand that First Amendment precedent is

25   usually binding on this Court almost always, especially on

1     related facts.  We've had cases -- I've had cases before you

2     where that issue has come up.

3             But older precedent or precedent that has been called

4     into question can be displaced by subsequent developments, and

5     Ward really did not address this threshold question.  It

6     assumed that the speech was protected to the extent that it

7     occurred in a classroom, as did Pickering previously and really

8     all of the other cases that predated Garcetti has set forth the

9     balancing framework.

10            Garcetti came along and really was a sea change, in my

11     view.  It said, wait a second, there is a threshold question

12     here; we do not get to balancing until you've answered that

13     question.

14            THE COURT:  So, the real issue, though, is I assume

15     that the plaintiffs are going to say to me that teachers are

16     different from other government employees; they have a measure

17     of academic freedom, even when they are teaching their

18     students; and that academic freedom, the extent to which

19     Garcetti restricts academic free speech was left open expressly

20     by the court in Garcetti, and so Ward remains good law.

21            What do you say to that?

22            MR. GARLAND:  I have two responses to that, your

23     Honor.  The first is that I think most of the academic freedom

24     discussion in Garcetti, if my memory serves me, was

25     post-secondary, and this law doesn't reach that.

1          THE COURT:  Well, I would say specifically the

2     majority in Garcetti was responding to Justice Souter's

3     comment.  Justice Souter's comment was expressly limited to

4     colleges and universities.  Justice Souter did not in any way

5     raise a concern about the application of Garcetti to secondary

6     or elementary schools.

7          And so, one way to read this would be to say, at most,

8     the Court left open the question of its applicability to

9     colleges and universities in order to address what they

10    identified as Justice Souter's concern.  Right?

11         MR. GARLAND:  I think that's right, your Honor.  And I

12    do think -- I'm not aware of anything that doesn't allow you to

13    look at how other Courts of Appeals have considered this, and

14    we've briefed it, and you've already identified Judge Sutton's

15    Sixth Circuit opinion and Judge Easterbrook's Seventh Circuit

16    opinion, and I don't have much more to add beyond the fact that

17    those decisions, admittedly, are as-applied challenges but

18    appear to support our position explicitly that Garcetti extends

19    to teachers.

20         THE COURT:  Yes, you've identified the Sixth and the

21    Seventh Circuit I think most strongly and directly have taken

22    this issue on and said that Garcetti does apply to elementary

23    and secondary school teachers, and teachers in elementary and

24    secondary school do not have a First Amendment right to teach

25    something that is inconsistent with the curriculum; they have

1    to teach what's in the curriculum.  They have no First

2    Amendment right to teach something that they're not allowed to

3    teach under the established curriculum.  That's your view.

4           Okay.  Let's assume that Ward applies.  Even if Ward

5    applies, the school board at the local level and the Department

6    of Education at the statewide level have unlimited ability to

7    impose any speech restriction that they choose on teaching as

8    long as it serves a legitimate pedagogical purpose and the

9    school gives notice before disciplining, right?

10           MR. GARLAND:  Yes, your Honor.

11           THE COURT:  Do you contend that this statute serves a

12   legitimate pedagogical purpose?

13           MR. GARLAND:  Yes, your Honor.

14           THE COURT:  Okay.  So, to the extent that it does and

15   it's not vague, you would say that ends the First Amendment

16   inquiry, even if Ward is the standard?

17           MR. GARLAND:  That's precisely the argument we've made

18   in reply.  Yes, your Honor.

19           THE COURT:  All right.  So, that's your position:

20   first, Ward doesn't apply at all; second, if Ward does apply,

21   Ward gives only limited discretion to teachers, that is, only

22   to teach -- they have to teach any restriction or any

23   requirement, as long as it has a legitimate pedagogical

24   purpose, which is a very low threshold, and there's notice.

25   Here you say it's notice.  If it's not vague, then you're

1    probably right; if it is vague, you're probably not right, and

2    that's how you would dispose of that.

3            All right.  Here's my question to you; this is

4    something your opponent referenced with respect to the

5    vagueness challenge:  You know Garcetti only -- you know that

6    government employees under Garcetti do not completely surrender

7    their First Amendment rights, right?

8            MR. GARLAND:  Yes, your Honor.

9            THE COURT:  Okay.  They retain First Amendment rights,

10   although limited by Pickering, to the extent they are engaging

11   in speech on a matter of public concern as a citizen, right?

12           MR. GARLAND:  Yes, your Honor.

13           THE COURT:  And the opposite of that is

14   quintessentially government speech.  To the extent they are

15   instructed to engage in speech as a part of their government

16   duties or to refrain from certain speech as a part of their

17   government duties, you would say no First Amendment protection,

18   but otherwise they do retain First Amendment protection.

19           To the extent this statute applies beyond the

20   classroom and extends to other interactions that could be

21   construed as teaching or advocacy directed at a pupil, that

22   could implicate First Amendment behavior, even under Garcetti,

23   couldn't it?

24           MR. GARLAND:  It could, your Honor, sure.  I accept

25   the premise.  I have a further response, though.

1          THE COURT:  Okay.  I'm interested in your response,

2     but I wondered if you thought about the Supreme Court's

3     decision in Bremmerton, which you're well aware of that recent

4     case involving a high school principal that the Supreme Court

5     said was allowed to engage in prayer at the 50-yard line after

6     a game with students.  And the Court there actually discussed

7     the Garcetti standard in that case and said that that principal

8     -- or excuse me -- that coach, even though he was on school

9     property with his students that he was charged with coaching

10    and engaging in prayer with them at the 50-yard line, that that

11    was non-governmental speech that would be judged -- if it was a

12    non-religious-type speech it would, therefore, be judged under

13    the broader standard, not under Garcetti, right?

14          So, if that's true, then one could envision a great

15    deal of speech that a teacher might engage in with a pupil

16    outside of the teaching of the classroom that could be swept

17    within the scope of this statute.  Now, they seem to argue

18    otherwise, but, to the extent that that's true, couldn't that

19    preserve a First Amendment claim, at least a limited First

20    Amendment claim, for teachers who might fear that -- say, for

21    example -- I don't know.

22          Do schools have after-school clubs where teachers

23    volunteer to supervise students?  If they're supervising as a

24    volunteer an after-school program, a chess club or something,

25    and someone engages in a discussion with them about racial

1    issues and they are to make a statement about that, they would

2    arguably have First Amendment rights on that issue, even under

3    Garcetti; and, if that's true, that, even if you're right about

4    the Garcetti framework, wouldn't that preserve a limited First

5    Amendment claim at least at the 12(b)(6) level for teachers

6    that are concerned that -- because, frankly, I think the

7    plaintiffs' argument that teachers retain academic freedom to

8    disregard the curriculum set by the school board, that's a very

9    troubling proposition that I don't think finds much support in

10   the case law.  But, to the extent that teachers have First

11   Amendment rights notwithstanding their role as teachers when

12   they do things like the coach in the program in Bremmerton,

13   that they might have First Amendment rights that would be

14   curtailed if they were subject to discipline for advocating one

15   of these banned concepts in a situation like that.

16        So, what's your response?

17        MR. GARLAND:  Thank you, your Honor.  I have a couple

18   of responses to that specific question.

19        First off, I think what you're getting at is the

20   concept of an overbreadth challenge, and that's how I

21   understand this First Amendment challenge, too.  But the

22   plaintiffs here are bringing a facial claim, and the standard

23   for a facial overbreadth challenge requires both that the text

24   of the statute sweep in, as you say, protected speech and that

25   actual fact demonstrate it at the pleading stage; presumably

1     that's the allegations in the complaint.

2          I would think the text of the statute contemplates the

3     circumstances that they are reaching here, that the text really

4     does tether the proscription to things folks are doing in their

5     official capacities.  It does so I think explicitly -- the

6     language in our guidance I think further clarifies that.  I

7     think reading it in conjunction with RSA 98-E as a matter of

8     State statutory construction further confirms it, because 98-E

9     protects in a similar manner.

10         THE COURT:  98-E specifically gives government

11    employees, recognizes the right that they have to speech

12    notwithstanding the fact that they are government employees.  I

13    agree with you on that.

14         MR. GARLAND:  Exactly, your Honor.  And so, I think as

15    a matter of how this statute must be construed as a matter of

16    statutory construction, it does not on its face extend to

17    speech that would be protected by the First Amendment.

18         THE COURT:  Maybe the plaintiff agrees with you.  I

19    thought he was making that argument.  I'm not inclined to agree

20    with that.  I think the statute seems to prohibit any advocacy

21    directed at a pupil, and so I think it sweeps broadly enough to

22    encompass that, or at least that's my concern.

23         Now, do you have a different reading of the statute?

24         MR. GARLAND:  I do, your Honor.  Forgive me.  I just

25    want to run back to my desk.

1          THE COURT:  Sure.

2          MR. GARLAND:  So, your Honor, my reading is, once

3     again, consistent with the FAQs, and I don't want to read too

4     much into the record here, but the statute reaches conduct of

5     people who work to administer programs on behalf of the State

6     of New Hampshire, including teachers in an educational setting.

7     I think as a matter of facial construction that only reaches a

8     governmental speech under the Garcetti framework.  I would

9     point the Court to --

10         THE COURT:  Yeah, but let's focus on the -- I don't

11    have it in front of me now, I have so many papers, but the

12    actual statute itself is directed at pupils, right?  And it

13    says, Pupils shall not be, and it's phrased in that kind of

14    confusing way.  I mean, it's not the ideal way to write a

15    statute, but it says, No pupil shall be, and taught is one of

16    the things.  But it goes quite beyond taught."  It includes

17    more advocacy.  And it doesn't say "in the classroom" or

18    anything like that, "in school," which could be a club,

19    after-school club for which a teacher is doing work, or in

20    lower grades, if a teacher stays on in an after-school program

21    and supervises the kids while they're on the playground waiting

22    for parents to come and pick them up or something.  Those are

23    activities that, arguably, are not governmental speech.  The

24    employer, the school district is not dictating what they may

25    say and not say, except to the extent they impose these banned

1    concepts on them, and they would retain some First Amendment

2    rights.

3           So, my concern is I think, to the extent the

4    plaintiffs assert that there is this First Amendment right to

5    academic freedom for elementary and secondary school teachers,

6    I have trouble squaring that with many cases, but, to the

7    extent that they are saying, We're afraid even when we're not

8    teaching the curriculum that we're subject to the statute and

9    could be disciplined for engaging in conduct that we have a

10   First Amendment right, it would require a Pickering balance

11   test.  Do you know what I mean?

12          Because this statute, if it were applied privately,

13   if, like, the Legislature adopted it and said, No person shall,

14   it would be unconstitutional in a second, because it's a

15   viewpoint-based discrimination that can't be -- speech

16   restriction that can't be justified and is not narrowly

17   tailored.

18          But what Pickering says is governmental employees who

19   engage in speech, even if they're not engaged in government

20   speech, they have First Amendment rights, but they're not the

21   same as everybody else's; they're subject to balancing in a

22   different way.

23          So, that's my concern, is, is there that space left

24   for a First Amendment claim, even if I am persuaded by your

25   contention that under Garcetti the core curricular teaching

1    that's done has to be done the way the school tells the teacher

2    to do it; they're not like university professors that arguably

3    have academic freedom that gives them greater First Amendment

4    protection.

5            Are the plaintiffs really advocating that teachers can

6    disregard the instructions on curriculum from the school board?

7    That somehow seems wrong to me.

8            MR. GARLAND:  Your point is well taken, your Honor.

9    My response to that, again, is, as a matter of construction,

10   which does require I think that this Court look to 98-E, it

11   shouldn't preserve that sphere.  It really couldn't without

12   conflicting, I think, with the speech protections that exist

13   under State law.

14           I point the Court to, and this isn't cited in our

15   brief, and I apologize for that, but United States versus

16   National Treasury Employees Union.  It's 513 U.S. 454.  I'm

17   going to characterize it.  I know you're going to read it.  But

18   all nine justices in that case have dealt with honoraria for

19   federal employees, and it was blanket ban on them.  All nine

20   justices in that case appeared to contemplate that, if there

21   were a sufficient nexus between the ban and the governmental --

22   the role as a governmental employee, that would survive a

23   facial challenge.  It was really a dispute in that case between

24   whether this ban could be saved because insofar as, you know,

25   could the private speech be severed from the public speech.

1    Justice O'Connor thought it could, five-justice majority

2    thought it couldn't, and then the three justices then took a

3    slightly different view and thought the whole thing survived.

4           But the point being that there is a pretty long

5    dialogue in that case about if a statute is connecting the

6    proscriptive conduct to governmental activity that's probably

7    okay, and I think that's reflected as well both in Honeyfund

8    and in Santa Cruz, where -- in Honeyfund, at least, it's really

9    just a footnote.  The footnote says, There's no dispute this

10   reaches private speech, so we're not going to get into that.

11          But in Santa Cruz Judge Freeman made the point that,

12   if this were limited to contract --

13          THE COURT:  Slow down.

14          MR. GARLAND:  I apologize.  If that case were limited

15   just to contractors doing work pursuant to their federal

16   contracts, it would be a different case.  Her concern was what

17   they're doing in private and it extending to private trainings

18   given by contractors unrelated to it.  The same view with

19   grantees there.  And I do think those cases support the notion

20   that, at least as a facial matter, if as a matter of statutory

21   construction the statute is tethered just to the sort of speech

22   that Garcetti would say isn't protected by First Amendment, the

23   facial challenge fails.  There may well be an as-applied

24   challenge if the concern that you have addressed comes to pass.

25          And I would note that I haven't been able to find any

1    facial challenge, at least at a U.S. Court of Appeals level, I

2    don't want to make a representation for District Courts, post

3    Garcetti that allowed a case to go forward based on the sort of

4    overbreadth theory that you've identified.  Every challenge

5    I've found has been an as-applied challenge.  Bremmerton was an

6    as-applied challenge.  The Sixth Circuit and Seventh Circuit

7    cases were as-applied challenges, too.

8           So, our position is as a matter of statutory

9    construction this does not sweep in enough protected conduct,

10   we don't think it sweeps in any, that it wouldn't be remedied

11   through that sort of challenge if it were misapplied, is our

12   position.  Thank you.

13          THE COURT:  Okay.  Good.  Anything else?

14          MR. GARLAND:  That's all, your Honor.

15          THE COURT:  Okay.  Thank you.  I'll hear plaintiffs on

16   the First Amendment issue.

17          MR. MOERDLER:  Your Honor, I have taken perhaps much,

18   too much time, but I would ask you to indulge me for a few

19   moments.

20          THE COURT:  I will.  It's an important issue.  I'll

21   hear you.

22          MR. MOERDLER:  And let me make very clear I doubt that

23   there was a single statement you just made that I would

24   disagree with, and yet I would say to you that First Amendment

25   protections are very much here.

1          Let me tell you why we pled a First Amendment claim.

2     The Supreme Court of the United States in three cases has said,

3     in words or substance that I'll give the Court in a moment, the

4     Court has said that the standard for First Amendment challenges

5     is more exacting where a void for vagueness challenge, not

6     determination, void for vagueness challenge is presented,

7     thereby suggesting to those on the FCC against Fox case and

8     also Baggett against Bullitt and Grayned, all three of those

9     Supreme Court cases.

10          Now that can be interpreted many, many ways.  One way

11    in which it is interpreted is the two interact, and you nailed

12    me on that in my main presentation when I talked about 189:11,

13    because what that does, it says to you the following:  I am

14    applying Garcetti because you are required to teach the

15    subject, but I'm not going to let you get off the hook on that,

16    because you're barred from doing it under this statute.

17          Put vagueness aside.  How do I know what speech is

18    chilled here?

19          Now, that isn't a total answer, and it cannot be until

20    there is discovery, which is what we said right from the

21    get-go, and that is exactly the point.  We reserved the right

22    to make an as-applied challenge depending on discovery.  If

23    there isn't a discovery here that shows it's there, I cannot

24    under Rule 11 allege it any further, but very clearly the

25    indicators are there, as I showed you in one of the documents

1    that was an exhibit.

2          Let me go a couple of steps further, if I may.  You

3    pointed out, quite correctly, and, as I said, I agree with

4    substantially everything you said to my adversary, that we seem

5    to argue otherwise from what the Court does.  We don't.

6          THE COURT:  Maybe you can help me with this, because

7    this is the struggle I have:  I read the case law, including

8    Ward, including Griswold, a number of other cases from outside

9    the Circuit that draw a distinction for First Amendment

10   purposes, academic freedom purposes between school teachers in

11   the elementary and secondary schools and college professors,

12   and that the concern that Justice Souter was expressing in

13   Garcetti, which I think is a very well-taken concern, that if

14   you simply say if you're engaging in government speech for your

15   employer, say at the University of New Hampshire, that you have

16   no First Amendment protection right would be very problematic

17   in a college or university setting.

18         On the other hand, it seems to me quite problematic to

19   suggest that that academic freedom extends in the same way to a

20   high school teacher, and I don't find support in the case law

21   for that.  But what I do find support for is that they don't

22   lose their First Amendment rights entirely.  They can't teach

23   something the school says they can't teach as long as the

24   school tells them clearly what it is they can't teach, but they

25   outside of the school might have -- outside of the classroom

1    doing their teaching duties might have a number of interactions

2    with pupils for which they could retain some residuum of First

3    Amendment protection.

4              So, I'm drawing that distinction.  If you think it's a

5    bad one, tell me --

6              MR. MOERDLER:  No, I don't.

7              THE COURT:  -- between curriculum control --

8              MR. MOERDLER:  I don't think it's a bad one.

9              THE COURT:  -- and speech outside of the curriculum.

10             You think that's a legitimate way to --

11             MR. MOERDLER:  I do not think it's a bad one.

12             THE COURT:  Okay.

13             MR. MOERDLER:  I suggest to you, however, the

14   following, and it is one that the case law has tended to go,

15   but I think it's the wrong test for the case law, and I believe

16   this case shows me why.

17             I keep coming back to 189, because there is a lengthy

18   dissertation by the Department of Education, which is also part

19   of the record, as to what you're allowed to teach and supposed

20   to teach.  You're supposed to teach genocide.  That's

21   superiority.  Take a look at Russia.  Can I teach the pupil by

22   saying that the Ukrainians were not of the match to the

23   Russians, that there's superiority there?  I'm required to

24   teach it.

25             I think what you get to is a principle which I can't

1    fully articulate but I will point to.  It's a waiver principle.

2    It's a principle that when government tells you to do it, it's

3    waived the protections of Garcetti, number one.

4            Number two, I have to take you back to one of my very

5    favorite quotes and why I have this case.  It's by Frankfurter

6    and John Marshall Harlan in Sweezy against New Hampshire.  It

7    is as follows:

8            I say that in these matters of the spirit inroads on

9    legitimacy must be resisted at their incipiency.  This kind of

10   evil grows by what it is allowed to feed on.  The admonition of

11   the Court in another context is applicable here.  It may be

12   that it is the least of the obnoxious thing in its mildest and

13   least repulsive form; but the illegitimate and unconstitutional

14   practices get their first footing in that way, namely, by

15   silent approaches and slight deviations from the legal modes of

16   procedure.

17           Now, I say to you that this is an as-applied case

18   because I believe that when we get into it, just based on the

19   statements of the legislators who introduced it, and based on

20   Edelblut's statement, based on those you're going to see that.

21   You're going to see partisan that's already been shown.

22           What about Pico, which specifically says in the

23   Supreme Court that if it is --

24           THE COURT:  Pico is a very important case, as you

25   know, a plurality decision --

1          MR. MOERDLER:  Right.

2          THE COURT:  -- that dealt with a very specific and a

3     highly First Amendment-ly sensitive issue of removal of books

4     from a school library, and I think Justice Souter's decision,

5     when writing for the Circuit in Griswold, made a very big

6     distinction.  He specifically talks about should a curriculum

7     decision be subject to the Pico review, or should it be subject

8     to our decisions about curricular control and concluded it

9     isn't a Pico case.

10         So I'm, frankly, reluctant to take that case, which

11    deals with a very important concept of library and what can be

12    removed from a library, and say, no, that wouldn't necessarily

13    apply in our case.

14         MR. MOERDLER:  I understand that, and I fully would

15    join in it if it were not, again, for the same fact, how do you

16    tell me what the curriculum is, when as recently as a few

17    months ago you're told to do it?

18         THE COURT:  Okay.  So, I think you have done a good

19    job of sensitizing me and to make me very carefully look at

20    your claim in your second count and maybe insofar as it relates

21    to your First Amendment claim as well, this argument that

22    you've expounded on in different ways that there are

23    requirements to teach X and prohibitions on teaching Y, and,

24    when you look at the two together, they leave a teacher with an

25    impossible burden.  That's your point?

1          MR. MOERDLER:  Yes, and I leave it there.

2          THE COURT:  And lend support to vagueness and First

3     Amendment.  I hear you on that.  I'll study it carefully before

4     I make any decision on the issue.

5          MR. MOERDLER:  I have one more point, two more points,

6     if I may.

7          THE COURT:  Go ahead.

8          MR. MOERDLER:  The first is, there is in the guidance

9     an explicit statement under Guidance Number 8 issued in the

10    name of the Department of Education and Human Rights and

11    Justice, which specifically says extracurricular activities are

12    part of the public school's work.

13         Now, that plays into the following question.  Let's

14    take Bremmerton a different way.  What is the difference if

15    that coach -- it's a high school football game.  What is the

16    difference if that coach assembles the kids in the break in

17    between the first and the second half and teaches religion,

18    pointing out, as the Supreme Court did, that freedom of speech

19    is in precisely the same provision of the *Constitution* as

20    freedom of religion?  And what if he wears a T-shirt that says,

21    Ukraine is right?  What is the difference between --

22         THE COURT:  I think maybe a more applicable problem

23    is, say, while the Black Lives Matter protests are going on,

24    and before that, when a professional football player is

25    criticized for kneeling at the *National Anthem* and a coach who

1    has a multi-racial staff of students is approached by students

2    after practice and say, We need to -- want to talk about this.

3    And, now, the coach may not be an educator under the standard,

4    but a lot of coaches are educators under the standard.  If he's

5    an educator under the standard and talks to pupils in ways that

6    could be -- that might not be governmental speech to which the

7    coach has no First Amendment right, and to the extent they

8    retain a First Amendment right it requires a balancing under

9    the more First Amendment protective standard that preceded

10    _Garcetti_, and under that, you know, combine that with the

11    vagueness argument you have, and you have a potential First

12    Amendment overbreadth argument.

13          MR. MOERDLER:  Exactly.

14          THE COURT:  I think you've made that point well.

15          MR. MOERDLER:  That is my point, and I add one last --

16    two words.

17          THE COURT:  Okay.

18          MR. MOERDLER:  Prior restraint.  Now, you add that to

19    the mix, and where are you?  You are in a situation, with

20    respect, your Honor, you are in a situation where you have

21    State action in the 189, you have specific counseling in the

22    FAQs that this is barred, you have a prior restraint, you have

23    no idea what is and isn't covered, and you have a prior

24    restraint that you can be brought up on charges right then and

25    there.  How do you do that?

1          THE COURT:  Okay.  All right.  I hear you on that,

2    although the words "prior restraint" do not appear in any of

3    the briefs that I've read.

4          MR. MOERDLER:  Your Honor, you are absolutely right.

5    I must confess to you that it is something I did in the

6    preparation of this argument.

7          THE COURT:  All right.  Well, I appreciate it.

8          So, let me just make clear to you, I have a very large

9    workload burden at the moment, and I'm trying to finish several

10   other very significant cases.  I don't expect I'll have a

11   decision for you until at least 60 days.  It won't be longer

12   than 90, but it will probably be about 60 days.

13         If the case survives the motion, then I will convene a

14   pretrial conference, and we can discuss the scope of any

15   discovery.  If the case, obviously, does not survive, then I'll

16   issue the order, the case will end, and appeal rights can be

17   preserved.  But as soon as I can get to a decision I'll issue

18   it, and then, if the case survives, we'll meet and talk about

19   the scope of discovery.

20         MR. MOERDLER:  Your Honor, I have no wish to give

21   offense in what I am about to say to anyone, least of all

22   Mr. Garland and his office.  I do hope that they and the

23   Department of Education and the other agencies have in mind the

24   preservation of all documents during that period.

25         THE COURT:  Well, you can send a preservation letter

1       to him.  He's probably done something already.

2              What do you want to say?

3              MR. GARLAND:  As a matter of course, your Honor, we

4       send document preservation notices.  I have no reason to

5       believe that one wasn't sent, but I will confirm when I get

6       back.

7              MR. MOERDLER:  Oh, that's fine.  Thank you.

8              THE COURT:  Okay, good.

9              I did not give the other side -- you're not raising a

10      First Amendment issue, but if you wanted to add anything, I'll

11      let you do it.

12             MR. BISSONNETTE:  My only addition, your Honor, is not

13      on the First Amendment claim, is to say, to the extent that

14      this claim survives, we probably will be seeking expedited

15      discovery.  We have the school year underway here.  There's a

16      lot of anxiety.

17             THE COURT:  Yeah.  I think, to the extent it survives,

18      now, I want to be -- I think we could envision an expedited

19      discovery regime but also a tightly focused discovery regime.

20      This is not a case where we need 200 depositions and 3 million

21      documents.  We can be targeted, and we can be expedited, and we

22      can be focused, and we can get the discovery done in a matter

23      of months, and we can get cross-motions for summary judgment,

24      which is where these cases ordinarily sort out if they don't

25      end up in a dismissal at the 12(b)(6) stage.  So, that would be

1    my intention:  fast, efficient, fair, narrow, get us to summary

2    judgment and then get a ruling one way or the other, if the

3    case survives the 12(b)(6) issue.

4         Okay.  All right.  I appreciate the good quality of

5    argument.  Thank you for your help.

6         THE CLERK:  All rise.

7    (WHEREUPON, the proceedings adjourned at 3:37 p.m.)

1                        C E R T I F I C A T E

2

3

4          I, Brenda K. Hancock, RMR, CRR and Official Court

5    Reporter of the United States District Court, do hereby certify

6    that the foregoing transcript constitutes, to the best of my

7    skill and ability, a true and accurate transcription of the

8    within proceedings.

9

10

11

12

13   Date: ___10/17/22             /s/ Brenda K. Hancock
                                   Brenda K. Hancock, RMR, CRR
14                                 Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25