## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW HAMPSHIRE

**Local 8027, AFT-N.H.,**
**AFL-CIO, et al.**

   v.         Case No. 21-cv-1077-PB
              Opinion No. 2023 DNH 005

**Frank Edelblut, Commissioner,**
**N.H. Department of Education, et al.**

### MEMORANDUM AND ORDER

 The plaintiffs in these consolidated actions are public school teachers, administrators, and teachers' associations. They challenge the constitutionality of several recent amendments to New Hampshire's education and antidiscrimination laws that restrict what public school teachers can say to their students about how to understand, prevent, and redress discrimination in our society. Several of the plaintiffs contend that the new laws violate their First Amendment right to free speech. They all argue that the laws are unconstitutionally vague. The defendants have responded with a motion to dismiss for failure to state a claim.

### I.  BACKGROUND

 The laws at issue in this case have their genesis in New Hampshire House Bill 544 ("HB544"), which was captioned "An Act relative to the propagation of divisive concepts." The core components of HB544 were later

added by amendment to House Bill 2 ("HB2"), a budget bill that was passed by the House and sent to the Senate on April 7, 2021. The Senate made substantial changes to HB2's divisive concepts provisions, which appear in Section 297 and 298 of the bill, and rebranded them as antidiscrimination laws. Differences between the House and Senate versions of the bill were resolved in conference, and HB2 became law on June 25, 2021.

HB2 made several changes to the state's education and antidiscrimination laws.[1] The amendment to the education laws, codified at N.H. Rev. Stat. Ann. ("RSA") § 193:40, identifies four concepts that a public primary or secondary school student may not be "taught, instructed, inculcated or compelled to express belief in, or support for":

> (a) That one's age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion or national origin is inherently superior to people of another age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin;

> (b) That an individual, by virtue of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin, is inherently racist, sexist, or oppressive, whether consciously or unconsciously;

---

[1] The parties cannot agree on a name for the new laws. Plaintiffs call them "divisive concept" or "banned concept" laws. Defendants refer to them as "antidiscrimination provisions." Rather than pick a side on this inconsequential point, I refer to the new laws as the "education and antidiscrimination amendments" or the "amendments."

(c) That an individual should be discriminated against or receive adverse treatment solely or partly because of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin; or

(d) That people of one age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin cannot and should not attempt to treat others without regard to age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin.

RSA § 193:40, I.

HB2 also added several new sections to chapter 354-A, known as the "Law Against Discrimination," that employ substantially similar versions of the banned concepts. RSA § 345-A:31 makes it unlawful for a public employer to "teach, advocate, instruct, or train" the banned concepts to "any employee, student, service recipient, contractor, staff member, inmate, or any other individual or group." RSA § 354-A:32 similarly states that "[n]o government program shall teach, advocate, or advance" any of the banned concepts. And RSA § 354-A:33 protects public employees from being disciplined for refusing to participate in any activity "at which a public employer or government

3

program advocates, trains, teaches, instructs, or compels participants to express belief in, or support for," any of the banned concepts.[2]

RSA § 193:40, III permits the Attorney General, or any other person "claiming to be aggrieved by a violation" of the new law, to obtain damages and injunctive relief from an offending school or school district, either by filing a lawsuit in superior court or by filing a complaint with New Hampshire's commission for human rights. RSA § 345-A:34 similarly permits a person "aggrieved" by a violation of the antidiscrimination amendments to pursue "all of the remedies available under" chapter 354-A, which include compensatory damages and injunctive relief.

RSA § 193:40, IV provides that a "[v]iolation of this section by an educator shall be considered a violation of the educator code of conduct that justifies disciplinary sanction by the state board of education." An "educator" is defined as "a professional employee of any school district whose position requires certification by the state board [of education]." RSA § 193:40, V. Potential disciplinary sanctions include reprimand, suspension, or revocation of an educator's certification. See N.H. Code Admin. R. Ed 511.01. In other words, an educator who is found to have taught or advocated a banned

---

[2]     The education and antidiscrimination amendments use several different terms to describe the speech that they prohibit. For ease of reference, I refer to the prohibited types of expression collectively as "teaching or advocacy."

concept may lose not only his or her job, but also the ability to teach anywhere in the state. See id.; see also id. Ed. 501.02(ad).

The new laws create safe harbors for certain conduct that may otherwise constitute teaching or advocacy of a banned concept. RSA § 193:40, II allows "discussing, as part of a larger course of academic instruction, the historical existence of ideas and subjects identified" by a banned concept. RSA § 354-A:29, II permits public employers to conduct "racial, sexual, religious, or other workplace sensitivity training based on the inherent humanity and equality of all persons." And RSA § 354-A:29, III disavows any limitation on "the academic freedom of faculty members" at public colleges and universities.

Passage of the education and antidiscrimination amendments led to immediate controversy over their scope. The following month, three state agencies — the department of education, the commission for human rights, and the department of justice ("enforcing agencies") — produced collective guidance regarding the scope and effects of the new provisions. Framed as "Frequently Asked Questions" ("FAQs"), one guidance document dealt with K-12 educational programs and the other concerned public employers and government programs. Both FAQs defined the term "inherent" in the first two banned concepts as referring to characteristics that are "natural, biological, or innate, as opposed to characteristics that are merely apparent,

accidental, or based on external factors." Doc. Nos. 36-8 at 1; 36-9 at 1. The
FAQs also explained that the amendments do not prohibit training or
education geared toward diversity, equity, equality, and inclusion, such as
implicit bias training.

In September 2021, the New Hampshire Attorney General ("AG")
issued an official opinion concerning the scope and application of the new
laws, after some stakeholders raised concerns that they were "confusing and
that public employers and schools will struggle to understand the scope of the
new prohibitions." Doc. No. 36-10 at 1. Describing the new statutory
provisions as "legislation of limited reach," id. at 5, the AG opined that the
first two banned concepts proscribe advocacy that one identified group has
"natural, biological, or innate characteristics, as opposed to apparent or
accidental characteristics that: (1) make them superior or inferior to other
identified groups or (2) make one identified group racist, sexist, or
oppressive." Id. at 3. According to the opinion, the last two banned concepts
prohibit advocacy "that any identified group can or should be treated
unequally to any other identified group and that one identified group should
be discriminated against or treated adversely." Id.

In December 2021, two groups of plaintiffs challenged the new laws in
separate complaints filed against the education commissioner and other state
officials. The first group consists of five educators, two of whom are also

parents of children enrolled in New Hampshire's public schools, and Local 8027 of the American Federation of Teachers-New Hampshire, a labor union that represents approximately 3,400 public school teachers, school support staff, city and town employees, police officers, library employees, and higher education faculty in the state (collectively, "AFT plaintiffs"). The second group includes two diversity, equity, and inclusion school administrators and the National Education Association-New Hampshire, a professional association representing more than 17,000 educators in the state (collectively, "NEA plaintiffs"). The two actions were later consolidated.

The AFT plaintiffs allege that the amendments violate their First Amendment right to free speech. Both complaints assert that the new laws are impermissibly vague in violation of the Fourteenth Amendment's Due Process Clause.

## II.   STANDARD OF REVIEW

To survive a motion to dismiss for failure to state a claim, a plaintiff must allege facts sufficient to "state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A claim is facially plausible if it pleads "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id.

In testing a complaint's sufficiency, I employ a two-step approach. See Ocasio-Hernández v. Fortuño-Burset, 640 F.3d 1, 12 (1st Cir. 2011). First, I screen the complaint for statements that "merely offer legal conclusions couched as fact or threadbare recitals of the elements of a cause of action." Id. (cleaned up). A claim consisting of little more than "allegations that merely parrot the elements of the cause of action" may be dismissed. Id. Second, I credit as true all of the plaintiff's non-conclusory factual allegations and the reasonable inferences drawn from those allegations, and then determine if the claim is plausible. Id. The plausibility requirement "simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence" of illegal conduct. Twombly, 550 U.S. at 556. The "make-or-break standard" is that those allegations and inferences, "taken as true, must state a plausible, not a merely conceivable, case for relief." Sepúlveda-Villarini v. Dep't of Educ. of P.R., 628 F.3d 25, 29 (1st Cir. 2010).

### III.   ANALYSIS

Defendants contend that the consolidated complaints must be dismissed because the education and antidiscrimination amendments do not on their face violate either the First Amendment's Free Speech Clause or the Fourteenth Amendment's Due Process Clause. Plaintiffs, unsurprisingly, disagree.

**A.      First Amendment Claim**

The AFT plaintiffs base their First Amendment claim on both their claimed right to speak as teachers and their children's corresponding right to receive information as public school students. I turn first to the claims they bring as teachers.

1.   Teachers' First Amendment Claim

Defendants' challenge to plaintiffs' claim as teachers can be simply stated: (1) plaintiffs are government employees; (2) the education and antidiscrimination amendments only restrict curricular speech; (3) curricular speech is government speech; and (4) the First Amendment does not protect speech by government employees when, as is the case here, they speak for the government rather than as citizens. Defendants base this argument on the Supreme Court's decision in Garcetti v. Ceballos, 547 U.S. 410 (2006), where the Court considered "whether the First Amendment protects a government employee from discipline based on speech made pursuant to the employee's official duties." Id. at 413. In answering that question, the Court built upon its prior decisions in Pickering v. Board of Education of Township High School District 205, 391 U.S. 563 (1968) and Connick v. Myers, 461 U.S. 138 (1983). As the Court explained the analytical framework:

"Pickering and the cases decided in its wake identify two inquiries to guide interpretation of the constitutional protections accorded to public employee speech. The first requires

determining whether the employee spoke as a citizen on a matter
of public concern. If the answer is no, the employee has no First
Amendment cause of action based on his or her employer's
reaction to the speech. If the answer is yes, then the possibility of
a First Amendment claim arises."

Garcetti, 547 U.S. at 418 (cleaned up).[3]

When an employee's speech may be protected because the employee is

speaking as a citizen on a matter of public concern, Garcetti, Connick and

Pickering instruct that a court must "attempt to balance the value of the

employee's speech — both the employee's own interests and the public's

interest in the information the employee seeks to impart — against the

employer's legitimate government interest in preventing unnecessary

disruptions and inefficiencies in carrying out its public service mission."

Bruce v. Worcester Reg'l Transit Auth., 34 F.4th 129, 137 (1st Cir. 2022)

(cleaned up).

Garcetti involved speech by a deputy district attorney that the Court

concluded was unprotected because he was speaking as a government

---

[3]     The Supreme Court later qualified its holding in Garcetti by stating
that "[t]he critical question under Garcetti is whether the speech at issue is
itself ordinarily within the scope of an employee's duties, not whether it
merely concerns those duties." Lane v. Franks, 573 U.S. 228, 240 (2014). In a
recent case, the First Circuit interpreted both Garcetti and Lane to require
courts to determine "whether an employee spoke 'pursuant to their official
duties'" by focusing on "whether the speech was 'part of what' the employee
was 'employed to do' rather than merely whether the employee engaged in
the speech 'at work.'" Bruce v. Worcester Reg'l Transit Auth., 34 F.4th 129,
136 (1st Cir. 2022) (quoting Garcetti, 547 U.S. at 420, 421).

employee rather than as a citizen. 547 U.S. at 422-24. Although that case did not concern curricular speech by public primary and secondary school teachers, defendants contend that Garcetti supplies the standard that I must apply when ruling on plaintiffs' First Amendment claim.

Plaintiffs argue Garcetti does not apply here because teachers have a First Amendment right to academic freedom that differentiates them from other public employees, at least when they are engaged in teaching. To support their position, they point out that the Supreme Court has not expressly extended Garcetti to curricular speech and argue that the controlling precedent on that issue is the First Circuit's earlier decision in Ward v. Hickey, 996 F.2d 448 (1st Cir. 1993). I disagree.

In Ward, a high school teacher was denied tenure after she discussed the abortion of fetuses with Down syndrome in her ninth-grade biology class. Id. at 450. The First Circuit analyzed the teacher's free speech claim by drawing on Supreme Court precedent addressing student speech. See id. at 452 (citing Tinker v. Des Moines Indep. Cmty. Sch. Dist., 393 U.S. 503, 506 (1969); Hazelwood Sch. Dist. v. Kuhlmeier, 484 U.S. 260, 271 (1988)). Adopting the Tinker-Hazelwood test, the court held that a school may restrict a teacher's curricular speech if "(1) the regulation is reasonably related to a legitimate pedagogical concern, and (2) the school provided the teacher with notice of what conduct was prohibited." Id. (cleaned up).

Ward predates Garcetti by more than a decade, and it does not discuss Pickering or Connick. Significantly, the First Circuit has not relied on Ward in any subsequent case for the proposition that plaintiffs advance here, not even in a case involving "curricular discretion" where the district court had relied on Ward. See Griswold v. Driscoll, 625 F. Supp. 2d 49, 60 (D. Mass. 2009), aff'd, 616 F.3d 53, 60 (1st Cir. 2010). Instead, the First Circuit affirmed the district court in Griswold on alternative grounds, holding that the challenged curriculum guide "did not implicate the First Amendment." 616 F.3d at 60. In another decision decided after Ward but prior to Garcetti, the First Circuit similarly rejected a curricular speech claim by a student teacher by using Pickering and Connick rather than Ward. See Hennessy v. City of Melrose, 194 F.3d 237, 248-49 (1st Cir. 1999). Accordingly, I am not persuaded by plaintiffs' contention that Ward rather than Pickering, Connick and Garcetti supply the standard of review in this case.

Plaintiffs alternatively argue that Garcetti does not apply to curricular speech claims even if such claims are governed by Pickering and Connick because the Garcetti majority expressly declined to consider in that case "whether the analysis we conduct today would apply in the same manner to a case involving speech related to scholarship or teaching." Garcetti, 547 U.S. at 425. A careful reading of Garcetti, however, leaves no doubt that the Court's concerns there were directed primarily at academic freedom claims by

12

college and university faculty rather than public primary and secondary
school teachers. We know this to be true because the majority's comment
responds expressly to Justice Souter's concern in dissent that the majority
opinion might "imperil First Amendment protection of academic freedom in
public colleges and universities, whose teachers necessarily speak and write
pursuant to official duties." Id. at 438 (Souter J., dissenting).

In Garcetti's wake, several circuit courts have recognized that public
college and university professors retain substantial academic freedom under
the First Amendment while engaged in teaching and scholarship. See, e.g.,
Meriwether v. Hartop, 992 F.3d 492, 505 (6th Cir. 2021); Buchanan v.
Alexander, 919 F.3d 847, 852-53 (5th Cir. 2019); Demers v. Austin, 746 F.3d
402, 411 (9th Cir. 2014); Adams v. Trs. of Univ. of N.C.-Wilmington, 640 F.3d
550, 564-65 (4th Cir. 2011).[4] But the circuits that have considered whether
public primary and secondary school teachers enjoy similar freedom to
determine what they will teach have concluded that their curricular speech is

---

[4]     The Ninth Circuit held in Demers that Garcetti does not apply to the
curricular speech of public university professors, but the opinion includes
dicta that could be read to also extend similar protection to public high school
teachers. See 746 F.3d at 412-13. Demers does not discuss the Ninth Circuit's
earlier decision in Johnson v. Poway Unified School District, which holds that
the curricular speech of public primary and secondary teachers is not
protected by the First Amendment. See 658 F.3d 954, 966-70 (9th Cir. 2011).
Thus, I read these opinions together to exempt only curricular speech by
public college and university professors from Garcetti's holding.

not protected by the First Amendment. See Johnson v. Poway Unified Sch. Dist., 658 F.3d 954, 966-70 (9th Cir. 2011); Evans-Marshall v. Bd. of Ed. of Tipp City Extended Village Sch. Dist., 624 F.3d 332, 342 (6th Cir. 2010); Mayer v. Monroe Cnty. Comm. Sch. Corp., 474 F.3d 477, 479-80 (7th Cir. 2007); cf. Lee v. York Cnty. Sch. Div., 484 F.3d 687, 694 n.11, 700 (4th Cir. 2007) (declining to apply Garcetti but concluding under Pickering and Connick that a teacher's speech was not protected by the First Amendment).

The reasons for treating curricular speech by college and university faculty differently from similar speech by primary and secondary school teachers are compelling. The Supreme Court has long recognized that "universities occupy a special niche in our constitutional tradition." Grutter v. Bollinger, 539 U.S. 306, 329 (2003); see also Sweezy v. New Hampshire, 354 U.S. 234, 249-55 (1957) (plurality opinion); Keyishian v. Bd. of Regents of Univ. of State of N.Y., 385 U.S. 589, 603 (1967) (recognizing that a university "classroom is peculiarly the 'marketplace of ideas'"). In such environments, "academic freedom . . . is of transcendent value to all of us and not merely to the teachers concerned." Keyishian, 385 U.S. at 603. In short, academic freedom concerns are paramount on college and university campuses.

Public primary and secondary school teachers, by contrast, are hired to teach the curriculum developed by the politically accountable branches of state and local government. Individual primary and secondary school

teachers simply aren't given the latitude to teach whatever they believe

students need to hear. As the Seventh Circuit observed in <u>Mayer</u>:

> A teacher hired to lead a social-studies class can't use it as a
> platform for a revisionist perspective that Benedict Arnold wasn't
> really a traitor, when the approved program calls him one; a
> high-school teacher hired to explicate Moby-Dick in a literature
> class can't use Cry, The Beloved Country instead, even if Paton's
> book better suits the instructor's style and point of view; a math
> teacher can't decide that calculus is more important than
> trigonometry and decide to let Hipparchus and Ptolemy slide in
> favor of Newton and Leibniz.

474 F.3d at 479.

College and university faculty also teach their classes in a very

different environment from the world of primary and secondary education.

No one is required to attend a public college or university, but primary and

secondary school education is compulsory, and most families lack either the

financial means or the spare time to satisfy the requirement through private

schools or home schooling. <u>Id.</u> While local school boards may have good

reasons to grant teachers substantial autonomy in choosing how best to

implement curricular standards, parents, students, and teachers will

inevitably disagree about what should be taught in public school classrooms.

When disagreements arise, they generally are better resolved by politically

accountable officials than by federal judges. <u>See</u> <u>Evans-Marshall</u>, 624 F.3d at

341. Accordingly, I agree with defendants that <u>Garcetti</u> applies and that the

First Amendment does not protect the curricular speech of primary and secondary school teachers.

For defendants, that ends the matter. Because they contend that the education and antidiscrimination amendments only apply to curricular speech, they argue that I need not consider plaintiffs' ancillary claim that the amendments also impermissibly restrict their extracurricular speech. I disagree. RSA § 193:40, I provides that "[n]o pupil in any public school in this state shall be taught, instructed, inculcated or compelled to express belief in, or support for," a banned concept. As plaintiffs argue, this provision can plausibly be read to cover interactions with pupils outside the classroom and even beyond the school grounds. After all, a pupil in a public school may interact with a teacher in a school hallway, schoolyard, lunchroom, or library, not to mention during extracurricular activities that take place on or off school grounds. Even the enforcing agencies' guidance in the FAQs recognize the arguably broad scope of the amendments by construing them to apply to extracurricular activities. See Doc. No. 36-8 at 2 ("The prohibitions apply to all activities carried out by public schools in their role as public schools, including extra-curricular activities that are part of the public school's work."). To underscore the point, the only acknowledged exception in the FAQs for activities that take place on a public school's property is for third-party events or activities, such as voluntary after-school programs

16

administered by outside organizations. See id. Thus, I agree with plaintiffs that the amendments arguably prohibit any advocacy of a banned concept that a teacher directs at a student, even outside the confines of a classroom.

Because the education and antidiscrimination amendments are susceptible to an interpretation that encompasses extracurricular speech, they plausibly restrict teachers' speech as private citizens. See, e.g., Kennedy v. Bremerton Sch. Dist., 142 S. Ct. 2407, 2424-25 (2022) (holding that a high school coach who engaged in prayer while on school property and in the immediate vicinity of students did not engage in government speech). As to such speech, Garcetti indicates that the court should apply the Pickering-Connick balancing test. Defendants have not analyzed plaintiffs' extracurricular speech claim under that test. Accordingly, I decline to dismiss the AFT plaintiffs' First Amendment claim to the extent it is based on the theory that the education and antidiscrimination amendments restrict their extracurricular speech.

### 2.  Students' First Amendment Claim

Two of the AFT plaintiffs have children who attend public schools in New Hampshire. Although they did not expressly allege a distinct First Amendment claim on behalf of their children, they left no doubt in their objection to defendants' motion to dismiss that they believe that the education and antidiscrimination amendments also violate their children's

right to free speech. Defendants object to what they see as an improper attempt by plaintiffs to add a claim that is not asserted in their complaint.

I do not doubt that a parent can assert a First Amendment claim on behalf of a child either as a "general guardian" pursuant to Fed. R. Civ. P. 17(c)(1), or as a "next friend," as is typically done in New Hampshire when a parent represents a child in a state court proceeding, see, e.g., Roberts v. Mills, 85 N.H. 517, 519 (1932). Plaintiffs, however, did not sue in either capacity. Nor did they include a distinct First Amendment claim on behalf of their children in their complaint. Accordingly, if plaintiffs want to sue on behalf of their children, they must file an amended complaint asserting the children's interests in a distinct claim for relief.[5]

---

[5] In allowing plaintiffs to amend their complaint, I do not mean to suggest that the First Amendment gives plaintiffs' children any greater control over a school's curriculum than it gives to teachers. Although the First Amendment protects a recipient's right to receive information from a willing speaker, Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc., 425 U.S. 748, 757 (1976), a recipient's right to receive information is derivative of the speaker's right to speak. See Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico, 457 U.S. 853, 867 (1982) ("the right to receive ideas follows ineluctably from the sender's First Amendment right to send them"); Doe ex rel. Doe v. Governor of N.J., 783 F.3d 150, 155 (3rd Cir. 2015); Ind. Right to Life, Inc. v. Shepard, 507 F.3d 545, 549 (7th Cir. 2007); Pa. Family Inst., Inc. v. Black, 489 F.3d 156, 165 (3rd Cir. 2007); In re Application of Dow Jones & Co., 842 F.2d 603, 608 (2d Cir. 1988). Should plaintiffs seek to amend their complaint to add a First Amendment claim on behalf of their children, defendants remain free to argue that a child's First Amendment right to receive information about a banned concept is no broader than a teacher's right to speak about the concept.

**B.   Vagueness Challenge**

Plaintiffs also argue that the education and antidiscrimination amendments are unconstitutionally vague, both facially and as applied to educators. Construing the claim as a facial vagueness challenge only, defendants argue that it cannot succeed for several reasons. First, defendants contend that the amendments are not vague in all of their applications, the standard that they believe should apply in this case. But even if a less stringent vagueness test applies, defendants argue that the amendments pass muster because they provide a discernible standard of conduct and protect against arbitrary or discriminatory enforcement.

1.   Classifying Plaintiffs' Vagueness Challenge

The complaints purport to assert both facial and as-applied vagueness challenges. Plaintiffs confirmed at oral argument that they are presenting both claims and that, in its current form, their challenge is as applied in the sense that they seek to invalidate the statutory prohibitions as applied to educators. Defendants, in a conclusory manner, construe the vagueness claim to be facial only, without addressing plaintiffs' nuanced as-applied challenge.

Generally, a facial challenge raises constitutional defects as to the terms of the statute itself, independent of its application to a plaintiff's particular set of circumstances. See United States v. Playboy, 529 U.S. 803, 834 n.3 (2000) (Scalia, J., dissenting). By contrast, an as-applied challenge is

focused on whether the statute's application to a plaintiff's actual or proposed conduct is unconstitutional. See id. Plaintiffs who bring a prospective as-applied vagueness challenge typically must identify specific activities that they plan to engage in but that are arguably barred. See Holder v. Humanitarian Law Project, 561 U.S. 1, 18-25 (2010); Copeland v. Vance, 893 F.3d 101, 112 (2d Cir. 2018). "The challenger cannot instead rely on hypothetical situations in which the statute could not validly be applied." Copeland, 893 F.3d at 113; see also Humanitarian Law Project, 561 U.S. at 22 (refusing to analyze "hypothetical situations designed to test the limits" of statutory prohibitions).

The complaints here are silent as to any particular advocacy that plaintiffs would pursue but for fear of running afoul of the statutory prohibitions. Rather, plaintiffs seek to redefine the nature of an as-applied challenge to encompass a facial challenge to a statute as applied to a subset of individuals whom it affects. Although there is reason to doubt plaintiffs' position that they have adequately pleaded an as-applied challenge, defendants' motion to dismiss does not present a developed argument regarding the viability of such a claim. Because the issue has not been adequately briefed, I deny defendants' motion to dismiss plaintiffs' as-applied vagueness claim without prejudice to their ability to argue at a later stage that the claim is without merit.

2.  Applicable Standard for Plaintiffs' Facial Vagueness Claim

The parties dispute the appropriate standard for evaluating plaintiffs'
facial vagueness challenge. Defendants argue that plaintiffs must prove that
the amendments are vague in all of their applications, citing Village of
Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489 (1982).
Plaintiffs disagree, pointing to the Supreme Court's more recent rejection of
that standard in Johnson v. United States, 576 U.S. 591 (2015), Sessions v.
Dimaya, 138 S. Ct. 1204 (2018), and United States v. Davis, 139 S. Ct. 2319
(2019).

The Supreme Court has not taken a consistent position over time on
the standard a court should use when evaluating facial vagueness challenges
outside of the First Amendment context. See generally Richard H. Fallon, Jr.,
As-Applied and Facial Challenges and Third-Party Standing, 113 Harv. L.
Rev. 1321 (2000). In Flipside, the Court set a high bar for such challenges: a
plaintiff had to show that the statute was "impermissibly vague in all of its
applications." 455 U.S. at 495. As Justice Thomas noted in his dissent in
Johnson, this standard "is simply an application of the broader rule"
espoused in United States v. Salerno, 481 U.S. 739 (1987), that "a statute is
facially unconstitutional only if 'no set of circumstances exists under which
the Act would be valid.'" Johnson, 576 U.S. at 636 n.2 (Thomas, J.,
dissenting) (quoting Salerno, 481 U.S. at 745). Because plaintiffs must show

under this standard that a statute has no valid applications, a single clear application of the law would defeat a facial vagueness challenge under this test. As the Second Circuit has noted, "[t]his standard effectively eliminates facial challenges outside of the First Amendment context that could not also be brought as an as-applied challenge, since any law that is unconstitutional in every set of circumstances is also necessarily unconstitutional when applied to any plaintiff." Dickerson v. Napolitano, 604 F.3d 732, 743-44 (2d Cir. 2010).

About a decade after Flipside was decided, a plurality of the Supreme Court in City of Chicago v. Morales challenged the notion that the Salerno standard applies in facial vagueness cases. See 527 U.S. 41, 55 n.22 (1999) (Stevens, J., with Souter, J. and Ginsburg, J., concurring) ("To the extent we have consistently articulated a clear standard for facial challenges, it is not the Salerno formulation, which has never been the decisive factor in any decision of this Court, including Salerno itself . . . ."). Although several courts of appeals subsequently questioned the continued vitality of the "no set of circumstances" standard, lower courts continued to apply it after Morales. See, e.g., Alphonsus v. Holder, 705 F.3d 1031, 1042 n.11 (9th Cir. 2013); United States v. Comstock, 627 F.3d 513, 518 (4th Cir. 2010).

More recently, however, the Supreme Court has decisively rejected the notion that clarity in some applications can save a statute from a facial

vagueness attack. In a trio of facial challenges not involving the First Amendment, the Court refused to adopt the view that "a statute is void for vagueness only if it is vague in all its applications." Johnson, 576 U.S. at 602; accord Dimaya, 138 S. Ct. at 1214 n.3; see also Davis, 139 S. Ct. at 2336. The residual clauses in the statutes at issue in those cases required judges to determine whether an offense qualified as a violent felony or a crime of violence by using a categorical approach, divorced from a defendant's actual conduct. The Court struck down all three statutes on vagueness grounds.

In Johnson, the Court considered a facial challenge to the residual clause of the Armed Career Criminal Act (ACCA), which imposed enhanced penalties for offenders with prior convictions for a "violent felony," defined to include any felony that "otherwise involves conduct that presents a serious potential risk of physical injury to another." 576 U.S. at 593-94 (cleaned up). The Court concluded that the clause was unconstitutionally vague even though there were some "straightforward cases" that clearly fell within its scope. See Id. at 602-03. In doing so, the Court acknowledged that some of its opinions have used the "vague in all applications" language that would have mandated a different result. See id. But, the Court concluded, "our holdings squarely contradict the theory that a vague provision is constitutional merely because there is some conduct that clearly falls within the provision's grasp." Id. at 602. The Court cited two prior holdings to illustrate the point:

23

> For instance, we have deemed a law prohibiting grocers from charging an "unjust or unreasonable rate" void for vagueness — even through charging someone a thousand dollars for a pound of sugar would surely be unjust and unreasonable. We have similarly deemed void for vagueness a law prohibiting people on sidewalks from "conduct[ing] themselves in a manner annoying to persons passing by" — even though spitting in someone's face would surely be annoying.

Id. at 602-03 (quoting United States v. L. Cohen Grocery Co., 255 U.S. 81, 89 (1921); Coates v. Cincinnati, 402 U.S. 611, 611 (1971)). "These decisions," the Court reasoned, "refute any suggestion that the existence of some obviously risky crimes establishes the residual clause's constitutionality." Id. at 603. Further, the Court observed that the "supposed requirement of vagueness in all applications is not a requirement at all, but a tautology: If we hold a statute to be vague, it is vague in all its applications (and never mind the reality)." Id. Because the ACCA's residual clause "produce[d] more unpredictability and arbitrariness than the Due Process Clause tolerates," id. at 598, the Court invalidated it in its entirety, even as to "straightforward cases." Id. at 602-03. In his dissent, Justice Thomas defended Flipside's "vague in all applications" standard as an extension of Salerno's "no set of circumstances" test and suggested that the majority was carving out an exception to that rule in facial vagueness cases. See id. at 636 & n.2 (Thomas, J., dissenting).

In Dimaya, the Supreme Court relied on Johnson to strike down as facially vague a similarly worded residual clause in an immigration statute that authorized the removal of aliens convicted of "a crime of violence." See 138 S. Ct. at 1213-16. Dissenting again, Justice Thomas reiterated his view that "a facial challenge requires a statute to be vague 'in all applications,'" but he acknowledged that Johnson "weakened" that principle. Id. at 1250 (Thomas, J., dissenting). In response, the majority confirmed that "Johnson made clear that our decisions 'squarely contradict the theory that a vague provision is constitutional merely because there is some conduct that clearly falls within the provision's grasp.'" Id. at 1214 n.3 (majority opinion) (quoting Johnson, 576 U.S. at 602).

In the last installment of the trilogy, the Supreme Court invalidated on facial vagueness grounds the residual clause of a criminal statute that authorized enhanced penalties for certain firearms offenses. See Davis, 139 S. Ct. at 2336. Without expressly reiterating its rejection of the "vague in all applications" standard, the Court in Davis endorsed its approach in Johnson and Dimaya and held that the statute's categorical approach was void for vagueness. See id. at 2325-36.

At least three circuit courts have analyzed the impact of Johnson and its progeny on facial vagueness challenges. The Seventh and Ninth Circuits have interpreted those cases as "put[ting] to rest the notion — found in any

number of pre-Johnson cases — that a litigant must show that the statute in question is vague in all of its applications in order to successfully mount a facial challenge." United States v. Cook, 914 F.3d 545, 553 (7th Cir.), vacated on other grounds, 140 S. Ct. 41 (2019); see Guerrero v. Whitaker, 908 F.3d 541, 544 (9th Cir. 2018) ("[W]e [previously] observed that the 'no set of circumstances' standard was subject to some doubt but that we would continue to apply that standard until a majority of the Supreme Court directs otherwise. That day has come. Johnson and Dimaya expressly rejected the notion that a statutory provision survives a facial vagueness challenge merely because some conduct clearly falls within the statute's scope.") (cleaned up).

By contrast, the Second Circuit has limited the Johnson line of cases to their "exceptional" facts. See United States v. Requena, 980 F.3d 30, 41-42 (2d Cir. 2020), cert. denied sub nom., Raymond v. United States, 141 S. Ct. 2761 (2021). In Requena, that court held that "vague in all applications" continues to be the default rule in facial vagueness cases with three limited exceptions: the First Amendment context, criminal laws lacking a scienter requirement, and Johnson-type cases where the statute calls for a categorical approach. See id. at 39-40. In doing so, the Second Circuit held "that Johnson's license to strike down a 'criminal statute . . . as facially vague even where it has some valid applications' extends only to the 'exceptional

circumstances' present in that case and its progeny." Id. at 42 (quoting
Copeland, 893 F.3d at 111 n.2). Thus, the Second Circuit has narrowly read
Johnson's rejection of the "vague in all applications" standard as limited to
the residual clause of the ACCA and its functional equivalents.

I agree with the Seventh and Ninth Circuits that the Johnson trio
heralded a more meaningful shift in the void for vagueness doctrine than the
Second Circuit recognized. In those cases, the Supreme Court rejected the
language in Flipside and Salerno that the mere existence of some clear
application can save a statute from unconstitutional vagueness. The Court
did not tie the demise of that standard to the facts of those cases. Instead, it
unequivocally rejected the notion that its holdings support the view that
clarity in some instances is enough to survive a vagueness challenge.
Moreover, the cases cited in Johnson to support its abandonment of the
"vague in all applications" standard did not concern categorical applications
of law such that the Court's discussion in Johnson could be construed as
limited to that context. See Coates, 402 U.S. at 611; L. Cohen Grocery Co.,
255 U.S. at 89. Therefore, the Supreme Court's rejection of the "vague in all
applications" standard was in no way tethered to the facts in Johnson. And if
any doubt remained after Johnson, it was dispelled in Dimaya, when the
Court plainly stated that Johnson had rejected the "vague in all applications"
standard as inconsistent with its holdings. See Dimaya, 138 S. Ct. at 1214

n.3. Because the Supreme Court's rationale in the <u>Johnson</u> line of cases was carefully considered and not expressly limited to the facts of those cases, it is binding on lower courts. <u>Cf.</u> <u>United Nurses & Allied Pros. v. Nat'l Lab. Rels.</u> <u>Bd.</u>, 975 F.3d 34, 40 (1st Cir. 2020) (explaining that lower courts are "bound by the Supreme Court's considered dicta") (cleaned up).

In support of their view that the "vague in all applications" standard remains viable post-<u>Johnson</u>, defendants cite to the First Circuit's recent decision in <u>Frese v. Formella</u>, 53 F.4th 1 (1st Cir. 2022). That case challenged New Hampshire's criminal defamation statute on First Amendment and vagueness grounds. <u>Id.</u> at 5. In setting forth background principles applicable to the vagueness claim, the court in <u>Frese</u> cited <u>Salerno</u> for the proposition that a successful facial vagueness challenge requires a showing "that no set of circumstances exists under which the [statute] would be valid." <u>Id.</u> at 7 (citing <u>Dutil v. Murphy</u>, 550 F.3d 154, 160 (1st Cir. 2008) (quoting <u>Salerno</u>, 481 U.S. at 745)). Because the case arose in the First Amendment context, however, the court in <u>Frese</u> did not apply that standard. Rather, it determined that the statute in question passed muster because it provided adequate notice and meaningful enforcement guidelines. <u>See</u> <u>id.</u> at 7-11. In other words, the fact that some conduct clearly fell within the provision's scope was not the reason the statute survived constitutional scrutiny. Considering that the court's brief mention of the <u>Salerno</u> standard played no

part in the disposition of the case, which gave the court no occasion to consider the impact of the Johnson line of cases on that standard, it does not bind lower courts. See Rossiter v. Potter, 357 F.3d 26, 31 (1st Cir. 2004).

Although not raised by the parties, I am also mindful that, post-Johnson, the Supreme Court has continued to cite to Salerno's "no set of circumstances" test when addressing other types of facial constitutional challenges. See Ams. for Prosp. Found. v. Bonta, 141 S. Ct. 2373, 2387 (2021); City of L.A. v. Patel, 576 U.S. 409, 417 (2015). But, like Salerno, those cases did not involve facial vagueness claims. Salerno addressed a facial attack on the federal Bail Reform Act based on substantive due process and Eighth Amendment grounds. See 481 U.S. at 746-55. In Bonta, the facial challenge to a state regulation was based on the First Amendment, and the Court noted that Salerno did not apply in that context. See 141 S. Ct. at 2387. Lastly, Patel involved a facial challenge to a state ordinance on Fourth Amendment grounds. See 576 U.S. at 419-28.

The continued viability of Salerno in these other contexts can fairly be reconciled with my interpretation of Johnson. As Justice Thomas suggested in his dissent in Johnson, the Supreme Court has effectively recognized that "void-for-vagueness claims are different from all other facial challenges not based on the First Amendment." 576 U.S. at 636 n.2 (Thomas, J., dissenting). Writing for the majority in Davis, Justice Gorsuch explained why vagueness

29

challenges merit special treatment. The core concern of the vagueness doctrine is lack of fair notice, that is, subjecting people to laws without giving them adequate warning about what those laws require. See Davis, 139 S. Ct. at 2323. In addition, vague laws constitute an impermissible delegation of legislative power because "[t]hey hand off the legislature's responsibility for defining criminal behavior to unelected prosecutors and judges." See id. Because of these constitutional infirmities, "a vague law is no law at all." Id. This reasoning is consistent with Johnson and leads me to conclude that plaintiffs should have a wider path to raise facial vagueness challenges than the stringent "vague in all applications" standard otherwise allows.

But even if I am wrong that Johnson requires more than such a minimal showing to defeat a vagueness claim, the "vague in all applications" standard would not apply here for several reasons. First, plaintiffs have alleged that the amendments abridge their First Amendment freedoms, which is a recognized exception to that standard. See, e.g., United States v. Williams, 553 U.S. 285, 304 (2008); Frese, 53 F.4th at 6-7; see also Grayned v. City of Rockford, 408 U.S. 104, 109 (1972) (recognizing that "where a vague statute abuts upon sensitive areas of basic First Amendment freedoms, it operates to inhibit the exercise of those freedoms") (cleaned up).

Second, unlike the statute in Flipside, the education and antidiscrimination amendments neither "simply regulate business behavior"

nor "contain[] a scienter requirement." <u>See</u> 455 U.S. at 499. Rather, as

defendants conceded at oral argument, the amendments lack a scienter

requirement and their violation can lead to serious consequences, including

the loss of livelihood. These features make the amendments more analogous

to the anti-loitering statute in <u>Morales</u>, where a plurality of the Supreme

Court sustained a facial vagueness challenge because the statute had no

scienter requirement, burdened a constitutional right, and vagueness

"permeate[d] the text" of the law. <u>See</u> 527 U.S. at 55.

   To summarize, the void-for-vagueness doctrine does not require a

showing that a statute is vague in all of its applications, especially where, as

here, the law subjects a violator to serious consequences, lacks a scienter

requirement, and implicates First Amendment rights. Therefore, that some

conduct clearly falls within the amendments' scope is insufficient to defeat

plaintiffs' vagueness claim.

   3.  <u>Application of the Vagueness Standard to Plaintiffs' Claim</u>

   "The vagueness doctrine, a derivative of due process, protects against

the ills of laws whose prohibitions are not clearly defined." <u>Frese</u>, 53 F.4th at

6 (cleaned up). The Supreme Court has stated that "[t]he degree of vagueness

that the Constitution tolerates . . . depends in part on the nature of the

enactment." <u>Flipside</u>, 455 U.S. at 498. Notably, greater clarity is required

when a statute either restricts speech, imposes a particularly severe penalty, or lacks a scienter requirement.

The prospect of "the chilling of constitutionally protected speech" has led courts to "apply a heightened standard" when reviewing statutes that impose restrictions on speech. Frese, 53 F.4th at 6 (cleaned up); see also Grayned, 408 U.S. at 109. As a result, speech restrictions "require a greater degree of specificity." Frese, 53 F.4th at 6 (cleaned up). The amendments at issue in this case are explicit viewpoint-based speech limitations that, as discussed above, arguably affect both the curricular and extracurricular speech of public primary and secondary school teachers. Because their extracurricular speech is plausibly entitled to First Amendment protection, a rigorous vagueness review is required.

The need for clarity is likewise paramount when a statutory provision authorizes severe consequences for a violator. For example, it is well-settled that criminal laws are subjected to the most exacting vagueness review. See Dimaya, 138 S. Ct. at 1212. Although the Supreme Court has at times endorsed "greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe," Flipside, 455 U.S. at 498-99, the Court in Dimaya rejected the notion that a less stringent standard should apply in civil cases involving particularly severe consequences. See Dimaya, 138 S. Ct. at 1212-13. In light

of the "grave nature of deportation" at issue in that case, the Court reasoned

that the same standard of certainty required of criminal laws applies in the

civil removal context. Id. at 1213 (cleaned up). In his concurrence, Justice

Gorsuch also called into question the basis for imposing a lesser standard in

the civil context in part because many civil laws carry greater penalties than

some criminal laws, such as those "that strip persons of their professional

licenses and livelihoods." Id. at 1229 (Gorsuch, J., concurring). Considering

that teachers who are found to have advocated a banned concept can be

stripped of their teaching credentials and thus deprived of their livelihoods,

this factor points in favor of requiring the most exacting vagueness review.

Lastly, laws that fail to incorporate a scienter requirement may also

receive greater scrutiny. See, e.g., United States v. Nieves-Castano, 480 F.3d

597, 603 (1st Cir. 2007) (explaining that the statute's "scienter requirement

ameliorates any vagueness concerns") (citing Hill v. Colorado, 530 U.S. 703,

732 (2000)). Indeed, the Supreme Court "has long recognized that the

constitutionality of a vague statutory standard is closely related to whether

that standard incorporates a requirement of mens rea." Colautti v. Franklin,

439 U.S. 379, 395 (1979), abrogated on other grounds, Dobbs v. Jackson

Women's Health Org., 142 S. Ct. 2228 (2022) (citing United States v. U.S.

Gypsum Co., 438 U.S. 422, 434-46 (1978); Papachristou v. City of

Jacksonville, 405 U.S. 156, 163 (1972); Boyce Motor Lines v. United States,

342 U.S. 337, 342 (1952)). As defendants have acknowledged, the education and antidiscrimination amendments lack a scienter requirement. In other words, teachers are not "protected from being caught in [the statute's] net by the necessity of having a specific intent to commit" a violation. See Papachristou, 405 U.S. at 163. As a result, inadvertent statements that are later deemed to advocate a banned concept can violate the amendments. This concern, combined with the amendments' viewpoint-based speech restrictions and the severe consequences that can follow if a teacher is found to have taught or advocated a banned concept, lead me to conclude that the exacting vagueness standard applied in criminal cases should apply here as well.

That standard requires that the law must give "a person of ordinary intelligence fair notice of what is prohibited" and must not be "so standardless that it authorizes or encourages seriously discriminatory enforcement." Williams, 553 U.S. at 304. A law is unconstitutionally vague if it fails either requirement. See id. Even under this demanding standard, however, vagueness doctrine does not require "perfect clarity and precise guidance." Id. (cleaned up). Rather, a statute is unconstitutionally vague for failing to provide adequate notice "only if it prohibits . . . an act in terms so uncertain that persons of average intelligence would have no choice but to guess at its meaning and modes of application." Frese, 53 F.4th at 10 (cleaned up). Similarly, a "statute authorizes an impermissible degree of enforcement

discretion — and is therefore void for vagueness — where it fails to set reasonably clear guidelines for law enforcement officials and triers of fact in order to prevent arbitrary and discriminatory enforcement." Id. at 7 (cleaned up).

Defendants argue that they should prevail even under this standard because the education and antidiscrimination amendments provide adequate notice and sufficient enforcement guidelines. I disagree. Although the amendments identify certain core concepts that may not be taught, they do not give either teachers or enforcers the guidance they need to find the line between what the amendments prohibit and what they permit. This is so especially because the amendments allow teachers to be sanctioned for speech that advocates a banned concept only by implication.

In addition to express advocacy, the AG has opined that the amendments can be violated by conduct that merely implies the truthfulness of a banned concept. See Doc. No. 36-10 at 7. For example, the opinion states that a public employer could violate the amendments if it creates a web-based anti-racist resource and states that it was designed to "serve as a resource for our white employees." Id. According to the AG, this conduct could violate the amendments because it "may imply that white people, specifically and for no other reason, are in need of anti-racist resources." Id. (emphasis added). In other words, a teacher could unknowingly violate the amendments by making

a statement that does not expressly endorse a banned concept but that could be understood to imply it. Coupled with the enforcing agencies' view that the amendments are not limited to curricular speech but also governs teachers' conduct during extracurricular activities, this statutory construction leaves open countless applications where a teacher does not directly assert a banned concept but, in the view of an enforcer, implies its correctness.

Consider, for example, the third banned concept, which bars an educator from teaching or advocating "[t]hat an individual should be discriminated against or receive adverse treatment solely or partly because of his or her . . . race." RSA § 193:40, I(c). In the coming months, the Supreme Court will decide whether colleges and universities can continue to use race-conscious admission policies. The plaintiffs in those cases assert that such policies improperly favor Black applicants at the expense of white and Asian-American applicants, whereas the defendants argue that the policies are necessary to ensure diversity in higher education. If a high school teacher attempts to explain the diversity argument to her class during a discussion of the case, will she face sanctions for teaching a banned concept? We simply don't know.

Likewise, consider the fourth banned concept, which prohibits, among other things, teaching or advocating that white people cannot treat Black people "without regard to" their race. RSA § 193:40, I(d). Given that advocacy

can take many forms, there is a real risk that a teacher could face sanctions for discussing the concept of implicit bias with a student.

Although I do not understand implicit bias to expressly embrace the notion that a person in one group "cannot" treat a person in another group equally, a discussion may certainly imply as much in the minds of others who have a different understanding of the concept. For example, a teacher may state that white persons can have difficulty treating non-white persons without regard to their race. An enforcer may later decide that the discussion implied support for the proposition that a white person "cannot" treat a Black person without regard to race, in violation of the fourth banned concept.

These examples illustrate the principal problem with the amendments: they do not give teachers fair notice of what they can and cannot teach. Teachers can be sanctioned for speech that they do not intend to advocate a banned concept. They can be sanctioned even for speech that is later deemed to violate the amendments only by implication. Because teachers can lose their jobs and teaching credentials if they cross the line into prohibited speech, they should not be left to guess about where that line will be drawn.

These problems are compounded because, as plaintiffs point out, teachers in New Hampshire have an affirmative duty to teach topics that potentially implicate several of the banned concepts. For example, state law explicitly mandates teaching about the evolution of "intolerance, bigotry,

37

antisemitism, and national, ethnic, racial, or religious hatred and discrimination," as well as "how to prevent the evolution of such practices." RSA § 189:11, I(j). Although the education and antidiscrimination amendments create an exception for teaching the "historical existence of ideas and subjects identified" as banned concepts, see RSA § 193:40, II, this exception does not fully encompass the broader scope of learning that RSA § 189:11 mandates. For example, beyond teaching the historical existence of Jim Crow laws, teachers are supposed to discuss their evolution and how such practices can be prevented. In this context, it is not difficult to imagine that a discussion of remedies for past discrimination such as reparations would take place, which could subject a teacher to sanctions for teaching a banned concept. As a result, teachers could, in plaintiffs' words, be left with "an impermissible Hobson's choice": shirking their responsibilities under RSA § 189:11, or teaching what RSA § 189:11 requires and potentially violating the prohibition against teaching a banned concept in RSA § 193:40. See Doc. No. 46 at 9. This is even more reason to require clarity in the amendments. Teachers should not be put in a position where they must instruct students on certain concepts but face the threat of job loss if their instruction unintentionally and only by implication crosses the line drawn in RSA § 193:40.

38

Defendants argue that a sufficiently narrow construction of the amendments would allay these fair notice concerns. In fact, during oral argument, defendants — one of whom is the AG — invited me to reject the AG's opinion that implied advocacy of a banned concept can violate the amendments. This position is untenable for several reasons.

First, a federal court is "without power to adopt a narrowing construction of a state statute unless such a construction is reasonable and readily apparent." Stenberg v. Carhart, 530 U.S. 914, 944 (2000) (quoting Boos v. Barry, 485 U.S. 312, 330 (1988)). This principle is an extension of the rule that a court cannot simply rewrite a statute to make it sufficiently clear. See id. Although defendants now seem to endorse the view that only express advocacy of a banned concept is prohibited, they have not persuaded me at this early stage in the case that the amendments are readily susceptible to such a construction.

Second, defendants' interpretation is at odds with the position that the AG has taken and that, to my knowledge, remains his official opinion on the subject. Although the AG's opinion does not have the force and effect of law, see id. at 940, it is a plausible reading of the statutory text. RSA § 193:40, I provides that "[n]o pupil . . . shall be taught, instructed, inculcated or compelled to express belief in, or support for," the banned concepts. It is arguable that these forms of expression encompass not only express

statements but also conduct that, by implication, constitutes teaching, instruction, or inculcation, such that the amendments sweep as broadly as plaintiffs fear.

So construed, the amendments also lack sufficient standards to guide agency discretion when determining what conduct constitutes a violation. How is an agency to determine whether a teacher has implied the truth of a banned concept? The amendments are silent on the matter, leaving it to the subjective ad hoc judgment of an enforcer. Cf. U.S. Lab. Party v. Pomerleau, 557 F.2d 410, 412 (4th Cir. 1977) ("Because a violation depends on the subjective opinion of the investigator, the speaker has no protection against arbitrary enforcement of the ordinance."); James v. Wilkinson, No. 89-0139-P(CS), 1991 WL 626750, at *5 (W.D. Ky. May 20, 1991) (explaining that when the focus is on what was implied rather than expressed, "the implication is, as with beauty, in the eye of the beholder"). As such, the amendments arguably create a significant risk of arbitrary enforcement. See Grayned, 408 U.S. at 108 ("[I]f arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them.").

Defendants argue that the amendments' enforcement structure protects against arbitrary or discriminatory enforcement. But nothing precludes a person from reporting a teacher to the department of education for violating the educator code of conduct. Under that department's

regulations, "[a] case shall be opened when a complaint of possible
misconduct against a credential holder has come to the attention of the
department either through direct reporting or other means." N.H. Code
Admin. R. Ed 511.01(a). Further, an investigation must be opened if there is
a "possible violation" of the educator code of conduct. Id. Ed 511.01(b). Thus,
the department of education must investigate possible violations of RSA
§ 193:40, which provides an avenue for directly pursuing teachers.

Defendants maintain, however, that the enforcing agencies have
informally settled on a process whereby such complaints against teachers are
not considered until there has been a finding of a violation against the school.
This process, defendants assert, is designed to "weed out the types of
harassing or spurious complaints [that plaintiffs] appear to be concerned
with." Doc. No. 36-1 at 35. But that process is neither a statutory nor a
regulatory requirement. It is only at the sufferance of the education
commissioner that complaints against teachers are purportedly held in
abeyance.[6] As such, the procedural safeguards that defendants tout are
arguably insufficient to protect plaintiffs against arbitrary enforcement.

---

[6]     In any event, plaintiffs have alleged that the department of education
is independently investigating such complaints prior to any finding of a
statutory violation against a school. They appended to their pleading
material suggesting that the department has engaged in investigative
activities concerning complaints that are at least plausibly based on alleged
violations of RSA § 193:40. See Doc. No. 45-2 at 17–21.

Instead, as plaintiffs suggest, "the fragmented and multiple layers of enforcement only serve to create many more opportunities for arbitrary and discriminatory enforcement." Doc. No. 45 at 36.[7]

In sum, the amendments' vague terminology, their lack of a scienter requirement, and the possibility that teachers could be found liable for teaching a banned concept by implication, leave both teachers and enforcers to guess at what speech the amendments prohibit. Given the severe consequences that teachers face if they are found to have taught or advocated a banned concept, plaintiffs have pleaded a plausible claim that the amendments are unconstitutionally vague.

---

[7]    Although the issue has not yet been briefed, it is difficult to reconcile the AG's position that teachers will not face individual liability for damages with a fair reading of chapter 354-A as amended. RSA § 354-A:31 now prohibits a public employer from teaching or advocating a banned concept to a student. RSA § 354-A:2, XV(a) provides that any violation of chapter 354-A is an "unlawful discriminatory practice." RSA § 354-A:2, XV(d) states that aiding and abetting an unlawful discriminatory practice is itself an unlawful discriminatory practice. And the New Hampshire Supreme Court ruled in U.S. Equal Opportunity Commission v. Fred Fuller Oil Company, 168 N.H. 606, 611 (N.H. 2016) that individual employees can be sued for aiding and abetting an unlawful discriminatory practice by an employer. Thus, in its current form, chapter 354-A appears to allow damage actions to be brought against individual teachers for aiding and abetting a violation of RSA § 354-A:31 by their employers.

## IV. <u>CONCLUSION</u>

Defendants' motion to dismiss the AFT plaintiffs' First Amendment claim (Doc. No. 36) is granted in part and denied in part. Defendants' motions to dismiss plaintiffs' vagueness claims (Doc. Nos. 36 and 37) are denied.

SO ORDERED.

/s/ Paul J. Barbadoro
Paul J. Barbadoro
United States District Judge

January 12, 2023

cc:   Counsel of record