**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW HAMPSHIRE**

_____
　　　　　　　　　　　　　　　　　　)
LOCAL, 8027 AFT-NEW HAMPSHIRE,　)
AFL-CIO, et al.,　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　)
　　　　　　Plaintiffs,　　　　　　　)
　　　　　　　　　　　　　　　　　　)
　　　　v.　　　　　　　　　　　　　)　　Case No. 1:21-cv-1077-PB
　　　　　　　　　　　　　　　　　　)
FRANK EDELBLUT, in his official　　)
capacity only as the Commissioner　)
of the New Hampshire Department　)
of Education, et al.,　　　　　　　　)
　　　　　　　　　　　　　　　　　　)
　　　　　　Defendants.　　　　　　　)
_____)

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### Introduction

Two plaintiff groups seek to invalidate new prohibitions on discrimination enacted by the New Hampshire legislature in 2021. Both groups bring void-for-vagueness challenges under the Due Process Clause of the Fourteenth Amendment. One plaintiff group—referred to in this memorandum as the AFT plaintiffs—also brings a challenge under the First Amendment, which the Court previously dismissed in part. Though the plaintiffs purport to challenge the antidiscrimination provisions in whole, they premise their legal theories on how those provisions apply to teachers.

The Court should enter summary judgment in the defendants' favor on all remaining claims. The AFT plaintiffs' First Amendment claim, now limited solely to teachers' extracurricular speech, is not viable as a facial challenge. Public-employee speech that is made pursuant to an employee's official duties is not entitled to First Amendment protection. *Garcetti*

*v. Ceballos*, 547 U.S. 410, 420–22 (2006). Determining whether *Garcetti* applies to a teacher's extracurricular speech is a highly fact- and context-specific inquiry that must be made on a case-by-case basis. It is not susceptible of resolution in the abstract in relation to an entire category of speech in the context of a facial First Amendment claim. Moreover, the AFT plaintiffs' have not met their threshold burden on this claim because they have never identified a category of extracurricular speech that they believe falls beyond *Garcetti* but is still subject to the antidiscrimination provisions.

The plaintiffs' vagueness challenge likewise fails as a matter of law. A facial vagueness claim presents a legal question that is resolved using the ordinary tools of statutory construction. A court must first construe the challenged statute and then apply the relevant vagueness standard. Even when applying the most exacting vagueness standard, courts "do not doubt the constitutionality of laws that call for the application of a qualitative standard . . . to real world conduct," as "the law is full of instances where a man's fate depends on his estimating rightly . . . some matter of degree." *Johnson v. United States*, 576 U.S. 591, 604 (2015) (citations and quotation marks omitted).

When properly construed, the antidiscrimination provisions set forth discernible standards for what they prohibit. A teacher violates the antidiscrimination provisions only when they affirmatively and deliberately convey information to a public-school student, know they are conveying the information in question, and that information is prohibited under the statute. The statute identifies what categories of information are prohibited in terms that teachers can understand. That teachers may sometimes have to make judgment calls or close cases can be envisioned does not render the antidiscrimination provisions vague on their face. *United States v.*

*Williams*, 553 U.S. 285, 305–06 (2008). And though the plaintiffs purport to bring a separate as-applied vagueness challenge, that claim is duplicative of their facial claim.

If, however, the Court determines that the antidiscrimination provisions are unconstitutional as applied to teachers, then it should sever the invalid provisions from the rest of the statutory scheme. To this end, the Court should at most invalidate RSA 198:40, IV, which provides for disciplinary sanction by the New Hampshire Board of Education. The remainder of the antidiscrimination provisions should remain intact.

## Standard of Review

"Summary judgment is warranted if the record, construed in the light most flattering to the nonmovant, presents no genuine issue as to any material fact and reflects the movant's entitlement to judgment as a matter of law." *Lawless v. Steward Health Care Sys.*, LLC, 894 F.3d 9, 20–21 (1st Cir. 2018) (citations and quotation marks omitted). When parties file cross-motions for summary judgment, a court must assess "each motion separately, drawing all inferences against each movant in turn." *Id.* (citations and quotation marks omitted). A "pure question of law" is "appropriate for resolution at the summary judgment stage." *Real Legacy Assurance Co. v. Santori Trucking, Inc.*, 560 F. Supp. 2d 143, 146 (D.P.R. 2008).

## Background

The defendants maintain that this case presents questions law. To the extent any facts are necessary to resolve those legal questions, those facts exist in public record and are subject to judicial notice under Federal Rule of Evidence 201(b)(2). *See Torrens v. Lockheed Martin Servs. Group. Inc.*, 396 F.3d 468, 473 (1st Cir. 2005). The defendants provide the following factual and procedural background for context. The factual background is largely derived from the background provided in the defendants' memorandum in support of their motions to dismiss.

**A.      House Bill 544 in the New Hampshire House of Representatives.**

On January 6, 2021, the New Hampshire House of Representatives introduced House Bill 544, "An Act relative to the propagation of divisive concepts," and referred the bill to the Executive Departments and Administration committee. *See* HB544 0002.[1] As introduced, the bill added a chapter prohibiting the propagation of "divisive concepts." *See* HB544 0005–0008. The original text of the bill defined "divisive concept" to include the following concepts:

a)  One race or sex is inherently superior to another race or sex;

b)  The state of New Hampshire or the United States is fundamentally racist or sexist;

c)  An individual, by virtue of his or her race or sex, is inherently racist, sexist, or oppressive, whether consciously or unconsciously;

d)  An individual should be discriminated against or receive adverse treatment solely or partly because of his or her race or sex;

e)  Members of one race or sex cannot and should not attempt to treat others without respect to race or sex;

f)  An individual's moral character is necessarily determined by his or her race or sex;

g)  An individual, by virtue of his or her race or sex, bears responsibility for actions committed in the past by other members of the same race or sex;

h)  Any individual should feel discomfort, guilt, anguish, or any other form of psychological distress on account of his or her race or sex; or

i)  Meritocracy or traits such as a hard work ethic are racist or sexist, or were created by a particular race to oppress another race.

j)  The term "divisive concepts" includes any other form of race or sex stereotyping or any other form of race or sex scapegoating.

HB544 0005.

---

[1] The parties have filed a joint agree-upon complete legislative history of both House Bill 544 and House Bill 2, as directed by the Court. *See* ECF Doc. No. 43. Consistent with the Court's April 18, 2022 Endorsed Order, the defendants cite to the Bates-stamped version of that legislative history in this memorandum.

Among other things, House Bill 544 proposed prohibiting the following: (1) the State of New Hampshire from "teach[ing], instruct[ing], or train[ing] any employee, contractor, staff member, student, or any individual or group, to adopt or believe any of the divisive concepts defined" in the new statutes; (2) any contractor with the State of New Hampshire from "us[ing] any workplace training that inculcates in its employees any form of race or sex stereotyping or any form of race or sex scapegoating" including training on the divisive concepts; and (3) any grantee of the State of New Hampshire from "us[ing] state funds or assets to promote any of the divisive concepts." *See* HB544 0006.

The House of Representatives' Executive Departments and Administration committee heard testimony in support of and in opposition to House Bill 544 across two days of hearings. *See* HB544 0010–0013. On March 24, 2021, the committee voted with ten in favor and nine opposed to recommend that House Bill 544 pass with an amendment that clarified the definition of contractor and what it means to be a contractor or grantee. *See* HB544 0002.

At the House of Representatives' April 8, 2021 session, that body voted to table House Bill 544 with 347 members voting to table and eighteen opposing the motion to table. *See* HB544 0002. Before the motion to table occurred, however, the House of Representative's Finance committee voted to amend House Bill 2, the biennial budget's trailer bill, to incorporate, among other things, the text of House Bill 544. *See* HB2 0008–0012. House Bill 2, including the text of House Bill 544, passed through the House of Representatives by a vote of 200 in favor and 181 opposed. *See* HB2 0040.

**B.    Removal of House Bill 544's language in the New Hampshire Senate and introduction of new antidiscrimination provisions into House Bill 2.**

House Bill 2, including the language of House Bill 544, was introduced in the New Hampshire Senate on April 1, 2021, and referred to the Senate's Finance committee. HB2 0003.

The Senate Finance committee held hearings on all of House Bill 2, including House Bill 544's language, on May 4, 2021. HB2 0003. Many testified in opposition to including House Bill 544 in the budget trailer bill, including the New Hampshire affiliate of the American Civil Liberties Union, which expressed many of the same arguments advanced in this case. *See* HB2 0046–0105. Thereafter, the Senate Finance committee removed House Bill 544's language entirely and replaced it with new antidiscrimination provisions. HB2 0966–0970. The new legislation would prohibit public employees and government programs, including primary and secondary public education programs, from teaching, advocating, or advancing the following:

(a) That one's age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion or national origin is inherently superior to people of another age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin;

(b) That an individual, by virtue of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin, is inherently racist, sexist, or oppressive, whether consciously or unconsciously;

(c) That an individual should be discriminated against or receive adverse treatment solely or partly because of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin; or

(d) That people of one age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin cannot and should not attempt to treat others without regard to age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin.

HB2 0969.

The new legislation abandoned the prohibition of "divisive concepts," ceased to apply to contractors and grantees, and did not limit the academic freedom of professors and scholars at public colleges and universities. *See* HB2 0966–0970. The new legislation permitted "sensitivity trainings" grounded in the "inherent humanity and equality of all persons and the ideal that all

persons are entitled to be treated with equality, dignity, and respect," to permit "discussing, as part of a larger course of academic instruction, the historical existence of ideas and subjects identified in this section," and to apply only to public employees performing work in their official capacities. HB2 0967.

In addition to removing House Bill 544's broad prohibition on "divisive concepts," House Bill 2 provided for an enforcement system for the bill's antidiscrimination provisions. It permitted those aggrieved by an alleged violation to file a complaint with the New Hampshire Commission for Human Rights or the superior court alleging that the school, school district, or government agency violated the new antidiscrimination provisions. HB2 0969. It also empowered the Board of Education to discipline licensees who had violated the new antidiscrimination provisions. HB2 0969.

On June 3, 2021, the Senate approved the amended version of House Bill 2, including the new antidiscrimination provisions. HB2 0004. Because of the amendments made to House Bill 2 by the Senate, the House of Representatives sought a committee of conference. HB2 0004. The committee of conference made some changes to House Bill 2 but kept the new antidiscrimination provisions intact. HB2 0004. House Bill 2 passed both chambers of the state legislature and, on June 25, 2021, Governor Christopher Sununu signed it into law. HB2 0005.

**C.      Guidance produced by the Department of Education, Department of Justice, and the Commission for Human Rights.**

In part based on concerns expressed by groups like NEA-NH, *see*, *e.g.*, ECF Doc. No. 1-18 at 2–4, the Department of Education, Commission for Human Rights, and Department of Justice (the "enforcing agencies") produced guidance regarding the scope and effect of the new antidiscrimination provisions. The enforcing agencies produced two sets of guidance documents, framed as "frequently asked questions." *See* ECF Doc. No. 36-8 (Frequently Asked Questions:

New discriminatory practice prohibitions applicable to K-12 educational programs, Department

of Education, Commission for Human Rights, and Department of Justice) (hereinafter

"Education FAQs"); ECF Doc. No. 36-9 (Frequently Asked Questions: New discriminatory

practice prohibitions applicable to public employers and government programs, Department of

Education, Commission for Human Rights, and Department of Justice) (hereinafter "Employer

FAQs"). One set of frequently asked questions was designed to address the concerns of

educators in K-12 programs and the other was designed to address the concerns of public

employers and government programs.

In anticipation of complaints being filed with the Commission for Human Rights at the

start of the school year, Attorney General Formella also issued an opinion in relation to the new

antidiscrimination provisions. *See* ECF Doc. No. 36-10 (Attorney General Opinion No. 2021-01,

New Hampshire Department of Justice, Sept. 7, 2021) (hereinafter "the AG Opinion"). That

opinion elaborated on Education and Employer FAQs and provided the Commission for Human

Rights, which is the state agency charged with investigating and adjudicating complaints under

the new antidiscrimination provisions, with a foundation upon which it could build any

investigation of alleged violations or rule on any alleged violations. *See generally id.*

Additionally, to avoid the danger of two separate agencies reaching different conclusions

regarding the existence of discrimination, the enforcing agencies developed a protocol for

evaluating complaints alleging a violation of the new antidiscrimination provisions by public

educators. Consistent with the statutory language, the first step is for the aggrieved individual to

either: (1) file a complaint with the Commission for Human Rights and avail themselves of that

agency's processes or (2) file a lawsuit in the superior court. RSA 193:40, III. In either

circumstance, the complaint would be filed against the school or school district, not the

individual teacher or administrator. *Id.* Only after the final determination, including the exhaustion of all appellate rights by the parties, that a violation of the antidiscrimination laws had occurred could the matter proceed to the second step. RSA 351-A:21, :21-a, :22. At that step, the Department of Education could commence disciplinary proceedings before the Board of Education to determine what sanction, if any, to impose upon the licensee. RSA 193:40, IV.

**D.    Procedural history.**

Each plaintiff group filed a separate complaint in this court in late 2021. ECF Doc. Nos. 1 & 30. The matters were consolidated, and the defendants moved to dismiss both complaints. ECF Doc. Nos. 36 & 37. After extensive briefing and oral argument, the Court issued a memorandum order granting the motions to dismiss in part and denying them in part. ECF Doc. No. 63.

The Court dismissed the AFT plaintiffs' First Amendment claim to the extent it was based on curricular speech. *Id.* at 9–16. The Court further concluded that the AFT plaintiffs had not articulated a First Amendment claim based on student speech in their complaint, but granted the AFT plaintiffs leave to amend their complaint to assert such a claim. *Id.* at 17–18. The Court allowed the AFT plaintiffs' First Amendment claim to proceed to the extent it concerned teachers' extracurricular speech. *Id.* at 16–17.

The Court denied the defendants' motions to dismiss as to the plaintiffs' vagueness challenge. *Id.* at 19–42. The Court concluded that the plaintiffs' vagueness challenge did not require a showing that the statute is vague in all of its applications. *Id.* at 21–31. The Court concluded instead that the vagueness challenge is subject to exacting review. *Id.* at 32–34. The Court reached this conclusion based on the view that the antidiscrimination provisions plausibly reach speech protected by the First Amendment, do not contain an express scienter requirement,

and impose potentially significant penalties on teachers if violated. *Id.* at 34. The Court concluded that the plaintiffs had plausibly alleged that the antidiscrimination provisions are facially vague at least in significant part because "the amendments allow teachers to be sanctioned for speech that advocates a banned concept only by implication." *Id.* at 35.

The Court also declined to dismiss the plaintiffs' as-applied vagueness challenge. *Id.* at 19–20. The Court acknowledged that the plaintiffs did not bring a traditional as-applied claim—*i.e.*, a claim that the antidiscrimination provisions were vague as applied to the plaintiffs' actual past or intended conduct. *Id.* at 20. The Court observed that the plaintiffs "seek to redefine the nature of an as-applied challenge to encompass a facial challenge to a statute as applied to a subset of individuals to whom it affects"—namely, teachers. *Id.* The Court expressed skepticism that this type of as-applied challenge was viable as a standalone claim but allowed it to proceed subject to further briefing in the future. *Id.*

The Court adopted a scheduling order by which the parties would engage in limited, expedited discovery before filing cross-motions for summary judgment. Feb. 15, 2023 Oral Order; Feb. 21, 2023 Endorsed Order. The parties now cross-move for summary judgment. As set forth below, the plaintiffs' remaining claims fail as a matter of law, and summary judgment should enter for the defendants.

## Discussion

I.      **The AFT plaintiffs' First Amendment challenge fails as a matter of law.[2]**

      A.      **Whether *Garcetti* applies to extracurricular speech requires a case-by-case analysis that precludes the facial relief the AFT plaintiffs seek.**

The Court dismissed the AFT plaintiffs' First Amendment claim at the Rule 12 stage to the extent it concerned curricular speech. The Court concluded that curricular speech is not entitled to First Amendment protection under the Supreme Court's decision in *Garcetti*. ECF Doc. No. 63 at 9–16. The Court declined, however, to dismiss the First Amendment claim to the extent it concerned extracurricular speech. *See id.* at 16–17. The Court suggested that extracurricular speech is governed by the balancing test established in *Pickering v. Board of Education of Township High School District 205*, 391 U.S. 563 (1968), and *Connick v. Myers*, 461 U.S. 138 (1983), not by *Garcetti*. ECF Doc. No. 63 at 17.

To the extent the Court meant to suggest that *Garcetti* necessarily does not apply to a teacher's extracurricular speech, the defendants respectfully disagree. Both *Garcetti* and subsequent cases that apply it make clear that determining whether an employee spoke "pursuant to their official duties" is a fact-intensive question ill-suited for hypothetical, prospective resolution. In *Garcetti*, the Supreme Court emphasized that the fact a public employee "expressed his views inside his office, rather than publicly, is not dispositive." 547 U.S. at 420. Rather, "[t]he proper inquiry is a practical one" turning not on "[f]ormal job descriptions," but rather "the duties an employee is actually expected to perform." *Id.* at 424–25. Thus, in *Garcetti*, the Supreme Court looked to both the speech in question and the manner in which it was made to

---

[2] Despite the Court's invitation, the AFT plaintiffs did not amend their complaint to state First Amendment claims based on student speech. The defendants therefore only address the First Amendment claim with respect to teachers' extracurricular speech.

conclude that it was not entitled to First Amendment protection. *See id.* at 420–22. In other words, whether the First Amendment protected the speech at issue turned on the facts of the case.

The Supreme Court, as this Court observed in its order, has since qualified the *Garcetti* standard. ECF Doc. No. 63 at 10 n.10. In *Lane v. Franks*, the Supreme Court stressed that "[t]he critical question under *Garcetti* is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not merely whether it concerns those duties." 573 U.S. 228, 240 (2014). In concluding that the speech in question there—"providing truthful subpoenaed testimony outside of the course of [an employee's] ordinary job responsibilities," *id.* at 235—retained First Amendment protection, the Supreme Court relied on the fact that it was "undisputed that [the plaintiff's] ordinary job responsibilities did not include testifying in court proceedings." *Id.* at 238 n.4. The Court thus did not need to reach "whether truthful sworn testimony would constitute speech under *Garcetti* when given as part of a public employee's ordinary job duties." *Id.* at 238 n.4.

The First Circuit has likewise observed that determining whether *Garcetti* applies requires a case-by-case inquiry. In *Foley v. Town of Randolph*, the First Circuit concluded that public statements made by a fire chief at the scene of a fatal fire were not subject to First Amendment protection under *Garcetti*. *See* 598 F.3d 1, 9–10 (1st Cir. 2010). To reach this conclusion, the First Circuit looked at the context of the speech in question. *See id.* at 7–9. The First Circuit concluded that this context differentiated that speech from the types of speech other courts had found to be protected. *See id.* The First Circuit emphasized that its holding did not "strip [the plaintiff] of the opportunity ever to speak publicly on similar issues without fear of retaliatory discipline." *Id.* at 9. Rather, the First Circuit stressed that "determining whether a

government employee who is head and de facto spokesman of his department is speaking as a citizen or an employee is a highly fact-specific inquiry." *Id.*

The First Circuit reiterated the view that *Garcetti* presents a fact-specific inquiry in *Decotiis v. Whittemore*, 635 F.3d 22, 31 (1st Cir. 2011). There, the First Circuit adopted a "two-step, context-specific inquiry" to assist in making this determination. *Id.* at 31 (quotation omitted). "First, a court must ask, 'what are the employee's official responsibilities?'" *Id.* Under this question, "the proper inquiry is practical rather than formal, focusing on the duties an employee is actually expected to perform, and not merely those formally listed in the employee's job description." *Id.* (citation and quotation marks omitted).

Second, a court must ask "'was the speech at issue made pursuant to those responsibilities?'" *Id.* The First Circuit has identified "several non-exclusive factors" that "are instructive" when resolving this question: (1) "whether the employee was commissioned or paid to make the speech in question"; (2) "the subject matter of the speech"; (3) "whether the speech was made up the chain of command"; (4) "whether the employee spoke at [the employee's] place of employment"; (5) "whether the speech gave objective observers the impression that the employee represented the employer when [the employee] spoke (lending it 'official significance')"; (6) "whether the employee's speech derived from special knowledge obtained during the course of . . . employment"; and (7) "whether there is a so-called citizen analogue to the speech." *Id.* at 32 (citations omitted).

More recently, the First Circuit applied *Garcetti*, *Lane*, and *Decotiis* in *Bruce v. Worcester Regional Transit Authority*, 34 F.4th 129 (1st Cir. 2022). The First Circuit observed that when assessing "whether an employee spoke pursuant to their official duties," a court "must focus on whether the speech was part of what the employee was employed to do rather than

merely whether the employee was engaged in speech at work." *Id.* at 136 (citation and quotation marks omitted). Turning to the nonexclusive factors outlined in *Decotiis*, the First Circuit concluded that a reasonable trier of fact could have determined that the plaintiff was speaking as a citizen when he made the speech at issue. *See id.* at 136–38. In reaching this conclusion, the First Circuit looked at the plaintiff's specific role within the defendant company, the fact he was a union representative, other speech the defendant company does and does not allow, the forum of the speech, and the nature of the speech in question. *See id.*

Other courts have likewise taken the view that *Garcetti* must be applied on a case-by-case basis. The Tenth Circuit has held that "[n]o bright-line rule governs when employees are speaking as part of their official duties." *Lincoln v. Maketa*, 880 F.3d 533, 539 (10th Cir. 2018). The Tenth Circuit accordingly "conduct[s] a practical inquiry on a case-by-case basis, asking whether the speech stemmed from and was of the type that the employee was paid to do." *Id.* (cleaned up). The Tenth Circuit "look[s] to both the content of the speech, as well as the employee's chosen audience, to determine whether the speech is made pursuant to an employee's official duties." *Rohrbough v. Univ. of Colo. Hosp. Auth.*, 596 F.3d 741, 746 (10th Cir. 2010). Similarly, the Ninth Circuit held *en banc* that determining the scope of an employee's professional duties requires a court "to conduct the practical, fact-specific inquiry required by *Garcetti*." *Dahlia v. Rodriguez*, 735 F.3d 1060, 1071 (9th Cir. 2013) (en banc) (citations and quotation marks omitted). The Sixth Circuit has also observed that *Garcetti* contemplates "a fact-specific inquiry into the duties an employee actually is expected to perform." *Fox v. Traverse City Area Pub. Sch. Bd. of Educ.*, 605 F.3d 345, 350 (6th Cir. 2010).

The takeaway from these decisions is that determining whether a public employee is speaking pursuant to their official duties is highly fact- and context-specific. This is just as true

of a teacher's extracurricular speech as it is of any other public-employee speech. The type of speech that is ordinarily within the scope of a debate coach's duties, for example, may well be very different from the type of speech that is ordinarily within the scope of the coach of the robotics club, the marching band director, or the track-and-field coach. The speech ordinarily within the duties of a teacher bringing an after-school group to an art museum may be different from the speech ordinarily within the duties of a teacher bringing that same group to a history museum. Moreover, *Garcetti* makes clear that even general categories like job titles are not dispositive; rather, a court must assess "the duties an employee *actually* is expected to perform." 547 U.S. at 424–25 (emphasis added).

Because this analysis is fact- and context-dependent, determining whether extracurricular speech is subject to *Garcetti*—and thus not protected at all—is not susceptible to prospective, blanket resolution through a facial First Amendment challenge. Rather, it must be assessed through an as-applied challenge considering the specific facts and context of the case at hand. That each of the decisions cited above arose through an as-applied challenge illustrates this point. Indeed, the defendants have not identified any case in which a court has determined in the abstract that *Garcetti* does not apply to a broad category of public-employee speech in the context of a facial First Amendment claim.

As the Court has recognized, the AFT plaintiffs' First Amendment claim is not viable if *Garcetti* applies. Determining whether *Garcetti* applies to public-employee speech requires a highly fact-specific inquiry into the public employee's duties and the context of the speech. The AFT plaintiffs bring only a facial First Amendment challenge devoid of that context. The Court should enter summary judgment for the defendants on this facial claim, without prejudice to any

individual teacher's ability to assert an as-applied challenge in the future based on their particular facts and circumstances.

**B.     The AFT plaintiffs have not met their burden on their facial First Amendment claim.**

To the extent *Garcetti*'s application can be assessed prospectively in the context of a facial First Amendment challenge, the AFT plaintiffs' claim still fails. Public employees bear the burden of showing both (1) that their speech is protected and (2) that it relates to a matter of public concern. *See Stuart v. City of Framingham*, 989 F.3d 29, 35 (1st Cir. 2021); *see also Greisen v. Hanken*, 925 F.3d 1087, 1111 (9th Cir. 2019) (observing that in a First Amendment retaliation case "the plaintiff also bears the burden of showing the speech was spoken in the capacity of a private citizen and not a public employee"); *Casey v. W. Las Vegas Indep. Sch. Dist.*, 473 F.3d 1323, 1328 (10th Cir. 2007) (Gorsuch, J.) ("[W]e are obliged to ask whether [the plaintiff] met her burden by providing evidence that her expressions were made in her capacity as a citizen and not pursuant to her 'official duties.'"). The AFT plaintiffs have not identified any type of extracurricular speech that they believe falls beyond *Garcetti* but is still subject to the antidiscrimination provisions. They therefore also have not met their threshold burden. For this alternative reason, the defendants are entitled to summary judgment on the AFT plaintiffs' First Amendment claim to the extent it concerns extracurricular speech.[3]

---

[3] Because the AFT plaintiffs have made no effort to make this showing, the defendants are under no obligation to justify the antidiscrimination provisions under the *Pickering-Connick* framework. The defendants nevertheless reserve the right to respond, as may be appropriate, to the extent the AFT plaintiffs attempt to make this showing in their cross-motion for summary judgment.

II.     **The defendants are entitled to judgment as a matter of law on the plaintiffs' vagueness claims.**

      A.      **The vagueness standard generally.**

"The vagueness doctrine, a derivative of due process, protects against the ills of laws whose 'prohibitions are not clearly defined.'" *Nat'l Org. for Marriage v. McKee*, 649 F.3d 34, 62 (1st Cir. 2011), *abrogated on other grounds by Ams. for Prosperity Found. v. Bonta*, 141 S. Ct. 2373 (2021) (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972)). "A statute is impermissibly vague if it 'fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement.'" *Frese v. Formella*, 53 F.4th 1, 6 (1st Cir. 2022) (quoting *Williams*, 553 U.S. at 304). "This creates two avenues by which to attack a vague statute: discriminatory enforcement and lack of notice." *Id.*

      In *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, the Supreme Court stated that, when a law "does not reach constitutionally protected conduct," "the complainant must demonstrate that the law is impermissibly vague in all of its applications." 455 U.S. 489, 498 (1982). In its order on the motions to dismiss, the Court concluded that this standard is no longer good law following the Supreme Court's decisions in *Johnson*, *Sessions v. Dimaya*, 138 S. Ct. 1204 (2018), and *United States v. Davis*, 139 S. Ct. 2319 (2019). ECF Doc. No. 63 at 21–31. The Court acknowledged that "[t]he Supreme Court has not taken a consistent position over time on the standard a court should use when evaluating facial vagueness challenges outside of the First Amendment context." *Id.* at 21 (citations omitted). The Court further acknowledged that federal courts of appeals have taken differing views on what effect *Johnson*, *Dimaya*, and *Davis* had on the facial vagueness standard. *See id.* at 25–27 (citing *United States v. Cook*, 914 F.3d 545, 553 (7th Cir.), *vacated on other grounds*, 140 S. Ct. 41 (2019); *Guerrero v. Whitaker*, 908

F.3d 541, 544 (9th Cir. 2018); *United States v. Requena*, 980 F.3d 30, 41–42 (2d Cir. 2020), *cert. denied sub nom.*, *Raymond v. United States*, 141 S. Ct. 2761 (2021)). The Court nonetheless "agree[d] with the Seventh and Ninth Circuits that the *Johnson* trio heralded a more meaningful shift in the void for vagueness doctrine than the Second Circuit recognized." *Id.* at 27.

The defendants respectfully disagree with this conclusion. The Supreme Court has made clear that if one of its precedents "has direct application in a case," lower courts "should follow [that precedent], leaving to [the Supreme] Court the prerogative of overruling its own decisions." *Agostini v. Felton*, 521 U.S. 203, 237 (1997) (citation and quotation marks omitted). This rule applies even when a precedent "appears to rest on reasons rejected in some other line of cases." *Id.* (same omissions). The Supreme Court did not formally overrule *Flipside* in *Johnson*, *Dimaya*, or *Davis*. To the extent those decisions contain dicta that calls *Flipside* into question, *see* ECF Doc. No. 63 at 28, the dicta "does not and cannot overrule established Supreme Court precedent." *Waine v. Sacchet*, 356 U.S. 510, 517 (4th Cir. 2004); *accord Eulitt v. Me. Dep't of Educ.*, 386 F.3d 344, 349 (1st Cir. 2004) (noting parenthetically that a district court "correctly regarded circuit precedent as 'good law' even though a subsequent Supreme Court dictum had 'presaged the demise' of the rule stated therein").

The defendants therefore maintain that *Flipside* remains good law. The Court has already dismissed the bulk of the AFT plaintiffs' First Amendment claim, and the defendants are entitled to summary judgment on the remainder of that claim for the reasons stated above. The antidiscrimination provisions accordingly do not reach constitutionally protected conduct, and the *Flipside* standard governs. *See* 455 U.S. at 498. The plaintiffs have never disputed that their facial vagueness challenge fails under the *Flipside* standard, and it is hard to see how they could. The defendants are therefore entitled to summary judgment on those claims.

While the defendants maintain this argument and preserve it for appeal, they recognize the Court has indicated that its views on the relevant legal standard are not likely to change. *See* ECF Doc. No. 72 (Transcript of Feb. 25, 2023 status conference) at 26:3–15 (noting that the Court had "spent a lot of time thinking about" this issue and its views were "not likely to change"). The defendants also acknowledge that the Court identified alternative reasons for why, in its view, the *Flipside* standard does not apply regardless of *Johnson*, *Dimaya*, and *Davis*. *See* ECF Doc. No. 63 at 30–31. The plaintiffs may advance additional arguments related to the relevant standard, including that extrinsic evidence somehow bears on whether a statute is vague. The defendants address these issues below.

**B.      Determining whether a statute is facially vague requires a purely textual analysis.**

The plaintiffs may seek to support their facial vagueness challenge with extrinsic evidence taken from deposition testimony or Commission for Human Rights case files. None of these materials bear on whether a statute is facially vague. Rather, precedent confirms that the vagueness inquiry turns on the text of the statute itself, when construed using the normal tools of statutory interpretation.

The Supreme Court has contemplated this type of text-bound analysis. The Supreme Court has made clear, for instance, that a vagueness claim based on an arbitrary enforcement theory does not turn on "the mere fact that close cases can be envisioned," but rather on whether the statutory *language* is indeterminate. *Williams*, 553 U.S. at 305–06. "What renders a statute vague is not the possibility that it will sometimes be difficult to determine whether the incriminating fact it established has been proved; but rather the indeterminacy of precisely what that fact is." *Id.* at 306. The Supreme Court has likewise noted that, when assessing a vagueness claim based on a lack-of-notice theory, "[t]he determination whether a . . . statute provides fair

warning of its prohibitions must be made on the basis of the statute itself and other pertinent law, rather than on the basis of an ad hoc appraisal of the subjective expectations of particular defendants." *Bouie v. City of Columbia*, 378 U.S. 347, 355 n.5 (1964). In other words, a facial vagueness claim requires an analysis of the challenged provision's language to determine whether it is sufficiently clear to put persons subject to the provision on notice of what conduct is prohibited and to guard against arbitrary enforcement.

The First Circuit has adhered to this textual approach when analyzing vagueness claims. In *United States v. Lachman*, the First Circuit observed that a vagueness claim requires a court "to decide two questions: first, [the court] must construe the meaning of the [challenged law]," and "[s]econd, [the court] must determine whether the [law] is void for vagueness under the construction [the court] ha[s] adopted." 387 F.3d 42, 50 (1st Cir. 2004). The First Circuit conducted the first step in this analysis by employing several traditional tools of statutory construction. *See id.* at 50–53. The First Circuit rejected an argument that extrinsic sources of evidence such as "affidavits of former regulators and industry participants regarding the [regulated] industry's understanding of the term" were relevant to the court's inquiry. *Id.* at 53. The First Circuit similarly made clear that, while an agency's interpretation of a law can inform a court's analysis when "reflected in public documents," *id.* at 54, "[t]he non-public or informal understandings of agency officials concerning the meaning of a [law] are . . . not relevant," *id.* The First Circuit also rejected an argument that these extrinsic materials were relevant evidence that the challenged regulation, when properly construed, was vague. *See id.* at 57–60. The First Circuit concluded that "[t]he mere fact that . . . various public government statements also noted that the [challenged term] was 'confusing' and 'ambiguous' also creates no issue of Due Process." *Id.* at 59 n.18.

The First Circuit has employed a similar analysis in other cases. In *McKee*, the First Circuit emphasized that "a statute is unconstitutionally vague only if it prohibits an act in terms so uncertain that persons of average intelligence would have no choice but to guess at its meaning and modes of application." 649 F.3d at 62 (cleaned up). The First Circuit then applied tools of statutory interpretation to the statutory language to conclude that the terms "promoting," "support," "opposition," "influencing," and "initiation," as used in several Maine election laws, did not render those laws vague on their face. *See id.* at 62–70. Similarly, in *Modern Continental/Obayashi v. Occupational Safety and Health Review Commissioner*, the First Circuit rejected a facial challenge to a provision in the Code of Federal regulations based on the "plain language" of the challenged regulation. *See* 196 F.3d 274, 281 (1st Cir. 1999). The First Circuit noted that because the regulation's application was clear "from a plain reading of the regulation," it was inappropriate to "inquire into industry standards." *Id.* And while the First Circuit more recently in *Frese v. Formella* declined to "address precisely what extrinsic context a court may consider in a vagueness analysis," it did so because "the core statutory text of the [challenged] statute provide[d] adequate enforcement guidelines and the prosecution scheme d[id] not alter or overcome this conclusion." 54 F.4th 1, 9 n.5 (1st Cir. 2022). These cases reflect that, under circuit precedent, a vagueness claim presents a question of law that turns on the language of the challenged provision itself, as construed using the standard tools of legal interpretation.

The D.C. Circuit shares this view. In *United States v. Bronstein*, the plaintiffs brought a facial vagueness challenge to a federal statute making it a crime to "make a harangue or oration, or utter loud, threatening, or abusive language in the Supreme Court Building or grounds." 849 F.3d 1101, 1104 (D.C. Cir. 2017). The D.C. Circuit observed that "[t]he vagueness analysis . . . is objective" and "turns on the tools of statutory interpretation," and therefore "involves only

pure questions of law." *Id.* at 1104, 1106 (citations and quotation marks omitted). The D.C. Circuit noted that a statute "is either susceptible to judicial construction or is void for vagueness based on the application of traditional rules of statutory interpretation." *Id.* at 1106. The D.C. Circuit emphasized that "the question is whether the term [at issue] provides a discernable standard when legally construed." *Id.* at 1107.

The D.C. Circuit noted in *Bronstein* that "a statutory term is not rendered unconstitutionally vague because it does not mean the same thing to all people, all the time, everywhere." *Id.* (cleaned up). Rather, a statute is impermissibly vague only if, after "applying the rules of interpreting legal texts, its meaning specifies no standard of conduct at all." *Id.* (cleaned up). The D.C. Circuit thus stressed that, "'as a general matter,' the vagueness doctrine 'does not doubt the constitutionality of laws that call for the application of a qualitative standard to real-world conduct,'" as "'the law is full of instances where a man's fate depends on his estimating rightly some matter of degree.'" *Id.* at 1108 (quoting *Johnson*, 576 U.S. at 603–04 (2015)) (brackets and ellipsis omitted). The D.C. Circuit noted that "[t]he question is whether the terms converge upon certain behavior that is useful as a descriptor of the core behavior to which the statute may constitutionally be applied." *Id.* at 1108 (cleaned up). The D.C. Circuit accordingly applied common interpretative tools, including dictionary definitions and canons of construction, to conclude that "a person of ordinary intelligence could read [the challenged] law and understand that, as a member of the Supreme Court's oral argument audience, making disruptive public speeches is clearly proscribed behavior—even in staccato bursts, seriatim." *Id.* at 1111.

The D.C. Circuit employed the same textual approach in *Act Now to Stop War and End Racism Coalition and Muslim American Society Freedom Foundation v. District of Columbia*,

846 F.3d 391 (D.C. Cir. 2017). That case concerned, among other things, a facial vagueness challenge to a District of Columbia regulation requiring the removal of signs relating to events "within 30 days after the event" even though other signs could remain posted "for up to 180 days." *Id.* at 396. The D.C. Circuit concluded that the regulation "sets reasonably clear guidelines for law enforcement officers to determine whether a sign is event related, and therefore is not unconstitutionally vague." *Id.* at 411. The D.C. Circuit reached this conclusion by interpreting the language of the challenged regulation. *Id.* at 411–13. The D.C. Circuit observed that "there [was] some evidence in th[e] record" that the challenged regulation "is susceptible of inconsistent application," *id.* at 411, but emphasized that "the most this evidence shows is that [the regulation] might be misapplied in certain cases," *id.* at 412. The D.C. Circuit stressed that "the success of a facial challenge on the grounds that [a law] delegates overly broad discretion to the decisionmaker rests not on whether the administrator has exercised his discretion unlawfully, but whether there is anything in [the law] preventing him from doing so." *Id.* (quoting *Forsyth Cnty., Ga. v. Nationalist Movement*, 505 U.S. 133 n.10 (1992)).

The Second Circuit, too, has eschewed relying on extrinsic evidence when assessing a vagueness challenge. In *Keepers, Inc. v. City of Milford*, the Second Circuit affirmed a district court determination that a city ordinance regulating "adult-oriented establishments" was not unconstitutionally vague. 807 F.3d 24, 27 (2d Cir. 2015). The plaintiff there argued that the district court had improperly considered an affidavit supplied by the city's police chief "because it contradicted testimony given by [the city's] former city attorneys" during a Rule 30(b)(6) deposition. *Id.* The Second Circuit held that this was at most harmless error, because "a court evaluating a challenge for vagueness must begin with the text [of the challenged law] itself." *Id.* at 37–38 (cleaned up). The Second Circuit emphasized that the district court "focused, *as it*

*should have*, primarily on the ordinance's plain meaning." *Id.* at 37 (emphasis added). The Second Circuit observed that "[w]hen the text of an ordinance is sufficiently clear to satisfy the Due Process Clause, a municipal officer's inability to supply precise answers regarding its hypothetical application is insufficient to render that ordinance unconstitutionally vague." *Id.* at 37–38.

The throughline in these cases is the same: that determining whether a statute is unconstitutionally vague requires only an objective assessment of the statute's terms using the traditional tools of statutory interpretation. Extrinsic evidence of how a statute has been applied in the past, what individual government officials may informally believe a statute means, or what the plaintiffs may subjectively believe the statute prohibits do not bear on this analysis. Nor does speculation that a statute might be applied in an inconsistent manner at some point in the future. The Court should reject any argument to the contrary.

> **C.     The language of the antidiscrimination provisions, when properly construed, is not facially vague.**

As discussed above, the First Circuit has prescribed a two-step analysis to determine whether a statute is vague. First, a court "must construe the meaning" of the statute. *Lachman*, 387 F.3d at 50. Second, a court "must determine whether the [statute] is void for vagueness under the construction . . . adopted." *Id.* The defendants address each of these steps in turn.

> **1.     Construing the antidiscrimination provisions.**

"When interpreting state law, a federal court employs the method and approach announced by the state's highest court." *Cahoon v. Shelton*, 647 F.3d 18, 22 (1st Cir. 2011). The New Hampshire Supreme Court "first look[s] to the language of the statute itself, and, if possible, construe[s] that language according to its plain and ordinary meaning." *Petition of Lafasciano*, 175 N.H. 518, 521–22 (2022) (citation and quotation marks omitted). The New

Hampshire Supreme Court "interpret[s] legislative intent from the statute as written and will not consider what the legislature might have said or add language that the legislature did not see fit to include." *Id.* at 522 (same omissions). The New Hampshire Supreme Court "construe[s] all parts of a statute together to effectuate its overall purpose and avoid an absurd or unjust result." *Id.* (same omissions). The New Hampshire Supreme Court "do[es] not consider words or phrases in isolation, but rather within the context of the statute as a whole." *Id.* (same omissions). "This enables [the court] to better discern the legislature's intent and to interpret statutory language in light of the policy or purpose sought to be advanced by the statutory scheme." *Id.* (same omissions).

Under New Hampshire Supreme Court precedent, "[i]t is a basic principle of statutory construction that a legislative enactment will be construed to avoid conflict with constitutional rights wherever reasonably possible." *State v. Ploof*, 162 N.H. 609, 620 (2011) (same omissions). This principle "does not justify disregarding unambiguous language." *Polonsky v. Town of Bedford*, 171 N.H. 89, 96 (2018) (same omissions). The doctrine of constitutional avoidance is, however, a "doubt-resolver[], useful when the language is ambiguous and a construction of the statute is *fairly possible* by with the question may be avoided." *Id.* (same omissions; emphasis in original).

Similarly, "it is well established in [New Hampshire Supreme Court] case law that an interpretation of a statute by the agency charged with its administration is entitled to deference." *Appeal of Town of Seabrook*, 163 N.H. 635, 644 (2012) (citation omitted). As with other rules of statutory construction, "[t]he deference afforded . . . is not absolute." *Id.* (same omission). The New Hampshire Supreme Court "will not defer to an agency's interpretation if it clearly conflicts with the express statutory language or if it is plainly incorrect." *Id.* (internal citations omitted).

The plaintiffs focus their facial vagueness challenge on RSA 193:40.[4] That statute describes four categories of information that "[n]o pupil in any public school in this state can be taught, instructed, inculcated or compelled to express belief in, or support for[.]" RSA 193:40, I. While this language is worded in the passive voice, context clues reveal that it refers to the affirmative acts of teaching, instructing, inculcating, or compelling public-school pupils to express a belief in or support for one of the prohibited categories. For instance, RSA 193:40, III contemplates that a school or school district can be subject to legal or equitable relief under RSA 354-A:34. Likewise, RSA 193:40, IV contemplates that an educator can be subject to disciplinary sanction by the state board of education for "violat[ing]" the statute. Read in context, then, it is clear that RSA 193:40 prohibits an educator, school, or school district from teaching, instructing, inculcating, or compelling to express a belief in or support for one of the proscribed categories of information.

The language of the other antidiscrimination provisions supports this reading. RSA 354-A:31 provides that "[n]o public employer, either directly or through the use of an outsider contractor, shall teach, advocate, instruct, or train any employee, student, service recipient, contractor, staff member, inmate, or any other individual or group, any one" of the same proscribed categories. RSA 354-A:32 provides that "[n]o government program shall teach, advocate, or advance any one or more" of those same categories. RSA 354-A:33 provides that "[n]o public employee shall be subject to any adverse employment action, warning, or discipline of any kind for refusing to participate in any training, program, or other activity at which a public employer or government program advocates, trains, teaches, instructs, or compels participants to express belief in, or support for," one or more of the same categories. "When interpreting two

---

[4] To the extent the plaintiffs attempt to broaden their challenge to other aspects of the antidiscrimination provisions in their cross-motion for summary judgment, the defendants will address those arguments in their forthcoming objection.

statutes that deal with similar subject matter," the New Hampshire Supreme Court "construe[s] them so that they do not contradict each other, and so that they will lead to reasonable results and effectuate the legislature purpose of the statutes." *Soraghan v. Mt. Cranmore Ski Resort, Inc.*, 152 N.H. 399, 405 (2005). The use of active voice in each of these provisions further confirms that the focus of the new antidiscrimination provisions is on the conduct of the person or entity conveying the information in question.

The antidiscrimination provisions do not define the words teach, instruct, inculcate, or compel, as used in RSA 193:40. When a statute "does not define the meaning of the terms [used] within [it]," the New Hampshire Supreme Court "look[s] to the dictionary for guidance as to the ordinary meaning of those terms." *Natal v. GMPM Co.*, 175 N.H. 74, 78 (2022).

All of these words are verbs with similar dictionary definitions. The word "teach" means "to show how to do something; to give instruction to; to train"; "to give lessons to (a student or pupil); to guide the study of; to instruct"; "to give lessons in (a subject); to hold classes in"; or "to provide with knowledge, insight, etc." *Webster's Deluxe Unabridged Dictionary* 1870 (2d ed. 1979). The word "instruct" means "to communicate knowledge to; to teach; educate"; "to give facts of the matter to; to inform"; or "to give directions or orders to." *Id.* at 951. The word "inculcate" means "to impress upon the mind by frequent repetition or insistent urging." *Id.* at 927. The word "compel" means "to drive or urge with force, or irresistibly; to constrain; to oblige; to necessitate, either by physical or moral force"; or "to take by force or violence; to bring about by force." *Id.* at 370.

These dictionary definitions demonstrate that RSA 193:40 applies to the affirmative and deliberate act of conveying information with knowledge of what information is being conveyed. The act of giving lessons or holding classes in a subject, for example, would be commonly

understood to require both the affirmative and deliberate act of giving the lessons or holding the classes and an understanding of the subject being taught. The same is true of communicating knowledge to someone, giving facts of the matter to someone, giving directions to someone, impressing something upon the mind of someone with frequent repetition or insistent urging, or driving or urging someone to believe something by force or violence. It is thus reasonable to read RSA 193:40 as proscribing the affirmative and deliberate act of conveying information prohibited by the statute with knowledge of the information being conveyed.

The next step of the analysis is to determine, again using the tools of construction, what each category in RSA 193:40, I, prohibits. Under the first two categories, educators, schools, and school districts are prohibited from teaching, instructing, inculcating, or compelling any public-school pupil to express belief in or support for the following propositions:

> That one's age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin, is inherently superior to people of another age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin;

> [and]

> That an individual, by virtue of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital status, mental or physical disability, religion, or national origin, is inherently racist, sexist, or oppressive, whether consciously or unconsciously.

RSA 193:40, I(a) & (b) (formatting altered). The only term in either category that the plaintiffs have suggested is vague is the word "inherently." That word is not defined in the statute.

As reflected in the AG Opinion, however, the word "inherent" does have a commonly understood dictionary definition: it means "'structural or involved in the constitution or essential character of something: belonging by nature or settled habit: intrinsic, essential.'" Attorney General Opinion 2021-01 (ECF No. 36-10) at 6 (quoting *Webster's Third New International*

*Dictionary*, 1163 (unabridged ed. 2002). Other dictionaries contain similar definitions. *See, e.g.*, *Webster's Deluxe Unabridged Dictionary* 943 (2d ed. 1979) (defining "inherent" as "existing in someone or something as a natural and inseparable quality, characteristic, or right; innate; basic; inborn"). In other words, an "inherent" characteristic is one that is natural, biological, or innate, not one that is perceived, accidental, or the result of external action or external factors. *See* Attorney General Opinion 2021-01 (ECF No. 36-10) at 6. An educator, school, or school district therefore violates RSA 193:40, I(a) by affirmatively and deliberately conveying to a public-school student that a person is naturally, biologically, or innately superior or inferior by virtue of that person's age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin. Similarly, an educator, school, or school district violates RSA 193:40, I(b) by affirmatively and deliberately conveying to a public-school student that a person is naturally, biologically, or innately racist, sexist, or oppressive by virtue of that person's age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin.

Under the third category, educators, schools, and school districts are prohibited from teaching, instructing, inculcating, or compelling any public-school pupil to express belief in or support for the following proposition:

> That an individual should be discriminated against or receive adverse treatment solely or partly because of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin.

RSA 193:40, I(c). In the context of this provision, the word "should" is "an auxiliary used to express (a) obligation, duty, propriety, necessity." *Webster's Deluxe Unabridged Dictionary* 1679. This category therefore prohibits teachers from conveying to students that there is some obligation or duty or that it is otherwise necessary or proper for an individual to be discriminated

against or treated adversely because that individual possesses one of the characteristics identified in the statute.

Under the fourth category, educators, schools, and school districts are prohibited from teaching, instructing, inculcating, or compelling any public-school pupil to express belief in or support for the following proposition:

> That people of one age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin cannot and should not attempt to treat others without regard to age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin.

RSA 193:40, I(d). The word "should" is used in the same sense discussed in the last paragraph. The word "cannot" is a negation of the verb "can," which means "to be able to." *Webster's Deluxe Unabridged Dictionary* 261. Accordingly, this category prohibits teachers from conveying to students that individuals are somehow unable to treat other persons without regard for the characteristics identified in the provision or that individuals otherwise should not treat others without regard for those characteristics.

### 2.   The antidiscrimination provisions, as construed above, pass constitutional muster.

Having construed RSA 193:40, the Court "must determine whether the [statute] is void for vagueness under the construction . . . adopted." *Lachman*, 387 F.3d at 50. The plaintiffs contend that RSA 193:40 is unconstitutionally vague under both a lack-of-notice and discriminatory-enforcement theory. Neither theory has merit.

"A statute is impermissibly vague for lack of notice only if it prohibits an act in terms so uncertain that persons of average intelligence would have no choice but to guess at its meaning and modes of application." *Frese*, 53 F.4th at 10 (cleaned up). Even under the heightened standard that applies to statutes with criminal penalties and those involving the First

Amendment, "perfect clarity and precise guidance have never been required." *Id.* at 6 (cleaned up). As construed above, RSA 193:40 reaches a narrow band of conduct: the act of affirmatively and deliberately conveying prohibited information to a public-school student with knowledge of the information being conveyed. This is an objectively discernible standard that a person of average intelligence would understand.

A person of average intelligence would further understand what information RSA 193:40 prohibits from being conveyed. Under the first category, a teacher may not convey to a public-school student that a person is naturally, biologically, or innately superior by virtue of that person's age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin. Under the second category, a teacher may not convey to a public-school student that a person is naturally, biologically, or innately racist, sexist, or oppressive by virtue of that person's age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin. Under the third category, a teacher may not convey to a public-school student that there is some obligation or duty or that it is otherwise necessary or proper for an individual to be discriminated against or treated adversely because that individual possesses one of the characteristics identified in the statute. Under the fourth category, a teacher may not convey to a public-school student that individuals are somehow unable to treat other persons without regard for the characteristics identified in the provision or that individuals otherwise should treat others based on those certain characteristics. These, too, are discernible standards that persons of average intelligence would understand.

The plaintiffs' vagueness claim also fails under an arbitrary-enforcement theory. "A statute authorizes an impermissible degree of discriminatory enforcement discretion—and is

- 31 -

therefore void for vagueness—where it fails to set reasonably clear guidelines for law enforcement officials and triers of fact in order to prevent arbitrary and discriminatory enforcement." *Frese*, 54 F.4th at 7 (citation and quotation marks omitted). A statute is not vague "because it requires some exercise of law enforcement judgment—indeed, enforcement inevitably requires the exercise of some degree of police judgment, and the question thus becomes whether the degree of judgment involved is acceptable." *Id.* at 9 (cleaned up). Thus, "what renders a statute vague is not the possibility that it will sometimes be difficult to determine whether the incriminating fact it establishes has been provided; but rather the indeterminacy of precisely what that fact is." *Id.*

Under the construction set forth above, RSA 193:40 provides sufficiently clear guidelines for law enforcement officials and triers of fact to survive a vagueness challenge. Those enforcing RSA 193:40 must determine whether an educator (1) affirmatively and deliberately conveyed information to a public-school student that is (2) prohibited under RSA 193:40, I, with (3) knowledge of the information conveyed. These determinations present quintessential "questions of fact." *Williams*, 553 U.S. at 306. Indeed, triers of fact "pass every day upon the reasonable import of a [person's] statements—whether, for example, they fairly convey a false representation or a threat of physical injury." *Id.* at 306–07 (citations omitted). They likewise routinely assess "the state of men's minds . . . having before them no more than evidence of their words and conduct, from which, in ordinary human experience, mental condition can be inferred." *Id.* at 306. That this sometimes can be a difficult endeavor or "close cases can be envisioned" does not create a vagueness problem. *Id.* at 305–06.

The plaintiffs argue, and this Court expressed concern, that the antidiscrimination provisions can be read to reach inadvertent or implied conduct, and that this renders them vague.

As set forth above, however, this is not the most natural way to read the statutes. Rather, the references to educators, school districts, and schools in RSA 194:40, III and IV, and the use of active voice in the other antidiscrimination provisions, reflects a legislative focus on the affirmative act of conveying information and the nature information being conveyed, not the subjective beliefs of the person receiving that information. The dictionary definitions of the verbs used in the statutes support this construction. These considerations undermine the notion that the antidiscrimination provisions can be violated inadvertently.

Moreover, even if the antidiscrimination provisions could reasonably be read to reach inadvertent or implied conduct, that is not the only reasonable construction. It is just as reasonable—and the defendants would contend far more so—to construe the antidiscrimination provisions as set forth above. When faced with multiple plausible constructions of a statute, the New Hampshire Supreme Court will adopt the construction that "avoid[s] conflict with constitutional rights wherever reasonably possible." *Ploof*, 162 N.H. at 620. Construing the antidiscrimination provisions as described above avoids the due-process concerns that arise when the application of a statute turns on "wholly subjective judgments," *Williams*, 553 U.S. at 306, or "an ad hoc appraisal of the subjective expectations of particular defendants," *Bouie*, 378 U.S. at 355 n.5. It is therefore the preferable construction.

In its prior order, the Court concluded that the AG Opinion had construed the antidiscrimination provisions such that "a teacher could unknowingly violate the amendments by making a statement that does not expressly endorse a banned concept but could be understood to imply it." ECF Doc. No. 63 at 35–36. The Court reached this conclusion based on the following language in the AG Opinion:

> For example, a public employer or government program may create a web-based resource entitled, "Anti-Racist Resources," and include information designed to

> promote a better understanding of racism and how to combat racism. But, if that web-based resource stated that it was designed to "serve as a resource to white people" or to "serve as a resource for our white employees," then it could violate [the provisions] because it may imply that white people, specifically and for no other reason, are in need of anti-racist resources—resources that could benefit people from all backgrounds.

Attorney General Opinion 2021-01 (ECF No. 36-10) at 7. This example, however, does not arise under RSA 193:40, but rather RSA 354-A:31 (Prohibition on Public Employers) and RSA 354-A:32 (Prohibition on the Context of Government Programs and Speech). There is no allegation in this case that teachers commonly make webpages that would contain the information described in this example such that they could be subject to sanction under RSA 193:40, IV for violating the antidiscrimination provisions.

In any event, the circumstances described in this example do not reflect inadvertent or accidental conduct. Rather, the example describes the affirmative act of placing on a website statements that are themselves evidence of racial discrimination and stereotyping of the kind the antidiscrimination provisions prohibits. If an enforcement action were brought based on these statements, a trier-of-fact would have to resolve any factual questions around how these statements were made and the context in which they arise to determine whether they fall within one of the prohibited categories. Depending on the surrounding facts and context, it might be a close question whether a violation has occurred. But "[w]hat renders a statute vague is not the possibility that it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved; but rather the indeterminacy of precisely what that fact is." *Williams*, 553 U.S. at 306. Thus, the mere fact that a public employer or government program may have to make a judgment call before placing statements of this kind on a website does raise a vagueness problem. Courts "do not doubt the constitutionality of laws that call for the application of a qualitative standard . . . to real world conduct" and "the law is full of instances

- 34 -

where a man's fate depends on his estimating rightly . . . some matter of degree." *Johnson*, 576 U.S. at 604 (citations and quotation marks omitted).

The Court also expressed concern in its order that the antidiscrimination provisions do not contain a scienter requirement. *See* ECF Doc. No. 63 at 34. The defendants did not dispute at oral argument, and do not dispute now, that there is no express scienter requirement set forth in the provisions. That does not mean, however, that the provisions can be violated inadvertently or unknowingly. As discussed above, the language used in RSA 193:40 requires that a teacher affirmatively and deliberately convey information and know what that information is. The language of RSA 193:40 is sufficiently clear that a teacher of average intelligence should be able to determine whether the information they are conveying violates the antidiscrimination provisions. That this may be difficult to discern in some cases does not mean RSA 193:40 is vague. *Williams*, 553 U.S. at 306; *Johnson*, 576 U.S. at 604. If a law is sufficiently clear, ignorance of the law itself or a mistaken belief as to what to what the law prohibits is not an excuse. *See State v. Stratton*, 132 N.H. 451, 457–58 (1989).

For all of these reasons, RSA 193:40, when properly construed, is not vague. The Court should therefore enter summary judgment for the defendants on the plaintiffs' facial vagueness claim even if it applies the "exacting" vagueness standard articulated in its earlier order.

### D.      The plaintiffs have not articulated a standalone as-applied vagueness claim.

In its order on the defendants' motions to dismiss, the Court concluded that the plaintiffs seek to bring both facial and as-applied vagueness challenges to the antidiscrimination provisions. The Court observed that the plaintiffs' as-applied challenge "is as applied in the sense that they seek to invalidate the statutory prohibitions as applied to educators." ECF Doc. No. 63 at 19. The Court noted that the plaintiffs' complaints "are silent as to any particular

advocacy that plaintiffs would pursue but for fear of running afoul of the statutory prohibitions." *Id.* at 20. The Court further noted that "the plaintiffs seek to redefine the nature of an as-applied challenge to encompass a facial challenge to a statute as applied to a subset of individuals whom it affects." *Id.* The Court noted that "there is reason to doubt plaintiffs' position that they have adequately pleaded an as-applied challenge," but denied the defendants' motion to dismiss as to the as-applied claim "without prejudice to their ability to argue at a later stage that the claim is without merit." *Id.*

The plaintiffs do not advance a viable as-applied vagueness challenge to the antidiscrimination provisions. As the Court observed in its earlier order, "[p]laintiffs who bring a prospective as-applied vagueness challenge typically must identify specific activities that they plan to engage in but that are arguably barred." *Id.* (citing *Holder v. Humanitarian Law Project*, 561 U.S. 1, 18–25 (2010); *Copeland v. Vance*, 893 F.3d 101, 112 (2d Cir. 2018)). "'The challenger cannot instead rely on hypothetical situations in which the statue could not validly be applied.'" *Id.* (quoting *Copeland*, 893 F.3d at 113). Here, the plaintiffs did not identify in their complaints any conduct that they would engage in but for fear of violating the antidiscrimination provisions. They did not seek to amend their complaints following this Court's order on the motions to dismiss to add such allegations. They cannot now present facts in the context of their summary-judgment filings that functionally amend into this case traditional as-applied challenges that were never pleaded.[5] The defendants are therefore entitled to summary judgment on the plaintiffs' as-applied vagueness claims.

---

[5] *See Johnson v. Thibodaux City*, 887 F.3d 726, 736 (5th Cir. 2018) ("[T]he plaintiffs may not defeat summary judgment on the basis of a theory found nowhere in their complaint, at least without also moving to amend or absent trial by consent."); *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004) ("A plaintiff may not amend her complaint through argument in a brief opposing summary judgment."); *Shanahan v. City of Chicago*, 82 F.3d 776, 781 (7th Cir. 1996) (same); *see also Katz v. Belveron Real Estate Partners*, LLC, 28 F.4th 300, 309 (1st Cir. 2022) (observing (1) that the

The as-applied theory the plaintiffs articulated during oral argument—that the antidiscrimination provisions are invalid "as applied to educators," ECF Doc. No. 63 at 19—does not alter this conclusion. "[T]he Supreme Court has confronted similar half-fish, half-fowl . . . challenges and instructed that where the challenges 'do[] not seek to strike [a statute] in all its applications' but the relief sought 'reach[es] beyond the particular circumstances of the plaintiffs,' they must 'satisfy [the] standards for a facial challenge to the extent of that reach.'" *Project Veritas Action Fund v. Rollins*, 982 F.3d 813, 826 (1st Cir. 2020) (quoting *John Doe No. 1 v. Reed*, 561 U.S. 186, 194 (2010) (emphasis omitted; other alterations in original). The plaintiffs' as-applied vagueness claim is therefore not a standalone claim and is instead duplicative of their facial vagueness claim. It is accordingly superfluous and need not be separately analyzed.

III.   **Any portion of the antidiscrimination provisions found to be unconstitutional must be severed.**

To the extent the Court concludes that the antidiscrimination provisions are unconstitutional in the way they apply to teachers, it should sever the offending portions of the provisions and leave the remainder intact. Because this case involves state statutes, the court must apply the New Hampshire Supreme Court's severability doctrine. *Cahoon*, 647 F.3d at 22. "In determining whether the valid provisions of a statute are severable from the invalid ones, [a court is] to presume that the legislature intended that the invalid part shall not produce entire invalidity if the valid part may be reasonably saved." *N.H. Democratic Party v. Sec'y of State*, 174 N.H. 312, 331 (2021). A court "must also determine, however, whether the unconstitutional provisions of the statute are so integral and essential in the general structure of the act that they

---

First Circuit has never recognized that "constructive amendments to the complaint can be effected at the summary judgment stage," and (2) that, in any event, the standard for constructive amendments is not met when the opposing party specifically objects to the amendment).

may not be rejected without the result of the entire collapse and destruction of the statute." *Id.*
The antidiscrimination provisions contain an express severability clause that states: "If any
provision of [the antidiscrimination provisions], or the application of any provision to any person
or circumstance is held to be invalid, the remainder of such sections, and their application to any
other persons or circumstances shall not be affected thereby." HB2 1017 (§ 91:299).

      The Court made clear in its earlier order that its concerns regarding the constitutionality
of the antidiscrimination provisions largely turned on how those provisions apply to teachers and
the repercussions teachers face for violating the provisions. ECF Doc. No. 63 at 42. It was in
large part for this reason—that teachers can face loss of certification for violating the provisions
and the provisions do not contain an explicit scienter requirement—that the Court concluded that
the plaintiffs' vagueness claim triggers "the most exacting vagueness review." *Id.* at 33–34. The
Court confirmed this view during the February 15, 2023 status conference. ECF Doc. No. 72 at
13–14.

      If the Court concludes that the penalties teachers face under the antidiscrimination
provisions push those provisions across the line from constitutional to unconstitutional as applied
to teachers then the Court should invalidate RSA 193:40, IV and sever that subsection from the
remainder of the statutory scheme. RSA 193:40, IV is the only portion of the provisions that
places a teacher's certification in jeopardy. Severing RSA 193:40, IV would thus alleviate the
constitutional concerns this Court has identified.

      RSA 193:40, IV is not "so integral and essential in the general structure of the act that [it]
may not be rejected without the result of the entire collapse and destruction of the statute." *N.H.*
*Democratic Party*, 174 N.H. at 331. That the legislature embedded a severability clause into the
antidiscrimination provisions is clear evidence that it believed different portions of the provisions

could operate independent of one another. That the antidiscrimination provisions consist of multiple statutes other than RSA 193:40 that apply to other public bodies demonstrates that the entire scheme would not fall if RSA 193:40, IV were invalidated. Likewise, RSA 193:40 would have independent force and effect against school districts, *see* RSA 193:40, III—none of which are parties to this lawsuit—even if RSA 193:40, IV were invalidated.

In sum, if the Court concludes that the antidiscrimination provisions are unconstitutional based on the penalties teachers face under RSA 193:40, IV, the Court should sever that provision and leave the remainder of the statutory scheme intact.

## Conclusion

For the foregoing reasons, the Court should enter summary judgment in the defendants' favor. If, however, the Court determines that the antidiscrimination provisions are unconstitutional in light of the penalties teachers face under RSA 193:40, IV, it should invalidate only that subsection and leave the remainder of the provisions intact.

Respectfully submitted,

FRANK EDELBLUT, in his official capacity as Commissioner of the Department of Education,

JOHN M. FORMELLA, in his official capacity only as Attorney General of the State of New Hampshire,

AHNI MALACHI, in her official capacity as Executive Director of the Commission for Human Rights,

CHRISTIAN KIM, in his official capacity as Chair of the Commission for Human Rights,

*and*

KENNETH MERRIFIELD, in his official capacity as Commissioner of the Department of Labor

By their attorney,

JOHN M. FORMELLA
ATTORNEY GENERAL

Date: August 14, 2023

/s/ Samuel Garland
Samuel R.V. Garland, Bar #266273
Senior Assistant Attorney General
Nathan Kenison-Marvin, Bar # 270162
Assistant Attorney General
Civil Bureau
New Hampshire Dept. of Justice
33 Capitol Street
Concord, NH 03301
(603) 271-3650
Samuel.RV.Garland@doj.nh.gov
Nathan.W.Kenison-Marvin@doj.nh.gov

**Certificate of Service**

I hereby certify that a copy of the foregoing was served on all counsel of record using the Court's electronic-filing service.

/s/ Nathan Kenison-Marvin
Nathan Kenison-Marvin