# EXHIBIT 2

DOE Commissioner
Frank Edelblut
Deposition
Transcript
Redacted, Publicly-
filed

(Unredacted
version has been
filed under seal)

Local 8027

vs

Frank Edelblut

Docket No. 1:21-cv-01077-PB

FRANK EDELBLUT

May 23, 2023



AVICORE REPORTING

15 Constitution Drive, Suite 1A • Bedford, NH 03110 • (603) 666-4100
info@avicorereporting.com • www.avicorereporting.com

UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

CERTIFIED ORIGINAL

Local 8027, AFT-New Hampshire, et al.,

Plaintiff,

v.

Frank Edelblut, Commissioner, et al,

Defendants.

No. 1:21-cv-01077-PB

DEPOSITION OF FRANK EDELBLUT

taken on behalf of the Plaintiffs

at New Hampshire Department of

Education, Concord, New Hampshire,

on May 23, 2023, at 10:20 a.m.

Court Reporter:

Cynthia Foster, LCR

LCR #14 (RSA 310-A:161-181)

---

**2**

1  APPEARANCES:
2  On behalf of the Plaintiffs, Local 8027, AFT-New
   Hampshire, AFL-CIO:
3  STROOCK & STROOCK & LAVAN LLP
   By: Charles Moerdler, Esq.
4       Elizabeth C. Milburn, Esq.
        David Kahne, Esq., by Zoom
5  180 Maiden Lane
   New York, NY  10038
6  212-806-5648
   cmoerdler@stroock.com
7  ecmilburn@stroock.com
8  On behalf of the Plaintiffs, Christina
   Philibotte, Andres Mejia, NEA-New Hampshire:
9  ACLU OF NEW HAMPSHIRE
   By: Gilles Bissonnette, Esq.
10 18 Low Avenue, Unit 12
   Concord, NH  03301
11 603-225-3080
   gilles@aclu-nh.org
12
   On behalf of the Defendants, Frank Edelblut,
13 Ahni Malachi, John Formella, et al:
   NH DEPARTMENT OF JUSTICE
14 By: Nathan W. Kenison-Marvin, Esq.
   33 Capitol Street
15 Concord, NH  03301
   603-271-1292
16 nathan.w.kenison-marvin@doj.nh.gov
17 Also present:
   Elizabeth A. Brown, Attorney
18 Department of Education
   Office of the Commissioner
19
   By Zoom:
20 Peter Perroni, Esq.
   Nathan Fennessy, Esq., nfennessy@preti.com
21 Morgan Nighan, Esq., mnighan@nixonpeabody.com
   Jennifer Eber, Esq.
22 Kayla Turner, Esq., kaylat@drcnh.org.
   Esther Dickinson, Esq., edickinson@nhnea.org
23

---

**3**

1                          INDEX
2                Deposition of Frank Edelblut
3  Examination by Mr. Moerdler:                        7
4  Examination by Mr. Bissonnette:                   115
5                        EXHIBITS
6  38   Email, Edelblut to Farrell, Oct 26, 2021,
7       DOE-00710-713                                 23
8  39   Email, Edelblut to Farrell, Sept 21, 2022,
9       DOE-09896-09898                               35
10 40   Email, DOE Communications Office to Edelblut,
11      Oct 5, 2021, with attachments                 91
12 41   Email, Edelblut to m41 hillsboroughnh, 15 Nov
13      2021, DOE-00871                              112
14 42   Email, Edelblut to SAU 5, 17 Nov 2021,
15      DOE-00866-868                                113
16 43   Email, Edelblut to Breen, 28 Dec 2021,
17      DOE-00848-849                                113
18 44   Email, Andrus to Edelblut, 15 May 2022,
19      DOE-01136                                    114
20 45   Email, Sanborn to Edelblut, 20 Aug 2021,
21      DOE-00067-69                                 126
22 46   Email, Farrell to Fenton, 19 Aug 2022,
23      DOE-009900-9901, 10298-10299                 129

---

**4**

1  47   Email, Gibson to Malachi, 22 Jul 2021,
2       DOE-00308                                    133
3  48   Email, Huyett to Edelblut, 25 Aug 2022,
4       DOE-07694-95                                 134
5  49   Richards to House Executive Departments and
6       Administration, February 18, 2021,
7       HB544 0203, 0296, 0297, 0241, 0243, 0244     136
8  50   How To Be An Antiracist, pages 18-20         146
9  51   CRT Parents Guide, PL00787-788               175
10 52   Email, Edelblut to Dean, 15 Nov 2021,
11      DOE-00869-870                                175
12       (Original exhibits retained by reporter)
13       (Scanned copies provided to all counsel)

5

1                    REQUESTS
2    Page 11    Emails reviewed by Commissioner Edelblut
3               in preparation of the deposition
4    Page 94    Responsive material to Exhibit 40
5    Page 107   Communications
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

6

1          S T I P U L A T I O N S
2                It is agreed that the deposition shall
3    be taken in the first instance in stenotype and when
4    transcribed may be used for all purposes for which
5    depositions are competent under New Hampshire
6    practice.
7                Notice, filing, caption and all other
8    formalities are waived.  All objections except as to
9    form are reserved and may be taken in court at trial.
10               It is further agreed that if the
11   deposition is not signed within thirty (30) days
12   after submission to counsel, the signature of the
13   deponent is waived.
14               It is further agreed that exhibits may
15   be retained by counsel until the time of trial.
16
17
18
19
20
21
22
23

7

1       MR. MOERDLER:  Good morning, Commissioner.
2    My name is Charles Moerdler.  I'm a member of
3    the firm of Stroock & Stroock & Lavan in New
4    York, and we represent the American Federation
5    of Teachers.  To my right is my colleague,
6    Elizabeth Milburn, and she, too, is from Stroock
7    & Stroock & Lavan, and she, too, represents the
8    AFT.
9       COMMISSIONER EDELBLUT:  Welcome to New
10   Hampshire.
11      MR. MOERDLER:  I spent many a happy year in
12   New Hampshire and indeed in Concord, just
13   outside of it.
14       FRANK EDELBLUT, DULY SWORN
15      MR. KENISON-MARVIN:  We can do the same
16   stipulations with respect to objections and
17   reserving rights as we've done in the prior two
18   depositions.
19      MR. MOERDLER:  Agreed.
20      MR. KENISON-MARVIN:  And also just putting
21   on the record the parties' agreement and
22   acknowledgement that there is a video recording
23   this morning so that counsel of record can

8

1    participate by being here live to view the
2    deposition as it proceeds today, and that the
3    video is for that limited purpose and the
4    parties have agreed that no recording shall be
5    made of the video.
6       MR. BISSONNETTE:  I can confirm that
7    agreement.
8       MR. EDELBLUT:  Can you just clarify?  You
9    said there's a video recording.  There's not a
10   video.  There's video transmission, but there's
11   not video recording.
12      MR. KENISON-MARVIN:  Correct.  Thank you.
13   I meant just video recording in the sense of
14   video running.  So thank you.  The court
15   reporter, Cindy, has informed me that she is
16   taking an audio recording for her own quality
17   assurance purposes, and she uses that strictly
18   for her own quality assurance in creating the
19   transcript and that when she's done creating the
20   transcript, that work product is permanently
21   destroyed.  My understanding is consistent with
22   your practice?
23      COURT REPORTER:  Yes.

9

1  BY MR. MOERDLER:

2  Q    Have you been deposed before, Commissioner?

3  A    I have.

4  Q    Can you tell us under what circumstances and how

5       often if you can remember approximately?

6  A    Yes.  I was deposed about a month ago.  For

7       another lawsuit involving the State.

8  Q    And that is the only time?

9  A    No.  I was deposed many, many years ago in

10      another party associated with a corporation.

11  Q    You know that this is going to be a question and

12      answer session where your answers are sworn and

13      recorded.  You have the same duty to tell the

14      truth as if you were in court.  You understand

15      that, sir?

16  A    I do.

17      I must go through this.

18  A    I do know.

19  Q    It's obligatory.  Would you only provide verbal

20      answers to questions rather than shaking your

21      head which is what most of us do most of the

22      time, but would you try and be responsive orally

23      and verbally rather than just by motion?

10

1  A    I will.

2  Q    And if you do not answer, if you do not

3       understand a question, please ask, and we'll be

4       happy to try and oblige.  If you do not ask to

5       have a question reread, we will assume that you

6       have understood it at least to the best of your

7       ability and are prepared to answer it; is that

8       correct?

9  A    That's correct.

10  Q    Please do something I fail to do too often, and

11      that is let me finish the question before you

12      answer it even though you know where I'm going.

13      Is that all right?

14  A    That's all right.

15  Q    And if you need any breaks we'll do whatever we

16      can to oblige you and accommodate that.

17      Do you understand these requests or

18      instructions, sir?

19  A    I do.

20  Q    And is there any reason you are unable to

21      testify truthfully or completely today?

22  A    Not that I'm aware of.

23  Q    What did you do to prepare for this deposition

11

1       today?

2  A    So I met with my counsel.

3  Q    Putting that aside, anything else?

4  A    I did not.

5  Q    Did you look at any documents?

6  A    I did.

7  Q    And can you tell us what they are?

8  A    I was provided by my counsel a series of emails.

9  Q    Do you have a list of those emails?

10  A    I do not.

11      MR. MOERDLER:  Nate, can I get a list of

12      the emails, please?

13      MR. KENISON-MARVIN:  To the extent there

14      are documents that you reviewed specifically.

15      MR. MOERDLER:  Yes.

16      MR. KENISON-MARVIN:  I'm not committing

17      that he reviewed the entire list of emails.  I

18      can talk to the witness about the emails that he

19      reviewed prior to the deposition today.

20      MR. MOERDLER:  Can you do that, please?

21      MR. KENISON-MARVIN:  We can talk about

22      that.

23      MR. MOERDLER:  What I would like to know is

12

1       what he reviewed as contrasted necessarily with

2       what you've given him.  He may not have had a

3       chance to read all of them.

4       MR. KENISON-MARVIN:  I can represent to you

5       that he has only been provided with documents

6       that are Bates stamped and have been provided to

7       Plaintiff's counsel.

8       MR. MOERDLER:  Perfect.  If you could

9       provide us the list though I would appreciate

10      it.

11  Q    Okay.  Would you please tell us your educational

12      background, sir?

13  A    Sure.  I have a bachelor of science degree and a

14      master's degree.

15  Q    In what subject?

16  A    Bachelor of science degree in business

17      administration with an emphasis in accounting,

18      and I have a master's degree in theology.

19  Q    And they are from?

20  A    The University of Rhode Island is my

21      undergraduate degree, and my graduate degree is

22      from the Greek Orthodox School of Theology.

23  Q    And would you tell us your work background?  If

13

1    you can.  As completely as you can.  In other
2    words, your employment background prior to
3    becoming Commissioner?
4  A  Sure.  I was initially out of college so I'll
5    start there.  I'm sure you don't want to know
6    when I start working or before that.
7        I was an accountant for the firm of
8    PriceWaterhouseCoopers.  I left there.  I was
9    the Chief Financial Officer for a company called
10   Niagara Corporation.  I left there.  I started a
11   company called Control Solutions.  I exited that
12   company and was a member of an early stage
13   investing group called Common Angels which then
14   ultimately changed its name to Converge Systems.
15   And so that's my professional career.
16  Q  And then did there come a point where you ceased
17   to be primarily occupied in a professional
18   career?  In other words, I believe I'm correct
19   in stating you became at some point in time a
20   member of the New Hampshire House of
21   Representatives.  Am I right?
22  A  That's correct.
23  Q  So was that your first, as somebody who's been

14

1    down this road, your first adventure into the
2    world of politics and government?
3  A  So what I would say is that in New Hampshire
4    participation as a State Representative is not a
5    vocational calling such that it would be the
6    professional career in the sense that State
7    Representatives in New Hampshire earn only $100
8    per year so it would be difficult to make that a
9    vocational endeavor.
10  Q  So were you doing that at the same time that you
11   were engaged in some other occupation?
12  A  Yes.
13  Q  And what was the other occupation while you were
14   doing that?
15  A  I was a member with Common Angels.
16  Q  And when did you first become a member of the
17   House of Representatives?
18  A  I believe in the 2014 time frame.
19  Q  And you then became Commissioner directly from
20   your service as a member of the House of
21   Representatives; is that correct?
22  A  That's correct.
23  Q  And were you appointed?

15

1  A  I'm nominated, and then I go through a
2    confirmation process with the Governor and
3    counsel.
4  Q  Who nominated you?
5  A  The Governor.
6  Q  The Governor nominated you, and then you go to
7    the confirmation process; is that correct?
8  A  That's correct.
9  Q  That was as of when?
10  A  In March of 2017, I believe.
11  Q  And you have been the Commissioner of Education
12   since that time?
13  A  That's correct.
14  Q  Could you describe your responsibilities as the
15   Commissioner of Education for New Hampshire?
16  A  Sure.  So I have oversight responsibility for
17   the agency that comprises the New Hampshire
18   Department of Education.  Many of those
19   responsibilities are enumerated in statute.
20  Q  Would you tell us in your own words what are
21   those responsibilities, whether they are
22   oversight of the agency or individually,
23   separately and apart?

16

1  A  I'm not sure I understand the question.
2  Q  Tell me what it is that you are charged with
3    actually doing in the area of education.
4        MR. KENISON-MARVIN:  Objection.  Calls for
5    a local contention, you can answer.
6        MR. MOERDLER:  Sorry?
7        MR. KENISON-MARVIN:  Object to the extent
8    it calls for a legal contention.  He can answer.
9        MR. MOERDLER:  All I want to know is what
10   he does.
11  A  So I have oversight responsibility for the
12   agency.
13  Q  And what does the agency do?
14  A  So the agency has a variety of activities.
15   Probably one of the easiest places to understand
16   many of those is in statute.  Particularly in
17   RSA 21:10 I believe is the statute.
18  Q  Does your agency have responsibility for the
19   public school system in the State of New
20   Hampshire?
21  A  I'm not sure I understand what you mean by
22   responsibility for them.
23  Q  Does it have any responsibility for the public

17

1 school system?
2     MR. KENISON-MARVIN:  Objection.  Vague and
3 legal contention.  You can answer.
4 A   So the New Hampshire Department of Education has
5     responsibility for administering the statutes,
6     many of which govern aspects of the education
7     system in New Hampshire, both public, nonpublic
8     and other educational programs.
9 Q   So you do have responsibility, for example, of
10    the charter schools.
11 A   I don't know what you mean by "responsibility."
12 Q   You have some jurisdictional responsibilities.
13 A   We have certain statutes that effect charter
14    schools, and we're responsible, some of those
15    statutes are our responsibility that we
16    administer.
17 Q   All right.  Now, in terms of private schools, do
18    you have the same kind of areas of
19    responsibilities?
20 A   We have areas of responsibility, but they are
21    not the same.  They as well, you know, are
22    enumerated in statute and rule and we administer
23    the statutes and the rules.

18

1 Q   Do you try to stay jurisdictionally within the
2     four Corners of those statutes that govern your
3     responsibilities?
4     MR. KENISON-MARVIN:  Objection, vague and
5     legal contention.
6 Q   Let me restate it then.  You've indicated in
7     your testimony that your responsibilities are
8     essentially those that are within the four
9     corners of a variety of statutes, correct?
10 A   I'm not sure I understand the question at this
11    point.
12 Q   I'll restate it again.  You've testified that in
13    response to my question as to what is your
14    responsibility, what are your responsibilities
15    as Commissioner, you've said they are oversight
16    of those areas as to which statute defines
17    responsibilities; is that correct?
18 A   So statute and rule.
19 Q   Statute and rule.  Now, within that area, do you
20    try to keep your activities within the confines
21    of that statutory scheme or rule scheme,
22    regulatory scheme?
23 A   So I'm not sure I understand the premise of the

19

1 question.  The Department is responsible for
2 administrating those statutes and rules as
3 they're enumerated.
4 Q   And when you act in an official capacity, do you
5     make a conscious effort to do no more than the
6     statute authorizes you as Commissioner to do?
7 A   So we as an agency attempt to act consistent
8     with the statutes and the rules which govern our
9     activities.
10 Q   And do you have anyone who counsels you as to
11    whether something is within or not within the
12    scope of those statutes?
13 A   We do as an agency.
14 Q   And that is?
15 A   It's a variety of people.
16 Q   And they are?
17 A   So we have legal counsel, we have an Attorney
18    General's office, we have legislators, and there
19    may be others in the agency who observe a
20    particular statute and may weigh in on whether
21    or not the activities of the agency are within
22    the scope of those.
23 Q   And you make a conscious effort to stay within

20

1 those areas; is that correct?
2     MR. KENISON-MARVIN:  Objection.  Vague.
3 A   The agency administers the statutes and not
4     beyond the statutes.
5 Q   Right.  That's all I wanted to know.
6     Now, you meet with parents from time to
7     time, do you not?
8 A   I do.
9 Q   And --
10 A   Can you just define what you mean by "meet"?
11    Just so that we understand.
12 Q   That's the expression you've used in a number of
13    the emails.
14 A   So I'm just trying to understand what you mean
15    by that.
16 Q   I think I use the English language pretty well,
17    sir.  Have you been trained in it.  Do you get
18    together with them?
19 A   So physically present, on a Zoom call, on a
20    telephone, can I just understand what you mean
21    by meet.
22 Q   Do you communicate in an oral capacity with
23    parents from time to time?

21

1  A    I do.
2  Q    Do you communicate with parents in writing from
3       time to time?
4  A    I do.
5  Q    Is there any other means by which you
6       communicate with parents?
7  A    I'm not sure, again, what you mean by
8       communication.  If I'm communicating with
9       someone --
10 Q    Sir, all I'm trying to do is get an answer to a
11      very simple question.  You've pointed me down
12      this road by telling me you didn't comprehend
13      the word "meet" so I'm going to take all the
14      component parts of the word "meet," and I'm
15      going to ask you those.
16 A    Thank you.
17 A    I do try to do it as politely as I know how.
18 A    Yes.  So I communicate with parents.
19 Q    All right.  Do you communicate with school
20      officials?
21 A    I do.
22 Q    Superintendents?
23 A    Yes.

22

1  Q    Principals?
2  A    Yes.
3  Q    People in the administrative area of schools?
4  A    Yes.
5  Q    When you do that, do you prepare some form of
6       written report for yourself or reminder or memo
7       as a matter of course in what you did or what
8       you're going to do?
9  A    As a matter of course, no.
10 Q    Now, do you meet with political party officials?
11 A    I have.
12 Q    All right.  Give me just a moment.  I'm trying
13      to find a document.  I do apologize, sir.
14      So I'm going to show you a document that
15      has been Bates numbered by the Attorney
16      General's office in producing it to us.  It's
17      document numbered 0711.  It is a portion of the
18      production covering additional pages to that.
19      If you'll look at page 0711 it is led by 0700 as
20      a memo or an email from you to a man by the name
21      of ▭▭▭▭▭▭ with a copy to Diana Fenton.
22      MR. KENISON-MARVIN:  Objection.
23      Foundation.  Can we mark this?

23

1       MR. MOERDLER:  I'm sorry.
2       MR. KENISON-MARVIN:  We're up to 38, I
3       think.
4       (Exhibit 38 marked for identification)
5  Q    I will come back to the specifics of that
6       meeting in a moment.  My question to you is here
7       is --
8  A    Might I read through the document first?
9  Q    Oh, sure.  Please.  Perhaps you'll read through
10      to 0713.
11 A    Okay.  So your question, sir?
12 Q    ▭▭▭▭▭▭▭▭▭▭▭▭▭▭▭▭▭▭
   ▭▭▭▭▭▭▭▭▭▭▭▭▭▭▭▭▭▭▭▭▭▭▭▭▭
15 Q    Who is she?  Do you know that?
16      MR. KENISON-MARVIN:  Objection.  Compound.
17      You can answer.
18      MR. MOERDLER:  I'm sorry?
19      MR. KENISON-MARVIN:  Compound.  Form.
20 Q    Do you know her?
21 A    I've spoken to her.
22 Q    Have you met with her?
23 A    No.  I've not met with her.

24

1  Q    Now, what I would like to just go through with
2       you is this apparently, I say apparently, if you
3       look at page 0712, ▭▭▭▭▭▭▭▭▭▭
4       communicated with you concerning an issue at
5       Kensington Elementary SAU 16, and you indicated
6       at the top of page 0712 that your memory was
7       refreshed, and you know the issue and spoke with
8       the superintendent.
9       Can you give us your best present
10      recollection of what that issue was?
11 A    Sure.  So my memory was refreshed because I did
12      not recall what SAU she was involved in, and I
13      believe that ▭▭▭, the parent of a student as
14      she expressed in the initial email dated
15      September 30th, was concerned about the content
16      of a reading book in her daughter's classroom.
17 Q    And upon receiving this information, you spoke
18      to the superintendent of SAU 16?
19 A    That's correct.
20 Q    And do you have any recollection at all as to
21      what you said to the superintendent and what he
22      said to you or she said to you?
23 A    I don't have specifics in terms of what the

25

1    content of that conversation was.  I can try
2    to --
3  Q    Give me your best present recollection.
4  A    Yes.  So my recollection would be that I would
5    point out that there is a parent of a student in
6    the district who is concerned about a particular
7    reading material in her classroom.
8  Q    And you communicated to that superintendent that
9    concern; am I correct?
10  A    I believe so.
11  Q    Did you give the superintendent any counsel as
12    to what he or she should or shouldn't do in
13    regard thereto?
14  A    I don't recall any specific counsel.
15  Q    Do you know what the superintendent said to you?
16  A    I don't recall what the superintendent said to
17    me.
18  Q    And do you remember reading the book?
19  A    I do.
20  Q    Do you know what the book was?
21  A    I may be able to recollect from --
22  Q    Perhaps I can help you, sir.
23  A    Okay.

26

1  Q    This is a book called A Good Kind of Trouble.
2  A    Okay.
3  Q    And do you remember reading it?
4  A    I do recall reading it.  I read a number of
5    books.  I don't remember the details of the
6    book.
7  Q    What I'm really trying to get at, sir, and I'm
8    trying to simplify it, if not I can go back into
9    the depths of it, would it be fair to say that
10    you are an activist Commissioner, hands-on
11    Commissioner, who believes in dealing with those
12    people in those areas that you have
13    responsibility either by oversight or otherwise
14    responsibility for?  Is that a fair statement?
15        MR. KENISON-MARVIN:  Objection.  Vague.
16  A    So I would say that I am a Commissioner who
17    tries to execute his responsibilities with
18    fidelity to the law and the rule.
19  Q    Do you do that on an active basis or delegative
20    basis?
21        MR. KENISON-MARVIN:  Same objection.
22  A    So again, I would say that I am a Commissioner
23    who tries to execute his responsibilities with

27

1    fidelity to the law.
2  Q    Do you do it personally or do you delegate it?
3        MR. KENISON-MARVIN:  Same objection.
4  A    I would say as a Commissioner I am both doing
5    activities as well as delegating activities.
6  Q    Now, here is a parent who has complained about a
7    book, and I will go into that book in a little
8    while.  What is your normal reaction, if there
9    is a normal reaction, when a parent complains
10    about a book, do you pick up the book and try
11    and read it?  Do you find out what the issue is?
12    What is she norm?
13  A    So it would depend on the circumstances of the
14    individual inquiry into the Department.
15  Q    Let's take a look at the query.
16  A    Okay.
17  Q    The query is on page 713.  What was it in that
18    query that triggered you to read the book?
19  A    Because I had a concerned parent.
20  Q    So that was my question.  When you have a
21    concerned parent, do you then try and get to the
22    bottom of the concern, communicate the concern,
23    and try and find out exactly what's involved?

28

1        MR. KENISON-MARVIN:  Objection.  Compound.
2    You can answer.
3  A    So --
4  Q    I'm happy to break it down.
5        MR. KENISON-MARVIN:  I guess I would ask
6    that we do it one question at a time if we can
7    as a matter of course.
8  Q    I'm trying to do that.
9  A    So again, depending on the individual inquiry to
10    me, I might take different pathways in terms of
11    trying to understand the context of the concern
12    of the parent.
13  Q    So let me take you to that concern as expressed
14    on 0713.
15  A    Okay.
16  Q    What was it in that concern that triggered you
17    to read the book?
18  A    Because the parent had reached out to me.
19  Q    So when a parent reaches out to you and says
20    that he or she has a concern about a book and
21    gives you some details as here, is it your
22    practice to then read the book?
23  A    I do read quite a lot of content, yes.

29

1   Q     And where in the statutes that you said marked
2         your responsibility is there one that says you
3         have a duty to read books?
4   A     So my duty is to support my customers to the
5         agency which include a variety of
6         constituencies.  Parents are one of them.  So I
7         try to be as prepared as possible to support my
8         constituencies.
9   Q     And then what was it that you did in terms of
10        calling and scheduling an appointment with the
11        superintendent?
12  A     I'm sorry.  Can you -- I'm not sure I understand
13        the question.
14  Q     Well, let me take you over to document number
15        DOE 70.
16            MR. BISSONNETTE:  Fenton Exhibit 19 that
17        was previously marked.  Nate will hold the
18        exhibits.
19  Q     Who is David Ryan, sir?
20  A     Can I just read the email first?
21  Q     Oh, please do.
22  A     Okay.  I've read the email.
23  Q     If you will go back and look at the document

30

1         that was 711 which is in front of you, you will
2         see that the date of your first email in there
3         is in the month of October, but that there are
4         emails going back for a little while before
5         that.  So, for example, if we look at the
6         document that is Exhibit 19 you will see it goes
7         back to August.  So would it be fair to say that
8         this query spanned a period of several months?
9   A     So I just want to correct.  You mentioned that
10        my first email was in October, but it's actually
11        September 30th.
12  Q     That's all right.  That's all right.
13  A     Okay.  So it does seem that there have been,
14        there's issues related to the Exhibit 38 which
15        are specifically enumerated in that email.  In
16        the Exhibit 19 which you provided to me, it
17        seems that there are a number of concerns that
18        this parent is raising.
19  Q     And you tried to get hold of the superintendent
20        there?
21  A     That's correct.
22  Q     And to discuss it with the superintendent?
23  A     That's correct.

31

1   Q     And what if you can recall was the general gist
2         because you said you could not remember
3         specifics, and I understand that.  What was the
4         general gist of your communication with the
5         superintendent?
6   A     That he had a parent who was concerned about the
7         content of a reading book in the classroom.
8   Q     And you have read the book, I take it, at this
9         point?
10  A     I did.
11  Q     Did you form an impression concerning the book?
12  A     I don't know what that means.
13  Q     Well, normally when you read a book, you either
14        like it, you dislike it, it's a tough book, it's
15        a not tough book.  Did you form any impression
16        concerning the book?
17  A     The recollection that I have from reading the
18        book in particular was that it was very poorly
19        written.
20  Q     And did you do anything beyond communicating the
21        concern of the parent to the superintendent?
22  A     At that time, that was the extent of it.
23  Q     Did you thereafter do anything concerning that

32

1         book?
2   A     So with respect to this book, subsequent, I
3         don't recall the date, the school invited me to
4         an event, and when I was at that event, then
5         they asked me to meet with the superintendent,
6         the two assistant superintendents, and the
7         principal to talk about that book.
8   Q     Do you have a recollection of what was said by
9         whom including yourself at that meeting?
10  A     I think it was the same conversation that I had
11        expressed to the superintendent, assuming that I
12        had connected to him.  I don't recall
13        specifically.  But that there was a parent who
14        was concerned about the content of this book.  I
15        believe that the school also shared information
16        about this parent.
17  Q     Was the book a book that was read in class; is
18        that what you said?
19  A     So my understanding from the email from ███ is
20        that this is a book that, it says in her email
21        this book was read aloud to my daughter's entire
22        class.  And so Read-Aloud is a pedagogical
23        technique where a teacher will actually read a

33

1    book to a group of students.
2  Q    And do teachers also assign books to read at
3       home as homework or otherwise?
4  A    Some teachers may.
5  Q    And do teachers say to students in these reading
6       type of courses go select a book and tell us
7       what you think of it?
8  A    Some teachers may.
9  Q    And do they give them areas in respect of which
10      those books to be read should fall?
11 A    They may do that or not.  That would not be part
12      of a Read-Aloud though.
13 Q    What would be?
14 A    So a Read-Aloud is where --
15 Q    No, no.  What would that be?
16 A    What would what be?
17 Q    When you assign a subject matter to a student to
18      find a book, read it and report on it?
19 A    That would be a pedagogical exercise that the
20      teacher assigns to the student.
21 Q    All right.  Now, do you have any recollection
22      you were asked to look at a book that had been
23      selected by a student in that regard?

34

1  A    You mean any time or in this context?
2  Q    Any time.
3  A    Any time.  So I have been on school visits where
4       students are participating in the pedagogy that
5       you've described, and the students may be in an
6       independent reading time, and so the educators
7       have encouraged me, and I've encouraged myself
8       as well to sit down with students and ask them
9       what are you reading about.  So that probably
10      has happened many times at that point in time.
11 Q    Do they to the best of your knowledge,
12      information, belief have in the New Hampshire
13      school system a reading club in various of the
14      schools?
15      MR. KENISON-MARVIN:  Objection.  Vague.
16 A    Yeah.  I'm not sure what you mean by "reading
17      club."
18 Q    Do they have clubs where students are encouraged
19      to read books of one kind or another?
20      MR. KENISON-MARVIN:  Same objection.
21 A    I have no knowledge of a specific club, but I
22      would assume that there probably are clubs, but
23      I have no knowledge of them.

35

1        (Discussion off the record)
2  Q    Let me see if we can move to another area and
3       come back to this.
4        (Exhibit 39 marked for identification)
5  A    Okay.  So your question.  I've read the email.
6  Q    Now, you have before you a document that bears
7       Bates numbers 09896 and running through 09898,
8       Bates marked numbers having been affixed by your
9       counsel.
10       Have you had a chance to read this?
11 A    I have.
12 Q    Now, do you know Betsi Harrington?
13 A    I do.
14 Q    How long have you known Ms. Harrington?
15 A    Since she contacted the agency.
16 Q    Not before that?
17 A    No.
18 Q    And when you received the email from Ms.
19      Harrington dated September 20, 2022, did you
20      read the book?
21 A    I did not.  Actually which book was this?  Let
22      me just see what book is that?  Yeah, so I was
23      not able to because it was on the Sora app, and

36

1       I didn't have access to that.
2  Q    So you've not seen or consulted the Sora app?
3  A    So can you correct that?  Rephrase that
4       question?
5  Q    Have you ever consulted or looked at the Sora
6       app?
7  A    So I've only seen screen shots of it because I
8       didn't have access to it --
9  Q    All right.
10 A    -- at this time.
11 Q    It's an app according to Ms. Harrington that's
12      used in many of the schools in the state.
13 A    That's correct.
14 Q    Do you have occasion to check the various apps
15      that are used by the schools in the state?
16      MR. KENISON-MARVIN:  Objection.  Vague.
17 A    I do not.
18 Q    Does your Department?
19 A    It would depend upon the nature of the checking
20      what an agency might have access to.  Sora would
21      not be one of those applications that we would
22      have access to.
23 Q    Is it not a commonly used application?

**37**

1  A  It's in many of our schools.

2  Q  Why wouldn't you have access to it?

3  A  Because that would constitute in most cases

4     curricular material, and the curricular material

5     is the domain of the school, and it is not

6     inside the jurisdiction of the agency.

7  Q  Let me see if I understand what you just said to

8     me.

9  A  Okay.

10 Q  Your agency does not have oversight jurisdiction

11    of matters relating to curricular; is that what

12    you're saying?

13 A  That's correct.

14 Q  And you do not look into that or inquire into

15    that?

16 A  Well, so I mean, again, the inquiries would

17    happen, we saw in an example here where someone

18    brought curricula material to our attention. We

19    are seeing here where a parent is bringing

20    curricula material to our attention. So that is

21    how the curricula material comes to our

22    attention.

23 Q  And does that happen frequently, infrequently,

**38**

1     just periodically? What is your best

2     recollection?

3  A  I would describe it as periodically.

4  Q  All right. And when you received this email

5     from Ms. Harrington --

6  A  Yes.

7  Q  -- and she had some concerns about the app and

8     what it showed and what it led to, you asked

9     that she give you a call to discuss it?

10 A  Yes.

11 Q  Why?

12 A  So that I could understand the details of the

13    problem that she understood there to be.

14 Q  And what did you do by way of followup, if

15    anything?

16 A  Well, when I'm looking at this particular email

17    I sent that to Rich Farrell.

18 Q  And what did you ask him to do?

19 A  I didn't ask him to do anything.

20 Q  Why did you send it to him?

21 A  Because this would fall within his domain at the

22    agency as something that needed to be looked at.

23 Q  So let me get this straight, and if I'm being

**39**

1     clumsy in it, I apologize. If you send an email

2     to Mr. Farrell, does it presuppose that he will

3     look at it?

4  A  It would depend upon the nature of the email

5     that was sent to Rich, but when I send an email

6     to someone I do understand that they will look

7     at it, but I don't have, I guess it depends on

8     what the email is and their reaction to that,

9     but that was the assumption.

10 Q  You don't intend it to be a deadend street, you

11    just sent it to him?

12 A  No. I assume that he will take the appropriate

13    action.

14 Q  All right. Now, what kind of action would you

15    expect him to take?

16 A  That would depend upon the nature of the email

17    that I send to him.

18 Q  All right. Let's take this one as an example.

19 A  Okay.

20 Q  What would you expect him to do?

21 A  Well, so this particular email has a number of

22    different pieces of content so there may be a

23    number of different aspects of this that Rich

**40**

1     may or may not take a look at.

2  Q  And do you have any expectation when you send

3     this one, for example, to Mr. Farrell that he

4     would inquire into what was involved here,

5     whether the claim was correct or not correct?

6  A  Again, I assume he would take whatever the

7     appropriate action is with respect to this

8     information.

9  Q  Would you expect a report back from him on it?

10 A  So he would probably report back not specific to

11    this but in a more general context of reporting

12    on activities that his particular bureau is

13    working on.

14 Q  You have a periodic meeting of a misconduct

15    committee?

16 A  We do. That would be incorrect. It's not a

17    committee.

18 Q  It's a grouping of three people, correct?

19 A  There are personnel. Okay.

20 Q  I apologize. Is that where you would expect

21    this to be reported on?

22 A  If there was something that needed to be brought

23    to my attention, that would be the format and

41

1    the forum whereby it would be brought to my
2    attention, correct.
3  Q    All right.  If you haven't heard back from Mr.
4    Farrell on, hypothetically, this issue, do you
5    follow up?  Is that your practice?
6  A    It would depend upon the nature of the issue.
7  Q    On issues such as is here tendered.
8  A    So in this particular case, you know, I would
9    assume that he would explain that to me in one
10    of my educator misconduct meetings and bring
11    that to my attention.  If not, I may have
12    brought it up or I may not have.  I don't know
13    the answer to that.
14  Q    Fair enough.  And would you expect to see some
15    sort of a written report from him on the
16    subject?
17  A    Generally, I don't review written reports.
18  Q    So you deal primarily with him in terms of oral
19    communications?
20  A    Well, we have the meeting where he's describing
21    and explaining things, correct.
22  Q    Now, am I correct that there are three people
23    who attend these meetings; they are Ms. Fenton,

42

1    Mr. Farrell, and you usually; is that correct?
2  A    Generally, and sometimes occasionally the Deputy
3    Commissioner might sit in as well.
4  Q    Does Mr. Berwick sit in?
5  A    Generally, he does not participate.
6  Q    And are there any notes, memoranda or the like
7    maintained at those meetings?
8  A    So I don't maintain any notes or memoranda.
9  Q    Do you know if anyone does?
10  A    I don't know the answer to that.
11  Q    Are they recorded?
12  A    They're not to my knowledge.
13  Q    Let's assume hypothetically that he reported on
14    something concerning this, and he said that's
15    nothing, don't worry about it.  Is that the end
16    of it?
17       MR. KENISON-MARVIN:  Objection.  Vague.
18    I'm trying to just understand the process.
19  A    So it may be that he comments, and that's the
20    end of it or it may be that I say had you
21    considered this or, you know, just in my typical
22    supervisory role I may inquire about it or I may
23    assume that he's done whatever he needs to do

43

1    with it, and I have no further inquiry.
2       And the other thing that sometimes happens
3    is maybe you have this inquiry followed by other
4    inquiry by the same family.  You know.
5  Q    Does there come a point in time or has there
6    ever come a point in time when there is a
7    question in your mind that this ought to be
8    examined further, investigated formally or
9    reported to the Human Resources or Rights
10    Commission?  Has that ever happened?
11       MR. KENISON-MARVIN:  Objection.  Vague and
12    compound.
13  A    That's a little bit compound.  If you would
14    break that down.
15  Q    Sure.
16  A    Because you escalated considerably in that
17    conversation.
18  Q    Please understand, I have nothing about the
19    utmost respect for you as an activist,
20    purposeful, and proper Commissioner in any way,
21    shape or form.  And so what I'm trying to do is
22    to phrase my questions so I can get through this
23    as fast as I can.

44

1  A    Very well.
2  Q    To your benefit and mine.  Does there ever come
3    a time that any of these misconduct committee
4    meetings, I'm calling it a committee but it is
5    not a formal committee, I understand that.
6  A    Just a meeting in the Department.
7  Q    Well, I should tell you your colleagues have
8    referred to it as the misconduct committee.
9       When there is an issue raised that is
10    elevated in your mind to being a matter of
11    further concern --
12  A    So I just want to go on the record.  You
13    referred to me as an activist, and I think
14    that's an incorrect characterization of the role
15    that I play.
16  Q    It was intended as a compliment, sir.
17  A    But as a role that I play as the Commissioner.
18    So then can you please repeat the questions?
19  Q    Please understand I have served as a
20    Commissioner of the State of New York and of the
21    City of New York, and I think of nothing higher
22    in deserving of respect and I still serve as one
23    than an activist Commissioner who does his job.

45

1        So I meant that has a compliment, sir.
2   A    If you may repeat the question for me?
3   Q    Madame reporter?
4        (Requested portion read back by court reporter)
5   A    Certainly.
6   Q    And what do you do then, if I may?  If there is
7        a practice or general procedure.
8            MR. KENISON-MARVIN:  Objection.  Compound.
9   A    There is conversation in the meeting until we
10       determine what the next steps should be, if any.
11  Q    And at the end of the day, who makes the
12       decision, you?
13  A    Well, I mean we all are collaborating around
14       what would happen next.  So it would depend on
15       the individual case.
16  Q    And to coin a phrase, does the buck stop with
17       you, sir?
18           MR. KENISON-MARVIN:  Objection.  Vague.
19  A    The buck does stop at Commissioner.
20  Q    I'm quoting Mr. Farrell, sir.
21       All right.  Now, what I'd like to
22       ascertain, this email that is Exhibit 39 raises
23       a number of questions about the propriety of the

46

1        materials that one can get through the Sora app.
2   A    That's correct.
3   Q    Did you at this point in time, September of
4        2022, have a view as to whether or not this was
5        something that would constitute a potential
6        violation of or concern with respect to what is
7        known as HB 2 and what's been referred to in
8        these depositions as HB 2?
9            MR. KENISON-MARVIN:  Objection, vague,
10       foundation, compound.
11  Q    Let's see if we can agree.  Exhibit 1 is the
12       full text of the so-called Banned Concepts Act.
13       I show it to you, sir.
14           MR. KENISON-MARVIN:  Exhibit 1.  I'll
15       provide it to the witness.
16           MR. BISSONNETTE:  I would note for the
17       record that the cover page of this document that
18       I created as this was affixed as Exhibit 1
19       attached to the Philibotte and Mejia Complaint
20       filed in this case.
21  A    So I have a document in front of me, you know,
22       referencing Chapter 91, HB 2.  It has several,
23       an Amended Analysis, and then it goes to page

47

1        145.  It has redacted content.  I don't know
2        what that is.  And then it has what is
3        referenced as 91:297 and other sections of law,
4        and then it's further redacted.  So you're
5        saying that this is?
6   Q    We have been using in the depositions thus far
7        the phrase HB 2.
8   A    To refer to this document.
9   Q    For discussion purposes, for simplicity, I can
10       refer to as the material in Exhibit 1 if you
11       prefer.  I can do it in any way that is most
12       convenient for you.
13  A    Okay.  I'm comfortable, have the document, and I
14       have, without going to the state statutory rule
15       I wouldn't know if this is the exact language or
16       not, but I have the document presented to me.
17  Q    Did you form an opinion to the best of your
18       recollection that the claims that here were
19       made, referring to Exhibit 39, rose to the level
20       of a potential questionable violation of HB 2?
21           MR. KENISON-MARVIN:  Objection.  Vague.
22  A    Yes.  So with respect to this particular
23       complaint, my recollection is that the direction

48

1        we took was not concern over a specific piece of
2        content so much as it was the Sora app and what
3        students may or may not be able to access using
4        that particular application and whether schools
5        had configured correct security parameters in
6        that application to prevent students from
7        accessing content that may not be
8        developmentally appropriate for them.
9   Q    Is this app available to students outside of the
10       classroom context?
11  A    These are part of the inquiries that we were
12       trying to make and to understand how does a
13       student access it, what are the protections that
14       are afforded relative to this application.
15       You know, my recollection from the various
16       conversations I had both with Ms. Harrington as
17       well as other school personnel relative to this
18       is that generally if the application is
19       configured correctly, in the school setting,
20       that we are able to limit students to
21       appropriate levels of content or the application
22       itself possesses the ability to limit students
23       to developmentally appropriate content.

49

1       But there was concern that when a student
2   is outside of the school environment and outside
3   of the school's either devices or firewall that
4   there may be an opportunity for that student to
5   use a third party device to use their log-in to
6   access the app and access material that may be
7   developmentally inappropriate for those
8   students.
9  Q    And what, if anything, did you do about that?
10 A    So we had a number of conversations.  We spoke
11      with the individuals at this particular school.
12      I believe it was the superintendent, it may have
13      been the librarian, to explain, and we had
14      conversations with Sora to understand what the
15      controls are in place.  There's the ability to
16      in Sora to allow certain materials to be
17      accessible to different age levels based on
18      developmentally appropriate content and make
19      sure that this particular School District was
20      able to configure those controls and implement
21      those.  I believe in this case that those times
22      of controls had not been configured.
23 Q    And was the application available to or used by,

50

1   and I know that's compound but I can break it
2   down if you wish, any other school to the best
3   of your knowledge?
4  A   I believe it's in a number of schools.
5  Q   A number of them.
6  A   That's correct.
7  Q   And did you have that communication with the
8      other schools also?
9  A   So we had that communication with a number of
10     the schools where that issue took place just
11     informally.  It may have been the content of a
12     broader communication.  We do calls with our
13     school leaders, and we may have notified them in
14     that call that if you're using Sora, there are
15     certain configuration aspects that need to be
16     done.
17         We did speak with Sora to make sure that
18     they as the vendor were able to work with their
19     customers who are the school districts to make
20     sure that Sora communicated to the districts
21     that these access controls are available to
22     them.
23 Q   To what extent did you find that they were

51

1   available, the application, to students outside
2   of the school setting?  In other words,
3   extracurricular like?
4  A   I'm not sure I understand the question.
5  Q   You indicated that the application is available
6      to students outside of the school setting,
7      correct?
8  A   Well, so again, depending upon how it was
9      configured.
10 Q   So it's the configuration rather than the
11     application, right?
12 A   Those are the same things.  You have an
13     application that is configured.  So how you
14     configure the application is what determines
15     your ability to access it in various modalities.
16 Q   And if it had been inappropriately or not
17     configured at all, would this type of conduct
18     have risen to the level where you would have had
19     some concerns respecting HB 2?
20         MR. KENISON-MARVIN:  Objection.  Vague.
21 A   I'm not sure I understand the --
22 Q   Well, let me be specific.  You have before you
23     Exhibit 39, and you have specific claims there

52

1   of it being inappropriately configured from the
2   standpoint of Ms. Harrington, and you indicated
3   that on the basis of what you had been given by
4   way of information that the application as used
5   in one or more of the schools had not been
6   properly configured when made available to
7   students.  And my question is -- did you view
8   the application, by the way, at any point?
9  A   So ultimately, I had Sora provide me with access
10     to the application, but this was much later down
11     the process.
12 Q   Okay.  Did you at any point form an opinion,
13     howsoever limited, as to whether when not
14     properly configured or not configured at all
15     information such as that as appears in Exhibit
16     39 would rise to the level of a potential
17     violation of HB 2 or the document before you?
18         MR. KENISON-MARVIN:  Objection.  Vague and
19     to the extent this question is based on premises
20     leading up to this question that misstates prior
21     testimony.  You can answer.
22 A   So my recollection of this particular incident
23     is that it was focused on the issue of access to

**53**

1    the Sora content. I don't recall that there was
2    an educator misconduct aspect discussed relative
3    to this. I don't have that recollection.
4         What I do recall relative to this is
5    principally the issue of the Sora application
6    and access to developmentally inappropriate
7    materials.
8  Q    Did you think the information it gleaned as
9    determined on page 09898 by Ms. Harrington would
10    be information that would be violative of HB 2
11    or would warrant checking whether it was?
12         MR. KENISON-MARVIN: Objection, vague,
13    compound, legal contention.
14  A    I have not actually gone through that exercise
15    at this point in time.
16  Q    Have you ever looked at a complaint through the
17    lens of --
18  A    Can I just correct something? I just want to be
19    clear about that. So I'm not sure that I'm
20    understanding your question. Can you just
21    repeat that last question? I want to make sure
22    I answer it precisely.
23  Q    Sure. Looking at what Ms. Harrington believed

**54**

1    the Sora application permitted someone to see,
2    if she was correct in her analysis, would you
3    say that is elevated to the level of raising
4    concerns under HB 2?
5         MR. KENISON-MARVIN: I'm going to object to
6    the extent that that question is different than
7    the prior one so it's unclear the prior
8    question.
9  Q    Have you ever looked at a complaint such as is
10    in Exhibit 39 through the lens of whether or not
11    cause for concern under HB 2 is present?
12         MR. KENISON-MARVIN: Objection. Vague.
13  A    So the responsibility of the agency is to
14    incorporate all laws in all of the actions that
15    it follows, whether it is, you know, the 193:40
16    or whether it is some other law, you know,
17    whether it's dealing with student privacy or
18    some other matter. So we bring all of those to
19    the table. The thing that I was trying to
20    clarify --
21  Q    Before you go further if I may. Bringing all of
22    those to the table as you put it.
23  A    Yes.

**55**

1  Q    Have you ever had occasion to look at whether
2    something like this would be elevated to raising
3    a concern under all of those as you defined it?
4         MR. KENISON-MARVIN: Same objection.
5  A    So I would say no. This particular email is
6    dealing with content, and it's not dealing with
7    educator actions per se where, you know, so I'm
8    having difficulty creating the nexus to the
9    statute so I would say I'm not sure I understand
10    that.
11  Q    Let's see if we can take you there.
12  A    Okay.
13         MR. KENISON-MARVIN: Whenever there's a
14    good point for a break I have to use the
15    restroom.
16         (Discussion off the record)
17         (Recess taken 11:26 - 11:34 a.m.)
18  Q    Commissioner, let me ask you again to put before
19    you Exhibit 19. You indicated earlier that when
20    you talked to the superintendent you conveyed
21    various complaints; is that correct?
22  A    So you're referring to Exhibit 19?
23  Q    Let's take that one as an example.

**56**

1  A    So with respect to Exhibit 19, I would have
2    expressed the concern about that the parent had
3    expressed to me that they were concerned about
4    the content of the particular Read-Aloud.
5  Q    And what would you expect that the
6    superintendent would do about that?
7  A    So I would assume as the superintendent they
8    would want to know if they have a parent who is
9    upset about something happening in their
10    instructional environment so I'm trying to bring
11    that to their attention.
12  Q    And would you expect that the superintendent
13    would have a conversation with the teacher?
14  A    I would expect that the superintendent would do
15    whatever is appropriate given the nature of the
16    specific complaint.
17         MR. BISSONNETTE: I'm accepting Esther
18    Dickerson from NEA into the Zoom. She's counsel
19    of record as well.
20         COMMISSIONER EDELBLUT: Do we need to
21    notice her about the recording aspect of this?
22         MR. BISSONNETTE: She's aware of it, but I
23    can convey to all lawyers that are present,

57

1    including Attorney Dickinson, just want to make
2    sure that everyone is aware that there will be
3    no record of the deposition per the agreement of
4    counsel.
5         COMMISSIONER EDELBLUT:  Thank you.
6  Q    If you will look at the first page of Exhibit 19
7    which is also marked as DOE 70 Bates stamped,
8    you'll see at the bottom ███████████████
9    copies not only you but the superintendent; do
10   you see that?
11 A    I see that ████ has copied a number of people.
12 Q    Correct.  Copies the teacher, correct?
13 A    I don't know who the teacher is.
14 Q    Teacher is mentioned in the second line in the
15   bottom paragraph.  ██████████████████
16 A    Okay.  So we can stipulate that, that's fine.  I
17   notice that the Governor as well is copied.
18 Q    Understood.  And do you have any view as to what
19   impact that has on the teacher?
20        MR. KENISON-MARVIN:  Objection.  Vague.
21 A    I don't know the answer to that, but I would
22   assume that bringing this to the attention of
23   the superintendent would help them to manage

58

1    that well.
2  Q    And what impact would it have on the teacher?
3         MR. KENISON-MARVIN:  Same objection.
4  A    So again I would hope that, I have no idea what
5    the impact would be on the teacher.  My hope
6    would be that the teacher would recognize that
7    they, too, have a parent who is uncomfortable
8    with some of the matters that are taking place
9    in the school, and they would work with that
10   parent to try to resolve those.
11 Q    So they would be guided accordingly.
12 A    Well, now there's a number of different
13   guidance, right?  So the teacher is aware of it,
14   the superintendent is aware of it.
15 Q    All right.  Now, other than the code of conduct
16   under what we've termed or I've termed as HB 2,
17   if a complaint is filed or a proceeding is
18   brought by either the Attorney General or the
19   Human Rights Commission, does the remedy include
20   any punishment for the teacher or is it only the
21   school?
22        MR. KENISON-MARVIN:  Objection.
23 A    I'm not sure I understand the question.

59

1         MR. KENISON-MARVIN:  Objection.  Vague,
2    compound, legal contention, assumes facts not in
3    evidence.  You can answer.
4  Q    Do you know what the remedies are, putting
5    complete aside the Code of conduct, what other
6    remedies that are capable of being assessed
7    under HB 2 for a violation and proceeding
8    brought either by an aggrieved party or by the
9    Attorney General or anybody else?
10        MR. KENISON-MARVIN:  Same objections.
11 Q    I just want to know his knowledge.
12 A    So I believe you're making reference to PL
13   00007, paragraph III.  "Any person claiming to
14   be aggrieved by a violation of the section
15   including the Attorney General may initiate a
16   civil action against a school or school district
17   in superior court for legal or equitable relief,
18   or with the New Hampshire commission for human
19   rights as provided under RSA 354-A-34.
20 Q    Doesn't that relief run against the school?
21   Look at Section III.  Against a school or a
22   School District, correct?
23 A    Those are the words of that statute.  I've not

60

1    had to legally interpret this so --
2  Q    I have no problem with that.  It doesn't provide
3    any remedy as against the teacher, does it?
4    Does it mention the teacher?
5         MR. KENISON-MARVIN:  Objection.  Compound,
6    legal contention.
7  A    It does not mention the teacher.
8  Q    What impact do you think it has upon the School
9    District, the superintendent or the School
10   District or the principal of the school when
11   there's a complaint that a teacher has done
12   something wrong?
13        MR. KENISON-MARVIN:  Objection.  Vague,
14   compound.
15 A    I think it would depend on the nature of the
16   complaint.
17 Q    Have you at any time formed an opinion as to
18   whether or not a book, let's take A Good Kind of
19   Trouble as an example.
20 A    So are we on a certain exhibit?
21 Q    No.  I'm not on an exhibit.
22 A    Okay.
23 Q    Whether a book raises concerns within the

61

1    parameters of HB 2?
2         MR. KENISON-MARVIN:  Objection.
3  Q   I'll repeat that.  Would you repeat it, please,
4    Madame Reporter?
5    (Requested portion read back by court reporter)
6         MR. KENISON-MARVIN:  Objection.  Vague and
7    compound.
8  A   So again, like the previous example, I'm not
9    sure I understand the nexus between specific
10   content and as I understand RSA 193:40 which
11   talks about, you know, teaching and instruction
12   and so on.
13  Q   See if I understand what you've just said.  If a
14   teacher reads out loud a paragraph or more of a
15   book, do you now understand the context?
16  A   I know what reading out loud means so I'm not
17   sure I understand the question.
18  Q   Have you ever formed an opinion as to whether
19   any material that, in my first example, a
20   teacher reads automatic out loud or is asserted
21   to have read out loud from a book rises to a
22   level of concern under HB 2?
23        MR. KENISON-MARVIN:  Objection.  Compound,

62

1    vague.
2  A   So it would be incomplete information to make
3    that determination because a teacher could read
4    many different parts of content that are not
5    connected to as I understand 193 about the
6    activities of the educator.
7  Q   What if the book is in the curriculum?
8  A   So I'm not sure I understand.  What is the
9    question?
10  Q   The question is simply this.  Have you ever
11   formed an opinion as to whether any content read
12   aloud from a book by a teacher in a classroom
13   rises to the level of concern with respect to HB
14   2?
15  A   So with all due respect, content is not the
16   subject of the purported HB 2 or 193:40.  The
17   activities, as I understand the law, you know,
18   no pupil in any public school in this state
19   shall be taught, instructed, inculcated, or
20   compelled to express belief in or support for
21   one or more of the following.
22        So an educator could use a wide variety of
23   content that doesn't then violate A, B, C or D.

63

1    I'm trying to understand what you're -- you've
2    created this nexus, and I'm not sure where
3    you're going.
4  Q   I have no problem with that.
5  A   Okay.
6  Q   I'll just ask you this question.
7         Is it your understanding just reading the
8    content, any content you'd like, stuff that Ms.
9    Harrington called to your attention, reading it
10   out loud is not teaching; is that what your
11   position is?
12  A   So it's not that it's not teaching.  You have to
13   go to A, B, C and D so you would say not
14   teaching A, if that teaching includes that one's
15   age, sex, gender identity, sexual orientation,
16   race, creed, color, marital status, familial
17   status, mental or physical disability, religion
18   or national origin is inherently superior to
19   people of another age, sex, gender identity,
20   sexual orientation, race, creed, color, marital
21   status, familial status, mental or physical
22   disability, religion or national origin as an
23   example, so if that is what is being taught, but

64

1    content itself doesn't do that.  Content is
2    neutral relative to the actions.
3  Q   So you bifurcate the term "teaching" from the
4    subject matter of the teaching.  Is that what
5    you're saying?
6  A   It is possible that someone could use content,
7    that the content itself is potentially
8    problematic relative to this statute, and the
9    teacher may use that content to demonstrate how
10   it's inappropriate to, you know, to assert that
11   one's, you know, age, sex is inherently superior
12   to another.
13        So in other words, the content is not, I'm
14   having trouble creating nexus to the content.
15  Q   Would teaching the subject of affirmative action
16   violate HB 2 under that hypothesis?
17        MR. KENISON-MARVIN:  Objection.
18  A   You'd have to give me more context around the
19   teaching of affirmative action.
20  Q   Affirmative Action is a wonderful thing now.  Is
21   that good?
22  A   So what I would --
23        MR. KENISON-MARVIN:  Same objection.  And

65

1    vague.  You can answer.
2  A    No pupil in any public school of this state
3    shall be taught, instructed, inculcated or
4    compelled to express a belief in or support for
5    any one or more of the following.  That one's,
6    you know, affirmative action, so that one's
7    race, you know, is inherently superior to the
8    people of another race, and so the adjudication
9    of that is something that would be made by the
10   Human Rights Commission.
11 Q    Putting aside the adjudication, I'm seeking your
12   opinion.  Would a teacher saying we need to have
13   more affirmative action because it is a good
14   thing be raised to the level of concern under HB
15   2?
16 A    I would need to have more context than the
17   simple statement that you provided to me.  Is
18   the context of the totality of the pedagogical
19   instruction one that teaches, instructs,
20   inculcates, compels, express belief in or
21   support for that one's race is inherently
22   superior.
23        So simply Title IX itself, at least my

66

1    limited understanding of it, does not state that
2    one race is inherently superior to another race
3    is my understanding of that.  So I would need to
4    have more context to understand the actions of
5    the educator.
6  Q    I'd like to take you for a moment to just jump
7    ahead.  Let me take you back to Exhibit 19 and
8    to what I believe is the third page of that
9    document.  First word on that page being trust.
10 A    Okay.
11 Q    And take you down to the third paragraph?
12 A    Which begins with regarding?
13 Q    Regarding.
14 A    Okay.
15 Q    I'd ask you to read that, please.
16 A    Okay.  So your question?
17 Q    Question, turning to that paragraph starting
18   with the word "regarding," let me just read two
19   sentences I'm interested in.  Regarding the
20   book, quote, "A Good Kind of Trouble," it is a
21   terrible book that shames, quote, "white"
22   children into thinking they are the oppressors
23   in society.  This book talks about gunshots,

67

1    rioting, looting, burning down buildings.  It
2    also made our daughter very uncomfortable and
3    scared," unquote.
4        Would you think that, did you form any
5    opinion as to whether or not that would raise a
6    level of concern under HB 2?
7  A    So again --
8        MR. KENISON-MARVIN:  Objection.  Vague.
9    Compound.  You can answer.
10 A    My response is not to adjudicate whether or not
11   they are violations of the particular law.  When
12   I read that paragraph, and even just reading it
13   now, I saw a number of concerns that the parent
14   had with respect to their child, and so that is
15   really what I focused in on in terms of I have a
16   child who's in school who is scared relative to
17   some of that content and wanted to make sure
18   that we try to support that child.
19 Q    Is it your testimony that when you read
20   something like this you exclude from your
21   consideration the provisions of HB 2?
22        MR. KENISON-MARVIN:  Objection.  Vague.
23 A    So my responsibility is not to adjudicate.

68

1  Q    I didn't ask you about adjudicating.  Put aside
2    adjudicating.  Is it your position that when you
3    read something like this, material I just
4    quoted, you exclude from your consideration any
5    concern with respect to HB 2?
6        MR. KENISON-MARVIN:  Same objection.
7  A    So again, when I read a paragraph like this, my
8    concern is all of the statutes which we are
9    responsible for administering.
10 Q    Okay.  That's fine.  I'd like to take you now to
11   a copy of your OpEd piece captioned, "Teach
12   children about racism, not to be racists."  All
13   right?  Exhibit 4.  This is a copy of an OpEd
14   piece in the Union Leader.  Correct?  And you
15   wrote that; is that correct?  That's the
16   question.  Please read it.
17 A    So my question --
18 Q    I have a clearer copy of the text if that's what
19   you want.
20 A    I have to put my glasses on for this one because
21   it's so tiny.
22 Q    I have one that was taken from the online --
23 A    That's okay.  I can read it here.  I've got my

69

1  glasses on.
2  Q  Sir, this is a copy of it, if this helps you.
3  A  No.  This is fine.  I can read it right here.
4  Okay.
5  Q  I will take you to the paragraph that is Exhibit
6  4, paragraph 10.
7  A  Okay.
8  Q  Starts with the words, In Ibram Kendi's "How to
9  be an Antiracist."
10  A  That's correct.
11  Q  Do you see that paragraph, sir?
12  A  I do.
13  Q  Would you say reading just the following would
14  raise concerns for you under HB 2.  Quote, "In
15  Ibram Kendi's "How to Be an Antiracist," a
16  prominent text in support of Critical Race
17  Theory, he states, quote, "the only remedy to
18  racist discrimination is antiracist
19  discrimination.  The only remedy to past
20  discrimination is present discrimination...The
21  only remedy to present discrimination is future
22  discrimination," close the quote within the
23  quote and close the main quote.

70

1  If a teacher were to teach that, would that
2  raise concerns under HB 2?
3  MR. KENISON-MARVIN:  Objection.  Vague.
4  Legal contention.
5  A  Again, depending on how the teacher was teaching
6  content.  Content itself.  Ibram Kendi's
7  material itself is not the subject as I
8  understand it to 193:40.  If the teacher, you
9  know, believes that we should teach students to
10  discriminate against others based on, from
11  193:40-I, you know, age, sex, gender identity,
12  sexual orientation, race, creed, color, then I
13  think that that would be a problem.
14  Again, I don't have adjudicatory
15  responsibility for that so these are my
16  opinions, but the intent of the OpEd is to say
17  we do not want discrimination in our New
18  Hampshire schools.
19  Q  And if a teacher were to say I want you to read
20  that book and focus on that paragraph, would
21  that raise concerns?
22  A  So again --
23  MR. KENISON-MARVIN:  Objection.

71

1  A  This is a book that is used in schools in New
2  Hampshire, and even if a teacher were to focus
3  on the book, the question would be you need the
4  broader context.  How is it that the teacher is
5  focusing on that particular passage.  If the
6  teacher were to focus on that passage with the
7  idea that we do not want to discriminate against
8  individuals based upon their age, sex, gender
9  identity, sexual orientation, race, creed,
10  color, marital status, familial status, mental
11  and physical disability, religion or natural
12  origin, it might be a very compelling lesson.
13  Q  And would that disclaimer that you have just
14  quoted from be sufficient to take it out of your
15  areas of concern under HB 2?
16  MR. KENISON-MARVIN:  Same objections.
17  A  I'm not sure I understand the question.
18  Q  Very simple.  If the teacher were to recite just
19  the first material I quoted without in any way
20  adding the material you just quoted, would that
21  raise a matter of concern?
22  A  So --
23  MR. KENISON-MARVIN:  Same objection.

72

1  A  I would need to see it in its complete context.
2  Q  That's the complete context.
3  A  There is no circumstance where that's the
4  context.
5  Q  That's it.
6  A  So the purpose of the OpEd is that we want to
7  teach students about racism but not to be
8  racists.  So the determination of whether or not
9  a teacher is discriminating against someone or
10  teaching students that one group is inherently
11  superior to another would be a determination by
12  the Human Rights Commission.
13  Q  Now my question.  Please read it back.
14  (Requested portion read back by court reporter)
15  Q  I repeat my question.
16  MR. KENISON-MARVIN:  Same objection.
17  A  I just think it's a fallacious hypothetical.
18  Q  Forget whether it's fallacious, wrong, anything
19  you like.  I'm asking you would it raise concern
20  in your mind.
21  A  I can't adjudicate it because I don't have
22  enough information.
23  Q  That's all the information there is.

73

1  A    I can't adjudicate it then.  I don't have enough
2       information.
3  Q    So you would not form an opinion based on that?
4  A    I don't believe that I would ever be faced with
5       a set of circumstances that are limited to one
6       sentence out of context.
7  Q    Are you incapable of forming an opinion based on
8       that?
9  A    No.  I think it's very easy to form opinions
10      about things, and my opinion is that you have
11      provided insufficient context in your
12      hypothetical to be able to form an accurate
13      opinion.
14  Q   I didn't ask you whether it was accurate or
15      inaccurate.  I asked you if you could form an
16      opinion.
17  A   I'm not able to form an opinion based on that
18      limited --
19  Q   Fair enough.  Can a teacher say they agree with
20      Kendi?
21  A   I don't understand why they would not be able to
22      agree with Kendi.  The question that would come
23      back are is they teaching, instructing,

74

1       inculcating or compelling to express belief in
2       or support for any one or more of the following.
3       That one's age, sex, gender identity, sexual
4       orientation, race, creed, color, marital status,
5       any of these immutable characteristics is
6       inherently superior to those of another.  That
7       is the salient question.
8  Q    No, it isn't, sir.  My question is very simply
9       this.
10          Can a teacher say I agree with the
11      quotation by Kendi that is as follows and no
12      more.  "How to Be an Antiracist, a prominent
13      text in support of Critical Race Theory states
14      the only remedy to racist discrimination is
15      antiracist discrimination.  The only remedy to
16      past discrimination is present discrimination.
17      The only remedy to present discrimination is
18      future discrimination," unquote.  Can a teacher
19      say I agree with that premise?
20          MR. KENISON-MARVIN:  Same objection.
21  A   So there's insufficient information to
22      adjudicate that.
23  Q   I'm not asking you to adjudicate, sir.  I'm just

75

1       asking --
2  A    So I don't have the context.  So a teacher may
3       say I agree with Kendi as a rhetorical device to
4       stimulate conversation among students.
5  Q    So you would have no problem then, for example,
6       in allowing a teacher to put forward -- hear my
7       question, please.  You would have no problem
8       with a teacher putting forward Mr. Kendi's book
9       and focusing on that paragraph.
10          MR. KENISON-MARVIN:  Objection.  Vague.
11  A   So the teacher themselves would be in the best
12      position to know if they are teaching,
13      instructing, inculcating or compelling to
14      express a belief in or support for any one or
15      more of the following, as I've repeated, that
16      one's age, you know or this immutable
17      characteristic is inherently superior to another
18      one.  The teacher themselves have clarity of the
19      action that they are doing at that time.  I have
20      a hypothetical construct that is really limited.
21  Q   Let me ask you this question.  Do you have any
22      concern that Kendi's book with all of the
23      content in it is shown to students in class?

76

1  A    So it would depend on the context of how that
2       material was used in the class.
3  Q    Read the book.  That's the context.  The sole
4       context.  I'd like to you read the book, and we
5       will discuss it.
6  A    So now there's more context.  It would depend on
7       what that discussion is, and I would go back to
8       the statute, and I would say that the educator
9       themselves would have clarity if they are
10      teaching, instructing, inculcating or compelling
11      to express a belief in or support for one or
12      more of these following things.
13  Q   Have you ever read the book Stabbed?
14  A   I have not.
15  Q   Would you have any concern if a teacher said I'd
16      like you as an extracurricular activity to read
17      anyone of the following books:  Stamped, Kendi's
18      How to Be an Antiracist, or the book that I
19      mentioned earlier, A Good Kind of Trouble.
20      Would you have any problem with that?  Read any
21      one of those books in your free time.
22  A   So again --
23          MR. KENISON-MARVIN:  Objection.  Compound.

77

1  A    The jurisdiction of the Department is not on the
2       curricular materials in the school.  Right?  So
3       that's not in the scope of my responsibility to
4       administer the various materials that are used
5       in curriculum.
6  Q    If a complaint came in saying that the Kendi
7       book, the Stamped book, or the A Good Kind of
8       Trouble have been listed by a teacher as books
9       that kids should read in their free time, would
10      you have any problem in terms of how to handle
11      that complaint?
12 A    Again, the curricular materials that a school is
13      choosing are not within the domain of the
14      Department of Education.
15 Q    Then why is it that you went to the
16      superintendent and talked to them about A Good
17      Kind of Trouble?
18 A    Because they had a parent who was upset, and I
19      would assume if I were a superintendent and I
20      had an upset parent that I would want to know
21      about that trying to help them support their
22      families.
23 Q    But you just said that's not within your domain.

78

1           MR. KENISON-MARVIN:  Objection.
2  A    What is within the domain of the Department is
3       to make sure that the system is able to function
4       well, and part of functioning well is to make
5       sure that the constituencies are being served.
6           So as I support my superintendents, if I
7       have a complaint from a parent, I bring that to
8       the attention of the superintendent so they can
9       manage it appropriately.
10 Q    And that's because you believe it's within your
11      responsible area as the Commissioner of
12      Education, correct?
13 A    To support them, correct.
14 Q    And so in doing that, do you in any manner, way,
15      shape or form tell them that there are issues
16      concerning the prescription of any of the three
17      books I've just mentioned?
18 A    So --
19          MR. KENISON-MARVIN:  Objection.  Vague.
20      Legal contention.  You can answer.
21 A    I mean, if I have a conversation with the
22      superintendent, in a particular conversation
23      hypothetically I may express like I don't think

79

1       that's a very good book.  In fact, I think I
2       shared with you earlier the conversation that I
3       had with the superintendent, two assistant
4       superintendents and their principal, and I
5       expressed my perspective to them about the
6       literary quality of the particular book, but it
7       remains their determination whether or not
8       they're going to use that book.  So that is
9       purely an opinion that I have shared with them.
10 Q    That's exactly what I want.  And now tell me, if
11      you will, do you think that would have any
12      persuasive impact upon them?
13 A    I don't know the answer to that.
14 Q    Do you think it would have any persuasive impact
15      upon the teacher if that were communicated by
16      the superintendent to the teacher the
17      Commissioner of Education has said he doesn't
18      think that's a very good book.
19          MR. KENISON-MARVIN:  Objection.  Vague.
20      Calls for speculation.
21 A    I think it would depend on how the
22      superintendent communicated that to the teacher.
23 Q    You just said the Commissioner of Education has

80

1       told us that's not a very good book.  Do you
2       think that would have a persuasive impact on the
3       teacher?
4           MR. KENISON-MARVIN:  Same objection.
5       Vagueness, speculation.  You can answer.
6  A    So I will speculate we have very capable
7       superintendents in the State of New Hampshire
8       who would take a piece of information like that
9       and they would manage it well to provide
10      constructive feedback to any of their educators.
11 Q    Thank you.  Give me just two minutes if I may.
12          One more question about this OpEd.  Did
13      anybody assist you or work with you in the
14      drafting of Exhibit 4?
15 A    I don't have any specific recollection, but
16      normally when I'm writing an OpEd it could be
17      that my Public Information Officer would be
18      assisting me and proofreading it.
19 Q    Anyone else?
20 A    I don't recall.
21 Q    Now, sir, I would like to show you a document I
22      don't think has yet been marked.
23          I ask you to take a look at Exhibit 14,

81

1    please.
2        Now, the second page of Exhibit 14 is an
3    OpEd that you wrote captioned Education's Sacred
4    Trust.
5    A    That's correct.
6    Q    If you prefer I can give you a blownup version
7    unless you can read that with ease.
8    A    I'll put my glasses on.  Okay.  I've read the
9    OpEd.  Not the attachments.
10   Q    Did anyone assist you in writing that OpEd?
11   A    Again, it may be that my Public Information
12   Officer reviewed a draft of it, but otherwise I
13   don't know.
14   Q    Anyone else?  You don't remember.
15   A    Not that I recall.
16   Q    Now, you'll see that in that document there is a
17   link to some external materials.  Correct?
18   A    Correct.
19   Q    Who compiled those materials?
20   A    I did.
21   Q    Pardon me?
22   A    I did.
23   Q    Okay.  And did you read them before you referred

82

1    to them?
2    A    I did.
3    Q    And you referred to those as, quote,
4    "exemplifying," quote, "actual instructional
5    material from New Hampshire schools that parents
6    have identified as conflicting with their
7    values."
8    A    That's correct.
9    Q    Now, what I would ask you is a couple of very
10   quick preliminary questions.  Where were the
11   materials obtained by you?
12   A    So generally they would have come into me via an
13   email or perhaps they came in directly to Rich
14   or Diana, and they were brought to my attention
15   or they may have come in to Stephen Berwick or
16   someone else in the organization.  So some place
17   here they came to my attention.
18   Q    And did you ask whether consents had been
19   obtained from either the person who photographed
20   the photographs that are part of it or any of
21   the materials that are in there to
22   republication?
23   A    I don't believe so.

83

1    Q    You saw, of course, that there are photographs
2    in there, correct?
3    A    Correct.  In the exhibit.
4    Q    And did you ask whether consents had been
5    obtained from the people who were photographed?
6    A    I did not.
7    Q    I'm going to show you a document that's been
8    Bates marked DOE 07053, and ask if you have seen
9    it before, and then I'm going to ask that it be
10   marked as an exhibit.
11       MR. BISSONNETTE:  For simplicity, this has
12   been previously marked as Exhibit 31.
13   Q    Have you seen that document before?
14   A    Let me just read it real quickly.
15   Q    For the record, I said 053 so it's 054.
16       Look at Exhibit 32, Nate.  I'm going to
17   give you 32 as well.
18       MR. KENISON-MARVIN:  Would you like me to
19   hand him 32?
20       MR. MOERDLER:  Yes.
21       MR. KENISON-MARVIN:  This one is marked
22   yellow, but all the others are gray.  It's not
23   the --

84

1        MR. BISSONNETTE:  Yes.  The reason is I
2    copied that internally, not externally, because
3    it is marked Confidential under Protective
4    Order.
5        (Discussion off the record)
6        MR. BISSONNETTE:  32 is marked
7    confidential.  Not 31.  I comply with protective
8    orders.
9    A    So your question.
10   Q    All right.  Now, my first question is did you
11   see this document before?
12   A    32?
13   Q    31.
14   A    I have seen 31.
15   Q    And 32 is the attachments to 31.
16   A    Sorry.  32 is?
17   Q    Yes.
18   A    So not all of 32.
19   Q    I believe --
20   A    32 has an email that's not associated with it so
21   what you're asserting is the attachments to 31
22   are pages 2 through the end but not the first
23   page of 32 because that's something different.

85

1  Q   Not the first page.  That's absolutely correct.
2  A   Okay.  So I'll stipulate that if you think these
3      are the attachments I don't know because I don't
4      have these.
5  ██████████████████████████████████████
   ████████████████████████████████
   ████████████████████████████████████████████
   ██████████████████████████████████████
   ██████████████████████████████████████████
   ██████████████████████████
13 Q   Let me go off the record for a moment.
14          (Discussion off the record)
15 Q   If you will take a look at Exhibit 14, the
16     document --
17          MR. KENISON-MARVIN:  Is this for me or the
18     witness?
19 Q   Both of you.  It's on the record.
20          Look at the document that's marked, it's
21     already part of the court record, I might add.
22     The document that's marked at the bottom PL
23     00696.

86

1  A   Just that page, 696?  Then your question?
2  Q   ████████████████████████████████
   █████████████████████████████████████████
   ████████████████████████████████████
   ███████████████████████████████████████████
   ████████████
   ████████████
   ████████████████████████████████████
   ██████████████████████████████████████████
   ████████████████████████████████████████
   ████████████████████████
   ██████████████████████████████████████████
   ████████████████████████████████████████
   ████████████████████████████████
   █████████████████████████████████████████
   ██████████████████████
   ████████████████████████████████████████████
   ██████████████████████████████████
   █████████████████████████████████████████

87

1  ██████████████████████████████
2  A   There's topic dividers in there, and the topic
3      that you initially referred to was Topic One and
4      now we're on Topic Five which begins on page PL
5      00714.
6  Q   So let me take this piece by piece if I may.
7  A   Okay.
8  Q   That's the only way I can do it rationally.  You
9      have seen Exhibit 31 before, correct?
10 A   31, I've now read that and I believe I've seen
11     31 before, yes.
12 Q   And you have seen Exhibit 32 before.
13 A   I have not seen Exhibit 32.  I've seen the
14     attachments to Exhibit 32.
15 Q   And you had not previously seen 32.
16 A   No.
17 Q   If you will look at Exhibit 32 so we complete
18     it, other than the -- may I see 32 for a moment,
19     please?  Other than the top 2, 4, 6, 8 lines, it
20     is Exhibit 31.  Is it not?
21 A   It's not because Exhibit 31 includes content at
22     the top as well that's not part --
23 Q   That's what I said.  That's what I said.

88

1  A   Actually you referenced the header at the top of
2      32 but Exhibit 31 similarly has information.
3  ██████████████████████████████████████
   ████████████████████████████████████████████
   ████████████████████████████████████
7  Q   Right.
8  A   The content of that email appears to be --
9  Q   Included in.
10 A   -- consistent between Exhibits 31 and 32.
11 Q   And so are the attachments, are they not?
12 A   So there are no attachments on 31.  There are
13     just references to attachments.
14 Q   Right.  Okay.
15          MR. MOERDLER:  Nate, I'm going to ask that
16     you produce for us a copy of the full text of
17     ████████████████████████████████████████████
   ████████████████.  That means including the exhibits,
19     not just the references.
20          MR. KENISON-MARVIN:  31 exhibits?
21          MR. MOERDLER:  Yes.
22          MR. KENISON-MARVIN:  I'll look at and see
23     if that's been done or not.  I'll take your





89

1    request.  I will represent to you that I will
2    look.  I can do it during a break as well.
3         MR. MOERDLER:  Okay.
4         MR. BISSONNETTE:  I didn't mean to
5    interrupt.  I can just say that I'm on
6    Relativity right now and have looked at the
7    documents after Bates stamped DOE 7054 in
8    Exhibit 31 and just haven't seen the exhibits.
9         MR. KENISON-MARVIN:  I'll take a look.  I
10   can do it now.  I can do it during a break later
11   and see.
12        MR. MOERDLER:  Let's do it so we know we're
13   talking about the same things as apples and
14   apples.
15 A    The other thing that I will stipulate is that
16   you put on the record there was an email from
17   ███████ to Commission Edelblut, and that's not
18   the case.
19 Q   Say that again?
20   ████████████████████████████████
     ████████████████████████████████████
     ███████████████████████████████████
     ██████████████████████████████████████

91

1    going to ask that you mark as a separate number
2    a copy of a communication from DOE
3    Communications Office to Commissioner Edelblut
4    with a series of 11 attachments as a separate
5    exhibit; is that correct?  Is that stipulated?
6    Those are the attachments.
7         MR. KENISON-MARVIN:  That the document that
8    you're holding, it has, the email on top is the
9    email that is document --
10 Q   This document is complete; is that correct?
11   Both as to the document itself and the
12   attachments.
13        MR. KENISON-MARVIN:  It has all of these
14   attachments.
15        MR. MOERDLER:  Correct.
16        MR. BISSONNETTE:  Is that, this document,
17   Exhibit 40?
18        (Exhibit 40 marked as an exhibit)
19        MR. MOERDLER:  Mr. Attorney General,
20   Mr. Bissonnette, we are agreed, are we not, that
21   Exhibit 40 is subject to the same protective
22   order that has previously been entered into
23   respecting confidentiality of documents.

90

1    ████████████████████████████
2  A   Thank you.  Just trying to be precise.
3  Q   I stand corrected.
4  A   If you wanted to stipulate that these may be the
5    attachments --
6         MR. KENISON-MARVIN:  I want to take an
7    opportunity to look and see what's going on.
8         MR. MOERDLER:  I'm going to make the
9    assumption that they are, although they haven't
10   been produced, just for simplicity's sake, all
11   right, without prejudice to you're saying they
12   weren't attached, all right?
13        MR. KENISON-MARVIN:  If you're comfortable
14   going forward on that basis.  I'm also happy to
15   take a look now and get you an answer.
16        MR. MOERDLER:  Go ahead.
17        MR. KENISON-MARVIN:  If we want to go off
18   the record.
19 Q   Sure.
20        (Lunch recess taken 12:31 - 1:15 p.m.)
21 Q   Madam reporter, I'm going to mark a document,
22   portions of which have previously been referred
23   to albeit they were not complete.  So I'm now

92

1         MR. KENISON-MARVIN:  Yes, I'll agree with
2    that.  Thank you for bringing it up.
3         MR. BISSONNETTE:  Yes.  Plaintiffs
4    Philibotte and Mejia are on board.
5  Q   Commissioner, I ask you to place before you
6    Exhibit 40, and I ask you to note a couple of
7    things.  █████████████████████████████
     ██████████████████████████████
     █████████████████████████████████████████
     ███████████████████████████
     ███████████████████████████████████████
     ███████████████████████████████████
     ████████████████████████████████████
     ████████████████████████████
17 Q   Okay.  Now, did you at some point become aware
18   of Exhibit 32?
19 A   So the first time I've seen this is today.
20 Q   Were you aware there was such a document without
21   seeing the document itself?
22 A   I was not aware of it.
23 Q   ██████████████████████████████████████



93

1 ███████████████████████

███████████████

4        Now, would you tell me, your OpEd was
5        written in April of 2021, correct?
6  A    That would be Exhibit 4?  What exhibit am I
7        referring to?
8  Q    It's 14.
9  A    Okay.  14.  Got it.  Okay.
10 ████████████████████████████████████

12 A    So your question is when was that OpEd written?
13 Q    I didn't ask the question.
14 A    Oh.  You had mentioned a date.
15 Q    I know.
16 A    I'm trying to understand what the question was.
17 Q    When was that OpEd written?  I have April 15,
18       2022.
19 A    That's when it looks like it was released on the
20       Department of Education's website.  I don't know
21       when I was actually published.
22 Q    Okay.  It was separately published in the Union
23       Leader at some point?

94

1  A    Correct.

███████████████████████████

████████████

██████████████████████████████

█████████████████████████

██████████████████████████████

███████████████████

██████████████████████████████████

████████████████████████████

██████████████████████

███████████████████████████████████

███████████████████████████

███████████████████████████

██████████████████

16 Q    Fine.  Now, would you tell us what you did with
17       Exhibit Number 40 upon receipt?
18 A    I don't recall exactly.  I imagine that I
19       somehow got the content of that information to
20       Rich Farrell.
21 Q    Did you get any report from Rich Farrell with
22       respect to that document?
23 A    If I did, I don't recall what that was.

95

1        MR. MOERDLER:  Nate, for the record, would
2  you please check the files to see if there's any
3  responsive material at all to Exhibit 40?  In
4  other words, when the Commissioner received it,
5  what did he do with it, are there any documents,
6  I'm looking for documents.
7        MR. KENISON-MARVIN:  I understand.  I'll
8  look.
9        MR. MOERDLER:  Is it logged, was it sent to
10 Farrell, if it was sent to somebody, did that
11 person report?  On his end it ends with the
12 receipt here.
13       MR. KENISON-MARVIN:  Understood.  I'll
14 look, and there are privilege logs forthcoming.
15 That's been something as we try to work through
16 discovery that we are getting to them as we've
17 indicated as quickly as we can.
18       MR. MOERDLER:  Do you have a sense it was
19 privileged?  Farrell's?
20       MR. KENISON-MARVIN:  There have been, there
21 are documents that are being withheld from being
22 delivered on process privileged grounds with
23 respect to communications amongst Department

96

1        members about deliberating with respect to
2        issues that the Department is deciding.  So that
3        will all be logged.  I can't tell you right now
4        if there's one that relate to this series of
5        emails, but I can look specifically.
6  Q    Let me ask a question.  If you object, you'll
7        object.
8        MR. KENISON-MARVIN:  Sure.
9  Q    Do you recall either your communicating or your
10       asking someone else to communicate with
11       Mr. ██████ that he should communicate with
12       HRC?
13 A    So I don't, I don't have any recollection of
14       communicating directly with Mr. ████████ on this
15       matter.
16 Q    Do you have any recollection of having asked
17       somebody else to do so?
18 A    And I don't have any recollection of asking
19       somebody else to do so.
20 Q    Do you have any recollection somebody else did
21       so even without asking you?
22 A    I don't know if they have or have not.
23 Q    Just completing the circle.



97

5   Q   Exhibit 14 was published on the 15th of April of
6        the year 2022.
7   A   Yes.

98

1   A

3   Q   All right.  And if you did, do you have any
4        recollection as to why you picked these items
5        bearing in mind this is some six months after
6        publication some six months after receipt?  Do
7        you have any recollection as to had you marked
8        it as something to follow up on or what?
9              MR. KENISON-MARVIN:  Objection.
10             MR. MOERDLER:  I know it's multiple,
11        compounded, and I acknowledge that.  I can do it
12        piece by piece.  Correct?
13             MR. KENISON-MARVIN:  Objection.  Vague.
14        Compound and calls for speculation.
15             MR. MOERDLER:  I know it's compound.  We'll
16        do it slowly.
17

99

1              You have acknowledged that you did the
2        compilation of the materials that are in Exhibit
3        14.
4   A   Okay.

100

9              MR. KENISON-MARVIN:  Objection.  Assumes
10        facts not testified to.  Misstates prior
11        testimony.
12             MR. MOERDLER:  I'm sorry?
13             MR. KENISON-MARVIN:  Assumes facts not
14        testified to and misstates prior testimony.
15             MR. MOERDLER:  All right.  We'll go through
16        it.
17             MR. KENISON-MARVIN:  I can explain my basis
18        if you want me to.
19             MR. MOERDLER:  No, it's going to take too
20        long.  Let's do it again.
21



**101**

16  Q    And you did not have a separate memorandum or
17        notation, this is important, we'll take a look
18        at it down the road?
19  A    No.  I have nothing like that.
20  Q    Do you know whether Exhibit 40 was the subject
21        of discussion at the misconduct, I call it
22        committee or group?
23  A    I don't have any recollection of this being part

**102**

1         of that conversation.
2   Q    Do you have any recollection that Exhibit 40 was
3         the subject of any conversation in or about
4         October of 2021 between you and either
5         Mr. Farrell or Ms. Fenton?
6   A    Yes.  So I have to assume it was part of some
7         kind of a conversation that took place.
8   Q    All right.  You testified, I believe, that you
9         did not communicate at any point with
10        Mr. _____ .
11  A    I don't believe I have, no.
12
16  Q    Do you have any reason to believe that anyone
17        associated with DOE communicated with
18        Mr. _____ prior to the publication in Exhibit
19        14?
20  A    I don't know the answer to that.
21  Q    Do you have any knowledge, information or
22        belief, and I'd like you to take a look at
23        Exhibit 40 as I ask that.

**103**

**104**

1
12            MR. BISSONNETTE:  That's Bates stamped
13        00321.
14            MR. MOERDLER:  Not on my copy.
15            MR. BISSONNETTE:  Oh, I'm sorry.  Carry on.



**105**

1 [redacted]

**106**

16 Q    Do you have any assumption concerning whether
17        either/or any of the principal, superintendent,
18        were notified of these claims?
19 A    So I don't have any knowledge as to what the
20        further action our agency would have taken with
21        regard to that.
22 Q    Are there any records that are maintained in the
23        ordinary course of business where your agency

**107**

1    notes that they have had a communication with a
2    superintendent and/or a principal concerning
3    these kind of matters?
4 A    It would depend upon the nature of the matter.
5 Q    Who would do that?
6 A    So it would depend on who is having the
7    conversation with the superintendent and what
8    the nature of the conversation was.
9        MR. MOERDLER:  Nate, if there have any
10    communication -- (cell phone ringing).
11        (Discussion off the record)
12        MR. MOERDLER:  Are there any records
13    that show that there were any communications, A,
14    within the Department of this, this being 40; B,
15    whether there are any communications within the
16    Department showing who they communicated with in
17    the school or the school district.  If you wish
18    to assert some form of privilege as to that I
19    would like to at least know that such occurred
20    without putting the comment on the content.
21        MR. KENISON-MARVIN:  I can represent to you
22    that in review of the documents, to the extent
23    there was a communication not within the

**108**

1    Department but a communication out to a school
2    official, documents have not been withheld.  We
3    have limited our search to the email
4    communications of the individuals we'd
5    identified at the beginning of discovery.  So to
6    the extent there would be communications that
7    wouldn't be within the emails of some other
8    individual, I can't rule out that possibility a
9    hundred percent, but to the extent there's a
10    communication that any of the individuals that
11    we've agreed to search, I can represent that to
12    the extent one of those individuals had a
13    communication regarding this matter with an
14    individual outside of the Department, I wouldn't
15    have withheld that document on the basis of
16    privilege.
17        MR. MOERDLER:  And could you just check if
18    there has been any communication with Messrs.
19    Farrell and Fenton in any way on this document?
20        MR. KENISON-MARVIN:  Just the question of
21    whether there was a communication.
22        MR. MOERDLER:  You know what will happen if
23    the answer is yes so you may as well save some

109

1   time.
2       MR. KENISON-MARVIN:  I mean, I'm happy to
3   look to, and you will, that would be logged,
4   too, you would see that in a privileged log.  So
5   I'm happy to, I think that that's fair question
6   for you to ask.
7       MR. MOERDLER:  And the last question is
8   since Mr. Berwick has said in writing he logs
9   everything that passes his desk, that's an
10  exaggeration, but would you check with him as
11  well?
12      MR. KENISON-MARVIN:  Who did you ask about?
13      MR. MOERDLER:  Berwick.
14      MR. KENISON-MARVIN:  Berwick.
15      MR. MOERDLER:  All right?
16      MR. KENISON-MARVIN:  So that we can keep
17  things moving here, I'll make sure that we're on
18  the same page.  Let's talk about this when we're
19  all wrapped up just to make sure we're on the
20  same page.
21      MR. MOERDLER:  Okay.  Good.
22 Q   Now, would you tell me, please, referring to
23  Exhibit 14, why these materials were included in

110

1   the article?  I know you said that you wanted to
2   use them as illustrative of something, and I'm
3   trying to understand what it is that you're
4   trying to communicate as the bottom line
5   message --
6 A   So I think that the OpEd is fairly
7   self-explanatory.  "When children come to school
8   they arrive reflecting the value systems of the
9   families responsible for raising them.  Those
10  value systems are as different as the children
11  themselves."  I'm going to -- if I continue on.
12      "Recent revelations from educators around
13  the country, mostly on social media platforms
14  like TikTok, reveal a number of educators who
15  believe that it is their responsibility to weigh
16  in on and influence the value systems of
17  children towards a particular goal.  This
18  impulse to influence a child's value system is
19  not limited to educators."
20      And -- then we talk about, I'll just keep
21  reading.  "As was recently revealed, Disney also
22  wants to weigh in.  It is not good enough simply
23  to allow parents and caregivers the

111

1   responsibility to install a value system they
2   believe is right for the child.  Whether it is a
3   rogue educator or a corporation trying to impose
4   a value system on impressionable youngsters,
5   that is not their job.  That is the job of
6   parents and caregivers.
7       "Fortunately, parents can choose to turn
8   off Disney.  They can't, however, easily escape
9   the efforts of activist educators who might be
10  knowingly dismantling the foundations of the
11  value system they're attempting to build.  That
12  means that families, when they send their
13  children to school, entrust educators to respect
14  the value systems that the family is building,
15  that this is the sacred trust that educators
16  have."
17      So the point of these examples is really to
18  flag or highlight content that individuals among
19  my constituencies have brought to our attention
20  that they believe may conflict with value
21  systems of the families of the children that are
22  in the schools.
23 Q   Do you within that framework believe it is not

112

1   the responsibility of teachers to influence the
2   value systems of the children toward a
3   particular goal such as "thou shalt not steal"?
4 A   So I believe that it is the responsibility of
5   the educators to support parents and support the
6   value systems of parents in the education of
7   children.
8 Q   And those values being whatever the parent deems
9   appropriate?
10 A  Well, so we have content standards that they
11  teach to students, and those content standards
12  are broad in terms of the content that they
13  have.  So for example, in our social studies
14  content standards, we talk about the importance
15  of law abiding, and stealing would not be law
16  abiding.  So the parents would know in advance
17  that this is the content that their children
18  might learn which is thou shalt not steal.  So
19  that would be a value system that the parent
20  understands entering into the system, that that
21  is a value system of our historical context that
22  will be presented to their children.
23 Q   I'm going to ask you, if I may, simply to

113

1    identify a couple of documents.  I'm going to

2    show you a document which has the Bates stamp

3    871, and we'll mark that as an exhibit.  It's a

4    document from you to "m41 hillsboroughnh."

5          (Exhibit 41 marked for identification)

6  Q    You've seen that before?

7  A    Hang on.  I'm just finishing reading it, if I

8    may.  Okay.  So I'm familiar with this email.

9  Q    This is an authentic copy of it?

10  A    I believe so.

11  Q    I'm going to show you a document that's been

12    Bates stamped DOE 00866 and ask you if you are

13    familiar with this document.

14          (Exhibit 42 marked for identification)

15  A    Let me just read this.  Okay.  I'm familiar with

16    Exhibit 42 now.

17  Q    That is a document that you --

18  A    I believe I'm familiar with it, yes.

19  Q    One more and we'll ask the question.  Same

20    question will apply on this document, your

21    familiarity with it.

22          (Exhibit 43 marked for identification)

23  A    So I'm familiar with all three of these.

114

1  Q    One more document.

2          I'll show you one more document and ask you

3    if you recall receiving this document from

4    Representative Louise Andrus on or about May 15,

5    2022.

6          (Exhibit 44 marked for identification)

7  A    I've reviewed all four documents.

8  Q    And do you recall receiving the document that

9    would be Exhibit 44?

10  A    I believe I did.

11  Q    Do you have any recollection of having responded

12    to it?

13  A    I do believe I had a conversation with

14    Representative Andrus.

15  Q    What did you say to her and what did she say to

16    you if you remember?

17  A    If I recall correctly, I encouraged her to talk

18    to the superintendent and indicate that the

19    titles of the books would be subject probably to

20    a Right-to-Know request and that collaboration

21    and cooperation might make it easier for both

22    parties to be able to satisfy the needs that Ms.

23    Andrus was seeking.

115

1  Q    I have one last question.

2  A    I believe as well I called the superintendent

3    and indicated to him that Representative Andrus

4    was inquiring about this matter also.

5  Q    One last question.  Do you have any recollection

6    of having suggested to Ms. Fenton and/or

7    Mr. Farrell at any point in time that they

8    should steer questions relating to possible

9    misconduct areas away from you or handle it

10    themselves?

11  A    I don't recall such a conversation.

12  Q    Would you have had such a conversation?  Would

13    you have suggested they take them away from you,

14    they should handle them without you?

15  A    So I don't believe so, and that would be

16    contradictory to our operation and function as

17    an agency.

18  Q    Thank you.  I thank you for your cooperation.

19          EXAMINATION

20  BY MR. BISSONNETTE:

21  Q    Thank you, Commissioner.  I know we have an hour

22    left, and I'm going to be as brief as I can.

23          Again, to introduce myself, I'm Gilles

116

1    Bissonnette with the ACLU.  I'm here on behalf

2    of the Plaintiffs Mejia and Philibotte.

3          Cindy, would you mind just reading back

4    that last response?  I just wanted to ask a

5    followup question.

6          (Requested portion read back by court reporter)

7  Q    Why would it be contradictory to how your agency

8    functions?

9  A    Because when the "committee" to use the

10    attorney's comment but basically when the Bureau

11    of governance meets to review various matters

12    associated with their work they're going to

13    bring to me anything that they think is

14    important for me to look at.

15  Q    And you are involved in the decision-making

16    process concerning whether something may

17    constitute a violation of the Code of conduct?

18  A    So I think I've described before how in that

19    meeting there's a presentation of various

20    matters in various stages of development, and

21    there is generally a recommendation from the

22    team in terms of if there was some type of an

23    action that we would take including gathering

117

1 additional information or something else, then I
2 would weigh in in that conversation on that.
3 Q   Do you view your role in those meetings as
4 accepting or rejecting the recommendations that
5 are presented to you?
6 A   No.  I review it as supervisory of a function in
7 the agency.
8 Q   But you're involved in the final approval
9 process then it sounds like; is that fair to
10 say?
11 A   Yes.  Can I just clarify that?
12 Q   Of course.
13 A   I'm involved in the final approval process when
14 it reaches a point of a final action that may be
15 taken.  It is possible that there are matters
16 that are resolved that either I have forwarded
17 over or have come in in other places that they
18 may take, act on, and it never rises to the
19 level of attention that they believe I need to
20 be part of that conversation.
21 Q   Is something that would reach your level of
22 attention included in the Department's
23 determination as to whether or not there's been

118

1 a violation of the Code of conduct?
2 A   Generally, if there's a violation of the code of
3 conduct, then I would know about it.
4 Q   Would you be involved in the final approval
5 process in determining whether, in the
6 Department's determination as to whether there's
7 a violation?
8 A   Yes.  So the way that most -- and quite frankly,
9 I'm going to conjecture a bit, speculate a
10 little bit, outside of my realm I would need to
11 confer with others in my agency relative to
12 this, but the work I'm involved with mostly is
13 oftentimes when there is a code of conduct
14 violation that's being evaluated by the
15 governance team, they are working with the
16 educator, generally the educator's legal
17 counsel, and reaching what I inartfully refer to
18 as kind of a plea bargain, an agreement in terms
19 of what action should be taken.  If no agreement
20 can be reached, then it's really not a
21 Department's action.  I believe at that point in
22 time it goes to a hearings officer and to the
23 State Board of Education.

119

1       So it's really my involvement is in that
2 process where there's some type of an agreement
3 reached with an educator and then I would sign
4 that settlement agreement.
5 Q   What if there's not an agreement reached and the
6 Department thinks there's a violation, how are
7 you involved in that process?
8 A   So generally not, I mean, I may have been
9 involved leading up to the point where there's
10 no agreement that's reached.  It's only ever
11 happened twice I think since I've been here.
12 And those matters then fall to Diana, and they
13 arrange for a Hearing Officer to hear it, and
14 then it goes before the State Board of
15 Education.  But my role, I'm no longer part of
16 that process.
17 Q   I don't mean to beat a dead horse --
18 A   No, no.  That's okay.
19 Q   But what I'm trying to understand is are you
20 involved in essentially what I'm going to call
21 like the charging decision.  That may not be the
22 right term for it, but that's what I'm really
23 trying to get at.  So I don't know if you can

120

1 describe your involvement in that piece.
2 A   So most of the time the way that it works is
3 that there's a recommendation made to me by my
4 governance team, and then we discuss how they
5 arrived there and if that seems like it's an
6 appropriate place.
7 Q   That's helpful.  Thank you.  I don't know
8 anything about this so I appreciate it, besides
9 what I've learned in this case.
10       I want to direct your attention,
11 Commissioner, to two exhibits that are already
12 before you that have been previously marked.
13 Exhibits 18 and 14.  So if you can just have
14 those in front of you.  I know you may already
15 have Exhibit 14 in front of you.
16 A   I don't know if I have 18.
17 Q   18 might be a new one for you.  Thank you.
18 A   Trying to keep track here.  And 14 is the other
19 one I do have.  Yes.
20 Q   Commissioner, this is the exhibit we talked
21 about.  So if you do need assistance, please let
22 me know in reviewing it.
23       So I'd just ask you, so my question which

121

1    is not a question is I just ask you to review
2    Exhibit 18 and let me know when you're done,
3    please.
4  A    So your question?
5  Q    I'm just going to direct your attention to the
6    page 10287 on Exhibit 18 with the line, can you
7    look into this.  Do you see the language?
8  A    Yes.  Well, I can't see it now, but now I can.
9  Q    Fair enough.  So that's the portion of the chain
10    that you are on; is that correct?
11  A    Correct.  I am on that portion of the chain.
12  Q    And if I direct your attention to the bottom of
13    that page on 10287, there is an email from Ms.
14    ███████ to you saying, "This was brought to my
15    attention today.  A Human Relations teacher at
16    the Londonderry High School gave these
17    worksheets out to students.  Is this allowed."
18    Do you see the language?
19  A    That's the very first string of the email.
20  Q    Exactly.  And the last two pages are those
21    worksheets.  Correct?
22  A    I can assume that they are, but I don't know.
23    I'd have to go back and look at the original

122

1    email.
2  Q    Okay.  I'm going to -- do you recall seeing
3    those worksheets on or around April 4th, 2022?
4  A    I mean, I may have.  I'd have to go back and
5    refresh my memory because I see a lot of
6    content.
7    (Court reporter admonition re simultaneous talking)
8  Q    I'm trying to cut to the chase.  All I'm really
9    trying to get at is demonstrating that that
10    attachment was in your April 2022 OpEd.
11    So now I'm going to direct your attention
12    to Exhibit 14 on Topic Seven, Bates stamped PL
13    735 to 737.  Do you see those?
14  A    I see those.
15  Q    Are those the same worksheets that are in
16    Exhibit 18?
17  A    They appear to be, yes.
18  Q    And in fact, did you get those worksheets --
19  A    So the only thing I would correct is that the,
20    on PL 00737 there are, in Exhibit 14 there's
21    redactions of responses, and those are not
22    redacted in 10289.
23  Q    Gotcha.  So thank you for that, and that's an

123

1    important clarification.  Are the pages in
2    Exhibit 14, Topic Seven, Bates stamped 736 to
3    737, the same worksheets that you received on
4    April 4th?
5  A    I believe they probably are, but without going
6    back to the original email, right?  But I
7    believe they probably are.
8  Q    Gotcha.  So your understanding is that these
9    worksheets in Exhibit 14 that we just
10    referenced, you received those about a little
11    over a week prior to the publication of your
12    April 15th OpEd receiving them from a Ms.
13    ███████, correct?
14  A    I believe so.
15  Q    We're done with that.  Thank you.  I just have a
16    couple other, well, few other questions.
17    There's a duty to report under the educator
18    Code of conduct, correct?
19  A    I believe there's a duty to report for every
20    citizen in the State of New Hampshire.
21  Q    What do you mean by that?
22  A    If someone believes that a child is being
23    abused, then they have a duty to report.

124

1  Q    Fair enough.  You're referring to New Hampshire
2    abuse and neglect statute?
3  A    Correct, which is a duty to report.
4  Q    Fair enough.  What I'm referring to, though, is
5    the duty to report in the Educator Code of
6    conduct.  Would you agree with me that there's a
7    duty to report under the Educator Code of
8    conduct?
9  A    Yes, I believe there is.
10  Q    And there's a specific provision in the
11    Education administrative rules governing the
12    contours of that duty to report obligation,
13    correct?
14  A    I believe so.  I haven't looked at that portion
15    of the rules in some time, but I believe that
16    there is a duty to report for educators relative
17    to misconduct.
18  Q    Fair enough.  That would include violations of
19    HB 2, correct?  Because HB 2 is part of the
20    Educator Code of conduct?
21    MR. KENISON-MARVIN:  Objection.  Vague and
22    legal contention.
23  A    So can you repeat the question?

125

1   Q     Could you read it back?

2          (Requested portion read back by court reporter)

3   A     So I believe, and I haven't looked at the

4          Educator code of conduct of recent, but I

5          believe that the code of conduct refers to RSA

6          354-A. I don't know if it makes reference to

7          193:40.

8   Q     I'd just refer you to Exhibit 1.

9   A     Which one?

10  Q     Exhibit 1.

11  A     Yes, I do. Okay.

12  Q     I'm just going to direct your attention to page

13         Bates stamped 07.

14  A     Okay.

15  Q     IV.

16  A     Yes.

17  Q     That says violation of this section by an

18         educator shall be considered a violation of the

19         educator code of conduct that justifies

20         disciplinary sanction by the state board of

21         education. Do you see that?

22  A     I do.

23  Q     So is a violation of HB 2 a violation of the

126

1          educator code of conduct?

2          MR. KENISON-MARVIN: Same objection.

3   A     So your initial question was is HB 2 part of the

4          code of conduct. I responded that RSA 354-A is

5          part of the educator code of conduct. This

6          states clearly that the violation of this

7          section by an educator shall be considered a

8          violation of the educator code of conduct that

9          justifies disciplinary sanction by the state

10         board of education.

11  Q     And that section is RSA 193:40, correct?

12  A     Correct.

13  Q     Okay. Sorry. I now understand why you said

14         what you said. Thank you for that.

15  A     Okay.

16  Q     Fair enough. No, I've got you. I'm going to

17         mark an exhibit here, and I do not know where we

18         are.

19         (Exhibit 45 marked for identification)

20  Q     When you're done reviewing Exhibit 45, just let

21         me know, please.

22  A     Okay. So I've read it.

23  Q     I'm just going to submit to you, Commissioner,

127

1          this looks like this is an exchange between you

2          and an individual named Kyle Sanborn who is a

3          member of the Gilford School Board. Is that an

4          accurate reflection of Exhibit 45?

5   A     He asserts that he is a member of the Gilford

6          School Board. I'm not intimately familiar with

7          that.

8   Q     Any reason to disbelieve --

9   A     No.

10  Q     There's reference here on the bottom of page 67

11         of Exhibit 45 that there is a section that you

12         will be referencing. Do you see that language?

13  A     I do.

14  Q     Where would you have referenced this -- strike

15         that.

16         I'll go back to that question. What

17         context would you have been referencing the

18         language at the bottom of page 67 of Exhibit 45?

19  A     So from the email and my recollection of the

20         conversation is he believed that there was, he

21         states in his email to me, and I think, I don't

22         see it in that email, but I believe it was part

23         of the conversation about a duty to report and

128

1          so I was trying to reference back to him this

2          duty to report.

3   Q     I guess what I'm interested in is the language

4          "that I will be referencing."

5   A     Yes.

6   Q     Where would you be referencing this is what I'm

7          trying to get at. Was there a presentation, a

8          speaking engagement? Is that what you were

9          referring to there?

10  A     I'm not certain. Because the email is a little

11         bit kind of chopped up as well. You'll see like

12         there's a certain font and is this correct and

13         it pastes something in then I have a statement

14         down below that says, and there's an aberrant

15         parentheses floating around in there, any

16         credential holder shall report any suspected

17         violation of code of conduct following the

18         school, the school district or the SAU reporting

19         procedures.

20         So I'm referencing this in this

21         conversation is what I believe I'm doing.

22  Q     Do you recall anything else about your

23         communications with Mr. Sanborn you haven't

129

1    testified to?

2  A   I believe that Mr. Sanborn was concerned about

3      the new law, and he was concerned whether or not

4      educators were following that.

5  Q   Did you ever have a communication with Mr.

6      Sanborn outside of what exists in Exhibit 45?

7  A   So the only the thing is I did, I met him at an

8      event up in Gilford.  Might have been the

9      Belknap County meeting and had a conversation

10     with him there.  That was the conversation I had

11     that I recall.

12 Q   Did you talk about the duty to report at that

13     meeting?

14 A   I don't recall that.

15 Q   Do you recall talking about HB 2?

16 A   I don't recall if I did what I might have said.

17 Q   We can move on from that document.  I promised

18     to be efficient.

19         The next exhibit is 46.

20         (Exhibit 46 marked for identification)

21 Q   So Commissioner, I'm actually, before you read

22     that, I'd also just ask you to pull Exhibit 29.

23     These two documents go hand in hand.  I don't

130

1    want to hide the ball here.

2  A   Do I have 29?  I don't recall having 29 yet.  We

3      just need to get that.

4  Q   Just let me know when you have both exhibits in

5      front of you.

6  A   Which one should I read first?

7  Q   I'm not going to have you read any right now,

8      but I'm sure that I'm going to have you to refer

9      to them.  Are you aware of a woman named Karlyn

10     Borysenko?

11 A   Maybe the name is vaguely familiar.  It's an

12     unusual name, but that's the extent that I have

13     for that.

14 Q   Okay.  So maybe I will direct your attention now

15     to the exhibits.  Your name is not on either of

16     them so that's why I hesitated to officially

17     direct your attention to them.

18         So first I'm going to direct your attention

19     to Exhibit 29 in the email from Mr. Farrell to

20     Karlyn Borysenko.  Do you see that email?  I

21     haven't asked you to read it yet, but do you see

22     the email I'm referencing?

23 A   So I see an email that says on August 24 at 9:37

131

1    Richard Farrell wrote.  It's unclear who that

2      was sent to although the respondent at the top

3      is Karlyn Borysenko.

4  Q   I know you're not on this email.  Have you seen

5      Exhibit 29 before?

6  A   Let me just read it?

7  Q   Of course.  Please do.

8  A   So I've read 29.

9  Q   So the bottom of page 29, Mr. Farrell tells Ms.

10     Borysenko, Commissioner Edelblut has forwarded

11     your inquiry directly to Ahni Malachi on 19

12     August 2022 for her review.

13         So my question is do you recall ever

14     sending an inquiry from Ms. Borysenko to

15     Director Malachi in August of 2022?

16 A   I don't have that recollection.

17 Q   Now I'm going to have to direct your attention

18     to Exhibit 46.

19 A   Okay.

20 Q   So exhibit, I would just represent to you

21     Exhibit 46, also a document you are not on, is

22     an email from Ms. Borysenko to the Human Rights

23     Commission but also copying Department of

132

1    Education.  What I'm referring to there is the

2      email at the bottom of page 9900 in Exhibit 46.

3      Do you see that?

4  A   I see an email from Karlyn to the Human Rights

5      Commission with a cc to DOE info and Rich

6      Farrell.

7  Q   So there are to two attachments to this email.

8      Exeter Regional School District Violation and

9      Exeter Regional School District Violation Data.

10     I'm going to submit to you on the version that

11     you have in Exhibit 46 you only have one of

12     those attachments.  We're sorting that out with

13     your counsel, but I wanted to flag this is not a

14     full and complete document with all the

15     attachments.

16         But my question to you is do you recall of

17     seeing this email on page 9901 of Exhibit 46 and

18     the HRC form that Ms. Borysenko completed also

19     in Exhibit 46?

20 A   Yes, I have no recollection of seeing either of

21     these.

22 Q   So you, I presume then it's fair to say you have

23     no recollection of ever forwarding this August

133

1    19th, 2022, complaint to Director Malachi?

2  A   Correct.

3  Q   Do you ever send complaints under HB 2 to

4    Director Malachi directly?

5  A   I don't believe I ever have.

6  Q   Okay.  Do you have any -- let me go back to

7    Exhibit 29.

8      Mr. Farrell represents that you forwarded

9    Ms. Borysenko's inquiry directly

10    Mr. Commissioner Malachi.  Would you have any

11    reason to think that Mr. Farrell is mistaken?

12  A   Or it could be that Mr. Farrell is referring to

13    the fact that it's possible that either he or

14    Diana forwarded something representing the

15    agency, and so maybe that's what he's referring

16    to when he's referring to that.

17  Q   Do you know one way or the other sitting here

18    today though?

19  A   No.

20      (Exhibit 47 marked for identification)

21  Q   Commissioner Edelblut, I'd just ask you to

22    review Exhibit 47 and let me know when you've

23    finished your review.

134

1  A   So your question?

2  Q   My question is you're on this email chain,

3    correct?

4  A   Correct.

5  Q   Did your Department ever respond to this press

6    inquiry?

7  A   I don't know the answer to that.

8  Q   Did you respond to this press inquiry?

9  A   I don't know the answer to that.

10  Q   Do you know if any of your colleagues at the

11    Department responded to this inquiry?

12  A   I don't know the answer to that.

13  Q   You can set it aside.

14      (Exhibit 48 marked for identification)

15  Q   After you've reviewed Exhibit 48, commissioner,

16    just let me know that you're done.

17  A   Yes.  Okay.  I've read it.

18  Q   Do you recall receiving this email from Ian

19    Huyett on Thursday, August 25th, 2022?

20  A   I do.

21  Q   Did you respond in writing to this email?

22  A   I believe I forwarded this to Diane.

23  Q   Do you recall Attorney Fenton responding to this

135

1    email?

2  A   I don't know what Attorney Fenton's actions were

3    with respect to this.  I believe she may have

4    had conversations with the Attorney General's

5    office.

6  Q   I guess my question is do you know whether or

7    not the Department had any communications with

8    Mr. Hewitt about this email after it was sent on

9    August 25, 2022?

10  A   I don't believe I've had any email

11    correspondence.

12  Q   Anyone from the Department have email

13    correspondence with Mr. Huyett?

14  A   Not to my knowledge.

15  Q   Anyone from the Department have verbal

16    communication with Mr. Huyett concerning the

17    contents of this August 25th email?

18  A   So I believe that Mr. Huyett followed up in a

19    conversation with me and asked me about it and I

20    indicated to him that I had referred it to my

21    attorney.

22  Q   Do you recall anything else about that

23    conversation sitting here today?

136

1  A   No.  I don't.  That was the gist of

2    conversation.

3  Q   How long did that conversation last?

4  A   I don't recall.

5  Q   So I'm going to ask you -- you can set that

6    aside, Commissioner, and I'm moving quickly as

7    you can see since I know we're getting close.

8      I'm going to have you again put before you

9    Exhibit 14 which are the topics to your April

10    2022 OpEd.  Do you have that in front of you?

11  A   I do.

12  Q   I'm going to direct your attention to Topic Ten

13    on Exhibit 14 which is Bates stamped 748 to 758.

14    Do you see that?

15  A   I do.

16  Q   What is Topic Ten?

17  A   So I believe that this is content that we

18    received from a parent that was about Exploring

19    Whiteness and Becoming an Anti-Racist, and I

20    believe that it takes place in a school district

21    as kind of an extra class.

22  Q   Was that parent Dan Richards?

23  A   I believe it was.

137

1  Q   I'm just going to, just closing the loop, so I'm
2      going to mark another exhibit.
3          (Exhibit 49 marked for identification)
4  Q   So do you have Exhibit 49 before you,
5      Commissioner?
6  A   Yes.
7  Q   I'm just going to represent to you what this is.
8      So this is portions of the legislative history
9      of HB 544 in which Mr. Richards submitted some
10     written testimony to the House Executive
11     Departments and Administration Committee, and
12     this is a reflection of what his testimony is.
13 A   Okay.
14 Q   Okay?  And I would just note that on Exhibit 49
15     Mr. Richards attaches a document entitled on
16     page 544 241, Exploring Whiteness and Becoming
17     an Anti-Racist Activist.  Do you see those
18     pages?
19 A   I do.
20 Q   241 to 244.  Correct?
21 A   Yes.  I'm just pointing out that they're
22     different than in 14.
23 Q   I was just about to do that.  So it looks to me

138

1      like --
2  A   Part of the syllabus was cut off at some point.
3  Q   Yes.  Page 241 in Exhibit 49 is the same thing
4      as page 749 in Exhibit 14.  Correct?
5  A   That's what it looks like other than there is a
6      notation on 00749 that's not on 0241.
7  Q   Those notations are, in addition to redactions
8      in page 749, you also have two handwritten
9      comments that say okay.  Am I correct?
10 A   Correct.  Those are the notations.
11 Q   Those redactions on page 749 are the Department
12     redactions, I presume?
13 A   Correct.
14 Q   Also going to turn your attention on Exhibit 14
15     to page 72 of 79 in the upper right.  Do you see
16     that?
17 A   Yes.
18 Q   Same page as page 243 in Exhibit 49.  Correct?
19 A   That looks correct.
20 Q   And it's the same for the next pages of those
21     documents, correct?  They're the same?
22 A   They appear to be.
23 Q   So I just want to make sure I understand that

139

1      the documents, the syllabus on Exhibit 49 that
2      Mr. Richards submitted to the House Executive
3      Department's Administration Committee is the
4      same document that you received from
5      Mr. Richards, a portion of which you attached as
6      Topic Ten to Exhibit 14; is that correct?
7  A   Correct.
8  Q   You can set that aside.
9          MR. KENISON-MARVIN:  Can I use the
10     restroom?
11         MR. BISSONNETTE:  Of course.
12         (Recess taken 2:33 - 2:38 p.m.)
13 Q   Commissioner, before you you should have two
14     exhibits, Exhibits 12 and 13.  Are they in front
15     of you?
16 A   They are.
17 Q   So I'm just going to represent to you that
18     Exhibit 12 is an Attorney General Memorandum
19     directed to the HRC.  Exhibit 13 looks to be
20     information, a reflection of a meeting that may
21     have occurred on September 8th, 2021, right
22     after the date that Exhibit 12 was issued.
23         So my question is do you remember a meeting

140

1      that took place on September 8, 2021, between
2      you and Director Malachi?
3  A   I don't remember specific -- I mean, I've had
4      various meetings with Ahni Malachi over the
5      years.  I don't remember a specific meeting on
6      that day.  To be clear as well, I don't actually
7      book my calendar.  That's done by a scheduler.
8  Q   Fair enough.  Fair enough.  I just noticed
9      because this is the date right after the AG memo
10     was issued so do you recall any meeting with
11     Director Malachi about Exhibit 12?
12 A   I don't.
13 Q   Okay.
14 A   In fact, I don't even recall a conversation with
15     Ahni Malachi about this AG memo.
16 Q   Fair enough.  When you typically meet with
17     Director Malachi on issues is it usually you two
18     that are present or are there other individuals
19     also that participate or does it depend?
20 A   It depends on what the issue is.  So Ahni
21     Malachi is also on the Board of Directors of one
22     of our charter schools.  So I see her in that
23     context, and I see her in a professional

141

1    context.  Generally if I'm meeting with Ahni
2    Malachi relative to any matter like this,
3    there's probably an Attorney General individual
4    who would be present.
5  Q   Okay.  You tell me if this isn't fair to say,
6    but I'm relying directly on your OpEd on Exhibit
7    4 just to not hide the ball, but is it fair to
8    say --
9  A   Exhibit 4.  Which one is that.  I do a lot of
10    OpEds.
11  Q   Teach children about racism.
12  A   Okay.
13  Q   So what I want to make sure is is it fair to say
14    that you supported HB 2?
15  A   So what I support is to make sure that children
16    and educators in New Hampshire are not
17    discriminated against in any way, shape or form.
18  Q   And in your view, as reflected in Exhibit 4,
19    they would be protected by HB 2 in your view,
20    right?
21  A   So can you repeat that question?
22  Q   Strike that.  I'm just going to refer you to the
23    bottom of Exhibit 4, page 398, quote, "The

142

1    guardrails outlined in this legislation recently
2    passed by the New Hampshire Senate help us to do
3    just that.  "Do just that" is the language that
4    precedes that sentence in the OpEd.  Do you see
5    that language?
6  A   I mean, it's all of the preceding language like
7    a summarizing sentence.
8  Q   I agree with that.  My question is you're
9    referring to HB 2 in that sentence, correct?
10  A   I quote aspects of that legislation in there
11    that are, I believe, excerpts from RSA 193:40,
12    and so I do believe that that law will help
13    protect our teachers and our students from being
14    discriminated against.
15  Q   And, in fact, you say on the opening sentence of
16    this OpEd it's important, correct?
17  A   I think it's important to make sure that our
18    students are not discriminated against and our
19    teachers are not discriminated against.
20  Q   So you think it's important.
21  A   I think not discriminating is important.
22  Q   When you say "not discriminating," what you're
23    referring to are the provisions that refer to HB

143

1    2, right?
2  A   I believe those are contributing to that.
3    Clearly, I've not in this OpEd excerpted the
4    entire content of Exhibit 1.
5  Q   Um-hum.
6  A   But I think that these are components that help
7    us toward that mission.
8  Q   I'm not trying to hide the ball here.  What I'm
9    just trying to get is, Commissioner, you say
10    twice in this OpEd, the last line and the first
11    line, "legislation recently passed by the New
12    Hampshire Senate."  That's HB2 as reflected in
13    Exhibit 1, correct?
14  A   Say that again?
15  Q   Sure.  You say in the first line and the last
16    line of your OpEd as reflected in Exhibit 4,
17    you're referring to legislation recently passed
18    by the New Hampshire Senate.  You see both of
19    those references?
20  A   Yes.
21  Q   In there you're referring to HB 2, right?
22  A   I'm referring to specifically the components of HB
23    193:40, but I believe that the other parts of HB

144

1    2 potentially are contributory to that, but this
2    OpEd is focused on those elements of 193:40.
3  Q   I got you.  That's fair.  I see what you're
4    saying.  So the language though that you're
5    referring to on both the first sentence and the
6    last sentence on Exhibit 4 is if I now turn your
7    attention to Exhibit 1 the provisions of RSA
8    193:40.
9  A   Well, so not all of 193:40, but specifically
10    193:40-I(a), (b), (c), and (d) which are in my
11    mind the provisions that the legislation passed
12    in order to try and not result in
13    discrimination.
14  Q   In those provisions that you just referenced, is
15    it fair to say based on the language in your
16    OpEd that you supported that language?
17  A   So I believe as I have indicated in this OpEd
18    that that will help avoid discrimination against
19    our educators and our students in New Hampshire.
20  Q   You're saying something a little bit different
21    from what I'm asking which is did you support
22    that language?
23  A   So I don't know what you mean by "support that

145

1   language."
2   Q   Did you oppose it?  Did you oppose the language?
3   A   So I don't have an opportunity to vote yes or no
4       on any particular piece of legislation, and so
5       in this OpEd I'm reflecting my opinion that
6       those aspects of RSA 193:40 that are referenced
7       and summarized in this OpEd are important
8       towards avoiding discrimination of our students
9       and our students in New Hampshire.
10  Q   And in your view they're also needed, correct?
11  A   Well, I believe that those provisions will help
12      avoid discrimination of students and educators
13      in the state of New Hampshire.  Whether or not
14      they're needed is a determination that the
15      legislature has to make.
16  Q   I'm just using your language, Commissioner.  I
17      don't mean to fight you on this, but you say in
18      the opening sentence of Exhibit 4 that it's
19      needed.  That was your position, correct?
20  A   Yes, it is.
21  Q   Okay.  So I'm just going to ask you again.  Is
22      it fair for me to characterize Exhibit 4 as
23      reflecting the Department of Education's support

146

1       for the provisions of HB 2 reflected in RSA
2       193:40 that you mentioned just moments ago?
3   A   I think the better way to understand this OpEd
4       is that I as the Commissioner of Education
5       believe that we do not want to, and as the
6       title, states, right?  We want to teach our
7       children about racism and not to be racist so
8       that is the intent of this OpEd.
9   Q   And the portions that you referenced before in
10      RSA 193:40 would do that in your view, correct?
11  A   I believe that they will contribute to that.
12  Q   And therefore in your view that language is
13      important and needed, correct?
14  A   So I believe that that language is needed in the
15      context of being helpful towards making sure
16      that our teachers and our students are not
17      discriminated against.
18  Q   Okay.
19          (Exhibit 50 marked for identification)
20  Q   Before I direct your attention to Exhibit 50,
21      does the Department of Education take positions
22      on legislation?
23  A   We do not take positions on legislation.  We

147

1       simply provide legislators with either the
2       benefits or the negative consequences as we
3       understand them associated with proposed
4       legislation.
5   Q   You're familiar with the parental bill of rights
6       legislation?
7   A   I am.
8   Q   Did the Department of Education take a position
9       on that piece of legislation?
10  A   We did not.
11  Q   Did the Department of Education tweet about the
12      outcome of that bill this week?
13  A   I believe it did.
14  Q   Do you recall a statement, quote, "The New
15      Hampshire Department of Education is
16      disappointed with the indefinite postponement of
17      SB 272 by the House and is hopeful that this
18      conversation will continue since it is possible
19      to simultaneously support students, educators,
20      and parents."  Do you recall that?
21  A   So I believe that that is a partial reflection
22      of a statement that this Department put out.
23  Q   You don't think that that tweet reflects the

148

1       Department's support for SB 272?
2   A   So similar to the OpEd which was put out after
3       the legislature acted on the legislation and
4       that tweet which was put out after the
5       legislature acted on it, we are simply
6       reflecting what we believe are the benefits or
7       detrimental effects of certain legislation.
8   Q   So I just want to make sure I understand your
9       testimony.  You don't believe that tweet that
10      was published last week to reflect the
11      Department's support for that bill?  You don't
12      interpret it that way?
13  A   So what I would understand that to be is it's
14      not possible to support something that is no
15      longer a bill and is indefinitely postponed.
16  Q   Okay.  I may have misheard this, Commissioner.
17      I apologize if I did, but there was some
18      reference before to the book, How to be
19      Antiracist, by Ibram X. Kendi.  Do you remember
20      generally talking about that book earlier today?
21  A   I believe it came up in your line of
22      questioning.
23  Q   I believe it did.  So I want to just direct your

149

1    attention to page 19 of what's been photocopied.
2    The language that is underlined.  I just want to
3    make sure that's the language that you quoted in
4    your OpEd on Exhibit 4.  Correct?
5  A  I can go look.
6  Q  Okay.
7  A  So I, the language looks similar.  I do note
8    that there's a "dot dot dot" in my quotation in
9    my OpEd so it could be that my quotation, I
10   don't recall exactly where I got it from, but it
11   could be from a presentation that Mr. Kendi
12   provided some place as opposed to quoting
13   directly out of that text, but he may have been
14   quoting the text himself, and I quoted that.
15 Q  Where did you get that quote then in Exhibit 4?
16   Do you recall?
17 A  I don't recall where I got it.
18 Q  Have you read the book How to be an Antiracist
19   by Ibram Kendi, portions of which are reflected
20   in Exhibit 50?
21 A  I have not, and I think I represented that
22   already.
23 Q  Before you were given Exhibit 50 moments ago,

150

1    had you seen the language around the underlying
2    portions of Exhibit 50 before today?
3  A  So can you repeat that question?
4  Q  Could you read it back?  See if I can do a
5    better job.  I might not be able to.
6    (Requested portion read back by court reporter)
7  A  So to be precise, I've not seen the language in
8    the text of the book.  I've seen the language
9    from other presentations made by Mr. Kendi, and
10   they are similar.
11 Q  They're similar.  Did those other references
12   that you've seen of Dr. Kendi's quotes, did it
13   include contextual language like the contextual
14   language that surrounds the underlined quote on
15   page 19 of Exhibit 50?
16 A  I don't recall.
17 Q  I'm going to -- my notes are all over the place.
18   This is what happens when you bat cleanup.  So
19   I'm going to come back to this, but I want to
20   probe a little bit more into your testimony with
21   respect to kind of what teaching means, and so
22   I'm going to direct your attention back to
23   Exhibit 1, and in particular the language on PL

151

1    00006 that says on line 24 to line 25, "No pupil
2    in any public school shall be taught,
3    instructed, inculcated or compelled to express
4    belief in, or support for, any one or more of
5    the following."  Do you see that language?
6  A  I do.
7  Q  So here I'm not talking about the four concepts
8    below.  I just have some questions about that
9    specific phrase.  So that's what I want to get
10   at.
11   So is there written criteria that the
12   Department has that defines what it means to
13   teach, instruct, inculcate or compel to express
14   belief in or support for something?
15 A  I would need to make reference to other people
16   in the agency to get a more specific response to
17   that question.
18 Q  We have done that, in fairness, but I just want
19   to ask you are you aware of any written criteria
20   that defines those terms on page 00006 of
21   Exhibit 1, lines 24 to 25?
22 A  So I'm not familiar with them.
23 Q  So is there any written criteria that you're

152

1    aware of in the Department that explains whether
2    or not a read-along would constitute teaching,
3    instructing, inculcating or compelling to
4    express a belief in?
5  A  I don't know the answer to that.
6  Q  You mentioned rhetorical devices as a possible
7    device that teachers may use.  Is there any
8    criteria within the Department that explains
9    what rhetorical devices a teacher may use that
10   would or would not constitute teaching,
11   instructing, inculcating or compelling to
12   express a belief in?
13 A  So I'm not aware of that.
14 Q  Is there any criteria within the Department that
15   explains whether assigning a book to students to
16   read constitutes teaching, instructing,
17   inculcating or compelling to express a belief?
18 A  I would have to make reference to others in the
19   agency.
20 Q  Sitting here today, are you aware of any?
21 A  Am I aware of any?  Could you repeat that?
22 Q  Could you just restate my last question?
23   (Requested portion read back by court reporter)

153

1  A   So I would have to reach further into the agency
2      to determine that.
3  Q   But sitting here today, are you aware?
4  A   I'm not aware of what those might be.
5  Q   So now I want to go back to now Exhibit 50, and
6      I want you to just assume for, and I'm
7      referencing the underlying language on Exhibit
8      50 that's also in your OpEd. I want you to
9      assume that a teacher has taught, instructed,
10     inculcated that underlined language. If that's
11     true, would that underlined language fall under
12     any of the four concepts lines 26 to the next
13     page on line 3.
14        MR. KENISON-MARVIN: I'll object to the
15     legal contention, and you can answer.
16  A  So I will start with the fact that it's not my
17     job, it's not within the purview of my
18     responsibility to adjudicate whether or not
19     certain actions by an educator would be some
20     type of an action under 193:40. So I can
21     speculate if that's where you want me to go.
22  Q  I would like you to speculate. How would you
23     speculate?

154

1  A   So the question then again is?
2  Q   The question then is if a teacher taught or
3      instructed, those two sentences that are
4      underlined on page 50, would it fall in your
5      view under any of the four concepts that are
6      listed on page 6 of Exhibit 1, line 26, to line
7      3 on page 7?
8  A   Am I allowed to write on this one?
9  Q   I can give you a copy.
10  A   I want to just go through and underline all the
11     principals and run each of them through my head.
12  Q   Please do. This can be your copy.
13  A   The question is with respect to this underlined
14     language in Exhibit 50?
15  Q   Um-hum.
16  A   So to your question, I think it would depend
17     upon the context of the instruction. The
18     content of Exhibit 50, again, content
19     being neutral, it's what you do with that
20     content.
21  Q   So my question is a little different, and I'll
22     explain why. So what I'm trying to do is parse
23     out teaching, instruction, and inculcating which

155

1      is kind of element one of the statute with
2      element 2 of the statute which is whether that
3      teaching, instruction or inculcating fits within
4      one of the four concepts. So what my question
5      is trying to do is assume that this would meet
6      the definition of teacher inculcate. So I'm
7      going to now reframe my question.
8         If a teacher taught, instructed or
9      inculcated students along the lines of what's
10     been underlined on Exhibit 50 that you also
11     quote in your OpEd on Exhibit 4, would that fit
12     any of the four concepts that are listed at the
13     bottom of page 6 and go on to the beginning
14     of 07?
15        MR. KENISON-MARVIN: I'll make the same
16     objection. Vagueness. Legal contention and
17     compound. And it represents the nature of the
18     first elements of the statute. You can answer.
19  A  So I think that it would be most clear in the
20     mind of an educator to determine whether or not
21     in teaching the text that you refer to in
22     Exhibit 50 if they are teaching that, one, a
23     group in this list of things is inherently

156

1      superior, that one group is inherently racist,
2      that one group receives adverse treatment or
3      should receive adverse treatment and should be
4      discriminated against or receive adverse
5      treatment solely because of those
6      characteristics or that they cannot and should
7      not attempt to treat others without regard to
8      those items.
9         So those are the four salient questions
10     that I think an educator would ask relative to
11     any content. Am I teaching that the inherent
12     superiority, the inherently racist, the adverse
13     treatment, and to not attempt to treat others
14     without regard to.
15  Q  I hear you. My question is a little different.
16        My question is would a teacher if they
17     taught that underlined language be teaching a
18     banned concept under the statute?
19  A  So there's not enough knowledge to know what the
20     question is. Is that teacher when they are
21     teaching this part of the context, are they
22     teaching that there is an inherently superior
23     group, an inherently racist, a group that should

157

1    receive adverse treatment solely or probably
2    because of these characteristics or that they
3    cannot and should not attempt to be treated
4    without regard to these characteristics.  So
5    that is really, you have to see the context of
6    what's taking place.
7  Q    Here though the context is, as I'm saying, they
8    are teaching or inculcating, that language
9    that's underlined.  So my question is if they
10    are teaching or inculcating that principle that
11    is underlined, would that fit any of the
12    concepts?
13  A    So again, you'd have to have its bigger context.
14    Right?  So you can't --
15  Q    I'm sorry.  Go on.
16  A    You have to have the full context of what is
17    being discussed.  I mean, in other words and I
18    think we ran into the same problem here.  You're
19    constructing a hypothetical with one sentence
20    and that's not how instruction takes place.
21        So you would have to put it in context and,
22    again, the individual who is doing the educating
23    would be very clear if they are inculcating or

158

1    teaching or instructing students that one's age,
2    sex, gender, et cetera, you know, is inherently
3    superior to another age, sex, gender or that an
4    individual by virtue of their age, sex, gender,
5    et cetera, is inherently racist or sexist or
6    oppressive or that an individual should be
7    discriminated against or receive adverse
8    treatment because of their age, sex, gender, et
9    cetera or that the people of one age, sex,
10    gender cannot and should not attempt to treat
11    others without regard to those things.  So that
12    is the context that you need.
13  Q    So you can't answer the question without that
14    context; is that correct?
15  A    So what I say is I don't have any instruction in
16    New Hampshire that is one sentence long.
17  Q    What if a teacher had the very question I just
18    asked you, how would you respond to that
19    teacher?  Can I teach page 19 of Exhibit 50.
20    Give me guidance.  What would your response be?
21        MR. KENISON-MARVIN:  Objection.
22  A    I'm sorry.  Did you --
23        MR. KENISON-MARVIN:  Objection.  Vague.

159

1  A    My response would be to go to the statute, go to
2    the Q & A which enumerates what you can and
3    can't do and ask yourself educator, am I
4    teaching, instructing or inculcating a student.
5    That seems very clear to the person who's doing
6    it that one's age, sex, gender, et cetera, is
7    inherently superior to another or that -- et
8    cetera.  I don't want to --
9  Q    No, that's fine.  Just reciting.
10  A    Exactly.  I've done it a couple times.  So this
11    is if you're an educator seems like very
12    straight forward that you would be able to just
13    look at these things.  Is my instruction doing
14    that, and it's not, the concept here keeps
15    coming back to the content.
16  Q    Even with that, if an educator still had a
17    question and thought it was maybe a little bit
18    less clear than you seem to think it is, could
19    they come to you for advice with respect to how
20    to comply with HB 2?
21  A    So right now we're in the midst of a lawsuit
22    with HB 2.  So most of the questions that we
23    would have would probably end up as a question

160

1    for perhaps the Human Rights Commission to
2    answer.
3  Q    Okay.  Based on your quotation of Dr. Kendi in
4    your OpEd on Exhibit 4, do you think it would be
5    reasonable for an educator to think they
6    couldn't assign Dr. Kendi's book under HB 2?
7        MR. KENISON-MARVIN:  Objection.
8    Speculation.  You can answer.
9  A    So if they were to have reached that conclusion,
10    and I would have to speculate relative to that,
11    my observation really would be, one, that and
12    this is which exhibit?  Let me get that right.
13    Let me get the right OpEd in front of me.  Is
14    that they have not read the OpEd in its
15    totality.  Because really the, if you look at
16    the rhetorical device associated with that,
17    there is a list of contradictory things the
18    paragraph before.  Right?  "For those who
19    promote Critical Race Theory or similar concepts
20    their thinking is not built on a foundation of
21    common sense, but on ideology, but on ideology
22    diametrically opposed to the truths found in our
23    Declaration of Independence, that we are all

161

1  created equal."
2      And then I use another counter argument to
3  that, and then I present another argument.
4  "This idea of is, of course, in complete
5  opposition to the Equal Protection clause of the
6  Fourteenth Amendment to the US Constitution.  As
7  Justice John Marshall Harlan stated in his
8  dissent of Plessy v. Ferguson, our Constitution
9  is color-blind and neither knows nor tolerates
10  classes among citizens."
11      I then go on to elaborate.  "And the
12  concepts of Critical Race Theory actually
13  contradict the very premises of the civil rights
14  movement and Dr. Martin Luther King himself."
15      And so what I would encourage my educators
16  to do if they were teaching this, so I myself
17  have used that contents, and I have used it in
18  the context of the Declaration of Independence
19  in the context of the Fourteenth Amendment, in
20  the context of Plessy v. Ferguson, in the
21  context of Martin Luther King so it seems to me
22  that the particular text that we're referring to
23  is quite rich in terms of the opportunity for

162

1      instruction of students.
2  Q    But I believe your prior testimony said if an
3      educator has questions about whether specific
4      instruction violates the statute they can't get
5      those answers from the DOE right now, it's
6      because of this litigation, is that your
7      position?
8  A    So if an educator comes to me, we provide
9      information to them, we provide guidance to
10      them, and that guidance includes a combination
11      of a Q & A document that we have published to
12      provide them specific guidance relative to that,
13      and it is specific reference to RSA 193:40,
14      prohibition of teaching of discrimination which
15      in my mind are quite clear in terms of
16      clarifying what can and can't happen.
17          Our educators are professionally educated.
18      They mostly have master's degrees.  And so I
19      don't think that the guidance that we are
20      providing to them is obscure to them or
21      unattainable in terms of understanding for
22      individuals who are highly educated.
23  Q    That's true, but I believe your prior testimony

163

1      is that while you think it's clear you're unable
2      to tell me whether if a teacher taught the
3      underlined language on Exhibit 4, you're unable
4      to tell me whether that's covered under HB 2
5      without context.  Correct?
6  A    So let me clarify.
7          MR. KENISON-MARVIN:  Objection.  Still
8      vague.
9  Q    Please do.
10  A    So then let me clarify.  So my question answer
11      is that if a teacher were to ask me a question,
12      I would provide them with what we believe is a
13      large body of guidance for them to be able to
14      make a determination or not.
15  Q    Is any of that guidance in the context of
16      specific books that they can or cannot teach
17      under the statute?
18  A    So the premise to your question is about
19      content.
20  Q    Yeah.
21  A    And that's not, my law says no pupil in any
22      public school shall be taught, instructed,
23      inculcated relative to that one's sex, et

164

1      cetera, is inherently superior, inherently
2      racist, received adverse treatment or cannot and
3      should not attempt to treat others without
4      regard.  It's not content specific.  So the
5      indicator should not be asking themselves what
6      is the content but what is the context of the
7      instruction that I'm providing to students.
8  Q    But you agree with me that you cite content in
9      your OpEd, correct, in the form of Dr. Kendi's
10      book, right?
11  A    I cite a number of pieces of content.  I cite
12      the Declaration of Independence --
13  Q    Not my question.  You cite Dr. Kendi as content,
14      correct?
15  A    So my OpEd cites the Declaration of
16      Independence, it cites Dr. Kendi, it cites the
17      Fourteenth Amendment, it cites Plessy v.
18      Ferguson, it cites Dr. Martin Luther King.  So
19      my OpEd has a number of citations in that
20      context.
21  Q    Thank you.  You cite Dr. Kendi as content,
22      correct?
23  A    I have cited Dr. Kendi as content --

165

```
1  Q    Thank you.
2  A    -- in this OpEd.
3  Q    All I'm asking.  Not trying to trick you.
4        I'm going to refer you to Exhibit 9.  After
5    you've reviewed Exhibit 9, just let me know when
6    you're ready.  Thank you.
7        MR. KENISON-MARVIN:  Gilles, I don't
8    know what your plan is --
9        MR. BISSONNETTE:  I have five more minutes.
10       MR. KENISON-MARVIN:  Okay.  5.
11       MR. BISSONNETTE:  Five more minutes from
12   when he says he's reviewed it.
13 A    So your question?
14 Q    My question is this is an email between you and
15   the President of AFT New Hampshire; is that
16   correct?
17 A    That's correct.
18 Q    There's a line in here that says, this is the
19   second part of a sentence, but I'm just trying
20   to streamline things.  We also want to reiterate
21   our offer to try to work through individual
22   circumstances that may be unclear to teachers.
23   In these cases the best approach is for them to
```

166

```
1    reach out directly and share the specific facts
2    and circumstances so that we can provide them
3    with clear guidance.
4        Is that a reflection of the Department of
5    Education's policy?
6  A    So I would hope that it is a reflection of the
7    Department of Education's policy.  I can tell
8    you that this email came together with input
9    from a variety of places within the agency to be
10   able to support the educators at a time when I
11   believe there were either lawsuits or threats of
12   lawsuits pending.
13 Q    So if a teacher has questions about whether
14   specific instruction is covered by the law, they
15   could come to the Department and work through
16   individual circumstances that may be unclear to
17   them; is that still something that could occur
18   today?
19 A    Correct, and the guidance that we would provide
20   them today would be in the form of a Q & A
21   guidance and questionnaire as well as reference
22   to the statute.
23 Q    Is that the only guidance that they would be
```

167

```
1    provided to a teacher if they were confused, the
2    Q & A from July 2021 and the statute?  Is that
3    all you'd give them?
4        MR. KENISON-MARVIN:  Objection.  Vague and
5    scope.
6  A    And I believe pending this lawsuit that that
7    would be the extent of the guidance that we
8    would provide to them.
9  Q    So you wouldn't answer if they had a followup
10   question, is Dr. Kendi's book, if I teach it, is
11   that covered under the statute, you wouldn't be
12   able to answer that question?
13       MR. KENISON-MARVIN:  Objection.  Vague.
14 A    So I would, and I would answer that question for
15   the educator principally by looking at the Q & A
16   but principally coming back to RSA 913:40, and I
17   would say are you teaching, inculcating, or are
18   you compelling to express a belief in or support
19   for any one or more of the following; that one's
20   immutable characteristics are inherently
21   superior, that an individual by virtue of these
22   immutable characteristics is inherently racist,
23   sexist or oppressive or that an individual
```

168

```
1    should be discriminated against because of these
2    immutable characteristics and that people cannot
3    and should not attempt to treat others without
4    regard to these immutable characteristics, and I
5    believe in that conversation with an educator
6    given the highly educated state and status of
7    our educators that they would be able to
8    understand that and apply that to their
9    pedagogy.
10 Q    I'm asking for your opinion though.
11 A    Yes.
12 Q    What is your opinion as to whether or not those
13   two sentences in your OpEd fall under the four
14   concepts in Exhibit 1.  I want to know what your
15   opinion is.  Could you tell me that?
16 A    So I think I've made that clear that content is
17   not what falls under the RSA 193:40.  Behavior
18   and how we treat other people including
19   instructing, teaching, inculcating or compelling
20   to express belief in or support for, the fact of
21   inherent superiority, inherently racist, receive
22   adverse treatment solely because of these
23   immutable characteristics or they cannot and
```

169

1    should not attempt to treat others without
2    regard to these immutable characteristics.  So I
3    think that I've asked and answered that several
4    times now.
5  Q    I don't think you've answered it, but I'm going
6       to move on.
7  A    Okay.
8  Q    Exhibit 14?
9  A    Yes, I have it in front of me.
10  Q    There's a reference here if I could find it, and
11       I'm expediting this considerably.  Topic Eight,
12       page 742 to 745.  Do you see that?  It's a
13       chapter of Tiffany Jewell's book, This Book is
14       Anti-Racist.
15  A    Okay.
16  Q    Do you see that chapter?
17  A    I do.
18  Q    Have you read it before?
19  A    I have.
20  Q    Did you read it to the Board of Education on
21       July 8th, 2021?
22  A    I believe I did.  Or at least excerpts.
23  Q    Why did you read it to the Board on July 8th,

170

1    2021?
2  A    Because I needed to make sure that the Board
3       understood some of the concerns that parents
4       were raising to the Department.
5  Q    Were those concerns justification for why HB 2
6       was necessary?
7       MR. KENISON-MARVIN:  Objection.  Legal
8       contention.
9  A    Can you repeat the question?
10       (Requested portion read back by court reporter)
11  A    So again, HB 2 or really it's RSA 193:40 in
12       particular I believe are helpful to ensure that
13       our teachers and our students in the State of
14       New Hampshire are not discriminated against.
15  Q    Are you aware of that chapter being used
16       anywhere in the State of New Hampshire in
17       school?
18  A    I believe it is.  Or it was.
19  Q    What was your understanding at the time as to
20       how it was being used in New Hampshire?
21  A    I only know that a parent brought it to our
22       attention and said that it was being used.
23  Q    Besides that parent bringing it to your

171

1    attention, any other complaints about that book?
2  A    There may have been more than one.  I don't
3       recall.
4  Q    Is that parent ▓▓▓▓▓▓▓▓?
5  A    I don't recall if it was her.  I believe it was
6       in the Exeter School District.
7  Q    Given that you referenced that text during the
8       July 8, 2021, Board of Education meeting, if I
9       taught that chapter, if I'm a middle school
10       teacher in Exeter, would I be violating HB 2?
11       MR. KENISON-MARVIN:  Objection.
12  A    So that would depend on whether you are
13       teaching, instructing, inculcating or compelling
14       to express a belief in or support for any one or
15       more of the following.  That one's age, sex,
16       gender identity, sexual orientation, et cetera,
17       are inherently superior to other, that they are
18       inherently racist, that they receive adverse
19       treatment solely or partly because of or that
20       they cannot or should not attempt to treat
21       others without regard to these immutable
22       characteristics.
23  Q    Besides reading that statue though, you can't

172

1    tell me whether if I taught that I'm violating
2    the law, right?
3  A    I would have to see how it's being used in this
4       context.  When you say "if I taught that," there
5       is not a content standard.  There is an activity
6       standard.  So I would have to see it in this
7       context, and again, I think that the best person
8       to know if they're violating these statutes
9       really are the individuals who are actually
10       doing the teaching.
11  Q    But if I taught that chapter.
12  A    Um-hum.
13  Q    If I taught it.
14  A    Yes.
15  Q    You can't answer today whether I'd be violating
16       the statute --
17  A    Because I don't know what your --
18       (Court reporter admonition - simultaneous talking)
19       MR. KENISON-MARVIN:  Objection.  Stop.
20       Stop.  It's misstating what the statute says,
21       first of all, and second, I'm just going to
22       instruct him not to answer anymore.  Let's talk
23       about if we have a basis to continue or not

**173**

1 because we've well over.
2   MR. BISSONNETTE: I'd like an answer to
3 that, and I have one last question.
4   MR. KENISON-MARVIN: Well, I'm going to
5 instruct -- don't answer the question. We can
6 talk about it. I do think that misrepresents
7 what the statute says at least and the question
8 is very vague the way it's asked right now. So
9 I'm happy to talk about it. If we want to do it
10 outside of the witness's presence, I can tell
11 you specifically my problem is, but we're well
12 over. I'm happy to talk about how we're going
13 to proceed from this moment, but I've been
14 pretty liberal in allowing this to go on beyond
15 our agreed time, and I'm happy to talk about
16 continuing to keep questions on the table. I
17 just, think we need to slow down here and talk
18 about where we're at and where we're going.
19   MR. BISSONNETTE: Off the record.
20     (Discussion off the record)
21     (Recess taken 3:20 - 3:25 p.m.)
22 (Requested portion read back by court reporter)
23   MR. BISSONNETTE: Strike that. I'm going

**174**

1       to withdraw the question.
2   Q   Can you identify, Commissioner, an incident of
3       instruction that occurred in New Hampshire
4       before HB 2 that would violate HB 2 had it been
5       in effect at the time the instruction occurred?
6         MR. KENISON-MARVIN: Objection. Vague.
7       Calls for legal contention.
8   A   I'm not familiar with any.
9   Q   The Exploring Whiteness syllabus that's on
10      Exhibit 14, Topic Ten. I just wanted you to
11      describe to me --
12  A   Just give me the page.
13  Q   Yes, of course. It's page 749, Topic Ten, of
14      Exhibit 14.
15  A   Okay.
16  Q   Do you have the context of this class? I
17      believe it was in Hanover.
18  A   I believe it was in Hanover, and I believe it
19      was an elective class that students signed up
20      for in a specials week that they have.
21  Q   Was it a class that students were required to go
22      to; do you know?
23  A   I think I indicated it was an elective class.

**175**

1   Q   Sorry. I didn't understand the terminology. I
2       appreciate that.
3         Just going through my note. I might be
4       done.
5         I'm introducing an exhibit and my question
6       is just going to be whether you've seen it
7       before.
8         (Exhibit 51 marked for identification)
9   A   I don't think I've seen this before.
10  Q   Do you recall ever speaking to the Northwood
11      GOP?
12        MR. KENISON-MARVIN: Objection. Vague.
13  A   Can you put a time frame on that?
14  Q   November 2021.
15  A   I don't recall that. I have spoken to the
16      Northwood GOP years ago.
17  Q   This would be to refresh your recollection. So
18      I've just marked as Exhibit 52 an email.
19        (Exhibit 52 marked for identification)
20  Q   Does Exhibit 52 refresh your recollection as to
21      whether or not you've ever spoken to the
22      Northwood GOP?
23  A   So it refreshes my recollection that I was

**176**

1       invited. I don't recall if I ever went out and
2       spoke to them or not. I don't have recollection
3       of that. I do speak to many groups though.
4   Q   You've spoken to political groups before, fair
5       to say?
6   A   I speak to all kinds of groups.
7   Q   I know. I get that. I'm just asking political
8       groups. Have you spoken to political groups
9       before?
10  A   All kinds of groups.
11  Q   Which includes political groups, correct?
12  A   That would include political groups.
13  Q   And in those political groups, have you
14      referenced HB 2 before?
15  A   I may have answered a question on it or have
16      spoken about various aspects of education.
17  Q   You ever speak about why it was necessary in
18      those group meetings?
19  A   I don't have any specific recollection of the
20      type of content that I would have shared on
21      that.
22  Q   Okay.
23        MR. BISSONNETTE: We'll all reserve,

**177**

1 obviously, and I want to thank the Commissioner

2 for his time.  Thank you, Elizabeth.  Thank you,

3 Nate, and thank you, Cindy, very much.

4     MR. KENISON-MARVIN:  I want to speak with

5 the Commissioner briefly about any areas for

6 followup before we recess for the day.  Give me

7 five minutes.

8         (Recess taken 3:30 - 3:40 p.m.)

9     MR. KENISON-MARVIN:  We don't have any

10 questions for the witness, and I just want to

11 reserve our right to read and sign the

12 transcript.

13     MR. BISSONNETTE:  We'll reserve as well,

14 and just thank you everyone very much.

15     (Deposition suspended at 3:40 p.m.)

16

17

18

19

20

21

22

23

**178**

1         I have carefully read the foregoing

2     deposition, and the answers made by me are true.

3

4

5                     _____

6                     FRANK EDELBLUT

7

8 STATE OF _____

9 _____, SS.

10

11         At_____on the

12 _____ day of _____ A.D.

13 2023, personally appeared the above-named FRANK

14 EDELBLUT and made oath that the foregoing answers

15 subscribed by him are true.

16                     Before me,

17

18

19

20                     _____

21                     Notary Public

22

23

**179**

1             C E R T I F I C A T E

2     I, Cynthia Foster, Registered Professional

3 Reporter and Licensed Court Reporter, duly authorized

4 to practice Shorthand Court Reporting in the State of

5 New Hampshire, hereby certify that the foregoing

6 pages, numbered 7 through 177, are a true and

7 accurate transcription of my stenographic notes of

8 the deposition of FRANK EDELBLUT who was first duly

9 sworn by me on May 23, 2023, for use in the matter

10 indicated on the title sheet, as to which a

11 transcript was duly ordered;

12         I further certify that I am neither

13 attorney nor counsel for, nor related to or employed

14 by any of the parties to the action in which this

15 transcript was produced, and further that I am not a

16 relative or employee of any attorney or counsel

17 employed in this case, nor am I financially

18 interested in this action.

19

20

21                     Cynthia Foster, LCR

22

23

**180**

1             E R R A T A

2     I, the undersigned, FRANK EDELBLUT, have read

  the transcript of my deposition held on May 23, 2023,

3 in the matter of Local 8027, AFT-New Hampshire,

  AFL-CIO v. Frank Edelblut, Commissioner, et al; and

4 the same is true and correct, to the best of my

  knowledge, with the exception of the following

5 changes noted below, if any:

6 PAGE/LINE  CORRECTION AND REASON FOR CORRECTION

7 _____

8 _____

9 _____

10 See attached sheet(s) for additional information:

11 ___Yes___No

12                     _____

13                     FRANK EDELBLUT

14 STATE OF _____)

                       ) ss.:

15 COUNTY OF _____)

16

       Subscribed and sworn to before me this _____ day

17 of _____, 2023.

18

19                     _____

20                     Notary Public

   My commission expires:

21

   _____

22

23

1          I have carefully read the foregoing

2      deposition, and the answers made by me are

true.[1]

3

4                                          _____

5                                          FRANK EDELBLUT

6

7

8   STATE OF *New Hampshire*

9   _____, SS.

10

11              At *25 Hall St, Concord* on the

12   ___*29*___   day of *June*_____ A.D.

13   2023, personally appeared the above-named FRANK

14   EDELBLUT and made oath that the foregoing answers

15   subscribed by him are true.

16                                  Before me,

17

18

19                                  _____

20                                  Notary Public

21

22

[1] Subject to the exception of the changes identified in the accompanying errata sheet and the

23   attachment thereto.

E R R A T A

I, the undersigned, FRANK EDELBLUT, have read
the transcript of my deposition held on May 23, 2023,
in the matter of Local 8027, AFT-New Hampshire,
AFL-CIO v. Frank Edelblut, Commissioner, et al; and
the same is true and correct, to the best of my
knowledge, with the exception of the following
changes noted below, if any:

PAGE/LINE   CORRECTION AND REASON FOR CORRECTION

P9 / L10          See attachment

P15 / L3          See attachment

P16 /L17          See attachment

See attached sheet(s) for additional information:

∎ Yes___No

_____
FRANK EDELBLUT

STATE OF  *NH*       )
                     ) ss.:
COUNTY OF *Merrimack* )

        Subscribed and sworn to before me this *29* day
of *June*       , 2023.

_____
Notary Public

My commission expires:

*May 31, 2028*

Local 8027, AFT-New Hampshire, et al. v. Frank Edelblut, Commissioner, et al. (No. 1:21-cv-01077-PB)

FRANK EDELBLUT

# ERRATA SHEET

## ATTACHMENT

Page 9, Line 10, Change:

Replace "party" with "matter" such that the transcript states:

"I was deposed many, many years ago in another ***matter*** associated with a corporation."

Reason: Transcription error.

Page 15, Line 3, Change:

Replace "counsel" with "Council" such that the transcript states:

"I'm nominated, and then I go through a confirmation process with the Governor and ***Council***."

Reason: Transcription error.

Page 16, Line 17, Change:

Replace "RSA 21:10" with "RSA 21-N" such that the transcript states:

"Particularly in ***RSA 21-N*** I believe is the statute."

Reason: Transcription error.

*[intentionally blank; continued on next page]*

Page **1** of **3**

Page 40, Lines 16–17, Change:

> After "We do" add "have a periodic meeting";
> Before "That would be incorrect" add "But"; and
> After "That would be incorrect" add "to characterize it as a 'committee'"

> With these changes, the transcript states:

> "We do ***have a periodic meeting***. ***But*** that would be incorrect ***to characterize it as a 'committee.'*** It's not a committee."

> <u>Reason</u>: To clarify testimony.


Page 47, Line 22, Change:

> After "Yes" add ", I agree with the objection that the question is vague, but I will try to answer it" such that the transcript states:

> "Yes***, I agree with the objection that the question is vague, but I will try to answer it***. So with respect to this particular complaint, my recollection is that the direction we took was not concern over a specific piece of content so much as it was the Sora app and what students may or may not be able to access using that particular application and whether schools had configured correct security parameters in that application to prevent students from accessing content that may not be developmentally appropriate for them."

> <u>Reason</u>: To clarify testimony.


Page 49, Line 21, Change:

> Replace "times" with "types" such that the transcript states:

> "I believe in this case that those ***types*** of controls had not been configured."

> <u>Reason</u>: Transcription error.


*[intentionally blank; continued on next page]*

Page 133, Line 20, Change:

After "Yes" add ", I understand." such that the transcript states:

"Yes*, I understand.*  I have no recollection of seeing either of these."

<u>Reason</u>: To clarify testimony.


Page 161, Line 17, Change:

Replace "contents" with "content" such that the transcript states:

"And so what I would encourage my educators to do if they were teaching this, so I myself have used that ***content***, and I have used it in the context of the Declaration of Independence in the context of the Fourteenth Amendment, in the context of Plessy v. Ferguson, in the context of Martin Luther King so it seems to me that the particular text that we're referring to is quite rich in terms of the opportunity for instruction of students."

<u>Reason</u>: Transcription error.


Page 164, Line 5, Change:

Replace "indicator" with "educator" such that the transcript states:

"So the ***educator*** should not be asking themselves what is the content but what is the context of the instruction that I'm providing to students."

<u>Reason</u>: Transcription error.


*[end]*