# EXHIBIT 3

DOE Attorney
Diana Fenton
Deposition
Transcript
Redacted,
Publicly-filed

(Unredacted
version has been
filed under seal)



# Transcript of Diana Fenton

**Date:** May 17, 2023
**Case:** Local 8027, AFT-New Hampshire, et al. -v- Edelblut, et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

**Page 1**

```
1              UNITED STATES DISTRICT COURT

2               DISTRICT OF NEW HAMPSHIRE

3

4   LOCAL 8027, AFT NEW HAMPSHIRE,    )

5   et al.,                          )

6               Plaintiffs,          )

7   v.                               )

8   FRANK EDELBLUT, in his official  )

9   capacity as Commissioner of the  )

10  Department of Education ("DOE"),  )

11              Defendant            )

12  ---------------------------------  C.A. 1:21-cv-01077-PB

13  ANDRES MEJIA, et al.,            )

14              Plaintiffs,          )

15  v.                               )

16  FRANK EDELBLUT, in his official  )

17  capacity as Commissioner of the  )

18  Department of Education ("DOE"),  )

19              Defendant.           )

20  ---------------------------------)

21

22            DEPOSITION OF DIANA FENTON

23

24

25
```

**Page 2**

```
1             DEPOSITION OF DIANA FENTON

2

3      THIS DEPOSITION TAKEN PURSUANT TO NOTICE OF DEPOSITION

4   AT NEW HAMPSHIRE DEPARTMENT OF JUSTICE, 33 CAPITOL STREET,

5   CONCORD, NEW HAMPSHIRE, ON WEDNESDAY, MAY 17, 2023,

6   COMMENCING AT 10:10 A.M.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**Page 3**

```
1                    APPEARANCES

2   For Plaintiffs Local 8027, AFT New Hampshire:
    STROOCK & STROOCK & LAVAN, LLP
3   David J. Kahne, Esq.
    Elizabeth C. Milburn, Esq.
4   Charles Moerdler, Esq. (via videoconference)
    180 Maiden Lane
5   New York, New York 10038-4982
    (212) 806-6419
6   dkahne@stroock.com
    emilburn@stroock.com
7   cmoerdler@stroock.com

8   For Plaintiffs Andres Mejia and Christina Philibotte:
    AMERICAN CIVIL LIBERTIES UNION OF NEW HAMPSHIRE
9   Gilles Bissonnette, Esq.
    18 Low Avenue
10  Concord, New Hampshire 03301
    (603) 224-5591
11  gilles@aclu-nh.org

12    - and -

13  DISABILITY RIGHTS CENTER - NEW HAMPSHIRE
    Kayla Turner, Esq. (via videoconference)
14  64 North Main Street, Suite 2
    Concord, New Hampshire 03301
15  (603) 228-0432
    kaylat@drcnh.org
16
      - and -
17
    GLBTQ LEGAL ADVOCATES & DEFENDERS
18  Chris Erchull, Esq. (via videoconference)
    18 Tremont Street, Suite 950
19  Boston, Massachusetts 02108
    (617) 426-1350
20  cerchull@glad.org

21    - and -

22  NIXON PEABODY, LLP
    Morgan C. Nighan, Esq. (via videoconference)
23  Exchange Place
    53 State Street
24  Boston, Massachusetts 02109
    (617) 345.1031
25  mnighan@nixonpeabody.com
```

**Page 4**

```
1                 APPEARANCES (Cont'd)

2
    For Defendants Frank Edelblut, Christian Kim, John
3   Formella, Ahni Malachi, and Ken Merrifield:
    NEW HAMPSHIRE DEPARTMENT OF JUSTICE
4   Civil Bureau
    Nathan W. Kenison-Marvin, Esq.
5   33 Capitol Street
    Concord, New Hampshire 03301
6   (603) 271-1292
    nathan.w.kenison-marvin@doj.nh.gov
7
    For Defendants National Education Association - New
8   Hampshire:
    NATIONAL EDUCATION ASSOCIATION - NEW HAMPSHIRE
9   Esther K. Dickinson, Esq. (via videoconference)
    9 South Spring Street
10  Concord, New Hampshire 03301
    (603) 224-7751
11  edickinson@nhnea.org

12  For Plaintiff American Federation of Teachers:
    NOLAN PERRONI, P.C.
13  Peter J. Perroni, Esq. (via videoconference)
    73 Princeton Street
14  North Chelmsford, Massachusetts 01863
    (978) 454-3800
15  peter@nolanperroni.com

16  For Defendant Department of Education:
    DEPARTMENT OF EDUCATION
17  Elizabeth A. Brown, Esq. (via videoconference)
    101 Pleasant Street
18  Concord, New Hampshire 03301
    (603) 271-6338
19  elizabeth.a.brown@doe.nh.gov

20  Court reporter:
    Sharon G. Saalfield, LCR No. 147, MA CSR, RDR, CRR
21

22

23

24

25
```

---

**5**

STIPULATIONS

1
2         It is agreed that the deposition shall be taken in the
3   first instance in stenotype and when transcribed may be used
4   for all purposes for which depositions are competent under
5   Federal law.
6         Notice, filing, caption and all other formalities are
7   waived.  All objections, except as to form, are reserved and
8   may be taken in court at time of trial.
9         It is further agreed that if the deposition is not
10  signed within thirty (30) days after submission to counsel,
11  the signature of the deponent is waived.
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

**6**

INDEX

1
2   WITNESS                                              PAGE
3   Diana Fenton
4     By Mr. Bissonnette                                  8
5     By Mr. Kahne                                        143
6
7                        EXHIBITS
8   NUMBER   DESCRIPTION                                 PAGE
9    1       Full Text of The Banned Concepts Act         11
10   2       New Hampshire Code of Conduct for
11           Educational Professionals                    15
12   3       Overview of the Department of Education's
13           Educator Misconduct Practices                18
14   4       Frank Edelblut, Teach Children About Racism,
15           Not to be Racists                            34
16   5       1/26/23 House Judiciary Hearing Transcript   77
17   6       3/08/23 House Judiciary Hearing Transcript   77
18   7       8/17/21 Email with Attachment                92
19   8       1/18/21 Email                                99
20   9       9/21/22 Email with Attachment                102
21   10      1/20/23 Email with Attachment                107
22   11      NEA-NH 7/12/21 and 8/05/21 Letters           110
23   12      Attorney General Opinion No. 2021-01         114
24   13      9/08/21 Email                                115
25   14      NH Department of Education Website            116

---

**7**

EXHIBITS (Cont'd)

1
2   NUMBER   DESCRIPTION                                 PAGE
3   15       12/13/21 Email                               123
4   16       9/03/21 Email Chain                          126
5   17       5/24/21 Email Chain                          126
6   18       4/07/22 Email                                137
7   19       8/23/21 Email with Attachments               148
8   20       2/22/22 Email                                154
9   21       Right to Freedom from Discrimination in
10           Public Workplaces and Education              159
11   22      11/15/21 Email Chain                         162
12   23      3/18/22 Email                                165
13
14
15
16
17
18
19
20
21
22
23  (Original exhibits were returned to Attorney Bissonnette.)
24  (Electronic copies of the exhibits are attached to the
25  transcript.)

---

**8**

1            DIANA FENTON,
2       having been duly sworn by Ms. Saalfield,
3       was deposed and testified as follows:
4            EXAMINATION
5       MR. BISSONETTE:  Good morning, Ms. Fenton.
6       THE WITNESS:  Good morning.
7       MR. BISSONETTE:  It's nice to see you again.
8   My name is Gilles Bissonnette.  I'm one of several
9   lawyers that represent the plaintiffs in this case.
10  And thank you for coming in for a deposition.
11       I just wanted to say at the outset that
12  counsel in the case have conferred and have agreed to
13  the normal stipulations which is that all objections,
14  except those to the form of the question, shall be
15  reserved to the time of trial.  Of course, that
16  stipulation excludes privilege, which can be raised as
17  well in this particular case by defense counsel.
18       And you had a -- you wanted to make sure you
19  preserved ability to read and sign?
20       MR. KENISON-MARVIN:  Just make it clear on
21  the record that we do request that our right to --
22  we'll exercise our right to do that under the rules.
23       MR. BISSONETTE:  Sure.
24  BY MR. BISSONETTE:
25  Q.  Attorney Fenton, have you been deposed before?

---

9

1  A.  No.
2  Q.  No.  So just some kind of -- I know you're an attorney,
3     but just some common ground rules, roadmap for the
4     deposition today.  There's no intention here to ask you
5     any trick questions.  If you have any questions or
6     concerns about the language I'm using in asking the
7     question, please let me know.  Obviously, the goal here
8     of all of us is to make sure we have a clear record
9     where you understand the question being asked so you
10    can answer to the best of your abilities.  Does that
11    make sense to you?
12 A.  It does.  Thank you.
13 Q.  Sure.  And, of course, if you need to take a break at
14    any point, just let me know.  We'll, of course, do
15    that.  I think we'll take breaks on the hour.  My only
16    request is that if you are asking for a break, that we
17    just close out a particular question before we do so.
18    Of course, no objection if there's a privilege concern
19    prior to answering a question if you want to confer
20    with your counsel on that, okay?
21 A.  Yes.  Thank you.
22 Q.  And do you know as well -- I just want to make sure
23    that you understand that the court may read portions of
24    this transcript, correct?
25 A.  Yes.

10

1  Q.  Okay.  And you know that you're under oath, correct?
2  A.  Yes.
3  Q.  Will anything prevent you from giving truthful and
4     accurate testimony today?
5  A.  I don't believe so.
6  Q.  Okay.  Throughout this deposition, I just want to make
7     sure we agree on terminology just so there's no
8     confusion and so the record is clean.  I know that in
9     the lawsuit, and in communications related to the
10    lawsuit, there's been various names for the statute
11    that's being challenged here, the banned concepts,
12    divisive concepts.
13       To avoid any kind of wrangling over terminology,
14    when I'm talking about the challenged law in this
15    deposition, I'm just going to use the phrase "HB 2."
16    Is that something we can agree on from a terminology
17    term?  I won't be talking about the other portions of
18    HB 2, but just limiting it to the challenged law.  So
19    if I use the term "HB 2" for the challenged law, will
20    we have a common understanding?
21       MR. KENISON-MARVIN:  Just object on the
22    foundation.
23       MR. BISSONETTE:  You can still answer the
24    question.
25       THE WITNESS:  If you could clarify what you

11

1     mean by "other portions," I believe that's a phrase you
2     used.  Other portions of the law?
3        MR. BISSONETTE:  Sure, sure.  So why don't we
4     introduce an exhibit.
5        (Exhibit 1 marked for identification.)
6  BY MR. BISSONETTE:
7  Q.  So, Ms. Fenton, I would just ask you to review Exhibit
8     1 and just let me know when you're done reviewing it,
9     please.
10 A.  I'm all set.
11 Q.  All set?  Thank you.  What is Exhibit 1?
12 A.  Exhibit 1 is House Bill 2.
13 Q.  Okay.  I'm going to refer you to pages Bates stamped
14    PL04 to PL07.  Are those the provisions of House Bill 2
15    that are being challenged in this particular lawsuit?
16 A.  That is my understanding, yes.
17 Q.  So if I were, throughout this deposition, to describe
18    those challenged provisions between PL04 and PL07 as HB
19    2, would we have just a common understanding on the
20    terminology?
21 A.  Yes.
22 Q.  Okay.  Are you a licensed attorney?
23 A.  Yes.
24 Q.  Before your role with the Department of Education,
25    which we're going to get into, what was your prior

12

1     position?
2  A.  I worked for the New Hampshire Attorney General's
3     office.
4  Q.  What was your role there at the time?
5  A.  I worked in the criminal bureau.
6  Q.  How long did you work in the criminal bureau?
7  A.  I worked for the New Hampshire Attorney General's
8     office from the spring of 2007 until the fall of
9     2015.
10 Q.  What were your general responsibilities in your role in
11    the criminal bureau between 2007 and 2015?
12 A.  My role was -- my position, I should say, was
13    grant-funded by the National Traffic Safety -- I forget
14    the last word.  National Traffic Safety Association.
15    It was a federal grant.
16 Q.  Okay.
17 A.  I focused on traffic fatalities.  That included
18    training law enforcement.  I did appellate work and I
19    did file work.
20 Q.  And is it fair to say in the fall of 2015, is that when
21    you moved to Department of Education, around that
22    time?
23 A.  That is accurate, yes.
24 Q.  And when you joined the Department of Education in
25    2015, what was your role?

13

1 A. My role was to oversee legislative matters, rulemaking
2 that came from newly enacted legislation, and to work
3 on educator misconduct issues.
4 Q. And you've been with the Department of Education since
5 the fall of 2015; is that correct?
6 A. That's correct, yes.
7 Q. And those responsibilities that you just listed, are
8 those still your current responsibilities?
9 A. There are some additional ones, but, yes, those are --
10 Q. What would those be? Thank you. Sorry to cut you off.
11 A. That's okay. I oversee special ed complaints, and I
12 oversee the individual who handles our constituent
13 concerns.
14 Q. Okay. Is your job -- is one of your jobs as well
15 overseeing investigations under the code of conduct?
16 A. Yes.
17 Q. What does it mean to oversee an investigation under the
18 code of conduct? How would you describe that
19 responsibility?
20 MR. KENISON-MARVIN: Objection.
21 MR. BISSONETTE: I'll rephrase.
22 BY MR. BISSONETTE:
23 Q. What does it mean to oversee investigations under the
24 code of conduct?
25 A. I work with and supervise Richard Farrell, who is the

14

1 investigator for the Department of Education.
2 Q. Any other responsibilities that you have in this
3 oversight function concerning investigations under the
4 code of conduct?
5 A. Can you clarify the question?
6 Q. Sure. When you're overseeing investigations under the
7 code of conduct, in addition to working with
8 Mr. Farrell, are there any other things that you do in
9 that oversight role?
10 A. I work with the union attorneys who are representing
11 educators.
12 Q. Anything else that you do?
13 A. I work with the school districts that might be involved
14 in the situation.
15 Q. Okay. Would it also -- would this responsibility in
16 overseeing investigations under the code of conduct
17 also involve interpreting the code of conduct and what
18 may be a violation?
19 A. Can you clarify your question?
20 Q. Sure. In overseeing investigations under the code of
21 conduct, is one of your responsibilities to interpret
22 under the code of conduct what could constitute a
23 violation?
24 A. Yes.
25 Q. In addition to working with school districts as part of

15

1 this oversight role -- strike that.
2 As part of this oversight role, when you're
3 working with school districts, would you also request
4 documents from school districts?
5 A. Yes.
6 Q. And when -- strike that.
7 I'm going to introduce one more exhibit. It's the
8 code of conduct. I just need to identify it. Let me
9 find it here. It's right here.
10 (Exhibit 2 marked for identification.)
11 BY MR. BISSONETTE:
12 Q. Before I ask you just to identify Exhibit 2, in your
13 oversight role with respect to overseeing
14 investigations under the code of conduct, does that
15 also include having communications with school district
16 superintendents?
17 A. Yes.
18 Q. Would that also include having communications with
19 teachers directly?
20 A. It could, yes.
21 Q. Could you identify -- strike that.
22 Could you just review Exhibit 2 and let me know
23 when you've completed your review of it, please? Thank
24 you.
25 Have you finished reviewing Exhibit 2?

16

1 A. Yes.
2 Q. Thank you. What is Exhibit 2?
3 A. It is more expansive than the code of conduct. It
4 starts with Administrative Rule Ed 501.01. It goes
5 into Ed 502, which is public information to include the
6 confidentiality of credential holders, certification
7 records. Ed 504.04, emergency authorization. And then
8 it goes into Ed 510, which is entitled code of conduct.
9 It also includes Ed 511, which is investigations and
10 disciplinary proceedings. And it includes Ed 512,
11 denial of certifications.
12 Q. The code of conduct begins on the page Bates stamped
13 PL00015, correct?
14 A. Yes.
15 Q. What is the code of conduct?
16 A. The code of conduct is for licensed educators in the
17 state of New Hampshire.
18 Q. And what is the code of conduct -- strike that.
19 When was the code of conduct created?
20 A. It was created in 2018. It was adopted by the state
21 board in November of 2018.
22 Q. And why was the code of conduct created in 2018?
23 A. The code of conduct was created in 2018 in response to
24 a statute that had passed.
25 Q. Did that statute require the creation of a code of

**17**

1  conduct?
2  **A. Yes.**
3  Q. Is that a statute that the Department of Education
4  supported?
5  **A. As a public agency, as a state agency, the Department**
6  **of Education does not support or oppose legislation.**
7  Q. Did the Department of Education testify on the
8  legislation that authorized the creation of a code of
9  conduct?
10 **A. I do not recall.**
11 Q. So the legislature mandated the creation of the code of
12 conduct; is that correct?
13 **A. Yes. That is what I testified to.**
14 Q. Do you know why -- why did the legislature -- do you
15 know why the legislature required the creation of a
16 code of conduct?
17 **A. I can't speculate as to why the legislature passed that**
18 **bill.**
19 Q. Were you involved in discussions with legislators with
20 respect to the bill requiring the creation of a code of
21 conduct?
22 **A. I'm sure I was. I don't recall the details of those**
23 **conversations.**
24 Q. Did you have any internal communications with
25 Department of Education employees at or around 2018

**18**

1  about the need for a code of conduct?
2  **A. Sitting here today, I do not recall if I had --**
3  Q. I'm sorry, I didn't mean to interrupt.
4  Do you have any understanding why the code of
5  conduct was created?
6  **A. My understanding was the code of conduct was created**
7  **pursuant to the law that had passed.**
8  Q. Do you have any understanding why that law was
9  passed?
10 **A. I think that question would cause me to speculate on**
11 **legislative intent.**
12 MR. BISSONETTE: Okay. I'm going to mark
13 this exhibit. This will be Exhibit 3.
14 (Exhibit 3 marked for identification.)
15 BY MR. BISSONETTE:
16 Q. So, Attorney Fenton, I'd just ask you to review Exhibit
17 3. Just let me know when you're done.
18 **A. I don't think you meant to give this to me at this**
19 **time.**
20 Q. You're right. I don't think so. My apologies.
21 There's too many documents.
22 Have you finished reviewing Exhibit 3?
23 MR. KENISON-MARVIN: Let the record reflect
24 that the witness handed the paper back to Attorney
25 Bissonnette.

**19**

1  MR. BISSONETTE: It is reflected. Thank you.
2  BY MR. BISSONETTE:
3  Q. So before you, you have Exhibit 3, correct?
4  **A. Yes.**
5  Q. What is Exhibit 3?
6  **A. Exhibit 3 is -- appears to be printouts of a PowerPoint**
7  **presentation, the title of which is "Overview of the**
8  **Department of Education's Educator Misconduct Practices**
9  **and Conducting Effective Investigations."**
10 Q. Did you prepare Exhibit 3?
11 **A. Yes.**
12 Q. Okay. Did you get any assistance from other Department
13 of Education employees in preparing Exhibit 3?
14 **A. I might have. Sitting here today, I do not recall.**
15 Q. I'm just going to refer you to page two of Exhibit 3,
16 which is Bates stamped DOE5650.
17 The first bullet point says, "The reason behind
18 the COC."
19 Did you write those words?
20 **A. I believe I did, yeah.**
21 Q. Do you give presentations about the code of conduct and
22 the reasons behind the code of conduct?
23 **A. That's a compound question.**
24 MR. BISSONETTE: I'll strike that.
25 BY MR. BISSONETTE:

**20**

1  Q. Do you give presentations on the code of conduct?
2  **A. I do.**
3  Q. Who do you give presentations to?
4  **A. I give presentations on the code of conduct to**
5  **educators, and I give presentations on the code of**
6  **conduct to administrators, and most recently was asked**
7  **to present on the code of conduct to noncertified**
8  **school staff.**
9  Q. And, as part of those presentations, do you explain the
10 reasons behind the code of conduct?
11 **A. Yes.**
12 Q. And, in those presentations, what do you say when you
13 discuss the reasons behind the code of conduct?
14 **A. Can you clarify your question, please?**
15 MR. BISSONETTE: Can you read the question
16 back, please?
17 (Court reporter read back question.)
18 THE WITNESS: Are we just referring to the
19 presentation I give that is labeled as Exhibit 3, or
20 other presentations?
21 BY MR. BISSONETTE:
22 Q. Why don't we limit it to the one that's on Exhibit 3
23 dated December 2021. Fair enough.
24 **A. Okay. So I believe in this particular presentation,**
25 **this was for superintendents or administrators, and I**

---

**Page 21**

1    wanted to address the role of the code of conduct and
2    how it intersects with the administrator's role in
3    handling employment issues.
4  Q.  What do you recall saying when you discussed the reason
5    behind the code of conduct in this presentation,
6    Exhibit 3?
7  A.  I think it's set out on DOE05650, what was discussed.
8  Q.  And what was that?
9  A.  That handling issues of educator misconduct as an
10    employment issue only does not solve what is a
11    statewide issue.
12  Q.  Do you recall at this presentation discussing any other
13    reasons behind the code of conduct?
14  A.  Again, referencing exhibit -- DOE05650, which I am sure
15    I referenced in giving the presentation, it states that
16    child safety is not a ZIP code issue, which seems to
17    tie into local control does not solve what is a
18    statewide issue of educator misconduct.
19  Q.  Beyond what's on page 5650 of Exhibit 3, are there any
20    other reasons that you're aware of why the code of
21    conduct exists?
22  A.  The code of conduct exists because it was required
23    pursuant to the legislation that was passed.
24  Q.  Do you think the code of conduct is important for the
25    state of New Hampshire?

---

**Page 22**

1        MR. KENISON-MARVIN:  Objection.  Vague.
2        MR. BISSONETTE:  You can answer.
3        THE WITNESS:  I do.
4  BY MR. BISSONETTE:
5  Q.  Why?
6  A.  The code of conduct helps to protect children in the
7    state of New Hampshire.
8  Q.  How does it help them?
9  A.  When educators who are having an inappropriate
10    relationship with a child are released from employment
11    in one district, and they go to another district and
12    reoffend, the code of conduct helps to prevent that.
13  Q.  Are there any other scenarios in which you think the
14    code of conduct is important to have in the state of
15    New Hampshire?
16  A.  Not that I can recall at this moment sitting here.
17  Q.  With respect to the code of conduct back on Exhibit 2,
18    again, starting on page 0015, is this something that
19    you were involved in drafting?
20  A.  And are you referring to it in its entirety from
21    0015 --
22  Q.  No, that's a great question.  I'm referring to the
23    pages starting at section Ed 510.01 to page 23 -- 22.
24    So were you involved in drafting any portions of
25    those pages?

---

**Page 23**

1  A.  There appear to be two administrative rules within the
2    pages you've referenced.  Can we address them
3    individually?
4  Q.  What's the first administrative rule you're referring
5    to?
6  A.  So administrative rule Ed 510.
7  Q.  And the second is 511?
8  A.  Yes.
9  Q.  Great.  No, I appreciate that clarification.
10    Why don't we just focus now on 510?  Are you
11    involved in drafting that provision of those
12    administrative rules?
13  A.  Are you referring to all of them, 510.01 through
14    510.05?
15  Q.  I am.  Any portion of those provisions.
16  A.  Yes.
17  Q.  And which portions?
18  A.  I participated in the drafting of Ed 510.01, Ed 510.02,
19    Ed 510.03, Ed 510.04, and Ed 510.05.
20  Q.  Okay.  And now on to section 511.  Were you involved in
21    the drafting of any portions of that administrative
22    rule?
23  A.  I was involved in drafting Ed 511.01.  I was involved
24    in drafting Ed 511.02.  I was involved in drafting Ed
25    511.03.  I was involved in drafting Ed 511.04.  And I

---

**Page 24**

1    was involved in drafting Ed 511.05.
2  Q.  Thank you.  With respect to those provisions, section
3    511 and 510, was there any other DOE employees involved
4    in the drafting of those provisions?
5  A.  You're referring to Ed 510 and 511?
6  Q.  Yes.
7  A.  In their entirety?
8  Q.  Yes.
9  A.  Yes.
10  Q.  And who would those individuals be?
11  A.  These are individuals from the Department of Education?
12  Q.  Yes.
13  A.  Nicole Highmark, Amanda Phelps.  There were probably
14    others, but, sitting here today, I can't recall other
15    than those exact individuals.
16  Q.  It was five years ago.  Who enforces -- strike that.
17    Does the Department of Education enforce the code
18    of conduct?
19  A.  What do you mean by "enforce"?
20  Q.  Bear with me.  So the definition of "enforce," as I
21    understand it, is "compelling compliance with."  So is
22    that your understanding of what "enforcement" means?
23  A.  I can agree to that term, yes.
24  Q.  Okay.  So does the Department of Education enforce the
25    code of conduct?

25

1  A.  Yes.
2  Q.  Okay.  Does any other entity enforce the code of
3      conduct in the state of New Hampshire?
4  A.  My understanding is that there are school districts
5      that have adopted the code of conduct into their school
6      policies, so I'm not sure if that falls within your
7      vision of the question.
8  Q.  So beyond school districts that have independently
9      placed the code of conduct in their policies, is there
10     any other entity in the state of New Hampshire that
11     enforces the code of conduct that's in Exhibit 2?
12  A.  To the best of my knowledge, no.
13  Q.  Okay.  So would it be fair to say then if the
14     Department of Education enforces the -- strike that.
15     I'm going to move on.
16     With respect to Exhibit 1, which is the -- which
17     is HB 2, I just want to direct your attention to page
18     07, Roman numeral IV, that says, "A violation of this
19     section by an educator shall be considered a violation
20     of the Educator Code of Conduct that justifies
21     disciplinary sanction by the State Board of Education."
22     Do you see that language?
23  A.  I do.
24  Q.  Is it fair to say that the language -- that language in
25     HB 2 makes clear that the prohibitions in HB 2 are in

26

1  the Educator Code of Conduct?
2      MR. KENISON-MARVIN:  Objection to the extent
3  it calls for a legal opinion.
4      MR. BISSONETTE:  You can answer if you can.
5      MR. KENISON-MARVIN:  Also object under Rule
6  106, completeness, with the redaction at the bottom of
7  the page not being -- you can provide the witness with
8  a -- I don't know if that information is --
9      MR. BISSONETTE:  I can submit that that
10  redacted information is a separate portion of HB 2 that
11  has no bearing on the challenged statute in this case.
12      MR. KENISON-MARVIN:  Okay.  Do you have an
13  unredacted copy just so that I can see that?
14      MR. BISSONETTE:  I can submit it on the
15  record.  You know, we can -- at a break, I can show it
16  to you.
17      MR. KENISON-MARVIN:  Okay.
18      MR. BISSONETTE:  Again, I'm not --
19      MR. KENISON-MARVIN:  I think that's -- I
20  think that's correct.
21      MR. BISSONETTE:  I'm not trying to slip one
22  past anyone.  This was filed as an exhibit to the
23  lawsuit in this particular case as Exhibit 1.  The
24  redactions exist just so individuals can differentiate
25  the portions of the challenged law and the challenged

27

1  law at issue in this case, differentiate that from the
2  other provisions of the HB 2 trailer bill that have no
3  bearing on this case, and, in many instances, reflect
4  issues that are totally unrelated to the topics in this
5  case.
6      MR. KENISON-MARVIN:  I would just preserve an
7  objection to the extent if there were information
8  that's redacted, it would be responsive to the
9  question.  I preserve that.
10      MR. BISSONETTE:  Fair enough.  Can I get the
11  question read back, please?
12      (Court reporter read back question.)
13      THE WITNESS:  I don't think it makes clear
14  that a violation is in the code of conduct, no.  That's
15  not how I read that.
16  BY MR. BISSONETTE:
17  Q.  Was the Department of Education involved in drafting
18     that section, Roman numeral IV?
19  A.  When you ask about the Department of Education, I can't
20     speak to the entire office.  I can speak to my role.
21  Q.  Did you have a role with respect to the language in
22     paragraph four on page 07 of Exhibit 1?
23  A.  No, I did not.
24  Q.  Reading Roman numeral IV, do you believe that the
25     provisions of HB 2 are in the code of conduct?

28

1      MR. KENISON-MARVIN:  Objection.  Vague.  You
2  can answer.  Also object to the extent it calls for a
3  legal opinion.
4      THE WITNESS:  I assume I can answer?
5      MR. BISSONETTE:  If you can.
6      THE WITNESS:  Can you read back the question?
7      (Court reporter read back question.)
8      THE WITNESS:  The exact provisions of HB 2 in
9  the code of conduct?  No, I do not.
10  BY MR. BISSONETTE:
11  Q.  Is that reflective of the Department of Education's
12     positions since the enactment of HB 2 in June 2021?
13  A.  I can't speak for the entire department.
14  Q.  What's your role as the individual that oversees
15     investigations in the code of conduct?
16  A.  I'm involved in imposing discipline, when appropriate,
17     on an educator's license if there's a confirmed
18     violation of the code of conduct.
19  Q.  Do you know if anyone in the Department of Education
20     was involved in the drafting of paragraph four?
21      MR. KENISON-MARVIN:  Objection to the extent
22  information calls -- responsive information talks about
23  legislative privilege and relates to conversations that
24  anyone at DOE would have had with legislators in
25  creating the statute -- the bill that was presented to

**29**

1   the legislature. We would take the position that these
2   conversations are a legislative act for which the
3   legislative privilege would apply.
4        MR. BISSONETTE: I just want to make sure I
5   understand the objection. Are you instructing her not
6   to answer to the extent it implicates communications
7   that occurred between the Department of Education and
8   legislators?
9        MR. KENISON-MARVIN: Can I hear the question
10  one more time?
11       (Court reporter read back question.)
12       MR. KENISON-MARVIN: So the substance of
13  communications. I would maintain the objection.
14       MR. BISSONETTE: Okay.
15       MR. KENISON-MARVIN: To the extent the
16  question is "Do you know if anyone was involved," you
17  can answer that question. The substance of their
18  communications, to the extent you are aware of any, I
19  would instruct you not to answer those on the basis
20  that it's protected by legislative privilege.
21       THE WITNESS: I am not aware of anyone at the
22  Department of Education who was directly involved in
23  drafting paragraph four on lines 11 and 12.
24  BY MR. BISSONETTE:
25  Q. Did the Department of Education support the inclusion

**30**

1   of paragraph four?
2   **A. I've testified previously that the Department of**
3   **Education is a state agency, and it does not support or**
4   **oppose legislation.**
5   Q. Did the commissioner of education support HB 2?
6        MR. KENISON-MARVIN: Objection. Vague.
7        THE WITNESS: I cannot speak --
8   BY MR. BISSONETTE:
9   Q. Do you recall ever reading an op-ed published by the
10  commissioner of education in which he articulated his
11  support for HB 2?
12  **A. I think you asked me a question, I didn't get a chance**
13  **to fully answer it, and then you asked another**
14  **question. If we could pick those apart so I could**
15  **fully answer them?**
16  Q. Sure.
17  **A. I apologize.**
18  Q. Sure. I believe your testimony is that the Department
19  doesn't take -- doesn't support or oppose legislation;
20  is that correct?
21  **A. That's correct.**
22  Q. Okay.
23  **A. The state agency only provides what we refer to as**
24  **technical assistance.**
25  Q. Got you. It's true, though, that the commissioner of

**31**

1   education will take positions on legislation, right?
2   **A. I'm not here to testify on behalf of Commissioner**
3   **Edelblut.**
4   Q. That's not my question. You work with Commissioner
5   Edelblut, correct?
6   **A. Yes, I do.**
7   Q. Are you aware of the positions that he takes on
8   legislation?
9   **A. All legislation? Can you clarify your question?**
10  Q. Generally. Generally. Are you aware of positions that
11  the commissioner of education takes on legislation?
12  **A. You're going to have to clarify your question. It's a**
13  **very broad question.**
14  Q. Sure. Are you aware of any instance in which the
15  commissioner of education has conveyed his support for
16  legislation?
17       MR. KENISON-MARVIN: I guess I will state --
18  instruct the witness not to answer to the extent there
19  were conversations that the legislative privilege would
20  protect with respect to the commissioner's knowledge of
21  conversations between commissioner and a legislator.
22  I'm not sure if you're asking for that, but I would
23  assert that privilege.
24       MR. BISSONETTE: I think that objection
25  doesn't come close to the question, frankly, that I've

**32**

1   asked. So I'd just ask that it be read back just so
2   the witness is aware of it. Thank you.
3        (Court reporter read back question.)
4        THE WITNESS: Would it be possible to narrow
5   the time frame? I've worked in this role overseeing
6   the legislative affairs -- as you, yourself, said, it
7   was five years ago -- since 2015. I believe
8   Commissioner Edelblut began in 2017. You probably
9   would know better than I would. So that's a big chunk
10  of time over which we've had a lot of bills come
11  forward. Is it possible for you to narrow your
12  question?
13  BY MR. BISSONETTE:
14  Q. Sure. I just want to -- I'm not trying to hide the
15  ball here. Really, what I'm trying to get at is your
16  testimony that the Department doesn't support or oppose
17  bills.
18  **A. Yes.**
19  Q. And I'm trying to flush that out. So my question is
20  are you aware of any instance in which the commissioner
21  of education, on behalf of the Department of Education,
22  has conveyed support publicly for legislation? Are you
23  aware of any instance?
24       MR. KENISON-MARVIN: Objection. Vague.
25       THE WITNESS: Support publicly, or

33

1  conversations that he and I have had or we have had as
2  a legislative team?
3  BY MR. BISSONETTE:
4  Q.  That's a fair clarification.  Public support.  Can you
5  answer the question with that caveat?
6  A.  So just so I'm clear, Commissioner Edelblut, speaking
7  publicly, supporting or opposing a particular bill?
8  Q.  Yes.
9  A.  Do I have personal knowledge of it?  I have heard of
10  it.  I am not aware of -- I can't think of a particular
11  instance in which that has occurred.
12  Q.  With respect to that situation in which you've heard of
13  it, do you recall the context?
14         MR. KENISON-MARVIN: Objection.  Vague.
15  Misstating prior testimony as well.
16         THE WITNESS:  Is it possible to clarify the
17  question?
18         MR. BISSONETTE:  Can you read back her prior
19  response, please?
20         (Court reporter read back answer.)
21  BY MR. BISSONETTE:
22  Q.  When you said you have heard of it, what were you
23  referring to?
24  A.  I have heard of other people saying to me there was an
25  op-ed or Commissioner Edelblut attended an event, but I

34

1  have not personally read the op-eds or attended those
2  events with Commissioner Edelblut.
3  Q.  What Commissioner Edelblut writes an op-ed, do you know
4  if he's writing on behalf of the Department of
5  Education or himself in an individual capacity?  Do you
6  have any knowledge of that?
7         MR. KENISON-MARVIN: Objection.  Vague.
8  Calls for a legal conclusion.
9         THE WITNESS:  Do I still answer the question?
10         MR. KENISON-MARVIN: You can answer to the
11  extent you know.  I maintain the objection.
12         THE WITNESS:  I am not aware.  That's a
13  question better posed to Commissioner Edelblut.
14         MR. BISSONETTE:  I'm going to mark the next
15  exhibit, which I think is Exhibit 4, if I'm not
16  mistaken.
17         (Exhibit 4 marked for identification.)
18         MR. KENISON-MARVIN: We're running up on the
19  hour.  I don't know if you want to do this?
20         MR. BISSONETTE:  Yes, we'll finish Exhibit 4.
21         MR. KENISON-MARVIN: Okay.
22  BY MR. BISSONETTE:
23  Q.  Are you finished reviewing Exhibit 4?
24  A.  I have.  Thank you.
25  Q.  What is Exhibit 4?

35

1  A.  Exhibit 4 is entitled Frank Edelblut, "Teach Children
2  About Racism, Not To Be Racist."  Union Leader.  And
3  then in parentheses it has the date of June 13th, 2021.
4         It appears to be what's referred to as an op-ed
5  written by Commissioner Edelblut.
6  Q.  Have you seen this before your deposition today?
7  A.  No.
8  Q.  So this is the first time you've seen this document?
9  A.  First time.
10  Q.  And did you just read it just moments ago?
11  A.  I did.
12  Q.  Do you think it would be correct based on this op-ed to
13  say that Commissioner Edelblut supported HB 2?
14  A.  I'm not here to testify on behalf of Commissioner
15  Edelblut.  Based on your question and my interpretation
16  of the op-ed, I think the op-ed is pretty clear.  It
17  speaks for itself that he is in support of it, yes.
18  Q.  I want to go back if I may, Attorney Fenton, just to
19  Exhibit 1, paragraph four again, that states,
20  "Violation of this section by an educator shall be
21  considered a violation of the Educator Code of
22  Conduct."
23         As someone who enforces the code of conduct, under
24  this provision, is a violation of HB 2 a violation of
25  the code of conduct?

36

1         MR. KENISON-MARVIN: Objection to the extent
2  it calls for a legal opinion.  You can answer.
3         THE WITNESS:  Based on my plain reading of
4  the -- of this statute -- and, again, referencing
5  section IV, which is lines 11 and 12 -- yes, it would
6  be a violation of the Educator Code of Conduct.
7  BY MR. BISSONETTE:
8  Q.  Do you know -- do you know of anyone at the Department
9  of Education was involved in drafting this language?  I
10  think I asked that, but I just wanted to make sure I
11  have the answer correct.
12  A.  I can only speak to what my actions were.  I think my
13  testimony was clear.  I was not involved.  To the best
14  of my recollection, sitting here today, I was not an
15  active participant in crafting paragraph four, which is
16  lines 11 and 12.
17  Q.  My question is a little different, though.  Do you know
18  if anyone else at the Department of Education was
19  involved in drafting section four?  I know you weren't,
20  but was anyone else?
21         MR. KENISON-MARVIN: Well, asked and
22  answered.  You can answer.
23         THE WITNESS:  To the best of my knowledge, I
24  don't know of anyone who was directly involved in
25  drafting section four, no.

**37**

1  BY MR. BISSONETTE:
2  Q.  Were you ever in meetings at or around June 2021 in
3  which this section was discussed by your DOE
4  colleagues?
5       MR. KENISON-MARVIN: Objection. Vague. You
6  can answer.
7       THE WITNESS: To the best of my recollection,
8  I do not recall being in a meeting where this
9  provision, section IV of HB 2, was discussed.
10      MR. BISSONETTE: Is now a good time for a
11  break? We've been going for an hour. Is that good?
12      MR. KENISON-MARVIN: Yes.
13      MR. BISSONETTE: Great.
14      (Recess taken.)
15  BY MR. BISSONETTE:
16  Q.  You're still under oath, Attorney Fenton. I want to
17  just go now to Exhibit 2, and I'm going to be asking
18  you some questions on the code of conduct provisions.
19  Again, the provisions start on the page Bates stamped
20  PL00015.
21  A.  **Before we do that, may I clarify —**
22  Q.  Absolutely.
23  A.  **— some testimony I gave prior to the break on what is**
24  **marked as Exhibit 4? It's Commissioner Edelblut's**
25  **op-ed. I believe my testimony, when asked if I was**

**38**

1  **familiar with this document, was no. I would like to**
2  **clarify that to the best of my recollection, I had not**
3  **seen that or read that document in its entirety until**
4  **today.**
5  Q.  Okay. Before today, had you seen portions of the
6  op-ed?
7  A.  **I don't believe I'd seen portions of it.**
8  Q.  Okay.
9  A.  **Again, to the best of my recollection —**
10  Q.  Okay.
11  A.  **— this was the first time that I had read it in —**
12  **certainly in its entirety.**
13  Q.  Okay. Were you aware it existed before today?
14  A.  **Was I aware of this exact op-ed? No. Am I aware that**
15  **Commissioner Edelblut writes op-eds? Yes, I am.**
16  Q.  Did you have -- even though you hadn't read it in full
17  until just moments ago, did you have any awareness of
18  the contents of the op-ed?
19      MR. KENISON-MARVIN: Objection. Vague.
20      THE WITNESS: Is it possible to clarify that
21  question?
22  BY MR. BISSONETTE:
23  Q.  So I know that you haven't read it. I guess what I'm
24  trying to --
25  A.  **Well, I did read it before the break.**

**39**

1  Q.  Yes, of course. I know that you didn't read it in full
2  until today, correct?
3  A.  **That is correct.**
4  Q.  Were you a party to any Department of Education
5  communications about the contents of this op-ed before
6  today?
7  A.  **To the best of my knowledge, sitting here today, I do**
8  **not recall being involved in any such discussions.**
9  Q.  Before you read it in full today, did you have any
10  understanding as to any portions of this op-ed?
11      MR. KENISON-MARVIN: Objection. Vague. You
12  can answer.
13      THE WITNESS: Would it be possible to clarify
14  that, what you mean by "understanding any portions"?
15      (Court reporter read back question.)
16  BY MR. BISSONETTE:
17  Q.  Before you read it in full today, did you have any
18  awareness of any portion of this op-ed?
19      MR. KENISON-MARVIN: Same objection. You can
20  answer.
21      THE WITNESS: I apologize for being
22  difficult. I think the question is very broad.
23  BY MR. BISSONETTE:
24  Q.  Do you have any ability to answer that question?
25  A.  **I'll refer back to my prior testimony that I was aware**

**40**

1  **that Commissioner Edelblut likes to write op-eds about**
2  **a variety of topics. Was I directly aware of this**
3  **op-ed marked as Exhibit 4? No, I was not.**
4  Q.  And I believe your testimony, just so I'm clear, was
5  that you don't recall being a party to any internal
6  Department of Education communications in which this
7  op-ed was discussed, correct?
8  A.  **That is correct. Sitting here today, I do not recall**
9  **being involved in any internal discussions about this**
10  **particular op-ed.**
11  Q.  So I'm going to go back now to just Exhibit 2 kind of
12  where we left off moments ago.
13  A.  **Thank you for the opportunity to clarify.**
14  Q.  No, that's important, and it's part of the process, so,
15  no, I appreciate that.
16      The code of conduct, again, it starts on Exhibit 2
17  at Bates stamp PL00015. I'm not going to ask you any
18  questions about specific provisions right now, but,
19  just generally, can anyone make a complaint under the
20  code of conduct?
21      Why don't I ask it this way? Strike that.
22      Who can make a complaint under the code of
23  conduct?
24  A.  **Pursuant to the code of conduct, superintendents have**
25  **an obligation to report any time there is belief that**

41

1    there has been a violation of the code of conduct.  I
2    believe you'll find that in Ed 510.05.
3  Q.  Is there any language that you're aware of in the code
4      of conduct in Exhibit 2 that limits who can make a
5      complaint under the code?
6  A.  No.  I'm not aware of any language that would limit
7      that.
8  Q.  And just so as to not hide the ball, I'm looking, in
9      particular, at section 511.01 (A) which is on page 18.
10     And that language says, in subsection A, "A case shall
11     be opened when a complaint of possible misconduct
12     against a credential holder has come to the attention
13     of the Department either through direct reporting or
14     other means."
15         Do you see that language?
16  A.  I do, yes.
17  Q.  And, just so I'm clear, anyone can make a complaint
18      under that language, right?
19  A.  Yes.
20  Q.  And, again, so as to not hide the ball, I'm still on
21      that section, 511.01 (A).  Would you agree with me that
22      the Department of Education is required to open a case
23      when a complaint of possible misconduct against a
24      credentialed teacher has come to the attention of the
25      Department?

42

1  A.  I want to clarify that you had referenced the code of
2      conduct.  My reading of this document, we are now in Ed
3      511, which is investigations and disciplinary
4      proceedings.  That's a separate section from the code
5      of conduct.
6  Q.  That's a great clarification.  So when you look at
7      subsection A, and it says "possible misconduct," is
8      that -- does that include violations of the code of
9      conduct?
10  A.  Yes.
11  Q.  Okay.  So kind of going back now to my original
12      question.  Would you agree with me that the Department
13      of Education is required to open a case when a
14      complaint of possible misconduct against a credentialed
15      teacher has come to the attention of the Department?
16  A.  Yes.
17  Q.  So what does "opening a case" mean?
18  A.  The Department's practice is to document what is
19      reported.
20  Q.  And how does the Department document what is reported
21      when it opens a case?
22  A.  I would refer most of these questions to Richard
23      Farrell, who is the investigator who does most of the
24      paperwork piece of this.
25  Q.  I definitely will ask him that, but I want your

43

1      understanding, the best you possibly can.
2          MR. BISSONETTE:  So could I just have that
3      question read back for me, please?
4          (Court reporter read back question.)
5  BY MR. BISSONETTE:
6  Q.  So what's your understanding?
7  A.  How does it document what is reported?
8  Q.  Yes.  I believe your testimony was, when I asked what
9      does it mean to open a case, and you said the
10     Department documents what is reported.  And what I want
11     to know is how does the Department document what is
12     reported, based on your understanding?
13  A.  We document -- the Department, rather, would make note
14      of the allegation, the person who is reporting it, the
15      person involved, and their -- depending on the
16      circumstance, there could be other information gathered
17      as well.
18  Q.  In deciding whether to open a case -- strike that.
19      In determining whether there's possible misconduct
20      which would require the Department to open a case, does
21      the Department reach out to the complaining party?
22  A.  I guess I'm confused by your question.  A complaining
23      party would be the person who's reporting it.
24  Q.  So I guess my question is you receive a complaint.
25      Would there be follow-up by the Department with the

44

1      complaining party as the Department decides when to
2      open a case or if to open a case?
3  A.  Depending upon the facts, there could be that
4      additional follow-up, yes.
5  Q.  So let me kind of get to the heart of this, then.  So
6      in looking at this language in 511.01 (A) which states
7      that "a case shall be opened when a complaint of
8      possible misconduct against a credential holder has
9      come to the attention of the Department either through
10     direct reporting or other means," what is the process
11     that is used to determine whether -- what is a
12     complaint of possible misconduct that would trigger a
13     case opening?
14  A.  Some of the initial criteria that the Department of
15      Education considers is whether or not the individual
16      that is being reported is, in fact, a licensed
17      educator.
18  Q.  If I may?  If the person is, in fact, a licensed
19      educator, is there any other criteria that's used in
20      determining whether or not the complaint consists of
21      possible misconduct that would trigger opening a case?
22  A.  The process would include getting some facts that would
23      support the allegation to determine if the allegation
24      does, in fact, fall within the code of conduct or if it
25      falls outside of the code of conduct.

45

1  Q.  Got you. So I know this happens before you open a
2      case. So in determining whether the case should be
3      opened, and when you're gathering those facts, how
4      would the Department go about gathering those facts?
5  A.  **Your question is very broad. Every case is different,**
6      **as I think you well know. In general terms, those**
7      **facts are gathered during that initial conversation.**
8  Q.  Okay. Are facts gathered by reaching out to school
9      superintendents at this stage in deciding whether to
10     open a case?
11 A.  **That could be done, yes.**
12 Q.  Are documents requested?
13 A.  **That request could be made, yes.**
14 Q.  Who's involved in the Department in the decision to
15     decide whether to open a case?
16 A.  **Typically, the decision is a discussion between myself**
17     **and Richard Farrell.**
18 Q.  Is the commissioner involved in those decisions in
19     deciding whether to open a case?
20 A.  **No.**
21 Q.  Has he ever been involved in that decision to decide
22     whether to open a case?
23 A.  **When the Department of Education opens a case, it's**
24     **just in receipt of information. There's no**
25     **decision-making position at that point in time.**

46

1  Q.  But in reading -- I just want to make sure my
2      understanding is correct here. In looking at 511.01
3      (A), my reading of that is that a case is opened when a
4      complaint of possible misconduct occurs. So is it
5      inaccurate to say that the Department makes a
6      determination as to whether or not possible misconduct
7      occurred before opening a case?
8  A.  **I think that Ed 511.01 (A) has to be read in**
9      conjunction with Ed 511.01 (B).
10 Q.  Okay. Is there a difference between opening a case and
11     an investigation within the Department?
12 A.  **Based upon my understanding of the code of conduct and**
13     **Ed 511, yes, there is.**
14 Q.  So that's really what I'm trying to parse out here. So
15     going back to subsection A. Does the Department make a
16     determination as to whether possible misconduct may
17     have occurred in deciding whether to open a case?
18 A.  **No.**
19 Q.  So how do you -- how would you then explain the process
20     in deciding whether to open a case, just so I
21     understand the process clearly.
22 A.  **My understanding of the code of conduct in Ed 511.01**
23     **and the Department of Education's practice as it**
24     **relates to this area is that a case is opened when**
25     **information is received.**

47

1  Q.  Would you open a case if a complaint was made but you
2      couldn't identify any potential violation of the code
3      of conduct in the complaint?
4      MR. KENISON-MARVIN:  Can I object?
5      Vagueness. Can you clarify when you're saying "you"?
6      Some of your questions have been DOE. Can you just
7      clarify that?
8      MR. BISSONETTE:  I'm asking -- she oversees
9      these investigations, so I'm asking what she knows.
10     THE WITNESS:  Can you read the question back?
11     (Court reporter read back question.)
12     THE WITNESS:  So opening a case would be
13     getting enough information to decide if there was a
14     possible violation or there wasn't. It's the initial
15     fact-finding, if you will, fact gathering.
16 BY MR. BISSONETTE:
17 Q.  Got it. So, just so I'm clear, a case will be opened
18     before a determination has been made that there's
19     possible misconduct. Is that an accurate understanding
20     of how the Department proceeds?
21 A.  **In terms of documenting information received, yes.**
22 Q.  Okay. Gotcha. Okay. I'm going to move on now to
23     paragraph B here that says, "After an initial review,
24     if the Department determines that a possible violation
25     of the code" -- I'm going to delete the as-specified

48

1      language -- "has occurred, an investigation shall be
2      opened."
3      Do you see that language?
4  A.  **Yes.**
5  Q.  So I just want to make sure it's accurate to say that
6      an investigation shall be opened by the Department
7      after an initial review if the Department determines
8      there's a possible violation, right?
9  A.  **Yes, that is what Ed 511.01 (B) says, yes.**
10 Q.  So if the Department concludes that there has been a
11     possible violation, the Department is obligated to open
12     an investigation, right?
13     MR. KENISON-MARVIN:  Objection to the extent
14     it calls for a legal conclusion. You can answer.
15     THE WITNESS:  Can you read the question back?
16     (Court reporter read back question.)
17     THE WITNESS:  That is my understanding of Ed
18     511.01 (B), yes.
19 BY MR. BISSONETTE:
20 Q.  So in determining whether there has been a possible
21     violation, I want to make sure I understand your
22     testimony correct. That would also include reaching
23     out to gather information from school districts,
24     correct?
25 A.  **It could.**

**49**

1  Q.  What else could it include?

2  A.  **We could talk to other individuals that might be**

3  **administrators. Depends on the nature of the facts.**

4  Q.  And it could include requesting documents from school

5  districts, right?

6  A.  **I believe I've already testified to that, yes.**

7  Q.  I just wanted to confirm.

8      And, under subsection B, it is only the Department

9  that makes this determination as to whether a possible

10  violation of the code of conduct has occurred,

11  correct?

12  A.  **That is my reading of Ed 511.01 (B), yes.**

13  Q.  In practice, is that how this works?

14  A.  **Yes.**

15  Q.  Okay. Now kind of moving on to the duty to report. I

16  know there was some testimony before a little bit about

17  that. That is on page PL00017 of Exhibit 2.

18      Can you explain to me how the duty to report works

19  under the code of conduct?

20      MR. KENISON-MARVIN: Objection. Vague. You

21  can answer.

22      THE WITNESS: Can you specify which section

23  of Ed 510.05 your question pertains to?

24      MR. BISSONETTE: Subsection A.

25      THE WITNESS: Ed 510.05 (A) states that "any

**50**

1  credential holder or licensed educator in the state of

2  New Hampshire has an obligation to report a suspected

3  violation of the code of conduct in accordance with

4  their school reporting procedures."

5  BY MR. BISSONETTE:

6  Q.  And that's how this applies in practice, just pursuant

7  to those very terms, correct? Strike that.

8      The Department enforces those provisions in

9  subsection A, correct?

10      Let me ask it another way. I'm not trying to

11  trick you.

12      The duty to report language in subsection A,

13  that's enforced by the Department, right?

14  A.  **I can't think of an instance in which the Department**

15  **has enforced that particular subparagraph. Is that**

16  **your question?**

17  Q.  No, no. I'm sorry. I see the confusion. My question

18  is a little different. This is -- subsection A in

19  510.05, that applies to educators in the state of New

20  Hampshire, right?

21      MR. KENISON-MARVIN: Objection. Vague.

22      THE WITNESS: No, it does not.

23  BY MR. BISSONETTE:

24  Q.  Okay. Why doesn't it?

25  A.  **Well, you said "educator." It doesn't apply to a**

**51**

1  **nonlicensed individual.**

2  Q.  Does the Department of Education believe that section

3  510.05 (A) is enforceable?

4      MR. KENISON-MARVIN: Objection to the extent

5  it calls for a legal opinion. You can answer.

6      THE WITNESS: I suppose it could be

7  enforceable.

8  BY MR. BISSONETTE:

9  Q.  Does the Department enforce it? It may not have cited

10  an educator for it, but is it something that it

11  enforces?

12      MR. KENISON-MARVIN: Objection. Vague.

13      THE WITNESS: It's difficult to say that the

14  Department enforces a particular provision, in this

15  instance, Ed 510.05 (A), if the Department has not done

16  so.

17  BY MR. BISSONETTE:

18  Q.  Does the Department of Education expect credential

19  holders to comply with section 510.05 (A)?

20  A.  **Yes.**

21  Q.  Okay. Is a credential holder's failure to comply with

22  section 510.05 (A) an independent violation of the code

23  of conduct?

24      MR. KENISON-MARVIN: Objection to the extent

25  it calls for a legal conclusion, and it's a

**52**

1  hypothetical.

2      THE WITNESS: Recognizing that it's a

3  hypothetical question, I suppose the Department could

4  take action in that instance under 510.05 (A), yes.

5  BY MR. BISSONETTE:

6  Q.  I believe your earlier testimony is that you were

7  involved in the drafting of this section. Can you

8  describe what you recall about your involvement in the

9  drafting of this section?

10      MR. KENISON-MARVIN: Object and instruct the

11  witness not to answer the question to the extent that

12  the question calls for specific details as to

13  conversation -- pre-decisional deliberations with

14  respect to the finality.

15      I don't know if you want me to say any more,

16  Gilles?

17      MR. BISSONETTE: Yeah, let me -- can you just

18  read back the question? Thank you for that. I just

19  want to make sure we're all in the same direction here.

20      (Court reporter read back question.)

21      MR. BISSONETTE: Is there a deliberative

22  process objection to that?

23      MR. KENISON-MARVIN: Yeah, I think that

24  question calls for information that would be

25  pre-decisional before this was final, and was

53

1  deliberative as to what it would be.
2  BY MR. BISSONETTE:
3  Q.  Going back to your earlier testimony that you were
4      involved in this drafting.  Who else was involved in
5      the drafting of this section besides you?
6  **A.  As to this particular section?**
7  Q.  Yes.
8  **A.  Ed 510.05 (A).  Sitting here today, I do not recall all**
9      **of the individuals who were involved in the drafting.**
10 Q.  Do you recall why this language was put in the code?
11         MR. KENISON-MARVIN:  Again, instruct the
12      witness not to answer to the extent the responsive
13      information would be -- involve pre-decisional
14      conversations about purposes of the code -- purposes of
15      this provision.
16         MR. BISSONETTE:  So I think my question was
17      just do you recall why?
18         MR. KENISON-MARVIN:  Okay.
19         MR. BISSONETTE:  So I think what I would just
20      do is ask yes or no, and, based on your response, I'll
21      decide the extent to which I probe.
22         Does that make sense, Nate?
23         MR. KENISON-MARVIN:  Yeah, I just want to
24      instruct the witness not to --
25         MR. BISSONETTE:  Fair enough.  No, I see

54

1  where you're going.
2         THE WITNESS:  Can you repeat the question?
3         (Court reporter read back question.)
4         THE WITNESS:  The code of conduct was created
5      by a stakeholder group, and the general sense was
6      wanting certified educators to report any instances of
7      misconduct.  I cannot recall any exact discussions that
8      were had back when the code was created as it pertains
9      to Ed 510.05 section A, in particular, sitting here
10     today, anyway.
11 BY MR. BISSONETTE:
12 Q.  In evaluating a -- in evaluating the duty to report
13     violation -- sorry, strike that.
14        In evaluating a duty to report potential
15     violation, can the Department investigate an educator
16     for failing to comply with that duty as well as the
17     other educator who may have actually violated the code?
18     Can those investigations happen at the same time, is my
19     question.
20        MR. KENISON-MARVIN:  I will object to it
21     being compound.
22        THE WITNESS:  Is it possible to break out
23     those questions?
24        MR. BISSONETTE:  Yeah, sure.
25 BY MR. BISSONETTE:

55

1  Q.  In evaluating the duty to report, the Department can
2      conduct investigations concerning whether an educator
3      has complied with that duty, right?
4  **A.  You're referring to 510.05 (A), right?**
5  Q.  Mm-hm.
6  **A.  I believe my testimony previous was yes.**
7  Q.  Okay.
8  **A.  The Department would have that authority.**
9  Q.  So my question is can the Department investigate
10     simultaneously a potential duty to report violation
11     alongside an investigation into the educator whose
12     conduct substantively violated the code?
13 **A.  I suppose that the Department could do that, yes.**
14 Q.  Are you aware of any educator who has been found in
15     violation of the duty to report since the code -- since
16     the code's enactment?
17 **A.  When you use the term "educator," can you clarify what**
18     **you mean?**
19 Q.  What I mean is credential holder.
20 **A.  Thank you.  Can you repeat the question?**
21        (Court reporter read back question.)
22        THE WITNESS:  As it pertains to Ed 510.05
23     (A), to the best of my recollection sitting here today,
24     I am not aware of any action taken under that
25     particular provision, 510.05 (A).

56

1  BY MR. BISSONETTE:
2  Q.  Gotcha.  Thank you.  And I'm going to just refer you to
3      page 10 which is actually Bates stamped PL18,
4      subsection F in particular.  I just want to make sure I
5      have a handle on that section.  I want to flag it for
6      you just so I'm not hiding the ball, but I just want to
7      make sure I understand it.
8         Is it fair to say that under these sections, the
9      Department must investigate a duty to report violation
10     where they have -- strike that.  Let me make sure I
11     have this language correct.
12        What's your understanding of subsection F?
13 **A.  My understanding of Ed 510.05 (F) is that the**
14     **Department has the ability to undertake an**
15     **investigation, as it's stated in the rule, if there is**
16     **a reason to believe that a licensed educator failed to**
17     **report a violation of the code of conduct.**
18 Q.  And the language in subsection F says "shall," correct?
19     "Shall undertake an investigation"?
20 **A.  Yes, it uses the word "shall undertake an**
21     **investigation," yes.**
22 Q.  So just so I understand.  So if the Department has
23     reason to suspect that a violation of the code of
24     conduct was known by a credential holder and not
25     reported, the Department must undertake an

**57**

1  investigation, right?
2      MR. KENISON-MARVIN: Objection to the extent
3  it calls for a legal conclusion. You can answer.
4      THE WITNESS: Can you read the question back?
5      (Court reporter read back question.)
6      THE WITNESS: I think that's an accurate
7  interpretation of Ed 510.05 (F), yes.
8  BY MR. BISSONETTE:
9  Q. An accurate?
10 A. An accurate.
11 Q. Inaccurate?
12 A. No. Accurate.
13 Q. It is accurate?
14 A. It is accurate, yes.
15 Q. Okay. Thank you. Sorry. I wasn't trying to belabor
16 the point.
17 A. I should have been clearer.
18 Q. I just wanted to make sure.
19 A. That's all right.
20 Q. Thank you.
21     MR. KENISON-MARVIN: I missed where we left
22 off with that.
23     MR. BISSONETTE: It is accurate.
24     MR. KAHNE: Yes.
25     MR. BISSONETTE: It is accurate.

**58**

1      MR. KENISON-MARVIN: Can you -- can we just
2  clarify?
3      MR. BISSONETTE: Do you want to read the
4  question back? I'm sure the people on Zoom are
5  chuckling right now.
6      (Court reporter read back testimony.)
7  BY MR. BISSONETTE:
8  Q. So we just had that answer read back. Is that an
9  accurate reflection of your testimony?
10 A. Yes.
11 Q. Okay.
12 A. I think so.
13 Q. Yes. I think we're good.
14     MR. BISSONETTE: Are we good?
15     MR. KENISON-MARVIN: I'm good.
16     MR. BISSONETTE: Okay. Thank you.
17 BY MR. BISSONETTE:
18 Q. I want to just pivot now to penalties under the code of
19 conduct. What are the penalties that exist if the
20 Department concludes that there's been violation of the
21 code?
22 A. Is there a particular section of the code of conduct
23 that you're referring to?
24 Q. Sure. I believe the language is in PL19 of Exhibit 2,
25 so I could direct your attention to, particularly, the

**59**

1  language in subsection J.
2  A. According to this document, which is Ed 511.01 (J)(2),
3  the potential discipline would be either a suspension
4  or revocation, or a reprimand.
5  Q. Okay. I know you said "potential." Based on my
6  reading of this, is it fair to say that under
7  subsection J, if there is -- if a credential holder is
8  deemed in violation of the code, that there has to be a
9  form of discipline? Is that an accurate reading of
10 this?
11     MR. KENISON-MARVIN: Objection to the extent
12 it calls for a legal opinion, and under 106 for
13 completeness with respect to other parts of the code,
14 and the administrative rules. You can answer.
15     THE WITNESS: Looking at 511.01 (J)(2), it
16 reads that the "Department shall propose a form of
17 discipline as follows."
18 BY MR. BISSONETTE:
19 Q. So I guess my question is -- I'm going to ask about the
20 code and then in practice.
21     So, under the code, is it your position that if
22 there is a violation, that discipline has to be
23 proposed?
24     MR. KENISON-MARVIN: Same objections. You
25 can answer.

**60**

1      THE WITNESS: Based upon the plain reading of
2  511.01 (J)(2), I would agree with that interpretation,
3  yes.
4  BY MR. BISSONETTE:
5  Q. Is that consistent with the Department's practice, that
6  interpretation?
7  A. The Department's practice does not look at 511.01
8  (J)(2) in isolation. It would incorporate all of the
9  other provisions that follow it in its entirety.
10 Q. And are those provisions -- what provisions are you
11 referring to?
12 A. (J)(3) and (J)(4), (J)(5).
13 Q. Is it correct to say, though, that those provisions
14 give criteria for the Department in deciding what
15 discipline to implement, but they don't allow the
16 Department to not impose discipline? Is that a correct
17 reading of the code?
18 A. I disagree with that, actually.
19 Q. Okay. Explain why.
20 A. I'm looking at 511.01 (J)(7), which is on PL00020.
21 Seven says, "If no disciplinary sanction is proposed,
22 the Department shall notify the credential holder in
23 writing that the investigation is closed."
24 Q. So your -- I just want to make sure I understand with
25 respect to section seven. You read that to mean even

61

1 if a violation was found, there could be a situation in
2 which no disciplinary sanction is proposed, correct?
3 **A. That is my interpretation looking at (J) in its**
4 **totality, not just in isolation of certain**
5 **subparagraphs, yes.**
6 Q. In practice, is that the practice of the Department?
7 **A. That's a very broad question.**
8 Q. Well, getting back to the specifics. It seems that the
9 Department, or at least you, read the rule to suggest
10 that even if there's been a violation, that no
11 disciplinary -- it's possible for no disciplinary
12 sanctions to be proposed. Is that a position that you
13 have as you are overseeing investigations under the
14 code of conduct?
15 MR. KENISON-MARVIN: Objection. Vague and
16 compound.
17 THE WITNESS: I believe that we have followed
18 that practice. Sitting here today, to the best of my
19 recollection, I cannot think of a particular
20 instance.
21 BY MR. BISSONETTE:
22 Q. Okay. So just so I'm clear, sitting here today, you
23 can't think of a particular instance in which there's
24 been a finding that the code of conduct has been
25 violated, but where no disciplinary sanction was

62

1 proposed, right?
2 **A. To the best of my recollection, sitting here today, I**
3 **cannot think of a particular case that would fall**
4 **within that fact pattern, but that doesn't mean it**
5 **doesn't exist.**
6 Q. Okay. Besides the three sanctions that we talked about
7 before, suspension, revocation, and reprimand, are
8 there other sanctions that the Department may oppose --
9 may propose if it concludes that there's been a
10 violation of the code of conduct?
11 **A. To the best of my knowledge, no.**
12 MR. BISSONETTE: I'm going to finish my line
13 with the code of conduct then maybe we can take a break
14 for a half an hour lunch. Does that make sense.
15 MR. KENISON-MARVIN: Fine with me.
16 MR. BISSONETTE: Okay. I want to -- and then
17 I can promise we won't talk as much about the code of
18 conduct after we eat.
19 BY MR. BISSONETTE:
20 Q. I want to just turn your attention, Attorney Fenton, to
21 page 18 on Exhibit 2. I'm going back to the language
22 in 511.01.
23 The Department determines that a possible
24 violation of the code has occurred, an investigation
25 shall be opened. We had a discussion about that

63

1 language.
2 Can you walk me through what those investigations
3 look like after there's been that threshold
4 determination of a possible violation of the code?
5 **A. Pursuant to Ed 511.01 (B), if the Department of**
6 **Education opens an investigation against a credentialed**
7 **educator, that individual is notified via a certified**
8 **letter.**
9 **I'll rephrase. It's a letter sent via certified**
10 **mail. Copies of that letter are sent to the respective**
11 **union, who is representing that individual, and the**
12 **employing superintendent. And those letters to the**
13 **union and the superintendent are sent via regular**
14 **mail.**
15 Q. And, after that process occurs, is there anything else
16 the Department does as part of its investigation to
17 decide whether there has been an actual violation of
18 the code?
19 **A. Depending upon the facts of the particular case,**
20 **additional steps could be taken, yes.**
21 Q. Could you just walk me through what those -- some of
22 those steps could be?
23 **A. Those steps could be receiving additional documentation**
24 **from the school district. Those steps could be meeting**
25 **with the educator. Those steps could include**

64

1 **interviewing other witnesses. Those steps could**
2 **include speaking with the union attorney representing**
3 **the individual.**
4 MR. BISSONETTE: Can I just have one minute?
5 MR. KENISON-MARVIN: Yes.
6 MR. BISSONETTE: I think can we go off, Nate?
7 MR. KENISON-MARVIN: I'm good with that.
8 (Recess taken.)
9 BY MR. BISSONETTE:
10 Q. Thank you, Attorney Fenton. I hope everyone had a good
11 lunch. I do have some -- a few follow-up questions
12 on the code of conduct. I know I promised I wouldn't,
13 but, I do, and then we're going to quickly pivot to
14 some other topics, thankfully.
15 So I'm going to just again go back to Exhibit 2,
16 direct your attention -- you have it in front of you.
17 Great. I'm looking, in particular, at Bates stamp PL21
18 in section 511.02. When you've identified that, just
19 let me know. I'm not asking you to read it, but just
20 when you're at that page.
21 Are you at that page?
22 **A. Yes, I'm at the page. Could you remind me what --**
23 Q. 511.02.
24 **A. Okay.**
25 Q. So I'm just looking at subsection A. I'm just going to

**65**

1    read the first clause. "If the Department determines
2    that a credential holder has violated the code of
3    conduct."
4        My question is who, at the Department, makes the
5    decision that a credential holder has violated the code
6    of conduct?
7  **A.  There is no one person at the Department of Education**
8    **who makes that determination.**
9  Q.  So who are the individuals that are involved in that
10    decision?
11  **A.  Again, your question is very broad, keeping in mind**
12    **that each case is fact dependent.**
13  Q.  So I believe your testimony that there's no one
14    individual. So who would be the individuals that would
15    be involved in that decision?
16  **A.  The individuals who could be involved, depending on the**
17    **nature of the case, would be myself, Richard Farrell,**
18    **the commissioner, the deputy commissioner, and there**
19    **could be others, depending upon the nature of the**
20    **case.**
21  Q.  What's the criteria used in deciding -- strike that.
22        What's the criteria that the Department uses in
23    determining whether a credential holder has violated
24    the code of conduct?
25  **A.  That determination would be made based on the facts of**

**66**

1    **the individual case.**
2  Q.  So it would depend on the facts. Would it depend on
3    anything else?
4  **A.  Are you referring to whether or not there's been a**
5    **violation of the code of conduct?**
6  Q.  Yeah.
7  **A.  Or are you referring to 511.02 (A), which is broader**
8    **than just determining whether the code of conduct has**
9    **been violated?**
10  Q.  That's a good question. I think really what I'm just
11    trying to get at is that determination that a violation
12    has been occurred, and the process the Department goes
13    through in making that decision.
14        So I'll kind of reiterate my question. I know
15    that you said that decision is based on the facts of
16    the individual case. Is there any other criteria -- my
17    question, is there any other criteria that's used by
18    the Department in deciding whether a credential holder
19    has violated the code of conduct?
20  **A.  In large part, that determination is made based on the**
21    **individual facts of the case. However, there could be**
22    **instances in which other criteria, other information is**
23    **taken into account.**
24  Q.  Any idea what that criteria would be just beyond the
25    individual facts of each case?

**67**

1  **A.  Sitting here today, I can't thank of a particular for**
2    **instance.**
3  Q.  Is there any criteria in the code of conduct in Exhibit
4    2 that articulates how the Department decides whether a
5    credential holder has violated the code?
6  **A.  I'd have to review the document.**
7  Q.  Please do. Having looked at the document, do you have
8    a response?
9  **A.  Not that I can see.**
10  Q.  Okay. I know that you listed many people who could be
11    involved in the decision -- the decision as to whether
12    there's been a violation. Are there regular meetings
13    that occur within the Department to make those
14    determinations?
15  **A.  To explicitly make those determinations, no, but we do**
16    **have regular meetings, yes.**
17  Q.  So are there meetings that occur within the Department
18    where these determinations are made?
19  **A.  Yes.**
20  Q.  Do they just depend on when the need arises, or are
21    they regularly scheduled meetings?
22  **A.  In most part, they are regularly scheduled meetings.**
23  Q.  Do you know how frequently those meetings occur?
24  **A.  Generally, monthly.**
25  Q.  And who would be at those meetings?

**68**

1  **A.  I believe the individuals that I previously testified**
2    **to. I will reiterate. Myself, Richard Farrell, the**
3    **commissioner, and the deputy commissioner.**
4  Q.  Gotcha. Thank you. Are these group decisions or --
5    sorry, strike that.
6        Is the decision as to whether or not a violation
7    has occurred a group decision, or does one person in
8    those meetings have the final say?
9  **A.  Whether or not there's been a violation of the code of**
10    **conduct is based upon the facts as presented.**
11  Q.  No, I understand. I think my question is a little
12    different, though. I'm just trying to figure out who
13    makes the decision based on the facts presented that
14    there's been a violation.
15        So kind of to reiterate my question, is the
16    decision as to whether or not a violation has occurred
17    based on the facts presented a group decision, or a
18    decision that's made by one person in that meeting?
19  **A.  I apologize if I'm being difficult, but it's -- it's**
20    **not an individual or a group of people who decide**
21    **whether or not there's been a violation of the code of**
22    **conduct. It's, again, based upon the facts as**
23    **presented.**
24  Q.  Yeah, but you'd agree with me that someone's making the
25    decision based upon the facts presented that there's

**69**

1    been a violation, right?
2  **A. I disagree with how you're phrasing it.**
3  Q.  Okay. I'm going to try to phrase it again.
4       So you have monthly meetings, approximately, in
5  which there are discussions concerning whether
6  violations have occurred under the code of conduct,
7  correct?
8  **A. That is not the purpose of those meetings, no.**
9  Q.  But during those meetings, those discussions occur,
10  correct?
11  **A. Those discussions can occur at that meeting. They**
12    **don't always occur at that meeting.**
13  Q.  Okay. So I guess my question is during those meetings,
14  I know who's present, but who makes the final decision
15  that there has been a violation? Whose decision is
16  that, is the question I'm asking.
17  **A.  And I'm not able to attribute that decision to any one**
18    **individual. The decision is based, again, as I've**
19    **testified, upon the facts of the case.**
20  Q.  Would you describe it as a group decision then? I'm
21  not trying to be difficult here.
22  **A. No, neither am I.**
23  Q.  I'm just trying to understand. Is it a group decision
24  that's made by all the participants in that meeting?
25  Is that how you would frame it, describe it?

**70**

1  **A.  Again, I'm not able to attribute the decision-making as**
2    **it pertains to whether there's been a violation of the**
3    **code of conduct to any one individual. It is fact**
4    **dependent.**
5  Q.  Okay. So you can't attribute it to any individual.
6  Can you attribute it to a group of individuals? Would
7  it be to everyone in that room? Who makes -- strike
8  that.
9      Who, in that room, makes the decision?
10  **A.  As I've testified to, I'm unable to attribute the**
11    **decision of whether there's been a violation of the**
12    **code of conduct to any one individual or a group of**
13    **individuals as that determination is pursuant to the**
14    **facts of the individual case.**
15  Q.  So I just want to make sure I understand. So you're
16  not able to testify as to who makes the decision within
17  the Department that a violation has occurred; is that
18  correct?
19  **A. That is correct. It is a fact-dependent**
20    **determination.**
21  Q.  Would there be -- ever be a series of facts in which
22  you make the final decision as to whether or not
23  misconduct occurred?
24  **A.  Whether or not there's a violation of the code of**
25    **conduct is based upon the facts of the case. It is not**

**71**

1    **attributable to any one individual.**
2  Q.  I hear you. I think that's where my question was a
3  little different.
4      Would there ever be a set of facts in which you
5  were the final decision-maker in deciding whether
6  misconduct occurred?
7  **A.  I suppose there could be. I can't think of a**
8    **particular for instance when that has occurred.**
9  Q.  Okay. Has there been a situation -- strike that.
10      Has there been a time in which a determination has
11  been made that there was a violation under the code of
12  conduct in which you were the final decision-maker?
13  **A.  As I've testified to previously, a determination of**
14    **whether or not there's a code of conduct violation is**
15    **determined by the facts. It's not attributable to any**
16    **one person. That would include myself.**
17  Q.  Is it attributable -- it's attributable to the
18  Department, I assume? The Department's making the
19  decision?
20  **A.  Again, I will refer you to my prior testimony. It's**
21    **based upon the facts of the individual case.**
22  Q.  Are you aware of a scenario, based on the facts of an
23  individual case, in which you made the decision that a
24  violation had occurred?
25  **A.  Sitting here today, I do not recall such an instance.**

**72**

1  I will refer to my prior testimony that that decision
2  is based upon the facts.
3  Q.  Okay. Has there ever been a series of facts in a case
4  in which a determination of misconduct -- a
5  determination that there's been a violation of the code
6  of conduct -- let me strike that again. There's a lot
7  there.
8      Has there been a situation in which there's been a
9  determination made in which -- that there's been a
10  violation, and that the commissioner was the
11  decision-maker in determining that there was a
12  violation?
13  **A.  I will refer you to my prior testimony that the**
14    **determination of whether there's been a violation of**
15    **the code of conduct is not attributable to any one**
16    **individual. Sitting here today, I'm not -- I do not**
17    **recall a situation in which the commissioner made the**
18    **determination that there was a violation of the code of**
19    **conduct.**
20  Q.  If it's not attributable to any one individual, is it
21  attributable to the people in the meeting in which that
22  decision is made?
23  **A.  Again, and I apologize for being difficult. I think**
24    **we're getting into the world of asked and answered, but**
25    **I won't play the role of the lawyer here.**

73

1    I will refer you to my prior testimony. The
2 decision as to whether there's been a violation of the
3 code of conduct is based upon the facts. It is not
4 attributable to any one individual.
5 Q.  I just want to -- the problem I'm having is that you're
6    using passive voice. I'm trying to use active voice.
7    So what I'm just trying to get at is who individually
8    makes these decisions based on the facts of each case?
9    That's it. Is that something that you feel comfortable
10    answering?
11 A.  To the best of my ability, I feel I've already answered
12    that question.
13    MR. BISSONETTE: Well, it's your -- it's your
14    lawyer that makes the decision whether to instruct you
15    not to answer. You don't have that prerogative,
16    regrettably, so I would just ask your counsel, is that
17    instruction being made? And, if not, I would ask that
18    it be answered. It's that simple.
19    So if that instruction's being made, we can
20    log it, have a conversation with the judge. There's no
21    privilege assertion. It's clearly relevant to this
22    case. Just trying to get at one of the core aspects of
23    this case as to who makes the decision. It's that
24    simple. So unless there's an instruction not to
25    answer, I would ask that the witness answer it.

74

1    MR. KENISON-MARVIN: Do you mind if we take a
2 break?
3    MR. BISSONETTE: Sure.
4    MR. KENISON-MARVIN: And I just talk with her
5 real fast? We can leave. We'll go.
6    (Recess taken.)
7    (Court reporter read back question.)
8 BY MR. BISSONETTE:
9 Q.  Is that something that you can answer?
10 A.  In large part, keeping in mind that each case is fact
11    dependent, the information that is provided to the
12    Department of Education comes through from a report, an
13    investigative report, that is done by the district, or
14    the district hires outside counsel to do that
15    investigation, and that investigation already makes the
16    finding.
17    That is why my testimony was that it's not
18    attributable to one individual because the
19    determination has already been made by an independent
20    report that was provided by the school district. Where
21    the Department will have discussions is when we decide
22    whether a particular fact pattern should be dealt with
23    as an employment issue or if it rises to the level of a
24    code of conduct.
25 Q.  So on the question as to whether it rises to the level

75

1    of a code of conduct violation, that's really the
2    decision that I'm interested in.
3 A.  Okay.
4 Q.  So I just -- my question is is that decision a group
5    decision, or is there any person at the DOE that has
6    final decision-making authority over that decision?
7 A.  Again, keeping in mind that each case is individual and
8    fact-dependent, in large part, we reach those decisions
9    as a group.
10 Q.  What happens if there's disagreement among individuals
11    in the group as to whether or not something reaches the
12    level of a code of conduct violation?
13 A.  Again, keeping in mind that every case is individual
14    and fact-dependent, we will discuss our respective
15    views.
16 Q.  And who makes the decision?
17 A.  I hate to use the old lawyer answer, it depends, but it
18    depends.
19 Q.  Okay. Have there been situations in which you have
20    made that decision in the event of a disagreement?
21 A.  I imagine that there have been, yes.
22 Q.  Have there been circumstances in which, in the event of
23    a disagreement, the commissioner that made that
24    decision?
25 A.  I would imagine that there have been, yes.

76

1 Q.  Have there been situations where there's disagreement
2    and Mr. Farrell has made the decision in determining
3    whether or not something has been a code of conduct
4    violation?
5 A.  I would imagine that there have been, yes.
6 Q.  Okay.
7    MR. BISSONETTE: Real quick.
8    (Discussion off record.)
9 BY MR. BISSONETTE:
10 Q.  Thank you for that. I'm going to kind of move on, I
11    know, as promised from the code of conduct.
12    So as to not hide of ball, what I'm going to be
13    talking a little bit about and asking you some
14    questions on is kind of this DOE referral process to
15    the Human Rights Commission. I know there was some
16    legislative testimony on that so I just want to just
17    kind of name where we'll be going there.
18 A.  I appreciate that. Thank you.
19 Q.  Not trying to hide the ball here.
20    I'm happy to present this as an exhibit, Attorney
21    Fenton, but I know that in your -- there was discussion
22    on January 26th in your testimony on HB33 that there
23    have been instances in which the Department says --
24 A.  I'm sorry, HB33 or --
25 Q.  I got it wrong. Let me start over.

77

1  A.  Okay.
2        MR. BISSONETTE:  You know, I'm just going to
3  introduce it.  It makes things easier.  We'll do
4  Exhibit 5.
5        (Exhibits 5 and 6 marked for identification.)
6  BY MR. BISSONETTE:
7  Q.  I'm just pausing to find the language I'm referring to.
8  I'm sorry, just bear with me.
9  A.  Take your time.
10 Q.  So, Attorney Fenton, I'm just going to refer you to
11 Exhibit 5 which I would represent is a portion of the
12 hearing, not the complete hearing, on HB33.  HB533.
13       And just directing your attention to the page
14 Bates stamped 795, on the bottom right, the language
15 stating, and I quote, "And imbedded within that fact
16 pattern there have been instances in which the
17 Department says there might be more here, there might
18 be something for the Human Rights Commission to look
19 at, and we have tried to refer that matter over."
20       Do you see that language?
21 A.  I do.
22 Q.  What instances were you referring to in your testimony
23 to the House Judiciary Committee there?
24 A.  Understanding the language of House Bill 2, that
25 matters that fall within HB 2 are to be adjudicated or

78

1  reviewed by the Human Rights Commission and/or the
2  Attorney General's office, there have been times in
3  which matters were brought to the Department's --
4  Department of Education's attention which the
5  Department then wanted to refer to the Human Rights
6  Commission for their review and adjudication if
7  appropriate.
8  Q.  And so that testimony dealt with code of conduct issues
9  with respect to HB 2 in particular, or more broadly?
10 A.  I would say issues that may or may not fall within HB
11 2.
12 Q.  Do you recall what those specific instances were that's
13 referenced on page 795, page eight, line 21?
14 A.  I believe what I was referring to here was an instance
15 that the Department of Education was in receipt of
16 information about actions that an educator took which
17 may or may not have been a violation of HB 2.
18 Q.  In that particular instance, had the -- I won't get
19 into the facts of it, but had the Department made a
20 decision on its own that there was a violation of HB
21 2?
22 A.  Absolutely not.
23 Q.  Okay.  Did the Department think it could have been a
24 possible violation?
25 A.  No.

79

1  Q.  Do you recall what the specific complaint was about, or
2  complaints?  Let me strike that.
3        When you say "instances," were you referring to
4  one instance or multiple instances?
5  A.  In this particular reference that you've made,
6  referring to Bates stamp 0795, page eight, I believe
7  what I was referring to in that instance was a matter
8  which had been brought to the Department of Education's
9  attention by a superintendent pursuant to the code of
10 conduct.
11 Q.  Do you recall what the nature -- strike that.
12       Do you recall what the substance of the report was
13 by the superintendent to the Department?
14 A.  Yes.
15 Q.  What was it?
16 A.  The nature of the report that was brought to the
17 Department of Education's attention via the code of
18 conduct was that a licensed educator had used a racial
19 slur in her classroom.  It was not in reference to any
20 one individual, but had used it more than one time.
21 Q.  Do you recall the SAU that was involved?
22 A.  I do not recall the number of the SAU.
23 Q.  Do you recall the -- where that school was located?
24 A.  Without being coy, I think so.  I'm not entirely
25 certain.

80

1  Q.  Recognizing that you may not be 100 percent certain, we
2  can caveat answers like that -- without being 100
3  percent sure, do you have an idea as to what the
4  municipality is, recognizing, again, that you're not a
5  hundred percent sure?
6  A.  I believe it was in the Sullivan County area.
7  Q.  Do you have an idea as to what the municipality was of
8  where this occurred?
9  A.  Might have been Newport.  Might have been
10 Charlestown.
11 Q.  Okay.  Besides this potential Sullivan County instance,
12 because I hear what you're saying, were there any other
13 instances that you were referring to when you used the
14 term "have been instances" on page 795 of Exhibit 5?
15 A.  That is the instant that really comes to my mind.
16 Q.  Okay.
17 A.  Were there other issues that were brought to the
18 Department's attention that may or may not have fallen
19 within the purview of House Bill 2?  Yes.
20 Q.  Bear with me for one moment, please.
21 A.  Take your time.
22 Q.  So I think, Attorney Fenton, at least, I'm going to ask
23 you to set those aside.  We can kind of move on from --
24 oh, that's not true.  I'm sorry.  You can set aside
25 Exhibit 5, but I am going to have a question about

81

1  Exhibit 6. My apologies.
2      And, in full disclosure, this is going to be the
3  line of questions asking about the standard operating
4  procedure, so I just want to define that for everyone.
5  A. I appreciate that. Thank you.
6  Q. No problem. Again, not trying to hide the ball.
7      I'm going to refer you, Attorney Fenton, to
8  Exhibit 6, in particular, PL806. And the language at
9  the bottom of page 19 in 806 that starts with -- I'm
10  going to quote, "And in working with Representative
11  Lynn and in working with the Attorney General's office
12  on the original bill, 533, we have since worked with
13  the AG's office to come up with an SOP as to how we
14  transfer those cases to the Human Rights Commission and
15  AG's office."
16      Attorney Fenton, do you see that language that I
17  just referred you to on PL806?
18  A. I do.
19  Q. Okay. Is there currently a standard operating
20  procedure in place with respect to how cases are
21  transferred from the DOE to the Human Rights
22  Commission?
23  A. No.
24  Q. So why did you make that statement to the
25  legislature -- excuse me, to the House Judiciary

82

1  Committee?
2  A. I had met with --
3      MR. KENISON-MARVIN: I'm going to object to
4  the extent that the question calls for communications
5  related to legislative acts, and it would be subject to
6  legislative privilege.
7      So to the extent your answer would include
8  communications that you had about the bill with
9  representatives or -- legislators or their aids, I
10  instruct you not to state that information in response
11  to the question.
12      MR. BISSONETTE: Without getting into too
13  many lawyerly diatribes, I would argue that this is a
14  public statement, and to the extent any privilege
15  exists, that it's been waived, but I -- in the spirit
16  of not getting bogged down in the weeds, I'll just
17  rephrase the question.
18  BY MR. BISSONETTE:
19  Q. Your testimony is that there is no current SOP in place
20  as to how cases are transferred from the HRC --
21  sorry -- from the DOE to the HRC, correct?
22  A. That is correct, yes.
23  Q. Okay. Is it fair to say, without getting into the
24  nature of those discussions, that there were
25  discussions with legislators about that?

83

1  A. Yes.
2  Q. Were there -- excluding discussions in which
3  legislators were involved, have there been -- and
4  without getting into the substance, have there been
5  internal Department of Education discussions concerning
6  an SOP?
7  A. Yes.
8  Q. Okay. Has there been any discussion about -- has
9  anything changed since January -- strike that.
10      Has anything changed since January 2023 when HB533
11  was introduced with respect to how cases can be
12  transferred from the Department of Education to the
13  HRC?
14      MR. KENISON-MARVIN: Objection.
15      MR. BISSONETTE: I'm just asking what the
16  current process is.
17      MR. KENISON-MARVIN: Vague and assuming facts
18  not testified to.
19      You can answer to the extent you know.
20      THE WITNESS: As it relates to the Department
21  of Education's ability to transfer cases to the Human
22  Rights Commission --
23      MR. BISSONETTE: Yes.
24      THE WITNESS: -- to the best of my knowledge,
25  nothing has changed. I should say, directly to the

84

1  Human Rights Commission, nothing has changed.
2  BY MR. BISSONETTE:
3  Q. I understand. Has anything changed with how these --
4  strike that.
5      Are you aware of statements that Representative
6  Glenn Cordelli made in March 2023 when he said that the
7  Attorney General's office has been more cooperative
8  with respect to getting cases referred to the Human
9  Rights Commission? Are you aware of that statement?
10  A. Do you have it?
11  Q. No. I'm just -- it's my -- are you aware of
12  Representative Cordelli having said that publicly? Is
13  that something that you're aware of?
14  A. I wasn't -- to the best of my knowledge, I wasn't
15  present when he said that.
16  Q. Would you agree with the statement that the Attorney
17  General's office has been more cooperative with getting
18  cases referred to the Human Rights Commission since
19  January 2023?
20  A. Yes.
21  Q. Okay. How have they -- how has the Attorney General's
22  office been more cooperative?
23  A. That's a pretty broad question. Is there a way to
24  narrow that down?
25  Q. I'm afraid not. You said that you agreed with that

85

1  statement, and I'm just trying to get at how the
2  Attorney General's office has been more cooperative
3  since January 2023.
4  **A.  Since January of 2023, I had a meeting with Attorney**
5  **Sean Locke of the Attorney General's office, and**
6  **Attorney Luke Brown, and we discussed procedural**
7  **mechanisms by which the Department of Education could**
8  **refer cases that may or may not fall within the purview**
9  **of HB 2 to the Attorney General's office for review.**
10  Q.   And was a decision made during that meeting as to what
11  new process to implement?
12  **A.  We agreed to terms as to what that procedural mechanism**
13  **would look like, and those terms were outlined and**
14  **written down.**
15        MR. BISSONETTE:  Okay.  Can I go off the
16  record?
17        (Recess taken.)
18        (Court reporter read back answer.)
19  BY MR. BISSONETTE:
20  Q.   What was the structure of that agreement?
21  **A.  Not to be difficult, but what do you mean by**
22  **"structure"?**
23  Q.   What was that agreement?  I'll just say that.  What was
24  the agreement?
25  **A.  It's difficult for me to go into the details of it**

86

1  because I don't have it in front of me, but, based upon
2  my recollection, what we had agreed to was that there
3  would be a procedural mechanism in place by which the
4  Department of Education could transfer cases that could
5  or could not fall within HB 2 -- that is not a
6  determination for the Department of Ed to make -- to
7  the Attorney General's office for their review.  And
8  each party agreed to what each agency's role would
9  play, and it was Sean Locke who wrote down an outline
10  of what that would look like.
11  Q.   Was that outline written during that meeting or after
12  that meeting?
13  **A.  The outline that I referred to was written during that**
14  **meeting.**
15  Q.   And was that outline during that meeting circulated to
16  the meeting's participants?
17  **A.  The three of us in that meeting all participated**
18  **verbally in the creation of it, so when you say**
19  **"circulate," I envision each of us holding it,**
20  **reviewing it.  Liz Brown was on a Zoom call, so that**
21  **would not be possible.**
22  Q.   Gotcha.
23  **A.  But did we all work collaboratively?  Yes.**
24  Q.   I just want to make sure I understand who the
25  participants were.  It was obviously you, Attorney

87

1  Locke, Liz Brown.  Were there any others in that
2  meeting?
3  **A.  To the best of my recollection --**
4  Q.   Okay.
5  **A.  -- there were not.**
6  Q.   And that outline that you were referencing, that's
7  something that all three of those participants -- I
8  want to make sure I understand.  Did all three of those
9  participants in that meeting have access to that
10  outline during that meeting?
11  **A.  What do you mean by "access"?**
12  Q.   When was that outline prepared?
13  **A.  I've already testified to that.**
14  Q.   Can you remind me?  I'm sorry.  Because I don't
15  remember it, so forgive me.  When was the outline
16  prepared?
17  **A.  The outline was prepared during the meeting.**
18  Q.   Okay.  And then everyone had access to it during the
19  meeting; is that correct?
20  **A.  I'm not sure what you mean by the term "access."**
21  Q.   I'm just trying to just get to the heart of this.  Can
22  you describe the process by which that outline was
23  created and given to the participants of that
24  meeting?
25  **A.  The three of us discussed what the issue -- the**

88

1  underlying issue was, and that is having the ability
2  for the Department of Education to transfer matters
3  which may or may not fall within the purview of House
4  Bill 2 to the Attorney General's office for review.
5  The three of us worked collaboratively, and it was
6  Attorney Sean Locke who wrote down the outline as to
7  that procedural mechanism.  It was -- so all three of
8  us contributed to it.  We did not take turns writing
9  it.
10       As I mentioned before, Attorney Brown was on a
11  Zoom -- Zoom function.  But it was collaborative in
12  nature, and it was a very strong working draft that
13  Sean then said he would type up and send to me and Liz
14  Brown for review and final steps.
15  Q.   That's helpful.  Thank you.  Did he prepare -- he
16  prepared that outline during the meeting again; is that
17  accurate to say?
18  **A.  So I think I've testified to this previously.  Sean**
19  **Locke wrote an outline during that meeting --**
20  Q.   Okay.
21  **A.  -- that we all contributed to.  It was verbal.  I**
22  **cannot testify whether or not he wrote a different**
23  **outline at a different time, but there was an outline**
24  **produced during that meeting.**
25  Q.   Okay.  Is the process that was agreed -- I know that

89

1    it's still being written up, but is the process that
2    was agreed to during that meeting the process that
3    existed now with respect to whether and how cases can
4    be transferred from the DOE to the HRC?
5  **A.   You'll have to clarify your question. My understanding**
6        **is that the Department of Education is not able to**
7        **transfer matters that may or may not fall within the**
8        **purview of House Bill 2 to the Human Rights**
9        **Commission.**
10 Q.   I guess my question is a little bit more simpler, I
11       think, which is, is the agreement that was reached
12       during that meeting that we just discussed, are the
13       terms of that agreement currently in effect with
14       respect to the transfer of cases from the DOE to the
15       HRC?
16           MR. KENISON-MARVIN: Object as vague and
17       asked and answered. If you want me to explain what I'm
18       thinking, I'm happy to.
19           MR. BISSONETTE: Do you want to do it on or
20       off the record?
21           MR. KENISON-MARVIN: I can do it on.
22           MR. BISSONETTE: Okay.
23           MR. KENISON-MARVIN: I'm just referring to
24       the first question about the standard operating
25       procedure. You'd asked if there was one, and the

90

1    answer, I believe, was no. So if you want to just
2    clarify when you're talking about process, if you're
3    distinguishing that from standard operating procedure?
4        MR. BISSONETTE: I got you. I got you.
5    That's fair. That's fair. So I'll strike the last
6    question.
7    BY MR. BISSONETTE:
8  Q.   My question is the agreement that was reached during
9        the meeting that you previously testified to, are the
10       terms of that agreement the process that currently
11       exists with respect to how cases can be transferred
12       from the DOE to the HRC?
13 **A.   The agreement that was reached in that meeting that I**
14       **testified to talked about transfer of matters that may**
15       **or may not fall within the purview of House Bill 2 from**
16       **the Department of Education to the Attorney General's**
17       **office.**
18 Q.   I see. I got you. Is --
19 **A.   I'm not trying to be difficult.**
20 Q.   No, no. You're right. The way that I framed that was
21       not fully reflective of that caveat, so I'll kind of go
22       back and kind of try to find a way to just be more
23       direct.
24           Is the agreement that was reached during that
25       meeting the way the process currently works with

91

1    respect to DOE referrals under HB 2?
2  **A.   Prior to that meeting, which occurred on or about**
3        **February 14th, '23, just so we have a reference point,**
4        **prior to that meeting with the Attorney General's**
5        **office, my understanding was that the Department of**
6        **Education was not in a position, nor was it allowed to**
7        **transfer any matters which may or may not fall within**
8        **the purview of House Bill 2 to the Human Rights**
9        **Commission for review. And it was -- it had been**
10       **unclear -- prior to my testimony on House Bill 533, it**
11       **was unclear that the Department of Education was able**
12       **to transfer those matters which may or may not fall**
13       **within HB 2 to the Attorney General's office.**
14 Q.   And so after -- I guess my question is the agreement
15       that was reached during that meeting that may have
16       occurred on or about February 14th, has that agreement
17       been in effect since that meeting?
18 **A.   Yes.**
19           MR. BISSONETTE: Okay. I'm going to just
20       switch gears a bit now that we've avoided the sticky
21       wicket of the SOP. Let me just express my thanks,
22       Attorney Kenison, for the dialogue that we've been able
23       to have on this.
24       BY MR. BISSONETTE:
25 Q.   We talked a little bit before about trainings, a

92

1    presentation on the code of conduct. Have you
2    conducted trainings on HB 2 in particular, the
3    challenged law in this case?
4  **A.   I have not done trainings exclusive to House Bill 2.**
5  Q.   Okay.
6  **A.   I have included information -- limited information**
7        **about House Bill 2 in some of the trainings that I've**
8        **done on the code of conduct, yes.**
9  Q.   Okay. So I think I know what you're referring to, but
10       to not hide the ball, I'll just mark it as my next
11       exhibit. Fair enough?
12 **A.   I appreciate that. Thank you.**
13           MR. BISSONETTE: That's how I try to operate.
14       So this next exhibit will be Exhibit 7.
15           (Exhibit 7 marked for identification.)
16       BY MR. BISSONETTE:
17 Q.   So I'd just ask you to -- you don't need to read it
18       word for word, but just take a quick scan of Exhibit 7.
19       Just let me know when you're done.
20           What is Exhibit 7?
21 **A.   Exhibit 7 starts off with an email from myself to**
22       **Richard Farrell, who is the investigator for the**
23       **Department of Education. The subject is code of**
24       **conduct. The date is August 17th of 2021. And behind**
25       **that email is a printout of the PowerPoint of the code**

93

1    of conduct presentation.
2  Q.   Is this the type of presentation you were referring to
3    in your prior testimony?
4  A.   **Which part of my testimony?**
5  Q.   I believe you testified that you've given presentations
6    in which -- that haven't been exclusive to HB 2 but in
7    which HB 2 was referenced.  That's a ballpark of what I
8    understood your testimony to be.  Is that accurate?  Is
9    my rendition of your prior testimony accurate?
10 A.   **I hope not.**
11 Q.   Tell me how it's wrong.
12 A.   **So I believe my testimony was this is a code of conduct**
13    **presentation.  My presentations concern the code of**
14    **conduct, and I had included some limited information**
15    **about HB 2.**
16 Q.   And I just want to make sure I understand.  Is the
17    limited information that you're referring to pages on
18    Exhibit 7 Bates stamped DOE 10079 to 10081?
19 A.   **Yes.**
20 Q.   Okay.  Do you recall how many times you've given this
21    presentation that include those pages I just referenced
22    on HB 2?
23 A.   **In exact number, I do not.**
24 Q.   Do you have an estimate, a ballpark, that you can
25    provide?

94

1  A.   **Certainly less than 10 times.  Probably not more than**
2    **five.**
3  Q.   Okay.
4  A.   **But I hesitate to lock myself in that much.**
5  Q.   I understand.  Your caveat lays that out.  I
6    understand.  I've been in that situation.
7        Do you recall, during these presentations in which
8    you've used these slides, have you received direct
9    questions about what might be covered under HB 2?
10 A.   **I do not recall any instances in which I received**
11    **questions as it pertained to what HB 2 entailed or what**
12    **HB 2 covered.  Any such questions I would have liked to**
13    **think I would refer to the Attorney General's office.**
14    **I would not have felt comfortable answering them.**
15 Q.   So you don't recall, just so I'm clear, in these --
16    strike that.
17        In these approximate five to 10 presentations,
18    recognizing that is not a number that you could
19    commit to, even, but during those presentations, who
20    would be the audience, for the most part?
21 A.   **Generally, for the presentation that you've given to me**
22    **which is marked as Exhibit 7, this is typically**
23    **provided to or presented to educators.**
24 Q.   I just want to button this up.  So you don't recall any
25    specific questions by educators at the time you've

95

1    given these presentations about what's covered under HB
2    2?
3  A.   **No, I do not.**
4  Q.   Okay.  The slides that we referenced before in
5    exhibit --
6  A.   **May I just --**
7  Q.   Yes, of course.
8  A.   **What you were looking at is not what Exhibit 7 is.**
9  Q.   Exactly.  I just realized that.  That's why I was
10    trying to find the page numbers.
11 A.   **So if we could just make sure we're on the same --**
12 Q.   We are on the same page.
13 A.   **Okay.  Those are different trainings.**
14 Q.   Yeah.
15 A.   **So you're asking me questions about Exhibit 7, and I'm**
16    **looking at Exhibit 7, and you're looking at a different**
17    **exhibit.**
18 Q.   I'm looking at, for the record, Exhibit 3, because I'm
19    planning out where I'm going to be going.
20 A.   **Okay.**
21 Q.   So don't worry too much about what I'm looking at.  But
22    you're right, the questions that I was asking were
23    tailored to Exhibit 7 to educators, the presentation
24    that we were just talking about.  Okay.
25        Was there ever a discussion within the Department

96

1    of Education on making a list of reading materials or
2    books that could potentially be violative of HB 2?
3        MR. KENISON-MARVIN:  Object to the extent
4    that -- I instruct you not to answer to the extent
5    there's responsive information about internal
6    discussions, predecisional discussions, regarding that
7    subject on the basis that it's protected under the
8    deliberative process privilege.
9        MR. KAHNE:  Predecisional to what?
10        MR. BISSONETTE:  Sorry.  I didn't mean to
11    have two lawyers arguing against you.
12        MR. KAHNE:  Sorry.
13        MR. BISSONETTE:  There would need to be an
14    actual decision, though, at some point, so...
15        MR. KENISON-MARVIN:  I think the case law is
16    clear that that's not the case.  There can be
17    circumstances of discussions involving nondecisions and
18    I have some case law to cite if you'd like me to.  I
19    think some courts have, in fact, made it clear that you
20    don't need a final decision.  There can be --
21    essentially, to fulfill the purpose of the privilege,
22    which is to encourage discussions about something that
23    might be done in the event that people want to have a
24    discussion, government workers want to have a
25    discussion about something to do with the policy behind

---

**97**

1  the privilege, is to encourage them to have that
2  discussion. If they decide not to take a final action,
3  that's okay. So I think I would stand behind the
4  objection.
5      MR. BISSONETTE: Okay.
6      MR. KENISON-MARVIN: Whatever the answer is,
7  if there's a final decision of something or not, I
8  don't think a final decision is necessary for that
9  privilege to apply.
10      MR. KAHNE: Just if I could just add? If the
11  decisional process privilege applied to all
12  communications within an agency without the need for
13  any final determination, that could potentially cover
14  all communications within an agency, so I don't think
15  that's contemplated by the privilege. So you've said
16  your point.
17      MR. BISSONETTE: I'm going to let that
18  question stand and just see what the instruction will
19  be.
20      MR. KENISON-MARVIN: I forget what the
21  question is.
22      MR. BISSONETTE: Why don't we start over? If
23  you could read the question and I just -- I mainly
24  interested in just what the instruction is. And I'm
25  sure for the witness, she'd probably like to know what

---

**98**

1  the instruction is, too.
2      (Court reporter read back question.)
3      MR. KENISON-MARVIN: I guess -- I think,
4  Gilles, the question, to the extent it calls for a yes
5  or no, I'm happy to let that answer go.
6      MR. BISSONETTE: I appreciate it.
7      MR. KENISON-MARVIN: And then we'll go from
8  there.
9      MR. BISSONETTE: Okay.
10      THE WITNESS: To the best of my recollection,
11  no.
12      MR. BISSONETTE: Bear with me. I'm just
13  trying to find a document.
14  BY MR. BISSONETTE:
15  Q. So beyond these -- the presentations that we just
16  discussed, outside that context, have you ever been
17  asked by an educator about whether specific texts are
18  covered by HB 2?
19  **A. Do you have a document you'd like to show me?**
20  Q. Just based on your recollection.
21  **A. I believe there was a communication from an**
22  **administrator, superintendent, to me, asking what HB 2**
23  **covered potentially in terms of what could be taught**
24  **and what couldn't be taught.**
25  Q. Aside from that communication, do you recall any other

---

**99**

1  administrators or educators that asked you what may be
2  covered under HB 2?
3  **A. I do not recall having those discussions with**
4  **administrators or educators. To the extent those**
5  **occurred, I would refer them to the Attorney General's**
6  **office. I did have them with attorneys, however.**
7      MR. BISSONETTE: Okay. I'm going to mark
8  this. I can't find my other copies. That's what's
9  been driving me crazy over here. So I'm just going to
10  give you both of them.
11      MR. KENISON-MARVIN: Do you want me to go
12  make any copies or anything for you?
13      MR. BISSONETTE: No, I'm happy to. That way,
14  we can know what we're looking at.
15      MR. KENISON-MARVIN: Do you want me to --
16      MR. BISSONETTE: Do you mind? Okay, maybe
17  we'll go off the record and do it.
18      (Exhibit 8 marked for identification.)
19  BY MR. BISSONETTE:
20  Q. Have you had an opportunity, Attorney Fenton, to look
21  at Exhibit 8?
22  **A. Yes.**
23  Q. Have you seen Exhibit 8 before?
24  **A. Yes.**
25  Q. And I apologize. It's not Bates stamped. I'm unclear

---

**100**

1  how that occurred. But with respect to Exhibit 8, in
2  which you're having a conversation with the
3  superintendent of SAU 4, is that the communication that
4  you're referencing in your earlier testimony?
5  **A. It was, yes.**
6  Q. Okay. Great. And I note that your response above that
7  quote, divisive topics, is handled by the Human Rights
8  Commission, et cetera. Is that -- that's the statement
9  that you made before that you would have referred them
10  to the Human Rights Commission?
11  **A. Yes.**
12  Q. And had you been asked by other individuals, educators,
13  as to what's covered by HB 2, is that the typical
14  response that you would be likely to give?
15  **A. Can you clarify the question?**
16  Q. Yeah. You know, I believe your testimony is you only
17  recalled specifically this one superintendent reaching
18  out with questions about what might be covered. If you
19  were asked by others, would this be the similar
20  response that you would give under -- today, sitting
21  here today?
22  **A. Before looking at this document, my testimony was that**
23  **I had referred — I had believed that I had referred**
24  **Pierre Couture to the Attorney General's office, and I**
25  **see, now that I've had an opportunity to review this, I**

---

101

1  suggested that he perhaps reach out to the
2  superintendents' association to see if they have any
3  guidance.
4      Your question, as it pertains to individual
5  educators, which I cannot think of a time where I've
6  had that conversation with an individual indicator, I
7  would not necessarily refer that person to the
8  superintendents' association. That would not be the
9  appropriate place to send them.
10 Q.  Are you aware of the superintendents' association
11 having created guidance on HB 2 at all?
12 A.  I, myself, am not aware of what the superintendents'
13 association did as it pertains to HB 2.
14 Q.  Okay. Do you know if the superintendents' association
15 has ever reached out to the Department of Education
16 about guidance concerning HB 2?
17 A.  I personally have not had a discussion with the
18 superintendents' association as it pertains to HB 2,
19 but they have reached out to the Department of
20 Education. They could have, and spoken to individuals
21 other than myself.
22 Q.  Gotcha. Fair enough. Are you aware of statements
23 made -- strike that.
24      I'm reading from a document. You're not on it,
25 okay? But I'm -- I just want to ask you about it.

102

1      Are you aware of statements made by the
2  commissioner of education to AFT that -- in which the
3  commissioner said, "Recognizing that a wide variety of
4  situations may arise, we also want to reiterate our
5  offer to try to work through individual circumstances
6  that may be unclear to teachers. In these cases, the
7  best approach is for them to reach out directly and
8  share the specific facts and circumstances so that we
9  can provide them with clear guidance."
10      Are you aware of statements made by the
11 commissioner of education to educators that they should
12 contact the DOE if they have -- if they want to work
13 through individual circumstances that may be unclear to
14 teachers?
15 A.  May I see that document?
16 Q.  Sure.
17 A.  Thank you.
18      MR. BISSONETTE: We'll mark it.
19      (Exhibit 9 marked for identification.)
20      MR. BISSONETTE: When you're done reviewing
21 Exhibit 9, just let me know.
22      THE WITNESS: Okay. I will do that. Thank
23 you.
24      MR. KENISON-MARVIN: Object on 106,
25 completeness, with respect to this being -- it appears

103

1  to be a response to an email. Do you have the email
2  that this responds to that the witness can also review?
3      MR. BISSONETTE: I do not. I mean, I'm
4  looking at the bottom of Bates stamp 7231 and I don't
5  see a chain. It is a complete version of this
6  document. Had there been a chain, I would have,
7  obviously, included in the exhibit.
8  BY MR. BISSONETTE:
9  Q.  So my question, though --
10      MR. KENISON-MARVIN: Let me stop you there.
11      MR. BISSONETTE: Of course. Of course.
12      MR. KENISON-MARVIN: Do you know if you --
13 maybe we need to look through and see if there is a
14 chain with this.
15      MR. BISSONETTE: My question is just going to
16 be have you seen this document before?
17      MR. KENISON-MARVIN: Okay.
18 BY MR. BISSONETTE:
19 Q.  Have you seen this document before?
20 A.  So as it pertains to Exhibit 9, because Exhibit 9 is
21 made up of the email and then the frequently asked
22 questions, new discriminatory practice prohibitions
23 which was created by the Attorney General's office, I
24 have to bifurcate this.
25      To the best of my recollection, I have not seen

104

1  this email that is the start of Exhibit 9. However, I
2  am familiar with, and have reviewed, the Attorney
3  General's office frequently asked questions. I refer
4  to it as a technical advisory. I think I put that in
5  my slide, in fact.
6  Q.  So I think my question has to do with recognizing you
7  haven't seen this document, but I want to -- I'm trying
8  to understand what DOE policy is. So in this
9  particular document from the commissioner to AFT,
10 there's a statement that, "We also want to reiterate
11 our offer to try to work through individual
12 circumstances that may be unclear to teachers. In
13 these cases, the best approach is for them to reach out
14 directly and share the specific facts and circumstances
15 so that we can provide them with clear guidance."
16      Is that the policy of the Department of Education
17 currently?
18 A.  I'm not sure if that policy still stands. I think, as
19 a state agency, we are very open to having people
20 contact us on a general basis, yes.
21 Q.  But it sounds like, based on Exhibit 8, when at least
22 one superintendent has reached out to you, your
23 approach has been to refer them to the Human Rights
24 Commission, correct?
25 A.  I don't think that's a fair statement of Exhibit 8.

105

1 Q. How is it unfair?
2 A. Well, what I stated was that these issues, which fall
3 within the purview of HB 2, is handled by the Human
4 Rights Commission and the Attorney General's office.
5 The Department, meaning the Department of Education,
6 has not issued much information on that topic. And
7 then I said to perhaps reach out to the
8 superintendents' association to see if they have any
9 guidance.
10 Q. If an educator reached out to you with individual
11 circumstances that they thought was unclear, and they
12 reached out to try to obtain clear guidance from the
13 Department, would they currently get it?
14 MR. KENISON-MARVIN: Objection. Vague. You
15 can answer.
16 THE WITNESS: If they reached out to me
17 personally, I would refer them to another agency.
18 MR. BISSONETTE: Okay.
19 THE WITNESS: I believe HB 2 is very clear
20 that any matters falling within HB 2 are to be handled
21 by the Human Rights Commission, and it was the Attorney
22 General's office that put out this frequently asked
23 questions. If anything, I would refer that individual
24 to this document, meaning the frequently asked
25 questions created by the Attorney General's office.

106

1 What other people in the Department of Education would
2 do, I'm not in a position to testify to.
3 BY MR. BISSONETTE:
4 Q. Gotcha. And it looks like, in this instance, the
5 commissioner is saying that we'll provide guidance
6 based on the individual circumstances of your case if
7 you find it unclear, right?
8 A. Yes.
9 Q. I'm just going to -- I just want to be clear. Back on
10 Exhibit 9, just the attachment to Exhibit 9. This is
11 issued by both the HRC, the Department of Justice, and
12 the Department of Education, right?
13 A. Yes, that's what it says. But to be clear --
14 Q. Of course. Please.
15 A. -- I did not -- I was not an active participant in
16 creating this document. This document was created by,
17 obviously, the entities listed there, but my
18 understanding is that Attorney Chris Bond was perhaps
19 an active participant in this document. I want my
20 testimony to be clear. I was not. So I read it when
21 everybody else read it, when it was made public.
22 Q. We all want it to be clear. That's helpful. When you
23 say "the document," I just want to be clear, you mean
24 the attachment to Exhibit 9, Bates stamped 7232 to
25 7234? That's what you're referring to?

107

1 A. That is correct. And, as you've already noted, I was
2 not included on the email that is 07231.
3 MR. BISSONETTE: I'm going to mark for
4 Exhibit 10 -- this is to close the loop on Exhibit 8,
5 because I found it.
6 (Exhibit 10 marked for identification.)
7 BY MR. BISSONETTE:
8 Q. So once you've finished reviewing Exhibit 10, Attorney
9 Fenton, just let me know.
10 A. Yes.
11 Q. So I'm now potentially concerned that Exhibit 8 may be
12 a draft and not something that was actually sent, so I
13 want to just close the loop on this.
14 So just kind of comparing Exhibit 8 and Exhibit
15 10, it looks like Exhibit 10 is a reflection of what
16 you may have actually sent Superintendent Pierre
17 Couture. I want to just get your confirmation on that,
18 if you know.
19 A. So it does -- I believe Exhibit 10, Bates stamped
20 DOE807808 is clear on its face. It's an email that I
21 sent to Pierre Couture, superintendent of SAU 4, and I
22 referred him to the Attorney General's website and the
23 frequently asked question document that is part of
24 Exhibit 9. I think that's consistent with my prior
25 testimony that I would refer people to this document,

108

1 being the frequently asked questions from the Attorney
2 General's office.
3 Q. I agree. I just wanted to make sure because I noticed
4 that there was some -- a difference between Exhibit 8
5 and 10, so I was just trying to close the loop on it.
6 My understanding of the document -- I just want to
7 make sure that you agree with me -- is that the version
8 of this email that was sent by you to Mr. Couture is
9 the version in Exhibit 10.
10 A. I don't know what Exhibit 8 is. I don't know if that's
11 a -- it looks to be a draft, and I will tell you why I
12 think that --
13 Q. Please do. Please do.
14 A. -- if I may? Because, again, I'm not trying to hide
15 the ball on you.
16 When I look at this, starting after that last
17 hyphen there, "Maybe reach out to the superintendents'
18 association and see if they have any guidance, or the
19 school," I would assume what I meant was the school
20 boards association, and that's not completed. And,
21 typically, knowing my style, I usually say a thank you
22 or a -- what have you. So it would appear to be a
23 draft, Exhibit 8. I cannot testify with all certainty
24 that it is.
25 Q. That's helpful. I appreciate that. As soon as I saw

109

1  both versions, I realized we were -- may have been
2  operating and doing questioning on a draft. I kind of
3  panicked. So I think we figured it out there. Thank
4  you for your testimony on that. I appreciate it.
5       MR. BISSONETTE: I have one more set of
6  questions that'll just take a few minutes and we can
7  take a two-minute break.
8       MR. KENISON-MARVIN: Can I just note
9  something for the record?
10      MR. BISSONETTE: Yeah.
11      MR. KENISON-MARVIN: To the extent that
12  goes -- not understanding that it was a draft, we'd put
13  on the record now we reserve our right to call that
14  back. Based on the discussion there, it sounds like
15  that's probably the case and it was inadvertent.
16      MR. BISSONETTE: Understood.
17      THE WITNESS: And it's not Bates stamped.
18      MR. KAHNE: That's just a printing issue, I
19  think.
20      MR. BISSONETTE: Is it?
21      MR. KAHNE: If we have it, it should have
22  been Bates stamped, I believe.
23      MS. MILBURN: I can check.
24      MR. KAHNE: Yeah.
25      MR. BISSONETTE: Here we go. Sorry. You can

110

1  set that aside, Attorney Fenton. Thank you. The next
2  exhibit will be Exhibit 10 (sic).
3       (Discussion off record.)
4       (Exhibit 11 marked for identification.)
5  BY MR. BISSONETTE:
6  Q. I'm just going to have you review Exhibit 11. Just let
7  me know when you're done reviewing it. My question is
8  going to be -- without the need for you necessarily to
9  read it all -- you certainly can -- is have you seen
10  these documents before?
11 A. To the best of my knowledge, sitting here today, this
12  is the first time I've seen these documents, and they
13  are not addressed to me.
14 Q. Were you ever involved in any meetings with your fellow
15  Department of Education employees about potential
16  responses to these letters?
17 A. To the best of my knowledge, sitting here today, my
18  knowledge and recollection, no, I was not involved in
19  any such meetings --
20 Q. Okay.
21 A. -- as it pertained to these letters.
22      MR. BISSONETTE: Okay. So we're just going
23  to take just a two-minute break to use the restroom.
24  Does that sound good?
25      MR. KENISON-MARVIN: Yes.

111

1       (Recess taken.)
2  BY MR. BISSONETTE:
3  Q. Attorney Fenton, you're still under oath. Thank you.
4       I want to just direct your attention to Exhibit 1
5  again, which is the text of HB 2. I'm just going to
6  refer you to page six. It's lines 24 to 25.
7  A. Oh, the Bates stamp number?
8  Q. Yes, I'm sorry, yes. PL0006. Yes.
9  A. Yes.
10 Q. So the language I'm just going to read into the record
11  says, "No people in any public school in the state
12  shall be taught, instructed, inculcated or compelled to
13  express a belief in or support for any one or more of
14  the following."
15      My question is does the Department of Education
16  have any criteria or policies that define what it means
17  to "teach, instruct, inculcate, or compel to express a
18  belief in or support for"?
19 A. To the best of my knowledge, sitting here today, I do
20  not believe so, other than the frequently asked
21  questions document that is on the Attorney General's
22  website. I preface that because, as pointed out to me,
23  it does say -- if I may refer to it?
24 Q. Absolutely. And you're referring to the exhibit on --
25  the attachment to Exhibit 9?

112

1  A. Yes. So it is issued by the Department of Education,
2  Commission for Human Rights, and Department of Justice.
3  So to the extent that this document addresses that
4  portion of the statute, I will tell you I refer to this
5  document, the frequently asked questions. I refer to
6  it as an Attorney General document.
7  Q. So beyond the FAQ that's the attachment to Exhibit 9,
8  is there any other criteria that you're aware of that
9  the Department uses in determining what "teach,
10  instruct, inculcate, or compel to express a belief in"
11  means?
12 A. To the best of my knowledge, no.
13 Q. Okay. Does the Department have a position on whether
14  HB 2 can be violated if a student makes a comment in
15  teacher-facilitated group discussion?
16 A. Does the Department have a position on that?
17 Q. Yeah.
18 A. To the best of my knowledge, no.
19 Q. Does the Department have a position on whether that
20  provision I'm referring to, "taught, instructed
21  inculcate, or compel to express a belief in," that that
22  would include playing devil's advocate, including a
23  teacher presenting two sides of a controversial
24  subject?
25 A. I'm sorry, can you repeat the question?

113

1  Q.  Sure. I'm really just trying to get at how the
2      Department construes that provision, "shall be taught,
3      instructed, inculcated, or compelled to express a
4      belief in," lines 24 to 25 on Exhibit 1, Bates stamped
5      006.
6          So does that language in -- does the Department
7      have a position on whether that language includes a
8      teacher playing devil's advocate, including presenting
9      two sides of a controversial subject?
10         MR. KENISON-MARVIN: Objection. You can
11     answer.
12         THE WITNESS: To the best of my knowledge,
13     no, the Department does not have a position on that.
14  BY MR. BISSONETTE:
15  Q.  With respect to that same language on Bates stamp 06,
16     does the Department have a position as to whether it
17     includes assigning -- a teacher assigning to a student
18     a point of view to argue?
19  **A.  To the best of my knowledge, I'm not aware that the**
20     **Department has a position on that provision.**
21  Q.  Again, with respect to that same language on PL006,
22     does the Department have a position as to whether or
23     not that language includes a teacher assigning a book
24     for general discussion in class?
25         MR. KENISON-MARVIN: Objection. It's vague,

114

1      and it's calling for application of fact to law.
2          MR. BISSONETTE: I'm just asking if they have
3      a position.
4          MR. KENISON-MARVIN: Maintain the same
5      objection. You can answer.
6          THE WITNESS: To the best of my knowledge,
7      the Department does not have a position on that.
8          MR. BISSONETTE: I'm going to close the loop
9      on Exhibit 1. I have another exhibit. I'm so sorry.
10     Are we on Exhibit 12?
11         THE REPORTER: Yes.
12         MR. BISSONETTE: Thank you.
13         (Exhibit 12 marked for identification.)
14  BY MR. BISSONETTE:
15  Q.  So, Attorney Fenton, please do take a look at Exhibit
16     12. My question to you will be have you seen this
17     document before, after you've reviewed it.
18  **A.  Okay.**
19  Q.  So my question is just have you seen this document
20     before?
21  **A.  I have, yes.**
22  Q.  Okay. Does this memo in any way govern the DOE's
23     enforcement of HB 2?
24         MR. KENISON-MARVIN: Object as vague and
25     misstating prior testimony.

115

1          MR. BISSONETTE: You know, I can ask a better
2      question, actually.
3          BY MR. BISSONETTE:
4  Q.  Does the DOE at all use the memo that's in Exhibit 12
5      with respect to how it enforces HB 2?
6          MR. KENISON-MARVIN: Same objection. You can
7      answer.
8          THE WITNESS: I can only answer that I have
9      not utilized this document. In fact, I was not aware
10     of it until very recently, so I have not used it. How
11     the Department uses it, I'm not in a position to
12     testify on behalf of the Department as a whole.
13         (Exhibit 13 marked for identification.)
14  BY MR. BISSONETTE:
15  Q.  Attorney Fenton, I've just put before you what's been
16     marked as Exhibit 13. You are not on this document,
17     but I wanted to put it before you to ask the question
18     are you aware of a meeting between the Department of
19     Education and the Human Rights Commission that occurred
20     after the issuance of the memo that's at Exhibit 12?
21  **A.  I do not recall this meeting exactly, no.**
22         MR. BISSONETTE: Okay. We're going to plow
23     through some documents, hopefully efficiently. The
24     next exhibit is going to be Exhibit --
25         THE REPORTER: 14.

116

1          (Exhibit 14 marked for identification.)
2  BY MR. BISSONETTE:
3  Q.  Again, I'm not going to ask you to view every page
4      because we would be here until tomorrow, Attorney
5      Fenton. I'm just going to just ask for a particular
6      focus on Bates stamped PL682 and 683. Obviously, you
7      can read the whole thing, but my only question is going
8      to be, you know, have you seen this op-ed before?
9  **A.  Is there a date on that op-ed?**
10  Q.  I can represent that it is April 2022, but I'm --
11         MR. KAHNE: 15.
12         MR. BISSONETTE: Oh, there it is, Attorney
13     Fenton. It's on page two, right below, "In the news.
14     For immediate release, April 15, 2022."
15         THE WITNESS: Okay. Thank you.
16         MR. BISSONETTE: Of course.
17         THE WITNESS: Do you have the document that
18     it's referencing?
19         MR. BISSONETTE: I do, in fact. Those are
20     the attachments.
21         THE WITNESS: Those are the attachments.
22     Okay.
23         MR. BISSONETTE: Yes, yes. And, again, I'm
24     not entirely sure if I'll go through them. I'm not
25     asking you to review them right now, just those two

117

1  pages.
2      THE WITNESS: I understand.
3      MR. BISSONETTE: Okay.
4  BY MR. BISSONETTE:
5  Q.  Have you seen this op-ed before, those two pages, PL682
6      to 683?
7  A.  I was aware of this op-ed. I think this is the first
8      time I've read it in its entirety, but I was aware of
9      the general premise of it, if you will.
10 Q.  So it's fair to say you didn't read any drafts of this
11     before it was published?
12 A.  To the best of my knowledge, I did not read any drafts
13     of this op-ed before it was published, no.
14 Q.  Before this op-ed was published, did you have --
15     actually, strike that.
16     I am now just going to just refer on page 682, the
17     line that says, "This document.PDF exemplifies actual
18     instruction material from New Hampshire schools that
19     parents have identified as conflicting with their
20     values."
21     Have you seen -- you may need to go page by page,
22     but have you seen these topics before that were
23     attached to this press release?
24     MR. KENISON-MARVIN: I'll object as vague.
25     If you want to go through them one by one just so it's

118

1  clear what you're asking?
2      MR. BISSONETTE: Why don't we -- why don't I
3  withdraw that question and do it more individually. I
4  think that's fair.
5  BY MR. BISSONETTE:
6  Q.  I wanted to close -- before I get into some individual
7      complaints, I wanted to close the loop on two questions
8      on some of the prior exhibits, so I'm going to refer
9      you to Exhibit 3. And my question is hopefully a
10     simple one. I'm trying to differentiate this
11     presentation on Exhibit 3 from the presentation on
12     Exhibit 7. And so my question is with respect to
13     Exhibit 3, who the audience was for that
14     presentation?
15 A.  To the best of my recollection, Exhibit 3 was a
16     presentation that was given to superintendents or
17     administrators.
18 Q.  Gotcha. And with respect to -- how would that audience
19     be different from the presentation that's attached to
20     Exhibit 7?
21 A.  The presentation contained in Exhibit 3 -- give Nate a
22     minute to catch up here. We're leaving him in the
23     dust. Slow it down.
24     THE WITNESS: Are we good?
25     MR. KENISON-MARVIN: Thank you. Go for it.

119

1      THE WITNESS: The presentation that's
2  contained within Exhibit 3 -- give me a minute while I
3  just quickly review it -- does not appear to go through
4  the particular provisions of the code of conduct as it
5  does in Exhibit 7, and Exhibit 7 is the code of conduct
6  for educators.
7      Exhibit 7 really sets out what those
8  particular provisions are, what they entail, what the
9  expectation for individual credentialed educators is,
10 whereas in Exhibit 3, it's really focusing more on the
11 Department of Education's relationship with
12 superintendents and how when we -- when we look at
13 instances of educator misconduct, they have to be
14 worked on as a partnership between the Department of
15 Education and the individual districts.
16 BY MR. BISSONETTE:
17 Q.  That's helpful. I'm just -- on one of these slides,
18     5665 on Exhibit 3, there's a reference that the
19     Department does not adjudicate these matters. It's
20     under HB 2. And then there's a question, "So why the
21     website?"
22     And I'm just kind of curious in this presentation
23     what you verbally told the superintendents as to why a
24     website was necessary?
25 A.  To the best of my recollection, sitting here today,

120

1      your question is what I told the superintendents?
2  Q.  During this presentation, yes.
3  A.  Understood.
4  Q.  Yes, yeah.
5  A.  To the best of my recollection, what I told the
6      superintendents, or other administrators who were in
7      the audience, was the website was there to facilitate
8      the transfer of these issues, which may or may not fall
9      within the purview of House Bill 2, to the HRC for
10     determination. It goes to assist parents, largely, but
11     other citizens as well, not just parents.
12 Q.  Do school -- strike that.
13     Do school districts have an obligation to conduct
14     their own investigations under the code of conduct?
15     How does that work?
16     I guess my question is how does that work when a
17     school district conducts its own investigation? Are
18     there requirements?
19     Now that I've given you three questions at once,
20     I'm going to withdraw all of them and just ask a very
21     clear question --
22 A.  Do you want to break that down for me?
23 Q.  -- which is does the code of conduct require school
24     districts to conduct their own investigations as to
25     potential violations?

Transcript of Diana Fenton
Conducted on May 17, 2023

121

1  A.  **To the best of my understanding of the code of conduct,**
2     **it does not.**
3  Q.  Okay.  So what's the scenario to which a school
4     district would be conducting an investigation under the
5     code of conduct?
6         MR. KENISON-MARVIN: Objection.  Vague.  You
7     can answer.
8         THE WITNESS:  Recognizing that all cases are
9     different and unique based upon the individual facts,
10    typically, a school district would undertake an
11    investigation, whether that's done by an administrator
12    in-house or they hire a private firm to do that
13    investigation.  They would do that because, presumably,
14    a code of conduct -- a violation of the code of conduct
15    would also be an employment matter, so the district
16    would undertake it for employment purposes.
17 BY MR. BISSONETTE:
18 Q.  Gotcha.  Do school districts themselves have an
19    obligation to conduct investigations under HB 2?
20        MR. KENISON-MARVIN: Objection.  Vague.
21    Calls for legal opinion.  You can answer.
22        THE WITNESS:  Can you reread the question?
23        (Court reporter read back question.)
24        THE WITNESS:  I am not aware of any such
25    obligation.

122

1  BY MR. BISSONETTE:
2  Q.  Have there been any discussions within the Department
3     of Education that you're aware of about whether Ibram
4     Kendi's How to Be an Antiracist violates HB 2?  To not
5     hide the ball, I only ask because it's in Exhibit 4
6     which is Commissioner Edelblut's op-ed.
7  A.  **Exhibit 4.**
8         MR. KENISON-MARVIN:  Same issue we had
9     earlier.  I'll -- I'm fine with a yes or no answer
10    there, and to the extent further information would be
11    privileged under deliberative, I instruct the witness
12    not to provide that information in response to this
13    question.
14        THE WITNESS:  Can you restate the question?
15        (Discussion off record.)
16        (Court reporter read back question.)
17        THE WITNESS:  I'm not aware of any such
18    discussions.
19 BY MR. BISSONETTE:
20 Q.  Have you ever read that book?
21 A.  **I have not.**
22 Q.  Have you read any portion of it?
23 A.  **I don't think so.**
24        MR. BISSONETTE:  Thank you.  We're going to
25    mark another exhibit.

123

1         (Exhibit 15 marked for identification.)
2  BY MR. BISSONETTE:
3  Q.  I'll just ask you to review it and just let me know
4     when you're done.
5         MR. BISSONETTE:  And also, while the witness
6     is reviewing, for the record, I know that there are
7     attachments.  I do not have them.  I'm not entirely
8     sure why.  Maybe they didn't follow sequentially in the
9     Bates stamp, or maybe I missed it, but, I just want to
10    make sure the witness and everyone knows that the
11    attachments are not affixed to the exhibit that is
12    being reviewed.
13 BY MR. BISSONETTE:
14 Q.  Have you seen Exhibit 15 before?
15 A.  **I have, yes.**
16 Q.  Okay.  What is Exhibit 15?
17 A.  **Exhibit 15 is an email from Commissioner Edelblut to**
18    **myself, cc'd to Richard Farrell and Christopher Bond.**
19    **It's in regards to an issue from SAU 29, which is in**
20    **Cheshire County.  And the email below is from a**
21    **gentleman by the name of ████████ to Frank Edelblut**
22    **as a concerned parent.**
23 Q.  And I see that this email was forwarded to you with a
24    message.  What did you do when you received this email
25    in response to Mr. ████ s (sic), for lack of a better

124

1     word, complaint?
2         MR. KENISON-MARVIN:  I'd just instruct the
3     witness to the extent the question is calling for
4     predecisional processes, discussions about what to do,
5     that we would assert deliberative process privileges to
6     that, discussions with any counsel within the DOE or
7     AG's office, and assert attorney/client privilege as to
8     that information.  So --
9         MR. BISSONETTE:  I hear you on that.  Can I
10    just rephrase the question?  That's fair.
11 BY MR. BISSONETTE:
12 Q.  Did -- was there an investigation in response to this,
13    this complaint from Mr. ████ (sic)?
14 A.  **So I will begin by saying the first part of the email**
15    **was brought for Chris Bond's attention.  The second**
16    **part of the email was for my review and Rich Farrell's**
17    **review.  And I believe that referred to the student**
18    **threatening to shoot up the school.**
19    **Are you referring to an investigation pursuant to**
20    **the code of conduct?**
21 Q.  Yes.  Let me just direct your attention to the bottom
22    of page 9586 where there's a complaint with respect to
23    a film called White Like Me by Tim Rise (sic).  And
24    then the email goes on to say, "This film emphasizes
25    white privilege and equates conservatism with white

125

1  supremacy.  The film should not be shown at all as it
2  is clearly CRT and in direct violation of New Hampshire
3  Bill HB 2, Sections 297 and 298, right to freedom from
4  discrimination and workplaces in education."
5      So my question is what, if anything, after you
6  received this email, did you do in response to that
7  specific complaint?
8          MR. KENISON-MARVIN:  Same objections under
9  the deliberative process and attorney/client
10 privileges.  I'll instruct you not to answer to the
11 extent you had conversations with other folks within
12 the Department about what to do in response to this
13 prior to making a decision about what would be done in
14 response to -- what, if anything, would be done in
15 response to receiving this email from this individual.
16         THE WITNESS:  To the best of my recollection,
17 based on my interpretation of the email, that portion
18 that you referenced, the film emphasizing white
19 privilege, was directed to Chris Bond.
20         MR. BISSONETTE:  Okay.
21         THE WITNESS:  To the best of my knowledge.
22 To the best of my recollection, sitting here today, I
23 do not recall taking any action as it pertained to
24 anything dedicated to the film, any reference to the
25 film.

126

1          BY MR. BISSONETTE:
2  Q.  That's helpful.  Do you know if anyone else in the
3      Department took action with respect to the film White
4      Like Me?
5  A.  Since Commissioner Edelblut said the first part of this
6      email, which I interpret to be reference to the film,
7      is for Chris, I can't speak for Attorney Bond, what
8      action he did or did not take as it pertains to any
9      reference to that film.
10 Q.  Without getting into the substance, were you involved
11     in any internal meetings concerning the film White Like
12     Me by Tim Wise, which that was discussed?
13 A.  To the best of my recollection, sitting here today, no,
14     I was not.
15 Q.  Okay.  We'll just set that aside.
16         (Exhibit 16 marked for identification.)
17     BY MR. BISSONETTE:
18 Q.  I'd just ask you to take a look at Exhibit 16.  Just
19     let me know when you're done, please.
20         MR. BISSONETTE:  In the interest of
21     completeness, I'm going to couple this with another
22     related exhibit, if you don't mind.
23         (Exhibit 17 marked for identification.)
24     BY MR. BISSONETTE:
25 Q.  You are not on that second email, but I have a question

127

1  about it and I don't want to hide the ball.  So just --
2  I'm sorry.  You're still reading, Attorney Fenton.
3      I'm sorry.  I think I just kicked you.  I'm sorry.
4      My apologies.
5  A.  You're fine.  I probably deserve to be kicked at some
6      point.
7  Q.  I don't know how that that'll come out in the
8      transcript.
9  A.  Hopefully, it was amusing for all our Zoom viewers
10     here.  Okay.
11 Q.  Thank you.  So with respect to -- what is Exhibit 16?
12 A.  Exhibit 16 is an email to me from Commissioner
13     Edelblut.  Wait, no.  I'm sorry.  Okay.  The top of
14     it -- all right.  The top of it is from me to
15     Commissioner Edelblut and Richard Farrell, the
16     investigator, and cc'd to the deputy commissioner in
17     response to the email that Commissioner Edelblut had
18     sent to myself and Richard Farrell and the deputy.
19         In that email he says, "I think we need to look
20     into this.  The events happened prior to the
21     anti-discrimination law, but, if true, certainly would
22     be considered unprofessional."
23         And then below that is an email from
24     ▮▮▮▮ to a long string of people that I will just
25     let the exhibit speak for itself on that.

128

1  Q.  Sure.
2  A.  And it contains a forwarded message that was sent to
3      Superintendent Corey from a concerned Hollis parent.  I
4      can only assume Superintendent Corey is the
5      superintendent of Hollis school district.  I don't know
6      off the top of my head.
7  Q.  Thank you.  So my -- I take it you've seen Exhibit 16
8      before?
9  A.  I have, yes.  And I believe I testified to that, yes.
10 Q.  Thank you.  Sorry if I made you repeat that.
11     Just with respect to your -- your email to
12     Commissioner Edelblut, "Thank you.  We will look into
13     it."
14         My question is did you look into it?
15 A.  I would like to think if I told my boss I would do
16     something, that I did it.  To the best of my
17     recollection, I did.
18 Q.  Do you recall what you did in response to this email
19     from the commissioner on September 3rd, 2021?
20         MR. KENISON-MARVIN:  Same objection.
21     Deliberative process privilege.  I'd instruct you not
22     to answer to the extent it's calling for discussions
23     you had prior to making any decision about what to do
24     in looking -- "looking into" the process by anything --
25     discussions you had related to what you would do.  I

---

**129**

1   instruct you not to provide that in responding to this
2   question.
3        Same with attorney/client privilege. So to
4   the extent you spoke with attorneys to seek legal
5   advice about what to do, same instruction.
6        THE WITNESS: I don't recall the exact steps
7   that were taken in this particular instance. In
8   general, if you would like me to --
9        MR. BISSONETTE: Absolutely.
10       THE WITNESS: -- set that out?
11       MR. BISSONETTE: Please do.
12       THE WITNESS: And, again, this is to the best
13   of my recollection without being able to say exactly
14   what steps I took as it pertains to this exact matter.
15   My typical process would be to have Richard Farrell
16   call the superintendent and find out more information
17   about the underlying issue. In this instance, it looks
18   like the time frame might have been an issue.
19   BY MR. BISSONETTE:
20 Q.  Do you recall ever having conversations with
21   Ms. ▇▇▇ about the email she sent on September
22   3rd?
23 **A.  To the best of my recollection, as I sit here today, I**
24   **do not recall having any such conversations with**
25   **Ms. ▇▇▇.**

---

**130**

1   Q.  With respect to that process that you generally
2       articulated, recognizing that you don't remember the
3       specifics of this particular, again, complaint, for
4       lack of a better term, that would occur before -- would
5       that come before any, like, case is formally opened
6       under the Educator Code of Conduct?
7   **A.  This matter -- and I'm going to speak in somewhat**
8       **general terms. This would not rise to the level of a**
9       **code of conduct issue.**
10  Q.  But before that determination is made, there would
11      still be outreach to the superintendent, potentially to
12      the complainant, generally, right?
13  **A.  I think that's a fair statement, yes.**
14  Q.  I'm just going to refer you to the first page of
15      Exhibit 17. Recognizing that you are not on this
16      email, but Commissioner Edelblut responds to
17      Ms. ▇▇▇ by saying, "If I open an inquiry on the
18      referenced educators, would this woman be willing to
19      provide testimony to our investigator?"
20       Can the commissioner unilaterally open an inquiry
21      on educators under the code of conduct?
22  **A.  This is the first I'm seeing of this email. I'm --**
23  Q.  I'm sorry, go on. I interrupted you.
24  **A.  I'm not aware that there was any inquiry opened as it**
25      **pertains to this issue that was brought to the**

---

**131**

1        **attention of the Department of Education.**
2   Q.  Generally, though, I guess my question is outside the
3       context of this specific complaint that Ms. ▇▇▇
4       lodged, does the commissioner have the ability to
5       unilaterally open an inquiry on an educator?
6        MR. KENISON-MARVIN: Objection to the extent
7       it calls for a legal conclusion.
8        THE WITNESS: In general, again, recognizing
9       that all cases are fact dependent, no.
10  BY MR. BISSONETTE:
11  Q.  And why is that?
12       MR. KENISON-MARVIN: Same objection.
13       THE WITNESS: When the Department places an
14       individual under investigation -- and by "individual,"
15       I mean a licensed credential holder -- those letters go
16       out with the deputy commissioner's signature on them.
17       They're not approved by the commissioner. They are
18       created by myself and Richard Farrell, and signed by
19       their deputy.
20       I think that's not directly answering your
21       question. You asked for an inquiry. I answered about
22       the investigation, which are two separate things.
23  Q.  Got you. So pivoting now.
24  A.  Sure.
25  Q.  You spoke about investigation. That's helpful.

---

**132**

1   A.  Sure.
2   Q.  And I think a distinction seems meaningful under the
3       code.
4        So with respect to -- I want to ask the same
5       question, but with respect to -- strike that.
6        I want to make sure I understand your testimony.
7        So going back to the code of conduct on Exhibit 2,
8       page 18, 511.01 (B). Is the process that you were just
9       referring to subsection B?
10  A.  Yes.
11  Q.  Okay. So your testimony is the commissioner doesn't
12      have the ability to unilaterally open an investigation
13      under 511.01 (B), correct?
14  **A.  I am not aware of any instance in which the**
15      **commissioner has initiated that process. He might --**
16      **let me clarify. He might express to me that he wants**
17      **me to look into it or flush it out, perhaps, but the**
18      **formal process of placing an educator under**
19      **investigation pursuant to Ed 511.01 (B), that process,**
20      **the mechanics of it, do not involve the commissioner.**
21      **He doesn't create the letter. He doesn't approve the**
22      **letter. He might know it's going out, but, in large**
23      **part, he's not a direct participant in that process, if**
24      **that helps.**
25  Q.  That does. Is that process with respect to the

133

1  mechanics of how an investigation shall be opened, is
2  that memorialized in a formal policy, procedure,
3  anywhere within your Department?
4  **A.  That process and procedure might be in draft form.  I**
5  **don't think there's a formal document.  But that is the**
6  **process that has been established when -- not**
7  **necessarily when Commissioner Edelblut started, but,**
8  **more importantly, when the deputy commissioner started,**
9  **because she has that direct oversight in those**
10 **matters.**
11 Q.  Now, it seems like the commissioner doesn't have a lot
12 of involvement in the mechanics of opening the
13 investigation, but does he have unilateral authority to
14 commence the investigation?  They're sort of different
15 kind of things.  So is that a distinction that's
16 meaningful to you in your practice?
17      MR. KENISON-MARVIN:  Objection.  Compound.
18      THE WITNESS:  There are questions on the
19 table right now, too.
20      MR. BISSONETTE:  Do you want to give that
21 back?  And I'll separate my two bad questions into
22 maybe one good one.
23      (Court reporter read back question.)
24 BY MR. BISSONETTE:
25 Q.  So does the commissioner have the unilateral ability to

134

1  decide under 511.01 (B) that an investigation shall be
2  opened?  The decision is what I'm referring to.
3      MR. KENISON-MARVIN:  Objection.  Legal
4  conclusion.  You can answer.
5      THE WITNESS:  Does he have the authority?  I
6  suppose an argument could be made that he does, based
7  on how the rules are written.  I can tell you, as a
8  matter of practice, I am not familiar with an instance
9  where he has initiated an investigation.  He might tell
10 me, as he did in that email, "Please review it.  Take a
11 look at it," but as I've previously testified, the
12 mechanics of that don't involve him.
13 BY MR. BISSONETTE:
14 Q.  Gotcha.  Just referring to 511.01 (A) on Exhibit 2 --
15 **A.  Yes.**
16 Q.  -- can the commissioner unilaterally open a case?
17      MR. KENISON-MARVIN:  Same objection.
18      THE WITNESS:  That would not be my
19 interpretation of that particular rule.
20 BY MR. BISSONETTE:
21 Q.  I'm just curious why you don't read it that way?
22      MR. KENISON-MARVIN:  Same objection.
23      THE WITNESS:  If we take Exhibit 16, for
24 example, it's not uncommon for the commissioner to
25 refer matters, or issues, or information that he has

135

1  received in his capacity to myself and Richard Farrell,
2  and we will then address it as we deem appropriate.
3      We will reach out to the superintendent or
4  the complainant and determine -- and then I think we
5  fall within the purview of 511.01 (A) where we take
6  down that information and go through our process, which
7  I've previously testified to.  Some of the things we
8  consider are whether or not the individual is a
9  certified educator.  If it is, in fact, an issue that's
10 enumerated in the code of conduct, things of that
11 matter.  Frank is, in large part, not an active
12 participant in that process.  He might refer a matter
13 to me, as I mentioned, as highlighted in Exhibit 16,
14 and then Rich and I review it, and the process moves
15 from there.
16 BY MR. BISSONETTE:
17 Q.  That's helpful.  What I'm really trying to do, not to
18 hide the ball, is mirror Exhibit 16 in just how this,
19 in real life, kind of falls within the Educator Code of
20 Conduct.
21      So I guess my question is assuming you looked into
22 it with respect to Exhibit 16, where would that have
23 fallen as to where the DOC was in its process?
24 **A.  The --**
25 Q.  The DOE in its process under 511.01.

136

1  **A.  Again, without being able to recollect the exact steps**
2  **taken as it pertains to Exhibit 16, I believe that it**
3  would fall within Ed 511.01 (A), and it would not -- it
4  would not have fallen within 511.01 (B).  It would not
5  have risen to a code of conduct.  And to the extent
6  that actions are deemed unprofessional, as is stated in
7  Commissioner Edelblut's email, those, in large part,
8  are employment matters.  They're not code of conduct
9  issues.
10 Q.  Gotcha.  That's helpful.  I don't do this work every
11 day, so trying to relate these principles to what's
12 happening, that's helpful for me.
13 **A.  If it -- if I may?**
14 Q.  Yes, please.  Of course.  Absolutely.
15 **A.  The code of conduct is narrowly tailored, and it, in**
16 **large part, addresses actions in which children are**
17 **being physically harmed.  There are some other things**
18 **in there about falsifying professional qualifications,**
19 **things of that nature.  But I have stated on many**
20 **occasions that the code of conduct should be narrowly**
21 **construed, and it was written by the stakeholder group**
22 **to be narrowly tailored to address those issues I just**
23 **related.**
24 Q.  That's helpful.  I was involved tangentially in the
25 Concord school district case, so I have some connection

137

1  to what you just said.
2  **A.  I'm sorry to hear that.**
3  Q.  Well, it was as an advocate, not in a personal
4  capacity.
5       The next exhibit here is going to be 18.
6       (Exhibit 18 marked for identification.)
7       THE WITNESS:  And I do have a time by which I
8  have to leave.
9       MR. BISSONETTE:  What would that be?
10      THE WITNESS:  4:00.  I could push it to 4:30.
11      MR. BISSONETTE:  We did not expect that.  I
12  think we expected to going to 5:00 at this rate.
13      Off the record.
14      (Recess taken.)
15  BY MR. BISSONETTE:
16  Q.  Exhibit 18, Attorney Fenton, after you've had an
17  opportunity to review it, I'm just going to ask whether
18  you've seen this document before.
19  **A.  Okay.**
20  Q.  Thank you.  I'm going to just quickly go to page 10287,
21  which is page two of the document.  And there's an
22  email from you to Mr. Farrell that says, "Can you look
23  into this?"
24      Do you see that email?
25  **A.  Mm-hm.**

138

1  Q.  What were you asking Mr. Farrell to look into?
2  **A.  Just to -- well, let me preface.  I am familiar with**
3  **this document.  I do not recall all the exact details,**
4  **but my expectation in saying that to Richard Farrell**
5  **would be to better understand what this matter entails.**
6  **This apparently was brought to us by a citizen, perhaps**
7  **a parent, and sent to -- looks like it was sent to**
8  **Commissioner Edelblut.**
9  **    And my expectation in saying to Rich Farrell, "Can**
10 **you look into this," would be that he would reach out**
11 **to the superintendent and get more information as it**
12 **pertains to what was brought to our attention.**
13 Q.  Had you made a determination when you asked Mr. Farrell
14 to do this that there may have been a violation under
15 the code of conduct?
16 **A.  No.**
17 Q.  Okay.  So you made this request -- strike that.
18      Was this a -- do you have any understanding at the
19 time you wrote the email, "Can you look into this,"
20 that this was a complaint under HB 2?
21 **A.  I do not recall if I -- if that was my understanding of**
22 **it.**
23 Q.  Okay.  Do you know whether or not this complainant,
24 Ms. ████, has filed separately a Human Rights
25 Commission complaint?

139

1       It's okay if you don't know.  I'm just asking if
2  you have any understanding whether or not she's done
3  anything with the HRC.
4  **A.  What Ms. ████ might or might not have done with the**
5  **Human Rights Commission, I am not aware of.**
6  Q.  Is there a criteria that you use when you decide to ask
7  Mr. Farrell to look into something?
8       MR. KENISON-MARVIN:  Objection.  Vague.
9       THE WITNESS:  I can answer in general
10 terms --
11      MR. BISSONETTE:  Sure.
12      THE WITNESS:  -- not necessarily as it
13 relates to what's identified in Exhibit 18.
14      Generally, in these instances, we get
15 information from a concerned citizen or a parent, and I
16 ask Rich to reach out to the superintendent so that we
17 can get some additional information so that we can
18 determine what the next steps may or may not be.
19 BY MR. BISSONETTE:
20 Q.  Gotcha.  That's helpful.  Do you recall if Mr. Farrell
21 did reach out to the superintendent in this instance?
22 **A.  Based upon Exhibit 18, it looks that he did.  Scott**
23 **Laliberte who is, I believe, the superintendent or**
24 **Londonderry, or was at the time.**
25 Q.  And then kind of back on page one of Exhibit 18, Bates

140

1  stamped 10286, Mr. Farrell writes to the commissioner,
2  you, and two other DOE employees, "Please review the
3  responses from Londonderry."
4       Did you review those responses from Londonderry?
5  **A.  To the best of my recollection, sitting here today, I**
6  **believe that I did.**
7  Q.  Okay.  Was this discussed in any meeting?  Strike that.
8       Looking at the email from Commissioner Edelblut to
9  Mr. Farrell to you and two other DOE employees, there's
10 a statement, "Can we discuss in our next meeting?"
11      Was there a discussion at a meeting about this
12 Londonderry complaint?
13 **A.  Sitting here today, I don't recall if there was a**
14 **meeting as it pertained to this particular instance.**
15 **Based on the email, I would assume there was, or it**
16 **more likely than not was an issue that Commissioner**
17 **Edelblut discussed with Attorney Christopher Bond.**
18 Q.  The last -- the first portion, Mr. Farrell to you, "You
19 should review the text messages," did you review the
20 text messages?
21 **A.  I'm -- can we clarify what the text messages -- is that**
22 **what's attached to this document?**
23 Q.  I can't clarify.  I think these attachments are what I
24 believe followed the email as it was produced, so...
25 **A.  If the premise is -- if the text messages are the**

141

1    images that are attached to Exhibit 18, then -- and
2    there are only two images -- the third page is cut
3    off -- then, yes, based on my recollection, I believe
4    that I did review those, yes.
5 Q.  And, again, do you recall any discussion that you were
6    involved in about those attachments?
7 A.  I do not recall any particular meeting or exact
8    discussion --
9 Q.  Okay.
10 A.  -- as it would pertain to those exact attachments.
11 Q.  To close the loop on this, and then I am done, I just
12    want to have you pull up exhibit -- I think it's 14.
13    It's the big stack of documents.  I'm going to refer
14    you to -- if you could just look at 696 to 700?  And
15    when you're done reviewing those, I'll have two other
16    pages.
17 A.  Okay.
18 Q.  Do you recognize the pages 697 to 700?
19 A.  I do not recall them sitting here today.  I do not
20    recall them.  I would imagine that I saw them at some
21    point, but I don't recall seeing this exact document,
22    no.
23 Q.  Do you know whether or not these are documents that
24    would be associated with the email that's referenced in
25    Exhibit 18?

142

1 A.  I would not have any knowledge of that, no.
2 Q.  So now I'm just going to turn your attention to 736 and
3    737.
4 A.  Okay.
5 Q.  I just want to make sure that we're on the same page,
6    that those are --
7 A.  These -- these two documents, yes.  736 and 737 --
8 Q.  Are the same documents attached --
9 A.  -- are the -- appear to be the documents that were
10    attached to Exhibit 18.
11 Q.  Okay.
12 A.  However, there's been -- it's been redacted in Exhibit
13    14.
14 Q.  Do you know how the Department ultimately responded to
15    this complaint on April 7th?
16 A.  To the best of my knowledge, sitting here today, this
17    matter would not have prompted an investigation to have
18    been opened, nor would it have been a violation of the
19    code of conduct as set out in exhibit -- what's the
20    exhibit?
21        MR. KAHNE:  2.
22        MR. BISSONETTE:  2.
23        THE WITNESS:  Oh, thank you.  Exhibit 2.
24 BY MR. BISSONETTE:
25 Q.  When you say -- sorry, go on.  I was about to cut you

143

1    off.  So you don't recall anything being done?
2 A.  Done in terms of --
3 Q.  Enforcement.
4 A.  Enforcement under the code of conduct?  No, I do not.
5 Q.  You said that you didn't view it as necessarily
6    violating the code of conduct.  Did you have a view at
7    the time as to whether or not it violated HB 2?
8 A.  It was --
9 Q.  I'm sorry?
10 A.  -- not my decision to make.  Those matters pursuant to
11    the law are to be referred to the Human Rights
12    Commission for determination.
13 Q.  So when you say "code of conduct," I just want to make
14    sure what you were referencing was the code of conduct
15    in Exhibit 2, but you were excluding the provisions of
16    HB 2?
17 A.  Yes.
18        MR. BISSONETTE:  Okay.  Thank you.
19        EXAMINATION
20 BY MR. KAHNE:
21 Q.  Attorney Fenton, my name is David Kahne.  I represent
22    the American Federation of Teachers in this action, and
23    I'm going to ask you a few questions, some follow-up
24    questions.  Same rules apply as for -- what we went
25    over from the beginning.  And I'll try to be as

144

1    efficient as possible because I understand that you
2    have some time constraints.
3        Why don't we stay on Exhibit 18?  If you look at
4    the bottom, the last email on the bottom of what's been
5    marked DOE10286, there's an email from Scott Laliberte,
6    who presumably is the superintendent of Londonberry
7    (sic), to Richard Farrell.  The last sentence -- or,
8    sorry, I should say the second to last sentence says,
9    "We have also reviewed this material through the lens
10    of the new divisive concepts law and find that the
11    subject of these activities do not apply."
12        Do you see that?
13 A.  I do.
14 Q.  My first question for you, Attorney Fenton, is why
15    wasn't this complaint referred to the HRC?
16 A.  I'm not sure if it wasn't referred to the HRC.
17    However, notwithstanding this instance, my
18    understanding is that the Department of Education is
19    not in a position to refer matters which may or may not
20    fall within House Bill 2 to the Human Rights Commission
21    for consideration.  That's what I have been told on
22    another matter.
23 Q.  So let's break that down.  Do you have knowledge of
24    Commissioner Edelblut ever forwarding complaints that
25    he receives to Commissioner Malachai?

145

1   A.  I am not here to testify on behalf of Commissioner
2       Edelblut.  He might have.  He might not have.  I don't
3       have any personal information as it pertains to that.
4   Q.  You don't -- do you know personally whether any
5       complaints have been received by the DOE and
6       transferred or referred to the HRC?
7   A.  I do not have personal information as it pertains to
8       referring cases to the Human Rights Commission.  I can
9       speak from my own personal experience in a case that I
10      referenced earlier during my testimony where I, through
11      the Department of Education, tried to refer a case to
12      the Human Rights Commission and was told that they
13      could not take that as a referral.
14  Q.  And I believe we've seen documents today, have we not,
15      where you instruct individuals to file a complaint with
16      the HRC, that that is the appropriate venue for those
17      complaints, right?
18          MR. KENISON-MARVIN:  Objection.  Compound.
19      BY MR. KAHNE:
20  Q.  Is that a fair characterization of documents that we've
21      seen?
22  A.  Could you specify which document?
23  Q.  Exhibit 10.  So in Exhibit 10, you refer Pierre Couture
24      to the Human Rights Commission.  You say that because
25      divisive concepts is handled by the Human Rights

146

1       Commission and the AG's office.  Do you see that?
2   A.  I do.
3   Q.  Okay.  So my question is, in the case of Londonberry,
4       why wasn't the superintendent of Londonberry referred
5       to the HRC?
6   A.  Well, getting back to Exhibit 10, I'm not necessarily
7       referring Pierre Couture to the Human Rights
8       Commission.  I'm just informing him that this issue is
9       handled by the Human Rights Commission and the Attorney
10      General's office.  Therefore, the Department has not
11      issued much information on this topic, and so then I
12      referred him to the Attorney General's website where
13      they had that FAQ.  I don't read this email in Exhibit
14      10 as me referring him to the Human Rights
15      Commission.
16  Q.  Okay.  I'm not talking about a formal referral.  I'm
17      just talking about telling an individual, who has a
18      complaint, that the proper place to bring a complaint
19      is with the Human Rights Commission.
20  A.  And going back to Exhibit 18, that conversation could
21      have occurred.  I am not -- I do not have any personal
22      information, as I'm sitting here today, to say whether
23      or not that was done or not.
24  Q.  Has the commissioner of education ever asked you to
25      investigate potential violations of HB 2?

147

1   A.  The law is clear that the Department of Education does
2       not adjudicate matters that may or may not fall within
3       HB 2.
4   Q.  I understand your testimony.  My question, though, is
5       has the commissioner of education ever asked you to
6       investigate potential violations of HB 2?
7           MR. KENISON-MARVIN:  I'll instruct the
8       witness with respect to any information the
9       commissioner sought from you that would have been a
10      privileged attorney/client communication where he's
11      seeking advice from you about whether or not to do
12      that, to not -- that that information is privileged and
13      to not provide it in response to that question.
14          THE WITNESS:  So I don't feel I can answer
15      that question without violating a potential privilege.
16      BY MR. KAHNE:
17  Q.  What privilege are you violating?
18  A.  Possible attorney/client.
19  Q.  Is the commissioner consulting you in your capacity as
20      his attorney?
21  A.  Generally, his attorney was Christopher Bond, and
22      Christopher Bond would advise him on those matters.
23  Q.  I'm also not asking you for the substance.  I'm asking
24      you if it has occurred.
25          Has the commissioner asked you to investigate

148

1       potential violations of HB 2?
2   A.  To the best of my recollection, sitting here today, he
3       has not.  And to the extent that he ever has, I would
4       have told him that we do not have the authority to do
5       so.
6           MR. KAHNE:  Okay.  Let's look at document --
7       what are we up to?
8           MR. BISSONETTE:  This will be 19.
9           (Exhibit 19 marked for identification.)
10      BY MR. KAHNE:
11  Q.  You don't need to read the entire thing, but does this
12      refresh your recollection of this series of emails that
13      occurred on or about August 23rd, 2021?
14  A.  Yes, I recall this email.  Yes.
15  Q.  Okay.  And what -- Commissioner Edelblut says on
16      Friday, August 20th, at 8:15 a.m., "I did call David
17      Ryan to ask for and about the book.  Can you get a
18      copy?  He has not returned my call."
19          Do you see that?
20  A.  I do, yes.
21  Q.  And what was Commissioner Edelblut referring to
22      there?
23  A.  I believe there was a book being referenced.  Perhaps
24      it was within this email.
25  Q.  Okay, so -- I'm sorry.  Go ahead.

149

1   A. I believe if you look -- oh, the Bates number is cut
2      off, but I believe they're referencing the book A Good
3      Kind of Trouble.
4   Q. Okay. And so am I correct that Commissioner Edelblut
5      was asking you to find a copy of A Good Kind of
6      Trouble?
7   A. That was my interpretation of his request, yes, and I
8      was going to go on Amazon and buy him a copy of the
9      book.
10  Q. And I asked you earlier whether the commissioner had
11     ever asked you to investigate into potential violations
12     of HB 2. Do you not understand this document to be a
13     complaint relating to a potential violation of HB 2?
14  A. I took his request, the commissioner's request, as
15     simply wanting a copy of the book.
16  Q. Right, but he could have asked his secretary for the
17     book, right?
18  A. Well, I think, in this instance, I became the
19     secretary. That's -- that was my limited role in this.
20     It might be silly, but I was going to go on Amazon and
21     get him a copy of the book, so I interpreted his email
22     as being that limited. He wanted to see what it was
23     all about.
24  Q. Okay. And getting back to 18, which is the Londonberry
25     email, that was -- that complaint was about course

150

1      conduct, too, right? Course content, I should say.
2      Excuse me.
3   A. Yes.
4   Q. Okay.
5   A. That is my understanding, yes.
6   Q. There is a discussion at the DOE about this particular
7      course conduct, wasn't there?
8   A. I don't have any particular recollection of any exact
9      meeting, but, I would assume, based on the nature of
10     the emails, that there was further discussion, and I
11     would believe that it would involve Chris Bond.
12     Attorney Bond, in large part, advised Commissioner
13     Edelblut as it pertained to matters that fell within HB
14     2.
15  Q. And but you said -- it says here, you say to
16     Commissioner Edelblut, "Yes, we need to discuss at our
17     next ed misconduct meeting in further detail."
18  A. Yes.
19  Q. That suggests to me that it was not just a conversation
20     with Attorney Bond and the commissioner, right?
21  A. Yes, but I included Christopher Bond on that string.
22     And, in large part, Christopher Bond would not be part
23     of our routine educator misconduct meeting, so he's
24     included here because, to the extent it involves or may
25     involve HB 2, I would have deferred to Attorney

151

1      Christopher Bond to guide Commissioner Edelblut as to
2      the next step.
3   Q. Okay. But fair to say that course content was
4      discussed at the board of ed at an educator misconduct
5      meeting?
6   A. I don't recall having that at an official educator
7      misconduct meeting, but I -- I would imagine that, yes,
8      it was discussed in some context. It might have been
9      an informal meeting between me and Christopher Bond and
10     the commissioner.
11  Q. Including whether it violates HB 2?
12  A. We didn't make a determination as to whether or not it
13     violated HB 2. We would make a determination as to
14     this is not within our purview. It should be referred
15     or have someone contact the Human Rights Commission.
16     It needs to be reviewed by the Human Rights Commission.
17  Q. But there is a certain amount of groundwork that gets
18     done at the DOE to determine whether it rises to the
19     level of a potential violation of HB 2, right?
20  A. I disagree with how you phrased that. It's not
21     determining whether it violates HB 2. It's determining
22     whether it falls within the Department of Education's
23     jurisdiction or it falls outside the Department of
24     Education's jurisdiction.
25  Q. Department of Education's jurisdiction is the code of

152

1      conduct, right?
2   A. Yes.
3   Q. And violations of HB 2 are violations of the code of
4      conduct, are they not?
5   A. That is what the law says.
6          MR. KENISON-MARVIN: Objection. Vague.
7      BY MR. KAHNE:
8   Q. The complaint process that you spoke about earlier
9      that's referenced in the Educator Code of Conduct which
10     is Exhibit 2, subdivision A, which says, "The case
11     shall be opened when a complaint of possible misconduct
12     against a credential holder has come to the attention
13     of the department either through direct reporting or
14     other means," those complaints can come in through
15     emails, right?
16  A. I would imagine, yes.
17  Q. Calls?
18  A. Yes.
19  Q. Direct calls to the commissioner?
20  A. Yes.
21  Q. Direct emails to the commissioner?
22  A. Yes.
23  Q. And when it says "a case shall be opened," can you
24     describe for me what it means for a case to be
25     opened?

153

1   A.  I've already testified to that.
2   Q.  Well, you said that things get documented, but you
3       didn't specify how they get documented.
4   A.  I believe I did go into detail as to what that means.
5   Q.  I don't recall.  Can you refresh my recollection?
6   A.  In large part, it would be the investigator, Richard
7       Farrell, and he would document the name of the person
8       the allegation is against, the name of the person
9       making the allegation, the school district, any other
10      facts which might be relevant.
11  Q.  Where does that get documented?
12  A.  That's probably a question best directed to Richard
13      Farrell.  He has his notes, and then he creates -- and
14      again, this is to the best of my knowledge.  I would
15      refer your question to Richard Farrell.  He has folders
16      where he writes down that information.
17  Q.  Folders?
18  A.  Mm-hm.
19  Q.  When a case is opened about a particular credential
20      holder, does that go into a credential holder's
21      personnel file?
22  A.  No, it does not.
23  Q.  Is it only when a formal investigation is opened?
24  A.  So we do not have personnel files.  Personnel files are
25      employment.  We do not govern employment.

154

1   Q.  So you've testified, I believe, that a formal letter
2       goes out to an educator or licensed credential holder
3       when an investigation is opened; is that right?
4   A.  That's correct.  That's my testimony.
5   Q.  Other than Richard Farrell documenting in a folder, is
6       there anything else that happens in connection with a
7       case being opened?
8   A.  I will defer your questions to Richard Farrell.  He can
9       better detail what he -- the information he takes and
10      what he opens.  If your question is about what is
11      logged in our EIS system, there is nothing logged in
12      our EIS system when a case is opened in accordance with
13      511.01 (A).
14  Q.  So let me show you what's been marked DOE10010.
15          MR. KAHNE:  What are we up to?  21?
16          THE REPORTER:  20.
17          (Exhibit 20 marked for identification.)
18      BY MR. KAHNE:
19  Q.  Do you see this, the document that's -- that I've --
20      that's Exhibit 20?
21  A.  I do.
22  Q.  Okay.  Do you see -- who's Stephen Berwick?
23  A.  Stephen Berwick is -- oversees our constituent concerns
24      and complaints.
25  Q.  Okay.  Do you see it says, "Diana -- here you go!  By

155

1       the way, don't forget, anything that comes in as a
2       complaint to me does get logged -- I do get some
3       discrimination and refer to HRC... however, great
4       responses to their questions."
5           Do you see that?
6   A.  Yes, I do.
7   Q.  Why is he saying that anything that comes in to him as
8       a complaint gets logged?
9   A.  So Stephen handles all of our constituent concerns that
10      come in, and he logs them in a database which is shared
11      with myself and the commissioner and the deputy, and I
12      believe the governor's office.  Those are -- that's his
13      database.  He does not oversee, nor is he involved in
14      educator misconduct cases.  So while he will log it
15      because it's a call that he got, he will document it in
16      his own database, he will then ultimately refer any
17      educator misconduct cases to Richard Farrell.  And, as
18      stated, anything that he feels might be HB 2, or not HB
19      2, he refers to the Human Rights Commission.
20  Q.  Are complaints that are opened made public?
21  A.  No.
22  Q.  Investigations?
23          MR. KENISON-MARVIN:  Objection.  Vague.
24          THE WITNESS:  Could you clarify your
25      question, please.

156

1       BY MR. KAHNE:
2   Q.  Are investigations that are opened by the Department of
3       Education made available to the public?
4   A.  In what sense?
5   Q.  In any sense.
6   A.  That's pretty broad.
7           MR. KENISON-MARVIN:  I will object to that as
8       being vague.
9           THE WITNESS:  Could you clarify?
10      BY MR. KAHNE:
11  Q.  Can a member of the public find out whether an educator
12      has had an investigation opened with respect to their
13      conduct?
14  A.  No.
15  Q.  You testified earlier that -- about your meeting, your
16      investigative meeting.  You testified about receiving
17      an investigative file from a superintendent.  Do you
18      remember that, from superintendents?  And reviewing
19      them?
20  A.  Yes, we have received investigation reports or files
21      from superintendents, depending on the case, yes.
22  Q.  And do superintendents, are they authorized to conduct
23      those investigations on their own?
24          MR. KENISON-MARVIN:  Objection.  Calls for a
25      legal conclusion.  You can answer.

157

1    THE WITNESS:  I believe that falls within the
2  purview of their role as superintendent, yes.
3  BY MR. KAHNE:
4  Q.  And within that investigation that superintendents can
5    conduct, can they also conduct -- can they conduct
6    investigations relating to potential violations of the
7    code of conduct?
8    MR. KENISON-MARVIN:  Same objection.
9    THE WITNESS:  To the extent that the code of
10   conduct has been incorporated within their district
11   policies, I believe that they can, yes.
12  BY MR. KAHNE:
13  Q.  Okay.  I want to draw your attention to Exhibit 3 which
14    is the training that you spoke about with Attorney
15    Bissonnette.  I wanted to cut out some time, direct
16    your attention directly to DOE05665.
17  **A.  Oh, okay.  Exhibit 3.  Got it.  It's on the top of the**
18    **pile.  Which one?  Which number?**
19  Q.  3.  It's 3.  It's 5665.
20  **A.  Okay.**
21  Q.  By the way, before we talk about this, you testified
22    earlier that you've included in your training now
23    sections on HB 2, right, since its passage?
24  **A.  I have done that.  I don't know if that's my current**
25    **practice as I do code of conduct training.**

158

1  Q.  Okay.  Why did you incorporate it?
2  **A.  I incorporated it at the time into my trainings that**
3    **we've referenced because it seemed to me there was a**
4    **lot of confusion in the field.  I received calls from**
5    **attorneys that had some confusion as to the**
6    **Department's role under HB 2, and I wanted to take an**
7    **opportunity to clarify that.**
8  Q.  So there was confusion among attorneys, you said; is
9    that right?
10  **A.  Yes.**
11  Q.  Confusion among superintendents, too, in your view?
12  **A.  In my view, yes.**
13  Q.  Among parents as well?
14  **A.  I would expect so, but my -- when I say there was**
15    **confusion in the field, I am referring to educators,**
16    **attorneys for school districts, and union attorneys,**
17    **and superintendents.**
18  Q.  Fairly educated people, right?
19  **A.  In my experience, yes.**
20  Q.  So the last bullet, "So why the website," is what you
21    were asked about before.  I just want to sort of close
22    the loop here.  Is the website here referring to the
23    Department of Education website?
24  **A.  Yes, I think that is what I was referring to.**
25  Q.  And is that because there was a -- there was

159

1    information on the Department of Education website
2    concerning HB 2?
3  **A.  No.**
4  Q.  Okay.  So what does this mean, "So why the website?"
5  **A.  So the website, at least when I wrote this, was in**
6    **reference to the —**
7  Q.  Sorry.  Go ahead.
8  **A.  So the reference to the website, when I wrote this, was**
9    **really a reference to the link by which complaints**
10    **could be filed that were sent directly to the Human**
11    **Rights Commission.**
12  Q.  Okay.  I'm going to show you a document that actually
13    does not have a Bates number on it.  It says, "Right to
14    freedom from discrimination in public workplaces and
15    education."
16    And it is, and I will represent on the record,
17    that it is a snapshot of the Department of Education
18    from November 10th, 2021.
19    (Exhibit 21 marked for identification.)
20  BY MR. KAHNE:
21  Q.  So does this refresh your recollection as to what the
22    Department of Education website said about HB 2 on or
23    around November of 2021?
24  **A.  It does, yes.**
25  Q.  Okay.  And I think you mentioned earlier a link to

160

1    public -- you mentioned a link on the website, right?
2  **A.  Yes, it's the filing of public education intake**
3    **questionnaire.**
4  Q.  Right.  Right.
5  **A.  That's — that was what I was referring to in that**
6    **slide in Exhibit 3.**
7  Q.  So why the website is that -- you saying why --
8  **A.  Why that link, that page?**
9  Q.  Why is the link on the DOE website?
10  **A.  Yes, that's what I was referring to.**
11  Q.  And why was it on the DOE website?  Go ahead.  I'm
12    listening.
13  **A.  I was not directly involved in the creation of that**
14    **link.  I believe that was worked on by Attorney Chris**
15    **Bond and the commissioner, but it was not worked on**
16    **directly by me.**
17    **My understanding, as kind of being peripheral to**
18    **those discussions, was that there was so much**
19    **information that was coming into the Department of**
20    **Education, which, again, may or may not have fallen**
21    **within the purview of HB 2, that the Department of**
22    **Education wanted to provide a resource, for lack of a**
23    **better term, by which individuals could directly file**
24    **those complaints with the Human Rights Commission,**
25    **noting that the Department of Education was not able to**

161

1      refer those matters to the Human Rights Commission for
2      review.
3 Q.   Do you recall whether there was press about the
4      launching of a website relating to these complaints?
5 A.   I would imagine there was. I don't have any personal
6      knowledge as to what that encompassed.
7 Q.   Before we get to that, do you see where it say under --
8      the intake form, it says, "If you believe an educator
9      may have violated the code of conduct, such a complaint
10      can be filed to the Department of Education by email to
11      Kate Walker. Kate.a.walker2@doe.nh.gov."
12      Do you see that?
13 A.   Mm-hm.
14 Q.   Who is Kate Walker?
15 A.   So Kate Walker worked within my unit for a short period
16      of time. She was -- her role was to assist me with
17      legislative affairs but also to help myself and Rich
18      with just keeping track of any allegations of code of
19      conduct cases that came in.
20 Q.   Okay. And so her name -- and she's a DOE employee --
21      is listed within the same paragraph as filing a public
22      education intake questionnaire, right? Or within the
23      same section, I should say.
24 A.   Yes.
25 Q.   Okay. Do you think this added to the confusion about

162

1      where to file complaints?
2 A.   I'm not in a position to say one way or the other.
3 Q.   Did the DOE continue to receive complaints regarding HB
4      2 after this website was launched?
5      MR. KENISON-MARVIN: Objection. Misstates
6      prior testimony.
7      THE WITNESS: Could you clarify your
8      question?
9      BY MR. KAHNE:
10 Q.   Did complaints relating to HB 2 continue to come in to
11      the Department of Education after the launch of this
12      website?
13      MR. KENISON-MARVIN: Same objection.
14      THE WITNESS: To the best of my knowledge,
15      yes, they did.
16      MR. KAHNE: I want to mark a new exhibit.
17      (Exhibit 22 marked for identification.)
18      BY MR. KAHNE:
19 Q.   Have you had a chance to review Exhibit 22?
20 A.   Yes, yes.
21 Q.   And what is this?
22 A.   It appears to be an email from Richard Farrell, who is
23      the investigator for the Department, to me. The
24      subject is "New Hampshire Moms for Liberty chapter
25      offers $500 to anyone who can catch teachers breaking a

163

1      new discrimination law."
2      Rich sends that to me saying "An anti-LGBTQ group
3      is also offering $500."
4      And then, below that, still the same subject --
5      and below that, there's a reference to an article from
6      Business Insider Australia.
7 Q.   And this email is from November 15th, 2021, right?
8 A.   Yes.
9 Q.   And the document I showed you earlier about the launch
10      of the new website was November 12th, I believe, 2021,
11      right? Or, I'm sorry, November 10th, 2021.
12 A.   So that appears to be the date at the very top that's
13      circled, and then it's written "11/10/21 Wayback
14      Machine." I'm not sure what that's in reference to.
15 Q.   Do you recall a bounty being offered for violations of
16      the new discrimination law on or around this time?
17 A.   I recall receiving this email.
18 Q.   Is that all you recall about it?
19 A.   I might have viewed the article that's referenced here.
20      As I say, I saw that when I was talking with Chris
21      earlier today, but I don't recall becoming very
22      familiar with this bounty that was being offered, no.
23 Q.   Do you recall having any conversations with anyone at
24      the DOE regarding the bounty?
25 A.   I would infer from my email that I talked to Chris

164

1      about it.
2 Q.   Do you recall that conversation?
3 A.   I don't recall the exact details of it.
4 Q.   Do you recall having any conversations with the
5      commissioner about the bounty?
6 A.   No, I do not.
7 Q.   Richard Farrell says to you, "An anti-LGBTQ group is
8      also offering $500."
9      Do you know which group he's referring to there?
10 A.   I do not.
11 Q.   Did you have any further conversations with Mr. Farrell
12      about bounties being offered for violation of the new
13      discrimination law?
14 A.   I do not recall any detailed discussions I had with
15      Richard. I do recall, I think, the extent of it was
16      that I found it very upsetting.
17 Q.   Why was it upsetting?
18 A.   I just find it very upsetting that people are putting
19      out bounties on educators. But that's a personal -- my
20      mom was a New Hampshire educator. I found that very
21      upsetting. But that had more to do with my personal
22      views rather than my professional views. But to the
23      extent I had any conversation with Richard Farrell
24      about it, I'm sure that was the tone of it.
25 Q.   Did he feel the same way, to your recollection?

165

1 A. That question is probably better directed to Richard
2    Farrell.
3 Q. Is it your understanding that the subject matter of HB
4    544 was put into HB 2 and then passed into law? I'm
5    switching gears. Sorry.
6 A. Thank you. Do you have HB 554 (sic)?
7 Q. I don't have the text.
8       MR. BISSONETTE: I actually do, if you think
9    it'd be useful.
10 BY MR. KAHNE:
11 Q. Actually, just based on your own recollection of what
12    it was. Is it your understanding that 544 became HB
13    2?
14 A. I would have to look at that time if I could.
15 Q. I'll just show you the email, DOE812.
16       (Exhibit 23 marked for identification.)
17 A. Okay.
18 Q. Do you see where it says -- it's an email from you to
19    Kayla Page, March 18th, 2022, and it says, "Richard
20    Farrell forwarded the email that you sent to him. You
21    are correct that the subject matter of HB 544 was put
22    into HB 2 and was passed into law last year."
23       Do you see that?
24 A. I do, yeah.
25 Q. And to the best of your recollection, is that the way

166

1    that you thought --
2 A. Apparently.
3 Q. -- about both bills?
4 A. Yes, apparently.
5 Q. Okay. Any reason to doubt why you would put that in an
6    email?
7 A. I would think the younger 2022 version of me would.
8 Q. Would know more?
9 A. Would have recollected that probably a little better.
10    So, yes, I will stand by what I wrote in the email. I
11    wish that I had more context as to the email that I was
12    responding to, but I stand by what I wrote, yes.
13 Q. Okay. Before I move on, I had shown you the website
14    before, the DOE website, the snapshot, which was
15    Exhibit 21. And I showed you that it had Kate Walker's
16    email address on it.
17 A. Yes.
18 Q. An employee of the DOE, an investigator, right?
19 A. She's not an investigator, no.
20 Q. I'm sorry. What is her position at DOE?
21 A. Well, she's no longer with the Department of Education,
22    and we never replaced her.
23 Q. What was --
24 A. She was really just an administrative assistant to me
25    and to Rich Farrell. And, to be clear, that section

167

1    also has a link to the Educator Code of Conduct and
2    Ethics.
3 Q. Right. And to your knowledge, do you know whether
4    the -- whether her name was eliminated -- was removed
5    from the website?
6 A. I believe that it was, yes.
7 Q. Why was it removed?
8 A. I know that Kate had expressed some hesitation of
9    having her name on there. Other than that, I don't
10    know ultimately why that decision was made. I know I
11    advocated for her because she reported to me.
12    Ultimately why that decision was made would probably be
13    with the commissioner.
14 Q. And so the commissioner made the ultimate decision to
15    do that, to remove her name?
16 A. I would -- I would think so.
17 Q. And it was strictly based on her own personal desire
18    not to be on the website?
19 A. No. My testimony is that she expressed to me
20    hesitation in having her name on the website. I
21    understood why she was hesitant, and I advocated on
22    behalf of her either to the commissioner directly or
23    more likely to the deputy commissioner. That is who I
24    directly report to.
25 Q. And you didn't have any conversations about it being

168

1    confusing to have a DOE employee listed near the
2    complaint intake form?
3 A. I don't recall that level of detail. That might have
4    occurred. I'm telling you what I recall, sitting here
5    today, and, what I recall, sitting here today, is that
6    it was expressed to me by someone who reports to me,
7    Kate Walker, that she was uncomfortable with that, and
8    I shared that with the deputy commissioner and/or the
9    commissioner, more likely than not the deputy
10    commissioner since I directly report to her.
11 Q. You testified earlier about -- well, switching gears.
12    Let's go to exhibit -- I think it's 5, which is your
13    testimony.
14       THE WITNESS: I apologize for being rude.
15    Can we do a time check? I do have to leave at 5:00,
16    and that was our agreement.
17       MR. KENISON-MARVIN: I have 5:00. How much
18    longer do you think you have?
19       MR. KAHNE: Is it 5:00?
20       MR. KENISON-MARVIN: Yeah.
21       MR. BISSONETTE: How much more? Do you want
22    to debrief real quick?
23       MR. KAHNE: Yeah.
24       (Recess taken.)
25 BY MR. KAHNE:

---

169

1  Q.  Attorney Fenton, you previously testified, and I don't
2      want to get into the details of it, but there was an
3      SOP regarding when DOE transfers matters to the AG's
4      office, right?
5  A.  **Yes, that was my testimony.**
6  Q.  Is there a difference between transferring for the DOE
7      transferring matters to the AG's office versus the
8      HRC?
9  A.  **I was told numerous times that the Department of**
10     **Education could not refer any issue, any matters, to**
11     **the Human Rights Commission for review and**
12     **determination, and -- can you repeat the question? I'm**
13     **sorry.**
14 Q.  I'm just trying to understand whether there's a
15     procedure in place as to how the DOE can refer matters
16     to the HRC versus the Attorney General's office.
17 A.  **I'm not aware of the Department of Education being able**
18     **to refer matters to the Human Rights Commission other**
19     **than the link on the website which allows the complaint**
20     **to go directly to the Human Rights Commission, which is**
21     **why there was a need for the SOP, for the Department to**
22     **refer these matters to the Attorney General's office**
23     **for review.**
24 Q.  Did the DOE seek legislation in the form of an
25     amendment to HB 2 to allow it to file complaints

170

1      directly with the HRC?
2  A.  **To HB 2?**
3  Q.  To HB 2.
4      MS. MILBURN: An amendment.
5      BY MR. KAHNE:
6  Q.  An amendment to HB 2. Sorry. Let me strike that.
7      Did the DOE seek an amendment to HB 2 to allow it
8      to file complaints with the HRC?
9  A.  **The only legislation I'm aware of is House Bill 533,**
10     **which was brought forth this session.**
11 Q.  Right. And the DOE supported that bill?
12 A.  **So, as I testified previously, a state agency doesn't**
13     **support or oppose. We provide technical assistance.**
14     **And I didn't -- I didn't see House Bill 533 as being an**
15     **amendment to HB 2.**
16 Q.  Okay. But it was going to add a section to HB 2,
17     didn't it?
18 A.  **It would add a section to the law that HB 2 created.**
19     **But, just so we're clear, I don't -- I didn't think of**
20     **HB 533 as amending House Bill 2, but I understand what**
21     you're saying. It amended the law, the 354 (A), yes.
22 Q.  Did you speak with the commissioner about HB 533?
23 A.  **I'm sure that I -- I'm sure that I did because we talk**
24     **about all legislative affairs.**
25 Q.  Do you know whether he was in favor of HB 533?

171

1  A.  **I'm not in a position to testify on what Commissioner**
2      **Edelblut likes or doesn't like.**
3  Q.  Did he ever express to you that he was in favor of HB
4      533?
5  A.  **Sitting here today, I do not recall, but I can tell you**
6      **in general terms he knows my position on the state**
7      **agency and testimony that we don't support or oppose.**
8      **We provide technical assistance.**
9  Q.  You testified earlier that the code of conduct is
10     narrowly tailored, right?
11 A.  **Yes.**
12 Q.  Does the incorporation of HB 2 into the code of conduct
13     expand the code of conduct?
14     MR. KENISON-MARVIN: Objection. Vague.
15     Calls for a legal conclusion. Misstates prior
16     testimony. You can answer.
17     THE WITNESS: I'll have to refer back to my
18     prior testimony. I don't -- I don't believe, looking
19     at the section -- when I read HB 2, I don't think I
20     interpreted it as expanding the code of conduct.
21     BY MR. KAHNE:
22 Q.  You're saying this was already covered in the code of
23     conduct?
24 A.  **No. I saw it as being separate from the code of**
25     **conduct. The code of conduct is a document that was**

172

1      **created by a different law. It was created pursuant to**
2      **rulemaking. This does not allow for any rulemaking for**
3      **the code of conduct.**
4  Q.  But it expands the categories of conduct that is
5      prohibited under the code of conduct?
6  A.  **I can understand your interpretation of that. That**
7      **wasn't my interpretation of it.**
8  Q.  Okay. You've had a chance to review HB 2, right?
9  A.  **Yes.**
10 Q.  Okay. Do you have an understanding of what is
11     prohibited from being taught now in schools that was
12     not previously prohibited?
13 A.  **Based on my review of the law?**
14 Q.  Yeah.
15 A.  **Yes.**
16 Q.  Okay. So what? What is prohibited now that was not
17     previously prohibited?
18     MR. KENISON-MARVIN: Objection. Vague.
19     Calls for a legal conclusion. You can answer.
20     THE WITNESS: I would just refer you back to
21     HB 2.
22     BY MR. KAHNE:
23 Q.  How about specific books? Are there books that you
24     know of that were -- could have previously been taught
25     and now cannot be taught because of HB 2?

173

1      MR. KENISON-MARVIN:  Same objection.  You can
2   answer.
3      THE WITNESS:  I'm not aware of any exact
4   books, no.
5   BY MR. KAHNE:
6   Q.  Any material at all?  Instructional material?
7      MR. KENISON-MARVIN:  Same objections.
8      THE WITNESS:  No, I am not aware of any books
9   or instructional material.
10  BY MR. KAHNE:
11  Q.  Your testimony is that violations of HR -- HB 2 are
12     for the HRC to make; is that right?
13  A.  Yes.
14  Q.  Is it your view that if there's a finding by the HRC of
15     discrimination, it's automatically a violation of the
16     code of conduct?
17     MR. KENISON-MARVIN:  Same objections.
18     THE WITNESS:  So looking at HB 2, section
19  four, which we've testified to previously, says,
20  "Violations of this section by an educator shall be
21  considered a violation of the Educator Code of Conduct
22  that justifies disciplinary sanction by the State Board
23  of Education."
24     So, yes, it could -- yes.  It could warrant
25  disciplinary sanction.

174

1   BY MR. KAHNE:
2   Q.  Could warrant or does warrant?
3   A.  Well --
4      MR. KENISON-MARVIN:  Same objections.
5      THE WITNESS:  We have not yet had one of
6   these cases adjudicated by the HRC, so it's speculation
7   at best.
8   BY MR. KAHNE:
9   Q.  But is it your view, if there were a determination, is
10     there still discretion within the DOE to determine
11     whether it's been a violation of the code of conduct?
12     MR. KENISON-MARVIN:  Same objections.
13     THE WITNESS:  Well, as I look at what is
14  marked as Exhibit 2, Ed 511.01 (J)(7), "If no
15  disciplinary sanction is proposed, the department shall
16  notify the credential holder in writing that the
17  investigation is closed."
18  BY MR. KAHNE:
19  Q.  So you've just read the code of conduct?
20  A.  Yes.
21  Q.  What's the answer to the question?
22  A.  Well, I think, if you look at 511.01 (J) in its
23     entirety, it sets out what the form of discipline can
24     be, the suspension, revocation, reprimand, but, in my
25     reading of subsection seven, the Department could

175

1      propose no disciplinary sanction.
2   Q.  So if an educator violates HB 2, they could have their
3      credentials revoked, right?
4   A.  Yes.
5   Q.  Okay.  Under the SOP, does the DOJ have to make a
6      referral to the HRC for complaints that it receives?
7   A.  Sitting here today, I'm not aware of that level of
8      detail.  I can't testify to that.  I don't have the
9      document in front of me.
10     MR. KAHNE:  One second.
11  BY MR. KAHNE:
12  Q.  The op-ed that you were shown earlier, Exhibit 12, I'm
13     not going to make you look through it.
14     I guess you could look through it.
15  A.  I think I was shown a couple of op-eds.
16  Q.  With the topics, topic one, topic two, topic three,
17     topic four, that op-ed, do you recall that?
18     THE WITNESS:  I just messed up your nice
19  pile.  I apologize.
20     MR. KAHNE:  I think it's Exhibit 14.
21     THE WITNESS:  Is it 14?  Oh, okay.
22  BY MR. KAHNE:
23  Q.  Did you -- and you don't have to look through every
24     single --
25  A.  Sure.

176

1   Q.  -- piece of paper.  Did you have any role in providing
2      the commissioner with the topics that are annexed to
3      the op-ed that is reflected in Exhibit 14?
4      MR. KENISON-MARVIN:  Let the record reflect
5   that Attorney Bissonnette has left the room.  I guess,
6   at this point, just to interrupt, I will say I think
7   we're taking the position that this will be the last
8   question, where one of the attorneys for plaintiffs has
9   needed to leave.  I think it's appropriate that we end
10  on this question.  I'll instruct the witness to not
11  answer any further questions after her answer to this
12  question.
13     THE WITNESS:  To the best of my recollection,
14  sitting here today, I did not personally provide the
15  commissioner with any of those attachments.
16     MR. KAHNE:  Thank you.  Before we close the
17  record, I don't believe Attorney Fenton has gone for
18  seven hours.  We have a few -- a few lines of
19  questioning that we just want to -- that we've spoken
20  to Nate about and we think that we can do it likely
21  next week by Zoom to lessen any inconvenience to you.
22     THE WITNESS:  Thank you.
23     MR. KAHNE:  I don't believe it'll last more
24  than half hour, 45 minutes at the most.
25     MR. KENISON-MARVIN:  And I haven't agreed to

---

177

1  that yet. I'd just let the record reflect that I want
2  to discuss it more with plaintiff's counsel.
3        And could the record just also reflect that
4  when Attorney Bissonnette left, he indicated to me that
5  he was -- I'm not sure if it already captures this, but
6  that he had something to the effect of childcare
7  responsibilities and that he needed to leave the
8  deposition for that purpose.
9        (Whereupon, the deposition was suspended at
10 5:21 p.m.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

178

1          C E R T I F I C A T E
2        I, Sharon G. Saalfield, a Licensed Shorthand
3  Reporter for the State of New Hampshire, Certified Shorthand
4  Reporter for the Commonwealth of Massachusetts, Registered
5  Diplomate Reporter and Certified Realtime Reporter, do
6  hereby certify that the foregoing is a true and accurate
7  transcript of my stenographic notes of the proceeding taken
8  at the place and on the date hereinbefore set forth to the
9  best of my skill and ability under the conditions present at
10 the time.
11        I further certify that I am neither attorney or
12 counsel for, nor related to or employed by any of the
13 parties to the action in which this proceeding was taken,
14 and further that I am not a relative or employee of any
15 attorney or counsel employed in this case, nor am I
16 financially interested in this action.
17        Before completion of the deposition, review of the
18 transcript was requested.
19        The foregoing certification of this transcript
20 does not apply to any reproduction of the same by any means
21 unless under the direct control and/or direction of the
22 certifying reporter.
23
24
25 Sharon G. Saalfield | Lic. No. 147, CSR, RDR, CRR

Local 8027, AFT-New Hampshire, et al. v. Frank Edelblut, Commissioner, et al. (No. 1:21-cv-01077-PB)

Diana Fenton

# ERRATA

I, the undersigned, DIANA FENTON, have read the transcript of my deposition held on May 17, 2023, in the matter of Local 8027, AFT-New Hampshire, et al. v. Edelblut, et al.; and the same is true and correct, to the best of my knowledge, with the exception of the changes noted below on Page 2 of 2 of this Errata:

_Diana E. Fenton_
Diana Fenton

STATE OF _NH_ )
                                 ) ss.:
COUNTY OF _Merrimack_ )

Subscribed and sworn to before me this _3_ day of _July_, 2023.

_Brendan O'Donnell_
Notary Public

My commission expires:

_10 | 17 | 2023_

*[intentionally blank; continued on next page]*

Page **1** of **2**

<u>Changes to Transcript</u>

Page 12, Line 19, Change:

> Replace "file" with "trial" such that the transcript states:
>
> "I did appellate work and I did ***trial*** work."
>
> <u>Reason</u>: Transcription error.

Page 24, Line 13, Change:

> Replace "Highmark" with "Heimarck" such that the transcript states:
>
> "Nicole ***Heimarck***, Amanda Phelps."
>
> <u>Reason</u>: Transcription error.

Page 85, Line 6, Change:

> Replace "Luke" with "Liz" such that the transcript states:
>
> "Since January of 2023, I had a meeting with Attorney Sean Locke of the Attorney General's office, and Attorney ***Liz*** Brown, and we discussed procedural mechanisms by which the Department of Education could refer cases that may or may not fall within the purview of HB 2 to the Attorney General's office for review."
>
> <u>Reason</u>: Transcription error.

Page 101, Line 6, Change:

> Replace "indicator" with "educator" such that the transcript states:
>
> "Your question, as it pertains to individual educators, which I cannot think of a time where I've had that conversation with an individual ***educator***, I would not necessarily refer that person to the superintendent's association."
>
> <u>Reason</u>: Transcription error.

[*end*]