# EXHIBIT 4

DOE Investigator
Richard Farrell
Deposition
Transcript
Redacted,
Publicly-filed

(Unredacted
version has been
filed under seal)



# Transcript of Richard Farrell

**Date:** May 18, 2023
**Case:** Local 8027, AFT-New Hampshire, et al. -v- Edelblut, et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

**Page 1**

```
1              UNITED STATES DISTRICT COURT
2                DISTRICT OF NEW HAMPSHIRE
3
4   LOCAL 8027, AFT NEW HAMPSHIRE,    )
5   et al.,                          )
6               Plaintiffs,          )
7   v.                               )
8   FRANK EDELBLUT, in his official  )
9   capacity as Commissioner of the  )
10  Department of Education ("DOE"), )
11              Defendant            )
12  --------------------------------- C.A. 1:21-cv-01077-PB
13  ANDRES MEJIA, et al.,            )
14              Plaintiffs,          )
15  v.                               )
16  FRANK EDELBLUT, in his official  )
17  capacity as Commissioner of the  )
18  Department of Education ("DOE"), )
19              Defendant.           )
20  ---------------------------------)
21
22          DEPOSITION OF RICHARD FARRELL
23
24
25
```

**Page 2**

```
1          DEPOSITION OF RICHARD FARRELL
2
3      THIS DEPOSITION TAKEN PURSUANT TO NOTICE OF DEPOSITION
4   AT NEW HAMPSHIRE DEPARTMENT OF JUSTICE, 33 CAPITOL STREET,
5   CONCORD, NEW HAMPSHIRE, ON THURSDAY, MAY 18, 2023,
6   COMMENCING AT 10:13 A.M.
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
1                      APPEARANCES
2
3   For Plaintiffs Local 8027, AFT New Hampshire:
    STROOCK & STROOCK & LAVAN, LLP
    David J. Kahne, Esq.
    Elizabeth C. Milburn, Esq.
4   Charles Moerdler, Esq. (via videoconference)
    180 Maiden Lane
5   New York, New York 10038-4982
    (212) 806-6419
6   dkahne@stroock.com
    emilburn@stroock.com
7   cmoerdler@stroock.com
8   For Plaintiffs Andres Mejia and Christina Philibotte:
    AMERICAN CIVIL LIBERTIES UNION OF NEW HAMPSHIRE
9   Gilles Bissonnette, Esq.
    18 Low Avenue
10  Concord, New Hampshire 03301
    (603) 224-5591
11  gilles@aclu-nh.org
12    - and -
13  DISABILITY RIGHTS CENTER - NEW HAMPSHIRE
    Kayla Turner, Esq. (via videoconference)
14  64 North Main Street, Suite 2
    Concord, New Hampshire 03301
15  (603) 228-0432
    kaylat@drcnh.org
16    - and -
17  GLBTQ LEGAL ADVOCATES & DEFENDERS
18  Chris Erchull, Esq. (via videoconference)
    18 Tremont Street, Suite 950
19  Boston, Massachusetts 02108
    (617) 426-1350
20  cerchull@glad.org
21  For Defendants National Education Association - New
    Hampshire:
22  NATIONAL EDUCATION ASSOCIATION - NEW HAMPSHIRE
    Esther K. Dickinson, Esq. (via videoconference)
23  9 South Spring Street
    Concord, New Hampshire 03301
24  (603) 224-7751
    edickinson@nhnea.org
25
```

**Page 4**

```
1                  APPEARANCES (Cont'd)
2
3   For Defendants Frank Edelblut, Christian Kim, John
    Formella, Ahni Malachi, and Ken Merrifield:
    NEW HAMPSHIRE DEPARTMENT OF JUSTICE
4   Civil Bureau
    Nathan W. Kenison-Marvin, Esq.
5   33 Capitol Street
    Concord, New Hampshire 03301
6   (603) 271-1292
    nathan.w.kenison-marvin@doj.nh.gov
7
    For Plaintiff American Federation of Teachers:
8   NOLAN PERRONI, P.C.
    Peter J. Perroni, Esq. (via videoconference)
9   73 Princeton Street
    North Chelmsford, Massachusetts 01863
10  (978) 454-3800
    peter@nolanperroni.com
11
    For Defendant Department of Education:
12  DEPARTMENT OF EDUCATION
    Elizabeth A. Brown, Esq. (via videoconference)
13  101 Pleasant Street
    Concord, New Hampshire 03301
14  (603) 271-6338
    elizabeth.a.brown@doe.nh.gov
15
    Court reporter:
16  Sharon G. Saalfield, LCR No. 147, MA CSR, RDR, CRR
17
18
19
20
21
22
23
24
25
```

**Page 5**

                    STIPULATIONS

      It is agreed that the deposition shall be taken in the
first instance in stenotype and when transcribed may be used
for all purposes for which depositions are competent under
Federal law.

      Notice, filing, caption and all other formalities are
waived.  All objections, except as to form, are reserved and
may be taken in court at time of trial.

      It is further agreed that if the deposition is not
signed within thirty (30) days after submission to counsel,
the signature of the deponent is waived.

**Page 6**

                    INDEX
WITNESS                         PAGE
Richard Farrell
  By Mr. Kahne                  7
  By Mr. Bissonnette            145
  By Ms. Milburn                171
  By Mr. Kenison-Marvin         203
  By Mr. Kahne                  204
              EXHIBITS
NUMBER   DESCRIPTION                        PAGE
1-23     Marked previously
24       10/18/21 Email Chain with Attachments    53
25       11/10/21 Department of Education Press Release  63
26       2/07/22 Letter with Attachments      72
27       2/22/22 Email Chain                  76
28       2/09/22 Email Chain                  79
29       8/24/22 Email                        86
30       9/17/21 Email Chain                  92
31       10/04/21 Email Chain                 152
32       10/04/21 Email Chain                 152
33       9/30/21 Email Chain                  156
34       11/11/21 Email Chain                 172
35       4/01/21 Email Chain                  189
36       6/14/22 Email Chain                  194
37       11/15/21 Email Chain                 198

**Page 7**

```
                 RICHARD FARRELL,
         having been duly sworn by Ms. Saalfield,
            was deposed and testified as follows:
                    EXAMINATION
     BY MR. KAHNE:
  Q.  Good morning, Mr. Farrell.
  A.  Good morning.
         MR. KAHNE:  Nate, before we start, we'll do
     the same stipulations that we did yesterday with
     Ms. Fenton?
         MR. KENISON-MARVIN:  Correct.  And I'll also
     put on the record now that we'll reserve our right to
     read and sign in accordance with the rules.
     BY MR. KAHNE:
  Q.  Mr. Farrell, can you state your name and address for
     the record?
  A.  Sure.  Richard J. Farrell, F-A-R-R-E-L-L, Junior.  My
     address is 36 Arrow, A-R-R-O-W, Lane, in Nashua, New
     Hampshire.
  Q.  Thank you, Mr. Farrell.  My name is David Kahne.  I
     represent one of the plaintiffs in this action, the
     American Federation of Teachers.  Have you ever been
     deposed before?
  A.  I have.
  Q.  When were you deposed?
```

**Page 8**

```
  A.  It was while I was a member of the New Hampshire State
     Police, so it's a number of years ago.
  Q.  You were deposed once?
  A.  Several times.
  Q.  In connection with more than one case?
  A.  Oh, yes.
  Q.  And what were the cases concerning?
  A.  Some of them were civil actions regarding motor vehicle
     accidents; others were criminal — depositions in
     criminal cases.
  Q.  Okay.  So you have some experience here with
     depositions.  So, you know, this is just sort of a
     question and answer session, but your answers are
     sworn, and so you have the same duty to tell the truth
     as you would in court.  You understand that?
  A.  I do.
  Q.  Okay.  Please provide only verbal responses to my
     questions.  You shouldn't shake your head so that the
     transcript can accurately reflect your answers.  Do you
     understand that?
  A.  I do.
  Q.  Okay.  If you don't understand a question, just ask me
     for clarification.  If you do answer a question, the
     record and I will both assume that you heard the
     question, that you understood it, and that you've
```

9

1    provided me with your best recollection in the answer.
2    Do you understand that?
3  **A.  I do.**
4  Q.  Please, to the best of your ability, let me finish my
5    questions completely even if you think you might know
6    what I am asking, okay?
7  **A.  Yes.**
8  Q.  If you need any breaks during the course of the
9    deposition, we're happy to accommodate.  The only thing
10   I do ask you is that you answer a question and don't
11   try to leave in the middle of a question.  But if you
12   need to take a break, we're happy to accommodate,
13   okay?
14 **A.  Yes.**
15 Q.  Any reason you're unable to testify truthfully today?
16 **A.  No.**
17 Q.  Any medications that would impair your ability to
18   testify truthfully?
19 **A.  No.**
20 Q.  What did you do to prepare for this deposition?
21 **A.  I consulted with this gentleman.  That's about it.**
22 Q.  Okay.  Did you have a meeting?
23 **A.  Yes.**
24 Q.  Okay.  How long did the meeting last?
25 **A.  Approximately one hour.**

10

1  Q.  Did you review any documents with --
2  **A.  What type of documents?  I don't know what you mean.**
3  Q.  Any documents at all.  Did you look at any documents in
4    preparation for this?
5  **A.  Yes.**
6  Q.  Okay.  What documents were those?
7  **A.  I looked at the code of conduct and I looked at the**
8    **administrative rules supporting the code of conduct.**
9  Q.  Anything else?
10 **A.  No.**
11 Q.  Did you discuss your deposition testimony with anyone
12   other than counsel today?
13 **A.  My testimony?  No.**
14 Q.  Did you discuss the substance of this litigation with
15   anyone other than counsel?
16 **A.  Yes.**
17 Q.  And who did you discuss it with?
18 **A.  Well, "discuss."  I talked with Attorney Fenton.  I**
19   **talked with my wife.**
20 Q.  Okay.  Let's start with Attorney Fenton.  What did you
21   discuss with Attorney Fenton about this case?
22 **A.  Times, locations, dates, duration of the deposition.**
23   **Not anything of substance.  Just logistics.**
24 Q.  Did you speak to her after her testimony yesterday?
25 **A.  I have not.**

11

1  Q.  And I assume the same thing with your wife?  Discussing
2    this case was just logistics as well?
3  **A.  Yes.**
4  Q.  Are you familiar with the nature of this action?
5        MR. BISSONNETTE:  Objection.  Vague.  You can
6    answer.
7        MR. KAHNE:  You can answer.
8        THE WITNESS:  Generally, yes.
9  BY MR. KAHNE:
10 Q.  Okay.  What do you generally know about it?
11 **A.  I understand, and I could be wrong, that the action is**
12   **related to a piece of legislation that might be**
13   **unconstitutional, and what my role in that might be.**
14 Q.  And what piece of legislation are you referring to?
15 **A.  The so-called HB 2 --**
16 Q.  Okay.
17 **A.  -- legislation.**
18 Q.  Okay.  And do you have an understanding of why it's
19   being challenged?
20 **A.  I think I do.**
21 Q.  What is that understanding?
22 **A.  Not being an attorney, I think it is that the law**
23   **itself may be somewhat vague.**
24 Q.  Okay.  So, for the purposes of this deposition, you've
25   already referred to the legislation as "HB 2."  And is

12

1    it okay -- it's also been referred to as the divisive
2    concepts ban, the banned concept statute.  But if I
3    refer to HB 2, you understand that I'm talking about
4    the legislation that's challenged in this action,
5    right?
6  **A.  As a general concept, yes.**
7  Q.  Okay.  Can you tell me a little bit about your
8    educational background?
9  **A.  How far back do you want to go?**
10 Q.  You can give me college.
11 **A.  Okay.  I attended the University of Notre Dame,**
12   **attended the University of Lowell, which is now the**
13   **University of Massachusetts at Lowell.  Undergraduate**
14   **degree there.  I also was a licensed educator upon**
15   **graduating from the University of Massachusetts.  And**
16   **then multiple trainings of various types including the**
17   **FBI training, NEA, national academy, things like that,**
18   **when I was within law enforcement.**
19 Q.  Okay.  And you mentioned -- am I right that you were an
20   English teacher?
21 **A.  I was.**
22 Q.  And for how long were you an English teacher?
23 **A.  About three — well, just three years.  I was two years**
24   **at Bishop Guertin High School, one year in Lowell,**
25   **Massachusetts school system, and I was Prop**

13

1  two-and-a-halfed, so we all lost our jobs on the same
2  day.
3      When I retired from the state police in 2012, I
4  worked for the Nashua school district for a period of
5  2012 and for the entire 2013 — 2012-2013 school year
6  as an at-will substitute teacher, long-term substitute
7  teacher.
8  Q.  Okay.  I want to make sure I have the sequence here.
9      After you graduated, was the first job that you had as
10  an educator?
11  A.  Yes.
12  Q.  And how long was that?
13  A.  That was two years at Bishop Guertin High School in
14  Nashua, would have been year in the Lowell school
15  district, and then 30 years in the state police, and
16  then more or less one year working in the Nashua school
17  district.
18  Q.  Okay.  And what did you do for -- what grade did you
19  teach English?
20  A.  High school.
21  Q.  High school English?  And what did do you for the state
22  police?
23  A.  It depends on when it was.
24  Q.  So starting at the beginning.
25  A.  Uniform patrol.  I went from uniform patrol to

14

1  detective.  Detective to — I was appointed first court
2  officer the state police ever had in the Manchester
3  District Court.  And then from there, the pilot program
4  included five different district courts where I was the
5  court officer and prosecutor for that.  From there, I
6  went to the auto theft unit.  I was in the major crime
7  unit.  Promoted back to uniform, was a supervisor in
8  two different capacities.  I got promoted a second
9  time, and then spent the last 10 years of my career at
10  the Attorney General's office.  I was the operations
11  officer for the New Hampshire Drug Task Force.
12  Q.  And your current position is as -- is investigator for
13  the Department of Education; is that right?
14  A.  That's correct.
15  Q.  And when did you start that?
16  A.  July 1st of 2013.
17  Q.  Is the investigator -- is it an appointed position?
18  A.  Well, that's a different type of question.  At first.
19  The first eight years, it was a contract position.  So
20  I had four two-year contracts as an independent
21  contractor working here, and then it was implemented
22  that the Department wanted me to become an employee
23  here, so for the past two years ending this coming July
24  1st, I've been an actual employee for the State of New
25  Hampshire again.

15

1  Q.  And who made the decision to hire you to the Department
2  of Education?
3  A.  That was Dr. Judith Fillion.  F-I-L-L-I-O-N.
4  Dr. Fillion interviewed me and she recommended to the
5  then commissioner, Dr. Barry, that I be awarded the
6  first contract.
7  Q.  Okay.  Now you are an employee of the Department of
8  Education; is that right?
9  A.  That's correct.
10  Q.  Okay.  Can you describe your responsibilities as an
11  investigator for the Department of Education?
12  A.  My responsibilities?
13  Q.  What are your job duties?
14  A.  My job duties.  I investigate allegations of code of
15  conduct violations for the Department of Education.
16  Q.  Is it only code of conduct violations?
17  A.  There are times when I have performed trainings for the
18  code of conduct.  I have done some basic and cursory
19  background investigations, worked with superintendents
20  to walk with them through the criminal background
21  checks process.  So kind of a jack-of-all-trades, but
22  my primary mission is the code of conduct and
23  investigating violations, or alleged violations, of the
24  code of conduct.
25  Q.  So I want to understand how you investigate alleged

16

1  violations of the code of conduct.  Is the first step
2  when the Department of Education receives a
3  complaint?
4  A.  That's one of the ways we get information about
5  allegations of code of conduct violations.  That's one
6  of several different sources.
7  Q.  Okay.  So starting with complaints.  How do you receive
8  those complaints?
9  A.  The complaints could be from — excuse me — an
10  individual parent.  They could come from a
11  self-reporting through the superintendent or a member
12  of the superintendent's staff.  We've received them
13  from law enforcement.  We've received them from the
14  DCYF, Department of Children, Youth, and Families.  I'm
15  sure there are others, but...
16  Q.  So, fair to say you received complaints from parents, I
17  think you said, right?
18  A.  Yes.
19  Q.  From superintendents?
20  A.  Yes.
21  Q.  From principals?
22  A.  Yes.
23  Q.  Do you receive those complaints by email?
24  A.  Some.
25  Q.  Do you receive some complaints by phone call?

17

1   A.  Yes.
2   Q.  Do those complaints come in to you directly?
3   A.  Sometimes.
4   Q.  Do they sometimes come directly to the commissioner?
5   A.  Sometimes.
6   Q.  Do they come to anybody else at the Department of
7       Education?
8   A.  Sure.  They can go to the commissioner.  They can go to
9       the deputy commissioner.  Many superintendents contact
10      Attorney Fenton directly.  They can come through the
11      Bureau of Credentialing.  They can come from, as I
12      said, parents, superintendents, principals.
13          I'm sure there are others, but those are the
14      primary areas of -- those are the primary places we get
15      reports.
16  Q.  Okay.  And now when you receive one of these
17      complaints, can you describe what you do as the
18      investigator for the Department of Education?
19  A.  The first thing that I would do is determine -- back
20      up.  I will gather facts and circumstances from the
21      complainant.
22  Q.  Does that include reaching out to superintendents?
23  A.  Occasionally.
24  Q.  Does that include speaking to principals?
25  A.  Occasionally.

18

1   Q.  Does that include speaking to other educators at the
2       school?
3   A.  Sometimes.
4   Q.  Does that include requesting documents?
5   A.  Sometimes.
6   Q.  When you receive a complaint, do you document that
7       complaint in any way?
8   A.  It depends on whether it actually falls within my
9       jurisdiction.
10  Q.  And your jurisdiction is possible violation of the code
11      of conduct?
12  A.  Correct.
13  Q.  Okay.  Now, assume that a case falls within your
14      jurisdiction.  Do you document that complaint in any
15      way?
16  A.  Initially, no.
17  Q.  Okay.  You qualified with "initially, no."  So does
18      that mean eventually, yes?
19  A.  Eventually, if it meets the criteria necessary for an
20      actual violation, then we would document the fact that
21      it was received.
22  Q.  Okay.  Do you have a folder where you mark down
23      complaints with the name of the complainant and
24      other -- other information like that?
25  A.  A folder?

19

1   Q.  Yeah.
2   A.  I don't know what that means.
3   Q.  So we heard testimony yesterday from Attorney Fenton,
4       I'll represent to you, that there's an intake process
5       and you receive information, that you document that
6       information in a folder which includes information such
7       as the complainant's name, the school that it relates
8       to, the alleged violator of the code of conduct.
9           Does that -- is that something that you do?
10          MR. KENISON-MARVIN:  I'll object to the
11      extent it misrepresents testimony yesterday.  You can
12      answer.
13          THE WITNESS:  If the information received
14      from the source, whatever that source might be, reaches
15      a level of a potential code of conduct violation, then
16      we will document it.  If it doesn't, we won't.
17  BY MR. KAHNE:
18  Q.  Who decides whether it reaches the level of a potential
19      code of conduct violation?
20  A.  Everything it goes through my supervisor, who would
21      be Attorney Diana Fenton.
22  Q.  Okay.  Now, assume -- what criteria do you use to
23      decide whether a complaint possibly violates the code
24      of conduct?
25  A.  You read the code of conduct, you examine the contents

20

1       of the complaint, and you determine whether or not we
2       have jurisdictional standing.
3   Q.  And is that a decision that's made with you and
4       Attorney Fenton?
5   A.  Attorney Fenton makes the final decision.  I provide
6       her with facts, and a decision is made.
7   Q.  Now, assume that Attorney Fenton has decided that a
8       complaint rises to the level of a possible code of
9       conduct violation.  How do you document that?
10  A.  I draw a case number.  The case number then relates to
11      a -- the name of the educator or the name of the
12      individual.  I create a folder, a file, and then I go
13      about the business of finding facts.
14  Q.  And, again, could you just describe how you go about
15      finding facts?
16  A.  It depends on the case.  Every case is different.  So
17      perhaps you could give me an idea of what you're
18      looking for.  I'm not sure.
19  Q.  If you could give me some examples of what -- how you
20      factually investigate complaints?
21  A.  Well, again, every case is different.  If the case
22      involves an alleged sexual assault of a child, we would
23      collect facts from a number of stakeholders -- law
24      enforcement, parents, staff -- and go in that
25      direction.

**21**

1    If it's something less than that, something that's
2  not criminal, we do go in a different direction,
3  gaining facts from documents, emails, interviews, that
4  type of thing.
5  Q.  And interviews are with superintendents, for example?
6  A.  Potentially.
7  Q.  Principals?
8  A.  Possibly.
9  Q.  Okay.  You spoke before about the decision as to
10  whether something rises to the level of a possible code
11  of conduct complaint.  Do you remember that?
12  A.  Yes.
13  Q.  And you said Attorney Fenton was involved in that?
14  A.  Yes.
15  Q.  Is the commissioner involved in that decision?
16  A.  At that stage?  I don't — I don't recall right now
17  whether there's an individual case where he was
18  involved in that triage process.
19  Q.  Is the commissioner ever involved in the factual
20  investigation of a case?
21  A.  To the extent that he receives direct emails or
22  correspondence from complainants, yes.  To the extent
23  that he actually interjects himself into actual
24  investigations, no.
25  Q.  After he receives a complaint, do you speak with him

**22**

1  about the factual gathering in a complaint?
2  A.  I try not to.
3  Q.  Why?
4  A.  I think that at that stage of the investigation, the
5  facts should be facts.
6  Q.  Why would having the commissioner involved in the
7  factual investigation not -- make it not about facts?
8  A.  Because the commissioner has a different role than I
9  do.
10  Q.  What's the commissioner's role?
11  A.  Well, you'd have to ask him.
12  Q.  What's your view of his role?
13  A.  I can tell you what my role is.  My role is gathering
14  facts, being an independent gatherer of facts, and
15  providing those to Attorney Fenton.
16  Q.  Does the commissioner ever ask you to request documents
17  from the superintendent?
18  A.  He may.  He may have.  He may have suggested that.  I
19  don't recall an instance where he has, but anything is
20  possible.  That's possible.
21  Q.  Has he asked you to talk to complainants directly?
22  A.  He has sent me emails, and I have, on occasion, spoken
23  to complainants.
24  Q.  Do you understand those emails from the commissioner to
25  be requests that you talk to complainants?

**23**

1  A.  No.
2  Q.  What do you understand those emails to be?
3  A.  Those are intake of a complaint, and we would then
4  refer to -- or defer to our usual practice.
5  Q.  Which is gathering factual information?
6  A.  Right.
7  Q.  Okay.  What we've been talking about thus far is
8  strictly about opening a case; isn't that right?
9  A.  Define "case."
10  Q.  Well, so the Educator Code of Conduct says that "a case
11  shall be opened when a complaint of possible misconduct
12  against a credential holder has come to the attention
13  of the department, either through direct reporting or
14  other means."
15  A.  Good definition.
16  Q.  And what we've been just talking about is the opening
17  of a case, right?
18  A.  Correct.
19  Q.  And all the factual investigation that goes -- that
20  comes after the opening of a case?
21  A.  Yes.
22  Q.  Okay.  And this is before the Department of Education
23  determines whether to open a formal investigation,
24  right?
25  A.  Yes.

**24**

1  Q.  Okay.  And that involves issuing a certified letter and
2  other procedures, right?
3  A.  Correct.
4  Q.  Okay.  So you spoke about criteria for deciding whether
5  something rises to the level of a possible code of
6  conduct violation.  Do you remember that?
7  A.  I do.
8  Q.  Okay.  What is the criteria that you and Attorney
9  Fenton use for moving from documenting and opening a
10  folder versus not opening a folder?
11    MR. KENISON-MARVIN:  Objection to the extent
12  it misstates prior testimony.  You can answer.
13    THE WITNESS:  Ask the question again, please.
14  BY MR. KAHNE:
15  Q.  Yeah, that's fair.  I think what you were -- what you
16  said is you just decide whether it's within your
17  jurisdiction, right?
18  A.  The case.
19  Q.  The case?
20  A.  Correct.
21  Q.  And if it is within your jurisdiction, you open a case
22  file?
23  A.  Correct.
24  Q.  And how do you determine whether something is within
25  your jurisdiction?

**25**

1  **A.  I look at the complaint, the facts of the complaint,**
2  **and determine whether or not the code of conduct**
3  **applies.**
4  Q.  Okay.  So it's just based on what the facts are and
5  whether you think it could potentially violate the code
6  of conduct?
7  **A.  No, it's not what I think.  It is whether the**
8  **collection of data and facts support an allegation of a**
9  **code of conduct violation, and that's done in**
10  **consultation with Attorney Fenton.**
11  Q.  Okay.  And the only things that you're looking at when
12  you're making that determination are the code of
13  conduct and the facts that you've gathered?
14  **A.  That is absolutely correct.**
15  Q.  Okay.  Can a school district independently investigate
16  possible violations of the code of conduct?
17  **A.  Of course.**
18        MR. KENISON-MARVIN:  Objection to the extent
19  it calls for a legal conclusion.  You can answer.
20        THE WITNESS:  Yes.
21  BY MR. KAHNE:
22  Q.  In your experience, can a superintendent independently
23  investigate possible violations of the code of
24  conduct?
25  **A.  A superintendent can authorize an investigation at his**

**26**

1  **level for code of conduct violations.**
2  Q.  And that includes -- that's an investigation that
3  includes talking to teachers.  That includes fact
4  gathering.  The same type of fact gathering
5  investigation that you were just talking about?
6        MR. KENISON-MARVIN:  Objection.  Compound.
7  You can answer.
8        THE WITNESS:  Slowly.
9  BY MR. KAHNE:
10  Q.  In your experience, how do superintendents conduct
11  those types of investigations?
12  **A.  Every superintendent is different.  Some**
13  **superintendents -- almost all superintendents in the**
14  **larger districts will delegate to subordinates.  Other**
15  **superintendents will ask for an independent**
16  **investigation.  They'll hire an attorney or a fact**
17  **finder.  There's any number of ways they conduct their**
18  **business.  But, again, that's their business, not**
19  **mine.**
20  Q.  And they can conduct investigations for any possible
21  code of conduct violation?
22  **A.  They conduct investigations that, generally speaking,**
23  **are policy, individual school district policies and**
24  **procedures.  Some of those bleed over into code of**
25  **conduct.  Some of them do not.**

**27**

1  Q.  Do they refer the results of their investigation to the
2  DOE?
3  **A.  If we ask them to.  Many times they conduct**
4  **investigations that have nothing to do with us.**
5  Q.  How would you know about those investigations?
6  **A.  We wouldn't.**
7  Q.  I think you just testified, "If we ask them for the
8  investigation."
9        How would that come to your attention?
10  **A.  I don't understand the question.**
11  Q.  I'm just trying to understand how an investigation that
12  a superintendent independently conducts arrives at the
13  DOE.
14  **A.  Well, if we have received a complaint, either**
15  **self-reporting from the superintendent or other**
16  **sources, we would then reach out to the district, the**
17  **charter school, for example, the head of school, the**
18  **superintendent's office, and ask them for supporting**
19  **documents and factual data during our triage process.**
20  Q.  Are you -- strike that.
21        Are you aware of superintendents conducting
22  investigations into violations of HB 2?
23  **A.  I have no idea.**
24  Q.  You have no idea whether that is occurring or is not
25  occurring?

**28**

1  **A.  Correct.**
2  Q.  Do you have meetings with Attorney Fenton and
3  Commissioner Edelblut and the deputy commissioner,
4  periodic meetings, to discuss investigations?
5  **A.  Yes.**
6  Q.  How often do those meetings occur?
7  **A.  They're supposed to occur once a month.**
8  Q.  Why do you say they're supposed to occur once a
9  month?
10  **A.  Sometimes schedules, conflicts, vacations, illnesses**
11  **put them off, so every four weeks become every six**
12  **weeks.  Sometimes we skip a month.  It all depends.**
13  **There's no rule.  There's no requirement.  It all**
14  **depends on scheduling.**
15  Q.  Is there a name for that meeting?
16  **A.  Educator misconduct meeting.**
17  Q.  And can you describe what occurs during that meeting?
18        MR. KENISON-MARVIN:  I'll just instruct
19  the -- Mr. Farrell to not answer with respect to
20  specific discussions and deliberations that occur
21  during those meetings, but to the extent the question
22  calls for generalized process during the meeting and
23  how the meeting proceeds, you can answer the question.
24        THE WITNESS:  There is a discussion about
25  individual cases.  Those cases are either progress

29

1  reports or determinations as to whether or not an
2  investigation should occur. And progress reports also
3  lead to proposed possible sanctions that might be
4  involved.
5      BY MR. KAHNE:
6  Q. What are the sanctions that the code of conduct
7  provides for?
8  **A. There are four things that would occur: One, there is**
9  **no sanction; two, there's a letter of reprimand; three,**
10 **there's a suspension; four, the revocation of**
11 **license.**
12 Q. And in your education misconduct meeting, are
13 determinations made as to what penalty, if any, to
14 impose?
15 **A. Those general discussions do occur, yes.**
16 Q. Well, general discussions, but is there a final
17 decision made during those meetings?
18 **A. Sometimes.**
19 Q. Do you vote?
20 **A. Do I vote? I have no vote, no. No. There's no**
21 **vote.**
22 Q. So who is -- who is the decision-maker in that
23 meeting?
24 **A. It's a collaborative effort. I think, ultimately, the**
25 **buck stops with the commissioner, but the effort itself**

30

1  **is a collaborative effort.**
2  Q. Okay. Is it possible to make a finding of educator
3  misconduct but determine that there is no sanction?
4      MR. KENISON-MARVIN: Objection to the extent
5  it calls for a legal conclusion. You can answer.
6      THE WITNESS: I don't understand the
7  question. I'm sorry.
8      BY MR. KAHNE:
9  Q. Under the -- in your experience, under the Educator
10 Code of Conduct, can there be a finding of educator
11 misconduct without the imposition of a sanction?
12     MR. KENISON-MARVIN: Same objection. You can
13 answer.
14     THE WITNESS: I don't remember that type of
15 resolution. I just don't remember that.
16     BY MR. KAHNE:
17 Q. Okay. But, to your knowledge, is that possible?
18 **A. I don't think it's possible, but I'm -- again, I've**
19 **never seen that.**
20 Q. Certainly very unlikely?
21 **A. It's unlikely.**
22 Q. So fair to say that when there's a violation of the
23 code of conduct, there's going to be the imposition of
24 a sanction?
25     MR. KENISON-MARVIN: Objection to the extent

31

1  it misstates the testimony. It's also a legal
2  conclusion, but you can answer.
3      BY MR. KAHNE:
4  Q. In your experience --
5  **A. So rephrase that for me, please.**
6  Q. -- is it fair to say that if there's been a violation
7  of the Educator Code of Conduct, that the Department of
8  Education will impose a sanction?
9  **A. No, that's not fair to say.**
10 Q. Why not?
11 **A. There are times when we identify a code of conduct**
12 **violation, and we work with the individual school or**
13 **school district, and the imposition of sanction is left**
14 **at the employment -- in the employment world and not in**
15 **the license world.**
16 Q. Okay, but separate that out. I understand there's two
17 separate lines: There's the employment line and
18 there's the credentialing line.
19 **A. Yes.**
20 Q. With respect to the credentialing line, have you ever
21 had the experience where there's been a violation of
22 the code of conduct and there has not been the
23 imposition of a sanction, to your recollection?
24 **A. So my recollection, I think the answer to that is**
25 **yes.**

32

1  Q. Okay. When do you recall that happening?
2  **A. I don't recall specifically, but I can tell you that**
3  **there are instances where code violation has occurred**
4  **and we do not take formal sanction against the licensed**
5  **educator.**
6  Q. Okay. Would it be fair to say that the vast majority
7  of the time there is an imposition of a sanction?
8      MR. KENISON-MARVIN: Objection to the extent
9  it misstates testimony. You can answer.
10     THE WITNESS: More likely than not, yes.
11     BY MR. KAHNE:
12 Q. Okay. Are there any other meetings that you -- are
13 there any other scheduled meetings that you have
14 regarding investigations on a periodic basis?
15 **A. With whom?**
16 Q. With Attorney Fenton and others at the DOE.
17 **A. I meet with Attorney Fenton, either in person or**
18 **virtually, every day. With respect to the**
19 **commissioner, the deputy commissioner, those meetings**
20 **are, generally speaking, once a month.**
21 Q. Okay.
22 **A. The educator misconduct meetings.**
23 Q. Okay. So you have educator misconduct meetings once a
24 month. You speak with Attorney Fenton every day. Is
25 there any other type of formal meeting that you have on

33

1  a periodic basis at the DOE?
2  **A.  I do not think so.**
3  Q.  Is there a duty to report in the Educator Code of
4  Conduct?
5       MR. KENISON-MARVIN: Objection.  Legal
6  conclusion.
7       THE WITNESS:  There is.
8  BY MR. KAHNE:
9  Q.  What do you understand about the duty to report?
10 **A.  First of all, there is a duty to report provision**
11 **within the code of conduct.  That's question one.**
12 Q.  The answer is yes?
13 **A.  Yes.**
14 Q.  Now, my question is what do you understand the duty to
15 report -- the duty to report to encompass?
16 **A.  If -- I think it's a threefold area.  The duty to**
17 **report pertains to individual educators, individual**
18 **administrators, and superintendents.  And each of those**
19 **groups of people have duties to report violations of**
20 **code of conduct that they're aware of.  So I think that**
21 **answers the question.**
22 Q.  Okay.  So -- and is failing to report a code of conduct
23 violation an independent violation of the code of
24 conduct?
25      MR. KENISON-MARVIN:  Same objection.  Legal

34

1  conclusion.  You can answer.
2       THE WITNESS:  That's not a fair question.
3       MR. KAHNE:  Okay.
4       THE WITNESS:  Because, for example, a
5  teacher's responsibility under reporting is limited, so
6  if the teacher goes to a supervisor and makes a report,
7  then the teacher is perfectly fine.
8       If it's an individual administrator makes the
9  report up the chain to command to their next superior,
10 they've covered their responsibility and duty.  It is
11 only when the chain is broken where a person is aware
12 of a code of conduct violation and either refuses to
13 make the report or fails to make the report.
14      So it's a loaded question.  It all depends on
15 what level and in which -- if a teacher tells her boss,
16 she's all set.  He's all set.  Done.  The boss, in the
17 administrative level, makes the report.  All done.  It
18 then goes --
19 BY MR. KAHNE:
20 Q.  I think I understand your testimony.  So let me start
21 at the base level.  If a teacher that knows of a code
22 of conduct violation and does not report that anywhere,
23 is that a violation of the code of conduct?
24      MR. KENISON-MARVIN:  Objection.  Legal
25 conclusion.

35

1       THE WITNESS:  My understanding is
2  potentially, yes.  Potentially, yes.
3  BY MR. KAHNE:
4  Q.  Why do you say "potentially, yes"?
5  **A.  Well, we don't know what the facts and circumstances**
6  **are, what she knew, when she knew it.  Who did she**
7  **speak to?  What was her understanding of the code of**
8  **conduct?  There are any number of reasons why that type**
9  **of report would not be made.**
10 **So it's -- I'm a fact-based guy.  So it's**
11 **potentially, but it's not clear until you get the facts**
12 **supporting it.**
13 Q.  Do they have to know of an actual violation of the code
14 of conduct, or do they have to report a possible
15 violation of the code of conduct?
16      MR. KENISON-MARVIN:  Same objection.
17      THE WITNESS:  That's an interesting question.
18 I think that if they -- that's one of the things that
19 we would do in the triage process to see whether
20 misconduct has occurred.  What did they know?  When did
21 they know it?  What was their understanding?  What were
22 their duties and responsibilities?  And you mix that up
23 not only with the code of conduct at the state level,
24 and licensure, but you also look at it at the policy
25 level at the individual school district.

36

1       So it's a very loaded question and it has
2  many nuances.  So I'm not going to tell you yes or no.
3  It's not going to happen.
4  BY MR. KAHNE:
5  Q.  But it is possible that you would open an investigation
6  or you would -- sorry -- you would open a case to look
7  into a failure to report for a teacher that didn't
8  report a possible violation of the code of conduct?
9  **A.  It is possible.**
10 Q.  Okay.  Same question with respect to superintendents.
11 Superintendents have a duty to report possible
12 violations of the code of conduct?
13 **A.  They do.**
14 Q.  Okay.  And if they do not report a possible code of
15 conduct violation, that is a -- that could be a
16 violation of the code of conduct?
17 **A.  Depending on the fact pattern, yes.**
18 Q.  Okay.  And I just -- loss of teaching credentials is
19 one of the potential sanctions in the code of
20 conduct?
21 **A.  Well, let's talk about the term "credential."  What do**
22 **you mean?**
23 Q.  Well, a credential -- the credential, the ability to
24 teach, for example, within the state of New Hampshire.
25 I'm looking at the code of conduct.  It says

---

37

1 "suspension, revocation, or reprimand." And I
2 assume -- I was referring to revocation. So what do
3 you understand revocation to be?
4 **A. Revocation for New Hampshire is the permanent removal**
5 **of a license.**
6 Q. Okay. So it is possible to have -- for the Department
7 of Education to permanently remove the license of a
8 teacher for violation of the code of conduct?
9         MR. KENISON-MARVIN: Objection. Legal
10 conclusion. But you can answer.
11        THE WITNESS: Is it possible? Repeat for me.
12 BY MR. KAHNE:
13 Q. Yeah. So one of the sanctions that the Department of
14 Education can impose for a violation of the code of
15 conduct is revocation of teaching credentials?
16 **A. Yes. Credential, though. I like to talk about**
17 **licenses and endorsements, which are, you know, part**
18 **and parcel of the overall term "credential."**
19 **      So I prefer to use the term "license" and, within**
20 **license, "endorsement." Credential is — my**
21 **understanding of credential is any piece of paper this**
22 **agency produces for an educator. So I prefer, if we're**
23 **going to talk about sanctions, I'd prefer to use the**
24 **term "license."**
25 Q. Okay.

---

38

1 **A. And endorsement. I think it's a better way to talk**
2 **about what we do.**
3 Q. Okay. And revocation would mean the loss of a license,
4 right?
5 **A. Correct.**
6 Q. Okay. I want to talk about your role in conducting
7 trainings, which I think you referred to earlier.
8        MR. KAHNE: One second.
9        (Discussion off record.)
10 BY MR. KAHNE:
11 Q. All right. Is it your understanding that a violation
12 of HB 2 would be a violation of the code of conduct?
13        MR. KENISON-MARVIN: Same objection.
14        THE WITNESS: That's not my understanding.
15        MR. KENISON-MARVIN: Legal grounds. You can
16 answer.
17        BY MR. KAHNE:
18 Q. I'm going to show you what's been previously marked --
19 I think it's 1. Exhibit 1.
20 **A. Thanks. What do you want me to do with this?**
21 Q. I'd like you to turn to page PL007.
22 **A. Okay, do you mind if I take a look at the page first?**
23 Q. Yeah, yeah. Please do. Please do.
24 **A. I think you said 007?**
25 Q. That's right.

---

39

1 **A. I'm there now.**
2 Q. Okay. And I'm specifically looking at Roman numeral
3 IV.
4 **A. "Violation of this section by an educator shall be**
5 **considered a violation of the Educator Code of Conduct**
6 **that justifies disciplinary sanction by the State Board**
7 **of Ed." Yes.**
8 Q. Okay. So I'm just -- what I was asking before is
9 whether a violation of -- do you understand this to be
10 HB 2, or what we've been discussing?
11 **A. Yeah.**
12 Q. Okay. And what I was asking before is whether a
13 violation of HB 2 is a violation of the code of
14 conduct?
15 **A. Based upon the Attorney General — Department of**
16 **Justice, the Attorney General's office, their**
17 **determination. Also the determination made here at the**
18 **Department of Education. We would only be — involve**
19 **ourselves after the Human Rights Commission process is**
20 **over.**
21 **      So, for example, in this case, if the Human Rights**
22 **Commission determines, through their investigative**
23 **process, not ours, that they have a finding, then it**
24 **would be reported to us and a decision to examine that**
25 **set of facts would be determined. We don't — I don't**

---

40

1 involve myself with these investigations at all.
2 Q. Where does it say that? What you just described, that
3 process, where does it say that?
4 **A. My understanding, it's in the Department of Justice**
5 **memo that went out to the field and to us, and that's**
6 **my marching orders from my supervisors.**
7 Q. Okay. I want to get back for a second to the meetings
8 that you talked about with Attorney Fenton, the
9 commissioner, and the deputy commissioner, the monthly
10 educator misconduct meetings.
11 **A. Yes, sir.**
12 Q. I just want to be clear. The commissioner is involved
13 in the decision as to whether there's been a violation
14 of the code of conduct, right?
15 **A. He is — the meetings have different levels within the**
16 **meetings and different stages of the investigation, so**
17 **to the extent that he — we conduct those meetings and**
18 **he asks questions, he is involved in the process. But**
19 **it's not until a decision is made that he then becomes**
20 **in agreement or disagreement with the recommendation.**
21 Q. Right. And I think you said the buck stops with him,
22 right?
23 **A. Correct.**
24 Q. So he's thumbs up, thumbs down?
25 **A. At the end of the day.**

41

1  Q. Okay. And do you ever recall during those meetings
2     discussing course materials of teachers in those
3     educator misconduct meetings?
4  A. **Almost likely.**
5  Q. Almost likely?
6  A. **Yeah.**
7  Q. So you think -- you think you recall that?
8  A. **Maybe. But I don't know in what term do you mean? I**
9     **mean, does it come up in conversation? Does it come**
10    **related to an investigation?**
11 Q. Yeah, either way. Either way.
12 A. **I'm sure it has.**
13 Q. Okay.
14 A. **I don't recall a specific instance, but I'm sure it**
15    **has.**
16 Q. Okay. And what do you recall about that?
17 A. **I don't recall anything about it.**
18 Q. But you do have a recollection that discussions of
19    educator material has come up in those meetings?
20 A. **Sure.**
21 Q. Okay. Frequently?
22 A. **No, not frequently. And -- no, not frequently.**
23 Q. And does the commissioner -- do you recall ever -- the
24    commissioner speaking about educator materials during
25    those meetings?

42

1  A. **Specifically or generally?**
2  Q. Take one and then the other.
3  A. **Specifically, I don't recall.**
4  Q. Okay.
5  A. **Generally, I'm almost certain that there have been**
6     **general discussions.**
7  Q. And what do you recall -- what general discussions do
8     you recall about course material with the
9     commissioner?
10    MR. KENISON-MARVIN: I just instruct --
11    object under the deliberative process privilege
12    grounds. To the extent there were discussions of
13    particular materials and discussions about what to do,
14    if anything, with respect to particular materials, I
15    would instruct you not to provide that information in
16    response to this question. To the extent the answer
17    calls for generalized information about discussions,
18    you can provide a generalized answer, but nothing
19    specific as to particular deliberations of any issue.
20    THE WITNESS: I don't know what any of that
21    means. Let's try again.
22    MR. KAHNE: Okay. Yeah.
23    BY MR. KAHNE:
24 Q. Have you ever discussed course materials with -- this
25    can be a yes or no -- with the commissioner during an

43

1     educator misconduct meeting?
2  A. **Course materials? You mean curriculum?**
3  Q. Sure.
4  A. **I mean, generally. Maybe. I don't have a direct**
5     **recollection of a specific instance, but, generally,**
6     **maybe.**
7  Q. Have you ever discussed HB 2 during those educator
8     misconduct meetings?
9  A. **I haven't discussed HB 2 with the commissioner or**
10    **anybody else in this building for a long time.**
11 Q. When was the last time you remember discussing?
12 A. **Shortly after it was passed.**
13 Q. Okay. And what do you remember about those
14    conversations?
15 A. **What is -- what is our -- I was curious as to what my**
16    **role would be.**
17 Q. Okay. And did you have -- so you were curious as to
18    what your role would be, and so did you have
19    conversations with people at the DOE about that?
20    MR. KENISON-MARVIN: I'll instruct the
21    witness not to answer specifics as to conversations
22    with the -- to the extent the question calls for "did
23    you have conversations," you can answer.
24    THE WITNESS: I'm certain we had
25    conversations, and I am also certain that the

44

1     Department of Justice solved the problem for me.
2     BY MR. KAHNE:
3  Q. Did you have conversations with the commissioner?
4  A. **I don't remember. Generally. Perhaps, but I don't**
5     **remember.**
6  Q. Do you have an understanding as to whether the
7     commissioner supported the passage of HB 2?
8  A. **You'll have to ask him. I have no idea.**
9  Q. Okay. I started to talk about your trainings that you
10    conduct.
11 A. **Yes.**
12 Q. Do I have it correct that you conduct trainings on both
13    the code of conduct and the code of ethics?
14 A. **Well, code of conduct, not the code of ethics. Code of**
15    **ethics is not in my realm.**
16 Q. Okay.
17 A. **Code of conduct is the enforceable action. Therefore,**
18    **I would only -- code of ethics is theoretical and**
19    **guidance. Code of conduct is actually enforceable. So**
20    **the trainings that I would -- that I have conducted in**
21    **the past have centered on code of conduct as opposed to**
22    **the code of ethics.**
23 Q. Who do you give those trainings to?
24 A. **It depends on who asks, and it depends on whether I go**
25    **individually, whether I go with Attorney Fenton, or**

45

1 whether Attorney Fenton handles them. So it depends.
2 Q. Okay. So break down those scenarios. When you go with
3 Attorney Fenton, is it usually to a certain type of
4 audience?
5 A. No, no. We've -- Attorney Fenton and I, together, have
6 conducted those trainings for small -- very small
7 groups, and very large groups. Generally, the issue as
8 to who provides the training has to do with what the
9 schedule looks like and whether, you know, we're
10 available, who's available. And that's how -- that's
11 what determines which one of us goes or whether we both
12 go.
13 Q. I'm interested in who the -- like, who the audience is.
14 A. Oh. Audiences could be -- we have done trainings for
15 individual charter schools. We've done trainings for
16 individual schools. We've done training for train the
17 trainer, where administrators for a large district
18 would come together and provide the training to
19 administrators who then go out and provide the training
20 to their subordinates. We've -- in smaller districts,
21 we have provided training for the entire district.
22    So it depends. We're pretty responsive to the
23 people asking us to come in. I try to be very
24 responsive. So I've done trainings for 10 people, and
25 I've done trainings for several hundred.

46

1 Q. So -- and the audience can be comprised of
2 superintendents?
3 A. Oh, we've done superintendent meetings, yeah, sure.
4 Q. Teachers themselves? Educators?
5 A. Teachers, yeah. Yeah.
6 Q. All right. Let's do Exhibit 7.
7 A. Do you want this one back?
8 Q. Sure. Yeah. Thank you.
9 A. Okay. How can I help you?
10 Q. So looking at Exhibit 7, it's DOE10057. This appears
11 to be an email from Diana Fenton to you. The subject
12 is "code of conduct." And the subject -- the email
13 itself says, "I updated it to include section 297 or HB
14 2. Please review."
15    Do you see that?
16 A. I do.
17 Q. Do you remember receiving this email?
18 A. I do.
19 Q. And the attachment, which, if you look, appears to be
20 your presentation, right?
21 A. It's the Department of Education presentation.
22 Q. Okay, but a presentation that you deliver along with
23 Attorney Fenton?
24 A. I have. I have done this presentation.
25 Q. Okay. My question is why was it updated to include

47

1 section 295 for HB 2?
2 A. Do you mind if I take a look at it to make sure?
3 Q. Sure, sure. Go ahead.
4 A. Thanks. This looks like the PowerPoint.
5 Q. It looks like the PowerPoint that you delivered to
6 superintendents?
7 A. Anybody that asks.
8 Q. So that could include superintendents?
9 A. Yeah.
10 Q. Could include teachers?
11 A. Sure.
12 Q. Okay. So what I was going to ask you is why was this
13 presentation updated to include section 297?
14 A. Well, the field was asking a great deal of questions
15 about the so-called HB 2 and our role in it. And I
16 thought, as well as Attorney Fenton thought, it would
17 be very important to let the field know exactly how
18 that would work for us, and what to expect from us. So
19 I think it was only fair to tell the field -- make the
20 field aware of our position and alleviate some of their
21 concerns.
22    There was a great amount of concern when this was
23 first put into place, so I think adding it was the very
24 appropriate thing to do.
25 Q. So I want to -- you used the term "the field." Who is

48

1 "the field"?
2 A. Teachers, administrators. Educators.
3 Q. So there was a great deal of concern from teachers,
4 educators, superintendents, too?
5 A. Everybody including me.
6 Q. About HB 2?
7 A. Yes.
8 Q. Okay. Why was there concern?
9 A. What was -- what did it mean? What was their role?
10 What was a violation? How would the process work? And
11 would there actually be sanctions on the license, which
12 basically you're talking about people's livelihood.
13 And what would the process be?
14    So we included that in our presentation.
15 Q. And you were concerned, too, you said?
16 A. Sure.
17 Q. And why were you concerned?
18 A. Because I'm the one that has to investigate this stuff,
19 and I wanted it to be as crystal clear as possible. I
20 don't like murky. I like clear.
21 Q. And fair to say when it was first passed, there was a
22 good deal of murkiness?
23 A. There was a perception of murkiness. What would we do?
24 How would we do it? I'm not talking about anybody
25 or -- anybody, anything in particular. I'm just

---

**49**

1 looking at what was the role of this agency going to
2 be? And there was a lot of rumor, innuendo, murkiness,
3 and I wanted -- I'm a guy that likes clear. So I
4 thought it was important to add this in.
5 Q. When you delivered this -- and it looks like this is
6 August 2021, so pretty soon after the passage of HB
7 2 -- did you receive questions at these trainings
8 regarding HB 2?
9 A. I'm sure I did.
10 Q. Okay. And what types of questions did you get?
11 A. Well, again, I'm just reviewing. Questions. What
12 would happen if this? What do you do? What does the
13 department do? And the answers, basically, were what
14 was in the PowerPoint presentation.
15 Q. Well, so let's look at that. So what's in the
16 PowerPoint presentation, it appears to be, if you look
17 at -- I think it's starting on DOE10079, I believe it's
18 the three pages concerning HB 2, so it looks like the
19 presentation has the actual statute?
20 A. That's what it looks like, yep. Yep.
21 Q. Okay. But were you asked questions about what was
22 covered by the statute?
23 A. I don't know.
24 Q. What types of material was -- is prohibited under the
25 statute?

---

**50**

1 A. No, I think -- my recollection is most of the questions
2 would center around what would we, as an agency, do for
3 complaints? And that's what I limited it to.
4 Q. And what was your answer when that was asked?
5 A. Technical advisory by the Attorney General's office,
6 and that we wouldn't be investigating those. They
7 would go to the human rights -- HRC or to the
8 Department of Justice. And it would only occur after a
9 finding was made in those places.
10 So the idea that we were out conducting these
11 investigations, I wanted it clear that we did not until
12 such time as there was a finding with the -- with the
13 Human Rights Commission and with the Department of
14 Justice.
15 Q. And, again, the fact that you were not going to conduct
16 those investigations, where did you get that
17 instruction from?
18 A. Attorney Fenton and the leadership in this building.
19 Q. And is there a writing about that?
20 A. I don't recall, but I know what -- I know what my
21 mission is.
22 MR. KAHNE: Okay. And to the extent that
23 there is a writing, Nate, we would call for the
24 production of that.
25 BY MR. KAHNE:

---

**51**

1 Q. Was there -- were you asked questions about what the
2 statute means during these trainings?
3 A. I may have been, but I wouldn't have answered those
4 questions. I would have said this is our process, and
5 the process is refer to the Human Rights Commission,
6 Department of Justice. The finding occurs, then it
7 comes back to us.
8 Q. Do you have an understanding of what's prohibited under
9 the statute?
10 A. I try not to.
11 Q. Why do you try not to?
12 A. It's just not my role. It just isn't my role. My role
13 is if HRC or the Department of Justice has a finding
14 that there is a violation of HB 2, then my role begins.
15 Nothing before that.
16 Q. Do you understand the words -- the way the statute
17 operates?
18 A. I understand.
19 MR. KENISON-MARVIN: Objection to the extent
20 it's calling for legal analysis.
21 BY MR. KAHNE:
22 Q. Just do you understand it?
23 A. I've read it.
24 Q. Okay. You've read it, but do you understand what's
25 prohibited under it?

---

**52**

1 A. I'm not an attorney. I read it. I think I understand
2 it, but it's irrelevant to me. It's completely
3 irrelevant to me because my mission, my goal, occurs
4 only after there's a finding with the HRC.
5 Q. You were a teacher?
6 A. I was.
7 Q. Right? Do you -- having read the statute, do you have
8 a sense of what you couldn't teach as a teacher?
9 A. I was a teacher 30 -- 40 years ago.
10 Q. Assume you're a teacher now.
11 A. I don't want to do that.
12 Q. Okay. Well, I'm asking you. Just assume. What would
13 you not be able to teach under the statute?
14 MR. KENISON-MARVIN: Same objection, to the
15 extent it calls for a legal conclusion.
16 BY MR. KAHNE:
17 Q. If you know?
18 A. I don't.
19 Q. You don't know. Okay. You referenced, I believe, a
20 DOJ memo out to the field regarding the DOE's role in
21 HB 2?
22 A. No, not the DOE memo. It would be the DOJ memo.
23 Q. What memo?
24 A. The technical advisory.
25 Q. Is that the FAQ? Is that what you're talking about?

53

1      Don't know?  Let's go to exhibit -- this is a
2  new -- this is a new exhibit.  Exhibit 24.
3      (Exhibit 24 marked for identification.)
4  BY MR. KAHNE:
5  Q.  And take a moment.  I don't want to --
6  **A.  Okay.  What am I looking at?**
7  Q.  So what I've just put in front of you is a document
8     that bears Bates number DOE09644, and it appears to be
9     an email from you to Diana Fenton regarding code of
10    ethics training dated October 18th, 2021.
11      And the email from you reads, "I have been asked
12    to schedule this training and perhaps do the
13    presentation.  Please find attached documents for
14    dissemination to your staff.  Is it possible to provide
15    a laptop and a PowerPoint for use?"
16      And it goes on.  Do you see that?
17  **A.  I do.**
18  Q.  First of all, is there a code of ethics training versus
19    a code of conduct training?
20  **A.  I don't do code of ethics training, so it would be code**
21    **of conduct training.**
22  Q.  So it just says code of ethics because it's a
23    mistake?
24  **A.  I have no idea why it says that.**
25  Q.  Okay.  Do you recall doing this training that's

54

1     referenced in Exhibit 24?  Compass Classic Academy.
2  **A.  I don't recall doing that training.**
3  Q.  Okay.  Attached to this email is a document that I just
4     referred to as "FAQ."  What I meant by that is
5     frequently asked questions.
6  **A.  Yes.**
7  Q.  Did you circulate this in connection with the
8     presentation to Compass Classic Academy?
9  **A.  I don't recall doing a presentation at Compass**
10    **Academy.**
11  Q.  Okay.
12  **A.  So if this was generated, it wasn't generated by me.**
13  Q.  Okay.  Did you, from time to time, in advance of your
14    presentations, circulate the frequently asked questions
15    document?
16  **A.  I don't recall sending that document related to the**
17    **code of conduct training.**
18  Q.  You mentioned -- you talked about a memo, a DOJ memo.
19    Is this the DOJ memo that you were talking about, or is
20    there another one?
21  **A.  What I'm referring to is the technical advisory.  So if**
22    **this is the technical advisory, that's what I'm talking**
23    **about.**
24  Q.  Have you ever seen the -- is this the technical
25    advisory?

55

1  **A.  I don't know.**
2  Q.  Do you recall ever speaking with training participants
3     about this document?
4  **A.  No.**
5  Q.  Have you reviewed this document before?
6  **A.  Yes.**
7  Q.  Okay.  So you know sort of in substance what it says?
8  **A.  I do.**
9  Q.  And is it your testimony that you would not answer
10    questions about what was and was not prohibited under
11    the statute at these trainings?
12  **A.  I stayed away from that.  I talked about our role and**
13    **our process in general because that's what the code of**
14    **conduct is.**
15  Q.  Did Attorney Fenton discuss what is and was not
16    prohibited?
17  **A.  You know, in the past year anyway, Attorney Fenton has**
18    **done more of these trainings than I have, so I can't**
19    **answer that question.  In many instances, I wasn't**
20    **there.**
21  Q.  Okay.  But in the ones that you were with Attorney
22    Fenton, do you recall any questions about what could
23    and could not be taught under the statute?
24  **A.  If there were such questions, I would have deferred to**
25    **her.  She's -- she's the legal person and she's my**

56

1     **boss.**
2  Q.  And do you have any recollections of what she said?
3  **A.  I don't.**
4  Q.  Okay.
5  **A.  I honestly don't.**
6  Q.  Do you recall those questions coming?
7  **A.  I don't.**
8      MR. KENISON-MARVIN:  Are we on a good spot to
9     take five?
10      MR. KAHNE:  Sure, sure.  We've been going a
11    while.
12      (Recess taken.)
13  BY MR. KAHNE:
14  Q.  Investigator Farrell, when we talked before the break,
15    you mentioned a technical advisory?
16  **A.  Yes.**
17  Q.  And can you describe for me what the technical advisory
18    is, to the best of your understanding?
19  **A.  To the best of my understanding, technical advisory**
20    **basically outlines how HB 2, compliance with HB 2,**
21    **would take place.**
22  Q.  Okay.  And we were just looking at -- I think it's 24.
23  **A.  Yep.**
24  Q.  And the second page of that is a frequently asked
25    questions document.  My question for you is do you know

**57**

1 whether this is the technical advisory you were
2 referring to?
3 **A. I believe it is.**
4 Q. You believe it is?
5 **A. Yeah.**
6 Q. Okay. And I believe you testified that the technical
7 advisory indicates that complaints are to be filed with
8 the Human Rights Commission?
9 **A. HRC or the Department of Justice.**
10 Q. Okay. Where does it say that?
11 **A. I haven't read it today.**
12 Q. Okay. So can you take a look at it?
13 **A. Okay.**
14 Q. Okay. So do you have -- where, in the technical
15 advisory, does it say that complaints are supposed to
16 be filed with the Commission for Human Rights?
17 MR. KENISON-MARVIN: Objection. Misstates
18 prior testimony. You can answer.
19 THE WITNESS: I think it's under 11 and 12.
20 At least that's my understanding of it.
21 BY MR. KAHNE:
22 Q. Does it say anywhere here that a complaint can be filed
23 for a code of conduct violation with the Department of
24 Education?
25 **A. It doesn't say that, nor does it say it can be.**

**58**

1 Q. So it doesn't either -- it doesn't say either way,
2 right?
3 **A. That's correct.**
4 Q. And, in addition to the Human Rights Commission, it
5 does also say that a complaint can be filed with the
6 Attorney General's office, right?
7 **A. Correct.**
8 Q. And it says that a civil claim can be filed in superior
9 court. Do you see that?
10 **A. I do.**
11 Q. Okay. Do you understand those to be other avenues for
12 filing a complaint?
13 **A. Yes.**
14 Q. You testified, I believe, that your understanding of
15 the procedure was that complaints about HB 2 were
16 supposed to go to HRC; is that right?
17 **A. HRC, and I said Department of Justice and the Attorney**
18 **General's office.**
19 Q. All right. Is that right? Is that all complaints
20 about HB 2?
21 MR. KENISON-MARVIN: Objection to the extent
22 it calls for a legal conclusion. You can answer.
23 BY MR. KAHNE:
24 Q. I'm interested in what your understanding of the
25 Department's policy is with respect to complaints filed

**59**

1 about HB 2.
2 **A. My understanding --**
3 MR. KENISON-MARVIN: Objection. Vague. You
4 can answer.
5 THE WITNESS: My understanding is that my
6 marching orders are that those complaints go to HRC,
7 Department of Justice. They don't come to me.
8 BY MR. KAHNE:
9 Q. All complaints?
10 **A. For human -- for HB 2.**
11 Q. Right. Okay. I'd like to use -- I'm going to show you
12 a document that's been previously marked Exhibit 3.
13 Just take a quick -- if you want to take a quick look?
14 Does this look familiar to you?
15 **A. Yes.**
16 Q. Okay. And what is this?
17 **A. It's a PowerPoint presentation that was created by**
18 **Attorney Fenton regarding practices and our**
19 **investigations.**
20 Q. Did you play any role in drafting this?
21 **A. I reviewed it, I think -- if I recall correctly, I**
22 **think I made a couple of spelling corrections, things**
23 **like that, but Attorney Fenton is the -- is the**
24 **architect.**
25 Q. Okay. First, if you go to DOE05656, there's a slide

**60**

1 that says, "Who do I call?"
2 **A. Yes.**
3 Q. It says, "All reports of educator misconduct are made
4 to Richard Farrell," with your contact information, and
5 Diana Fenton with her contact information. Do you see
6 that?
7 **A. Yes. Yes, sir.**
8 Q. And is that true?
9 **A. It's true because it's here. And, in practice, they**
10 **come to me and they come to Attorney Fenton.**
11 Q. And this presentation, like the previous presentation
12 we were looking at, was updated to include the new HB
13 2. And I'm looking specifically at DOE05665.
14 MR. KENISON-MARVIN: To the extent there's a
15 question, I'll object to it being vague.
16 MR. KAHNE: There's no question yet.
17 THE WITNESS: What's the number again? I'm
18 sorry.
19 MR. KAHNE: 05665.
20 THE WITNESS: Yeah, there were -- I see them.
21 BY MR. KAHNE:
22 Q. Okay. And so does this -- does it appear here that
23 this training was updated to include a section on HB
24 2?
25 **A. There were two -- there were two additions. First one**

61

1       was HB 1240, and the second addition was HB 2.
2   Q.   Okay.  Speaking specifically about the page on HB 2.
3        There's text about an allegation of violation of HB 2,
4        how it's to be adjudicated.  The third bullet on this
5        page says, "So why the website?"
6            Do you have an understanding as to why it says
7        that?
8   A.   I think I do, but that's just an opinion.
9   Q.   Okay.  What is your opinion?
10  A.   There was a --
11           MR. KENISON-MARVIN:  I'm just going to
12       instruct the witness not to answer to the extent that
13       your opinion would involve testimony about discussions,
14       deliberations about why a website exists, or something
15       related to a website existing.  Deliberative
16       discussions about why the website.  If you want to hear
17       the question again, I can make that more specific.
18           BY MR. KAHNE:
19  Q.   The question is what is your understanding of why this
20       bullet, "So why the website?" is there?
21  A.   My understanding is there is a reference to a website
22       where complaints can be filed.  It was posted on the
23       Department of Education website.  I think that's what
24       it is, but I don't know.
25  Q.   Okay.  There was a -- your understanding is that there

62

1        was a website where complaints could be filed on the
2        Department of Education website?
3   A.   It's in the Department of Education website, I
4        believe.
5   Q.   What is the answer to this question:  So why the
6        website?
7   A.   I don't have an answer to the question.  This is --
8        this training is generally conducted by Diana Fenton.
9        I don't know why it's there, and if I were conducting
10       the training, I don't know that I would have an answer
11       for it.
12  Q.   Do you have an understanding as to whether there was
13       confusion about where members of the public could file
14       complaints?
15  A.   Ask it again, please.
16  Q.   Was there confusion about where members of the public
17       could file complaints after the passage of HB 2?
18           MR. KENISON-MARVIN:  Objection.  Vague and
19       compound to the extent it's a different question to the
20       one that was asked and asked to be repeated.
21           MR. KAHNE:  That's not really --
22           MR. KENISON-MARVIN:  What I mean is the first
23       question is "Do you understand," and the second one is
24       "Is there."
25           BY MR. KAHNE:

63

1   Q.   So my question is was there confusion after the passage
2        of HB 2 as to where people could file complaints?
3   A.   My recollection is that there were -- there was a lack
4        of mechanism, period.
5   Q.   What do you mean by "lack of mechanism"?
6   A.   Well, I think -- there was no place identified for
7        people to go.
8   Q.   And do you recall on or about November of 2021 there
9        being the launch of a DOE website for the filing of
10       complaints?
11  A.   I don't have an independent recollection of that.
12  Q.   Okay.
13  A.   If you have something?
14  Q.   Yeah, I do.
15           MR. KAHNE:  This is going to be Exhibit 25.
16           (Exhibit 25 marked for identification.)
17           BY MR. KAHNE:
18  Q.   So does that refresh your recollection as to the DOE
19       launching a website for the reporting of complaints?
20  A.   I remember this press release.
21  Q.   Okay.  What do you remember about it?
22  A.   I remember that it was issued.
23  Q.   Okay.  Do you remember Diana Krol building a website
24       for individuals to use to report incidences of
25       discrimination?

64

1   A.   I don't know what Diana Krol did.
2   Q.   Okay.  Do you recall having discussions with the
3        commissioner about the launching of the web page?
4   A.   Define "discussions."
5   Q.   Any conversations.
6   A.   I think I recall that there was a website that was
7        going to be launched.  Other than that, that was the
8        extent of the discussion.
9   Q.   Do you know why the DOE launched a website?
10           MR. KENISON-MARVIN:  Objection.  I instruct
11       you not to answer to the extent the answer calls for
12       deliberations as to why something was being done.
13           THE WITNESS:  No idea.
14           BY MR. KAHNE:
15  Q.   Do you know who, at the DOE, wanted the website?
16  A.   I don't.
17  Q.   Do you know whether it was the commissioner?
18  A.   I don't.
19  Q.   I want to show you -- do you know whether there was
20       contact information for DOE employees on the website?
21  A.   I do not.
22  Q.   Who is Kate Walker?
23  A.   Oh, Kate Walker no longer works here.  She was a staff
24       person here.
25  Q.   A what?

65

1  A.  A staffer here.
2  Q.  And what were her job responsibilities?
3  A.  I really don't know.
4  Q.  Did she have any role in investigations?
5  A.  There was a period of -- no, not in investigations,
6     no.
7  Q.  You were about to say there was a period?
8  A.  There was a period of time where she was trying to
9     create a dashboard, but that never got off the ground.
10    So in terms of active role in investigations, she had
11    none.
12 Q.  Let me show you a document that was previously marked
13    Exhibit 21.  And I'm going to represent to you that
14    this is a snapshot of the DOE website from November
15    10th, 2021.
16       MR. BISSONNETTE:  Could I just also add to
17    the record that there is handwriting at the top of the
18    document.  That is my handwriting, just to more visibly
19    reflect my understanding that this is an extraction of
20    the website as of November 10th, 2021.  I just wanted
21    to make that clear because I didn't yesterday.
22       THE WITNESS:  The Wayback Machine?
23       MR. KENISON-MARVIN:  We can have a
24    discussion --
25       THE WITNESS:  Brings back memories.

66

1        MR. KENISON-MARVIN:  We can have a discussion
2     off the record about what the Wayback Machine is.  But
3     I did want to explain where that handwriting came from,
4     that it is mine.
5  BY MR. KAHNE:
6  Q.  So is this the Department of Education's website, to
7     your knowledge?
8        MR. KENISON-MARVIN:  I'm going to object on
9     106.  It was represented that this is a portion of, so
10    to the extent --
11 BY MR. KAHNE:
12 Q.  Okay.  So is it your understanding this is a portion of
13    the Department of Education's website?
14 A.  Sure.
15 Q.  And is this the -- we previously looked at a Exhibit
16    25, which was a press release about the launching of a
17    website.  Is it your understanding that this is the
18    website that was launched in November 2021?
19       MR. KENISON-MARVIN:  Same objection on
20    completeness under Rule 106.
21       MR. KAHNE:  You can answer.
22       THE WITNESS:  I had virtually nothing to do
23    with this.
24    BY MR. KAHNE:
25 Q.  Ever go to the website?

67

1  A.  No.
2  Q.  Do you know -- have any knowledge about whether DOE --
3     whether Kate Walker's name was removed from the website
4     at any point?
5  A.  I have no idea.
6  Q.  Let me show you a document that's been previously
7     marked Exhibit 22.  Have you had a chance to look at
8     that?
9  A.  I did.
10 Q.  What do you recall about Exhibit 22?
11 A.  Nothing.
12 Q.  This appears to be an email from you to Diana Fenton on
13    November 15th, 2021, and the subject line is "New
14    Hampshire Moms for Liberty chapter offers $500 to
15    anyone who can catch teachers breaking a new
16    discrimination law."
17       Do you see that?
18 A.  I do.
19 Q.  And it looks like you forwarded an email to Diana
20    Fenton from Business Insider Australia.  Do you see
21    that, too?  Do you see that?
22 A.  I do.
23 Q.  What do you recall about forwarding this article to
24    Diana Fenton?
25 A.  Absolutely nothing.

68

1  Q.  What do you recall about the Moms for Liberty bounty?
2  A.  I knew it was out there.  That's it.
3  Q.  Well, what did you -- how did I find it?
4  A.  Someone sent it to me, I think.  But, again, that's
5     speculation.  I don't know.  I became aware of it.  I
6     sent it to my supervisor.
7  Q.  Why did you send it to your supervisor?
8  A.  I think it potentially was germane to the topic.
9  Q.  Germane to what topic?
10 A.  Our involvement in HB 2.
11 Q.  Okay.  And why was -- why was the moms -- I'm just
12    trying to unpack this.  Why was Moms for Liberty bounty
13    germane to your involvement in HB 2?
14 A.  I wanted --
15       MR. KENISON-MARVIN:  Objection to the extent
16    it doesn't represent the testimony.  You can answer if
17    you understood the question.
18       THE WITNESS:  I provide Attorney Fenton with
19    anything that I think is relevant to our ongoing
20    process.  So this -- and I'm speculating because I
21    don't see the initial email because there had to have
22    been an initial email.  I don't know why I sent it to
23    her other than it was a timely topic and I wanted her
24    to be aware of it.
25    BY MR. KAHNE:

---

**69**

1  Q.  Why did you want her to be aware of it?
2  A.  Seriously?
3  Q.  Yeah.
4  A.  Because it was germane to the topic of the day, meaning
5      HB 2.  So I saw it and I sent it to her.
6  Q.  Were you concerned by it?
7  A.  Not particularly.
8  Q.  Why not?
9  A.  I think it speaks for itself.
10 Q.  You say here, "An anti-LGBT group is also offering
11     $500."
12         Do you know what LGBT group?
13 A.  Anti.
14 Q.  Sorry.  Anti-LGBT group.
15 A.  And I don't recall.
16 Q.  Do you recall conversations with Attorney Fenton about
17     the bounties?
18 A.  I'm sure we had discussions, but I don't recall that.
19 Q.  You don't recall anything about them?
20 A.  I just -- no, I honestly don't.  I sent it up.  It was
21     timely.  And that's the end of it.
22 Q.  And was it timely because -- it was timely because of
23     the passage of HB 2 and DOE's role in enforcing HB 2?
24 A.  I think it was just timely in that it involved
25     teachers, and education, and the education field, so I

**70**

1      think it was timely in that respect.
2  Q.  This -- the article is from November 15th, 2021.  Do
3      you see that?
4  A.  I see that.
5  Q.  Okay.  And the website I showed you was from November
6      10th, 2021.
7  A.  Okay.
8  Q.  Do you see any connection between those two things?
9  A.  I don't.
10 Q.  Did you see an increase in complaints to the DOE after
11     the establishment of the website, the launch of the
12     website?
13 A.  I don't think we got an increase in complaints because
14     there were no complaints before HB 2 regarding HB 2, so
15     any complaint would be more than what we had before HB
16     2.
17 Q.  Well, sure.  But HB 2 was passed in June of 2021,
18     right?  And then the website launched in November of
19     2021?
20 A.  Let's think about the timing here.  June.  Summer
21     vacation.  Kids aren't in school.
22 Q.  Okay.
23 A.  There's a practical application here.  So before HB 2,
24     there were no HB 2 complaints.  After HB 2, it happened
25     in the summer.  There's -- kids aren't in school.

**71**

1      There's a lot of other things happening.  And then the
2      fall comes in, and one complaint under HB 2 would be
3      more than we had in May of 2021.
4  Q.  So but fair to say that you received more HB 2
5      complaints after November of 2021?
6  A.  No, that's not fair to say.  I don't -- I never said
7      that, and I don't recall.
8  Q.  Do you think that the passage of HB 2 impacted teachers
9      in the field?
10 A.  You're asking me for an opinion?
11 Q.  Yeah.
12 A.  You'd have to ask the teachers in the field.
13 Q.  Did you observe any -- in your investigations, any
14     difference in the way things were being reported to the
15     DOE?
16         MR. KENISON-MARVIN:  Objection.  Vague.  You
17     can answer.
18         THE WITNESS:  No, the same types of
19     misconduct when things came in at the same relative
20     rate regarding code of conduct violations.
21 BY MR. KAHNE:
22 Q.  But then you would also receive complaints relating to
23     HB 2?
24 A.  I don't know that we received a great deal of
25     complaints, to be honest with you.  And, if we did, I

**72**

1      didn't deal with them.
2  Q.  Did the commissioner ever ask you to look into course
3      material after the passage of HB 2?
4          MR. KENISON-MARVIN:  I'll just instruct the
5      witness to not answer to the extent you would say --
6      information about conversations, deliberations about
7      what that means.  It's a yes-or-no question.  You can
8      answer to the extent the question calls for that.
9          THE WITNESS:  Okay.  So one more time?
10 BY MR. KAHNE:
11 Q.  Did the commissioner ever ask you to look into course
12     material after the passage of HB 2?
13 A.  Course material?
14 Q.  Instructional material, curriculums.
15 A.  I honestly don't recall him asking me to look into
16     instruction materials.  He may have.  I don't -- just
17     don't recall.
18         MR. KAHNE:  I'm going to show you a new
19     document that is Bates number 000068 and it will be a
20     new document number 26.
21         (Exhibit 26 marked for identification.)
22 BY MR. KAHNE:
23 Q.  Okay.  Do you recall receiving this letter?
24 A.  I remember reading it, yes.
25 Q.  Okay.  What is "No Left Turn," to your knowledge?

73

1   A.  I have absolutely no idea.
2   Q.  Okay.  Well, the first line says, "No Left Turn in
3       Education is a national education advocacy
4       organization."
5           Any reason to believe that's not true?
6   A.  If that's what they say they are, I guess it's true.
7   Q.  Okay.  What is your recollection of receiving this --
8       receiving this letter?
9   A.  I don't know what you mean.
10  Q.  What do you remember about receiving this letter?
11  A.  I received it.
12  Q.  Anything -- the circumstances surrounding your receipt
13      of this letter?
14  A.  No.
15  Q.  Okay.  If you look at the second page, the second to
16      last paragraph says, "It is" -- so I should say, the
17      paragraph before says, "While some educators signed the
18      same pledge before New Hampshire's law was passed, they
19      did so anticipating passage of New Hampshire's law and
20      promising to break it after enactment."
21          Then the next paragraph says, "It is more than
22      enough evidence for this board to act and for the
23      bureau to open investigations into all New Hampshire's
24      Zinn pledge signatories.  The educator code itself
25      states that the Department of Education shall undertake

74

1       an investigation of an educator if the department
2       merely has reason to suspect that any educator
3       knowingly failed to report a violation of the codes."
4           Do you see that?
5   A.  I see it.
6   Q.  Do you agree with it?
7   A.  Do I agree with what?
8   Q.  With that characterization of the educator code.
9           MR. KENISON-MARVIN:  Objection to the extent
10      it calls for a legal conclusion.
11          MR. KAHNE:
12  Q.  Do you agree with that characterization of that -- is
13      that an accurate reflection of what the educator code
14      says?
15  A.  No.
16  Q.  It doesn't say that it shall undertake an
17      investigation?
18          MR. KENISON-MARVIN:  Objection to the extent
19      there's a completeness issue about what the code says.
20      And the entire code is not in front of him.
21          MR. KAHNE:  You can answer.
22          THE WITNESS:  Try again.
23          BY MR. KAHNE:
24  Q.  Why is that incorrect?
25          MR. KENISON-MARVIN:  Same objections.  You

75

1       can answer.
2           THE WITNESS:  They took on the pieces of the
3       code.  They didn't take out the entire code, nor did
4       they take any technical advisory, nor did they take in
5       our policies and procedures.  This is their opinion.
6       It's some character named Michael Green.  Because he
7       says it doesn't make it so.
8           BY MR. KAHNE:
9   Q.  He attached a list of teachers to this letter?
10  A.  Yes.
11  Q.  Did you see that?
12  A.  I did.
13  Q.  Okay.  And did you look into any of these teachers that
14      is attached to this letter?
15  A.  I don't remember.  I remember that we got the letter.
16      It went to Drew Cline, the board chair.  I believe
17      that's who he is.  And I don't know that we looked into
18      or conducted an investigation into any of these
19      teachers.
20  Q.  You don't know if you did?
21  A.  I don't remember doing it.
22  Q.  But you may have?
23  A.  I don't know.
24          MR. KAHNE:  That's a new document, Exhibit
25      27.

76

1           (Exhibit 27 marked for identification.)
2           BY MR. KAHNE:
3   Q.  So this is a document dated February 22nd, 2022.  It is
4       from Diana Krol to Commissioner Edelblut.  Do you see
5       that?
6   A.  I do.
7   Q.  And if you look all the way at the bottom, there is a
8       series of media inquiries --
9   A.  Yes, sir.
10  Q.  -- including one involving the New Hampshire chapter of
11      No Left Turn in Education.  Do you see that?
12  A.  Where is that?
13  Q.  So there's an email from Kimberly Houghton to
14      Commissioner Edelblut, and it says, "I have some media
15      inquiries from over the weekend."
16  A.  I'm reading that, yep.
17  Q.  Okay.  And then if you look to the next page, DOE06882,
18      at the bottom, there's a press release from the New
19      Hampshire chapter of No Left Turn in Education.  Do you
20      see that?
21  A.  Got it.
22  Q.  Okay.  And the press release appears to relate to the
23      letter and the signing of the Zinn pledge that's
24      reflected in the letter.  Do you see that?
25  A.  I do.

77

1   Q.  Okay.  Now, at the top of this email chain, Diana Krol
2        says to the commissioner, "I have Rich doing some
3        digging as well.  Below is the link to the contact
4        section on their website, if all else fails," and it
5        appears to have the No Left Turn website.
6             Do you see that?
7   A.  I see it.
8   Q.  Does it refresh your recollection as to what digging
9        you did regarding the No Left Turn letter?
10  A.  It doesn't.
11  Q.  Do you have any reason to believe that you didn't do
12       the digging that's reflected here?
13  A.  Well, you have to look at who wrote the email.  And
14       Diana Krol -- I don't work for Diana Krol, so I don't
15       know where she would represent to the commissioner that
16       I did anything.
17  Q.  So she would have no reason to know if you were
18       investigating?
19  A.  I'm not sure, but she's not my boss.  I wouldn't be
20       responding to her.
21  Q.  Did you communicate with superintendents about the No
22       Left Turn letter?
23  A.  I think some superintendents communicated with us.
24  Q.  Okay.  And what do you recall about that?
25  A.  That they saw some of the media attention to No Left

78

1        Turn and were concerned about it.
2   Q.  Why were they concerned about it?
3   A.  Because they have educators that work for them on the
4        list, so, of course, they would be concerned.
5   Q.  Okay.  And do you know whether educator --
6        superintendents also received the same No Left Turn
7        letter?
8   A.  I believe.  I believe many of them did, but, again,
9        that's an independent recollection.  I can't say yes,
10       but I believe that some of them, or many of them,
11       did.
12  Q.  And then your recollection is they contacted you?
13  A.  I think there was some contact between some
14       superintendents and me.
15  Q.  And what do you recall about those communications that
16       you had?
17  A.  The only thing I can remember -- and I think there
18       might be some emails where I said -- where this is not
19       our thing.
20  Q.  Why was it not your thing?
21  A.  Because HB 2 isn't my thing.  HB 2 violations are not
22       my thing.  And many of the -- many of the allegations
23       made in the No Left Turn stuff just were factually not
24       true.
25  Q.  Well, which is it?  Was it not your thing, or was it

79

1        the -- that the allegations were not true?
2   A.  Well, so it was really easy for me because I'm not
3        doing HB 2 investigations.  So that was very easy for
4        me.  In reading, independently reading the documents,
5        some of what they wrote in their documents just weren't
6        factual.
7   Q.  What wasn't factual that you remember?
8   A.  Well, let me review some of this stuff.
9             In Exhibit 26, they make their decision that
10       there's more than enough evidence for us to open an
11       investigation, when, in fact, that's not true.
12  Q.  Okay.  It's not true because there was not enough
13       evidence to open an investigation?
14  A.  It's not true because we don't investigate these
15       allegations.
16  Q.  Okay.
17            (Exhibit 28 marked for identification.)
18       BY MR. KAHNE:
19  Q.  Okay.  So are you familiar with this email?
20  A.  Yeah, I sent it to Garth McKinney.
21  Q.  And who is Garth McKinney?
22  A.  The former interim superintendent of the Nashua school
23       district.
24  Q.  And it appears from this email that Mr. McKinney is
25       asking if you should investigate the No Left Turn

80

1        letter, right?
2   A.  No, he's asking if he should.
3   Q.  Yeah.  Sorry.  If he should investigate?
4   A.  Yeah.
5   Q.  And so he's one of the superintendents that also
6        received the No Left Turn letter then?
7   A.  Yes, sir.
8   Q.  And you responded, "I wanted to give you an update
9        regarding the No Left Turn letter.  I received a
10       similar letter with all the names on it.  Additionally,
11       Drew Cline, state board chair, and the state board
12       members, got the same letter.  Every school district
13       with an identified teacher received the same letter
14       specific to the identified educator.  I have consulted
15       with the Assistant Attorney General assigned to our
16       office, Chris Bond, and Attorney Diana Fenton.  Neither
17       of these lawyers feel we have an interest in the
18       allegations."
19            What is your understanding of why you wrote, "We
20       do not have an interest in the allegations"?
21            MR. KENISON-MARVIN:  Object and instruct --
22       on deliberative process and attorney/client privilege
23       grounds.  To the extent your answer would include
24       information regarding advice or legal -- legal advice
25       or interpretations provided by lawyers and

**81**

1  deliberations about why anybody has an interest in
2  anything, I instruct the witness not to answer the
3  question.
4  BY MR. KAHNE:
5  Q.  I'm just asking what you meant by -- did you think that
6  you didn't have an interest in the allegations?
7  A.  What do you mean?
8  Q.  Well, you wrote that "we don't" -- "none of the lawyers
9  feel we have an interest in the allegations."
10  Did you feel you didn't have an interest in the
11  allegations?
12  A.  That's not my job to make that decision.  I went to my
13  supervisors who expressed their concerns and their
14  interest.
15  Q.  Okay.
16  A.  And I responded to Garth.
17  Q.  Okay.  And it looks like the next sentence says that
18  they reviewed the list back in the summer, right?
19  "Attorney Fenton and Chris Bond reviewed the list back
20  in the summer, and the decision was the same, and the
21  day of action in New Hampshire took place on June 12th,
22  2021.  Therefore, it is believed that the signatures,
23  if confirmed, were affixed to the pledge prior to HB 2
24  becoming law."
25  Do you see that?

**82**

1  A.  Mm-hm.
2  Q.  Is that your understanding of why there was no
3  investigation into the No Left Turn letter?
4  MR. KENISON-MARVIN:  Objection.  Vague.
5  THE WITNESS:  Well --
6  MR. KAHNE:  You can answer.
7  THE WITNESS:  In the summer, there was no --
8  there was no possible violation of the code of conduct.
9  After the bill was passed, there was still no -- we
10  still didn't have an interest because we didn't
11  investigate HB 2.
12  So before the day of -- what is it called?
13  The day of action?  So there was no HB 2 on the day --
14  on the day of action, so there wouldn't have been any
15  violation of anything.  And nothing changed at the date
16  of this email.
17  BY MR. KAHNE:
18  Q.  But do you read this email as saying that Chris Bond
19  and Ms. Fenton did not have an interest in the
20  allegations because it's an HB 2 investigation?
21  MR. KENISON-MARVIN:  Objection.  Vague and
22  compound.
23  BY MR. KAHNE:
24  Q.  Where does it say that here?
25  A.  That's the -- that's what I -- that was the intent of

**83**

1  my email.
2  Q.  It looks like -- to me, it looks like the timing of the
3  signing of the pledge is the reason for not
4  investigating.  Do you disagree with that?
5  A.  No, I disagree with that.  There are two things that
6  are at play:  One, the initial reports came to us and
7  there was no HB 2, so how could there be a violation of
8  HB 2 if there was none?
9  Second, there's new allegations with this letter
10  that was republished or reprinted, and nothing had
11  changed.  There was still no Department of Education
12  interest in the case.
13  So one was there was no HB 2.  Second one was we
14  still don't have an interest.  There's no code of
15  conduct interest here.
16  Q.  Do you know whether the -- did the DOE refer this to
17  HRC?
18  A.  No.
19  Q.  They did not?
20  A.  We can't.
21  Q.  Why can't you?
22  A.  We were told that we didn't have standing to file with
23  HRC; that individuals would have standing, but we did
24  not.
25  Q.  Who told you that?

**84**

1  A.  Attorney Fenton told me that that was the response she
2  got, and that's what we do.
3  Q.  To your knowledge, is there a writing that reflects
4  that the DOE cannot refer matters to the HRC?
5  A.  You'd have to ask Diana Fenton.
6  Q.  Have you ever seen a writing?
7  A.  Again, you'd have to ask Diana.  My understanding is
8  very simple.
9  Q.  What is your understanding?
10  A.  We don't -- we don't refer to HRC.
11  Q.  Why wasn't No Left Turn told to file a complaint with
12  the Department of Justice or HRC?
13  A.  Not my job.  You'd have to ask Diana.
14  Q.  Aren't there occasions where you tell complainants that
15  the proper way to file a complaint is with the HRC?
16  A.  Yes.  Individual parents.
17  Q.  Okay.  So individual parents you tell that the
18  proper -- that they should file a complaint with the
19  HRC, but No Left Turn is different than that?
20  A.  They're not an individual parent with standing.
21  They're an entity.  So I left it with Diana Fenton and
22  the legal team.  There's no --
23  Q.  I'm trying to understand the process here as to how you
24  decide to direct somebody to HRC versus not -- just not
25  conducting an investigation.  How does that happen?

---

**Page 85**

1  A.  I don't know what that question means.

2  Q.  In certain instances, a complaint comes in and the

3      Department of Education refers that complainant to the

4      HRC, right?

5  A.  Okay.  That has happened.

6  Q.  In other instances, they do not?

7  A.  That has also not happened.

8  Q.  Why -- why do you or do you not refer a complainant to

9      HRC?

10 A.  You'd have to ask Attorney Fenton.

11 Q.  You have no role in that decision?

12 A.  She's the decider.  She is my boss.  I provide her the

13     information.  She turns around and makes the decision

14     and we go with what her decision is.

15 Q.  Does the commissioner have any role in that decision?

16 A.  Once again, you'd have to ask Diana Fenton.

17 Q.  I'd have to ask Diana Fenton if the commissioner has a

18     role?

19 A.  Yes.

20 Q.  To your knowledge, does the commissioner have a role in

21     referring complainants to HRC?

22 A.  Himself?

23 Q.  Yeah.

24 A.  I have no idea.

25 Q.  When a complaint comes in, how do you decide whether or

---

**Page 86**

1      not it implicates HB 2?

2          MR. KENISON-MARVIN:  Objection.  Vague.

3          THE WITNESS:  Ask the question again, please.

4      BY MR. KAHNE:

5  Q.  When a complaint comes in, how do you decide whether

6      the complaint concerns a potential violation of HB 2?

7  A.  You listen to the complainant and determine what the

8      complaint is.  And if it falls in that realm, I would

9      then pass it off to Attorney Fenton and say, "Here we

10     have a complainant.  I think this is HB 2.  What's your

11     position?"  And that's where we go.

12 Q.  Do you do any investigation to see whether or not it

13     concerns HB 2?

14 A.  Well, if it's anything remotely associated with the

15     provisions of HB 2, I immediately send it over to my

16     supervisor.  A decision is made to refer the parent

17     elsewhere, I think.

18 Q.  What do you mean, "I think"?

19 A.  That's my general recollection of how the process

20     works.

21 Q.  Let me show you a document which is 29.

22         (Exhibit 29 marked for identification.)

23     BY MR. KAHNE:

24 Q.  Do you recall this email exchange?

25 A.  Yes.

---

**Page 87**

1  Q.  Okay.  This appears to be an email that you received

2      from Karlyn Borysenko dated August 24th, '22, and

3      appears to relate to a complaint that she filed or that

4      she was seeking to file.  Do you agree with that?

5  A.  The entire thing is not here.

6  Q.  But what do you recall about receiving information from

7      Karlyn Borysenko of Actively Unwoke?

8          MR. KENISON-MARVIN:  Based on the witness's

9      testimony, I will object to 106 and completeness to the

10     extent the email is not here, but you can answer.

11         THE WITNESS:  So the complaint itself isn't

12     here, so I would assume that it's an HB 2-related

13     complaint, and this is my response to her, and then her

14     unhappiness with her response to me.

15     BY MR. KAHNE:

16 Q.  Do you recall this complaint?

17 A.  I honestly -- I don't recall the complaint.

18 Q.  I want to direct your attention to -- you say in the

19     one, two, three, four, five, six -- "This agency

20     reviews the license status of New Hampshire educators.

21     The current complaint does not allege the violation of

22     any portion of the code of conduct by individual

23     educators within SAU 16."

24         Do you see that?

25 A.  I do.

---

**Page 88**

1  Q.  And then she provided the names of specific educators,

2      right?

3  A.  She did.

4  Q.  Okay.  And were you saying that the reason for not

5      reviewing this was because individuals had not been

6      named?

7  A.  No, I'm saying it's -- I'm not investigating it because

8      it's outside of my jurisdiction.  It's an HB 2 issue.

9      And I gave her recourse to contact the Human Rights

10     Commission.

11 Q.  On the bottom, it says, "Commissioner Edelblut has

12     forwarded your inquiry directly to Ahni Malachi on

13     August 19th, 2022, for her review."

14         Do you see that?

15 A.  I do.

16 Q.  Do you recall Commissioner Edelblut forwarding this

17     complaint directly to the commissioner of the HRC?

18 A.  If I wrote that he did, then he did.

19 Q.  And has he done that before?

20 A.  I don't remember.

21 Q.  Is that the protocol for the commissioner to forward

22     directly to the HRC?

23 A.  Commissioner does what the commissioner wants to do.

24     I'm not his boss.

25 Q.  But can he do anything he wants, or is there a protocol

**89**

1  in place for these complaints to be --
2  **A. You'd have to ask the commissioner.**
3  Q. Did you have any conversations with the commissioner
4  about Actively Unwoke?
5  **A. I don't recall whether I did or did not.**
6  Q. Anything that would refresh your recollection as to
7  whether you had a conversation with him about that?
8  **A. What does that mean?**
9  Q. Are there any -- sitting here today, you do not
10  remember. Is there anything I could show you?
11  **A. Sure. If you have something, show it to me, but I**
12  **don't recall.**
13  Q. Does the commissioner typically receive direct emails
14  from parents?
15  **A. Yes.**
16  Q. And does he respond to them directly?
17  **A. Sometimes.**
18  Q. And does sometimes he forward emails he receives to
19  you?
20  **A. Yes.**
21  Q. What types of emails does he forward to you from
22  parents?
23  **A. Any number of unhappy parents filing complaints about a**
24  **school district or an individual employee or a policy.**
25  **He gets a lot of stuff, and that -- those**

**90**

1  **communications, he sends them to me. He sends them to**
2  **Diana Fenton. He sent them to Chris Bond when he was**
3  **here. He sent them to Attorney Brown when she was**
4  **here.**
5  Q. Do you know how he decides whether to send an email to
6  you?
7  **A. I have no idea.**
8  Q. Or to Commissioner Malachi?
9  **A. I have absolutely no idea how he decides, what he**
10  **decides, or what his thought process is.**
11  Q. Is there -- do you know of a procedure in place for how
12  he triages those complaints from parents?
13  **A. I have no idea. You'd have to ask him.**
14  Q. We looked earlier at a technical advisory that had a
15  series of numbers. Do you know why that was issued?
16  **A. Which one?**
17  Q. The -- it was attached to your presentation.
18  **A. The FAQs?**
19  Q. Yeah, the FAQs. Why was that issued?
20  **A. You'd have -- that was issued by the Department of**
21  **Justice, correct?**
22  Q. Well, that's a good question, because it looks like it
23  says it's issued by the Department of Education, the
24  Commission for Human Rights, and the Department of
25  Justice?

**91**

1  **A. You'd have to ask who wrote it. I have no idea who**
2  **wrote it. None whatsoever.**
3  Q. Do you have an understanding of whether it's a
4  Department of Education document?
5  **A. I don't. I thought it was a Department of Justice**
6  **document. That was my understanding. I could very**
7  **well be wrong, but I don't know who wrote it. I just**
8  **know that it's there.**
9  Q. And do you know what the impetus for that document
10  was?
11  **A. You'd have to ask the people that wrote it. I can only**
12  **speculate.**
13  Q. Fair to say that there needed to be clarification as to
14  HB 2?
15      MR. KENISON-MARVIN: Objection. Vague.
16      THE WITNESS: Again, you'd have to ask the
17  people that wrote it.
18  BY MR. KAHNE:
19  Q. So on the email that I was showing you, the Actively
20  Unwoke one, it says, "Pursuant" -- the second line
21  says, "Pursuant to guidance from the Office of the
22  Attorney General, Department of Justice, this complaint
23  should first be reviewed by the Human Rights
24  Commission, HRC."
25      Do you see that?

**92**

1  **A. I do.**
2  Q. What guidance were you talking about?
3  **A. I would imagine the FAQs, as well as Attorney Fenton,**
4  **Attorney Chris Bond.**
5  Q. Well, but you're saying "pursuant to guidance from the
6  Office of the Attorney General." I'm just trying to
7  understand, is it the FAQ?
8  **A. I would imagine it's a combination of the FAQ and**
9  **attorney -- Assistant Attorney General Chris Bond and**
10  **Attorney Fenton.**
11  Q. But when we looked at the FAQ, we didn't see anything
12  that said a complaint couldn't be filed with the --
13  could or couldn't be filed with the DOE?
14  **A. That's it. Correct.**
15  Q. That's correct?
16  **A. Yeah.**
17  Q. Here's another.
18      MR. KAHNE: What document are we up to?
19      THE REPORTER: 30.
20      (Exhibit 30 marked for identification.)
21  BY MR. KAHNE:
22  Q. Have you had a chance to review this?
23  **A. I just did, yeah.**
24      MR. KENISON-MARVIN: Can I have it?
25      MR. BISSONNETTE: Oh, I'm sorry.

93

1         MR. KENISON-MARVIN:  That's okay.
2     BY MR. KAHNE:
3     Q.  On Exhibit 30 appears to be an email dated -- starts
4         with an email dated Friday, September 17th, 2021.  It
5         is from -- it says it's from a Plaistow resident.  Am I
6         saying that right?
7     A.  Plaistow, yeah.
8     Q.  Plaistow resident who removed both of his kids from the
9         school district "because of indoctrination and other
10        problems happening in the Timberlane district.  There
11        are many problems swept under the rug and not much
12        accountability.  Many times emails and complaints go
13        nowhere."
14            Do you see that?
15    A.  I do.
16    Q.  And then the commissioner responds directly, right?
17    A.  Yes.
18    Q.  And you say the commissioner does that a fair amount?
19    A.  He does.
20    Q.  He says, "Any time we receive a complaint, we take it
21        very seriously and conduct an investigation where
22        warranted and within our scope of jurisdiction."
23            Do you see that?
24    A.  I do.
25    Q.  He says, "When we have a finding, we take appropriate

94

1         action against an educator's license.  That action
2         ranges from reprimand to suspension to revocation.
3         Under the new anti-discrimination law, we will also
4         investigate and take investigation although that also
5         falls under the Human Rights Commission as the first
6         line of intervention."
7             Do you see that?
8     A.  I do.
9     Q.  So he's saying -- do you understand him to be saying
10        that the DOE is also going to be investigating and
11        taking action under the new anti-discrimination law?
12    A.  You'd really have to ask Frank.
13    Q.  Okay.  But then it gets forwarded to you by Stephen
14        Berwick, and he says, "Heads-up my, friend.  May come
15        your way"?
16    A.  Yes.
17    Q.  Why would he have said that?
18    A.  I've got to know who Stephen Berwick is.
19    Q.  Okay.  So tell me who Stephen Berwick is.
20    A.  Stephen is -- he was wears many hats and he deals with
21        a lot of complaints.  A lot of complaints come his way.
22        He does a lot of stuff with bullying, things like that.
23        And he got the cc and sent it to me.
24    Q.  But your testimony previously was that HB 2 is not
25        your -- not your -- you don't do any investigations

95

1         related to HB 2?
2     A.  I do not.
3     Q.  So why would Stephen Berwick, on this complaint, which
4         is plainly HB 2-related, say, "Head's-up, my friend.
5         May come your way"?
6     A.  Well, I don't know that it's -- I don't know that it's
7         all only about HB 2.  If you read the original email --
8         and I bet you there's more than just this original
9         email, but read it carefully.
10            He says, "Both of my kids are" -- "I removed my
11        kids from school because of indoctrination and other
12        problems happening in the district.  There are many
13        problems swept under the rug and not much
14        accountability."
15            That tells me he's talking about more than one
16        thing.  He went to Berwick.  Berwick sent it to me
17        saying, "Hey, this might come your way."
18            He -- this person who was writing the email has
19        said multiple things in two sentences, or three.  So to
20        say that it's all HB 2 related is a slanted view of
21        what he wrote.  He's talking about different things.
22        And Berwick looked at it and said, "Hey, this may come
23        your way."
24    Q.  Heads-up?
25    A.  Yeah.

96

1     Q.  But it's possible that there was a component of this
2         complaint that was related to HB 2, right?
3     A.  Sure.
4     Q.  Okay.  And that could get forwarded to you to
5         investigate?
6     A.  No.  It could get forwarded to me, and I'm not
7         investigating it.  I go to Attorney Fenton.  I say,
8         "Look, this is HB 2.  I'm not doing this."
9             But, in this instance, there were other things.
10        This is just one email in a vacuum.  What else was he
11        talking about?  I don't know.
12            And read -- if you want to read that three-line --
13        that three-line paragraph, you can read it your way
14        that it's all about HB 2, or you can read it my way,
15        that there's more than one thing happening here.
16    Q.  Okay.  But it does seem like, would you agree with me,
17        that the commissioner is saying under the new
18        discrimination law, we will investigate and take
19        action, although that also falls under the Human Rights
20        Commission?
21    A.  First -- first, I'm not going to agree with you at all
22        because we have different visions of what was just read
23        to us.  That's number one.
24            Number two, ask the commissioner.
25    Q.  I'm just -- I just want to understand what your -- if

Transcript of Richard Farrell
Conducted on May 18, 2023

97

1    you -- what you believe the commissioner's position to
2    be.
3  A.  **Ask him.**
4  Q.  I will.  We will.  We certainly will.
5  A.  **I can't --**
6  Q.  But have you had conversations with the commissioner
7    about investigating complaints related to HB 2?  Any
8    conversations at all?
9  A.  **The conversations that I've had with him and with**
10   **Attorney Fenton and Attorney Bond and now Attorney**
11   **Brown is that we don't investigate.  It goes to the**
12   **Human Rights Commission or the Department of Justice.**
13   **Period.**
14 Q.  And what did the commissioner say to you in response to
15   that?
16 A.  **I have no idea.**
17 Q.  You don't have any recollection of --
18 A.  **I don't.**
19 Q.  -- specific conversations you've had with him?
20 A.  **I really don't.  I know what my position is and what I**
21   **believe my job is.**
22 Q.  Did the commissioner ever ask you to collect
23   information for an op-ed that he was writing?
24 A.  **I -- no.  I didn't even know he wrote an op-ed.  I**
25   **don't -- I don't pay a lot of attention to some of that**

98

1    **stuff.  If he did, and it was sent to me, I probably**
2    **read it.  But in terms of providing him stuff...**
3  Q.  Let's do Exhibit 18.
4        MR. KENISON-MARVIN:  Can we do this one, take
5    a break after this?
6        MR. KAHNE:  After this one, sure.
7        THE WITNESS:  Okay.  So, unfortunately, I'm
8    completely challenged here.
9    BY MR. KAHNE:
10 Q.  With the size of the type?
11 A.  **I can't read it.  I mean, if you have a magnifying**
12   **glass or something, or maybe blow it up?**
13 Q.  I'll read --
14 A.  **Or you can read it.**
15 Q.  I'll read it to you.
16 A.  **Okay.  Thanks.**
17 Q.  So, if you look at the bottom, if you go to the second
18   page of this, which is DOE10287, there's an email from
19   ███████████  The subject line is "Londonberry
20   (sic)."  It says -- and it's to the commissioner.
21   "Good evening.  This was brought to my attention
22   today.  A human relations teacher at the Londonberry
23   High School gave these worksheets out to students.  Is
24   this allowed?"
25        Do you see that?

99

1  A.  **I believe you.**
2  Q.  Okay.
3  A.  **I can't read it.**
4        MR. KENISON-MARVIN:  One, he can't read it.
5    And this -- I would make a completeness 106 objection
6    to the extent we need to take a break to blow this up
7    so he can see it.  If he can't see it, I think it's not
8    completely in front of him, practically, and he's
9    entitled to have the whole thing in front of him and
10   look at it when you're presenting it to him.  So we
11   might need to take a break and figure out a way to get
12   this in the size and font that he can see it --
13        MR. KAHNE:  Okay.
14        MR. KENISON-MARVIN:  -- if you want to ask
15   questions about it.
16        MR. KAHNE:  That's fine.  Do you want to take
17   a break and try to blow it up?
18        MS. MILBURN:  I can blow it up on the
19   computer.
20        MR. KAHNE:  But we need to print it out, too,
21   right?
22        MR. KENISON-MARVIN:  I'm wondering if there's
23   a way to project it, if we could do a projection
24   format, or some way so that he can see it.  Otherwise,
25   I think it's unfair to ask him questions about it.

100

1        MR. KAHNE:  Can we pull up it on a computer
2    and zoom in?
3        MR. KENISON-MARVIN:  As long as he can read
4    it.
5        THE WITNESS:  As long as I can read it.
6    That's fine.
7        MR. KENISON-MARVIN:  Do you want to use mine?
8        MS. MILBURN:  I can blow it up.
9        THE WITNESS:  I'm sorry, the 65-year-old eyes
10   are --
11        MR. KAHNE:  You don't have to apologize.
12        MR. BISSONNETTE:  I've got the same issue.
13        MR. KENISON-MARVIN:  Now I'm confused where
14   we left things.  Is Gilles doing something with respect
15   to this?
16        MS. MILBURN:  I think he may have went to the
17   bathroom.
18        MR. KENISON-MARVIN:  I have to go to the
19   bathroom.
20        MR. KAHNE:  Yeah, sure.
21        (Recess taken.)
22   BY MR. KAHNE:
23 Q.  Mr. Farrell, before we get into that, and I do want you
24   to look at that exhibit -- in prior exhibits, you have
25   said that certain complaints that have come in have

101

1  included both HB 2 content and other content, right?
2  **A. Yes, yes.**
3  Q. And so that happens from time to time, right, that a
4  complaint comes in and it doesn't just have a safety
5  issue. It doesn't just have an HB 2 issue; it can be
6  combined, right?
7  **A. It can.**
8  Q. Okay. If that happens, do you investigate the entire
9  file, or do you somehow wall off the HB 2 aspects of
10  the investigation?
11  **A. I'll either do one of two things: I'll either refer**
12  **the entire matter to the Human Rights Commission, or**
13  **I'll wall off the additional misconduct allegation.**
14  **It's really hard to do that because the parent, or the**
15  **complainant, it just weaves in and out, and it's very**
16  **hard.**
17  **So, generally speaking, I will refer the entire**
18  **matter. And then once HRC is finished, we'll come back**
19  **and look at whether or not there's still an existing**
20  **child safety or code of conduct violation.**
21  Q. Has that happened before, or you're just saying this is
22  how you would do it?
23  **A. It's only one time that I can recall we did it, and we**
24  **sent the whole thing to HRC, and then it came back to**
25  **us, and then we looked at only the minimal piece of the**

102

1  educator misconduct.
2  Q. That was not related to HB 2?
3  **A. Correct.**
4  Q. Is there any protocols in place for how you sort of
5  segregate one versus the other?
6  **A. That was a unique circumstance. There's no protocol.**
7  **And I would run it by Attorney Fenton for her approval**
8  **to determine which way we're going to go.**
9  **So we'd take the facts, review, send it to —**
10  **bring it to her, determine which way we're going to go,**
11  **whether we send the whole thing off or piecemeal it.**
12  Q. And is Attorney Fenton the sole decider as to whether
13  something touches HB 2?
14  MR. KENISON-MARVIN: Objection. Vague. You
15  can answer.
16  THE WITNESS: Really, you'd have to ask Diana
17  that. I take the complaints. I'm the
18  boots-on-the-ground guy. I take the complaints, get
19  the facts, review with her. What she does with them,
20  how she does it, who else she speaks to, you'll have to
21  ask her.
22  BY MR. KAHNE:
23  Q. Well, let's look at 18 then.
24  **A. Okay. 18.**
25  Q. And before we do that, you said there was -- I'm going

103

1  to call it a hybrid complaint with both HB 2 and
2  other -- and other concerns, code of conduct concerns.
3  What district was that from?
4  **A. I think -- and, again, it's a recollection, but I**
5  **thought it was Exeter.**
6  Q. Exeter. Okay.
7  **A. I think.**
8  Q. Okay. Turning to Exhibit 18 which I've been -- I'm
9  told is regarding Londonderry. I had mispronounced it
10  before. If you look at the second page, which is DOE
11  10287?
12  MR. KENISON-MARVIN: Let me add, let the
13  record reflect he's viewing this on the monitor and not
14  the marked exhibit.
15  We pressed a button and it's now bringing up
16  a URL, so we might need a little --
17  MS. MILBURN: Here, let me try.
18  MR. KENISON-MARVIN: The mouse would be
19  better. We can go to the mouse for more precision.
20  THE WITNESS: Yeah, let's use the mouse.
21  MS. MILBURN: Hopefully that works.
22  THE WITNESS: Okay. Where am I looking?
23  BY MR. KAHNE:
24  Q. So go to the -- I mean, the first email in the chain
25  appears to be dated April 4th, 2022, from ▮▮▮▮

104

1  ▮▮▮ to Frank Edelblut. Do you see that?
2  **A. I'm looking. April 4th?**
3  Q. Yeah.
4  **A.** ▮▮▮▮▮▮ **to Frank Edelblut on the 4th.**
5  Q. It says, "Good evening."
6  **A. Yes.**
7  Q. It says, "Good evening. This was brought to my
8  attention today. A human relations teacher at the
9  Londonderry High School gave these worksheets out to
10  students. Is this allowed?"
11  Do you see that?
12  **A. I do.**
13  Q. Okay. And if you keep going, it looks like she
14  attaches the worksheets that the human relations
15  teacher at Londonderry High School distributed.
16  **A. Yes.**
17  Q. Okay. And there's Diversity Bingo and there's another
18  worksheet on sexual orientation, national origin. Do
19  you see that?
20  **A. I do.**
21  Q. So it appears as though the commissioner is receiving
22  this complaint from a parent, right?
23  **A. Yes.**
24  Q. Okay. And then the commissioner forwards it on to
25  Diana Fenton, right?

105

1  A.  Let me see.  Okay.  "Attorney Fenton, can you look into
2     this?"
3  Q.  Before you even get there, the commissioner is sending
4     it to Diana Fenton?
5  A.  Yes.
6  Q.  He just forwards it.  No email.  Then Diana sends it to
7     you and says, "Can you look into this?"
8        So the first question I have for you is why did
9     Attorney Fenton ask you to look into this if it just
10    concerns a human relation teacher's worksheets in
11    Londonderry?
12  A.  Okay.  Now, again, this is my guess is that this
13    wasn't -- Diana made a triage decision that it wasn't
14    an HB 2 matter, but, rather, what's called a
15    nonacademic survey matter, which there's a nonacademic
16    survey statute in New Hampshire.
17       So my guess is, and my recollection of this case
18    is, that it was deemed not to be a House Bill 2 issue,
19    but, rather, a nonacademic survey, which has
20    requirements within a nonacademic -- I'm sorry,
21    nonacademic survey that talk about parental opt-outs --
22    I'm sorry, parental opt-in notification of the content,
23    and permission slips, per se.
24       That's my guess, that she made that decision that
25    it was not an HB 2 matter, but, rather, a matter

106

1     falling under nonacademic surveys.  That's what I'm
2     remembering.
3  Q.  So nonacademic surveys you're saying has to do with
4     whether parents can opt out of curricular --
5  A.  Opt in.
6  Q.  Opt in, or whether they're required to get parental
7     opt-ins for certain material; is that right?
8  A.  That's the only thing that makes sense, because she --
9     that's my recollection that this was.
10 Q.  But there --
11 A.  This was -- this had nothing to do with House Bill 2.
12    It had more to do with nonacademic surveys.  And that's
13    just my remembrance.  I could be totally wrong.  Again,
14    you'd have to ask Diana that, but that's my
15    recollection.
16 Q.  Okay.  There could be a lot of overlap, though,
17    couldn't there, between these nonacademic surveys and
18    what's covered by HB 2?
19       MR. KENISON-MARVIN:  Objection.  Vague.  You
20    can answer.
21    BY MR. KAHNE:
22 Q.  So material that you're saying is -- this material,
23    which you're not sure may have to do with the opt-out
24    or opt-in of a parent, concerns educational materials,
25    right?  Curricular materials?  Isn't it the case that

107

1     HB 2 also covers curricular materials?
2        MR. KENISON-MARVIN:  Objection.  Compound.
3        THE WITNESS:  My answer is based on the
4     emails and her -- what you asked me, why would she send
5     it to me?  That's the only logical explanation for me.
6     BY MR. KAHNE:
7  Q.  Aside from Londonderry, now -- because you've raised
8     this opt-in issue that I was not aware of previously.
9     I'm curious as to whether there would be overlap
10    between the opt-in issue and the HB 2 prohibitions?
11 A.  No, because one has to do with nonacademic survey.  The
12    rest would be totally separate from that.
13 Q.  Okay.  But if you look here -- well, first, it does
14    look like you investigated this, right?  That you --
15 A.  You'd have to -- let me finish.
16 Q.  It looks like in the next one you contacted the
17    superintendent, Scott Laliberte?
18 A.  Laliberte.
19 Q.  Laliberte, right?  And you say -- you're asking about
20    ███████████  "Is she on your radar?"  What did you
21    mean by that?
22 A.  Is this educator someone that you've dealt with before?
23 Q.  Well, it's not an educator, right?  ███████████  is
24    a --
25 A.  That's what I don't --

108

1  Q.  Is a parent?
2  A.  I don't recall.  Okay.
3  Q.  So do you remember this now?
4  A.  I remember talking to Laliberte.  I remember that it
5     was determined to be a survey issue, and not House Bill
6     2.  I sent it to the commissioner to review Laliberty's
7     response.  Again, he talks about opt-in content.
8  Q.  But you see at the -- Scott Laliberte, on April 7th,
9     "reviewed the material through the lens of the new
10    divisive concepts law and find that the subject of
11    these activities do not apply," right?
12 A.  Well, that's what his response was.
13 Q.  Right, and so he was looking -- he was also looking at
14    the material through the lens of HB 2, right?
15 A.  That's what he was looking at.
16 Q.  Okay.  And then you got that response, and then you
17    forwarded it to the commissioner?
18 A.  Correct.
19 Q.  And then you discussed that at your next meeting, which
20    presumably is the educator misconduct meeting?
21 A.  Correct.
22 Q.  And so you discussed this material that's attached,
23    which is about Diversity Bingo and "identities that you
24    most often associate with."  You discussed that at an
25    educator misconduct meeting with the commissioner?

**109**

1  A.  No, I didn't discuss the content.  I discussed strictly
2      looking at the opt-out/opt-in content.  I would say the
3      content of the material may not match the relatively
4      benign syllabus.
5          So I wasn't looking at HB 2 there, nor was — nor
6      was — that was my intent.  We met at the educator
7      misconduct meeting, and the topic was not HB 2; it was
8      nonacademic surveys and parental opt-in.
9  Q.  But did you review the material itself?
10 A.  I reviewed the — what I reviewed wasn't necessarily
11     the material.  What I reviewed was whether or not the
12     policy — I'm sorry, the statute was followed regarding
13     parental review and parental opt-in.
14 Q.  Did anybody else in the meeting review this course
15     material?
16 A.  I think the commissioner, Attorney Fenton, and the
17     deputy — whoever was there reviewed the material, not
18     under the guise of HB 2, but under the guise of was
19     this an academic or nonacademic survey, and were
20     parents offered the opt-out — I'm sorry, the opt-in
21     provision, and were they notified?  And that's the
22     extent of my involvement in this case.
23 Q.  Do you know whether or not this material made its way
24     to any op-ed that the commissioner published with
25     material that he found objectionable?

**110**

1  A.  I remember the op-ed you're talking about, and it was
2      about Londonderry, but I don't know that it was about
3      this.  I'm not sure.  I think — you may be conflating
4      some other issues.
5  Q.  So if you want to take a look at Exhibit 14?
6          THE WITNESS:  Do you have it?
7          MR. KENISON-MARVIN:  I do.
8          THE WITNESS:  Are we done with the emails?
9          MR. KAHNE:  I would keep that up.
10         THE WITNESS:  Thanks.
11     BY MR. KAHNE:
12 Q.  Before we get there, that opt-in — opt-out/opt-in
13     context, is that a provision of the code of conduct?
14 A.  It is a statute, and it's — it has been deemed to be a
15     possible violation of the code of conduct.
16 Q.  So a violation of the opt-in/opt-out statute is
17     considered a violation of the code of conduct?
18 A.  Possibly.
19         MR. KENISON-MARVIN:  Objection.  Calls for a
20     legal conclusion.
21     BY MR. KAHNE:
22 Q.  It could possibly be?
23 A.  Yeah.
24 Q.  Same way a violation of HB 2 could be a violation of
25     the code of conduct?

**111**

1          MR. KENISON-MARVIN:  Same objection.
2          THE WITNESS:  No.
3          MR. KAHNE:  You can answer.
4          THE WITNESS:  Two different things that are
5      apples and oranges.  HB 2 has a process that goes
6      through another filter that requires a finding before
7      it gets to us, whereas the opt-in provision is, in
8      itself, a violation of state law.
9      BY MR. KAHNE:
10 Q.  But the opt-in provision is a violation of state law.
11     The violation of HB 2 is a violation of state law?
12 A.  We don't know that at the outset.
13 Q.  Well, but that's just these procedures that have sort
14     of — right?
15 A.  Well, procedures are important.
16 Q.  Okay.  But the only thing separating them, those two
17     things, is the technical advisory, or whatever other
18     procedures that are unwritten?
19         MR. KENISON-MARVIN:  Objection.  Vague and
20     calls for a legal conclusion.  Legal analysis.
21     BY MR. KAHNE:
22 Q.  You're reviewing opt-in, right, under the code of
23     conduct?
24 A.  Correct.
25 Q.  Because a violation of the opt-in is a violation of the

**112**

1      code of conduct?
2          MR. KENISON-MARVIN:  Same objection.
3      BY MR. KAHNE:
4  Q.  Can be?
5          MR. KENISON-MARVIN:  Legal analysis.
6          THE WITNESS:  It's possible that it's a
7      violation of the code of conduct.
8      BY MR. KAHNE:
9  Q.  Right.  And I'm just trying to understand.  The thing
10     that makes HB 2 different is this other procedure that
11     you're talking about?
12         MR. KENISON-MARVIN:  Same objection.
13     BY MR. KAHNE:
14 Q.  Right?
15 A.  I think there's a huge difference.
16 Q.  I'm not saying if it's big or small.  I'm just saying
17     that is the difference.
18 A.  Yeah.
19         MR. KENISON-MARVIN:  Same objection.
20     BY MR. KAHNE:
21 Q.  By the way, is a — is a failure to report a violation
22     of HB 2 a violation of the code of conduct?
23         MR. KENISON-MARVIN:  Same objection.
24         THE WITNESS:  I don't know.
25     BY MR. KAHNE:

Transcript of Richard Farrell
Conducted on May 18, 2023

---

113

1  Q.  Could it be?
2          MR. KENISON-MARVIN:  Same objection.
3          THE WITNESS:  That's not my decision to make.
4  BY MR. KAHNE:
5  Q.  Well, whose decision --
6          MR. KENISON-MARVIN:  Same objection.
7          THE WITNESS:  I guess I'm not really
8      understanding the whole question, but any decision
9      would be made by my superiors, not by me.
10  BY MR. KAHNE:
11  Q.  Well, I'm not saying you personally.  I'm saying under
12      your understanding of the code of conduct, which
13      contains a duty to report provision, right, a failure
14      of a teacher to report a violation of HB 2 would be a
15      violation of the code of conduct, right?
16          MR. KENISON-MARVIN:  Same objection.
17          THE WITNESS:  I don't think I'm qualified to
18      answer that question.
19  BY MR. KAHNE:
20  Q.  Why not?
21  A.  It's a trap question, I think.
22  Q.  I'm not trying to trap you.
23  A.  Yeah, you are.
24      No, I honestly don't believe that I'm qualified to
25      answer that question.  A teacher -- you're asking me to

---

114

1      assume that a teacher, A, knows what the statute is;
2      and, B, that that said teacher understands the
3      statute.
4  Q.  Which is hard.
5  A.  And then knowingly fails to report.  That's a lot of
6      ifs.
7  Q.  And if all of those ifs line up --
8  A.  I just don't see it.  I don't see them all lining up.
9  Q.  Why couldn't they all line up?
10  A.  I've never seen it.
11  Q.  Is it because the statute is hard to understand?
12          MR. KENISON-MARVIN:  Same objection.
13          THE WITNESS:  I have no idea.  All I know is
14      that I've never seen it.
15  BY MR. KAHNE:
16  Q.  This op-ed, April 15th, 2022.  And if you look at -- if
17      you look back at Exhibit 18, that is April 7th, 2022.
18      So about eight days later, right?
19  A.  Okay.
20  Q.  Are you familiar with this op-ed written by the
21      commissioner about Education Sacred Trust?
22  A.  I'll have to read it.
23  Q.  Okay.
24  A.  Okay.
25  Q.  Okay.  So you've had a chance to read this?

---

115

1  A.  Mm-hm.
2  Q.  How would you characterize the content of this op-ed?
3      What is it about?
4          MR. KENISON-MARVIN:  Objection.  Vague.  You
5      can answer.  And compound.
6  BY MR. KAHNE:
7  Q.  What is this op-ed about, to you?
8  A.  My opinion?
9  Q.  Yes.
10  A.  I think he's talking about parental rights.
11  Q.  Where does it say he's talking about parental rights?
12  A.  I think that's what I just received from reading it.  I
13      think he's talking about parental rights.
14  Q.  If you look here at topic -- it's PL00696.
15  A.  Okay.
16  Q.  This appears to be part of -- the same email chain that
17      we looked at in Exhibit 18 is part of the topics that
18      are covered under Commissioner Edelblut's op-ed; isn't
19      that right?
20  A.  Say that again, please.
21  Q.  The email on 00696, the bottom one, is the same email
22      chain -- is from the same email chain as Exhibit 18?
23  A.  Okay.
24  Q.  So the superintendent, Scott Laliberte, found that the
25      material did not violate the divisive concepts law.  He

---

116

1      said, "We've reviewed this material through the new
2      divisive concepts law and find the subject of these
3      activities do not apply."  And yet the commissioner
4      included this in his op-ed, right?
5  A.  Where did he do that?
6  Q.  Well, if you keep looking, the human relations course
7      is -- the next couple of pages are the -- and if you
8      look at 7736, it's Diversity Bingo again, and
9      Identities You Think About Most Often, the same
10      material that was the subject of the complaint from
11      ███████████
12  A.  Okay.
13  Q.  Why did the commissioner include this in his op-ed, to
14      your knowledge?
15  A.  You would have to ask him.
16  Q.  Did he ask you to send materials to him for inclusion
17      in this op-ed?
18  A.  No.
19  Q.  He did this all on his own?  Do you know if he did this
20      all on his own?
21  A.  I don't know.  I honestly don't know.
22  Q.  It looks like he's including --
23          MR. KENISON-MARVIN:  I'm sorry, I'm confused
24      as to document numbers.  There's some in here that
25      don't have a Bates stamp, and there's some where the

**117**

1  Bates stamp has been crossed out at the end, so I'm not
2  able to keep up at the moment.  7736.
3  MR. KAHNE:  7736.
4  MR. KENISON-MARVIN:  There's documents in
5  here that don't have a Bates stamp.
6  MR. KAHNE:  They do.  They're just on the
7  side.
8  MR. BISSONNETTE:  It's either on the bottom
9  right or upper right.
10  MR. KENISON-MARVIN:  Oh, here.  And the two
11  that are at issue, sorry, 7736, and what was the other
12  one that you referenced?
13  MR. KAHNE:  Oh.  Well, 736, 737.
14  MR. KENISON-MARVIN:  Okay.
15  MR. KAHNE:  And then Mr. Farrell's email, 696
16  through 700.
17  MR. KENISON-MARVIN:  I have those.  Okay.
18  I'm good.  Thank you.
19  BY MR. KAHNE:
20 Q.  You sent the -- you sent the human relations core
21  syllabus to the commissioner, right?
22 **A.  Where is that?**
23 Q.  That is at 00696 at the top, Richard Farrell to
24  Commissioner Edelblut.
25 **A.  So I sent him Laliberty's email, right?**

**118**

1  Q.  This looks like it's different from the email chain.
2  It looks like, "Please review" -- the attachment is
3  separate from Exhibit 18 when you say, "Please review
4  the responses from Londonderry."
5  **A.  But what is the attachment?**
6  Q.  The attachment is what comes after.  It's the syllabus.
7  **A.  Okay.  So it starts with the human relations?**
8  Q.  That's right.
9  **A.  Okay.**
10  Q.  And that occurred five days after --
11  MR. KENISON-MARVIN:  I'll object just to the
12  extent, like, can you -- on foundation.  Can you ask
13  him if that was the attachment?
14  MR. KAHNE:  Okay, sure.
15  MR. KENISON-MARVIN:  And we'll get some
16  foundation.
17  BY MR. KAHNE:
18  Q.  Is that an accurate reflection of what was attached to
19  your email, to your knowledge?
20  **A.  Perhaps.**
21  Q.  Perhaps?  But this email to the commissioner comes
22  after Exhibit 18.  It's April 12th, not April 7th.  Do
23  you see that?
24  **A.  Okay.**
25  Q.  So my question is did the commissioner ask you to send

**119**

1  this material in connection with his preparation of the
2  op-ed?
3  **A.  I had no idea he was doing an op-ed.**
4  Q.  Do you have a recollection of him asking you to send
5  this in April?
6  **A.  No, I do not.**
7  Q.  Can you look through the topics here and see whether
8  any of the communications, including the text messages
9  that are here, were to or from you?
10  **A.  Where?**
11  Q.  In the attachments.  In the attachments to Exhibit 14.
12  Attachments to the op-ed, Education Sacred Trust.
13  Topic one.  Topic two.
14  **A.  Okay.  So there's a screenshot.**
15  Q.  Where is that?
16  **A.  702.**
17  Q.  Yeah.  "A friend has a 6th grader at"?
18  **A.  Yeah.**
19  Q.  Is that your phone?
20  **A.  No.**
21  Q.  Okay.  Yes, so I'm asking you to review this document
22  to see whether any of this information came from you.
23  MR. KENISON-MARVIN:  I still say that
24  question's vague.
25  BY MR. KAHNE:

**120**

1  Q.  None of this is your -- your phone -- your text
2  messages or anything?
3  **A.  I don't think.  See, I don't have a State-issued phone,**
4  **so that cell phone number that you had was -- is my**
5  **personal cell phone number, so I try never to use my**
6  **personal cell phone for this stuff.  And I honestly**
7  **don't have really what you're talking about.**
8  Q.  I'm just asking whether you provided any of these
9  materials to the commissioner in connection with his
10  authoring that op-ed.
11  **A.  Absolutely not.**
12  Q.  Okay.
13  **A.  If I -- if I provided anything, background information**
14  **regarding a complaint, possible, but did I -- I didn't**
15  **even know he wrote an op-ed until after the op-ed was**
16  **written, so I have no idea what you're talking about**
17  **there.**
18  Q.  Did you -- in the Londonderry complaint, do you recall
19  whether you sent the materials to the superintendent,
20  Scott Laliberte?
21  **A.  Laliberte?**
22  Q.  Laliberte.
23  **A.  What do you mean by that?**
24  Q.  So if you look at 18, at Exhibit 18 -- I'm jumping.
25  Sorry.  So Thursday, April 7th, 2022, it says, "Good

121

1   morning, Rich." This is from Scott Laliberte?
2 A.  What page number is that?
3 Q.  It's the top page of the last email.  "We have had an
4   opportunity to review the material that you'd sent and
5   have the following information for you in response to
6   the inquiry."
7 A.  Okay.  Okay.
8 Q.  So you sent the superintendent material, right?
9 A.  Yeah.  I sent him the material that was -- that I got
10   from -- that Ms. ████████ provided, I think.
11 Q.  So let me just understand the chain of events here.
12   Ms. ████████ provides information to the commissioner?
13 A.  Yes.
14 Q.  The commissioner forwards it to Diana Fenton?
15 A.  Yes.
16 Q.  Diana Fenton forwards the information to you?
17 A.  Yes.
18 Q.  And you forward the information to a superintendent,
19   Scott Laliberte, right?
20 A.  Yes.
21 Q.  Who views the material, among other things, through the
22   lens of the divisive concepts law?
23 A.  That's how he did it.  I can't control that.
24 Q.  But that is what happened, just as a matter of fact.
25 A.  Okay.

122

1 Q.  Okay.  Yes.  Okay.
2 A.  Wait a minute now.  I sent it to him and said, "Please
3   review," correct.
4 Q.  Yeah, yeah.
5 A.  Okay.  So I didn't say, "Please review under HB 2," or
6   anything else.  He reviewed it under his own guise.  I
7   reviewed it under something else.
8 Q.  All I'm saying is that the superintendent reviewed the
9   material that you had sent to him under the lens, in
10   his words, of the new divisive concepts law?
11 A.  Well, that's his interpretation of what I sent.
12 Q.  But he did that?
13 A.  Yes, that's fine.
14 Q.  Did you talk on the phone with him about this?
15 A.  Probably, yeah.
16 Q.  Okay.  So you had conversations with him before sending
17   him the material?
18 A.  No.  No.  I think I sent him -- what I traditionally
19   do, will send an email to the superintendent and say,
20   "Please review attached and give me a call," and then
21   we have communications or additional emails.
22 Q.  Okay.  So what do you remember about your conversation
23   with Scott Laliberte?
24 A.  I don't.
25 Q.  Nothing?

123

1 A.  No.  We've talked a couple of times.  I know he
2   reviewed the material.  He had his position.  We
3   didn't -- I mean, I didn't do anything with the
4   material in terms of educator misconduct.  I provided
5   it to him, talked to him about it, got additional
6   information, I think, and then we met and discussed the
7   matter with Attorney Fenton.
8 Q.  Why wasn't this referred to the HRC?
9 A.  As I said before, the view from our -- our vantage
10   point was this was about a survey issue under the
11   statute regarding nonacademic surveys, and not House
12   Bill 2.
13 Q.  Yeah, I just want to understand the nonacademic
14   surveys.  Explain what that means again.
15 A.  So if a teacher asks questions, or questionnaires, or
16   surveys of students, and, in this case, there was the
17   divisive concept ring and then there were questions,
18   like a Bingo sheet where questions were asked, the
19   determination was that that was potentially a
20   nonacademic survey as opposed to an HB 2 issue.  So
21   that was my lens.  What Laliberte looked at is -- you'd
22   have to ask Laliberte what his lens was.
23 Q.  This -- how does something become a survey or not?  How
24   is it a survey or not a survey?
25 A.  Which is, again, why you conduct an investigation to

124

1   determine if it's a survey.  Does it fall within the
2   statute?  Was there an opt-in?  Was there a syllabus?
3   Parents know what was being distributed?  Those are the
4   kinds of questions that we would ask.
5 Q.  And so it seems as though Laliberte was viewing this as
6   a survey that touched on HB 2 topics?
7 A.  That is up -- that's his --
8 Q.  Yes?
9 A.  -- vision.  I have no control over that.  My vision and
10   my lens was strictly not HB 2.  My lens was did the
11   teacher engage in a nonacademic survey?  And, if so,
12   did it violate the statute?  That's the sole lens that
13   I had.
14 Q.  And did you make that threshold determination?
15 A.  I don't make that threshold determination.  We work it
16   through Attorney Fenton.  She makes the determination.
17   As you can see, there was "Let's talk about this at our
18   next meeting."
19     I don't recall -- I don't believe anything
20   happened in terms of sanctions at all.
21 Q.  Have you been asked to investigate any complaints
22   relating to books being taught in a classroom?
23 A.  Have I been asked to investigate books being taught?
24 Q.  Have you been asked to look into further books --
25   certain books being taught in a classroom?

125

1  A.  Well, we've had complaints by parents, in particular,
2  that object to certain books being used in school
3  libraries and school -- and schools, and in
4  classrooms.
5  Q.  And what do you do with those complaints?
6  A.  I immediately run to Diana Fenton and say, "Hey, we
7  have this complaint," and "What do you want do?"
8  Q.  And has there been occasions where she says, "Look at
9  the book"?
10  A.  There's been occasions where it's "Look at the book."
11  There's been occasions where she's asked, "Can you see
12  if these books are there?  Can you determine if
13  it's" -- and it gets very complicated because it's not
14  just the book being in the library.  There's the --
15  there are other issues regarding electronic books and
16  electronic libraries.  So it gets very confusing.  And
17  parents are very creative when it comes to complaining
18  about the books.  So you have to -- you have to cut
19  through the nonsense and determine whether or not
20  there's actually a code of conduct violation.
21  Q.  Do you remember specific books that you've looked at?
22  A.  Sure.  There's -- the one that keeps popping up that
23  everybody likes to hate is Gender Queer.
24  Q.  And so there's a complaint about Gender Queer.  And you
25  look -- do you read the book?

126

1  A.  I've read the book, sure.
2  Q.  Okay.  And you read the book to see whether the
3  inclusion of that book violates the -- or providing
4  that book violates the code of conduct?
5  A.  No.  I read the book because I want to be educated as
6  to what the complaint is about, and then I will go over
7  and talk to Attorney Fenton about that.
8  Q.  Any other books that you remember?
9  A.  If you gave me a list, I could tell you.  There are
10  other books that have been -- people have complained
11  about.  But that's the one that seems to be the one
12  that people object to a lot.
13  Q.  How about A Good Kind of Trouble?
14  A.  Yeah, that.  That's been there.
15  Q.  So have you read that one?
16  A.  I have not.
17  Q.  But people have complained about that, and you've
18  gotten those complaints?
19  A.  Yes.
20  Q.  And have you spoken -- in connection with, you know,
21  let's say A Good Kind of Trouble, have you spoken with,
22  like, superintendents or principals or teachers as part
23  of your looking into it?
24       MR. KENISON-MARVIN:  Objection.  Vague.  You
25  can answer.

127

1       THE WITNESS:  If we get to the complaint
2  where we're doing triage, I might -- I don't talk to
3  teachers about this.  I go way above their pay grade
4  because teachers don't make policy decisions.  So I
5  would go to the superintendent.  I don't even talk to
6  the building principals.  I go right to the
7  superintendent and say, "Hey, we have a complaint from
8  a parent.  This is the book they're complaining about.
9  Is it in your library?"
10       So that's a fact-based inquiry.  I'm not
11  making a judgment one way or the other.  I'm just
12  gaining facts so I can then go to Attorney Fenton and
13  say, "Okay.  I contacted SAU whatever.  This is the
14  book that's been complained about.  The book is in the
15  library.  What do you want to do?"
16  BY MR. KAHNE:
17  Q.  And that's happened more than once?
18  A.  Oh, sure.
19  Q.  And it's happened for multiple books?
20  A.  Multiple books.  Multiple school districts.
21  Q.  And each time you go and you speak with the
22  superintendent about the book being where it was
23  complained of, something similar?
24  A.  Yeah.  You know, is it in the high school library?  Is
25  it the middle school library?  Is it in the elementary

128

1  school library?  Those have bearings.  You know, those
2  are important facts to know.  Or is it even in the
3  building at all?  And is it in the SORA app?
4       So it's a fact-based question.  Is it there?
5  Isn't it there?  Once I get the facts, I provide it to
6  Diana Fenton for her review.
7  Q.  And just in the stage of, you know, sort of from the
8  code of conduct, what you're describing is not a formal
9  investigation, but it's when a complaint -- a case has
10  been opened because of a complaint?
11  A.  It's even before the case has been opened.  I mean, so
12  a parent is angry and upset about a book being in a
13  library.  So let's collect the data and determine
14  whether or not we even go to the triage phase.
15  Q.  Okay.  Has that happened with the commissioner
16  forwarding material, too, like, where the commissioner
17  forwards not A Good Kind of Trouble, but a commissioner
18  forwards some material and you then, to the
19  superintendent, say, "Is this book in your library?"
20  That kind of thing?
21  A.  Sure.
22       MR. KENISON-MARVIN:  Objection.  Vague,
23  compound.  You can answer.
24       THE WITNESS:  Okay.  We get them -- the
25  commissioner could forward it.  I could get it from a

129

1  parent. We can get them from grandparents. I mean, we
2  get them from all sorts of different places. And
3  before you even do the triage phase of this, you
4  determine what are the facts? And the facts are
5  important. And once the facts are presented, the
6  decision is made to leave the -- not even leave the
7  inquiry phase; go to triage or open a case. And so
8  it's a multi-step process. And when it comes to books,
9  you just get the facts.
10  BY MR. KAHNE:
11 Q.  Two more things, and I think we can wrap for your
12  non-lunch. The first is I just want to show you the
13  code of conduct, which I'm sure you're familiar with.
14     Actually, I'm going to give you two documents.
15  One is the code of conduct, which has been marked
16  Exhibit 2, and the other is Attorney General Opinion
17  which has been marked Exhibit 12.
18     MR. KENISON-MARVIN: Can we bring the
19  computer back?
20     MR. KAHNE: Oh, yes. Sorry. Sorry.
21     MS. MILBURN: Thank you.
22     MR. KENISON-MARVIN: Thank you.
23  BY MR. KAHNE:
24 Q.  So on the code of conduct piece, I just want to
25  understand this opt-in -- the subject matter of opt-in

130

1  and how it relates to the code of conduct. Does the
2  code of conduct have a provision relating to opt-in?
3 **A.  Not specifically.**
4 Q.  So how is that within -- you've testified that your
5  jurisdiction is the code of conduct, so I'm trying to
6  understand how do we know that opt-in is part of the
7  code of conduct?
8 **A.  The statute -- there's a statutory requirement that**
9  **there be parental notification and an opt-in. If that**
10  **doesn't occur, then the determination by my superiors**
11  **is that it's a possible code of conduct violation.**
12 Q.  Which -- which provision of the code would that
13  violate?
14     MR. KENISON-MARVIN: Objection. Legal
15  conclusion.
16     THE WITNESS: Well, again, you'd have to ask
17  my superior that. I just -- my bottom line is that
18  I've been told if there is a question about opting into
19  a nonacademic survey, we will investigate it as a
20  possible code of conduct violation.
21  BY MR. KAHNE:
22 Q.  Where does that instruction come from?
23 **A.  From Attorney Fenton, my direct supervisor.**
24 Q.  Is there any writing about that?
25 **A.  What do you mean?**

131

1 Q.  Is there a policy that says if there's an issue
2  relating to opt-in -- there's a violation of opt-in,
3  such violation will be considered a violation of the
4  code of conduct?
5 **A.  There's nothing in writing that I'm aware of.**
6 Q.  Have you had any conversations with the commissioner
7  about investigating -- about opt-in being a violation
8  of the code of conduct?
9 **A.  Yes.**
10 Q.  And what are the nature of those conversations that you
11  had?
12 **A.  Just he would --**
13     MR. KENISON-MARVIN: Objection. Vague.
14     THE WITNESS: Oh, yeah.
15     MR. KENISON-MARVIN: Deliberative process
16  objection to the extent it's asking for specifics about
17  deliberation.
18     MR. KAHNE: All right. Strike that.
19  BY MR. KAHNE:
20 Q.  Do you know whether this is a policy of the
21  commissioner's to look into the opt-in -- opt-in
22  violations as a violation of the code of conduct?
23 **A.  You'd have to ask the commissioner. I take my orders**
24  **at that -- at that level from Attorney Fenton. However**
25  **we get the complaint, we look to see whether or not**

132

1  **there's an opt-in. If there isn't, why not? Many**
2  **times it's resolved without any sanction.**
3 Q.  Exhibit 12. Yeah, Exhibit 12.
4 **A.  Okay.**
5 Q.  Just take a second to look at it. You don't have to
6  read the whole thing.
7 **A.  Okay.**
8 Q.  My question is have you seen this document before?
9 **A.  I don't know whether I have or haven't.**
10 Q.  What do you understand it to be?
11 **A.  Well, I didn't finish reading it, so...**
12 Q.  Okay. Do you use this opinion in any way in your
13  day-to-day work?
14 **A.  Since I don't believe I've read it before, I guess the**
15  **answer would be no.**
16 Q.  When you were referring earlier to the technical
17  advisory, I just want to be sure that this is not what
18  you were talking about.
19 **A.  I don't think this is what I was talking about. I**
20  **think what I was talking about was the FAQ sheet.**
21 Q.  Before when you were talking about books, you talked
22  about A Good Kind of Trouble. I think Queer -- what
23  was it? Queer?
24 **A.  Gender Queer.**
25 Q.  Gender Queer. Have you looked into Stamped?

133

1  A.  You know, I'm not sure.
2  Q.  You can't recall?
3  A.  I can't recall.
4  Q.  Possible?
5  A.  Possible.  Sure.
6  Q.  How to Be an Antiracist?
7  A.  I've seen that.
8  Q.  Have you looked into it, like --
9  A.  No.  I've seen it in a list of banned books.
10  Q.  Okay.  And is it a list of banned books that were part
11     of a fact gathering that you were doing?
12  A.  No, it's from the American Library Association most
13     banned books in the United States, and they list them.
14     So I've seen that title from the American Library
15     Association.
16  Q.  Okay.  But you haven't spoken to any superintendents
17     about it or anything?
18  A.  I don't believe so.
19       MR. KAHNE:  Okay.  Would now be a good time
20     to maybe break?  Is that good?
21       MR. KENISON-MARVIN:  Fine with me.
22       (Recess taken.)
23  BY MR. KAHNE:
24  Q.  I first want to ask you about the procedure for
25     referring complaints received by the Department of

134

1     Education to the Attorney General's office, okay?
2  A.  Sure.
3  Q.  Are you aware of any standard operating procedure for
4     complaints that come in for the -- to the DOE to be
5     referred to the Attorney General's office?
6  A.  No.
7  Q.  Are you aware of any agreement between the Attorney
8     General's office and the DOE regarding what types of
9     complaints can get referred?
10  A.  No.
11  Q.  Have you ever spoken to Attorney Fenton about such
12     standard operating procedure?
13  A.  Yes.
14  Q.  Okay.  What have you discussed with her?
15  A.  Be more specific.
16  Q.  So I just asked if you've discussed a standard
17     operating procedure for transferring complaints from
18     the DOE to the Attorney General's office with Attorney
19     Fenton.  Have you ever had conversations about that?
20  A.  We've had conversations, but there is no SOP that I'm
21     aware of.  Nothing formal.  There's no policy or
22     procedure regarding this agency notifying that agency.
23       Now, I know that there's been discussions about
24     that, but I don't know -- I don't believe there's been
25     any policy decision made.

135

1  Q.  And I think we discussed this earlier, but there is no
2     standard operating procedure for when a complaint gets
3     referred from the DOE to the HRC?
4  A.  We don't refer anything to DOE to HRC in my -- to the
5     best of my knowledge, we don't do that.
6  Q.  And why is that again?
7  A.  My understanding is that we don't have -- the HRC
8     doesn't believe that we have standing to do so, that
9     the individual complainant has standing, but that we,
10     as an agency, do not.
11  Q.  Does the commissioner have the power to unilaterally
12     open a case under the code of conduct?
13       MR. KENISON-MARVIN:  Objection.  Legal
14     conclusion.  You can answer.
15  BY MR. KAHNE:
16  Q.  Can Commissioner Edelblut open a case under the code of
17     conduct?
18       MR. KENISON-MARVIN:  Same objection.
19       THE WITNESS:  He has never done that.
20  BY MR. KAHNE:
21  Q.  And -- okay.  If -- in your view, if HRC makes a
22     determination that there's been a violation of HB 2, is
23     that an automatic violation of the code of conduct?
24       MR. KENISON-MARVIN:  Same objection.
25       THE WITNESS:  I don't believe so, but we

136

1     haven't conducted an investigation.  So if HRC comes
2     back with a finding, we would then determine is the
3     person involved a licensed educator?  If the person
4     involved is not a licensed educator, we have no
5     jurisdiction.  No standing.  No case.
6        We would do our process to determine if it's
7     a code of conduct violation, the finding that was made,
8     and, if there was a code of conduct violation, what
9     would the sanctions potentially be.  So that's a big
10     hypothetical situation that, by the way, has never
11     happened.
12  BY MR. KAHNE:
13  Q.  So you're saying after HRC would make a determination,
14     your understanding is that the Department of Education
15     would make an independent decision about whether that
16     violates the code of conduct?
17       MR. KENISON-MARVIN:  Same objection.
18       THE WITNESS:  I'm sorry.
19       MR. KAHNE:  Go ahead.
20       THE WITNESS:  The facts would -- the fact
21     would be, A, that they made a finding.  Now, what is
22     that finding?  B, let's look at the finding in light of
23     the code of conduct, determine through our process
24     whether it meets the criteria.  If so, what would any
25     sanction be?

137

1    So it would be -- they refer to us. Who
2  knows what their determination was? They've just made
3  a determination. We would then decide, investigate,
4  gather facts to determine is it, in fact, a code of
5  conduct violation.
6  BY MR. KAHNE:
7  Q.  And is that because the DOE has exclusive jurisdiction
8    to decide whether there's been a violation of the code
9    of conduct?
10    MR. KENISON-MARVIN:  Same objection.
11    THE WITNESS:  I think that a better way to
12  phrase it is that we have jurisdiction and control over
13  license status.
14  BY MR. KAHNE:
15  Q.  Is any other agency able to determine whether a license
16    holder has violated the code of conduct?
17    MR. KENISON-MARVIN:  Same objection.
18    THE WITNESS:  Well, I would -- again, this
19  is -- I'm not an attorney. However, I would say other
20  agencies would have a standing when it comes to Section
21  5 violations.
22    So, for example, if a police agency arrests a
23  teacher for one of the 20 identified Section 5
24  violations, they -- that alone would be enough for us
25  to take an immediate sanction on the license.

138

1    So they don't have jurisdiction over the
2  license, but their actions would have a direct bearing
3  on a required sanction by this agency.
4  BY MR. KAHNE:
5  Q.  Right, but the only agency that can actually issue
6    those penalties to the license holder is the Department
7    of Education?
8  A.  Well, again, that's not actually accurate. The
9    Department of Education doesn't take action or
10    sanctions. The state board of education ultimately
11    takes the sanction. So it's a common mistake, but the
12    Department of Education doesn't issue sanctions. The
13    state board ultimately issues sanctions.
14  Q.  So does it propose those sanctions?
15  A.  No, the Department of Education -- in the protracted
16    practice, the hearings officer will make a
17    recommendation based upon a hearing with the Department
18    of Education, me, Attorney Fenton, and witnesses, and
19    they would make a proposal to the state board after
20    that hearing for sanction. So the state board takes
21    the action.
22  Q.  Okay. Did there come a time when the Department of
23    Education sought subpoena power -- to grant subpoena
24    power to you as investigator?
25  A.  Yes.

139

1  Q.  When did that occur?
2  A.  This -- very recently.
3  Q.  It was in March?
4  A.  Yeah, I think I testified in front of the House
5    Judiciary Committee.
6  Q.  Why was that -- was the legislation supported by the
7    Department of Education?
8  A.  I guess.
9  Q.  Okay. And why was the subpoena power sought?
10  A.  I've been here 10 years, and everything I do here is
11    based on relationships and good faith working
12    relationships with superintendents and other
13    stakeholders, the union representatives, AFT. Attorney
14    Donovan's awesome to work with. The attorneys for NEA
15    are great.
16    So everything is about good faith and trust. And,
17    at a given point, all of that good faith and trust and
18    working relationships comes -- in the legal process
19    comes to an end. And we've been looking for -- I've
20    been looking for some level of subpoena power since
21    shortly after I arrived here. And it's not so much
22    that the field generally is obstructive. They're not.
23    Everybody wants to cooperate with these things because
24    my goal is to keep kids safe. But it's a practical
25    application.

140

1    And I'll give you some examples. Let's say a
2  local police department gets involved in a sexual
3  assault, and a teacher is involved in a sexual assault,
4  and there's an action. There's an arrest. There's a
5  conviction. And we are going to have a contested
6  hearing regarding that educator. The educator doesn't
7  want to surrender the licensing. We want the police to
8  come in and testify to what they did, what they saw,
9  and they're more than willing to do that.
10    However, as a practical matter, police officers
11  have days off. They work nights. They work weekends.
12  And the police chief will say to us, "Hey, I'm happy to
13  help, but my guy, he can't be there on Tuesday because
14  it's his day off. If you give me a subpoena, I can pay
15  him."
16    No subpoena, you're not going to get paid. So
17  it's a practical application.
18    Think about this also as an example. You have a
19  teacher in classroom 1, and that teacher is accused of
20  misconduct of some form or fashion, and teacher number
21  2 is a material witness to that action. Both of them
22  are represented by the American Federation of Teachers,
23  for example. And I have no subpoena power to have the
24  teacher in classroom 2 come in and testify at a
25  hearing. They can just tell me, "Sorry. No subpoena?

141

1  Sorry."
2       Now, it's a material witness and there's
3  absolutely nothing I can do to prevent that or to
4  change it.
5       There are sometimes documents involved and police
6  reports. They say, "Happy to help. You need to
7  generate a subpoena."
8       So far, I've been very fortunate because people
9  know me. I think most people trust that I'm doing the
10  right thing and they're cooperative. But there are
11  times when they're not. And I don't have the ability
12  to subpoena documents or persons. So it's a practical
13  matter as opposed to some nefarious evil, you know,
14  desire to go after teachers.
15 Q.  Sure. So I think you testified before the House
16  Judiciary Committee -- at the House judiciary hearing
17  that your subpoena power, while not limited in words,
18  would be limited to enforcing the code of conduct?
19 A.  Stay in my lane. Code of conduct.
20 Q.  Stay in your lane. Code of conduct.
21 A.  Correct.
22 Q.  Okay. And that would include using the subpoena for
23  any potential violations of the code of conduct by a
24  teacher?
25 A.  Yeah.

142

1 Q.  Yeah. Okay. When you were talking about that, you
2  said that you have to be careful that people weaponize
3  the code of conduct. Parents weaponize it on occasion.
4  School districts, perhaps. "We don't want to weaponize
5  the code. We want to stay within the bounds of the
6  code, and weaponizing it is a really bad idea."
7       Do you remember that?
8 A.  I stand by every word.
9 Q.  Okay. What did you mean by weaponizing the code of
10  conduct?
11 A.  I think that speaks for itself. I can give you
12  examples if you'd like.
13 Q.  Sure. Parents that are in the IEP process and -- or a
14  504, a combination process, and they're unsuccessful in
15  their efforts to change an IEP, get an IEP, or make
16  accommodation changes. In their zeal to protect their
17  child, they will then turn around and become aware of
18  the code of conduct and allege misconduct because the
19  door for due process in the IEP, for example, process,
20  has closed. So we can open a door alleging misconduct.
21       That's what weaponizing the code of conduct is.
22  And I don't think we should weaponize the code of
23  conduct. We have educators -- I'll give you a very
24  good example. You understand the code of conduct
25  didn't exist until 2018, and, for all intents and

143

1  purposes, January 1st of 2019. Prior to that, if a
2  teacher broke their contract with a school district,
3  that was actually a possible code of conduct violation.
4  It no longer is.
5       Currently, because of the circumstances with
6  teacher shortages, superintendents have contacted this
7  agency and said, "Teacher X has violated the contract.
8  I want to file a code of conduct violation." That's
9  weaponizing the code. It doesn't exist any longer.
10       So I don't want superintendents weaponizing it. I
11  don't want teacher-on-teacher weaponizing it. I don't
12  want parents weaponizing it. And I don't want anybody
13  at the Department of Education to do that, either.
14  Stay within the bounds of what the code talks about.
15 Q.  What about parents who disagree with curricular
16  decisions? Would that -- and lodge a code of conduct
17  violation? Would that be weaponizing the code of
18  conduct?
19 A.  It depends on what the complaint is. I mean, every
20  complaint's different. You'd have to give me a fact
21  pattern. But, I mean, potentially, sure. Parents
22  could weaponize the code of conduct. Parents -- by --
23  because of curriculum. They could weaponize the code
24  of conduct because of books in libraries. They can do
25  anything they want. That's why I think it's critically

144

1  important to narrow the scope and really work against
2  weaponizing that code.
3 Q.  Give me a second here.
4       So I've previously showed this to you. It's sort
5  of what we've been discussing a lot of today. And I
6  just want you to look at it for a minute, review it.
7       What I'm specifically going to refer to is on
8  00005.
9 A.  Okay.
10 Q.  Sorry, give me one second. Okay. I'm sorry. 000006.
11  And 91:298 says, "New section. Prohibition on teaching
12  discrimination."
13       Do you see it?
14 A.  I do.
15 Q.  And you've reviewed this before? Have you seen it
16  before?
17 A.  I have.
18 Q.  Okay. I just want your understanding as to what this
19  banned concept -- these are four banned concepts, A, B,
20  C, and D? Have you heard it referred to as four banned
21  concepts?
22 A.  I have.
23 Q.  Okay. If you look at banned concept four, which is in
24  D, could you read that and tell me what you believe is
25  prohibited under subsection D?

145

1  A.  Beginning with that "People of one age, sex, gender,
2     identity, sexual orientation, race, creed, color,
3     marital status, familial status, mental, physical
4     disability, religion or national origin cannot/should
5     not attempt to treat others with regard to age, sex,
6     gender," et cetera.  Okay.
7  Q.  What does that mean to you?
8        MR. KENISON-MARVIN:  Objection to the legal
9     conclusion.  You can answer.
10       THE WITNESS:  What exactly are you asking me?
11  BY MR. KAHNE:
12  Q.  What can't a teacher teach under that subdivision?
13  A.  I have no idea.  I have no idea.
14       MR. KAHNE:  All set.  Yeah.  I'm going to
15    turn it over to --
16       MR. BISSONNETTE:  Thank you, Mr. Farrell.
17           EXAMINATION
18  BY MR. BISSONNETTE:
19  Q.  I know that we've met once or twice before, but my name
20    is Gilles Bissonnette, and I'm counsel to a separate
21    plaintiff's group in this case against two individuals,
22    Andres Mejia and Tina Philibotte.
23       Thank you again for coming in today.  I know we're
24    at the tail end of this, but we all do appreciate it.
25       I'm going to ask you some questions.  I'm going to

146

1     do my absolute best to not duplicate anything that's
2     been covered, I think.
3  A.  Okay.
4  Q.  That's only fair to you and to everyone in this room.
5        So I just have a few topics that I want to cover
6     in addition to just a few additional documents that I
7     want to present to you.  So can I begin?
8  A.  Sure.
9  Q.  I want to just kind of close the loop on some of the
10    questions you've received about the standard operating
11    procedure.  So what I would like to do, if it's okay
12    with you, is just turn your attention to Exhibit 6,
13    please.
14       If you have Exhibit 6, I'm going to turn your
15    attention to the page that's Bates stamped PL806.
16       Let me just say at the outset, Mr. Farrell, that
17    I'm going to represent to you that you this is a transcript
18    of the House Judiciary Committee hearing on HB 533 that
19    took place on March 8, 2023.  I believe you were in
20    attendance at that hearing, correct?
21  A.  Correct.
22  Q.  And what Exhibit 6 is is just a transcript, not of the
23    complete hearing, but just certain portions.
24  A.  Okay.
25  Q.  Okay?  So I would like to direct your attention to page

147

1     806.  And in the bottom left portion of the document,
2     page 19 of the quadrants on the page, Attorney Fenton
3     publicly stated, "And in working with Representative
4     Lynn and in working with the Attorney General's office
5     on the original House Bill 533, we have since worked
6     with the AG's office to come up with an SOP as to how
7     we'd transfer those cases to the Human Rights
8     Commission and the AG's office."
9        Do you see that?
10  A.  I do.
11  Q.  That statement?
12  A.  I do.
13  Q.  Are you aware of a meeting that took place in February
14    of 2023 before this hearing about a procedure by which
15    complaints would get transferred to the Human Rights
16    Commission and the AG's office?
17  A.  I was not aware.  I'm not sure what you're talking
18    about, but I wasn't part of any of that type of a
19    meeting.
20  Q.  So you weren't involved in a meeting with Attorney
21    Fenton and Sean Locke with the Department of Justice
22    about a procedure that would exist to transfer cases to
23    the Human Rights Commission and Department of
24    Justice?
25  A.  I was not involved in that meeting at all.

148

1  Q.  So you never saw, on or about February 14th, 2023, any
2     document that was prepared by Attorney Locke
3     memorializing and understanding among all of those
4     offices about how cases would be transferred?
5  A.  I don't believe I was, no.
6  Q.  Okay.  Do you have any -- just so I understand your
7     testimony, you have no knowledge of that meeting?
8  A.  I knew about the meeting after it happened, but I was
9     not a participant in the meeting.
10  Q.  Who did you -- who talked to you about that meeting
11    after it occurred?
12  A.  I would imagine -- the only person I would have talked
13    to is Diana Fenton.
14  Q.  What did Ms. Fenton say about that meeting?
15  A.  I don't recall directly.  I don't know that there was a
16    resolution.  I still don't know whether there's a
17    resolution.
18  Q.  Okay.  Besides that conversation that you had after
19    that meeting with Ms. Fenton, have you had any other
20    internal conversations within the Department about any
21    agreement that may have been reached at that meeting?
22  A.  To the best of my knowledge, no.
23  Q.  How long did that discussion with Ms. Fenton occur
24    about that February meeting?
25  A.  Well, it wasn't a meeting.  It was -- it was a brief

149

1    conversation.
2    Q.  Brief conversation.  Couple minutes?
3    A.  Couple minutes.
4    Q.  Okay.  Thank you.  I appreciate that.  I'm going to
5        move on.  I can play the video if you want -- and I'm
6        switching gears.  Well, strike that.  I'm just going to
7        ask this question.
8            If I'm a teacher, and I want to sign a book, and
9        I'm unsure if it's covered under HB 2, could I call the
10       Department of Education and get an answer as to whether
11       a book is covered or not?
12   A.  I don't know the answer.  I know I have never taken
13       such a call.
14   Q.  Okay.
15   A.  And in terms of whether they can, or can't, or if they
16       have, I don't know.  I've never been involved in
17       that.
18   Q.  If you received a call about whether this book, this
19       antiracist, is covered under the law, and I'm thinking
20       about teaching it, how would you respond today to that
21       type of inquiry?
22   A.  A teacher calls me?
23   Q.  Yes, sir.
24   A.  My first -- the first thing I think I would do is refer
25       her or him back to the superintendent because it was --

150

1        it'd be more of a curriculum question.
2    Q.  So what if that superintendent called you and said, "A
3        teacher has reached out to me about whether a book is
4        covered under HB 2, and I'm looking for guidance from
5        the Department as to whether it's covered or not," how
6        would you respond to that question?
7    A.  I would do probably two things:  I would say, "You have
8        an attorney that you hired.  Get a hold of your
9        attorney."
10           And the second thing I would do is "Perhaps you
11       should talk directly to my attorney, Attorney
12       Fenton."
13   Q.  So besides inviting that superintendent to reach out to
14       his district counsel, your other likely response would
15       be to talk to your supervisor?
16   A.  Correct.
17   Q.  Any other potential responses you think you'd give
18       beyond those two referrals?
19   A.  That's it.
20   Q.  I'm just going to refer you as well, Mr. Farrell, to --
21       let me just try to identify the exhibit.  Exhibit 10.
22       And I'll just freely acknowledge, Mr. Farrell, you are
23       not on this email.
24   A.  Thanks.
25   Q.  But I would like you to take a look because I just have

151

1        some questions about Department procedure.
2    A.  Okay.
3    Q.  Take a look at it, and when you're done, please let me
4        know.
5    A.  Okay.
6    Q.  So I would just submit that this is an email from
7        someone from SAU 4 asking Attorney Fenton as to whether
8        or not there's someone at the DOE who can speak with a
9        teacher and principal here in Newfound with specifics
10       about what she can say or not say regarding issues that
11       might pertain to divisive concepts.
12           Do you see that at the bottom of the document --
13       document 807 of Exhibit 10?
14   A.  Yeah.  Pierre Couture talks to Diana Fenton, who
15       responds.
16   Q.  Yeah.  Have you ever seen this email before?
17   A.  No.
18   Q.  Were you ever aware that Attorney Fenton had a
19       conversation with Pierre Couture, the superintendent of
20       Newfound area school district?
21   A.  Say it again?
22   Q.  Are you aware that Ms. Fenton had a conversation with
23       the superintendent in SAU 4?
24   A.  No.
25   Q.  Okay.  Were you aware that Ms. Fenton told the

152

1        superintendent -- expressing thanks for reaching out
2        but that divisive concepts is handled by the Human
3        Rights Commission?
4    A.  That --
5    Q.  I'm just asking are you aware --
6    A.  No, no.
7    Q.  I'll say it again just so we can have a clean record.
8    A.  I've got it now.  No, I am not aware that she had this
9        conversation with Pierre and that Pierre was referred
10       to the HRC.
11   Q.  Okay.
12           MR. BISSONNETTE:  I'll mark two additional
13       exhibits.
14           (Exhibits 31 and 32 marked for
15       identification.)
16       BY MR. BISSONNETTE:
17   Q.  Can I just ask you to read just the cover emails on the
18       top of both Exhibits 31 and 32 and just let me know
19       when you're done, please?
20   A.  You want me to do what now?
21   Q.  Sorry.  Just read the front pages of Exhibits 31 and
22       32.
23   A.  Oh, okay.
24   Q.  Thank you.
25   A.  Okay.



153

1  Q.  My question is have you seen either of these documents
2      before?  I know you're not on there, but have you seen
3      them before?
4  A.  I've seen 31 before.
5  Q.  And with respect to 31, Exhibit 31, I know that there
6      are not attachments on Exhibit 31, but if I refer you
7      to the attachments to Exhibit 32.
8  A.  Yes.
9  Q.  Would those attachments have been the attachments that
10     would have been affixed to Exhibit 31?
11 A.  I think so.
12 Q.  Okay.  Not a trick question.  I thought so, I just -- I
13     just wanted to confirm.
14         When did you see Exhibit 31?
15         Maybe I'll ask it this way.  Withdraw that
16     question.
17
18
19
20
21
22
23
24
25

154

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20 Q.  Okay.  Do you recall any investigation being conducted
21     by the Department in response to this complaint?
22 A.  I do not believe any investigation was conducted.
23 Q.  Setting aside the term "investigation."  Do you recall
24     any specific contact that you may have had with anyone
25     within that school district about the complaint?

155

1
2
3
4
5
6
7
8
9
10
11
12
13 Q.  Anything else that you recall about -- anything else
14     that you can recall that you haven't testified to today
15     with respect to how the Department has handled the
16         complaint in Exhibit 31 and 32?
17 A.  I have nothing more to give.
18         MR. KENISON-MARVIN:  I don't want to
19     interrupt.  Maybe we can do this later.  I'm just
20     forgetting the exact provisions of the protective order
21     with respect to information -- if we're marking it
22     confidential for purposes of the deposition.  We can do
23     that later.
24         MR. BISSONNETTE:  I have to look at the
25     provision.  Can we go off the record?

156

1         (Discussion off record.)
2         MR. BISSONNETTE:  I'm going to introduce an
3      exhibit.  What number are we at?
4         THE REPORTER:  33 is next.
5         (Exhibit 33 marked for identification.)
6  BY MR. BISSONNETTE:
7  Q.  Mr. Farrell, I'll just ask you to take a look at
8      Exhibit 33.  Just let me know when you're done.
9         And after you reviewed that -- again, so as to not
10     hide The ball, I'm also going to ask you to look at
11     Exhibit 19, so I don't know if you have that.
12         So no need for you to read all of this, but my
13     reading of Exhibits 19 and 33 suggest that there's a
14     complaint about a book A Good Kind of Trouble.  And so
15     my question to you is were you familiar with a
16     complaint that a parent submitted concerning the book A
17     Good Kind of Trouble?
18 A.  I don't remember the first one -- the first complaint
19     was September 30th, yes?  From Ms.              .  Mr.?
20     I was not involved in any of that email chain at all.
21     I don't know what --
22 Q.  What I'm referring to, if you can just look on Exhibit
23     19, page 72?  I recognize that you're not on this
24     email, but I don't want my questions to be viewed as
25     shots in the dark here as to why I'm asking them.

157

1    But there's language on Exhibit 19, page 72, where
2 an individual is complaining about the book A Good Kind
3 of Trouble.  Do you see that language beginning with
4 the paragraph regarding the book A Good Kind of
5 Trouble?
6 **A.  Yes.  I'm looking at it now.**
7 Q.  Gotcha.  And this is an email lodging a complaint
8 arising out of SAU 16; is that correct?
9 **A.  SAU 16?**
10 Q.  Yes.
11 **A.  Yeah.**
12 Q.  So I guess my question to you is were you aware --
13 setting these emails aside, were you aware of a
14 specific complaint in SAU 16 concerning the book A Good
15 Kind of Trouble?
16 **A.  I honestly -- this is new to me.**
17 Q.  Okay.
18 **A.  Unless you can show me somewhere where these were**
19 **forwarded to me, this is brand-new to me.**
20 Q.  I cannot.  And so what I'm asking is did you --
21 **A.  No.**
22 Q.  Were you involved in any investigation concerning the
23 book A Good Kind of Trouble?
24 **A.  No.**
25 Q.  Okay.  That's all I'm trying to get at.

158

1 **A.  I'm actually kind of surprised my name isn't on some of**
2 **that stuff.**
3 Q.  With respect to Exhibit 33, if you just look at page
4 one, Commissioner Edelblut writes to Ms. ████████
5 saying, "I met with the school last week on October
6 25th, 2021."
7    Do you know what Commissioner Edelblut is
8 referring to in that email?
9 **A.  I have no idea.**
10 Q.  He also says, "Know that I have read the book and we
11 are taking appropriate action."
12    Do you know any action that Commissioner Edelblut
13 has taken in response to this complaint?
14 **A.  No.**
15 Q.  Thank you.  I'm going to refer you to Exhibit 16.  This
16 is an email that you were on, but I'd just ask you to
17 take a look at it and let me know when you've finished
18 reading it.
19 **A.  Okay.**
20 Q.  So this is an email.  The bottom portion of page 59 is
21 an email from Ms. ████ to various individuals
22 concerning a complaint arising out of Hollis.  And
23 Commissioner Edelblut elevates this to Ms. Fenton who
24 then responds, "Thank you.  We will look into it."
25    Is that -- did I accurately describe generally

159

1 what Exhibit 16 is?
2 **A.  Yes.**
3 Q.  Okay.  Do you know what, if anything, the Department
4 did in response to this complaint from Ms. ████████?
5 **A.  I do not.**
6 Q.  Did you ever speak to Ms. ████ about this Hollis
7 complaint?
8 **A.  No.**
9 Q.  Did you ever engage -- did you ever have a
10 communication with anyone that works for a public
11 school in Hollis about this complaint?
12 **A.  I don't remember communicating with anybody about this**
13 **complaint.**
14 Q.  Okay.  Do you have any internal communications within
15 the Department about this complaint?
16 **A.  If I did, it would have been with Attorney Fenton, but**
17 **I don't recall.**
18 Q.  When Ms. Fenton says, "We will look into it," do you
19 know what Ms. Fenton did in response to this
20 complaint?
21 **A.  That's a pretty standard response --**
22 Q.  Okay.
23 **A.  -- that Diana would give, I mean, with any kind of**
24 **communication.**
25 Q.  Gotcha.

160

1 **A.  So what she did after this email, I have no idea.**
2 Q.  You don't know.  Okay.  Thank you.  Done with that.
3 I'm also going to refer you to Exhibit 15.
4    So, Mr. Farrell, just take a look at Exhibit 15.
5 When you're done reviewing it, let me know.
6 **A.  Okay.**
7 Q.  And I would just represent to you, and correct me if
8 you think this is inaccurate, that what Exhibit 15 is
9 is an email from Matt Carney to Commissioner Edelblut
10 articulating various concerns, and Commissioner
11 Edelblut then forwards that email with a sentence of
12 commentary on his part.  He sent it to Diana Fenton,
13 copies you and Christopher Bond; is that correct?
14 **A.  Correct.**
15 Q.  Okay.  I want to refer you to the line at the bottom of
16 page 9586 on Exhibit 15 in which a complaint is made
17 about the film White Like Me by Tim Wise.  And then the
18 email goes on to say, "This film emphasizes white
19 privilege and equates conservativism with white
20 supremacy.  The film should not be shown at all as it's
21 clearly CRT and in direct violation of NH Bill HB 2,
22 sections 237 and 298, right to freedom from
23 discrimination in public workplaces in education."
24    Do you see that language at the bottom of the
25 page?

161

1   A.  I do.
2   Q.  Do you recall what, if anything, the Department did in
3       response to that specific concern that was raised?
4   A.  I don't recall anything that was done regarding
5       paragraph two.
6   Q.  Do you recall any communications that you were a party
7       to within the Department about the film White Like Me
8       by Tim Wise?
9   A.  No.
10  Q.  Did you -- with respect to the complaint about that
11      film, did you ever have any conversations with anyone
12      in Keene employed by that school district about that
13      film?
14  A.  About paragraph two, or the film?
15  Q.  Yes, sir.
16  A.  No.
17  Q.  With respect to that email in its entirety that
18      Mr. Carey submitted to Commissioner Edelblut, did you
19      have a conversation with anyone employed within the
20      Keene school district?
21  A.  We -- I had discussions with Rob Malay, the
22      superintendent, and I had conversations with Cindy
23      Gallagher. She's the principal. But it didn't -- I
24      didn't address paragraph two. It was more about the
25      allegations of violence and fights and fight clubs and

162

1       filming violence in the school.
2   Q.  Do you recall -- in speaking with Superintendent Malay,
3       do you recall any reference to the film?
4   A.  I, honestly, focused on the allegations about violence
5       in the school and classrooms.
6   Q.  So do you recall asking any questions about the film?
7   A.  I don't recall.
8   Q.  Did Ms. Gallagher -- same question. Do you recall
9       asking any questions about the film White Like Me?
10  A.  No, I was focused on the rest of the complaint.
11  Q.  Okay.
12          MR. BISSONNETTE: Can I go off the record for
13      just one minute, please?
14          (Discussion off record.)
15  BY MR. BISSONNETTE:
16  Q.  I am going to refer you to an exhibit that was
17      previously marked as Exhibit 4. And I know that you're
18      taking a look, Mr. Farrell, at this exhibit. I can
19      just tell you that it was an op-ed published by the
20      commissioner on June 13th, 2021. My question just will
21      be before today, had you read this op-ed before?
22  A.  Have I read it before? Yes.
23  Q.  When did you read this op-ed?
24  A.  After it was published.
25  Q.  Okay. So I'm going to just direct your attention to a

163

1       provision of the op-ed that says -- that references the
2       book by Ibram Kendi How to Be an Antiracist. Do you
3       see that?
4   A.  Whereabouts? Oh, I see.
5   Q.  Sure. It's in -- you got it? Okay.
6   A.  Yep.
7   Q.  My question is is that -- have you read that book
8       before?
9   A.  I've read portions of the book and reviews of it, but I
10      haven't read the entire book.
11  Q.  Did you read the portion of the book in which Mr. Kendi
12      states -- and this is quoted by Commissioner
13      Edelblut -- "The only remedy to racist discrimination
14      is antiracist discrimination."
15  A.  Yeah, I think so.
16  Q.  Why did you read the book?
17  A.  It was -- the book itself is circulating in the agency.
18      It had been talked about before. And, as I said
19      earlier --
20          MR. KENISON-MARVIN: I am going to object and
21      just instruct him not to answer that question on the
22      basis that he was asked to review it for some sort of
23      deliberative purpose to have a discussion with other
24      agency staff about an issue related to the book.
25          So to the extent your answer calls for that

164

1       deliberative type of information about why you're doing
2       something, I would instruct you not to answer.
3           MR. BISSONNETTE: Let me just ask a question
4       about that.
5           MR. KENISON-MARVIN: Sure.
6   BY MR. BISSONNETTE:
7   Q.  When did you read the book?
8   A.  I didn't read the entire book.
9   Q.  Sorry. When did you read portions of the book? Thank
10      you for your correction.
11  A.  So I read portions of the book because it was -- it
12      came up in the agency, and I wanted to educate myself
13      as to what the book was about.
14  Q.  When did it come up in the agency? Before or after the
15      op-ed was published?
16  A.  I honestly don't remember.
17  Q.  Did it come up in the context of a specific complaint
18      that was made to the department?
19  A.  I don't think so.
20          MR. BISSONNETTE: Okay. So I'm actually
21      going to ask that question again because I don't think
22      that deliberative process privilege now applies in
23      light of those responses.
24  BY MR. BISSONNETTE:
25  Q.  So do you remember specifically why you read the book?

165

1    Was it just because it was being discussed within the
2    Department?
3    A.  Yeah.  I try to -- I try to educate myself on things
4    that are coming into the agency.
5    Q.  Who was discussing this book within the Department?
6    A.  I honestly don't recall.
7    Q.  Were you involved in discussions with -- strike that.
8        Were you a party to discussions in which the
9    commissioner referenced How to Be an Antiracist?
10   A.  I'm trying to recall if that -- if the author came up
11   during an educator misconduct meeting, but not related
12   to a complaint, but related to a misconduct meeting
13   generally.
14   Q.  Do you know one way or the other --
15   A.  No.
16   Q.  -- sitting here today?
17   A.  No.
18   Q.  Do you think the portions of the book that you read of
19   Dr. Kendi's How to Be an Antiracist would be covered
20   under HRC?
21       MR. KENISON-MARVIN:  Objection to legal
22   conclusion.  You can answer.
23       THE WITNESS:  That the book itself was an HB
24   2 violation?
25       MR. BISSONNETTE:  Well, start with the

166

1    portions that you read.
2        THE WITNESS:  I didn't have a complaint.
3        MR. BISSONNETTE:  Okay.
4        THE WITNESS:  So I don't know that I would
5    have ever made that inquiry.
6        BY MR. BISSONNETTE:
7    Q.  Okay.  If I were a teacher, though, and I read
8    Commissioner Edelblut's op-ed, and I read the book How
9    to Be an Antiracist, and I thought I would want to
10   include it in a high school class, how would I get an
11   answer as to whether that book is covered or not?
12   A.  Well, I think I would begin at the local level.
13   Q.  Okay.
14   A.  I would go to my principal or my department head,
15   principal, curriculum director, superintendent, and the
16   local elected school board.
17       I think it's important to note that New Hampshire
18   is a local-control state, and I would think that that
19   would be my first series of steps.
20   Q.  And if I were a teacher and I couldn't get that answer
21   from my superintendent, could I get that answer from
22   the Department of Education as to whether or not this
23   particular book is covered under HB 2?
24   A.  I think that that question would ultimately go to Diana
25   Fenton.

167

1    Q.  Okay.
2    A.  And I would defer to her expertise in answering the
3    question.  I certainly wouldn't answer the question.
4    Q.  Okay.  Do you think it would be reasonable for an
5    educator reading this op-ed to think that the book How
6    to Be an Antiracist is covered under HB 2?
7        MR. KENISON-MARVIN:  Objection.  Vague and
8    legal conclusion.  You can answer.
9        THE WITNESS:  I honestly -- I couldn't put
10   myself in that position right now.  Maybe 30 years ago,
11   maybe I could, being a teacher, but, right now, I don't
12   think I could answer that question honestly.
13       BY MR. BISSONNETTE:
14   Q.  Okay.  I know that you testified before that you were
15   unsure whether this book came up in the context of a
16   misconduct meeting.  My question is why would it
17   potentially have come up in a misconduct meeting?
18   A.  These meetings -- the meeting themselves talk about
19   current cases, status of the current cases, direction,
20   conclusions, and then they devolve into other topics of
21   discussion.  And so it's not -- those monthly meetings
22   are not limited to the ongoing cases that we have.
23   They kind of devolve into other things.
24   Q.  Are you aware of this book ever having been used in a
25   public school, whether at the instruction level or the

168

1    staff training level?
2    A.  I do not.
3    Q.  Okay.  I'm going to direct your attention as well --
4    thank you for that, Mr. Farrell -- to Exhibit 14 which
5    is the thick document that I know was before you
6    before.  And I am going to direct your attention to the
7    pages Bates stamped 741 to 745.
8    A.  Topic eight?
9    Q.  Yes.  Yes, sir.
10   A.  Okay.
11   Q.  I would just represent to you, Mr. Farrell, that this
12   is, you know, one of the topics that was attached to
13   Commissioner Edelblut's April 15, 2022, op-ed.  And I'd
14   also represent to you that what those pages are, they
15   are chapter 10 of a book, This Book is Antiracist by
16   Tiffany Jewell.
17       I just have it right here.  My question to you is
18   have you seen this chapter before?
19   A.  I don't remember seeing this chapter, no.
20   Q.  So you don't recall reading it before?
21   A.  No.
22   Q.  Okay.  Have you been involved in any Department of
23   Education meetings in which this chapter was
24   discussed?
25   A.  I never read it and I don't remember being involved in

169

1      a discussion about it.
2  Q.  Do you attend board of education meetings?
3  A.  I try not to.
4  Q.  Okay.
5  A.  I attend one a year for sure.
6  Q.  Fair enough.  So what I'm going to represent to you is
7      that portions of this chapter were read by the
8      commissioner during a July 8, 2021, board of education
9      meeting.  So my question is did you attend that
10     meeting?
11 A.  I did not.
12 Q.  Okay.  Thank you.  I appreciate it.  I just have one
13     last question.  Have you ever had any communications
14     with your Department of Education colleagues about
15     instruction that had occurred in New Hampshire that
16     would be banned by HB 2?
17 A.  You know, I don't believe we've ever had that direct
18     conversation.  With me, anyway.
19 Q.  Sure.  Have you been involved in any communications
20     within the Department of Education about specific books
21     that were taught before HB 2 but now couldn't be taught
22     because of HB 2?
23 A.  I've never had a conversation.
24 Q.  Okay.  Have there been any discussions about books that
25     were taught before HB 2 that potentially now could be

170

1      banned under HB 2?
2  A.  No.
3  Q.  Do you know -- you read exhibit -- Exhibit 16 which is
4      Commissioner Edelblut's op-ed?
5  A.  Yes.
6  Q.  Fair to say that he supported HB 2, correct?
7  A.  You really have to ask him.  I mean, you could read and
8      make assumptions, but you'd have to ask him.
9  Q.  I'm asking what your assumption is after having read
10     Exhibit 4.
11 A.  I don't think he's opposed to HB 2.  I really don't
12     know.  He's an interesting person, so I don't really
13     know what -- I just -- I can't answer that question.
14 Q.  I'm not trying to hide the ball.  What I'm --
15 A.  I know.
16 Q.  -- trying to get at specifically are the types of
17     instruction that HB 2 was trying to get at that now can
18     no longer be implemented in New Hampshire.  So that's
19     really what I'm trying to get at.
20     So based on your communications with Commissioner
21     Edelblut, are you aware of any instruction that
22     previously occurred in New Hampshire before HB 2 that
23     now could not occur in New Hampshire?
24 A.  I don't know of any.
25     MR. KENISON-MARVIN:  I'm going to object on

171

1      legal conclusion grounds.  You can answer.
2      THE WITNESS:  Yeah, I honestly don't know of
3      any.
4  BY MR. BISSONNETTE:
5  Q.  You don't know one way or the other?
6  A.  No.
7      MR. BISSONNETTE:  Okay.  I'm going to turn it
8      over to my colleague who's going to address another
9      segment of the case and then, hopefully, we'll be
10     done.
11     MR. KENISON-MARVIN:  Depending on how long, I
12     do need to run to the restroom at some point unless
13     you're going to be a couple minutes.
14     MS. MILBURN:  Yeah, let's take a break.
15     (Recess taken.)
16     EXAMINATION
17 BY MS. MILBURN:
18 Q.  Hi, Mr. Farrell.
19 A.  Hi.
20 Q.  My name is Tina Milburn, and I represent one of the
21     plaintiffs in this case, the American Federation of
22     Teachers, along with David Kahne.
23     I know it's been a long day, so I'm going to try
24     and be brief, but I'm going to be asking you some
25     follow-up questions on your testimony from earlier, and

172

1      also some questions specifically related to the claims
2      that the AFT has brought in this case.  The same rules
3      that applied with Mr. Bissonnette and Mr. Kahne apply
4      with respect to my questions.
5  A.  Okay.
6  Q.  Okay.  Great.  So if I understood your testimony from
7      earlier today, you stated that the DOE does not
8      formally investigate teachers for violations of HB 2
9      until there's been a finding by the HRC; is that fair
10     to say?
11 A.  Yes.
12 Q.  I want to show you a new exhibit.
13     (Exhibit 34 marked for identification.)
14 BY MS. MILBURN:
15 Q.  So I want to direct your attention to DOE705.  This is
16     an email chain between you and Terri Donovan.  Do you
17     know who Terri Donovan is?
18 A.  Oh, sure.
19 Q.  Who is Terri Donovan?
20 A.  Terri Donovan is an attorney for the American
21     Federation of Teachers.  She's a sweetheart.  I'm going
22     to a training for her on June the 7th.
23 Q.  So Terri Donovan asks, "I'm curious how many complaints
24     over the new law have been received."  And that's at
25     the bottom of the DOE 705.

173

1      And then your response is that "I have not
2  undertaken any formal investigation related to the
3  divisive concepts."
4      Do you see that?
5  A.  Let's start again.
6  Q.  The bottom of the first page, 705.
7  A.  Okay.  Terri Donovan says, "I understand the HRC part."
8  Q.  Right.  She says, "I'm curious how many complaints over
9     the new law have been received."
10 A.  All right.  And my response is above, correct.
11 Q.  Correct.  And in your response, you say, "I have not
12    undertaken any formal investigation related to divisive
13    content."
14 A.  Correct.
15 Q.  Is that right?
16 A.  Yeah.
17 Q.  Were there any informal investigations related to the
18    divisive content?
19 A.  No.
20 Q.  That's it with this.
21 A.  Okay.
22 Q.  So you previously testified that you were a high school
23    English teacher; is that right?
24 A.  Was, yes.
25 Q.  And how many teachers -- or is it fair to say that you

174

1  have a good understanding about what a teacher's
2  day-to-day work looks like based off of that
3  experience?
4  A.  Sure.
5  Q.  They interact with students outside of the classroom?
6  A.  Yes.
7  Q.  Is that correct?  In hallways?  In the hallway --
8  A.  Yeah.
9  Q.  -- for example?  In a schoolyard?  Lunch room?
10 A.  Yes.
11 Q.  In a library?
12 A.  Yes.
13 Q.  What do you consider to be part of the school
14    curriculum, in your view?
15 A.  I don't understand the question.
16 Q.  There -- schools have curriculums; is that right?
17 A.  Yes.
18 Q.  What do you consider that to entail?
19 A.  A curriculum meaning subjects taught, the way they're
20    taught.  Curriculum would deal with credit hours,
21    requirements for graduation, and the subsets in each --
22    in each field.  So that would be curriculum.
23 Q.  I'm going to show you what's been previously marked as
24    Exhibit 24.
25 A.  Okay.

175

1  Q.  If you could turn to the second page?  Do you recognize
2     this document?
3  A.  The FAQ?
4  Q.  Correct.
5  A.  Yeah.
6  Q.  If you could go to item number eight?
7  A.  Yes.
8  Q.  It discusses that this law applied to all school
9     activities, or just teaching?
10 A.  Okay.
11 Q.  And it says, "The prohibitions apply to all activities
12    carried out by public schools in their role as public
13    schools, including extracurricular activities that are
14    part of the public school's work," correct?
15 A.  Correct.
16 Q.  How would you define "extracurricular activities"?
17 A.  Extracurricular activities could be anything from
18    sporting situations, coaching, dance, plays.  Anything
19    that happens -- better way to put it.  Anything that
20    happens within the confines of the definition of the
21    Safe Schools Act.  So anything -- if it's defined as a
22    safe school, the property of the Safe Schools, anything
23    that happens within the confines of that Safe Schools
24    Act would apply.
25 Q.  Okay.  I'm not familiar with the Safe Schools Act.

176

1  A.  Safe schools basically says that Safe Schools -- the
2     Safe Schools Act talks about where -- what is a school?
3     What is the definition of the curtilage of the school?
4        So, for example, under the Safe Schools Act, a
5     teacher on a bus to and from a field trip, that's Safe
6     Schools.  That's covered.  A teacher that's becoming a
7     coach and working as a coach, theater, drama.  Anything
8     within the curtilage or the extended portion of a
9     school.
10       It gets kind of creative because many hockey
11    programs -- for example, hockey rinks are not --
12    they're private facilities, but if a hockey team for a
13    high school is playing and/or practicing on that
14    facility, it becomes an extension of Safe Schools.
15       So I would say the answer to that would be
16    anything that falls within the curtilage of the Safe
17    Schools definition.
18 Q.  Understood.  So just to provide some clarification, an
19    after-school debate club, for example, would be
20    considered an extracurricular activity?
21 A.  Sure, yes.
22 Q.  Discussion with a student in the library?
23 A.  Yeah.
24 Q.  Any activity after school hours?
25 A.  Yes.

**177**

1  Q.  Anything outside of school property?

2  **A.  As long as it's covered under the Safe Schools, yes.**

3  Q.  Understood.

4      Okay.  Does the statute apply -- does the HB 2

5  apply to a teacher's expression of their personal

6  beliefs in the classroom, in your view?

7      MR. KENISON-MARVIN:  Objection.  Legal

8  conclusion.  You can answer.

9      THE WITNESS:  Say it again now?

10 BY MS. MILBURN:

11 Q.  If a teacher is expressing their own personal beliefs

12 on a particular subject in the classroom, could HB 2

13 apply to what they're saying?

14     MR. KENISON-MARVIN:  Same objection.

15     THE WITNESS:  I don't think I have enough

16 information to give you a reasonable response.

17     MS. MILBURN:  I'll give you an example.

18     THE WITNESS:  Okay.

19 BY MS. MILBURN:

20 Q.  Let's say a teacher says that they like the book How to

21 Be an Antiracist in the classroom.  Could that be

22 covered by the statute?

23     MR. KENISON-MARVIN:  Same objection.

24     THE WITNESS:  I don't think I'm qualified to

25 make that -- to answer that question properly.

**178**

1  BY MS. MILBURN:

2  Q.  Okay.  Just going back to the FAQs.  It says the law

3  does not apply to all activities that may occur on a

4  public school's property.  Do you see that at the

5  bottom of the --

6  **A.  Yes.**

7  Q.  What activities would occur in a public school that are

8  not covered by HB 2 under your interpretation of these

9  FAQs?

10     MR. KENISON-MARVIN:  Same objection.

11     THE WITNESS:  Well, many schools -- I live in

12 Nashua, and there are two beautiful theaters and two

13 high schools.  The middle school, the Elm Street Middle

14 School, has the lovely O'Keefe auditorium.  It's a

15 beautiful theater.  And that rent that space out

16 routinely to other types of third-party groups.

17     I don't think any of this provision, although

18 it's in a school, I don't think it covers any of those

19 activities.  They're not licensed educators.  They're

20 third parties.  They're not employees.  It's nothing to

21 do with HB 2, in my view.  I could be wrong, certainly.

22 I'm not an attorney.  But that kind of thing wouldn't

23 be covered.

24 BY MS. MILBURN:

25 Q.  So fair to say, like, if you're contracting out to a

**179**

1  third-party vendor, and a third party is involved,

2  that's when HB 2 would not apply?

3      MR. KENISON-MARVIN:  Same objection.

4      THE WITNESS:  I just don't think it applies

5  to anyone that's not a licensed educator, that's not an

6  employee of a school district.

7  BY MS. MILBURN:

8  Q.  So we've previously discussed that you were a high

9  school teacher.  I'd like to ask you some questions

10 about HB 2 and what is and is not covered under the

11 statute.  Are you familiar with affirmative action?

12 **A.  Yes.**

13 Q.  And you have previously said that a debate club would

14 be covered under the statute; is that correct?

15 **A.  Possibly.**

16 Q.  Possibly?

17     MR. KENISON-MARVIN:  That does misstate the

18 prior testimony.  I'll object to that.  And legal

19 conclusion.

20 BY MS. MILBURN:

21 Q.  You previously said that a debate club was an

22 extracurricular activity; is that right?

23 **A.  Yes.**

24 Q.  If a teacher discussed affirmative action during the

25 debate club, in your view, would that violate HB 2?

**180**

1      MR. KENISON-MARVIN:  Objection.  Legal

2  conclusion.

3      THE WITNESS:  I don't think it's a fair

4  question for me because I don't know the context.  I

5  mean, are you talking about "Here's a debate topic.

6  We're going to talk about affirmative action today and

7  we're going to debate the merits of it."

8      I mean, that's one question.  If it's a

9  unilateral discussion or presentation by the teacher,

10 it's a different discussion.  So what are you talking

11 about?

12     MS. MILBURN:  Let's keep your former example.

13     THE WITNESS:  Okay.

14 BY MS. MILBURN:

15 Q.  So the teacher asked the students to debate the merits

16 of affirmative action during debate club.  Would you

17 view that as a violation of HB 2?

18     MR. KENISON-MARVIN:  Same objection.

19     THE WITNESS:  I'm not an attorney.  So, as a

20 former teacher, I think it would be a useful debate

21 tool.

22 BY MS. MILBURN:

23 Q.  As a former teacher, would you -- and understanding the

24 statute, HB 2, would you view that as a violation of

25 the statute if you made that a debate question?

181

1     MR. KENISON-MARVIN: Objection. Vague and
2 legal conclusion.
3     THE WITNESS: Again, this is -- you're asking
4 me personally?
5     MS. MILBURN: Your personal opinion.
6     THE WITNESS: I think utilizing that topic as
7 a debate topic doesn't violate anything.
8 BY MS. MILBURN:
9 Q.   Going to another example. If a teacher in the hallway
10 wore a pin that said "America is Racist," would you
11 view that in your own personal view as being a
12 violation of HB 2?
13     MR. KENISON-MARVIN: Same objection. Legal
14 conclusion.
15     THE WITNESS: I think there are people that
16 would make that allegation.
17 BY MS. MILBURN:
18 Q.   What about in your personal opinion?
19     MR. KENISON-MARVIN: Same objection.
20     THE WITNESS: In my personal capacity or in
21 my professional capacity?
22     MS. MILBURN: Personal capacity.
23     THE WITNESS: Personal capacity? I mean, I
24 don't think it's the best idea for a teacher to do a
25 number of things because it impacts other students.

182

1 But is it their right? I suspect it probably is.
2 BY MS. MILBURN:
3 Q.   Switching to another example. What if during -- would
4 you consider an after-school film club to be an
5 extracurricular activity?
6     MR. KENISON-MARVIN: Objection. Vague and
7 legal conclusion.
8     THE WITNESS: Again, it comes down to is it
9 approved by the school board? Is it approved by the
10 school superintendent? Is it an approved program? If
11 it's an approved program, sure.
12 BY MS. MILBURN:
13 Q.   And what if a teacher showed students during the
14 after-school film club the movie that we were
15 previously discussing, White Like Me by Tim Wise?
16 Would that be a violation of HB 2?
17     MR. KENISON-MARVIN: Same objection.
18     THE WITNESS: I don't know. I haven't seen
19 the film.
20     MS. MILBURN: Okay.
21     THE WITNESS: So I can't -- I can't answer
22 that question.
23 BY MS. MILBURN:
24 Q.   You previously testified, I think, that you had read
25 portions of How to Be an Antiracist; is that right?

183

1 A.   Yes.
2 Q.   If a teacher recommended to a student in the library
3 that they read that book, would you view that as being
4 a violation of HB 2?
5     MR. KENISON-MARVIN: Same objection.
6     THE WITNESS: Under what context?
7 BY MS. MILBURN:
8 Q.   A student comes to a teacher and asks, "What do you
9 think I should read in my own free time?" And the
10 teacher recommends that book. Do you think that's a
11 violation of HB 2?
12     MR. KENISON-MARVIN: Same objection.
13     THE WITNESS: I honestly don't know. I don't
14 know the answer to the question.
15 BY MS. MILBURN:
16 Q.   Is there any public guidance beyond these FAQs that
17 would help teachers understand answers to the questions
18 that I just posed to you?
19 A.   From this agency?
20 Q.   From the DOE or from any other agency.
21 A.   I'm not aware of any.
22 Q.   So, just in your work for the DOE, I get the sense that
23 you're concerned with children's safety. That's
24 important to you; is that right?
25 A.   That's my number one priority.

184

1 Q.   And it's fair to say that you stay informed of whether
2 or not there are any safety concerns in schools at any
3 time; is that fair to say?
4     MR. KENISON-MARVIN: Objection. Vague.
5     THE WITNESS: That's fair.
6 BY MS. MILBURN:
7 Q.   And you're concerned with whether or not children are
8 being put at risk by teachers; is that fair to say?
9 A.   Yes.
10 Q.   Are you aware of any incidents at any school where
11 extracurricular activities were disrupted because a
12 teacher discussed a topic that was banned under HB 2?
13 A.   No.
14 Q.   And we previously talked about a teacher wearing a pin
15 that says "America is Racist"; is that right?
16 A.   We talked about that, yeah.
17 Q.   Would you consider that to be disruptive behavior?
18     MR. KENISON-MARVIN: Objection. Vague.
19     THE WITNESS: Does it potentially have the
20 ability to disrupt? Certainly.
21 BY MS. MILBURN:
22 Q.   But you're not aware of any instance where --
23 A.   None that I'm aware of, no.
24 Q.   What about recommending the book that we were
25 previously discussing, How to Be an Antiracist, to a

185

1   student? Would you consider that to be disruptive
2   behavior?
3        MR. KENISON-MARVIN: Same objection.
4        THE WITNESS: Context.
5   BY MS. MILBURN:
6   Q. What if, in response to a student's question like we
7      discussed before about what they would recommend for
8      outside-of-class reading, they recommended that book?
9      Is that disruptive?
10       MR. KENISON-MARVIN: Same objection.
11       THE WITNESS: Disruptive to whom?
12       MS. MILBURN: To the school in general.
13       THE WITNESS: I don't know.
14  BY MS. MILBURN:
15  Q. So we've previously discussed the Moms for Liberty
16     bounty. Do you remember that?
17  A. Yes.
18  Q. Did you ever discuss any concerns with teachers about
19     Moms for Liberty?
20  A. Individual teachers?
21  Q. Yes.
22  A. I don't recall doing that.
23  Q. Did you ever have any conversations with anyone who was
24     concerned about Moms for Liberty in general, about
25     being reported on by Moms for Liberty, or because of

186

1   the Moms for Liberty bounty?
2        MR. KENISON-MARVIN: Objection. Vague and
3   compound.
4        THE WITNESS: I don't have direct
5   recollection of having that kind of a discussion with
6   anyone here.
7   BY MS. MILBURN:
8   Q. And we previously discussed the No Left Turn group?
9   A. Yes.
10  Q. Is that right? I'm going to show you another document.
11       (Discussion off record.)
12       MR. BISSONNETTE: Exhibit 28.
13  BY MS. MILBURN:
14  Q. So if we could show Exhibit 28?
15  A. Okay.
16  Q. So you're familiar with the No Left Turn in
17     Education --
18  A. Yes.
19  Q. -- group? Did you ever discuss No Left Turn with any
20     teacher?
21  A. With a teacher?
22  Q. With any teachers.
23  A. Not that I recall, no.
24  Q. And do you remember any teacher ever expressing
25     concerns about potentially violating HB 2 in response

187

1   to No Left Turn?
2   A. I don't believe I ever communicated with any of the
3      teachers identified on that list, so, no.
4   Q. What about any teachers --
5   A. No.
6   Q. -- that were not on the list?
7   A. I wouldn't have any reason to. These are confidential
8      matters, so I wouldn't talk about that outside.
9   Q. Are you aware of any teachers who were found to have
10     violated HB 2 because they signed the pledge?
11  A. Absolutely not.
12  Q. This email says, "We reviewed the same list back in the
13     summer, and the decision was the same. Moreover, the
14     day of action in New Hampshire took place on June 12,
15     2021. Therefore, it is believed that the signatures,
16     if confirmed, were affixed to the pledge prior to HB 2
17     becoming law."
18       Do you see that?
19  A. I see.
20  Q. In your view, would a teacher have violated the statute
21     if they had signed the pledge after the law was
22     passed?
23  A. I think that was clear --
24       MR. KENISON-MARVIN: Objection. Legal
25  conclusion. You can answer.

188

1        THE WITNESS: I think that's clear. And the
2   email speaks for itself. One, it was -- the day of
3   action was before; and, two, no. So I think that
4   speaks for itself.
5   BY MS. MILBURN:
6   Q. So, no, they would not have violated the statute if
7      they had signed the pledge after the law was passed?
8   A. That's what the email says, yeah.
9   Q. Is it your understanding that the Zinn pledge was
10     signed by teachers outside of the school grounds?
11  A. I have no idea where they signed it.
12  Q. Teachers have social media platforms; is that right?
13  A. Yes. Yes, they do.
14  Q. And they're friends with students on those platforms,
15     right?
16  A. Oh, yes, indeed, they are.
17  Q. You sound concerned with the social media platforms.
18  A. Oh, I wish teachers could live in my shoes for a few
19     minutes, and they would have a different opinion, I
20     think, at the end of spending a day in my shoes.
21  Q. And so teachers can share content with students on
22     these platforms; is that right?
23  A. Oh, I would assume so, yeah.
24  Q. In your view, would public postings that a teacher
25     makes on their social media platform be covered under

189

1  HB 2?
2        MR. KENISON-MARVIN: Objection. Legal
3  conclusion.
4        THE WITNESS: The question is too broad for
5  me. I mean, is it while they were working? Was it a
6  sanctioned website? Was it on their email account?
7  Was it text messages? Was it a Facebook or Instagram?
8  When did it occur? Under what context?
9        MS. MILBURN: So I'll show you a document.
10       (Exhibit 35 marked for identification.)
11  BY MS. MILBURN:
12 Q. So if you could turn your attention to the second page,
13    which is DOE00909?
14 A. Yes.
15 Q. It's an email from James Laboe to Edelblut. You're not
16    on this email. He says, "Frank, I'm not sure if you've
17    had a chance to view Kate LeClaire's Twitter feed in
18    relation to the study guide materials that she was
19    circulating to teachers. Because of our presentation
20    Tuesday night, she is now restricted access, i.e. her
21    Twitter feed is no longer open to the public."
22       So taking a look at this email, if a teacher is
23    circulating study guide materials on their Twitter
24    feed, is there a possibility that they would violate HB
25    2?

190

1        MR. KENISON-MARVIN: Same objection. Legal
2  conclusion.
3        THE WITNESS: I can't answer that question
4  because I don't know what the study guide is. I have
5  no idea what's being provided. As a general rule,
6  Twitter accounts and Instagram, Facebook, communicating
7  with kids outside of the normal structured email for
8  the district is never a good idea, which leads to
9  things like this. So I can't answer your question
10  because I don't know what the study guide says or what
11  it provides.
12 BY MS. MILBURN:
13 Q. Is the code of conduct covered outside of school
14    property? Does the code of conduct apply outside of
15    school property?
16 A. If you take a look at Ethical Use of Technology, which
17    I think is principle four, yes, it does, depending on
18    what the content is and what's been transmitted. I
19    mean, the cases that I like to work on, almost
20    invariably with educator misconduct, in some form or
21    fashion, has a social media component to it.
22       So in terms of your question, I can't answer
23    because I don't know what, hypothetically, you're
24    talking about.
25 Q. Is it fair to say that the code of conduct would apply

191

1  to a teacher's social media account?
2 A. Depending on what the social media is doing. We've had
3    teachers grooming kids. We've had teachers going onto
4    certain websites and trying to groom kids or connect
5    with them sexually. So, yeah, it certainly could be a
6    violation of the code of conduct.
7 Q. In your view, would a teacher violate HB 2 if they said
8    "America is a racist country" on their Twitter feed and
9    shared that content with students?
10       MR. KENISON-MARVIN: Objection. Legal
11  conclusion.
12       THE WITNESS: I'd have to see the full
13  context.
14 BY MS. MILBURN:
15 Q. Have you heard of any instances where a teacher removed
16    a post from their social media platform because they
17    thought it might violate HB 2?
18 A. No. I'm not familiar with any specific instance that
19    you've described.
20 Q. Let's assume in my hypothetical that a teacher's
21    Twitter feed did violate HB 2.
22 A. Well, that would be -- that would be a process after it
23    goes to the Human Rights Commission, the Department of
24    Justice. It's a long process.
25 Q. Let's assume that it went through that process. It was

192

1  determined that the content violated the statute.
2  Would the Twitter feed be covered under the statute?
3        MR. KENISON-MARVIN: Same objection, and
4  vague.
5        THE WITNESS: I'm not sure I -- I'm not
6  following what you mean. So let me just understand
7  your question. There's been a full investigation
8  referred to the Human Rights Commission. There's been
9  a finding, and the finding has been referred to us.
10       MS. MILBURN: Correct.
11       THE WITNESS: Okay. Now, what's your
12  question?
13 BY MS. MILBURN:
14 Q. In your view, after it's reached that point, would the
15    Twitter feed violate the statute?
16       MR. KENISON-MARVIN: Objection.
17 BY MS. MILBURN:
18 Q. In your --
19 A. You've already said it did.
20       MR. KENISON-MARVIN: Same objection. Vague
21  and legal conclusion.
22       MS. MILBURN: Sorry. Let me take that back.
23 BY MS. MILBURN:
24 Q. Would the DOE, in your opinion, take the position that
25    it violates the Educator Code of Conduct?

193

1    MR. KENISON-MARVIN: Same objections.
2    THE WITNESS: Well, again, we talked about
3 this earlier. It's the process.
4    MS. MILBURN: Correct.
5    THE WITNESS: So once it comes back with a
6 finding, there would be an investigation at the DOE
7 level to determine if there is code of conduct
8 violation. So you're asking me a question that I can't
9 answer.
10 BY MS. MILBURN:
11 Q.  Just taking my scenario one last time. Once the HRC
12    has determined that there was a violation of the
13    statute, what would be left for the DOE to investigate
14    in that instance?
15 **A.  Well, what's left is what is the pleading? What are**
16    **the facts? Does it form within the code of conduct?**
17    **And, if so, what would any sanction be? I think that's**
18    **what our role would be after the finding.**
19 Q.  And is it possible that a teacher's posting on Twitter
20    could be found to be a violation of the code of
21    conduct?
22 **A.  Well, you've already -- this is a strange question.**
23    **You've already told me that the Human Rights Commission**
24    **has had a finding that it violated the statute.**
25 Q.  Correct.

194

1 **A.  Correct?**
2 Q.  Correct.
3 **A.  Okay. So then it comes to us to review, and does it**
4    **violate the code of conduct? And, if so, what's the**
5    **sanction? We're not reinventing the wheel. There's**
6    **already been a finding. So Twitter account, social**
7    **media, drawing of the blackboard. It's all the same.**
8    **They've made a finding. We now investigate and**
9    **determine sanctions.**
10 Q.  So it's your testimony that the posting on Twitter
11    could be sanctionable?
12    MR. KENISON-MARVIN: Objection. Misstates
13    the testimony. Asked and answered.
14    THE WITNESS: That's not what I said.
15    There's already been a finding.
16    MS. MILBURN: Correct.
17    THE WITNESS: So we go over, we do our work,
18    and determine the sanction. We're not reinventing
19    anything.
20    MS. MILBURN: Got it. Okay. I'm going to
21    show you a new document.
22    (Exhibit 36 marked for identification.)
23 BY MS. MILBURN:
24 Q.  Do you recall this email between you and Brian Taylor
25    on June 14th, 2022?

195

1 A.  Okay. I don't recall getting it. I got it.
2 Q.  So you don't -- do you recall Rachael Blansett?
3 **A.  So Rachael Blansett, I think the first thing that I**
4    **would have done in receiving this email would be to**
5    **determine whether Rachael Blansett is a licensed**
6    **educator. And if she was a licensed educator, I would**
7    **go one way. If she's not a licensed educator, I have**
8    **no jurisdictional involvement, so I'd go a different**
9    **way.**
10    **And if this is the only email correspondence, my**
11    **guess is -- and I could be wrong -- that she's not a**
12    **licensed educator. Therefore, I have no say in it at**
13    **all.**
14 Q.  Do you recall -- you don't recall what happened with
15    this complaint?
16 **A.  Well, I can tell you nothing happened with the**
17    **complaint, because I have a pretty good memory, and**
18    **this is recent. And this name does not register with**
19    **me as a sanctionable -- a person with any kind of**
20    **sanction or investigation.**
21 Q.  If a teacher posted this same content that you've had a
22    chance to review here in the email online, on a blog
23    post, would you view that as violating HB 2?
24    MR. KENISON-MARVIN: Objection. Legal
25    conclusion.

196

1    THE WITNESS: Well, it didn't, so...
2 BY MS. MILBURN:
3 Q.  I understand. But if it was a teacher or they posted
4    this same content, would you view that as violating HB
5    2?
6    MR. KENISON-MARVIN: Same objection.
7    THE WITNESS: Well, to whom was it posted?
8    There are too many unanswered questions. I mean, it's
9    a social media post. It's off work. It's wherever.
10    She's a teacher. She does it in July, on the 4th of
11    July. School's not in session. Who was her audience?
12    I have no idea. I don't have enough facts to make that
13    kind of a determination.
14 BY MS. MILBURN:
15 Q.  What if they were sharing this content with students on
16    the blog?
17 **A.  I'd have to look at the facts. My guess is send it off**
18    **to Human Rights Commission.**
19 Q.  Based off of what you see in this email, would a parent
20    have legitimate grounds to file a complaint against a
21    teacher with the Human Rights Commission?
22    MR. KENISON-MARVIN: Same objection.
23    THE WITNESS: Say it again.
24 BY MS. MILBURN:
25 Q.  Based off the facts that you have in this email --

197

1  A.  Yep.
2  Q.  -- would a parent have legitimate grounds to file a
3      complaint against the teacher with the HRC?
4          MR. KENISON-MARVIN:  Same objection, and
5      vague.  You can answer.
6          THE WITNESS:  A parent can file a legitimate
7      complaint about anything; whether there's a finding is
8      a different story.  So could a parent take this stuff
9      and file a complaint?  Anybody can file a complaint.
10 BY MS. MILBURN:
11 Q.  Do you think it would be reasonable, based off of these
12     set of facts, to file a complaint?
13         MR. KENISON-MARVIN:  Same objections.
14         THE WITNESS:  Reasonable for whom?  The
15     parent or the --
16         MS. MILBURN:  Reasonable for the parent.
17         THE WITNESS:  Sure.  A parent can file
18     anything they want.  It's more than reasonable to file.
19     Whether there's any substance to it is a different
20     story.
21 BY MS. MILBURN:
22 Q.  And we previously touched on this, but I just want to
23     clarify.  Just to confirm the Educator Code of Conduct
24     does apply to educators or credential holders when
25     they're off duty?

198

1  A.  It can.
2  Q.  Are you aware of any private citizens who have
3      investigated teachers when they're off duty for
4      violating HB 2?
5  A.  I have no idea what you're talking about.  No.
6  Q.  Has the DOE received any complaints from private
7      citizens in investigating teachers when they're off
8      duty for violating HB 2?
9  A.  So say it again one more time, please.
10 Q.  Sure.  Has the DOE received any complaints from private
11     citizens who are investigating teacher conduct off duty
12     that violates HB 2?
13         MR. KENISON-MARVIN:  Objection.  Vague.
14         THE WITNESS:  So what you're asking me is
15     they're conducting their own investigation?  I have no
16     idea.  I've never heard of that, to tell you the truth.
17         MS. MILBURN:  I'm going to show you one more
18     document.  I think this is 37.
19         (Exhibit 37 marked for identification.)
20 BY MS. MILBURN:
21 Q.  Again, you're not copied on this email, but let me know
22     once you've had a chance to read it.
23 A.  Okay.
24 Q.  Are you familiar with Cheryl Dean?
25 A.  I have no idea who she is.

199

1  Q.  Are you aware of any private hotlines that had been
2      created to report on teachers?
3  A.  First I've seen.  No, I don't.
4  Q.  Any other efforts that have been taken by private
5      citizens to report on teachers?
6  A.  You mean as an organization?  No.
7  Q.  The last document I am going to show you is -- I think
8      it's Exhibit 31.
9  A.  I've got it, I think.  Yep.  Okay.
10
11
12
13
14
15
16
17
18     Do you see that?
19 A.  I do.
20 Q.  Have you received any complaints about books that
21     teachers have on their shelves in their classrooms?
22
23
24
25

200

1
2  Q.  In your personal view, do you believe that books that
3      teachers have in their classrooms are covered under HB
4      2?
5          MR. KENISON-MARVIN:  Objection.  Legal
6      conclusion and vague.
7          THE WITNESS:  You'd have to provide me
8      context for it.  I mean, is the teacher reading the
9      book and it's in her book bag and it's not being used
10     for curriculum purposes as opposed to something else?
11     The question is -- I can't answer that question.
12 BY MS. MILBURN:
13 Q.  Let's assume that it's just out on their bookshelf for
14     students to see, but they're not using it as part of
15     their instruction.
16 A.  And that's the question?  Is that --
17 Q.  Could that violate HB 2?
18         MR. KENISON-MARVIN:  Same objections.
19         THE WITNESS:  I'd have to know the context.
20     And even if it did, or we thought it did, I would refer
21     to the Human Rights Commission anyway.  I wouldn't be
22     involved until the very end of the process.
23         MS. MILBURN:  Could we just take a two-minute
24     break?
25         (Recess taken.)

201

1      MS. MILBURN:  I just have one final question.
2      BY MS. MILBURN:
3  Q.  Is there any scenario in which a teacher's social media
4      platform could be covered under HB 2?
5      MR. KENISON-MARVIN:  Objection. Legal
6  conclusion and vague.
7      THE WITNESS:  I would have to see the case.
8  I don't know.
9      BY MS. MILBURN:
10 Q.  Are there any set of facts where it's possible that it
11     could be covered?
12     MR. KENISON-MARVIN:  Same objection.
13     THE WITNESS:  I mean, that would be a
14     decision made by the Human Rights Commission, so we
15     would, if we got an intake like that, refer, and let
16     them do their work.  So I really can't answer that
17     question.
18     MS. MILBURN:  Thank you.
19     MR. BISSONNETTE:  Attorney Kenison and I did
20     have a discussion off the record that I'll place on the
21     record with respect to Exhibit 32 which is a document
22     that was produced by the Human Rights Commission, not
23     the Department of Education, which is Bates stamped 53
24     to 64. It's been designated confidential subject to
25     protective order.  That is Exhibit 32 in its entirety.

202

1      The parties agree that discussion with
2  respect to Exhibit 2 in the deposition transcript will
3  also be designated as confidential subject to
4  protective order.
5      And, in addition, because the witness
6  reviewed and had placed before him Exhibit 32, that
7  there would also -- there's an understanding among the
8  parties that the witness will sign the acknowledgment
9  form at the back end of the protective order in order
10 to ensure the confidentiality of Exhibit 32.
11     Of course, the plaintiffs aren't waiving
12 their rights with respect to challenging that
13 designation at any point, particularly in advance of
14 the filing of a public pleading, but this is to
15 maintain, in the interim, that designation if, and
16 until, any party elects to challenge that designation
17 subject to the terms of the protective order.
18     Did I get that right?  I think.
19     MR. KENISON-MARVIN:  It sounded eloquent.
20     MR. BISSONNETTE:  With that, I mean, I think
21 on behalf of all of us, I think we wanted to express
22 our thanks.
23     MR. KENISON-MARVIN:  I do have a few
24 redirects.
25     MR. BISSONNETTE:  Oh, of course.  Of course.

203

1      MR. KENISON-MARVIN:  I think I do, but I'd
2  like to take another break just to speak shortly with
3  Mr. Farrell.
4      (Recess taken.)
5      EXAMINATION
6  BY MR. KENISON-MARVIN:
7  Q.  I'm just going to have -- I intend one or two short
8      questions for you just to follow up on the testimony
9      you gave today.  Try to be brief.
10     I want to have you look at Exhibit 1, cover page
11     titled "Full Text of the Banned Concepts Act."
12     And earlier today you were asked to look at the
13     page marked PL0006, particularly the provision 193:41D.
14     Do you see where I'm looking?
15 A.  Yes.  Line 36.
16 Q.  Correct.  And it continues onto the next page, that
17     whole provision.  I think Attorney Kahne had read that
18     provision and asked you something to the effect of if
19     you knew what it meant.  Do you remember giving that
20     testimony?
21     MR. KAHNE:  Objection.
22     MR. KENISON-MARVIN:  Can you tell me what
23     the --
24     MR. KAHNE:  Objection. Mischaracterizes my
25     question, and I didn't read the section.

204

1      BY MR. KENISON-MARVIN:
2  Q.  Do you remember looking at this section earlier?
3  A.  I do.
4  Q.  Okay.  And do you remember being asked something to the
5      effect of if you knew what that meant?
6  A.  Yes.
7  Q.  And do you remember giving testimony to the effect of
8      "I have no idea"?
9  A.  Yes.
10 Q.  Can you explain that testimony and what you meant when
11     you said "I have no idea"?
12 A.  I obviously can read the language, but I had -- I have
13     no idea because this would all go to the Human Rights
14     Commission and it has no bearing on me.  So when I -- I
15     was answering the question badly.  I should have said I
16     understand what it means: One group of people can't
17     harm another group of people.  And I understand what
18     that means, but it has no bearing on me because these
19     will all be referred to HRC for their findings.  So I
20     misspoke.
21     MR. KENISON-MARVIN:  I don't have anything
22     else.
23     MR. KAHNE:  Just one follow-up here.
24     EXAMINATION
25     BY MR. KAHNE:

205

1  Q.  Mr. Farrell, I understand your testimony now is that
2      you understand what these words mean, but I believe my
3      question earlier was do you understand what it
4      prohibited under subsection D?  And so my question is
5      do you know what materials are prohibited under
6      subsection D?
7           MR. KENISON-MARVIN:  Objection as to legal
8      conclusion.
9      BY MR. KAHNE:
10 Q.  From instruction.  From educational instruction.
11          MR. KENISON-MARVIN:  Objection as to -- it
12     calls for a legal conclusion.
13          THE WITNESS:  So, in reading it, first of
14     all, the complaint would be forwarded.  I would not be
15     involved in this until a finding is made.  But what it
16     seems to me to mean is that one group of people or one
17     group of thoughts can't be imposed to another group of
18     people based on the prerequisites:  Race, religion,
19     creed, color, et cetera.
20     BY MR. KAHNE:
21 Q.  Okay.  But the language here says that one group of
22     people cannot and should not attempt to treat others
23     without regard to age, sex, gender identity.  Do you
24     see that?
25 A.  I do.

206

1           MR. KENISON-MARVIN:  Objection to the extent
2      it misstates what the language says.
3           MR. KAHNE:  Well, how have I misstated it?
4           MR. KENISON-MARVIN:  Sorry.  I'm looking for
5      the language where it says "one group of people."
6      BY MR. KAHNE:
7  Q.  Would affirmative action be covered under subsection
8      D?
9           MR. KENISON-MARVIN:  Objection.  Legal
10     conclusion.  Asked and answered.
11     BY MR. KAHNE:
12 Q.  Do you know?
13 A.  I don't.
14 Q.  Do you know if reparations would be covered under
15     subsection D?
16          MR. KENISON-MARVIN:  Objection.  Same.  Same
17     objections.
18          THE WITNESS:  Again, I don't, and that would
19     be a decision made by the Human Rights Commission, and
20     not me.
21     BY MR. KAHNE:
22 Q.  So, fair to say you have no idea whether those topics
23     would be covered?
24 A.  No.
25          MR. KENISON-MARVIN:  Same objections.

207

1      BY MR. KAHNE:
2  Q.  And are you aware of any book covered under -- that
3      would be prohibited under the law?
4           MR. KENISON-MARVIN:  Objection.  Vague.
5      BY MR. KAHNE:
6  Q.  Are you aware of any book that is prohibited under the
7      prohibition on teaching discrimination?
8           MR. KENISON-MARVIN:  Same objection.  And I
9      think that goes beyond the scope of what I was
10     redirecting him on, to the extent you're asking about
11     the law and not subsection D.  I just asked about
12     subsection D.
13          MR. KAHNE:  So subsection D.
14          THE WITNESS:  The question is?
15     BY MR. KAHNE:
16 Q.  Are you aware of any book that is prohibited from being
17     taught in New Hampshire public schools under subsection
18     D of the law?
19 A.  I am not.
20          MR. KAHNE:  Okay.
21          (Whereupon, the deposition was concluded at
22     4:39 p.m.)
23
24
25

208

1              C E R T I F I C A T E
2       I, Sharon G. Saalfield, a Licensed Shorthand
3  Reporter for the State of New Hampshire, Certified Shorthand
4  Reporter for the Commonwealth of Massachusetts, Registered
5  Diplomate Reporter and Certified Realtime Reporter, do
6  hereby certify that the foregoing is a true and accurate
7  transcript of my stenographic notes of the proceeding taken
8  at the place and on the date hereinbefore set forth to the
9  best of my skill and ability under the conditions present at
10 the time.
11      I further certify that I am neither attorney or
12 counsel for, nor related to or employed by any of the
13 parties to the action in which this proceeding was taken,
14 and further that I am not a relative or employee of any
15 attorney or counsel employed in this case, nor am I
16 financially interested in this action.
17      Before completion of the deposition, review of the
18 transcript was requested.
19      The foregoing certification of this transcript
20 does not apply to any reproduction of the same by any means
21 unless under the direct control and/or direction of the
22 certifying reporter.
23         _Sharon G. Saalfield_
24 _____
           Sharon G. Saalfield,
25         Lic. No. 147, CSR, RDR, CRR