**EXHIBIT 5**

HRC Director
Ahni Malachi
Deposition
Transcript
Redacted,
Publicly-filed

(Unredacted
version has been
filed under seal)

Local 8027

vs

Frank Edelblut

Docket No. 1:21-cv-01077-PB

AHNI MALACHI

May 24, 2023



AVICORE REPORTING

15 Constitution Drive, Suite 1A • Bedford, NH 03110 • (603) 666-4100
info@avicorereporting.com • www.avicorereporting.com

UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

**CERTIFIED ORIGINAL**

Local 8027, AFT-New Hampshire, et al.

Plaintiff,

v.

Frank Edelblut, Commissioner, et al

Defendants.

No. 1:21-cv-01077-PB

VOLUME I

DEPOSITION OF AHNI MALACHI

taken on behalf of the Plaintiffs

at the New Hampshire Commission

for Human Rights, Concord, NH,

on May 24, 2023, at 11:15 a.m.

Court Reporter:

Cynthia Foster, LCR

LCR #14 (RSA 310-A:161-181)

---

**3**

INDEX

Deposition of Ahni Malachi

Examination by Mr. Bissonnette:                  5

EXHIBITS

53  Letter, Malachi to DiLorenzo,
    March 4, 2022, DOE-10269-72           19

54  Email, BurkeCohen to Malachi,
    20 Sep 2021, HRC-00379-380            49

55  Exhibit 19, July 21, 2021,
    Guidance, PL 00415-423                77

56  NH Commission for Human Rights,
    Minutes, October 7, 2021,
    HRC-00391-394                         94

57  Commissioner Edelblut's Objections
    and Responses to the Plaintiffs'
    First Set of Interrogatories          99

58  Christian Kim and Ahni Malachi's
    Objections and Responses to the
    Plaintiffs' First Set of
    Interrogatories                      101

(Original exhibits retained by reporter)

(Scanned copies provided to all counsel)

---

**2**

APPEARANCES:

On behalf of the Plaintiffs, Local 8027, AFT-New
Hampshire, AFL-CIO:
STROOCK & STROOCK & LAVAN LLP
By: Charles Moerdler, Esq.
    Elizabeth C. Milburn, Esq.
    David Kahne, Esq., by Zoom
180 Maiden Lane
New York, NY  10038
212-806-5648
cmoerdler@stroock.com
ecmilburn@stroock.com

On behalf of the Plaintiffs, Christina
Philibotte, Andres Mejia, NEA-New Hampshire:
ACLU OF NEW HAMPSHIRE
By: Gilles Bissonnette, Esq.
18 Low Avenue, Unit 12
Concord, NH  03301
603-225-3080
gilles@aclu-nh.org

On behalf of the Defendants, Frank Edelblut,
Ahni Malachi, John Formella, et al:
NH DEPARTMENT OF JUSTICE
By: Nathan W. Kenison-Marvin, Esq.
33 Capitol Street
Concord, NH  03301
603-271-1292
nathan.w.kenison-marvin@doj.nh.gov
By Zoom:
Peter Perroni, Esq.
Nathan Fennessy, Esq., nfennessy@preti.com
Morgan Nighan, Esq., mnighan@nixonpeabody.com
Jennifer Eber, Esq.
Kayla Turner, Esq., kaylat@drcnh.org.
Esther Dickinson, Esq., edickinson@nhnea.org

---

**4**

S T I P U L A T I O N S

It is agreed that the deposition shall
be taken in the first instance in stenotype and when
transcribed may be used for all purposes for which
depositions are competent under New Hampshire
practice.

Notice, filing, caption and all other
formalities are waived.  All objections except as to
form are reserved and may be taken in court at trial.

It is further agreed that if the
deposition is not signed within thirty (30) days
after submission to counsel, the signature of the
deponent is waived.

It is further agreed that exhibits may
be retained by counsel until the time of trial.

---

5

1          AHNI MALACHI, DULY SWORN
2               EXAMINATION
3 BY MR. BISSONNETTE:
4   Q    Thank you, and I just want to make clear for the
5       record that we have the same stipulations as
6       yesterday.  I think we're all in an agreement,
7       and there's obviously going to be no recording
8       of this deposition today.  We're all in
9       agreement there.
10         MR. KENISON-MARVIN:  I agree.
11   Q    Director Malachi, I know we've met before.  My
12       name is Gilles Bissonnette.  I represent Tina
13       Philibotte and Andres Mejia in this case.  Thank
14       you so much for coming in today.  I'm just going
15       to kind of walk you through kind of what the
16       deposition process looks like, the common
17       understandings and agreements that we have amid
18       this process.  So before I kind of go through
19       that, I just want to ask you have you ever been
20       deposed before?
21   A    No.
22   Q    Okay.  So the way this works, obviously, is
23       we're in a room, a reporter is going to be

6

1       recording everything that we say to one another.
2       So I think it's important that we don't talk
3       over each other.  That's more an issue for the
4       lawyers as opposed to the witnesses so I can
5       promise you I will do my best to let you finish
6       your answers before I ask another question, and
7       reciprocally, I would just ask that you wait to
8       provide an answer until I finish my question.
9       Does that make sense?
10   A    Yes.
11   Q    And if you don't understand a question, please
12       tell me, and I'll be happy to rephrase or make
13       an effort to reclarify.  If you don't do that
14       and you respond to the question, I'm going to
15       assume that you have understood the question.
16       Okay?
17   A    Okay.
18   Q    And as well, I would just ask you given the fact
19       that we have a court reporter here transcribing
20       the deposition that I'd ask that you just avoid
21       nonverbal cues so just make sure your responses
22       are verbal and are loud enough to be heard by
23       both the folks in this room and the reporter.

7

1   Q    Okay?
2   A    Yes.
3   Q    And this is especially important.  I know this
4       isn't always, you know, a fun process going
5       through a deposition, you can take breaks at any
6       time.  Typically, we do them on the hour.  If
7       you need them sooner, that's totally fine.
8       Whatever makes you the most comfortable if you
9       need a break.  My only kind of caveat would be
10       if there's a pending question that we just
11       answer that question before we take that break.
12         There's one exception to that.  If there's
13       a privilege assertion or a privilege question
14       being raised either by you or by counsel, of
15       course, I think then it would be appropriate to
16       take a break even if we don't yet have an answer
17       to that question.  Okay?
18   A    Yes.
19       (Discussion off the record re Zoom)
20   Q    If the Zoom component of this deposition becomes
21       a distraction visually, I can move myself so
22       it's less in sight so that is an option I just
23       want to make you aware of as well.

8

1       Obviously, you were just sworn in.  You do
2       know that you're under oath, correct?
3   A    Yes.
4   Q    Okay.  And I'm going to just kind of represent
5       to you that there is a chance in this case that
6       the deposition today, either in whole or in
7       part, would be made available to the judge in
8       this case.  Is that something that you're aware
9       of?
10   A    Yes.
11   Q    Will anything prevent you from giving truthful
12       and accurate testimony today?
13   A    I don't understand the question.
14   Q    Is there anything that would prevent you from
15       giving truthful testimony today at this
16       deposition?  Medications, family issues, is
17       there anything kind of in your life that would
18       prevent you from giving truthful testimony.
19   A    No.
20   Q    Okay.  I assume that you know that this is a
21       lawsuit that challenges portions of what the
22       Plaintiffs have called the Banned Concepts Act.
23       Do you understand that's what's being litigated

9

1      in this case?

2   A   I would push back against the title of that.

3   Q   Please do.  Yes.  How so?

4   A   So if you are talking about RSA 354-A:29 through

5       34, is that what you're asking me?

6   Q   That is.  Do you understand that those are the

7       provisions of New Hampshire law that are being

8       challenged in this case?

9   A   Yes.

10  Q   If I were to call those provisions that are

11      being challenged "HB 2," and I wouldn't be

12      referencing the entire bill of HB 2, but if I

13      were to use the term "HB 2" to reference those

14      provisions 354-A:29 to 34, do we have a common

15      understanding on just the title of the

16      challenged law?

17  A   The preference would be the freedom from

18      discrimination in public workplaces and

19      education because that's the name of the amended

20      section.

21  Q   Would you prefer that I call it the Freedom from

22      Discrimination Law?  I just want to make sure we

23      have a common understanding on terminology.

10

1       That's all.  Would that be your preference?

2   A   I can agree to that portion of the exact title.

3       Yes.

4   Q   Okay.  So if I were to use the term the Freedom

5       from Discrimination Law in the course of this

6       deposition, you would understand that what I'm

7       referring to are the provisions in New Hampshire

8       law RSA 354-A:29 to 34.

9   A   Yes.

10  Q   Okay.  I'm just going to just so again we have a

11      common understanding on terminology, I'm just

12      going to put before you what's been previously

13      marked as Exhibit 1, and I am going to ask you

14      to just review this, Director Malachi, briefly,

15      but I do want to represent to you that that

16      first page is a page created by me as Exhibit 1

17      to the lawsuit that Majia/Philibotte Plaintiffs

18      filed in this case.

19          So setting that cover page aside, I would

20      just ask you to review pages marked PL 004 to PL

21      007 and my question is going to be when you're

22      done reviewing that is this the law that you

23      understand to be challenged in this case and

11

1       that we are calling the Freedom from

2       Discrimination Law in this deposition.

3   A   PL 004 through?

4   Q   004 to 007.

5   A   Okay.  So to answer your question, there's a bit

6       of a discrepancy.  So are you asking me if pages

7       4 through 7 are relative to 354-A and the

8       section entitled Right to Freedom from

9       Discrimination in Public Workplaces in Education

10      or is there an additional question that you're

11      asking?

12  Q   Sure.  I guess my opening question is is it your

13      understanding that the unredacted language on

14      pages 4 and 7 of Exhibit 1 contain the statutory

15      language that's being challenged by the

16      Plaintiffs in this case?

17  A   So my specific answer would be in part, yes.

18      There are other statutes that are listed there.

19  Q   Okay.  When I use the phrase in this case, the

20      "Freedom from Discrimination Law" which is the

21      common terminology we discussed, the law being

22      challenged in this case, is it your

23      understanding that we're referring to the

12

1       language on pages 4 through 7 on Exhibit 1?

2   A   As it relates to 354-A, subsections 29 through

3       34?

4   Q   Okay.

5   A   Yes.

6   Q   And I'm going to just direct your attention to

7       just page 6 which deals with RSA 193:40.  Do you

8       see that language?

9   A   193:40.  I see that.

10  Q   Yes.  I would just, I don't know if you know

11      this, but I will just represent to you again so

12      we have a common understanding that that portion

13      which is not in 354-A is also being challenged

14      by the Plaintiffs.  So is that something that

15      you knew before today?

16  A   I have knowledge about 354-A and subsections

17      dealing with :29 through :34.

18  Q   Do you have any knowledge with respect to

19      193:40?

20  A   That's not the statute that I work with.

21  Q   Okay.  We'll get to that.  That's good to know

22      though.  Thank you.

23          Director Malachi, what's your current

13

1    position?
2  A  I'm Executive Director of the New Hampshire
3     Commission on Human Rights.
4  Q  How long have you been in that role?
5  A  Five years. Little over.
6  Q  What are your duties in that role?
7  A  They're a variety of duties. I could certainly,
8     maybe faster to give you my job description in
9     writing.
10 Q  Well, I think maybe just give me a summary of
11    how you would describe those duties.
12 A  I'm in charge of the New Hampshire Commission
13    for Human Rights. The staff, media liaison,
14    legislative liaison, budgeting, liaison to the
15    Governor's office, other duties as assigned.
16 Q  When you say "other duties as assigned," who
17    would be doing the assigning?
18 A  It could be the legislature could, the Governor
19    could, the Commissioners could.
20 Q  When you say "Commissioners," who are you
21    referring to?
22 A  The Commissioners of the Commission.
23 Q  For Human Rights?

14

1  A  Yes.
2  Q  How many are there?
3  A  There are 7.
4  Q  How would you describe how your role interacts
5     with the role of the Commissioners within the
6     Commission of Human Rights?
7  A  Could you be more specific?
8  Q  Within the structure of the Commission for Human
9     Rights Commission, do you report to
10    Commissioners, do they supervise you, how would
11    you describe that relationship?
12 A  I communicate with all of the Commissioners, but
13    primarily the Chair of the Commission, and it
14    could be day to day, it could be -- we have a
15    meeting every month. The Commission meets
16    monthly.
17 Q  Okay. And outside the meetings that occur, what
18    are the general topics of conversation that you
19    have with the Chair of the Commission?
20 A  We talk about the status of affairs with the
21    Commission. So caseload, legislation, budgets,
22    other topics.
23 Q  I know that you said that the Commission meets

15

1     every month. What are the general topics of
2     agenda items that are covered by the Commission
3     when they meet monthly?
4  A  Those are the topics, the ones I just mentioned,
5     those are the topics that we cover.
6  Q  Okay. Is the actual Commission involved in the
7     processing and handling of complaints that come
8     into the office or is that outside their
9     responsibilities?
10 A  Are you asking me if the Commission or the
11    Commissioners?
12 Q  What would be the difference?
13 A  The Commission would be staff in this office.
14    The Commissioners would be the individuals.
15 Q  Thank you. I appreciate that.
16 A  So I wasn't clear.
17 Q  I appreciate that. Are the Commissioners
18    involved in processing complaints that come into
19    the office?
20 A  If I understand your question, are you asking me
21    if they have any involvement in charges that
22    come in?
23 Q  Yes.

16

1  A  Okay. They do.
2  Q  Could you describe that involvement generally?
3     MR. KENISON-MARVIN:  Objection.
4  Foundation. You can answer.
5  A  The Commissioners upon completion of an
6     investigation, there's an Investigating
7     Commissioner that's assigned to a charge who
8     would then make a finding of probable cause or
9     no probable cause.
10 Q  So I just want to be clear. We'll get into kind
11    of what that process looks like in just a few
12    minutes, but I just want to make sure I
13    understand the Investigating Commissioner is a
14    Commissioner on the Commission for Human Rights;
15    is that fair to say?
16 A  Yes.
17 Q  Okay. I kind of zoomed a little bit too far
18    forward. I did want to get to your tenure, your
19    work history before you took this job with the
20    HRC five years ago. So what was your place of
21    employment before you took this position at the
22    Human Rights Commission?
23 A  Hearst, Inc.

17

1  Q    What was your role at Hearst, Inc.?

2  A    So specifically I worked for WMUR, and I was

3       the, what it's called, Public Service Manager.

4  Q    And could you give me the approximate duration

5       of that employment using years?  You don't have

6       to give me months.

7  A    Approximately six years.

8  Q    Could you give me the years, that six-year

9       range?  Was that 2000 when to when?

10 A    I believe it was 2012 to 2018.

11 Q    Okay.  Is 2018 when you assumed this role at the

12      Human Rights Commission?

13 A    Yes.

14 Q    What were your responsibilities in that role at

15      Hearst, Inc.?

16 A    Producing Public Service Announcements for

17      charities, and other nonprofits.  Responsibility

18      for public-facing events where the TV station

19      was involved and other duties.

20 Q    I'm now going to kind of go back into our

21      discussion with complaints.

22         Could you just describe how the Human

23      Rights Commission processes complaints?

18

1         MR. KENISON-MARVIN:  Objection.  Foundation

2      and vague.

3  Q    Let me ask this.  Does the Human Rights

4      Commission process complaints made by members of

5      the public under the law against discrimination?

6         MR. KENISON-MARVIN:  Objection.  Vague.

7  A    Is there something more specific that you can

8      offer --

9  Q    I'm afraid not.

10 A    -- to allow me to answer?

11 Q    My question is pretty direct.  Yes or no, does

12      the New Hampshire Commission for Human Rights

13      process complaints made by the public under the

14      law against discrimination?

15         MR. KENISON-MARVIN:  Freedom from

16      Discrimination Law?

17 Q    I'm actually just talking about 354-A here

18      generally.  So I could, maybe I'll clarify my

19      question.  I'm not getting into HB 2 right now,

20      and we will get there, but just generally with

21      respect to 354-A, does the Human Rights

22      Commission process complaints made by the public

23      under RSA Chapter 354-A?

19

1  A    Yes.

2  Q    Can you describe for me what that process looks

3      like?

4  A    Someone who believes they've been discriminated

5      against will make a call, and if the context of

6      what they're alleging meets prima facie then a

7      charge is docketed, the other party is noticed,

8      and then there would be an investigation of the

9      charge.

10 Q    Okay.  I'm going to mark Exhibit 53.

11         (Exhibit 53 marked for identification)

12 Q    I put before you a document that's marked as

13      Exhibit 53.  Do you have Exhibit 53 in front of

14      you?

15 A    It looks like that's what it says here.

16 Q    Okay.  So I would just ask you to just review

17      Exhibit 53.  I'm just going to have some

18      questions about it so let me know when you're

19      finished reviewing it.

20         Have you reviewed Exhibit 53?

21 A    I have looked at it, yes.

22 Q    Great.  Thank you.  Have you seen Exhibit 53

23      before?

20

1  A    Exhibit 53?

2  Q    Yes.

3  A    No.

4  Q    Exhibit 53 at least to me looks like a letter

5      from you dated March 4th, 2022, to

6      Representative DiLorenzo.  Have I accurately

7      described Exhibit 53?

8  A    As it appears here, yes, but I'm not sure unless

9      I compare it to something that I wrote to know

10      if this is exactly the same thing.

11 Q    Well, I can submit to you that this is a

12      document that it seems that you copied to

13      Commissioner Frank Edelblut and that was

14      produced to us by the Department of Education.

15      Any reason to think this is not an accurate

16      reflection of a letter that you wrote on March

17      4th to Representative DiLorenzo?

18 A    Based on what this looks like here?  Yes.

19      However, if I'm not comparing it to the signed

20      copy that I have, then I'm assuming that this is

21      the same thing.

22 Q    Okay.

23 A    But without comparing it, I can't say that it

21

1  is.

2  Q   I'm just going to refer you to the last page of

3      the document, page 10272.  Does that look like

4      your signature?

5  A   Yes, it does.

6  Q   So I just want to make sure that we have a

7      common understanding.  Any reason for you to

8      believe sitting here today without you having

9      cross-referenced this with a copy of your files

10     that this is not a true and accurate copy of a

11     letter that you wrote on March 4th, 2022, to

12     Representative DiLorenzo?

13 A   As I sit here today, it looks like it.

14 Q   Okay.

15 A   Without having the opportunity to

16     cross-reference.

17 Q   Okay.  I'm just going to direct your attention

18     on page 2 of this document, Bates stamped 10270,

19     the language that states, that begins with "To

20     fully answer your question," and goes on to the

21     next page and ends in paragraph (d) ending with

22     the language "to appeal in a public forum, New

23     Hampshire Superior Court."

22

1          Do you see the language that I just

2      referred to you in Exhibit 53?

3  A   So where specifically are you on page 2?  So I

4      make sure I'm in the same place with you.

5  Q   Subsection 5(a) begins with "to fully answer

6      your question."  Do you see that language?

7  A   I do.

8  Q   And now the box of text that I'm just wanting to

9      direct your attention to would end in subsection

10     (d) on the next page which begins with "both

11     parties are afforded."  Do you see that?

12 A   I do.

13 Q   My question is just that an accurate

14     reflection of how the complaint process works

15     within the Human Rights Commission?

16 A   I will need to read this section.

17 Q   Please do.

18 A   Okay.

19 Q   Director Malachi, have you reviewed the language

20     that we just referenced moments ago, subsections

21     (a) through (d) on pages 10270 to 10271 on

22     Exhibit 53?

23 A   I did.

23

1  Q   Is it an accurate reflection at the time it was

2      written on March 4th, 2022, of how the complaint

3      process works within the Human Rights

4      Commission?

5  A   As I sit here today reading this, it does appear

6      to be an accurate reflection of the

7      Commissioner's process.

8  Q   Sitting here today on May 24th, 2023, is this

9      still an accurate reflection of how the

10     complaint process works within the Human Rights

11     Commission?

12 A   Yes.

13 Q   Okay.  You mentioned earlier in your testimony

14     that a complaint could come in through a call.

15     I guess my question for you is what are the ways

16     in which complaints come into the office?

17 A   Can you clarify by what you mean regarding a

18     complaint?

19 Q   Well, you use the term on Exhibit 53, bottom of

20     page 10270, use the phrase "understanding of the

21     complaint process."  So what did you mean there

22     when you said "complaint process"?

23 A   So the Commission, regarding the word complaint,

24

1      complaint for the Commission means a docketed

2      charge.  So is that the question that you're

3      asking?

4  Q   Well, my question just was just what did you

5      mean when you said complaint process?  So I want

6      to make sure I understand that your definition

7      of complaint as it was used on the bottom of

8      10270 is a docketed complaint; is that what

9      you're saying?

10 A   Correct.

11 Q   So what I'm going to, my question here is going

12     to be a little bit different, but I appreciate

13     that definition you provided.

14         What are the forms in which predocketed

15     complaints come into your office?

16 A   So a complaint is only something that's

17     docketed.  So that's why I'm asking for clarity.

18 Q   What if I just used the phrase "allegations of

19     discrimination," would that be an easier phrase

20     to use?

21 A   Are you using allegation as something that's not

22     docketed versus a complaint that is?

23 Q   I am in part because that's the language that's

25

1    used at the bottom of 10270 where you state
2    investigate and pass upon allegations of
3    discrimination.
4         So I think my question to you is going to
5    be what are the forms in which allegations of
6    discrimination are made that come to your
7    office?
8  A   A person who believes they've been discriminated
9    against can make a phone call and talk to us
10   about it.  They can email us.  They could drop
11   something off.
12 Q   Okay.  The language at the bottom of 10270 says
13   that an assessment is made to ensure the
14   complainant has a prima facie case.  Do you see
15   that language?
16 A   Yes.
17 Q   And then the second sentence, the next page or
18   additional sentence on the next page says, "If
19   this is the determination, the allegation of
20   discrimination is verified," there's some
21   bracketed language, then "submitted to the
22   Commission, and becomes a docketed charge of
23   discrimination whereby both parties are notified

26

1    in writing."  Do you see that language?
2  A   Yes.
3  Q   Is there a form a complaint needs to be
4    submitted in for it to be docketed?
5         MR. KENISON-MARVIN:  Objection.  Vague.
6    Mischaracterizes prior testimony.
7  Q   Let me ask the question more directly.  Can a
8    complaint be documented if it's oral?
9         MR. KENISON-MARVIN:  Same objections.
10 A   I'm unclear as to the question.
11 Q   I'm afraid I don't really know how to ask it
12   more directly.  Are there criteria -- let me ask
13   it this way.  Are there criteria for how a
14   complaint must be submitted for it to be
15   docketed?
16        MR. KENISON-MARVIN:  Same objections.
17 A   Could you ask the question again, please?
18 Q   Could you read it back, please?
19        (Requested portion read back by court reporter)
20        MR. KENISON-MARVIN:  Same objections.
21 A   That question is confusing.
22 Q   Why is it confusing?
23 A   So I'm unclear if you're asking about, because

27

1    we've talked about allegations, we've talked
2    about complaints.  So --
3  Q   Gotcha.
4  A   The Commission language has bearing.  So in
5    order to answer the question I need clarity on
6    what you're asking.
7  Q   Yes.  I see the confusion now.  So my question
8    is going to be for an allegation of
9    discrimination to be docketed, does the Human
10   Rights Commission have criteria -- strike that.
11        For an allegation of discrimination to be
12   docketed, does the Commission have requirements
13   as to the form in which the allegation is
14   submitted to the Commission?
15 A   Are you ultimately asking about people
16   communicating with us or a docketed charge?
17 Q   Why don't you read the question back just so
18   we're all rowing in the same direction.
19        (Requested portion read back by court reporter)
20 Q   So that question is I'm referring to predocketed
21   allegations, and all I'm trying to get at is is
22   there a requirement for them to be in writing,
23   can they be oral, that's what I'm getting at.

28

1    That's a compound question, and I'm only
2    providing that for context.  I'm going to reask
3    the question again.
4         For an allegation of discrimination to be
5    docketed, does the Commission have requirements
6    as to the form in which the allegations are
7    submitted to the Commission?
8  A   To answer your question, in reading 5(a), it
9    clearly states that it must be verified and
10   verification is a notary seal.
11 Q   Okay.  Can you refer that page to me?
12 A   It is -- so if you're looking at the document,
13   the number 5 starts on page 2, and then (a) is
14   on page 2, and towards the end of (a) which is
15   now on page 3 at the very top.
16 Q   Thank you.  So just so I'm clear, for an
17   allegation of discrimination to be docketed, is
18   it your testimony that it would need to be in a
19   writing, signed by the complainant, and
20   witnessed by a notary and submitted to the
21   Commission; is that correct?
22 A   That is correct.
23 Q   Okay.  For an allegation of discrimination to be

29

1    docketed, does the complainant have to use a
2    form provided by the Human Rights Commission or
3    can they use any other form of writing that is
4    verified and signed by the Complainant and
5    witnessed by a notary?
6  A    The complainant would need to use a form by the
7    Commission.
8  Q    Okay.  Did anyone assist you in writing the
9    letter marked as Exhibit 53?
10 A    There's always legal review.
11 Q    Fair.  Do you recall there being legal review
12    with respect to Exhibit 53?
13 A    As I sit here today, I'm unsure.
14 Q    Okay.  I know you haven't been deposed before.
15    I want to say that depositions are not a memory
16    test.  So if you can't remember, it's fine and
17    understandable especially if we're talking about
18    events years ago.  So I understand.
19         With respect to the language on page 2 and
20    beginning on page 3, Bates stamped 10270, "an
21    assessment is made to ensure that the
22    complainant has a prima facie case, i.e., "at
23    first sight" the claim meets the legal standard

30

1    to file a charge with the Commission."  Do you
2    see that language?
3  A    Yes.
4  Q    Who makes that decision within the Commission as
5    to whether a prima facie case has been made?
6  A    Staff and/or legal assistance.
7  Q    Who would be just the names of the staff and/or
8    legal assistants that would be involved in that
9    decision?
10 A    The actual name or the position name?
11 Q    You know, actually, let's do positions.  That's
12    probably easier.  Thank you for the
13    clarification.
14 A    So the intake coordinator is the first step with
15    the Commission, and that would be in
16    consultation with the Assistant Director.  And
17    if there was additional consultation needed,
18    then we would speak with our client services
19    representative in the Department of Justice.
20    Civil Bureau, Department of Justice.
21 Q    Okay.  Is the client services representative at
22    the Department of Justice right now, who would
23    that be?

31

1  A    Sean Locke.
2  Q    The intake coordinator.  Do you have one intake
3    coordinator or multiple intake coordinators?
4  A    Usually there is one, but if they're not in, it
5    could be someone else.
6  Q    Who would that other person would be if that
7    intake coordinator is not in?
8  A    It varies.  It could be the Assistant Director.
9    Could be an investigator.
10 Q    Who is the Assistant Director currently?
11 A    Sarah Burke Cohen.
12 Q    And you just mentioned the investigator moments
13    ago.  Does the Commission have one investigator,
14    multiple investigators?
15 A    Multiple.
16 Q    How many?
17 A    Five.
18 Q    How does an intake coordinator decide when to
19    consult with the Assistant Director about
20    whether to docket an allegation of
21    discrimination?
22         MR. KENISON-MARVIN:  Objection.
23    Foundation.  Vague.  Asks for speculation.  You

32

1    can answer.
2  Q    You can answer it if you can.
3  A    The Assistant Director is the supervisor of the
4    intake coordinator.
5  Q    Does the intake, what I'm just trying to get at
6    is how these decisions are made.  That's it.  So
7    I guess what I'm trying to figure out is are
8    there standards that exist with respect to when
9    the intake coordinator consults with the
10    Assistant Director making this decision?  Are
11    there policies in place concerning when that
12    consultation occurs?
13         MR. KENISON-MARVIN:  Objection.  Compound.
14    You can answer.
15 A    Broadly speaking.  There are for all of the
16    areas of jurisdiction that the Commission has
17    there are legal standards.
18 Q    Um-hum.
19 A    So the prima facie is based on the legal
20    standard.
21 Q    Do you know how frequently the intake
22    coordinator consults with the Assistant Director
23    with respect to decisions as to when to docket

33

1     an allegation of discrimination that's been
2     made?
3  A   I do not.
4  Q   Are there periodic meetings that occur within
5     the intake coordinator and the Assistant
6     Director with respect to whether to docket
7     allegations of discrimination?
8  A   I believe they meet weekly, but I'm unsure.
9  Q   Okay.  Are those meetings that you're present
10    for?
11 A   I am not.
12 Q   Who is present at those meetings in which
13    decisions are made as to whether or not to
14    docket an allegation of discrimination?
15       MR. KENISON-MARVIN:  Objection.
16    Foundation.  You can answer.
17 A   I would want to clarify something.
18 Q   Please do.  Of course.
19 A   Those are weekly meetings that take place,
20    generally speaking.
21 Q   Okay.
22 A   It's not always whether to docket or not to
23    docket.

34

1  Q   Gotcha.
2  A   The initial step in docketing is the legal
3     standard.
4  Q   I'm just trying to get at how that decision is
5     made.  That's all.  So in these weekly meetings
6     is it fair to say that there are agenda items
7     that exist independent of decisions whether to
8     docket allegations of discrimination?
9  A   I would be making an assumption because I don't
10    attend those meetings.
11 Q   Without guessing, what's your knowledge of
12    what's discussed during those weekly meetings,
13    the generally topics of discussion?
14 A   Generally speaking, I think it would depend.  If
15    the intake coordinator is a new person, then
16    you're still in the process of training and
17    looking at the legal standard to make sure
18    there's understanding.
19       If they're someone that's more seasoned,
20    then there could be potentially a clarification
21    on something.  It could be any number of things.
22 Q   Okay.  Now, I know that this docketing decision
23    is done by the intake coordinator in

35

1     consultation with the Assistant Director.  Does
2     the Assistant Director ever bring you in to the
3     decision as to whether or not to docket an
4     allegation of discrimination?
5  A   Could you ask that again?
6  Q   Could you read that back, please?
7     (Requested portion read back by court reporter)
8  A   To answer the first part of your question, the
9     intake coordinator is not always meeting with
10    the Assistant Director to make a determination
11    of whether or not to docket a charge.
12 Q   Is it fair to say that sometimes the intake
13    coordinator is making that decision without
14    consulting the Assistant Director, right?
15 A   It would be fair to say that the intake
16    coordinator may not need the assistance of the
17    Assistant Director to make that determination.
18 Q   Have you ever been consulted by members of your
19    staff about a decision whether or not to docket
20    an allegation of discrimination?
21 A   I'm unsure how to answer that question.
22 Q   What about the question kind of gives you pause?
23 A   It's very broad.  Could you ask it again?

36

1  Q   I'm happy to ask the court reporter to state the
2     question again.
3     (Requested portion read back by court reporter)
4  A   So that's a very broad question.  The best
5     answer that I could give you sitting here today
6     would be if there were a question, we would
7     speak with an attorney if there was an issue
8     that could not be resolved.
9  Q   Has a member of your staff ever asked for your
10    feedback as to whether or not the Commission
11    should docket an allegation of discrimination?
12 A   Maybe.
13 Q   Do you recall any instances sitting here today
14    where that may have occurred?
15 A   Sitting here today, I can't give you a
16    definitive answer.
17 Q   Okay.  So you don't recall sitting here today a
18    specific example in the context of a specific
19    allegation where you were asked to provide
20    feedback as to whether or not that allegation
21    should be docketed, correct?
22 A   That is correct.
23 Q   I just want to go back again to the kind of the

37

1    format of these allegations of discrimination.
2    Besides being in writing, verified, signed by
3    the complainant and witnessed by a notary, are
4    there any other requirements for allegations of
5    discrimination to become docketed complaints?
6  A   I'm sorry.  Are there other requirements?
7  Q   Yes.  Beyond meeting the prima fascia legal
8    standard, are there any other format
9    requirements that exist within the Commission
10   for those allegations to become docketed?
11 A   Can you just go over your list again to make
12   sure that I'm --
13 Q   Absolutely.  In writing, verified, signed by the
14   complainant, and witnessed by the notary.
15       MR. KENISON-MARVIN:  Let me just object to
16   the extent it calls for a legal contention, but
17   you can answer.
18 A   I'm unaware of any other bases.  It must be
19   verified which means it's on paper, and it has
20   to have a signature which the notary is
21   verifying.
22 Q   Just referring to the last line of paragraph (a)
23   that is on page 271, there's language that

38

1    states whereby both parties are notified in
2    writing.  Do you see that?
3  A   Yes.
4  Q   So I just want to make sure I understand the
5    process.  Once an allegation of discrimination
6    becomes a docketed complaint, a notice is
7    submitted to the complaining party and the
8    individual alleged to have violated the law; is
9    that correct?
10 A   Yes.
11 Q   What does that writing look like actually?  What
12   is the format in which that notice is provided?
13       Why don't I ask one good question instead
14   of two compound questions.  So what is the
15   format in which that notice is provided to the
16   complaining party and the individual alleged to
17   have engaged in discrimination?
18 A   The parties receive a cover letter from the
19   Commission.  Enclosed with that is a copy of the
20   charge made by the Complainant.
21 Q   Is that docketed complaint once it is docketed,
22   is it something that becomes a public record at
23   all?

39

1  A   No.  It's confidential.
2  Q   Referring to now subsection (b), "The complaint
3    is investigated, and a determination is made by
4    the Investigating Commission whether the charge
5    has a Probable Cause (PC) or No Probable Cause
6    (NPC) finding."  Do you see that language I just
7    referenced?
8  A   Yes.
9  Q   How are docketed complaints investigated?
10   What's that process?
11 A   The investigation process is the investigator
12   reviews any documentation that has already been
13   submitted by either parties and/or requests
14   additional documentation from the parties.  Has
15   interviews with the parties.
16 Q   Is the investigator here a member of the
17   Commission?
18 A   I'm unclear about the question.
19 Q   I believe in earlier testimony we talked about
20   Commission investigators.  Do I have that
21   recollection correct?
22       Let me ask this.  Who is doing the
23   investigating with respect to "the complaint is

40

1    investigated" language in paragraph B of page
2    10271 in Exhibit 53?
3  A   There's a staff member that is an
4    anti-discrimination investigator.
5  Q   Is that staff member a Commissioner or someone
6    who's on staff?
7  A   It is not a Commissioner.
8  Q   Okay.  How is that investigator assigned?
9    What's that process?  Strike that.
10       How is the investigator assigned?
11       MR. KENISON-MARVIN:  Objection.
12   Foundation.
13 A   The Assistant Director will assign new cases
14   each month to the investigators.
15 Q   Are you involved in that assignment process?
16 A   No.
17 Q   Am I correct -- I didn't write this down, but I
18   want to make sure I have this crystal clear.  I
19   believe you earlier said that there's around
20   five investigators.  Am I accurately remembering
21   your testimony?
22 A   Yes.
23 Q   After that investigation is completed, what does

41

1    the investigator do next?
2         MR. KENISON-MARVIN: Objection. Vague,
3    foundation, speculation. You can answer.
4  Q   Why don't I ask you it this way. I'm not trying
5    to hide the ball. I'm trying to streamline this
6    process.
7         Paragraph (b) says that the complaint is
8    investigated and then a determination is made by
9    the Commissioner as to whether or not there's
10   probable cause or no probable cause. Is that an
11   accurate reflection of the current process?
12 A   Yes.
13 Q   Why don't we take just a short break.
14        (Recess taken at 12:23 - 12:37 p.m.)
15 Q   Director Malachi, there is one background
16   question that I actually just forgot to ask so
17   I'm going to go back into my introductory line
18   of questions, and I just wanted you to describe
19   your educational background for me. My
20   apologies for forgetting to ask that.
21 A   How far back are you asking?
22 Q   Why don't you start post high school.
23 A   I have a degree in journalism. Are you asking

42

1    for the school or just the degrees?
2  Q   Yes. School, degrees and approximate dates.
3  A   Ooh.
4  Q   Approximate dates.
5  A   Long time ago. Degree in journalism. Georgia
6    State University. 1989 maybe. Master's degree
7    in human services counseling, Liberty University
8    maybe 2017. You're asking completed programs?
9  Q   Yes. If you have programs that you didn't
10   complete as well, that would be helpful, too.
11 A   Currently enrolled in a doctoral program. I
12   don't know if you're --
13 Q   Oh. I didn't know that. Where is that
14   occurring?
15 A   Liberty University as well. That would be a
16   doctorate of strategic leadership when
17   completed.
18 Q   Any idea when you'll complete it? I know that's
19   a hard question to ask for any doctoral program.
20 A   It is a very tough question to answer. A couple
21   of years.
22 Q   Okay.
23 A   Not exactly sure. Could be less, could be more.

43

1  Q   Okay.
2  A   You know how that goes.
3  Q   I sure do. I sure do. Thank you. That's
4    helpful.
5         I have a few kind of followup questions on
6    just the general complaint process, and then I
7    promise that we are going to move on.
8         Do allegations of discrimination before
9    they're docketed, do they have to come from the
10   person who has -- strike that.
11        Can allegations of discrimination, can they
12   be forwarded by other state agencies to be
13   considered by the Commission for docketing?
14 A   I am unclear on what, how to answer that
15   question. Is there a way to be more specific so
16   I can --
17 Q   Sure. If an allegation of discrimination comes
18   in from the Department of Education, can the
19   Department of Education forward that allegation
20   of discrimination to the Human Rights Commission
21   for consideration?
22 A   To clarify --
23 Q   For consideration as to whether it would be

44

1    docketed?
2  A   On whether to docket?
3  Q   Yes.
4  A   So that's a little tough to answer, but I will
5    try my best.
6  Q   Please do.
7  A   Ultimately, a docketed charge has to be
8    completed by the complainant. So there isn't a
9    way, other than a complainant's attorney.
10   Outside of the complainant themselves signing
11   and swearing under the pains and penalties of
12   perjury, then their attorney could do that on
13   their behalf. That is the only way to docket a
14   charge.
15 Q   Before an allegation of discrimination is
16   docketed, do staff members at the HRC ever
17   consult with other state agencies?
18 A   Could you clarify?
19 Q   I believe your testimony before is that as part
20   of the docketing decision process there will
21   sometimes be consultation with your attorney
22   representative of the Department of Justice; is
23   that fair to say?

45

1   A   Relatively speaking.  So it's not an everyday
2       thing to do that.  If something is different,
3       then we would consult.
4   Q   It would depend on the circumstances, right?
5   A   Context.
6   Q   Exactly.  I understand what you're saying.  I
7       guess my question is whether when a complaint
8       is -- strike that.
9          When an allegation of discrimination comes
10      into your office, excluding the Department of
11      Justice, is there any other state agency that
12      would be consulted as part of the
13      decision-making process as to whether to docket
14      an allegation of discrimination?
15  A   As I sit here today, I'm unaware of another
16      agency that we would consult.
17  Q   Okay.
18  A   If I'm understanding your term.
19  Q   You are.  I think you are.
20         Has there ever been an instance that you're
21      aware of in which an allegation of
22      discrimination has been brought forward to your
23      office in which members of your staff have had

46

1       conversations with Department of Education about
2       whether to docket that allegation?
3   A   Clarification.  Are you asking ever in the
4       history, ever?
5   Q   Since you've been here.
6   A   Relative to?
7   Q   Sorry.  Relative to any allegation of
8       discrimination with the time frame being since
9       you've been Executive Director of the
10      organization.
11  A   Okay.  As of 2019 is when education meaning K
12      through 12 public education which covers public
13      schools, public charter schools as well as
14      public academies, that is when education was
15      added to the statute for the Commission so prior
16      to that there were no education charges.
17         Since then as far as I know sitting here
18      today I mean I could certainly confer with
19      staff, but I am unaware of a time that there was
20      consultation with the Department of Education
21      relative to a docketed charge.
22  Q   Okay.  That's helpful.
23         I'm going to refer you back, Director

47

1       Malachi, on Exhibit 53 to the language 5(a) to
2       5(d).  Do you see that language?
3   A   Yes.
4   Q   I just want to confirm.  Is that the same
5       process that exists with respect to allegations
6       of discrimination that are brought under the
7       Freedom from Discrimination statute we
8       referenced before in 354-A:9 to 354-A:34?
9   A   A-29 through A-34?
10  Q   Yes.  The question is is it the same process.
11      That's all.
12  A   Okay.  So to specifically answer your question,
13      what's described in the section that you
14      mentioned on the document on Exhibit 53 is the
15      process for the Commission full stop.
16  Q   And that would include how allegations of
17      discrimination are handled under the Freedom
18      from Discrimination Law in Exhibit 1 located at
19      RSA 354-A:29 to 34.  Correct?  And I'm excluding
20      from that question 193:40, to be clear.
21  A   So to be specific, what's mentioned in Exhibit
22      53 is the Commission's process which is no
23      different relative to any part of how the

48

1       Commission is looking at a charge.  So anything
2       that's assigned to the Commission to look at as
3       a potential allegation or I should say as a
4       docketed charge, (a) through (d).
5   Q   And just trying to close the loop on that.  So
6       that would include allegations made under the
7       right to freedom from discrimination statute in
8       RSA 354-A:29 to 34.  Right?
9   A   It includes the entire statute, yes.
10  Q   I want to direct your attention also on Exhibit
11      53 to (e) on page 10271.  The language that says
12      "Finally, the Department of Education (DOE)
13      would be the arbiters of "educator discipline"
14      according to RSA 193:40 (IV), and as "educator"
15      as defined by RSA 193:40 (V)."  Do you see that
16      language?
17  A   Yes.
18  Q   Just to be clear, that was your understanding as
19      of March 4th, 2022.  Correct?
20  A   Yes.
21  Q   Is that still your understanding of the law?
22  A   Yes.
23  Q   Since the Freedom from Discrimination Law was

49

1    passed, and I want to be very clear, just
2    talking now about RSA 354-A:29-34. Okay? Have
3    you or members of the Commission conducted any
4    trainings on those provisions, public trainings?
5    A    No.
6    Q    So there have been no trainings from the Human
7         Rights Commission to educators; is that correct?
8    A    Correct.
9    Q    Have there been requests for the Human Rights
10        Commission to provide such trainings by any
11        member of the public?
12   A    I'm unsure. I would have to confer.
13   Q    Okay.
14        (Exhibit 54 marked for identification)
15   Q    So Director Malachi, I've put before you what's
16        been marked as Exhibit 54 and just ask you to
17        review Exhibit 54 and let me know when you're
18        done.
19   A    Okay.
20   Q    Have you seen Exhibit 54 before?
21   A    Maybe.
22   Q    I would just note that the top of Exhibit 54 is
23        an email from Sarah Burke Cohen who I believe is

50

1    the, I want to get the title, Assistant
2    Director, to you dated Monday, September 20th,
3    2021, forwarding an email chain from Irv
4    Richardson of New Hampshire NEA to the Human
5    Rights Commission email address.
6         So do you recall seeing this email,
7    Director Malachi, on or about September 20th,
8    2021?
9    A    Maybe. I mean that was multiple years ago. So
10        lots of emails.
11   Q    I would just note that at the bottom of Exhibit
12        54 is a request made from Mr. Richardson of NEA
13        New Hampshire stating do you have someone
14        associated with the Human Rights Commission that
15        might provide further clarification on the law
16        and answer questions from educators using a
17        virtual platform? I have reached out to the New
18        Hampshire Department of Education, and they
19        indicated I should make such a request to
20        you.
21        Do you recall how the Human Rights
22        Commission responded to this request from NEA
23        New Hampshire?

51

1    A    I don't recall.
2    Q    Do you recall you or any member of your staff
3         ever speaking to NEA New Hampshire about
4         clarifications on the law, sections 297 and 298
5         of House Bill 2?
6    A    I do not recall.
7    Q    Do you recall any internal communications about
8         whether or not to accept this invitation from
9         NEA New Hampshire?
10   A    I don't recall.
11   Q    Any communications externally with the
12        Department of Education about whether to accept
13        this invitation?
14   A    I don't recall.
15   Q    I want to go back to a series of questions I
16        asked about whether complaints can be referred
17        by other agencies. Are you aware of any
18        standard operating procedure or agreement that
19        exists between the Department of Education and
20        the Department of Justice with respect to how
21        complaints the Department of Education receives
22        under RSA Chapter 354-A can be referred to the
23        Human Rights Commission?

52

1    A    Ask that again? Because I'm unsure how to
2         answer that.
3    Q    I'm not entirely sure what I asked.
4         (Requested portion read back by court reporter)
5         MR. KENISON-MARVIN: I'll object as
6    compound.
7    Q    Is that a question you can answer?
8    A    Is there a more specific part of that question
9         that you're asking?
10   Q    I'm going to try to ask it a better way, and I'm
11        going to pull up a document to just assist me in
12        asking the question.
13        I'm just going to refer you to Exhibit 6.
14        MR. BISSONNETTE: Nate, is that something
15        that you could just pull? Thank you.
16   Q    So what I'm going to direct your attention to,
17        you've never seen this before is my assumption,
18        Director Malachi, but in the interest of
19        streamlining this inquiry, I'm going to direct
20        you to Bates stamped 806 on Exhibit 6. If you
21        go to the bottom left quadrant, page 19, on page
22        806, there's language from Ms. Diana Fenton that
23        begins with, and this is in the middle of a

**53**

1  sentence, quote, "we have since worked with the
2  AG's office to come up with an SOP as to how we
3  transfer those cases to the Human Rights
4  Commission and to the AG's office."
5      Do you see, my question only right now is
6  do you see the language that I just referenced?
7  A   No.
8  Q   Okay.
9  A   What line are you on?
10 Q   Absolutely.  Page 19 begins on the bottom left
11     quadrant beginning on line 25.  I'll just read
12     it just once more just so we're on the same
13     page.  "We have since worked with the AG's
14     office to come up with an SOP as to how we
15     transfer those cases to the Human Rights
16     Commission and the AG's office."  Do you see
17     that language?
18 A   I do.
19 Q   Okay.  Do you know who Diana Fenton is?
20 A   Yes.
21 Q   Who is Diana Fenton?
22 A   She's an attorney.
23 Q   Okay.  And I just represent to you that this is

**54**

1  a portion of the hearing testimony that occurred
2  on March 8, 2023, before the House Judiciary
3  Hearing.  So that's why I asked that prior
4  question to you.  So I'm just trying to get at
5  what your understanding is of this SOP.  So I'm
6  going to reask the question.
7      Are you aware of any standard operating
8  procedure that exists that governs how cases
9  that the Department of Education receives under
10 RSA 354-A can be referred to the Human Rights
11 Commission?
12 A   How allegations are referred?
13 Q   Allegations of discrimination.  Yes.
14 A   That would be between the AG's office and the
15     Department of Education.
16 Q   Okay.  I'm just asking about what you're aware
17     of.  Are you though sitting here today aware of
18     any standard operating procedure?
19 A   Sitting here today, I'm unclear.  You would have
20     to speak with the AG's office to understand what
21     that process is.
22 Q   Have you ever had any communications with the
23     Department of Education about a standard

**55**

1  operating procedure that would refer allegations
2  of discrimination to your office that were
3  received by the Department of Education?
4  A   I'm sorry.  Say that again?
5      (Requested portion read back by court reporter)
6  A   I'm sorry.  Read it one more time.
7      (Requested portion read back by court reporter)
8  A   So the question is unclear because, generally
9      speaking, the Commission covers education.
10 Q   Um-hum.
11 A   Which is separate from HB 2 or 354-A:29 through
12     34.  So are you asking, so could you clarify the
13     question that you're asking?
14 Q   Sure.  What I was asking is about any provision
15     of 354-A which would include the provisions that
16     have been challenged in this case in
17     354-A:29-34.  So with that I'll just, I'll kind
18     of reframe my question.
19     Have you been a party to any communications
20     with the Department of Education concerning a
21     standard operating procedure that would allow
22     for the referral of allegations of
23     discrimination under RSA chapter 354-A to the

**56**

1  Commission from the Department of Education?
2  A   Okay.  If I understand your question -- I'm,
3      okay.  Have I ever been a party to conversations
4      regarding an SOP for transferring allegations
5      from the Department of Education to the
6      Commission.
7  Q   Precisely.
8  A   Okay.  Thank you.
9  Q   No.  No.  It's fine.  I want to make sure we're
10     on the same page.  I understand.
11 A   Have there ever been conversations between
12     myself and the Department of Education?  Broadly
13     speaking, yes.  To the specifics that you're
14     asking, it is not my understanding that I have
15     been.
16 Q   Okay.  When you say "broadly speaking," you're a
17     party to those communications, when would those
18     communications have occurred and with whom?
19 A   In 2019.  Somewhere thereabouts because that was
20     when education was included in the statute so it
21     would have been with my agency attorney and with
22     Diana Fenton to have an understanding of some of
23     the specific kinds of education cases we could

57

1    get.  So to further answer the question, 504 and
2    IEP, the Commission would not have experience in
3    that area.  However, if a student was not
4    receiving that assistance due to discrimination,
5    then there would have to be a further
6    conversation to address how to move that case
7    forward regarding our confidentiality which is
8    different from other agencies and so there could
9    need to be a conversation.
10   Q    That makes sense in light of those changes in
11   2019.
12        After the enactment of the Freedom from
13   Discrimination Law memorialized in 354-A:29 to
14   34, did you ever have a similar conversation as
15   to how cases could be referred from the DOE to
16   the Human Rights Commission under those new
17   provisions?
18   A    I believe there may have been some general
19   conversation and to be specific about the
20   generalization, the individual who is
21   potentially aggrieved has to file a charge.
22   Q    Okay.
23   A    In order for the Commission to take action.

58

1    Q    Okay.  So you said general conversations?  Do
2    you recall when those general conversations
3    occurred and with whom?
4    A    I don't.  I mean, certainly it would have been
5    after the act was signed.  So some time after --
6    I believe it went into effect in 2021.  So it
7    would have been some time after June of 2021.
8    More specifically, I can't tell you.
9    Q    Okay.  If you had those communications with the
10   Department of Education do you know whether or
11   not Diana Fenton would have been a participant
12   in those discussions?
13   A    Yes.  I believe she would have been.
14   Q    Do you also believe that Elizabeth Brown would
15   have been a party to those communications?
16   A    I don't know.
17   Q    Do you know who Elizabeth Brown is?
18   A    I do not know who that is.
19   Q    Fair enough.  Would an attorney from the
20   Department of Justice also have been a party to
21   those communications?
22   A    I need a moment.
23   Q    Please do.  Just for the record I'm not asking

59

1    for the substance of those communications, just
2    whether the attorney would have been a party,
3    but I'm happy to give you a minute.
4    A    Yes.
5         (Director Malachi and Atty. Kenison-Marvin
6         leave the conference room and return)
7    (Requested portion read back by court reporter)
8    A    Okay.  That's a lot.  So the question was
9    generally speaking conversations with the
10   Department of Education relative to the Freedom
11   from Discrimination Law act.
12   Q    No.  Relative to whether and how referrals could
13   be made of complaints that the Department of
14   Education receives under RSA 354-A:29 to 34, how
15   and if those referrals could be made by the
16   Department of Education to the Human Rights
17   Commission.
18   A    Okay.  Now that I'm clear, I would not have been
19   a party to conversations between the Department
20   of Education and the AG's office relative to the
21   referral of cases or allegations or -- it could
22   only be an allegation.
23   Q    Okay.  I want to make sure that I now understand

60

1    your prior testimony.  After the enactment of
2    the, let me just say the challenged law in this
3    case, have you had conversations with Attorney
4    Fenton about how allegations of discrimination
5    under the Freedom from Discrimination Law could
6    be referred by the Department of Education to
7    the Human Rights Commission?
8    A    That actually needs a little more clarity.  If
9    you're asking if it was made clear that there
10   has to be someone to sign a charge, meaning a
11   complainant, then there was a conversation
12   relative to that.
13   Q    Okay.
14   A    Outside of that, meaning that general charges,
15   general, no, not that I can recall.
16   Q    That meeting that you just referenced, who was a
17   participant in that meeting?
18   A    So the meeting that I referenced was in larger
19   context of the new amendment.  It was not
20   specific to an agreement or a standard operating
21   procedure between the Department of Education
22   and the Department of Justice to be clear.
23   Q    That's helpful.  Do you know when this meeting

61

1    occurred?

2  A    Which meeting?

3  Q    The meeting that you just referenced that was

4    part of a larger context in which there was a

5    discussion that someone has to sign a charge for

6    the Commission to accept it.  That meeting.

7  A    I do not recall.

8        MR. KENISON-MARVIN:  I want to object.  I

9    think that mischaracterizes the testimony.

10       MR. BISSONNETTE:  I was just trying to get

11   at that meeting.  Whatever that was discussed at

12   that meeting.

13       MR. KENISON-MARVIN:  I don't want to make a

14   speaking objection, but I want to try to cut to

15   the chase if I can be helpful.

16       MR. BISSONNETTE:  Please do.

17       MR. KENISON-MARVIN:  Maybe I'm wrong in my

18   misunderstanding, whether there's a distinction

19   between the general meeting and the conversation

20   with Diana Fenton.

21       MR. BISSONNETTE:  Okay.

22       MR. KENISON-MARVIN:  That's where my

23   objection is based.

62

1  Q    May I have, Cindy, I'm sorry to burden you.  Can

2    I just have read back to me the portion of

3    Director Malachi's response in which she talks

4    about the larger context.

5        (Requested portion read back by court reporter)

6  Q    So my question is what do you remember about

7    that meeting in which that larger context was

8    referenced and who participated in that meeting?

9  A    The meeting would have been some time ago.  I am

10   not a hundred percent clear on all of the

11   individuals that may have been there.

12 Q    Okay.  What do you recall, is there anything you

13   could recall sitting here today about the

14   substance of that meeting that was part of a

15   larger context?

16 A    Generally speaking, my recollection, I believe

17   we may have talked about the case processing

18   process.

19 Q    Okay.

20 A    I know that attorneys were present.

21 Q    Okay.  When you refer to "case processing," do

22   you recall any specifics about that?

23       MR. KENISON-MARVIN:  I'll state a limited

63

1    objection.  To the extent that you have a

2    recollection of conversations that anyone was

3    asking attorneys for legal advice or how law

4    would apply, that information we would claim a

5    privilege to and I would instruct you not to

6    provide the details of those conversations as

7    well as any decisions that were being made,

8    deliberations related to decisions to be made,

9    substance of those conversations.  So I would

10   instruct you not to provide those details on the

11   basis of those privileges.  To the extent you

12   can answer the question without providing,

13   there's information in response to the question

14   that you could provide that's not what I

15   described, you can answer it.

16       MR. BISSONNETTE:  I'm going to withdraw the

17   question real quickly in light of that

18   objection.

19 Q    Back to this meeting I would, though, in an

20   effort to try to probe that privilege a bit,

21   just try to get a handle on who all the

22   participants were in that meeting if you could

23   remember.  Just if you could list them all out.

64

1  A    As I stated, that was several years ago so I

2    don't have a complete recollection of everyone

3    that was in the room.

4  Q    Okay.  Do you know if Attorney Sean Locke was in

5    the room?  Any recollection?

6  A    I do not recall.

7  Q    Okay.  Were other state agencies represented at

8    that meeting?

9  A    Could you be more specific?

10 Q    Sure.  Did the Department of Education have a

11   representative at that meeting?

12 A    Yes.

13 Q    Who was that representative?

14 A    In my hazy recollection I believe their attorney

15   was there which would have been Chris Bond I

16   believe at the time.

17 Q    Okay.  And do you recall anyone else that was

18   present during this meeting?

19 A    The Commissioner might have been there, but I am

20   not a hundred percent sure.

21 Q    You may have answered this and I forget the

22   response and I apologize, but obviously we know

23   that the challenged law in this case was enacted

65

1    in June 2021.  Do you recall when this meeting
2    occurred after June 2021?
3  A    I do not recall.
4  Q    Okay.  Do you recall whether any decisions were
5    made during this meeting about how to process
6    claims of discrimination that are made under
7    354-A:29 to 34?
8  A    I don't recall the full context or content of
9    the conversations.
10  Q    I want to kind of now pivot from that meeting,
11    Director Malachi.  I know that you said earlier
12    that there was a discussion or statement made
13    where you said that for a case to be docketed by
14    the HRC that someone has to sign a charge.  Am I
15    accurately remembering your testimony?
16  A    I would hope I would have stated that the
17    complainant has to sign a charge.
18  Q    Yes, please.  I'm sorry.
19  A    Or their attorney.
20  Q    Thank you.  Was that something that was
21    discussed in a separate conversation with
22    Attorney Fenton?
23  A    I don't recall.

66

1  Q    Aside from the meeting that you just referenced
2    moments ago that was part of a larger context,
3    do you recall any other communications with any
4    other state officials outside of the HRC about
5    how allegations of discrimination could be
6    referred from the Department of Education to the
7    Human Rights Commission?
8  A    Could you ask that again, please?
9  Q    Sure.  Excluding the meeting that we just
10    referenced that was part of a larger context, do
11    you recall having any other discussions with
12    state officials outside of the Human Rights
13    Commission about how allegations of
14    discrimination could be referred by the
15    Department of Education to the Human Rights
16    Commission?
17  A    Are you asking if it's an allegation or are you
18    asking if it's a charge?
19  Q    Allegation of discrimination.  Hasn't been
20    docketed, it comes to the Department of
21    Education, Department of Education may think
22    that that could constitute a violation under
23    Exhibit 1, the challenged law in this case, and

67

1    conversations about whether the Human Rights
2    Commission could accept that as an allegation
3    and then proceed to make a determination as to
4    whether or not it should be docketed.
5  A    I'm unsure of any -- I don't recall any
6    conversations.
7  Q    Okay.  I don't want to know the contents, but I
8    do have to ask the question.  Did you ever
9    receive a document from Attorney Sean Locke that
10    generally discussed how allegations of
11    discrimination that the DOE may receive could be
12    referred to the Human Rights Commission?  Just
13    asking whether you received a document along
14    those lines.
15  A    I don't recall.
16  Q    Okay.  Last question along these lines, and I'm
17    going to wrap up this inquiry.  I'm just going
18    to submit to you that Representative Glenn
19    Cordelli stated in March 2023 that the Attorney
20    General's office has, quote, "been more
21    cooperative," end quote, with respect to, quote,
22    "getting cases referred to the Human Rights
23    Commission."  This was stated around March 2023.

68

1    Do you know what Representative Cordelli is
2    talking about there?
3  A    You would have to ask him.
4  Q    But you've never had communications with the
5    Department of Education, the Department of
6    Justice about the Attorney General's office
7    becoming more cooperative with respect to
8    getting cases referred to the Human Rights
9    Commission; is that true?
10  A    I don't recall any conversations of that type.
11  Q    Okay.  With respect to the challenged law in
12    this case in Exhibit 1, was your office ever
13    involved in drafting the language of Exhibit 1
14    when HB 2 was in the Senate, to be considered in
15    the Senate?
16  A    Could I see Exhibit 1?
17  Q    Yes.  Of course.
18  A    Could you ask me your question again, please?
19    (Requested portion read back by court reporter)
20  A    No.
21  Q    Were you ever asked for feedback while Exhibit 1
22    was being considered in the Senate by
23    legislators concerning the language in Exhibit

69

1     1?
2  A   No.
3  Q   You can set that aside.  Thank you, Director
4     Malachi.
5        I just did have a couple followup questions
6     about this referral business, and I'm sorry to
7     belabor the point.
8        Besides yourself, and I know we went over
9     the conversations that you may or may not have
10    been involved in with respect to whether
11    allegations could be referred, are you aware of
12    any communications that Commissioners within the
13    Human Rights Commission may have had with the
14    Department of Justice or the DOE about how
15    allegations of discrimination could be referred
16    by the DOE to the HRC?
17 A   I don't recall having any knowledge.
18 Q   Have there been any writings issued by either
19    you or the Commissioners to staff about whether
20    to accept allegations of discrimination under
21    the challenged law from the Department of
22    Education?
23 A   Could you be more specific on the writings?

70

1  Q   Sure.  By writing, what I mean are any
2     directive, policies, or guidance.
3  A   No.
4  Q   The communication that you had as part of a
5     larger context that we referenced before, did
6     you brief your fellow Commissioners about that
7     conversation?  Strike that.
8        That conversation that you referenced in
9     your earlier testimony that was part of a larger
10    context, did you brief the Commissioners about
11    that communication?
12 A   Sitting here today, I don't recall.
13 Q   I'm going to switch gears here.  Okay?  Director
14    Malachi, there was a statement made by the
15    Attorney General's office at the Motion to
16    Dismiss hearing in this case, quote, "The
17    Department of Education as a matter of practice
18    is simply declining to consider any allegation
19    that these statutes are being violated by any
20    teacher until and unless that person making the
21    complaint has gone to the Human Rights
22    Commission."  And I think I can go back to make
23    sure I'm accurately reflecting that, but I

71

1     believe the Attorney General's office confirmed
2     that during the hearing, but my question to you
3     is is that your understanding of the process
4     with respect to when the Department of Education
5     under their code of conduct can pursue a charge
6     under the challenged law?
7  A   Could you reread the part that you'd like me to
8     answer.
9  Q   Sure.  Quote, "The Department of Education as a
10    matter of practice is simply declining to
11    consider any allegation that these statutes are
12    being violated by any teacher until and unless
13    that person making the complaint has gone to the
14    Human Rights Commission."
15       My question to you is is that your
16    understanding as well of when the Department of
17    Education can pursue action against an educator
18    under the challenged law?
19 A   If I'm understanding the question, the answer
20    would be statutorily someone has to come to the
21    Commission first.
22 Q   Okay.
23 A   And then once we have completed our process and

72

1     any appeals that the person may have, then it
2     moves on to wherever it goes after that.
3  Q   Okay.  Where does that understanding come from?
4     Is that in a writing, in a document?  What's the
5     basis of your statement that someone first has
6     to come to the HRC?
7        MR. KENISON-MARVIN:  Objection to the
8     extent it calls for a legal contention.  You can
9     answer.
10 A   Statutorily to file a charge of discrimination
11    under 354-A a Complainant has to come to the
12    Commission, whether it's employment, public
13    accommodation, housing, or K through 12
14    education, and as such unless outlined
15    differently there would be any other amended
16    section based on the statute.
17 Q   Do you have any other basis for that besides
18    what's in the statute?
19       MR. KENISON-MARVIN:  Same objection.
20 Q   Any other basis for believing that?
21 A   I'm sorry?  Restate?
22 Q   Besides what's in the statute, do you have any
23    other reason for believing that a complainant

73

1    must first seek relief before the Human Rights
2    Commission before action can be taken against an
3    educator?
4  A    The statute is the guidance.
5  Q    Okay. I'm just going to direct your attention
6    back to Exhibit 1, and page PL 006 starting at
7    line 23. It goes on to page 7, line 15. So
8    this is the statute RSA 193:40, and when you see
9    that language just let me know.
10 A    I'm sorry. Line 23 through?
11 Q    I'm sorry. Line 23 to the next page, line 19,
12    and it's RSA 193:40 on Exhibit 1.
13 A    I see it.
14 Q    Okay. Do you have any authority in enforcing
15    that statute?
16    MR. KENISON-MARVIN: Objection. Legal
17    contention. You can answer.
18 A    The Commission does not have jurisdiction over
19    193:40.
20 Q    So if someone brought a claim to the Human
21    Rights Commission under RSA 193:40, your view is
22    you would have no jurisdiction to adjudicate it;
23    is that correct?

74

1    MR. KENISON-MARVIN: Same objection.
2  A    The Commission has jurisdiction over 354-A.
3  Q    And RSA 193:40 is not within RSA 354-A so is it
4    fair to say in your view you do not believe the
5    Commission has jurisdiction to hear a claim
6    under RSA 193:40?
7    MR. KENISON-MARVIN: Same objection.
8  A    As I sit here today it would be my understanding
9    that the Commission only has authority over
10    354-A.
11 Q    Do you know sitting here today who would have
12    jurisdiction over a complaint made exclusively
13    under 193:40?
14    MR. KENISON-MARVIN: Same objection.
15 A    I do not have expertise in 193 so whose RSA that
16    belongs to would be the body that has authority
17    over 193:40.
18 Q    Okay. Besides the statute has there been
19    written guidance that explains that a person
20    must first go to the Human Rights Commission
21    before action could be taken against the
22    teacher?
23    MR. KENISON-MARVIN: Same objection.

75

1  A    Could you clarify which statute?
2  Q    I'm going to withdraw the question.
3    I would like to direct your attention,
4    Director Malachi, back to Exhibit 1. I'm just
5    going to direct your attention in particular to
6    page 004, line 37. Bear with me one second,
7    please.
8    On line 36 on page PL 004 of Exhibit 1
9    there's language there that states, quote, "no
10    public employer, either directly or through the
11    use of an outside contractor, shall teach,
12    advocate, instruct or train any employee,
13    student, service recipient, contractor, staff
14    member, inmate or any other individual group,
15    any one or more of the following." Do you see
16    that language?
17 A    Yes.
18 Q    What I'm going to just kind of focus you on is
19    the language "shall teach, advocate, instruct or
20    train" in the statute. Okay? So that's the
21    language that I'm targeting right now in my next
22    line of questions on line 37 on page PL 004 of
23    Exhibit 1.

76

1    So my question is does the Human Rights
2    Commission have any internal policy or guidance
3    as to what the terms mean, "teach, advocate,
4    instruct or train" under that statute?
5  A    No.
6  Q    Is there any internal guidance within the
7    Commission explaining whether or not the phrase
8    "teach, advocate, instruct or train" would
9    include teacher-facilitated group instruction in
10    a classroom?
11 A    No.
12 Q    Is there any written guidance or policy that
13    would explain whether or not the phrase "teach,
14    advocate, instruct or train" would include
15    assigning a book to students in a classroom?
16 A    I'm sorry. Internal policy or the FAQ?
17 Q    Any internal policy -- that's a fair question.
18    So any internal policy excluding the FAQ
19    as to whether the phrase "teach, advocate, instruct
20    or train" includes assigning a book to students?
21 A    I'm sorry. Is there a policy, no.
22 Q    You just referenced guidance. Were you
23    referring to the July 2021 guidance that was

77

1    issued with respect to the challenged law?
2  A  I don't know the date.  If you're asking about
3    the FAQ provided by the Attorney General, that
4    is what I'm speaking of.
5  Q  I'm just going to direct your attention to --
6      MR. BISSONNETTE:  If you wouldn't mind just
7    pulling out real quick, Nate, just Exhibit 24.
8      MR. KENISON-MARVIN:  For the witness?
9      MR. BISSONNETTE:  You know what?  Pull that
10   one back.  I'm sorry.
11     (Exhibit 56 marked for identification)
12 Q  So my question to you is going to be, after
13   you've reviewed it, are these the FAQs that you
14   just referenced that are in Exhibit 55.
15 A  Sitting here today without comparing to any
16   notes I might have, it does appear that this is
17   most likely the Frequently Asked Questions
18   guidance.
19 Q  That's all I wanted to know.  So setting aside
20   the contents of Exhibit 55, is there any other
21   internal policy or procedure that exists within
22   the Commission that defines what it means to
23   "teach, advocate, instruct or train" under the

78

1    provisions of RSA 354-A:31 in Exhibit 1?
2  A  No.
3  Q  I'm sorry to bounce around, Director Malachi.  I
4    know moment a ago you said you're not an expert
5    on 193:40 in Exhibit 1.  Is there anyone at the
6    Human Rights Commission that would be an expert
7    in RSA 193:40 and what it means and how it
8    operates?
9  A  No.
10 Q  With respect to how an allegation of
11   discrimination is docketed, and the prima facie
12   determination that's made, are there any
13   internal policies or procedures within the
14   Commission as to when a prima facie case has
15   been made under RSA 354-A:29-34?
16 A  Specifically speaking, no.
17 Q  Do you know sitting here today how decisions are
18   made as to whether a prima facie case has been
19   satisfied under the provisions in RSA
20   354-A:29-34?
21 A  Generally speaking, there's a legal standard and
22   so when that legal standard is met, then the
23   allegation can then become a charge, provided

79

1    the complainant is pursuing a charge.
2  Q  Okay.  So the reference "legal standard."  I
3    just want to make sure.  Is what you're
4    referring to just the language of the statute in
5    RSA 354-A:29-34?
6  A  To that I understand, yes.
7  Q  Are there any other standards that you're using
8    in deciding whether or not an allegation of
9    discrimination brought under RSA 354-A:29-34
10   should be docketed?
11     MR. KENISON-MARVIN:  Objection to the
12   extent it misstates prior testimony.
13 A  Could you be a little more specific?
14 Q  How about this.  Beyond the FAQs that we just
15   presented to you in Exhibit 54, and beyond the
16   language of the statute in RSA 354-A:29-34, is
17   there any other policy or guidance that the
18   Commission uses in deciding whether an
19   allegation of discrimination under RSA
20   354-A:29-34 should be docketed?
21 A  No.
22 Q  Can we take a two-minute break?
23     (Discussion off the record)

80

1      (Lunch recess taken 1:51 - 2:32 p.m.)
2  Q  So we're back on.  I'm just going to have your
3    attorney put before you what's been previously
4    marked as Exhibits 12 and 13.  I'd just ask you
5    to review Exhibits 12 and 13 briefly and just to
6    let me know when you finish.
7      Thank you, Director Malachi.  With respect
8    to Exhibit 12, I would just represent to you
9    that the cover page to Exhibit 12 is a document
10   I created just as a cover sheet to the September
11   7, 2021, AG memo that was affixed to the Mejia
12   and Philibotte complaint in this case.  So I
13   just wanted to flag that for you.
14     But with respect to PL 425 to 433 on
15   Exhibit 12, have you seen this document before?
16 A  To the extent that this is the Attorney
17   General's opinion, without comparing it to the
18   actual copy that I have, I can't state that this
19   is exactly it.  However, if this is the Attorney
20   General's opinion, then I've seen his opinion.
21 Q  Okay.  Any reason though to believe sitting here
22   today that this document that I've put before
23   you at PL 425 to 433 is not the Attorney

81

1    General's opinion from September 7, 2021?
2  A   I don't have, I don't have my copy and I'm just
3    looking at this copy.  So without comparing,
4    then I would say I can't be a hundred percent
5    sure.  However, if you're stating that it's the
6    Attorney General's opinion that I have a copy
7    of, then it's probably that.
8  Q   Do you have a copy handy in your office?
9  A   I'm not sure.
10 Q   Okay.
11 A   It might be in a file.
12 Q   I guess my question is without having looked at
13    the copy in your office, do you have any reason
14    to believe having reviewed Exhibit 12 that this
15    would not be the version of the Attorney General
16    memo that you have in your office?
17 A   Specifically to answer your question, I don't
18    have it memorized so I couldn't say that this is
19    the exact copy.
20 Q   I just want to close the loop without having to
21    send you on a fishing expedition so I do need an
22    answer to this.
23       Do you have any reason to believe after

82

1    having reviewed the pages affixed to Exhibit 12
2    that this is not the version of the September
3    7th, 2021, version that's in your office?
4  A   As I stated, I don't have it in front of me.
5  Q   Okay.
6  A   If you're stating that you have made no changes,
7    then I guess I have to trust you.
8  Q   Okay.  I'm going to have to, in light of that
9    testimony I'm going to have to ask her to go get
10    a copy.  Sorry.
11       MR. KENISON-MARVIN:  She said maybe, I
12    think.
13       MR. BISSONNETTE:  Can we go off the record?
14       (Discussion off the record)
15       (Director Malachi and Atty. Kenison-Martin
16       leave the conference room and return
17       2:39 - 2:46 p.m.)
18 Q   Director Malachi, without having seen the
19    version of Exhibit 12 that resides in the
20    offices of the Commission, do you have any
21    reason to believe that the document following
22    Exhibit 12 is not an accurate depiction of the
23    September 7, 2021, AG memo?

83

1  A   As I sit here today I don't have a specific
2    reason to think this isn't it.  However, I'm not
3    a hundred percent sure, but I don't have a
4    specific objection or question or issue.
5  Q   Thank you.  I appreciate that.  My question is
6    without getting into -- strike that.
7       Does this memo govern how the Human Rights
8    Commission enforces RSA 354-A:29 to 34?
9       MR. KENISON-MARVIN:  Objection.  Vague.
10    Legal contention.  You can answer.
11 A   When you say "govern," could you be more clear?
12 Q   Maybe I'll just ask the question more generally.
13       Does Exhibit 12 have any impact on how the
14    Human Rights Commission enforces RSA 354-A:29 to
15    34?
16       MR. KENISON-MARVIN:  Same objection.  You
17    can answer.
18 A   I'm not still a hundred percent certain that I
19    understand your question.  However, all of 354-A
20    is governed by the statute as it's written as
21    well as the legal standard.
22 Q   So direct your attention to the first page of
23    Exhibit 12 Bates stamped PL 00425.  This is

84

1    directed to Chairman Palardy and to you,
2    Director Malachi, and the first sentence states,
3    "You requested, on behalf of the New Hampshire
4    Commission for Human Rights, that this office
5    provide an official Attorney General opinion
6    concerning the scope and application of the
7    recently passed sections 297 and 298 of House
8    Bill 2."  Do you see that language?
9  A   I do.
10 Q   Did the Commission request an official Attorney
11    General opinion concerning the scope and
12    application of Sections 297 and 298 of House
13    Bill 2?
14 A   I'm not sure that that, your question, I think
15    it may speak to privilege.
16 Q   I think with respect to that particular question
17    I'm just referencing confirmation as to what's
18    in a public document.
19       MR. KENISON-MARVIN:  Object to maybe
20    compound question.  Just clarify now what the
21    question is on the table?
22 Q   Sure.  I just want to confirm whether it is
23    accurate that the Commission for Human Rights

---

85

1   requested that the Attorney General's office

2   provide an official Attorney General opinion

3   concerning the scope and application of the

4   recently passed Sections 297 and 298?

5       MR. KENISON-MARVIN:  I'll object on

6   attorney-client privilege to the extent the

7   question relates to not what's stated in the

8   document but with respect to specific requests

9   or communications made to the Attorney General

10  by the HRC.

11      MR. BISSONNETTE:  And I am not, just to be

12  very clear because I understand the objection, I

13  am not asking for communications beyond seeking

14  confirmation that there was a request from the

15  Human Rights Commission to the Attorney

16  General's office along the lines of the first

17  sentence on page 425 of Exhibit 12.

18      MR. KENISON-MARVIN:  Mind if we step out

19  for just a second?

20      (Director Malachi and Atty. Kenison-Marvin

21      leave the conference room and return

22      2:50 - 3:42 p.m.)

23  Q   So Director Malachi, I'm just going to obviously

---

86

1   reference the first sentence on Exhibit 12

2   beginning with the statement you requested on

3   behalf of the New Hampshire Commission for Human

4   Rights that this office provide an official

5   Attorney General opinion concerning the scope

6   and application of the recently passed Sections

7   297 and 298 of House Bill 2.  Do you see that

8   language in Exhibit 12?

9  A   Yes.

10  Q   So my question is did the Commission for Human

11      Rights request that the Attorney General's

12      office provide an official opinion concerning

13      the scope and application of Section 297 and 298

14      of House Bill 2?

15  A   As it relates specifically to me, did I go to

16      the AG and request an opinion, no.  However, I

17      think it would be fair to say that the

18      Commission requested an opinion.

19  Q   Okay.  Excluding any communications that the

20      Commission may have had with its lawyers at the

21      Department of Justice, can you explain to me why

22      the Commission sought an opinion?

23  A   I'm sorry.  Could you say that again?

---

87

1  Q   Yes.  Excluding the contents of any

2      communications that the Commission may have had

3      with its lawyers at the Department of Justice,

4      could you explain why the Commission sought the

5      opinion?

6       MR. KENISON-MARVIN:  Objection to the

7      extent it misstates the witness's answer to the

8      prior question.

9  Q   Can I withdraw the question?  I'd just like to

10     hear back exactly what the witness said.  Thank

11     you.

12     (Requested portion read back by court reporter)

13 Q   Excluding any communications that the Commission

14     had with its lawyers at the New Hampshire

15     Department of Justice, can you explain why the

16     Commission requested an opinion?

17 A   I'm unclear if that's privileged communication.

18      MR. KENISON-MARVIN:  The question doesn't

19     include any information that was discussed with

20     attorneys.  I believe I understand it to be

21     attorneys at DOJ, but to the extent there was

22     counsel not only with DOJ attorneys but any

23     attorney representing HRC that was a privileged

---

88

1   communication seeking advice to do something or

2   whether or not to do something, that would be

3   privileged, but I understand the question not to

4   ask for that information about content of

5   communications with attorneys that were

6   representing the HRC; is that correct?

7       MR. BISSONNETTE:  That is.  Yes.

8  A   With that clear, could you, I'm sorry, could you

9      ask the question one more time so I could

10     answer?

11  Q   Understood.  Just going to have it read back.

12     Thank you, Cindy.

13     (Requested portion read back by court reporter)

14  A   The Commission was aware of concern from the

15     public about Sections 297 and 298 and requested

16     the opinion.

17  Q   Okay.  And do you recall the specific concerns

18     from the public that were raised?

19  A   No.  I don't remember.  I don't recall the

20     specifics.

21  Q   Okay.  Were those specific concerns that you're

22     referencing, did they reflect the general

23     concern that the law was confusing?

---

89

1 A    I couldn't speak to my recollection of the
2       conversation.  It would be reflected in whatever
3       the opinion was.
4 Q    Is that reflected, just to be clear, I'm not
5       getting into communications with lawyers here,
6       but are those concerns reflected on the first
7       sentence of the second paragraph on page 1 in
8       which the memo states, "Some have voiced
9       concerns that these new statutes are confusing
10      and that public employers in schools will
11      struggle to understand the scope of the new
12      prohibitions"?
13 A    That could be.
14 Q    Sitting here today, can you recall anything more
15      specific about the concerns that are referenced
16      in Exhibit 12 and that were a reason for why the
17      Commission requested an opinion?
18 A    Sitting here today, no.
19 Q    I'm just going to refer you to you to Exhibit
20      13, Director Malachi, that's been placed in
21      front of you.  I would just submit to you this
22      is a document produced not by the HRC but by the
23      Department of Education.  That seems to suggest

90

1       an accepted meeting, I'm not sure by whom,
2       concerning Review and Discuss Procedure/Process
3       for Incidences of Anti-Discrimination in which
4       there potentially were as attendees you and
5       Commissioner Edelblut.
6          Have I accurately described at least what
7       Exhibit 13 reflects?
8 A    I don't have a recollection of this.
9 Q    Do you recall a meeting with Commissioner
10      Edelblut on or about September 8, 2021?
11 A    I don't recall a specific meeting.
12 Q    Okay.  Does the fact that this September 8 date
13      on Exhibit 13, does the fact that that's one day
14      after the September 7, 2021, AG memo in Exhibit
15      12 refresh your recollection at all about
16      whether a meeting occurred and what may have
17      been discussed?
18 A    No.
19 Q    Sitting here today, you have no recollection,
20      just to be clear, you have no recollection of
21      any meeting with Commissioner Edelblut on or
22      about September 8, 2021, correct?
23 A    No.

91

1 Q    You can set those aside.
2          I did have another question on Exhibit 12.
3       My apologies.  How does this memo impact if at
4       all how the Commission enforces RSA 354-A:29 to
5       34?
6          MR. KENISON-MARVIN:  Objection.  Compound
7       and foundation.
8 Q    I'm going to withdraw.  I'm not going to use the
9       term "impact."  I'm trying to figure out if this
10      is a memo you use in enforcing RSA 354-A:29-34
11      so I'm just going to ask the question that way.
12         Does Exhibit 12 guide how the Commission
13      for Human Rights enforces RSA 354-A:29 to 34?
14 A    So I'm a bit unclear on the question.  Are you
15      asking me specifically this document?  Or does
16      an AG opinion affect how the Commission does its
17      work?
18 Q    No, good question.  I'm simply referring to
19      Exhibit 12 and whether it guides how the
20      Commission applies specifically RSA 354-A:29 to
21      34?
22 A    If I understand your question, insomuch as it is
23      information from the Attorney General of the

92

1       State of New Hampshire, then yes.  However, it
2       doesn't change our process.
3 Q    Okay.  I guess my question is how do you use
4       this document?  How does the Commission use
5       Exhibit 12?
6 A    If you're asking do we use it in our day-to-day
7       work, is that what you're asking?
8 Q    How does the Commission use Exhibit 12 with
9       respect to its duties in enforcing RSA 354-A:29
10      to 34?
11         MR. KENISON-MARVIN:  Objection.
12      Foundation.
13 A    Please ask the question again?
14 Q    Cindy, would you mind reading the question back?
15      (Requested portion read back by court reporter)
16 A    Respective of this document we don't.
17 Q    Does it in any way guide how the Commission
18      applies RSA 354-A:29 to 34?
19 A    Are you asking additionally?  Outside of the
20      statute?
21 Q    Yes.  I'm just trying to figure out how this
22      memo is used by your office.  So we've
23      established, correct, that the Commission

93

1    requested an AG memo, right?

2  A   Yes.

3  Q   We've established that the Commission received

4      an AG memo, right?

5  A   That would be fair.

6  Q   So my question is having requested it and

7      received it, does Exhibit 12 guide in any way

8      the Commission's application of RSA 354-A:29 to

9      34?

10       MR. KENISON-MARVIN:  Objection.

11     Foundation.

12  A   Insomuch as the document was requested by the

13     Commission, it was requested for the public.

14  Q   Okay.  So this wasn't requested with the intent

15     to assist the Commission in enforcing the

16     statute?  Do I understand your testimony

17     correctly?

18  A   Correct.

19  Q   Has the Commission since the issuance of the

20     September 7, 2021, opinion used this opinion in

21     interpreting the provisions of RSA 354-A:29 to

22     34?

23  A   Could you clarify relative to what?

94

1  Q   Relative to any allegation of discrimination

2      that has been received by the Commission under

3      the challenged law in this case.

4  A   No.

5  Q   I'm going to set that aside.  I'm going to have

6      one more exhibit.

7       (Exhibit 56 marked for identification)

8  Q   So Director Malachi, just as you read this, I'm

9      only going to have you look at one particular

10     paragraph, and that's the paragraph on the

11     bottom of page 2 of Exhibit 56 that's Bates

12     stamped HRC 00392, and that has been

13     highlighted, and I will submit that that

14     highlighting has been done by Plaintiffs'

15     counsel in this case.

16       So I think just to kind of streamline this

17     process I think what I would just ask you to do

18     is read that entire paragraph beginning with

19     "Director Malachi discussed the impact of HB 2,"

20     and when you finish that paragraph on page 2,

21     just let me know when you're done, please.

22  A   Okay.

23  Q   So I'm going to just direct your attention to

95

1      the language again that Plaintiffs' counsel has

2      highlighted in this document.  Director Malachi

3      explained -- strike that.

4        I want to direct your attention to the

5      language that's been highlighted by Plaintiffs'

6      counsel, "Assistant Director Burke Cohen and

7      Director Malachi explained that the likely

8      inspiration was that there have been instances

9      in which information has been presented in

10     trainings and K - 12 classrooms that states

11     directly and/or impliedly that inherent traits

12     establish a person's inferiority/superiority."

13       Do you see that language?

14  A   Yes.

15  Q   Is that an accurate reflection of what was said

16     during the October 7, 2021, meeting of the Human

17     Rights Commissioners?

18  A   I don't have a recollection.

19  Q   Okay.  Any reason to think that that isn't an

20     accurate reflection of what was said at the

21     meeting?

22  A   No.

23  Q   Sitting here today, do you continue to believe

96

1      that the likely inspiration for HB 2 was that

2      there been instances in which information has

3      been presented in trainings in K through 12

4      classrooms that states directly and/or impliedly

5      that inherent traits establish a person's

6      inferiority or superiority?

7  A   I'm sorry.  Ask the first part of the question

8      again?

9  Q   Sure.  I know that you have no reason to believe

10     this was an inaccurate reflection of what you

11     said at the meeting.  My question to you is that

12     is this still your present understanding that

13     the likely inspiration by the supporters of the

14     challenged law, quote, "was that there have been

15     instances in which information has been

16     presented in trainings in K through 12

17     classrooms that states directly and/or impliedly

18     that inherent traits establish a person's

19     inferiority/superiority?

20  A   I'm not having an opinion one way or the other.

21  Q   I just want to short-circuit this.  All I'm

22     asking for is you had an opinion at the time as

23     to what the likely inspiration was for HB 2.  So

97

1    my question is sitting here today, does the
2    opinion on page 2 that you had on October 7th,
3    2021, continue to be your opinion sitting here
4    today.  That's all.
5        MR. KENISON-MARVIN:  Objection to the
6    extent it mischaracterizes and misstates prior
7    testimony.
8  A   Sitting here today I haven't given much thought
9    to this statement two years ago.
10 Q   But you had an opinion obviously on October 7,
11   2021, correct?
12       MR. KENISON-MARVIN:  Objection.
13   Misrepresents prior testimony.
14 Q   Are you able to answer that question?
15 A   Oh, if I had an opinion?
16 Q   Then.
17 A   Then?
18 Q   Yes.
19 A   This is part of a discussion so I'm reading
20   what's written here.
21 Q   I understand that.  It seems to me based on the
22   minutes that this is a summary of at least an
23   explanation provided by Assistant Director Burke

98

1    Cohen and Director Malachi which is you.  So I
2    guess what I'm trying to get at is you had this,
3    this is an explanation -- strike that.
4        Do you know what is being referenced when
5    the language states in this explanation that,
6    quote, "there have been instances in which
7    information has been presented in trainings in K
8    through 12 classrooms that states directly
9    and/or impliedly that inherent traits establish
10   a person's inferiority/superiority?
11 A   I'm sorry.  Are you asking if I have --
12 Q   What were the instances being referred to.
13   That's what I'm trying to forget at.
14       MR. KENISON-MARVIN:  Objection.
15   Foundation.
16 A   I don't have a recollection.
17 Q   So you don't know what was being referred to
18   with respect to the specific instances that are
19   on the bottom of page 2 HRC-00392?
20 A   I do not have a specific recollection.
21 Q   Do you have any recollection of this discussion
22   that took place on October 7, 2021, that's
23   referenced in the highlighted language on page

99

1    2, HRC-00392?
2  A   I do not.
3  Q   I'm going to also introduce another exhibit.
4        (Exhibit 57 marked for identification)
5        MR. BISSONNETTE:  And I am also going to,
6    if it's okay, Nate, I'm going to have before the
7    witness the exhibit previously marked Exhibit 32
8    as well.  I'm just going to use these in
9    conjunction with each other.  Thank you.
10       (Discussion off the record)
11 Q   Director Malachi, Exhibit 57 are Christian Kim's
12   and your objections and responses to the
13   Plaintiff's First Set of Interrogatories,
14   correct?
15 A   You said 57?
16 Q   There should be two exhibits in front of you.
17   The first is 57.
18       MR. KENISON-MARVIN:  Just clarify the title
19   of the document versus caption.
20 Q   So I'll strike my last question.
21       I want to just confirm that in this case
22   in which Commissioner Edelblut and other state
23   actors are Defendants, can you confirm that

100

1    Exhibit 57 consists of the Objection and
2    Responses to the Plaintiff's First set of
3    Interrogatories submitted to Chairperson
4    Christian Kim and you, Executive Director Ahni
5    Malachi?
6  A   I would have to look through this and speak with
7    counsel to give you an answer to that question.
8  Q   Take as much time as you need.  I do need you to
9    confirm that.
10       MR. KENISON-MARVIN:  Off the record for
11   just a second.
12       (Director Malachi and Atty. Kenison-Marvin
13       leave the room and return
14       4:09 - 4:21 p.m.)
15 Q   If you could just reread the last question?
16       (Requested portion read back by court reporter)
17 A   Okay.  I'm very unclear in looking and this
18   document which is noticed as Exhibit 57, these
19   are questions for the Commissioner of Education.
20   This is an Interrogatory for him specifically.
21   So I can't answer or attest to anything for the
22   Commissioner of Education.  Am I looking at the
23   wrong document?

101

1 Q   Are you referring to the caption that says Local
2     8027 versus Frank Edelblut?  Is that what you're
3     referring to?
4 A   So I'm referring to Exhibit 57 that has that
5     caption, and in looking through this document it
6     talks about the Commissioner objecting and
7     carries through on the Commissioner's
8     objections, and it states the Human Rights
9     Commission in some of the objections as part of
10    Commissioner's answer.
11        MR. KENISON-MARVIN:  I do have a different
12    document than her, I think.
13 A   It is not for the Human Rights Commission if you
14    look at the signatures.  Verification pages.
15 Q   So you have the wrong document?  That's my
16    fault.
17        MR. KENISON-MARVIN:  I can just look at
18    everything, but yeah, it's captioned the
19    Commissioner Frank Edelblut.
20        (Exhibit 58 marked for identification)
21        MR. BISSONNETTE:  Thank you for flagging
22    that, and I apologize.  So that's on me.  Thank
23    you.

102

1 Q   So while you're reviewing that, Director
2     Malachi, I'll have the same question with the
3     caveat now is whether Exhibit 58 consists of
4     Chairperson Christian Kim's and your objections
5     and responses to the Plaintiffs' First Set of
6     Interrogatories in this case.
7 A   Okay.  For the 13th time, your question again?
8        (Discussion off the record)
9 Q   Is Exhibit 58 the Interrogatory Responses of
10    both Chairman Kim and you in response to the
11    Plaintiffs' First Set of Interrogatories in this
12    case?
13 A   That is a fair assessment.
14 Q   Okay.  And you reviewed these responses before
15    they were submitted to Plaintiffs' counsel in
16    this case, I assume?
17 A   That's fair.
18 Q   And you signed a verification on page 15 of
19    Exhibit 58, correct?
20 A   That would be my electronic signature.
21 Q   I'm only going to direct your attention to page
22    10 and the response to Interrogatory number 6.
23    There's a statement, quote, "The HRC Defendants

103

1     can confirm that the HRC has docketed one
2     complaint made under the amendments," end quote.
3     Do you see that sentence?
4 A   Where are you on the page?
5 Q   Sure.  I'm on page 10.
6 A   Yes.
7 Q   Above paragraph 7, the statement, quote, "The
8     HRC Defendants can confirm that the HRC has
9     docketed one complaint made under the
10    amendments."
11 A   I see that.
12 Q   Sure.  I've also put before you a document
13    that's been previously marked as Exhibit 32.  Do
14    you see, I'm not asking you to read it yet but
15    do you see is Exhibit 32 in front of you?
16 A   Yes.
17 Q   So my question is and you can take time to
18    answer this, is Exhibit 32 the docketed
19    complaint referenced on page 10 of your
20    Interrogatory responses in Exhibit 58?  And if
21    we need a minute to go off the record I'm happy
22    to do so as well.
23 A   So Exhibit 32 is not a docketed response or not

104

1     a docketed charge.
2 Q   Okay.  What is that sentence on page 2, what is
3     the complaint that it is referencing
4     specifically?
5 A   Which document are you on?
6 Q   I'm on Exhibit 58.
7 A   Okay.
8 Q   Quote, "The HRC Defendants can confirm that the
9     HRC has docketed one complaint made under the
10    amendments," end quote.  Do you see that
11    language?
12 A   I do.
13 Q   What is the Commission referring to in that
14    statement?
15 A   It's referring to a docketed charge, a docketed,
16    so it's an allegation and then it becomes,
17    potentially becomes docketed and so it is
18    referring to a docketed charge.
19 Q   Okay.  And was that docketed charge produced in
20    this litigation, do you know?
21 A   I would need to confer with my attorney because
22    once we take a charge, well, anything, so
23    conversations, questionnaires, charges are all

## 105

1  confidential.
2  Q  Um-hum.  Okay.  Is the complaint in Exhibit 32,
3     talking about the contents of the complaint, let
4     me start again.
5         Is the contents of the complaint from
6     Mr. [REDACTED] in Exhibit 32 the same contents of
7     the complaint that was docketed and that is
8     reflected on page 10 of Exhibit 58?
9  A  I may need to confer with my attorney.  I'm
10    unsure of what I can share based on
11    confidentiality of the Commission.
12        MR. KENISON-MARVIN:  I'm happy to do this
13    just off the record quickly.
14        (Discussion off the record)
15    (Requested portion read back by court reporter).
16 A  So I need clarification.  Are you asking if
17    Mr. [REDACTED] completed one of our forms?  Are
18    you asking if just this information is a charge?
19    I'm not clear on what you're asking.
20 Q  I'm a little bit at a disadvantage because I
21    only have what the Commission produced to us in
22    litigation.  The only documents with respect to
23    Mr. [REDACTED]'s complaint that have been produced

## 106

1  in this litigation is what's reflected in
2  Exhibit 32.  That's all we've received.  In
3  addition, there's been a representation made to
4  us by counsel that this complaint has been
5  docketed.
6      So all I'm just trying to get at is are the
7  contents of Mr. [REDACTED]s complaint in his
8  email in Exhibit 32 the contents of the
9  complaint that has been docketed by the HRC as
10 reflected on page 10 of Exhibit 58?
11 A  Okay.  So the answer to the question is a
12 docketed charge is on a specific form with the
13 Commission.  That form is then verified.  Any
14 additional information that a complainant wishes
15 to add to that, whatever that is, at the time of
16 filing the charge they are welcome to do that.
17 They are not required to do that.  All that is
18 required is their sworn affidavit that the
19 events that they are discussing or the events
20 that they are alleging have happened and then
21 that form is verified.  So their signature and
22 then their signature is witnessed by a notary.
23 So all charges, regardless of type, are on

## 107

1  official documents with the commission.  So it
2  has to be on that form which is signed by the
3  Complainant and verified by a notary.  So I'm
4  not sure if that answers your question.
5  Q  It's difficult for me because all I have with
6     respect to Mr. [REDACTED]'s allegation is what's
7     reflected in Exhibit 32.  I don't have anything
8     else produced with respect to that allegation,
9     but there's been an indication made to me that
10    this is a docketed complaint.  There's been a
11    statement under oath from the Human Rights
12    Commission that there's one docketed complaint
13    under the amendments, and I'm trying to get at
14    what that docketed complaint is.  What are its
15    contents.
16        So that's going to be my question to you.
17    I'm referring you back, Director Malachi, to the
18    statement, quote, "The HRC Defendants can
19    confirm the HRC has docketed one complaint made
20    under the amendments," end quote.  What is the
21    substance of that complaint that has been
22    docketed?
23 A  So the substance of the docketed complaint would

## 108

1  be whatever the individual is alleging took
2  place, that information is put on a specific
3  form that they would then sign and that
4  signature is verified and that becomes the
5  docketed complaint.
6  Q  So I haven't received that form.  So I guess my
7     question is can you sitting here today, can you
8     recall what the allegation was in the form that
9     was docketed and led to a docketed complaint
10    made under the amendments?  What was the
11    complaint about?  That's all I'm trying to get
12    at.
13 A  To my recollection -- I'll stay that.  Question
14    again, please?
15    (Requested portion read back by court reporter)
16 A  Without having the exact complaint document in
17    front of me, I cannot tell you with a hundred
18    percent certainty what is in the complaint.
19    However, it would allude to something that is in
20    this email to the Commission, but I don't have
21    the exact language in front of me.
22 Q  Can we go off the record?  Can I just speak with
23    you?

**109**

1           (Counsel leave the conference
2       room and return 4:43 - 4:49 p.m.)
3       MR. BISSONNETTE:  After conferring with
4   counsel, we are going to suspend this deposition
5   and reconvene at a later time to cover just a
6   few of the outstanding issue areas, and I
7   believe there's agreement between counsel on
8   that.
9       MR. KENISON-MARVIN:  Yes.  Before we go off
10  the record, I'll put on the record officially
11  that we will be reserving the right to read and
12  sign once everything is concluded.
13          (Deposition suspended at 4:49 p.m.)
14
15
16
17
18
19
20
21
22
23

**111**

1           C E R T I F I C A T E
2       I, Cynthia Foster, Registered Professional
3   Reporter and Licensed Court Reporter, duly authorized
4   to practice Shorthand Court Reporting in the State of
5   New Hampshire, hereby certify that the foregoing
6   pages, numbered 5 through 109, are a true and
7   accurate transcription of my stenographic notes of
8   the deposition of AHNI MALACHI who was first duly
9   sworn by me on May 24, 2023, for use in the matter
10  indicated on the title sheet, as to which a
11  transcript was duly ordered;
12          I further certify that I am neither
13  attorney nor counsel for, nor related to or employed
14  by any of the parties to the action in which this
15  transcript was produced, and further that I am not a
16  relative or employee of any attorney or counsel
17  employed in this case, nor am I financially
18  interested in this action.
19
20
21                  Cynthia Foster, LCR
22
23

**110**

1           I have carefully read the foregoing
2       deposition, and the answers made by me are true.
3
4
5                   _____
6                   AHNI MALACHI
7
8   STATE OF _____
9   _____, SS.
10
11          At_____on the
12  _____ day of _____ A.D.
13  2023, personally appeared the above-named AHNI
14  MALACHI and made oath that the foregoing answers
15  subscribed by her are true.
16                  Before me,
17
18
19
20                  _____
                    Notary Public
21
22
23

**112**

1           E R R A T A
2       I, the undersigned, AHNI MALACHI, have read the
    transcript of my deposition held on May 24, 2023, in
3   the matter of Local 8027, AFT-New Hampshire, et al v.
    Frank Edelblut, Commissioner, et al; and the same is
4   true and correct, to the best of my knowledge, with
    the exception of the following changes noted below,
5   if any:
6   PAGE/LINE   CORRECTION AND REASON FOR CORRECTION
7   _____
8   _____
9   _____
10  See attached sheet(s) for additional information:
11  ___Yes___No
12                  _____
                    AHNI MALACHI
13
14  STATE OF _____)
                        ) ss.:
15  COUNTY OF _____)
16
        Subscribed and sworn to before me this _____ day
17  of _____, 2023.
18
19                  _____
                    Notary Public
20
    My commission expires:
21
    _____
22
23

1          I have carefully read the foregoing

2      deposition, and the answers made by me are

3  true.[1]

4

5                                          _Ahni Mal_
                                    AHNI MALACHI

6

7

8  STATE OF  _New Hampshire_

9  _Merrimack_____, SS.

10

11          At _Merrimack County_ on the

12  _17th____ day of _July_____ A.D.

13  2023, personally appeared the above-named AHNI

14  MALACHI and made oath that the foregoing answers

15  subscribed by her are true.

16                              Before me,

17

18

19

20                              Notary Public

21

22

23  [1] Subject to the changes indicated on the accompanying errata and
   attachment thereto.

```
 1                        E R R A T A

 2        I, the undersigned, AHNI MALACHI, have read the
      transcript of my deposition held on May 24, 2023, in
 3    the matter of Local 8027, AFT-New Hampshire, et al v.
      Frank Edelblut, Commissioner, et al; and the same is
 4    true and correct, to the best of my knowledge, with

 5    the exception of the following changes noted below,

 6    if any:

 7    PAGE/LINE   CORRECTION AND REASON FOR CORRECTION

 8       P23 / L7   See attachment

 9       P27 / L4   See attachment

10

11    See attached sheet(s) for additional information:

12    X  Yes___No

13                          _____
                                   AHNI MALACHI

14    STATE OF New Hampshire)
                            ) ss.:
15    COUNTY OF Merrimack   )

16
         Subscribed and sworn to before me this 17th day
17
      of  July        , 2023.
18
19                        _____
                                   Notary Public
20
      My commission expires:
21
          Kelly A. Mederos, Esq
22    Notary Public, State of New Hampshire
      My Commission Expires December 21, 2027
23
```

Local 8027, AFT-New Hampshire, et al., Plaintiffs vs. Frank Edelblut, Commissioner, et al., Defendants (D.N.H. Case No. 1:21-cv-01077-PB)

Ahni Malachi

# ERRATA SHEET

## ATTACHMENT

Page 23, Line 7, Change:

> Replace "Commissioner's" with "Commission's" such that the transcript states:
>
> "As I sit here today reading this, it does appear to be an accurate reflection of the ***Commission's*** process."
>
> <u>Reason</u>: Likely transcription error; otherwise, to clarify testimony.

Page 27, Line 4, Change:

> Replace "bearing" with "meaning" such that the transcript states:
>
> "The Commission language has ***meaning***."
>
> <u>Reason</u>: Likely transcription error; otherwise, to clarify testimony.

*[end]*