# EXHIBIT 6

HRC Assistant
Director
Sarah Cohen
Deposition
Transcript
Redacted,
Publicly-filed

(Unredacted
version has been
filed under seal)

Local 8027

vs

Frank Edelblut

Docket No. 1:21-cv-01077-PB

SARAH COHEN

June 26, 2023



**AVICORE REPORTING**

15 Constitution Drive, Suite 1A • Bedford, NH 03110 • (603) 666-4100
info@avicorereporting.com • www.avicorereporting.com

UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

Local 8027, AFT-New Hampshire, et al.

Plaintiff,

v.                    **CERTIFIED ORIGINAL**

Frank Edelblut, Commissioner, et al

Defendants.

No. 1:21-cv-01077-PB

DEPOSITION OF SARAH BURKE COHEN

taken on behalf of the Plaintiffs

at the New Hampshire Attorney

General's Office, Concord, NH,

on June 26, 2023, at 10:08 a.m.

Court Reporter:

Cynthia Foster, LCR

LCR #14 (RSA 310-A:161-181)

---

**3**

1    INDEX

2    Deposition of Sarah Burke Cohen

3    Examination by Mr. Bissonnette:          5

4    Examination by Mr. Kahne:                96

5    Examination by Mr. Kenison-Marvin:      119

6

7    EXHIBITS

8    59   Complaint                          10

9    60   Commission for Human Rights website   26

10   61   Email BurkeCohen to Sheldon, 17 Nov 2021,

11        HRC-00413-415                       26

12   62   Charge of Discrimination, ▉▉▉▉▉

13        HRC-00416-420                       37

14   63   Public Education Questionnaire,

15        HRC-00065-00067, 00067.1, 00068.1   63

16   64   Fax from Perroni to Borysenko,

17        Borysenko R.45 Response, 000001-17  72

18   65   Exeter Regional Cooperative School

19        District article by Karlyn Borysenko

20   66   Email, Malachi to ▉▉▉, 31 Aug 2022,

21        HRC-00709-713                       72

22   67   Unwoke Army Tweet Thread and Related

23        Documents, PL 00576-677             73

---

**2**

1    APPEARANCES:
2        On behalf of the Plaintiffs, Local 8027, AFT-New
         Hampshire, AFL-CIO:
3        STROOCK & STROOCK & LAVAN LLP
         By: David Kahne, Esq., by Zoom
4        180 Maiden Lane
         New York, NY  10038
5        212-806-5648
         dkahne@stroock.com
6
         On behalf of the Plaintiffs, Christina
7        Philibotte, Andres Mejia, NEA-New Hampshire:
         ACLU OF NEW HAMPSHIRE
8        By: Gilles Bissonnette, Esq.
         18 Low Avenue, Unit 12
9        Concord, NH  03301
         603-225-3080
10       gilles@aclu-nh.org
11       On behalf of the Defendants, Frank Edelblut,
         Ahni Malachi, John Formella, et al:
12       NH DEPARTMENT OF JUSTICE
         By: Nathan W. Kenison-Marvin, Esq.
13       33 Capitol Street
         Concord, NH  03301
14       603-271-1292
         nathan.w.kenison-marvin@doj.nh.gov
15
         By Zoom:
16       Peter Perroni, Esq.
         Jennifer Eber, Esq.
17       Kayla Turner, Esq., kaylat@drcnh.org.
         Esther Dickinson, Esq., edickinson@nhnea.org
18
19
20
21
22
23

---

**4**

1         (EXHIBITS - continued)

2    68   Email, BurkeCohen to Malachi, 18 Nov

3         2021, ▉▉▉, HRC-00359-360, 00046-49,

4         HRC-00930                           77

5    69   Email, BurkeCohen to Malachi, ▉▉▉,

6         18 Nov 2021, HRC-00039-50           78

7    70   Email, BurkeCohen to Malachi, ▉▉▉,

8         18 Nov 2021, HRC-00042-45, HRC-000932   80

9    71   Public Education Intake Questionnaire,

10        ▉▉▉, HRC-00343-344,

11        HRC-00936                           81

12   72   Email, BurkeCohen to Malachi, ▉▉▉,

13        HRC-00036-00038, HRC-965-966        82

14   73   Email, BurkeCohen to Malachi, ▉▉▉,

15        HRC-000178-186, HRC-00213           82

16   74   Email, ▉▉▉ to HRC, HRC-01003-09     83

17   75   Email, HRC to ▉▉▉, 15 Apr 2022,

18        HRC-00086-87                        85

19   76   Email, HRC to Malachi, 22 Apr 2022,

20        ▉▉▉, HRC-00340-341                  86

21   77   Email, ▉▉▉ to Malachi, 7 Dec 2022,

22        HRC-00187-212                       87

23

5

1                    EXHIBITS (continued)

2    78    Email, BurkeCohen to Malachi, 18 Nov

3          2021, ████████, HRC-00977-988          88

4          (Original exhibits retained by court reporter

5          and returned to Attorney Bissonnette)

6          (Scanned copies provided to all counsel)

---

6

S T I P U L A T I O N S

It is agreed that the deposition shall be taken in the first instance in stenotype and when transcribed may be used for all purposes for which depositions are competent under New Hampshire practice.

Notice, filing, caption and all other formalities are waived.  All objections except as to form are reserved and may be taken in court at trial.

It is further agreed that if the deposition is not signed within thirty (30) days after submission to counsel, the signature of the deponent is waived.

It is further agreed that exhibits may be retained by counsel until the time of trial.

---

7

1         SARAH BURKE COHEN, DULY SWORN

2         MR. BISSONNETTE:  I know, Attorney Kenison,

3    we have the same agreement with respect to prior

4    stipulations. Just confirming that.

5         MR. KENISON-MARVIN:  Yes.

6              EXAMINATION

7    BY MR. BISSONNETTE:

8    Q    Assistant Director Cohen, my name is Gilles

9         Bissonnette.  I'm the Legal Director of the ACLU

10        of New Hampshire.  I'm not sure we've met before

11        in fact.

12   A    I'm not sure.

13   Q    But it's a pleasure to meet you today, and my

14        role in this case is I represent a client group

15        in this case, in particular Andres Mejia and

16        Tina Philibotte with respect to a challenge to

17        kind of what we have all kind of called either

18        HB 2 or the amendments.

19   A    Okay.

20   Q    In this case.  So that's my role and it's a

21        pleasure to meet you.

22             I'm just going to start off by just asking

23        whether or not you've ever been deposed before.

---

8

1    A    I have not.

2    Q    So the way this process works, I'm not trying to

3         trick you.  There are no trick questions here.

4         So if you don't understand a question, please

5         tell me.  If you don't understand wording, you

6         know, please let me know.  Otherwise, I will

7         assume that you understand the question.  Okay?

8    A    Okay.

9    Q    And please as well just try to avoid nonverbal

10        cues.  As you know, we have a stenographer here

11        today.  Her role is to record in full our

12        conversation, but what you cannot do is record

13        nonverbal communication.  So I'd just ask that

14        you communicate orally.  Okay?

15   A    Okay.

16   Q    If you need a break at any time, absolutely ask

17        me.  It will absolutely be accommodated.  The

18        only caveat there is that if there's a pending

19        question I would just ask that that question be

20        answered before we break, but I want to make

21        sure that you feel comfortable, as comfortable

22        as one can be amidst this process so if you need

23        to use the restroom, grab a drink of water, just

9

1    mentally take a break for a couple minutes, I
2    understand.  Just let me know at any time.
3  A   Okay.
4  Q   Will anything prevent you from giving truthful
5    and accurate testimony today?
6  A   No.
7  Q   You're aware that this lawsuit is about a
8    challenge to what some have called or the
9    Plaintiffs have called the banned concepts law?
10 A   Yes.
11 Q   Just so we have the same kind of terminology, I
12    I'm either going to use the term "the
13    amendments" or "HB 2" to refer to the challenged
14    legislation in this case, and I just want to
15    make sure that when we both use that terminology
16    that we're referring to the same thing.  Does
17    that make sense?
18 A   It does.
19 Q   Okay.  Have you spoken to anyone at the Human
20    Rights Commission about your deposition today?
21 A   No.
22 Q   I'm just going to mark Exhibit 59.
23       (Exhibit 59 marked for identification)

10

1  Q   So I'm just going to ask to you review Exhibit
2    59, Assistant Director Cohen.  Just let me know
3    when you're finished reviewing.
4  A   Okay.
5  Q   Have you reviewed Exhibit 59 --
6  A   I have.
7  Q   -- Assistant Director Cohen?  And I just want to
8    make sure that you understand that you're
9    testifying on behalf of the Human Rights
10    Commission with respect to the topics that are
11    designated in Schedule A of Exhibit 59.  Do you
12    understand that to be the case?
13 A   I do.
14 Q   Okay.  And you're prepared today to testify on
15    those topics, correct?
16 A   I am.
17 Q   And I also just want to make clear that you
18    understand that to the extent a question falls
19    outside of these topics that you'll be
20    testifying in your individual capacity; is that
21    correct?
22 A   I understand that to be correct.
23 Q   What is your role at the Human Rights

11

1    Commission?
2  A   I am the Assistant Director.
3  Q   And how long have you been in that role?
4  A   Since 2018.
5  Q   And what are your responsibilities in that role?
6  A   I am the direct supervisor for the intake
7    coordinator and investigators.
8  Q   How do you supervise the intake coordinators?
9  A   We meet, the intake coordinators and I meet
10    bi-weekly, and we discuss any questions the
11    intake coordinator has about intakes that are
12    coming in.
13 Q   Are decisions made in those meetings about
14    whether to docket an allegation of
15    discrimination?
16 A   Not always.
17 Q   Sometimes, though; is it fair to say?
18 A   Sometimes.
19 Q   What's the standard that's used in determining
20    whether or not an allegation of discrimination
21    should be docketed?
22       MR. KENISON-MARVIN:  Objection.  Scope.
23    You can answer.

12

1  A   So answering in my personal capacity, not as the
2    Commission, we look at the jurisdiction, what
3    the statute reads, right?  So we determine in a
4    light most favorable to the intake inquiry
5    whether we'll take it or not.  We base it on
6    jurisdiction of number of employees, whether it
7    substantively falls within the scope of 354-A.
8  Q   Okay.  I think you also said that in your role
9    you are direct supervisor of investigators as
10    well.
11 A   Correct.
12 Q   Can you explain to me how that role functions?
13 A   I meet with the investigators once a month.  We
14    discuss their caseload, we discuss any questions
15    they have moving cases along legal standard
16    wise, any research that we need to do relative
17    to a specific case, and I review their reports
18    before they go up to the Commissioners to ensure
19    they are complete.
20 Q   Are these cases that have already been docketed
21    by the Human Rights Commission that are being
22    investigated by the investigators?
23 A   Correct.

13

1  Q    When you say review reports that are completed
2    by the investigators, is a report completed in
3    every case that is docketed by the Human Rights
4    Commission?
5        MR. KENISON-MARVIN:  Objection, scope.  You
6    can answer.
7  A    Answering in my, personally, so there are a
8    number of different ways cases move through the
9    Commission for Human Rights.  You have cases
10    that we go through what we call a full
11    investigation so they get to the point where
12    there is a finding issued by an investigating
13    commissioner of either probable cause or no
14    probable cause.
15        However, there are other times that a case
16    can sort of be resolved at the Commission.
17    Complainants have the ability to remove the case
18    to court.  There's also potential of settlement
19    of the cases.  So if there's a resolution of
20    settlement, then it gets closed.  Or there are
21    times where complainants decide they do not want
22    to pursue their charge at the Commission any
23    longer.

14

1  Q    Okay.  So with the exception of those cases in
2    which there's been a settlement or withdrawal or
3    removal to Superior Court, in all other cases
4    are reports completed by investigators?
5        MR. KENISON-MARVIN:  Same objection.
6  A    Answering for myself personally, yes.
7  Q    Thank you.  I know we got into the weeds pretty
8    quickly there, but I'm going to take a little
9    bit of a step back.  Before 2018, what were you
10    doing before 2018?
11  A    I was --
12  Q    Before your role here.  Sorry.  To be specific.
13    Professionally.
14  A    So I have been with the Commission since 2015.
15  Q    Okay.  What was your role between 2015 and 2018
16    at the Commission?
17  A    I started in 2015 as the intake coordinator.
18  Q    How long were you in that role?
19  A    I was in that role, so I was promoted to a
20    full-time investigator in 2016.  However,
21    because of staffing I was still completing the
22    position of intake coordinator.
23  Q    Understand.  Okay.

15

1  A    Until about probably close to the end of 2016.
2  Q    Okay.  What does it mean to be a -- I know you
3    supervise intake coordinators, but describe to
4    me what that role entails.
5        MR. KENISON-MARVIN:  Objection.  Scope.
6    You can answer.
7  A    Answering with my personal knowledge, the intake
8    coordinator's role is receive calls that come
9    in, inquiries that come into the Commission.
10    These inquiries come in both orally via the
11    phone or via someone coming, a walk-in.  Or they
12    come in in written form via email or regular
13    mail.
14        The intake coordinator role is to sort of
15    look at the jurisdictional components, and if
16    the intake meets the jurisdictional components,
17    to send out an intake questionnaire to that
18    person, and then from there the intake
19    questionnaire comes in and if it still meets the
20    jurisdictional components for a charge of
21    discrimination, the intake coordinator for those
22    who are pro se or unrepresented as a courtesy
23    assist them with drafting a charge of

16

1    discrimination.
2  Q    Okay.  Once that charge of discrimination comes
3    in, what's the intake coordinator's role at that
4    point in evaluating the?
5        MR. KENISON-MARVIN:  Same objection.
6  A    Answering for my personal knowledge is once, so
7    charge comes in as docketed, it has to be signed
8    and verified by the Complainant.  That is
9    considered a docketed charge.  The intake
10    coordinator's role is also to be the keeper of
11    the cases that are unassigned, that they have
12    not been assigned to an investigator.
13  Q    Okay.  Is part of the role of an intake
14    coordinator in assessing whether or not there's
15    a prima facie claim of discrimination?
16        MR. KENISON-MARVIN:  Same objection.
17  A    For my personal knowledge, yes.
18  Q    What is the criteria used in determining whether
19    the prima facie standard has been met by a
20    person alleging discrimination?
21        MR. KENISON-MARVIN:  Same objection.
22  A    From my personal experience, evaluating an
23    inquiry is looking at the statutory jurisdiction

17

1  of the Commission for Human Rights pursuant to
2  354-A which looks at number, looking at what
3  type of claim it is, public accommodation,
4  public education, housing, or employment, and
5  looking at the statutory requirements depending
6  on that from there.
7      If it's employment you look at the number
8  of employees to ensure that there are the
9  requisite number of employees.  From there you
10  also look to see if the allegations actually
11  fall within what our statute says we can
12  investigate.
13 Q   Gotcha.  Okay.  Thank you.  That's helpful.
14 A   Um-hum.
15 Q   I just want to make sure I understand your
16  background.  You were promoted in 2016 to, how
17  did you frame it?  Full-time intake coordinator?
18 A   No.  That is not what I said.
19 Q   What did you say?
20 A   So in 2015 intake coordinator was part-time.
21 Q   Okay.
22 A   2015.  So I was part-time in 2015.  I was
23  promoted in 2016 to full-time investigator.

18

1  Q   Full-time investigator.  I'm sorry.  Okay.
2      How long were you in that full-time
3  investigator role?
4  A   From 2016 until my promotion to Assistant
5  Director in 2018.
6  Q   Okay.  So approximately two years.  Could you
7  describe to me what your role was as a full-time
8  investigator between 2016 and 2018?
9  A   So describing, I'm describing it from my
10  personal experience.
11 Q   Um-hum.
12 A   That an investigator's role is to investigate
13  the cases that are docketed, right?  So part of
14  that is requesting information, document
15  information, it can be, it is also interviewing
16  complainants and individually named parties and
17  any other witnesses that would have relevant
18  information for the case.
19 Q   Before you joined the Human Rights Commission in
20  2015, what were you doing professionally?
21 A   I was a staff attorney at New Hampshire Legal
22  Assistance.
23 Q   I didn't know that.

19

1  A   Um-hum.
2  Q   Great organization.  How long were you a staff
3  attorney at NHLA?
4  A   I was a staff attorney at NHLA starting in 2011.
5  Q   Okay.  What was your role as a staff attorney at
6  NHLA at that time?
7  A   I worked in the Fair Housing project.
8  Q   With Elliott Barry?
9  A   With Elliott.
10 Q   One of my heroes.  Okay.  As an attorney in the
11  Fair Housing project, what generally were your
12  day-to-day responsibilities?
13 A   That's going back a bit.  Generally, so I was,
14  working in this project I was also the testing
15  coordinator for the Fair Housing program.  So
16  some of that was scheduling Fair Housing
17  testing, some of it was representing clients.
18  Some of it was preparing reports for the federal
19  government as it is a federal grant that they
20  have.
21 Q   Okay.  Did you have any employment positions
22  prior to 2011?
23 A   I was with New Hampshire Legal Assistance from

20

1  2008.
2  Q   Okay.  What was your role at NHLA generally
3  between 2008 and 2011?
4  A   I was considered a paralegal.
5  Q   Okay.  You went to law school, I know.
6  A   I did.
7  Q   When did you graduate law school?
8  A   I graduated law school in 2004.
9  Q   Where did graduate from?
10 A   Suffolk University Law School.
11 Q   And after you graduated, what was your first
12  position of employment?
13 A   I believe I was working at RiverStone Claims
14  Management.
15 Q   And how long were you there?
16 A   Let's see.  I was there I believe a couple of
17  years.  Honestly, I can't remember.
18 Q   That's a long time ago, I know.
19 A   It is.
20 Q   And just to kind of short circuit this and close
21  the loop kind of on your background, I'm just
22  curious, kind of what were you doing
23  professionally between 2004 when you graduated

21

1      and 2008 before you joined NHLA?
2  A    So I was -- I took the bar exam.  I took some
3      time off from, I worked.  During law school I
4      worked for MetLife Auto and Homes in-house
5      counsel.  I took some time off after I graduated
6      to study for the bar exam. ████████████
   ████████████████████ I started working at
8      RiverStone Claims Management as a legal
9      assistant/paralegal.  I can't remember exactly
10      what the title was.  And I was processing or
11      doing sort of the background of processing
12      general liability claims for the attorneys that
13      worked for RiverStone.
14  Q    Are you currently licensed in New Hampshire?
15  A    I am.
16  Q    When did you obtain your license?
17  A    2011.
18  Q    Do you personally assign cases to investigators
19      after a case is docketed?
20  A    Yes.
21  Q    How is that decision made as to who a case gets
22      assigned to?
23         MR. KENISON-MARVIN:  Objection.  Scope.

22

1      You can answer.
2  A    So we assign cases in order of the way they've
3      been received.
4  Q    Okay.  Is your supervisor, the Director, ever
5      involved in determining whether or not an
6      allegation of discrimination should be docketed?
7  A    Yes.
8  Q    Okay.  Under what circumstances would the
9      Director be involved in that docketing decision?
10         MR. KENISON-MARVIN:  Same scope objection.
11  A    So from my personal knowledge, it could be, if
12      it's a case, so some of it is if I'm not
13      available.
14  Q    Okay.
15  A    Sometimes it's if it's something that we are
16      doing that's newer.  Like when public education,
17      straight-up public education was added to the
18      statute.  We also had discussions, would have
19      been revolving around RSA 354:29 through 34 when
20      it was added to the statute.
21  Q    Could I have that last response just read back
22      to me just so I make sure I heard it correctly?
23      (Requested portion read back by court reporter)

23

1  Q    With respect to allegations of discrimination
2      that are made under RSA 354-A:29 to 34, are
3      those cases in which the Director would always
4      be involved in determining whether it's
5      docketed?
6         MR. KENISON-MARVIN:  Same objection.
7  A    From my personal knowledge, I believe so.
8  Q    Okay.  And I believe you testified earlier that
9      there are meetings that occur between you and
10      intake coordinators about how to handle
11      allegations of discrimination including whether
12      to docket them, correct?
13  A    Correct.
14  Q    Okay.  And at least in some instances during
15      those meetings there's determinations made as to
16      whether or not the prima facie standard has been
17      met, correct?
18  A    Correct.
19  Q    Is the Director involved in those meetings as
20      well or present during those meetings?
21         MR. KENISON-MARVIN:  Same objection.
22  A    Sometimes.  Depending on her schedule.
23  Q    I was going to ask kind of what determines that.

24

1      So it's scheduling issues would dictate whether
2      or not she's there or not there; is that
3      correct?
4  A    Correct.
5  Q    Just so we have a common understanding, I'm
6      actually just going to put before you a document
7      that's been previously marked Exhibit 1.
8         I'm going to ask you to review Exhibit 1,
9      but I'm going to give you my question in advance
10      before you read it and simply going to be is it
11      your understanding that this is the law being
12      challenged in this case.  So that's the
13      question, and I'd just ask you to review it, and
14      let me know when you're done with your review.
15         I know, Assistant Director Cohen, that
16      you're still reviewing this document, but I just
17      wanted to flag the operative text on Exhibit 1
18      is PL 004 to PL 007.  Thank you.
19  A    I'm sorry.  What was the question?
20  Q    Sure.  So the question is I just want to make
21      sure we have a common understanding that the
22      language in Exhibit 1 from PL 004 to PL 007 is
23      the text of the legislation that's being

25

1    challenged in this case.
2  A    So the text that I am familiar with that I am
3       here to, my understanding is what I'm here to
4       testify under would be PL 004 to PL 006.  I can
5       only testify as to 354-A.  The remaining
6       sections of 006 and 007 are not the statute that
7       I am familiar with.
8  Q    Okay.
9  A    So with that caveat, it is my understanding that
10      it appears that the document that you provided
11      has the statutory addition to 354-A.
12  Q   Okay.  So I just want take make sure I
13      understand your testimony that you're prepared
14      to, you're prepared to talk about with respect
15      to complaints in particular those made under
16      354-A:29 to 34.  Correct?
17  A   That is correct.
18  Q   And that's not the case with respect to RSA
19      193:40.  Is that fair to say?
20  A   That is correct.
21  Q   And I just want to make sure I understand your
22      testimony that is not a statute that you're
23      familiar with, correct?

26

1  A    Correct.
2  Q    Okay.  That's helpful.  I appreciate that, and
3       again, it's just to make sure that we're on the
4       same page when we talk about the challenged law
5       and the amendments so I appreciate that
6       clarification.
7          I am going to mark a new exhibit.
8          (Exhibit 60 marked for identification)
9          (Exhibit 61 marked for identification)
10  Q   I've put two exhibits before you.  Exhibit 60 is
11      a printout of the HRC's website stating How to
12      File a Complaint, and also attached to Exhibit
13      60 is a blank Public Education Intake
14      Questionnaire Form for RSA 354-A:29 to 34 that I
15      can represent to you that I printed out from the
16      HRC's website.
17         So I'd ask you to review Exhibit 60 and
18      confirm whether or not this is an accurate
19      reflection of the HRC's website with respect to
20      how to file a complaint and an accurate
21      reflection of the Public Intake Questionnaire
22      Form under RSA 354-A:29-34.
23         MR. KENISON-MARVIN:  Objection on scope and

27

1    compound.
2  A    Answering personally, it appears that this is
3       the Commission's website.  It appears that this
4       is the intake questionnaire that is available on
5       the Commission's website.
6  Q    Okay.  I'm going to refer you to the front page
7       of the blank questionnaire form on Exhibit 60.
8       Do you see that?
9  A    Yes.
10  Q   And the language states, Was the offered
11      program/training part of an extracurricular
12      activity, question mark.  Do you see that?
13  A   I do.
14  Q   Were you involved in the creation of this
15      questionnaire or the form questionnaire on
16      Exhibit 60?
17  A   Personally, yes.
18  Q   How were you involved in its creation?
19  A   I typed it into the system.
20  Q   I guess my -- maybe I could ask a question a
21      little bit more generally.  Who took a stab at
22      the first draft of the questionnaire that's
23      attached to Exhibit 60?

28

1          MR. KENISON-MARVIN:  Objection.  Scope and
2       vague.  You can answer.
3  A    I don't recall.
4  Q    Okay.  Were you involved in reviewing drafts of
5       this form questionnaire?
6  A    Yes.
7  Q    Do you recall providing feedback or comments on
8       any provisions of the form?
9  A    I do not recall specifically.
10  Q   Okay.  I'm just going to refer you now to
11      Exhibit 61 which I'll just submit is an email
12      from you to it seems like several other New
13      Hampshire employees copied Director Ahni Malachi
14      dated November 17, 2021.
15         I'll just ask you to review Exhibit 61 and
16      let me know when you're completed your review.
17      Have you finished reviewing Exhibit 61?
18  A   I have.
19  Q   What is Exhibit 61?
20  A   It appears to be an email.
21  Q   Okay.  And it seems to me at least that this is
22      an email exchange in mid-November 2021 that's
23      discussing how to modify the HRC's complaint

29

1  website to reflect the passage of the
2  amendments. Is that a correct characterization
3  of what this email chain is?
4  A  It appears to be an email to, yes, Department of
5  Information Technology to update the
6  commission's website with the specified updates.
7  Q  When was the Human Rights Commission's website
8  updated to reflect the fact that members of the
9  public can file allegations of discrimination
10  under the amendments?
11     MR. KENISON-MARVIN: Objection. Scope.
12  A  I'm not sure.
13  Q  Would it have been -- what I'm trying to get at
14  is timing. Would it have been around November
15  of 2021?
16  A  I don't recall.
17  Q  Okay. Bear with me. I just wanted to ask a
18  followup question with respect to the role of
19  investigators. Is there a scenario in which an
20  investigation concerning an allegation of
21  discrimination can occur before it is docketed?
22     MR. KENISON-MARVIN: Objection. Scope.
23  A  I'm sorry. Can you ask that again?

30

1  Q  Sure. Of course. My question is are there
2  circumstances in which an allegation of
3  discrimination could be investigated before it's
4  actually docketed by the Human Rights
5  Commission?
6     MR. KENISON-MARVIN: Same objection.
7  A  I'm not sure I can answer that.
8  Q  Is it because of the term "investigation"?
9  A  Yes.
10  Q  So I'll try not to use that word because I can
11  see how that could complicate things.
12     Is there any fact gathering that the HRC
13  conducts with respect to allegations of
14  discrimination before a determination is made
15  that it meets the prima facie threshold and is
16  docketed? And if so, just what does that look
17  like?
18     MR. KENISON-MARVIN: Objection. Scope.
19  Compound. You can answer.
20  A  I'm going to say potentially, and then I need
21  you to, I would prefer you be more specific
22  about any other further questions on that.
23  Q  Sure. So what if any fact gathering does the

31

1  Human Rights Commission do in evaluating whether
2  an allegation of discrimination meets the prima
3  facie threshold? And what I mean by fact
4  gathering is just external factual
5  investigations of the claim.
6     MR. KENISON-MARVIN: Objection. Scope.
7  Vague. Compound. You can answer.
8  A  It may not seem like it is, but that is a
9  complicated question.
10  Q  I'm not familiar with this process.
11  A  I'm struggling with answering, you know, that
12  question.
13     It's probably because just being an outsider to
14  this process I'm using terms that may not make
15  as much sense to you. So what's complicated,
16  why is that question kind of hard to answer from
17  your perspective?
18  A  So answering this personally --
19  Q  Um-hum.
20  A  -- an intake comes in and an inquiry is made.
21  An intake questionnaire is requested of the
22  inquirer, I would say, if that person hasn't
23  already submitted one. So that would be

32

1  gathering evidence.
2  Q  Okay.
3  A  Or gathering information. So I'm not sure,
4  that's why I'm struggling with understanding
5  what you're looking for.
6  Q  Okay. So I guess that's helpful so beyond kind
7  of reaching out to the complainant and asking
8  them to submit a questionnaire, is there any
9  other fact gathering that the Human Rights
10  Commission would do before it's decided to
11  docket a complaint?
12     MR. KENISON-MARVIN: Same objection.
13  Scope.
14  A  Not generally.
15  Q  Okay. Thank you. You can set both of those
16  aside.
17  A  I put them over here.
18  Q  You already did it. Great.
19     I'm going to direct your attention to
20  Exhibit 56.
21     So I'd just ask you to review Exhibit 56,
22  Assistant Director Cohen, and let me know when
23  you've done your review.

33

1       While you review that, Assistant Director
2   Cohen, so as to not hide the ball what I'm going
3   to be referring you to and asking you about is
4   the text that's highlighted on page 28 of
5   Exhibit 56, HRC-00392.  So I just wanted to
6   highlight that before you review, and just let
7   me know when you've completed it.
8  A    Okay.
9  Q    So what is Exhibit 56?
10  A    Exhibit 56 appears to be the New Hampshire
11  Commission for Human Rights Commissioners'
12  Meeting minutes from October 7th, 2021.
13  Q    Okay.  And on the bottom of page 2, on the page
14  Bates stamped HRC-00392, there is a sentence
15  that states, "Assistant Director Burke Cohen and
16  Director Malachi explained that the likely
17  inspiration was that there have been instances
18  in which information has been presented in
19  trainings in K through 12 classrooms that states
20  directly and/or impliedly that inherent traits
21  establish a person's inferiority/superiority."
22       Do you see that language?
23  A    I do.

34

1  Q    Is that an accurate reflection of what was
2   stated during the October 7, 2021, HRC
3   Commissioner's meeting?
4       MR. KENISON-MARVIN:  Objection.  Scope.
5  A    I can say that it's in the meeting minutes.
6  Q    Do you recall this being stated during the
7   October 2021 meeting?
8  A    I do not recall specifically.
9  Q    Do you know what's being referenced on page 2
10  when the document states that the inspiration
11  was that there have been instances in which
12  information has been presented in trainings and
13  K through 12 classrooms that states directly
14  and/or impliedly that inherent traits establish
15  a person's inferiority/superiority?
16       MR. KENISON-MARVIN:  Same objection.
17  A    Answering personally, and looking at the
18  document, it says in the first paragraph, I mean
19  in that earlier paragraph the impact of HB 2.
20  Q    Um-hum.  There's a reference here to, quote,
21  "have been instances" on page 2 of this exhibit.
22  Do you recall with any specificity what those
23  instances are that are referred to?

35

1       MR. KENISON-MARVIN:  Same objection.
2  A    Answering from my personal recollection, no.
3  Q    Okay.  You can set that aside.
4       I recognize that the limits of your
5   testimony here are kind of with respect to HSA
6   354-A:29-34 so that's what I'm going to be
7   referring to in this next series of questions,
8   but my question is do you know what types of
9   instruction that has occurred in New Hampshire
10  that the amendments in RSA 354-A:29-34 were
11  intended to ban?
12       MR. KENISON-MARVIN:  Objection.  Scope.
13  Vague.
14  A    Could you ask that question again, please?
15  Q    Sure.  I guess what I'm trying to figure out is
16  could you identify, are you aware of any
17  instruction that occurred by an educator in New
18  Hampshire before the enactment of the amendments
19  that would have violated the amendments had the
20  amendments been in effect during that time of
21  instruction?
22       MR. KENISON-MARVIN:  Same objections.
23  A    No.

36

1  Q    Okay.  I'm going to move on to just some of the
2   complaints now that I know are in the topics of
3   Exhibit 59.  So I'm just going to direct your
4   attention, if you go back, Assistant Director
5   Cohen, to Exhibit 59?  I'm trying to find a way
6   to streamline this so we're not here all day.
7   So if you look at the Schedule A to Exhibit 59?
8       (Discussion off the record)
9       (Recess taken 10:57 - 11:01 a.m.)
10  Q    Thank you, Assistant Director Cohen.  I'm going
11  to direct your attention to Exhibit 59 and in
12  particular on the Schedule A at the bottom of
13  page 1 of the Schedule A on to page 2 of the
14  Schedule A there are a list of kind of
15  complaints as defined in that Schedule A made
16  under the amendments based on at least my review
17  of the documents that have been produced by the
18  Human Rights Commission.
19       So my question to you is are the complaints
20  that are listed on the bottom of page 1 and 2 in
21  the Schedule A the complete list of complaints
22  or allegations of discrimination that have been
23  made under the amendments to the Human Rights



37

1    Commission?

2 A   Yes.

3 Q   Okay.  Are you aware of any other complaints or

4     allegations of discrimination made under the

5     amendments that are not listed on pages 1 and 2

6     of the Schedule A in Exhibit 59?

7 A   No.

8 Q   Okay.  Thank you.  You can set that aside.

9         Now what I'm going to do is pull out a few

10       documents, and this is with respect to the ▮▮▮

▮▮▮▮▮▮▮▮▮▮  complaint so just bear with me for one

12       moment.

13          MR. BISSONNETTE:  Would you mind, Nate,

14       pulling out Exhibit 32?

15 Q   So I'm going to have you review 32 along with a

16       new exhibit that we are going to mark as Exhibit

17       62.

18          (Exhibit 62 marked for identification)

19 Q   I just want to make sure everyone is settled

20       with respect to Exhibits 32 and 62.  I'll let

21       Nate get settled here.

22          MR. KENISON-MARVIN:  Go for it.

23 Q   Assistant Director Cohen, I'm just going to have

38

1     you review Exhibit 32 and Exhibit 62▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮ , and I'd ask

4     you to review both of those exhibits and just

5     let me know when your review is complete.

6         (Discussion off the record)

7 A   I'm ready.

8 Q   Assistant Director, Cohen have you reviewed

9     Exhibit 62 and 32?

10 A  I have.

11

39

1

12 Q   Can I interrupt you?  I want to be very clear

13       that here are you testifying on behalf of the

14       Human Rights Commission.

15          MR. KENISON-MARVIN:  As to the specific

16       order as to what you did next I would take the

17       position that HRC is not here to be deposed

18       about each specific item in response to a

19       complaint.  I don't think that was contemplated

20       that level of specificity.

21          MR. BISSONNETTE:  You can respond how you

22       see fit.

23

40

1



41

12  A    Answering from my personal knowledge of
13       generally how charges are drafted, there is a
14       template form obviously for the charge part of
15       it with filling in the boxes.
16  Q    Um-hum.
17  A    And then using information supplied by the
18       complainant, the intake coordinator drafts the
19       charge of discrimination for the complainant's
20       review.

43

42

8   A    Complaints are formally docketed by the
9        Commission upon receipt of a verified, signed
10       and verified charge.

44



45

1

47

1

2  A    So every investigator has a caseload of 25.

3        When they finish up a case, it's a continual 25

4        cases, they get a new case assigned.

8        As I previously testified, the intake

9        coordinator is the keeper of the cases that are

10       unassigned.

46

1

48

1



**49**

1 [redacted]

**51**

1    potentially that not working out.  Let us review
2    it real quick.
3         (Recess taken 11:26 - 11:31 a.m.)
4    (Requested portion read back by court reporter)
5 Q    We're back.  Thank you.  I'm going to withdraw
6    the last question and just reask it just for the
7    clarity of the record.
8    [redacted]

**50**

1 [redacted]

18         MR. KENISON-MARVIN:  Recognizing you don't
19    want to lose momentum, there's a part of the
20    back of my brain thinks if we take a quick break
21    right now we could get past this.
22         MR. BISSONNETTE:  Okay.
23         MR. KENISON-MARVIN:  At the risk of

**52**



53

1 ████████████████

54

1 ████████████████

55

1 ████████████████

4  Q    I don't want to get into the nature of that
5       meeting, but I do want to know whether it's
6       typical for the Department of Justice to be
7       consulted when an allegation of discrimination
8       is made under 354-A generally.  How typical is
9       it?
10         MR. KENISON-MARVIN:  Objection.  Scope.
11      You can answer.
12  A    It really depends on the complexity of the case.

56



57

1

58

1

59

1

I have kind of two kind of

6    cleanup questions on process that I neglected to

7    ask, and then we'll go through the rest of the

8    complaints.

9        With respect to on Exhibit 1, the

10   amendments that have been challenged in this

11   case, with respect to RSA 193:40 on the page

12   Bates stamped 006 to 007, I believe your

13   testimony earlier was you're not familiar with

14   that section; is that correct?

15   A    Not familiar.  Have I read it before, yes.  Am I

16   familiar with it, not particularly.

17   Q    Is it the Department of Education that's tasked

18   with enforcing those provisions?

19        MR. KENISON-MARVIN:  Objection.  Scope.

20   Calls for legal conclusion.  You can answer.

21   A    It appears that is what RSA 193 does.

22   Q    Okay.  With respect to, now I'm going to turn

23   your attention to other provisions of Exhibit 1.

60

1        In particular, RSA 354-A:31 on page PL 0004.  Do

2    you see that?

3    A    Starts on line 36 of PL 0004?

4    Q    Yes.  And in particular the statute says no

5    public employer.  Do you see that language?

6    A    Yes.

7    Q    Is it correct that under RSA 354-A:31 it is only

8    a public employer and not an individual employee

9    that would be held liable under this section?

10       MR. KENISON-MARVIN:  Objection.  Scope.

11   Calls for legal conclusion.

12   A    Did you want me to answer?  Okay.

13   Q    Yes.  If you can.

14   A    I thought you didn't want me to answer.  I'm

15   sorry.  I was confused by that.  I'm sorry.  Now

16   we have to go back.

17   Q    Let me just ask it a different way.  I'm not

18   trying to trick you here.

19   A    No.

20   Q    What I'm trying to get at is under RSA 354-A:31,

21   can an individual public employee be sued?

22       MR. KENISON-MARVIN:  Same objection.

23   Q    Or is that statute limited to public employers?

61

1   That's really the question that I'm trying to
2   get at.
3          MR. KENISON-MARVIN:  Same objections.
4   A   It appears from the writing of 354-A:31 and the
5   definition of what a public employer means at
6   354-A:30 that a public employer includes the
7   state or any subdivision, does not include
8   individuals in that definition.
9   Q   Okay.  I'm going to move on now to some of the
10   other complaints.  Thank you, by the way.
11   ███████████████████  It's going to require
13   Exhibit 14.
14          So I put before you, Exhibit 14, Assistant
15   Director Cohen.  Please do not read the entire
16   document because it is long, and I'm only going
17   to direct your attention to a few pages.
18   A   Okay.
19   Q   Exhibit 14 before you is an OpEd that I'll
20   submit to you in an effort to streamline things
21   an OpEd published by the Commissioner of
22   Education dated April 25th, 2022, and attached
23   to that OpEd hyperlinked in the OpEd are a

62

1   series of documents that the Commissioner put
2   together, and I'm going to direct your attention
3   to the following pages Bates stamped.  Okay?
4   And they start at PL 00714.
5   A   Um-hum.
6   Q   To 725.  I'd ask you to review those pages
7   quickly.  So it's 714 to 725 on Exhibit 14.
8   A   Okay.
9   ███████████████████████████████
███████████████████████████████████
███████████████████████████████
███████████████████████████████
███████████████████████████
█████████████████████
█████████████████████████
███████████████████████████████████
██████████████████
████████████████████████████
21          We're going to mark a new exhibit.  I
22   believe this is Exhibit 63.
23          (Exhibit 63 marked for identification)





11  Q    Okay.  I'm going to refer you back now to
12      Exhibit 14 that I know you had before you a few
13      minutes ago.  It's that thick document there.
14          I'm going to refer you to on Exhibit 14
15      which again just for the clarity sake in the
16      record is an OpEd that Commissioner Edelblut
17      published on April 2022 embedded within which is
18      are various attachments.  One of those
19      attachments I'm going to refer to is on PL 736
20      to 737.
21          My question is have you seen these two
22      pages before which is a worksheet with a circle
23      on it that talks about various identities and



69

1    another, this is for the record, and a worksheet
2    with the phrase "Diversity Bingo."
3         My question is have you seen those two
4    worksheets before?
5    A    I don't recall.
6

70

1

71

1

4    Q    Okay.  All right.  So we're going to move now on
5         to another complaint, and then we're going to
6         plow ahead.  I'm doing the ones that I'm likely
7         to ask more questions first.  Can we just pause
8         for one second?
9              (Discussion off the record)
10   Q    So before you, Assistant Director Cohen, I know
11        that you have I believe five exhibits, and I
12        think these all pertain to a complaint that was
13        submitted by                        , and
14        so kind of in the interest of not hiding the
15        ball and just making sure that all the documents
16        are in one place, I just wanted to present them
17        all before you at once.
18             So I'm just going to kind of list off for
19        people on Zoom and for clarity in the record
20        just what these            exhibits are and I'll
21        just go exhibit by exhibit.
22             So the first is an exhibit previously
23        marked as Exhibit 46 that's actually in this

72

1    instance produced by the Department of
2    Education, and at the bottom of Exhibit 46
                                                  . That's Exhibit
6    46.
7         Exhibit 64 is the complete set of documents
8    that were presented by Ms. Borysenko in response
9    to a subpoena that was served in this case.
10   Those documents are Bates stamped Borysenko 01
11   to 17.
12        In addition, in Exhibit 65 I have a website
13   article published by Ms. Borysenko on August
14   19th, 2022.  Incidentally, that website is
15   referenced by Ms. Borysenko in Exhibit 46 in her
16   email to the Human Rights Commission dated
17   August 19th of 2022.
18        Exhibit 66 is an email chain Bates stamped
19   HRC 709 to 713 that
                                                    .



73

```
1          And lastly, on Exhibit 67 is a series of
2    tweets from Ms. Borysenko published on Twitter
3    on or about August 19th, 2022, that I compiled
4    from Twitter reflecting what Ms. Borysenko said
5    publicly on Twitter concerning her complaint
6    that was submitted in August.
7
```

74

```
1
2    Q    Oh, okay.  How long were you on maternity leave
3         for?  Approximate dates if you don't mind me
4         asking.
5    A    July 14th through October 15th, we'll just say.
6    Q    Okay.  First, congratulations.
7    A    Thank you.
8    Q    I hope your child which would now be what, a
9         year?
10   A    Almost a year.
11   Q    Hope it's sleeping.
12   A    Mostly.  Mostly.
13   Q    I know the troubles there.  Nate and I were just
14        talking about that incidentally.  I recognize
15        you don't have personal knowledge.  You were on
16        maternity leave or parental leave at that time.
17        Do you recall though how the Commission
18        responded?  Do you have knowledge about how the
19        Commission responded to this complaint?
20   A
```

75

```
1
2

14

20
```

76

```
1
```



77

1

2        (Exhibit 68 marked for identification)

3   Q

79

1

78

20       (Exhibit 69 marked for identification)

80

8   Q     Okay.  You can set that aside.

9            (Exhibit 70 marked for identification)

10



81

83

21        (Exhibit 72 marked for identification)

14        (Exhibit 74 marked for identification)

82

84

1

14        (Exhibit 73 marked for identification)



85

1 ▮▮▮▮▮▮▮▮▮▮▮▮

14  Q     Okay.  You can set it aside.
15        (Exhibit 75 marked for identification)
16        (Discussion off the record)

86

1 ▮▮▮▮▮▮▮▮▮▮

12        (Exhibit 76 marked for identification)
13 ▮▮▮▮▮▮▮▮▮▮

87

1 ▮▮▮▮▮▮▮▮▮▮▮▮

10        (Exhibit 77 marked for identification)
11 ▮▮▮▮▮▮▮▮▮▮▮▮

88

1 ▮▮▮▮▮▮▮▮▮▮

6         (Exhibit 78 marked for identification)
7   Q     Before you in Exhibit 78 is what I'm going to
8         call the ▮▮▮▮▮ complaint.  It's Bates stamped
9         HRC-977 to 988.
10        Now, this is kind of more of a complaint
11        against the law to some extent than anything
12        else, but I wanted to just ask you whether or
13        not Exhibit 78 is a complete reflection of how
14        the Human Rights Commission responded to the
15        concerns raised by Mr. ▮▮▮▮▮.
16  A     It appears to be.
17  Q     Okay.  You can set that aside as well.  One
18        minute, please.
19 ▮▮▮▮▮▮▮▮▮▮



**89**

1

[redacted]

**90**

1

[redacted]

10 Q    Okay.  It's fair then to say even before the
11        docketing which didn't occur in this instance
12        there was no engagement between the Human Rights
13        Commission and the School District, correct?
14 A    It appears that way from what you've presented
15        to me.
16 Q    Okay.  Let me just go over my notes.  I have a
17        couple questions.  Probably five minutes left.
18 A    If you want to go over your notes, I'm going to
19        go to the ladies room.
20            (Recess taken 12:51 - 12:57 p.m.)
21 Q    I'm going to put before you Exhibit 4 and
22        Exhibit 14.
23 A    Okay.

**91**

1 Q    So I'm going to start with Exhibit 4 which you
2        haven't yet seen in this case and this is an
3        OpEd that was published by the Commissioner of
4        Education in June of 2021 as this law was being
5        processed by the legislature.
6 A    Um-hum.
7 Q    You are welcome to read this entire thing and
8        you probably should, but I'm going to in
9        particular direct your attention to a paragraph
10        that talks about Ibram Kendi.  So why don't you
11        just read this OpEd and tell me when you're
12        done, and I'll direct your attention
13        specifically to the Kendi provision of the OpEd.
14        Okay?
15 A    Um-hum.  Okay.
16 Q    Have you seen Exhibit 4 before today?
17 A    I may have read it when it came out.  I don't
18        remember.
19 Q    Okay.  I'm just going to refer you, there's a
20        paragraph here about a book written by Dr. Kendi
21        in which Commissioner Edelblut quotes a portion
22        of that book with a quote being, "The only
23        remedy to racist discrimination is antiracist

**92**

1        discrimination.  The only remedy to past
2        discrimination is present discrimination.  The
3        only remedy to present discrimination is future
4        discrimination."
5            So my question is if a teacher taught those
6        quoted sentences in a New Hampshire school, does
7        the Human Rights Commission have an opinion as
8        to whether or not that would violate RSA
9        354-A:29-34?
10            MR. KENISON-MARVIN:  Objection.  Scope.
11        Legal conclusion.  Vague.  You can answer from
12        your personal knowledge.
13 A    My personal knowledge would be you would have to
14        have an intake questionnaire.
15 Q    So I guess my question is -- I understand that.
16        I suppose if a teacher had this concern, you
17        know, hey, the Commissioner of Education wrote
18        this in an OpEd, I want to use this book and
19        teach this book, and they're concerned that
20        doing so may violate RSA 354-A:29 to 34, could
21        they call the Human Rights Commission and get an
22        answer to that question?
23            MR. KENISON-MARVIN:  Objection.  Scope.

93

1  A    The Human Rights Commission is open to answer
2       questions about the statute to either party to a
3       charge.  Right?  To either a complainant calling
4       with questions about whether they have a charge
5       or a respondent calling with questions about,
6       you know, the law itself.
7  Q    Sure.  So if an educator called and said I want
8       to teach this book, I don't know whether it's
9       covered by the law or not, especially because
10      Commissioner Edelblut cited it in an OpEd, would
11      they be able to get an answer from the Human
12      Rights Commission as to whether or not teaching
13      that book would be covered under the law or not?
14          MR. KENISON-MARVIN:  Objection.  Scope.
15 A    In my personal opinion, there's a lot more to,
16      as you may know or may not know, when you're
17      teaching a course there's a lot more to whether
18      you're teaching a book or not teaching a book
19      and what goes along with that course.  It's a
20      complicated question because you have to look at
21      the context of things.  Are you mentioning the
22      book?  I mean, there's a lot to it.  You know,
23      that's what I'll say.

94

1  Q    Sure.  So I guess I'll try to put a finer point
2       on it because we have in Exhibit 4 three
3       sentences that the Commissioner of Education
4       cites as being potentially problematic.
5           So if a teacher taught the following
6       sentences in a classroom, quote, "the only
7       remedy to racist discrimination is antiracist
8       discrimination, the only remedy to past
9       discrimination is present discrimination, the
10      only remedy to present discrimination is future
11      discrimination," if that was taught in a public
12      school would that violate RSA 354-A:29 to 34?
13          MR. KENISON-MARVIN:  Objection, scope.
14 A    I'm not sure I would, when people call and ask
15      us advice about the law there's a fine line
16      between us telling them what the law says and
17      giving them legal advice.  I could not give a
18      teacher or complainant legal advice on whether
19      them teaching that would make a charge or not.
20 Q    Okay.
21 A    That would be something they would have to talk
22      to an attorney about.
23 Q    Okay.  You can set that aside.  I'm going to

95

1       refer you now to Exhibit 14.
2           So on Exhibit 14 I'm just going to refer
3       you to what's listed as Topic Eight, PL 741 to
4       745.  This is a chapter of a book by Tiffany
5       Jewell, Chapter 10.  The book is called This
6       Book is Anti-Racist.  I would submit to you that
7       it's for 11 to 15 year olds.  And I'd also
8       submit to you that it's a book that was
9       referenced by the Commissioner of Education with
10      respect to the amendments during a July 2021
11      Board of Education meeting.
12          So my question to you is if an educator in
13      light of the Department of Education's reference
14      to this book had a concern about whether the
15      teaching of this book violated RSA 354-A:29-34,
16      your recommendation would be that they would
17      reach out to District Counsel as to get an
18      answer as to whether or not this complied with
19      the law?
20 A    Correct.
21 Q    Any other recommendation for an educator wanting
22      to know whether or not teaching this book would
23      violate the law?

96

1           MR. KENISON-MARVIN:  Objection.  Scope.
2       106.
3  A    What?
4           MR. KENISON-MARVIN:  Rule of completeness.
5       You can answer.
6  A    I would suggest that the educator read the law,
7       read the FAQs that are available as well as the
8       opinion issued by the Attorney General's office.
9  Q    And what if they after reading the law, reading
10      the FAQ, and reading the September 21 AG opinion
11      still had questions about whether certain
12      instructions were covered, what would that
13      educator do?
14          MR. KENISON-MARVIN:  Same objection on
15      scope.
16 A    I would suggest they contact their legal counsel
17      for legal advice.
18 Q    Okay.  You can set those aside.
19          MR. BISSONNETTE:  Attorney Kahne, I'm done
20      with my examination.
21              EXAMINATION
22 BY MR. KAHNE:
23 Q    I'm sorry I'm doing this virtually, Assistant

97

1    Director Burke Cohen.  It's better to be there
2    in person, but hopefully, I'll ask Gilles to
3    assist me with some of the documents.  There
4    shouldn't be very many documents, and I also
5    shouldn't be very long.  So I think we can do
6    this pretty efficiently if that's okay.
7  A    Okay.
8  Q    My name is David Kahne.  I am an attorney for
9    the American Federation of Teachers.  In this
10    lawsuit the same rules that Gilles went over
11    with you will apply to my questioning.  Do you
12    understand that?
13  A    I do.
14  Q    Okay.  There's a few areas I'd like to ask you
15    about, some of which you covered with Gilles.
16    I'd just like to ask a few followup questions.
17    The first is the process about docketing
18    complaints.  If I understand your testimony
19    correctly, allegations of discrimination that
20    are brought to the HRC can become a docketed
21    complaint; is that right?
22  A    Yes.
23  Q    And they become a docketed complaint after there

98

1    has been a finding that the prima facie elements
2    of discrimination have been met?
3        MR. KENISON-MARVIN:  Objection to scope.
4    Go ahead.
5  A    Personally, from my personal experience, yes.
6  Q    Okay.  And after there is a docketed complaint,
7    is it your testimony that after that occurs then
8    a factual investigation takes place?
9        MR. KENISON-MARVIN:  Objection, scope.  You
10    can answer.
11  A    Yes.  An investigation occurs after -- I'm
12    sorry.  Not directly after.  Once an
13    investigator is assigned to the case, an
14    investigation commences.
15  Q    Okay.  And you testified that you previously
16    were an investigator; is that right?
17  A    I was.
18  Q    Okay.  And so I'm interested in your describing
19    the investigation process and particularly in
20    the context of public schools.
21  A    Okay.  From my personal experience as an
22    investigator, if you've reviewed our Commission
23    rules you can see what tool kit, like tools we

99

1    have available to us.
2        So an investigation starts with often we
3    request information in our notice letter from
4    the respondent which is their answer to the
5    charge as well as any affirmative defenses that
6    they are putting forward.
7        From there we ask for additional
8    information as we need it.  We interview
9    complainants or witnesses or respondents
10    depending on the case and depending on the fact
11    pattern.  It's hard to make a generalized
12    outline of what an investigation looks like
13    because I don't know the facts of each specific
14    case.
15        But generally speaking, collect
16    information, documentation, that may or may not,
17    you know, help with the case, right?  Sometimes
18    you get documentation from parties that is not
19    super helpful, but we also use our tools of
20    interviewing people so that we can gather that
21    information and make a recommendation to the
22    Investigating Commissioner.
23  Q    And as part of that investigation has it, in

100

1    your experience, has it been contacting school
2    principals?
3  A    In my experience, yes, that can be part of an
4    investigation.
5  Q    How about contacting district superintendents?
6  A    It can be part of an investigation.
7  Q    Are there any protocols in place as to when a
8    superintendent should be contacted?
9        MR. KENISON-MARVIN:  Objection.  Scope.
10  Q    Or is it at the discretion of the investigator?
11        MR. KENISON-MARVIN:  Same objection.
12  A    It would be -- again, each case is different.
13    No case that we have is the same.  So it would
14    be sort of at the discretion of the
15    investigator.  You can see that how that's
16    outlined in the rules.  The investigator
17    determines the relevancy of interviews with
18    parties, interviews with witnesses, and
19    collection of documents.
20        So if a superintendent was part of that
21    case fact pattern and needed to be contacted for
22    investigation, that would happen.  Generally by
23    the time a case is assigned to an investigator,

101

1    the respondent is represented by counsel.  So
2    any contact with the school would be through
3    counsel.
4  Q    Do investigators contact other state agencies in
5    your experience during the investigation phase
6    like the Department of Education?
7  A   I suppose it could.  We could.
8  Q   Who makes the ultimate determination as to
9    whether or not a complaint gets docketed?
10       MR. KENISON-MARVIN:  Objection.  Scope.
11  A   The ultimate decision essentially would be from
12    the Executive Director, I mean, but with the
13    caveat on that of it's determined by whether
14    there's jurisdiction of the Commission.  If
15    there is a prima facie case, it is docketed.  If
16    there is not a prima facie case, then it's not
17    docketed.
18  Q   But the determination as to whether or not
19    there's been as prima facie case is made by the
20    Executive Director?
21  A   I mean, that would be the ultimate decision
22    maker.  Yes.
23  Q   Are allegations of discrimination referred to

102

1    the HRC from other state agencies?
2        MR. KENISON-MARVIN:  Objection.  Scope.
3  A   In my experience they can be, yes.
4  Q   And under what circumstances have you had
5    complaints referred to the HRC?
6  A   In my experience, we have had complaints
7    referred from the New Hampshire Employment
8    Security Office for employment-related
9    complaints that they receive from their clients
10    during unemployment filings, and we've received
11    them on occasion from the Department of Labor as
12    well.
13  Q   How about from the Department of Education?
14  A   We have received referrals from the Department
15    of Education.  Generally we ask that the
16    referring agency tell the person to contact us
17    directly.
18  Q   So generally that's what you do, but there have
19    been instances in which the Department of
20    Education has referred cases to the HRC?
21       MR. KENISON-MARVIN:  Objection.  Scope.
22  A   So when cases are referred to us from any
23    agency, we generally tell the agency to suggest

103

1    to that person that they contact us directly.
2  Q   Has there been a case that the HRC opened where
3    the Department of Education simply referred it
4    the HRC without an individual filing an intake
5    questionnaire?
6        MR. KENISON-MARVIN:  Objection.  Scope.
7  A   I'm not sure.  For my personal experience.
8  Q   You spoke earlier about your client service
9    representative, right?
10  A   Yes.
11  Q   I'm not familiar with that so can you explain,
12    the client service representative is an attorney
13    at the Department of Justice; is that right?
14  A   That is correct.
15  Q   Is there one particular attorney that's assigned
16    to the Human Rights Commission?
17  A   Yes.
18  Q   Who is that attorney?
19  A   During the time period of these, during the time
20    period of this, I guess the complaints that
21    we've discussed today, we've had two client
22    service representatives.  Assistant Attorney
23    General Jill Perlow and Assistant Attorney

104

1    General Sean Locke.
2  Q   And who is the person from HRC that decides
3    whether to consult with your client service
4    representative?
5  A   That would be the Director.
6  Q   Are there policies/procedures in place for when
7    that request should be made for a consultation?
8        MR. KENISON-MARVIN:  Objection.  Scope.
9  A   No specific procedures, no.
10  Q   So in this particular case, Attorney Bissonnette
11    was referring to the ████████ complaints.  Do
12    you remember his series of questions about that?
13  A   I do.
████████████████████████████████████████████
████████████████████████████████████
████████████████████████████████████████
████████████████████
19  Q   Okay.  And you said that the reason that you did
20    so was because, I believe this is your
21    testimony, that it was a relatively new
22    statutory amendment; is that right?
23  A   That is correct.

**105**

1  Q    Is it because you were looking for clarity on
2       how to apply the new amendments?
3           MR. KENISON-MARVIN:  Objection.  Scope.
4  A    I would say yes.
5  ████████████████████████████████████████
█████████████████████
████████████████████████████████████████████
███████████████████████████████████████████
█████████████████████████████████████████████████
██████████████████████████████
█████████████████████████████████████████████████
████████████████████████████████████████████████
███████████████████████████████████████████
█████████████████████████████████████████████████
████████████████████████████████████████████████
█████████████████
███████████████████████████████████████████
███████████████████████████████████████████████
████████████████████████████████████████
██████████████████████████████████████
████████████████████████████████████████████

**106**

███████████████████████████████████████
█████████████████████████████████████████████
██████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
█████████████████████████████████████████
███████████████████████████████████████████████
████████████████████████████████
███████████████████████████████████████████████
███████████████████
███████████████████████████████████████
████████████████████
██████████████████████████████████████████████
1  20  Q    Are there any processes or procedures, written
21        processes or procedures involved describing how
22        a complaint under the new amendment could be
23        referred to the HRC from the DOE?

**107**

1           MR. KENISON-MARVIN:  Objection.  Scope.
2  A    I believe there is something on their website.
3       Well, it's not referred from -- I believe there
4       is a page on their website that tells people how
5       to file a complaint with the Commission, the
6       HRC.
7  Q    In your view was there -- shortly after the
8       passage of the amendments, in your view was
9       there confusion amongst the public as to where
10      to file a complaint?
11          MR. KENISON-MARVIN:  Objection.  Scope.
12      Calls for speculation.  Vague.  You can answer.
13 A    In my opinion, I suppose.
14 Q    Why do you say that?
15          MR. KENISON-MARVIN:  Same objections.
16 A    Because I believe it was in the newspapers, the
17      press.
18 Q    Aside from the ████████ complaint, am I correct
19      that there was one other complaint that Attorney
20      Bissonnette referred to where you also consulted
21      your client services representative?
22          MR. KENISON-MARVIN:  Objection.  Scope.
23 A    Without you specifying, I'm not --

**108**

1  Q    You don't recall?
2  A    Sorry.  No.
3  Q    How often do you consult with the DOJ regarding
4       allegations of a complaint that come into the
5       HRC?
6           MR. KENISON-MARVIN:  Objection.  Scope.
7  A    In my experience, you know, it really depends on
8       the complexity of the complaint or other issues
9       that may be involved in a complaint that we are
10      not specialists in.  For example, I can use, my
11      example would be bankruptcy cases.  We have
12      respondents that are bankrupt sometimes.  I am
13      not a specialist in bankruptcy.  Neither is
14      anyone on my staff.  So we consult with the
15      Attorney General's office to understand what
16      Chapter 11, Chapter 9, and how that relates to
17      our ability to investigate a case.
18 Q    Does it also have to do with the complexity of
19      the law that you're applying?
20          MR. KENISON-MARVIN:  Objection.  Scope.
21 A    In my opinion, I would say yes.
22 ████████████████████████████████████████████████
████████████████████████████████████████████████████████



109

1

111

1    objection?
2        MR. KENISON-MARVIN:  Putting all the
3    documents that relate to your question that
4    you're making representation --
5  Q    Okay.  Then Let's look at the Borysenko intake
6    questionnaire if you don't mind, Gilles.
7        MR. BISSONNETTE:  That's going to be
8    Exhibit 64.  So just for the record, everyone,
9    we're now referring to the one of the Borysenko
10    exhibits.  Exhibit 64, Bates stamped 000011.
11  A    Okay.
12  Q    So if you compare those two documents, the
13    Borysenko intake questionnaire?
14  A    Um-hum.

19  Q    Okay.  Do you have any knowledge as to why that
20    question was added to the questionnaire?
21        MR. KENISON-MARVIN:  Objection.  Scope.
22  A    I don't recall sitting here right now.
23  Q    Do you recall anything about that question?

110

1

16  Q    That question does not appear on all of the
17    intake questionnaire forms that I have reviewed.
18    I'll represent that to you.  Do you know whether
19    that question was added to the intake
20    questionnaire form?
21        MR. KENISON-MARVIN:  Objection.  Scope.
22    Completeness, 106.
23        MR. KAHNE:  What's the completeness

112

1        MR. KENISON-MARVIN:  Objection.  Scope.
2  A    I mean, I would have added the boxes, but I
3    don't have any memory of why we put it on there
4    or what the purpose was.
5  Q    Okay.  And when you added the boxes, NH DOE
6    refers to, I assume, the New Hampshire
7    Department of Education?
8  A    That is my assumption as well.
9  Q    Okay, and so you would have added that for the
10    complainant to indicate whether they filed a
11    complaint with the New Hampshire Department of
12    Education.  Is that fair?
13        MR. KENISON-MARVIN:  Same objection.
14  A    Yes.
15  Q    What would the nature of that complaint be if
16    you know?
17        MR. KENISON-MARVIN:  Same objection.
18  A    I assume the nature of that complaint would be
19    under whatever the part of the statute that was
20    added that's under what, RSA 193?
21  Q    Okay.  Do you have any recollection whether, I
22    should say, I don't, based on the, we'd have to
23    look at the dates, but do you have an

113

1    understanding as to whether or not it was added
2    or deleted from the intake questionnaire.
3        MR. KENISON-MARVIN:  Same scope objection.
4        MR. BISSONNETTE:  If it would assist the
5    witness, I would just say that the current
6    version of the questionnaire is Exhibit 60.
7  A    Okay.  Thank you.
8  Q    Thank you, Gilles.
9        MR. BISSONNETTE:  Yes.
10  A    So it appears that it was deleted using Exhibit
11    60 as the current iteration.
12  Q    Does that refresh your recollection as to why it
13    was deleted from the intake questionnaire form?
14  A    I don't know why it was deleted.
15  Q    Have you had any conversations with Commissioner
16    Edelblut about the amendments?
17  A    No.
18  Q    How about Richard Farrell?
19  A    No.
20  Q    You testified to a conversation that you
21    understand Commissioner Malachi had with
22    Investigator Farrell about one particular
23    complaint.  Do you know whether Commissioner

114

1    Malachi has had other conversations with
2    Investigator Farrell about other complaints?
3  A    Director Malachi?  And Investigator Farrell?  I
4    do not know.
5  Q    Do you know how frequently she speaks with the
6    Department of Education?
7  A    I do not know.
8  Q    You testified, Attorney Bissonnette went through
9    some of the complaints and asked whether or not
10    certain content would violate the statute.  I
11    think you testified in sum and substance that it
12    would depend on certain circumstances.
13        My question is does the HRC have any
14    guidance as to whether any particular
15    educational materials violate RSA 354?
16        MR. KENISON-MARVIN:  Objection to scope.
17  A    I would say the guidance we have was issued by
18    the Attorney General's office in his opinion and
19    our FAQ on the statutes.
20  Q    Do you know whether anyone at the HRC uses the
21    Attorney General's opinion or the FAQs?
22        MR. KENISON-MARVIN:  Objection to form.
23  A    Uses it for what?

115

1  Q    Applies it to complaints that come in through
2    the complaint process.
3  A    Yes.
4  Q    Do you have any particular examples of that?
5  A    I do not.
6  Q    Do you know why the HRC requested that the
7    Attorney General issue an opinion on the
8    amendments?
9        MR. KENISON-MARVIN:  Objection.  Scope.
10  A    I do not specifically, no.
11  Q    Does the HRC have any obligation to notify the
12    Department of Education when there's been a
13    docketed complaint?
14  A    No.
15  Q    How about when there's been a finding of
16    probable cause for discrimination?
17  A    No.
18  Q    Ultimately, do the Commissioners vote once a
19    complaint has gone through the docketed
20    complaint phase, there's been an investigation,
21    there's an Investigative Commissioner, can you
22    just take me through the process after there's
23    been a docketed complaint what else has to

116

1    happen?
2        MR. KENISON-MARVIN:  Objection.  Scope.
3    Vague.
4  A    In accordance with RSA 354-A, if you read the
5    statute, the way the Commission's process works
6    is an Investigating Commissioner following the
7    investigation makes a finding of either probable
8    cause or no probable cause.  If a case is found
9    to be no probable cause, it is dismissed with
10    appeal rights.  If the case is found to be
11    probable cause, it moves on in the process
12    towards the public hearing.  In between the
13    public hearing and moving it from probable cause
14    to public hearing, the parties meet for a
15    conciliation and a prehearing, and then it moves
16    to public hearing.  After probable cause is
17    found, both parties have the ability to remove
18    the case to Superior Court.
19  Q    When Attorney Bissonnette showed you Exhibit 1,
20    he asked you a question about who the, I don't
21    know if it's respondent or charged party,
22    typically is in these cases, and you looked at
23    the definition of public employer and saw that

117

1    it listed counties, cities, towns, precincts,
2    districts, school administrative units, et
3    cetera, and you said that it appeared from the
4    text of the statute that that's who the, it was
5    a prohibition on public employers.
6         Aside from the text of the statute, in
7    these cases have you ever seen a case that was
8    not brought against one of these entities?
9         MR. KENISON-MARVIN:  Objection.  Scope.
10   Vague.
11 A   In the text -- I'm sorry.  Can you clarify that
12   question?
13 Q   Yes.  So you were looking at 354-A:31?
14 A   Yes.
15 Q   Which is the prohibition on public employers.
16 A   Okay.
17 Q   And I believe the question was regarding who the
18   charged or responding party is in these cases.
19 A   Correct.
20 Q   And your testimony was that it lists who the
21   public employers are, and I'm just asking in
22   your experience has it been the case in these
23   cases that the charged party is school

118

1    districts, school administrative units or
2    quasi-public entities?
3  A   ███████████████████████████████████████████
    ████████████████████████████
5  Q   How about allegations of discrimination?
6  A   The intake inquiries have been generally from
7    the documentation the School Districts with the
8    exception I think as I recall one is naming the
9    Commissioner of Education directly.
10 Q   Are you aware of a bounty that was put on
11   teachers by Moms for Liberty as a result of the
12   passage of the amendments?
13        MR. KENISON-MARVIN:  Objection.  Scope.
14 A   I am.
15 Q   And what is your understanding of that?
16        MR. KENISON-MARVIN:  Same objection.
17 A   My understanding is whatever was, I think it was
18   WMUR had an article on it.  So I believe, my
19   understanding is that this group put a bounty
20   for and would pay for a docketed charge.
21 Q   Did you have any conversations with anyone at
22   HRC about that article?
23 A   Maybe.  I don't remember specifically.

119

1  Q   Just give me a couple more seconds here.  Okay.
2    I think that's all I have.
3        MR. KENISON-MARVIN:  I think I might have a
4    few quick followups, but I need to run to the
5    restroom quickly.
6         (Recess taken 1:37 - 1:53 p.m.)
7        MR. KENISON-MARVIN:  First, before I do one
8    quick area of followup, I just wanted to put on
9    the record our right to read and sign and
10   reserving that.
11        MR. BISSONNETTE:  Yes.  So we've agreed
12   that hopefully we can get it done shorter than
13   the 30-day deadline because of briefing
14   purposes.  Okay.  Thank you.
15        MR. KENISON-MARVIN:  I don't think we have
16   a final agreement as to date because we'll work
17   to get that done in accordance with the briefing
18   date.
19        MR. BISSONNETTE:  So long as it's a few
20   days before the briefing deadline.
21        MR. KENISON-MARVIN:  That's our intention.
22              EXAMINATION
23 BY MR. KENISON-MARVIN:

120

1  ████████████████████████████████████████
   ████████████████████████████████████
   ████████████████████████████████████████
   ████████████████████████████████████
   ████████████████████████████████████████████
   ████████████████████████████████████████████
   ███████████████████████████
   ████████████████████████████████████████
   █████████████████████████
   ████████████████████████████████████████████
   ████████████████████████████████████████████
   ████████████████████████████████████
   ███████████████████████████████████
   ████████████████████████████████████████
   ████████████████████████████
18 Q   Okay.  I don't have anything else.
19        MR. BISSONNETTE:  Okay.  I'm good if
20   Attorney Kahne is good?
21        MR. KAHNE:  I'm good.
22        MR. BISSONNETTE:  Okay.  Thank you.
23            (Deposition ended at 1:54 p.m.)

**121**

1    I have carefully read the foregoing
2    deposition, and the answers made by me are true.
3
4
            _____
5                    SARAH BURKE COHEN
6
7
8    STATE OF _____
9    _____, SS.
10
11        At_____on the
12    _____ day of _____ A.D.
13    2023, personally appeared the above-named SARAH BURKE
14    COHEN and made oath that the foregoing answers
15    subscribed by her are true.
16                    Before me,
17
18
19
            _____
20                    Notary Public
21
22
23

**123**

1            E R R A T A
2        I, the undersigned, SARAH BURKE COHEN, have read
    the transcript of my deposition held on June 26,
3    2023, in the matter of Local 8027, AFT-New Hampshire,
    et al v. Frank Edelblut, Commissioner, et al, and the
4    same is true and correct, to the best of my
    knowledge, with the exception of the following
5    changes noted below, if any:
6    PAGE/LINE   CORRECTION AND REASON FOR CORRECTION
7    _____
8    _____
9    _____
10   See attached sheet(s) for additional information:
11   ___Yes___No
12   _____
            SARAH BURKE COHEN
13
14   STATE OF _____)
                         ) ss.:
15   COUNTY OF _____)
16
        Subscribed and sworn to before me this _____ day
17   of _____, 2023.
18
19   _____
            Notary Public
20
    My commission expires:
21
    _____
22
23

**122**

1        C E R T I F I C A T E
2        I, Cynthia Foster, Registered Professional
3    Reporter and Licensed Court Reporter, duly authorized
4    to practice Shorthand Court Reporting in the State of
5    New Hampshire, hereby certify that the foregoing
6    pages, numbered 7 through 120, are a true and
7    accurate transcription of my stenographic notes of
8    the deposition of SARAH BURKE COHEN who was first
9    duly sworn by me on June 26, 2023, for use in the
10   matter indicated on the title sheet, as to which a
11   transcript was duly ordered;
12       I further certify that I am neither
13   attorney nor counsel for, nor related to or employed
14   by any of the parties to the action in which this
15   transcript was produced, and further that I am not a
16   relative or employee of any attorney or counsel
17   employed in this case, nor am I financially
18   interested in this action.
19
20
            _Cynthia Foster_
21            Cynthia Foster, LCR
22
23

1    I have carefully read the foregoing

2   deposition, and the answers made by me are true.

3

4

5          SARAH BURKE COHEN

6

7

8 STATE OF _New Hampshire_

9 _Merrimack_ , ss.

10

11    At _Merrimack County_ on the

12 _21st_ day of _July_  A.D.

13 2023, personally appeared the above-named SARAH BURKE

14 COHEN and made oath that the foregoing answers

15 subscribed by her are true.

16        Before me,

17

18

19

20       Notary Public

21

22    Kelly A. Mederos, Esq
    Notary Public, State of New Hampshire
23    My Commission Expires December 21, 2027