# EXHIBIT 13

Declaration of
Plaintiff Christina
Kim Philibotte

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| LOCAL 8027, AFT-NEW HAMPSHIRE, AFL-CIO, RYAN RICHMAN, JOHN DUBE and JOCEYLN MERRILL, teachers in the New Hampshire Public Schools, and KIMBERLY GREEN ELLIOTT and MEGHAN EVELYN DURDEN, parents or guardians of children in the New Hampshire public schools. | ) ) ) ) ) ) |
|        Plaintiffs, | ) ) |
|        v. | ) ) |
| FRANK EDELBLUT, in his Official Capacity as Commissioner of the DEPARTMENT OF EDUCATION ("DOE"), CHRISTIAN KIM in his Official Capacity as the Chair of the NEW HAMPSHIRE COMMISSION ON HUMAN RIGHTS, and JOHN FOMELLA in his Official Capacity as ATTORNEY GENERAL of the State of New Hampshire. | ) ) ) ) ) ) ) ) |
|        Defendants. | ) |

Civil No. 1:21-cv-01077-PB

------------------------------------------------------------------------

| | |
|---|---|
| ANDRES MEJIA, CHRISTINA KIM PHILIBOTTE, and NATIONAL EDUCATION ASSOCIATION-NEW HAMPSHIRE, | ) ) ) ) |
|        Plaintiffs, | ) ) |
|        v. | ) ) |
| FRANK EDELBLUT, in his official capacity only as the Commissioner of the New Hampshire Department of Education, | ) ) ) |
| JOHN M. FORMELLA, in his official capacity only as the Attorney General of the State of New Hampshire, | ) ) |
| AHNI MALACHI, in her official capacity only as the Executive Director of the New Hampshire Commission for Human Rights, | ) ) ) |
| CHRISTIAN KIM, in his official capacity only as the Chair of the New Hampshire Commission for Human Rights, | ) ) ) ) |
| KEN MERRIFIELD, in his official capacity only as the Commissioner of the Department of Labor, | ) ) |
|        Defendants. | ) |

## DECLARATION OF CHRISTINA KIM PHILIBOTTE

I, Christina Kim, Philibotte, pursuant to 28 U.S.C. § 1746, depose and say as follows:

1

1.      I live in Merrimack County, New Hampshire. I grew up in Manchester and graduated from West High School.[1]

2.      I am the Chief Equity Officer for the Manchester School District, which is the largest and most diverse school district in New Hampshire.  Approximately 49% of the District's students were of color as of the 2021-2022 school year.[2]  I am the first person to hold this position, and I started in July 2021.  The Manchester Board of School Committee approved my position on June 28, 2021—three days after the Amendments went into effect.

3.      This position was created following robust community engagement, and this creation was part of the Manchester School District's February 2020 strategic plan. This position was crafted to help ensure that—especially given the disproportionate rates of graduation, reading and math proficiency, as well as suspension rates among students of color—institutional systems are created that support and rectify the hardship that many of students of color experience because of systemic racism.[3] As stated in the February 2020 strategic plan, the goal was to do the following:

> Hire an Equity Director to Oversee Alignment of All Equity Work—This role would prioritize the district's focus on issues of diversity, equity, and inclusion (DEI). This is a cross-cutting role that will support work across the entire organization. The director would work to coordinate multiple coherent streams of DEI work across the system including aligned professional development, curricular support, disciplinary actions, hiring and retention of people from diverse backgrounds throughout MSD, and systems improvement, as well as grant-funded projects. A key focus would be to adopt tools, resources, and concepts within MSD that bring an equity lens.

4.      One of the goals of my position is to train teachers and faculty to understand the needs of students of color and those with marginalized identities.  This effort is aimed at creating a more culturally fluent teaching staff so that this staff can better connect with their learners.  This

---

[1] *See also* Sarah Gibson, "In an Effort to Improve Equity, Manchester School District Turns to a West High Alum," *NHPR* (Sept. 21, 2021), https://www.nhpr.org/nh-news/2021-09-21/in-effort-to-improve-equity-manchester-school-district-turns-to-a-west-high-school-alum; *see also* Manchester Proud, "Champion Spotlight: Tina Philibotte, MSD Chief Equity Officer," https://www.manchesterproud.org/champion-spotlight-tina-philibotte/.

[2] *See also* Michael Cousineau, "Manchester Schools' Diversity Efforts Will Take Years," *Union Leader* (Dec. 19, 2021), https://www.unionleader.com/news/business/whats_working/manchester-schools-diversity-efforts-will-take-years/article_e92b6c28-4b28-5df0-b407-7d5bc2031009.html ("The school district's population of 12,400 students is split almost equally between Whites and minorities.").

[3] *See* Sarah Gibson, "In an Effort to Improve Equity, Manchester School District Turns to a West High Alum," *NHPR* (Sept. 21, 2021), https://www.nhpr.org/nh-news/2021-09-21/in-effort-to-improve-equity-manchester-school-district-turns-to-a-west-high-school-alum ("Manchester's overall test scores are lower than the state average. According to analysis by the community group Manchester Proud, scores for low-income, Black and Latino students are even lower — in some cases, half of the average Manchester score.  Dropout rates are also higher in the district, as are detention and suspension rates for students of color and students with disabilities. Many families of all ethnic backgrounds are disconnected from school.").

effort reinforces the creation of a sense of belonging for these students where these students would now feel more connected to, and better represented in, the books they read and the discussions they have in the classroom.

5.      In my role, I am taking proactive steps to tackle important equity issues, including the need to create frameworks to engage and enhance student voice, as well as improve family engagement.  This engagement helps make sure that students feel like they are agents in their own learning.

6.      The Manchester School District—along with School Administrative Unit ("SAU") 16—are the first school districts in New Hampshire to have full-time DEI administrators. Two additional DEI administrators have since been employed by the Oyster River Cooperative School District and the Concord School District since the filing of this December 2021 lawsuit.

7.      Indeed—following George Floyd's murder on May 25, 2020—these districts have created these positions in an increased effort to expose students to the lived experiences, contributions, and history—both past and present—of BIPOC (Black, Indigenous, and People of Color) individuals. These efforts are part of a growing and widespread consensus among educators that inclusive education practices that give voice and attention to the experiences of all students are critical.  Students must see themselves in the books they read and in the classroom discussions they have to become contributing participants in our increasingly diverse and multi-racial democracy.

8.      For example, by presenting a more informed and truthful portrayal of topics such as the empowering experiences and achievements of BIPOC and marginalized communities in the face of African enslavement, Jim Crow, segregation, and racial discrimination—and discussing with students the existing legacy of these actions, racial stereotypes, prejudice, explicit and implicit bias or "unconscious bias"—educational opportunities for all students are expanded.  This expansion of these educational opportunities takes many forms, but is unified by the aim of ensuring equal access to educational content for students of all backgrounds, and exposure to various perspectives that reflect the diversity of New Hampshire and America.

9.      In my role, I am devoted to nurturing an equitable and inclusive school environment where all students feel seen, heard, and valued.  I bring to this role over 15 years of experience in public education advocating and applying anti-racist/anti-bias and culturally responsive teaching practices as a DEI educational consultant, English teacher, and Dance/Performing Arts Teacher/Director. Through my work, I have led and designed (and continue to lead and design)

conversations about race and equity through teacher/leader workshops, presentations, and trainings.

10.    I previously was an English teacher and Director of the Dance Program at Goffstown High School for nearly 13 years. In this role, I was a 2019 finalist for New Hampshire Teacher of the Year, as well as the recipient of the 2019 SAU19 Dreamkeeper award.

11.    I am a fellow with New Hampshire Listens. I am also a two-time fellow of the National Writing Project—a network of teachers, university faculty, researchers, writers, and community educators working to advance writing and the teaching of writing. I was in the 2022 class of Leadership New Hampshire—a statewide program whose mission is to build a community of informed and engaged leaders.  I was also an Advisory Group member of the Endowment for Health's Race & Equity Series—a series that holds important convenings of diverse stakeholders, as well as ongoing working groups, tackling racial justice and equity challenges in New Hampshire, including in civic engagement, economic development, education, government, health, and law enforcement/criminal justice.  I have received the 2022 NAACP Manchester Excellence in Education award, as well as the Martin Luther King Jr. Coalition's 2023 Social Justice award.

12.    I have dedicated my professional life to training and instruction on DEI concepts. Such instruction is vital for the provision of a quality education and thriving democracy for all Granite Staters, and particularly Granite Staters of color. This instruction has increased the engagement, participation, and sense of belonging for students in my District. And students have expressed to me their desire to gain greater exposure to the perspectives of communities of color through the books they read and through course curriculum.

13.    For example, students have come to several Manchester Board of School Committee meetings stating their desire to have cultural studies in the curriculum, and they have given testimony before the Board that they want to feel more represented in the curriculum.  And students have told me that they want to talk about their own personal experiences in the classroom and how these experiences relate to course materials.  For these students, having these conversations is essential to help them process their own lived experiences where literature and history are used as a tool to help the students navigate the current world around them.  If we do not provide thoughtful and safe environments where students can connect the curriculum to their own lives with caring adults—and where teachers can affirm their students' lived experiences— then students are not meaningfully learning, they are robbed of a full education, and they feel

uncared for.  Learning does not happen in the abstract.  It happens when teachers and students can ask questions and acknowledge both the flawed and joyous world that has a direct impact on students, and where students can talk about their lives in the context of the course material.

14.     I am directly impacted by the Amendments challenged in this case.  I conduct staff trainings within the Manchester School District focusing on culturally-responsive education—a student-centered practice of mindfully and intentionally incorporating the experiences, culture, and identity of students (including those from historically marginalized groups) to help expand their educational opportunities. This includes developing strategies for how to relate and empathize with students, as well as developing curriculum consistent with these goals, so that each student is seen, heard, and valued.

15.     Previously, in conducting DEI trainings before the Amendments and before I assumed the role of Chief Equity Officer for the Manchester School District, I would specifically use terms and concepts like "anti-racism" and "anti-bias."  Because of the Amendments and their penalties, I now rarely use terms and concepts focusing on "anti-racism" in staff trainings—and have advised others to avoid them as well.

16.     For example, I now rarely use the term "anti-bias" in Manchester staff trainings because of the Amendments, and I have limited reference to implicit bias or "unconscious bias" in these trainings.  I have also told educators to avoid references to implicit bias or "unconscious bias."  Instead of being explicit and referencing "anti-bias" concepts directly, I now have to resort to using terms that are less precise, including now using the term "self-awareness" as an alternative—a different concept that involves understanding one's emotions and personal identity based on self-definition and others' perceptions, as well as recognizing how we are socialized.

17.     Also, instead of directly using the term "anti-racism," I now "dance around" this concept if I ever have the opportunity to address it—which is less often given the fear that exists around the Amendments.  Instead, if given the opportunity, I now talk more about my own personal experience as a South Korean adoptee to try to make connections for students and educators that could much more easily be accomplished if I felt that I was able to use the term "anti-racism."  I rarely use the term "anti-racism" because of its connection to Ibram X. Kendi's 2019 book *How to be an Antiracist*, which the Commissioner of Education cited as a reason why the Amendments are necessary.

18.     As one of only four current full-time DEI school administrators in New Hampshire, I also routinely field inquiries from teachers throughout New Hampshire as to whether certain

books and information would be banned under the Amendments. Yet, given the Amendments' vagueness, I cannot answer basic questions as to what is covered under the Amendments. As a result of this uncertainty, instructional choices have been chilled in order to avoid enforcement consequences.

19.     Teachers throughout New Hampshire regularly ask me for validation if certain books or concepts related to race are covered under the Amendments.  I cannot answer because the Amendments are unclear, and I ask the teachers to think through scenarios if they are challenged about what they are teaching.  I explain that I cannot insulate them if they are challenged by a parent or member of the public.  For example, in these conversations, I have recommended that teachers omit reciting during a "read aloud" certain lines of text in Jewell Parker Rhodes's 2018 book *Ghost Boys*—a book that follows the story of Jerome, a 12-year-old Black boy, who is shot and killed by a White police officer before coming back as a ghost.  The lines of text in this book that I have recommended be omitted from a "read aloud" reference unconscious racial bias, particularly during the courtroom scene on pages 85-87 where the prosecutor asks the officer who shot Jerome the following: "Have you heard of racial bias?"; [Have you] heard prejudice can affect your thoughts, actions?  Whether consciously. Knowing. Or unconsciously?"; and "Possibly you were responding to unconscious stereotypes of black men as large, threatening, dangerous?"  I have told the teacher that, at most, if these portions are to be presented at all during the class, it should come from the audiobook, not from the teacher.  Portions of *Ghost Boys* are attached to this declaration.

20.     When I explain to these teachers that the Amendments exist and that I cannot provide validation that certain instruction or reading material are exempt from the Amendments, the teacher often has an emotional response where they now feel that they have to make a choice between talking about a text in a culturally relevant way or being subjected to scrutiny from a principal or, even worse, potentially having their license impacted.  These educators are scared.

21.     I have also spoken to public school students about issues concerning race at events in my individual capacity.  For example, in around the Fall of 2021, I had conversations with Concord public school students while volunteering for that school district about "anti-racism" and the fact that there are few teachers of color in New Hampshire, as well as the Amendments.  These issues were of public concern to the students, and I was speaking as a private person.  I also spoke to public school students at a superintendents' conference on or about Tuesday, November 9, 2021 where I told these students my personal experiences of racism, as well as acknowledged the racism

that these students have experienced.  These issues were of public concern to the students, and I was speaking as a private person in these examples.

22.     I am certified by the State Board of Education and, thus, am subject to the Educator Code of Conduct that is now embedded within the Amendments' provisions in RSA 193:40.

23.     I am bringing this lawsuit in my individual capacity, and not on behalf of the Manchester School District that employs me.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 3rd day of August, 2023.


*/s/ Christina Kim Philibotte*
Christina Kim Philibotte



*"TIME TO WAKE UP."*

I SPIN AROUND. WHO SAID THAT?

ACROSS THE STREET, I SEE HIM.
WISPY LIKE SOFT RAIN. *A GHOST?*

LIKE ME?

· · · · · · · · · · · · · · · ·

Praise for

# GHOSt BOYs

★ "Rhodes beautifully weaves together the fictional and the historical...
in this gripping and all-too-necessary novel about police brutality, injustice,
and the power of bearing witness to the stories of those who are gone."
—*Booklist*, starred review

"*Ghost Boys* gently walks readers through the minefield of young black boys who
have been killed due to racism, dating back to the murder of Emmett Till. By
exploring the fear that is at the core of these murders, Jewell Parker Rhodes
suggests ways the living can crack that fear and, eventually,
end this epidemic of death."
—Nikki Grimes, *New York Times*–bestselling and award-winning author of
*Garvey's Choice* and *One Last Word*

"The voice of *Ghost Boys* is nothing less than prophetic:
It rings out in its plot lines, in its characters, in its tones, in its images.
And here is what that voice says: *Bear witness.*"
—Gary D. Schmidt, award-winning author of *The Wednesday Wars*

"Haunting, heartbreaking, and timely, this is a book that will start
important conversations."
—Kate Messner, author of *The Seventh Wish*



ISBN 978-0-316-26228-6

EAN

9 780316 262286

51799 >

$17.99 U.S.
$22.99 CAN.

## ONLY THE LIVING CAN MAKE THE WORLD BETTER. LIVE AND MAKE IT BETTER

Twelve-year-old Jerome is shot by a police officer who mistakes his toy gun for a real threat. As a ghost, he observes the devastation that's been unleashed on his family, his friend Carlos, and his community in the wake of what they see as an unjust and brutal killing.

Jerome meets another ghost: Emmett Till. Emmett helps Jerome process what has happened, on a journey toward recognizing how historical racism may have led to the events that ended his life. Jerome also meets Sarah, the daughter of the police officer, who grapples with her father's actions.

Once again Jewell Parker Rhodes deftly weaves historical, social, and political layers into a gripping and poignant story about how children and families face the complexities of today's world—and how one boy, in particular, who never had a chance to grow up, comes to understand American blackness in the aftermath of his own death.



# Jewell Parker Rhodes

is the author of *Ninth Ward*, a Coretta Scott
King Honor Book, *Sugar*, winner of the
Jane Addams Children's Book Award,
*Bayou Magic*, and *Towers Falling*. She has
also written many award-winning books
for adults.



VISIT US AT **LBYR.COM**
**#GHOSTBOYS**

Also available from


hachette
AUDIO



Jacket illustration © 2018 Shadra Strickland
Jacket design by Marcie Lawrence
Jacket © 2018 Hachette Book Group, Inc.
Printed in the U.S.A.

7.99 U.S.
2.99 CAN.

# GHOSt BOYs

Jewell Parker Rhodes



LITTLE, BROWN AND COMPANY
New York  Boston

This book is a work of fiction. Names, characters, places, and incidents are the product of the author's imagination or are used fictitiously. Any resemblance to actual events, locales, or persons, living or dead, is coincidental.

Copyright © 2018 by Jewell Parker Rhodes
Interior illustrations copyright © 2018 by Shutterstock.com

Cover art copyright © 2018 by Shadra Strickland.
Cover design by Marcie Lawrence.
Cover copyright © 2018 by Hachette Book Group, Inc.

Hachette Book Group supports the right to free expression and the value of copyright. The purpose of copyright is to encourage writers and artists to produce the creative works that enrich our culture.

The scanning, uploading, and distribution of this book without permission is a theft of the author's intellectual property. If you would like permission to use material from the book (other than for review purposes), please contact permissions@hbgusa.com. Thank you for your support of the author's rights.

Little, Brown and Company
Hachette Book Group
1290 Avenue of the Americas, New York, NY 10104
Visit us at LBYR.com

First Edition: April 2018

Little, Brown and Company is a division of Hachette Book Group, Inc. The Little, Brown name and logo are trademarks of Hachette Book Group, Inc.

The publisher is not responsible for websites (or their content) that are not owned by the publisher.

Library of Congress Cataloging-in-Publication Data
Names: Rhodes, Jewell Parker, author.
Title: Ghost boys / by Jewell Parker Rhodes.
Description: First edition. | New York ; Boston : Little, Brown and Company, 2018. | Summary: "After seventh-grader Jerome is shot by a white police officer, he observes the aftermath of his death and meets the ghosts of other fallen black boys including historical figure Emmett Till"— Provided by publisher.
Identifiers: LCCN 2017019240| ISBN 9780316262286 (hardcover) | ISBN 9780316262255 (ebook) | ISBN 9780316262248 (library edition ebook)
Subjects: | CYAC: Police shootings—Fiction. | Racism—Fiction. | Death—Fiction. | African Americans—Fiction. | Family life— Illinois—Chicago—Fiction. | Till, Emmett, 1941–1955—Fiction. | Chicago (Ill.)—Fiction.
Classification: LCC PZ7.R3476235 Gho 2018 | DDC [Fic]—dc23
LC record available at https://lccn.loc.gov/2017019240

ISBNs: 978-0-316-26228-6 (hardcover); 978-0-316-26225-5 (ebook)

Printed in the United States of America

LSC-C

Printing 20, 2021

## Preliminary Hearing
## Chicago Courthouse

*April 18*

"Were you surprised you shot a child?"

"Asked and answered, Your Honor," says the defending lawyer.

"I'll rephrase. Why were you surprised?" asks the lawyer calmly. "Can't you tell the difference between a boy and a man?"

"Yes, of course. I mean . . . it was dark."

"Daylight."

The judge's face is like a mask; her hair, silver. She peers at Officer Moore.

Officer Moore swallows. "Yes, daylight. He was big."

"More than any other twelve-year-old?"

"Yes. Bigger."

"Are you prejudiced?"

Jewell Parker Rhodes

"No."

"Liar," someone shouts.

"Quiet," the judge warns, tapping her gavel once.

I look across the courtroom at Sarah. Eyes wide, her elbows on her knees, her palms cupped over her head. I'm standing next to her father, studying him.

"Have you heard of racial bias?"

"No."

"Heard prejudice can affect your thoughts, actions? Whether consciously. Knowing. Or unconsciously?"

"I'm not racist."

"Possibly you were responding to unconscious stereotypes of black men as large, threatening, dangerous?"

"No. I acted with just cause."

"How tall is your daughter?"

"Objection," says the seated lawyer.

"Sustained," answers the judge.

"I'll ask another way. Would it surprise you if I told you Jerome Rogers, the child you killed, was no taller than five feet, ninety pounds?"

Officer Moore is surprised.

Her palms pressed tight against her ears, Sarah bows her head. She can't see her father squirm. I can.

86

s, tapping her gavel once.

room at Sarah. Eyes wide,
her palms cupped over her
her father, studying him.

al bias?"

fect your thoughts, actions?
ving. Or unconsciously?"

onding to unconscious ste-
e, threatening, dangerous?"
ise."

er?"

ted lawyer.

judge.

uld it surprise you if I told
d you killed, was no taller
s?"

ed.

t against her ears, Sarah
her father squirm. I can.

Then, it's my turn to be surprised. The ghost boy sits beside her. He tries to hold Sarah's hand. She doesn't flinch. Neither hand meets. They can't. He's dead; she's alive.

Sarah sees us both.

Ghost boy extends his hand toward me. Like I'm supposed to hold it? Be grateful?

I flinch. *What am I supposed to do? What does it mean?*

Officer Moore's plump-faced lawyer asks for a lunch break.

The judge agrees. For a few seconds, she closes her eyes. I think it doesn't matter if Sarah can see me and the ghost boy. It only matters that the judge sees Sarah's dad is lying.


People file out of the courtroom. Pop is steadying both Ma and Grandma. Officer Moore guides his wife, hand on her back.

I don't move. Sarah and the ghost boy walk out of the courtroom, turning once to look back at dead me.