# EXHIBIT 42

NEA-NH July 12,
2021 and August
5, 2021 Letters
(Depo. Ex. 11)

**EXHIBIT 11**

D. Fenton

5/17/2023

Reporter: Sharon Saalfield
RDR, CRR

# EXHIBIT 18

NEA-NH July 12, 2021 and August 5, 2021 Letters



July 12, 2021
**First Class U.S. Mail**

John M. Formella, Esq.
Attorney General
N.H. Dept. of Justice
33 Capitol Street
Concord, NH 03301

Re: Implementation Guidance for Public School Districts Regarding House Bill 2

Dear Attorney General Formella:

As President of NEA-NH, which represents 17,000 educators in our state, I write to request the issuance of formal guidance on the implementation of HB 2 within public school districts and public institutions of higher education across the State of New Hampshire. More specifically, the statutory language passed, under the section entitled: "Right to Freedom from Discrimination in Public Workplaces and Education," contains ambiguity requiring clarification. Such clarification is particularly important for certified educators given that the statutory language provides: "IV. Violation of this section by an educator shall be considered a violation of the educator code of conduct that justifies disciplinary sanction by the state board of education." (emphasis added).

Therefore, please issue detailed guidance to be followed by educators, administrators and school boards covering, at a minimum, the following subject areas:

1. What types of academic instruction regarding inherent and/or institutional bias or discrimination are prohibited;

2. What it means to permissibly teach prohibited "subjects identified in this section" as a "larger course of academic instruction" as included in section RSA 193:40, II;

3. Which topics related to racial and/or social justice are specifically prohibited from academic teaching and dialogue within public schools;

4. Whether or not academic instruction regarding historical racism, including, without limitation, in relation to slavery, segregation, the civil rights movement and affirmative

1

Case 1:21-cv-01077-PB Document 85-43 Filed 08/14/23 Page 4 of 9

action, may still be taught in public school classrooms. If so, how a violation of RSA 193:40 can be avoided when discussing these topics;

5. What specific categories of literature or written subject matters are prohibited from assignment or dissemination to students;

6. What are the parameters educators must follow when answering questions from students about current events that touch the topic areas in the law, e.g. the protests surrounding police reform, the Black Lives Matter movement, and news stories about the passage of this law;

7. What may be taught about historical systems and practices which led to discriminatory outcomes. For example, what is permissible to be taught about "redlining" by the Federal Housing Administration in the 1930's that led to racially segregated neighborhoods throughout the United States;

8. Is teaching about the existence of implicit bias or other similar social sciences prohibited. If not, what are the guideposts for discussing this kind of theory in classrooms;

9. What are the best practices for public school districts, administrators and public educators to avoid a violation of the new provisions enacted by HB 2 regarding the education of public school students;

10. What, if any, discretion remains with the New Hampshire Board of Education to not issue discipline where it is found that a teacher or district allowed students to hear or be taught prohibited information, which, in accordance with RSA 193:40, IV, "shall be considered a violation of the educator code of conduct that justifies disciplinary sanction by the state board of education;"

11. How does the law apply to higher education staff as the law only mentions the academic freedom of faculty members. Are their prohibitions on what staff members can discuss, teach, or provide to students;

12. What are the guideposts for academic freedom provided to University System Faculty. HB2 states the law shall not limit academic freedom to "research, publish, lecture, or teach in the academic setting" does this mean their freedom on these topics is absolute?

Once we have received guidance from the Department of Justice, we will swiftly disseminate that much-needed information to our members. As we approach the 2021-22 academic year, time is of the essence. The current state of confusion caused by HB 2 as it relates to public education will likely lead to unnecessary legal disputes and action if clarification is not provided. If we can be of assistance to you in forming your analysis and/or producing guidance, please do not hesitate to contact us for that purpose.

PL 00409

Thank you for your attention to this important and time-sensitive matter. We look forward to hearing from you soon.

Sincerely,

Megan Tuttle

Megan Tuttle
President
NEA-NH

3



**NEA New Hampshire**
*Shaping the Future, One Student at a Time*

August 5, 2021
**EMAIL**

John M. Formella, Esq. (attorneygeneral@doj.nh.gov)
Attorney General
N.H. Dept. of Justice
33 Capitol Street
Concord, NH 03301

Frank Edelblut
Commissioner (frank.edelblut@doe.nh.gov)
Department of Education
101 Pleasant Street
Concord, NH 03301

Re: Request for Further Clarification Concerning Implementation Guidance on House Bill 2for
Public School Districts

Dear Attorney General Formella and Commissioner Edelblut:

I write to you as the President of NEA-NH, an organization representing approximately 17,000
educators in New Hampshire, every single one of whom are impacted by the "Right to Freedom
From Discrimination in Public Workspaces and Education" law signed by Governor Sununu on
June 25, 2021. It is because of this vast impact to our membership that I am following up with a
further communication after our letter of July 12, 2021, has thus far been unanswered by your
offices.

NEA-NH has reviewed the 2½ -page FAQ guidance issued on Wednesday July 21, 2021 (your
Guidance). We appreciate the time and effort expended by your offices in developing this
guidance, which answers a number of questions that our members have had about the new law.
Additional questions remain, however, on which we seek clarification. Because the licenses,
careers, professional reputations, and livelihoods, of our members are at stake for any violation
of the law, it is imperative that they have a detailed understanding of what conduct and/or
teaching practices are prohibited by the law and constitute "a violation of the educator code of
conduct that justifies disciplinary sanction by the state board of education." With the 2021-2022
school year quickly approaching, we need your assistance in making the full scope of the law
clear.

As we understand the law, as construed though the lens of your July 21st Guidance, we understand it to permit the teaching and discussions described below. If we are mistaken in our legal analysis, please respond in detail to correct our understanding. Given the high stakes for our members, it is imperative for our members to be provided with reliable, detailed guidance that will allow them to clearly avoid the severe consequences of violating this amorphous law.

We understand as follows:

1. Discussing with students[1] incidents of racism or other prejudices exhibited and experienced by them or others in the school community or elsewhere is permitted.

2. Engaging in conversations about racism or other prejudices students, or others known to them, may have exhibited in the past is not prohibited provided the educator does not instruct students that they exhibited those behaviors because of inherent characteristics.

3. It is permissible to draw attention to the language, behavior, or writing of a student that might be sexist, racist, or otherwise prejudicial. The law does not prohibit educators from referring for discipline students for such behavior or comments provided it is done in accordance with school policy and procedure and state law. In fact, in order to comply with requirements of the "Bullying Law" educators are required to recognize and report such conduct in accordance with the school board policy implementing the law. *See* NH RSA 193-F.

4. Introducing students to the concept of implicit bias, discussing the topic, and discussing student experiences with bias is permitted, so long as students are not taught that bias is inherent in students due to their status as members of a specific group. Implicit bias training and education specifically pertaining to states of mind which are learned, assumed, or reinforced by society and not "inherent," is permitted.

5. Structural Racism (a.k.a Societal Racism, Systemic Racism) describes the ways in which institutional, historical, cultural, and interpersonal practices that are learned or imposed create racism within structures of society, the economy and the government. It does not contemplate that persons or groups are naturally, biologically, or innately racist. Therefore, including the concept of Structural Racism in instruction and conversation with students is permitted.[2]

6. Specific books or works of certain authors are not "banned" under the law.[3] Assigning students the writings of certain authors that express the author's particular view or theory about discrimination, racism or other prejudices is permitted provided the educator

---

[1] "Students," encompasses both K-12 students and higher education students. "Educators," are those teaching and non-teaching employees in both K-12 and public higher education institutions.

[2] For example, students could be taught, not only about the racist historical practice of "redlining," but also about the lasting inequalities and structural barriers it has created for generations of African Americans.

[3] On June 13, 2021 Commissioner Edelblut wrote an Op-Ed in the Union Leader leaving the distinct impression that Dr. Ibram Kendi's book, *How to be an Anti-Racist* may not be assigned under the new law. He raised the same proposition at the July 8, 2021 State Board of Education meeting. The Guidance is not consistent with his statements. Please address this contradiction. Additionally, if there are certain texts which your offices' believe are *per se* prohibited under this law, please provide a list so educator's know that prior to making 2021-2022 lesson plans.

2

conveys to students that the book represents the author's opinion or theory and the educator does not require the student to adopt the theory or opinion. For example, the works of James Baldwin are not *per se* prohibited from instruction or discussion in accordance with the above.

7.      The law permits teaching novels, non-fiction works, or other approved texts by instructing students on, and discussing, the historical context surrounding the works. Such permitted instruction and discussion includes information on racism or other prejudices which were expressed in both overt and subtle ways by systems, individuals, and government actors.

8.      The law permits instruction on, and discussion of, racism and oppression in teaching historical events and contemporary events, so long as students are not instructed that the individual actors were inherently racist. For example, educators may explain the racism carried out systematically, collectively and individually by southern slave owners in the United States, prior to the American Civil War. Educators may also explain the collective and large-scale societal discrimination and genocide carried out by Nazi Germany against Jewish populations in several countries. These historical issues can be connected to the modern era to explain the danger of racism and neo-Nazi groups that exist today.

9.      Teaching historically accurate lessons is permissible under the law, even if that history challenges students' notions of history as they previously understood it, provided the educator does not assign racist or prejudicial actions to the historical actors as inherent to them. For example, accurately teaching about the genocidal impact on Native Americans of the arrival of colonial Americans to the United States, and the subsequent western expansion of the United States, is permitted.

10.     The use of the historical primary sources (original documents) in coursework is permitted provided the use of sources is part of a larger course of academic instruction. This is the case even if the sources may contain an author's assertion that one race or group is inherently inferior to another, for example Thomas Jefferson's *Notes on the State of Virginia.*

11.     Similarly, it is permissible to assign reading of fiction and non-fiction works where character(s) may express discriminatory beliefs or engage in discriminatory acts against other characters or persons, for example *To Kill a Mockingbird* or *Huckleberry Finn.* Discussion about the actions of those characters, their discriminatory beliefs, or intent is not prohibited.

12.     It is permissible under the law to use teaching techniques which probe a student's understanding of their current reality, push them to think critically and analytically about social and historical contexts, and asks them to empathize with others or consider a different perspective then the one they currently have, provided the educator does not require that the student adopt a view that racism is inherent to some individuals.

13.     It is permissible to discuss the subject of "white privilege," a set of social and economic advantages that are a product of systems, structures, and learned biases, so long as the privilege is not discussed in such a way as to indicate that the racial favoritism at the core of white privilege is "inherent" or cannot be overcome.

3

14. It is permissible to engage with students in discussion of gender non-conformity, acknowledging different gender identities of students and colleagues, and curriculum which contains characters and story lines which discuss or highlight gender non-conforming, or LGBTQ individuals provided the text does not promote discrimination of such individuals.

15. The law permits the exhibiting and sharing of art, music, dance, or other artistic expressions that comment on racism, sexism, or other prejudices provided it is age appropriate and relevant to the curriculum approved by the School Board or higher education institution. It is also permitted for artists, writers, and historians to address students or for students to read about the artist's motivation for the work.

The paragraphs above do not purport to exhaustively describe all of the instruction and discussion that is permitted under the law but are illustrative of the types of discussion and instruction that we understand remain permitted. We appreciate your prompt response to confirm that these examples are consistent with your understanding of the law, so that educators may plan accordingly for the upcoming year.

We expect that as the implementation of the law moves forward, we may encounter scenarios requiring further analysis. We are hopeful that your offices, as the chief law enforcement and educational agencies of the Granite State, will have continual open dialogue with us about these issues as they arise.

Sincerely,

Megan Tuttle

Megan Tuttle
President, NEA-New Hampshire

4