# EXHIBIT 65

Excerpts of
Mar 8, 2023
HB533
Hearing

(Depo. Ex. 6)

**EXHIBIT 6**
D. Fenton
5/17/2023
Reporter: Sharon Saalfield
RDR, CRR

### Page 1

New Hampshire House of Representatives
House Judiciary Hearing - HB 533
March 8, 2023

### Page 2

1  (Excerpt begins)
2      CHAIRMAN LYNN: So with that, I'm going to
3  open the hearing on HB533, the amendment, and I would
4  recognize Diana Fenton from the Department of
5  Education.
6      Oh, I'm sorry. Do we have -- you have
7  somebody with you, Ms. Fenton?
8      MS. FENTON: I do. Good morning. My name is
9  Diana Fenton. I'm an attorney with the Department of
10 Education. With me is Richard Farrell, who's an
11 investigator for the Department.
12     I want to be clear, as an initial matter,
13 this bill before you, this amendment which requests
14 subpoena power for the Department of Education for
15 purposes of conducting investigations of educator
16 misconduct is not about Commissioner Frank Edelblut.
17 It's not for Commissioner Frank Edelblut. It is for
18 Investigator Richard Farrell, in order for him to
19 conduct his investigations. The Department has been
20 working very hard over the past few years to enhance
21 our child safety initiatives. We have seen various
22 stories in the news where the Department has been
23 working on addressing those matters. Concord always
24 comes to mind, where we are finding educators who
25 should not be around children, who are having

### Page 3

1  inappropriate relationships with children. They are
2  few and far between, but they're very, very important
3  and critically important.
4      The Code of Conduct was passed in 2018, and
5  under that document, the Department conducts
6  investigations of educator misconduct and subpoena
7  power, which other state agencies have in order to
8  facilitate their investigations, OPLC as a point --
9  case in point, has subpoena power would help to
10 facilitate that. But you don't have to take my word
11 for it. That's why Richard Farrell is here, to speak
12 on the work that he does.
13     Please.
14     MR. FARRELL: Good morning. My name is
15 Richard Farrell. I'm currently employed by the
16 Department of Education as an investigator. I began
17 this mission on July 1st, 2013.
18     CHAIRMAN LYNN: Okay. You know, Mr. Farrell,
19 can I just ask you, when you -- I'm not going to
20 interrupt you now, but when -- before you leave, would
21 you just fill out one of the pink cards?
22     MR. FARRELL: Yes, please.
23     CHAIRMAN LYNN: Thank you.
24     MR. FARRELL: I began this mission in July
25 1st, 2013, after serving 30 years as a member of the

### Page 4

1  New Hampshire State Police. Before that, I was a
2  licensed educator. I spent three years teaching high
3  school English and coaching football in Massachusetts
4  and in a private school in Southern New Hampshire. At
5  the time of my employment, the New Hampshire -- New
6  Hampshire relied on administrative rules to define the
7  conduct -- to define and conduct investigations into
8  allegations associated with educator misconduct. The
9  Code of Conduct didn't exist at all. Unfortunately, I
10 learned very quickly that the tools available to me to
11 complete my assigned cases were very limited. In fact,
12 I didn't have any at all. Therefore, the best approach
13 forward for me was to make the determined effort to
14 identify myself to, create relationships with, and
15 cultivate trust with the field. This included with
16 superintendents, principals, union attorneys, union
17 reps, attorneys representing school districts, and
18 other stakeholders.
19     At first, and very understandably, there was
20 skepticism, but I'm a person of Irish heritage, and
21 I've been gifted with the ability to tell people where
22 to go and convince them to look forward to the trip.
23 You see, I had no tools. I had no warrants. I had no
24 subpoenas. I just had administrative rules and
25 relationships. I asked Dr. Judy Fillion almost

Page 5

immediately, my immediate supervisor, legendary Dr. Fillion, why we didn't at least have subpoena powers while other investigators overseeing licensure had that tool over at OPLC. I didn't get a reasonable answer, and I've been asking ever since for ten years.

I think it's very important to understand very definitively that my first and most important mission is to keep kids safe. I have been called to public service for nearly 40 years, and I take this responsibility very, very seriously. This is about kid -- keeping kids in our school safe and protecting them from the 1 percent of educators who do not share in this belief. That's right, 1 percent. I worked for Commissioner Barry. I now work for Commissioner Edelblut, and God willing, I will work for another commissioner in the future. This is not, as a local newspaper trumpeted this past Sunday, "Edelblut seeks subpoena power to investigate educator misconduct." That's not what this is about.

I am asking, the agency is asking, and we need to do three things. This request has nothing to do with political agenda or me carrying water for any commissioner. I need these tools to complete my mission. The three-pronged mission is, protect our most vulnerable neighbors, our children, protect our

Page 6

educators. That's right. Well over 90 percent of our cases alleging misconduct are deemed to be unfounded. We exonerate more teachers every day than we do take action against the license of a teacher. Over the past ten years, I've been -- investigated, on average, 150 cases that we log in as cases that meet our triage process. In any given year, we take action, suspensions or revocations, involving ten educators on average. This does not count the many reports we get that do not survive our triage process.

And finally, the third part of our mission is to remove educators that did damaging our kids. Over the past ten years, I've been faced with difficult task of asking for information. Many times, I've been denied access to reports, statements, witness information, names, ages, local disciplinary records, investigative findings, and other crucial bits of evidence that would've assisted in protecting students, exonerating educators falsely accused, and removing bad apples from our classrooms.

CHAIRMAN LYNN: I'm sorry. Did you say -- you said you had been denied access? Is that what you're saying?

MR. FARRELL: That's correct.

CHAIRMAN LYNN: All right.

Page 7

MR. FARRELL: Over the past two to three years, school districts are routinely hiring third-party investigators, attorneys that work for the districts as contractors. And, in fact, a new company has been started that focuses strictly on providing third-party investigations for school districts. Most of the time, we are not allowed to look at those reports. We don't have subpoena power to get those reports. Sometimes we're allowed to review them in-camera in a conference room at a law firm and glean the information from those. Many times, we're not allowed to touch them at all. Many of our most difficult and heinous cases involving the exploitation of our children, the sexual exploitation of our children, began on social media postings, text messaging, and the use of cell phones. Often, the initial triage of these cases do not appear to be criminal in nature. Therefore, our many, many partners in law enforcement could not assist us in getting the information that we needed. We have no tools to get this information because we have no subpoena powers. Again, the kids are left hanging. The teachers accused have no support and don't have the information to exonerate them, and the bad teacher has the possibility of slipping off the hook. Again, this comes down to

Page 8

relationships I've created and creativity in the investigations.

We have all -- have been very lucky that this agency and I and school districts and their staff, union reps and their attorneys work reasonably well together to get the job done, but the day is coming when this will not happen. I am -- I'm amazed, absolutely amazed, that an investigator for OPLC can subpoena records associated with barbers, cosmeticians, nurses, and other licensees, and the Department of Education, who oversee the safety of children, do not have that authority. It's 2023. Our children should be protected, and subpoena power will allow us to do that.

Thank you very much. If you have any questions, I'll --

CHAIRMAN LYNN: Questions for this -- for either of these witnesses?

Yes, Representative Perez.

REPRESENTATIVE PEREZ: Thank you. Thanks for taking my question. Will this cover all school employees? For example, will it cover the principals, the custodians, or is it just educators?

MR. FARRELL: So for my purposes as educator misconduct, it's for license holders. So that would be

Page 9

1 superintendents, assistant superintendents, principals,
2 administrators, teachers, paraprofessionals that hold
3 licenses.
4      CHAIRMAN LYNN: All right. Other questions
5 for this witness? Seeing none, thank you --
6      Oh, I'm sorry. Representative Brennan.
7      REPRESENTATIVE BRENNAN: Thank you,
8 Mr. Chairman. Thank you for taking my question.
9      Earlier in your testimony, you stated that
10 1 percent of teachers do not share the common goal of
11 keeping our children safe, and I'm wondering if you
12 might be able to provide the source for that number.
13      MR. FARRELL: I'd be happy to give you the
14 list of suspended and revoked educators that we've
15 compiled. We can do it by year, we can do it by
16 alphabetical order, but it's a small percentage of
17 people that have engaged in misconduct that have put
18 children at risk, and that's the 1 percent I'm talking
19 about.
20      REPRESENTATIVE BRENNAN: Follow up, please.
21      MR. FARRELL: Yes.
22      REPRESENTATIVE BRENNAN: Would that 1 percent
23 be in regards to New Hampshire educators, or is that a
24 nationwide figure?
25      MR. FARRELL: That'd be New Hampshire. I

Page 10

1 don't have any facts or figures to support any other
2 state but the one that I work in.
3      REPRESENTATIVE BRENNAN: Thank you.
4      CHAIRMAN LYNN: Any questions?
5 Representative DiLorenzo.
6      REPRESENTATIVE DILORENZO: Thank you,
7 Mr. Chair.
8      Sir, could you tell me what the significance
9 of your Irish heritage has to do with this bill?
10      MR. FARRELL: Oh, it's kind of like to -- a
11 little bit of blarney that I have. It's nice to be
12 able to communicate with, create relationships, get
13 people to trust that I'm not working opposed to their
14 position. It's -- sometimes it's easier to convince
15 people to be on your team than trying to pound them
16 over the head.
17      REPRESENTATIVE DILORENZO: Thank you.
18      CHAIRMAN LYNN: Representative Paige.
19      REPRESENTATIVE PAIGE: Yeah. Thanks for
20 taking my question. Top of the morning.
21      So the -- just I want to -- I have a question
22 on terms of what you defined. You said the license
23 holders would come under the purview of this subpoena
24 power, right? So if I have a license to teach or
25 administrate or whatever, a neighbor does, that -- the

Page 11

1 Department would have that authority over that person
2 wherever they may be?
3      MS. FENTON: I'm going to assist on this
4 question.
5      REPRESENTATIVE PAIGE: Well, I just -- could
6 he answer that question, though? I think -- he
7 mentioned that. I want to understand. He's doing the
8 investigation. That's why he's here, right?
9      MS. FENTON: He certainly is, yes.
10      REPRESENTATIVE PAIGE: Thank you.
11      MR. FARRELL: So the Code of Conduct is the
12 method that we use to conduct investigations. And the
13 Code of Conduct is very limited in its scope, and the
14 scope is a license holder. So, for example, we cannot
15 go in and examine a custodian, a kitchen staffer, a
16 secretary, because they don't hold licenses with the
17 Department of Education. So my investigations and the
18 Code of Conduct is limited to those persons who hold
19 licenses that we control. Anybody else in the school
20 district, any other employee, we can't use the subpoena
21 power for them because they're not license holders. So
22 it's limited to those persons that hold the license.
23      CHAIRMAN LYNN: Other -- follow-up? Sure.
24      REPRESENTATIVE PAIGE: Yeah.
25 Changing subjects quickly, it sounded like.

Page 12

1 if I understood your testimony correctly, you said that
2 you're having success in your job right now, but the
3 day will come. Is that what you said?
4      MR. FARRELL: Yeah. We are having success,
5 and we are getting increasingly pushback from certain
6 stakeholders that are saying, "No, we're not going to
7 provide that information for you." I can give you
8 anecdotal -- or I can give you definitive information
9 that -- for example, just this week we had a -- an
10 educator that has come under our radar, this licensed
11 educator that was -- that is under investigation. And
12 I had to deal with three different superintendents to
13 ask for assistance in an investigation to determine
14 whether or not misconduct may have occurred. I got
15 three different answers from three different
16 superintendents, two of which were great and very
17 assisting. One flat out said, "No, I'm not going to
18 give you that information." And it's crucial
19 information to determine whether or not educator
20 misconduct occurred and any action that we might take
21 regarding this educator. So I had one case, three
22 superintendents. One flat out said, "No, thank you."
23 I don't have any authority to say to the
24 superintendent, no, I really need this information,
25 please, please, please give me this information. I

Page 13

1  don't have the authority to do it. So I have three
2  superintendents, two had levels of cooperation, one
3  said no.
4       CHAIRMAN LYNN: Other questions? Yes.
5  Representative Greeson.
6       REPRESENTATIVE GREESON: Thank you,
7  Mr. Chairman.
8       Thank you, sir, for answering our questions.
9  Is a subpoena a first line of action or a last line of
10 action for you?
11      MR. FARRELL: For me, it'd be the last line
12 of action. I would exhaust every other opportunity I
13 had and that would be the last thing that I would use.
14      CHAIRMAN LYNN: Other questions for this
15 witness? Representative Manos.
16      REPRESENTATIVE MANOS: Thank you, Mr. Chair.
17 I believe you talked about third-party
18 investigators, and those are contractors with the
19 Department of Education.
20      MR. FARRELL: No, contractors for school
21 districts.
22      REPRESENTATIVE MANOS: Okay. And so you're
23 having difficulty getting their reports?
24      MR. FARRELL: Correct.
25      REPRESENTATIVE MANOS: Thank you.

Page 14

1       CHAIRMAN LYNN: Representative Andrews.
2       REPRESENTATIVE ANDREWS: Thank you,
3  Mr. Chair. Thank you for taking my question. And
4  either one of you can answer this. If this only deals
5  with licensed employees of a school district, where
6  does it fall? Other employees, if they are -- come
7  under misconduct, who do they complain to?
8       MS. FENTON: It would be an employment issue
9  that the district would address.
10      CHAIRMAN LYNN: Other questions?
11 Representative Smith.
12      REPRESENTATIVE SMITH: Yes. Thank you.
13 Following up on my colleague's question. In
14 that situation, if you were aware of a problem, would
15 you -- if someone is not licensed but employed in the
16 public schools in this state, would you be able to go
17 to the Attorney General's Office, Attorney General
18 providing counsel for all agencies, to ask for help in
19 getting that information, whether it requires a
20 subpoena or not?
21      MR. FARRELL: When it comes to non-licensed
22 persons, I routinely have referred those type of cases
23 to the local county attorney, the local police, and
24 other partners that we have. Because sometimes that
25 behavior that is in question maybe border on criminal

Page 15

1  behavior. So we would immediately -- I immediately
2  pass that on to other authorities. We just had -- I
3  think you probably saw the news that a bus driver was
4  arrested yesterday. We got that information from the
5  school district, from the superintendent almost within
6  minutes after he became aware of it. We immediately --
7  I immediately forwarded it to the Chief of Police in
8  the Hudson Police Department and they conducted a
9  robust investigation that had had nothing to do with
10 us, but we were able to refer it to the right agency.
11      CHAIRMAN LYNN: Other questions for this
12 witness? Yes. Representative Leavitt.
13      REPRESENTATIVE LEAVITT: Thank you for taking
14 my question.
15      So you just mentioned that an educator was
16 found -- or you're looking into investigating. And why
17 would you have more than one superintendent to ask
18 the -- you know, to question about that person? Don't
19 you normally just have one superintendent that that
20 educator would be under?
21      MR. FARRELL: In this particular case, and
22 very often this is the case, this involved three
23 superintendents. One was superintendent of a district
24 at the time the person was initially hired, the second
25 superintendent was the new superintendent who works in

Page 16

1  the -- that same district, and the third superintendent
2  was a previous employer. So we went out and asked each
3  one of those superintendents to assist us in triaging
4  that case.
5       CHAIRMAN LYNN: All right. Representative
6  Horgan.
7       REPRESENTATIVE HORGAN: Thank you very much.
8  You mentioned the case of the bus driver, and I read
9  about that in the newspaper. I guess it was this
10 morning or yesterday morning. They all kind of meld
11 together and the -- actually, the case of the bus
12 driver, bus drivers are licensed, but I think they're
13 to drive school buses, but they're licensed by the DOT.
14 But -- and this is a little bit out of the purview of
15 our --
16      CHAIRMAN LYNN: So is there a question?
17      REPRESENTATIVE HORGAN: Yes, there's going to
18 be, yes. A little bit out of the purview of question,
19 and we're going against the political trend, as anybody
20 listened to governor's budget address knows, but would
21 it make your job easier if perhaps we licensed
22 everybody who was in a child-facing role with the
23 schools, regardless of whether or not they were
24 educators or paraprofessionals or just support staff?
25      MR. FARRELL: Well, it -- no, the answer is

Page 17

1  no. It wouldn't make my job easier. And I think we
2  have to define who educators are and what the Code of
3  Conduct is. So I think by expanding -- I wouldn't want
4  to expand the role of this agency to be involved with
5  persons that are not licensed.
6      REPRESENTATIVE HORGAN: Thanks.
7      CHAIRMAN LYNN: Other -- yes,
8  Representative MCBEATH.
9      REPRESENTATIVE MCBEATH: Good morning.
10     CHAIRMAN LYNN: Good morning.
11     REPRESENTATIVE MCBEATH: I'm in a different
12 place.
13     CHAIRMAN LYNN: All right.
14     REPRESENTATIVE MCBEATH: No, Chair. Good
15 morning and thank you for taking my question.
16     I think you testified that you said without
17 the subpoena power, you would have no authority to get
18 the information that you were requesting. So what is
19 the scope of the subpoena? Is it, you can get any
20 information you want? I mean, what's the hook for, you
21 know, containing what information your subpoena power
22 has?
23     MR. FARRELL: The subpoena power would be
24 limited to what I ask for. So I wouldn't -- it's not a
25 fishing net that would go out and, you know, drag the

Page 18

1  ocean for all types of information. It'd be
2  specific -- a report, for example, personnel record,
3  for example. Past disciplinary practices or actions
4  against the educator. Those are the type of things,
5  witness statements. We're not casting a wide net and
6  trying to capture people in that net. We want to be
7  very limited and focused on the allegation and those
8  things associated with the allegation.
9      CHAIRMAN LYNN: Yes.
10     REPRESENTATIVE MCBEATH: So I think that's
11 what I'm asking. So you are not limited within the
12 scope of whatever you want?
13     MR. FARRELL: Absolutely not. And keep in
14 mind, Code of Conduct is my guide. That's the -- my
15 boundaries. Those -- just like when I was in the state
16 police, there are certain things, those are -- I have
17 to stay within my lane. And the Code of Conduct is my
18 lane, and I don't go outside that Code of Conduct. I
19 don't go outside those lanes. So the idea that --
20 you'll see, if you look at the Code of Conduct, you
21 have to be very careful that people weaponize the Code
22 of Conduct. Parents weaponize it on occasion, school
23 districts perhaps. We don't want to weaponize the
24 code. We want to stay within the bounds of the code
25 and weaponizing it is really a bad idea.

Page 19

1      REPRESENTATIVE MCBEATH: Thank you.
2      CHAIRMAN LYNN: Other questions for this
3  witness? Yes, Representative, excuse me, Turer.
4      REPRESENTATIVE TURER: Thank you, Mr. Chair.
5  Thanks for taking the question.
6      I am sort of going back to the idea this is a
7  -- an amendment to the original bill that came before
8  us. And I know it's a full replacement of that bill.
9  But I guess my question is, the original bill
10 basically, and I believe that's why it's before this
11 committee, specifically targeted complaints related to
12 student discriminatory practices. And I'm wondering,
13 is the request before us now -- sounds like it may be
14 much broader than sort of things related to student
15 discriminatory practices. So I'm wondering how you see
16 the split between the two and whether or not this is
17 actually much broader than sort of what originally was
18 put before us. Thanks.
19     MS. FENTON: This is a completely different
20 concept than the original House Bill 533. And as I
21 mentioned at the beginning of my testimony, Richard
22 Farrell had been asking for this type of bill for quite
23 a while. And in working with Representative Lynn and
24 working with the Attorney General's office on the
25 original House Bill 533, we have since worked with the

Page 20

1  AG's office to come up with an SOP as to how we
2  transfer those cases to the Human Rights Commission and
3  the AG's office. It was brought up in that
4  conversation kind of separate and apart from it, that
5  the Department should probably seek subpoena power for
6  the Code of Conduct investigations that we do. And so
7  we thought that this would be the opportunity to do
8  that. And my understanding is Representative Lynn has
9  worked -- or spoken to the attorney general's office
10 about this amendment. But obviously, I will let him
11 speak to that.
12     MR. FARRELL: No, that's true. The second --
13 the Amendment 20230739H is -- you'll see that the
14 wording of that is slightly different than the earlier
15 proposed amendment. And that change in wording
16 reflects suggestions by the Attorney General's office.
17 That's why the -- that's the slight change in wording.
18     REPRESENTATIVE TURER: Okay. So just quick
19 follow-up. And I don't know whether I'm asking this of
20 -- the scope then of what we're talking about today
21 would go beyond sort of the original bill in terms of
22 not just targeting discriminatory complaints, but
23 targeting essentially any issue before the -- that
24 comes before you.
25     MS. FENTON: The short answer to your

Page 21

1  question is, yes, it is broader, but I'm going to --
2  it's a nuance because it falls directly within the Code
3  of Conduct. So to reference back to Richard Farrell,
4  we are within the bounds of the Code of Conduct, but it
5  is outside of the discriminatory practices, yes. Thank
6  you.
7      CHAIRMAN LYNN: Other questions for the --
8  Yes. Representative Payne -- Paige? I'm sorry.
9      REPRESENTATIVE PAIGE: Could -- that could be
10 true. So I'm just trying an off -- bouncing a little
11 bit off of Representative Turer's question in the
12 timeline. And I'm trying to catch up from the original
13 bill to the amendments we have with the subpoena issue
14 here before us. But if I'm understanding this
15 correctly, Mr. Farrell's been working at the Department
16 of Education for about ten years. 2018 is when the
17 Code of Conduct has -- was passed or adopted, however
18 we want to phrase that. And now it's 2023. But Mr.
19 Farrell's been asking for the subpoena power for as
20 long as he's been employed there. Is this the first
21 time the department's asked -- this is a yes or no. Is
22 this the first time the department's asked for subpoena
23 power?
24      MS. FENTON: Yes.
25      CHAIRMAN LYNN: Other questions for this

Page 22

1  witness? Seeing none, thank you very much.
2  (End of excerpt)

Page 23

1      CERTIFICATION
2
3      I, Alicia Jarrett, do hereby certify that the
4  foregoing is a correct transcript from the electronic
5  sound recording provided for transcription and prepared
6  to the best of my professional skills and ability.
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23  _____
24  ALICIA JARRETT, AAERT NO. 428   DATE: April 14, 2023
25

```
 1                    C E R T I F I C A T I O N
 2
 3            I, Alicia Jarrett, do hereby certify that the
 4      foregoing is a correct transcript from the electronic
 5      sound recording provided for transcription and prepared
 6      to the best of my professional skills and ability.
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21      [signature: Alicia J. Jarrett]
22
23      _____
24      ALICIA JARRETT, AAERT NO. 428      DATE: April 14, 2023
25
```