## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| LOCAL 8027, AFT-NEW HAMPSHIRE, AFL-CIO, RYAN RICHMAN, JOHN DUBE and JOCEYLN MERRILL, teachers in the New Hampshire Public Schools, and KIMBERLY GREEN ELLIOTT and MEGHAN EVELYN DURDEN, parents or guardians of children in the New Hampshire public schools.<br>　　　　Plaintiffs,<br>　　　　　　v.<br>FRANK EDELBLUT, in his Official Capacity as Commissioner of the DEPARTMENT OF EDUCATION, CHRISTIAN KIM in his Official Capacity as the Chair of the NEW HAMPSHIRE COMMISSION ON HUMAN RIGHTS, and JOHN FOMELLA in his Official Capacity as ATTORNEY GENERAL of the State of New Hampshire.<br>　　　　Defendants.<br>------------------------------------------------------------------------<br>ANDRES MEJIA,<br>CHRISTINA KIM PHILIBOTTE, and<br>NATIONAL EDUCATION ASSOCIATION-NEW HAMPSHIRE,<br>　　　　Plaintiffs,<br>　　　　　　v.<br>FRANK EDELBLUT, in his official capacity only as the Commissioner of the New Hampshire Department of Education,<br>JOHN M. FORMELLA, in his official capacity only as the Attorney General of the State of New Hampshire,<br>AHNI MALACHI, in her official capacity only as the Executive Director of the New Hampshire Commission for Human Rights,<br>CHRISTIAN KIM, in his official capacity only as the Chair of the New Hampshire Commission for Human Rights,<br>KEN MERRIFIELD, in his official capacity only as the Commissioner of the Department of Labor,<br>　　　　Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)　Civil No. 1:21-cv-01077-PB |

## PLAINTIFFS' JOINT OBJECTION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## [***REDACTED PUBLIC VERSION***][1]

---

[1] An unredacted, sealed version of this brief has been filed with the Court.

## <u>TABLE OF CONTENTS</u>

**Page(s)**

TABLE OF AUTHORITIES ........................................................................................ ii

INTRODUCTION ...................................................................................................... 1

SUMMARY OF ARGUMENT .................................................................................. 6

PLAINTIFFS' RESPONSE TO DEFENDANTS' "BACKGROUND" STATEMENT OF
FACTS [LOCAL RULE 56.1(B)] ............................................................................. 7

ARGUMENT ............................................................................................................. 8

I.     The Amendments Are Unconstitutionally Vague Under the Fourteenth Amendment
(Counts I and II in the AFT Action and Count I in the Mejia Action). ...................... 8

  a.    This Court Applied the Correct Standard for a Vagueness Challenge at the
Motion to Dismiss Stage. ........................................................................................ 8

  b.    Extrinsic Evidence Can Be Considered in a Facial Vagueness
Challenge. .............................................................................................................. 10

  c.    Defendants' Reliance on Dictionary Definitions in Defining "Teaching" Does
Not Remedy the Amendments' Confusion and Lack of a Scienter Requirement. ..... 13

  d.    The Four Banned Concepts Are Hopelessly Vague .................................................. 22

  e.    The Record Shows that the Amendments Lead to Arbitrary and Discriminatory
Enforcement. .......................................................................................................... 25

II.    The Amendments Violate Plaintiffs' First Amendment Rights by
Restricting Educators' Private, Extracurricular Speech
(Count III in the AFT Action). ................................................................................. 27

    a.    Defendants Cannot Shield the Amendments From a First Amendment
Challenge, Whether "Facial" or, as Pled and Evidenced Through
Discovery, "As Applied." ................................................................................... 28

    b.    AFT Plaintiffs Also Prevail Under the Traditional *Pickering* Analysis. ........ 32

III.   The Doctrine of Severability Does Not Apply. ....................................................... 37

    a.    Severing RSA 193:40, IV Would Not Cure the Amendments' Infirmities. ... 38

    b.    The Unconstitutional Provisions of the Amendments Are Integral and
Essential to the General Structure of the Amendments. ................................... 41

  CONCLUSION ........................................................................................................ 43

i

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Act Now To Stop War & End Racism Coal. v. District of Columbia*,
846 F.3d 391 (D.C. Cir. 2017) ............................................................................13

*Amalgamated Transit Union Local 85 v. Port Authority of Allegheny Cnty.*,
513 F. Supp. 3d 593 (W.D. Pa. 2021) *aff'd*, 39 F.4th 95 (3d Cir. 2022) ...............30

*Baird v. Bellotti*,
450 F. Supp. 997 (D. Mass. 1978), *aff'd*, 443 U.S. 622 (1979)..............................42

*Bouie v. City of Columbia*,
378 U.S. 347 (1964)...................................................................................5, 13, 23

*Broadrick v. Oklahoma*,
413 U.S. 601 (1973)..............................................................................................31

*Bruce v. Worcester Regional Transit Auth.*,
34 F.4th 129 (1st Cir. 2022)............................................................................35, 36

*Carolina Youth Action Project; D.S. by and through Ford v. Wilson*,
60 F.4th 770 (4th Cir. 2023) ...........................................................................9, 11

*Claremont School Dist. v. Governor (Statewide Property Tax Phas-ln)*,
144 N.H. 210 (1999) .............................................................................................42

*Coates v. City of Cincinnati*,
402 U.S. 611 (1971)..............................................................................................31

*Connally v. General Const. Co.*,
269 U.S. 385 (1926)...................................................................................5, 14, 15

*Connick v. Myers*,
461 U.S. 138 (1983)..............................................................................................32

*Decotiis v. Whittemore*,
635 F.3d 22 (1st Cir. 2011).............................................................................35, 36

*Foley v. Town of Randolph*,
598 F.3d 1 (1st Cir. 2010).....................................................................................35

*Frese v. Formella*,
53 F.4th 1 (1st Cir. 2022), <u>cert. denied</u>,
2023 WL 6377803 (U.S. Oct. 2, 2023)................................................................10

ii

*Garcetti v. Ceballos*,
    547 U.S. 410 (2006) ("*Garcetti*") ................................................................... *passim*

*Gooding v. Wilson*,
    405 U.S. 518 (1972)..................................................................................................30

*Grayned v. City of Rockford*,
    408 U.S. 104 (1972)......................................................................................... *passim*

*Honeyfund.com, Inc. v. DeSantis*,
    622 F. Supp. 3d 1159 (N.D. Fla. 2022) (appeal filed on Sept. 19, 2022)...........14, 42

*Johnson v. United States*,
    576 U.S. 591 (2015)................................................................................................8, 9

*Keepers, Inc. v. City of Milford*,
    807 F.3d 24 (2d Cir. 2015)...................................................................................12, 13

*Kennedy v. Bremerton Sch. Dist.*,
    142 S. Ct. 2407 (2022)..........................................................................................32, 34

*Kessler v. City of Providence*,
    167 F. Supp. 2d 482 (D.R.I. 2001).......................................................................28, 31

*Lane v. Franks*,
    573 U.S. 228 (2014)..............................................................................................32, 33

*Lanzetta v. New Jersey*,
    306 U.S. 451 (1939)...................................................................................................5

*League of Women Voters of Fla. Inc. v. Fla. Sec'y of State*,
    66 F.4th 905 (11th Cir. 2023) ..................................................................................20

*Leavitt v. Jane L.*,
    518 U.S. 137 (1996)..................................................................................................37

*Local 8027 v. Edelblut*,
    No. 21-cv-1077-PB, __ F. Supp. 3d __, 2023 U.S. Dist. LEXIS 5593
    (D.N.H. Jan. 12, 2023)..................................................................................... *passim*

*Manning v. Caldwell for City of Roanoke*,
    930 F.3d 264 (4th Cir. 2019) ...................................................................................11

*Miller v. Wilkinson*,
    No. 2:98-CV-275, 2010 WL 3909119 (S.D. Ohio Sept. 30, 2010) ...........................11

*N.H. Democratic Party v. Sec'y of State*,
    174 N.H. 312 (2021) .......................................................................................37, 41, 42

*NAACP v. Button*,
    371 U.S. 415 (1963) ............................................................................28, 30, 32

*Opinion of the Justices*, 106 N.H. 202, 206 (1965) ....................................................37

*Pernell v. Fla. Bd. of Governors of State Univ. Sys.*,
    641 F. Supp. 3d 1218 (N.D. Fla. 2022) (appeal filed), *stay of injunction
    denied*, Nos. 22-13992-J, 22-13994-J, 2023 U.S. App. LEXIS 6591
    (11th Cir. Mar. 16, 2023) ............................................................................14, 24, 42

*Pickering v. Board of Education of Township High School District 205*,
    391 U.S. 563 (1968)............................................................................... *passim*

*R.A.V. v. City of St. Paul*,
    505 U.S. 377 (1992)............................................................................10

*Santa Cruz Lesbian and Gay Community Center v. Trump*,
    508 F. Supp. 3d 521 (N.D. Cal. 2020) ............................................................23

*Sessions v. Dimaya*,
    138 S. Ct. 1204 (2018)............................................................................8, 9

*Smith v. Goguen*,
    415 U.S. 566 (1974)............................................................................10

*Stenberg v. Carhart*,
    530 U.S. 914 (2000) (Breyer, J.)............................................................12

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard College*,
    600 U.S. 181 (2023)............................................................................34

*Texas v. Johnson*,
    491 U.S. 397 (1989)............................................................................10

*Tinker v. Des Moines Indep. Community School Dist.*,
    393 U.S. 503 (1969)............................................................................36

*United States v. Dávila-Reyes*,
    23 F.4th 153 (1st Cir. 2022), *reh'g en banc granted, opinion withdrawn*, 38
    F.4th 288 (1st Cir. 2022)............................................................16

*United States v. Davis*,
    139 S. Ct. 2319 (2019) (Gorsuch, J.) ............................................................16

*United States v. Dervishaj*,
    169 F. Supp. 3d 339 (E.D.N.Y. 2016) ............................................................11

iv

*United States v. Lachman*,
  387 F.3d 42 (1st Cir. 2004) ....................................................................12

*United States v. National Treasury Employees Union*,
  513 U.S. 454 (1995) ("*NTEU*") ...........................................27, 28, 29, 30

*United States v. Williams*,
  553 U.S. 285 (2008) ..............................................................................15

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*,
  455 U.S. 489 (1982) ...........................................................................8, 9

*Wagner v. City of Holyoke*,
  100 F. Supp. 2d 78 (D. Mass. 2000) .............................................30, 31

*Yates v. United States*,
  574 U.S. 528 (2015) ..............................................................................15

**Statutes**

N.H. Code Admin. R. Ed 510.01 ..............................................................38

N.H. Code Admin. R. Ed 510.02 ..............................................................38

N.H. Code Admin. R. Ed 510.03 ..............................................................38

N.H. Code Admin. R. Ed 511.01 .........................................................22, 26

RSA 193:38 ..............................................................................................38

RSA 193:40 ...................................................................................... *passim*

RSA 275-E:4 .............................................................................................40

RSA 275-E:8 .............................................................................................40

RSA 354-A:21 ..........................................................................................40

RSA 354-A:21-a ........................................................................................40

RSA 354-A:29 ..........................................................................38, 39, 40, 43

RSA 354-A:30 .................................................................................. *passim*

RSA 354-A:31 .................................................................................. *passim*

RSA 354-A:32 .................................................................................. *passim*

NY 79760467v4
10/03/2023 3:58 PM

RSA 354-A:33 ...................................................................................................38, 39, 40

RSA 354-A:34 ...................................................................................................38, 39, 40

**Other Authorities**

Jeff Amy, *A Georgia teacher wants to overturn her firing for reading a book to students about gender identity*, ASSOCIATED PRESS (Aug. 10, 2023), https://apnews.com/article/georgia-teacher-fired-reading-book-gender-identity-737c044e9118677ca311dc8dc0c5d416.......................................................................6

NY 79760467v4
10/03/2023 3:58 PM

Plaintiffs oppose Defendants' motion for summary judgment as to (i) the Fourteenth Amendment's procedural due process/vagueness claim alleged in Counts I and II of the AFT Action and in Count I of the Mejia Action and (ii) the First Amendment's freedom of speech claim alleged in Count III of the AFT Action given the Amendments' impact on educators' private, extracurricular speech.[2]

## **INTRODUCTION**

Defendants' motion for summary judgment effectively seeks re-argument of the legal assertions on which their prior unavailing motion to dismiss was based.[3]  Only fleetingly do Defendants mention discovery (*see* Defs.' Memo. at 19), instead asserting that—while this Court identified several areas in which discovery could be helpful, *see* Feb. 15, 2023 Transcript (DN 72) at 21:1-22:7—this Court should ignore the evidence in the record that supports Plaintiffs' claims. Defendants dismiss as irrelevant critical deposition admissions by the key public officials charged with interpreting and enforcing the Amendments, as well as thousands of pages of illuminating documents that Defendants produced.  And Plaintiffs' motion presents the compelling testimony of educators' real world (and uncontradicted) experiences with the Amendments, including the chill that the law has created in New Hampshire classrooms.

Rather than engage with much of this evidence, Defendants present claims debunked in discovery and rejected by this Court in its January 12, 2023 order.  *See Local 8027 v. Edelblut*, No. 21-cv-1077-PB, __ F. Supp. 3d __, 2023 U.S. Dist. LEXIS 5593 (D.N.H. Jan. 12, 2023).  To illustrate, in arguing that the Amendments meet the constitutional requirement of setting forth

---

[2] As to Count IV of the AFT Action, this Court concluded (and Plaintiffs accordingly assume here) that this Count encompasses the relief requested in Counts I-III of the AFT Action.  *See* Sept. 14, 2022 Motion to Dismiss Hearing Transcript (DN 55) at 2:19-23.

[3] Plaintiffs will not burden this submission with repetition of prior extensive briefing.  Instead, Plaintiffs respectfully refer the Court to their prior submissions, including on Defendants' motion to dismiss.  *See, e.g.,* DN 45, 46, 52, 53, 83.

"explicit standards" to prevent arbitrary and discriminatory enforcement, *see Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972), Defendants again ask this Court to accept that "the enforcing agencies" developed a "protocol"—which Defendants labeled in prior briefing as an "order of operations"—for "evaluating complaints" alleging a violation of the Amendments by educators, starting with the filing of a complaint with the Defendant Commission for Human Rights ("HRC"). *See* Defs.' Memo. at 8.  But what Defendants omit from their memorandum is the undisputed fact that, at deposition, the HRC expressly disavowed any jurisdiction over enforcing RSA 193:40 and instead foisted this responsibility, even in the first instance, back on the Department of Education ("DOE").[4]  The DOE, in turn, disclaimed at deposition responsibility for initially reviewing claims under RSA 193:40—the sole proviso in the Amendments to explicitly reference public school education—and, instead, testified that the HRC has jurisdiction over such matters.  Which is it?  It is unclear.[5]

There also is no formal written "protocol" for evaluating complaints.  The answers to Question Nos. 11 and 12 in the July 2021 FAQs do not explicitly state that a complaint under the Amendments cannot be filed with the DOE.  *See Exs. 41 (Depo. Ex. 9), 44 (Depo. Ex. 24), 45 (Depo. Ex. 55)*.  Moreover, though Plaintiffs sought in discovery the production of a supposed "standard operating procedure" in the form of an "outline"—which the DOE and Department of Justice ("DOJ") claim to have prepared during a February 14, 2023 meeting to govern the process for referring matters from the DOE to the HRC, *see* Fenton Depo. 84:5-91:18—Defendants declined to produce this "standard operating procedure" or "protocol" to Plaintiffs, let alone produce it to the public.[6]

---

[4] *See* Malachi Depo. 12:18-20, 73:5-74:17, 78:3-9; Cohen Depo. 59:17-21.
[5] *See* Edelblut Depo. 65:8-10; Fenton Depo. 105:10-106:2; Farrell Depo. 39:18-20.
[6] Defendants also declined to produce numerous communications concerning complaints received by the DOE under the deliberative process privilege.  *See* Privilege Log (attached as *Exhibit A*).

2

Nor is any unwritten "protocol" granting the HRC exclusive enforcement over the Amendments being enforced in practice. While DOE witnesses at deposition tried to disclaim any formal and legal adjudicatory role in the Amendments' enforcement until the HRC acts, Defendant DOE Commissioner Frank Edelblut testified at length as to his efforts to uplift the complaints of parents (one of his stated "customers"[7]) to school superintendents and principals, even when the complaint referenced the Amendments and even when there was no possible violation of the Code of Conduct raised. *See* Pls.' Stmt. of Facts (DN 85) ¶¶ 136-139.[8]

Against this background of acknowledged governmental and public confusion in enforcement, Defendants ignored repeated requests from Plaintiffs NEA-NH and AFT union leadership, acting on behalf of their members, seeking to obtain more details and guidance as to what the Amendments mean so that they can properly educate their members. *See Ex. 7, Tuttle Decl.* ¶ 9; *Ex. 8, Howes Decl.* ¶¶ 10-13. Rather than respond to the New Hampshire unions and educators on what content is prohibited, DOE Commissioner Edelblut chose instead to speak to political groups where he "may have answered a question on" the Amendments.[9] He also promptly responded to a pro-Amendments group entitled "No Left Turn In Education" to assist the group in locating teachers who, prior to the enactment of the Amendments, had signed a petition promising to teach "true history" so that the group could pursue those teachers at their schools.[10]

The harm caused by the Amendments has reached the classroom. For example, as detailed in the declaration of teacher Alison O'Brien, a parent complained that she played two music videos created by two modern Black artists as part of a course involving the Harlem Renaissance. Ms.

---

[7] *See* Edelblut Depo. 29:4-8.

[8] *See also* Edelblut Depo. 20:22-22:4, 29:4-8, 77:15-78:9.

[9] *See Ex. 59 (Depo. Exs. 37, 52)* (Northwood GOP invitation to speak on the Amendments); Edelblut Depo. 175:20-176:21.

[10] *See Ex. 74 (Depo. Ex. 43)*.

O'Brien's district called her into a meeting with the purpose of (i) telling her that she was being "investigated" by the DOE and (ii) relaying DOE Investigator Richard Farrell's comment to school officials that Ms. O'Brien "might want to look at [DOE Commissioner Frank Edelblut's April 15, 2022 op-ed, *see Ex. 40 (Depo. Ex. 14)*] so she could understand the context of his investigation." *See e.g.*, *Ex. 11*, O'Brien Decl. ¶¶ 7-9, 13-19.  Although Ms. O'Brien never heard anything else from the DOE, the chill of this interaction was real, and the inquiry had professional ramifications. *See id.* ¶¶ 21-22, 24 25 (noting that "[t]his episode became known to my fellow teachers at the High School," and that "[i]t is extremely rare for a teacher to be interrupted three times throughout the day by administrators").

While teachers are investigated and chilled from speaking in their classroom, the relevant public officials are unable or unwilling to themselves identify what teaching material violates the Amendments' statutory scheme—a scheme containing one banned concept that even DOE Commissioner Edelblut said  is "confusing" in an email written prior to the filing of this lawsuit. *See Ex. 19*.  Notably, Defendants' witnesses repeatedly testified that they could not provide any concrete example of a prohibited lesson or instruction material, *see* Pls.' Stmt. of Facts (DN 85) ¶¶ 114-120, let alone cite a single example of instruction occurring in New Hampshire before the Amendments were enacted on June 25, 2021 that would be barred under the Amendments terms. *See* Pls.' Stmt. of Facts (DN 85) ¶ 123; *see also* Edelblut Depo. 174:2-8; Fenton Depo. 172:23-173:9; Farrell Depo. 169:12-18, 170:20-24; Cohen Depo. 35:15-23.  They declined to answer basic questions on whether specific course instruction or content would be covered under the Amendments' prohibitions, instead directing educators with specific questions to the text of Amendments and Defendants' July 2021 FAQs.  *See* Pls.' Stmt. of Facts (DN 85) ¶¶ 114-120. Even DOE Commissioner Edelblut and DOE Attorney Fenton acknowledged their inability to

4

respond, stating that those questions required answers from HRC, while HRC Assistant Director Cohen—when asked similar questions (for example, what specific content in books would be proscribed)—replied: "I could not give a teacher or complainant legal advice on whether them teaching that would make a charge or not." *See* Cohen Depo. 94:14-19.  The HRC suggested that, if educators have specific questions, their recourse would be to ask and consult with a lawyer.  *Id.* 96:9-17; *see also id.* 94:21-22, 95:12-20.  But how a teacher could find a lawyer and get a meaningful answer in the seconds between a student's question and the expected response remains a mystery.

Defendants in their memorandum rely almost exclusively on dictionary definitions to provide clarification.  The U.S. Supreme Court has made clear that this is no answer.[11]  But even if it was, can anyone seriously suggest that teachers should periodically interrupt teaching to consult and announce the dictionary definition of words or to restate a lesson (or the answer to a student's question) using such definitions, much less retain a lawyer to aid them in doing so?  In the face of this reality, it is little wonder that teachers and school officials—here, the "person[s] of ordinary intelligence" who must have "a reasonable opportunity to know what is prohibited," *see Grayned*, 408 U.S. at 108—are confused.

---

[11] The argument Defendants here are forced to make—namely, that reference to dictionaries will make clear the legislative intent behind the words and phrases that the legislature employed—is answered by the Supreme Court's observation in *Bouie v. City of Columbia*, 378 U.S. 347 (1964).  There, the Court noted that, when a statute would thus be made to appear narrow and precise, it nonetheless fails constitutional scrutiny because it "lulls" the "ordinary" person "…into a false sense of security, giving him no reason even to suspect that conduct clearly outside the scope of the statute as written will be retroactively brought within it by an act of judicial construction." *Id.* at 352.  Moreover, while Defendants urge otherwise, the Supreme Court in *Connally v. General Const. Co.* aptly observed that the question of vagueness cannot "be solved by resort to the established canons of construction that enable a court to look through awkward or clumsy expression, or language wanting in precision, to the intent of the Legislature," especially where "the vice of the statute … lies in the impossibility of ascertaining, by any reasonable test, that the Legislature meant one thing rather than another …"  269 U.S. 385, 394 (1926); *see also Lanzetta v. New Jersey,* 306 U.S. 451, 453 (1939).

In sum, Defendants' second "bite at the apple" fails for the same reasons that their motion to dismiss failed.  The background against which the cross-motions for summary judgment are presented is one of confusion born of vague statutory language: both the enforcers of the Amendments and the "ordinary person" impacted by the law (here, educators) are understandably confused as to who enforces it and the scope of its proscriptions.  Plaintiffs have demonstrated the Amendments' ambiguities and the culture of fear that they create.[12]  The Amendments should be invalidated and enjoined.

## SUMMARY OF ARGUMENT

This Objection makes several specific points summarized here.  *First*, this Court should decline Defendants' attempt to reargue the applicable vagueness standard that was resolved at the motion to dismiss stage.  *See* Defs.' Memo. at 17-19; *see also infra* Section I.a.

*Second*, this Court should reject Defendants' effort to use dictionary definitions to bypass the hundreds of documents and five depositions elicited in discovery.  *See infra* Section I.b-c.  As multiple courts have held, extrinsic evidence can be considered in a facial vagueness challenge, and this evidence confirms the Amendments' ambiguity.  Indeed, this Court previously opined that it would be relevant and useful to know, among other things, about complaints that have been made pursuant to the Amendments, the interpretation of the Amendments by those agencies tasked with enforcing their provisions, and the legislative history.  *See* Feb. 15, 2023 Transcript (DN 72) at 21:1-22:7.

*Third*, the record refutes Defendants' argument that "the enforcing agencies" have "developed a protocol for evaluating complaints" under RSA 193:40.  *See* Defs.' Memo. at 8.  At

---

[12] One Georgian educator was recently fired under the "panic" that led New Hampshire and other states to crack down on inclusive education.  *See* Jeff Amy, *A Georgia teacher wants to overturn her firing for reading a book to students about gender identity*, ASSOCIATED PRESS (Aug. 10, 2023), https://apnews.com/article/georgia-teacher-fired-reading-book-gender-identity-737c044e9118677ca311dc8dc0c5d416.

6

the outset, the creation of yet another "protocol"—on top of Defendants' two prior efforts to rewrite the statute through the July 2021 FAQs (*see Exs. 41 (Depo. Ex. 9), 44 (Depo. Ex. 24), 45 (Depo. Ex. 55)*) and September 2021 Attorney General opinion (*see Ex. 53 (Depo. Ex. 12)*)—only demonstrates that the Amendments are unclear and unsalvageable.  In any event, notwithstanding any manufactured (but still ephemeral) "protocol," the record is replete with testimony from DOE and HRC employees stating that they do not have jurisdiction over RSA 193:40, each pointing the finger at the other agency as the relevant enforcers of this provision.  *See infra* Section I.e.

*Fourth*, AFT Plaintiffs have met their burden to show that the Amendments infringe on teachers' First Amendment rights as private citizens on matters of public concern.  *See infra* Section II.

*Finally*, in a tacit acknowledgment of the Amendments' infirmities identified by this Court, Defendants argue that the Amendments can be saved by severing RSA 193:40, IV, which directly makes a violation of the Amendments a violation of the Educator Code of Conduct.  As this Court extensively noted in its January 12, 2023 order, the Amendments' constitutional infirmities go far beyond the provisions in RSA 193:40, IV.  In any event, what Defendants miss is that, even absent RSA 193:40, IV, the Amendments still place teachers' careers in jeopardy.  A teacher could still face disciplinary action by the DOE under the Educator Code of Conduct even if this Court were to sever this unconstitutional provision.  For these reasons, severing RSA 193:40, IV does not cure the ambiguities that exist in the Amendments, including those that this Court previously identified in its January 12, 2023 order.  *See infra* Section III.

## PLAINTIFFS' RESPONSE TO DEFENDANTS' "BACKGROUND" STATEMENT OF FACTS [LOCAL RULE 56.1(B)]

This matter can be decided on cross-motions for summary judgment.  To the extent this Court construes Defendants' "Background" section on Pages 3-10 of their memorandum of law as

a statement of material facts pursuant to Local Rule 56.1(a), Plaintiffs respond by stating that the material facts in this case generally are not in dispute for the purposes of summary judgment, and Plaintiffs hereby additionally refer this Court to their Statement of Undisputed Facts in response, *see* DN 85, and Pages 3-8 of their May 20, 2022 Joint Memorandum of Law in Response to Defendants' Motion to Dismiss, *see* DN 45.[13]

## **ARGUMENT**

I. **The Amendments Are Unconstitutionally Vague Under the Fourteenth Amendment (Counts I and II in the AFT Action and Count I in the Mejia Action).**

   a. **This Court Applied the Correct Standard for a Vagueness Challenge at the Motion to Dismiss Stage.**

This Court has stated that its views on the relevant legal standard for a facial vagueness challenge are unlikely to change. *See* Feb. 15, 2023 Transcript (DN 72) at 26:9-12. Nevertheless, Defendants re-argue that—based on *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498 (1982)—when a law "does not reach constitutionally protected conduct," "the complainant must demonstrate that the law is impermissibly vague in all of its applications." *See* Defs.' Memo. at 17. Setting aside that the Amendments *do* reach constitutionally protected speech under the First Amendment for the reasons explained in Section II *infra*, this Court has resolved this issue, holding—in reliance on the Supreme Court's precedents in *Johnson v. United States*, 576 U.S. 591 (2015), and *Sessions v. Dimaya*, 138 S. Ct. 1204 (2018)—that "the void-for-vagueness doctrine does not require a showing that a statute is vague in all of its applications, especially where, as here, the law subjects a violator to serious consequences, lacks a scienter

---

[13] To the extent Defendants attempt to submit their own, more formal, affirmative statement of facts in their objection (instead of merely responding to Plaintiffs' Statement of Facts under Local Rule 56.1(b)), Plaintiffs reserve their right to request the opportunity to respond in a supplemental submission.

requirement, and implicates First Amendment rights." *See Local 8027*, 2023 U.S. Dist. LEXIS 5593, at *38.  This Court should decline Defendants' efforts to revisit this issue.

      Defendants are incorrect on the standard to be applied.  In *Johnson v. United States*, the Supreme Court rejected the premise from *Village of Hoffman Estates* that, to succeed on a facial vagueness claim, the complainant must demonstrate that the law is impermissibly vague in <u>*all*</u> of its applications.  *See* 576 U.S. at 602-03.  To quote the Supreme Court in *Johnson*, "our holdings squarely contradict the theory that a vague provision is constitutional merely because there is some conduct that clearly falls within the provision's grasp." *Id.* at 602.   As the *Johnson* Court further explained, "[i]t seems to us that the dissent's supposed requirement of vagueness in all applications is not a requirement at all, but a tautology: If we hold a statute to be vague, it is vague in all its applications ...." *Id*. at 603.  And in *Sessions v. Dimaya*, the Supreme Court relied on *Johnson* to strike down as facially vague a similarly worded residual clause in an immigration statute that authorized the removal of non-citizens convicted of "a crime of violence." *See* 138 S. Ct. at 1213-16.  In response to Justice Thomas's dissent, the Court confirmed that "*Johnson* made clear that our decisions 'squarely contradict the theory that a vague provision is constitutional merely because there is some conduct that clearly falls within the provision's grasp.'" *Id.* at 1214 n.3 (quoting *Johnson*, 576 U.S. at 602).  And since this Court's January 12, 2023 order, the Fourth Circuit has joined those courts (including from the Seventh and Ninth Circuits) that have rejected Defendants' position. *See Carolina Youth Action Project; D.S. by and through Ford v. Wilson*, 60 F.4th 770, 781-82 (4th Cir. 2023).

      In sum, this Court's vagueness standard in its January 12, 2023 order was correct, several circuit courts considering this issue have agreed with this Court's conclusion, and Defendants have not presented any compelling reason why this Court should revisit or reverse its prior conclusion.

NY 79760467v4
10/03/2023 3:58 PM

**b. Extrinsic Evidence Can Be Considered in a Facial Vagueness Challenge.**

Perhaps to avoid the compelling record that has been developed confirming the Amendments' ambiguities, Defendants contend that extrinsic evidence does not "bear on whether a statute is facially vague." *See* Defs.' Memo. 19. Defendants are incorrect.

While the First Circuit in *Frese v. Formella* declined to "address precisely what extrinsic context a court may consider in a vagueness analysis," it did so only because "the core statutory text of the [challenged] statute provide[d] adequate enforcement guidelines and the prosecution scheme d[id] not alter or overcome this conclusion." 53 F.4th 1, 9 n.5 (1st Cir. 2022), cert. denied, 2023 WL 6377803 (U.S. Oct. 2, 2023). Here, while this Court can definitively conclude that the Amendments are vague without extrinsic evidence where the Amendments' "core statutory text" lacks adequate enforcement guidelines (as this Court previously concluded in its January 12, 2023 order), Defendants are wrong to suggest that extrinsic evidence is categorically barred in a facial vagueness challenge. This Court was correct in wanting to consider the Amendments' constitutionality in the context of complaints that have been made and how enforcers have interpreted the law's provisions. *See* Feb. 15, 2023 Transcript (DN 72) at 21:1-22:7. This approach is consistent with United States Supreme Court precedent allowing consideration in a facial challenge of "the interpretation of the statute given by those charged with enforcing it." *See Grayned*, 408 U.S. at 110.[14]

In a facial vagueness challenge (as in any case), courts must be free to evaluate the challenged statutory provisions "in their context and with a view to their place in the overall

---

[14] Similarly, Justice Scalia in *R.A.V. v. City of St. Paul* made clear that the "practical operation" of a statute (there, a speech restriction) is relevant to constitutional determinations. *See* 505 U.S. 377, 391-92 (1992). And in *Smith v. Goguen*, the Supreme Court considered public "tendencies" to treat the flag unceremoniously in determining the sufficiency of compliance with constitutionally-prescribed notice standards, *see* 415 U.S. 566, 574 (1974), holding that, "[w]here inherently vague statutory language permits such selective law enforcement, there is a denial of due process." *Id.* at 576; *see also Texas v. Johnson*, 491 U.S. 397 (1989).

10

statutory scheme." *Manning v. Caldwell for City of Roanoke*, 930 F.3d 264, 273 (4th Cir. 2019)

(holding that the challenged statute permitting civil interdiction of "habitual drunkards" must be

considered quasi-criminal in nature, even though the statute itself did not define criminal penalties,

because it was a necessary predicate for imposing the increased criminal penalties) (quoting *Davis*

*v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989)).   In other words, the context of the

challenged statute matters.   Similarly, in *Carolina Youth Action Project; D.S. by and through Ford*

*v. Wilson*, the Court relied on extrinsic evidence to find that South Carolina's "disorderly conduct"

schools law was facially vague.   There, consistent with *Grayned*'s invitation to examine "the

interpretation of the statute given by those charged with enforcing it," the Court looked at

deposition testimony of law enforcement officers, statistics showing disparate enforcement based

on race, and evidence from individual enforcement actions.   *See* 60 F.4th at 784 ("Lacking any

meaningful standards, the record confirms that officers deploy a glorified smell test to determine

whether a student's disorder is disorderly enough to be criminal.   For example, one police officer

testified arrest may be appropriate if 'someone is causing such a disturbance that it would cause

me to look over and see what's going on' but not if 'someone [is] having a loud discussion with

someone.' …. Indeed, evidence submitted to the district court shows that between 2015 and 2020,

Black youth were charged with disorderly conduct for incidents in schools at roughly seven times

the rate of their white peers.").[15]

      Defendants have not cited a case holding that extrinsic evidence is barred in considering a

facial vagueness challenge of a state statute.   Instead, in the cases Defendants do cite, the courts

---

[15] Extrinsic evidence also is relied upon by courts in upholding laws against vagueness challenges. *See, e.g.*, *United States v. Dervishaj*, 169 F. Supp. 3d 339, 347 (E.D.N.Y. 2016) (holding that, "[c]ollectively, the text, past case applications, and interpretive history of the firearms provision distinguish it from [the Armed Career Criminals Act]" such that it does not suffer from the same unconstitutional facial vagueness.); *Miller v. Wilkinson*, No. 2:98-CV-275, 2010 WL 3909119, at *6 (S.D. Ohio Sept. 30, 2010) (reasoning that, "[g]iven the prevalence of that language in the case law and the fact that prison officials are assumed to be knowledgeable of the legal context in which they operate, there is substantial guidance available to them," and concluding that a law provided fair notice).

concluded that extrinsic evidence did not render a law vague where it was otherwise sufficiently clear—a predicate that plainly does not exist here.  For example, in *United States v. Lachman*, 387 F.3d 42, 52 (1st Cir. 2004), cited by Defendants, the Court first looked to the intent of Congress to determine the meaning of a federal statute.  It addressed the particular factual context to explain why a different interpretation would frustrate congressional intent.  *Id.*  ("An exclusive use definition would permit easy evasion of the regulation . . . This is clear from the very facts of this case . . .").  Having arrived at a clear interpretation consistent with congressional intent, the Court rejected arguments that it must give weight to the contrary interpretations of some agency officials.  *Id.* at 54.  It concluded that the evidence was "irrelevant" owing to the particular rules of statutory interpretation involved in assessing a federal law.  *Id.* ("[W]e look to agency interpretations only when the statute or regulation remains ambiguous after we have employed the traditional tools of construction."); *see also id.* ("So too, _under Chevron_, the Supreme Court has made clear that informal agency interpretations of statutes, even if public, are not entitled to deference.") (emphasis added).  The same dynamic does not exist here where the text of the Amendments is far from sufficiently clear, and where federal courts are not permitted the same leeway in interpreting state laws.  *See Grayned*, 408 U.S. at 110 (noting that "it is not within our power to construe and narrow state laws").[16]  The other cases cited by Defendants are similarly distinguishable.[17]

---

[16] Indeed, unlike the dynamic in *Lachman*, Defendants' "guidance" is entitled to no authoritative weight because, as is the case here, _state courts_ are also independently charged with enforcing the Amendments, and any aggrieved person may bring a private action under the Amendments in Superior Court. *See Stenberg v. Carhart*, 530 U.S. 914, 940 (2000) (Breyer, J.) ("[O]ur precedent warns against accepting as authoritative an Attorney General's interpretation of state law when the Attorney General does not bind state courts or local law enforcement authorities.") (internal quotation marks and citations omitted).

[17] Another case cited by Defendants—*Keepers, Inc. v. City of Milford*—is similarly distinguishable.  There, the Court stated that, "[w]hen the text of an ordinance is sufficiently clear to satisfy the Due Process Clause, a municipal official's inability to supply precise answers regarding its hypothetical application is insufficient to render that ordinance unconstitutionally vague."  *See* 807 F.3d 24, 37-38 (2d Cir. 2015).  Again, unlike *Keepers*—and as this Court suggested in its January 12, 2023 order—"the text of" the Amendments is not "sufficiently clear to satisfy the Due Process Clause," and therefore nothing prevents the consideration of extrinsic evidence to confirm this ambiguity.  In another case relied upon by Defendants, the Court acknowledged that "there is some evidence in this record that section 108.13 is susceptible of inconsistent application."  *Act Now To Stop War & End Racism Coal. v. District of*

### c.  Defendants' Reliance on Dictionary Definitions in Defining "Teaching" Does Not Remedy the Amendments' Confusion and Lack of a Scienter Requirement.

Defendants admit that the Amendments do not have a scienter requirement "insofar as it doesn't say 'knowing,' it doesn't say 'purposely,' et cetera." *See* Sept. 14, 2022 Motion to Dismiss Hearing Transcript (DN 55) at 12:17-24; *see also* Defs.' Memo. at 35.  That should end the argument.

Nevertheless, in an apparent effort to address this Court's January 12, 2023 decision highlighting the Amendments' lack of a scienter requirement, Defendants seek to define the terms "teach" and "instruct" using dictionary definitions to argue that the Amendments contain a "knowledge of the information conveyed" requirement.  *See* Defs.' Memo. at 26-30, 32-33. Defendants also seek to reinterpret RSA 193:40, I's "shall be taught" language to impose an "affirmative act[] of teaching" requirement.  *Id.* at 26, 27-28.  These arguments fail because Defendants' new definitions and reinterpretations (i) improperly seek to rewrite the Amendments by adding material terms to narrow the law's scope, (ii) fail to meaningfully address this Court's scienter analysis, and (iii) are contradicted by the record itself where Defendants in discovery made no mention of these definitions when explaining how they enforce the Amendments.  *See Bouie*, 378 U.S. at 352-53 ("There can be no doubt that a deprivation of the right of fair warning can result not only from vague statutory language but also from an unforeseeable and retroactive judicial expansion of narrow and precise statutory language …. Even where vague statutes are concerned, it has been pointed out that the vice in such an enactment cannot be cured in a given  case by a construction in that very case placing valid limits on the statute ….") (internal quotations omitted);

---

*Columbia*, 846 F.3d 391, 411 (D.C. Cir. 2017).  While that Court concluded that the evidence showed that the law "might be misapplied in certain cases"—but "does not show that section 108.13 lacks criteria to cabin enforcement discretion," *see id.* at 412—here, the extrinsic evidence in this case goes beyond merely showing how the Amendments "might be misapplied in certain cases."  Rather, the extrinsic evidence confirms that Defendants' own guidance and protocols "lack[] criteria to cabin enforcement discretion" because, in practice, such protocols are not uniformly followed and are the subject of debate even among the Amendments' enforcers.

13

*see also Connally v. General Const. Co.*, 269 U.S. 385, 394 (1926). Defendants' argument is problematic for another reason: their effort to address this Court's January 12, 2023 decision by relying on dictionary definitions not found in the July 2021 FAQs or September 2021 Attorney General opinion is yet another effort to publish a new set of "guidance," this time in the form of a legal brief not broadly disseminated to the public or the State's educators. *See* Defs.' Memo. at 26-30. Defendants' apparent need to clarify what the Amendments mean for a third time only confirms that the law's provisions are hopelessly vague.

As a threshold matter, "the fact that the [Amendments] use[] real words found in an English dictionary does not magically extinguish vagueness concerns. . . . If that were true, the Due Process Clause would tolerate laws containing the most incomprehensible stream-of-consciousness word salads so long as they used actual words." *See Honeyfund.com, Inc. v. DeSantis*, 622 F. Supp. 3d 1159, 1181 (N.D. Fla. 2022) (preliminarily enjoining Florida's so-called "Individual Freedom Act"—or "Stop WOKE Act"—impacting workplaces in part on the grounds that it was "impermissibly vague") (appeal filed on Sept. 19, 2022); *see also Pernell v. Fla. Bd. of Governors of State Univ. Sys.*, 641 F. Supp. 3d 1218, 1280 (N.D. Fla. 2022) ("Nonetheless, as this Court previously made clear—both in *Honeyfund* and at the hearing on Plaintiffs' motions—the fact that the IFA uses real words found in an English dictionary does not magically extinguish vagueness concerns.") (appeal filed), *stay of injunction denied*, Nos. 22-13992-J, 22-13994-J, 2023 U.S. App. LEXIS 6591 (11th Cir. Mar. 16, 2023). "Whether a statutory term is unambiguous … does not turn solely on dictionary definitions of its component words. Rather, '[t]he plainness or ambiguity of statutory language is determined [not only] by reference to the language itself, [but as well by] the specific context in which that language is used, and the broader context of the statute as a whole.' . . . Ordinarily, a word's usage accords with its dictionary definition. In law as in life,

14

however, the same words, placed in different contexts, sometimes mean different things." *Yates v. United States*, 574 U.S. 528, 537 (2015) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997)).

In other words, Defendants' use of dictionary definitions does not change the hallmark of the vagueness inquiry, which is focused on whether a law fails to "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited" or if it is "so standardless that it authorizes or encourages seriously discriminatory enforcement." *Grayned*, 408 U.S. at 108 (internal citations omitted); *United States v. Williams*, 553 U.S. 285, 304 (2008). As the Supreme Court observed in *Connally v. General Const. Co.*, 269 U.S. 385 (1926): "Nor can the [vagueness] question be solved by resort to the established canons of construction that enable a court to look through awkward or clumsy expression, or language wanting in precision, to the intent of the Legislature. For the vice of the statute here lies in the impossibility of ascertaining, by any reasonable test, that the Legislature meant one thing rather than another …" *Id*. at 394.

*First*, the legislature chose not to define the phrases "teaching," "instructing," "inculcating," or "compelling to express a belief in or support for." *See* RSA 193:40, I; RSA 354-A:30-32. Instead, the legislature purposefully left a gaping hole of ambiguity for educators to try to decipher (and for enforcers to employ according to their personal predilections) whether these phrases include even casual conversation, class discussions, or "read-alongs" with students.[18] Attempting to fill this gap, Defendants now use a dictionary to define these phrases to argue that the Amendments only apply to "the affirmative and deliberate act of conveying information *with knowledge of what information is being conveyed*." *See* Defs.' Memo. at 27 (emphasis added);

---

[18] Indeed, as noted in Section III *infra,* there is no clear indication in the legislative history of the Amendments (*see* DN 43) that the sponsors of the Amendments, much less the legislature itself, would have initiated this measure (let alone enacted it) without, for example, its undefined terms or its direct and drastic implications on educators' licenses which the Defendants (but not the legislature) now seem willing to abandon through severance.

*see also* Defs.' Memo. at 2 ("A teacher violates the antidiscrimination provisions only when they affirmatively and deliberately convey information to a public-school student, _know they are conveying the information in question_, and that information is prohibited under the statute.") (emphasis added), 32 (same).  This creative interpretation is improper because it misreads even the dictionary definitions Defendants rely upon and, in so doing, adds words to the statute that the legislature saw fit to not include.  For example, Defendants' own cited dictionary definitions of "teach" and "instruct" do _not_ require that an educator has "knowledge of what information is being conveyed"; rather, Defendants' recited dictionary definitions of these two terms simply require only that the educator "_provide_ with knowledge" or "_communicate_ knowledge to."  *See* Defs.' Memo. at 27.  In other words, these definitions use "knowledge" as something to be conveyed, _not_ as a purposeful mental state for educators.  Defendants' effort to add language to these definitions to impute a mental state requirement is improper.  It is "up to" the New Hampshire legislature "to narrow the language of" a statute "if it so chooses," not Defendants or this Court.  *See United States v. Dávila-Reyes*, 23 F.4th 153, 193 (1st Cir. 2022) ("we have no license to rewrite [the statute] to satisfy constitutional requirements"), *reh'g en banc granted, opinion withdrawn*, 38 F.4th 288 (1st Cir. 2022); *see also United States v. Davis,* 139 S. Ct. 2319, 2323 (2019) ("In our constitutional order, a vague law is no law at all … [and] the role of the courts under our Constitution is not to fashion a new, clearer law to take its place, but to treat the law as a nullity and invite Congress to try again.") (Gorsuch, J.).

_Second_, even if this Court were to credit and apply Defendants' dictionary definitions that impute "knowledge of what information is being conveyed" to the Amendments (which it should not), this definition still would not cure the Amendments' lack of a scienter requirement.  This is because even this added language would not impose a specific intent _to commit a violation_ of the

Amendments.  *See Local 8027*, 2023 U.S. Dist. LEXIS 5593, at *40-41 ("As defendants have acknowledged, the education and antidiscrimination amendments lack a scienter requirement.  In other words, teachers are not 'protected from being caught in [the statute's] net by the necessity of having a specific intent *to commit' a violation.*") (quoting *Papachristou v. City of Jacksonville*, 405 U.S. 156, 163 (1972)) (emphasis added).  Educators, of course, can knowingly teach, without knowing that the information taught implicates the Amendments given their vagueness.  Thus, even with this added language, it is still true, as this Court observed, that "inadvertent statements that are later deemed to advocate a banned concept can violate the amendments."  *See Local 8027*, 2023 U.S. Dist. LEXIS 5593, at *41.

*Third*, if there was any doubt that these new definitions go beyond the Amendments' plain terms, it is confirmed by the fact that no document or deposition testimony elicited in discovery supports a "knowing" standard or Defendants' new dictionary definitions.  Again, this "knowing" standard is absent from the July 2021 FAQs and September 2021 Attorney General opinion, which demonstrates that this standard is not supported by a plain reading of the statute.  Both Defendant DOE Commissioner Edelblut and DOE Attorney Fenton admitted at deposition that there are no policies or procedures as to what the terms "taught, instructed, inculcated or compelled to express belief in, or support for" mean under RSA 193:40, I beyond the July 2021 FAQs.  *See* Fenton Depo. 111:4-114:7; Edelblut Depo. 150:17-153:4.   This includes no policies or procedures indicating that the Amendments contain a "knowing" requirement, or whether the Amendments include teacher-facilitated group discussion, a teacher playing "devil's advocate" in presenting two sides of a controversial subject, assigning to a student a point of view to argue, engaging in "read alongs," assigning a book for general discussion in class, or simply answering a student's question.  *See* Fenton Depo. 112:13-114:7; Edelblut Depo. 151:23-153:4.  And Defendants' newly created,

17

*ex ante*, "knowing" standard—or any scienter requirement for that matter—exists nowhere in any training conducted by the DOE in which the Amendments were presented.  *See Ex. 50 (Depo. Ex. 3)*, at DOE-05665 (in presentation for Superintendents and Administrators focusing on the DOE's role with districts in evaluating misconduct, referencing Amendments on one slide without stating what they mean); *Ex. 51 (Depo. Ex. 7)*, at DOE-10079-10081 (in presentation addressing the Code of Conduct for credentialed educators, referencing the Amendments' terms); *Ex. 44 (Depo. Ex. 24)*, at DOE-09669-9671 (same).  Neither did any of Defendants' deponents rely on these new dictionary definitions when they were repeatedly asked what it means for an educator to "teach" (under RSA 193:40, I and RSA 354-A:31-32), "instruct" (under RSA 193:40, I and RSA 354-A:31), "inculcate" (under RSA 193:40, I), or "compel a student to express belief in or support for" (under RSA 193:40, I) a particular concept.  Rather, DOE Commissioner Edelblut testified that the educator is in the "best position to know if they" are violating the Amendments and what constitutes "teaching," "instructing," or "inculcating."  *See* Edelblut Depo. 66:3-5 71:3-4, 72:1-2, 75:11-20.  In other words, Defendants' new dictionary standard receives no support from Defendants' documents or their own deponents.  Rather, it has been constructed by their lawyers in a belated effort to defend the Amendments in court.

    *Fourth*, contrary to the "knowing" dictionary standard presented in Defendants' memorandum, the record is replete with instances where the agencies charged with enforcing the Amendments explained that even they do *not* understand the law's plain meaning.  Below is a non-exhaustive summary:

- DOE Commissioner Edelblut wrote that he found portions of the Amendments confusing (*see Ex. 19*), and DOE Attorney Fenton testified that "there was a lot of confusion in the field" concerning the Amendments, including among attorneys, superintendents, and parents—many of whom are "[f]airly educated people."  *See* Fenton Depo. 158:1-19.

18

- HRC Director Malachi acknowledged that the Amendments are "complex," and that the HRC consulted with the DOJ about understanding them. *See Ex. 20 (Depo. Ex. 56)*. HRC Assistant Director Cohen also testified that the HRC consults with the DOJ on allegations of discrimination depending "on the complexity of the case" and "the complexity of the law" being applied, and that the HRC has consulted with the DOJ concerning the Amendments because the HRC was "looking for clarity on how to apply the new amendments." *See* Cohen Depo. 55:4-21, 104:14-108:21. There is no indication in the record that HRC employees now understand what the Amendments mean.

- DOE Investigator Richard Farrell stated at deposition that he had "no idea" what a teacher cannot teach under the fourth banned concept. *See* Farrell Depo. 144:23-145:13, 204:7-207:19 (attempting to later clean up this telling testimony with the assistance of counsel, after a break at deposition, he acknowledged that he is not "aware of any book that is prohibited from being taught in New Hampshire public schools under subsection D of the law").

- DOE Commissioner Edelblut similarly told at least one school superintendent that he should ask his district's counsel if he had questions under the Amendments. *See Ex. 57*, DOE-00856-57 ("[i]f you have questions about the material, I would encourage you to reach out to your district's legal counsel").

- HRC Director Malachi acknowledged that the HRC requested the September 7, 2021 opinion from the Attorney General because of concerns received from some members of the public that the Amendments were confusing and that some would struggle to understand their scope. *See Ex. 53 (Depo. Ex. 12)*; Malachi Depo. 88:11-89:18 ("The Commission was aware of concern from the public about Sections 297 and 298 and requested the opinion.").

Indeed, Plaintiffs' declarations (*see Exs. 8-13*) illustrate that the Amendments do not merely pose "judgment calls" or "close cases" for educators, *see* Defs.' Memo. at 2, but rather present difficult and persistent questions that teachers must answer every day—and without the ability to pick up a dictionary or call a lawyer every time a student asks a question. In the face of this daily reality for educators, Defendants' witnesses have abandoned teachers who have to make these split-second "judgment calls" by refusing to answer basic questions about whether certain content would be covered by the Amendments—including content that DOE Commissioner Edelblut quoted in his June 13, 2021 op-ed as an example for why the Amendments are "an

important, and needed, contribution to our education system." *See Ex. 21 (Depo. Ex. 4)* at PL00398.[19]

*Fifth*, RSA 193:40, I's prohibition on students being "compelled to express belief in, or support for" a banned concept compounds these vagueness concerns because it turns on how a listener reacts and, likewise, contains no scienter requirement for the speaking educator. Defendants' definitions focus on the definition of "compel," *see* Defs.' Memo. at 27, but ignore the subjectivity of the phrase "belief in" or "support for" that triggers a violation based on a listener's reaction. Like a law prohibiting actions that have the "effect of influencing," *see League of Women Voters of Fla. Inc. v. Fla. Sec'y of State*, 66 F.4th 905, 947 (11th Cir. 2023), this provision gives educators no way of knowing whether their statements will have the prohibited effect of "compell[ing] to express belief in" a banned concept. *See* RSA 193:40, I(a).

*Finally*, Defendants argue that RSA 193:40, I's passive voice "shall be taught" language refers to the "*affirmative acts* of teaching, instructing, inculcating, or compelling public-school pupils to express a belief in or support for one of the prohibited categories." *See* Defs.' Memo. at 26 (emphasis added). This argument merely repeats Defendants' motion to dismiss position. It also ignores that neither the July 2021 FAQs nor September 2021 Attorney General explicitly stress such an "affirmative act" requirement, and, in fact, broadly extend the application of the Amendments even beyond teaching. *See Exs. 41 (Depo. Ex. 9), 44 (Depo. Ex. 24), 45 (Depo. Ex. 55)* (acknowledging in response to Q&A No. 8 that the law does not apply to "just teaching," but rather applies to "all activities carried out by public schools in their role as public schools"). In

---

[19] *See also* Cohen Depo. 94:14-19 (declining to give teachers "legal advice"); *see also id.* 94:21-22, 95:12-20; Farrell Depo. 149:8-150:19 (stating that teachers should ask a lawyer if there are questions); Edelblut Depo. 166:13-169:8 (declining to give a direct answer as to what is covered, and instead simply directing Plaintiffs, and other educators who may have specific questions, to the text of the Amendments and Defendants' July 2021 FAQs), 49:18-150:16 (acknowledging that he had not read Dr. Kendi's 2019 book), 155:8-156:14, 157:7-160:2; 167:9-169:4 (collectively declining to say whether Dr. Kendi's 2019 book was covered under the Amendments, and instead resorting to restating the Amendments' provisions and deflecting these questions back to the individual educators and the HRC to answer).

any event, this argument fails because the legislature is capable of using active language limiting the Amendments' reach to instruction specifically taught by teachers and did so elsewhere in RSA 354-A[20], but refused to do so in the portion of the Amendments explicitly governing teacher conduct in RSA 193:40, I.   Instead, lawmakers intentionally used the passive voice, "shall be taught" in RSA 193:40, I, plausibly covering a more expansive myriad of circumstances where teacher-led instruction veers into a student discussion on banned topics, or broad homework assignments that result in the student reaching for a book containing proscribed material, or even a discussion with a librarian as to what publication addresses a specific proscribed subject.   After all, classroom discussions where students are giving presentations and instructing others are coordinated by educators who are arguably now crossing a line when classroom discourse covers any of the banned concepts.   The most plausible interpretation of RSA 193:40 is that it is not textually limited to classroom instruction exclusively spoken by educators, as RSA 193:40 textually places no limitation on who provides the information to students and in what form.   *See also* Mejia Compl., Ex. 21 (DN 1-21) (Attorney Wolowitz interpretation noting that "[c]lassroom discussions present a particular risk because a teacher cannot predict what students might say and because the definition of 'taught' is so broad"). ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[20] *See* RSA 354-A:31 ("[n]o public employer . . . *shall teach* ....") (emphasis added); RSA 354-A:32 ("[n]o government program *shall teach* ....") (emphasis added).

███████[21]   RSA 193:40 does not even clearly fix the situs of such communication. While Defendants may wish this Court to bless their rewrite of the Amendments to include an "affirmative act of teaching" requirement, this is something this Court may not do for the same reasons explained above.

### d.  The Four Banned Concepts Are Hopelessly Vague

The breadth and ambiguity of the concepts targeted by the Amendments further exacerbate the law's vagueness.

As to the first two banned concepts, what does it mean to suggest that someone is "inherently superior" (concept one) or "inherently racist [or] sexist" (concept two)?  Hoping to answer this question, Defendants rely on guidance documents that employ dictionary definitions to narrow the term "inherent."  *See* Defs.' Memo. at 28-29.  But, as argued at the motion to dismiss stage, these definitions only highlight the ambiguities of these two concepts.  *See* Pls.' Motion to Dismiss Obj. Memo. (DN 45) at 15-18 (addressing first and second concepts), 27-28.

For example, Defendants' continued use both in their summary judgment memorandum and in the September 7, 2021 Attorney General opinion (but not in the July 2021 FAQs) of the phrase "by … settled habit" as a definition for "inherent" adds to the confusion.  This is because this "settled habit" dictionary definition of "inherent" includes a characteristic—whether it be racism, sexism, or otherwise—that is *not* "intrinsic" or "essential."  How can one seriously expect educators to distinguish (and do so in snap decisions in the classroom) between racist or sexist beliefs that are developed through "settled habit" (or even know what those "settled habits" are or

---

[21]   DOE Investigator Richard Farrell also testified that he has informed school districts about complaints under the Code of Conduct concerning school library books even before a case was opened under N.H. Code Admin. R. Ed 511.01(a) or before there was a determination that the book or teaching of a book potentially violates the Code of Conduct under N.H. Code Admin. R. Ed 511.01(b).  *See* Farrell Depo. 124:24-129:9.  Moreover, educator Alison O'Brien's declaration demonstrates that even commercially available music videos apparently are fair game for DOE scrutiny.  *See Ex. 11, O'Brien Decl.* ¶¶ 7-9, 13-19.

whose "settled habits" they are) and those developed through external factors that are not "extrinsic" or "essential"?  As a result, "[s]o far as the words of the statute [are] concerned," Plaintiffs  are "given not only no 'fair warning,' but no warning whatever, that their conduct … would violate the statute."  *Bouie*, 378 U.S. at 355.  Indeed, it is worth noting that the banned concepts enjoined in *Santa Cruz Lesbian and Gay Community Center v. Trump*, 508 F. Supp. 3d 521 (N.D. Cal. 2020) also used the term "inherent."  Defendants have no answer for this nearly identical authority.

Contrary to Defendants' suggestion, the term "inherent" is merely one of many flaws with the Amendments.  Beyond the usage of the word "inherent" in these two banned concepts, the *Santa Cruz* Court determined that analogous provisions in President Trump's Executive Order were vague on their face given the plaintiffs' allegations that "training on unconscious bias is critical" to their work, and the plaintiffs there did "not know whether they can continue with this critical training" under the Executive Order.  *See Santa Cruz*, 508 F. Supp at 543-44.  Here, Plaintiffs and educators throughout New Hampshire face this same dilemma, including with respect to the second banned concept's use of the term "unconsciously."  Moreover, through extensive briefing, Plaintiffs have demonstrated how *all* the substantive prohibitions in the Amendments are vague and inexorably intertwined.  In its January 12, 2023 order, this Court found the language of the Amendments far more troubling than the law's use of the word "inherent."

Defendants' third crack at manufacturing their own "guidance" in their memorandum of law also fails to address this Court's significant concerns with the third and fourth banned concepts. Defendants' mere restatement of these concepts does little to clarify their meaning.  *See* Defs.' Memo. at 29-30, 31.  For example, Defendants' new interpretation of the third banned concept to replace the word "should" with the phrases "obligation or duty" or "something that is necessary or

proper" does nothing to address this Court's concern that the third banned concept could arguably block discussions on affirmative action. *See Local 8027*, 2023 U.S. Dist. LEXIS 5593, at *8, *43-44.

Similarly, Defendants state that the fourth banned concept is not vague because it "prohibits teachers from conveying to students that individuals are somehow unable to treat other persons without regard for the characteristics identified in the provision or that individuals otherwise should not treat others without regard for those characteristics." *See* Defs.' Memo. at 30. But Defendants never actually explain what this fourth concept even means beyond restating its "unintelligible" text. *See Pernell*, 641 F. Supp. 3d at 1281 ("As this Court recognized in *Honeyfund*, concept four thus features a rarely seen triple negative, resulting in a cacophony of confusion" and is "mired in obscurity, bordering on the unintelligible"). Setting aside this fourth banned concept's obscure triple negative and DOE Commissioner Edelblut's own admission that the language "is confusing," *see Ex. 19*, tellingly left unaddressed is this Court's specific concern with whether a teacher could face sanctions for discussing implicit bias with a student under this concept. *See Local 8027*, 2023 U.S. Dist. LEXIS 5593, at *44. It is also noteworthy that, despite Defendants' claim that a "purely textual analysis" confirms that the Amendments "[are] not facially vague," *see* Defs.' Memo. at 19, 24, Defendants at deposition could not easily understand or explain this fourth concept when confronted solely with its text or point to any prohibited material. *See* Sept. 14, 2022 Motion to Dismiss Hearing Transcript (DN 55) at 26:24-27:6 ("See, that you and I are having so much trouble even communicating about the fourth concept may tell us something about the challenge"); Farrell Depo. 144:23-145:13, 204:7-207:19; *see also* Edelblut Depo. 174:2-8; Fenton Depo. 172:23-173:9; Farrell Depo. 169:12-18, 170:20-24; Cohen Depo. 35:15-23.

**e.  The Record Shows that the Amendments Lead to Arbitrary and Discriminatory Enforcement.**

In an effort to argue that the Amendments will not lead to arbitrary and discriminatory enforcement, Defendants assert that, "to avoid the danger of two separate agencies reaching different conclusions regarding the existence of discrimination, the enforcing agencies developed a protocol for evaluating complaints alleging a violation of the new antidiscrimination provisions by public educators." *See* Defs.' Memo. at 8.  Under this purported (and unwritten) "protocol," "only after the final determination [by the HRC or the state Superior Court] … that a violation of the antidiscrimination laws had occurred could the matter proceed to the second step" where the DOE "could commence disciplinary proceedings before the Board of Education to determine what sanction, if any, to impose upon the licensee." *Id*. at 9.  This "protocol"—as well as the purported and ephemeral "standard operating procedure" prepared during a February 14, 2023 meeting to govern the process for referring matters from the DOE to the HRC (a meeting that excluded the HRC)—is just one of a number of documents that Defendants were either unwilling or unable to produce in discovery. *See supra* pp. 2-3, and n. 6.  The "protocol" does not withstand scrutiny and is wholly unsupported by the record in this case.  The record demonstrates the following:

- The "protocol" is contradicted by deposition testimony revealing that none of the enforcing agencies can agree on whether they have jurisdiction to enforce RSA 193:40.  The DOE repeatedly pointed the finger at the HRC as the enforcer of RSA 193:40.  *See* Edelblut Depo. 65:8-10; Fenton Depo. 105:10-106:2; Farrell Depo. 39:18-20.  The HRC repeatedly pointed the finger back at the DOE as the enforcer of RSA 193:40.  *See* Malachi Depo. 12:18-20, 73:5-74:17, 78:3-9; Cohen Depo. 59:17-21.  In fact, Defendant HRC Executive Director Malachi and HRC Assistant Director Cohen testified that the HRC has "no jurisdiction" to enforce RSA 193:40 and no familiarity with its provisions, which is in direct conflict with the testimony of all three DOE witnesses who uniformly asserted that the responsibility for applying RSA 193:40 lies with the HRC.  *See* Edelblut Depo. 65:8-10; Fenton Depo. 105:10-106:2; Farrell Depo. 39:18-20; Malachi Depo. 73:5-74:17; Cohen Depo. 59:17-21.

- This "protocol" is contradicted by the text of RSA 193:40, IV itself, which makes clear that a violation of RSA 193:40 constitutes an independent violation of the Educator Code

of Conduct.  In other words, this "protocol" "is neither a statutory nor a regulatory requirement," and, in fact, is contradicted by the DOE's own rules.  *See Local 8027*, 2023 U.S. Dist. LEXIS 5593, at *49. The DOE's own rules state that it cannot turn a blind eye to a report under the Amendments, which constitute a violation of the Code of Conduct. The DOE is required to investigate such a report and conclude whether a violation has occurred no matter how minor or trivial the offense.  *See* Pls.' Stmt. of Facts (DN 85) ¶ 14. The DOE's presentations to administrators—including those that reference the Amendments—state that school officials should call the DOE "[a]nytime [sic] there is a suspected [Code of Conduct] violation." *See Ex.  50 (Depo. Ex. 3)*, at DOE-05652, 5654, 5656 (DOE presentation stating that the DOE should be called "as soon as possible").

- This "protocol" is not actually how the Amendments are enforced.  In practice (and consistent with the DOE's rules noted above), the DOE "opens a case" and conducts an "initial review" on every complaint it receives in which any misconduct is alleged, including before the DOE has determined that a "possible violation of the code of conduct" exists and before the DOE has opened a formal investigation under N.H. Code Admin. R. Ed 511.01(b).  *See* Fenton Depo. 47:17-21; Farrell Depo. 23:19-25, 25:1-3.  These "initial reviews" occur any time a case is "opened" under N.H. Code Admin. R. Ed 511.01(a) and are done so that the DOE can determine whether there has been a "possible violation of the code of conduct" requiring the opening of a formal investigation under N.H. Code Admin. R. Ed 511.01(b).  While the DOE may disclaim any formal and legal adjudicatory role in the Amendments' enforcement until the HRC acts (which the HRC has represented it lacks jurisdiction to do under RSA 193:40), the DOE—including DOE Commissioner Edelblut himself—are attentive to all concerns raised by parents under the Educator Code of Conduct.  *See* Edelblut Depo. 20:22-22:4, 29:4-8, 77:15-78:9.  They will directly uplift those concerns to superintendents and principals, even when there is no possible violation of Code of Conduct raised.  *See id.* 20:22-22:4, 29:4-8, 77:15-78:8; *see also* Pls.' Stmt. of Facts (DN 85) ¶¶ 136-139.

DOE Commissioner Edelblut's periodic public statements—statements not always readily available to every educator—may even constitute the DOE's actual guidelines for legally-compliant conduct.  For example, the DOE seemingly used at least one of Commissioner Edelblut's op-eds from April 15, 2022 as a guidepost for applying the Amendments[22], all while Defendants repeatedly declined at deposition to answer basic questions on whether specific course instruction or content would be covered under the Amendments' prohibitions, instead punting the

---

[22] *See e.g.*, Ex. 11, O'Brien Decl. ¶¶ 7-9, 13-19 ("As I had already provided the background information about the videos to the administration, the purpose of the meeting appeared to be to tell me I was being 'investigated' by the Department, to relay Investigator Farrell's comments to me about the Commissioner's [April 15, 2022] Op-Ed, and to give me a copy of the Op-Ed.").

issue among themselves, or directing educators with specific questions to the text of Amendments and Defendants' July 2021 FAQs.  *See* Pls.' Stmt. of Facts (DN 85) ¶¶ 114-120.

For these reasons, Defendants' supposed "protocol" runs contrary to the Amendments' plain terms and is unsupported by the record.

## II. The Amendments Violate Plaintiffs' First Amendment Rights by Restricting Educators' Private, Extracurricular Speech (Count III in the AFT Action).

Defendants principally argue that AFT Plaintiffs' First Amendment claims are "not viable as a facial challenge" because this case requires a case-by-case analysis under *Garcetti v. Ceballos*, 547 U.S. 410 (2006) ("*Garcetti*").  *See* Defs.' Memo. at 1, 11.  Yet, Defendants acknowledge—as they must—that this Court has already held that AFT Plaintiffs' extracurricular speech is governed by the *Pickering-Connick* balancing test, not *Garcetti*.  *See Local 8027*, 2023 U.S. Dist. LEXIS 5593, at *15-17; Defs.' Memo. at 11.[23]  In cases like this where a law places a wholesale and sweeping chill on teachers' private speech *ex ante*, engaging in *Garcetti's* case-by-case analysis is impracticable and inapplicable.  Rather, the modified *Pickering* test for prospective government restrictions set forth in *United States v. National Treasury Employees Union*, 513 U.S. 454 (1995) ("*NTEU*") and the Supreme Court's overbreadth doctrine provide independent bases to find the Amendments unconstitutional under the First Amendment.  *See* Pls.' Memo. of Law (DN 83-1) at 55-70.  In any event, Defendants' undue focus on *Garcetti* misses this Court's directive to actually analyze AFT Plaintiffs' extracurricular claim under the *Pickering-Connick* balancing test.  *See Local 8027*, 2023 U.S. Dist. LEXIS 5593, at *17.  Under that required framework, AFT Plaintiffs

---

[23] This Court stated the following: "Because the education and antidiscrimination amendments are susceptible to an interpretation that encompasses extracurricular speech, they plausibly restrict teachers' speech as private citizens" requiring "appl[ication of] the *Pickering-Connick* balancing test."  *See Local 8027*, 2023 U.S. Dist. LEXIS 5593, at *23.

27

have met their burden to show that the Amendments infringe on teachers' First Amendment rights as private citizens on matters of public concern.

      **a.  Defendants Cannot Shield the Amendments From a First Amendment Challenge, Whether "Facial" or, as Pled and Evidenced Through Discovery, "As Applied."**

Defendants' effort to shield the Amendments' sweeping prohibitions from judicial review under the theory that a "case-by-case analysis" must be conducted is unsupported.  *See* Defs.' Memo. at 11.  It is well-settled that "[b]road prophylactic rules" like the Amendments "in the area of free expression are suspect."  *NAACP v. Button*, 371 U.S. 415, 438 (1963).  As set forth in Plaintiffs' opening memorandum, there are two independent bases on which this Court can find that the Amendments are facially unconstitutional without engaging in a burdensome case-by-case analysis requiring each of the thousands of teachers impacted by the law to engage in needless and expensive litigation and discovery, impossibly burdening them and the judicial process.  The schoolteachers of New Hampshire need not wait until they are disciplined, or worse, before litigating the unconstitutionality of the Amendments under the First Amendment.

*First*, a heightened version of this Court's recommended *Pickering* analysis applies when evaluating a law like this one that functions as a "wholesale deterrent to a broad category of expression by a massive number of speakers."  *NTEU*, 513 U.S. at 467-68; *see also Kessler v. City of Providence*, 167 F. Supp. 2d 482, 488 (D.R.I. 2001) ("Plaintiff's individual circumstances are largely irrelevant" for purposes of the *NTEU* analysis).  The Amendments are broad, using passive language to prohibit any student from being "taught, instructed, inculcated or compelled to express belief in, or support for, any one or more of the following …."  *See* RSA 193:40, I.  Such sweeping statutory language, as noted in this Court's January 12, 2023 order (and as confirmed by the DOE during discovery), covers any interaction between teachers and students "outside the classroom and even beyond the school grounds," including in hallways, schoolyards, lunchrooms, libraries,

and during off-campus extracurricular activities.  *See Local 8027*, 2023 U.S. Dist. LEXIS 5593, at

*22.   DOE Investigator Richard Farrell confirmed in discovery how far the Amendments'

application to extracurricular activities extends:

> Q.      How would you define "extracurricular activities" [referenced in the July 2021
> FAQs]?
>
> A.      Extracurricular activities could be anything from sporting situations, coaching,
> dance, plays. . . . Anything that happens within the confines of the definition of the Safe
> Schools Act.  So anything—if it's defined as a safe school, the property of the Safe Schools,
> anything that happens within the confines of that Safe Schools Act would apply.
>
> . . .
>
> So, for example, under the Safe Schools Act, a teacher on a bus to and from a field trip,
> that's Safe Schools.  That's covered.  A teacher that's becoming a coach and working as a
> coach, theater, drama.  Anything within the curtilage or the extended portion of a school.
> It gets kind of creative because many hockey programs—for example, hockey rinks are
> not—they're private facilities, but if a hockey team for a high school is playing and/or
> practicing on that facility, it becomes an extension of Safe Schools.  So I would say the
> answer to that would be anything that falls within the curtilage of the Safe Schools
> definition.

*See* Farrell Depo. 174:23-177:3.  These sweeping and vague provisions, *see infra* Section I.c-e,

fail to detail the precise speech prohibited, necessarily intruding on teachers' protected speech as

private citizens and chill expression far beyond the curriculum.  *See* Ex. 8, Howes Decl. ¶ 11

(testifying that the Amendments impact extracurricular activities and "broadly reach[]

discussions" in "hallways, on sports fields, in after-school clubs, traveling to competitions, in

teachers offices and in myriad other ways"); *see also* Pls.' Memo. of Law (DN 83-1) at 11-12, 55-

68; *Exs.* 41 (Depo. Ex. 9), 44 (Depo. Ex. 24), 45 (Depo. Ex. 55) at PL 00419 (Q&A No. 8 in July

21, 2021 FAQs, stating that "[t]he prohibitions apply to *all* activities carried out by public schools

in their role as public schools, including extra-curricular activities that are part of the public

school's work") (emphasis added).  Like the honoraria ban in *NTEU* which chilled speech before

it occurred, the Amendments pre-censor teachers' private speech on a myriad of topics of public

concern.  It would be impractical for this Court to allow such censorship to continue unaddressed while waiting for each teacher threatened by the Amendments' prohibitions to face a Hobson's Choice: either involuntarily surrender constitutional rights, spend their salaries or savings to protect such rights, or simply quit teaching in New Hampshire public schools—a tragic alternative already occurring.  As in *NTEU*, because of the absence of any justification to compel the intolerable choices that the State seeks to foist upon teachers under the Amendments, the "crudely crafted burden" on Plaintiffs' speech rights cannot be sustained.  *NTEU*, 513 U.S. at 477; *see also* Pls.' Memo. of Law (DN 83-1) at 55-68.[24]

Defendants' blanket assertion that AFT Plaintiffs' First Amendment challenge is "a fact-intensive question ill-suited for hypothetical, prospective resolution" also ignores the well-settled overbreadth doctrine.  Defs.' Memo. at 11.  Defendants skirt controlling Supreme Court precedent holding that courts need not engage in a case-by-case analysis of a plaintiff's First Amendment claims where a law does not carefully punish only unprotected speech.  *See Gooding v. Wilson*, 405 U.S. 518, 522 (1972) (holding that statutes "must be carefully drawn or be authoritatively construed to punish only unprotected speech and not be susceptible of application to protected expression"); *see also NAACP*, 371 U.S. at 433 (noting that the "government may regulate [speech] only with narrow specificity").  At bottom, a court can invalidate a law like the Amendments under

---

[24] To the extent Defendants argue that the heightened *NTEU* standard only applies to restrictions on speech outside the workplace, that argument lacks merit.  It is well-settled that, like *Pickering*, no rigid "off-the-clock" standard exists to address the applicability of *NTEU*.  *Amalgamated Transit Union Local 85 v. Port Authority of Allegheny Cnty.*, 513 F. Supp. 3d 593 (W.D. Pa. 2021) *aff'd*, 39 F.4th 95 (3d Cir. 2022), also is instructive in this regard.  There, the Court indicated that, "while both *'Pickering* and *NTEU* arose in the context of speech activities that occurred during non-duty hours, they also recognized that the same balancing test applies during duty hours, although the potential for immediate workplace disruption would be greater in such situations.'" *Id.* at 611 n.7 (quoting *Am. Fed'n of Gov't Employees v. D.C.*, No. 05-0472, 2005 WL 1017877, at *10 (D.D.C. May 2, 2005)).  The Court went on to note that, "consistent with the First Amendment's broader disfavor of prior restraints, the key distinction drawn by *NTEU* was not between speech at work and speech outside of work, but between, on one hand, broad, prior restraints on employee speech related to matters of public concern, and, on the other hand, after-the-fact disciplinary proceedings against individual employees." *Id.*

the overbreadth doctrine if it finds that there is a real and substantial danger that a law punishes a substantial amount of protected speech. *See Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973); *see also Coates v. Cincinnati*, 402 U.S. 611, 616 (1971) (finding law overbroad without benefit of a factual record); *Wagner v. City of Holyoke*, 100 F. Supp. 2d 78, 84–85 (D. Mass. 2000) ("In a facial challenge to the overbreadth and vagueness of an enactment, a court must first determine whether the enactment reaches a substantial amount of constitutionally protected conduct.") (citation omitted).

Here, the Amendments implicate with an exceedingly broad brush of censorship speech that is not solely "limited to categories of recognized unprotected speech: defamatory speech, obscene speech, unlawful speech, and speech made with reckless disregard for the truth." *Id.* at 86. Instead, the prohibitions place unbounded, non-situs specific restrictions on teachers' discussions with students about the four banned concepts, including during extracurricular activities and outside the classroom. *See also infra* Section I.c. As testified by AFT President Deborah Howes, these restrictions include the "subjective nature of what a student infers, or . . . what a parent who isn't even in the classroom, infers about" discussions during an extracurricular activity. *See Ex. 8*, Howes Decl. ¶¶ 10-11. Plaintiffs demonstrated in their moving memorandum the myriad of instances where the Amendments punish teachers as private citizens given the absence of any guardrails limiting their reach. *See* Pls.' Memo. of Law (DN 83-1) at 68-70. The Amendments' substantial impact on constitutionally protected speech is fatal. *See Kessler*, 167 F. Supp. 2d at 490 ("Order No. 16 implies that authorization is required before speaking on any topic, not solely Police Department matters, if the speaker will be acting as a 'representative' of the Police Department, or 'may be construed' as such.").

Simply put, laws restricting speech must be specific and precise to avoid a chilling effect on expression. *NAACP*, 371 U.S. at 415. The Amendments are neither specific nor precise, and their prohibitive sweep chills and punishes protected expression in schools and during extracurricular activities. The law already has had a chilling effect, and it should be struck down as unconstitutionally overbroad on that basis.

### b. AFT Plaintiffs Also Prevail Under the Traditional *Pickering* Analysis.

In response to AFT Plaintiffs' First Amendment challenge, Defendants' recitation of *Garcetti* fails as a matter of law, especially in light of this Court's January 12, 2023 order. There, this Court directed the parties to analyze the Amendments' application to extracurricular speech under the *Pickering-Connick* test. *See Local 8027*, 2023 U.S. Dist. LEXIS 5593, at *17.[25] Drawing on the Supreme Court's decision in *Kennedy v. Bremerton School District*, 142 S. Ct. 2407 (2022), this Court established a clear line between curricular speech made within the confines of a teacher's employment and extracurricular speech. Defendants acknowledge as much, stating that this Court already held that Plaintiffs' extracurricular speech "is governed by the balancing test established in *Pickering v. Board of Education of Township High School District 205*, 391 U.S. 563 (1968), and *Connick v. Myers*, 461 U.S. 138 (1983), not by *Garcetti*." Defs.' Memo. at 11 (citing *Local 8027*, 2023 U.S. Dist. LEXIS 5593, at *17) (emphasis added). Defendants should not be permitted to resurrect their old and unsuccessful argument that *Garcetti* applies.

AFT Plaintiffs have satisfied their burden to show that the Amendments infringe on teachers' First Amendment rights under this Court's mandated *Pickering-Connick* analysis. *See* Defs.' Memo. at 2. *Lane v. Franks*, 573 U.S. 228 (2014), cited in Defendants' motion for summary

---

[25] AFT Plaintiffs will not re-argue, but do not waive, whether *Garcetti* applies to curricular speech given this prior Court's decision. AFT Plaintiffs note, however, that it remains an open question in several jurisdictions. *Garcetti* is an ill-fit for analyzing free speech rights in schools and is ripe for appellate review. *See* AFT Pls.' Opp. to Mot. to Dismiss (DN 46) at 8.

judgement, illustrates the point.  *See* Defs.' Memo. at 12.  There, the Supreme Court engaged in the *Pickering-Connick* balancing test to find that the government was unjustified in disciplining a director of community intensive training for youth who testified as a fact witness about a colleague's malfeasance.  Contrary to Defendants' blanket assertion that the Supreme Court stressed whether the speech at issue was pursuant to the plaintiff's job responsibilities under *Garcetti*, the Supreme Court assessed the plaintiff's claims using a two-part inquiry under this Court's recommended *Pickering* analysis, first determining "whether the employee spoke as a citizen on a matter of public concern."  *Lane*, 573 U.S. at 237.  The Court then turned to the second step of the *Pickering* framework to determine "whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the public."  *Lane*, 573 U.S. at 237.  In doing so, the Supreme Court found that the plaintiff's speech was entitled to First Amendment protection.

That reasoning confirms that AFT Plaintiffs' First Amendment claim should prevail as a matter of law even under the traditional *Pickering* analysis.  Several plaintiffs have testified that the Amendments impact their speech as citizens, rather than in their capacity as public employees.  *See generally* Pls.' Memo. of Law (DN 83-1) at 58-63.  By way of example, high school World History teacher and Plaintiff Ryan Richman testified that the Amendments restrain what he can say to students during Model United Nations and in everyday interactions about the War in Ukraine and the U.S. election process.  *See Ex. 17*, Richman Decl. ¶¶ 9-10.  Chief Equity Officer for the Manchester School District, Plaintiff Christina Kim Philibotte, testified about the Amendments' impact on her discussions with students about race at events in her "individual capacity."  *See Ex. 13*, Philibotte Decl. ¶ 21.  John Dube also signed a petition outside of school in the Spring of 2021 pledging simply to teach "honest history" in response to the Amendments, only to be subjected to

online harassment, threats, and an FBI investigation.  *See* Ex. 9, Dube Decl. ¶¶ 12-17.  Thus, AFT Plaintiffs have shown through uncontradicted evidence that the Amendments, in practice, implicate teachers' private speech.

Plaintiffs have also identified in their moving papers other examples of the types and categories of protected speech subject to the Amendments prohibitions.  *See*  Pls.' Memo. of Law (DN 83-1) at 69.  And it is not difficult to envision other instances in which the Amendments could punish protected speech.  One can readily visualize a scenario where, as described by AFT President Deborah Howes, a New Hampshire teacher is "traveling to competitions" after school with a student or group of students and listening to the local or national news on the radio and is asked a question about his or her opinion on "racial issues"—a subject that this Court posited at oral argument.  *See* Sept. 14, 2022 Motion to Dismiss Hearing Transcript (DN 55) at 78:25-79:1. On the "sports fields" described by Ms. Howes, the same football coach in *Bremerton* could be prohibited from wearing a "Black Lives Matter" headband on the field or discussing his own view on the recent Supreme Court's affirmative action case *Students for Fair Admissions, Inc. v. President & Fellows of Harvard College*, 600 U.S. 181 (2023), when asked by members of his team.  The problem, as this Court recognized, is that the Amendments, as drafted with an all-encompassing brush, broadly extends to any "interactions that could be construed as teaching or advocacy directed at a pupil."  *See* Sept. 14, 2022 Motion to Dismiss Hearing Transcript (DN 55) at 77:20-23.  Notably, Defendants' memorandum avoids suggesting otherwise.  And Defendants' bare suggestion that AFT Plaintiffs "never identified a category of extracurricular speech that they believe falls beyond *Garcetti* but is still subject to the antidiscrimination provisions" is flatly unsupported and, as noted above, inaccurate.  *See* Defs.' Memo. at 2.

34

Further, it cannot seriously be disputed that the topics in the foregoing examples (and those identified in Plaintiffs' memorandum) involve "matters of public concern," touching on subjects that are of "social, political, or other interest to a community." *See* Pls.' Memo. of Law (DN 83-1) at 64 (collecting cases). Perhaps for this reason, this argument is not mentioned in Defendants' motion.

On the other side of the balancing, Defendants do not attempt to provide a justification for the scope of the Amendments, tellingly arguing that they are "under no obligation to justify the [Amendments] under the *Pickering-Connick* framework." Defs.' Memo. at 16. As stated in Plaintiffs' Motion for Summary judgment:

> None of the evidence produced in discovery suggests there has been any articulated reason why the Amendments, even if they were not unconstitutionally vague, should reach so comprehensively. Rather, the legislative history here demonstrates that the Amendments' goal (as pressed by its sponsors) was to censor speech based on subjective political partisan beliefs and little, if anything, else. *See* Stmt. of Facts (DN 85) ¶¶ 54-76 (reciting legislative history). Importantly, during discovery, none of the Defendants' witnesses could articulate any specific objectionable educational material that was permissible before the passage of the Amendments, but that was now prohibited by the Amendments' passage. Edelblut Depo. 174:2-8; Fenton Depo. 172:23-173:9; Farrell Depo. 169:12-18, 170:20-24; Cohen Depo. 35:15-23.

*See* Pls.' Memo. of Law (DN 83-1) at 66. Moreover, "[n]othing in discovery or the legislative record points to specific unaddressed discrimination in New Hampshire that needed fixing, let alone one or more as to which the Amendments would fill that void. There is also no evidence in the record of actual disruption in schools from discussing banned concepts." *See id.* at 67. Particular political viewpoints of certain legislators are not a sufficient justification for a wholesale restriction on free speech rights.

For these reasons, Defendants' reliance on cases applying *Garcetti* to Plaintiffs' First Amendment claims is inapposite and contrary to this Court's prior ruling. *See* Defs.' Memo. at 12-13 (citing *Decotiis v. Whittemore*, 635 F.3d 22 (1st Cir. 2011), *Foley v. Town of Randolph*, 598

35

F.3d 1, 9-10 (1st Cir. 2010) and *Bruce v. Worcester Regional Transit Auth.*, 34 F.4th 129 (1st Cir. 2022)).  And, in any event, these cases brought by individuals under Section 1983 did not assess the facial constitutionality of a broad-based ban like the Amendments implicating the private speech of thousands of teachers.  *Decotiis*[26] addressed whether one speech and language specialist could express her opinion to parents about child development services not complying with state laws.  *Foley* involved a challenge brought by the chief of the town's fire department alleging that the town suspended him for publicly criticizing the fire department's lack of funding and staffing during a press conference.  *Bruce* considered whether public comments made by a bus driver to Telemundo were protected by the First Amendment.  None of these cases have relevance to a challenge brought against a sweeping law that restricts private speech *before it even happens*, especially through RSA 193:40, I's use of the passive voice and the guidance documents confirming the law's application to extracurricular activities.  Again, as stated by this Court and confirmed through discovery, this provision "can plausibly be read to cover interactions with pupils outside the classroom and even beyond the school grounds."  *See Local 8027*, 2023 U.S. Dist. LEXIS 5593, at *22.

Against this backdrop, the Amendments violate Plaintiffs' First Amendment rights under the traditional *Pickering* analysis. If, as the case law makes clear, teachers do not "shed their constitutional right to freedom of speech or expression at the schoolhouse gate," *Tinker v. Des Moines Indep. Community School Dist.,* 393 U.S. 503, 506 (1969), then the Amendments—which

---

[26] It merits emphasis that Defendants have already cited *Decotiis* in their motion to dismiss as support for their failed argument that *Garcetti* should apply to AFT Plaintiffs' speech.  A closer read of *Decotiis* reveals that the Court declined to dismiss plaintiff's case for failure to state a claim, even under *Garcetti*, because the complaint "alleges facts that plausibly set forth citizen speech."  *Decotiis*, 635 F.3d at 35.  The Court similarly found that the *Pickering* balancing tipped in plaintiff's favor because "we cannot say that [the government's] risk of disruption and inefficiency outweighs the important interests served by Decotiis's speech." *Id.* at 36.

curtail _any_ discussion about the banned concepts by teachers in _any_ capacity and in _any_ place when interacting with students—cannot stand.

**III. The Doctrine of Severability Does Not Apply.**

Perhaps in recognition of the Amendments' infirmities, Defendants argue that, "[t]o the extent the Court concludes that the [Amendments] are unconstitutional in the way they apply to teachers, it should sever the offending portions of the provisions and leave the remainder intact." *See* Defs.' Memo. at 37. Defendants are incorrect.

Severability of state legislative provisions is "a matter of state law." *Leavitt v. Jane L.*, 518 U.S. 137, 139 (1996). In New Hampshire, in determining whether the valid provisions of a statute are severable from the invalid ones—and consistent with the severability clause that exists in the Amendments—a court is "to presume that the legislature intended that the invalid part shall not produce entire invalidity if the valid part may be reasonably saved." *See N.H. Democratic Party v. Sec'y of State*, 174 N.H. 312, 331 (2021) (quoting *Associated Press v. State*, 153 N.H. 120, 141 (2005)). However, a court must also determine "whether the unconstitutional provisions of the statute are so integral and essential in the general structure of the act that they may not be rejected without the result of an entire collapse and destruction of the statute." *Id.* A severability clause will not save a statute if, after severing, "[v]ital objectives in the entire scheme . . . cannot be carried out." *Opinion of the Justices*, 106 N.H. 202, 206 (1965).

Applying these principles, severability would be inappropriate. Rather than examining in detail the severability of the Amendments' multiple offending provisions that this Court identified in its January 12, 2023 order, Defendants' analysis narrowly focuses on only one of the Amendments' defects that could lead to arbitrary and discriminatory enforcement—namely, the prospect of the DOE, under RSA 193:40, IV, having the power to enforce the Amendments as an independent violation of the Educator Code of Conduct. *See* RSA 193:40, IV ("Violation of this

section by an educator shall be considered a violation of the educator code of conduct that justifies disciplinary sanction by the state board of education."). As explained below, even if Section IV were the only constitutional infirmity in the law—and it is not—the severance of Section IV does not allay this Court's concern that "nothing precludes a person from reporting a teacher to the department of education for violating the educator code of conduct." *See Local 8027*, 2023 U.S. Dist. LEXIS 5593, at *48-49.

   **a. Severing RSA 193:40, IV Would Not Cure the Amendments' Infirmities.**

   The Amendments cannot be salvaged by severing RSA 193:40, IV because doing so would still fail to cure the Amendments' constitutional deficiencies in several ways.

   *First*, Defendants' suggestion that, without RSA 193:40, IV, educators' licenses would no longer be in jeopardy is incorrect. These penalties would remain, and the DOE could still take independent action for a violation of the Amendments under the Educator Code of Conduct. This is because, following the 2019 enactments at RSA 193:38 applying the Law Against Discrimination in the education context, a violation of that Law Against Discrimination's entire chapter at RSA ch. 354-A—*which would include the subsequently-enacted Amendments under RSA 354-A:29-34*—already constitutes a Code of Conduct violation even without RSA 193:40, IV. *See* Ex. 109 (Depo. Ex. 2) (Code of Conduct at N.H. Code Admin. R. Ed 510.01(b)(1), 510.02(b)(1), 510.03(b)(1) barring discrimination "as specified in RSA 354-A:1"); *see also* RSA 193:38 (bootstrapping under RSA ch. 193 *all* Law Against Discrimination violations under the 2019 amendments, stating that "[n]o person shall be excluded from participation in, denied the benefits of, or be subjected to discrimination in public schools because of their age, sex, gender identity, sexual orientation, race, color, marital status, familial status, disability, religion, or national origin, *all as defined in RSA 354-A* ….", which would include the subsequently enacted challenged Amendments at RSA 354-A:29-34) (emphasis added). As this Court noted, "an

38

investigation must be opened if there is a 'possible violation' of the educator code of conduct." *See Local 8027*, 2023 U.S. Dist. LEXIS 5593, at \*49.  Thus, even without RSA 193:40, IV, the DOE must therefore still investigate possible violations of RSA 354-A:29-34 under the Code of Conduct, which provides "an avenue for directly pursuing teachers."  *Id.* at \*49.

But even if this Court were to disregard the DOE's own rules and conclude (which it should not) that the DOE no longer makes threshold violation decisions under the Amendments with the severance of RSA 193:40, IV, the two-step process described by Defendants, *see* Defs.' Memo at 8-9, would still have practical license and career ramifications for educators—except that the educator, with potential sanctions on the line from the DOE if the HRC concludes that there is a violation, may now *not* even be placed on notice of any pending HRC proceeding because such a proceeding is *only* filed against a district.  *See id.* (noting that "the complaint would be filed against the school or school district, not the individual teacher or administrator").  For example, in the one docketed matter before the HRC concerning the Amendments, it is unclear that the individual educator or their union counsel have been placed on notice of this HRC matter that could have serious downstream impacts on the educator's license.  *See* Pls.' Stmt. of Facts (DN 85) ¶ 140(a). In other words, bypassing RSA 193:40 would effectively allow the educator to be found liable in a HRC proceeding in absentia, as the HRC's determination that the school district violated the Amendments under RSA 354-A:29-34 would then, in turn, trigger the potential for charges against the educator under the Code of Conduct.  Any suggestion that an educator and both their livelihood and professional relationships would not be practically impacted by an HRC proceeding in which the educator (as an agent of a school district) is accused of violating the Amendments—especially when Defendants acknowledge that, after this first step, the DOE "could commence disciplinary

39

proceedings before the Board of Education to determine what sanction, if any, to impose upon the licensee," *see* Defs.' Memo at 9—defies practical reality.

*Second*, Defendants' suggestion that, without RSA 193:40, IV, the problem of multiple agency enforcement would be cured also is incorrect.  Even if this Court believes that RSA 193:40, IV's severance would preclude the DOE from making independent violation determinations under the Amendments, multiple agency enforcement would still be a reality, with the number of agencies with independent enforcement power over the Amendments now, at best, reduced from five *to four*: (i) the state courts under RSA 354-A:29-34 and RSA 193:40, III[27], (ii) the DOJ under RSA 354-A:29-34 and RSA 193:40, III[28], (iii) the HRC under RSA 354-A:29-34 and RSA 193:40, III[29], and (iv) the Department of Labor under RSA 354-A:34 given that section's reference to RSA ch. 275-E, which is New Hampshire Whistleblowers' Protection Act.[30]  Defendants' insistence that—even with the removal of RSA 193:40, IV—action can only be taken following a decision by the HRC or the Superior Court, *see* Defs.' Memo. at 8, is inconsistent with the statutory scheme that expressly gives the DOJ and Department of Labor the independent ability to take action under

---

[27] RSA 354-A:34 in the Amendments states that "[a]ny person aggrieved by an act made unlawful under this subdivision may pursue all of the remedies available under RSA 354-A ….," which includes the right to bring an action in Superior Court "at the expiration of 180 days after the timely filing of a complaint with the [Human Rights] commission, or sooner if the commission assents in writing."  *See* RSA 354-A:21-a.  RSA 193:40, III states that "[a]ny person claiming to be aggrieved by a violation of this section, including the attorney general, *may initiate a civil action against a school or school district in superior court for legal or equitable relief* …."  *See* RSA 193:40, III (emphasis added).

[28] The Law Against Discrimination specifically gives the Attorney General the authority to "make, sign, and file [a] complaint" under the Law, which would include a complaint for an alleged violation of the Amendments.  *See* RSA 354-A:21, I(a).  In connection with the filing of a complaint under the Law Against Discrimination, the Attorney General also is "authorized to take proof, issue subpoenas and administer oaths in the manner provided in the civil practice law and rules."  *See* RSA 354-A:21, I(b).  The Amendments' provisions at RSA 193:40, III also state that the Attorney General "may initiate a civil action against a school or school district in superior court for legal or equitable relief" for a violation of RSA 193:40, I.  *See* RSA 193:40, III.

[29] RSA 193:40, III states that "[a]ny person claiming to be aggrieved by a violation of this section … may initiate a civil action against a school or school district … with the New Hampshire commission for human rights as provided in RSA 354-A:34."

[30] The Department of Labor has the authority to investigate and hold hearings on complaints under RSA ch. 275-E.  *See* RSA 275-E:4; RSA 275-E:8.

the Amendments.  Defendants' continued effort to rewrite and narrow the Amendments to limit this enforcement beyond what the legislature envisioned further highlights the law's ambiguity.

*Third*, even with the removal of RSA 193:40, IV, the Amendments would continue to lack a scienter requirement and, thus, could be violated without any purposeful conduct.  Again, as noted above, discovery has borne out the Amendments' lack of a scienter requirement and rebutted Defendants' efforts to rewrite the Amendments in their memorandum.  *See supra* Section I.c.  The Amendments' lack of a scienter requirement is further confirmed by Defendants' own acknowledgment that an educator can violate the law by implication.  *See Local 8027*, 2023 U.S. Dist. LEXIS 5593, at *42 (noting that the Amendments "allow teachers to be sanctioned for speech that advocates a banned concept only by implication"); *Ex. 53 (Depo. Ex. 12)* at PL00431 (AG's Sept. 7, 2021 opinion).  Severing RSA 193:40, IV would do nothing to cure this fatal flaw.

*Fourth*, severing RSA 193:40, IV would do nothing to address the unconstitutional ambiguities with the four banned concepts themselves in the Amendments, including those ambiguities identified by this Court in its January 12, 2023 order.  *See supra* Section I.d.

*Finally*, the Amendments' unconstitutional impact on protected extracurricular speech under the First Amendment would be unaffected by severing RSA 193:40, IV.  This constitutional violation—and its resulting chill—exists independent of how the Amendments are enforced under RSA 193:40, IV.  *See supra* Section II.

### b. The Unconstitutional Provisions of the Amendments Are Integral and Essential to the General Structure of the Amendments.

Severability also is inappropriate here where the Amendments' ambiguity, their lack of a scienter requirement, and their ability to be violated by implication "are so integral and essential in the general structure of the act that they may not be rejected without the result of an entire collapse and destruction of the statute."  *See N.H. Democratic Party*, 174 N.H. at 331.  Here, the

NY 79760467v4
10/03/2023 3:58 PM

Amendments broad proscription—without a scienter limitation—of any "teaching," "instruction," "inculcation," or "compelling to express a belief in, or support for" (*see* RSA 193:40, I; RSA 354-A:31-32), or "advocacy," "training," or "advancement" (*see* RSA 354-A:31-32) of a banned concept are centerpieces of (and vital to) the statutory scheme. *See N.H. Democratic Party*, 174 N.H. at 331 ("We agree with the trial court that 'Form B and the VAD are the centerpieces of SB 3, without which much, if not all, of the legislation ceases to make sense.'"). These flawed prohibitions, the lack of a scienter requirement, and the nebulous language of the four banned concepts permeate and infect the entirety of the Amendments. *See Honeyfund.com*, 622 F. Supp. 3d at 1184 n.13 (holding that the "Court need not confront severability because the unconstitutionally vague 'objectivity' requirement, which governs the entire challenged provision, renders the statute as a whole unconstitutionally vague"); *Pernell*, 641 F. Supp. 3d at 1286 n.62 (same).

Here, it would be impossible to sever these unconstitutional infirmities without radically altering the scope of the statute. Given that one of the Amendments' key infirmities is the *absence* of a scienter requirement, it is unclear how this infirmity could even be resolved without a wholesale rewrite of the law that affirmatively adds material terms that the legislature saw fit to *not* include. Whether to affirmatively add language to the Amendments is a decision for the legislature, not this Court—especially when it is unclear if the legislature would have even enacted the Amendments altogether with a scienter requirement or with clarified "banned concepts." *See Claremont School Dist. v. Governor (Statewide Property Tax Phas-In)*, 144 N.H. 210, 218 (1999) ("While there is a presumption in favor of severability, the principle is not to be applied if it gives a statute meaning the legislature did not intend, either by addition or subtraction from its terms.") (citation omitted); *see also Baird v. Bellotti*, 450 F. Supp. 997, 1005 n.10 (D. Mass. 1978)

42

("Severability is a process of striking out, not of insertion or rewriting."), *aff'd*, 443 U.S. 622 (1979).  This is perhaps why Defendants make no reference to the Amendments' scienter defect in their severability analysis.

It also would make little sense for this Court to sever the four individual banned concepts. They all share the same constitutional infirmities—namely, they seek to suppress disfavored viewpoints, and they are impermissibly vague.  Moreover, the legislature effectively deemed prohibition of all four concepts necessary to achieve its purpose, *see* RSA 354-A:29, I, so judicially picking and choosing among the provisions would undermine the legislature's purpose. Indeed, speculation alone would support the notion that the legislature would have adopted the Amendments in such an "incomplete" form.   And if the four banned concepts were severed, RSA 193:40, II (addressing concepts "as part of a larger course of academic instruction") and RSA 354-A:29, II (addressing "workplace sensitivity trainings") presumably would remain.  As RSA 193:40, II and RSA 354-A:29, II work hand-in-hand with the four banned concepts, these two provisions would make no sense standing alone.

## CONCLUSION

WHEREFORE, Plaintiffs respectfully request that this Court:

A. Deny Defendants' Motion for Summary Judgment (*see* DN 84);

B. Grant Plaintiffs' Motion for Summary Judgement, and enter summary judgment in their favor as to (i) the Fourteenth Amendment's procedural due process claim alleged in Counts I and II of the AFT Action and in Count I of the Mejia Action and (ii) the First Amendment's freedom of speech claim alleged in Count III of the AFT Action given the Amendments' impact on the extracurricular speech of educators (*see* DN 83); and

C. Grant any other relief that is just or equitable.

NY 79760467v4
10/03/2023 3:58 PM

October 3, 2023                                    Respectfully Submitted,


                                                   */s/ Peter J. Perroni*
                                                   Peter J. Perroni, Esq. (N.H. Bar No. 16250)
                                                   NOLAN PERRONI PC
                                                   73 Princeton Street
                                                   North Chelmsford, MA 01863
                                                   Tel.: 978.454.3800
                                                   peter@nolanperroni.com

STROOCK & STROOCK & LAVAN LLP
Charles G. Moerdler, Esq.*
David J. Kahne, Esq.*
Elizabeth Milburn, Esq.*
180 Maiden Lane
New York, New York 10038
Tel.: 212.806.5400
cmoerdler@stroock.com

Daniel J. McNeil, Esq.*
David Strom, Esq.*
American Federation of Teachers
555 New Jersey Ave. NW
Washington DC 20001
Tel.: 202.393.7472
dmcneil@aft.org
dstrom@aft.org

Mark Richard, Esq.*
Phillips, Richard & Rind P.A.
9360 S.W. 72nd Street, Suite 283
Miami, FL 33137
Tel.: 305.412.8322
mrichard@phillipsrichard.com

SELENDY & GAY PLLC
Faith Gay, Esq.*
1290 6th Avenue
New York, NY 10104
(212) 390-9000
fgay@selendygay.com

*Co-Counsel for Local 8027, AFT-New
Hampshire, AFL-CIO, Ryan Richman,*

44

*John Dube and Jocelyn Merrill, teachers in the New Hampshire Public Schools, and Kimberly Green Elliot and Meghan Evelyn Durden parents or guardians of children in the New Hampshire public schools.*

45

*/s/ Gilles R. Bissonnette*
Gilles R. Bissonnette (N.H. Bar. No. 265393)
Henry R. Klementowicz (N.H. Bar No.
   21177)
SangYeob Kim (N.H. Bar No. 266657)
AMERICAN CIVIL LIBERTIES UNION OF NEW
   HAMPSHIRE
18 Low Avenue, Concord, NH  03301
Tel.  603.224.5591
gilles@aclu-nh.org

*/s/ Chris Erchull*
Chris Erchull (N.H. Bar No. 266733)
GLBTQ LEGAL ADVOCATES & DEFENDERS
18 Tremont, Suite 950
Boston, MA 02108
Tel.: 617.426.1350
cerchull@glad.org

Jennifer Eber (N.H. Bar No. 8775)
Kayla Turner (N.H. Bar No. 270167)
DISABILITY RIGHTS CENTER-NEW HAMPSHIRE
64 N Main St, Ste 2
Concord, NH 03301-4913
Tel.: 603.228.0432
JenniferE@drcnh.org
kaylat@drcnh.org

*/s/ Morgan C. Nighan*
Morgan C. Nighan (N.H. Bar No. 21196)
NIXON PEABODY LLP
Exchange Place
53 State Street
Boston, MA  02109-2835
Tel.: 617.345.1031
mnighan@nixonpeabody.com

*/s/ David A. Vicinanzo*
David A. Vicinanzo (N.H. Bar No. 9403)
S. Amy Spencer (N.H. Bar. No. 266617)
NIXON PEABODY LLP
900 Elm Street, 14th Floor
Manchester, NH 03101
Tel.: 603.628.4000
dvicinanzo@nixonpeabody.com
aspencer@nixonpeabody.com

William E. Christie (N.H. Bar No. 11255)
SHAHEEN & GORDON, P.A.
107 Storrs Street
P.O. Box 2703
Concord, NH  03302
Tel.: 603.225.7262
wchristie@shaheengordon.com

Emerson Sykes*
Speech, Privacy, and Technology Project
Leah Watson*
Sarah Hinger*
Racial Justice Program
AMERICAN CIVIL LIBERTIES UNION
   FOUNDATION
125 Broad Street, 18th Floor
New York, NY  10004
Tel.: 212.549.2500
esykes@aclu.org
lwatson@aclu.org
shinger@aclu.org

*Co-counsel for Plaintiffs Andres Mejia and Christina Kim Philibotte*

46

*/s/ Jason Walta*
Alice O'Brien\*
Jason Walta\*
NATIONAL EDUCATION ASSOCIATION
1201 Sixteenth St. NW
Washington, DC 20036
Tel: 202.822.7035
aobrien@nea.org
jwalta@nea.org

Esther K. Dickinson (N.H. Bar No. 20764)
Lauren Snow Chadwick (N.H. Bar No. 20288)
Staff Attorneys
NATIONAL EDUCATION ASSOCIATION-
   NEW HAMPSHIRE
9 South Spring Street
Concord, NH 03301-2425
Tel.: 603.224.7751
edickinson@nhnea.org
lchadwick@nhnea.org

Nathan R. Fennessy (N.H. Bar No. 264672)
PRETI FLAHERTY BELIVEAU & PACHIOS LLP
57 North Main Street
Concord, NH 03301
Tel.: 603.410.1500
rtoland@preti.com

*Co-Counsel for National Education Association-New Hampshire*

\*Admitted *pro hac vice*.

47