# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW HAMPSHIRE

_____
                                                    )
LOCAL, 8027 AFT-NEW HAMPSHIRE,        )
AFL-CIO, et al.,                                    )
                                                    )
        Plaintiffs,                          )
                                                    )
        v.                                      )     Case No. 1:21-cv-1077-PB
                                                    )
FRANK EDELBLUT, in his official         )
capacity only as the Commissioner       )
of the New Hampshire Department        )
of Education, et al.,                             )
                                                    )
        Defendants.                        )
_____)

## MEMORANDUM IN OPPOSITION TO PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT

### Introduction

Following this Court's order on the defendants' motion to dismiss, the plaintiffs conducted months of discovery. Despite this Court's observation that this discovery should be "expedited" and "targeted," ECF Doc. No. 72 at 19:3, the plaintiffs propounded, and the defendants responded to, dozens of interrogatories. The defendants also produced nearly 10,000 pages of documents in response to the plaintiffs' document requests. The plaintiffs deposed numerous state officials, including the Commissioner of the Department of Education and the Executive Director of the Commission for Human Rights. The plaintiffs now move for summary judgment, supported by a 70-page memorandum, arguing that they should prevail in this case based largely on their characterization of the factual record.

The plaintiffs' arguments are unavailing. This is true with respect to their facial vagueness claim for a simple reason: that claim presents, as it always has, a pure question of law.

Determining whether a statute is vague depends on the text of the statute itself, when construed using the normal tools of statutory interpretation. *United States v. Bronstein*, 849 F.3d 1101, 1106 (D.C. Cir. 2017) (a statute "is either susceptible to judicial construction or is void for vagueness based on the application of traditional rules of statutory interpretation"). Courts have consistently rejected efforts, like those made by the plaintiffs here, to prove vagueness through extrinsic materials like deposition testimony, abstract hypotheticals, and affidavits. This Court should do the same.

This Court should instead conclude that RSA 193:40, the only statute the plaintiffs seriously focus on in their briefing, survives even exacting vagueness review. As explained in the defendants' underlying memorandum, this statute, when properly construed, sets forth a sufficiently discernible standard to overcome a facial vagueness claim based on either a lack-of-notice or discriminatory-enforcement theory. The extrinsic materials the plaintiffs rely on do not and cannot change this. The defendants are therefore entitled to summary judgment on the plaintiffs' facial vagueness claim.

But even if the extrinsic materials the plaintiffs rely on were relevant to the vagueness inquiry, they do not show what the plaintiffs say they do. The fact that government officials could not definitively answer in the abstract whether certain books or subjects are banned under RSA 193:40 is not a reflection of the statute's vagueness. It is instead a reflection of imprecise questioning based on the demonstrably incorrect notion that RSA 193:40 categorically bans *any* book or subject from being taught. As the officials deposed in this case consistently (and correctly) testified, context is essential when determining whether a violation of RSA 193:40 has occurred. And the plaintiffs also all but ignore that there is no support in the record for the

contention that RSA 193:40, which has now been effect for more than two years, will be wielded as part of a widespread, politically motivated effort to target teachers.

The AFT plaintiffs' First Amendment claim fares no better. That claim is now limited to extracurricular speech. Extracurricular speech is not entitled to First Amendment protection if it is made pursuant to an employee's official duties. *Garcetti v. Ceballos*, 547 U.S. 410, 420–22 (2006). Whether *Garcetti* applies is a highly fact- and context-specific question that is not susceptible of resolution in the abstract through a facial claim. The AFT plaintiffs ignore this threshold question in their memorandum and skip straight to *Pickering-Connick* balancing. This is fatal to their facial First Amendment claim. The claim would still fail, however, even if *Pickering-Connick* balancing applied. And RSA 193:40 does not violate the overbreadth doctrine, both because it is not substantially overbroad in an absolute sense or relative sense and because, even if it were, it is readily susceptible of a limiting construction.

The plaintiffs' claims accordingly fail as a matter of law, and the Court should grant the defendants' motion for summary judgment and deny the plaintiffs' cross-motion.

**Standard of Review**

"Summary judgment is warranted if the record, construed in the light most flattering to the nonmovant, presents no genuine issue as to any material fact and reflects the movant's entitlement to judgment as a matter of law." *Lawless v. Steward Health Care Sys.*, LLC, 894 F.3d 9, 20–21 (1st Cir. 2018) (citations and quotation marks omitted). When parties file cross-motions for summary judgment, a court must assess "each motion separately, drawing all inferences against each movant in turn." *Id.* (citations and quotation marks omitted). A "pure question of law" is "appropriate for resolution at the summary judgment stage." *Real Legacy Assurance Co. v. Santori Trucking, Inc.*, 560 F. Supp. 2d 143, 146 (D.P.R. 2008)

**Background**

The defendants have summarized the relevant factual and procedural background in their underlying memorandum. As set forth there, the defendants maintain that this case presents questions of law and that to the extent any facts are necessary to resolve those legal questions, they are matters of public record that are subject to judicial notice.

The defendants acknowledge that the plaintiffs have appended a lengthy statement of facts to their cross-motion. The vast majority of the paragraphs in the plaintiffs' statement of facts are direct quotations from deposition transcripts or affidavits, and the defendants do not dispute that these quotations are accurate. But the defendants do dispute that any of this evidence is *material*. *See* LR 56.1(b) ("A memorandum in support of a summary judgment motion shall incorporate a short and concise statement of *material* facts . . . .") (emphasis added). The plaintiffs cite virtually all of these materials in support of their facial vagueness claim. As explained in the defendants' underlying memorandum and below, extrinsic materials like affidavits and deposition testimony do not bear on whether a statute is facially vague. *See* ECF Doc. No. 84-1 at 19–24; *infra* § I.A.

The defendants also dispute how the plaintiffs have characterized much of the deposition testimony they rely on. As set forth below, the plaintiffs' contention that none of the deponents could "explain the meaning of the Amendments," ECF Doc. No. 83-2 at 5; *see id*. at 18, 37, is belied by the record, *see infra* § I.B (citing numerous places in the record that counter this assertion). The defendants also dispute the plaintiffs' suggestion that the deponents "could not agree on who enforces one of the Amendments' key provisions—namely, RSA 193:40," ECF Doc. No. 83-2 at 6, because this is also belied by the record, *see infra* § I.B (citing numerous places in the record to counter this assertion).

It also bears noting that in the more-than-two years since RSA 193:40 has been in effect, only a handful of complaints have been filed with the Commission for Human Rights. *See* ECF Doc. No. 85-7 ("Cohen Depo.") at 36:10 to 37:7.  And of that handful, only one has been docketed and there has not yet been any finding of probable cause, much less a finding of a violation of RSA chapter 354-A. *See id.* 38:11 to 62:20, 77:3 to 78:19, 83:2-9, 88:10-16, 90:3-15. No Board of Education action has yet been initiated against an educator under RSA 193:40, IV. And the deposition testimony makes clear that the order of operations described in the defendants' earlier filings is being followed.

**Discussion**

**I.      The plaintiffs have failed to demonstrate that RSA 193:40 is facially vague.**

"The vagueness doctrine, a derivative of due process, protects against the ills of laws whose 'prohibitions are not clearly defined.'" *Nat'l Org. for Marriage v. McKee*, 649 F.3d 34, 62 (1st Cir. 2011), *abrogated on other grounds by Ams. for Prosperity Found. v. Bonta*, 141 S. Ct. 2373 (2021) (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972)). "A statute is impermissibly vague if it 'fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement.'" *Frese v. Formella*, 53 F.4th 1, 6 (1st Cir. 2022) (quoting *United States v. Williams*, 553 U.S. 285, 304 (2008)). "This creates two avenues by which to attack a vague statute: discriminatory enforcement and lack of notice." *Id.*

The plaintiffs bring a facial vagueness claim. "[F]acial challenges are disfavored because they often rest on speculation, run contrary to the fundamental principle of judicial restraint, and threaten to short circuit the democratic process." *Frese*, 53 F.4th at 7 (citations and quotation

marks omitted). This remains true even of facial challenges that implicate a heightened vagueness standard. *See id.* at 6.

In their underlying memorandum, the defendants have set forth in detail why the plaintiffs' facial vagueness challenge fails as a matter of law. ECF Doc. No. 84-1 at 17–35. The defendants have explained why the standard set forth in *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498 (1982), remains good law, and why the plaintiffs' claim fails under that standard. ECF Doc. No. 84-1 at 17–18. In acknowledgement that this Court has taken a different view of the relevant standard, the defendants have also explained why RSA 193:40 survives even under exacting vagueness review. *Id*. at 18–35. The defendants rely on their memorandum and do not repeat all of these arguments here in full. In short, RSA 193:40, when properly construed using traditional tools of statutory interpretation, sets forth a sufficiently discernible standard of conduct to defeat a facial vagueness claim based on either a lack-of notice or discriminatory-enforcement theory. *See id*.

Though the plaintiffs devote more than 40 pages of their own memorandum to their vagueness challenge, they make little effort to conduct the type of vagueness inquiry reflected in the defendants' memorandum and required by precedent. To the extent the plaintiffs' memorandum contains any statutory construction at all, it is taken from this Court's memorandum and order. *See* ECF Doc. No. 83-2 at 20, 24. This Court previously emphasized, however, that while it had "identified various problems with the vagueness of the statute," it had not "made a definitive ruling and nobody should count their chickens." ECF Doc. No. 72 at 9:14-17. As the defendants have explained in their underlying memorandum, the concerns the Court identified do not render RSA 193:40 vague. ECF Doc. No. 84-1 at 18–35.

Instead, the plaintiffs largely seek to support their vagueness claim through extrinsic materials. The plaintiffs point to ways some teachers and schools have modified their conduct based on RSA 193:40, statements by government officials during deposition testimony, and op-eds written by the Commissioner of the Department of Education as evidence of vagueness. More generally, the plaintiffs pepper their briefing with a series of hypothetical questions, which they fault the defendants for not definitively answering during depositions or through official guidance. *See, e.g.,* ECF Doc. No. 83-2 at 3–4, 9–10, 20, 25, 27, 31, 35, 37. The plaintiffs contend that all of this "confirms" the statutes' vagueness. *Id*. at 4.

The plaintiffs' reliance on these extrinsic materials is misplaced. It is clear from precedent that a vagueness claim turns on an objective assessment of a statute's terms using traditional tools of statutory interpretation, not on extrinsic evidence of how a statute has been applied, what individual government officials may believe a statute means, or what the plaintiffs may subjectively believe the statute prohibits. But even if any of this evidence was relevant, the plaintiffs mischaracterize it or take it out of context. And they all but ignore that enforcement actions under RSA 193:40 have been few and far between, that no Board of Education proceeding has been initiated pursuant to the statute, and that the order of operations described in the defendants' earlier briefing is being followed. The evidence in the record therefore neither can nor does show that RSA 193:40 is vague.

**A.      The extrinsic materials the plaintiffs rely on do not bear on whether the RSA 193:40 is facially vague.**

In their memorandum, the plaintiffs rely in significant part on the deposition testimony of officials from the Commission for Human Rights and the Department of Education. The plaintiffs contend that these officials would not or could not definitively answer questions as to what conduct RSA 193:40 prohibits and how the statute is enforced. *See* ECF Doc. No. 83-2 at

5–6, 37–44. The plaintiffs similarly contend that some of the answers that were provided to these questions were inconsistent with one another. *See id*. The plaintiffs contend that some of the officials' answers also conflicted with official guidance issued with respect to RSA 193:40. *See id*. And the plaintiffs contend that some of the officials professed, either explicitly or implicitly, confusion in relation to what RSA 193:40 prohibits and how the Commission for Human Rights and the Department of Education respectively enforce the statute. *See id*. at 6, 28, 40, 47.

The plaintiffs' characterization of this deposition testimony is not accurate for the reasons stated below. *See infra* Part I.B. But even if it were, none of the testimony bears on whether RSA 193:40 is facially vague. As discussed in the defendants' underlying memorandum, precedent confirms that the vagueness inquiry turns on the text of the statute itself, when construed using the normal tools of statutory interpretation. *See* ECF Doc. No. 84-1 at 19–24 (collecting cases). In keeping with this text-bound inquiry, courts assessing vagueness challenges have consistently declined to rely on deposition testimony or affidavits from government officials concerning how the challenged law applies or is enforced *even when* those officials are tasked with enforcing that law.

For instance, in *Act Now to Stop War and End Racism Coalition and Muslim American Society Freedom Foundation v. District of Columbia* ("*Act Now*"), the D.C. Circuit upheld a city regulation on campaign posters against a facial vagueness challenge despite inconsistent deposition testimony by inspectors tasked with enforcing the regulation. *See* 846 F.3d 391, 412 (D.C. Cir. 2017). The inspectors had testified during their depositions "that they had some leeway to assess" how the regulation applied. 846 F.3d at 412. When questioned about whether the regulation would apply to a specific, real-life 2012 campaign poster, the inspectors "were not unanimous" in their views. *Id.* Some inspectors also testified that they had "difficulty deciding"

how time limitations in the regulation "applied to posters listing multiple events with different dates." *Id.*

The D.C. Circuit observed at the outset that because "speech [was] involved," "rigorous adherence to the requirement of a reasonable degree of clarity [was] necessary to ensure that ambiguity does not chill protected speech." *Id.* at 411 (citation and quotation marks omitted). The D.C. Circuit then construed the language of the challenged regulation using normal tools of interpretation. *See id.* at 411–12. The D.C. Circuit noted that there was "some evidence in this record that" the challenged regulation "is susceptible of inconsistent application." *Id.* at 411. The D.C. Circuit stressed, however, that "[t]he most [this] evidence shows is that" the challenged regulation "might be misapplied in certain cases," not that the regulation "lacks criteria to cabin enforcement discretion." *Id.*

Similarly, in *Keepers, Inc. v. City of Milford*, the plaintiff "sought to substantiate" its facial vagueness challenge to a city ordinance that regulated "adult-oriented establishments" "by developing evidence that City officials interpreted" the challenged regulation "in a manner inconsistent with its plain meaning or in a manner that gave inadequate notice of the conduct proscribed." 807 F.3d 24, 27, 31 (2d Cir. 2015). The plaintiff conducted a Rule 30(b)(6) deposition of the City's former municipal attorney, who "was unable to answer various questions regarding the potential application and interpretation of" the ordinance. *Id.* at 32. When the plaintiff relied on this testimony in a motion for summary judgment, the City supplied an affidavit from its chief of police that "offered additional guidelines regarding the interpretation and enforcement" of the ordinance, "with particular focus on those provisions that [the plaintiff's] motion had identified as vague." *Id.* at 33. In concluding that the ordinance was not vague, the district court relied on both the deposition testimony and the affidavit. *Id.* at 27.

On appeal, the plaintiff argued that the district court erred in considering the affidavit. *Id.* The Second Circuit concluded that any error was, at most, harmless "because excluding the affidavit would not have affected the outcome of the case." *Id.* at 37. The Second Circuit observed that the district court had "concluded that the ordinance was clear on its face without relying on any extrinsic evidence at all." *Id.* The Second Circuit emphasized that "a municipal official's inability to supply precise answers regarding [an ordinance's] hypothetical applications is insufficient to render that ordinance unconstitutionally vague." *Id.* at 37–38.

In *Hills v. Scottsdale Unified School District*, the plaintiff challenged, among other things, a school district policy that prohibited "any flyers of a commercial, political, or religious nature." 329 F.3d 1044, 1046 (9th Cir. 2003). The Ninth Circuit sided with the plaintiff on an as-applied First Amendment challenge. *See id.* But it rejected his facial void-for-vagueness challenge. *See id.* at 1056. The Ninth Circuit concluded that the policy was sufficiently clear that "persons of ordinary intelligence can determine what is prohibited." *Id.* It reached this conclusion even though school district officials "did vary somewhat in their deposition testimony as to what would be excluded under the policy." *Id.* The Ninth Circuit emphasized "that there might be some close cases or difficult decisions does not render a policy unconstitutionally vague." *Id.*

In *United States v. Lachman*, three defendants charged with and convicted of violating the Export Administration Act of 1979 ("EAA") successfully moved for acquittal notwithstanding the verdict on the ground that the one of the EAA's implementing regulations was unconstitutionally vague. 387 F.3d 42, 44 (1st Cir. 2004). During post-trial briefing, the defendants had supplied, among other things, affidavits suggesting that "Commerce officials within the agency internally gave the [challenged language] a contrary interpretation and

affidavits as to statements made by Commerce officials at industry seminars also suggesting a contrary interpretation." *Id.* at 54. Based in part on these affidavits, the district court had concluded that "Commerce had employed a number of competing interpretations of" the challenged language and "bore the responsibility to settle on one interpretation of the term." *Id.* at 48 (citation and quotation marks omitted).

In vacating the judgment of acquittal, the First Circuit emphasized that "[t]he views of Commerce officials are simply irrelevant to [the court's] interpretative task." *Id.* at 54. The First Circuit observed that, while an agency's interpretation of a law may inform a court's analysis when "reflected in public documents," *id.* at 54, "[t]he non-public or informal understandings of agency officials concerning the meaning of a [law] are . . . not relevant," *id.* The First Circuit further stressed that "[t]he mere fact that . . . various public government statements also noted that the [challenged term] was 'confusing' and 'ambiguous' also creates no issue of Due Process." *Id.* at 59 n.18. The First Circuit concluded that the challenged regulation was not vague by construing the regulation's text. *Id.* at 56–59.

These decisions all demonstrate that the plaintiffs' reliance on the deposition testimony of Commission for Human Rights and Department of Education officials misses the mark. Even if the plaintiffs had accurately characterized that testimony, the testimony itself does not (and cannot) change the language of the statute. The testimony of agency officials in litigation as to how a statute applies or is enforced is not the type of official agency interpretation that courts might consider when construing ambiguous statutory language. *Cf. id.* at 54. As set forth in the defendants' underlying memorandum, the statutory language here, when properly construed, sets forth a sufficiently discernible standard to survive even exacting vagueness review. That is the start and end of the vagueness analysis. *See United States v. Bronstein*, 849 F.3d 1101, 1106

(D.C. Cir. 2017) (a statute "is either susceptible to judicial construction or is void for vagueness based on the application of traditional rules of statutory interpretation").

The plaintiffs' reliance on two op-eds that the Commissioner of the Department of Education published is unavailing for similar reasons. For the most part, the plaintiffs appear to cite these op-eds for some perceived rhetorical value.[1] Regardless, the plaintiffs cite no support for the proposition that an op-ed is somehow bestowed with interpretive value simply because it is penned by a government official. Defense counsel have been unable to find any instance of the New Hampshire Supreme Court referring to (let alone relying on) an op-ed when construing a statute. Under circuit precedent, "informal understandings of agency officials concerning the meaning of a regulation" are "not relevant." *Lachman*, 387 F.3d at 54. This is true even of public statements "made by government officials at industry seminars," because they are "not the kind of formal agency statements that are entitled to deference." *Id.* at 54–55. The plaintiffs' reliance on the Commissioner's op-eds is therefore also misplaced.

In related vein, the plaintiffs contend that the defendants' alleged refusal to answer a series of hypotheticals posed during depositions or raised rhetorically in this litigation proves the plaintiffs' vagueness claim. Again, the plaintiffs are mistaken. "[W]ords are rough-hewn tools, not surgically precise instruments." *Draper v. Healey*, 827 F.3d 1, 4 (1st Cir. 2016) (*Souter*, J.) (cleaned up). "[W]hile there is little doubt that imagination can conjure up hypothetical cases in which the meaning of [a challenged statute] will be in nice question," courts are "condemned to

---

[1] For instance, the plaintiffs frequently cite the op-eds in an apparent attempt to undermine the deposition testimony of the Commissioner and other state officials. It is unclear, as a substantive matter, what the plaintiffs think this gains them. Even if the deposition testimony and the op-eds were relevant to the vagueness inquiry—and they are not—then all the plaintiffs would have accomplished is to create weight and credibility issues that would render summary judgment inappropriate. *See Xiaoyan Tang v. Citizens Bank, N.A.*, 821 F.3d 206, 216–17 (1st Cir. 2016).

the use of words" and "can never expect mathematical certainty from our language." *Hill v. Colorado*, 530 U.S. 703, 733 (2000) (citations and quotation marks omitted).

Courts have rejected the sort of proof-by-hypothetical argument the plaintiffs advance here. In *Platt v. Board of Commissioners on Grievances & Discipline of the Ohio Supreme Court*, the plaintiff brought, among other things, a vagueness challenge to fundraising and advocacy limitations in the Ohio Code of Judicial Conduct on persons seeking judicial office. 894 F.3d 235, 241 (6th Cir. 2018). During discovery, the plaintiff had propounded interrogatories on the defendant raising a series of hypotheticals as to how the challenged limitations applied. *See id.* at 247–52. The defendant repeatedly responded that "a violation of the Ohio Code of Judicial Conduct would be evaluated on a case-by-case basis." *See*, *e.g.*, *id.* at 248. The plaintiff argued that these responses admitted that the challenged provisions were vague, because "the individuals responsible for the adoption, enforcement and/or interpretation of such rules could not declare whether certain conduct is prohibited *vel non* under the pertinent rule." *Id.*

The Sixth Circuit flatly rejected this argument. While the court acknowledged that "[h]ypotheticals are a favorite tool of those bringing vagueness challenges," it stressed that it was "obvious" that "almost any criminal or civil prohibition is susceptible to clever hypotheticals testing its reach." *Id.* at 251. The court noted that "[a]ny law student, intimately familiar with the classic 'issue-spotter' exam, knows this well." *Id.* The court observed that "[t]he very point of a well-crafted exam is to test the student's ability to apply a given law or set of laws to novel facts, and the very sharpest students will often come to different bottom-line conclusions: Did Terry TaxEvader violate the Internal Revenue Code? Maybe so. But then again—maybe not." *Id.* The court reasoned that, short of proving vagueness, the defendant's "case-by-case basis refrain" "only illustrates the inadvisability of trying to provide definitive answers to incomplete and ill-

defined factual scenarios." *Id.* at 249. The court noted that "specific facts, including the precise words the candidate uses and the audience to whom he or she is speaking, would determine whether the candidate has moved from permissible discussion on contentious legal or political subjects to prohibited advocacy for a specific candidate." *Id.* at 250. The court emphasized that "a rule is not unconstitutionally vague because a plaintiff presents a tough hypothetical." *Id.* (citation and quotation marks omitted).

The Ninth Circuit recently reached a similar conclusion in *Hernandez v. City of Phoenix*, 43 F.4th 966 (9th Cir. 2022). The plaintiffs there challenged a police department policy governing its employees' use of social media. *Id.* at 972. "In advancing their facial vagueness challenge, plaintiffs rel[ied] heavily on deposition testimony" from a former police officer "who was charged with supervising investigation into alleged violations of the Department's social media policy." *Id.* at 983. When "asked to opine on whether hypothetical social media posts addressing hot-button political issues, such as abortion, would run afoul of the policy," the officer "could not give definitive opinions" and "explain[ed] that in most instances he would need additional contextual information to make an informed judgment." *Id.* The Ninth Circuit emphasized that, "[r]ather than demonstrating the facial invalidity of the Department's policy," the officer's "answers merely reflect the fact that deciding whether any given social media post violates the policy involves a heavily fact- and context-dependent exercise that often cannot be performed with only the bare content of a hypothetical post." *Id.* The Ninth Circuit rejected the plaintiffs' facial vagueness claim based the language of the challenged policy, notwithstanding the officer's testimony. *Id.* at 982–83.

It bears noting that each of these cases involved the regulation of speech, which triggers heightened vagueness review. *See Frese*, 53 F.4th at 6.[2] Yet in each case the court conducted its vagueness analysis based on the language of the challenged provision. Each court rejected the notion that a government official's inability to answer hypothetical questions to a plaintiff's satisfaction demonstrates vagueness. This Court should do the same.

Finally, the plaintiffs append affidavits to their cross-motion reflecting that some teachers and schools have altered their curriculums or stopped teaching certain books due to the enactment of RSA 193:40. *See*, *e.g.*, ECF Doc. No. 85-13 ¶¶ 15–19; ECF Doc. No. 85-15 ¶ 12; ECF Doc. No. 85-16 ¶ 16. The plaintiffs also attach affidavits in which teachers express confusion over what RSA 193:40 proscribes. *See*, *e.g.*, ECF Doc. No. 85-13 ¶ 19; ECF Doc. No. 85-12 ¶ 13–19. The plaintiffs contend that these affidavits show that the RSA 193:40 does not provide sufficient notice of the conduct they prohibit. *See* ECF Doc. No. 83-2 at 25–26. This argument, too, is unavailing.

"In any system that relies on the administration of laws of general applicability in many different circumstances, some degree of ambiguity is all but inevitable." *Act Now*, 846 F.3d at 411. "[A] term is not rendered unconstitutionally vague because it does not mean the same thing to all people, all the time, everywhere." *Bronstein*, 849 F.3d at 1107 (cleaned up)). Indeed, "the law is full of instances where a man's fate depends on his estimating rightly . . . some matter of degree." *Johnson v. United States*, 576 U.S. 591, 604 (2015) (citations and quotations omitted). Accordingly, "[t]he determination whether a . . . statute provides fair warning of its prohibitions must be made on the basis of the statute itself and other pertinent law, rather than on the basis of an ad hoc appraisal of the subjective expectations of particular" persons or entities subject to the

---

[2] Indeed, in *Hernandez*, the Ninth Circuit reversed the dismissal the plaintiff's First Amendment retaliation claim. *See* 43 F.4th at 973.

statute. *Bouie v. City of Columbia*, 378 U.S. 347, 355 n.5 (1964). Thus, the fact that certain teachers and schools have made judgment calls when determining how to comply with RSA 193:40 does not mean that the statute is vague.

In sum, the plaintiffs cannot prove their facial vagueness claim through extrinsic materials like deposition testimony, op-eds, affidavits, or hypotheticals. The Court should reject their effort to do so.

**B.      Even if extrinsic evidence were relevant, the plaintiffs mischaracterize the record.**

For the reasons already discussed, the plaintiffs' effort to inject factual issues into their facial attack is inappropriate because the facial validity of RSA 193:40 is a pure question of law. But even if it were appropriate to inject factual argument into this case, the plaintiffs have mischaracterized the record here.

According to the plaintiffs, "the developed record confirms this Court's reading of the text of the law and its vagueness." *See* ECF Doc. No. 83-2 at 4. They say this is so because "[n]one of the[ ] [defendants'] witnesses could explain the meaning of the Amendments or how they will be enforced." *Id*. at 5. This is clearly contradicted by the record, and the fact that witness answers may not have been what the plaintiffs were fishing for does not give the plaintiffs license to disregard those answers because they do not help their case.

The crux of the plaintiffs' suggestion that none of the witnesses could "explain the meaning of the Amendments" is that the witnesses "repeatedly declined at deposition to answer basic questions on whether specific course instruction or content would be covered under the Amendments' prohibitions." ECF Doc. No. 83-2 at 5; *see id*. at 18, 37. As noted above, though, these so-called "basic questions" that the plaintiffs say the witnesses "failed to answer" were a litany of hypotheticals about whether teachers violate the antidiscrimination provisions by

simply exposing students to certain content or ideas. *See, e.g.*, *id*. at 37 (asserting that "[w]hen

asked at deposition about whether the _teaching_ of specific books would be covered under RSA

193:40's four prohibitions, Commissioner Edelblut declined to give direct answers") (emphasis

in original); *id*. at 38 (asserting that Commissioner Edelblut "declin[ed] to give direct answers

regarding teaching specific content"); *id*. at 40 (asserting that Investigator Farrell and Attorney

Fenton "punted similar questions about whether the teaching of specific texts would be

covered"); *accord* ECF Doc. No. 85-3 ("Edelblut Depo.") at 64:15-16 ("Would teaching the

subject of affirmative action violate HB 2 under that hypothesis?"); *id*. at 64:20-21 ("Affirmative

Action is a wonderful thing now. Is that good?"); *id*. at 65:12-15 ("Would a teacher saying we

need to have more affirmative action because it is a good thing be raised to the level of concern

under HB 2?"); *id*. at 76:15-21 ("Would you have any concern if a teacher said I'd like you as an

extracurricular activity to read any one of the following books: Stamped, Kendi's How to Be an

Antiracist, or the book that I mentioned earlier, A Good King of Trouble. Would you have any

problem with that?  Read any one of those books in your free time."); *id*. at 156:16-18 ("My

question is would a teacher if they taught that underlined language be teaching a banned concept

under the statute?").[3]

---

[3] Aside from the plaintiffs' having materially mischaracterized witness responses to these abstract
hypothetical questions as discussed herein, it is simply inappropriate in a facial vagueness challenge for
the plaintiffs to offer up a record of deponent responses to questions about how the law may apply in
undeveloped hypothetical circumstances that are not before the Court. *See Hill*, 530 U.S. at 733
(explaining that "speculation about possible vagueness in hypothetical situations not before the Court will
not support a facial attack on a statute when it is surely valid in the vast majority of its intended
applications") (internal quotation omitted); *accord Hernandez*, 541 F. Supp. 3d at 1002 (citing *Hill* and
explaining that "circumstances where deponents randomly provide equivocal responses to hypotheticals
concerning the Policy's application does not aid Plaintiff's due process claim" as the hypotheticals "rest
on speculative events and reactions" and "[c]onsequently, they raise the risk of premature interpretation
of policies on the basis of factually barebones records") (internal brackets and quotations omitted); *Am.
Ass'n of People with Disabilities v. Herrera*, No. CIV 08-0702 JB/WDS, 2010 U.S. Dist. LEXIS 89607,
at *34 (D.N.M. July 28, 2010) (explaining that "[t]he officials' opinions on hypothetical situations in
which they think the statute might apply does not dilute [the statute's] plain meaning and intended
application").

This line of questioning embeds a faulty premise that the plaintiffs continue to assert in this litigation: the notion that RSA 193:40 somehow categorically bans certain books or subjects from being taught. Though the plaintiffs clearly see some rhetorical value in continuing to make this assertion, it is wrong. Nothing in RSA 193:40 (or any of the other antidiscrimination provisions) purports to categorically ban any book or subject from being taught. Indeed, there is express statutory language dispelling this notion. *See* RSA 193:40, II ("Nothing in this section shall be construed to prohibit discussing, as part of a larger course of academic instruction, the historical existence of ideas and subjects identified in this section."). For their part, the Department of Justice, Department of Education, and Commission for Human Rights have been steadfast in their position that context matters when determining whether a violation of RSA 193:40 has occurred. *See*, *e.g.*, ECF Doc. No. 36-8 at 1–2, ECF Doc. No. 36-9 at 1–2; ECF Doc. No. 36-10. That officials cannot give concrete answers when asked "is [x book] banned under the statute?" is not evidence of a vague statute, but rather of an imprecise or ill-defined question. *Platt*, 894 F.3d at 249 (observing that the defendant's "case-by-case basis refrain" "only illustrates the inadvisability of trying to provide definitive answers to incomplete and ill-defined factual scenarios").

It should hardly be surprising, then, that Commissioner Edelblut responded to the plaintiffs' hypotheticals about topics like affirmative action and books such as *Stamped*, *How to be an Anti-Racist*, and *A Good Kind of Trouble* by making it clear that neither RSA 193:40 nor any other provision works a blanket prohibition on this content. Instead, as Commissioner Edelblut repeatedly testified, the question is whether a teacher has endeavored to teach a student to "express belief in or support for" certain ideas. *See* Edelblut Depo. 62:15-21 ("So with all due respect, content is not the subject of the purported HB 2 or 193:40. The activities, as I understand

the law, you know, no pupil in any public school in this state shall be taught, instructed, inculcated, or compelled *to express belief in or support* for one or more of the following.") (emphasis added); *id*. at 65:16-22 ("I would need to have more context than the simple statement that you provided to me. Is the context of the totality of the pedagogical instruction one that teaches, instructs, inculcates, compels, *express belief in or support for* that one's race is inherently superior.") (emphasis added); *id*. at 75:2-4 ("So the teacher themselves would be in the best position to know if they are teaching, instructing, inculcating or compelling *to express belief in or support for* any one or more of the following") (emphasis added); *id*. at 76:6-12 ("It would depend on what that discussion is, and I would go back to the statute, and I would say that the educator themselves would have clarity if they are teaching, instructing, inculcating or compelling *to express a belief in or support for* one or more of these following things.") (emphasis added); *id*. at 167:16-19 ("I would say are you teaching, inculcating, or are you compelling *to express belief in or support for* any one or more of the following.") (emphasis added); *id*. at 168:16 to 169:4 ("So I think I've made that clear that content is not what falls under the RSA 193:40. Behavior and how we treat other people including instructing, teaching, inculcating or compelling *to express belief in or support for*, the fact of inherent superiority, inherently racist, receive adverse treatment solely because of these immutable characteristics or they cannot and should not attempt to treat others without regard to these immutable characteristics. *So I think that I've asked and answered that several times now*.") (emphasis added).

And as Commissioner Edelblut testified time and again, whether a teacher has endeavored to teach a student to "express belief in or support for" an idea depends on context that the plaintiffs' purely content-based and abstract hypotheticals lacked entirely. *See* Edelblut

Depo. 55:5-7 (explaining that "[t]his particular email is dealing with content, and it's not dealing with educator actions per se"); *id*. at 61:8-12 (answering question about whether books such as *A Good Kind of Trouble* "raise[ ] concerns within the parameters of HB 2" by stating: "So again, like the previous example, I'm not sure I understand the nexus between specific content and as I understand RSA 193:40 which talks about, you know, teaching and instruction and so on."); *id*. at 72:1 ("I would need to see it in its complete context."); *id*. at 73:4 ("I don't believe that I would ever be faced with a set of circumstances that are limited to one sentence our of context."); *id*. at 76:1-2 ("So it would depend on the context of how that material was used in the class."); *id*. at 76:6-7 ("It would depend on what that discussion is . . . ."); *id*. at 154:16-20 ("I think it would depend upon the context of the instruction. The content itself of Exhibit 50, again, content being neutral, it's what you do with that content."); *id*. at 157:16-20 ("You have to have the full context of what is being discussed. . . . You're constructing a hypothetical with one sentence and that's not how instruction takes place."); *id*. at 158:15-16 ("So what I say is I don't have any instruction in New Hampshire that is one sentence long."); *id*. at 163:18 to 164:7 (It's not content specific. So the [educator] should not be asking what is the content but what is the context of the instruction that I'm providing to students."); *id*. at 172:3-10 ("I would have to see how it's being used in this context. When you say 'if I taught that,' there is not a content standard. There is an activity standard. So I would have to see it in this context, and again, I think that the best person to know if they're violating these statutes really are the individuals who are actually doing the teaching.").

  To illustrate the meaning of the antidiscrimination provisions, when the plaintiffs asked Commissioner Edelblut whether teachers could say they agree with Ibram X. Kendi's thinking on remedying discrimination with discrimination, Commissioner Edelblut clearly explained that

teachers are free to expose students to Kendi's thinking and to tell students that they agree with Kendi "as a rhetorical device to stimulate conversation among students."[4] *Id*. at 75:2-4; *accord id*. at 70:5-8 ("Again, depending on how the teacher was teaching content. Content itself. Ibram Kendi's material itself *is not* the subject as I understand it to 193:40."); *id*. at 71:1-5 ("[E]ven if a teacher were to focus on the book, the question would be you need the broader context. How is it that the teacher is focusing on that particular passage."). Commissioner Edelblut similarly testified that the antidiscrimination provisions do not prohibit a teacher from saying to students: "We need to have more affirmative action because it is a good thing." *See id*. at 65:11 to 66:5. As Commissioner Edelblut thoughtfully explained, "I would need to have more context than the simple statement that you provided to me. Is the context of the totality of the pedagogical instruction one that teaches, instructs, inculcates, compels, *express belief in or support for* that one's race is inherently superior. . . . So I would need to have more context to understand the actions of the educator." *Id*. at 65:16 to 66:5. The record is accordingly clear that rather than having declined to answer the plaintiffs' so-called "basic questions on whether specific course instruction or content would be covered under the Amendments' prohibitions," Commissioner Edelblut answered those questions and told them no.

The plaintiffs likewise mischaracterize that Commission for Human Rights Assistant Director Cohen was asked "similar questions" about "what specific content would be covered" that she "did not answer directly." ECF Doc. No. 83-2 at 38 (citing Cohen Depo. 93:7 to 94:19). The plaintiffs' cited question to Assistant Director Cohen did not concern "specific content." To

---

[4] Pointing to the Supreme Court's decision in *Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589 (1967), the plaintiffs observe that "there are many reasons why an instructor might 'teach,' 'advocate,' or 'advance' a particular viewpoint during class, including simply as a means of prompting students to take it seriously, to contest it, to debate it, or to think critically about it." ECF Doc. No. 83-2 at 21. Despite this testimony of Commissioner Edelblut (which the plaintiffs make no mention of), the plaintiffs then assert that "it is entirely unclear whether the Amendments permit such traditional forms of teaching, and Defendants' continuing refusal to clarify the law only exacerbates this reality." *Id*.

the contrary, the plaintiffs' asked Assistant Director Cohen generally about whether teachers would "be able to get an answer from the Human Rights Commission as to whether or not teaching that [unspecified] book would be covered under the law." Cohen Depo. at 93:7-13. In response to that very abstract question, Assistant Director Cohen provided a concrete answer that echoed Commissioner Edelblut's testimony: "In my personal opinion, there's a lot more to, as you may know or may not know, when you're teaching a there's a lot more to whether you're teaching a book or not teaching a book and what goes along with that course. It's a complicated question *because you have to look at the context of things*. Are you mentioning the book?  I mean, there's a lot to it." *Id*. at 93:15-23 (emphasis added). In so testifying, Assistant Director Cohen similarly expressed that the antidiscrimination provisions prohibit subjective advocacy for certain content, not simply teaching about that content.

With respect to Investigator Farrell and Attorney Fenton, the plaintiffs represent that they "punted similar questions about whether the teaching of specific texts would be covered" to other individuals. ECF Doc. No. 83-2 at 40 (citing ECF Doc. No. 85-5 ("Farrell Depo.") 149:8 to 150:19, 166:7-167:3; ECF Doc. No. 85-4 ("Fenton Depo.") 105:10 to 106:2). But like the question to Assistant Director Cohen, the questions posed to Investigator Farrell had nothing to do with "the teaching of specific texts." Rather, the plaintiffs generally asked Investigator Farrell if a teacher could call the Department of Education to "get an answer as to whether a book is covered or not," Farrell Depo. 149:8-11, and about "how" teachers could seek answers about whether a book was "covered or not," *id*. at 166:10-11. And the question they cite with respect to Attorney Fenton generally concerned whether teachers would get "clear guidance" about unspecified circumstances if they reached out to Attorney Fenton personally. Fenton Depo. 105:10-13. Thus, again contrary to the plaintiffs' representations, neither Investigator Farrell nor

Attorney Fenton declined to answer "basic questions on whether specific course instruction or content would be covered under the Amendments' prohibitions."

The plaintiffs also mischaracterize the record testimony in asserting that the defendants' witnesses "could not agree on who enforces one of the Amendments' key provisions—namely, RSA 193:40." ECF Doc. No. 83-2 at 6. According to the plaintiffs, "the DOE repeatedly pointed the finger at the HRC as the enforcer of RSA 193:40." *Id*. at 7 (citing Edelblut Depo. 65:8-10; Fenton Depo. 105:10 to 106:2; Farrell Depo 39:18-20). The record does not support this.

Rather, in testifying that the Commission for Human Rights adjudicates whether a violation of the antidiscrimination provisions occurred, *see* Edelblut Depo. 65:8-10, Commissioner Edelblut simply referred to the underlying statutory enforcement scheme (*i.e.*, the order of operations) whereby the Department of Education does not commence a disciplinary proceeding against an educator under RSA 193:40 until after Commission for Human Rights has issued a final determination that the educator's school or school district violated the antidiscrimination provisions. *See* ECF Doc. No. 36-1 at 9–10; ECF Doc. No. 48 at 2–3. Attorney Fenton's testimony that she believes "HB 2 is very clear that any matters falling within HB 2 are to be handled by the Human Rights Commission," Fenton Depo. 105:19-21, and Investigator Farrell's similar testimony that Department of Education officials "only [ ] involve ourselves after the Human Rights Commission process is over," Farrell Depo 39:18-20, merely refer to that enforcement scheme too.

### C.    The record dispels the plaintiffs' suggestions of widespread, politically motivated enforcement against teachers.

Throughout this litigation, the plaintiffs have repeatedly raised the specter of a widespread, politically motivated effort to wield RSA 193:40 to target teachers. That neither

plaintiff group sought a preliminary injunction suggests that this was more rhetoric than an actual, demonstrable concern. The record bears this out.

The antidiscrimination provisions have been in effect since June 25, 2021. HB2 0005. During that time, only a handful of complaints have been filed with the Commission for Human Rights, *see* Cohen Depo. 36:10 to 37:7, and none have been filed in superior court. The Commission for Human Rights has screened out most of the complaints that have been filed without docketing them, as they were patently frivolous or meritless. *See id.* at 77:3 to 78:19, 83:2-9, 88:10-16, 90:3-15. Only one complaint has been docketed, and none has yet resulted in a finding of probable cause, much less a violation of RSA chapter 354-A. *See id.* at 38:11 to 62:20 (testimony regarding only docketed complaint).

No Board of Education action has yet been initiated against an educator under RSA 193:40, IV. Rather, the deposition testimony makes clear that the order of operations described in the defendants' earlier filings is being followed.  In other words, in the more than two years that RSA 193:40 has been in effect, no teacher has faced the loss of their credentials under the statute.

Unsurprisingly, the plaintiffs barely mention any of this in their memorandum. They instead contend that the Commissioner of the Department of Education is not following state law by deferring to the Commission for Human Rights in the first instance. *See* ECF Doc. No. 83-2 at 39–40. But this is not for the plaintiffs or this Court to decide. The defendants maintain that the order of operations described in their earlier briefing is supported by the language and purpose of the statute. It is clear that the Attorney General possesses the authority to "exercise a general supervision over the state departments, commissions, boards, bureaus, and officers, to the end that they perform their duties according to law." *See* RSA 7:8; *see also New Hampshire v. United*

*States Dep't of Educ.*, No. 01-cv-346-M, 2022 U.S. Dist. LEXIS 9936, at *9 (D.N.H., May 16, 2022) ("Certainly, the Attorney General possesses all the authority necessary to resolve intramural legal disputes among executive agencies."). And "a claim that state officials violated state law in carrying out their official responsibilities is a claim against the State that is protected by the Eleventh Amendment." *Lopez v. Massachusetts*, 588 F.3d 69, 73 (1st Cir. 2009) (cleaned up). The plaintiffs cannot simultaneously insist that evidence of how the antidiscrimination provisions are enforced is relevant to their vagueness claim and ignore what that evidence actually shows.

In the end, whether RSA 193:40 is facially vague rises and falls with the statutory text. *Bronstein*, 849 F.3d at 1106 (a statute "is either susceptible to judicial construction or is void for vagueness based on the application of traditional rules of statutory interpretation"). But it bears emphasizing that even if the factual record here were relevant, it does not support the plaintiffs' narrative. Rather, it shows that much of the rhetoric in the plaintiffs' pleadings has proven to be unfounded.

## II.     The AFT plaintiffs have failed to demonstrate that RSA 193:40 is unconstitutional as applied to extracurricular speech.

In light of this Court's memorandum and order, the AFT plaintiffs' First Amendment claim survives only as it relates to extracurricular speech. ECF Doc. No. 63 at 16–17. The AFT plaintiffs argue that they are entitled to summary judgment on this claim under the *Pickering-Connick* framework and the overbreadth doctrine. *See* ECF Doc. No. 83-2 at 57–70. For the following reasons, neither argument has merit.

### A.     *Pickering-Connick*

The AFT plaintiffs premise their *Pickering-Connick* argument on a non-sequitur. They contend that mere fact that RSA 193:40 may reach extracurricular speech necessarily means that

it "restrict[s] New Hampshire public school teachers' private, protected First Amendment speech." ECF Doc. No. 83-2 at 58. But this argument begs a threshold question: whether any extracurricular speech the statute reaches is entitled to First Amendment protection at all. The AFT plaintiffs do not attempt to answer this question.

The defendants have addressed this issue in their underlying memorandum. ECF Doc. No. 84-1 at 11–15. As discussed there, the defendants respectfully disagree with the notion that the Supreme Court's holding in *Garcetti*, is categorically inapplicable to extracurricular speech. *Id*. Rather, precedents from the Supreme Court, First Circuit, and other federal courts of appeals demonstrate that whether a public employee is speaking "pursuant to their official duties" under *Garcetti* is a highly fact- and context-specific question. *See id*. (collecting cases). This question is not susceptible of prospective, blanket resolution through a facial First Amendment challenge, and instead must be assessed through an as-applied challenge presenting the necessary facts and contexts. *See id*.

The Supreme Court's recent decision in *Kennedy v. Bremerton School District*, 142 S. Ct. 2407 (2022)—which the AFT plaintiffs heavily rely on in their memorandum—illustrates this point. Notably, that case arose in the context of an as-applied challenge. And the conduct at issue occurred during an extracurricular activity: a high school football game. *See id.* at 2415. Yet the Supreme Court did not suggest that this fact, standing alone, rendered *Garcetti* inapplicable. To the contrary, the Court noted that "the parties' disagreement" turned on "one question alone: Did Mr. Kennedy offer his prayers in his capacity as a private citizen, or did they amount to government speech attributable to the District?" *Id.* at 2424. To answer this question, the Court turned to the context- and fact-specific considerations highlighted in *Garcetti* and *Lane v. Franks*, 573 U.S. 228 (2014). *See Kennedy*, 142 S. Ct. at 2424. Looking to "both the substance of

Mr. Kennedy's speech and the circumstances surrounding it," the Court concluded that he did not "offer[] his prayers while acting within the scope of his duties as a coach." *Id.* at 2425. Only then did it proceed to *Pickering-Connick* balancing. *See id.* at 2425.

The AFT plaintiffs nonetheless suggest that their First Amendment claim triggers "a more exacting *Pickering* analysis" under *United States v. National Treasury Employees Union*, 513 U.S. 454 (1995) ("*NTEU*"). ECF Doc. No. 83-2 at 59. This suggestion embeds the same non-sequitur that exists in the AFT plaintiffs' overall argument. "*Garcetti* has clarified and expanded on the earlier law." *Curran v. Cousins*, 509 F.3d 36, 44 (1st Cir. 2007). "The *Garcetti* Court clarified the 'citizen' prong of the analysis, defining when a public employee speaks as a citizen rather than as an employee." *Lindsey v. City of Orrick*, 491 F.3d 892, 897 (8th Cir. 2007). In the wake of *Garcetti*, courts must answer this threshold question before proceeding to *Pickering-Connick* balancing.

*NTEU* predates *Garcetti* by more than a decade, and therefore did not benefit from *Garcetti*'s refinements to the legal landscape. Accordingly, the Court in *NTEU* did not conduct any meaningful analysis of whether the law in question there, which "prohibit[ed] federal employees from accepting compensation for making speeches or writing articles," *NTEU*, 513 U.S. at 457, reached at least some speech that was not entitled to First Amendment protection at all because it was made pursuant to the employees' official duties. To the extent the Court touched on this question at all, it was in a single passing sentence. *See NTEU*, 513 U.S. at 465 ("[The plaintiffs] seek compensation for their expressive activities in their capacity as citizens, not as Government employees.").

*NTEU* must therefore be read in light of *Garcetti*, not despite it. *Garcetti* dictates that before a court can proceed to *Pickering-Connick* balancing, it must first determine whether the

speech at issue was made pursuant to a person's official duties. *See Garcetti*, 547 U.S. at 419–20.

This determination, as discussed above and in the defendants' underlying memorandum, is

highly fact- and context-specific.

      To the extent the AFT plaintiffs do give examples of extracurricular speech that they

believe is subject to the provisions, these examples do not supply the necessary context to

determine whether *Garcetti* applies. The AFT plaintiffs contend, for instance, that the provisions

"restrict speech at sporting events, bus rides to and from events, chess competitions, yearbook

club meetings, newspaper meeting discussions, orchestra rehearsals, and all spontaneous run-ins

between students and teachers outside the classroom and in the halls of the school." ECF Doc.

No. 83-2 at 61. They further contend that the provisions "cover off-campus, non-instructional

interactions with students, often without pay and frequently in response to searching questions, at

student-led initiatives such as the Young Republicans Club, the Gay-Straight Alliance, and

Students for Racial Justice." *Id*. But as the defendants explained in their underlying

memorandum:

> The type of speech that is ordinarily within the scope of a debate coach's duties,
> for example, may well be very different from the type of speech that is ordinarily
> within the scope of the coach of the robotics club, the marching band director, or
> the track-and-field coach. The speech ordinarily within the duties of a teacher
> bringing an after-school group to an art museum may be different from the speech
> ordinarily within the duties of a teacher bringing that same group to a history
> museum. Moreover, *Garcetti* makes clear that even general categories like job
> titles are not dispositive; rather, a court must assess "the duties an employee
> *actually* is expected to perform." 547 U.S. at 424–25 (emphasis added).

ECF Doc. No. 84-1 at 15. The mere fact that the provisions may be read to reach different

extracurricular activities does not mean that any speech made during those activities necessarily

falls beyond *Garcetti*'s reach.

If, however, the Court does conclude that *Pickering-Connick* balancing can be applied prospectively and in the abstract in the context of a facial claim, thee AFT plaintiffs still have not met their burden under that framework. When applying *Pickering-Connick*, courts "attempt to balance the value of an employee's speech—both the employee's own interests and the public's interest in the information the employee seeks to impart—against the employer's legitimate government interest in preventing unnecessary disruptions and inefficiencies in carrying out its public service mission." *Bruce v. Worcester Reg'l Transit Auth.*, 34 F.4th 129, 138 (1st Cir. 2022) (cleaned up). Courts consider "(1) the time, place and manner of the employee's speech, and (2) the employer's motivation in making the adverse employment decision." *Id.* (citations and quotation marks omitted). "If, in considering these factors, [a court] determine[s] that the employee faced only those speech restrictions that are necessary for his employer to operate efficiently and effectively, then the defendants' restrictions on speech were adequately justified." *Id.* (cleaned up).

RSA 198:40 prohibits teachers from conveying four categories of information to students. Under the first category, a teacher may not convey to a public school student that a person is naturally, biologically, or innately superior by virtue of that person's age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin. ECF Doc. No. 84-1 at 31. Under the second category, a teacher may not convey to a public-school student that a person is naturally, biologically, or innately racist, sexist, or oppressive by virtue of that person's age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin. *Id.* Under the third category, a teacher may not convey to a public-school student that there is some obligation or duty or that it is otherwise necessary or proper for an individual to be

discriminated against or treated adversely because that individual possesses one of the characteristics identified in the statute. *Id*. Under the fourth category, a teacher may not convey to a public-school student that individuals are somehow unable to treat other persons without regard for the characteristics identified in the provision or that individuals otherwise should not treat others without regard for those characteristics. *Id*.

The AFT plaintiffs make no effort to explain what value there is, either to a specific teacher or to the public at large, in conveying any of these specific categories of information to a public-school student during a school-sanctioned extracurricular activity. Instead, the AFT plaintiffs double down on the notion that RSA 198:40 generally bans teachers from discussing things like the Holocaust, the Civil Rights Movement, and affirmative action with students. As discussed above, the statute does no such thing. The plaintiffs have therefore failed to meet their burden under the first step of the *Pickering-Connick* balancing.

The government, in contrast, has a significant interest—and in many instances a compelling one—in prohibiting discrimination based on age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin. For many of these categories, this interest is enshrined in constitutional law. *See, e.g.*, *Clark v. Boscher*, 514 F.3d 107, 114 (1st Cir. 2008) ("A plausible equal protection violation is established when a plaintiff shows by his or her well-pleaded facts that she was treated differently from others similarly situated based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person."). All are enshrined in federal and state statutes. *See, e.g.*, 42 U.S.C. § 2000e; RSA 354-A:1. The AFT plaintiffs have not identified any

extracurricular speech that (1) would not be subject to *Garcetti*, and (2) would be subject to RSA 193:40 where the value of the speech would outweigh these significant interests.

In sum, the AFT plaintiffs have not demonstrated that *Garcetti* is categorically inapplicable to extracurricular speech. The Supreme Court's recent decision in *Bremerton School District* clearly contemplates otherwise. This question must be answered before *Pickering-Connick* balancing is triggered, and answering it requires a highly fact-specific inquiry into the public employee's duties and the context of the speech. The AFT plaintiffs bring a facial challenge entirely devoid of that context. But even if *Pickering-Connick* did apply, the AFT plaintiffs have failed to meet their burden. For all of these reasons, their First Amendment claim fails to the extent based on *Pickering-Connick*.

### B.   Overbreadth

The AFT plaintiffs also argue that the challenged provisions are unconstitutionally overbroad. "Under the overbreadth doctrine, a statute is facially invalid if it prohibits a substantial amount of protected speech." *McKee*, 649 F.3d at 51 (citations and quotation marks omitted). "The overbreadth doctrine is strong medicine that should be employed with hesitation, and then only as a last resort." *Id.* at 51–52 (cleaned up).

"The first step in the overbreadth analysis is to construe the challenged statute; it is impossible to determine whether a statute reaches too far without first knowing what the statute covers." *Williams*, 553 U.S. at 293. In their underlying memorandum, the defendants have set forth how the challenged provisions should be construed using the New Hampshire Supreme Court's rules of statutory interpretation. ECF Doc. No. 84-1 at 24–35. The Court should adopt that construction.

The next question is whether the statute, as construed, prohibits "a substantial amount of protected expressive activity." *Williams*, 553 U.S. at 297. A court must "vigorously enforce[] the requirement that a statute's overbreadth be *substantial*, not only in an absolute sense, but also relative to the statute's plainly legitimate sweep." *Id.* at 292 (emphasis in original). The plaintiffs' memorandum makes clear that they are principally concerned about how RSA 193:40 affects curricular speech. This Court has already held, however, that curricular speech is not protected under the First Amendment. ECF Doc. No. 63 at 9–16. The AFT plaintiffs offer no evidence to demonstrate that the provisions prohibit a substantial amount of extracurricular speech relative to curricular speech. *See Williams*, 553 U.S. at 292. As discussed above and in the defendants' underlying memorandum, the AFT plaintiffs have similarly not demonstrated that all *extracurricular* speech is subject to First Amendment protection. Indeed, the AFT plaintiffs do not endeavor to identify any extracurricular speech that would be prohibited by the provisions, yet still entitled to First Amendment protection. The AFT plaintiffs have therefore failed to demonstrate that the provisions, when properly construed, prohibit a substantial amount of expressive activity in *either* an absolute or relative sense.

Even if the amount of protected speech the RSA 193:40 reaches was substantial, however, an overbreadth challenge will not succeed if the statute is "readily susceptible to a narrowing construction that would make it constitutional." *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 397 (1988) (citation and quotation marks omitted). "The key to application of this principle is that the statute must be readily susceptible to the limitation; [courts] will not rewrite a statute law to conform it to constitutional requirements." *Id.* (internal quotation marks omitted). RSA 193:40 states that "[n]o pupil *in any public school* in this state shall be taught, instructed, inculcated, or compelled to express belief in, or support for," one of the prohibited categories of

information. RSA 193:40, I (emphasis added). This language can readily be construed to limit

the scope of RSA 193:40 to curricular speech. Such a construction would eliminate any

overbreadth concerns. And it would be in keeping with the New Hampshire Supreme Court's

application of its own constitutional-avoidance doctrine. *See Doe v. Comm'r, N.H. Dep't of*

*Health & Human Servs.*, 174 N.H. 239, 251, 254 (2021).

      For all of these reasons, the AFT plaintiffs' overbreadth challenge also fails.

     **C.**    **To the extent the AFT plaintiffs have proven their First Amendment claim as a matter of law, this Court should only invalidate RSA 193:40 to the extent it applies to extracurricular speech.**

      "Generally speaking, when confronting a constitutional flaw in a statute, [courts] try to

limit the solution to the problem." *Ayotte v. Planned Parenthood*, 546 U.S. 320, 328 (2006).

Courts "prefer, for example, to enjoin only the unconstitutional applications of a statute while

leaving other applications in force, or to sever its problematic portions while leaving the

remainder intact." *Id.* at 328–29 (citations omitted). "Accordingly, the normal rule is that partial,

rather than facial, invalidation is the required course, such that a statute may be declared invalid

to the extent that it reaches too far, but otherwise left intact." *Id.* at 329 (cleaned up).

      Here, the Court has already held that RSA 193:40 does not violate the First Amendment

to the extent it applies to curricular speech. If the Court concludes that the statute *does* violate the

First Amendment when applied to extracurricular speech—and it should not for the reasons

already stated—then it should limit any remedy accordingly.

      The "[t]hree interrelated principles" that inform the scope of constitutional remedies all

support this outcome. *See id.* at 329. By limiting any remedy on the AFT plaintiffs' First

Amendment claim solely to extracurricular speech, the Court will not "nullify more of [the]

legislature's work than is necessary." *Id.* Devising this type remedy "does not entail

quintessentially legislative work," *id.*; indeed, drawing a line between curricular and extracurricular speech is similar to the type of remedy the Supreme Court has previously ordered in the First Amendment context, *see, e.g.*, *United States v. Grace*, 461 U.S. 171, 183 (1983) (holding that a law prohibiting the carrying of signs, banners, or devices violated the First Amendment as applied to sidewalks, but not to the Supreme Court building). And, as discussed in the defendants' underlying memorandum, the legislature included a severability clause that applies to RSA 193:40, which explicitly states that ""If any provision of [the antidiscrimination provisions], *or the application of any provision to any person or circumstance* is held to be invalid, the remainder of such sections, and their application to any other persons or circumstances shall not be affected thereby." HB2 1017 (§ 91:299) (emphasis added). This reflects a legislative intent to leave as much of RSA 193:40 intact as possible, in the event some application of the statute was deemed unconstitutional. *See Ayotte*, 546 U.S. at 330–31.

In sum, if the Court concludes that RSA 193:40 does violate the First Amendment to the extent it applies to extracurricular speech, it should invalidate the statute solely in that context and leave the rest of the statute intact.

## Conclusion

For the foregoing reasons, the plaintiffs have failed to demonstrate that they are entitled to summary judgment on their vagueness claim. Similarly, the AFT plaintiffs have failed to demonstrate that they are entitled to summary judgment on their remaining First Amendment claim. Rather, as set forth above and in the defendants' underlying memorandum, the plaintiffs' claims fail as a matter of law. The Court should deny the plaintiffs' motion for summary judgment and grant the defendants' cross-motion for summary judgment.

Respectfully submitted,

FRANK EDELBLUT, in his official capacity
as Commissioner of the Department of
Education,

JOHN M. FORMELLA, in his
official capacity only as Attorney General
of the State of New Hampshire,

AHNI MALACHI, in her official capacity as
Executive Director of the Commission for
Human Rights,

CHRISTIAN KIM, in his official capacity as
Chair of the Commission for Human Rights,

     *and*

KENNETH MERRIFIELD, in his official
capacity as Commissioner of the Department of
Labor

By their attorney,

JOHN M. FORMELLA
ATTORNEY GENERAL

Date: October 3, 2023

*/s/ Samuel Garland*_____
Samuel R.V. Garland, Bar #266273
Senior Assistant Attorney General
Nathan Kenison-Marvin, Bar # 270162
Assistant Attorney General
Civil Bureau
New Hampshire Dept. of Justice
33 Capitol Street
Concord, NH 03301
(603) 271-3650
Samuel.RV.Garland@doj.nh.gov
Nathan.w.kenison-marvin@doj.nh.gov

**Certificate of Service**

I hereby certify that a copy of the foregoing was served on all counsel of recording using the Court's electronic-filing service.

*/s/ Samuel Garland*
Samuel R.V. Garland