## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW HAMPSHIRE

Local 8027, AFT-N.H., AFL-CIO, et al.,

       v.                               Case No. 21-cv-1077-PB
                                          Opinion No. 2024 DNH 040

Frank Edelblut, Commissioner,
N.H. Department of Education, et al.

## MEMORANDUM AND ORDER

In 2021, the State of New Hampshire substantially amended its education and antidiscrimination laws. The new laws were quickly challenged in two separate lawsuits. The cases, both filed on behalf of public school educators, were subsequently consolidated into the present action. The matter is before me on the parties' cross-motions for summary judgment.

## I.     BACKGROUND

### A.    The Amendments

The laws at issue in this case have their genesis in New Hampshire House Bill 544 ("HB544"). HB544, in turn, was based on President Trump's executive order on "Combating Race and Sex Stereotyping." See Exec. Order No. 13950, 85 Fed. Reg. 60683 (Sept. 22, 2020), revoked by Exec. Order No. 13985, 86 Fed. Reg. 7009 (Jan. 20, 2021). That executive order sought to end federally-funded training based on "anti-American propaganda," such as

"critical race theory" ("CRT")[1] See OFF. OF MGMT. & BUDGET, EXEC. OFF. OF THE PRESIDENT, OMB MEMORANDUM NO. M-20-34, TRAINING IN THE FEDERAL GOVERNMENT (2020). To this end, the executive order prohibited the use of public funds to promote so-called "divisive concepts" pertaining to race and sex. Exec. Order No. 13950, 85 Fed. Reg. at 60685.

After President Biden revoked President Trump's executive order, New Hampshire state legislators introduced HB544 to prohibit the state from teaching the same "divisive concepts" identified in President Trump's executive order. The core components of HB544 were later added by amendment to House Bill 2 ("HB2"), a budget bill that was passed by the House and sent to the Senate on April 7, 2021. The Senate made substantial changes to HB2's divisive concepts provisions, which appear in sections 297

---

[1] CRT refers to a 1970s-era movement within the legal academy that sought to analyze the role of race and racism in the American legal system. VICTOR RAY, ON CRITICAL RACE THEORY xxi-xxiii (2022). Although the phrase is used to describe a diverse category of scholarship, CRT fundamentally looks to "the various ways in which assumptions about race affect the players within the legal system (judges, lawyers, and lay people) and have a determining effect on substantive legal doctrines." Douglas E. Litowitz, Some Critical Thoughts on Critical Race Theory, 72 NOTRE DAME L. REV. 503, 503-04 (1999). CRT is premised on several "core tenets," including, most notably, that race is a social construct, rather than a biological reality; that racism is a common and pervasive force throughout society that exists on a structural, rather than purely individual, level; and that racism cannot be effectively addressed through "[c]olorblindness" or race-neutral policies. Angela Onwuachi-Willig, The CRT of Black Lives Matter, 66 ST. LOUIS U.L.J. 663, 669-70 (2022) (collecting sources); accord RAY, supra, at 3, 17, 32.

and 298 of the bill, and rebranded them as antidiscrimination laws. Differences between the House and Senate versions of the bill were resolved in conference, and HB2 became law on June 25, 2021.

HB2 modified the state's education and antidiscrimination laws in several ways.[2] It added a new provision to the education laws, codified at N.H. Rev. Stat. Ann. ("RSA") § 193:40, which identifies four concepts that public primary or secondary school students may not be "taught, instructed, inculcated or compelled to express belief in, or support for":

(a) That one's age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion or national origin is inherently superior to people of another age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin;

(b) That an individual, by virtue of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin, is inherently racist, sexist, or oppressive, whether consciously or unconsciously;

(c) That an individual should be discriminated against or receive adverse treatment solely or partly because of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin; or

(d) That people of one age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical

---

[2]    I refer to the amendments to the state's education and antidiscrimination laws collectively as the "Amendments."

> disability, religion, or national origin cannot and should not attempt to treat others without regard to age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin.

RSA § 193:40, I.

HB2 also added several new sections to Chapter 354-A, known as the "Law Against Discrimination," that employ substantially similar versions of the banned concepts. RSA § 354-A:31 makes it unlawful for a public employer to "teach, advocate, instruct, or train" the banned concepts to "any employee, student, service recipient, contractor, staff member, inmate, or any other individual or group." RSA § 354-A:32 similarly states that "[n]o government program shall teach, advocate, or advance" any of the banned concepts. And RSA § 354-A:33 protects public employees from being disciplined for refusing to participate in any activity "at which a public employer or government program advocates, trains, teaches, instructs, or compels participants to express belief in, or support for," any of the banned concepts.

RSA § 193:40, III permits the Attorney General, or any other person "claiming to be aggrieved by a violation" of the new law, to obtain damages and injunctive relief from an offending school or school district, either by filing a lawsuit in superior court or by filing a complaint with New Hampshire's Commission for Human Rights. RSA § 354-A:34 similarly permits a person "aggrieved" by a violation of the antidiscrimination

amendments to pursue "all of the remedies available under" Chapter 354-A, which include compensatory damages and injunctive relief.

RSA § 193:40, IV provides that a "[v]iolation of this section by an educator shall be considered a violation of the educator code of conduct that justifies disciplinary sanction by the state board of education." An "educator" is defined as "a professional employee of any school district whose position requires certification by the state board [of education]." RSA § 193:40, V. Potential disciplinary sanctions include reprimand, suspension, and revocation of the educator's certification. See N.H. Code Admin. R. Ed 511.01. In other words, an educator who is found to have taught or advocated a banned concept may lose not only his or her job, but also the ability to teach anywhere in the state. See id.; see also N.H. Code Admin. R. Ed 501.02(ad).

The new laws create safe harbors for certain conduct that may otherwise constitute teaching or advocacy of a banned concept. RSA § 193:40, II allows "discussing, as part of a larger course of academic instruction, the historical existence of ideas and subjects identified" as a banned concept. RSA § 354-A:29, II permits public employers to conduct "racial, sexual, religious, or other workplace sensitivity training based on the inherent humanity and equality of all persons." And RSA § 354-A:29, III

states that the new laws do not impose any limitations on "the academic freedom of faculty members" at public colleges and universities.

Passage of the Amendments led to immediate controversy over their scope. The following month, three state agencies—the Department of Education, the Commission for Human Rights, and the Department of Justice ("enforcing agencies")—collectively produced guidance regarding the scope and effects of the new provisions in the form of two "Frequently Asked Questions" documents ("FAQs"). Doc. 36-8; Doc. 36-9. Educators and other stakeholders, however, continued to raise concerns that the Amendments were "confusing and that public employers and schools will struggle to understand the scope of the new prohibitions." Doc. 36-10 at 1.

Accordingly, in September 2021, the New Hampshire Attorney General ("AG") issued an official opinion concerning the scope and application of the new laws. Id. Describing the new statutory provisions as "legislation of limited reach," the AG opined that the first two banned concepts proscribe advocacy that an identified group has "natural, biological, or innate characteristics, as opposed to apparent or accidental characteristics that: (1) make them superior or inferior to other identified groups or (2) make one identified group racist, sexist, or oppressive." Id. at 3, 5. According to the opinion, the last two banned concepts prohibit advocacy "that any identified

group can or should be treated unequally to any other identified group and that one identified group should be discriminated against or treated adversely." Id. at 3.

Defendant Frank Edelblut, the Commissioner of the Department of Education, also published two opinion articles in the *New Hampshire Union Leader* that expressed his support for the Amendments. The first of the two op-eds was published on June 13, 2021, prior to HB2's passage. In it, Edelblut argued that the Amendments were "important" and a necessary "contribution to our education system." Doc. 85-22 at 4. The second op-ed, entitled "Education's Sacred Trust" and published on April 15, 2022, criticized "activist educators who might be knowingly dismantling the foundations of a value system [parents] are attempting to build." Doc. 85-41 at 3.

In its online version, the April 2022 article appended several documents that, according to Edelblut, exemplified "actual instructional material from New Hampshire schools that parents have identified as conflicting with their values" and which demonstrated "biases [that] are beginning to seep into our own institutions." Id. Several of those attachments had been submitted to the Department of Education by parents and other community members, including two books—Stamped: Racism, Antiracism,

and You: A Remix of the National Book Award-winning "Stamped from the Beginning," by Jason Reynolds and Dr. Ibram X. Kendi, and This Book is Anti-Racist, by Tiffany Jewell—as well as materials concerning diversity that were provided to students in a Human Relations course. Id. at 20, 39-40, 63-66.

## B.   **Procedural Background**

In December 2021, two groups of plaintiffs filed suit against the education commissioner and other state officials, challenging the Amendments in separate complaints. The first group consists of five educators and Local 8027 of the American Federation of Teachers-New Hampshire, a labor union representing approximately 3,400 public school teachers, school support staff, city and town employees, police officers, library employees, and higher education faculty in the state (collectively, "AFT plaintiffs"). The second group includes two diversity, equity, and inclusion ("DEI") school administrators, and the National Education Association-New Hampshire, a professional association representing more than 17,000 educators in the state (collectively, "NEA plaintiffs"). Both sets of plaintiffs argued that the Amendments are unconstitutionally vague on their face. The AFT plaintiffs also asserted that the Amendments violate their First

Amendment right to free speech. The two actions were later consolidated, and the defendants moved to dismiss both complaints.

My memorandum order, issued on January 12, 2023, granted the defendants' motions in part and denied them in part. Doc. 63. I dismissed the AFT plaintiffs' First Amendment claim to the extent that it was based on the plaintiffs' assertion that primary and secondary school teachers have a constitutional right to control their curricular speech. Id. at 17. Because, however, I determined that the Amendments plausibly could be construed to also reach teachers' constitutionally protected private speech, I declined to dismiss the claim in full. Id.

When addressing the plaintiffs' vagueness claim, I first resolved a dispute concerning the standard a court must use when evaluating a pre-enforcement facial vagueness claim.[3] Id. at 21. The defendants, relying on Village of Hoffman Estates v. Flipside, Hoffman Estates., Inc., 455 U.S. 489 (1982), took the position that a facial vagueness challenge can never succeed

---

[3]   In addition to the plaintiffs' pre-enforcement facial vagueness claim, they also assert what they describe as an as-applied vagueness claim in the sense that the Amendments are vague "as applied" specifically to teachers. I expressed skepticism that their claim is really an as-applied challenge when I addressed the defendants' motions to dismiss, but I declined to dismiss the claim because the issue had not been adequately briefed. Id. at 20. The parties have again declined to brief the issue. Because I conclude that the Amendments are facially invalid, I need not consider whether the plaintiffs can maintain their as-applied challenge as a distinct cause of action.

unless the challenged statute is vague in all applications. I rejected the

defendants' argument based on Johnson v. United States, 576 U.S. 591

(2015), Sessions v. Dimaya, 584 U.S. 148 (2018), and United States v. Davis,

588 U.S. 445 (2019), a trio of more recent decisions in which the Supreme

Court refused to apply the "vague in all applications" standard to the facial

vagueness challenges that were before the Court.[4] Applying the generally

accepted test for vagueness challenges, I then determined that the plaintiffs

had stated a plausible claim for relief. Doc. 63 at 42.

The parties have since engaged in expedited discovery and filed cross-

motions for summary judgment. Both sides agree that no material facts are

---

[4]     The defendants maintain that Village of Hoffman Estates remains good
law, and they argue again in favor of the "vague in all applications" standard.
I see no reason to revisit my earlier conclusion, beyond noting that, since I
issued my order, the Courts of Appeals for the Fourth and Eleventh Circuits
have also concluded that Johnson, Sessions, and Davis widened the path for
facial vagueness challenges beyond the "vague in all applications" standard.
See Young Israel of Tampa, Inc. v. Hillsborough Area Reg'l Transit Auth., 89
F.4th 1337, 1349-50 (11th Cir. 2024) (explaining that pursuant to United
States v. Salerno, 481 U.S. 739 (1987), a "successful facial challenge
require[d] a showing that the law in question is unconstitutional in all of its
applications," but that "in its more recent cases," including Sessions and
Johnson, "the Supreme Court has cut back on the broad statement . . . at
least when vagueness is the constitutional vice"); Carolina Youth Action
Project v. Wilson, 60 F.4th 770, 781-82 (4th Cir. 2023) ("[T]he Supreme Court
has now twice clarified that 'although statements in some of [its] opinions
could be read to suggest otherwise,' the Court's 'holdings squarely contradict
the theory that a vague provision is constitutional merely because there is
some conduct that clearly falls within the provision's grasp.'") (emphasis in
original) (quoting Johnson, 576 U.S. at 602).

in dispute and the case is ready for resolution. Because I conclude that the Amendments are unconstitutionally vague, I grant the plaintiffs' motion for summary judgment (Doc. 83) and deny the defendants' corresponding cross-motion (Doc. 84) without addressing the AFT plaintiffs' First Amendment argument.

## II.    <u>STANDARD OF REVIEW</u>

Summary judgment is appropriate when the record reveals "no genuine issue as to any material fact and reflects the movant's entitlement to judgment as a matter of law." Perea v. Editorial Cultural, Inc., 13 F.4th 43, 50 (1st Cir. 2021) (cleaned up). The evidence submitted in support of the motion must be considered in the light most favorable to the nonmoving party, drawing all reasonable inferences in its favor. Navarro v. Pfizer Corp., 261 F.3d 90, 94 (1st Cir. 2001).

A party seeking summary judgment must first identify the absence of any genuine dispute of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). A material fact "is one 'that might affect the outcome of the suit under the governing law.'" United States v. One Parcel of Real Prop., 960 F.2d 200, 204 (1st Cir. 1992) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). If the moving party satisfies this burden, the nonmoving party must then "produce evidence on which a reasonable finder

of fact, under the appropriate proof burden, could base a verdict for it; if that party cannot produce such evidence, the motion must be granted." Ayala–Gerena v. Bristol Myers-Squibb Co., 95 F.3d 86, 94 (1st Cir. 1996); see Celotex, 477 U.S. at 323.

When parties cross-move for summary judgment, the standard of review is applied to each motion separately. Am. Home Assurance Co. v. AGM Marine Contractors, Inc., 467 F.3d 810, 812 (1st Cir. 2006); see Mandel v. Boston Phoenix, Inc., 456 F.3d 198, 205 (1st Cir. 2006) ("The presence of cross-motions for summary judgment neither dilutes nor distorts this standard of review."). Thus, I must "determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed." Adria Int'l Grp., Inc. v. Ferré Dev., Inc., 241 F.3d 103, 107 (1st Cir. 2001).

### III.   ANALYSIS

The plaintiffs argue that the Amendments violate the Fourteenth Amendment's Due Process Clause because they are unconstitutionally vague. I begin with the legal principles that shape my analysis.

### A.   The Vagueness Standard

Vagueness doctrine "rests on the twin constitutional pillars of due process and separation of powers." Davis, 588 U.S. at 451; see also Sessions, 584 U.S. at 155-56. The doctrine serves due process concerns by requiring

that those subject to the law be given "a reasonable opportunity to know what is prohibited." Grayned v. City of Rockford, 408 U.S. 104, 108 (1972). It also promotes the proper allocation of power among the three branches of government by requiring legislatures, rather than less politically accountable judges and executive branch officials, to "define what conduct is sanctionable and what is not." Sessions, 584 U.S. at 156. Accordingly, a legislative enactment will be found to be unconstitutionally vague if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." United States v. Williams, 553 U.S. 285, 304 (2008); see also McCoy v. Town of Pittsfield, 59 F.4th 497, 509 (1st Cir. 2023) (applying Williams to a vagueness challenge to a town ordinance).

Vagueness doctrine does not require perfect legislative precision. "What renders a statute vague is not the possibility that it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved; but rather the indeterminacy of precisely what that fact is." Williams, 553 U.S. at 306. "Because words are rough-hewn tools, not surgically precise instruments, some degree of inexactitude is acceptable in statutory language. Reasonable breadth in the terms employed by an ordinance does not require that it be invalidated on vagueness grounds."

Draper v. Healey, 827 F.3d 1, 4 (Souter, Circuit Justice, 1st Cir. 2016)

(cleaned up). Instead, a statute is unconstitutionally vague "only if it

prohibits an act in terms so uncertain that persons of average intelligence

would have no choice but to guess at its meaning and modes of application."

Frese v. Formella, 53 F.4th 1, 10 (1st Cir. 2022) (cleaned up). And a "statute

authorizes an impermissible degree of enforcement discretion—and is

therefore void for vagueness—where it fails to set reasonably clear

guidelines for law enforcement officials and triers of fact in order to prevent

arbitrary and discriminatory enforcement." Id. at 7 (quoting Act Now to Stop

War & End Racism Coal. v. District of Columbia, 846 F.3d 391, 410 (D.C.

Cir. 2017)).

    1.    <u>Speech Restrictions</u>

The degree of scrutiny that a legislative enactment will receive when it

is challenged on vagueness grounds will vary depending on both the nature of

the enactment and the consequences that follow from its violation. When

assessing a vagueness challenge, the "test of vagueness applies with

particular force in review of laws dealing with speech." Hynes v. Mayor of

Oradell, 425 U.S. 610, 620 (1976); <u>see also</u> Vill. of Hoffman Ests., 455 U.S. at

499 (noting that "a more stringent vagueness test should apply" to laws

interfering with the right of free speech). This is because First Amendment

"freedoms are delicate and vulnerable, as well as supremely precious in our society. The threat of sanctions may deter their exercise almost as potently as the actual application of sanctions. Because First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity." NAACP v. Button, 371 U.S. 415, 433 (1963) (citations omitted). "[W]here a vague statute abuts upon sensitive areas of basic First Amendment freedoms, it operates to inhibit the exercise of those freedoms." Grayned, 408 U.S. at 109 (cleaned up). "Uncertain meanings inevitably lead citizens to steer far wider of the unlawful zone than if the boundaries of the forbidden areas were clearly marked." Id. (cleaned up). Such self-censorship is inimical to our democracy, as "[t]he right to speak freely and to promote diversity of ideas and programs is . . . one of the chief distinctions that sets us apart from totalitarian regimes." Terminiello v. City of Chicago, 337 U.S. 1, 4 (1949).

The danger presented by vague speech restrictions is especially severe when a law purports to regulate speech based on the speaker's viewpoint. As the Supreme Court has explained:

> Discrimination against speech because of its message is presumed to be unconstitutional. . . . When the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant. Viewpoint discrimination is thus an egregious form of content discrimination. The government must abstain from

regulating speech when the specific motivating ideology or the
opinion or perspective of the speaker is the rationale for the
restriction.

Rosenberger v. Rector & Visitors of Univ. of Va., 515 U.S. 819, 828-29 (1995)

(citations omitted); see also Ridley v. Mass. Bay Transp. Auth., 390 F.3d 65,

82 (1st Cir. 2004) ("The bedrock principle of viewpoint neutrality demands

that the state not suppress speech where the real rationale for the

restriction is disagreement with the underlying ideology or perspective that

the speech expresses."). Courts should thus "apply the most exacting

scrutiny to regulations that suppress, disadvantage, or impose differential

burdens upon speech because of its content." Turner Broad. Sys., Inc. v.

FCC, 512 U.S. 622, 642 (1994).

    2.    Penalty Provisions

    The consequences that follow from a violation of an allegedly vague

statute can also affect "[t]he degree of vagueness that the Constitution

tolerates." Vill. of Hoffman Ests., 455 U.S. at 498. Civil statutes will often be

subject to lesser scrutiny than criminal statutes because "the consequences

of imprecision are less severe." Sessions, 584 U.S. at 156 (quoting Vill. of

Hoffman Ests., 455 U.S. at 498-99). But "the happenstance that a law is

found in the civil or criminal part of the statute books" is not dispositive. Id.

at 184 (Gorsuch, J., concurring in part). As Justice Gorsuch observed in

Sessions, certain civil penalties are "routinely graver than those associated
with misdemeanor crimes—and often harsher than the punishment for
felonies." Id.; see also Kashem v. Barr, 941 F.3d 358, 370 (9th Cir. 2019) ("A
provision that nominally imposes only civil penalties but nonetheless carries
a 'prohibitory and stigmatizing effect' may warrant 'a relatively strict test.'")
(quoting Vill. of Hoffman Estates, 455 U.S. at 499)). Grave civil penalties can
include "remedies that strip persons of their professional licenses and
livelihoods." Sessions, 584 U.S. at 184 (Gorsuch, J., concurring in part).

Those are precisely the sanctions that the Amendments contemplate
here. RSA § 193:40, IV states that teaching a banned concept constitutes a
"violation of the educator code of conduct." Because those who violate the
educator code of conduct may have their teaching credentials revoked, the
education amendments threaten teachers with the loss of their livelihood as
well as the inability to practice their chosen profession anywhere in the
state. See N.H. Code Admin. R. Ed 511.01(j)(2)(b). And, despite the
defendants' arguments to the contrary, the antidiscrimination amendments
expose teachers to civil liability. The antidiscrimination amendments
provide that anyone aggrieved by a violation of the statute can pursue "all of
the remedies available under" the Law Against Discrimination. RSA
§ 354-A:34. The Law Against Discrimination, in turn, authorizes aggrieved

parties to sue not only employers but also individual employees who aid and

abet in an employer's "unlawful discriminatory practice." See RSA

§ 354:A-21, I(a); see also U.S. Equal Opportunity Comm'n v. Fred Fuller Oil

Co., 168 N.H. 606, 610 (2016). Because the phrase "unlawful discriminatory

practice" is defined to include a violation of any provision of Chapter 354-A—

including the antidiscrimination amendments—a teacher found to have

aided and abetted the teaching of a banned concept in violation of RSA

§ 354-A:31 may be subject to monetary damages.[5] See RSA § 354-A:2, XV.

---

[5]      Although the defendants did not address the issue in their brief, they
argued at the motions hearing that teachers cannot be held liable for
monetary damages under the antidiscrimination amendments. Relying on the
"well established canon of statutory interpretation . . . 'that the specific
governs the general,'" the defendants argue that the narrow relief against
teachers specified in RSA § 193:40 supersedes the broader relief that is
generally permitted under the Law Against Discrimination. RadLAX
Gateway Hotel, LLC v. Amalgamated Bank, 566 U.S. 639, 645 (2012)
(quoting Morales v. Trans World Airlines, Inc., 504 U.S. 374, 384 (1992)). The
defendants' argument, however, rests on the faulty premise that RSA
§ 193:40 provides an exclusive remedy against teachers who teach banned
concepts. RSA § 193:40 addresses the professional consequences that could
befall teachers who violate the education amendments, but it does not imply
that those consequences are to the exclusion of any other remedies. And RSA
§ 193:40 does not reference, let alone restrict, the availability of damages for
violations of the antidiscrimination amendments. Cf. In re Johnson, 161 N.H.
419, 424 (2011) (noting that the specific/general canon comes into play where
"one statute deals with a subject in general terms, and another deals with a
part of the same subject in a more detailed way") (quoting State v. Bell, 125
N.H. 425, 432 (1984)); In re Heinrich, 160 N.H. 650, 654-55 (2010) (finding

In sum, RSA § 193:40 threatens teachers with the loss of their license, while RSA § 354-A:31 threatens teachers with civil liability. Although teachers do not face criminal penalties for teaching a banned concept, it is difficult to conceive of more serious consequences that could befall a person in a civil proceeding than those that a teacher might face if they are found to have done something that the Amendments prohibit. For this reason, the laws are subject to the "most exacting vagueness review." Doc. 63 at 33.

3.    Statutory Interpretation

Before determining whether the Amendments satisfy this standard, I must first attempt to determine what they prohibit. Because the Amendments are state laws, I construe them using the interpretive principles that the New Hampshire Supreme Court employs when it interprets legislation. See Faber v. Ciox Health, LLC, 944 F.3d 593, 602 n.7 (6th Cir. 2019) (explaining that federal courts use state law when construing state statutes); see generally Abbe R. Gluck, Intersystemic Statutory Interpretation: Methodology as "Law" and the Erie Doctrine, 120 YALE L.J. 1898 (2011). Following this approach, I begin with the statutory text. State v. Priceline.com, Inc., 172 N.H. 28, 33 (2019). If a statute defines its terms, a

_____

that a statute that provided detail as to a particular subject controlled over one that lacked any detail).

court ordinarily will defer to the meaning provided by the legislature. Id. But where those terms are left undefined, a court must attempt to determine whether legislative language has a "plain and ordinary meaning." Id. (quoting Appeal of Town of Pelham, 143 N.H. 536, 538 (1999)). In undertaking this process, a court "will not consider what the legislature might have said or add language that the legislature did not see fit to include." Conduent State & Local Sols., Inc. v. N.H. Dep't of Transp., 171 N.H. 414, 420 (2018). Statutes must be read "in the context of the overall statutory scheme, not in isolation." Czyzewski v. N.H. Dep't of Safety, 165 N.H. 109, 111 (2013).

There is an important difference, however, between ordinary statutory interpretation and judicial rewriting of legislation to save it from a vagueness challenge. As the Supreme Court has explained when considering vagueness challenges to federal statutes, "[t]his Court may impose a limiting construction on a statute only if it is readily susceptible to such a construction. We will not rewrite a law to conform it to constitutional requirements, for doing so would constitute a serious invasion of the legislative domain and sharply diminish Congress's incentive to draft a narrowly tailored law in the first place." United States v. Stevens, 559 U.S. 460, 481 (2010) (cleaned up); see also Davis, 588 U.S. at 448 ("When

Congress passes a vague law, the role of courts under our Constitution is not to fashion a new, clearer law to take its place, but to treat the law as a nullity and invite Congress to try again."). Because the Amendments are state laws, the New Hampshire Supreme Court has the final say as to their meaning. Accordingly, I will sustain the plaintiffs' vagueness challenge only if I determine that the Amendments are "not readily subject to a narrowing construction by the state courts." Erznoznik v. City of Jacksonville, 422 U.S. 205, 216 (1975).

**B.    The Amendments**

The Amendments identify four banned concepts that a student may not be "taught, instructed, inculcated or compelled to express belief in, or support for." RSA § 193:40, I. They do not, however, define any of the terms that must be understood to determine what is prohibited. Nor has either the Department of Education or the Commission on Human Rights adopted regulations to explain the Amendments. See, e.g., In re Weaver, 150 N.H. 254, 256 (2003) (explaining that although "the interpretation of a statute is to be decided ultimately by" the courts, "statutory construction by those charged with its administration is entitled to substantial deference").

In light of the limited guidance as to what the Amendments prohibit, I am persuaded they are fatally vague in three ways: (1) they do not provide

fair notice as to the concepts that teachers may not teach, (2) they do not sufficiently explain when classroom discussion of a banned concept qualifies as impermissible teaching, and (3) they do not give teachers enough guidance to know when their extracurricular communications are within the Amendments' reach. I address each of these defects below and then explain why the vagueness of the Amendments is compounded by the fact that they permit teachers to be disciplined without a finding that a teacher has acted with scienter. In the concluding section, I review the evidence in the record that reveals how teachers have been affected by the Amendments since their enactment.

    1.    <u>The Concepts</u>

One of the most difficult interpretive challenges the Amendments present is that they fail to address their intended target directly. <u>Cf.</u> Teeboom v. City of Nashua, 172 N.H. 301, 310 (2019) (noting that statutory construction is guided by "the circumstances which led to [the statute's] enactment, and especially the evil or mischief which it was designed to correct or remedy") (quoting Appeal of Coastal Materials Corp., 130 N.H. 98, 103 (1987)). Supporters of the Amendments have made no secret of the fact that their aim is to restrict what teachers can say about what plaintiffs call

DEI initiatives but supporters of the Amendments call CRT.[6] But rather than take on issues like structural racism, implicit bias, and affirmative action directly, the Amendments employ general terms such as teaching that one race is superior to another, that individuals are inherently racist, and that individuals should not be subject to adverse treatment because of their race. While these banned concepts may appear straightforward at first glance, their ambiguity comes to light when put into practice.[7]

Take, for example, the second concept, which prohibits teaching that a person, by virtue of his status in an identified group, is "inherently racist,

---

[6]   See, e.g., Doc 85-22 at 4 (Edelblut op-ed asserting that the law will address "those who promote Critical Race Theory or similar concepts"); Senate Finance Committee, HB 2 Deliberations, YOUTUBE (May 26, 2021), https://www.youtube.com/watch?v=0AbLc51xKrU (statement by Senator Bob Giuda advocating for the Amendments as necessary to "ensure that the minds of our future generations of our state are not being unduly influenced by advocacy for such toxins as Critical Race Theory").

[7]   The first concept, which prohibits teaching that certain groups are "inherently superior" to others, is only scarcely addressed in the parties' briefs. The defendants have not attempted to interpret the concept beyond reiterating its prohibitions, and the plaintiffs have not explained how the first concept fails to give adequate notice or invites arbitrary enforcement. Given the lack of developed argument on the matter, I do not address the first concept beyond noting that it suffers from the same interpretive challenges as the other three concepts. That is, because the first concept does not address its intended target directly, it is unclear "what is prohibited beyond literally espousing that, for example, 'White people are superior to Black people.'" Honeyfund.com, Inc. v. DeSantis, 622 F. Supp. 3d 1159, 1181 (N.D. Fla. 2022).

sexist, or oppressive, whether consciously or unconsciously." One broadly accepted form of bias is "implicit bias," which is understood to be a "negative attitude, of which one is not consciously aware, against a specific social group." See Implicit Bias, AM. PSYCH. ASS'N, https://www.apa.org/topics/implicit-bias [https://perma.cc/2ES7-YE4V]. Implicit biases are "thought to be shaped by experience and based on learned associations between particular qualities and social categories" and may influence behavior, even if unconsciously. Id. Does instructing students on the prevalence of implicit bias teach them that some groups are "inherently racist, sexist, or oppressive"?

The AG addressed this question in an official opinion, which concluded that implicit bias trainings are not prohibited by the second concept. Doc. 85-54 at 9. But, because the AG's opinion substantially departs from any accepted method of statutory interpretation, it exacerbates, rather than resolves, the significant ambiguity created by the second concept.

The AG begins his argument by quoting a dictionary definition of "inherent" as something that is "structural or involved in the constitution or essential character of something : belonging by nature or settled habit : intrinsic, essential." Id. at 8 (quoting WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1163 (2002)). He then focuses on the terms "intrinsic" and

"essential," without addressing the fact that the definition on which he relies includes tendencies that arise out of either "nature" or "settled habit." Id. Then, for reasons that the AG does not provide, he proceeds to develop his own definition of inherent as something that is "natural, biological, or innate, as opposed to being apparent, accidental, or a characteristic created by external action or external factors, such as current or historical discrimination, stereotyping, environment, or cultural messaging." Id. Again, without further explanation, the AG applies this definition to conclude that the second concept does not prohibit teaching about implicit bias because it is not an inherent form of bias. Id. at 8-9.

The AG's analysis fails to persuade for several reasons. First, the AG considers only a portion of the dictionary's definition of "inherent," without grappling with the fact that the definition also states that something can be inherent if it arises out of "settled habit." Second, he does not attempt to explain why implicit bias is not "inherent" even under his newly proffered definition. And, finally, he does not specify what other forms of unconscious bias may not be taught if the second concept does not include implicit bias.

Accordingly, the AG's opinion does not resolve the lack of clarity left by the text of the second concept. See Appeal of Pub. Serv. Co. of N.H., 124 N.H. 79, 87 (1983) (noting that, although an enforcing agency's interpretation of a

statute is "entitled to [the court's] consideration," it need not be deferred to where it is "based upon a misconstruction of the statute"). Without sufficient guidance from the text of the Amendments or the AG, teachers cannot know what, if any, instruction they can provide on implicit biases.

The third concept suffers from a similar vagueness problem. By its terms, it prohibits only teaching that a person "should be discriminated against or receive adverse treatment" because they belong to an identified group. But how, if at all, does the concept apply to teaching about affirmative action?

If one accepts the premise that providing a preference to one group necessarily entails discrimination against other groups, then advocating for at least some forms of affirmative action would be prohibited by the Amendments. See Pernell v. Fla. Bd. of Governors of State Univ. Sys., 641 F. Supp. 3d 1218, 1233-34 (N.D. Fla. 2022) (recognizing that teaching the merits of affirmative action would be prohibited by a similarly worded statute); see also Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll., 600 U.S. 181, 218-19 (2023) (concluding that giving preference to members of certain racial groups in college admissions necessarily subjects members of other racial groups to unlawful discrimination). But whether this premise is correct in all applications is an issue on which there is no real

consensus.[8] See, e.g., Caroline Mala Corbin, A Critical Race Theory Analysis of Critical Race Theory Bans, 14 U.C. IRVINE L. REV. 57, 83 (2024) (asserting that the third concept does not impact teaching about affirmative action because "taking race into account" is not the same as "teaching that an individual should be discriminated against" on the basis of race) (cleaned up). Because the third concept makes no mention of this premise, and expressly prohibits only teaching that a person should be "discriminated against" because of their group status, teachers are left to guess when, if at all, the third concept prohibits teachers from teaching about the benefits of affirmative action.

The issue only becomes murkier when considering specific efforts to redress past discrimination and promote diversity. The Supreme Court has concluded that at least some race-conscious remedies are legally permissible and, indeed, constitutionally mandated in order to remedy the effects of past discrimination. See, e.g., Swann v. Charlotte-Mecklenburg Bd. of Ed., 402 U.S. 1, 18 (1971) (approving use of race conscious remedies to redress state-imposed segregation); see also Parents Involved in Cmty. Schs., 551 U.S. 701,

---

[8]     Indeed, at the motions hearing, counsel for the defendants appeared to recognize a distinction between teaching that one group "should be discriminated against" and teaching that "one group [should be] preferred over another." Doc. 108 at 7.

737 (2007) ("[N]o one questions that the obligation to disestablish a school system segregated by law can include race-conscious remedies . . . ."). Can teachers extol the virtues of these court-sanctioned efforts to remedy past discrimination, even though they expressly involve differential treatment on the basis of race?

What of efforts to increase diversity on which there is no judicial consensus? For example, the First Circuit recently held that schools may implement facially neutral measures to increase diversity, even if those measures are adopted with the intention of reducing the percentage of over-represented races within a particular institution. Bos. Parent Coal. for Acad. Excellence Corp. v. Sch. Comm. for Bos., 89 F.4th 46, 60 (1st Cir. 2023). But at least two members of the Supreme Court have questioned this holding, expressing their view that even facially neutral policies can constitute racial discrimination if undertaken with the purpose of increasing diversity. Coal. for TJ v. Fairfax Cnty. Sch. Bd., No. 23-170, --- S. Ct. ----, 2024 WL 674659 (Mem), at *4 (Feb. 20, 2024) (Alito, J., joined by Thomas, J., dissenting from the denial of certiorari).

As these cases demonstrate, the question of when efforts to redress past discrimination or increase diversity cross into impermissible racial discrimination presents a legal quandary on which reasonable minds can,

and do, differ. Yet the Amendments force teachers to guess as to which diversity efforts can be touted and which must be repudiated, gambling with their careers in the process.

The most obvious vagueness problem is presented by the fourth concept, which prohibits teaching that individuals of one group "cannot and should not attempt to treat others without regard to" their membership in another group. As other courts have observed, this language is "bordering on unintelligible" because it employs the dreaded triple negative form. Honeyfund.com, 622 F. Supp. 3d at 1182; see also Pernell, 641 F. Supp. 3d at 1281 ("[C]oncept four thus features a rarely seen triple negative, resulting in a cacophony of confusion."). The defendants' failure to resolve this confusion and offer a substantive explanation as to the meaning of the concept only highlights its lack of clarity.

But even if this were not enough, I cannot determine what, if anything, the fourth concept prohibits that is not already banned by the first three concepts. The New Hampshire Supreme Court has consistently made clear that "[t]he legislature is not presumed to waste words or enact redundant provisions and whenever possible, every word of a statute should be given effect." State v. Beattie, 173 N.H. 716, 720 (2020) (quoting Garand v. Town of Exeter, 159 N.H. 136, 141, (2009)); see also White v. Auger, 171 N.H. 660,

666-67 (2019). Thus, the legislature presumably intended to ban something in the fourth concept that was not already covered by the first three.

But I am unable to discern what this might be given the substantial—if not total—overlap between the first three concepts and the fourth. How, if at all, is teaching that individuals should be discriminated against on the basis of race different than teaching that individuals should not be treated without regard for race? And how is teaching that certain individuals cannot treat others without regard for sex different than teaching that certain individuals are inherently sexist? The text provides no clues, thus rendering it impossible to interpret the fourth concept consistent with the New Hampshire Supreme Court's rules of statutory construction.

All told, the banned concepts speak only obliquely about the speech that they target and, in doing so, fail to provide teachers with much-needed clarity as to how the Amendments apply to the very topics that they were meant to address. This lack of clarity sows confusion and leaves significant gaps that can only be filled in by those charged with enforcing the Amendments, thereby inviting arbitrary enforcement.

2.   Teaching

The Amendments are also fatally flawed because they do not sufficiently explain when a teacher will be subject to sanctions for teaching a

banned concept. The Amendments provide that students may not be "taught, instructed, inculcated or compelled to express belief in, or support for" the banned concepts, but they lack clarity as to what it means to "teach" a banned concept.

In attempting to construe the Amendments, the defendants cite to various dictionary definitions but do not grapple with the individual meaning of the word "taught" (or, for that matter, any of the other enumerated verbs). Rather, the defendants read the Amendments' text as collectively prohibiting "the affirmative and deliberate act of conveying information with knowledge of what information is being conveyed." Doc. 84-1 at 27.

I cannot accept the defendants' reading of the Amendments because it fundamentally ignores the separate prohibitions against teaching, instructing, inculcating, and compelling and instead construes each prohibition as essentially synonymous. See id. (asserting that each of the prohibited acts relies on "similar dictionary definitions"). Adopting such a construction would violate "the well-recognized principles of statutory construction that all words of a statute are to be given effect, that the legislature is presumed not to use words that are superfluous or redundant, and that when the legislature uses two different words, it generally means two different things." State v. Bakunczyk, 164 N.H. 77, 79 (2012). Thus,

contrary to the defendants' argument, "taught" ordinarily means something different from "instructed," "inculcated," or "compelled to express belief in, or support for." But what exactly is prohibited by the word "taught" is far from clear.

While teaching can sometimes consist of merely instructing students on objective facts, teachers often employ more nuanced techniques designed to encourage the development of critical thinking skills. For example, teachers may attempt to stimulate discussion by asking students pointed questions or encourage debate by presenting students with ideas contrary to their own. When such techniques are used to explore a banned concept, it is impossible to know whether a banned concept has been impermissibly taught.

Take, for example, a teacher who decides to teach the Supreme Court's most recent affirmative action decision and touts the dissenters' analysis while paying limited attention to the majority opinion. See generally Students for Fair Admissions, Inc., 600 U.S. at 190. The teacher may view herself as simply teaching students about the dissenters' method of constitutional analysis, but a student may interpret her lesson as teaching that the dissenters were correct. Could her discussion of the case expose her to discipline if she does not explain that the dissenters' analysis is wrong? The text of the Amendments provides no hint, leaving the teacher's fate

subject only to an enforcing agency's subjective interpretation of what was taught.

Or suppose that, during a class discussion of the affirmative action case, a student forcefully argues that the majority's decision was wrong and that race-conscious remedies should be permitted to promote diversity even if they tend to favor one group over another. Will the teacher be subject to discipline if she fails to immediately rebuke the student? The defendants suggest that she might, noting that teachers may sometimes be required to offer "disclaimers" in response to student statements to avoid running afoul of the Amendments. Doc. 108 at 4-6, 10. When the failure to issue a disclaimer constitutes teaching, however, remains a mystery.

A similar ambiguity as to what it means to teach a concept proved fatal in Keyishian v. Bd. of Regents of Univ. of State of N.Y., 385 U.S. 589 (1967). In that case, the Supreme Court invalidated a statute that banned state universities from employing any person who "by word of mouth or writing wilfully and deliberately advocates, advises or teaches the doctrine that the government of the United States . . . should be overthrown or overturned by force, violence or any unlawful means." N.Y. CIV. SERV. § 105(1)(a). The Court explained that, because "advocacy of the doctrine of forceful overthrow is separately prohibited," the prohibition against teaching the doctrine could

ostensibly extend to a professor who merely "informs his class" about the banned doctrine, without in any way advocating for that doctrine. Keyishian, 385 U.S. at 600. For this reason, the Court concluded that the statute was "plainly susceptible of sweeping and improper application" and unconstitutionally vague. Id. at 599.

So too here, the Amendments' ambiguity as to when a concept is "taught" means that teachers could be prohibited from merely discussing ideas that fit within the banned concepts.[9] Given the unclear line between acceptable and unacceptable discussions, teachers have virtually no way of knowing whether a lesson that touches upon the banned concepts violates the Amendments.[10] Teachers are thus left in the untenable position of having to

---

[9]     Indeed, the Amendments here implicate even greater vagueness concerns than those at issue in Keyishian given that, as I will explain, the Amendments do not contain a scienter requirement. Cf. id. at 600 (finding that the word "teach" rendered the statute impermissibly vague, even though the statute only prohibited "wilful[]" and "deliberate[]" teaching).

[10]     The safe harbor for discussions involving the "historical existence" of banned concepts "as part of a larger course of academic instruction" does little to guide teachers as to what they may and may not do. As an initial matter, it applies only to historical discussions and therefore has no bearing on discussions of current matters. Moreover, the safe harbor still requires teachers to guess as to when a permissible discussion of a banned concept goes too far and becomes prohibited teaching. See, e.g., Santa Cruz Lesbian & Gay Cmty. Ctr. v. Trump, 508 F. Supp. 3d 521, 544 (N.D. Cal. 2020) ("The line between teaching or implying (prohibited) and informing (not prohibited) 'is so murky, enforcement of the ordinance poses a danger of arbitrary and

wager their careers on a guess or else refrain from discussing matters that implicate the banned concepts altogether. This lack of clarity renders the statute unconstitutionally vague.

3.   Extracurricular Speech

Another profound problem with the Amendments is that they do not provide sufficient guidance as to when teachers may be subject to sanctions for engaging in speech that is protected by the First Amendment. Teachers do not have the right to control their curricular speech, Doc. 63 at 15-16, but nor do they "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate," Tinker v. Des Moines Indep. Cmty. Sch. Dist., 393 U.S. 503, 506 (1969). Whether and to what extent the First Amendment protects a teacher's extracurricular speech is a context-specific and fact-intensive question that turns on the balance of the interests involved. See generally Connick v. Myers, 461 U.S. 138, 142 (1983); Pickering v. Bd. of Educ., 391 U.S. 563, 568 (1968). Even though the First Amendment does not protect a teachers' curricular speech, it is beyond dispute that at least some interactions between students and teachers are protected by the First Amendment, even if they occur on school grounds or during school hours. See,

discriminatory application.'") (quoting Hunt v. City of Los Angeles, 638 F.3d 703, 712 (9th Cir. 2011)).

e.g., Kennedy v. Bremerton Sch. Dist., 597 U.S. 507, 529-30 (2022)

(concluding that a football coach's post-game, on-field prayers with students

were entitled to First Amendment protection); Wood v. Fla. Dep't of Educ.,

No. 4:23cv526, --- F. Supp. 3d ----, 2024 WL 1536749, at *17 (N.D. Fla. Apr. 9,

2024) (concluding that a teacher's decision to share her pronouns at the start

of class was protected by the First Amendment).

On their face, the Amendments apply whenever and wherever a

teacher instructs a student on a banned concept and thus implicate

constitutionally protected interactions between teachers and students.

Indeed, the defendants made their intention to apply the Amendments to

extracurricular speech clear by asserting in the July 2021 FAQs that the

Amendments "apply to all activities carried out by public schools in their role

as public schools, including extra-curricular activities that are part of the

school's work." Doc. 36-8 at 2. Accordingly, as the plaintiffs note in their brief:

> The Amendments restrict speech at sporting events, bus rides to
> and from events, chess competitions, yearbook club meetings,
> newspaper meeting discussions, orchestra rehearsals, and all
> spontaneous run-ins between students and teachers outside the
> classroom and in the halls of the school. The Amendments cover
> off-campus, non-instructional interactions with students, often
> without pay and frequently in response to searching questions,
> at student-led initiatives such as Young Republicans Club, the
> Gay-Straight Alliance, and Students for Racial Justice.

Doc. 83-2 at 61.

Because the Amendments apply broadly to both curricular and extracurricular speech, they potentially intrude on many informal communications between teachers and students that could be entitled to constitutional protection. Where, as here, a law "is capable of reaching expression sheltered by the First Amendment, [due process] demands a greater degree of specificity than in other contexts." Smith v. Goguen, 415 U.S. 566, 573 (1974). Yet, for the reasons I have explained, the Amendments fail to draw the bright line between covered and noncovered speech that the Constitution demands of laws affecting free speech. See Ozonoff v. Berzak, 744 F.2d 224, 231 (1st Cir. 1984) ("Precision of regulation must be the touchstone in an area so closely touching our most precious freedoms. Without precision, an inhibitory regulation may prevent speech far beyond the regulation's intent.") (cleaned up).

   4.   Scienter

As the Supreme Court has recognized, a "scienter requirement may mitigate a law's vagueness, especially with respect to the adequacy of notice to the complainant that his conduct is proscribed."[11] Vill. of Hoffman Ests.,

---

[11]   Scienter is the "degree of knowledge that makes a person legally responsible for the consequences of his or her act or omission; the fact of an act's having been done knowingly, esp[ecially] as a ground for civil damages or criminal punishment." Scienter, BLACK'S LAW DICTIONARY (11th ed. 2019).

455 U.S. at 499; see also Hill v. Colorado, 530 U.S. 703, 732 (2000). The

defendants concede that the Amendments do not contain an "express scienter

requirement," but they assert that this omission is largely irrelevant because

the act of teaching "requires that a teacher affirmatively and deliberately

convey information and know what that information is." Doc. 84-1 at 35.

I am unpersuaded by the defendants' argument because it

misconstrues the role that scienter plays in mitigating vagueness concerns.

The value of a scienter requirement is that it limits a law's scope to those

who knowingly engage in a particular course of conduct. Even if I were to

accept the defendants' contention that a teacher can violate the

Amendments only by deliberately conveying information to her students,[12]

the absence of a true scienter requirement leaves teachers vulnerable to

sanctions if they inadvertently cross the boundary between permissible and

prohibited speech.

---

[12]    For the reasons I have explained, the defendants' assertion that the
Amendments' prohibition against teaching applies only to the "affirmative
and deliberate act of conveying information with knowledge of what
information is being conveyed" rests on an untenable reading of the text. Id.
at 27. Given the inherent ambiguity as to when a concept is "taught," a
teacher could violate the Amendments without affirmatively and
deliberately instructing students on a particular concept—for example, by
failing to offer a disclaimer in response to a student's advocacy for a banned
concept, which the defendants concede could form the basis for liability. Doc.
108 at 4-6, 10.

The First Circuit's decision in United States v. Nieves-Castano, 480 F.3d 597, 603 (1st Cir. 2007), illustrates the way in which a scienter requirement can mitigate the impact of an otherwise vague statute. There, the court considered a vagueness challenge to a criminal statute that prohibited a person from knowingly possessing a firearm "at a place that the individual knows, or has reasonable cause to believe, is a school zone." Id. at 602 (quoting 18 U.S.C. § 922(q)(2)(A) (amended 2015)). Because the statute defined the term "school zone" broadly as "the area 'within a distance of 1,000 feet from the grounds of a public, parochial[,] or private school,'" the defendant argued that the statute failed to provide objective criteria that a person could use to determine when they had entered a school zone. Id. at 603 (quoting 18 U.S.C. § 921(a)(25)(B)). In rejecting this argument, the court emphasized the importance of the statute's scienter requirement by stating that the defendant "could only have been convicted if she knew or reasonably should have known that her possession of the firearm was within a school zone, and this scienter requirement ameliorates any vagueness concerns." Id.

The legislation at issue in this case differs from the statute before the court in Nieves-Castano because teachers can face discipline for violating the Amendments by conveying banned information to a student without any proof that they have knowingly crossed the line that separates permissible

and prohibited speech. Because teachers can be found to have crossed that indistinct line without any finding of scienter, the vagueness of the Amendments is compounded rather than mitigated.

## C.  **Impact**

For the reasons I have explained, the Amendments are vague in ways that cannot be resolved through ordinary statutory interpretation. The record demonstrates that these ambiguities invite arbitrary enforcement and deprive teachers of fair notice, not only in theory but also in practice.

### 1.   Arbitrary Enforcement

Because the Amendments fail to establish "minimal guidelines to govern [their] enforcement," officials are free to "pursue their personal predilections" when applying the law. Kolender v. Lawson, 461 U.S. 352, 358 (1983) (quoting Goguen, 415 U.S. at 574-75 (1974)). Indeed, the record demonstrates that those charged with enforcing the law have relied on Commissioner Edelblut's personal opinions on what is appropriate instruction, as expressed in his op-ed articles, to guide their efforts.

The articles, which were written by Edelblut in his personal capacity, identified various actions by teachers and instructional materials that he viewed as problematic. Doc. 85-22 at 4; Doc. 85-41 at 3-4. The June 2021 article advocates for the Amendments by asserting that they are necessary to

address content that undermines American values and teaches students "to be racists," such as Kendi's book <u>How to Be an Antiracist</u>. Doc. 85-22 at 4. The April 2022 article does not reference the Amendments at all, but rather identifies various classroom materials pertaining to race and sexuality that, in Edelblut's view, "undermin[e] the sacred trust that educators hold" by "compromis[ing] the values of families." Doc. 85-41 at 4. Neither article explicitly states that the identified content runs afoul of the Amendments, let alone explains how it conflicts with the law.

Despite the fact that the articles offer minimal interpretive guidance, Department of Education officials have referred educators to them as a reference point. For example, after showing two music videos to her class as part of a unit on the Harlem Renaissance, Alison O'Brien, a social studies teacher at Windham High School, was called into a meeting with her principal and informed that she was being investigated by the Department of Education in response to a parent's complaint. Doc. 85-12 at 3. Department of Education Investigator Richard Farrell recommended that Windham's administrators consult Edelblut's April 2022 opinion article to understand the context of the investigation against O'Brien, without otherwise explaining why O'Brien's lesson warranted investigation. <u>Id.</u> at 5-6. After witnessing her

experience, O'Brien's colleagues grew anxious about facing similar actions themselves and modified their lesson plans accordingly. Id. at 6.

The threat of arbitrary enforcement based on Edelblut's personal views has impacted teachers even in the absence of a formal complaint. For example, teachers at Keene Middle School planned to have their eighth graders read another one of Kendi's books, Stamped: Racism, Antiracism, and You: A Remix of The National Book Award-winning "Stamped from the Beginning". Doc. 85-17 at 3. The school purchased 250 copies of the book but, after reading Edelblut's June 2021 article criticizing one of Kendi's other books, the planned reading was cancelled. Id. at 3-4.

As one teacher at the school explained, he and his colleagues were confused about what "kinds of teaching could take place and what kind[s] of materials could be used" under the Amendments and looked to "publicly available comments from the Commissioner" for guidance. Id. at 4. After reading Edelblut's June 2021 op-ed, the teachers concluded that Edelblut "believed the work of Dr. Kendi violated the [Amendments]." Id. Accordingly, the teachers decided against the planned reading. Id.

As these examples demonstrate, the Amendments' ambiguities leave significant gaps that both officials and teachers understand can only be filled by those charged with their enforcement. By referring educators to Edelblut's

articles for guidance, the department relies on Edelblut's personal views to serve as gap-filler and therefore threatens teachers with enforcement on an "ad hoc and subjective basis" guided by the "personal preferences" of an unelected official rather than clearly delineated statutory standards. Grayned, 408 U.S. at 109, 113 n.22.

        2.    <u>Insufficient Notice</u>

Vague laws have been likened to a sword of Damocles, dangling above the heads of those it governs and threatening to drop without any warning. As Justice Marshall observed in <u>Arnett v. Kennedy</u>, the "value of a sword of Damocles is that it hangs—not that it drops. For every employee who risks his job by testing the limits of the statute, many more will choose the cautious path and not speak at all." 416 U.S. 134, 231 (1974) (Marshall, J., dissenting).

Justice Marshall's remarks ring true here. As the record demonstrates, uncertainty surrounding what the Amendments do and do not prohibit has caused teachers to err on the broad side of caution by self-censoring their lesson plans and, in some circumstances, leaving the profession altogether.

Consider, for example, Jennifer Given, a former high school social studies teacher at Hollis/Brookline High School with 19 years of experience in the field. Doc. 85-15 at 3. Based on the "constant confusion with students and

parents" caused by the Amendments, Given felt the need to significantly modify her teaching methods "out of fear that [she] would be accused of" violating the Amendments, regardless of whether she was actually doing so. Id. at 3. For example, Given stopped assessing student performance through essay and open-ended short answer questions out of concern that those methodologies might be misinterpreted by students who believed they had to agree with a certain position to score well on an assessment. Id. Given also significantly restricted open class discussion and stopped allowing her students to choose their own topics for research papers out of a concern that the students would include subject matter in their papers that could violate the Amendments. Id. at 3-4. Additionally, Given refrained from "analogizing material to students' own experiences and interests"—despite the pedogeological value of doing so "in social studies curriculums and historical courses where students can easily believe historical events only happened in the past"—out of fear that such discussions could lead to a complaint against her. Id. at 4. Given found that these changes negatively impacted student learning and resulted in decreased class participation. Id. at 3-4. Given was so troubled by this fact, and so frustrated by the difficulties presented by the Amendments, that she decided to leave teaching altogether. Id. at 3.

Patrick Keefe, a high school English teacher at Campbell High School, has also modified his teaching practices out of fear of violating the Amendments. Doc. 85-13 at 3. For example, Keefe's students read the novel Beloved, by Toni Morrison, which examines the "destructive legacy of slavery" through the story of a formerly enslaved woman in the post-Civil War period. Id. at 5. Prior to the Amendments' passage, Keefe would attempt to place the novel "in a contemporary framework" by inviting students to consider, for example, whether the legacy of slavery is evident in the modern world or how the novel's themes relate to current events like the Black Lives Matter movement. Id. Now, however, Keefe is uncomfortable engaging with students in this way because he worries that it could be "misunderstood" as implying that "there is a 'correct' answer to [his] question[s]" or that students are "'require[ed]' . . . to agree" with the premise of those questions. Id. at 5-6. Keefe fears that, because "parents and students misunderstand instruction techniques, such as using the Socratic method, playing devil's advocate, or seemingly agreeing or disagreeing with a student in order to draw out analytical thinking," he might be subject to a complaint based on a misinterpretation of his lesson. Id. at 6. In an attempt to assuage his fears, Keefe asked the school administration for additional guidance on how to comply with the Amendments, but he "was told there was none available

other than the Attorney General's Frequently Asked Questions." Id. Given the uncertainty as to the law's reach, Keefe is unsure how to engage in "any contemporary investigation of race" without violating the Amendments and feels compelled to avoid the topic altogether, despite the "valuable analytical training" that the exercise provides to students. Id.

The Amendments have chilled extracurricular speech as well. Ryan Richman, a high school history teacher at Timberlane Regional High School, has censored not only his lesson plans but also his interactions with students through his role as a faculty advisor for the school's Model United Nations team. Doc. 85-18 at 3-4. Richman explains that he has restricted what he says "around the students in their research for competitions, on the way to competitions, and in everyday interactions"—conversations which could be subject to First Amendment protection—out of fear that he might violate the Amendments by commenting on the sort of "controversial topics" that frequently arise at Model UN competitions. Id. at 4. As a result of these constraints and Richman's concerns about the effects that they are having on his students, Richman is considering resigning. Id.

These examples are only illustrative of the wide-ranging difficulties that teachers face in attempting to conform their behavior to the vague strictures of the Amendments. Without adequate notice of what the

Amendments prohibit, teachers are incentivized to steer well clear of anything that could be construed as violating the Amendments, even if it means utilizing less effective teaching methods. As a result, the work teachers do best is inhibited, and students are forced to bear the costs of the Amendments' ambiguity.

## IV.    <u>REMEDY</u>

Having concluded that the Amendments' prohibitions against teaching banned concepts are unconstitutionally vague, I must consider which, if any, parts of the Amendments may nonetheless be upheld. The Amendments are subject to a severability clause that requires courts to preserve any parts or applications of the Amendments that are unaffected by a judicial determination that other parts or applications are invalid.[13] Relying on this clause, the defendants argue that, if the plaintiffs' vagueness claim has merit, it should be resolved by invalidating only subsection IV of RSA § 193:40, which treats any violation of RSA § 193:40 as a violation of the educator code of conduct. The defendants appear to base this argument on their view that the Amendments can only be unconstitutionally vague if

---

[13]    The clause states that "[i]f any provision of sections 297-298, or the application of any provision to any person or circumstance is held to be invalid, the remainder of such sections, and their application to any other persons or circumstances shall not be affected thereby." HB2 § 91:299.

teaching a banned concept can be sanctioned as a code of conduct violation. I am unpersuaded by this argument because the premise on which it is based is false.

The Amendments are vague not because they subject teachers to severe professional sanctions, but because they fail to provide teachers with sufficient notice of what is prohibited and raise the specter of arbitrary and discretionary enforcement. Invalidating RSA § 193:40, IV would fail to address these concerns because the plaintiffs would continue to be directly barred from teaching the banned concepts by the remaining subsections of RSA § 193:40. They would also be indirectly prohibited from teaching the banned concepts by RSA §§ 354-A:32 and 354-A:33, which bar public schools from teaching the concepts, because schools would be required to enforce the prohibitions against their teachers to avoid damages actions. And, for the reasons I explained, teachers who aid and abet their employers in teaching the concepts would themselves continue to face the prospect of individual damages actions under RSA § 354-A.

Thus, although striking down RSA § 193:40, IV would certainly lessen the harm that teachers would face for teaching a banned concept, its invalidation alone would not free teachers from the need to guess as to whether they are acting unlawfully. Nor would it provide those charged with

enforcing the Amendments with the guidance they need to prevent arbitrary enforcement. Accordingly, I cannot resolve the plaintiffs' vagueness claim merely by invalidating RSA § 193:40, IV. Instead, the constitutional infirmities I have identified require the invalidation of not only the sanction provided by RSA § 193:40, IV, but also the vague provisions themselves—RSA §§ 354-A:31, 354-A:32, and 193:40.[14]

## V.    CONCLUSION

The Amendments are viewpoint-based restrictions on speech that do not provide either fair warning to educators of what they prohibit or sufficient standards for law enforcement to prevent arbitrary and discriminatory enforcement. Thus, the Amendments violate the Fourteenth Amendment to the U.S. Constitution.

Although the plaintiffs have sought both declaratory and injunctive relief, I have no reason to believe that the defendants will fail to respect this

---

[14]    The plaintiffs do not expressly challenge RSA §§ 354-A:29 or 354-A:33, nor do those provisions include the vague language that plagues RSA §§ 354-A:31, 354-A:32, and 193:40. Thus, I decline to invalidate these provisions. See N.H. Democratic Party v. Sec'y of State, 174 N.H. 312, 331 (2021) (explaining that under New Hampshire law, courts are to "presume that the legislature intended that the invalid part shall not produce entire invalidity if the valid part may be reasonably saved" and consider "whether the unconstitutional provisions of the statute are so integral and essential in the general structure of the act that they may not be rejected without the result of an entire collapse and destruction of the statute") (quoting Associated Press v. State, 153 N.H. 120, 141 (2005)).

court's ruling that the Amendments are unconstitutional on their face.

Accordingly, I grant the plaintiffs' request for declaratory relief but

determine that injunctive relief is not necessary at the present time. See

Wooley v. Maynard, 430 U.S. 705, 711 (1977) (explaining that injunctive

relief is not required if the plaintiffs' interests will be protected by a

declaratory judgment).

For the reasons discussed, the plaintiffs' motion for summary judgment

(Doc. 83) is granted as set forth herein. The defendants' cross-motion for

summary judgment (Doc. 84) is denied.

SO ORDERED.

/s/ Paul J. Barbadoro
Paul J. Barbadoro
United States District Judge

May 28, 2024

cc:     Counsel of Record