1                    UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF NEW HAMPSHIRE
2

3      * * * * * * * * * * * * * * * * *
                                        *
4      LOCAL 8027 AFT-NEW HAMPSHIRE,    *
       AFL-CIO, ET AL.,                 *
5                                        *
                           Plaintiffs.  *
6                                        *
                    v.                  *  No. 1:21-cv-1077-PB
7                                        *  January 16, 2024
                                        *  10:00 a.m.
8      FRANK EDELBLUT, IN HIS OFFICIAL  *
       CAPACITY ONLY AS THE             *
9      COMMISSIONER OF THE NEW          *
       HAMPSHIRE DEPARTMENT OF          *
10     EDUCATION, ET AL.,               *
                                        *
11                         Defendants.  *
                                        *
12     * * * * * * * * * * * * * * * * *

13        TRANSCRIPT OF HEARING ON MOTIONS FOR SUMMARY JUDGMENT
                BEFORE THE HONORABLE PAUL J. BARBADORO
14

15     APPEARANCES:

16     For the Plaintiffs:      Gilles R. Bissonnette, Esq.
                                American Civil Liberties Union
17                              of New Hampshire

18                              Charles Moerdler, Esq.
                                Joshua M. Goldman, Esq.
19                              Harry Sandick, Esq.
                                Patterson Belknap Webb & Tyler

20                              Morgan C. Nighan, Esq.
                                Nixon Peabody LLP
21

22                              Chris Erchull, Esq.
                                GLBTQ Legal Advocates & Defenders
                                (GLAD)
23

24              (Appearances continued next page)

25

1    <u>For the Defendants:</u>        Samuel R. V. Garland, Esq.
                                 Nathan W. Kenison-Marvin, Esq.
2                                New Hampshire Department of Justice
                                 Office of the Attorney General (Civil)
3

4

     <u>Court Reporter:</u>           Brenda K. Hancock, RMR, CRR
5                                Official Court Reporter
                                 United States District Court
6                                55 Pleasant Street
                                 Concord, NH 03301
7                                (603) 225-1454

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

P R O C E E D I N G S

THE CLERK:  All rise for the Honorable Court.  Please be seated.

This Court is in session and has before it for consideration hearings on Motions for Summary Judgment in 21-cv-1077-PB, <u>Local 8027, et al. versus New Hampshire Department of Education, et al</u>.

THE COURT:  I was made aware of an email from Mr. Bissonnette about the Protective Order and redactions that were made in the briefing materials.  What more do you want to tell me about that, whoever is speaking?

MR. BISSONNETTE:  Thank you, your Honor.  Gilles Bissonnette on behalf of plaintiffs Andres Mejia and Christina Philibotte, also here speaking on behalf of NEA-New Hampshire.

I don't have much to add beyond that email.  We just did want to flag, consistent with the Protective Order, that there's some information, I think a small, very small subset of information that is protected.  It principally has to deal with information that has been sent to the Human Rights Commission.  There's an assertion that that information is confidential by statute.  That was one of the reasons why we entered into a Protective Order in this case.  The redactions are targeted to that.  Though that could come up in various ways in the course of this argument, we are happy to bifurcate, to not communicate about those issues in open court and have a very small,

1     bifurcated hearing at the end, in the event that the Court

2     wants to hear more about that information in those documents.

3     But that was the reason for bringing it to this Court's

4     attention.

5          THE COURT:  Yeah.  What I would suggest is that no one

6     should unilaterally, without getting permission from the Court,

7     raise a matter that is subject to the Protective Order, but I'm

8     open to hearing the argument that I need to know about

9     something subject to Protective Order.  If someone wants to

10    make that argument, I'll hear it, decide what to do, which

11    could involve a discussion under seal or might involve my

12    decision with respect to the State process.  To the extent that

13    I need to have in the public record something that is required

14    to resolve the claim, I might be required to disclose it,

15    notwithstanding the State provision making it confidential.

16    I'd certainly want to hear from the State and would respect the

17    State interests here.

18          But ultimately I've got to decide a case, and I don't

19    decide cases based on secret information, so that would be a

20    problem for me, if I needed to do it.  It's not apparent to me

21    at the present time that I need to have that information, but

22    I'm open to hearing why I should.  Okay?  Is that acceptable to

23    you?

24          MR. BISSONNETTE:  That is, your Honor.  We are

25    planning today in public court to not bring up that

1   information, not unilaterally breach that agreement that we

2   have entered into.

3           THE COURT:  Mr. Garland, what's your view?

4           MR. GARLAND:  Yeah, I have no problem with any of

5   that, your Honor.  I believe you do have the information --

6           THE COURT:  I do.

7           MR. GARLAND:  -- in the sealed versions of it.  I

8   think you know what our argument is as to whether you need it

9   to resolve the case one way or the other based on the briefing.

10          THE COURT:  You don't think I need anything that was

11  gleaned in the last year to resolve the case.  We're going to

12  get into that.  But I understand your view on that point.

13          MR. GARLAND:  And my only ask would be, if you don't

14  consider that information -- if we don't bring it up today, I'm

15  not planning on getting into the specifics, but in the course

16  of coming to a decision you determine you may need to disclose

17  it, we obviously haven't briefed the State's interest, and I

18  would just ask for an opportunity to do that.

19          THE COURT:  Yeah.  I will make an effort, and my Clerk

20  will remind me as we go through the drafting process, that, to

21  the extent we need to look beyond the redacted briefing and

22  need to refer to materials that are redacted, I'll first

23  consult with the parties and give you an opportunity to be

24  heard about that.

25          MR. GARLAND:  That works for me.  Thank you, your

1    Honor.

2                THE COURT:  Okay.  All right.  A second issue which

3    relates to something that Mr. Garland has raised, and that is,

4    it appears to me, from reading the briefs, that both the

5    plaintiffs and the defendants agree that this case is ready for

6    resolution.  There are Cross-Motions for Summary Judgment

7    pending, and I don't see either party arguing that the other

8    party's motion must be denied because facts material to the

9    resolution of a claim they are making is in genuine dispute,

10   and, if I'm wrong about that, speak now or forever hold your

11   peace.

12               I don't want someone coming up to the Court of

13   Appeals, saying, The judge shouldn't have decided the case

14   because there were facts that were in dispute.  If they're in

15   dispute, tell me, but I didn't see any reference to that from

16   either the plaintiff or the defendant.  In fact, the defendant

17   says, if I'm understanding the defendants' position correctly,

18   is you could have decided this at the complaint level.  To the

19   extent you are inclined to rule against us, we think you made a

20   mistake, but that mistake is a mistake of law, not anything

21   that's factual.  There's no fact that the State thinks in any

22   way affects the resolution of this case, because, to the extent

23   facts were produced, they have no bearing on the question

24   before the Court.

25               So, I take you both to say that, and if either of you

1    says that, Oh, Judge, you know, we should win on summary

2    judgment, but the other side shouldn't, you need to speak up

3    now.

4           Are the plaintiffs making that contention?

5           MR. BISSONNETTE:  No.  We -- I agree with your

6    assessment, your Honor.

7           THE COURT:  Do you agree?  I'm sorry.  Counsel, you

8    agree as well?

9           MR. MOERDLER:  No.

10          THE COURT:  Okay.  Thank you.

11          MR. GARLAND:  Likewise, your Honor.

12          THE COURT:  I tend to forget that there are two

13   plaintiffs, two cases.  I don't want to foreclose anyone from

14   being heard.  I hope that we can, in dealing with the

15   plaintiffs, try not to be redundant but to identify certain

16   areas in which there may be supplemental argument that needs to

17   be made that pertains to one complaint or another, and one of

18   those I will be asking about at some point during the

19   plaintiffs' presentation, in particular, about the nature of

20   the First Amendment claim here, what is or is not being made,

21   which is -- I'll lay on the table my view.

22          I understand the parties to be pressing a facial

23   vagueness argument in which it is facially vague and violates

24   both the Due Process Clause of the Fourteenth Amendment and the

25   First Amendment, to the extent the facial vagueness endangers

1   speech values.  It's not clear to me that there is any other

2   First Amendment claim that's being pressed by anyone, but I do

3   see some allegations about overbreadth as a distinct theory;

4   and, to the extent one of you is asserting an overbreadth

5   claim, I'll ask that person, when I question about it -- and I

6   think it's your group that is raising that argument, Counsel --

7   I will ask for a brief exchange about that particular issue,

8   and I'll disclose to you my view about this very confusing

9   subject of how do facial First Amendment vagueness claims and

10  First Amendment overbreadth claims overlap, and how are they

11  distinct, and, to the extent that they are distinct, does the

12  distinctness matter to this particular case.

13          So, you can start thinking about that.  I'll ask you

14  about it at the appropriate time.

15          All right.  So, I propose, then, to move right into

16  the cross-motions.  Since both sides are seeking judgment, it

17  makes sense to me to have the party who has the burden of proof

18  to go first, have the plaintiffs explain to me why the

19  plaintiffs should win, and then have the defendants respond.

20          I'll also say that we have a distinct issue with

21  respect to severance that I want to leave to the end.  So,

22  don't present your -- you have a severability argument that,

23  even if I say the statute or the amendments are

24  unconstitutional in certain respects, that I should sever off

25  and deal with other portions of the statute.  We're going to

1    save that to the end, okay?

2           So, with that in mind, why don't you briefly present

3    your position, and I'll have some questions as we go along, and

4    if you could explain to me, if at all, how you and

5    Mr. Bissonnette are dividing up the argument.

6           MR. MOERDLER:  Exactly what I intend to do.

7           THE COURT:  Okay.  Go ahead.

8           MR. MOERDLER:  Your Honor, what we have decided to do

9    is to break this essentially into two parts on our side.  The

10   first part is for me to deal with a couple of issues that

11   relate to standard very briefly; then my colleague,

12   Mr. Bissonnette, will deal with vagueness; and I will deal with

13   overbreadth and First Amendment.

14          THE COURT:  Okay.

15          MR. MOERDLER:  Let me just make one more point, if I

16   may, so we have it clear.  It is in that last point, in

17   overbreadth, that we will encounter the issue of the Protective

18   Order.

19          THE COURT:  All right.  When we get to it, you'll

20   point out --

21          MR. MOERDLER:  I just wanted you to know.

22          THE COURT:  Okay.  Yeah.  And that's fine.  I

23   appreciate that.

24          I'm a little bit concerned about your reference to

25   standing.

1          MR. MOERDLER:  No, not standing.  Standards.  I

2     apologize.

3          THE COURT:  Standards.  Okay.  I misheard you.  I

4     said, wow, the defendants, I think wisely, didn't make a

5     standing argument here.  It's complicated enough.  I don't want

6     to hear standing arguments being raised.  Okay.  Standards I'm

7     fine with.  Standing?  Oh, I thought we were past that point.

8          Okay.  Go ahead.

9          MR. MOERDLER:  Your Honor, Charles Moerdler, Patterson

10    Belknap, on behalf of the plaintiffs.

11         When we first appeared before your Honor, you

12    expressed, and it stayed with me throughout, a, quote, core

13    concern, and that core concern, as you put it, was does the

14    statute leave educators, quote, in great doubt as to whether

15    their conduct may or not be read properly.  That was a point

16    that stayed with me, because we were focusing on different

17    legal aspects and question, and that was the gut issue in this

18    case:  Does it confuse?  Does it leave people in doubt as to

19    what they should be doing?  That's the measure in every major

20    Supreme Court decision.

21         THE COURT:  I think you're absolutely right.  I'm only

22    speaking about my concern.  My concern all along has been about

23    educators who have to confront these amendments, and the

24    concern is certainly a notice concern, but there is a related

25    concern which is almost as important, and that is concern about

1    arbitrariness in enforcement.

2            MR. MOERDLER:  I agree.

3            THE COURT:  So, it is a dual concern with facially

4    vague statutes.  The dual concern is do they give adequate

5    notice?  And these are both concepts that are fundamental to

6    the rule of law.

7            Anyone who identifies rule of law concerns as

8    important will list why are they important, what are the

9    essential attributes of a rule of law system.  One of the most

10   important is people need to be able to discern whether their

11   conduct is in violation of the rule of law or not.

12           And the second related rule of law concern is law

13   needs to be enforced evenhandedly, and to the extent that

14   decision-makers are given the power to arbitrarily enforce the

15   law, because the statute is so vague, there is a very serious

16   rule of law concern, and those dual concerns are at the heart

17   of what I have been focused on in examining your claims.

18           MR. MOERDLER:  And I should tell the Court that was

19   the second point I was about to make.

20           THE COURT:  All right.

21           MR. MOERDLER:  And, indeed, we followed both of those

22   points, and, as you will hear at the First Amendment end of it,

23   although it may equally apply to the vagueness point, that's

24   where we focused in the depositions, and that's where I think

25   we hit the smoking gun, if you will, and I will get to that in

1    precise terms.

2         Let me make a point by way of background.  In these

3    depositions, which I must thank the Court for giving us the

4    opportunity to flesh out this record, not one State official,

5    not the Commissioner of Education nor any member of his staff,

6    not the Human Rights Commission or any member of its staff

7    could tell us what conduct was absolutely proscribed.  Not one

8    of them could tell us, and we asked, and we asked again, and we

9    asked again, and all we ever got was to have the statutory

10   language read back us to.

11        THE COURT:  From my reading, they added one other word

12   that they repeated over and over again, which is "context,"

13   right?  They said, Here's the language, and it all depends on

14   context, and I can't say more about it.  I may be

15   oversimplifying, but that's what I took from the briefs that

16   I --

17        MR. MOERDLER:  They were well prepared, your Honor.

18   They did what they had to do, and I compliment them for it as a

19   lawyer.

20        But it is a fact that at no point has any official of

21   the State of New Hampshire been willing to tell us, and I'm not

22   saying able, I said willing to tell us what is proscribed, what

23   was proscribed previously, it is proscribed again, what was not

24   proscribed before and is proscribed now.

25        THE COURT:  Well, let me ask you to engage with

1       Mr. Garland's, I think one of his principal points about that.

2       He argues and cites some cases to support the proposition that

3       what the administrators or the implementers of the law think

4       about how it applies -- if I'm misrepresenting your argument,

5       you'll tell me -- but I understood you to be saying that what

6       matters is the Court's construction of the statute and the

7       analysis of vagueness the way the Court construes the statute,

8       and what the Commissioner of Education thinks the statute means

9       is not relevant at all, so it shouldn't matter.

10              Am I oversimplifying or misstating your position on

11      that?

12              MR. GARLAND:  I don't think you're misstating it, your

13      Honor, probably not oversimplifying it either.  There are

14      certainly portions of the rules of construction that allow you

15      to stray into things like official guidance documents, but,

16      when we're getting into hypotheticals and depositions and

17      things along those lines, that's where I think the case law

18      suggests that's beyond the scope of the Court's analysis.

19              THE COURT:  All right.  So, you're saying that,

20      whether they answered those questions or not, their answers

21      really don't have content that is useful to me in trying to

22      discern the outer boundaries of the statutory language.  That's

23      a job I have to do based on the text of the statute.

24              MR. GARLAND:  And the rules of construction.

25              THE COURT:  And the rules of construction.

1          MR. GARLAND:  That's a fair --

2          THE COURT:  All right.  So, that's what he's saying.

3     What's your response?  Anything you have to say about that?

4          MR. MOERDLER:  He's wrong.  And if I may make the

5     point, it is very clear from Supreme Court of the United States

6     teaching, from <u>Grayned</u> in a direct quote from Frankfurter, no

7     less.  In <u>Grayned</u> the Court made the point that extrinsic

8     evidence is appropriate to define words, to define conduct, to

9     define excess.  There are a half a dozen additional cases,

10    including First Circuit cases, which make exactly the same

11    point, and after the argument, with the Court's permission,

12    since this came up in his brief --

13         THE COURT:  Yes.  I didn't want replies.

14         MR. MOERDLER:  All I want is to give you the

15    citations.

16         THE COURT:  You should just provide the citations.  I

17    would appreciate that.

18         MR. MOERDLER:  Good.  Your Honor, let me just make the

19    point you made from an advocate's point of view.  If you

20    cannot, as the entity charged with enforcement, under oath tell

21    me A is good and B is bad, C is good and D is bad, then how can

22    you enforce it?  Do I have to wait until you punish me?  Do I

23    have to wait until then?

24         Indeed, as I shall point out later on, one of the most

25    concerning pieces of paper in this entire case was touched upon

1      in question number 85 in the Statement of Undisputed Facts.  It

2      was a letter written by one of the unions to the Commissioner,

3      asking specifically, Is A, B, C and D all right, and, if not,

4      what can we do?  No answer.  That was before this litigation

5      started.  They were looking for a path to go forward, not an

6      excuse or an aftermath, because the moment a teacher is

7      criticized to her principal or his principal, that teacher is

8      damned; that career is tainted.

9              That's true of all of us.  When I say to an associate,

10     You did a lousy job, that associate's guaranteed to remember it

11     forever, and that's true of the teacher, and I will demonstrate

12     the proof of that pudding later on.

13             THE COURT:  Can I ask you about -- you're, of course,

14     familiar with a number of Supreme Court decisions.  When the

15     Court decides that a statute is not unconstitutionally vague,

16     you will often see in the Court's opinion statements like

17     these:  A careful advocate could come up with any number of

18     hypothetical cases for which the answer is not clear, and

19     courts should be very cautious about getting lost in

20     hypotheticals, when it comes to vagueness challenges about

21     conduct that is not in fact in issue, and in fact a court,

22     exercising it's appropriate principles of judicial restraint,

23     should be cautious about taking hypotheticals.

24             So, that's what courts say when they say a statute is

25     not vague.  When they say a statute is vague, they oftentimes

1   focus on how it could be applied in other contexts and say

2   that's highly important.  How do I draw the line between not

3   getting lost in hypotheticals and, on the other hand, looking

4   at applications that, in fact, teachers could want to engage

5   in?  One of the things I thought was what is in the record

6   about evidence in this case of teachers who are actually

7   self-censoring or identifying conduct that they would like to

8   engage in but they are not engaging in because of the very

9   extraordinarily serious consequences of later being found in

10  violation?

11          So, first, how do I draw the line between those two

12  bodies of cases, which you're well aware of; and, second, do

13  you agree with me that it may be relevant to look at what the

14  evidence in the case shows about how plaintiffs or other

15  teachers are self-censoring out of fear that their conduct

16  might be later swept into the very wide net that these

17  amendments create?

18          MR. MOERDLER:  And that was the third lesson you

19  taught me at the outset, because we cited one hypothetical -- I

20  cited to you one hypothetical after another, and you made that

21  exact point at that time.  And you were right, because the

22  answer is what is the proof of the pudding?  But for this

23  discovery, I would still be out there on that limb.  This

24  discovery showed in plain and precise terms, and I'm going to

25  give you at the end three precise examples from this record of

1    where you draw the line, because you, better than most, better

2    than all that I've seen so far, can draw that line with

3    dispatch.

4              That line is essential.  It says to you one thing:

5    Not only in my gut, but in my mind I know that you have crossed

6    a line between what you shouldn't be doing hypothetically and

7    what you are on the verge of doing.  It is where it becomes

8    clear that you really have such flexibility as your rule that

9    you can do anything.  That's the difference.  That's the

10   demarcation line between arbitrary and enforceability.  If you

11   are empowered to make a decision flexibly, without constraints,

12   without the guidelines that <u>Marshall</u> spoke of and are spoken of

13   in <u>Kolender</u> and the other cases, absent the guidelines you have

14   a potential, a high potential, for arbitrary and capricious

15   action, and that is exactly what has happened with this

16   statute, and that is exactly what was predicted for it.  I

17   apologize, but that is the fact.

18             Your Honor, I have one more point or two more points

19   very quickly before I leave this.

20             The first one is to turn back to the statement of

21   facts.  I must compliment my friend, Bissonnette, for a superb

22   job in pulling those materials together.  It is comprehensive,

23   it touches the good, the bad and the ugly, and tells you the

24   story in plain terms.  That's why I was able to point you to

25   specifically number 85, to show you what the teachers wanted

1   before all of this started, before the litigation.

2        With respect to one more issue, and that is standards,

3   not standing, we have here, as you have observed, a First

4   Amendment issue abutting a vagueness issue, and the courts have

5   been very clear about the fact that, when those two abut there

6   is a heightened standard, a standard in some of the cases of

7   strict scrutiny.

8        There's another issue that abuts here that we have not

9   touched upon, we did in the briefs, but we have not touched

10  upon in argument before, and that is content.  Where you have

11  content, where you have content challenged because it is

12  content based --

13       THE COURT:  Can I stop you?  And I think that's a

14  point worthy of emphasis.  This statute -- and if Mr. Garland

15  has a different view, it's important for him to point this out

16  when he speaks.  I have no doubt about the fact that this

17  statute is a speech-restriction statute.  That is fundamentally

18  what it does.  It is speech restriction, it is content based,

19  and, even more powerfully, it is viewpoint based.  And so, when

20  we look at how the First Amendment treats speech, how do we

21  view viewpoint-based discriminations on speech?  It is with

22  very, very demanding standards before you can extend

23  viewpoint-based speech restrictions and validate them.

24       Now, here we have to acknowledge, though, there is

25  this overlay of the Garcetti doctrine, and you, respectfully,

1    will disagree with me on this, but I have marked out an area

2    that I believe is not subject to First Amendment protection.

3    It's still a speech restriction; it's just unprotected speech

4    in this area.  But to the extent it goes beyond what Garcetti

5    says is unprotected speech, the fact that it is a

6    viewpoint-based statute that discriminates on speech based on

7    viewpoint suggests that the court has to exercise special

8    caution in that area.  I assume you would agree.

9         MR. MOERDLER:  And, your Honor, I would make two

10   points in that regard.  The first is, because it is content

11   based, one looks as well as to whether it is overbroad, so that

12   Garcetti may protect it to a certain point; for, if you take

13   the king's shilling, you are required to adhere to the king's

14   command, but when the command is unlawful, when the command is

15   improper, when it is arbitrary, capricious, any one of those

16   things, it is no longer a command, and that is open under the

17   case law, as I will point out later.  I just wanted to focus on

18   the content-based one, because there are two cases, neither of

19   which have been cited to date, and both of which should be.

20        The Supreme Court touching on a content-based statute

21   in Reed against Gilbert, 576 U.S. 155 at 163-64 --

22        THE COURT:  I cited Reed -- I've found two state

23   statutes to be unconstitutional, in violation of First

24   Amendment grounds, in 30 years of doing this work.  One of them

25   was what's called the "ballot selfie" case in New Hampshire,

1    where I relied extensively on the Reed decision.  The First

2    Circuit did not think it needed to rely on that standard.  So,

3    I'm very familiar with that particular issue.

4         MR. MOERDLER:  And the other one, of course, is

5    Sorrell against ISM, reported at 564 --

6         THE COURT:  So, you know that decision -- I found the

7    identical statute unconstitutional.  The First Circuit said I

8    was wrong.  The Supreme Court said I was right and upheld the

9    -- excuse me -- invalidated the statute, an identical statute

10   in Vermont, and the State had to come back and agree that the

11   New Hampshire identical statute was now unconstitutional --

12        MR. MOERDLER:  So that I am not accused of plagiarism,

13   I did indeed trace your cases, but I do want to note for the

14   record that that is an issue that has not been touched upon

15   enough, because here you have the spectacle of a vague statute,

16   at least arguably so, you have a statute that is viewpoint

17   restrictive, and you have a statute that on its face is content

18   based, viewpoint based, and therefore strict scrutiny may not

19   even be enough if you read cases like Reed, which really say

20   don't do it.

21        And so, I would add one last point, and that is that

22   the vagueness challenge here can never get lost entirely as

23   being by itself because of the additional points I have just

24   made and the standards they force the Court, with respect, to

25   bring to bear in judging a statute like this.

1              And, with the Court's permission, I would ask the

2    Court to let Mr. Bissonnette deal with the vagueness point

3    directly.

4              THE COURT:  All right.  Thank you.

5              MR. MOERDLER:  And I thank the Court.

6              MR. BISSONNETTE:  Thank you, your Honor.  Again,

7    Gilles Bissonnette on behalf of the plaintiffs Andres Mejia,

8    Christina Kim Philibotte, who are present today, as well as

9    NEA-New Hampshire.

10              I want to get right to some of the points, your Honor,

11    that you raised at the outset:  the deposition testimony

12    concerning this kind of additional criteria of context; in

13    addition, I want to just add some elaborating points on

14    extrinsic evidence, if I may.  Is that appropriate?

15              THE COURT:  Yes.

16              MR. BISSONNETTE:  Thank you.  So, the notion of

17    context matters, which we heard time after time after time

18    again in the deposition, in addition to simply having the

19    statute recited back to us when we asked basic questions

20    concerning what was covered, educators need to know, at least

21    according to the State, what is barred by reading the statute,

22    but, by adding the notion that additional context matters, it

23    shows once again I think, your Honor, the subjective nature of

24    this inquiry, that a violation is in the eye of the beholder,

25    and that there are an infinite number of ways in which this law

1    may apply or may not apply.  Teachers are left with no answers

2    as to what context is okay and what context is not.

3          I want to get to both the practical problems with that

4    and the underlying legal issue which the State raises, which is

5    does any of that really matter, all of that deposition

6    testimony?

7          First off, I'm trying to ground this case and not make

8    this the law school exam problem that the State is trying to

9    present to this Court.  This is a real case, where hundreds, if

10   not thousands, of teachers are genuinely trying to figure out

11   what is covered and what is not.  Can I teach this particular

12   book?  If so, how can I teach it?  Are classroom discussions

13   covered?  Are read-alongs covered?  Can I assign multiple

14   perspectives to different students and have them have a

15   discussion or even debate a particular issue?  These aren't

16   hypotheticals.  These are vital questions for educators so they

17   can know and have some certainty that they're not violating the

18   statute, because, if they guess wrong, they can lose their

19   license.  So, I just want to just highlight that these aren't

20   just hypothetical questions; these are critical questions for

21   New Hampshire educators.

22          THE COURT:  Well, to the extent -- and I think you do

23   make some references in your brief, but if you want to draw to

24   my attention specific examples, that would be helpful, and I'll

25   hear Mr. Garland's argument that I should ignore that, but it

1      does seem to me relevant.  To the extent that you have evidence

2      that teachers are, in fact, changing the way they are teaching

3      now because of a concern that they may be swept into the net

4      that's cast by the amendments, that strikes me as worthy of

5      consideration, certainly.

6             MR. BISSONNETTE:  Yes.  I think that evidence was well

7      developed by the plaintiffs in this case, and it is the last

8      section of the Plaintiffs' Statement of Facts here.

9             But just to summarize, though, these weren't just

10     hypotheticals.  We asked -- in addition to whether certain

11     texts were covered, we asked questions like, What is teaching

12     under the statute?

13            But even setting that aside, we raised specific books

14     that the Department of Education actually asserted in the

15     public record were reasons for why the law was actually

16     necessary.

17            THE COURT:  Well, let me just -- I need to underscore

18     this point; this is so that Mr. Garland can be prepared to

19     address this:  When we look at the vagueness challenge here, I

20     think we have to look, and I think your brief makes this point,

21     but I want it to be quite clear to Mr. Garland that I see it as

22     significant, that the problem, from your perspective, is not

23     only a problem about what speech is banned, what concepts

24     cannot be spoken, what they mean.  There's also a concern about

25     what it means to teach --

1          MR. BISSONNETTE:  Yes.

2          THE COURT:  -- to inculcate, to instruct.  And so, you

3     have vagueness across two dimensions.  One is as to the content

4     of the banned concept, what is the banned concept, what is or

5     is not banned, and then what is teaching.  If a student raises,

6     Teacher, I'd like to talk about white privilege, is that

7     teaching if the teacher allows the student to talk about white

8     privilege, or is that not covered teaching, instruction,

9     inculcating?  So, there's a question about the vagueness of the

10    concepts, and there's a question about what is teaching.

11         MR. BISSONNETTE:  Yes.

12         THE COURT:  And if you go back to the old

13    anticommunist cases like Keyishian, that the Court, Justice

14    Brennan, makes that point in his discussion of teaching in that

15    case about a different subject, kind of communism or conduct

16    that is advocating the violent overthrow.  He makes the point,

17    in finding that statute unconstitutionally vague, that there's

18    a problem with these concepts of identifying when something is

19    teaching or not.  So, there's a need for guidance about that

20    that is -- I understand you to make the argument that that's

21    one of the reasons why it's unconstitutional.

22         If you think of it as -- and that also bears upon the

23    First Amendment vagueness argument, because, to the extent one

24    can encompass within this concept of inculcating, instructing,

25    teaching, communications between a teacher and a student in

1      contexts other than in the classroom, it starts to raise

2      questions about how that may infringe on protected conduct that

3      the teacher might want to engage in but that an administrator

4      of the statute might consider teaching, advising, inculcating,

5      I would use the term advocating.

6              MR. BISSONNETTE:  Yes.

7              THE COURT:  So, I just want to make that -- to me that

8      is very important, that this is not, in your view, only vague

9      because it doesn't explain, provide sufficient guidance as to

10     what concepts are or are not banned.

11             MR. BISSONNETTE:  Yes.

12             THE COURT:  It also is vague and it doesn't describe

13     adequately what kinds of behaviors by teachers in what contexts

14     are prohibited.

15             MR. BISSONNETTE:  And there's even disagreement I

16     think within the state as to what's covered.  Is it just

17     teaching?  Can it be by implication?  Does there have to be

18     knowing requirement?  I mean, I think the state is all over the

19     map.

20             But I do agree with you that I think the way that I

21     have looked at the statute is you break it down into its

22     component parts.  The first is the how, that is to say, what

23     constitutes teaching, what constitutes inculcating, what

24     constitutes compelling to express a belief in support of or

25     against something.  That is a key element of the statute, and

1   we asked multiple questions trying to get to the bottom of what

2   the enforcers think that means, and we couldn't get any

3   answers.  That's where the defendants kept saying, well,

4   context matters.

5          And they went even further to say, you know what?

6   That's just left for educators to decide.  That is an

7   exceedingly unhelpful response from the enforcers of the

8   statute, to just pawn it right back on educators who are trying

9   to figure out what's required of them so they don't

10  inadvertently break this law and end up getting hauled either

11  into court or before a DOE proceeding.  That is element one,

12  though, of the statute.

13         Element two is, of course, assuming there's been

14  teaching, assuming there's been inculcating or compelling to

15  express a belief and/or support for something, is was a banned

16  concept implicated, was a banned concept taught, assuming

17  something was taught?  And that's where, if you look at the

18  deposition testimony very carefully -- I'm going to be blunt.

19  I was incredibly frustrated by the responses, and that's

20  because I was saying throughout.  Let's assume there was

21  teaching, let's assume there was inculcating, and I want to

22  teach, using the words of the statute, teach, I want to teach

23  this particular book, or I want to teach this particular

24  sentence from Dr. Kendi, the very same sentence that the

25  Department of Education said was a reason why this law was

1     necessary in the first place.  Is it covered?  And I kept

2     getting, Context matters, context matters.  I am giving you the

3     context, I am teaching this particular sentence, but is it one

4     of the four banned concepts?  No answer.  So, if I can't get a

5     straight answer at a sworn deposition, how are educators

6     supposed to figure out what's covered or not, when it's either

7     punting it back to them or just plainly not answering direct

8     questions?

9         This wasn't a matter, your Honor, of just I'm trying

10    to figure out, like, what are the close cases in this

11    particular case.  I want any case so teachers can have at least

12    some guidance what the contours are of this particular statute.

13        THE COURT:  Well, let me ask you a related point that

14    I was wondering about.  You're focusing on the outer boundaries

15    of the amendment.  What about the core ideas that the amendment

16    is addressed to?  Can you identify evidence in the record of

17    either conduct prior to the adoption of the amendment that

18    legislative history demonstrates was clearly what was the

19    problem or conduct subsequent to the enactment of the

20    amendments that someone says is prohibited?

21        MR. BISSONNETTE:  Yes.

22        THE COURT:  Because evaluating vagueness can involve

23    not only a look at the outer boundaries but at the core, and to

24    the extent there's no core identified --

25        MR. BISSONNETTE:  Yeah.

1          THE COURT:  -- it's harder to determine the outer

2    boundaries.  So, do you have a thought about that?

3          MR. BISSONNETTE:  I do.  So, let's look at -- well,

4    first off, let me just say at deposition I asked that very

5    question of the enforcers, so, What is covered by this statute

6    that was taught before that would be banned?  And no one would

7    answer the question.  They said, you know, I don't know, or, I

8    can't point to any information.

9          So, let's just set that aside.  Not a very helpful

10   response.  Laws are supposed to mean something, they're

11   supposed to do something, and I can't even get the enforcers to

12   point at prior texts that have been taught that they think are

13   problematic, that they think now would be banned.

14         But setting that aside, we do know of two specific

15   texts that the Department of Education has referenced publicly

16   for why this law is necessary.  The first is a two-sentence

17   snippet from this book by Dr. Kendi, *How to Be an Antiracist,*

18   cited by the Commissioner of Education in an op-ed explaining

19   why these amendments were, quote, needed and necessary.

20   Setting that aside.

21             In addition, a second book --

22         THE COURT:  I can't remember.  Is the op-ed in the

23   record?

24         MR. BISSONNETTE:  Yes, the op-ed is in the record.

25         THE COURT:  So, are the two sentences you're talking

1    about identified in the op-ed?

2         MR. BISSONNETTE:  Yes.  Yes.  And, in fact, I would

3    just note at the outset, your Honor -- Exhibit 40 -- that the

4    two sentences that he cites, The only remedy to racist

5    discrimination is antiracist discrimination; the only remedy to

6    past discrimination is present discrimination; the only remedy

7    to present discrimination is future discrimination.

8         Now, you take that out of context, what does that

9    mean?  The very next portions of that same paragraph are citing

10   Linden B. Johnson in a 1965 speech as well as U.S. Supreme

11   Court Justice Harry Blackmun, who wrote -- was writing about

12   affirmative action.

13        So, your concern was does the statute sweep within its

14   scope statements concerning affirmative action?  We have proof

15   right here that it potentially would.  But let's set that

16   aside.

17        We also have a second book that the Department of

18   Education cited for why this law is necessary, Tiffany Jewell's

19   book, *This Book is Anti-Racist*, a book written by a woman of

20   color really designed to kind of empower students, particularly

21   students of color, to talk about injustices that they see in

22   the world, including racism.  This book, Commissioner of

23   Education says in a State Board of Education meeting, This

24   shows why -- that these things are happening in New Hampshire.

25   That was in July of 2021.

1      So, these aren't hypotheticals, right?  These are real

2  books, real texts that have been propounded by the Department

3  of Education to say this is why this law is necessary.

4      So, at deposition what do we do?  Is this book

5  covered?  If I were to teach this book that you referenced,

6  teach, using the words of the statute, would an educator be in

7  violation?  No answer.  If I were to teach those two sentences

8  in Dr. Kendi's book that you referenced in your op-ed, if I

9  were to teach it would I be in violation?  No answer.  Those

10  are specific examples of texts in the record that I just want

11  to --

12      THE COURT:  I will say Mr. Garland's thought resonates

13  with me, at least to this extent:  In interpreting the statute,

14  what the statute means, and my interpretation obviously is not

15  authoritative, it would be what the New Hampshire Supreme Court

16  ultimately says, I ordinarily wouldn't take into account

17  beliefs from people off the street or even administrators as to

18  what the statute means, but it does seem to me -- Mr. Garland,

19  when it comes to your turn, you'll tell me why I'm mistaken

20  about this -- that it is important to understand if the

21  administrator is unable to point out in a deposition whether

22  teaching that would be wrong but says in op-eds, as the chief

23  administrator of the statute ultimately -- and we'll get to

24  this issue of the relationship between the Human Rights

25  Commission and the Department -- tells the world of teachers,

1    These are the problems, but I won't tell you in a regulation,

2    or I won't tell you in a deposition, isn't that exactly the

3    kind of arbitrariness that is one of the two fundamental

4    concerns that vagueness law is trying to address?

5              MR. BISSONNETTE:  Yes.

6              THE COURT:  That's my initial thought on that, and

7    Mr. Garland can respond when his time comes.

8              MR. BISSONNETTE:  Well, that's my thought, too.  This

9    isn't a person off the street, your Honor, right?  This is the

10   Department of Education Commissioner.  He heads a misconduct

11   committee with other individuals.  He fields -- he has been

12   fielding complaints under this statute, and ultimately he is

13   tasked with enforcing it, including going so far as engaging in

14   license ramifications with respect to educators.  So, you know,

15   this a person whose opinion matters in evaluating this statute.

16             I would just note for the record that summary judgment

17   Exhibit 21 is Commissioner Edelblut's op-ed.

18             So, those are two specific texts.

19             But also in the trenches of the justice system --

20   excuse me -- the education system, pardon me, how have those

21   public statements from the DOE actually trickled down to

22   educators?  And they've had a real effect.

23             The Mejia declaration, Exhibit 15, paragraph 16, texts

24   like Tiffany Jewell's book, *This Book is Anti-Racist,* Jason

25   Reynolds, Dr. Kendi's 2020 book for individuals 12 and older

1    entitled *Stamped* have been removed from instruction.  Why?

2    Because we have the DOE talking about these books, and it's

3    only natural for educators, Oh, my gosh.  Are these going to be

4    violative?  So, they pull them from instruction, even when

5    there are plans to do so.

6          The O'Mara declaration, which is Exhibit 16 of the

7    summary judgment record, *Stamped* was expressly approved by at

8    least one school board for eighth graders only to never come

9    off the shelf in one district, following Commissioner

10   Edelblut's July 13, '21 public statements concerning Dr. Kendi.

11         Plaintiffs Ryan Richman and John Dube have also

12   curtailed and restrained their classroom discussion.

13         So, real-life ramifications for educators.

14         I would like to get to extrinsic evidence, though, as

15   well, just really brief on that.

16         THE COURT:  Okay.

17         MR. BISSONNETTE:  I think it might be appropriate to

18   turn it over to Attorney Garland.  I know I've been --

19         THE COURT:  Well, I've got a few questions for you,

20   though.

21         MR. BISSONNETTE:  Oh, sure.

22         THE COURT:  Whatever you need to do, finish up, and

23   then I'll ask my questions.

24         MR. BISSONNETTE:  Thank you.  On the extrinsic

25   evidence piece, we do think that defendants are wrong that

1    extrinsic evidence cannot be categorically considered in a

2    facial vagueness challenge.  You can consider this evidence,

3    you should.  But, even if you disagree, I think you reach the

4    same conclusion, that the law is vague on its face similar to

5    the conclusion at least at the 12(b)(6) stage that this Court

6    reached, which was just based on the contours of the particular

7    statute.

8              So, I think this is an important legal question.  At

9    the end of the day I don't think it matters with respect to the

10   ultimate end result.  I think the law is unconstitutional,

11   whether you consider the well-developed record or not.

12             So, I think the short of it is I don't think we need

13   to present extrinsic evidence, but we have it, and it confirms

14   that we're right.

15             And I want to just echo what my colleague,

16   Mr. Moerdler, said at the outset, that I think we start here

17   with the language in Grayned that says precedent allows

18   consideration in a facial challenge of, quote, the

19   interpretation of the statute given by those charged with

20   enforcing it.  We did that.  That was what the point of those

21   depositions were all about.  These are enforcers.  How do they

22   interpret and apply it in practice?

23             The cases that the defendants cite, in those cases the

24   courts concluded that extrinsic evidence did not render a law

25   vague where the law was otherwise sufficiently clear, and I

1    would submit that predicate just doesn't exist here, where the

2    text of the amendments is far from sufficiently clear; and we

3    know it's not clear, because there's already been two efforts

4    through guidance to try to reimagine or reframe or reinterpret

5    the particular statute.  So, I think we know right away that

6    this law isn't sufficiently clear.  It's appropriate to bring

7    in extrinsic evidence concerning how enforcers have interpreted

8    it not just through guidance but in application and as well the

9    trickle-down effect to educators themselves.

10         But I think here, of course, extrinsic evidence can

11   and should be a two-way street, because I think, of course, you

12   have the State saying, You can't consider extrinsic evidence,

13   but you can consider our extrinsic evidence, which is the two

14   guidance documents they've issued.  I think you have to look at

15   both.  You can't just say, You can consider my extrinsic

16   evidence but not the extrinsic evidence presented by the

17   plaintiffs.

18         Just with respect to some of the cases that have kind

19   of evaluated this question, we did cite the Carolina Youth

20   Action Project case.  I think that is a very powerful case on

21   this particular question.  So, there there was a challenge to a

22   school's disorderly conduct or disorderly action statute, and

23   there there was deposition testimony presented, there was

24   extrinsic evidence concerning disparities presented, and I just

25   think it's a very, very powerful case that shows the power and

1    importance of extrinsic evidence.  So, I just wanted to --

2         THE COURT:  What do you make of the defendants'

3    citation to Lachman, 387 F.3d 42, and I think Platt, 894 F.3d

4    251, which are two decisions that they cite for the proposition

5    that I really shouldn't consider the materials that you're

6    drawing to my attention?

7         MR. BISSONNETTE:  Sure.  I think there's two points

8    with respect to Lachman.  In Lachman that predicate was met,

9    the law sufficiently clear just on its face, I don't need to

10   evaluate extrinsic evidence.  We don't have that here.  The law

11   is unclear on its face.  We know, because we have all of these

12   extrinsic interpretations and reimaginings of the statute that

13   have been proffered by the State.

14        But also, too, that is a very different case.  I

15   actually think, when you read it very carefully, it's a federal

16   court case looking at the interpretation of a federal statute,

17   where there is more latitude, frankly, than there is here with

18   respect to how a federal judge interprets a state statute.

19   Grayned itself says, It is not within our power to construe and

20   narrow state laws.

21        The language that the defendants pull from Lachman

22   have to do with Chevron deference, have to do with in the

23   context of Chevron and the Administrative Procedures Act what

24   is the appropriate interpretation to evaluate.  That's not what

25   we're dealing with here.  We're dealing with a state statute

1    that, in our view, is sufficiently vague and ambiguous that it

2    can require -- or this Court can evaluate extrinsic evidence.

3    Carolina Products demonstrates that.

4         And why do we know that it's met that predicate for

5    this Court to be able to look at extrinsic evidence?  Because

6    they've already presented extrinsic evidence themselves in the

7    context of two guidance documents and, in addition, further

8    reimagining of the statute in their briefing.

9         THE COURT:  From your position, I at least understand

10   your argument, it is the defendants, Mr. Garland's boss, can

11   issue Attorney General opinions without notice, public notice

12   and comment, you can issue guidance documents, as many as you

13   want or as few as you want.  They aren't laws, they aren't

14   rules, they aren't subject to rulemaking, but I should consider

15   those, but I shouldn't consider anything else, and that gives

16   one party complete control over what kind of extrinsic evidence

17   to be considered.

18        MR. BISSONNETTE:  Yeah.  I think it's pretty unfair,

19   to be honest with you, your Honor.  But I think Carolina Youth

20   Action Project just has some really good language here.  That

21   is also a vagueness case, and there the court explicitly

22   rejected there the State's argument that the court shouldn't

23   consider statistics in the record, stating that the evidence

24   had, quote, value to confirm that the disorderly conduct law

25   fails to give sufficient guidance to prevent discrimination

1   enforcement.  So, I just think it's very powerful there, when

2   you have a law that is going to have broad-based application to

3   thousands of individuals, as the statute did in the Carolina

4   case, and could have broad application to a significant amount

5   of speech and conduct.  So, I think that's very informative.

6   The Hills (ph) case -- was it the <u>Platt</u> or Hills case you

7   wanted me to address?

8             THE COURT:  <u>Platt</u> was the one I had in my notes.

9             MR. BISSONNETTE:  Exactly.  <u>Platt</u> really, I think the

10  focus in <u>Platt</u> really is that, the thrust of why the State is

11  relying on it is because they think we're just using

12  hypotheticals throughout the deposition testimony, and I just

13  think these aren't hypotheticals; these are real examples,

14  using real books proffered by the Department of Education.  So,

15  I just don't think that that's --

16            THE COURT:  I know your colleague is going to want to

17  address overbreadth at some point, so I'm going to give him a

18  chance to do that, but I do have a couple of questions for

19  you --

20            MR. BISSONNETTE:  Oh, sure.  Of course.

21            THE COURT:  -- about how the statute is administered,

22  the amendments are being administered now, and that is, they

23  create this responsibility, some of which are assigned to the

24  Human Rights Commission, and some of which are assigned to the

25  Department of Education, and I expressed a view in my ruling on

1    the Motion to Dismiss as to how I understood that relationship

2    to work as a matter of law, but, in reading the briefs, it

3    seems like the defendants take the position that it doesn't

4    really work that way.  The defendants take the position that

5    the Department of Education basically takes a hands-off

6    approach to any allegation of a violation of the Educator Code

7    of Conduct, won't take any disciplinary action against any

8    teacher until and unless it has first been fully passed through

9    the Human Rights Commission and the Human Rights Commission has

10   found a violation.  I don't see anything in the statute that in

11   any way authorizes that, and in my order I can only look at

12   law.  So, I looked at the law, and the Department of

13   Education's own regulations don't contemplate anything like

14   that.

15        What am I missing there?

16        MR. BISSONNETTE:  You're not missing anything.  This

17   same argument was raised at the Motion to Dismiss.

18        THE COURT:  Yeah.  And I told people how I thought it

19   worked, and I didn't see anybody in their brief telling me, Oh,

20   you just overlooked something.

21        MR. BISSONNETTE:  No, no.  I think we are in the same

22   place we were a year ago, where it continues to be the

23   defendants' position that the DOE isn't involved in making

24   determinations under the amendments, and it's really a

25   question --

1       THE COURT:  There is nothing in the amendments or in

2  the regulations that prohibit the Commissioner from doing that

3  at any point, other than that he decides with the Commissioner

4  of the Human Rights Commission, Let's agree that you do

5  something first.

6       MR. BISSONNETTE:  I totally agree.  To be blunt, we

7  think that is a manufactured construction of the statute to try

8  to get at or address the arbitrary and discriminatory

9  enforcement concerns that we've raised in this case.  We don't

10  see any validity to the assertion raised by the State that, no,

11  the DOE doesn't have enforcement power.  The DOE has

12  enforcement power.  It was contemplated in 193:40, IV.  This is

13  a violation of the Educator Code of Conduct.  The whole point

14  behind that provision is to give the DOE enforcement --

15       THE COURT:  I read the regulations to obligate the

16  Commissioner --

17       MR. BISSONNETTE:  Absolutely.

18       THE COURT:  -- to enforce the Educator Code of Conduct

19  and not to simply stand back and say, Well, I'm not going to do

20  anything.

21       So, that was a concern of mine.  I've tried to use the

22  law to interpret the statute, but apparently the State is

23  taking a different view about what the law requires, or maybe

24  they agree, No, that's what the law requires, but we have

25  agreed amongst ourselves to do something different.

1          MR. BISSONNETTE:  I'll have to allow the State to

2     articulate their position there.  To me, I think the law is

3     very clear.  The four corners of the statute mandate that the

4     DOE has enforcement authority.  When you look at the Code of

5     Conduct rules, the DOE has to engage in investigations under

6     this particular statute.  It is everything that this Court said

7     we think is true, when you look at the very four corners of the

8     Code of Conduct and the statute at issue here.

9          I do want to say that there's I think, going back to

10    the extrinsic evidence, I know that they said that DOE doesn't

11    have enforcement power, even though we think that's wrong,

12    looking at the four corners of the statute.  I actually think

13    in the trenches the DOE is pretty active here, right?  They get

14    complaints under the amendments.  They have an obligation under

15    their own rules to engage in what are called initial inquiries.

16    These occur before there's even been a *prima facie* or initial

17    determination that there's a violation.  What do they do?  They

18    call superintendents up and they say, Hey, I got this

19    complaint.  This is something that maybe you should look into,

20    including complaints where the amendments are referenced.  And

21    I think what the State --

22          THE COURT:  That's in the record here?

23          MR. BISSONNETTE:  Yes.  And I would refer the Court to

24    Plaintiffs' Statement of Facts 138 to 141, where we documented

25    this extensively.  I mean, what the State is going to say --

1      THE COURT:  You never need to get to an actual

2  enforcement action if you can simply make someone aware, Hey,

3  something might happen if you continue to engage in that

4  conduct.

5      MR. BISSONNETTE:  I think it's probably subtler than

6  that, to be honest.  But you have the enforcer calling

7  superintendents up.  It would be like if the Attorney General's

8  Office called the ACLU up, Hey, I may be asking you questions

9  about your nonprofit status.  These are conversations.  These

10  are touches.

11      THE COURT:  I'll look at those things in the record.

12      MR. BISSONNETTE:  Thank you.

13      THE COURT:  The last question I have for you is about

14  Footnote 7 of my opinion.  I don't know if anybody paid any

15  attention to Footnote 7, but I laid out in Footnote 7 a concern

16  that I have that the way in which the amendments interact with

17  Chapter 354-A, that individual teachers can be exposed to

18  individual damage liability for violating the

19  antidiscrimination laws, and I laid that out in Footnote 7 very

20  specifically, because, if I'm wrong about that, somebody should

21  tell me.  I happen to know the case that the Supreme Court

22  worked on, Fred Fuller Oil, where the Court recognized aiding

23  and abetting individual liabilities.

24      MR. BISSONNETTE:  Yes.

25      THE COURT:  That was my case.

1          MR. BISSONNETTE:  Yes.

2          THE COURT:  They sent it to the New Hampshire Supreme

3     Court for an opinion, and they clarified and changed our view

4     of the statute.

5          MR. BISSONNETTE:  Yup.

6          THE COURT:  And I discussed the specific provisions in

7     the amendments that make certain things a violation of the

8     antidiscrimination law and explained my view that they appear

9     to subject individual teachers to damage actions for violation

10    of the antidiscrimination law.  So, if that's true, when I

11    consider the consequences of a teacher being deemed to be in

12    violation, they include not only potentially losing your

13    employment, losing your certification to teach, but they could

14    subject teachers to individual liability as to damages.

15         MR. BISSONNETTE:  Yes.

16         THE COURT:  Am I right or wrong about that?

17         MR. BISSONNETTE:  You're 100 percent right.  And this

18    is also germane to severance, which I know we'll get to at the

19    end of the argument, right?

20         THE COURT:  Yeah.

21         MR. BISSONNETTE:  If you sever 135:40 does that

22    address everything?  Not necessarily, because, as this Court

23    concluded, I think accurately summarized, there could be aider

24    and abettor liability.  I think this Court's interpretation is

25    right.  I also think the Attorney General's Office would have

1    to agree, because they just brought an aider and abetting civil

2    rights action against NSC-131 against actual individuals.

3         So, I think you are right.  I agree with Footnote 7.

4         THE COURT:  Well, let me ask Mr. Garland, have I

5    correctly interpreted the State's law on the possibility that a

6    teacher who teaches a banned concept, in violation of the

7    amendments, engages in an antidiscriminatory act which can

8    subject a teacher as an aider and abettor to their employer of

9    a violation of the antidiscrimination law and can expose that

10   teacher to liability for damages?

11        MR. GARLAND:  So, I disagree with that, your Honor.

12        THE COURT:  What is your argument, because you didn't

13   put it in your brief?

14        MR. GARLAND:  Yeah.

15        THE COURT:  But you understand the way I've set out

16   the law there?

17        MR. GARLAND:  Yes.

18        THE COURT:  What's wrong with it?

19        MR. GARLAND:  So, the big difference, right, is Fred

20   Fuller is focused on the interplay between three provisions.

21   It's 351-A:2, 351-A:7, which is limited to employment

22   discrimination, which isn't relevant here.  I guess it's maybe

23   four provisions, 354-A:21 and 21-a.  And I think the big

24   disconnect between Fred Fuller and this case here is that

25   354-A:21 and 354-A:21-a kind of set forth the general way that

1    violations under the law against discrimination are enforced.

2    They say you can go to the Human Rights Commission, and the

3    Supreme Court said and you can name an employee as part of the

4    HRC complaint.  21-a says then you can, based on certain time

5    frames, go to Superior Court.  There's no constraining language

6    in there.

7          And, as I read <u>Fred Fuller</u>, the Supreme Court was

8    saying, Well, you have the aiding and abetting provision in

9    A:2, and you have this -- nothing limiting it when you go into

10   court or to the HRC, and so, therefore, individual liability

11   works.

12         The big difference between that and here is we have

13   193:38 and 193:40, III, and those two provisions are the ones

14   that contemplate enforcement specifically of the

15   antidiscrimination provisions of the amendments, and they say

16   enforced against a school or school district in the HRC --

17         THE COURT:  But, although, the general

18   antidiscrimination laws say enforcement against employer, which

19   caused the federal courts in this District to uniformly say the

20   analogy to Title VII applies, and you can't bring claims

21   against individuals, and notwithstanding that fact the New

22   Hampshire Supreme Court made the determination that there can

23   be individual liability.  So, I don't think that cuts it at

24   all, because the antidiscrimination law is a law against

25   discrimination by employers, and yet it has been interpreted to

1    allow for discrimination claims to be brought against

2    individuals like Mr. Fuller.

3           MR. GARLAND:  So, I would just ask the Court to

4    compare A:21 and A:21-a versus 193:38, 193:40, III.  Excuse me.

5    I think I said IV before.  I think that's where the distinction

6    exists, because, if those general provisions can be enforced

7    against everybody, we have much more specific language in

8    193:38, 193:40, III, where the specific rules -- controls over

9    the general.

10          THE COURT:  I'll take a look at it, but it's just, as

11   I said, the antidiscrimination law is a law that on its face

12   only allows for actions against employers, just as this law

13   that you're talking about, the amendment to 354-A, deals with

14   school districts.  It works the same way.  I don't see how you

15   can say in one case it does and the other case it doesn't.

16          MR. GARLAND:  As I read Fred Fuller, your Honor, it

17   was very largely dependent upon those two provisions I keep

18   noting, A:21, A:21-a, which I do think are supplanted by the

19   provisions I'm mentioning here, and so I disagree that the

20   analysis works as cleanly as you're describing.  I would just

21   ask that you look at that.

22          THE COURT:  I will.  I will take a careful look at it.

23          At least there is a risk, unless the New Hampshire

24   Supreme Court comes up with a distinction that's not apparent

25   to me and says, Oh, don't worry about that, there's a risk that

1    teachers could be subjected to individual liability for

2    damages.  That's a concern here.  Do I think it was an intended

3    consequence of the legislation?  No, I don't, but that's what

4    happens when you put legislation like this onto an

5    appropriations bill and run it through without extensive

6    analysis.  But that is a real potential problem.  I'll look at

7    the statutes that you're talking to me about, but that is at

8    this point -- I didn't see in your brief any discussion that

9    took issue with that portion of Footnote 7.  That's why I'm

10   asking the question now.

11         MR. GARLAND:  And that's why I'm prepared for it

12   today, your Honor.

13         THE COURT:  All right.

14         MR. GARLAND:  Thank you.

15         MR. BISSONNETTE:  I just have one brief comment to

16   that, and I'll then cede my time to Attorney Garland.

17         193:40 and 354 are different statutes, right?  So, I

18   don't think you can kind of, like, well, if we merge them or

19   think about them in concert -- they're different statutes.

20   Now, educators are on the hook under both sections, right?

21   They're on the hook under 193:40.  But, even if you were to,

22   like, get rid of that statute, they're on the hook under

23   354-A:32, which deals with no government program shall teach,

24   advocate or advance.  Teachers, obviously, are part of

25   government programs, right?  And then you look, of course, at

1    RSA 354-A:31, no public employers, either directly or through

2    the use of an outside contractor, shall teach, advocate,

3    instruct.  Of course, teachers are part of public employers.

4    They are on the hook in both statutes.  They independently

5    impose liability.

6           And I would submit again Footnote 7 is correct, and I

7    would also submit again that in a different case that was filed

8    about a month ago the Attorney General's Office is seeking to

9    employ -- apply 354 to specific individuals that are part of

10   NSC-131.  So, they have a very broad application of that

11   statute here.

12          THE COURT:  NSC-131 --

13          MR. BISSONNETTE:  They're a horrible neo-Nazi group,

14   frankly, that has been protesting outside the Teatotaller in

15   Concord.

16          But I just think it's important context here that they

17   have a fairly broad, rightly or wrongly, your Honor, right,

18   they have a fairly broad interpretation of 354-A, including its

19   application to individuals which could and does apply to

20   teachers.

21          THE COURT:  But Mr. Garland's argument is, Don't worry

22   about it, because 193:40 is very different, right?  That seems

23   to be what you're suggesting.

24          MR. GARLAND:  Yeah, in a general sense, your Honor.

25   It's very different, because it supplants the more general

1    language, the more general enforcement language in 354-A.

2         THE COURT:  All right.  So, your argument is kind of,

3    to the extent that the Legislature provides a specific remedy

4    as to individuals, it impliedly displaces additional remedy.

5    But there's a provision in the statute that says none of these

6    remedies in any way limit a right of action that exists in any

7    way, shape or form against these people.  I don't have the

8    exact language in front of me, but there is a provision in the

9    amendments that essentially, if I'm remembering correctly, say

10   nothing displaces any remedy that may exist anywhere else by

11   common law or otherwise.

12        MR. BISSONNETTE:  354-A:34 is that statute.  Part of

13   the amendments:  Any person aggrieved by an act made unlawful

14   under this subdivision may pursue all of the remedies available

15   under RSA 354-A.  There are some more statutes:  RSA 491,

16   RSA 275-E, RSA 98-E, or any other applicable common law or

17   statutory cause of action.  It would be weird, I think, for the

18   language of 193 in this bill to somehow supersede or negate or

19   repeal earlier language in the same bill.  That doesn't make

20   any sense to me.

21        THE COURT:  Just a quick comment, Mr. Garland, and

22   then we'll move on.

23        MR. GARLAND:  I just would clarify that I'm not saying

24   it abrogates it, that it supersedes it.  If I used that word,

25   that probably was imprecise.  I'm saying that just under

1    general rules of construction it supplants it, that, when you

2    have a general provision with general enforceability, and then

3    in some other statute dealing with similar subject matter

4    there's something more specific, the New Hampshire Supreme

5    Court has time and again said the more specific language

6    controls.  So, that's the construction point I'm making.  I

7    appreciate you'll take a look at it.

8              THE COURT:  Okay.  I'll take a close look.

9              All right.  So, we're going to get close to a break.

10   Maybe I should hear your argument about overbreadth, and then

11   we'll take a break, and then we'll come to the defendants,

12   okay?  And then after we get the defendants,' I'm going to ask

13   the defendants to make their severance argument, and then the

14   plaintiffs to respond, and then we'll finish.  Okay?

15             MR. MOERDLER:  Your Honor, just one thought.  I do

16   need about five minutes to give you some testimony from the

17   record, that I can put it in the overbreadth, I can put it in

18   later, whatever your Honor please.

19             THE COURT:  You want to read it into the record

20   yourself?

21             MR. MOERDLER:  No, no.  I want to summarize.  It's a

22   summary of it.

23             THE COURT:  Oh, okay.  Yeah, you can do that now.

24             MR. MOERDLER:  Okay.

25             THE COURT:  Do that, and then we'll address your

1    overbreadth argument, and then we'll move on.  Is that

2    acceptable?

3              MR. MOERDLER:  Before I do that, may I do one other

4    thing?

5              THE COURT:  Yes.

6              MR. MOERDLER:  You asked three questions.  I'd like to

7    answer them, if I may.  All right?

8              THE COURT:  All right.

9              MR. MOERDLER:  The first question was on the issue of

10   explicit and the two cases cited by Mr. Garland.  I would rest

11   entirely on the following quotation of the Supreme Court, as

12   voiced by Justice Marshall.  In this situation, as Mr. Justice

13   Frankfurter put it:  We must extrapolate its allowable meaning.

14   Here, we are relegated to the words of the ordinance itself, to

15   the interpretations the court below has given to analogous

16   statutes.  Perhaps to some degree we must look to the

17   interpretation of the statute given by those charged with

18   enforcing it.

19             That is the point about using case law and practice to

20   interpret a statute and holding.  That language has been cited

21   in half a dozen cases that we will give you, including the

22   First Circuit.

23             THE COURT:  Okay.  Thank you.  That's helpful.

24             MR. MOERDLER:  The second point you made, or it was

25   really more than a second point, it was multiple, is also

1    answered by a quotation by a late, great jurist by the name of

2    Sandra Day O'Connor:  Although the doctrine, vagueness, focuses

3    both on actual notice to citizens and arbitrary enforcement, we

4    have recognized recently that the more important aspect of the

5    vagueness doctrine is not actual notice, but the other

6    principal element of the doctrine - the requirement that the

7    legislature establish minimal guidelines to govern law

8    enforcement.  And that's where the problem pops up.

9         From the standpoint of the teacher, in answer to a

10   question you put earlier, the concern is risk.  These are

11   content statute.  I run a risk.  If I teach it and it is wrong,

12   I can lose my license, and indeed that has been the testimony

13   on the depositions.

14        Number two, does it give one party complete control,

15   as you had indicated, of the process?  When it's vague, when,

16   as I shall show you, the Department of Education enforcement

17   mechanism says to a teacher, Look at the op-ed, look at the

18   op-ed to determine how you should conduct yourself, that's

19   about as vague an enforcement and lack of guidelines as you can

20   possibly imagine.  And, again, that's in this record, and I

21   shall get to it, although that's the part that has to be dealt

22   with separately.

23        And you asked, lastly, how does the system work?  The

24   system doesn't, because what works is what is said by the

25   administrator of that system.  If I can write an op-ed -- and

1    understand this op-ed is a little different from most.  It is

2    one that is in language relatively little, two pages, but on

3    the flip side there's a notation that attaches 72 pages of

4    photographs, documents and the like which are characterized in

5    that op-ed, Exhibit 40, are characterized as teachers going

6    beyond the pale.  When you have that, as I shall demonstrate,

7    in an actual case now pending, albeit *in camera* or wherever,

8    when you have that you have no guidelines, you have no system,

9    you have anarchy and dictatorship, and I apologize for saying

10   that.  I've lived through both.

11        When you can have someone say, *Stamped* is not a book I

12   like, and that means you cannot read it, you cannot have it in

13   a room, the teacher is prosecuted affirmatively for having had

14   books in a room, then you have a problem.  You don't have to

15   burn the book; you just ban the book.

16        So, having said that, your Honor, let me go, if I may,

17   to one last point on this.  You asked one last question:  What

18   is the intention of the bill in this regard?

19        My colleague, Mr. Goldman, gives me the following

20   quotation:  The bill is designed in part to ensure that the

21   minds of future generations of our state are not being unduly

22   influenced by advocacies for such toxins as critical race

23   theory, Senator Robert -- Bob Giuda, Statement of Facts number

24   70.

25        Now, with that said, your Honor, if I may go to the

1    overbreadth point, or should I wait?

2            THE COURT:  Yes.

3            MR. MOERDLER:  Your Honor ruled that Garcetti carved

4    out a whole exception in this area, saying the First Amendment

5    may not apply or be enforced in this area because, when you

6    take the king's shilling, you work for the king.  That's the

7    parent law.  But it doesn't say that everything you have that

8    comes from the king is a command that must be obeyed.  And

9    that's not what the courts say.

10           So, for example, following on Bremerton is the case of

11   Beathard against Lyons, 620 F. Supp. 3d 775, from the District

12   Court in Illinois.  It said as follows:  The replacement of a

13   Black Lives Matter poster with an All Lives Matter poster on an

14   office door is private speech and not covered by Garcetti.  It

15   is protected by the First Amendment, so that you have the

16   beginnings there.  And now let me, if I may, show you where

17   this case goes in the real world of the teacher.

18           THE COURT:  I don't want to get too far into

19   abstraction, but I am interested in your thinking about the

20   relationship between a First Amendment facial vagueness

21   challenge and a First Amendment overbreadth challenge, and I'll

22   tell you my view, and then you can explain to me, if yours

23   differs, why.

24           I find this area of law, as do most of the

25   commentators, if you read a constitutional law treatise, they

1    will say things like, Many courts treat the two as

2    interchangeable arguments, they're very difficult to untangle,

3    courts oftentimes don't talk about the differences between

4    them.  I do understand them to overlap in certain areas but to

5    be analytically distinct types of claims.  I draw some support

6    for that view from the Supreme Court's decision in <u>Holder</u>

7    <u>against Humanitarian Law Project</u>, a 2010 decision, where I

8    think the majority describes the relationship of a vagueness

9    and an overbreadth claim.  I'll just quote from a portion of it

10   for you and then explain my thinking so you can react to it:

11         The Court of Appeals contravened the rule that a

12   plaintiff who engages in some conduct that is clearly

13   proscribed cannot complain of the vagueness of the law as

14   applied to the conduct of others, citing to <u>Hoffman</u>, a case

15   we've all cited many times.  The rule makes no exception for

16   conduct in the form of speech.  Thus, even to the extent a

17   heightened vagueness standard applies, a plaintiff whose speech

18   is clearly proscribed cannot raise a successful vagueness claim

19   under the Due Process Clause of the Fifth Amendment for a lack

20   of notice, and he certainly cannot do so based on the speech of

21   others.  Such a plaintiff may have a valid overbreadth claim

22   under the First Amendment, but our precedents make clear that a

23   Fifth Amendment vagueness challenge does not turn on whether a

24   law applied to a substantial amount of protected expression.

25         In my mind, an overbreadth challenge does not require

1   vagueness.  You can have a successful overbreadth law challenge

2   to a statute that is not vague at all.  So, vagueness is not

3   required.  You can have overbreadth challenges that involve

4   statutes that are vague.

5        Another fundamental difference is, if you are being

6   prosecuted for violating a statute and it's agreed that you

7   violated the statute and the violation is one that is

8   Constitutionally permissible, overbreadth is a special

9   analytical method that the Court will entertain arguments that,

10  even though as applied to you, the person who is being

11  prosecuted, the statute is nevertheless invalid, because in a

12  substantial number of other applications it violates the First

13  Amendment.

14       So, I see overbreadth as being a very powerful

15  doctrine, but I'm not sure that in its application here it in

16  any way is distinguishable from what I consider the core claim

17  that both plaintiffs are really making, which is that this is

18  an overbroad statute, and it violates the First Amendment to

19  the extent it's overbroad in ways that could chill protected

20  speech, and it's overbroad in violation of the Due Process

21  Clause to the extent it doesn't give fair notice, allows for

22  arbitrary enforcement.

23       I don't see a distinct overbreadth claim in which

24  those claims fail but the overbreadth claim survives, because

25  this is not a case in which any of the named plaintiffs are

1       being charged with doing something that violates the statute.

2       So, they can bring a facial vagueness challenge, and it's not

3       necessary for them to bring an overbreadth challenge, and it

4       doesn't do any analytical work to bring a distinct argument

5       under an overbreadth theory.

6               I don't know if that's been clear enough for you, but

7       that's my sort of general thinking about it.  Your reaction?

8               MR. MOERDLER:  I would agree with you, but I would

9       take you to the next step, which is on this record, and it came

10      up in the course of the examination of the chief investigator

11      for the Department of Education.  He was asked a question:

12      What if a teacher was seen in the hallway wearing a Don't be a

13      Racist pin?  Now, in New York the courts have so far held the

14      attire that you may wear in the office, in school, may not

15      include pins.  It was because of that case, which I lost,

16      because of that case I focused on it here, because the

17      investigator said, Be careful; you don't know whether that pin

18      is going to be allowed to be worn.

19              When I read that, it brought it back as the

20      distinction of a separate area.  That person in New York would

21      have violated the New York code in terms of attire, and yet on

22      the speech side it's overbroad.  That was my point in trying to

23      say that on that issue you have that potential.

24              In this case you are 100 percent correct.  There is no

25      distinction here.  Whether you view this case as a First

1   Amendment case, unfortunately only in a narrow area, perhaps

2   larger, as you look at the overbreadth, and I will show you in

3   a moment it is really large, it is in that area that <u>Garcetti</u>

4   takes a backseat.  It's the area in which the teachers have a

5   concern.  Because let me, if I may, give you a quick series of

6   just the points that were made by the chief investigator, who

7   was, fortuitously, once a teacher --

8        THE COURT:  Can I just interrupt to make one other

9   quick point before it escapes me so that you understand my

10  thinking?  In saying that I don't think there is a meaningful

11  distinction between an overbreadth claim in this case and a

12  First Amendment facial vagueness claim in this case, that

13  argument -- that view of mine hinges on an earlier decision

14  that I have already made that the government doesn't agree

15  with, that you can maintain a facial vagueness claim even

16  though the statute is not vague in all applications.

17       And I will point out, Mr. Garland, there are now two

18  more Circuits, one a few days ago that agrees with my view on

19  this, it's now four to one, but, once you make that leap, as I

20  have done -- maybe the Circuit will disagree, but four Circuits

21  agree with me, one does not -- once you make that leap in the

22  context of this case there's no need to get into overbreadth as

23  a distinct claim, because the facial vagueness encompasses all

24  of the First Amendment concerns that we have in this particular

25  case, and someone is allowed to maintain that claim.

1          And I think of overbreadth as the unusual case where

2    someone has engaged in conduct that unquestionably is

3    sanctionable under the statute without violation of the First

4    Amendment, someone who is given a curricular guidance from the

5    district that, You shall teach X, and they say, I am not doing

6    it, I'm teaching Y, and they are subject to liability under

7    this provision, sanction under the Educator Code of Conduct,

8    they are allowed under an overbreadth rule to say, Strike it

9    down, because, even if it isn't unlawful as to me, it's

10   unlawful in a substantial number of other applications.  That's

11   where overbreadth gives you a special right, and I just don't

12   think it's necessary to get to in this case.

13        MR. MOERDLER:  Let me tell you why I do it, your

14   Honor.  The late Charles L. Brieant, former Chief Judge of the

15   United States District Court for the Southern District of New

16   York, and a close friend, was wont to say to me, Never, ever

17   assume that the Circuit goes along.  Put the argument on the

18   record.

19        THE COURT:  Wise advice.  Wise advice.  So, in any

20   event, just a last comment on that, and then we'll take our

21   break, okay?  Is there anything else you wanted to add on that

22   point?

23        MR. MOERDLER:  I just wanted to take you through a few

24   examples, because they make your point, but you need to have

25   them in, background in terms of this is this case.

1          THE COURT:  Let me do this:  I'm going to give my

2     reporter a break, and then I'll ask you to do that very briefly

3     in just a couple of minutes --

4          MR. MOERDLER:  I will do it very briefly, I promise.

5          THE COURT:  -- and then we'll turn to you,

6     Mr. Garland, and we will finish up.  Okay?  All right.  We'll

7     take a break.

8          THE COURT:  We'll take a break.

9          MR. MOERDLER:  I might add he referred to it as the

10    "circus," not the "circuit."

11         THE COURT:  I will not comment on that.

12          (Recess taken from 11:25 a.m. to 11:48 a.m.)

13         THE CLERK:  All rise for the Honorable Court.  Please

14    be seated.  This hearing is back in session.

15         THE COURT:  Okay.  Just take a couple of minutes, wrap

16    up, and then we'll hear from Mr. Garland.

17         MR. MOERDLER:  I will.  No more than a couple, I

18    promise.

19          Your Honor, let me just give you one point.  The

20    Court, the Supreme Court has made clear, quote, Vagueness leads

21    to overbreadth, and that you will find in the Coates case,

22    402 U.S. 611, and in Houston against Hill, 402 U.S. 451 and to

23    Judge Kennedy's dissent in Hill against Colorado, 530 U.S. --

24         THE COURT:  I was reading Hill over the weekend.  I

25    agree with that statement, but I don't think vagueness is

1    required for overbreadth.

2            MR. MOERDLER:  I agree with you.

3            THE COURT:  Okay.

4            MR. MOERDLER:  That was why my first question to

5    Farrell was about the pin, and his answer very simply was,

6    There are people who will argue that that is in violation of

7    the code.

8            Your Honor, I just want to go into some of these so

9    you can quickly see the flavor of this, and I promise you I

10   will not be long.

11           Mr. Farrell was asked if he was aware of any incident

12   where extracurricular activities were disrupted because a

13   teacher discussed a barred topic.  Answer:  No.  These are the

14   quick Garcetti questions that we put to him.  He was asked if

15   the teacher Code of Conduct applies outside of school property.

16   Answer:  Yes, depending, of course, on the conduct.  He was

17   asked:  What is the function of reporting up or reporting down

18   on violators?  He said:  The code requires you to report to the

19   next higher up and the higher ups to report as well, so that,

20   if they see somebody misbehaving or not reporting a violation,

21   they are themselves guilty of a violation.

22           THE COURT:  As I understand it, that works the same

23   way it does, and I'm more familiar, with the Code of

24   Professional Conduct, in which we, as lawyers, sometimes have

25   obligations to report violators of the Code of Professional

1    Conduct.  The teacher Code of Conduct works the same way.

2         MR. MOERDLER:  That's correct.

3         THE COURT:  So, not only the person who is actually

4    teaching the banned concept but the teacher who fails to report

5    the teaching of the banned concept can be in violation of the

6    code.

7         MR. MOERDLER:  I serve on the disciplinary committee,

8    so I know, but I will tell you it shows the breadth and the

9    reach of the problem and why for the teacher it's a risk issue.

10        And two more points.  Loss of license is a sanction,

11   again, Farrell's testimony.  And finally he said, Indeed, even

12   when teachers are off duty, the teacher is subject to the

13   educators' Code of Conduct, transcript 197 to 198.

14        Your Honor, I have two points, and then I'm done.

15        One is an example of where the breadth of this gets

16   out of sight and really does illustrate vagueness leads to

17   overbreadth.  There is in the packet of papers before the Court

18   an affidavit of a teacher by the name of Alison O'Brien.  She

19   was teaching a course in music and teaching the Harlem

20   Renaissance and taught by giving two videos of music,

21   commercially available videos.  Within moments a parent

22   complained to the Commissioner, the Commissioner signaled the

23   chief investigator, and he called the principal or

24   superintendent.  Within moments she was pulled out for the

25   first of three times, publicly out of the classroom, first to

1    report to the assistant principal, then to the principal, and

2    then to the superintendent at what she had done was so bad, and

3    in each instance they said, It's okay.  And then is the whole

4    point of this:  The chief investigator communicated through the

5    superintendent to that teacher, it's in that affidavit, that

6    declaration, Read the op-ed of April 22 of the Commissioner,

7    and it will provide you your guidance.

8            So, it isn't just FAQs, it isn't just opinions of the

9    Attorney General.  It's articles, op-eds, statements and quotes

10   by the Commissioner of Education, who can do it because the

11   statute is overbroad, who can do it because it's vague, and who

12   can enforce it because -- you asked a question, and here's the

13   answer:  Here are the teachers' affidavits, which show you how

14   they have had to change their scholastic programs.  Keefe,

15   English.  Changed the way that certain courses were taught.

16   Mejia, the plaintiff in one of the cases, no longer conducts

17   implicit bias classes and training.  Merrill, English, stopped

18   assigning articles about systemic racism and white privilege.

19   O'Brien, stopped assigning commercially available videos.

20   O'Mara, history, no more assignment of the book *Stamped* by

21   Kendi.  It was one of the books that was depicted in that

22   op-ed, which I'll just finish with in a second.  And

23   Philibotte, the Chief Equity Officer, no longer references

24   implicit bias and other concepts when conducting bias training.

25            This is the op-ed.  It's not very big, but attached to

1     it and part of it and keyed into it are 72 pages of thou shall

2     nots.

3              THE COURT:  I'm a little confused.  When you say

4     "attached to it," do you mean there is an electronic version of

5     the op-ed --

6              MR. MOERDLER:  Correct.

7              THE COURT:  -- that included hyperlinks to specific

8     materials you're talking about?

9              MR. MOERDLER:  Correct.  Yes.  72 pages of it.

10             THE COURT:  Okay.

11             MR. MOERDLER:  Your Honor, I have one last point,

12    which, at your convenience, I would like to do *in camera*, just

13    to be on the right side of the Protective Order, and that is a

14    specific case that I think teaches you, if you need it.

15             THE COURT:  Let's do that at the end so that we don't

16    have to clear the courtroom --

17             MR. MOERDLER:  I agree.

18             THE COURT:  -- and bring everybody back in.

19             MR. MOERDLER:  Fine.

20             THE COURT:  I'll give you a chance to do that right at

21    the end.

22             MR. MOERDLER:  And I thank the Court for its great

23    courtesy.  I much appreciate it.

24             THE COURT:  Thank you.

25             All right.  Mr. Garland, I heard a statement read to

1    me that teachers are subject to the Code of Conduct when off

2    duty.  Is that something you agree with?

3              MR. GARLAND:  You got me with the very first question,

4    your Honor, that I'm not --

5              THE COURT:  You heard what he just said.

6              MR. GARLAND:  I heard what he said.

7              THE COURT:  That was from an affidavit in --

8              MR. MOERDLER:  It was the deposition of Mr. Farrell,

9    the chief investigator.

10             THE COURT:  Okay.  Yeah.  And I just don't know -- I'm

11   catching you cold on that.  I don't want to throw you off your

12   stride, but that is interesting to me, because we are -- I know

13   you're going to be prepared for and I am going to be asking you

14   about how I should understand the limits of the prohibition on

15   teaching, instructing, inculcating, et cetera, and I was not

16   aware of that statement until it was read.  So, if you don't

17   have anything to say on it now, you can move on, but I am

18   interested in it.

19             MR. GARLAND:  I don't have anything to say right now.

20   I can understand your interest.  I'm happy to provide you --

21             THE COURT:  If I need clarification, I will ask for a

22   supplemental brief, but I will look at it in the record and

23   make what I will of it, and we can just move on.  But I don't

24   want to start questioning you before you say a word.  That was

25   just -- it just came up in his comments.

1          So, what do you want to say in support of your

2     position?

3          Let me ask one last question.  I think I have

4     understood you correctly that, in your view, nothing that has

5     been acquired during the discovery process should affect my

6     analysis in any way.  Do you agree with that?

7          MR. GARLAND:  I do, your Honor.  Yes.

8          THE COURT:  Okay.  And, since nothing that's been

9     learned in discovery should affect my analysis in any way,

10    you've also said, And the problem before you is a question of

11    law.  You agree with that?

12         MR. GARLAND:  I do, your Honor.

13         THE COURT:  Okay.  So, what you really are saying to

14    me is, to the extent you didn't rule in our favor on the Motion

15    to Dismiss, you should reconsider your ruling and now change

16    your mind and agree with us?

17         MR. GARLAND:  I would modify that slightly, and that's

18    only because, and I recall you mentioning this, your Honor, at

19    the February conference, that your order had lots of statements

20    in it that were couched with qualifiers like "plausible" and

21    things like that, and you identified some things that we hadn't

22    briefed, you identified some specific concerns you had that, as

23    I understood it, we were coming at a fairly high level of

24    generality, and you said, Well, wait a second, I've got X, Y

25    and Z concerns, and part of what we've tried to do in our

1    briefing is to identify why those concerns shouldn't result in

2    where you seemed to be leaning in your order.

3         THE COURT:  So, because we were at 12(b)(6), what is

4    the standard?  Plausibility.  Why would I use that language?

5    Because I try to use the standard of review that I'm supposed

6    to use.  But the analysis, absent some change, either a

7    correction of law or some additional evidence, would have led

8    to the conclusion on certain claims you prevailed.  I accepted

9    your view at least insofar as the right to dictate curriculum

10   is a right that the government has, and teachers don't have a

11   First Amendment right to teach contrary to curriculum

12   instruction, so you prevailed on that issue.  But on the

13   fundamental issues of vagueness, my order leads to the

14   conclusion that, unless what was plausible then is no longer

15   plausible now, that you lose on this particular issue.  You

16   understand that?

17        MR. GARLAND:  I do, your Honor.  And, if you'll

18   recall, I think at the February conference, too, we did resist

19   the notion that discovery was necessary.  We were prepared to

20   brief those issues then.  I think I -- I believe I was candid

21   on the record then, understanding what direction you were

22   leaning.

23        But we do think that, given the benefit of the ability

24   to refine our briefing on -- especially on the statutory

25   construction question, because that was largely absent from our

1    initial round of briefing, you identified some concerns as you

2    construed the statute, and we did try to take the opportunity

3    to explain why those concerns shouldn't lead you down the road

4    that I acknowledge you were going down in the earlier order.

5         THE COURT:  Yeah.  I just want to be clear I gave the

6    plaintiffs' arguments and your responses to them very careful

7    consideration.  Certain areas I agree I went into that the

8    parties had not explored with the same depth, and maybe now

9    there's an opportunity to, on reflection -- and one of my

10   purposes in doing that was to make sure everybody had a full

11   opportunity to point out any mistakes in the analysis, which is

12   what I'm understanding you're really trying to do now in a

13   respectful way, and I'm completely fine with that.  This is my

14   giving you an opportunity to tell me where I may have gone

15   wrong in my analysis.

16        I think you have adequately responded, I will reserve

17   judgment as to whether you're right, to the plaintiffs' use of

18   extrinsic evidence.  Unless you want to add something more to

19   that, I'll rely on what you've said now and on your briefs.

20        But I am interested in hearing anything you have to

21   tell me about why I didn't quite get it right the first time or

22   why, when I abandoned plausibility and simply rule, I should

23   rule differently than what I thought was plausible at the time.

24        MR. GARLAND:  Understood, your Honor.  I would just

25   like to make just a couple of points on the extrinsic evidence

1    that I think is reflected in our briefing, but to respond to

2    things I heard today.

3              THE COURT:  Go ahead.

4              MR. GARLAND:  The reason why, and I would dispute the

5    notion that there's a fairness concern around it that the Court

6    can consider things like an AG opinion or the FAQs, is because

7    that is part of the New Hampshire Supreme Court's statutory

8    constructional analysis, as I understand it, and our position

9    is that the Court really, when it's determining whether this

10   statute is vague, has to construe the statute, because it's a

11   state law, has to look at the rules of construction the New

12   Hampshire Supreme Court would use, and they don't have

13   authoritative weight, and you've identified that, and I don't

14   dispute it, but they are the sort of official guidance

15   documents that that court has looked at when construing a

16   statute, and in our mind that's very different from testimony

17   during a deposition, comments that are embedded in an op-ed or

18   something of those sorts or the sort of affirmative extrinsic

19   evidence, for lack of a better word, that the plaintiffs bring

20   in.

21             THE COURT:  Well, let me throw this at you and see

22   what your reaction is.  I'm inclined to agree with you that

23   with respect to -- when I am engaged in simply the task of

24   statutory construction I am not going to give significant

25   weight to what someone says.  To the extent New Hampshire says

1    give weight to an AG opinion, I'll, of course, do that, but

2    beyond that what legislators testify they think the statute

3    means or what the Commissioner thinks that he's not willing to

4    develop in terms of regulations that are put out for notice and

5    comment and are within the fair scope of implementing a statute

6    that may be under the New Hampshire version of Chevron should

7    be given some kind of deference, apart from that I'm not

8    inclined to attach weight when interpreting the statute.  But,

9    when trying to understand the way the statute applies gives

10   rise to the potential for arbitrariness and enforcement,

11   evidence about arbitrariness in the enforcer's viewpoint seem

12   to me to be entirely appropriate for consideration, and to the

13   extent there are deposition excerpts and inability or refusal

14   to provide any further guidance than what is in the actual text

15   of the statute does seem to be appropriate for consideration

16   when determining whether the statute, as I construe it, allows

17   for arbitrary enforcement by someone who is going to choose to

18   apply it here, not apply it there.  So, why isn't it relevant

19   at least for that purpose?

20          MR. GARLAND:  I don't find in the case law, your

21   Honor, anyplace where that is given dispositive weight.  It's

22   only ever given kind of confirmatory weight.  And so the

23   courts, even in the Carolina case that they've cited, and one

24   major distinction there is I think it's a class action where

25   you have class-based evidence and statistics, which is largely

1    absent here, and the court grappled with whether that's really

2    just a big as-applied challenge or a facial challenge, but

3    setting that distinction aside, even in the cases where courts

4    do consider it, courts start with looking at the text.

5          THE COURT:  I'm never going to give dispositive

6    weight.  I'm a totality of circumstances guy.  You learn one

7    thing when you do this job for a while that courts always want

8    to express things in terms of totality of relevant

9    circumstances, so I won't be doing that, I guarantee you.  I'm

10   just saying it may be relevant, not dispositive, to see

11   examples in which the people charged with enforcing are

12   expressing views about the statute which could support a claim

13   that, as construed, it permits arbitrariness and enforcement,

14   because that's one of the two principal concerns that you

15   address with the vagueness challenge.

16         MR. GARLAND:  Your Honor, my principal response to

17   that is I don't see that, as I read the cases, as something

18   courts are giving that sort of consideration to.  In a few of

19   the cases we've cited courts have actually rejected the notion

20   that, because people who are charged with enforcing it give

21   inconsistent statements that really is evidence of that.

22         THE COURT:  All right.  Let's turn from that and turn

23   to a second type of evidence that I see the plaintiffs

24   producing, and that is evidence about how behaviors are being

25   changed without enforcement actions ever having to be brought.

1      The case law on this is replete with references to when speech

2      regulations are vague one of the principal dangers is they can

3      chill protected speech because you impose a high enough

4      sanction to a vague speech regulation people will stay a mile

5      away from it so they don't end up getting killed.  You can go

6      back to the communist cases, the <u>Keyishian</u> case, and you'll see

7      it replete through case law.  It would seem that evidence that

8      in fact that's occurring here, to the extent there is evidence

9      of that fact, it would be relevant to the analysis.  Do you

10     disagree with that?

11         MR. GARLAND:  I do, your Honor, insofar as any of that

12     evidence would be evidence of ways that curricular choices are

13     being changed.  I don't think that the notion that people are

14     modifying their behavior in a realm where it isn't protected by

15     the First Amendment is evidence of vagueness at all.  We live

16     in a society that's largely governed by proscriptive statutes.

17     Every single day we have to make determinations whether we're

18     going to conduct ourselves in one way or another, Johnson

19     speaks of this, Williams speaks of this, and make judgment

20     calls, and where the concern really becomes one of

21     constitutional magnitude is if it is implicating First

22     Amendment protected conduct.

23         So, when we're talking about the core classroom

24     speech, and I know we have talk about extracurricular coming

25     up, I don't think that is evidence that shows anything with

1    respect to vagueness.  What I do think it might show is the

2    profound policy disagreements that exist around this statute.

3    I'm not disputing that, the idea that there are people of good

4    faith on both sides who have very strong disagreements about

5    what teachers should be doing in the context of curricular

6    speech, but that shouldn't inform whether the statute's vague.

7    I don't think that bears on that at all.

8         THE COURT:  All right.  Well, the last area I'd ask,

9    and then you can wrap up on this issue of what I can and cannot

10   consider, I noted at the outset that courts that find statutes

11   to be -- reject vagueness challenges speak critically about

12   hypotheticals, courts that find statutes vague often use

13   hypotheticals to address the potential vagueness.  I assume

14   you're in the camp of no hypotheticals should be allowed, I

15   shouldn't be allowed to ask you any.  Is that your position?

16        MR. GARLAND:  I wouldn't go so far as that, your

17   Honor.  I don't think that they ultimately control or really

18   persuasively inform the vagueness analysis.  As I read the

19   cases in I think the second camp you just identified, again,

20   it's really confirmatory.  It may well be a kind of artifact of

21   an attempted persuasive judicial writing, right?  There's

22   always attorneys who are trying to belt and suspenders their

23   positions, and I know judges very often will do that too.

24             I'm not in here saying, and I do want to make this

25   clear, that there is a case that clearly says in or out with

1    respect to hypotheticals with respect to extrinsic materials,

2    but if you look through both sides of the cases, and I think

3    the weight of authority is on our position on this, it is

4    always first a statutory construction, and then the remainder

5    of it, when courts do get into it, I think is largely

6    superfluous.  I don't see it as controlling the analysis.  I

7    don't really see it as putting a major thumb on the scales.

8            THE COURT:  I would say everything in moderation.

9    Hypotheticals are very important in trying to understand the

10   limits of a provision that is charged with being overly broad

11   or vague in its application.  So, I'm going to have a couple of

12   hypotheticals for you, whether you like it or not.  You can try

13   to answer them.  But what else did you want to say about the

14   scope of things I should and shouldn't consider?

15           MR. GARLAND:  Going back to one point, your Honor, I

16   was trying to make before with respect to the statements during

17   depositions, again, it's our position that you don't need to

18   look at any of that, that it's not relevant, but I would ask

19   the Court to consider, and you identified this I think when

20   Attorney Moerdler or Attorney Bissonnette was arguing, that the

21   one thing that all of those officials kept saying is context,

22   and I do think that's critical.  I don't think that's something

23   that could be swept aside, because it really is what will

24   inform whether any book, whether any subject falls --

25           THE COURT:  Certainly as someone who has to make

1   decisions about difficult things, context is always very

2   important, but that doesn't mean no answers can be given, no

3   guidance can be provided.  The statute might potentially

4   encompass anything, and we aren't going to tell you until and

5   unless we charge you with something.  That isn't consistent

6   with rule of law.  Rule of law requires a reasonable ability to

7   understand what you can do and can't do.  So, I'm not sure just

8   invoking the word "context" is sufficient if the statute in its

9   application doesn't provide sufficient guidance as to what is,

10  in fact, prohibited or not.

11          MR. GARLAND:  So, one kind of specific response to

12  that, and then I think it dovetails nicely with the more

13  general argument that I want to make with respect to the

14  language of the statute, I would ask that the Court, if it

15  hasn't already, and I think you may well have, take a close

16  look at the sort of questions that were being asked, because

17  you know that any deponent's going to be instructed, Don't

18  answer a question that isn't asked here, and the questions are

19  very specific, yes or no, can you teach it, can you not teach

20  it.

21          THE COURT:  Well, then, maybe I can ask you whether

22  something is covered or not, ask you, well, what context would

23  you like to know before you answer the question and then have

24  you answer the question, because that might help me in

25  understanding whether the plaintiffs' argument that the statute

1    potentially covers things that are subject to constitutional

2    protection or not, whether a concept is or is not banned,

3    whether a statement of a concept that is banned is unlawful

4    because it's teaching instruction.  To the extent you can

5    provide me your views as to those things, that might be

6    helpful, because I think that's where the problem is.

7        So, I get your point.  I'll be restrained in my

8    hypotheticals.  I understand the realities of deposition.

9    They're in a defensive crouch; they're not inclined to just

10   have an informative conversation.

11       But the problem remains how do we help teachers know

12   what they can and can't do?  I assume you're not trying to trap

13   people.  You want them to be able to clearly understand what

14   they can and can't do, and that's a legitimate interest that

15   you should share with the plaintiffs in this case.

16       MR. GARLAND:  For sure, your Honor, and we certainly

17   do, and I think that's where, if you look to the statutory

18   construction that we've articulated in our briefing, and I

19   think we've tried to address both of the potential areas of

20   vagueness that you've identified on the record today, the idea

21   of what does it mean to teach, to inculcate, the additional,

22   instruct, to compel, as embodying a question what does that

23   mean, and that's one question in this case, and then

24   ultimately, okay, what is prohibited under the statutes, under

25   the I(a), (b), (c), (d), is separate, and we've tried to break

1    it down in a way that allows for the Court to understand our

2    position on that.

3            We've largely turned to dictionary definitions with

4    respect to "teach," with respect to "instruct," with respect to

5    "inculcate" and "compel."  That's a common tool the New

6    Hampshire Supreme Court uses, and, when you look through the

7    dictionary definitions, they contemplate something that isn't

8    just the conveying information by inference or something along

9    those lines.  It's something more affirmative, it's something

10   more deliberate.

11           THE COURT:  Well, is the Socratic method a teaching

12   method?

13           MR. GARLAND:  For sure, your Honor, in the abstract.

14           THE COURT:  Are you teaching when you ask questions

15   using the Socratic method?

16           MR. GARLAND:  Yeah, I think you are, for sure.

17           THE COURT:  When you ask questions of your students

18   about white privilege, are you teaching it, even though you're

19   not taking a view about white privilege; you're trying to get

20   them to think about white privilege, what it means, is it real,

21   what is the extent of it?  If you ask questions, are you

22   teaching?

23           MR. GARLAND:  I think you are, your Honor, and I think

24   that falls within the definitions that we've identified, that,

25   still, it's some sort of affirmative and deliberate act

1       designed to convey information.  As I understood --

2              THE COURT:  So, let me try a hypothetical on you.  So,

3       suppose a high school teacher is teaching Thoreau's book

4       *Walden*, okay, a book near and dear to my heart, I grew up five

5       miles away from Walden Pond, and there's a famous statement

6       that Thoreau makes in that book:  It's never too late to give

7       up our prejudices.  Suppose a teacher writes that on the board,

8       and a student raises his hand and says, People can't give up

9       their prejudices; they're inherent.  What is the teacher

10      supposed to do in response to that to avoid losing their

11      teaching license?

12             MR. GARLAND:  I think a teacher may well have to

13      consider adding context or disclaimer to that sort of

14      statement, may have to identify that it is --

15             THE COURT:  That's wrong?  They have to affirmatively

16      tell the student, That's wrong; that isn't true?

17             MR. GARLAND:  I'm not saying that, your Honor.

18      Something more general in the sense of that's one particular

19      way of looking at it, and I think that's really where this

20      starts to, in my mind, blur the vagueness inquiry and the

21      policy inquiry.  A lot of people of very good faith profoundly

22      disagree that a teacher should have to do that.

23             THE COURT:  Nothing in my ruling -- I don't take any

24      position on whether any of the banned concepts are good or bad,

25      should be in the curriculum, should not be in the curriculum.

1    That's not my job.  I say it's the responsibility of the State.

2    I suggest that school boards are in a better position most

3    often to do that, in conjunction with public hearings and so

4    forth, but it's the State's responsibility, not mine, to

5    declare whether concepts are good.

6            So, I don't take any position on should there be,

7    should it allow, should it not be.  I'm concerned about the

8    vagueness of the statute and how teachers can lose their job,

9    lose their teaching license, potentially be subject to damages

10   for not responding to a comment from a student in a classroom

11   in the right way.  That's my concern.

12           What can you tell me about whether in that

13   hypothetical, what other context would you want to know that

14   could give a teacher guidance about how to respond to a student

15   that challenges Thoreau's statement that, It's never too late

16   to give up our prejudices?

17           MR. GARLAND:  I think the additional guidance that a

18   teacher would need can be found in the statutes, and I think

19   that goes down to Roman numeral I and the letter portions of

20   the statutes, which is, if the statement is coming back of the

21   kind you're describing, a teacher may well have to add a

22   caveat, may well have to add a disclaimer, not a rejection of

23   the notion, I don't think that's contemplated by the statutes,

24   but may well have to make clear how it fits within the larger

25   context of education.  I think the statutes provide sufficient

1   guidance on this, and I do think this is where, when we're

2   talking about cases, that I would posit around the margins the

3   fact that a teacher has to make those judgment calls does not

4   mean the statute is vague.

5   THE COURT:  Could a teacher in a high school civics

6   class assign to students -- and I'm picking up specifically on

7   something from the plaintiffs' brief, where they were picking

8   up on something I said in my opinion about the affirmative

9   action case -- could a teacher assign and have a class

10  discussion about Justice Sotomayor's dissent in that case?

11  MR. GARLAND:  For sure, your Honor.

12  THE COURT:  And they could talk about affirmative

13  action and why reparations might be necessary, not just

14  diversity promotion?  They could talk about that, and that

15  wouldn't in any way endanger a teacher for teaching,

16  advocating, inculcating that one group should be preferred over

17  another?

18  MR. GARLAND:  No, I don't think it would run afoul of

19  it, because the statutes don't simply prohibit what you just

20  described, which is one group preferred over another.  They

21  prohibit the idea that --

22  THE COURT:  I don't know if the plaintiffs will agree

23  with you on that.

24  MR. GARLAND:  I doubt they will, your Honor.

25  THE COURT:  I don't think I'll agree with you on it

1     either.  I mean, I won't try to argue with you on it.  But I

2     think the banned concepts can be read to encompass that, that

3     one group should be -- it is wrong that one group should be

4     preferred over another based on their race, for example.

5          MR. GARLAND:  I don't agree with that, your Honor, but

6     the point that I -- the main point that I would make in

7     response to that focuses on the word "could" have that you just

8     used, because I do think a lot of what we're talking about and

9     part of the peril in hypotheticals is it is a question of

10    could, and it's a question of could in cases that are on the

11    margins, could this violate it.

12          You resisted the notion in the earlier argument, and I

13    remember it well, that you can rewrite the statute, and I'm not

14    advocating that you can, but what you can do, sitting in the

15    context of a federal judge looking at state law, is you can try

16    to divine what the Supreme Court, New Hampshire Supreme Court,

17    would do, again using its rules of construction, and one of its

18    rules of construction is construing language, if it is

19    susceptible of a reading that's broader that creates a

20    constitutional problem and susceptible to narrow

21    construction --

22          THE COURT:  I am very cautious about the doctrine of

23    constitutional avoidance.  I'm dealing with that in another

24    case right now in which Mr. Bissonnette is one of the litigants

25    involving the Zadvydas opinion, where Justice Breyer applied

1    the doctrine in a different context.

2           But I think the argument for a federal judge applying

3    the doctrine of constitutional avoidance to adopt a

4    construction of a New Hampshire statute is extremely

5    problematic, as a general rule, and I would be inclined,

6    frankly, rather than do that, to certify, because it would be

7    an assumption of power on my part that would be -- my job is I

8    would say is the statute constitutional or not?  If it's not

9    constitutional the way it's written, I'm done, it's

10   unconstitutional.  But to say, Well, it really is an important

11   constitutional principle, and it could be read that way, so I'm

12   going to avoid it, that should be up to the New Hampshire

13   Supreme Court, not to me, because I'm not the final interpreter

14   of New Hampshire law, as you know.

15          I also find the doctrine of constitutional avoidance

16   to be a very problematic concept that should be applied in only

17   very narrow circumstances, because it assumes -- it applies

18   judicial power to control over the legislative process that I

19   think courts should be very cautious about accepting.  We have

20   the power to say they're unconstitutional.  We don't have the

21   power to adopt -- we shouldn't ordinarily adopt reading A over

22   reading B because we think one reading might present

23   constitutional -- we're not sure, we are not saying it would,

24   but we think it might, and I would be using that as a

25   last-resort principle.  Certainly, I'd be cautious about

1   applying it to the state statutes.

2          MR. GARLAND:  Understood, your Honor, and we haven't

3   since our opening brief advocated certification here, but the

4   point -- the point I would make is there is a middle ground,

5   and it may well be certification, between -- sitting here

6   today, I can think of hypothetical ways that this language can

7   apply that would present constitutional problems, strike down

8   the statute or strike down an application of the statute

9   versus, well, the State's telling me there's a better way to

10  read it or a narrow way to read that saves the statute, and I

11  think it is that question, and I do think invalidating a

12  statute facially, state statute, presents many of the same,

13  I'll call them federalism concerns -- you didn't use that

14  word -- or comity concerns that would countenance making sure

15  we know how the New Hampshire Supreme Court would apply it.

16          I would say, too, the New Hampshire Supreme Court

17  applies its doctrine of constitutional avoidance, as I

18  understand it, a bit differently than I understand Federal

19  Courts do, and it may well be that, if it were presented with

20  competing readings of the statute.  Now, I'm not trying to

21  retreat from the notion that I think our reading based on the

22  definitions we've identified is the better reading and solves

23  the problem, but if there's a question there I do think that

24  that court would be the one that could provide some guidance

25  before kind of, root and stem, the whole statute falls.

1          THE COURT:  When you were last before me you agreed

2     that the amendments do not have a scienter standard.  Are you

3     backing away from that now?  Is that what you're doing?  I'm

4     trying to understand your position on that.

5          MR. GARLAND:  So, not backing away from that

6     statement, your Honor, and I tried to make clear in the

7     briefing that we're not backing away from it.  There isn't any

8     reference to knowing, to purposeful, even negligence or

9     something like that in the standard.

10         I do think, though, and this is really to some of the

11    initial points I was making something that was missing from our

12    initial briefing.  I don't think it's a difference from our

13    initial briefing.  We really didn't get into, because we didn't

14    understand that to be the main concern that the plaintiffs were

15    focused on, the kind of, the very close read of the language in

16    the statutes that we've now provided you, and so, I think when

17    you do that close read, sure, the word "knowing" is not in

18    there, the word "purposeful" is not in there.  I'm not backing

19    away from that.  I take that as it is, and how it fits into the

20    analysis is a matter that I know you've identified, but I do

21    think it contemplates and it fairly contemplates that you know

22    what you're doing.  You're not just tripping into a violation

23    of this statute but, rather, doing something affirmative,

24    something deliberate, and you're aware of what you're

25    conveying.

1        THE COURT:  So, you know, and I went into this in my

2  opinion, New Hampshire law requires teachers in Section 189 to

3  specifically teach -- and let me pull the actual language out

4  so we can talk about it.  189 requires teachers to teach, I'm

5  quoting now, how intolerance, bigotry, anti-Semitism, and

6  national, ethnic, racial or religious hatred and discrimination

7  have evolved in the past, which is not an issue here, can

8  evolve into genocide and mass violence, such as the Holocaust,

9  and how to prevent the evolution of such practices.  So, the

10  teachers, on the one hand, are required to talk about how

11  things can evolve in the future, and how does that not place

12  pressure on teachers to affirmatively teach, on the one hand,

13  while threatening them with loss of licensure on the other if

14  they stray, even unintentionally, into something that an

15  administrator later determines with context involves advocacy

16  of a banned concept?

17        MR. GARLAND:  I guess this is a place where I could

18  use a more specific example, because I think advocating

19  concepts like affirmative action, advocating concepts like --

20        THE COURT:  Well, how about the concept of structural

21  racism?  You understand what that term is understood to mean,

22  right?

23        MR. GARLAND:  Yes.

24        THE COURT:  Doesn't structural racism -- don't you,

25  engaging in discussions about structural racism, can they not

1    be discussions about how discrimination can evolve into

2    intolerance over time?

3           MR. GARLAND:  I would say they certainly can, your

4    Honor, but, as I understand the concept of structural racism,

5    it doesn't get into the sort of inherent

6    superiority/inferiority, inherent racism, sexism, et cetera,

7    that the statute contemplates.  That's something far narrower,

8    it's something biological, innate, not just simply something

9    that would be more cultural or learned behavior, and I think

10    that is reflected in the AG opinion, it's reflected in our

11    briefing, and that's the distinction.  You can certainly teach

12    about the concept.  I don't understand structural racism to say

13    person X is white and therefore was born racist, which I think

14    is where you would start to cross the line with the statute.

15           THE COURT:  And you would say teachers have no trouble

16    teaching implicit bias training in their classroom, implicit

17    bias, linking them to the famous website where you can engage

18    in questions and get an implicit bias score?  None of that

19    could in any way cross into the line of being impermissible, in

20    danger of violation of the statute?  Is that your view?

21           MR. GARLAND:  It may well, again, require a teacher to

22    identify what they're not providing the information to do, and

23    the teacher may well have to say, and this is, again, trying --

24           THE COURT:  What if a student says, The implicit bias

25    data tells us that we're inherently biased; we can't avoid our

1    discriminatory thinking?  That isn't my view of what the

2    implicit bias data suggests, but students are going to raise

3    those kinds of concerns.  Are you saying that, unless they give

4    what you call a disclaimer, they have to correct the student,

5    essentially; otherwise they will be in violation?

6              MR. GARLAND:  Well, I think it depends on how the

7    student raises it.  I think if a teacher were to provide

8    implicit bias training or to teach about implicit bias, and a

9    student were to run home and say, The teacher taught me that I

10   am inherently racist, I don't think that's a violation.  I

11   think that perhaps could result in a complaint, but that's the

12   sort of thing that would be weeded out based on the constraints

13   that are in the statute.  I think if a student, going back to

14   your initial hypothetical, were to bring it up to the teacher

15   in class, a teacher might have to consider how to contextualize

16   that statement.

17              But, again, I appreciate the fact that there are very

18   many people of good faith who do not think a teacher should

19   have to do that, but whether the statute provides sufficient

20   guidance to a teacher about how to do that, I think it does,

21   particularly when that sort of statement coming up in the

22   context of curricular speech would not, as I understand it,

23   impinge upon the First Amendment.

24              THE COURT:  You've had this on the books now for a

25   while.  Have you put in place any training from the Department

1    of Education for teachers about what they can and cannot do to

2    violate the statute?

3              MR. GARLAND:  I don't think there has been any -- I

4    know the record that you have had since the briefing happened

5    there was no training.  I don't believe there has been since.

6              THE COURT:  I think you will remember from my opinion

7    I understood the Commissioner and the Attorney General to take

8    the view that one can transgress the statute by implication.

9    Do you still stand by that position?  Do you think that that's

10   wrong?  And, if so, how do you respond to the analysis that I

11   provided of that?

12             MR. GARLAND:  I think the analysis you provided, your

13   Honor, and we've tried to address this in our briefing, too,

14   overstated or read too much into the word "imply" within the AG

15   opinion, because my recollection is of both your opinion and

16   our exchange at the last hearing was you were focused on that

17   statement within the AG opinion that's saying posting something

18   on the website and conveying on the website that this may be

19   beneficial to white people, or something along those lines,

20   could imply that they're inferior or in a way that would

21   violate the statute.  But that isn't what I understood the

22   general concern about implied violations to be, which is you

23   have no idea what you're doing, and you happen to make some

24   sort of offhand comment, and all of a sudden you are swooped up

25   into an enforcement action; but, rather, there's affirmative

1   deliberate acts there.  There is taking this information,

2   posting it on a website, and conveying out to the world that

3   this may be beneficial to white people because -- for whatever

4   reason, and then ultimately where that shakes out, what was the

5   purpose of putting it up there, what was the understanding when

6   it was posted on the website, or, if this were conveyed in a

7   classroom is -- as I read United States versus Williams, much

8   more within the realm of what Justice Scalia says there is the

9   sort of things courts or adjudicators have to deal with all the

10  time.  These are kind of the thoughts that are in people's

11  minds and the motivations for conduct, not what I understood

12  your concern to be, which is you can do something completely

13  accidentally and, based entirely upon how it's subjectively

14  taken --

15          THE COURT:  Right.

16          MR. GARLAND:  -- it could violate.

17          THE COURT:  Yeah, you don't say it directly, you don't

18  intend to say it, but someone later viewing your statement can

19  deem it to be in violation because it implies that a banned

20  concept is correct, and that seems to be what the AG is saying

21  there.

22          MR. GARLAND:  I disagree with that, your Honor.  I

23  think what the AG is saying there is taking -- affirmatively

24  putting this stuff on the website would be, and conveying the

25  statement, I can't remember it exactly --

1            THE COURT:  And he's not saying what the statement

2      itself is violates; they're saying it violates because it may

3      imply something.  That's the problem.  It suggests not only

4      what you actually say, but what implications can be drawn from

5      it can get you fired and lose your teaching license.  To the

6      extent that is what the statute potentially allows, it has

7      inherent vagueness problems.

8            MR. GARLAND:  So, what I think is not present in the

9      AG opinion, and where I would resist what you just said, is the

10     notion that *ipso facto* it is a violation of the statute.  I

11     think what would happen is, and you're well aware of this, I'm

12     sure, sitting in the position you're in, and we certainly are

13     in our office, is anyone can complain about anything at any

14     time, right, and whether it ultimately is a violation of a law

15     is part of the adjudicative process, and that's where arbitrary

16     or discriminatory enforcement --

17           THE COURT:  What do you say about, I don't know this

18     is true, this is what they're saying, that the Commissioner is

19     having communications with superintendents about things that

20     might be violations that never get to an adjudication; they're

21     just an informal communication from the Commissioner to a

22     superintendent that, Hey, you ought to be aware that this might

23     be a problem for you?  Isn't that completely divorced from this

24     kind of nuanced hearing process that you say I engage in?

25     Yeah, but I don't call people up who are potential litigants

1  and say, You know, you'd better not do that or you might end up

2  in trouble.  I adjudicate things.

3      Is the Commissioner doing what the plaintiffs say he's

4  doing?

5      MR. GARLAND:  So, I believe the plaintiffs have

6  identified in the record one example of that, and I guess I

7  have two responses, one specific direct response, and one more

8  general one.  The first direct response is that the

9  Commissioner isn't the adjudicator here, the Board of Education

10  is the adjudicator, and if you look within the State regs, the

11  Commissioner through his investigator can investigate whether

12  there's been a violation, but it still must go to the

13  adjudicator.  So, if the Commissioner thinks, right, wrong or

14  otherwise, something has happened and engages in an

15  investigation, that isn't a finding that there's been a

16  violation of the law that subjects somebody to a loss of their

17  licensure; there's still that process around it.

18      THE COURT:  Do you think that could potentially have a

19  chilling effect on a teacher if they get called into the

20  superintendent's office and told the Commissioner of Education

21  has raised a concern about something that you're doing in your

22  office, or a Department of Education investigator comes out to

23  the school and says, You know, we're just investigating this,

24  and we can't tell you whether it's a violation or not, but read

25  the op-ed?  I don't know if that's happening, but that's what

1    the plaintiffs suggest is happening.

2          MR. GARLAND:  The plaintiffs have, as I understand it,

3    identified one example of it happening or one example specific

4    to what you were just describing.  More generally, to the

5    extent the record's relevant, there haven't been widespread

6    investigations, there have been no Board of Education

7    enforcement actions, and so we really have one example.

8          THE COURT:  You seem to make something of the fact in

9    your brief that there have been no findings of violation and

10   few complaints under the -- what are you trying to make from

11   that?  What inference are you asking me to draw from that?

12         MR. GARLAND:  Well, I think, your Honor, as I read

13   your order, and as I've understood the plaintiffs' arguments

14   from the get-go, there was this concern that there would be a

15   widespread effect of teachers kind of facing potential loss of

16   their license in the face of a potentially vague law, and so I

17   guess the first point I'm making is I don't think you need to

18   consider that at all, because that's beyond the record that I

19   think you need to consider.

20         THE COURT:  You cite it, so I assume you think it

21   helps you, and I'm trying to figure out why you think it helps

22   you.

23         MR. GARLAND:  Because I think it pretty firmly

24   demonstrates a year and a half into this law, I guess, 2 1/2

25   years into this law being in effect that there isn't this

1    widespread threat of loss of licensure; it really isn't

2    happening.

3          THE COURT:  Well, I'm not sure that's an inference

4    that you can really draw.  There are several other inferences

5    one might draw, right?  You tell me why yours is a better one.

6    One inference might be the whole law is a solution in search of

7    a problem that doesn't exist, and so, since there were no

8    violations before, there aren't going to be any violations now.

9    That's certainly a plausible explanation, because no one has

10    produced evidence that this was a problem in New Hampshire

11    before the enactment of the statute.  I have not seen any

12    evidence that you've produced or anyone else has produced that

13    was, in fact, a real problem.  So, to the extent it's a

14    solution in search of a problem, that would explain why there

15    are few violations and not an argument that would be favorable

16    to your cause, because, to the extent there is no even core to

17    the statute that addresses a legitimate concern, the vagueness

18    problems of the statute are enhanced.

19          Another potential inference is because it's

20    accomplishing exactly what we want, which is chill as much

21    expression as we can; we don't need to enforce, we just need to

22    have the threat of enforcement.

23          A third explanation is we're all lying low until the

24    judge rules on the constitutionality of this statute.

25          Those are all possible explanations for the fact that

1    there are few, and the only one that's potentially helpful to

2    you, as I see it, is the one you're advocating, but those other

3    explanations are certainly at least plausible explanations as

4    well.  So, I'm not sure I can draw much one way or the other

5    from the absence of complaints.

6              MR. GARLAND:  I think that's fair, your Honor.  The

7    one way that I think all those inferences are, in fact, helpful

8    to us is that, if the Court is going to consider these

9    extrinsic materials, it's still in the context of a facial

10   claim, and I do have a hard time imagining, even with the

11   exacting standard you've identified, and even considering

12   extrinsic materials of this kind, that one example without any

13   additional explanation as to why there's only one example is

14   proof that this statute is facially unconstitutional.  And so,

15   I do think in that regard it certainly doesn't hurt us, but,

16   again, my principal argument on that is you don't need to worry

17   about it at all.

18             THE COURT:  I hear you.  Okay.  Let me ask you, you

19   alluded to this, you knew I was going to get into this one,

20   this curricular/extracurricular distinction, and I want to be

21   clear about this.  I drew on the existing body of case law to

22   conclude that, with respect to curricular speech, there is no

23   protected First Amendment right on the part of teachers or

24   students to demand a particular curriculum or the right to

25   teach their own curriculum contrary to the curriculum dictated

1   by the government.  In saying, though, drawing a distinction

2   between curricular and extracurricular, I am not suggesting

3   that there's a black-and-white end line between curricular and

4   extracurricular and Garcetti only applies to curricular speech.

5   There is some, certainly in my view, some area beyond

6   curricular in which you are still doing what you are paid to

7   do, speaking the speech that you are paid to speak.  Okay?

8        So, I agree with you to that extent, but that doesn't

9   mean that this statute doesn't potentially reach beyond the

10  areas in which Garcetti says the speech is entitled to no

11  constitutional value, and, given a statement like the one

12  quoted from the investigator that the Code of Conduct applies

13  when you're off duty, there's concern about the extent to which

14  the amendments apply when you're off duty.

15       Do you have a view about that particular issue?

16       MR. GARLAND:  So, with respect to the investigator's

17  statement, I may well have to take up your invitation, if it

18  comes to it, to address it separately, because that wasn't

19  something I had thought about in advance of today.  What I

20  would say, and I hope this is clear from our briefing, is with

21  respect to Garcetti there may well be, and I'm not disputing

22  there may well be, some extracurricular speech, there certainly

23  is, that falls beyond the scope of what Garcetti would apply

24  to.  But when making that determination --

25       THE COURT:  Right.  Bremerton makes that clear.

1    Certainly, when you're doing prayer on school grounds, on the

2    football field right after the game, with your players gathered

3    around you, the Supreme Court didn't emphasize that fact, but

4    it is in the record below and not contradicted, that raises --

5    and the Court says that's not Garcetti unprotected speech,

6    that's protected speech, that suggests that there are many

7    things that teachers can do on school property while students

8    are around that is entitled to First Amendment protection.  You

9    would agree, wouldn't you?

10        MR. GARLAND:  I agree with that, your Honor, but what

11   I think Bremerton shows is that's not something that can be

12   done sitting here in the abstract on the record that we have,

13   that, if you look at the majority opinion in Bremerton, and I

14   believe it's the Ninth Circuit's majority opinion in the

15   underlying case, there are profoundly different views based on

16   the specific facts and contexts that existed there about

17   whether this was speech made pursuant to an official duty or

18   not.

19        THE COURT:  Right.  But when you have vagueness

20   problems, again, when you're imposing severe consequences like

21   loss of a -- you would agree with me, because the case law is

22   just so overwhelming, depriving people of employment,

23   particularly depriving teachers of employment who have

24   statutory protections and a due process property interest in

25   their jobs, taking away a license of somebody, those are very,

1   very serious consequences, can have very profound, chilling

2   effects.  So, I understand your point that it's sometimes

3   difficult to discern where the line of constitutional

4   protection is, but that's an argument that tends to reinforce

5   the vagueness problem rather than undermine it.

6           MR. GARLAND:  I don't think so, your Honor, because I

7   think it ultimately goes to the burden that the plaintiffs

8   would have -- what the plaintiffs have here with respect to a

9   facial claim, even if it is a facial claim subject to an

10  exacting standard.  I don't think you can say, well, there is

11  some category, we're not going to tell you exactly what that

12  is, we can't define it in the abstract, but there is some

13  category which none of us dispute that falls beyond Garcetti

14  and therefore takes the First Amendment and kind of overlay it

15  on the entire statute and the statute falls because of this

16  exacting standard.  I think what you need to have before you,

17  and I don't think this record reflects it, is what that speech

18  is, what that speech is that's beyond the scope of Garcetti

19  that there will be some First Amendment protection to, so that

20  we can actually do, once we get beyond there, a

21  Pickering-Connick balancing.  And, as I read the cases that

22  postdate Garcetti, including Bremerton, this isn't being done

23  in the abstract, it's not being done through facial challenges,

24  it's not being done whether they're overbreadth or they're

25  vagueness; it's being done on a case-by-case basis in the

1    context of an as-applied challenge where the record is

2    developed and the Court can say, I'm looking at this

3    nonexhaustive list of factors and these considerations, and

4    it's on this side of the line or that side of the line, a

5    question that I would posit is very close in some cases and may

6    well have been in <u>Bremerton</u> in light of the competing opinions.

7    So, that's really the point I'm trying to make with respect to

8    that.

9              THE COURT:  Look, I recognize trying to convince a

10   judge that he made a mistake is a challenging job, and you've

11   responded to my questions very well, and I appreciate that,

12   because it's a hard thing to do, to stand up and tell somebody

13   why you think they've got it wrong, and I'll give you a chance

14   to say anything else you want to say pretty much without

15   interruption, because you've addressed my questions, but I want

16   to then finish by talking about the severance argument that

17   you're presenting here.  So, before we get to that, is there

18   anything else you'd like to add or say to support your

19   position?

20             MR. GARLAND:  I don't think so, your Honor.  I think

21   the one other point that I would just like to make, it's in our

22   brief, is the concept of an as-applied challenge here.  We

23   don't think it exists.  We think it's really part and parcel --

24             THE COURT:  My own view, frankly, is that I resolved

25   that issue in my prior order.  These issues are -- these are

1    complicated questions, and the plaintiffs did try to assert

2    what I called an as-applied-to-teachers claim, which I say is

3    not an as-applied challenge, it's a facial challenge, because

4    they are not having a teacher come up in front of me and

5    identify, This is the behavior that I'm engaging in or want to

6    engage in, and I want you to tell me that it would be

7    unconstitutional to apply this statute to me.  I think some

8    courts have referred to that as a hybrid applied challenge.

9         And so, I get the point, but in terms of analysis I

10   analyze this -- they preserve their arguments for something

11   different -- I analyze this as a facial vagueness challenge,

12   which I believe they can maintain.  I believe they can maintain

13   it because the unlawful and all-application standard doesn't

14   govern here for the reasons I set forth in my prior order.

15        If I'm wrong about that and you appeal, as I expect

16   you will, and the Court of Appeals agrees, that will be the end

17   of the litigation, from my perspective, because there is no

18   as-applied challenge here the way I'm seeing it.

19        MR. GARLAND:  I think we're on the same page, your

20   Honor.  The only reason I bring it up and we tried to brief it

21   is, as you noted in your prior order, that we hadn't briefed it

22   earlier, and so I just wanted to make sure we were all on the

23   same page.

24        THE COURT:  Okay.  I concluded that it was not

25   appropriate as an as-applied challenge in that prior order.

1          MR. GARLAND:  So, shifting to severability, then, I

2     think we've made two different arguments, kind of depending on,

3     and I don't think they're inconsistent, but it depends on kind

4     of where the Court identifies, if it does identify, a problem

5     in the statute, and the first one is reflected in our opening

6     briefing, where we advocate striking 193:40, IV, and I want to

7     make very clear that I'm not advocating you do this, because I

8     don't think the statute is vague, but ultimately, if the Court

9     concludes it is, as I read your order and as I understand from

10    our exchange today, your big concern is the particularly

11    punitive repercussion of loss of licensure, and that is the

12    provision that triggers that.

13          THE COURT:  I think you may be underestimating what I

14    see as the problem here.  Certainly the sanction that is

15    involved focuses the mind about the problems associated with

16    vagueness.  To the extent that it intrudes into First Amendment

17    areas, the greater the sanction, the stronger the chilling

18    effect, the more obvious the violation, right?  So, that's

19    really important.  And with respect to even the due process

20    violation, the greater the sanction the more danger that is

21    attendant to allowing an overly vague statute to stand.  But

22    that doesn't mean that there are no concerns, when you restrict

23    teacher behavior, that could stray into First Amendment grounds

24    simply by eliminating the penalty.

25          More likely, I would be more receptive to the idea

1    that what I should do is strike 193:40 in its entirety and any

2    provision of 354-A that purports to subject teachers to

3    liability for advocating a banned concept, leaving other

4    portions of the statute alive.

5         So, do you want to respond to that as a response?

6         MR. GARLAND:  Yes, your Honor.  So, I think the case

7    law, particularly the U.S. Supreme Court case law, on this is

8    clear, that the Court should strike no more than is invalid,

9    and I do think -- I understand your point, but, as I view the

10   prism through which this claim is being analyzed, one of the

11   major thumbs on the scale for an exacting standard is 193:40,

12   IV.  We've made our Fred Fuller argument, and I'm not going to

13   repeat that argument here, but that's the basis for why it

14   really doesn't extend, the repercussions don't really extend

15   beyond 193, IV with respect to teachers.  So, the focus here is

16   on teachers, it's on the unique repercussions that teachers

17   face, and --

18        THE COURT:  Certainly there would be no basis for

19   striking 354-A:33, which nobody said anything that that affects

20   teachers in some adverse way.  Is anybody going to stand up and

21   argue that that should be stricken?  That's the no public

22   employee shall be subject to adverse employment action, warning

23   or discipline of any kind for refusing to participate in a

24   training.  That's a protection, to the extent it applies to

25   anybody, it isn't a restriction on anything a teacher can do,

1    so I wouldn't understand the plaintiffs, who are only teachers,

2    parents, students -- I wouldn't understand them to be seeking

3    that I strike that provision, and I wouldn't find any basis to

4    do it on this particular record.  I've had no argument.

5         I would understand an argument from the plaintiffs,

6    which I expect they will make, that 193:40 is so entangled with

7    354-A potential aider and abettor liability that you have to go

8    beyond 193:40 and also address 354-A to the extent it can

9    subject teachers, not employers, but teachers to liability,

10   because I think the concerns that public employers; that is,

11   one level of government interacting with another level of

12   government are much less problematic when they are done through

13   vague statutes, and I don't have any superintendent of schools

14   joining this litigation trying to say the State Department of

15   Education can't apply this vague statute to us.  We can leave

16   that for another day, if it should arise.

17        My concern is about teachers.  My concern is about how

18   people can be restricted in engaging in protected speech they

19   would otherwise feel free to engage in and not be chilled by a

20   vague statute.  My concern is that teachers not be subject to

21   punishment, loss of license, being fired based on an overly

22   vague statute.  That's my concern.  To the extent I can address

23   that by striking some portions of the statutes but not others,

24   I'm open to hearing that.

25        So, your starting point is just strike IV of 193:40.

1    If it's unconstitutional, that's all you need to do.

2            MR. GARLAND:  And the reason why that's our position,

3    your Honor, is twofold.  First, that gets rid of the specific

4    concerns you've identified with licensure being on the line.

5    That's the portion of it that authorizes it.  And so that, to

6    the extent there's a thumb on the scale of the vagueness

7    analysis because of that particular concern, that eliminates

8    it.

9            It's our position that the plaintiffs have failed just

10   as a matter of law with respect to their burden here to show

11   that this statue does, in fact, extend to speech that is beyond

12   the scope of Garcetti, and so I think that our pitch to you

13   here is, well, because they fail to do that, that First

14   Amendment thumb on the scales is no long there either.

15           To the extent the Court disagrees, and this gets kind

16   of into the second severability argument we've made in our

17   reply brief or our objection, and this goes more to the

18   remedies available under the Ayotte decision, I think the Court

19   can say, because of the severability clause here, it is invalid

20   insofar as it applies to teachers' extracurricular speech.  I

21   don't think that's rewriting the statute, and I think

22   ultimately what Ayotte says, when you're talking through the,

23   considering the concepts of --

24           THE COURT:  See, I don't draw that bright line that

25   you're talking about, curricular/extracurricular.  I think when

1    you get beyond curricular you start to have real concerns about

2    the vagueness of the scope of the statute.  So, you have

3    potential vagueness concerns as to what a banned concept means,

4    potential concerns about what it means to teach, instruct,

5    inculcate, et cetera, and potential concerns about the extent

6    to which it extends into behaviors by teachers that would be

7    protected First Amendment speech.  One thing, for example, and

8    this isn't hypothetical, this is true, back during the protests

9    following the George Floyd killing there were walkouts, and

10   teachers and students together marched in support of BLM, and

11   if there were discussions between teachers and students during

12   a march like that, it would arguably be teaching, and yet it

13   would clearly be entitled to constitutional protection of some

14   degree.

15          And so, that's where I start to see problems.  It's

16   not a bright-line curricular/extracurricular.  It is that it

17   isn't restricted to curricular speech and can extend to

18   anything that constitutes teaching, inculcating with a student.

19   I agree it doesn't apply to purely private conduct, but if a

20   teacher has a blog and they know the students are accessing the

21   blog, are they inculcating with their blog?  All those things

22   start to become real significant problems that aren't

23   hypothetical.  Teachers have blogs.  Teachers take positions on

24   things like BLM, and they've done it with students.

25          So, those are my concerns about the scope being too

1    broad.

2           MR. GARLAND:  And my reaction to that, your Honor, is,

3    setting aside my argument with respect to the merits that has a

4    First Amendment overlay, or if it's a separate First Amendment

5    claim, which I understand your view on it, and I do believe I

6    agree with that, what I understand Ayotte versus Planned

7    Parenthood to talk about is, when you have a statute that has

8    some scope, that reaches -- that would infringe upon the

9    constitutional right, the preference, based on considerations

10   of federalism, based on considerations of comity, is to

11   invalidate it only to the extent it's invalid.  I think the

12   Court can do that consistent with the --

13          THE COURT:  I think that is true when there's a

14   severance clause, as there is here, but not in ways that

15   distort the scope of the statute.  That is the concern I have,

16   is that judges can't change the meaning of statutes by picking

17   and choosing and striking out provisions of it.  That would be

18   a misuse of the judicial power, in my view.

19          MR. GARLAND:  And I think where we disagree is that it

20   would be ultimately rewriting the statute in some way to say

21   strike out IV and ultimately say it would be invalid insofar as

22   it reaches extracurricular speech based on the enhanced

23   vagueness concerns that you've identified with the First

24   Amendment overlay; and the two reasons for that are, first,

25   Ayotte versus Planned Parenthood, which I know you know, and I

1    don't want to belabor that, but also the severability clause

2    here doesn't just talk about provisions within the statute.

3    The Legislature was very clear that applications are also

4    something that should be kept out.  And here, because that

5    language is expressed in there, I have a hard time seeing how

6    the Legislature would have said you need to strike down all of

7    193:40 when -- I'm using "core" differently from how we've used

8    it in the vagueness --

9              THE COURT:  But if I only struck down 193:40 and those

10    portions of 354-A that dealt with teacher liability, the

11    prohibitions on programs and schools from teaching the banned

12    concepts would still be alive.  That would be consistent with

13    your view about how I should be cautious about severing.  It

14    still would be unlawful for a district to teach a banned

15    concept.  You just couldn't use the fact that teachers wouldn't

16    be subject to liability, they wouldn't be subject to discipline

17    for teaching it; it would be the responsibility of the school

18    district to make sure that it didn't happen, take whatever

19    steps that are required to do it.  If they start doing it in

20    ways that are unconstitutional, lawsuits might have to be

21    brought against them for doing it.  If the school district

22    thinks that it unconstitutionally restricts, they would

23    probably be better off bringing a lawsuit in state court to

24    adjudicate the relative responsibilities between school

25    districts and -- because the State usually speaks with one

1    voice, ultimately, on those issues.

2         So, that seems to me to be a measured response.  I get

3    your point I should be even more narrow, I shouldn't do

4    anything, but I can just strike that one sentence at the end of

5    193:40 and we're good to go, in your view.

6         MR. GARLAND:  And I would just point to our objection.

7    To the extent you have concerns when you get beyond curricular

8    speech, and I understand you're not drawing a bright line, but

9    where there are enhanced First Amendment concerns when you get

10    beyond the kind of core of <u>Garcetti</u> we've talked about here you

11    can issue an order that makes clear it's invalid with respect

12    to that application consistent with the severability clause.

13         We may not be saying very different things.  I think

14    it's just a question of what statutory language --

15         THE COURT:  Let me ask you one last question, and then

16    I'll turn to the plaintiffs for their response on severability.

17    In the very rare cases where I have found a state statute to be

18    unconstitutional, I have relied on case law where I have said

19    essentially, relying on this case law, I've declared this

20    statute to be unconstitutional in the following ways.  I assume

21    that I don't need to issue an injunction against the State,

22    because the State will comply with this order or seek to have

23    relief from it with the Court of Appeals or get the order

24    overturned in the Court of Appeals and I won't need to issue an

25    injunction as such.  Is that consistent with the State's

1    position, or would you require me to issue an injunction --

2    evaluate the applicability of the injunction standard, issue an

3    injunction and actually enjoin you from doing certain things?

4           MR. GARLAND:  I don't think you need to in this

5    context, your Honor.  I think a federal court order applying

6    the federal *Constitution* to say this portion of the statute or

7    these applications are invalid, subject to it being reversed on

8    appeal, I can't envision --

9           THE COURT:  That wouldn't bar you from seeking some

10   kind of order from the Court of Appeals to allow the statute to

11   continue to be implemented while it's on appeal.  I don't take

12   lightly the idea of enjoining the State from doing or not doing

13   things, and, as long as it's clear to me the State's going to

14   abide by my orders while they appeal, I don't think it's

15   necessary.

16          So, you can take a final view on that when the time

17   comes, if it comes, but I take your answer as you probably

18   don't think I will need to do that.  You'll respect the order,

19   appeal it, take whatever actions to undermine it you can, but

20   you'll bide by it until and unless you get a court to authorize

21   you to do otherwise.

22          MR. GARLAND:  So, I think it's more than probable that

23   that's the case, but I would propose doing it this way.  That's

24   not an issue I thought about coming in today.  No one really

25   briefed a question of an injunction.  I will take that back to

1    people who have the authority to be --

2              THE COURT:  Yeah.  Notify the Clerk if you're not in

3    agreement on that, and I'll set a briefing schedule and have

4    short five-page briefs and pick it up on the briefs without

5    further oral argument.

6              MR. GARLAND:  That's perfect.  That works for me.  I

7    have nothing further, your Honor.

8              THE COURT:  Thank you.  Who from the plaintiffs wants

9    to address severability?

10             MR. BISSONNETTE:  I'm happy to, your Honor.  I think

11   Attorney Moerdler might have follow-up.  I do need to use the

12   restroom, though.

13             THE COURT:  Okay.  I understand.  These marathon

14   hearings, you have to constantly think of that.  We are coming

15   to an end, we are going to end in a very few minutes, but I'm

16   going to just sit there.  Let's take a three-minute break for

17   anybody that needs to use the restroom.  We're going to finish

18   up very quickly, though, okay?

19             MR. BISSONNETTE:  I understand, your Honor.

20             MR. MOERDLER:  One quick footnote?

21             THE COURT:  Yes.

22             MR. MOERDLER:  I have some severe reservations with

23   respect to the severability.

24             THE COURT:  All right.  We'll hear both of you on it,

25   then, but very quickly, though.

1          MR. MOERDLER:  I can do that later.  That's no

2     problem.

3          THE COURT:  Okay.  Good.  All right.

4          (Recess taken from 1:00 p.m. to 1:03 p.m.)

5          THE COURT:  Let's reconvene.  All right.

6          So, Mr. Bissonnette, your response to what Mr. Garland

7     has said about severance and what I've said about severance.

8          MR. BISSONNETTE:  Sure.  So, I want to first start

9     with the severability argument raised by the State, which is

10    that you just kind of take out RSA 193:40, IV, and I don't

11    think that works for various reasons.  But I do want to say at

12    the outset here that the first question, of course, is what's

13    the violation of the statute, right?  That is going to

14    ultimately dictate what gets severed at the end of the day, if

15    anything can, in fact, be severed, absent wholesale striking of

16    the statute.

17         And I think, just to piggyback off of what Attorney

18    Garland is saying, I just want to be very clear that the

19    violations here exist far beyond any First Amendment-related

20    issues, right?  The concern here, the due process-related

21    concern here, à la vagueness, applies far beyond the

22    extracurricular speech that is protected under the First

23    Amendment that this Court found, right?  And that's because the

24    statute, even with respect to curricular speech, is incredibly

25    broad, and that's because, of course, the law can be violated

1   by implication, there's no *mens rea* requirement and, of course,

2   because of the severe penalties that exist even for curricular

3   speech that may not be protected under the First Amendment,

4   even though we've preserved that it is, but that is still an

5   independent violation, regardless of whether or not that type

6   of curricular instruction is protected under the First

7   Amendment.  So, I just wanted to be very clear.

8          Obviously, to the extent that any First Amendment

9   protected speech falls within the scope, that requires even

10  more heightened due process vagueness analysis, but we already

11  have that here, independent of the First Amendment, for all the

12  reasons that this Court flagged in its original order.

13         So, I just wanted to be very clear, because the

14  severability argument started kind of moving into, you know, is

15  it only limited to extracurricular speech.  I just want to be

16  very clear what our claim is about at the end of the day.

17         THE COURT:  I completely agree with you.  Where I

18  think I might disagree with you is the full extent of

19  severance, because my focus is on how this affects teachers.

20         MR. BISSONNETTE:  Yeah.

21         THE COURT:  Engage in a thought experiment with me.

22  Assume that the statutes had been enacted, the amendments were

23  enacted but they had no references to teachers at all, it was

24  purely programs, government agencies, the state government

25  telling local governments, Don't teach X in your schools, and,

1    if you do, we are going to make people who are aggrieved, give

2    them the right to sue you for damages.  The problems associated

3    with vagueness there are not nearly as severe, in my mind.  If

4    a school district then starts to fulfill its obligation by

5    threatening teachers, sanctioning teachers, then there would be

6    as-applied challenges that a teacher could make to any

7    potential discipline.  But one program -- one level of

8    government telling another level of government, Do this, don't

9    do that, are ordinarily not nearly as problematic as something

10   that addresses the freedoms of individuals.

11            MR. BISSONNETTE:  I still think it would be very

12   problematic.  But I first want to get to the license piece.

13   Even if you severed 193:40, IV, I actually think under the

14   Educator Code of Conduct there are still licensing

15   ramifications, so I just wanted to address that, even with that

16   severance.  And I can just point the Court to Exhibit 109,

17   which is the Code of Conduct, Sections 510.01(b)(1), Section

18   510.02(b)(1) -- sorry.  I just said that.  Sorry.

19   510.01(b)(1), 510.02(b)(1) and 510.03(b)(1).  And why those are

20   relevant is because, independent of 193:40, IV, those portions

21   of the Code of Conduct independently bootstrap any violation of

22   354-A, which would include the banned concepts law, even if you

23   struck 193:40, IV from the statute.  So, I just want to be very

24   clear.  You sever the statute, there are still licensing

25   ramifications, number one.

1          Number two, setting aside those licensing

2     ramifications, even if you were to leave teachers to the whim

3     of the HRC process and not the DOE disciplinary process, that

4     doesn't cure the infirmities of this law, because there are

5     still practical career ramifications for educators, right?

6     Setting aside that that's aider and abettor liability and they

7     still could be on the hook for administrative fines, which is

8     what the DOJ is seeking in that other case I referenced against

9     individuals, right, but if your district is brought in under a

10    claim made under 354-A alleging that the educator's conduct

11    violated the statute, that is still inevitably going to have

12    ramifications on your career.  It could very well mean internal

13    disciplinary ramifications, not with respect to licensure but

14    with respect to employment, which is the purview of local

15    school districts.

16          So, I think the notion that we can just get rid of

17    licensing and that cures the kind of penalty aspect of the

18    statute is really just incorrect, because, from a practical

19    reality perspective, it is the individual educator that is

20    still getting hauled through that process under 354-A, because

21    it is their instruction that is the subject of the complaint

22    and the ultimate adjudication.

23          THE COURT:  But if they're not subject to liability

24    for it, they may be a witness in the proceeding, but they're

25    not subject to liability.  We have a lot of experience, because

1 that's the way the employment discrimination laws work under

2 the federal system.  You're not subject to individual

3 liability.  You might be a witness, your employer might fire

4 you because you engaged in improper discrimination, but you

5 aren't exposed to personal liability.

6    MR. BISSONNETTE:  That's the key point, though.  I

7 want to just kind of lightly push back against that, your

8 Honor, because you might be a witness, sure.  You might still

9 also lose your job.  I mean, that is a real consequence of

10 this, even though that you may not be a direct party through

11 the 53, 54-A proceedings.  I just think that that is a very

12 real practical development here that we can't kind of detach

13 ourselves from.  That is a real issue that would confront an

14 educator going through the 354-A process.  And I just think

15 that really needs to be uplifted here and shows, again, that I

16 think we still have a law with vague provisions combined with

17 onerous penalties.  It may not be licensure, but it's still

18 being effectively hauled through a 354-A proceeding, maybe not

19 as a party, but as a witness, with the end result being that

20 your livelihood is still on the line; you can get fired at the

21 end of the day.

22    And I'll add one additional caveat, your Honor, that

23 you flagged.  Well, in a 354-A proceeding they may be a party

24 -- they may not be a party.  That is a problem as well, right,

25 one would think, because, if they're not a party to that

1    particular proceeding, are they going to have their own

2    counsel?  How are they going to be represented?  Is there

3    appropriate due process afforded to them at the end of the day?

4    And I think those are real questions and ones, as well, that

5    are raised in the information that's under seal in this case.

6           THE COURT:  So, you say strike the programmatic

7    language as well, not just -- so you have to start --

8           MR. BISSONNETTE:  Yeah.

9           THE COURT:  -- 193:40 in its entirety out.

10          MR. BISSONNETTE:  Absolutely.

11          THE COURT:  And you would say the 354-A provisions

12   that address the teaching or advocacy of a banned concept would

13   also go out, which would be the entirety of 354-A:31.

14          MR. BISSONNETTE:  And 32.

15          THE COURT:  And 32.  So, you would agree with me that

16   it wouldn't reach 33, right, because there's nothing you're

17   saying that --

18          MR. BISSONNETTE:  Yeah.  I think I'm inclined to

19   agree.  That's not something --

20          THE COURT:  If you, on reflection, disagree, you'll

21   notify the Court.

22          MR. BISSONNETTE:  I will.  I will, your Honor.  I

23   will, your Honor.

24          THE COURT:  Okay.  So, I get what you're saying.

25   Probably 354-A:34, to the extent it allows a remedy for

1      violating the antidiscrimination provisions of 354-A.

2             MR. BISSONNETTE:  This begs the question that what

3      you're doing still could end up being a rewrite, when you look

4      at the provisions of 354-A --

5             THE COURT:  The problem that's bothering me is,

6      whether I like it or not, I'm not taking any position on that,

7      it's not my province to do that, I do believe under the State

8      law that the Legislature has reserved certain power to give

9      instruction to school districts about what they can and cannot

10     teach.  I think my opinion suggests that a better way to do

11     that is to allow school boards to make decisions, but there's

12     no doubt that the State legislature has the power to do that,

13     and there's no First Amendment issue implicated in instructing

14     what can and can't be done in the curriculum because it's at

15     least my view that the politically accountable branches should

16     determine curriculum, not individual teachers.

17            And I've tried to draw what I think is an important

18     distinction between post-secondary education and primary and

19     secondary education.  Where I think academic freedom is

20     constitutionally protected with respect to state universities,

21     college, post-secondary instruction, I don't think it exists

22     with respect to primary and secondary instruction.

23            And so, I'm cautious about trying to interfere with

24     the State's effort to instruct lower governmental units what

25     they can and can't do, but I'm going to think about your

1    concern.  Your concern essentially is in the end of the day,

2    whether teachers can be disciplined under the code or can be

3    subject to damages, even if they aren't and they can't,

4    allowing this to be in place because of its vagueness will

5    inevitably cause lower school districts to overbroadly apply

6    it, and it will end up hurting teachers indirectly, because

7    school districts will come under pressure to apply this in the

8    arbitrary way that you think it could be applied and impose

9    restrictions, and then school districts will enforce those

10   against teachers in ways that will cause them the kind of harm

11   you're concerned about.

12       MR. BISSONNETTE:  There would still be a sanction,

13   maybe not as direct as licensure, but all kinds of other

14   direct, indirect --

15       THE COURT:  All right.  I'll have to think that one

16   through.  I haven't really focused on it.

17       MR. BISSONNETTE:  Yeah.  But, listen, with

18   severability, at the end the day, even if you were to take out

19   193:40, IV, it doesn't address the fact that the amendments

20   still lack a scienter requirement, it doesn't address the

21   infirmities in the text of the several banned concepts,

22   including the infirmities that the Court addressed in its prior

23   decision.  So, I think the notion that the licensing piece is

24   the only problem is just incorrect, including according to this

25   Court's prior analysis.  And, again, of course it is improper

1   through severance to rewrite a statute.  And I think the issues

2   with there not being a scienter requirement, the only way to

3   fix that is to rewrite the statute to impose a scienter

4   requirement that the Legislature clearly decided not to impose

5   in this particular piece of legislation, and we just don't

6   think that that's something that can be done.

7          So, that's my summary of severance.  I do have some

8   closing remarks.  Should I reserve those for a later period?

9          THE COURT:  We're getting done here.  So, I will say

10  your colleague wanted to say something on severance.  Let him

11  say it, and then you can wrap up, and we'll be done.  All

12  right.

13         MR. BISSONNETTE:  Thank you.

14         MR. MOERDLER:  Your Honor, I hate to be the gainsayer,

15  but I do have a problem.  I have it on several scores.  Let me

16  take the least concerning personally, but I think I have to, to

17  protect your Honor's record.  In Ayotte and in other cases we

18  have seen the courts make the point, the appellate courts, that

19  the legislative intent is a trump card.  The Legislature, when

20  you look at how this bill was passed in the first instance and

21  you look at subsequent attempts to change it, it is not of a

22  mind, at least the former Legislature, to do this piecemeal,

23  and so the question then you must add to your pile of woes is

24  are you now taking something that the Legislature wanted as

25  part of a whole and keep it as part of the whole?  I am less

1    concerned about the Legislature than anyone, but I think for

2    the record we need to know that the Legislature made it clear

3    in its deliberation it was going to be an all deal.  That was

4    the Committee discussion.  So, please bear that one in mind.

5         Now the more important one.  Teachers now are attuned

6    to the fact that there is risk.  They're not attuned to how

7    broad it is or what the penalties are fully, but they know

8    there's something here that's dangerous.  When virtually all of

9    them shy away from anything in the area, you know something is

10   wrong.  You also know it when you have private suits available

11   to you, that you can get sued from it.

12        And, lastly, hold that thought, if you will, until you

13   hear five minutes and no more of presentation which I want to

14   do so that I do not violate a code.

15        THE COURT:  All right.  We're going to do that.  We're

16   going to finish, close the courtroom, and I'll hear you on

17   that, and we'll end up then.

18        MR. MOERDLER:  All right.

19        THE COURT:  Good.  Thank you.

20        All right.  Mr. Bissonnette, any last remarks from you

21   before we deal with that process?  And then we'll hear anything

22   Mr. Garland wants to say; then we'll conclude the public

23   hearing, and I'll just address any *in camera* concerns that the

24   parties want to raise with me.

25        MR. BISSONNETTE:  Thank you, your Honor.  So, I'm just

1    getting my bearing here.  There's just a few kind of

2    housekeeping matters.

3         There's been discussion of op-eds in this case from

4    the Commissioner.  I just wanted to be clear there are two

5    op-eds, and I just wanted to kind of differentiate them.  Both

6    are incredibly important and I think critical to evaluate in

7    this case.

8         The first is the June 13th, 2021 op-ed, that's summary

9    judgment Exhibit 21; and the second is the April 15th, 2022

10   op-ed, and that's summary judgment Exhibit 40.  So, I know

11   we've been talking about op-eds.  I just wanted to be clear

12   that there's two of them in this case.

13        I want to just go to the interpretations that we heard

14   from Attorney Garland earlier, because I do think they're

15   important to kind of get in the weeds on, and I'm going to do

16   it incredibly briefly, because it is in our brief, but I just

17   think it's worth flagging.  I think kind of this effort to put

18   a knowledge requirement in through dictionary definitions just

19   doesn't work, and it doesn't work when you look at the very

20   definitions that the defendants are employing in this case.

21        So, their own cited dictionary definitions of "teach"

22   don't require that an educator has, quote, knowledge of what

23   information is being conveyed.  Rather, their own dictionary

24   definitions simply require that only the educator, quote,

25   provide knowledge.  So, just look carefully at their dictionary

1  definitions, because it doesn't create a mental state

2  requirement at all, even though I think they're kind of trying

3  to bootstrap it in.  What their definitions talk about is what

4  is knowledge being conveyed as a noun, not the mental state of

5  an educator when they're providing knowledge.  I think that

6  that may sound like an argument that only a lawyer can

7  appreciate, but I think it's incredibly important here when you

8  look at these definitions.

9          THE COURT:  I think they're doing the best they can

10  under difficult circumstances, because they recognize the

11  statute doesn't have any scienter associated with it, and so

12  they're trying to help me see that teaching, that those words

13  involve some volitional action, but I'm not sure that's

14  sufficient to say that you are knowingly advocating this

15  concept or that concept.  Those are different, and they exist

16  as requirements in the criminal law for very good reasons.  We

17  just don't have strict liability statutes.  Because the

18  consequences of a violation are so substantial, part of the

19  rule of law function is to impose some mental state requirement

20  for a criminal sanction, and this sanction is not criminal.

21  It's not so much as, like, removal from the United States when

22  you're a noncitizen who has entered illegally and is subject to

23  removal.  But short of that, it's about one of the most serious

24  sanctions that one can have, a loss of licensure, and that's a

25  loss of the ability to practice your livelihood.  It's about as

1    serious a sanction as you can impose short of a criminal

2    sanction, and that's why I think we have to be especially

3    careful about this.

4             MR. BISSONNETTE:  It's technical but vitally

5    important, given this Court's prior analysis, where it said the

6    lack of a scienter requirement was important in your thinking.

7    So, I did think that was important to uplift, but these new

8    dictionary definitions, we talk about extrinsic evidence, this

9    is the third piece of extrinsic evidence now that I think we've

10   received from the State concerning how to interpret or apply --

11            THE COURT:  They don't like your extrinsic evidence.

12            MR. BISSONNETTE:  Well, they don't like mine, but I

13   think this is really a third crack at the apple, and I think

14   all of this really demonstrates that this law is just a mess

15   from beginning to end and needs to be enjoined.  This

16   requirement, this knowing requirement, it's not in any of the

17   depositions, it's not really in any of the two prior iterations

18   of the guidance in this case, and I think, to me, that just

19   kind of tells us what we need to know, that this law is really

20   hopeless and needs to be enjoined.

21            And we can make one further point, which we will *in*

22   *camera*, about the current HRC docketed complaint.  The fact

23   that there is one docketed complaint is public; the context and

24   content of it is what's under a Protective Order in this case.

25            But you flagged as well, though, it's also

1    inconsistent, this knowing requirement, with the DOJ, Attorney

2    General opinion that says it could be violated by implication.

3    Listen, I know we could try to say that's not what he meant,

4    but that's what it says.  It's the Attorney General of the

5    State of New Hampshire trying to provide an example of what

6    could violate the statute.  Educators have to take that

7    seriously, superintendents have to take it seriously, and they

8    are.

9          And that gets to my second-to-last point, which is

10   what you raised at the outset, which is, well, you know, we've

11   seen a small number of complaints, according to the State.  I

12   just want to uplift what I think is really going on here in

13   this law.  The point of this law I don't really necessarily

14   think is to take a license away.  It's to use the threat of

15   loss of license and career ramifications to chill instruction

16   in schools by scaring them, and I think that is what is

17   happening; but I don't just think it, I know it, because that

18   is in the record in this case through the numerous declarations

19   that have been submitted by educators here.

20         And who loses at the end of the day in the face of all

21   of these ramifications and censorship of educators?  It's

22   students.  Students are the reason why teachers show up every

23   day, why they join the profession.  They're doing this work for

24   them.  Their instruction is chilled.  It's not just

25   instruction, it's not just the ability to link history to the

1    present day, which is how students learn.  They relate the past

2    to what's going on in their lives, their feelings, their views.

3    That is how you make education relatable.

4         It not only inhibits that type of instruction.  It

5    also inhibits statements that validate the lived experiences of

6    students, what they're thinking, what they're feeling, which

7    are critically important not just for every student but

8    students of color, trans students that suffer very high rates

9    of bullying and high incidents of depression and suicide, the

10   ability of an educator to say, You feel that way, I hear you,

11   I'm with you, you are not alone, and it is those types of

12   statements that have to be made clearly and unequivocally.

13        The Attorney General's Office says, Why don't you

14   caveat it to death or do a disclaimer?  That's not what these

15   students need.  They need to feel heard in the classroom, and

16   this law prevents that from happening.  Thank you.

17        THE COURT:  All right.  Thank you.

18        Mr. Garland, your final remarks before we do this *in*

19   *camera* session.

20        MR. GARLAND:  Very briefly, your Honor.  So, with

21   respect to the last point, I understand what Attorney

22   Bissonnette is saying.  It's throughout the briefs, it's

23   identified, and I think those points are all made in extremely

24   good faith.  There is no claim here on behalf of students.  The

25   plaintiffs had the opportunity to bring that claim.  It wasn't

1    amended.  And so, I do think that is starting to divorce what

2    is before this Court from kind of the claim that doesn't --

3              THE COURT:  Well, yeah.  Mr. Bissonnette makes a very

4    powerful point.  None of us are unmindful of that, not me, not

5    you, not him, but I want to make sure people understand the

6    difference, as I know you do, between what you do as a

7    policymaker, as a political person, as a citizen and what you

8    do as a judge.  I don't make decisions about the law based on

9    my personal policy preferences, what I would like the world to

10   be, what would be the most effective form of education, how we

11   can best reach students.  I have to address things in a

12   somewhat different way, and I know you all know that.  But I

13   certainly am not at all indifferent to or unmindful of the

14   problems that students face and how anything which leaves

15   teachers second-guessing themselves about whether they can

16   express empathy to their students, can try to understand their

17   students' predicaments is a real concern.  It's just my

18   analysis is this kind of constitutional analysis that I feel

19   I'm required to engage in.

20             I don't think we need to say more than that.  I

21   understand your views, Mr. Bissonette's views, all of that.

22             MR. GARLAND:  And so, really just two other points,

23   your Honor, and they're related.  I know there has been a

24   couple of references to the fact that we're trying to kind of

25   have our cake and eat it too with respect to what we think you

1  can consider versus what the plaintiffs think you can in terms

2  of extrinsic materials.  I reject that.  I think the things

3  that we're asking you to look at, including dictionary

4  definitions, are just core tools that courts use when they're

5  doing text-based analyses of statutes.  And so --

6         THE COURT:  They are extrinsic materials, but they're

7  the kinds of extrinsic materials that are used in statutory

8  interpretation.

9         MR. GARLAND:  That's my point, your Honor.  I know you

10  understand it.

11         And the last point I'd make is we think we've given

12  you a plausible reading of the statute based on our own

13  construction.  We think it is the better reading of the statute

14  based on our own construction.  I know from your past order and

15  your comments today you may not agree with that, but it's our

16  view that Federal Courts don't strike down statutes.  It really

17  only invalidates statutes or portions of statutes as a last

18  resort, and I don't think that it is necessary -- that the

19  statute is necessarily read in the way that creates the

20  concerns you've identified, creates the concerns the plaintiffs

21  identified, and that should inform your analysis for the

22  reasons in our briefing and what I've already said today.

23  Thank you.

24         THE COURT:  All right.  Thank you.

25         All right.  So, I want to just commend the parties.

1    Very helpful, very helpful arguments on all sides here.  I will

2    hear this matter *in camera* and otherwise take the matter under

3    advisement.

4           In a few instances I've identified for you, Here's

5    what I think you're saying.  If you, on reflection, take a

6    different view, you can notify the Clerk.  I don't want to

7    hear -- invite supplemental briefing.

8           I did allow plaintiffs' counsel to submit a list of

9    citations.  You can go ahead and do that through the Clerk,

10   make sure that opposing parties have a copy of it.  I

11   otherwise -- I don't want to delay to get supplemental briefs.

12   You've all been thinking about this for a year; I've been

13   thinking about it for a year.  I want to get working on it.

14          So, unless you are inclined to change a position or

15   feel that I've invited you to do something different to notify

16   the Clerk, I'm going to assume that I have the record in front

17   of me and I can make my decision, and I'm going to go about

18   making it.  If you should notify the Clerk about some issue,

19   I'll potentially hear you about why I should take additional

20   materials, but I'm ready to decide it, you're ready for me to

21   decide it.  I want to get it going.  So, don't come back and

22   ask to file something unless there's a real good reason.  Okay?

23   All right.

24          Yes.

25          MR. GARLAND:  Can I ask for one clarification on that,

1    your Honor?  Based on my notes, I think my homework is to let

2    you know, if you rule against us, whether a declaration would

3    be enough, or whether we're going to insist on an injunction.

4              THE COURT:  Yes.

5              MR. GARLAND:  And my understanding with respect to the

6    first question you asked me, which was about Investigator

7    Farrell's statement about the application of the Code of

8    Conduct --

9              THE COURT:  I don't think I invited you to make any

10   additional, but if you, on reflection, feel there is some

11   clarification that you could make that would be succinct and

12   submitted easily, you notify the Clerk that you want to do it,

13   and opposing counsel, and I'll make a decision about whether

14   I'll even allow you to do it.  I'm inclined to sort of take the

15   record as we've got it at this point, just because we've

16   already devoted so much time and effort to it.

17             MR. GARLAND:  Thank you.  Understood, your Honor.  I'm

18   not asking for the opportunity.  That was just the other point

19   I had in my notes.  Thank you.

20             THE COURT:  Okay.  Again, thank you, everybody.  That

21   concludes the public portion of the hearing.  I'd ask people

22   who are not here with a party -- if you are a party or employed

23   by a party and the lawyers want you to be able to be here, I

24   don't have any objection, but otherwise any member of the

25   public should exit now, because I need to seal the courtroom

1    for a brief proceeding.

2          MR. BISSONNETTE:  Your Honor, based on the record, I

3    believe under the Protective Order it is attorneys' eyes only.

4          THE COURT:  Oh, it is attorneys' eyes only?  Then, in

5    that case, just the attorneys.  Thank you.

6          (WHEREUPON, the proceedings adjourned at 1:30 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        C E R T I F I C A T E

2

3

4            I, Brenda K. Hancock, RMR, CRR and Official Court

5   Reporter of the United States District Court, do hereby certify

6   that the foregoing transcript constitutes, to the best of my

7   knowledge, skill, ability and belief, a true and accurate

8   transcription of the within proceedings.

9

10

11

12

13   Date: ___6/2/24_____      /s/ Brenda K. Hancock
                                  Brenda K. Hancock, RMR, CRR
14                                Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25